## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| DVL, INC. and DVL KEARNY HOLDINGS, LLC, | : : : : | Civil Action No. 17-4261 (KM) (JBC) |
| Plaintiffs, | : : | |
| v. | : : | |
| CONGOLEUM CORPORATION and BATH IRON WORKS CORPORATION, | : : : | |
| Defendants. | : : | |

---

**APPENDIX TO BATH IRON WORKS CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT AND DEFENDANT CONGOLEUM CORPORATION'S CROSS-CLAIM**

---

Thomas R. Curtin
George C. Jones
GRAHAM CURTIN
A Professional Association
4 Headquarters Plaza, P.O. Box 1991
Morristown, NJ 07962-1991
(973) 292-1700

Catherine Steege
John VanDeventer
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350

*Attorneys for Defendant*
*Bath Iron Works Corporation*

**APPENDIX**

| DKT. | DOCUMENT | APP. EX. |
|---|---|---|
| Bankr. Dkt. 4439 | Notice Of Debtors' Motion For Order Pursuant To Sections 105, 363, 1107 And 1108 Of The Bankruptcy Code And Rules 2002, 6004, 9014 And 9019 Of The Federal Rules Of Bankruptcy Procedure (I) Authorizing Debtor To Enter Into A Settlement And Compromise Of Certain Claims, (II) Approving Sale Of Certain Insurance Policies Free And Clear Of Liens, Claims, Interests And Other Encumbrances, And (III) Approving The Settlement And Buyback Agreement And Releases By And Between The Congoleum Entities And The Century Entities | 1 |
| Dist. Dkt. 664 | Order Confirming Fourth Amended Joint Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code Of The Debtors, The Official Asbestos Claimants' Committee, The Official Committee Of Bondholders For Congoleum Corporation, *Et Al.,* And The Futures Representative Dated As Of March 11, 2010 (As Modified) | 2 |
| Dist. Dkt. 435-1 | Disclosure Statement With Respect To The Fourth Amended Joint Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code Of The Debtors, The Official Asbestos Claimants' Committee, The Official Committee Of Bondholders For Congoleum Corporation, *Et Al.,* And The Futures Representative Dated As Of March 11, 2010 | 3 |
| Bankr. Dkt. 4572 | Order Pursuant To Sections 105, 363, 1107 And 1108 Of The Bankruptcy Code And Rules 2002, 6004, 9014 And 9019 Of The Federal Rules Of Bankruptcy Procedure (I) Authorizing Debtor To Enter Into A Settlement And Compromise Of Certain Claims, (II) Approving Sale Of Certain Insurance Policies Free And Clear Of Liens, Claims, Interests And Other Encumbrances, And (III) Approving The Settlement And Buyback Agreement And Releases By And Between The Congoleum Entities And The Century Entities | 4 |
| Bankr. Dkt. 7218 | Opinion Regarding The Motion Of First State Insurance Company And Twin City Fire Insurance Company For Summary Judgment Denying Confirmation Of The Amended Joint Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code Of The Debtors, The Official Asbestos Claimants' Committee And The Official Committee Of Bondholders For Congoleum Corporation, *Et Al.*, Dated As Of November 14, 2008 | 5 |
| Bankr. Dkt. 7244 | Order Granting Stay Pending Appeal | 6 |

| DKT. | DOCUMENT | APP. EX. |
|---|---|---|
| Bankr. Dkt. 7620 | Order and Opinion: Granting summary Judgment And Denying Confirmation Of The Twelfth Amended Joint Plan Of Reorganization Under Chapter 11, Affirmed In Part And Reversed In Part | 7 |
| Bankr. Dkt. 7635 | Administrative Order re Withdrawal of Reference | 8 |
| Dist. Dkt. 133 | Second Amended Joint Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code Of The Debtors, The Official Asbestos Claimants' Committee And The Official Committee Of Bondholders For Congoleum Corporation, *Et Al.*, Dated As Of October 22, 2009 | 9 |
| Dist. Dkt. 340 | Third Amended Joint Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code Of The Debtors, The Official Asbestos Claimants', The Official Committee Of Bondholders For Congoleum Corporation, Et Al., And The Futures Representative Dated As Of February 12, 2010 | 10 |
| Dist. Dkt. 434-1 | Fourth Amended Joint Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code Of The Debtors, The Official Asbestos Claimants' Committee, The Official Committee Of Bondholders For Congoleum Corporation, Et Al., And The Futures Representative Dated As of March 11, 2010 | 11 |
| Bankr. Dkt. 6432 | Notice Of Filing Of Verification Of Publication Of Notice Of (A) Entry Of Revised Order (I) Approving Disclosure Statement With Respect To Joint Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code Of The Futures Representative, The Debtors, The Official Asbestos Claimants' Committee And The Official Committee Of Bondholders For Congoleum Corporation, Et *Al.*, Dated As Of February 5, 2008, (II) Setting Briefing Schedule With Respect To Insurers' Standing To Object To Confirmation Of The Proposed Plan, And (III) Scheduling Confirmation Hearing; And (B) Procedures And Deadline For Voting On The Proposed Plan | 12 |
| Bankr. Dkt. 4521 | Notice Of Verification Of Publication Giving Notice Of Hearing On Century's Settlement Agreement Filed At Docket No. 4439 | 13 |
| Dist. Dkt. 703 | Notice Of (A) Occurrence Of Effective Date; (B) Substantial Consummation Of The Plan; And (C) Bar Dates For Certain Administrative Claims And Professional Claims | 14 |
| Dist. Dkt. 632-1 | Notice Of Correction To And Refiling Of Plan Proponents' Memorandum Of Law In Support Of Confirmation Of The Fourth Amended Joint Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code Dated As Of March 11, 2010 | 15 |

# APPENDIX EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-2(c)**

**OKIN, HOLLANDER & DELUCA, L.L.P.**
One Parker Plaza
Fort Lee, New Jersey 07024
(201) 947-7500
Paul S. Hollander (PH-2681)
Gregory S. Kinoian (GK-7386)

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1540 Broadway
New York, New York 10036
(212) 858-1000
Richard L. Epling (*pro hac vice* admission)
Kerry A. Brennan (*pro hac vice* admission)

Attorneys for Congoleum Corporation, et al.,
Debtors and Debtors-in-Possession

| | |
|---|---|
| In re:<br><br>**CONGOLEUM CORPORATION, <u>et al.</u>,**<br><br>   Debtors and Debtors-in-Possession. | Chapter 11<br>Case No.:    03-51524 (KCF)<br>Jointly Administered<br>Judge: Honorable Kathryn C. Ferguson |

**DEBTORS' MOTION FOR ORDER PURSUANT TO SECTIONS 105, 363, 1107 AND
1108 OF THE BANKRUPTCY CODE AND RULES 2002, 6004, 9014 AND 9019 OF
THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (I) AUTHORIZING
DEBTOR TO ENTER INTO A SETTLEMENT AND COMPROMISE OF CERTAIN
CLAIMS, (II) APPROVING SALE OF CERTAIN INSURANCE POLICIES FREE AND
CLEAR OF LIENS, CLAIMS, INTERESTS AND OTHER ENCUMBRANCES, AND (III)
APPROVING THE SETTLEMENT AND BUYBACK AGREEMENT AND RELEASES
<u>BY AND BETWEEN THE CONGOLEUM ENTITIES AND THE CENTURY ENTITIES</u>**

Congoleum Corporation ("*Congoleum*"), Congoleum Sales, Inc., and Congoleum

Fiscal, Inc. (collectively, the "*Debtors*") hereby move this Court (the "*Motion*") for the entry of

an Order substantially in the form attached as Exhibit A to the Settlement and Policy Buyback

Agreement and Release (the "*Approval Order*"), pursuant to Rules 2002(a), 6004, 9014 and

9019 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*") and sections

105(a), 363, 1107 and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the

"*Bankruptcy Code*"), (1) authorizing and approving the certain Settlement and Policy Buyback

Agreement and Release (together with the exhibits thereto, the "*Settlement and Buyback

Agreement*") dated as of August 17, 2006 among (a) Congoleum, individually and on behalf of

all of the Congoleum Entities;[1] (b)  upon its creation, the Plan Trust; and (c) Century Indemnity

Company, individually and as successor to CCI Insurance Company, as successor to Insurance

Company of North America ("Century"), and on behalf of all of the Century Entities; and (2)

authorizing and approving the transactions, injunctions, releases and contractual undertakings set

forth in the Settlement and Buyback Agreement (the "*Settlement Transactions*").  In support of

this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334,

157(b)(2)(A), (M) and (O).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2), (A), (M) and (O).

2.     The statutory predicates for the relief requested herein are Bankruptcy Code

sections 105(a), 363, 1107 and 1108, and Bankruptcy Rules 2002(a), 6004, 9014 and 9019.

## GENERAL BACKGROUND

3.     On December 31, 2003 (the "*Petition Date*"), the Debtors each filed voluntary

petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy

---

[1] All capitalized terms not otherwise defined herein shall have the respective defined meanings set forth in the
Settlement and Buyback Agreement.  The capitalized terms that are not defined in the Settlement and Buyback
Agreement, but are listed in Section I.BB of the Settlement and Buyback Agreement, shall have the meaning
ascribed to such terms in the Eighth Modified Joint Prepackaged Plan of Reorganization dated March 17, 2006 (the
"*Eighth Modified Plan*"), or the Ninth Modified Joint Plan of Reorganization dated August 11, 2006 (the "*Ninth
Modified Plan*", as indicated in Section I.BB.

Court for the District of New Jersey (the "*Court*").  The Debtors continue to manage and operate

their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy

Code.

4.     Congoleum is a leading manufacturer of resilient sheet and tile flooring, serving

both residential and commercial markets.  Its sheet, tile, plank and through-chip inlaid products

are used in remodeling, manufactured housing, new residential construction and commercial

applications.  Congoleum also purchases wood laminates and accessory products for resale.

Congoleum is a subsidiary of American Biltrite, Inc. ("*ABI*"), which is not a debtor in these

Chapter 11 Cases.

5.     Congoleum is currently the subject of over 100,000 known asbestos-related

personal injury claims as a result of alleged exposure to asbestos-containing products.  During

the period in which Congoleum produced asbestos-containing products, Congoleum purchased

primary and excess insurance policies providing more than $1 billion of coverage.  However,

certain of Congoleum's excess carriers have become insolvent or are currently disputing

coverage.

6.     On March 17, 2006, the Debtors filed their Eighth Modified Plan (ECF Doc.

#3742).  The Debtors filed their disclosure statement in support of the Eighth Modified Plan on

March 17, 2006 (ECF Doc. #3743).  On August 11, 2006, the Debtors and the ACC filed their

Ninth Modified Plan (ECF Doc. # 4402).  The Debtors and the ACC filed their Disclosure

Statement in support of the Ninth Modified Plan on August 11, 2006 (ECF Doc. #4403).  A

hearing to consider the Disclosure Statement is scheduled for September 21, 2006.

7.     The Century Entities issued to certain Congoleum Entities policies of insurance

under which certain Congoleum Entities are insureds or claim to be entitled to insurance (the

"*Subject Policies*," as defined in the Settlement and Buyback Agreement).  The known Subject

Policies are listed on Exhibit C to the Settlement and Buyback Agreement.

8.     Congoleum and the Century Entities dispute whether, and to what extent, the

Subject Policies afford coverage for:  (i) all Asbestos Claims that may be subject to the Claimant

Agreement;[2] (ii) all other Asbestos Claims; and (iii) all non asbestos-related Claims such as

environmental and other general liability claims (the "*Coverage Dispute*").  In addition, Century

has asserted counterclaims for affirmative relief.  The policies issued by Century at issue in the

Coverage Dispute are those that Congoleum contends afford it coverage for asbestos-related

Claims,  and those policies are a subset of the group of policies denominated Subject Policies.

9.     In order to resolve the Coverage Dispute, as well as all of the other contested

matters in these Chapter 11 Cases, the parties have entered into the Settlement and Buyback

Agreement on the terms described below.

10.     The parties engaged in lengthy and comprehensive negotiations regarding the

terms of the Settlement Transactions, and the Settlement and Buyback Agreement represents an

arm's-length compromise on the issues by all of the parties thereto.  *See* Declaration of Howard

N. Feist, III (the "*Feist Dec*.") attached hereto as Exhibit B at ¶ 2.

11.     The Future Claims Representative (the "FCR") and the Asbestos Creditors

Committee (the "ACC") participated in the negotiations of the Settlement and Buyback

Agreement and support its approval.  *Id.* at ¶ 3.

---

[2]     Congoleum and Century are parties to a lawsuit styled *Congoleum Corporation v. ACE American
Insurance Company, et al.,* Docket No. MID-L-8908-01 pending in the Superior Court of New Jersey, Law
Division, Middlesex County (the "*Coverage Action*").  The Coverage Action pertains to certain Asbestos Claims,
including those that may be subject to the Claimant Agreement.  All other Claims, asbestos or otherwise, are not
currently at issue in the Coverage Action.

## THE SETTLEMENT AND BUYBACK AGREEMENT

12.     The parties have entered into the Settlement and Buyback Agreement which, subject to the approval of this Court, fully and finally compromises and resolves the Coverage Dispute and other disputes between or among them, including those arising in these Chapter 11 Cases.  A true and correct copy of the Settlement and Buyback Agreement, together with its attachments, is attached hereto as Exhibit A.[3]  Consummation of the transactions described in the Settlement and Buyback Agreement is conditioned upon, *inter alia*, entry of a final order of this Court approving the Settlement and Buyback Agreement and the Settlement Transactions embodied and contemplated therein, and upon certain specified conditions having been fulfilled, including confirmation of a plan of reorganization for the Debtors containing a section 524(g) plan trust and channeling injunction for Asbestos Claims that may be asserted directly or indirectly against the Century Entities and an injunction under sections 105(a), 363(b) and 363(f) and to implement the sale of the Subject Policies under section 363(b) of the Bankruptcy Code.

13.     Pursuant to the Approval Order attached to the Settlement and Buyback Agreement as Exhibit A (the "Approval Order"), the Settlement and Buyback Agreement is to be implemented, in part, through the sale of the Subject Policies to Century pursuant to section 363(b) of the Bankruptcy Code.  Upon the First Payment Date, but subject to the satisfaction of the conditions precedent to the Trigger Date, pursuant to sections 105(a), 363(b) and 363(f) of the Bankruptcy Code, the Debtors shall be and are deemed to have sold, transferred and conveyed the Subject Policies to Century free and clear of all Claims, liens, encumbrances and/or

---

[3]     In the event of any discrepancy between any term as described here and the definition of that same term in the Settlement and Buyback Agreement, the definition in the Settlement and Buyback Agreement shall govern. Likewise, the actual text of the Settlement and Buyback Agreement, as opposed to any characterization thereof, shall govern.

interests of any kind and/or nature whatsoever, to the extent permitted under Section 363(f) of

the Bankruptcy Code (the *"363 Sale"*).  The Parties further agree that the Settlement and

Buyback Amount is at least equal to the fair value of the Subject Policies, and that upon the first

Payment Date, Century shall be deemed to own the Subject Policies free and clear of all Interests

of any Person.  Pursuant to section 363(f) of the Bankruptcy Code, the 363 Sale is to be free and

clear of all Claims, liens, encumbrances and interests of any kind in the Subject Policies, which

Claims, liens, encumbrances and interests shall attach to the proceeds of the sale with the same

validity and priority as they had in the Subject Policies.

14.    The Approval Order also provides that, effective upon the First Payment Date but

subject to the satisfaction of the conditions precedent to the Trigger Date, pursuant to sections

105(a) and 363(b) and (f) of the Bankruptcy Code, all Persons and Entities who have asserted,

and who might subsequently assert, Claims, including Asbestos Claims, against the Century

Entities relating to or arising out of the Subject Policies, shall be forever enjoined, barred and

estopped from asserting any such Claims, liens, encumbrances or interests of any kind or nature

with respect to the Subject Policies against the Century Entities and their respective property and

assets, including the Subject Policies (the "*363 Injunction*").

15.    Pursuant to the Settlement and Buyback Agreement, to settle the outstanding

disputes and to purchase the Debtors' interests in the Subject Policies, Century agrees to pay, on

behalf of the Century Entities, a total of $16,950,000 (the "*Settlement and Buyback Amount*") to

the Plan Trust, or as otherwise directed by the Court consistent with the terms of the Settlement

and Buyback Agreement, on the following payment schedule:

a.    Within sixty (60) calendar days following the Trigger Date,[4] Century shall pay, on behalf of the Century Entities, Five Million Dollars ($5,000,000) (the date on which the funds are actually paid is referred to herein as *"First Payment Date"*);

b.    One year after the First Payment Date, Century shall pay on behalf of the Century Entities a total of Five Million Dollars ($5,000,000) (the "*Second Payment Date*");

c.    Two years after the First Payment Date, Century shall pay on behalf of the Century Entities a total of Five Million Dollars ($5,000,000) (the "*Third Payment Date*"); and

d.    Three years after the First Payment Date, Century shall pay on behalf of the Century Entities the remaining One Million Nine Hundred and Fifty Thousand Dollars ($1,950,000) (the "*Fourth Payment Date*").

16.    The obligation to pay the Settlement and Buyback Amount is several, not joint and several, to the Century Entities, and, without waiver of that understanding, Century is the only entity assuming the payment obligation, which it assumes in full.

**<u>The Century Policies</u>**

17.    The Century Entities have six policies at issue in the Coverage Action, each of which was issued by Insurance Company of North America between 1965 and 1986.  Feist Dec. at ¶ 4.  These Policies are all excess policies, and because most of them were written for policy periods longer than 12 months, there are disputes about the limits available under each such policy.  Policies XBC 1838 and XBC 40971, effective from October 13, 1965 until January 1, 1967 and January 1, 1967 until January 28, 1970, respectively, were written to provide coverage in excess of $5 million of other excess coverage as well as primary coverage for each year in which each policy was in effect and are in the second excess layer above primary insurance.  *Id.* Congoleum contends that adding together the applicable limits of these two policies would produce a sum of $80 million while Century contends that adding together the applicable limits

---

[4]    The "Trigger Date" means the date on which all of the conditions precedent set forth in Section II of the Settlement and Buyback Agreement have either occurred or been waived.

of these two policies would produce a sum of $25 million. *Id.* Policy XBC 43099, effective

from January 28, 1970 until February 16, 1973, was written to provide coverage in excess of $15

million of other excess coverage as well as primary coverage for each year in which the policy

was in effect. *Id.* Congoleum contends that the applicable limit of liability of this policy is $40

million while Century contends that the applicable limit of liability of this policy is $10 million.

*Id.* Policy XCP 3904, effective from February 16, 1973 until January 1, 1976, was written to

provide coverage in excess of $20 million of other excess coverage as well as primary coverage

for each year in which it was in effect. *Id.* Congoleum contends that the applicable limit of

liability of this policy is $15 million while Century contends that the applicable limit of liability

of this policy is $5 million. *Id.* Policy XCP 3956, effective from December 17, 1973 until

January 1, 1976, was written to provide coverage in excess of $25 million of other excess

coverage as well as primary coverage for each year in which it was in effect. *Id.* Congoleum

contends that the applicable limit of liability of this policy is $15 million while Century contends

that the applicable limit of liability of this policy is $5 million. Policy XBC 155083, effective

from January 1, 1985 until January 1, 1986, was written to provide coverage in excess of primary

coverage for the year in which it was in effect. *Id.* The aggregate limit of liability of this policy

is $11 million. *Id.* Congoleum and the Century Entities dispute the allocation of losses and/or

claims to applicable insurance years. *Id.* at ¶ 5.

18.    The fact that a policy is written to provide coverage "excess over" a certain

amount does not mean that the policy will start to respond once an insured has incurred that

certain amount in total losses or claims. Under the allocation principles applicable in New

Jersey, responsibility for payment of covered asbestos-related claims is generally spread over all

applicable policy periods taking into account policy limits on a weighted basis during the entire

continuum from the later of a claimant's first date of exposure to asbestos or the first date of

available insurance coverage for asbestos claims to the earlier of the date of manifestation of the

alleged asbestos-related injury or the last date of available insurance coverage for asbestos

claims. *See Carter-Wallace, Inc. v. Admiral Ins. Co.,* 154 N.J. 312 (1998). Thus, for example, a

payment of $10,000 relating to injury that is spread over policy periods from 1975 through 1985

would only implicate each of those policy years in a relatively small allocated amount

proportionate to the total available limits in each year. Moreover, an excess policy generally

would not respond until losses and/or claims allocated to the applicable policy period exhaust all

of the underlying limits of liability and applicable retentions or deductibles of the policies below

or underneath that excess policy. *Id.* There are exceptions to this general rule and, in addition,

allocation of claims to particular years depends on the trigger dates for particular claims. *Id.*

Congoleum and the Century Entities dispute the allocation of losses and/or claims to applicable

insurance years.

19.     Under the Plan, the bulk of contemplated asbestos claim payments would not

occur immediately upon confirmation, but instead, payments to claimants would occur over time

as the Plan Trust evaluates and allows claims. Feist Dec. at ¶ 6. The Debtors believe that the

first $500 million of claim allowances by the Plan Trust, when spread over the years of coverage,

likely would impair the indemnity limits of Century policies in an amount of approximately $17

million. *Id.* While it is difficult to predict when claim allowances would total $500 million, and

some including Century may contend that they should never reach $500 million, under the

Settlement and Buyback Agreement, the Plan Trust would have nearly $17 million in hand from

Century during the first few years of the Plan Trust's operations. *Id.*

20.     In exchange for the payment of the Settlement and Buyback Amount, the Century

Entities shall be designated as Settling Asbestos Insurance Companies, as such term is defined in

the Eighth Modified Plan, and, as such, shall be entitled to all of the protections afforded

thereunder, including a channeling injunction under Bankruptcy Code section 524(g) (the

*"524(g) Injunction"*).

21.     As part of the Settlement and Buyback Agreement, the Congoleum Entities also

have agreed to use their reasonable best efforts to obtain Bankruptcy Court approval of the Plan

as modified to incorporate an injunction under section 105(a) of the Bankruptcy Code that

permanently enjoins all holders of Claims not channeled by the Channeling Injunction from

asserting against the Century Entities any such Claims, provided that they arise out of or relate to

the Subject Policies or the insuring relationship of the Century Entities with the Congoleum

Entities (the "*105(a) Relief*").  The Settlement and Buyback Agreement sets forth what shall be

deemed to satisfy the requirements of reasonable best efforts.

22.     The Settlement and Buyback Agreement also provides for comprehensive mutual

releases by, and among, the Century Entities, the Congoleum Entities and the Plan Trust and for

releases of specified Claims (including non-asbestos Claims) by and among the Congoleum

Entities and the Century Entities.  However, in the event that any insurer of the Debtors either:

(i) obtains a final binding award against a Century Entity after a contested proceeding; or (ii)

agrees to a settlement with a Century Entity with the consent of the Debtors prior to the Plan

Effective Date or with the consent of the Plan Trust following the Plan Effective Date entitling

such insurer to obtain a sum certain from such Century Entity as a result of such insurer's claim

for contribution, subrogation, indemnification, reimbursement or other similar claim against such

Century Entity for such Century Entity's alleged share or equitable share of the defense and/or

indemnity of a Congoleum Entity, the Congoleum Entity shall voluntarily reduce or return to such insurer an amount of any such final award or settlement payment that they obtained or may obtain from such other insurer for Claims released pursuant to the Settlement and Buyback Agreement, which amount shall be sufficient to eliminate the Century Entity's obligation to satisfy the award against it.

**RELIEF REQUESTED**

23.    By this Motion, the Debtors request the entry of an order substantially in the form of the proposed Approval Order pursuant to Bankruptcy Rules 2002(a), 6004, 9014 and 9019, and Bankruptcy Code sections 105(a), 363, 1107 and 1108:  (i) approving the terms of the Settlement and Buyback Agreement, and (ii) authorizing and directing Congoleum to effectuate the Settlement Transactions in accordance with the terms and conditions of the Settlement and Buyback Agreement, including the sale of the Subject Policies to the Century Entities free and clear of all Claims, liens, encumbrances or interests of any kind or nature whatsoever in exchange for payment of the Settlement and Buyback Amount to the Plan Trust, or as otherwise directed by the Court, with any and all Claims, liens, encumbrances or interests in and to the Subject Policies attaching to the Settlement and Buyback Amount, which is to be distributed in accordance with the Plan, the Plan Trust and the Trust Distribution Procedures thereunder.

**I.    THE SETTLEMENT AND BUYBACK AGREEMENT AND THE SETTLEMENT TRANSACTIONS CONTEMPLATED THEREUNDER SHOULD BE APPROVED PURSUANT TO BANKRUPTCY RULE 9019**

24.    This Court has the right and the power to approve the Settlement and Buyback Agreement and the Settlement Transactions.  *See* 11 U.S.C. § 363; FED. R. BANKR. P. 9019. Bankruptcy Rule 9019 provides, in pertinent part, that "[o]n motion by the trustee [or debtor in

possession] and after notice and hearing the court may approve a compromise and settlement." Fed. Bank. R. 9019(a).

25.     Courts generally have recognized that insurance policies are property of a debtor's estate within the meaning of 11 U.S.C. §541(a). *See, e.g., First Fid. Bank v. McAteer*, 985 F.2d 114, 116 (3d Cir.1993) (citing *Estate of Lellock v. Prudential Ins. Co.*, 811 F.2d 186, 189 (3d Cir.1987)) (insurance policies fit within section 541's definition of "property of the estate"); *see also MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 92 (2d Cir.) ("Numerous courts have determined that a debtor's insurance policies are property of the estate, subject to the bankruptcy court's jurisdiction."), *cert. denied*, 488 U.S. 868 (1988); *Minoco Group of Cos. v. First State Underwriters Agency*, 799 F.2d 517, 519 (9th Cir. 1984) (quoting *In re Davis*, 730 F.2d 176, 184 (5th Cir. 1984) (internal quotation marks omitted) (Under the weight of authority, insurance contracts have been said to be embraced in [section 541(a)'s] definition of property.); *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 1001 (4th Cir.), *cert. denied*, 479 U.S. 876 (1986) (same). Thus, this Court has authority over the proposed Settlement and Buyback Agreement and Settlement Transactions because this Motion proposes a use or disposition of the Subject Policies, which are property of the Debtors' estates.

26.     Settlements and compromises are "a normal part of the process of reorganization." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)). Indeed, "[t]o minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'" *In re Martin*, 91 F.3d 389, 393 (3rd Cir. 1996) (quoting *Collier on Bankruptcy* ¶ 9019.03[1] (15th ed. 1993).

27.    To approve a compromise and settlement under Bankruptcy Rule 9019(a), a bankruptcy court should find that the compromise and settlement is fair and equitable, reasonable, and is in the best interests of the debtor's estate.  *See, e.g., TMT Trailer Ferry, Inc.*, 390 U.S. at 424; *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994).

28.    In determining whether to approve a proposed settlement, a bankruptcy court need not decide the numerous issues of law and fact raised by the settlement, but rather should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'"  *In re W.T. Grant Co.,* 699 F.2d 599, 608 (2d Cir. 1983); *see also In re Penn Central Transp. Co.,* 596 F.2d 1102, 1114 (3d Cir. 1979).  The Debtors believe that the Settlement and Buyback Agreement and the Settlement Transactions provided thereunder are reasonable, are in the best interest of their estates and should be approved.

29.    In deciding whether a particular settlement falls within the "range of reasonableness," courts consider the following factors:  (a) the probability of success in the litigation; (b) the likely difficulties of collection; (c) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (d) the paramount interest of the creditors.  *See In re Martin*, 91 F.3d at 393.  The Debtors have determined that entering into the Settlement and Buyback Agreement is in the best interest of their estates because the settlement constitutes a fair and equitable compromise after consideration of the aforementioned factors.

### A.    The Probability of Success in the Debtors' Pursuit of Coverage is Impossible to Predict

30.    As this Court well knows, the Century Entities have vigorously opposed the Debtors' position with respect to whether, and to what extent, the Subject Policies afford coverage for certain Claims, including Asbestos Claims.  Feist Dec. at ¶ 7.  Indeed, the parties have been litigating coverage issues with respect to Asbestos Claims that may be subject to the Claimant Agreement in the Coverage Action for several years at great expense to the Debtors. *Id*.  The Century Entities have asserted numerous defenses to liability and counterclaims for affirmative relief, both with respect to the Claimant Agreement and with respect to Asbestos Claims outside of the Claimant Agreement, including defenses alleging:

- The Claimant Agreement and certain previous and subsequent settlements entered into by Congoleum without the consent and over the express objections of the Century Entities and other insurers, are not fair, reasonable and in good faith, and the proposed Trust Distribution Procedures under the Plan (collectively, the "*Congoleum Settlements*"), were not entered into in good faith and/or are not fair and reasonable.

- The Congoleum Settlements breached the cooperation clause and the no voluntary payment clause of the Subject Policies.

- The Congoleum Settlements do not exhaust underlying insurance.

- The Congoleum Settlements violate the Century Entities' right to settle.

- As structured, the Congoleum Settlements do not create a legal liability of the Congoleum Entities.

- There is no coverage under the Subject Policies for the Congoleum Settlements.

31.    Given these disputed factual and legal issues, it is uncertain if, and to what extent, the Debtors would be successful in their pursuit of coverage under the Subject Policies.  *Id*. However, the Settlement and Buyback Agreement will provide these bankruptcy estates with a certainty of collection under the Subject Policies in the near future.  *Id*.

### B.    The Difficulties Associated with Collection under the Subject Policies Weigh in Favor of Settlement

32.    Century is in run-off and has not written policies for years.  As such, Century apparently has no new income from the issuance of new policies.  Its primary business concern is fixing liabilities.  This Court previously has cited the difficulty of collection of a judgment against an insurance company in run-off in its approval of the Debtors' settlement agreement with Mt. McKinley Insurance and Everest Reinsurance Company (the "*MMIC Settlement Agreement*"), another insurer in run-off.[5]  The entire settlement amount to be paid by Century will be paid within approximately three years, with two-thirds of the total amount to be paid by Century within less than a year and a half of the Confirmation Order becoming a final order.

33.    In addition, the Century Entities are excess insurance carriers with policies that have varying attachment points, and most of them would not even be reached unless cumulative asbestos losses spread in accord with New Jersey law were in excess of $500 million.  In order to collect the full combined aggregate limits of the Subject Policies, the Century Entities contend that the Debtors would have to incur over $1.2 billion in total losses or claims allocated over various years of coverage before the Subject Policies would be exhausted.  *See Carter-Wallace, Inc. v. Admiral Ins. Co.,* 154 N.J. 312 (1998).  In addition, any outcome of the Coverage Action at the trial level will almost certainly be appealed and further coverage disputes will also likely arise.

---

[5]  This Court stated, "[t]he second Martin factor requires the Court to consider any difficulties to be encountered in collection. That is not insignificant here because Mt. McKinley is in a runoff. The settlement envisions an immediate payment, rather than payment over time, which is beneficial to the estate under these circumstances." *See In re Congoleum Corp.,* Case No. 03-51524 (KCF) (Bankr. D.N.J. October 31, 2005) Transcript of Hearing at 30.

34.     In contrast, the Settlement and Buyback Agreement provides certainty that the Plan Trust will receive $16.95 million upon the satisfaction of certain conditions.  Accordingly, the Debtors submit that these estates will be better served by the certainty of collecting $16.95 million relatively soon after plan confirmation rather than waiting possibly many years for the Plan Trust to complete a sufficient number of claim allowances to trigger a higher coverage contribution than that under current dollars.  Moreover, this certainty would also allow the Debtors to avoid the delay of waiting for the appeals process to play out with respect to the Coverage Action if, in fact, Congoleum ultimately is successful in its pursuit of coverage under the Subject Policies.

### C.     The Complexity, Expense, Inconvenience and Delay of the Debtors' Pursuit of Coverage under the Subject Policies Weigh In Favor of Settlement

35.     The Coverage Action has become more, not less, complex over time.[6]  For example, Congoleum and the ACC now have proposed a Plan that calls for forbearance of rights granted under the Claimant Agreement.  This would, in effect, render much of the Claimant Agreement moot.  As a result, the Debtors moved to stay Phase I of the Coverage Action, which concerns coverage for the Claimant Agreement.  The Century Entities, however, objected to the motion and have persisted in their prosecution of the litigation.  The Court in the Coverage Action denied the stay.  As a result, the Debtors are in a position where they are forced to litigate a costly action that may ultimately become moot.

---

[6]     This Court recognized the realities of the Coverage Action at the hearing to approve the Debtors' settlement agreement with respect to the MMIC Settlement Agreement, stating that "[i]t's beyond cavil that Factor 3, the complexity and expense of the litigation, has been established with regard to the coverage action.  It is likely, at least from the Debtors' perspective, that the litigation will become even more expensive and take even longer now that [Gilbert, Heintz & Randolph] has been disqualified."  *See In re Congoleum Corp.*, Case No. 03-51524 (KCF) (Bankr. D.N.J. October 31, 2005) Transcript of Hearing at p. 28-29.

36.     Regardless of the outcome of the Coverage Action, however, resolution of the Coverage Action would affect only a portion of the possible Claims arising under the Subject Policies.  The current phase of the Coverage Action implicates only the Claimant Agreement.  The parties would still need to resolve Asbestos and non-asbestos Claims under the Subject Policies that are not subject to the Claimant Agreement.  Given the complexity of the issues involved in the Coverage Action and these Chapter 11 Cases, ultimate resolution of the other Claims under the Subject Policies is sure to be a protracted process.

37.     The costs attendant with trying such a protracted litigation are enormous.  The Debtors and the Century Entities, therefore, desire to settle their disputes so that they are not forced to litigate the numerous contested issues between the parties for months and years to come.

38.     Settlement discussions between Century and Congoleum were adverse and at arm's length.  Feist Dec. at ¶ 8.  There have been on and off again settlement negotiations for more than two and-a-quarter years.  The parties were at an impasse until a few months ago, when as a result of continued negotiations between the parties and participation by the ACC and FCR, the basic framework of a potential settlement between the Congoleum Entities and the Century Entities emerged.

39.     The Debtors submit that the terms of the Settlement and Buyback are the product of extensive and comprehensive arm's-length negotiations and they reflect true compromise by all of the parties thereto, including the FCR and the ACC.  *Id.*  The complexity, expense, and time-consuming nature of the settlement negotiations reflect, to a great degree, the complexity, expense, uncertainty and time-consuming nature of the Coverage Action and the Chapter 11 Cases for the Debtors.

17

**D.**    **The Settlement and Buyback Agreement is in the Paramount Interest of the Creditors**

40.    The Debtors believe that this Settlement and Buyback Agreement provides a significant and valuable benefit to the Debtors' estates and their creditors and that combined transactions constitute a fair and equitable compromise of the Coverage Dispute.  Feist Dec. at ¶ 9.  Indeed, both the FCR and the ACC implicitly recognize the benefit of this settlement by their support of the Settlement and Buyback Agreement.  *Id.*

41.    The Settlement and Buyback Agreement provides for $16.95 million to be paid into the Plan Trust (or as otherwise directed by the Court) upon satisfaction of certain conditions precedent.  The Debtors, in their business judgment, believe that the creditors of the estate would be better served by an agreement to pay them $16.95 million within approximately three years following the Trigger Date upon satisfaction of the conditions precedent, rather than possibly receiving an as yet undetermined amount at an as yet undetermined point in the future.  Feist Dec. at ¶ 10

42.    The Debtors submit that the terms and conditions of the Settlement and Buyback Agreement are fair and reasonable in light of costs, potential risks, delays and costs associated with continued litigation of the Coverage Dispute and the allowance process for Asbestos Claims, which will begin anew if Congoleum's Plan, which does not permit allowances pursuant to the terms of the Claimant Agreement, is confirmed.  Feist Dec. at ¶ 11.  The Coverage Dispute, as well as these Chapter 11 Cases, involve many complex questions of law and fact.  *Id.* In addition, all of the parties involved have been forced to allocate substantial resources to the resolution of the Coverage Dispute and these Chapter 11 Cases.  *Id.*

43.    Indeed, when considering "the paramount interest of Creditors" with respect to the MMIC Settlement Agreement (a settlement with another high level excess carrier), the Court

held that "[f]rom what has been presented to the Court, not only in these papers but throughout

this case, the Court can conclude that this settlement, as well as the settlements with other

insurers, represent the Creditors' surest chance of payment on their claims." *See In re

Congoleum Corp.,* Case No. 03-51524 (KCF) (Bankr. D.N.J. October 31, 2005) Transcript of

Hearing at p. 30-31.

     44.    The circumstances which led the Court to make this finding have not changed.

Accordingly, the Debtors believe that the Settlement Documents and the Settlement Transactions

represent a fair resolution of Coverage Dispute from the Debtors' perspective, and that approval

of the Settlement and Buyback Agreement and Settlement Transactions are in the best interest of

their estates and creditors.  Feist Dec. at ¶ 12.

     45.    For the foregoing reasons, Congoleum submits that the proposed Settlement and

Buyback Agreement and Settlement Transactions, including the 363 Sale and the 105(a) Relief,

are fair and equitable, are in the best interests of its creditors and estate, and represent the sound

business judgment of Congoleum. *Id.*  The Settlement and Buyback Agreement and Settlement

Transactions ensure a fair resolution given the costs and vagaries of litigation.  Accordingly, the

Debtors respectfully request that this Court both approve the Settlement and Buyback Agreement

and authorize and direct Congoleum to perform and effectuate the Settlement Transactions in

accordance with the terms and conditions of the Settlement and Buyback Agreement.

## II. THE SALE OF THE SUBJECT POLICIES FREE AND CLEAR OF ALL CLAIMS, LIENS, ENCUMBRANCES AND INTERESTS IS AUTHORIZED PURSUANT TO SECTION 363(F) OF THE BANKRUPTCY CODE

### A. This Court May Authorize the Sale of the Subject Policies Free and Clear of All Claims, Liens, Encumbrances and Interests Pursuant to Bankruptcy Code § 363(f)

46.    The full consummation of the sale of the Subject Policies will (a) transfer all of the Debtor's claims, rights, title, and interests with respect to the Subject Policies to the Century Entities, (b) will extinguish any right by any entity to bring any claim against the Century Entities with respect to the Subject Policies, and (c) will transfer any claims, liens, encumbrances or interests by any entity with respect to the Subject Policies to the proceeds of the sale pursuant to Bankruptcy Code § 363(f).

47.    As set forth above, the Third Circuit, along with the vast majority of other courts, has held that insurance policies are property of a debtor's bankruptcy estate.  *See, e.g., First Fid. Bank v. McAteer*, 985 F.2d at 116; *see also MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d at 92 ("Numerous courts have determined that a debtor's insurance policies are property of the estate, subject to the bankruptcy court's jurisdiction."), *cert. denied*, 488 U.S. 868 (1988); *Minoco Group of Cos. v. First State Underwriters Agency*, 799 F.2d at 519; *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d at 1001.  As such, the Debtors' interests in Congoleum's policies are subject to sale under Bankruptcy Code § 363(b)(1), which permits a debtor-in-possession to sell estate property out of the ordinary course of business, after notice and a hearing.  11 U.S.C. § 363(b)(1).  Indeed, this Court previously has authorized Congoleum to enter into sale and buyback transactions with its insurers.  *See e.g., In re Congoleum Corp.,* Case No. 03-51524 (KCF) (Bankr. D.N.J. July 18, 2005) Order Authorizing and Approving Settlement and Buyback

Agreement and Release Among Debtors, Plan Trust and AIG Companies and Related

Transactions, Including the Possible Assignment of the AIG Settlement Payments.

48.     This Court unquestionably has the power to approve the sale of the Subject

Policies as part of the Settlement and Buyback Agreement free and clear of any Claims, liens,

encumbrances and interests so long as the sale (i) satisfies the requirements of Bankruptcy Code

§ 363(f) and (ii) provides adequate protection for any holder of an interest in the property being

sold.  11 U.S.C. § 363(e).

49.     Section 363(f) of the Bankruptcy Code permits the Debtors to sell assets free and

clear of Claims, liens, encumbrances and interests if:

> (1)  applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)  such entity consents;
>
> (3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)  such interest is in a bona fide dispute; or
>
> (5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

50.     Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any one of the

conditions enumerated therein will suffice to warrant the Debtors' sale of their Subject Policies

to the Century Entities free and clear of all Claims, liens and interests, so long as any holder of

an interest in the Subject Policies is adequately protected.  In this case, the Debtors are aware of

only one asserted lien on the proceeds of the Subject Policies, the lien granted in favor of the

Collateral Trustee on all Asbestos Insurance Collateral.  To the extent that any other entity

asserts an interest in the Subject Policies released by the Debtors, the Debtors submit that one or

more of Sections 363(f)(1), (2) and/or (5) apply and permit the sale.

### B. The 105(a) Relief and the 363 Injunction Are Necessary to Implement the Section 363 Sale Pursuant to Bankruptcy Code § 363(f)

51.     The Debtors seek an injunction pursuant to Bankruptcy Code § 105(a) to implement the sale of the Subject Policies free and clear of all Claims, liens, encumbrances and interests under Bankruptcy Code § 363(f).  Section 105(a) of the Bankruptcy Code expressly provides bankruptcy courts the equitable power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  This section has been construed to give a bankruptcy court broad authority to provide equitable relief appropriate to assure the orderly conduct of reorganization proceedings.  The equitable powers authorized by § 105(a), however, cannot be used "to create substantive rights that would otherwise be unavailable under the Code… and must be exercised within the parameters of the Code itself."  *Combustion Eng'g Inc.,* 391 F.3d 190, 236 (3d Cir. 2004) (citations omitted).  An injunction under §105(a), therefore, is appropriate if it is used to effectuate other provisions of the Code, such as section 363 of the Bankruptcy Code.  *See e.g., MacArthur Co. v. Johns-Manville Corp.,* 837 F.2d 89 (2d Cir. 1988).

52.     In this case, the Debtors seek the 363 Injunction in order to implement the sale of the Subject Policies free and clear of all Claims, liens, encumbrances and interests pursuant to section 363(f) of the Bankruptcy Code.  As a condition of the Settlement and Buyback Agreement, Century, on behalf of the Century Entities, will pay the Settlement and Buyback Amount only if they can have certainty that the Century Entities will be released fully from, and have injunctive protection against, all Claims, *including non-asbestos claims*, that may be based on, or derive from, the Subject Policies.  Indeed, inherent in Settlement and Buyback Agreements is that the party settling will not have to pay twice on account of the same released claim.

22

53.     With respect to the asbestos-related Claims that are being settled pursuant to the Settlement and Buyback Agreement, the section 524(g) Injunction that will issue upon plan confirmation will channel all asbestos-related Claims and Demands under the Subject Policies to the Plan Trust.  The Settlement and Buyback Agreement, however, also settles all non-asbestos related Claims that would not fall within the ambit of the § 524(g) Injunction.  The Debtors, therefore, also seek an injunction in the Plan pursuant to section 105(a) of the Bankruptcy Code to protect the Century Entities against all non-asbestos related Claims in furtherance of the terms of the Settlement and Buyback Agreement and the 363 Sale.

54.     To the extent that any Person or Entity has an Asbestos-related interest in the Subject Policies that has been released, such interest is adequately protected as required by section 363(e) of the Bankruptcy Code by the attachment of such interest to the proceeds of the sale.

55.     In *In re Burns and Roe Enterprises, Inc.,* the Bankruptcy Court for the District of New Jersey approved a sale and buyback Settlement and Buyback Agreement between the debtor and one of its insurers pursuant to which the settling insurer purchased the debtor's interest in the subject insurance policies free and clear of all claims, liens and interests pursuant to Bankruptcy Code § 363(f), coupled with an injunction issued pursuant to section 105(a).  *See e.g., In re Burns and Roe Enterprises, Inc.,* Case No. 00-41610 (RG) (Bankr. D.N.J. Feb. 17, 2005) Order Approving Settlement and Buyback Agreement and Enjoining Certain Claims Against the Hartford Parties (the *"Burns and Roe Order"*).[7]

---

[7]     A true and correct copy of the Burns and Roe Order is attached hereto as Exhibit C.

56.    Pursuant to the terms of the *Burns and Roe* settlement, the debtor sold its interests in insurance policies issued by the settling insurer back to the settling insurer free and clear of all claims, liens and interests under section 363(f).  In conjunction with the sale, the Bankruptcy Court issued an immediate injunction pursuant to sections 363(f) and 105(a) of the Bankruptcy Code which permanently stayed, restrained or enjoined any party from taking action against the settling insurer for the purpose of recovering payment on account of any claims or interests under the policies sold.  *See* Burns and Roe Order at p. 8-9.

57.    In this case, the 363 Injunction in the Approval Order and the § 105(a) Relief to be incorporated into the Plan are necessary to implement sale of the Subject Policies free and clear of all non-asbestos related Claims under Bankruptcy Code § 363(f) and to provide the additional protection against such Claims for which the Century Entities have bargained.  For each of these reasons, the Debtors request that the Court authorize the sale of the Subject Policies to the Century Entities free and clear of all Claims, liens, and interests pursuant to Bankruptcy Code section 363(f).

        **C.    The Century Entities Are Entitled to Protection Under Section 363(m) of the Bankruptcy Code**

58.    Pursuant to Section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *In re Mark Bell Furniture Warehouse, Inc.,* 992 F.2d 7, 8 (1st Cir. 1993); *In re Willemain v. Kivitz,* 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Vanguard Oil & Serv. Co.,* 88 B.R. 576, 580 (E.D.N.Y. 1988).

59.    The Debtors submit that the Settlement and Buyback Agreement reached with the Century Entities was the result of protracted arm's-length negotiations and is entitled to the protections of Section 363(m).  *See* Feist Dec. ¶ 8.  The Parties have not engaged in any conduct

that would cause or permit the Settlement and Buyback Agreement or the Settlement

Transactions to be avoided under section 363(n) of the Bankruptcy Code, such as entering into

an agreement to control the price of the Settlement and Buyback Amount.  *Id.* at ¶ 13; *see also,*

*Ramsay v. Vogel*, 970 F.2d 471 (8th Cir. 1992); *Lone Star Indus. v. Compania Naviera Perez*

*Companc (In re New York Trap Rock Corp.)*, 42 F.3d 747 (2d Cir. 1994).  Thus, the sale of the

Subject Policies would not be avoidable under section 363(n) of the Code.

## NOTICE, PRIOR APPLICATIONS AND WAIVER OF BRIEF

60.    Notice of this Motion has been provided to all creditors under Bankruptcy Rule

2002(a), including:  (a) the "Core Service List" and the "Master Service List," each as defined in

the Order Establishing Case Management and Administrative Procedures, dated February 25,

2004, and the "Master E-Mail Service List," as defined in the Order (1) Amending The Order

Establishing Case Management and Administrative Procedures Entered On February 25, 2004

And The Order Establishing Procedures For Interim Compensation And Reimbursement Of

Expenses Of Professionals Entered On February 10, 2004 And (2) Allowing Notice By E-Mail

And Establishing Procedures Therefor, dated September 6, 2005; (b) the Claimants'

Representative; (c) the Office of the United States Trustee; (d) the FCR and counsel to the FCR;

(e) the ACC's members and its counsel; (f) parties who have filed a notice of appearance in these

Chapter 11 Cases; (g) the Collateral Trustee (the "Collateral Trustee") of the Congoleum

Collateral Trust (the "Collateral Trust") established pursuant to a Collateral Trust Agreement

dated August 16, 2003; (h) ABI and counsel to ABI; (i) counsel to all known holders of Asbestos

Claims as reflected in the Rule 2019 Statements and proofs of claim filed in these Chapter 11

Cases, claims submitted in connection with the Settlement Between Congoleum Corporation and

Various Asbestos Claimants attached as Exhibit E to the Disclosure Statement with respect to the

Plan (the "Claimant Agreement"), and ballots submitted in connection with these Chapter 11

Cases; (j) all known holders of Asbestos Claims whose counsel is not included within the

preceding clause who, as of at least ten (10) Business Days prior to the Hearing, became known

through filing of a proof of claim or Rule 2019 Statement; (k) counsel to the Official

Bondholders' Committee; (l) all Additional Named Insureds whose addresses are reasonably

known to Debtors unless otherwise agreed upon by the Parties; and (m) any notice in addition to

that described in Sections IV.A (i) through IV.A (ii), inclusive, in such other manner as the

Century Entities may reasonably direct, with any such additional service to be at the cost of the

Century Entities.  For purposes of the foregoing, the Debtors request that this Court confirm its

prior rulings in these cases that that notice to an attorney for the holder of an Asbestos Claim

constitutes notice to such holder for purposes of notice of the Motion, the Settlement and

Buyback Agreement, and the Settlement Transactions.

61.    Further, notice of the motion and this hearing will be made by publication in the

national and international editions of *USA Today*, which form of notice is attached hereto as

Exhibit Z (the "Publication Notice"), and such Publication Notice, together with the notices

described in the preceding paragraph, are adequate and reasonable under the circumstances and

the Debtors submit that no other or further notice is required or need be sent.  The Debtors

believe that such notice is appropriate and sufficient and is in accordance with the requirements

of the Bankruptcy Rules including Bankruptcy Rules 2002 and 9019, the Bankruptcy Code and

applicable law.  The Debtors respectfully submit that no further notice of the Motion is required.

No prior request for the relief sought herein has been made to this Court or any other court.

62.    The Debtors submit that this Motion presents no novel issues of law requiring the

citation to any authority other than that referred to above and, accordingly, no brief is necessary.

WHEREFORE, the Debtors respectfully request that the Court enter the Approval Order,

attached hereto as Exhibit A to the Settlement and Buyback Agreement, (i) granting the relief

requested in this Motion, (ii) approving the terms and provisions of the Settlement and Buyback

Agreement; (iii) authorizing and directing Congoleum to effectuate the Settlement Transactions

in accordance with the terms of the Settlement and Buyback Agreement; and (iv) granting such

other and further relief as to which the parties may show themselves to be justly entitled.


Dated:  August 21, 2006                          Respectfully submitted,

                                                 **OKIN, HOLLANDER & DᴇLUCA, L.L.P.**


                                                 /s/      Gregory S. Kinoian
                                                 One Parker Plaza
                                                 Fort Lee, New Jersey 07024
                                                 (201) 947-7500
                                                 Paul S. Hollander (PH-2681)
                                                 Gregory S. Kinoian (GK-7386)

                                                 And
                                                 **PILLSBURY WINTHROP SHAW PITTMAN
                                                 LLP**
                                                 1540 Broadway
                                                 New York, New York 10036
                                                 (212) 858-1000
                                                 Richard L. Epling (*pro hac vice* admission)
                                                 Kerry A. Brennan (*pro hac vice* admission)
                                                 Attorneys for Congoleum Corporation, et al.,
                                                 Debtors and Debtors-in-Possession

# Exhibit A

# Settlement and Buyback Agreement

## SETTLEMENT AND POLICY BUYBACK AGREEMENT AND RELEASE

This Settlement and Policy Buyback Agreement and Release ("Settlement and Buyback Agreement") is made by and among Congoleum Corporation, Congoleum Sales, Inc. and Congoleum Fiscal, Inc.; upon its creation, the Plan Trust; and Century Indemnity Company, individually and as successor to CCI Insurance Company, as successor to Insurance Company of North America.

## RECITALS

**WHEREAS,** asbestos-related Claims including, but not limited to Asbestos Personal Injury Claims and Asbestos Property Damage Claims, have been asserted against certain of the Congoleum Entities; and

**WHEREAS,** certain of the Century Entities issued or allegedly issued one or more of the Subject Policies; and

**WHEREAS,** the Congoleum Entities assert that certain of the Century Entities are obligated to provide coverage under the Subject Policies with respect to asbestos-related Claims including Asbestos Personal Injury Claims and Asbestos Property Damage Claims; and

**WHEREAS,** there is a dispute among certain of the Congoleum Entities and certain of the Century Entities regarding their respective rights and obligations with respect to insurance coverage for Claims including Asbestos Claims; and

**WHEREAS,** Congoleum Corporation and Century Indemnity Company are parties to a lawsuit styled <u>Congoleum Corporation v. ACE American Insurance Company, et al.,</u> Docket No. MID-L-8908-01 pending in the Superior Court of New Jersey, Law Division, Middlesex County (the "Coverage Action") in which Congoleum Corporation has asserted claims against Century Indemnity Company, among other insurers; and

**WHEREAS,** on December 31, 2003, Congoleum Corporation, Congoleum Fiscal, Inc. and Congoleum Sales, Inc. (collectively, the "Debtors") filed petitions pursuant to Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"), jointly administered under Case No. 03-51524 (KCF) (collectively, the "Chapter 11 Cases"); and

**WHEREAS,** the Debtors continue to operate their businesses as debtors and debtors-in-possession; and

**WHEREAS,** Claims including Asbestos Claims have been asserted against certain of the Congoleum Entities and may be asserted in the future, and certain of the Congoleum Entities may contend that such Claims are covered under the Subject Policies; and

**WHEREAS,** on March 17, 2006, the Debtors filed the Eighth Modified Joint Plan of Reorganization; and

**WHEREAS,** certain of the Century Entities have objected and continue to object to the plans of reorganization proposed by the Debtors in the Chapter 11 Cases; and

**WHEREAS,** the Parties now wish to enter into an agreement to settle the outstanding disputes referred to above, exchange releases as set forth herein from any further obligations under the Subject Policies that will effect, among other things, the full and complete release of the Century Entities from any and all liability of any kind arising from the Congoleum Flooring Business, and effect the buyback of the Subject Policies thereby terminating all of the Century Entities' respective obligations under, and the Congoleum Entities' respective rights in, the Subject Policies;

**NOW, THEREFORE,** in consideration of the promises and of the mutual covenants contained herein, and intending to be legally bound hereby, subject to the satisfaction of all the conditions precedent as set forth in Section II of this Settlement and Buyback Agreement (where and when applicable), the Parties do hereby agree as follows:

## I.    <u>DEFINITIONS</u>

The following definitions apply to the capitalized terms herein wherever those terms appear in this Settlement and Buyback Agreement, including the prefatory paragraph, recitals, the Sections below and any exhibits attached hereto.  Capitalized terms in the prefatory paragraph, recitals, and in the Sections below have the meanings ascribed to them therein to the extent they are not otherwise defined in this Definitions Section.  The capitalized terms that are not defined in this Settlement and Buyback Agreement but are listed below in Section I.BB are given the meanings designated in the Eighth Modified Joint Plan of Reorganization as of March 17, 2006 or the Ninth Modified Joint Plan of Reorganization as of August 11, 2006, as indicated in Section I.BB.  Moreover, each defined term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender.  The word "including" means "including but not limited to."

A.    "ABI" means American Biltrite Inc.

B.    "ACC" means the Official Committee of Unsecured Asbestos Claimants initially appointed by the United States Trustee in the Bankruptcy Case on or about April 21, 2004 and also sometimes known as the Asbestos Creditors Committee.

C.    "Additional Named Insured" means any other Person, other than Congoleum Corporation, who or that is or asserts to be a named insured, additional insured, additional named insured, or is qualified as an insured under any or all of the policies listed on Exhibit C, and/or who or that otherwise asserts or claims any right, title or interest of or through an insured, a named insured, additional insured or additional named insured under (a) any or all of the policies listed on Exhibit C, including, without limitation, the entity Congoleum-Nairn, Inc. named in policies XBC-1838 and XBC-40971, the entity Congoleum Corporation named in policies XCP3904 and XCP3956, the entity Congoleum Corporation named in policies XBC155083 (incorrectly named Congoleum Incorporated in policy XBC155083) and XCP GO 7908702, the entity Congoleum Industries, Inc. named in policies XBC-43099 and XCP3904, the entity Bath

Industries, Inc. named in policies XBC-43099, XCP3904 and XCP3956, the entities Kinder Manufacturing Company, Inc. and Lewis Carpet Mills, Inc. named in policy XBC-40971, and the entities Bath Iron Works Corp., Kinder Manufacturing Company, Inc., Lewis Carpet Mills, Inc., Pennsylvania Crusher Corporation, Mersman Brothers Division, Webb Furniture Corporation, Coronet Manufacturing Co., Inc., Howard Parlor Furniture Co., Howard Parlor Furniture Co. of Texas, Inc., Howard Frame Co., Edson, Incorporated, Relax-o-Lounger, Inc., Tri-State Floors, Inc., and/or J. Isenberg & Son, Inc. named in policies XCP3904 and XCP3956 (to the extent that any such person asserts such rights under the Subject Policies).

D. "Approval Order" means an order of the Bankruptcy Court, to be entered in the Bankruptcy Case, in substantially the form attached hereto as Exhibit A, with only such modifications as to which the Parties have consented to in writing, which order shall, among other things: (i) approve this Settlement and Buyback Agreement, the compromise and settlement memorialized herein and authorize the Debtors to perform under the Agreement in accordance with its terms; (ii) authorize and approve the sale, transfer and assignment of the Subject Policies to Century Indemnity Company, free and clear of all interests, pursuant to and to the fullest extent permitted by Sections 105 and 363 of the Bankruptcy Code; (iii) finds that Century Indemnity Company is a good faith purchaser of the Subject Policies and, as such, is entitled to all protections provided to a good faith purchaser under Section 363(m) of the Bankruptcy Code; and (iv) provides that this Settlement and Buyback Agreement shall be fully binding upon the Parties and their respective successors and assigns, including the Reorganized Debtors and the Plan Trust, and all other Persons to the fullest extent permitted by applicable law.

E. "Business Day" means any day other than a Saturday, Sunday or other "legal holiday" as defined in Federal Bankruptcy Rule 9006(a).

F. "Century Indemnity Company" means Century Indemnity Company, individually, and as successor to CCI Insurance Company, as successor to Insurance Company of North America.

G. "Century Entities" means: (i) Century Indemnity Company, ACE American Insurance Company (f/k/a CIGNA Insurance Company), and ACE Property and Casualty Insurance Company (f/k/a CIGNA Property and Casualty Insurance Company); (ii) the direct or indirect predecessors, successors and assigns of each of the foregoing Persons described in Section I.G(i), no matter the degree of removal from the Persons described in Section I.G(i) (which terms shall include any Person who assumes the liabilities of any of the foregoing Persons described in Section I.G(i) and (ii) with the approval of the appropriate insurance commissioner or other official); (iii) the respective officers, directors and attorneys of each of the foregoing Persons identified in Section I.G(i) but only when acting in their capacity as such; (iv) the respective past, present and future, direct and indirect, parents, subsidiaries, and affiliates of the entities identified in Section I.G(i) and (ii), including the entities listed on Exhibit B, when acting in their capacity as such and to the extent that Century Indemnity Company has the power and authority to give the releases set forth in Section VI on their behalf; and (v) the respective past and present officers, directors, employees, shareholders, agents, principals, attorneys, and representatives of the Persons described in Sections I.G(iv), but only when acting in their capacity as such and to the extent that the Century Indemnity Company has the power and

authority to give the releases set forth in Section VI on their behalf. Any Person who meets the definition set forth above shall be individually referred to as a "Century Entity."

H.    "Claim" means:

(i)    "Claim" as that term is defined in the Section 101(5) of the Bankruptcy Code;

(ii)    "Demand" as that term is defined in the Section 524(g)(5) of the Bankruptcy Code;  and

(iii)    Any past, present or future, known or unknown, asserted or unasserted, foreseen or unforeseen, matured or unmatured, concealed or disclosed, fixed or contingent, direct or indirect claim, complaint, cross-complaint, counterclaim, affirmative defense, writ, demand, inquiry, request, suit, lawsuit, liability, action, cause of action, administrative proceeding, governmental action, order, judgment, settlement, lien, loss, cost or expense, and whether in law, equity, admiralty, or otherwise, and whether for economic loss, general damages, medical monitoring, punitive damages, attorneys' fees or otherwise;

I.    "Channeling Injunction" means a permanent injunction to be issued by the Bankruptcy Court and incorporated into the Confirmation Order under Section 524(g), that (a) channels, from and after the Plan Effective Date, (i) all Plan Trust Asbestos Claims, which shall include, without limitation, any and all such Claims against any of the Debtors in their individual capacity and as successors in interest to any Congoleum Entity that engaged at any time in the Congoleum Flooring Business, whether named as such or by operation of law, and (ii) all Asbestos Personal Injury Claims, which defined term shall include all Claims caused or allegedly caused by asbestos for which any predecessor or predecessors of the Debtors are otherwise liable under applicable law (that are not released hereunder, if any), of any Person, including ABI (unless such Claims are otherwise released pursuant to the Plan), against the Century Entities relating to the Subject Policies that in any way arise out of the manufacture, sale, distribution, installation, formulation, marketing, transport, handling or any other activity involving the products or premises of the Congoleum Entities, including without limitation, any operation claims, contribution claims, direct action claims, insurance coverage claims, ABI Asbestos Personal Injury Indemnity Claims (unless such claims are otherwise released pursuant to the Plan) and Congoleum Derivative Action, into the Trust to be established pursuant to the Bankruptcy Plan and (b) permanently enjoining the prosecution, continuation or commencement of any such Claim against, among other Persons, any or all of the Century Entities.  The Channeling Injunction shall not provide injunctive protection to any other Asbestos Insurance Company that is broader than the injunctive protection provided to Century Entities; provided, however, that, if such injunction offers broader protection, the Debtors will use best commercial efforts to provide comparable protection to the Century Entities.

J.    "Confirmation Order" means an order or orders entered by the Bankruptcy Court in the Chapter 11 Cases, together with any order of the United States District Court issued pursuant to Section 524(g)(3)(A) of the Bankruptcy Code confirming or affirming such order, that:

(i)    Confirms the Plan and incorporates the Channeling Injunction;

(ii)    Has the effect of providing that the Channeling Injunction applies in full to the Century Entities with respect to any and all current and future asbestos claims, Asbestos Claims and Demands, and any other Claims, which are channeled to the Trust;

(iii)    Specifies that:  (a) the Century Entities are Settling Asbestos Insurance Companies or incorporates by reference the schedule referred to in Section II.B below; (b) any prerequisites to permit the designation of the Century Entities as Settling Asbestos Insurance Companies under the terms of the Plan have been satisfied; and (c) Settling Asbestos Insurance Companies are entitled to all of the benefits of the Asbestos Channeling Injunction as Protected Parties;

(iv)    Contains findings that that Relax-o-Lounger, Inc., Kinder Manufacturing Company, Inc., Lewis Carpet Mills, Inc., Lewis Carpet Mills, Inc., Pennsylvania Crusher Corporation, Mersman Brothers Division, Webb Furniture Corporation, Coronet Manufacturing Co., Inc., Howard Parlor Furniture Co., Howard Parlor Furniture Co. of Texas, Inc., Howard Frame Co., Edson, Incorporated, J. Isenberg & Son, Inc. and Bath Iron Works Corp. have no responsibility for any of the liabilities of the Congoleum Flooring Business; provided, however, that Century Indemnity Company may waive this requirement in writing;

(v)    Provides that all of the Congoleum Entities' obligations and rights under this Settlement and Buyback Agreement shall be binding on and inure to the benefit of the Plan Trust and the Plan Trustee, and each of the foregoing shall become fully bound to all of the terms and conditions of this Settlement and Buyback Agreement, including the releases in Section VI, and of the Approval Order without the need for further act or documentation of any kind (which may be accomplished by a provision that makes all Asbestos Insurance Settlement Agreements, including this Settlement and Buyback Agreement, and related approval orders, including the Approval Order, binding upon and inure to the benefit of the Plan Trust and the Plan Trustee);

(vi)    Specifies that the Congoleum Entities, the FCR, the Plan Trustee, the ACC, the Claimants' Representative or anyone else may not seek to terminate, reduce or limit the scope of the Channeling Injunction or any other injunction with respect to any Century Entities.

K.    "Congoleum Entities" means: (i) the Debtors; (ii) Congoleum Corporation (the corporate entity incorporated in 1986 in Delaware, Federal Tax ID #02-0398678) as the parent of Congoleum Fiscal, Inc., Congoleum Sales, Inc. and Congoleum Pty, and one of the three debtors-in-possession; (iii) the Debtors' respective present, direct and indirect, subsidiaries and affiliates; (iv) the officers, directors and attorneys of the entities listed in Section I.K (i) through (ii) but only when acting in their capacity as such; (v) the entity Congoleum-Nairn, Inc. named in policies XBC-1838 and XBC-40971, the entity Congoleum Corporation named in policies XCP3904 and XCP3956, the entity Congoleum Corporation named in policies XBC155083 and XCP GO 7908702, the entity Congoleum Industries, Inc. named in policies XBC-43099 and XCP3904, the entity Bath Industries, Inc. named in policies XBC-43099, XCP3904 and

XCP3956, the entity Tri-State Flooring, Inc. named in policies XCP3904 and XCP3956, Congoleum Company, Inc., Fibic Corporation, and C.C. Liquidating Corp., to the full extent but only to the extent such entities conducted, managed, operated or were in any way involved in the Congoleum Flooring Business; (vi) the respective past and future, direct and indirect, parents, subsidiaries and affiliates of the Persons described in Sections I.K(i) and (ii), inclusive, in their capacities as such and to the full extent but only to the extent that the Debtors have the power and authority to give the releases set forth in Section VI on their behalf; (vii) any other Additional Named Insureds under the Subject Policies, to the extent such entities conducted and operated, or otherwise have any liability for, the Congoleum Flooring Business and to the full extent but only to the extent that the Debtors have the power and authority to give the releases set forth in Section VI on their behalf; (viii) the direct and indirect predecessors, successors and assigns of each of the foregoing Persons, in their capacities as such and to the full extent but only to the extent that the Debtors have the power and authority to give the releases set forth in Section VI on their behalf; and (ix) the past and present respective officers, directors, employees, shareholders, agents, principals, attorneys and representatives of the Persons described in Sections I.K(i),(iii) and (v) through I.K(viii), inclusive, but only when acting in their capacity as such and to the extent that the Debtors have the power and authority to give the releases set forth in Section VI on their behalf.  Notwithstanding anything above to the contrary and for the avoidance of doubt, ABI shall not be deemed "Congoleum Entities."  Any Person who meets the definition set forth above shall be individually referred to as a "Congoleum Entity."

L.      "Congoleum Flooring Business" means the business involved in the manufacture, sale, distribution, installation, formulation, marketing, transport, handling or any other activity involving in any way flooring, vinyl sheeting flooring or floor tile products of any kind (including, but not limited to, battleship linoleum, resilient sheet vinyl flooring and tile flooring) as such activities may have been engaged in by any one or more of the Congoleum Entities; provided, however, that Congoleum Flooring Business does not include carpets within its definition or the definition of flooring and does not include the shipbuilding operations of Bath Iron Works Corp., or of Bath Industries, Inc., if any, (it being understood that such operations exclude the products of the Congoleum Flooring Business).  Solely for informational purposes and to assist the parties, but not to restrict or limit the definition of the term "Congoleum Flooring Business," the Debtors represent that the above defined business was headquartered continuously in Kearny, New Jersey, from before 1965 to 1987 and none of the Congoleum Entities conducted a Congoleum Flooring Business from a headquarters other than in Kearny, New Jersey, during this period.

M.      "Court" means the Bankruptcy Court or the United States District Court for the District of New Jersey or other court of competent jurisdiction.  The "Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of New Jersey and, to the extent it exercises jurisdiction over the Bankruptcy Case, the United States District Court for the District of New Jersey.

N.      "Coverage Action" means the action pending in the Superior Court of New Jersey, Law Division, Middlesex County, captioned, Congoleum Corporation v. ACE American Insurance Company, et al., Docket No. MID-L-8908-01.

O.      "Execution Date" means the earliest date on which this Settlement and Buyback Agreement has been signed by all of the signatories hereto as reflected by the last dated signature entered on the signature page.

P.      "FCR" means the Futures Claims Representative appointed pursuant to the Bankruptcy Court's February 18, 2004 Order in the Chapter 11 Cases, solely in his capacity as such, together with his successors and assigns, solely in their respective capacities.

Q.      "Final Order" means an order as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, to petition for certiorari, to reargue, to rehear or to reconsider shall have been waived in writing by the Person possessing such right, or, in the event that an appeal, writ of certiorari, or reargument, rehearing or reconsideration thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied or from which reargument, rehearing or reconsideration was sought, and the time to take any further appeal, petition for certiorari, or move for reargument, rehearing or reconsideration shall have expired, and no such further appeal, petition for certiorari, or motion for reargument, rehearing or reconsideration shall have been filed.

R.      "Interest" means, with respect to the Subject Policies, any Claim, encumbrance, pledge, option, charge, easement, security interest, lien, deed of trust, or other right or interest of any nature, whether voluntarily incurred or arising by operation of law or in equity, and shall include any agreement to give any of the foregoing in the future, and any contingent or conditional sale agreement or other title retention agreement or lease in the nature thereof.

S.      "Motion" means the motion and supporting declarations and exhibits attached thereto, to be filed by the Debtors with the Bankruptcy Court for approval of this Settlement and Buyback Agreement and entry of the Approval Order, which Motion and supporting declarations shall be shared with the Parties in advance of filing and be in form and substance reasonably acceptable to the Parties.

T.      "Parties" means the signatories to this Settlement and Buyback Agreement.

U.      "Person" means any natural or legal entity or person, including an individual, a corporation, a partnership, an association, a trust, a joint venture, a union, any other entity or organization, and any federal, state or local government or any governmental or quasi-governmental body or political subdivision or any agency, department, board or instrumentality thereof.

V.      "Plan" shall mean a plan of reorganization for the Debtors to be filed in the Bankruptcy Case pursuant to Sections 1121 and 524(g) of the Bankruptcy Code, as such plan may be modified or amended from time to time in accordance with its terms, which plan shall (among other things), provide for: (a) the Channeling Injunction; (b) the creation of the Trust; (c) the undertaking and assumption by the Trust of its obligations as set forth in this Settlement and Buyback Agreement; (d) the granting to the Century Entities of any additional release, injunction, injunctive protection, covenant not to sue, bar, or defense against and from any

Claims of any Person that may be granted Pursuant to the Plan to any other insurer that settles with the Debtors, and (e) the granting to the Century Entities of all the benefits and protections as are provided for under Section II.E(i).  The terms of such Plan shall be consistent with the rights and benefits provided to the Century Entities under this Settlement and Buyback Agreement and with the duties and obligations of, and releases provided by, the Congoleum Entities under this Settlement and Buyback Agreement.  The terms of the Plan may not otherwise have a material adverse effect on the interests of the Century Entities under this Settlement and Buyback Agreement.

W.      "Plan Effective Date" means the earlier of:  (i) the "Effective Date" as that term is defined in the Plan; or (ii) the first Business Day after the date on which all of the conditions precedent to the effectiveness of the Plan specified in the Plan have been satisfied or waived, or, if a stay of the Confirmation Order is in effect on such date, the first Business Day after the expiration, dissolution, or lifting of such stay.

X.      "Settlement and Buyback Amount" means the sum of Sixteen Million Nine Hundred and Fifty U.S. Dollars ($16,950,000) in cash, certified or cashiers check, or wire transfer, at the option of Century Indemnity Company.

Y.      "Subject Policies" means (a) the policies of insurance listed on **Exhibit C**; and (b) all other policies of insurance, whether the policies are primary, umbrella, excess or otherwise, and whether called liability, first party, third party, property, environmental impairment, employer liability or otherwise and whether known or unknown, issued by any Century Entity listed on **Exhibit B** prior to the Execution Date:  (i) to any Congoleum Entity; and/or (ii) under which any Congoleum Entity claims to be entitled to insurance, rights or benefits, except for the statutory portion of any workers' compensation policy.  With respect to any policy of insurance encompassed by Section I.Y(b), such policy shall be deemed to be a Subject Policy only to the extent of any Congoleum's Entity's rights and interests therein.  For the purposes of this Settlement and Buyback Agreement, the Parties agree that "Subject Policies" shall not include:  (w) any policy of insurance issued by a Person that is not a Century Entity as of the Execution Date that acquires, is merged into, or is acquired by a Century Entity on or after the Execution Date; (x) any policy of insurance issued to a Person that was not a Congoleum Entity on or before the Execution Date, except to the extent that a Congoleum Entity had rights thereunder which arose on or before the Execution Date; (y) the policies listed on **Exhibit E** and/or (z) the policies listed on Exhibit F, except to the extent that such policies would provide coverage to the Congoleum Entities for asbestos related Claims, including Plan Trust Claims.

Z.      "Trigger Date" means the date on which all of the conditions precedent set forth in Section II of this Settlement and Buyback Agreement have occurred.

AA.      "Trust" or "Plan Trust" means a trust to be established, on or before the Effective Date, in accordance with the terms of the Plan (and the Confirmation Order), for the payment of, and into which shall be channeled, all Plan Trust Asbestos Claims against the Congoleum Entities which shall include, without limitation, (a) any and all such Claims against any of the Debtors in their capacity as the successor in interest to the Congoleum Entities that engaged at any time in the Congoleum Flooring Business, whether named as such or by operation of law, and, (b) in accordance with the Channeling Injunction and this Agreement, all, such Claims of

any Person against any or all of the Century Entities relating to or arising out of the Subject Policies or any Asbestos Personal Injury Claim, including any Contribution Claim, Direct Action Claim, or Insurance Coverage Claim.

BB.     The following Capitalized terms that are not defined in this Settlement and Buyback Agreement are given the meanings designated in the Eighth Modified Joint Plan of Reorganization as of March 17, 2006: Asbestos Claims, Asbestos Claims and Demands, Asbestos Channeling Injunction, Asbestos Insurance Company, Asbestos Insurance Settlement Agreements, Asbestos Property Damage Claims, Claimants' Representative, Settling Asbestos Insurance Companies, Protected Parties, Plan Trustee, Plan Trust Asbestos Claims, and Reorganized Debtors.  The following Capitalized terms that are not defined in this Settlement and Buyback Agreement are given the meanings designated in the Ninth Modified Joint Plan of Reorganization as of August 11, 2006: ABI Asbestos Personal Injury Indemnity Claims, Congoleum Derivative Action and Asbestos Personal Injury Claims.

## II.      <u>CONDITIONS PRECEDENT</u>

The obligations of Century Indemnity Company set forth in Section III and the obligations of and releases of the Congoleum Entities and Century Entities set forth in any other provision in this Settlement and Buyback Agreement made subject to this Section II are subject to and made expressly contingent upon the satisfaction of each of the following conditions precedent:

A.      The Approval Order shall have become a Final Order;

B.      A schedule shall have been filed with the Bankruptcy Court prior to the conclusion of the Confirmation Hearing, listing the Century Entities as Settling Asbestos Insurance Companies and such schedule shall not have been amended to remove the Century Entities from such schedule;

C.      If and to the extent required under the terms of the Plan, any necessary prerequisites to permit the designation of the Century Entities as Settling Asbestos Insurance Companies, entitled to all of the benefits and protections of the Asbestos Channeling Injunction as Protected Parties, under the terms of the Plan have been satisfied;

D.      The Confirmation Order shall: (i) be in conformity with the definition of Confirmation Order in Section I.J above; (ii) be in form and substance reasonably acceptable to Century Indemnity Company and otherwise consistent with the terms of, this Settlement and Buyback Agreement; and (iii) shall have become a Final Order;

E.      The Debtors:  (i) shall have filed a modified Plan which (a) provides the Century Entities with the benefits and protections of the Channeling Injunction, which benefits and protections are no less favorable to the Century Entities than those provided under the Eighth Modified Plan of Reorganization and are in form and substance acceptable to the Century Entities, (b) provides**,** in a form reasonably acceptable to Century Indemnity Company, for an injunction pursuant to Section 105(a) of the Bankruptcy Code that permanently enjoins all holders of Claims not channeled by the Channeling Injunction from asserting against the Century Entities any such Claims, provided that they arise out of or relate to the Subject Policies

or the insuring relationship of the Century Entities with the Congoleum Entities, (c) provides, in a form reasonably acceptable to Century Indemnity Company, for the granting of a full and complete release by each claimant that receives a distribution under the Plan from the Trust of all Claims (including without limitation any and all claims against the Century Entities, the Congoleum Entities and the Additional Named Insureds), arising from, relating to, or involving the manufacture, sale, distribution, installation, formulation, marketing, transport, handling or any other activity involving any asbestos containing products of the Congoleum Entities or their premises to the extent such Claim arises from, relates to or involves exposure to asbestos, including without limitation, any operation claims, contribution claims, direct action claims, insurance coverage claims and that such modifications as are necessary are made to the Disclosure Statement and otherwise to cause such consent to be effective; provided, however, that any Person who files an objection to the Section 363 sale provisions of the Approval Order shall be denied the benefits of the release otherwise to be conferred by this Section II.E(c) with Century Indemnity Company and the Debtors having the joint right to waive this requirement; (d) provides that the Reorganized Debtors will not in any way voluntarily assist any person or entity in the establishment of any right, action, cause of action or claim against the Century Entities in anyway relating to any Asbestos Claim or other Claim released under this Settlement and Buyback Agreement; and (e) the terms of which Plan shall be consistent with the rights and benefits provided to the Century Entities under this Settlement and Buyback Agreement and with the duties and obligations of, and releases provided by, the Congoleum Entities under this Settlement and Buyback Agreement; (ii) Congoleum shall use reasonable best efforts to obtain entry of an order confirming such modified Plan which provides all of the benefits and protections described in this Section II.E(i) to the Century Entities; and (iii) an order confirming such modified Plan providing all such benefits and protections under this Section II.E(i) to the Century Entities shall have become a Final Order, which Final Order, as it pertains to such benefits and protections, is in conformity with this Section II.E(i) and is acceptable in form and substance to the Century Entities as to those benefits and protections and which Final Order, as it pertains to such benefits and protections, cannot be modified, limited or terminated without the consent of the Century Entities; and (iv) the Effective Date of such modified Plan as described in this Section II.F shall have occurred;

      F.      The Plan Effective Date shall have occurred; and

      G.      The Debtors or the Plan Trust shall have notified the Century Entities that all of the conditions precedent described in Sections II.A through II.F, inclusive, have occurred and in fact they have occurred.

Century Indemnity Company, at its sole option and in its sole discretion, shall have the right to waive the satisfaction of any or all of the conditions precedent described in Sections II.B through II.G, inclusive, including any subsection(s) thereof, by delivery of written notice thereof to Congoleum Corporation pursuant to Section XVI below, and any condition so waived shall be deemed irrevocably waived and satisfied for all purposes of this Settlement and Buyback Agreement.

## III.    **PAYMENT**

A.      Century Indemnity Company shall pay the Settlement and Buyback Amount, on behalf of the Century Entities, to the Plan Trust, or as otherwise directed by the Court consistent with the terms of this Settlement and Buyback Agreement, on the following payment schedule:

(i)      Within sixty (60) calendar days following the Trigger Date, Century Indemnity Company shall pay, on behalf of the Century Entities, Five Million Dollars ($5,000,000) (the date on which such funds are actually paid shall be referred to herein as the "First Payment Date");

(ii)      One year after the First Payment Date, Century Indemnity Company shall pay, on behalf of the Century Entities, Five Million Dollars ($5,000,000) (the "Second Payment Date");

(iii)      Two years after the First Payment Date, Century Indemnity Company shall pay, on behalf of the Century Entities, Five Million Dollars ($5,000,000) (the "Third Payment Date") and

(iv)      Three years after the First Payment Date, Century Indemnity Company shall pay, on behalf of the Century Entities, the remaining One Million Nine Hundred and Fifty Thousand Dollars ($1,950,000) (the "Fourth Payment Date") of the Settlement and Buyback Amount.

B.      The Parties agree that the payments made pursuant to this Settlement and Buyback Agreement and the other consideration provided are for Claims against the Congoleum Entities, including Asbestos Claims.

C.      The obligation to pay the Settlement and Buyback Amount is several, not joint and several, to the Century Entities, and, without waiver of that understanding, Century Indemnity Company is the only entity assuming the payment obligation, which it assumes in full.

## IV.    **LITIGATION AND BANKRUPTCY OBLIGATIONS**

A.      No later than five (5) Business Days following the Execution Date, the Debtors shall:

(i)      File, and take all steps to pursue granting of, a motion pursuant to Federal Rule of Bankruptcy Procedure 2002, 6004 and 9019 and Sections 105, 363 and 1142 of the Bankruptcy Code, in a form that is reasonably acceptable to the Century Entities, seeking the Bankruptcy Court's entry of the Approval Order;

(ii)      Serve the motion and notice of a hearing on such motion in a form, manner and scope that is in compliance with all applicable Bankruptcy Rules on: (a) the "Core Service List" and the "Master Service List," each as defined in the Order Establishing Case Management and Administrative Procedures, dated February 25, 2004, and the "Master E-Mail Service List," as defined in the Order (1) Amending The Order Establishing Case Management and Administrative Procedures Entered On February 25,

2004 And The Order Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of Professionals Entered On February 10, 2004 And (2) Allowing Notice By E-Mail And Establishing Procedures Therefor, dated September 6, 2005; (b) the Claimants' Representative; (c) the Office of the United States Trustee; (d) the FCR and counsel to the FCR; (e) the ACC's members and its counsel; (f) parties who have filed a notice of appearance in these Chapter 11 Cases; (g) the Collateral Trustee (the "Collateral Trustee") of the Congoleum Collateral Trust (the "Collateral Trust") established pursuant to a Collateral Trust Agreement dated August 16, 2003; (h) ABI and counsel to ABI; (i) counsel to all known holders of Asbestos Claims as reflected in the Rule 2019 Statements and proofs of claim filed in these Chapter 11 Cases, claims submitted in connection with the Settlement Between Congoleum Corporation and Various Asbestos Claimants attached as Exhibit E to the Disclosure Statement with respect to the Plan (the "Claimant Agreement"), and ballots submitted in connection with these Chapter 11 Cases; (j) all known holders of Asbestos Claims whose counsel is not included within the preceding clause who, as of at least ten (10) Business Days prior to the Hearing, became known through filing of a proof of claim or Rule 2019 Statement; (k) counsel to the Official Bondholders' Committee; (l) all Additional Named Insureds whose addresses are reasonably known to Debtors unless otherwise agreed upon by the Parties; and (m) any notice in addition to that described in Sections IV.A (i) through IV.A(ii), inclusive, in such other manner as the Century Entities may reasonably direct, with any such additional service to be at the cost of the Century Entities. Congoleum shall file in the Bankruptcy Case a certification of such service no later than two days after completing service.

(iii)    Seek a hearing on the motion no later than September 11, 2006 (the "Settlement Hearing Date"), provided, however, that the Debtors will use reasonable best efforts to file by the filing deadline for the September 11, 2006, hearing date and, should they fail to meet the deadline after using reasonable best efforts, Century Indemnity Company shall join in any motion by the Debtors to seek a hearing on shortened notice necessary to achieve the Settlement Hearing Date.

The Debtors shall use their reasonable best efforts to have the Bankruptcy Court enter the Approval Order as soon as reasonably possible. The Century Entities shall support the Debtors' efforts to obtain such approval. The Century Entities shall provide the Debtors with such declarations in support of the Motion as the Debtors may reasonably request, and the Debtors shall provide such declarations in support of the Motion that the Congoleum Entities may reasonably request.

B.    Following the Execution Date but before the Settlement Hearing Date, the Debtors shall file modifications to the Plan, in a form reasonably acceptable to Century Indemnity Company, pursuant to Section 1127 of the Bankruptcy Code, which provide all of the benefits and protections described in Section II.E(i) to the Century Entities, but are made expressly subject to the Approval Order becoming a Final Order. Subject to any applicable privilege, the Debtors shall provide Century Indemnity Company with drafts of the plan documents, and Century Indemnity Company shall provide timely written suggestions in response thereto on matters relevant to compliance with the requirements of this Settlement and Buyback Agreement; provided, however, that the Parties' rights and obligations under this

Settlement and Buyback Agreement shall not be limited by the Parties cooperating in such manner.  The Debtors shall use their reasonable best efforts to obtain Bankruptcy Court approval of the Plan as so modified to incorporate such benefits and protections.  From and after the Execution Date, the Debtors and the Century Entities shall file no further discovery, motions, objections and/or Claims against each other; provided, however, that the Century Entities shall have the right to file their own objections and to join in objections to confirmation filed by other parties, and to prosecute all such objections and oppose confirmation of the Plan as currently filed if the Approval Order has not been entered by the date when such action is required by the Court, and the Debtors shall be free to oppose any such objections and related activities.  The Parties fully reserve all of their rights pertaining to discovery, motions, objections and Claims made prior to the Execution Date in the Chapter 11 Cases until such time as the Approval Order becomes a Final Order.  Within three (3) Business Days of the Approval Order becoming a Final Order, the Century Entities shall withdraw, stay, adjourn or suspend all objections to the Debtors' motions or applications pending in the Bankruptcy Case (including any appeals of decisions in the Bankruptcy Case) in accord with terms to be agreed upon that reasonably preserves the parties respective interests and serves the overall intent of the Settlement and Buyback Agreement, and shall take no action (including, without limitation, initiating discovery) that may hinder, delay or oppose actions of the Debtors in the Chapter 11 Cases, provided that such actions by the Debtors are consistent with this Settlement and Buyback Agreement.  Subject to Section V, upon the Court's entry of the Approval Order, the Century Entities shall not object to or oppose confirmation of the Plan and shall not appeal the Confirmation Order.  Subject to Section IX, prior to the First Payment Date, no provisions of the Plan or the Plan Documents, findings of fact in the Confirmation Order, conclusions of law in the Confirmation Order, or other rulings of the Court in the context of the proceedings on confirmation of the Plan shall be used by the Plan Trust or any other Person as evidence in any way in any proceeding involving a Century Entity, nor shall they have any evidentiary, res judicata, collateral estoppel or other preclusive or other effect against any of the Century Entities in any proceeding (the "No Use/No Effect Restriction"); provided, however, that this No Use/No Effect Restriction shall not apply after the Trigger Date except with respect to any order approving any settlement with Gilbert, Heintz & Randolph LLP, The Kenesis Group or their principals, partners and employees and any findings of fact or conclusions of law involving such Persons.

C.      The Debtors shall communicate with Century Indemnity Company and its representatives at their reasonable request concerning the status of the Motion, the Plan, the disclosure statement and confirmation and, subject to any applicable privilege, shall provide Century Indemnity Company and its representatives with copies of requested pleadings, notices, the Plan, proposed orders and other documents relating to the Motion, the Approval Order and the Channeling Injunction.

D.      Prior to the conclusion of the Confirmation Hearing, (i) the Debtors shall have designated the Century Entities as Settling Asbestos Insurance Companies on the schedule of Settling Asbestos Insurance Companies filed by the Debtors; and (ii) any necessary prerequisites under the terms of the Plan have been satisfied so as to permit the designation of the Century Entities as Settling Asbestos Insurance Companies, entitled to all of the benefits and protections of the Asbestos Channeling Injunction as Protected Parties, provided, however, that such provisions may be made subject to the Approval Order becoming a Final Order.

E.      The Congoleum Entities and the Plan Trustee shall not seek to terminate, or reduce or limit the scope of the Asbestos Channeling Injunction, with respect to the Century Entities after the Confirmation Order becomes a Final Order.

F.      The Debtors shall use their reasonable best efforts to obtain in the Approval Order the protection of a sale free and clear pursuant to Section 363(f) of the Bankruptcy Code for the buyback of the Subject Policies.

G.      The Parties agree that no Party will seek to reject this Settlement and Buyback Agreement as an executory contract in the Chapter 11 Cases or any other bankruptcy case.

H.      Within three (3) Business Days of the Execution Date, Congoleum Corporation and Century Indemnity Company shall submit a Consent Order to the court in the Coverage Action seeking a dismissal without prejudice of all of the Claims each has asserted against the other in the Coverage Action.  The Consent Order shall provide that, on the First Payment Date, such dismissals shall convert, without any need for further act or deed, to dismissals with prejudice.  The Consent Order shall further provide that, in the event that the Settlement and Buyback Agreement becomes null and void pursuant to its terms, then any Congoleum Entity and any  Century Entity, to the extent it has the right to do so, may re-institute litigation against each other, in accordance with Section V.B(viii) below, and that neither the "Entire Controversy Doctrine" nor New Jersey Rule 4:30A nor any analogous doctrine or rule shall bar any such Congoleum Entity and any such Century Entity from asserting, in such litigation, the same or substantially similar Claims and/or defenses to those asserted in the Coverage Action.  Any such Congoleum Entity or any such Century Entity may also file and/or assert any Claims and/or defenses which have arisen since the Execution Date .  In any event, the Parties agree that any such Congoleum Entity and any such Century Entity will not be bound by any rulings and or decision in the Coverage Action made after Execution Date.  The Congoleum Entities and the Century Entities will each bear their own fees and costs in the Coverage Action and in the Chapter 11 Cases.

I.      Between the time that the Approval Order becomes a Final Order and the effective date of the releases under Section VI, the Congoleum Entities and the Century Entities covenant not to sue one another or take any action that would adversely affect such releases.

J.      The Debtors shall not seek to set a bar date or take such other action as would have the cause or effect of releasing any Claims that were or could have been brought by the Century Entities in the Chapter 11 Cases, including any claim for substantial contribution, before the First Payment Date.

## V.      **TERMINATION OF SETTLEMENT AND BUYBACK AGREEMENT**

A.      After the Execution Date, this Settlement and Buyback Agreement shall become null and void upon the occurrence of any of the following contingencies:

(i)      The failure of the Coverage Court to enter the Consent Order described in Section IV.H above;

(ii)     The entry by the Court of an order confirming a Chapter 11 plan of reorganization for the Debtors other than the Plan;

(iii)     The entry by the Court of an order that states that the Century Entities are not Settling Asbestos Insurance Companies;

(iv)     The entry of a Final Order denying approval of the Settlement and Buyback Agreement;

(v)     The entry of an order by the Court converting the Chapter 11 Cases into Chapter 7 cases or dismissing the Chapter 11 Cases; and

(vi)     The proposal or filing of a plan of reorganization by the Debtors that:  (a) is inconsistent with the rights and benefits provided to the Century Entities under this Settlement and Buyback Agreement and/or with the duties and obligations of, and releases provided by, the Congoleum Entities under this Settlement and Buyback Agreement; and/or (b) otherwise has a material adverse effect on the interests of the Century Entities under this Settlement and Buyback Agreement.

Century Indemnity Company, in its sole option and in its sole discretion, shall have the right to waive, in writing, any of the contingencies set forth in Sections V.A(i) through V.A(iii), inclusive, and V.A (vi) by notice to the Persons described in the notice provisions in Section XVI below within thirty (30) Business Days of the occurrence of any such contingency(ies), and any such contingency(ies) so waived shall be deemed irrevocably waived and satisfied.  If all such contingencies are so waived or are satisfied, then this Settlement and Buyback Agreement shall continue in full force and effect.

B.     Notwithstanding anything in this Settlement and Buyback Agreement to the contrary, in the event that this Settlement and Buyback Agreement becomes null and void pursuant to Section V.A above:

(i)     The Settlement and Buyback Agreement, except for Sections I, IV.H, V, IX, XII, XVI and XVII (which Sections shall remain in full force and effect), shall be vitiated and shall be a nullity;

(ii)     None of the Century Entities shall be obligated to pay the Settlement and Buyback Amount pursuant to this Settlement and Buyback Agreement;

(iii)     None of the Century Entities and none of the Congoleum Entities shall be bound by the terms of any Approval Order;

(iv)     None of the Century Entities shall be designated as, and none of the Century Entities shall receive the benefits or protections of, a Settling Asbestos Insurance Company, including, without limitation, any injunctive or related benefit provided for in the Plan, Confirmation Order, or otherwise in the Chapter 11 Cases, including any injunction or benefit provided under the authority of Sections 105, 363, or 524(g) of the Bankruptcy Code;

(v)     The Century Entities and the Congoleum Entities shall have all the rights, defenses and obligations under or with respect to any Subject Policies that they would have had absent this Settlement and Buyback Agreement;

(vi)     Any otherwise applicable statutes of limitations or repose, or other time-related limitation, shall be deemed to have been tolled for the period from the Execution Date through the thirtieth day after receipt of notice by any of the Parties that any of the contingencies listed in Sections V.A(i) through V.A(vi), inclusive, has/have occurred so that the Settlement and Buyback Agreement becomes null and void, and no Party shall assert or rely on any time-related defense to any Claim by any Century Entity or Congoleum Entity related to such period;

(vii)     The releases set forth in Section VI below shall become null and void <u>ab initio</u>;

(viii)     Any Party who was a party in the Coverage Action may elect to re-file a coverage action against any other party in the Coverage Action.  Such a new coverage action shall be called the "New Coverage Action."  All discovery taken in the Coverage Action or in relationship to any of the Plan's previous versions, and any and all evidence admitted, testimony taken, and rulings of the Court entered in the trial of the Coverage Action between August 2, 2005 and the Execution Date may be used in the New Coverage Action, subject to any applicable rules of admissibility.  No rulings of the court, conclusions of law, or findings of fact entered in the Coverage Action after the Execution Date, shall be used as evidence in any way in any proceeding involving a Century Entity or Congoleum Entity or have any evidentiary, <u>res judicata</u>, collateral estoppel or preclusive or other effect against any such Century Entity or Congoleum Entity in the New Coverage Action.  The Parties agree that neither the "Entire Controversy Doctrine" of New Jersey nor New Jersey Rule 4:30A nor any analogous doctrine or rule shall bar any such Congoleum Entity and any such Century Entity from asserting, in such litigation, the same or substantially similar Claims and/or defenses to those asserted in the Coverage Action or any other claims.  Additionally, any such Century Entity or any such Congoleum Entity may file and/or assert any Claims and/or defenses which have arisen since the date the trial of the Coverage Action began, on August 2, 2005.  In the event of a New Coverage Action, the Century Entities shall have the right to examine or cross-examine any witnesses designated by any of the Parties in the New Coverage Action who were not examined or cross-examined by Century Indemnity Company prior to the closing of the trial in the Coverage Action before any such testimony or evidence adduced from or introduced through such witnesses can be used in any way in the New Coverage Action by any Congoleum Entity; and

(ix)     The Century Entities may pursue any and all objections, whether to confirmation of a Chapter 11 plan of reorganization for the Congoleum Entities, or otherwise and assert any and all available Claims.

## VI.    BUYBACK AND TERMINATION OF POLICY RIGHTS AND RELEASE

A.    Effective upon the First Payment Date, the Congoleum Entities remise, release, acquit and forever discharge the Century Entities from any Claims arising from, relating to or involving the Subject Policies, including, but not limited to (i) any Claims arising from, relating to or involving asbestos-related Claims, including, but not limited to, Plan Trust Asbestos Claims, and (ii) any Claims that were or could have been brought in the Coverage Action.

B.    For the avoidance of doubt, the Parties hereby confirm that the releases granted by the Congoleum Entities to the Century Entities as set forth in Section VI.A are intended to include and do include releases from any and all Claims that any Congoleum Entity ever had, now has or may in the future have against any of the Century Entities arising from or related to what is commonly referred to as bad faith or insurer misconduct and which includes:  (i) the insurance relationship between any Century Entity and any Congoleum Entity and any obligations of any Century Entity under or in connection with such relationship; (ii) the obligations of any Century Entity to any Congoleum Entity as a result of (a) issuance of the Subject Policies, (b) the handling of Claims against any Congoleum Entity, (c) the defense or trial of Claims against any Congoleum Entity, or (d) the settlement of Claims against any Congoleum Entity; (iii) any and all acts or omissions by any Century Entity in connection with Claims made against any Congoleum Entity; (iv) any and all Claims arising from or relating to loss prevention or engineering acts or omissions by any Century Entity performed in connection with the insurance relationship between any Century Entity and any Congoleum Entity; (v) any Claims with respect to payments made or not made by any Century Entity to or on behalf of any Congoleum Entity prior to the Execution Date; and (vi) any actual or alleged bad faith, fraud, unfair competition, breach of contract, breach of duty of good faith and fair dealing, violation of insurance statute or regulation or extra-contractual liability of any kind, type or description, including any and all Claims that arise under or from the laws, whether statutory, common or otherwise, of one or more of the fifty (50) states or any other jurisdiction.

C.    Effective upon the First Payment Date, the Century Entities remise, release, acquit and forever discharge the Congoleum Entities from any Claims arising from, relating to or involving the Subject Policies, including, but not limited to:  (i) any Claims arising from, relating to or involving asbestos-related Claims, including, but not limited to, Plan Trust Asbestos Claims; (ii) any Claims that were or could have been brought in the Coverage Action; and (iii) any Claims that were or could have been brought in the Chapter 11 Cases, including any claim for substantial contribution.

D.    For the avoidance of doubt, the Parties hereby confirm that the releases granted by the Century Entities to the Congoleum Entities as set forth in Section VI.C are intended to include and do include releases from any and all Claims that any Century Entity ever had, now has or may in the future have against any of the Congoleum Entities arising from or related to what is commonly referred to as reverse bad faith or policyholder misconduct and which includes:  (i) the insurance relationship between any Century Entity and any Congoleum Entity and any obligations of any Congoleum Entity under or in connection with such relationship; (ii) the obligations of any Congoleum Entity to any Century Entity as a result of (a) issuance of the Subject Policies, (b) the handling of Claims against any Congoleum Entity, (c) the defense or trial of Claims against any Congoleum Entity, or (d) the settlement of Claims against any

Congoleum Entity; (iii) any and all acts or omissions by any of the Congoleum Entities in connection with Claims made against any Century Entity; and (iv) any actual or alleged bad faith, fraud, unfair competition, breach of contract, breach of duty of good faith and fair dealing, violation of insurance statute or regulation or extra-contractual liability of any kind, type or description, including any and all Claims that arise under or from the laws, whether statutory, common or otherwise, of one or more of the fifty (50) states or any other jurisdiction.

      E.      For the avoidance of doubt, none of the releases set forth herein shall release:  (i) any of the Congoleum Entities' or any of the Century Entities' respective obligations under this Settlement and Buyback Agreement, and the Parties hereby reserve and retain all rights in connection with the enforcement of this Settlement and Buyback Agreement; and/or (ii) any reinsurance policy, contract or certificate issued by any Century Entity and/or any reinsurance treaty in which any Century Entity participates.

      F.      In consideration of the promises contained in this Settlement and Buyback Agreement and consistent with the scope of the releases given in Section VI, effective immediately upon the First Payment Date, but subject to the satisfaction of the conditions precedent, as set forth in Section II above:  (i) the limits of liability of all of the Subject Policies are hereby deemed by the Parties to be fully extinguished for all Claims; (ii) any and all purported rights, duties, responsibilities and obligations of any Century Entity alleged to have been created or that may be created by the Subject Policies and that have been released pursuant to Section VI are hereby deemed extinguished, terminated, canceled and otherwise fully satisfied; and (iii) any and all rights under the Subject Policies that have been released pursuant to Section VI shall be and are extinguished, terminated and voided, subject to the terms and conditions of this Settlement and Buyback Agreement.

      G.      In addition, as of the First Payment Date, the Debtors shall be and are deemed to have sold, transferred and conveyed the Subject Policies to Century Indemnity Company pursuant to Section 363 of the Bankruptcy Code, free and clear of all Claims, liens, encumbrances and/or interests of any kind and/or nature whatsoever, to the extent permitted under Section 363(f) of the Bankruptcy Code.  The Parties further agree that the Settlement and Buyback Amount is at least equal to the fair value of the Subject Policies, and that upon the First Payment Date, Century Indemnity Company shall be deemed to own the Subject Policies free and clear of all Interests of any Person.  As of the First Payment Date, none of the Century Entities shall have a duty or obligation to defend, pay defense costs, indemnify or otherwise to provide defense, indemnity, coverage, services or benefits of any kind whatsoever released pursuant to Section VI under the Subject Policies.  To the extent requested by the Century Entities, on (or as soon as practicable after) the Trigger Date, the Debtors shall execute and deliver to the Century Entities a bill of sale, in form and substance acceptable to the Parties, evidencing such sale of the Subject Policies to the Century Entities.

      H.      The Debtors agree and jointly represent that the promises and consideration given by any of the Century Entities pursuant to this Settlement and Buyback Agreement, including, but not limited to the payment of the Settlement and Buyback Amount by Century Indemnity Company on behalf of the Century Entities pursuant to this Settlement and Buyback Agreement, constitute a fair and reasonable exchange for:  (i) the releases granted to Century Entities in this Settlement and Buyback Agreement; (ii) the sale, transfer, conveyance and buyback of the rights

and interests of the Congoleum Entities in the Subject Policies; and (iii) the designation of the Century Entities as Settling Asbestos Insurance Companies, entitled to the rights and benefits afforded to Settling Asbestos Insurance Companies under the Plan and as set forth in the Approval Order and the Confirmation Order, including the rights and benefits of the Asbestos Channeling Injunction and any other Section 105(a) and 524(g) injunctions that may be granted under the Plan, Approval Order and the Confirmation Order with respect to all Claims, including all Plan Trust Asbestos Claims and Indirect Asbestos Claims. The Debtors further acknowledge and agree that the Century Entities have provided consideration for the buyback of the non-asbestos coverage under the Subject Policies.

I.      The Parties expressly agree that, upon the Trigger Date, the Settlement and Buyback Amount is the total amount that any of the Century Entities is obligated to pay on account of any and all Claims of any kind made under or relating to the Subject Policies.  Other than payment by Century Indemnity Company of the Settlement and Buyback Amount, under no circumstances will any of the Century Entities ever be obligated to make any additional payments to the Debtors, the Trust, or any other Person on account of any and all Claims of any kind in connection with the Subject Policies or for any asbestos-related Claim relating to the Congoleum Entities under the policies listed in Exhibit F.

J.      Except to the extent set forth in Section VI.L and VI.M, the release provisions of this Section VI are not intended to release and shall not be construed deemed to effect a release of any Claims arising from, relating to or involving any policy of insurance **or portion thereof** that is not a Subject Policy.

K.      Each Party expressly assumes the risk that acts, omissions, matters, causes or things may have occurred that they do not know or do not suspect to exist.  Each Party hereby waives the terms and provisions of any statute, rule or doctrine of common law that either:  (i) narrowly construes releases purporting by their terms to release claims, in whole or in part based upon, relating to or arising from such acts, omissions, matters, causes or things; or (ii) restricts or prohibits releasing of such claims.  Without limitation, each Party acknowledges that it has been advised by its attorneys concerning, and is familiar with, the California Civil Code Section 1542.  Section 1542 of the California Civil Code provides as follows:

> a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of the executing of the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Each Party expressly waives any and all rights under California Civil Code Section 1542 and under any other federal or state statute or law of similar effect.  The Parties further agree that this reference to the California Civil Code shall not give rise to any argument that California law applies to this Settlement and Buyback Agreement or the disputes resolved pursuant hereto.

L.      The Congoleum Entities do not have and are not entitled to insurance, rights or benefits, under the policy set forth in **Exhibit D** hereto (the "Listed Policy") for any Plan Trust Claim or other Claim arising from, relating to, or involving the manufacture, sale, distribution, installation, formulation, marketing, transport, handling or any other activity involving any

asbestos containing flooring products of the Congoleum Entities or their premises, to the extent such Claim arises from, relates to or involves exposure to asbestos associated in any way with the products or operations of the Congoleum Flooring Business, including without limitation, any operation claims, contribution claims, direct action claims, or insurance coverage claims, and in fact, to the extent that they had or have any interest, expressly renounce any such interest in the Listed Policy and agree that they have no right to assert any such Claims under the Listed Policy and that there is no coverage available to them under the Listed Policy for such Claims. If, after the Execution Date, a court of competent jurisdiction were to rule, after a final order on appeal, that a Congoleum Entity has an interest or right in a Listed Policy as defined above, or if, after the Execution Date, new information were to reveal that a Congoleum Entity has an interest in a Listed Policy as defined above, then such Listed Policy will be deemed a Subject Policy.

M.    The Congoleum Entities agree that the policies listed in **Exhibit F** do not provide coverage for asbestos-related Claims against the Congoleum Entities.

N.    Notwithstanding the foregoing, any Claims that the Century Entities may have against ABI and its predecessors and successors and their officers, directors and employees, but only when acting in their capacity as such, shall be fully preserved regardless of any contrary terms that may be included in the Plan or Confirmation Order.

## VII.    <u>DEFENSE OF THE CHANNELING INJUNCTION</u>

A.    The Trust will cooperate with the Century Entities in the defense of the Channeling Injunction.

B.    The Parties agree that, to the extent any defense or cooperation provisions of the Travelers settlement with the Debtors are approved by the Court, the Century Entities shall share in such rights consistent with the Travelers settlement.

## VIII.    <u>REDUCTION OF JUDGMENT</u>

In the event that any insurer of the Debtors either:  (i) obtains a final binding award (whether by judgment, arbitration award, or other judicial or quasi-judicial proceeding) against a Century Entity after a contested proceeding; or (ii) agrees to a settlement with a Century Entity with the consent of the Debtors prior to the Plan Effective Date or with the consent of the Plan Trust following said Plan Effective Date (which consent in either case shall not be unreasonably withheld) entitling such insurer to obtain a sum certain from such Century Entity as a result of such insurer's claim for contribution, subrogation, indemnification, reimbursement or other similar claim against such Century Entity for such Century Entity's alleged share or equitable share of the defense and/or indemnity of a Congoleum Entity, the Congoleum Entity shall voluntarily reduce or return to such insurer an amount of any such final award (whether by judgment, arbitration award or other judicial or quasi-judicial proceeding) or settlement payment that they obtained or may obtain from such other insurer for Claims released pursuant to this Settlement and Buyback Agreement, which amount shall be sufficient to eliminate the Century Entity's obligation to satisfy the award against it.

## IX.  NO ADMISSIONS BY THE PARTIES; RIGHTS OF THIRD PARTIES

A.  Nothing contained herein is or shall be deemed to be:

(i)  An admission by the Century Entities that any Congoleum Entity or any other Person was or is entitled to any insurance coverage under the Subject Policies, or as to the validity of any of the positions that have been or could have been asserted by any Congoleum Entity;

(ii)  An admission by the Congoleum Entities as to the validity of any of the positions or defenses to coverage that have been or could have been asserted by Century Entities with respect to the Subject Policies;

(iii)  An admission by any Party of any liability whatsoever with respect to asbestos-related Claims including, but not limited to Plan Trust Asbestos Claims, Indirect Asbestos Claims or other Claims or Demands;

(iv)  A waiver by the Century Entities of any position that they may adopt or already have adopted concerning the appropriateness of any bankruptcy process or procedure or any other issue or matter in any other case or proceeding;

(v)  An admission by any Century Entity as to the validity of anything with respect to the Plan, including, without limitation, any claim allowance process or criteria, medical criteria, exposure criteria, disease matrices, claim values, or trust distribution procedures that have been or will be adopted, used or applied or any aspects of the Plan that may implicate the rights and duties of the Century Entities; or

(vi)  An admission by any Congoleum Entity or any Century Entity as to the manner in which the other may allocate the Settlement and Buyback Amount for its own purposes between and among the Subject Policies.

In entering into this Settlement and Buyback Agreement, no Party has waived, nor shall be deemed to have waived, modified, or retracted any rights, obligations, privileges or positions it has asserted or might in the future assert in connection with any Claim, matter, insurance policy or Person outside the scope of this Settlement and Buyback Agreement.

B.  Except as expressly provided in this Settlement and Buyback Agreement, the Parties specifically disavow any intention to create rights in third parties under or in relation to this Settlement and Buyback Agreement.

C.  The Parties agree that no part of this Settlement and Buyback Agreement may be used in any proceeding as an admission by or evidence against or for any other purpose as evidence of the Parties' respective rights, duties or obligations under and in relation to any policy of insurance, including the Subject Policies; provided, however, that this restriction shall not apply to any proceeding in connection with or related to the interpretation, validity, enforcement or breach of this Settlement and Buyback Agreement.  The Parties further agree that no part of this Settlement and Buyback Agreement or the fact that the Century Entities have entered into it may be used in any proceeding as an admission by, evidence against, or for any other purpose in

an action involving any of the Century Entities pertaining to the validity of anything with respect to the Plan, including, without limitation, any claim allowance process or criteria, medical criteria, exposure criteria, disease matrices, claim values, or trust distribution procedures that have been or will be adopted, used or applied or any aspects of the Plan that may implicate the rights and duties of the Century Entities.

D.      All actions taken and statements made by the Parties or their representatives relating to their participation in this Settlement and Buyback Agreement, including its formation and implementation, shall relate to this matter only and shall be without prejudice or value as precedent and shall not be taken as a standard by which other matters may be judged or adjudicated.

E.      Subject only to the limitations set out in the third from last sentence of this paragraph IX.E, the Century Entities shall not seek reimbursement of any payments that Century Indemnity Company is obligated to make under this Agreement, whether by way of a claim for contribution or subrogation, or otherwise, from any Person other than the Century Entities' reinsurers in their capacity as such.  Each of the Debtors shall use its reasonable best efforts to obtain from all insurers with which it settles an agreement similar to that set forth in the preceding sentence; provided, however, that notwithstanding anything to the contrary herein, the failure of the Debtors to obtain such an agreement from any other insurer with which they settle shall not constitute a breach of this Agreement.  Notwithstanding the foregoing, the Century Entities shall retain the right to assert a cross-complaint or counterclaim against any Person that first asserts a claim against any one of them seeking a monetary recovery.  Notwithstanding the foregoing or anything to the contrary that may be stated in Sections I.K or VI above, the Century Entities shall retain any and all such rights, if any, as they otherwise have against (i) Saul Ewing LLP with respect to its attorney client relationship with the Century Entities, (ii) Gilbert Heintz & Randolph LLP, (iii) The Kenesis Group LLC or (iv) partners, associates, principals and shareholders of the Persons referred to in Section IX.E (i) - (iii).  The Century Entities hereby represent and warrant that there are no pending lawsuits filed in court or other pending claims against them currently that would trigger the right to assert a cross-complaint or counterclaim referred to in the preceding sentence.  The Debtors hereby represent and warrant that they are aware of no lawsuits or other pending claims against the Century Entities by the Persons referred to in the preceding two sentences.

X.      **SUCCESSORS**

This Settlement and Buyback Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns, including the reorganized Debtors and the Plan Trust.

XI.      **REPRESENTATIONS AND WARRANTIES**

A.      The Debtors represent and warrant that Congoleum Corporation, as defined in Section I.K.(ii), and as a signatory to this Settlement and Buyback Agreement, owns the rights of the Congoleum Entities to coverage under the Subject Policies identified on Exhibit C.

B.      The Debtors represent and warrant that Congoleum Corporation, as defined in Section I.K.(ii)  has three subsidiaries:  Congoleum Fiscal, Inc., Congoleum Sales, Inc., and Congoleum Pty. and that there are no other direct or indirect subsidiaries of these entities.

C.      Congoleum Fiscal, Inc., and Congoleum Sales, Inc. represent and warrant that they do not own any rights to coverage under the Subject Policies identified in Exhibit C, and to the extent that Congoleum Pty. owns rights to coverage under the Subject Policies identified in Exhibit C, such rights are being released and sold free and clear pursuant to the terms and conditions of this Settlement and Buyback Agreement.

D.      Each Party represents and warrants that it has full authority to execute this Settlement and Buyback Agreement as its binding and legal obligation (subject, however, in the case of the Debtors, to the requirement that the Approval Order be entered).  The person signing this Settlement and Buyback Agreement on behalf of each Party represents and warrants he or she is authorized to execute this Settlement and Buyback Agreement (subject, however, in the case of the Debtors, to the requirement that the Approval Order be entered) on behalf of all Persons for whom he or she signs.

E.      Each Party represents and warrants, which representation and warranty is based solely upon an inquiry performed by their respective employees and, in the case of Century Indemnity Company, the employees of Resolute Management, Inc. also, involved in the Coverage Action and in the negotiation, documentation and execution of this Settlement and Buyback Agreement and their counsel involved in the Coverage Action and in the negotiation, documentation and execution of this Settlement and Buyback Agreement, that they are not aware of any Subject Policies other than the insurance policies and alleged policies identified in **Exhibit C** hereto.

F.      Each Party represents and warrants that this agreement has been negotiated and analyzed by their respective counsel and has been executed and delivered in good faith, pursuant to arms-length negotiations and for value and valuable consideration.

G.      Each Party represents and warrants that neither it nor any of its predecessors, successors, assigns, or affiliates has previously assigned, transferred  or purported to assign or transfer to any other Person any right, Claim, Demand, claim of right, or cause of action released, waived or assigned herein; provided, however, that the Century Entities have previously disclosed that Century Indemnity Company, is successor to CCI Insurance Company, which is successor to Insurance Company of North America.  Century Indemnity Company further represents and warrants that it is authorized to purchase the interests of the Subject Policies that are being purchased and sold pursuant to this Settlement and Buyback Agreement.

H.      The Debtors represent and warrant that Congoleum Corporation (i) is the successor in interest to the entity Congoleum-Nairn Inc. named in policies XBC-1838 and XBC-40971, the entity Congoleum Corporation named in policies XCP3904 and XCP3956, the entity Congoleum Corporation named in policies XBC155083 and XCP GO 7908702, the entity Congoleum Industries, Inc. named in policies XBC-43099 and XCP3904, the entity Bath Industries, Inc. named in policies XBC-43099, XCP3904 and XCP3956, the entity Tri-State Flooring, Inc., named in policies XCP3904 and XCP3956, Congoleum Company Inc., Fibic

Corporation, and C.C. Liquidating Corp. with respect to the Congoleum Flooring Business; and, (ii) with respect to the Congoleum Flooring Business, is the sole successor in all respects with regard to coverage, and that Congoleum Corporation, as defined in Section I.K.(ii), owns the rights to coverage under the Subject Policies identified on Exhibit C as may ever have been held by such entities with and in all respects to the Congoleum Flooring Business.

       I.     The Debtors represent and warrant that Relax-o-Lounger, Inc., Kinder Manufacturing Company, Inc., Lewis Carpet Mills, Inc., Lewis Carpet Mills, Inc., Pennsylvania Crusher Corporation, Mersman Brothers Division, Webb Furniture Corporation, Coronet Manufacturing Co., Inc., Howard Parlor Furniture Co., Howard Parlor Furniture Co. of Texas, Inc., Howard Frame Co., Edson, Incorporated, J. Isenberg & Son, Inc. and Bath Iron Works Corp. have no responsibility for any of the liabilities of the Congoleum Flooring Business.

       J.     Other than any pending or threatened Claims by Debtors against the Century Entities under the Subject Policies, Century Indemnity Company represents and warrants which representation and warranty is based solely upon an inquiry performed by its employees and the employees of Resolute Management, Inc. involved in the Coverage Action and in the negotiation, documentation and execution of this Settlement and Buyback Agreement and their counsel involved in the Coverage Action and in the negotiation, documentation and execution of this Settlement and Buyback Agreement, that they are aware of no pending Claims against any Century Entity by others that would be released by Section VI or barred by an injunction contemplated and provided for by this Settlement and Buyback Agreement**.**

       K.     The Debtors represent and warrant that the flooring operations of the Congoleum Entities to which they succeeded, including the manufacture, sale, distribution, installation, formulation, marketing, transport, handling or any other activity involving in any way flooring, vinyl sheeting flooring or floor tile products of any kind, were headquartered in Kearney, New Jersey, continuously from before 1965 to 1987.

## XII.     <u>NO PREJUDICE AND CONSTRUCTION OF AGREEMENT</u>

       A.     This Settlement and Buyback Agreement is the product of informed negotiations and involves compromises of the Parties' legal positions.  This Settlement and Buyback Agreement is without prejudice to positions taken by the Parties with regard to other insureds or to other insurers.  This Settlement and Buyback Agreement is the jointly drafted product of arm's length negotiations between the Parties with the benefit of advice from counsel, and the Parties agree that it shall be so construed.  As such, no Party will claim that any ambiguity in this Settlement and Buyback Agreement shall be construed against any other Party by reason of the identity of the drafter.

       B.     The negotiation, execution and performance of this Settlement and Buyback Agreement shall not be deemed to be or cited as an act of bad faith or a violation of any statute, regulation, contract or duty owed by any Party to any other Party.

       C.     In the event that any stand down, release, injunction, injunctive protection, covenant not to sue, bar or defense against, any Claim that is granted under this Settlement and Buyback Agreement is not upheld by a court of competent jurisdiction, the terms of such stand

down, release, injunction, injunctive protection, covenant not to sue, bar or defense shall be enforceable to the fullest extent permitted by applicable law.

## XIII.    ENTIRE AGREEMENT AND TERM

A.    This Settlement and Buyback Agreement expresses the entire agreement and understanding between and among the Parties.  Except as expressly set forth in this Settlement and Buyback Agreement, there are no representations, warranties, promises or inducements, whether oral, written, expressed or implied, that in any way affect or condition the validity of this Settlement and Buyback Agreement or alter its terms.  If the facts or law related to the subject matter of this Settlement and Buyback Agreement are found hereafter to be other than is now believed by any of the Parties, the Parties expressly accept and assume the risk of such possible difference of fact or law and agree that this Settlement and Buyback Agreement nonetheless shall be and remain effective according to its terms.  This Settlement and Buyback Agreement shall be binding on, and inure to the benefit of, the Parties and their respective successors and assigns in their respective capacities as such.  This Settlement and Buyback Agreement shall have perpetual existence, except as expressly provided herein.

B.    Titles and captions contained in this Settlement and Buyback Agreement are inserted only as a matter of convenience and are for reference purposes only.  Such titles and captions are intended in no way to define, limit, expand, or describe the scope of this Settlement and Buyback Agreement or the intent of any provision hereof.

## XIV.    NO MODIFICATION

No change, amendment, variation or modification of the terms of this Settlement and Buyback Agreement shall be valid unless it is made in writing and signed the Debtors, and Century Indemnity Company.  In the event that any such Person is dissolved following the Execution Date, the remaining Persons may modify this Settlement and Buyback Agreement without that Person's consent.  After the Plan Effective Date, any change, amendment, variation, or modification of the terms of this Settlement and Buyback Agreement will also require the consent of the Plan Trust.

## XV.    EXECUTION

This Settlement and Buyback Agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.  Each counterpart may be delivered by facsimile transmission, and a faxed signature shall have the same force and effect as an original signature.

## XVI.    NOTICES

Any and all statements, communications, or notices to be provided pursuant to this Settlement and Buyback Agreement shall be in writing and sent by facsimile or by first-class mail, postage prepaid.  Such notices shall be sent to the individuals noted below, or to such other individuals as each Party may designate in writing from time to time:

**IF TO CONGOLEUM CORPORATION OR TO ANY
OTHER CONGOLEUM ENTITY:**

Howard N. Feist III
Congoleum Corporation
57 River Street
Wellesley, MA  02481-2097
Phone: (781) 237-6655
Fax:    (781) 237-6880
e-mail:  sfeist@alumni.princeton.edu

With a copy to:

Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, NY  10036-4039
Attn:    Richard L. Epling, Esq.
         Kerry A. Brennan, Esq.
Phone: (212) 858-1000
Fax:    (212) 858-1500
e-mail: richard.epling@pillsburylaw.com
        kerry.brennan@pillsburylaw.com

Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC  20004-2401
Attn:    Mitchell F. Dolin, Esq.
         Michael St. Patrick Baxter, Esq.
Phone: (202) 662-5210
Fax:    (202) 662-6291
e-mail: mdolin@cov.com
        mbaxter@cov.com

**IF TO THE PLAN TRUST:**

Plan Trustee
Contact information to be supplied by the Plan Trust

**IF TO THE CENTURY ENTITIES:**

Resolute Management, Inc.
United Plaza
30 South 17th Street
Suite 700
Philadelphia, PA 19103
Attn:    Mark Muth, Esq.
Phone: (267) 765-6413
Fax:    (267) 765-6414

e-mail:  mark.muth@resolute-midatlantic.com

Century Indemnity Company
30 South 17th Street, 7th Floor
Philadelphia, PA 19103
Attn :  Christopher Eskeland
Phone: (267) 765-3794
e-mail: Christopher.Eskeland@ace-ina.com

## XVII.    <u>NEGOTIATION PRIVILEGE</u>

All communications, negotiations and/or discussions leading up to the execution of this Settlement and Buyback Agreement and all related communications, negotiations and/or discussions shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions.  The Parties agree that any and all such communications, negotiations and/or discussions shall remain confidential, inadmissible and not subject to discovery.

## XVIII.    <u>LEGISLATIVE CONTINGENCY PROVISION</u>

A.    In the event Asbestos Fund Legislation is enacted and the Asbestos Fund Legislation Effective Date is on or before February 15, 2008, then on and after the Asbestos Fund Legislation Effective Date, Century Indemnity Company shall have no obligation to make payment of any unpaid amount not yet due and owing under this Settlement and Buyback Agreement (the "Unpaid Amount") so long as the Century Entities are assessed and do in fact make a payment and/or contribution to the Asbestos Fund (the "Asbestos Fund Payment") that is greater than the Unpaid Amount and is based, at least in part, upon (1) past payments for defense and indemnity costs for asbestos-related bodily injury claims made by the Century Entities pursuant to liability policies of insurance issued by the Century Entities; (2) historic premium charged by the Century Entities for lines of liability insurance that have sustained losses for asbestos-related bodily injury claims; (3) amounts reserved by the Century Entities for the asbestos exposure of their insureds; or (4) the estimated cost to the Century Entities for their future liability for asbestos-related bodily injury claims under liability insurance policies issued to the insureds of the Century Entities, including the Congoleum Entities.  Even if the contingencies of the previous sentence are met, Century Indemnity Company shall nonetheless have an obligation to pay the Unpaid Amount if and in the dollar amount that the Century Entities are entitled to receive a credit or set-off pursuant to the Asbestos Fund Legislation that diminishes the Asbestos Fund Payment, which credit or set-off is permitted in recognition of the obligation of the Century Entities under this Settlement and Buyback Agreement to pay towards the Unpaid Amount.  For the avoidance of doubt, the amount that Century Indemnity Company would be obligated to pay towards the Unpaid Amount in the foregoing sentence would be equal to the dollar amount of the credit or set-off permitted to the Century Entities in respect of this Settlement and Buyback Agreement.  This Section XVIII shall have no effect on the release provisions of Section VI.

B.      The Century Entities shall not be required to pay any amount that any Congoleum Entity will be required to pay (or does in fact pay) to the Asbestos Fund other than provided in Section XVIII.A.

C.      Definitions

"**Asbestos Fund**" means a fund, trust or other similar mechanism created by Asbestos Fund Legislation.

"**Asbestos Fund Legislation**" means any legislation enacted by the United States Congress and signed by the President of the United States, or that becomes law without the President's signature, that establishes a fund, trust, or other similar mechanism that has the effect of providing for resolution of substantially all of the asbestos-related bodily injury claims that are pending or, in the absence of the Asbestos Fund Legislation, could have been filed in the state or federal courts.  The term "Asbestos Fund Legislation" is intended to encompass what is commonly understood to be "asbestos reform" legislation and is not intended to encompass general tort reform, class action reform, malpractice reform, or tax reform, or any other legislation that would regulate, limit or control Claims without regard to whether such Claims arise from or are attributable to exposure to asbestos or asbestos-containing products.  For the avoidance of doubt, the fact that legislation alters or modifies the requirements or standards for establishing liability against the Debtors and/or the Plan Trust (including legislation that imposes medical and/or exposure criteria, imposes strict liability on the Debtors and/or the Plan Trust, or regulates or limits the jurisdiction or forum in which asbestos-related bodily injury claims may be brought) without also creating a fund to pay for such Claims is not "Asbestos Fund Legislation" under this Section XVIII.C.

"**Asbestos Fund Legislation Effective Date**" means the date on which Asbestos Fund Legislation is signed by the President of the United States or becomes law without the President's signature.

D.      In the event that the Bankruptcy Court denies the Debtors' motion seeking approval of its settlement with St. Paul Travelers or an alternative settlement agreement is approved by the Court, the Asbestos Fund Legislation Effective Date in this Agreement shall be reset at either the date the Confirmation Order becomes a Final Order or the date selected for the Asbestos Fund Legislation Effective Date in the alternative St. Paul Travelers settlement that is approved, if any, whichever is later.

# XIX.      **ADMINISTRATIVE TERMS**

A.      After the Confirmation Order becomes a Final Order, the Trust shall cooperate, at the sole expense of the Century Entities, in the Century Entities' reasonable requests for information as follows:  the Century Entities shall have the right, at their own expense, upon reasonable request and notice, at a time and place convenient to the responding Trust, to review any Claims or payments funded in whole or in part by the proceeds of this Settlement and Buyback Agreement.  Neither the Trust nor any trustee shall have any obligation to create any new documents or to collect any information in connection with any such review beyond those ordinarily created or maintained by the Trust, as applicable, and the Century Entities shall not be

permitted to challenge the allowance or payment of the Claims by the Trusts, as applicable, or any administrative payments or costs of the Trust, as applicable.  This Section XIX, and any results of such a review contemplated hereunder, shall not affect the Century Entities' payment obligations under this Settlement and Buyback Agreement.  The Century Entities shall not provide any results of such review to any other entity and shall keep any and all such results confidential, except that the Century Entities may provide such results to any of their auditors, tax consultants, regulators, or reinsurers for the purpose of obtaining reinsurance for any portion of the Settlement Agreement and Buyback Amount, or complying with applicable regulations, provided that the Century Entities shall inform such parties that the review and/or audit results and information contained therein are confidential, and use reasonable efforts to obtain a commitment from such parties to maintain the confidentiality of the information.

B.      The Century Entities have the right to allocate unilaterally the Settlement and Buyback Amount to the Subject Policies for their own purposes.  Any allocation of the Settlement and Buyback Amount to any of the Subject Policies is not intended to be, nor shall be interpreted as or deemed to be, an acknowledgment or concession that coverage exists or existed under the Subject Policies or binding upon the Century Entities or the Congoleum Entities.

C.      Congoleum agrees to cooperate with the Century Entities after the Trigger Date in connection with their seeking any reinsurance by maintaining and providing upon reasonable request documents which may be needed in the pursuit of such reinsurance.

## XX.      **MISCELLANEOUS**

The Parties shall execute such instruments, agreements or other documents and take such further actions as may be reasonably required to carry out the provisions of this Settlement and Buyback Agreement and the transactions contemplated hereby.

[The remainder of this page is left blank intentionally.]

IN WITNESS WHEREOF, this Settlement and Buyback Agreement, consisting of 30 pages, including the signature page and Exhibits A through F, has been read and signed by the duly authorized representatives of the Parties on the dates set.

August _17_, 2006

**CONGOLEUM CORPORATION, CONGOLEUM SALES, INC. and CONGOLEUM FISCAL, INC. (on behalf of all of the Congoleum Entities)**

By: _____

Name: _HOWARD N. FEIST_

Title: _CFO_

August __, 2006

**CENTURY INDEMNITY COMPANY** (individually and as successor to CCI Insurance Company, as successor to Insurance Company of North America) **(on behalf of all of the Century Entities)**

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, this Settlement and Buyback Agreement, consisting of 30 pages, including the signature page and Exhibits A through F, has been read and signed by the duly authorized representatives of the Parties on the dates set.

August __, 2006

**CONGOLEUM CORPORATION, CONGOLEUM SALES, INC. and CONGOLEUM FISCAL, INC. (on behalf of all of the Congoleum Entities)**

By: _____
    Name: _____
    Title: _____

August 17, 2006

**CENTURY INDEMNITY COMPANY** (individually and as successor to CCI Insurance Company, as successor to Insurance Company of North America) **(on behalf of all of the Century Entities)**

By: _____
    Name: _Christopher J. Eskeland_
    Title: _President_

**Exhibits to**

**Settlement and Policy Buyback Agreement and Release**

<u>Ex.</u>      <u>Description</u>

A        Proposed Form of Order Approving Settlement

B        List Referenced in Section I.G

C        List of Subject Policies Referenced in Section XI.A

D.       Policies that do not insure the Congoleum Flooring Business Referenced in Section VI.L

E.       Excluded Policies Allegedly Issued By Other Non-Century Insurers Referenced in Section I.Y

F.       List of Policies that do not provide Coverage to Congoleum for Asbestos Related Claims Referenced in Section I.Y

**SETTLEMENT AND BUYBACK AGREEMENT EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>CONGOLEUM CORPORATION, *et al.*,<br><br>Debtors. | Case No. 03-51524 (KCF)<br><u>Jointly Administered</u><br><br>Chapter 11 |

**ORDER PURSUANT TO SECTIONS 105, 363, 1107 AND 1108 OF THE BANKRUPTCY CODE AND RULES 2002, 6004, 9014 AND 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (I) AUTHORIZING DEBTOR TO ENTER INTO A SETTLEMENT AND COMPROMISE OF CERTAIN CLAIMS, (II) APPROVING SALE OF CERTAIN INSURANCE POLICIES FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND OTHER  ENCUMBRANCES, AND (III) APPROVING THE SETTLEMENT AND BUYBACK AGREEMENT AND RELEASES BY AND BETWEEN <u>THE CONGOLEUM ENTITIES AND THE CENTURY ENTITIES</u>**

The relief set forth on the following pages, numbered two (2) through nineteen (17) is hereby **ORDERED.**

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century
Entities

This matter came before the Court on the Motion for Order Approving Settlement and

Policy Buyback Agreement and Release with the Century Entities, *et al.* (the "*Motion*"), filed by

Congoleum Corp., Congoleum Sales, Inc., and Congoleum Fiscal, Inc., the debtors and debtors-

in-possession herein (the "*Debtors*"), seeking approval of the Settlement and Policy Buyback

Agreement and Release, dated as of August 8, 2006 (attached hereto as Exhibit 1 and as it may

be amended, supplemented or otherwise modified from time to time in writing, the "*Settlement*

*and Buyback Agreement*"), and the settlements, releases, compromises and policy buyback

contained therein pursuant to Bankruptcy Code Sections 105, 363, 1107 and 1108 and Rules

2002, 6004, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy*

*Rules*").  All capitalized terms not otherwise defined herein shall have the meaning ascribed to

such terms in the Settlement and Buyback Agreement.  Capitalized terms that are not defined in

this Approval Order or in the Settlement and Buyback Agreement are given the meanings

designated in the Eighth Modified Joint Plan of Reorganization, dated as of March 17, 2006.

Adequate notice of the Motion and of the hearing on the Motion was given by mailing, or

emailing in the case of the Master E-Mail service list defined below, a copy of the Motion and

notice of the hearing on the Motion to:  (a) the "Core Service List" and the "Master Service

List," each as defined in the Order Establishing Case Management and Administrative

Procedures, dated February 25, 2004, and the "Master E-Mail Service List," as defined in the

Order (1) Amending The Order Establishing Case Management and Administrative Procedures

Entered On February 25, 2004 And The Order Establishing Procedures For Interim

Compensation And Reimbursement Of Expenses Of Professionals Entered On February 10, 2004

And (2) Allowing Notice By E-Mail And Establishing Procedures Therefor, dated September 6,

2

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century
Entities

2005; (b) the Claimants' Representative; (c) the Office of the United States Trustee; (d) the FCR

and counsel to the FCR; (e) counsel to the members of the ACC and the ACC's counsel; (f)

parties who have filed a notice of appearance in these Chapter 11 Cases; (g) the Collateral

Trustee (the "Collateral Trustee") of the Congoleum Collateral Trust (the "Collateral Trust")

established pursuant to a Collateral Trust Agreement dated April 16, 2003; (h) ABI and counsel

to ABI; (i) counsel to all known holders of Asbestos Claims as reflected in the Rule 2019

Statements filed in these Chapter 11 Cases, claims submitted in connection with the Settlement

Between Congoleum Corporation and Various Asbestos Claimants attached as Exhibit E to the

Disclosure Statement with respect to the Plan (the "Claimant Agreement"), or ballots submitted

in connection with these Chapter 11 Cases; (j) all known holders of Asbestos Claims whose

counsel is not included within the preceding clause who, as of at least ten (10) Business Days

prior to the Hearing, became known through filing of a proof of claim; and (k) the members of

the Bondholders' Committee and counsel to such Committee and such other Persons as are listed

on the Certificate of Service filed by the Debtors.

Further, notice of the motion and this hearing was made by publication in the national

and international editions of *USA Today* and such publication notice, together with the notices

described in the preceding paragraph, are adequate and reasonable under the circumstances and

no other or further notice is required or need be sent.

A hearing on the Motion was held on September 11, 2006 (the "Approval Hearing"), to

consider approval of the Settlement and Buyback Agreement and all interested parties were

given an opportunity to be heard and to present evidence and object to the Motion.  Based upon

the record of the Approval Hearing and of these Chapter 11 Cases, the Court having reviewed

NY1:1653568.26

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century Entities

the Motion and determined that the relief requested in the Motion is in the best interests of the

Debtors, its estate, its creditors and other parties in interest, and after due deliberation thereon,

and good and sufficient cause appearing therefor:

The Court hereby FINDS[1] that:

A.    This Court has jurisdiction to hear and determine the Motion pursuant to

28 U.S.C. §§ 157 and 1334.  This Motion presents a core proceeding pursuant to 28 U.S.C.

§§ 157(b)(2)(A), (N) and (O).  Venue in this District is proper under 28 U.S.C. §§ 1408 and

1409.

B.    The notice of the Motion, the deadline to object to the Motion, and the

hearing on the Motion described above constitutes due, sufficient and timely notice to all persons

entitled thereto in accordance with the requirements of the Bankruptcy Code, the Bankruptcy

Rules and the local rules for the U.S. District Court for the District of New Jersey and the

Bankruptcy Court, and of due process.  No other or further notice of the Motion, the hearing on

the Motion, or the request for entry of this Approval Order, is or shall be required.  This Court

hereby further finds that notice to an attorney for the holder of an Asbestos Claim constitutes

notice to such holder for purposes of notice of the Motion, the Approval Hearing, the Settlement

and Buyback Agreement, and the Approval Order.

C.    This Approval Order is "final" within the meaning of 28 U.S.C.

§ 158(a)(1).

D.    A reasonable opportunity to object or be heard with respect to the motion

and the relief requested therein has been afforded to all parties in interest.  To the extent that any

---

[1] Findings of fact shall be construed as conclusions of law and conclusions of law as findings of fact when appropriate in accordance with Bankruptcy Rule 7052.

4

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century Entities

Person (i) either (a) received proper notice of these matters (or is represented by a Person, including, without limitation, the FCR or counsel, that received such notice) or (b) having had notice of these Chapter 11 Cases, elected not to request notices regarding these Chapter 11 Cases, and (ii) failed to object to the Motion and the entry of this Approval Order, then such Persons, including without limitation, the Debtors and the Plan Trust (or, to the extent that it has not yet been formed or does not yet exist, its predecessor(s) in interest), the FCR, the Claimants' Representatives and the ACC, hereby shall have no right to file or prosecute an appeal of this Approval Order.

   E. The Congoleum Entities and the Century Entities negotiated at arm's length and in good faith to reach a settlement on the matters resolved through the Settlement and Buyback Agreement.

   F. The Subject Policies are property of the Debtors' estates, and this Court has the jurisdiction and power to approve the Settlement and Buyback Agreement and the compromises and releases contained therein.

   G. The Debtors have due and proper corporate authority to enter into the Settlement and Buyback Agreement and perform all of their obligations thereunder.  No consents or approvals, other than this Approval Order, are required for the Debtors to perform all of their obligations thereunder, including the sale and transfer of the Subject Policies.  The consummation of the Settlement and Buyback Agreement by the Debtors and the Plan Trust does not conflict, contravene, or cause a breach, default or violation of any law, rule, regulation, contractual obligation or organizational or formation document.

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century
Entities

       H.     The compromises contained in the Settlement and Buyback Agreement are

a valid and proper exercise of the reasonable business judgment of the Congoleum Entities and

represent an exchange for reasonably equivalent value.  The releases to be made by the

Congoleum Entities pursuant to Section VI of the Settlement and Buyback Agreement are

appropriate and should be approved.  The Century Entities would not have entered into the

Settlement and Buyback Agreement or any of the compromises and settlements contained

therein, or agreed to pay the Settlement and Buyback Amount, without the benefit of obtaining

the releases contained in the Settlement and Buyback Agreement and the injunctions contained

or to be contained in the Plan and the Confirmation Order and in this Approval Order.

       I.     The Settlement and Buyback Agreement results in substantial benefits to

the Debtors' estate and holders of Claims, including Asbestos Claims, by (i) settling complex

litigation; and (ii) receiving payment of the Settlement and Buyback Amount from the Century

Entities for the benefit of the estate and holders of Asbestos Claims.  The Settlement and

Buyback Agreement is fair and equitable with respect to the Debtors and the Plan Trust and the

persons who have asserted, and who might subsequently assert, Claims, including Asbestos

Claims, against the Debtors and/or the Plan Trust and/or the Century Entities and/or the Subject

Policies.

       J.     Each of the following factors has been taken into account by the Parties in

reaching the compromises embodied in the Settlement and Buyback Agreement, and each factor

supports approval of the Settlement and Buyback Agreement and the entry of this Approval

Order pursuant to Bankruptcy Rule 9019:

NY1:1653568.26

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century Entities

(a)       the probability of success in the litigation of the claims between the Debtors and the Century Entities, including the ranges of recoverable damages;

(b)       the likelihood that even if the Debtors were successful in the Coverage Action, the Century Entities would exhaust their appellate rights thereby delaying collection of any judgment;

(c)       the complexity of the litigation between the Debtors and the Century Entities, and the expense, inconvenience and delay necessarily attending it;

(d)       the paramount interest of creditors and proper deference to their reasonable views regarding the Settlement and Buyback Agreement; and

(e)       whether the conclusion of the litigation promotes the integrity of the judicial system.

K.       Furthermore, the Debtors have demonstrated that the probability of success for the Debtors in litigation over the matters resolved by the Settlement and Buyback Agreement, including without limitation issues related to the Coverage Action, is uncertain; that the litigation of the matters resolved by the Settlement and Buyback Agreement would be complex, costly to the estate, and would delay the Debtors' reorganization under Chapter 11; and that the entry into the Settlement and Buyback Agreement is necessary and appropriate to assist the Debtors' reorganization and is in the best interests of the Debtors, their estates and the Debtors' creditors, including, without limitation, the persons who have asserted, and who might subsequently assert, Claims, including Asbestos Claims, against the Debtors, the Plan Trust, the Century Entities and/or the Subject Policies, and all parties in interest, because, among other

7

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century
Entities

reasons, of the Settlement and Buyback Amount that Century Indemnity Company will pay  to

the Trust.

   L.  Considering all of the factors set forth in *In re Martin*, 91 F.3d 389, 393

(3d Cir. 1996), as discussed in the Motion, the provisions and conditions of the Settlement and

Buyback Agreement are in the best interests of the Debtors, their estates, their creditors, holders

of Demands, the Plan Trust, and all other parties in interest.  The Debtors have demonstrated

good, sufficient and sound business purposes, causes and justifications for the relief requested in

the Motion and the approval of the transactions contemplated thereby.

   M.  The terms of the compromise and exchanges of consideration, as set forth

in the Settlement and Buyback Agreement, including, without limitation, the sale of the Subject

Policies free and clear of any and all Interests: (i) are in the best interests of the Congoleum

Entities, including the Debtors, their respective estates and all of their respective creditors and

other parties in interest; and (ii) are entered into in good faith.  Neither the Debtors nor the

Century Entities have engaged in any conduct that would cause or permit the Settlement and

Buyback Agreement to be avoided under Section 363(n) of the Bankruptcy Code.  The Century

Entities are not "insiders" as that term is defined in Section 101(31) of the Bankruptcy Code.

   N.  Pursuant to Sections 105 and 363  of the Bankruptcy Code, the sale of the

Subject Policies free and clear of any Interest is permitted, and the issuance of the channeling

injunction effective upon the First Payment Date, permanently enjoining the prosecution,

continuation or commencement of any Claim by any Person who has asserted, and who might

subsequently assert, Claims, including Plan Trust Asbestos Claims, against the Century Entities

relating to or arising out of the Subject Policies, is and will be proper, and that no such Claim can

8

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century Entities

be asserted against any of the Century Entities.  See, e.g., MacArthur Co. v. Johns-Manville

Corp., 837 F.2d 89, 93 (2nd Cir. 1988).  The interests of creditors will be protected in that the

Settlement and Buyback Amount will be paid to the Trust.

      O.      Neither the Settlement and Buyback Agreement, nor the transactions

contemplated thereby, are subject to avoidance under Section 363(n) of the Bankruptcy Code.

Neither the Debtors, the Century Entities, nor any of their representatives, has engaged in any

conduct that would cause or permit the Settlement and Buyback Agreement, or the sale of the

Subject Policies contemplated therein, to be avoided under Section 363(n) of the Bankruptcy

Code or that would prevent the application of Section 363(m) of the Bankruptcy Code.

      P.      Century Indemnity Company is a good faith purchaser within the meaning

of Section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections

afforded thereby.  The Century Entities, including Century Indemnity Company, have acted and

will be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in

effecting the buyback of the Subject Policies contemplated by the Settlement and Buyback

Agreement at all times after the entry of this Approval Order.

      Q.      The terms and conditions of the Settlement and Buyback Agreement and

the Settlement and Buyback Amount to be paid to the Plan Trust, or as otherwise directed by the

Court consistent with the terms of the Settlement and Buyback Agreement, on behalf of the

Century Entities (i) are fair and reasonable; (ii) constitute reasonably equivalent value and fair

consideration for the Subject Policies; and (iii) are within the range of reasonableness required

for approval of the Settlement and Buyback Agreement under the Bankruptcy Code and

applicable law.  The sale of the Subject Policies to Century Indemnity Company under the

9

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century
Entities

Settlement and Buyback Agreement will constitute transfers for reasonably equivalent value

under Section 548 of the Bankruptcy Code and comparable provisions of non-bankruptcy law.

      R.      The sale and transfer of the Subject Policies will (i) be a legal, valid, and

effective transfer of all of the rights and interests in and to the Subject Policies to the Century

Entities and (ii) vest the Century Entities with good title to, and all of the rights and interests in

and to, the Subject Policies free and clear of all Claims, Liens, encumbrances and interests of any

kind or nature whatsoever because the standards set forth in Sections 363(f)(1), (f)(2) and (f)(5)

of the Bankruptcy Code have been satisfied.  Any and all non-debtor holders of Claims, Liens,

encumbrances and/or interests of any kind or nature whatsoever in the Subject Policies, if any,

who did not object to the Motion and to the sale and transfer of the Subject Policies, or who

withdrew their objections, are deemed to have consented pursuant to Section 363(f)(2) of the

Bankruptcy Code.  Any holder of a Secured Claim or Asbestos Secured Claim who did object to

the Motion falls within Sections 363(f)(1) or 363(f)(5) of the Bankruptcy Code and is adequately

protected by having its interests, if any, attach to the Settlement and Buyback Amount.

      S.      Consummation of the sale of the Subject Policies will not subject the

Century Entities to any debts, liabilities, obligations or Claims of any kind or nature whatsoever,

whether known or unknown, contingent or otherwise, existing as of the date hereof or hereafter

arising, of or against the Debtors, the other Congoleum Entities or any other Person by reason of

such sale of the Subject Policies, including, without limitation, based on any theory of successor

or transferee liability.

      T.      By entering into the Settlement and Buyback Agreement, the Congoleum

Entities and the Century Entities have compromised their positions and have not admitted to or

10

Debtor: Congoleum Corp., *et al.*

Case No: 03-51524

Caption: Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century Entities

waived any legal, factual or other positions with respect to the Coverage Action, or other disputes between the Congoleum Entities and the Century Entities, the Subject Policies, the insurance relationship between the Congoleum Entities and the Century Entities, or any other matters.

   U. The Settlement Agreement is an Asbestos Insurance Settlement Agreement.

   NOW, THEREFORE, pursuant to Bankruptcy Code Sections 105(a), 363(b) and (f), 1107 and 1108 and Bankruptcy Rules 2002, 6004, 9014 and 9019(a), IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

   1. The Motion shall be and hereby is GRANTED in all respects, and the Settlement and Buyback Agreement is hereby approved in all respects. For the reasons set forth herein and on the record at the hearing on the Motion, all objections that have not been withdrawn, resolved, waived or settled are hereby overruled on the merits and all reservations of rights included therein, are overruled on the merits.

   2. The failure specifically to include or reference any particular term or provision of the Settlement and Buyback Agreement in this Approval Order shall not diminish or impair the effectiveness of such term and provision, it being the intent of the Court that the Settlement and Buyback Agreement be authorized and approved in its entirety.

   3. The terms and provisions of the Settlement and Buyback Agreement, together with the terms and provisions of this Approval Order, shall be binding in all respects upon all Entities, including each of the Debtors, their respective Estates, any and all Chapter 7 and Chapter 11 trustees thereof, the Plan Trust, the Plan Trustee, the FCR and each of the Entities

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century Entities

whose interests he represents, the Collateral Trust, the Collateral Trustee, the Claimants'

Representatives and the Persons who have asserted, and who might subsequently assert, Claims,

including Asbestos Claims, against the Debtors, the Plan Trust, the Century Entities and/or the

Subject Policies, the Debtors' other creditors, shareholders of any of the Debtors, all Persons

claiming an interest under or in the Subject Policies, and all interested parties, administrative

agencies, governmental units, federal, state and local officials maintaining any authority with

respect to the Settlement and Buyback Amount, and their respective successors and assigns.

4.    The Debtors are hereby authorized, empowered and directed to take all necessary

and appropriate acts to carry out and implement the Settlement and Buyback Agreement in

accordance with its terms without further order of the Court, including designating the Century

Entities as Settling Asbestos Insurance Companies and Protected Parties in the Confirmation

Order, and after the Effective Date of the Plan occurs, treating the Century Entities as Settling

Asbestos Insurance Companies and Protected Parties under the Plan for all purposes in these

Chapter 11 Cases.  The designation of the Century Entities as Settling Asbestos Insurance

Companies shall entitle the Century Entities to the rights and benefits afforded to Settling

Asbestos Insurance Companies under the Plan, including the rights and benefits of the Asbestos

Channeling Injunction and any other Section 105 and 524(g) injunctions granted under the Plan

and the Confirmation Order with respect to all Claims, including all Plan Trust Asbestos Claims.

5.    The Settlement and Buyback Agreement and this Approval Order constitute valid

and binding obligations of the Debtors, their Estates and the Plan Trust, which shall be

enforceable in accordance with the terms thereof and shall be binding on the Debtors and their

Estates, and any and all successors to and assigns of the Debtors, including the Plan Trust, any

12

Debtor: Congoleum Corp., *et al.*

Case No: 03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century Entities

Plan Trustee appointed in these Chapter 11 Cases or any other case or proceeding, and all present

and future holders of Claims, including without limitation, Plan Trust Asbestos Claims and

Demands and any Person who has asserted, and who might subsequently assert, Claims,

including Asbestos Claims, against the Debtors, the Plan Trust, the Century Entities and/or the

Subject Policies, and all other parties in interest, as set forth in the Settlement and Buyback

Agreement.  The Confirmation Order and the Plan Trust Agreement shall include as an

obligation of the Plan Trust, effective from the creation of the Plan Trust, that such trust shall be

subject to and bound by the Settlement and Buyback Agreement and the Approval Order.  Upon

its creation, the Plan Trust, without further order of any court or action by any Entity, shall be

automatically deemed to be  a party to the Settlement and Buyback Agreement.

　　　　6.　　　The releases contained in Section VI of the Settlement and Buyback Agreement

are hereby approved in all respects and shall be effective in accordance with the terms of the

Settlement and Buyback Agreement.  All Claims released pursuant to the Settlement and

Buyback Agreement shall be deemed dismissed and forever released as of the First Payment

Date.

　　　　7.　　　Pursuant to Section 363(b) of the Bankruptcy Code, the Debtors and the Century

Entities are further authorized to consummate the provisions of the Settlement and Buyback

Agreement that concern the sale, transfer and conveyance of the Subject Policies, free and clear

of any Interests to Century Indemnity Company, in accordance with the terms and subject only to

the conditions specified herein and in the Settlement and Buyback Agreement.

　　　　8.　　　Accordingly, pursuant to Sections 105(a) and 363(b) and (f) of the Bankruptcy

Code, upon the First Payment Date the Debtors will sell, transfer and convey, and will be

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century
Entities

deemed to have sold, transferred and conveyed, the Subject Policies to Century Indemnity

Company free and clear of all Claims, liens, encumbrances and interests of any kind or nature

whatsoever, including without limitation any Claims for contribution, indemnity or other liability

under the Subject Policies against any of the Century Entities, whether arising prior to, during, or

subsequent to the Bankruptcy Case.  The sale, transfer and conveyance of these rights and

interest shall constitute a legal, valid and effective transfer of the Subject Policies.

9.      The transactions contemplated by the Settlement and Buyback Agreement

including, without limitation the sale of the Subject Policies to Century Indemnity Company free

and clear of all Interests, are undertaken by the Century Entities in good faith, as that term is

used in Section 363(m) of the Bankruptcy Code.  Century Indemnity Company shall be deemed a

"good faith, purchaser" under Section 363(m) of the Bankruptcy Code of the rights and interests

in the Subject Policies and all of the Century Entities are entitled to the protection provided by

such designation without further order of this Court.  Accordingly, effective upon the First

Payment Date but subject to the satisfaction of the conditions precedent to the Trigger Date, in

addition to the injunctions granted under the Plan and the Confirmation Order that will protect

the Century Entities as Settling Asbestos Insurance Companies, all Persons and Entities shall be

hereby forever enjoined, barred and estopped from asserting any Claims, liens, encumbrances or

interests of any kind or nature with respect to the Subject Policies against the Century Entities

and their respective property and assets, including the Subject Policies.

10.      The reversal or modification on appeal of the authorization to consummate the

sale of the Subject Policies and the transactions contemplated by the Settlement and Buyback

Agreement shall not affect the validity of the sale of the Subject Policies to Century Indemnity

14

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century
Entities

Company or the other transactions contemplated by the Settlement and Buyback Agreement,
unless such authorization is duly stayed pending such appeal.

11.    The Century Entities are not, and shall not be deemed to be, successors to the
Debtors and/or their respective bankruptcy estates by reason of any theory of law or equity as a
result of consummation of the transactions provided in the Settlement and Buyback Agreement
or otherwise.  None of the Century Entities shall assume any liabilities of the Debtors or their
estates by virtue of having entered into the Settlement and Buyback Agreement.  Except to
enforce or for breach of the Settlement and Buyback Agreement, the transfer of the Subject
Policies to Century Indemnity Company pursuant to the Agreement does not and will not subject
or expose any of the Century Entities to any liability, claim, cause of action or remedy.

12.    The Century Entities are not obligated to perform under the Settlement and
Buyback Agreement and/or the Settlement and Buyback Agreement shall become null and void,
except for Sections I, IV.H, V, IX, XII, XVI and XVII (which Sections shall remain in full force
and effect) if, among other things, any of the provisions of a plan of reorganization proposed or
filed by the Debtors are inconsistent with the rights and benefits provided to the Century Entities
under the Settlement and Buyback Agreement and/or with the duties and obligations of, and
releases provided by, the Congoleum Entities under the Settlement and Buyback Agreement
and/or otherwise would have a material adverse effect on the interests of the Century Entities
under the Settlement and Buyback Agreement.  This Order and Settlement and Buyback
Agreement will be deemed part of any plan of reorganization for the Debtors and shall be
incorporated by reference as if set forth in full.  No part of any plan offered by the Debtors shall
be interpreted in a manner inconsistent with this Order and Settlement and Buyback Agreement.

15

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century
Entities

13.     The Plan, in furtherance of the sale, transfer and conveyance of the Subject

Policies to Century Indemnity Company, free and clear of all Interests, shall provide for, as of

the Effective Date, the establishment of the Trust and the effectiveness of the Channeling

Injunction in favor of the Century Entities, and the other benefits and protections provided for in

the Settlement and Buyback Agreement.  In addition, to the extent that any such Plan or other

order approving an insurer settlement provides for any additional release, injunction, injunctive

protection, covenant not to sue, bar or defense against, from or on any Claim of any Person that

may be granted pursuant to the Plan and/or other order to any other insurer that settles with the

Debtors, the Century Entities shall be entitled to the full protection, covenant, bar or defense.

14.     This Court shall retain jurisdiction to enforce this Approval Order and to decide

any disputes arising with respect to the sale, transfer or conveyance of the Subject Policies, the

Settlement and Buyback Agreement and the transactions contemplated therein, and the terms and

conditions of this Order.  Such jurisdiction shall be retained even if a plan of reorganization is

confirmed for the Debtors and/or the bankruptcy case is closed, and the bankruptcy case may be

reopened for such purpose.

15.     The Settlement and Buyback Agreement shall govern and control in the event of

any conflict or inconsistency between the Settlement and Buyback Agreement and the Plan or

any other plan of reorganization or liquidation or order of any type entered in (i) these

Chapter 11 Cases, (ii) any subsequent chapter 7 case into which the Chapter 11 Cases may be

converted, or (iii) any related proceeding subsequent to entry of this Approval Order.  The

provisions of this Approval Order are nonseverable and mutually dependent.

NY1:1653568.26

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century Entities

16.     Any Claims' that the Century Entities may have against ABI and its predecessors and successors and their officers, directors and employees shall be fully preserved regardless of any contrary terms that may be included in any other plan of reorganization or confirmation order.

17.     This Approval Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing and shall not be stayed under Bankruptcy Rule 6004(g).

[The remainder of page is intentionally left blank]

## SETTLEMENT AND BUYBACK AGREEMENT EXHIBIT B

## LIST REFERENCED IN SECTION I.G

ACE American Insurance Company (formerly known as CIGNA Insurance Company, formerly known as INA Underwriters Insurance Company, formerly known as Allied Insurance Company, formerly known as Allied Compensation Insurance Company)

ACE Employers Insurance Company (formerly known as CIGNA Employers Insurance Company, formerly known as INA Employers Insurance Company, formerly known as INA Farmers Insurance Company)

ACE Fire Underwriters Insurance Company (formerly known as CIGNA Fire Underwriters Insurance Company, formerly known as Aetna Fire Underwriters Insurance Company)

ACE Indemnity Insurance Company (formerly known as CIGNA Indemnity Insurance Company, formerly known as Alaska Pacific Assurance Company, formerly known as North State Insurance Company)

ACE Lloyds Insurance Company (formerly known as CIGNA Lloyds Insurance Company, formerly known as American Lloyds Insurance Company)

ACE Property & Casualty Insurance Company (formerly known as CIGNA Property & Casualty Insurance Company, formerly known as Aetna Insurance Company)

Allied Insurance Company (formerly known as California Food Industry Insurance Company)

ACE Insurance Company of Illinois (formerly known as CIGNA Insurance Company of Illinois, formerly known as INA Insurance Company of Illinois)

ACE Insurance Company of Ohio (formerly known as CIGNA Insurance Company of Ohio, formerly known as INA Insurance Company of Ohio)

ACE Insurance Company of Texas (formerly known as CIGNA Insurance Company of Texas, formerly known as INA of Texas, formerly known as Pacific Employers Indemnity Company)

ACE Insurance Company of the Midwest (formerly known as CIGNA Insurance Company of the Midwest, formerly known as Aetna Insurance Company of the Midwest)

Atlantic Employers Insurance Company

Bankers Standard Fire and Marine Company (formerly known as Commercial Standard Fire and Marine Company)

Bankers Standard Insurance Company (formerly known as All Risk Insurance Company)

SETTLEMENT AND BUYBACK<br>AGREEMENT EXHIBIT B

Century Indemnity Company in its own capacity and in its capacity as: (1) successor to CIGNA Specialty Insurance Company (formerly known as California Union Insurance Company); (2) successor to CCI Insurance Company as successor to Insurance Company of North America; and (3) successor to CCI Insurance Company as successor to Insurance Company of North America as successor to Indemnity Insurance Company of North America

Central National Insurance Company of Omaha (only to the extent policies issued by Cravens, Dargan & Company, Pacific Coast and its subsidiaries)

Horace Mann Insurance Companies (but only with respect to policies issued before August 1998)

Illinois Union Insurance Company (formerly known as GATX Insurance Company)

Imperial Casualty Company (only to the extent policies were issued by GATX Underwriters, Inc.)

INA Surplus Insurance Company (formerly known as Delaware Reinsurance Company)

Indemnity Insurance Company of North America, in its own capacity and as successor in interest to INA Insurance Company, Connecticut General Fire & Casualty Insurance Company, Indemnity Insurance Company of North America (New York) and Stuyvesant Insurance Company

Industrial Underwriters Insurance Company

Insurance Company of North America (formerly known as The President and Directors of the Insurance Company of North America)

Motor Vehicle Casualty Company (only to the extent policies issued by Cravens, Dargan & Company, Pacific Coast and its subsidiaries)

Pacific Employers Insurance Company

Service Fire Insurance Company (only to the extent policies issued by Cravens, Dargan & Company, Pacific Coast and its subsidiaries)

U.S. Fire Insurance Company, North River Insurance Company, International Insurance Company, International Surplus Lines Insurance Company, Mount Airy Insurance Company, Viking Insurance Company, Industrial Indemnity Insurance Company, Industrial Indemnity of Alaska Insurance Company and Industrial Underwriters Insurance Company of Dallas, but only to the extent of policies they issued to the Congoleum Entities that were novated to or assumed prior to December 31, 1994 by one of the companies listed in other parts of this Exhibit B

Westchester Fire Insurance Company

SETTLEMENT AND BUYBACK
AGREEMENT EXHIBIT B

Westchester Surplus Lines Insurance Company (formerly known as Industrial Insurance Company of Hawaii, Ltd.)

3

## SETTLEMENT AND BUYBACK AGREEMENT EXHIBIT C

## LIST OF SUBJECT POLICIES REFERENCED IN SECTION XI.A

| Policy Number | Name of Alleged Insurer | Alleged Policy Period[2] |
|---|---|---|
| XBC 1838 | Insurance Company of North America | 10/13/1965 to 01/01/1967 |
| XBC 40971 | Insurance Company of North America | 01/01/1967 to 01/28/1970 |
| XBC 43099 | Insurance Company of North America | 01/28/1970 to 02/16/1973 |
| XCP 3904 | Insurance Company of North America | 02/16/1973 to 01/01/1976 |
| XCP 3956 | Insurance Company of North America | 12/17/1973 to 01/1/1976 |
| XBC 155083 | Insurance Company of North America | 01/01/1985 to 01/01/1986 |
| XCPGO 7908702[3] | Insurance Company of North America | 05/01/1985 to 01/01/1986 |
| XLP GO 790915-9 | Cigna Insurance Company[4] | 01/01/1986 to 01/01/1987 |
| XLPGO9026824 | Cigna Insurance Company[4] | 03/07/1986 to 01/01/1987 |

---

[2] The "Alleged Policy Period" legend is not binding and is provided only for purposes of generally assisting in identifying the policies and is not intended as a full statement of the Parties positions.

[3] On June 20, 2006, the Superior Court of New Jersey, Law Division, Middlesex County, entered orders in the proceeding entitled Congoleum Corporation v. ACE American Insurance Co., et al., Docket No.: MID-L-8908-01, granted the motion of Century Indemnity Company for judgment and the involuntary dismissal of INA Policy XCP GO 7908702 in accord with the provisions of the Order.

[4] On June 20, 2006, the Superior Court of New Jersey, Law Division, Middlesex County, entered orders in the proceeding entitled Congoleum Corporation v. ACE American Insurance Co., et al., Docket No.: MID-L-8908-01, the motion of ACE American Insurance Company (f/k/a CIGNA Insurance Company) for judgment and the involuntary dismissal ACE American Insurance Company and CIGNA Insurance Company in accord with the provisions of the Order.

SETTLEMENT AND BUYBACK
AGREEMENT EXHIBIT B

## SETTLEMENT AND BUYBACK AGREEMENT EXHIBIT D

## POLICIES THAT DO NOT INSURE THE CONGOLEUM FLOORING BUSINESS
## REFERENCED IN SECTION VI.L

| Policy Number | Name of Alleged Insurer | Alleged Policy Period |
|---|---|---|
| WC 760122 | Aetna Insurance Company | 03/21/1972 - 01/01/1973 |

## SETTLEMENT AND BUYBACK AGREEMENT EXHIBIT E

## EXCLUDED POLICIES ALLEGEDLY ISSUED BY OTHER NON-CENTURY INSURERS REFERENCED IN SECTION I.Y

| Carrier Name | Policy Number | Policy Begin Date | Policy End Date[5] |
|---|---|---|---|
| Aetna Casualty & Surety Co. | 01 XN 326 WCA | 10/12/1972 | 1/1/1976 |
| Aetna Casualty & Surety Co. | 01 XN 904 WCA | 1/1/1976 | 1/1/1977 |
| Aetna Casualty & Surety Co. | 01 XN 905 WCA | 1/1/1976 | 1/1/1977 |
| Aetna Casualty & Surety Co. | 01 XN 1221 WCA | 1/1/1977 | 1/1/1978 |
| Aetna Casualty & Surety Co. | 01 XN 1222 WCA | 1/1/1977 | 1/1/1978 |
| Aetna Casualty & Surety Co. | 01 XN 1631 WCA | 1/1/1978 | 1/1/1979 |
| Aetna Casualty & Surety Co. | 01 XN 1632 WCA | 1/1/1978 | 1/1/1979 |
| Aetna Casualty & Surety Co. | 01 XN 2061WCA | 1/1/1979 | 1/1/1980 |
| Aetna Casualty & Surety Co. | 01 XN 2062 WCA | 1/1/1979 | 1/1/1980 |
| Aetna Casualty & Surety Co. | 01 XN 2455 WCA | 1/1/1980 | 1/1/1981 |
| Aetna Casualty & Surety Co. | 01 XN 2456 WCA | 1/1/1980 | 1/1/1981 |
| Aetna Casualty & Surety Co. | 01 XN 2079 WCA | 1/1/1981 | 1/1/1982 |
| Aetna Casualty & Surety Co. | 01 XN 2877 WCA | 1/1/1981 | 1/1/1982 |
| Aetna Casualty & Surety Co. | 01 XN 2878 WCA | 1/1/1981 | 1/1/1982 |
| Aetna Casualty & Surety Co. | 01 XN 3267 WCA | 1/1/1982 | 1/1/1983 |
| Aetna Casualty & Surety Co. | 01 XN 3268 WCA | 1/1/1982 | 1/1/1983 |
| Aetna Casualty & Surety Co. | 01 XN 3269 WCA | 1/1/1982 | 1/1/1983 |
| AIU Insurance Co. | 75-100034 | 1/1/1978 | 1/1/1979 |
| AIU Insurance Co. | 75-100996 | 1/1/1979 | 1/1/1980 |
| AIU Insurance Co. | 75 101790 | 1/1/1980 | 1/1/1981 |
| AIU Insurance Co. | 75-102500 | 1/1/1981 | 1/1/1982 |
| AIU Insurance Co. | 75-102594 | 1/1/1982 | 1/1/1983 |
| AIU Insurance Co. | 75-103280 | 1/1/1983 | 1/1/1984 |
| AIU Insurance Co. | 75-103173 | 1/1/1984 | 1/1/1985 |
| American Centennial Insurance Company | CC-01-58-52 | 1/1/1984 | 1/1/1985 |
| American Home Assurance Co. | CE 3380176 | 10/12/1972 | 1/1/1976 |
| American Home Assurance Co. | SCLE 80 65427 | 1/1/1976 | 1/1/1977 |
| American Home Assurance Co. | SCLE 80 65428 | 1/1/1976 | 1/1/1977 |
| American ReInsurance Co. | M0691611 | 2/16/1973 | 1/1/1976 |
| Colonia Insurance Co. | 85-L-1116/01 | 1/1/1985 | 1/1/1986 |
| Continental Casualty | RDU 9973758 | 1/1/1964 | 1/1/1967 |
| Continental Casualty | RDU 9433828 | 1/1/1967 | 1/28/1970 |
| Continental Casualty | RDX 0308091604 | 1/28/1970 | 2/16/1973 |
| Continental Casualty | RDU 8065433 | 2/16/1973 | 1/1/1976 |

---

[5] The "Alleged Policy Period" legend is not binding and is provided only for purposes of generally assisting in identifying the policies and is not intended as a full statement of the Parties positions.

1

| Carrier Name | Policy Number | Policy Begin Date | Policy End Date[5] |
|---|---|---|---|
| Continental Casualty | RDX 8937036 | 12/17/1973 | 1/1/1975 |
| Continental Insurance Co. | EXC 102428 | 1/1/1985 | 1/1/1986 |
| Employers Commercial Union | EY 9399 004 | 1/28/1970 | 2/16/1973 |
| Employers Ins. Of Wausau | 5733-00-200275 | 1/1/1982 | 1/1/1983 |
| Employers Ins. Of Wausau | 5734-00-200275 | 1/1/1983 | 1/1/1984 |
| Employers Ins. Of Wausau | 5736-00-102319 | 1/1/1985 | 1/1/1986 |
| Employers Ins. Of Wausau | 5736-02-102319 | 1/1/1985 | 1/1/1986 |
| Employers Ins. Of Wausau | Unknown | 1/1/1985 | 1/1/1986 |
| Employers Mutual Casualty Co. | MMO 70018 | 1/1/1978 | 1/1/1979 |
| Employers Mutual Casualty Co. | MMO 70606 | 1/1/1979 | 1/1/1980 |
| Employers Mutual Casualty Co. | MMO 70607 | 1/1/1979 | 1/1/1980 |
| Employers Mutual Casualty Co. | MMO 71201 | 1/1/1980 | 1/1/1981 |
| Employers Mutual Casualty Co. | MMO 71202 | 1/1/1980 | 1/1/1981 |
| Employers Mutual Casualty Co. | MMO 71653 | 1/1/1981 | 1/1/1982 |
| Employers Mutual Casualty Co. | MMO 71654 | 1/1/1981 | 1/1/1982 |
| Employers Mutual Casualty Co. | MMO 73047 | 1/1/1982 | 1/1/1983 |
| Employers Mutual Casualty Co. | MMO 73048 | 1/1/1982 | 1/1/1983 |
| Employers Mutual Casualty Co. | MMO 73326 | 1/1/1983 | 1/1/1984 |
| Employers Mutual Casualty Co. | MMO 73526 | 1/1/1984 | 1/1/1985 |
| Employers Mutual Liability Ins. Co. of Wisconsin | 0524 00 084282 | 1/1/1973 | 1/1/1974 |
| Employers Mutual Liability Ins. Co. of Wisconsin | 0525 00 084282 | 1/1/1974 | 1/1/1975 |
| Employers Mutual Liability Ins. Co. of Wisconsin | 0526 00 084282 | 1/1/1975 | 3/1/1976 |
| Excess Insurance Co. Of America | EL 10355 | 1/1/1980 | 1/1/1981 |
| Federal Ins. Co. | 7932 98 47 | 1/1/1977 | 1/1/1978 |
| Federal Ins. Co. | (79) 7932-98-47 | 1/1/1978 | 1/1/1979 |
| Fireman's Fund | XLX 1202504 | 10/12/1972 | 12/17/1973 |
| First State Insurance Company | 924233 | 1/1/1977 | 1/1/1978 |
| First State Insurance Company | 925946 | 1/1/1978 | 1/1/1979 |
| First State Insurance Company | 927497 | 1/1/1979 | 1/1/1980 |
| First State Insurance Company | 929216 | 1/1/1980 | 1/1/1981 |
| First State Insurance Company | 930852 | 1/1/1981 | 1/1/1982 |
| First State Insurance Company | 933238 | 1/1/1982 | 1/1/1983 |
| First State Insurance Company | 934313 | 1/1/1983 | 1/1/1984 |
| Gibraltar Cas. Co. | GMX 00451 | 1/1/1980 | 1/1/1981 |
| Gibraltar Cas. Co. | GMX 00452 | 1/1/1980 | 1/1/1981 |
| Gibraltar Cas. Co. | GMX 00856 | 1/1/1981 | 1/1/1982 |
| Gibraltar Cas. Co. | GMX 00857 | 1/1/1981 | 1/1/1982 |

2

SETTLEMENT AND BUYBACK
AGREEMENT EXHIBIT F

| Carrier Name | Policy Number | Policy Begin Date | Policy End Date[5] |
|---|---|---|---|
| Gibraltar Cas. Co. | GMX 01497 | 1/1/1982 | 1/1/1983 |
| Gibraltar Cas. Co. | GMX 01498 | 1/1/1982 | 1/1/1983 |
| Gibraltar Cas. Co. | GMX 02027 | 1/1/1983 | 1/1/1984 |
| Gibraltar Cas. Co. | GMX 02028 | 1/1/1983 | 1/1/1984 |
| Gibraltar Cas. Co. | GMX 02545 | 1/1/1984 | 1/1/1985 |
| Gibraltar Cas. Co. | GMX 02546 | 1/1/1984 | 1/1/1985 |
| Granite State Ins. Co. | 80-94046 | 1/1/1977 | 1/1/1978 |
| Granite State Ins. Co. | SCLD 80 94047 | 1/1/1977 | 1/1/1978 |
| Granite State Ins. Co. | 6179-0998 | 1/1/1979 | 1/1/1980 |
| Granite State Ins. Co. | 6180-1880 | 1/1/1980 | 1/1/1981 |
| Granite State Ins. Co. | 6481-5121 | 1/1/1981 | 1/1/1982 |
| Granite State Ins. Co. | 6482-5348 | 1/1/1982 | 1/1/1983 |
| Granite State Ins. Co. | 6483-5546 | 1/1/1983 | 1/1/1984 |
| Granite State Ins. Co. | 6484-0070 | 1/1/1984 | 1/1/1985 |
| Highlands Ins. Co. | SR 10276 | 10/12/1972 | 12/17/1973 |
| Highlands Ins. Co. | SR 10638 | 1/1/1975 | 1/1/1976 |
| Highlands Ins. Co. | SR 20042 | 1/1/1976 | 1/1/1977 |
| Highlands Ins. Co. | SR 20227 | 1/1/1977 | 1/1/1978 |
| Highlands Ins. Co. | SR 20482 | 1/1/1978 | 1/1/1979 |
| Highlands Ins. Co. | SR 20789 | 1/1/1979 | 1/1/1980 |
| Highlands Ins. Co. | SR 20943 | 1/1/1980 | 1/1/1981 |
| Highlands Ins. Co. | SR 21208 | 1/1/1981 | 1/1/1982 |
| Highlands Ins. Co. | SR 21396 | 1/1/1982 | 1/1/1983 |
| Highlands Ins. Co. | SR 21696 | 1/1/1983 | 1/1/1984 |
| Highlands Ins. Co. | SR 22005 | 1/1/1984 | 1/1/1985 |
| Holland-America Insurance Company | H83678 | 1/1/1981 | 1/1/1982 |
| Home Insurance Company | HEC 9791374 | 1/28/1970 | 2/16/1973 |
| Integrity Insurance Company | XL 200500 | 1/1/1979 | 1/1/1980 |
| Integrity Insurance Company | XL 201439 | 1/1/1980 | 1/1/1981 |
| Integrity Insurance Company | XL 201522 | 1/1/1981 | 1/1/1982 |
| Integrity Insurance Company | XL 203766 | 1/1/1982 | 1/1/1983 |
| Integrity Insurance Company | XL 207014 | 1/1/1983 | 1/1/1984 |
| Integrity Insurance Company | XL 207970 | 1/1/1984 | 1/1/1985 |
| Integrity Insurance Company | XL 210163 | 1/1/1985 | 1/1/1986 |
| International Surplus Lines Insurance Company (ISLIC) | XSI 10018 | 1/1/1985 | 1/1/1986 |
| International Surplus Lines Insurance Company (ISLIC) | XSI 10017 | 1/1/1985 | 1/1/1986 |
| Liberty Mutual Ins. Co. | Unknown | 1/1/1952 | 1/1/1953 |
| Liberty Mutual Ins. Co. | Unknown | 1/1/1953 | 1/1/1954 |

3

SETTLEMENT AND BUYBACK
AGREEMENT EXHIBIT F

| Carrier Name | Policy Number | Policy Begin Date | Policy End Date[5] |
|---|---|---|---|
| Liberty Mutual Ins. Co. | Unknown | 1/1/1954 | 1/1/1955 |
| Liberty Mutual Ins. Co. | LB24-914417-55 | 1/1/1955 | 1/1/1956 |
| Liberty Mutual Ins. Co. | LP-24-692115-56 | 1/1/1956 | 1/1/1957 |
| Liberty Mutual Ins. Co. | LP-6032-900078-37 | 1/1/1957 | 1/1/1958 |
| Liberty Mutual Ins. Co. | LP-6032-900078-38 | 1/1/1958 | 1/1/1959 |
| Liberty Mutual Ins. Co. | LP-6032-900078-39 | 1/1/1959 | 1/1/1960 |
| Liberty Mutual Ins. Co. | LP-632-004138-040-TD93 | 1/1/1960 | 1/1/1961 |
| Liberty Mutual Ins. Co. | LP1-632-004138-041 TD 93 | 1/1/1961 | 1/1/1962 |
| Liberty Mutual Ins. Co. | LP1-632-004138-042 TD93 | 1/1/1962 | 1/1/1963 |
| Liberty Mutual Ins. Co. | LP1-632-004138-043 TD 93 | 1/1/1963 | 1/1/1964 |
| Liberty Mutual Ins. Co. | LP1-632-004138-044 TD 93 | 1/1/1964 | 1/1/1965 |
| Liberty Mutual Ins. Co. | LP1-632-004138-045 TD 93 | 1/1/1965 | 1/1/1966 |
| Liberty Mutual Ins. Co. | LP1-632-004136-046 TD 93 | 1/1/1966 | 1/1/1967 |
| Liberty Mutual Ins. Co. | LG1-632-004138-047 | 1/1/1967 | 1/1/1968 |
| Liberty Mutual Ins. Co. | LG1-632-004138-048 | 1/1/1968 | 1/1/1969 |
| Liberty Mutual Ins. Co. | LG1-632-004138-049 | 1/1/1969 | 1/1/1970 |
| Liberty Mutual Ins. Co. | LGl-632-004138-040 | 1/1/1970 | 1/1/1971 |
| Liberty Mutual Ins. Co. | LG1-632-004138-041 | 1/1/1971 | 1/1/1972 |
| Liberty Mutual Ins. Co. | LG1-632-004138-042 | 1/1/1972 | 1/1/1973 |
| Liberty Mutual Ins. Co. | LG1-641-004051-046 | 3/1/1976 | 1/1/1977 |
| Liberty Mutual Ins. Co. | LG1-641-004051-047 | 1/1/1977 | 1/1/1978 |
| Liberty Mutual Ins. Co. | LG1-641-004051-048 | 1/1/1978 | 1/1/1979 |
| Liberty Mutual Ins. Co. | LGl-641-004051-049 | 1/1/1979 | 1/1/1980 |
| Liberty Mutual Ins. Co. | LG1-641-004051-040 | 1/1/1980 | 1/1/1981 |
| Liberty Mutual Ins. Co. | LG1-612-004157-041 | 1/1/1981 | 1/1/1982 |
| Liberty Mutual Ins. Co. | LG1-612-004157-042 | 1/1/1982 | 1/1/1983 |
| Liberty Mutual Ins. Co. | LG1-612-004157-043 | 1/1/1983 | 1/1/1984 |
| Liberty Mutual Ins. Co. | LG1-612-004157-044 | 1/1/1984 | 1/1/1985 |
| Liberty Mutual Ins. Co. | LG1-612-004157-045 | 1/1/1985 | 1/1/1986 |
| Liberty Mutual Ins. Co. | RG1-612-004157-046 | 1/1/1986 | 8/19/1986 |
| Liberty Mutual Ins. Co. | RG1-612-004207-046 | 8/19/1986 | 8/19/1987 |
| London Companies And Lloyds | K21782 | 11/12/1953 | 11/12/1954 |
| London Companies And Lloyds | K21783 | 11/12/1953 | 11/12/1954 |

SETTLEMENT AND BUYBACK
AGREEMENT EXHIBIT F

| Carrier Name | Policy Number | Policy Begin Date | Policy End Date[5] |
|---|---|---|---|
| London Companies And Lloyds | K21784 | 11/12/1953 | 11/12/1954 |
| London Companies And Lloyds | K28288 | 11/12/1954 | 1/1/1958 |
| London Companies And Lloyds | K28289 | 11/12/1954 | 1/1/1958 |
| London Companies And Lloyds | K28290 | 11/12/1954 | 1/1/1958 |
| London Companies And Lloyds | K28291 | 11/12/1954 | 1/1/1958 |
| London Companies And Lloyds | CK2458 | 1/1/1958 | 2/1/1961 |
| London Companies And Lloyds | CK2459 | 1/1/1958 | 2/1/1961 |
| London Companies And Lloyds | 881/UHL 0036 | 1/12/1976 | 1/1/1977 |
| London Companies And Lloyds | 881/WHL551 | 4/1/1976 | 4/1/1977 |
| London Companies And Lloyds | 881/UJL 0056 | 1/1/1977 | 1/1/1978 |
| London Companies And Lloyds | 881/UJL 0057 | 1/1/1977 | 1/1/1978 |
| London Companies And Lloyds | 881/UJL 0389 | 4/1/1977 | 1/1/1980 |
| London Companies And Lloyds | WJU551 | 4/1/1977 | 12/31/1977 |
| London Companies And Lloyds | 881/WK0151 | 1/1/1978 | 1/1/1979 |
| London Companies And Lloyds | 881/WK0161 | 1/1/1978 | 1/1/1979 |
| London Companies And Lloyds | 881/WKT051 | 1/1/1978 | 1/1/1979 |
| London Companies And Lloyds | 881/WLT121 | 1/1/1979 | 1/1/1980 |
| London Companies And Lloyds | FUL083067 | 1/1/1980 | 1/1/1981 |
| London Companies And Lloyds | FUL083811 | 1/1/1981 | 1/1/1982 |
| London Companies And Lloyds | FUL084656 | 1/1/1982 | 1/1/1983 |
| London Companies And Lloyds | 707/FULD8556 | 1/1/1983 | 1/1/1984 |
| Midland Insurance Company | XL 111017004473-5/ 111017004472-7 | 10/12/1972 | 1/1/1976 |
| Midland Insurance Company | XL 145821 | 1/1/1976 | 1/1/1977 |
| Midland Insurance Company | XL 152158 | 1/1/1977 | 1/1/1978 |
| Midland Insurance Company | XL 148361 | 1/1/1978 | 1/1/1979 |
| Midland Insurance Company | XL 160344 | 1/1/1979 | 1/1/1980 |
| Midland Insurance Company | XL 706593 | 1/1/1980 | 1/1/1981 |
| Midland Insurance Company | XL 723759 | 1/1/1981 | 1/1/1982 |
| Midland Insurance Company | XL 724778 | 1/1/1982 | 1/1/1983 |
| Midland Insurance Company | XL 748705 | 1/1/1983 | 1/1/1984 |
| Midland Insurance Company | XL 770107 | 1/1/1984 | 1/1/1985 |
| Midland Insurance Company | XL 770108 | 1/1/1984 | 1/1/1985 |
| Mission Insurance Company | M81757 | 1/1/1975 | 4/1/1976 |
| Mission Insurance Company | M831963 | 4/1/1976 | 4/1/1977 |
| Mission Insurance Company | M856066 | 1/1/1980 | 1/1/1981 |
| Navigators Insurance Co. | 85-L-1116/01 | 1/1/1985 | 1/1/1986 |
| Old Republic Insurance Company | OZX 11607 | 1/1/1981 | 1/1/1982 |
| Old Republic Insurance Company | OZX 11787 | 1/1/1982 | 1/1/1983 |
| Protective National Insurance Company of | XUB 180-72-81 | 1/1/1984 | 1/1/1985 |

5

| Carrier Name | Policy Number | Policy Begin Date | Policy End Date[5] |
|---|---|---|---|
| Omaha | | | |
| Prudential Reinsurance Company | DXC 901037 | 1/1/1976 | 1/1/1977 |
| Prudential Reinsurance Company | DXC DX0067 | 1/1/1977 | 1/1/1978 |
| Prudential Reinsurance Company | DXC DX 0588 | 1/1/1978 | 1/1/1979 |
| Prudential Reinsurance Company | DXC DX 0659 | 1/1/1978 | 1/1/1979 |
| Prudential Reinsurance Company | DXC DX 1356 | 1/1/1979 | 1/1/1980 |
| Prudential Reinsurance Company | DXC DX 1357 | 1/1/1979 | 1/1/1980 |
| Puritan Insurance Co. | ML 65 04 47 | 1/1/1978 | 1/1/1979 |
| Puritan Insurance Co. | ML 65 15 58 | 1/1/1979 | 1/1/1980 |
| Puritan Insurance Co. | ML 65 22 64 | 1/1/1980 | 1/1/1981 |
| St. Paul Fire & Marine Insurance Company | 590XA0834 | 10/12/1972 | 1/1/1976 |
| Stonewall Insurance | 36000045 | 1/1/1976 | 1/1/1977 |
| Transit Casualty Company | SCU 9550 66 | 1/1/1979 | 1/1/1980 |
| Transit Casualty Company | SCU 955-427 | 1/1/1980 | 1/1/1981 |
| Transit Casualty Company | SCU055787 | 1/1/1981 | 1/1/1982 |
| Transit Casualty Company | SCU955786 | 1/1/1981 | 1/1/1982 |
| Transit Casualty Company | SCU 956122 | 1/1/1982 | 1/1/1983 |
| Transit Casualty Company | SCU 956-123 | 1/1/1982 | 1/1/1983 |
| Transit Casualty Company | SCU 956394 | 1/1/1983 | 1/1/1984 |
| Transit Casualty Company | SCU 956395 | 1/1/1983 | 1/1/1984 |
| Transit Casualty Company | SCU 956652 | 1/1/1984 | 1/1/1985 |
| Transit Casualty Company | SCU 956653 | 1/1/1984 | 1/1/1985 |
| Transit Casualty Company | SCU 957115 | 1/1/1985 | 1/1/1986 |
| Transport Indemnity Co. | TEL 900359 | 1/1/1984 | 1/1/1985 |
| Transport Indemnity Co. | TEL 01129C | 1/1/1985 | 7/15/1985 |
| Twin City Fire | TXS 102624 | 1/1/1983 | 1/1/1984 |
| Twin City Fire | TXS103545 | 1/1/1984 | 1/1/1985 |
| U.S. Fire Insurance Co. | 349 001829 9 | 1/1/1985 | 1/1/1986 |
| U.S. Fire Insurance Co. | H02317 | 1/1/1985 | 1/1/1986 |
| Unigard Mutual | 1-0682 | 2/16/1973 | 5/19/1975 |
| United Reinsurance Corp. of NY | 85-L-1116/01 | 1/1/1985 | 1/1/1986 |
| Unknown (but not any Century Entity) | Unknown | 2/1/1961 | 1/1/1962 |
| Unknown (but not any Century Entity) | Unknown | 1/1/1962 | 1/1/1963 |
| Unknown (but not any Century Entity) | Unknown | 1/1/1963 | 1/1/1964 |
| Western Employers Insurance Company | EX10-0185-20348 | 1/1/1985 | 1/1/1986 |

6

SETTLEMENT AND BUYBACK
AGREEMENT EXHIBIT F

## SETTLEMENT AND BUYBACK AGREEMENT EXHIBIT F

## LIST OF POLICIES THAT DO NOT PROVIDE COVERAGE TO CONGOLEUM FOR ASBESTOS RELATED CLAIMS REFERENCED IN SECTION I.Y[6]

| Policy Number | Name of Alleged Insurer | Alleged Policy Period[7] | Named Insured | Coverage Type |
|---|---|---|---|---|
| EEC005109 | California Union Insurance Company | 03/86-01/87 | Congoleum Industries, Inc. | Excess Liability |
| EEC005119 | California Union Insurance Company | 03/86-01/87 | Congoleum Industries, Inc. | Excess Liability |
| CRXD35307813 | ACE American Insurance Company | 08/02-08/03 | Congoleum Corporation | Property |
| 70551179 | ACE International | 11/03 –6/04 | American Biltrite Far East, Inc. | Foreign Liability |
| S000298098 | INA | 12/94-12/95 | Missing | Non-owned Aircraft |
| XLPG03137739 | CIGNA Insurance Company | 07/86-07/87 | Hillside | Excess Liability |
| XLPG00420659 | INA | 07/87-07/88 | Hillside | Excess Liability |
| XCPG1178519-0 | INA | 07/88-07/89 | Hillside | Excess Liability |
| XCPG13016306 | INA | 07/89-07/90 | Hillside | Excess Liability |
| HILLS-675 | ACE Insurance Company, LTD. | 02/88-02/91 | Hillside | Excess Liability |
| XCPG1415574-0 | INA | 07/90-07/91 | Hillside | Excess Liability |
| XCPG15154597 | Indemnity INA | 07/91-07/92 | Hillside | Excess Liability |
| XCPG14033427 | INA | 07/92-07/93 | Hillside | Excess Liability |
| 523-508001-3 | North River Ins. Co. | 07/87-07/88 | Hillside | Umbrella Liability |
| 524-201743-8 | North River Ins. Co. | 07/88-07/89 | Hillside | Umbrella Liability |
| AVG06920 | INA | 12/87-12/88 | Hillside | Non-owned Aircraft |

[6] Century Indemnity Company warrants that the following insurance policies listed on Schedule F were novated to or assumed by the Century Entities:  North River Insurance Co. Policy 523-508001-3, North River Insurance Co. Policy 524-201743-8 and International Insurance Co. Policy 523-425336-3.  Century Indemnity Company agrees that, as of the date of this Settlement and Buyback Agreement, it has not been able to confirm if the following insurance policies were novated to or assumed by the Century Entities, and it agrees that if the following policies were not novated to or assumed by the Century Entities as set forth in Exhibit B, they will be deleted and/or deemed deleted from this Schedule F:  International Insurance Co. Policy 523-4496795 and International Surplus Lines Co. Binder No. 7828 (the reference to a "binder" is without prejudice to any argument that the Century Entities may have that a policy or binder was not issued and shall not be construed as a concession or admission that a policy or binder was issued).

[7] The "Alleged Policy Period", "Named Insured", and "Coverage Type" legends are not binding and are provided only for purposes of generally assisting in identifying the policies and are not intended as a full statement of the Parties positions.

SETTLEMENT AND BUYBACK
AGREEMENT EXHIBIT F

| Policy Number | Name of Alleged Insurer | Alleged Policy Period[7] | Named Insured | Coverage Type |
|---|---|---|---|---|
| S00080366 | INA | 12/89-12/90 | Hillside | Non-owned Aircraft |
| S00133942 | INA | 12/90-12/91 | Hillside | Non-owned Aircraft |
| S00188694 | INA | 12/91-12/92 | Hillside | Non-owned Aircraft |
| S00232944 | INA | 12/92-12/93 | Hillside | Non-owned Aircraft |
| S00267892 | INA | 12/93-12/94 | Hillside | Non-owned Aircraft |
| PRP035502 | CIGNA Insurance Company | 08/94-08/95 | Hillside | Property |
| 523-425336-3 | Int'l Ins. Co. | 01/86-01/87 | ABI | Excess Liability |
| 523-4496795 | Int'l Ins. Co. | Unknown | ABI | Unknown |
| Binder No. 7828 | Int'l Surplus Lines Co. | Unknown | ABI | Unknown |
| XCC 013227 | Pacific Empl. Ins. Co. | 07/86-01/87 | ABI | Excess Liability |
| XCC 013269 | Pacific Empl. Ins. Co. | 01/87-01/88 | ABI | Excess Liability |
| XOOG15189393 | INA | 04/92-04/93 | ABI | Excess Liability |
| OGLG15189423 | INA | 04/92-04/93 | ABI | Primary-CGL |
| DOXG21660693001 | ACE American Insurance Company | 12/03-12/04 | ABI | D&O |
| DOXG21660693002 | ACE American Insurance Company | 12/04-12/05 | ABI | D&O |
| DOXG21660693003 | ACE American Insurance Company | 12/05-12/06 | ABI | D&O |
| NO1250565 | ACE American Insurance Company | 12/04-12/07 | ABI | Kidnap & Ransom |
| G21667973001 | ACE American Insurance Company | 12/04-12/05 | ABI | Commercial Crime |
| G21667973002 | Westchester Fire Insurance Company | 12/05-12/06 | ABI | Commercial Crime |
| PFF054569 | ACE American Insurance Company | 06/03-06/04 | ABI | Foreign Liability |
| PFF073879 | ACE American Insurance Company | 06/04-06/05 | ABI | Foreign Liability |

2

SETTLEMENT AND BUYBACK
AGREEMENT EXHIBIT F

NY1:1653568.26

# Exhibit B

## Feist Declaration

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-2(c)**

**OKIN, HOLLANDER & DELUCA, L.L.P.**
One Parker Plaza
Fort Lee, New Jersey 07024
(201) 947-7500
Paul S. Hollander (PH-2681)
Gregory S. Kinoian (GK-7386)

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1540 Broadway
New York, New York 10036
(212) 858-1000
Richard L. Epling (*pro hac vice* admission)
Kerry A. Brennan (*pro hac vice* admission)

Attorneys for Congoleum Corporation, et al.,
Debtors and Debtors-in-Possession

| | |
|---|---|
| In re:<br><br>**CONGOLEUM CORPORATION, <u>et al.</u>,**<br><br>    Debtors and Debtors-in-Possession. | Chapter 11<br>Case No.:    03-51524 (KCF)<br>Jointly Administered<br>Judge: Honorable Kathryn C. Ferguson |

### DECLARATION OF HOWARD FEIST, III IN SUPPORT OF DEBTORS' MOTION FOR ORDER PURSUANT TO SECTIONS 105, 363, 1107 AND 1108 OF THE BANKRUPTCY CODE AND RULES 2002, 6004, 9014 AND 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AUTHORIZING AND APPROVING SETTLEMENT AND POLICY BUYBACK AND RELEASE <u>AMONG THE CONGOLEUM ENTITIES AND THE CENTURY ENTITIES</u>

I, Howard N. Feist, III, being of full age, do hereby certify as follows:

1.    I am the Chief Financial Officer for Congoleum Corporation ("*Congoleum*," together with Congoleum Sales, Inc., and Congoleum Fiscal, Inc. the "*Debtors*").  I submit this declaration in support of Debtors' Motion (the "Motion") for Order Authorizing and Approving the Settlement and Buyback Agreement and Release Among the Congoleum Entities, the Plan Trust, and the Century Entities and Sale of the Subject Policies Pursuant to Sections 105(a), 363,

1107 and 1108 of the Bankruptcy Code and Rules 2002(a), 6004, 9014 and 9019 of the Federal

Rules of Bankruptcy Procedure.[1]

    2.     The parties engaged in lengthy and comprehensive negotiations regarding the

terms of the Settlement Transactions, and the Settlement and Buyback Agreement represents an

arm's-length compromise on the issues by all of the parties thereto.

    3.     The Future Claims Representative (the "FCR") and the Asbestos Creditors

Committee (the "ACC") participated in the negotiations of the Settlement and Buyback

Agreement and support its approval.

    4.     The Century Entities have six policies at issue in the Coverage Action, each of

which was issued by Insurance Company of North America between 1965 and 1986.  These

Policies are all excess policies, and because most of them were written for policy periods longer

than 12 months, there are disputes about the limits available under each such policy.  Policies

XBC 1838 and XBC 40971, effective from October 13, 1965 until January 1, 1967 and January

1, 1967 until January 28, 1970, respectively, were written to provide coverage in excess of $5

million of other excess coverage as well as primary coverage for each year in which each policy

was in effect and are in the second excess layer above primary insurance.  Congoleum contends

that adding together the applicable limits of these two policies would produce a sum of $80

million while Century contends that adding together the applicable limits of these two policies

would produce a sum of $25 million.  Policy XBC 43099, effective from January 28, 1970 until

February 16, 1973, was written to provide coverage in excess of $15 million of other excess

coverage as well as primary coverage for the year in which the policy was in effect.  Congoleum

---

[1]     All capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the
Motion.

contends that the applicable limit of liability of this policy is $40 million while Century contends

that the applicable limit of liability of this policy is $10 million.  Policy XCP 3904, effective from

February 16, 1973 until January 1, 1976, was written to provide coverage in excess of $20

million of other excess coverage as well as primary coverage for the years in which it was in

effect.  Congoleum contends that the applicable limit  of liability of this policy is $15 million

while Century contends that the applicable limit of liability of this policy is $5 million.  Policy

XCP 3956, effective from December 17, 1973 until January 1, 1976, was written to provide

coverage in excess of $25 million of other excess coverage as well as primary coverage for the

years in which it was in effect.  Congoleum contends that the applicable limit of liability of this

policy is $15 million while Century contends that the applicable limit of liability of this policy is

$5 million.  Policy XBC 155083, effective from January 1, 1985 until January 1, 1986, was

written to provide coverage in excess of primary coverage for the year in which it was in effect.

The aggregate limit of liability of this policy is $11 million.

   5.  Congoleum and the Century Entities dispute the allocation of losses and/or claims

to applicable insurance years.

   6.  It is the Debtors' belief that under the Plan, the bulk of contemplated asbestos

claim payments would not occur immediately upon confirmation, but instead, payments to

claimants would occur over time as the Plan Trust evaluates and allows claims.  The Debtors

believe that the first $500 million of claim allowances by the Plan Trust, when spread over the

years of coverage, likely would impair the indemnity limits of Century policies only in an amount

of approximately $17 million.  While it is difficult to predict when claim allowances would total

$500 million, under the Settlement and Buyback Agreement, the Plan Trust would have nearly

$17 million in hand from Century during the first few years of the Plan Trust's operations.

7.      The Century Entities have vigorously opposed the Debtors' position with respect to whether, and to what extent, the Subject Policies afford coverage for certain Claims, including Asbestos Claims.  The parties have been litigating coverage issues with respect to Asbestos Claims that may be subject to the Claimant Agreement in the Coverage Action for several years at great expense to the Debtor.  The Century Entities have asserted numerous defenses to liability, both with respect to the Claimant Agreement and with respect to Asbestos Claims outside of the Claimant Agreement, including defenses alleging:

- The Claimant Agreement and certain previous and subsequent settlements were entered into by Congoleum without the consent of appropriate insurers, were not fair, reasonable or in good faith, and the proposed Trust Distribution Procedures under the Plan (collectively, the "*Congoleum Settlements*"), were not entered into in good faith and/or were not reasonable.

- The Congoleum Settlements breached the cooperation clause and the no voluntary payment clause of the Subject Policies.

- The Congoleum Settlements do not exhaust underlying insurance.

- The Congoleum Settlements violate the Century Entities' right to settle.

- There is no coverage under the Subject Policies for the Congoleum Settlements.

Given these disputed factual and legal issues, it is uncertain if, and to what extent, the Debtors would be successful in their pursuit of coverage under the Subject Policies.  However, the Settlement and Buyback Agreement will provide these bankruptcy estates with a certainty of collection under the Subject Policies in the near future.

8. The terms of the Settlement and Buyback are the product of extensive and comprehensive arm's-length negotiations and they reflect true compromise by all of the parties thereto, including the FCR and the ACC.

9. The Debtors believe that this Settlement and Buyback Agreement provides a significant and valuable benefit to the Debtors' estates and their creditors and that combined transactions constitute a fair and equitable compromise of the Coverage Dispute. The Debtors understand that both the FCR and the ACC believe the Settlement and Buyback Agreement to be in the best interests of the estates as evidenced by their support of the settlement.

10. The Debtors, in their business judgment, believe that the creditors of the estate would be better served by an agreement to pay them $16.95 million within approximately three years following the Trigger Date upon satisfaction of the conditions precedent, rather than possibly receiving an as yet undetermined amount at an as yet undetermined point in the future.

11. The Debtors submit that the terms and conditions of the Settlement and Buyback Agreement are fair and reasonable in light of costs, potential risks, delays and costs associated with continued litigation of the Coverage Dispute and the allowance process for Asbestos Claims, which will begin anew if Congoleum's Plan, which does not permit allowances pursuant to the terms of the Claimant Agreement, is confirmed. The Coverage Dispute, as well as these Chapter 11 Cases, involve many complex questions of law and fact. In addition, all of the parties involved have been forced to allocate substantial resources to the resolution of the Coverage Dispute and these Chapter 11 Cases.

12. The Debtors believe that the Settlement Documents and the Settlement Transactions, including the 363 Sale and the 105(a) Relief, are fair and equitable, represent a fair

resolution of Coverage Dispute from the Debtors' perspective, are in the best interest of their estates and creditors, and represent the sound business judgment of Congoleum.

13.    The Parties have not engaged in any conduct that would cause or permit the Settlement and Buyback Agreement or the Settlement Transactions to be avoided under section 363(n) of the Bankruptcy Code, such as entering into an agreement to control the price of the Settlement and Buyback Amount.

14.    Based upon a review of the documents in Congoleum's possession, I understand the following:

(A)    With respect to the Congoleum Flooring Business, Congoleum is the successor in interest to the entity Congoleum-Nairn Inc. named in policies XBC-1838 and XBC-40971, the entity Congoleum Corporation named in policies XCP3904 and XCP3956, the entity Congoleum Corporation named in policies XBC155083 and XCP GO 7908702, the entity Congoleum Industries, Inc. named in policies XBC-43099 and XCP3904, the entity Bath Industries, Inc. named in policies XBC-43099, XCP3904 and XCP3956, the entity Tri-State Flooring, Inc., named in policies XCP3904 and XCP3956, Congoleum Company Inc., Fibic Corporation, and C.C. Liquidating Corp.; and, (ii) with respect to the Congoleum Flooring Business, is the sole successor in all respects with regard to coverage, and that Congoleum Corporation, as defined in Section I.K.(ii), owns the rights to coverage under the Subject Policies

identified on Exhibit C to the Settlement and Buyback Agreement as may ever have been held by such entities with and in all respects to the Congoleum Flooring Business.

(B).    Relax-o-Lounger, Inc., Kinder Manufacturing Company, Inc., Lewis Carpet Mills, Inc., Lewis Carpet Mills, Inc., Pennsylvania Crusher Corporation, Mersman Brothers Division, Webb Furniture Corporation, Coronet Manufacturing Co., Inc., Howard Parlor Furniture Co., Howard Parlor Furniture Co. of Texas, Inc., Howard Frame Co., Edson, Incorporated, J. Isenberg & Son, Inc. and Bath Iron Works Corp. have no responsibility for any of the liabilities of the Congoleum Flooring Business.

(C).    The flooring operations of the Congoleum Entities to which they succeeded, including the manufacture, sale, distribution, installation, formulation, marketing, transport, handling or any other activity involving in any way flooring, vinyl sheeting flooring or floor tile products of any kind, were headquartered in Kearney, New Jersey, continuously from before 1965 to 1987.

Dated: August __ 2006

Howard N. Feist, III

# APPENDIX EXHIBIT 2

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | ) | Case No. 09-04371 (JAP) |
| | ) | |
| CONGOLEUM CORPORATION, | ) | Chapter 11 |
| CONGOLEUM SALES, INC., and | ) | Case No. 03-51524 |
| CONGOLEUM FISCAL, INC., | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## FOURTH AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF THE DEBTORS, THE OFFICIAL ASBESTOS CLAIMANTS' COMMITTEE, THE OFFICIAL COMMITTEE OF BONDHOLDERS FOR CONGOLEUM CORPORATION, ET AL. AND THE FUTURES REPRESENTATIVE DATED AS OF MARCH 11, 2010

**THIS PLAN PROVIDES, AMONG OTHER THINGS, FOR THE ISSUANCE OF INJUNCTIONS UNDER SECTION 524(g) OF THE BANKRUPTCY CODE THAT RESULT IN THE CHANNELING OF ALL ASBESTOS-RELATED LIABILITIES OF CONGOLEUM CORPORATION AND THE PROTECTED PARTIES SET FORTH HEREIN INTO A TRUST AS MORE FULLY DESCRIBED HEREIN.**

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
**1540 Broadway**
**New York, NY 10033-4039**
**Richard L. Epling**
**Robin L. Spear**
**Kerry A. Brennan**

**Attorneys for the Debtors**

**AKIN GUMP STRAUSS HAUER & FELD LLP**
**One Bryant Park**
**New York, NY 10036**
**Michael S. Stamer**

**AKIN GUMP STRAUSS HAUER & FELD LLP**
**1333 New Hampshire Avenue, N.W.**
**Washington D.C. 20036**
**James R. Savin**
**David M. Dunn**
**Joanna F. Newdeck**

**Attorneys for the Official Committee of Bondholders**

**CAPLIN & DRYSDALE, CHTD.**
**One Thomas Circle, N.W.**
**Washington, D.C. 20005**
**Peter Van N. Lockwood**
**Ronald Reinsel**

**Attorneys for the Asbestos Claimants' Committee**

**ORRICK, HERRINGTON & SUTCLIFFE LLP**
1152 15th Street, N.W.
Washington, D.C. 20005
Roger Frankel
Richard H. Wyron
Jonathan Guy
Debra L. Felder

Attorneys for R. Scott Williams, as Futures Representative

**OKIN, HOLLANDER & DELUCA, LLP**
**PARKER PLAZA**
**400 Kelby Street**
**Fort Lee, NJ 07024**
**Paul S. Hollander**
**James J. DeLuca**

**TEICH GROH**
**691 State Highway 33**
**Trenton, NJ 08619**
**Michael A. Zindler**

**GREENBAUM, ROWE, SMITH & DAVIS LLP**
**75 Livingston Avenue**
**Roseland, NJ 07068**
**Nancy Isaacson**

**FORMAN HOLT ELIADES & RAVIN LLC**
80 Route 4 East, Suite 290
Paramus, NJ 07652
Stephen Ravin

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME.......................... 1

    1.1    Scope of Definitions................................................................................. 1

    1.2    Definitions............................................................................................... 1

    1.3    Rules of Interpretation:  Application of Definitions, Rules of Construction, and Computation of Time ........................................................................ 17

    1.4    Exhibits and Schedules ........................................................................... 17

ARTICLE II CLASSIFICATION OF CLAIMS AND INTERESTS ................................................... 18

    2.1    Generally................................................................................................. 18

    2.2    Unclassified Claims ................................................................................ 18

    2.3    Classes .................................................................................................... 18

ARTICLE III TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS ............. 19

    3.1    Summary................................................................................................. 19

    3.2    Administrative Claims ............................................................................ 19

    3.3    Priority Tax Claims ................................................................................. 19

    3.4    DIP Financing Claim. .............................................................................. 19

    3.5    Substantial Contribution Claims ............................................................. 19

ARTICLE IV TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ...................................... 20

    4.1    Claims and Interests ............................................................................... 20

    4.2    Reservation of Rights Regarding Claims ................................................ 22

    4.3    Reservation of Fair and Equitable (Cram Down) Power......................... 22

ARTICLE V IMPLEMENTATION OF THE PLAN ...................................................................... 22

    5.1    The Plan Trust......................................................................................... 22

    5.2    Certain Mergers ...................................................................................... 24

    5.3    The Amended and Restated Certificate and the Amended and Restated Bylaws ....................... 24

    5.4    Directors and Officers of Reorganized Congoleum ................................ 24

    5.5    Cancellation of Existing Securities and Agreements of the Debtors/Discharge of the Indenture Trustee ..................................................... 25

    5.6    Exit Facility ............................................................................................ 25

    5.7    Issuance of New Securities and Debt Instruments .................................. 25

    5.8    Registration Rights Agreement ............................................................... 25

    5.9    Stockholders Agreement ......................................................................... 25

    5.10    Effectuating Documents/Further Transactions........................................ 26

    5.11    Exemption from Certain Transfer Taxes and Recording Fees ................. 26

    5.12    Section 346 Injunction ............................................................................ 26

    5.13    Corporate Action..................................................................................... 26

|       | 5.14 | Litigation Settlement Agreement. | 26 |
|       | 5.15 | Review of Claimants' Counsel Expenses | 28 |
|       | 5.16 | Non-Asbestos Reserve Fund | 28 |
|       | 5.17 | Intercompany Settlement | 29 |
|       | 5.18 | Deemed Consolidation of Debtors For Plan Purposes Only | 30 |

**ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS WITH RESPECT TO CLAIMS OTHER THAN PLAN TRUST ASBESTOS CLAIMS** ... 30

|       | 6.1 | Plan Distributions | 30 |
|       | 6.2 | Distributions of Cash | 30 |
|       | 6.3 | No Interest on Claims | 30 |
|       | 6.4 | Delivery of Distributions | 30 |
|       | 6.5 | Distributions to Holders as of the Record Date | 31 |
|       | 6.6 | Fractional Securities; Fractional Dollars | 31 |
|       | 6.7 | Withholding of Taxes | 31 |
|       | 6.8 | Unclaimed Property. | 31 |

**ARTICLE VII RESOLUTION OF DISPUTED CLAIMS** ... 31

|       | 7.1 | Disallowance of Improperly Filed Claims | 31 |
|       | 7.2 | Prosecution of Objections to Claims | 31 |
|       | 7.3 | No Distributions Pending Allowance | 32 |
|       | 7.4 | Distributions After Allowance | 32 |

**ARTICLE VIII TREATMENT OF EXECUTORY CONTRACTS, UNEXPIRED LEASES AND SETTLEMENTS** ... 32

|       | 8.1 | Assumption of Unexpired Leases and Executory Contracts | 32 |
|       | 8.2 | Damages Upon Rejection | 33 |
|       | 8.3 | Insurance Agreements | 33 |
|       | 8.4 | Compensation and Benefits Programs | 33 |
|       | 8.5 | Retiree Benefits | 34 |
|       | 8.6 | Indemnification of Directors, Officers and Employees | 34 |

**ARTICLE IX ACCEPTANCE OR REJECTION OF THE PLAN** ... 34

|       | 9.1 | Classes Entitled to Vote | 34 |
|       | 9.2 | Acceptance by Impaired Classes of Claims | 34 |
|       | 9.3 | Acceptance by Impaired Class of Interests | 34 |
|       | 9.4 | Acceptance Pursuant to Section 524(g) of the Bankruptcy Code | 34 |
|       | 9.5 | Presumed Acceptance of Plan | 34 |
|       | 9.6 | Reservation of Rights | 34 |

**ARTICLE X CONDITIONS TO CONFIRMATION AND EFFECTIVENESS** ... 35

|       | 10.1 | Conditions to Confirmation | 35 |
|       | 10.2 | Conditions to Effectiveness | 36 |

| 10.3 | Waiver of Conditions | 38 |

**ARTICLE XI INJUNCTIONS, RELEASES AND DISCHARGE** .................................................. 38

| 11.1 | Discharge | 38 |
| 11.2 | Exculpation | 38 |
| 11.3 | Releases by Holders of Plan Trust Asbestos Claims | 38 |
| 11.4 | Discharge Injunction | 39 |
| 11.5 | Third Party Releases | 39 |
| 11.6 | Asbestos Channeling Injunction | 39 |
| 11.7 | Reservation of Rights | 40 |
| 11.8 | Rights Against Non-Debtors under Securities Laws | 40 |
| 11.9 | Rights Against Debtors Under Environmental Laws | 40 |
| 11.10 | Disallowed Claims and Disallowed Interests | 40 |
| 11.11 | Anti-Suit Injunction | 40 |
| 11.12 | Insurance Neutrality | 41 |
| 11.13 | No Liability for Solicitation or Participation | 42 |

**ARTICLE XII MATTERS INCIDENT TO PLAN CONFIRMATION** ........................................ 42

| 12.1 | Term of Certain Injunctions and Automatic Stay | 42 |
| 12.2 | No Successor Liability | 42 |
| 12.3 | Revesting | 42 |
| 12.4 | Vesting and Enforcement of Causes of Action | 42 |
| 12.5 | GHR/Kenesis Actions | 43 |

**ARTICLE XIII MISCELLANEOUS** ................................................................. 43

| 13.1 | Jurisdiction | 43 |
| 13.2 | General Retention | 43 |
| 13.3 | Specific Purposes | 43 |
| 13.4 | Payment of Statutory Fees | 45 |
| 13.5 | Securities Law Matters | 45 |
| 13.6 | Plan Supplement | 45 |
| 13.7 | Allocation of Plan Distributions Between Principal and Interest | 45 |
| 13.8 | The Asbestos Claimants' Committee, the Futures Representative and the Bondholders' Committee | 45 |
| 13.9 | Revocation of Plan | 46 |
| 13.10 | Modification of Plan | 46 |
| 13.11 | Modification of Payment Terms | 46 |
| 13.12 | Entire Agreement | 47 |
| 13.13 | Headings | 47 |
| 13.14 | Professional Fee Claims | 47 |

iii

| | | |
|---|---|---|
| 13.15 | Recordable Order | 47 |
| 13.16 | Preparation of Estates' Returns and Resolution of Tax Claims | 47 |
| 13.17 | No Admission | 47 |
| 13.18 | Consent to Jurisdiction | 47 |
| 13.19 | Setoffs | 47 |
| 13.20 | Successors and Assigns | 47 |
| 13.21 | Non-Debtor Waiver of Rights | 47 |
| 13.22 | Further Authorizations | 48 |
| 13.23 | No Bar to Suits | 48 |
| 13.24 | Conflicts | 48 |
| 13.25 | Notices | 48 |
| 13.26 | Duty to Cooperate | 49 |
| 13.27 | Governing Law | 49 |

## INTRODUCTION

The Plan Proponents hereby propose this plan of reorganization pursuant to the provisions of Chapter 11 of the United States Bankruptcy Code. Capitalized terms used herein are defined in Article I below.

Reference is made to the Disclosure Statement distributed contemporaneously herewith for a discussion of the history, businesses, properties and results of operations of the Debtors and the risks associated with the Plan. All holders of Claims and Interests entitled to vote on the Plan are encouraged to read the Plan and Disclosure Statement in their entirety before voting to accept or reject the Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and Sections 13.6, 13.9 and 13.10 of the Plan, the Plan Proponents reserve the right to alter, amend, modify, revoke or withdraw the Plan prior to its substantial consummation.

## ARTICLE I

### DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

#### 1.1    **Scope of Definitions**

All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in Section 1.2 of the Plan. Any term used in the Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

#### 1.2    **Definitions**

**"ABI"** means American Biltrite Inc., a Delaware corporation.

**"ABI Asbestos Claim"** means any Asbestos Claim that may be asserted by ABI now or in the future other than an ABI Asbestos Indemnity Claim.

**"ABI Asbestos Indemnity Claim"** means any ABI Asbestos Personal Injury Indemnity Claim or ABI Asbestos Property Damage Indemnity Claim.

**"ABI Asbestos Personal Injury Indemnity Claim"** means any asbestos personal injury indemnification Claim or Demand that may be asserted by ABI against Congoleum at any time under the Joint Venture Agreement.

**"ABI Asbestos Property Damage Indemnity Claim"** means any asbestos related property damage indemnification Claim or Demand that may be asserted by ABI against Congoleum at any time under the Joint Venture Agreement.

**"ABI Canada License Agreement"** means the License Agreement, effective January 1, 2006, between Congoleum and American Biltrite (Canada) Ltd., as amended on the Effective Date pursuant to the Intercompany Settlement.

**"ABI Claim"** means any Claim or Demand at any time that may be asserted by ABI at any time against any Debtor, including without limitation ABI Asbestos Claims, ABI Rejection Damages Claims, and ABI Asbestos Indemnity Claims.

**"ABI Parties"** means any current or former officers, directors and employees of ABI, in their capacity as such.

**"ABI Rejection Damages Claims"** means any and all rejection damages claims that might arise upon the deemed rejection of the Intercompany Agreements provided for in Section 5.17 of the Plan.

"**Administrative Claim**" means any Claim for the payment of an Administrative Expense.  The term "Administrative Claim" shall not include Asbestos Claims.

"**Administrative Expense**" means (a) any cost or expense of administration of the Reorganization Cases under section 503(b) of the Bankruptcy Code including, but not limited to, (1) any actual and necessary post-petition cost or expense of preserving the Estates or operating the Debtors' assets and businesses, (2) any payment to be made under the Plan to cure a default on an assumed executory contract or unexpired lease, (3) any post-petition cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of business, (4) the outstanding fees and expenses of the Indenture Trustee incurred in accordance with Section 6.6 of the Indenture relating to the Senior Notes, including the reasonable fees and expenses of counsel to the Indenture Trustee, and (5) compensation or reimbursement of expenses of professionals to the extent allowed by the Bankruptcy Court or the District Court under section 327, 328, 330(a), 331, 503(b) or 1103 of the Bankruptcy Code, including, without limitation, the Debtors and their professionals, the Futures Representative and its professionals, the Bondholders' Committee and its professionals, and the Asbestos Claimants' Committee and its professionals and (b) any fee or charge assessed against the Estates under 28 U.S.C. § 1930.

"**Affiliate**" shall have the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

"**Allowed**" means:

(a)     With respect to an Administrative Claim:

(i)     such amount that represents a Claim of a professional person employed under sections 327, 328, 524(g)(4)(B)(i) or 1103 of the Bankruptcy Code who is required to apply to the Bankruptcy Court or the District Court for the allowance of compensation and reimbursement of expenses pursuant to section 330 of the Bankruptcy Code, to the extent such Claim is allowed by a Final Order of the Bankruptcy Court or the District Court under sections 330 or 331 of the Bankruptcy Code;

(ii)     such amount that represents the reasonable fees and expenses of the Indenture Trustee and its counsel that were otherwise incurred in accordance with the terms of the Indenture and are outstanding on the Effective Date; and

(iii)     other than with respect to a Claim described in clauses (a)(i) and (a)(ii) of this definition, such amount that represents an actual or necessary expense of preserving the Estates or operating the business of any of the Debtors, any such Claim to the extent that it constitutes an Allowed Administrative Claim, or if such Claim is a Disputed Claim, any such Claim to the extent it is allowed in whole or in part by a Final Order of the Bankruptcy Court or the District Court and only to the extent that such allowed portion is deemed, pursuant to a Final Order of the Bankruptcy Court or the District Court, to constitute a cost or expense of administration under section 503 or 1114 of the Bankruptcy Code;

(b)     With respect to an Asbestos Property Damage Claim that was filed prior to the expiration of the Asbestos Property Damage Claim Bar Date, such amount as is liquidated and allowed by the Bankruptcy Court or the District Court; and

(c)     With respect to any Claim other than a Plan Trust Asbestos Claim, an Asbestos Property Damage Claim or an Administrative Claim, such Claim or any portion thereof (i) that has been allowed in whole or in part by a Final Order of the Bankruptcy Court or the District Court; (ii) that has been expressly allowed in the Plan; (iii) as to which, on or before the Effective Date, (A) no Proof of Claim has been filed with the Bankruptcy Court or the District Court and (B) the Claim is listed in the Schedules (as they may be amended) and not listed as disputed, contingent, or unliquidated; or (iv) for which a Proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court or District Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court or the District Court, or other applicable bankruptcy law, and as to which either (A) no objection to its allowance has been filed within the periods of limitation fixed by the Plan, the Bankruptcy Code, or any order of the Bankruptcy Court or District Court, or (B) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order.

Exhibit A--Plan.DOC

"**Allowed Amount**" means the sum at which a Claim is Allowed.

"**Amended and Restated Bylaws**" means the Amended and Restated Bylaws of Reorganized Congoleum to become effective on the Effective Date, which shall be substantially in the form attached hereto as Exhibit "J". The Amended and Restated Bylaws will be filed as part of the Plan Supplement.

"**Amended and Restated Certificate**" means the Amended and Restated Certificate of Incorporation of Reorganized Congoleum to become effective on the Effective Date, which shall be substantially in the form attached hereto as Exhibit "K".  The Amended and Restated Certificate will be filed as part of the Plan Supplement.

 "**Anti-Suit Injunction**" means the injunction described in Section 11.11 of the Plan.

"**Asbestos Channeling Injunction**" means the injunction described in Section 11.6 of the Plan.

"**Asbestos Claimant**" means the holder of an Asbestos Personal Injury Claim.

"**Asbestos Claimants' Committee**" means the official committee of the representatives of holders of present unsecured Asbestos Personal Injury Claims, solely in its capacity as such, which committee as of the date hereof consists of the following representatives of the holders of present unsecured Asbestos Personal Injury Claims: Perry Weitz, Esquire, Joseph Rice, Esquire, Steven Kazan, Esquire, Russell Budd, Esquire and Robert Taylor, II, Esquire.

"**Asbestos Claims**" means, collectively, Plan Trust Asbestos Claims and ABI Asbestos Claims.

"**Asbestos In-Place Insurance Coverage**" means any insurance coverage, not reduced to Cash settlement proceeds, available for the payment or reimbursement of liability, indemnity or defense costs arising from or related to Asbestos Claims or Demands or Plan Trust Expenses under any Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement.

"**Asbestos Insurance Action**" means any claim, cause of action, or right of any Debtor against any Asbestos Insurance Company, including without limitation, the Coverage Litigation, arising from or related to: (a) any such Asbestos Insurance Company's failure to provide or pay under Asbestos In-Place Insurance Coverage, (b) the refusal of any Asbestos Insurance Company to compromise and settle any Asbestos Claim under or pursuant to any Asbestos Insurance Policy, or (c) the interpretation or enforcement of the terms of any Asbestos Insurance Policy with respect to any Asbestos Claim.

"**Asbestos Insurance Action Recoveries**" means (a) Cash derived from and paid pursuant to Asbestos Insurance Settlement Agreements, (b) the right to receive proceeds of Asbestos In-Place Insurance Coverage, and (c) the right to receive the proceeds or benefits of any Asbestos Insurance Action.

"**Asbestos Insurance Assignment**" means the transfer, grant and assignment of the Asbestos Insurance Rights to the Plan Trust described in Article V of the Plan, which will be effectuated pursuant to the Insurance Transfer Agreement.

"**Asbestos Insurance Company**" means any insurance company, insurance broker, guaranty association, liquidator, rehabilitator or any other Entity with demonstrated or potential liability to any of the Debtors, the Reorganized Debtors, or the Plan Trust under or related to an Asbestos Insurance Policy.

"**Asbestos Insurance Policy**" means any insurance policy issued to or for the benefit of any of the Debtors in effect at any time on or before the Effective Date that may afford any of the Debtors indemnity or insurance coverage, upon which any claim has been or may be made with respect to any Asbestos Claim.

"**Asbestos Insurance Rights**" means any and all rights, titles, privileges, interests, claims, demands or entitlements to any proceeds, payments, initial or supplemental dividends, scheme payments, supplemental scheme payments, causes of action and choses in action related to Asbestos In-Place Insurance Coverage, whether now

existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, including but not limited to:

(i)        any and all rights to pursue or receive payments with respect to Asbestos Claims under any Asbestos In-Place Insurance Coverage, whether for liability, defense or otherwise;

(ii)       any and all rights to pursue or receive payments related to any Asbestos In-Place Insurance Coverage that was entered into by any domestic or foreign insolvent insurance company, whether in receivership, liquidation, rehabilitation, run-off, scheme of arrangement or any other form of proceeding;

(iii)      any and all rights to pursue or receive payments related to any Asbestos In-Place Insurance Coverage from any state insurance guaranty association in connection with any state insurance guaranty association statute; *provided, however*, that Asbestos Insurance Rights shall not include any rights or obligations under any insurance policy or settlement agreement to which the Debtors are a party insofar as such insurance policy or settlement agreement relates to Workers' Compensation Claims; and

(iv)      any and all rights to pursue any Causes of Action against, or to receive payments related to any Asbestos In-Place Insurance Coverage from, any Asbestos Insurance Company.

**"Asbestos Insurance Settlement Agreement"** means any settlement agreement between or among any of the Debtors and a Settling Asbestos Insurance Company relating to any Asbestos Claim or Asbestos Insurance Action.

**"Asbestos Insurer Coverage Defenses"** means all defenses at law or in equity that an Asbestos Insurance Company may have under any Asbestos Insurance Policy or applicable law to provide Asbestos In-Place Insurance Coverage to or for Asbestos Personal Injury Claims or Plan Trust Expenses that have been channeled to or assumed by or incurred by the Plan Trust pursuant to the Plan; *provided, however,* that in the event there is a Final Order determining that the Bankruptcy Code authorizes the Asbestos Insurance Assignment by preempting any terms of any Asbestos Insurance Policy or provisions of applicable non-bankruptcy law that otherwise might prohibit the Asbestos Insurance Assignment, "Asbestos Insurer Coverage Defenses" shall not include any defense that the Asbestos Insurance Assignment is prohibited by any Asbestos Insurance Policy or applicable non-bankruptcy law.

**"Asbestos Personal Injury Claim"** means (a) any claim, demand or lawsuit (including, but not limited to, any Claim or Demand), whenever and wherever arising or asserted against any of the Debtors or their respective present or former officers, directors or employees in their capacities as such and (b) any debt, obligation or liability (whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, bonded, secured or unsecured), whenever and wherever arising or asserted, of the Debtors or their respective present or former officers, directors or employees in their capacities as such (including, but not limited to, all thereof in the nature of or sounding in tort, contract, warranty, or any other theory of law, equity or admiralty); in either case (a) or (b) for, based on or arising by reason of, directly or indirectly, physical, emotional, bodily or other personal injury, sickness, disease, death or damages based on the foregoing (including, but not limited to, any claim or demand for compensatory damages, loss of consortium, proximate, consequential, general, special or punitive damages, reimbursement, indemnity, warranty, contribution or subrogation) whether or not diagnosable or manifested before the Confirmation of the Plan or the close of the Reorganization Cases, (x) caused or allegedly caused, in whole or part, directly or indirectly: (i) by exposure to asbestos or asbestos-containing products manufactured, supplied, distributed, handled, fabricated, stored, sold, installed, or removed by any Debtor and/or its predecessors; or (ii) by services, actions, or operations provided, completed or taken by any Debtor and/or its predecessors in connection with asbestos or asbestos-containing products or (y) caused or allegedly caused by asbestos for which any Debtor or its predecessors, are alleged to be liable under any applicable law including, but not limited to, Indirect Asbestos Claims, *provided* that Asbestos Personal Injury Claim shall not include Workers' Compensation Claims, ABI Asbestos Claims or Asbestos Property Damage Claims.

**"Asbestos Personal Injury Claim Sub-Account"** means that portion of the Plan Trust Assets to be made available for payment of Plan Trust Asbestos Claims (and related Plan Trust Expenses) other than Allowed Asbestos Property Damage Claims.

"**Asbestos Property Damage Claim**" means any Claim or remedy or liability for damage to property (whether or not such Claim, remedy or liability is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty or otherwise), for which the Debtors are alleged to be or may be responsible by judgment, order or settlement and that (1) arises from or relates to any building or other real property in which asbestos was or is, or asbestos-containing products were or are, alleged to have been installed prior to the Petition Date; and (2) seeks monetary or other relief for injury to, destruction, loss of use, diminution in value, and/or asbestos-related repair or maintenance of such property or for the cost of inspection, encapsulation, decontamination, containment, removal, or other abatement of the asbestos or asbestos-containing products installed or allegedly installed in such property. Asbestos Property Damage Claim also includes any such Claims, remedies or liabilities as described immediately above that seek (a) compensatory damages (such as proximate, consequential, general and special damages) and punitive damages; and/or (b) reimbursement, indemnification, subrogation and/or contribution, including, without limitation, any Asbestos Property Damage Contribution Claim. Notwithstanding the foregoing, Asbestos Property Damage Claim does not include any ABI Asbestos Claim or Asbestos Personal Injury Claim.

"**Asbestos Property Damage Claim Bar Date**" means May 3, 2004, the date designated by the Bankruptcy Court as the last date for filing Proofs of Claim on account of an Asbestos Property Damage Claim against the Debtors.

"**Asbestos Property Damage Claim Sub-Account**" means that portion of the Plan Trust Assets, consisting solely of the Asbestos Property Damage Insurance Rights, to be made available for payment of Allowed Asbestos Property Damage Claims.

"**Asbestos Property Damage Contribution Claim**" means any Claim or remedy or liability for damage to property asserted against the Debtors (whether or not such Claim, remedy or liability is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty or otherwise) that is: (1) held by any Entity or assignee or transferee thereof which has been, is, or may be a defendant in an action alleging damage to property that (i) arises from or relates to any building or other real property in which asbestos was or is, or asbestos-containing products were or are, alleged to have been installed prior to the Petition Date, and (ii) seeks monetary or other relief for injury to, destruction, loss of use, diminution in value, and/or asbestos-related repair or maintenance of such property or for the cost of inspection, encapsulation, decontamination, containment, removal, or other abatement of the asbestos or asbestos-containing products installed or allegedly installed in such property; and (2) on account of alleged liability by the Debtors for reimbursement, indemnification, subrogation, or contribution of any portion of any damages such Entity (or assignee or transferee thereof) has paid or may pay to the plaintiff in such action. Notwithstanding anything herein to the contrary, Asbestos Property Damage Contribution Claim does not include any ABI Asbestos Claims or Asbestos Personal Injury Claims.

"**Asbestos Property Damage Insurance Rights**" means all rights arising under all insurance policies, issued to or for the benefit of any of the Debtors that may afford any of the Debtors indemnity or insurance coverage solely for Asbestos Property Damage Claims, which policies are set forth on Exhibit "A" attached hereto. The foregoing includes, but is not limited to, rights under insurance policies, rights under settlement agreements made with respect to such insurance policies, rights against the estates of insolvent insurers that issued such policies or entered into such settlements, and rights against state insurance guaranty associations arising out of any such insurance policies issued by insolvent insurers.

"**Avoidance Actions**" means, collectively, the Omnibus Avoidance Action and the Sealed Avoidance Action.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*., as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Reorganization Cases.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of New Jersey.

Exhibit A--Plan.DOC

**"Bankruptcy Professional"** means any Person (a) employed pursuant to an order of the Bankruptcy Court or District Court, as applicable, in accordance with section 327 or 1103 of the Bankruptcy Code and to be compensated for services pursuant to sections 327, 328, 329, 330 and/or 331 of the Bankruptcy Code, or (b) who applies to the District Court for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code.

**"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Reorganization Cases.

**"Bar Dates"** means the date(s), if any, designated by the Bankruptcy Court or the District Court as the last date(s) for filing Proofs of Claim against the Debtors.

**"Bondholders' Committee"** means the official committee of bondholders appointed in these Reorganization Cases on January 27, 2006, as reconstituted from time to time, solely in its capacity as such.

**"Business Day"** means any day other than a Saturday, Sunday or a legal holiday (as such term is defined in Bankruptcy Rule 9006(a)) on which commercial banks are open for business in New York, New York.

**"Cash"** means lawful currency of the United States of America and its equivalents.

**"Causes of Action"** means, without limitation, any and all rights, remedies, claims, causes of action, liabilities, obligations, suits, debts, sums of money, damages, judgments, and demands whatsoever, whether known or unknown, in law, equity, or otherwise which may be brought by or on behalf of the Debtors and/or the Estates, arising under any provision of the Bankruptcy Code or other applicable law, including the GHR/Kenesis Actions.

**"Century Entities"** shall have the meaning ascribed to such term in the Settlement and Buyback Agreement.

**"Claim"** means a claim against the Debtors (or any of them), whether or not asserted, as defined in section 101(5) of the Bankruptcy Code, and further shall include, but is not limited to, Asbestos Claims.

**"Claimant Agreement"** means that certain Settlement Agreement Between Congoleum and Various Asbestos Claimants, as amended by the first amendment thereto, entered into by Congoleum and certain Asbestos Claimants, through their counsel, prior to the Petition Date, as amended from time to time in accordance with its terms.

**"Claimants' Counsel"** means Joseph F. Rice, Esquire and Perry Weitz, Esquire, collectively, in their capacity under the Claimant Agreement as the representatives of certain holders of Asbestos Personal Injury Claims.

**"Class"** means a category of Claims or Interests, as classified in Article II of the Plan pursuant to section 1122(a)(1) of the Bankruptcy Code.

**"Collateral Trust"** means the Collateral Trust established pursuant to the Collateral Trust Agreement, the Security Agreement and the Claimant Agreement.

**"Collateral Trust Agreement"** means that certain irrevocable trust agreement entered into by Congoleum and Arthur J. Pergament and Wilmington Trust Company, as amended by the first amendment thereto, and any further modifications or amendments thereto.

**"Collateral Trustee"** means the Trustee as defined and named in the Collateral Trust Agreement.

**"Confirmation"** means the approval of the Plan by the District Court pursuant to section 1129 and other applicable sections of the Bankruptcy Code.

**"Confirmation Date"** means the date on which the Confirmation Order is entered on the docket of the District Court.

**"Confirmation Hearing"** means the hearing(s) which will be held before the District Court, as appropriate, at which the Plan Proponents will seek Confirmation of the Plan.

**"Confirmation Order"** means the order of the District Court confirming the Plan pursuant to section 1129 and other applicable sections of the Bankruptcy Code.

**"Congoleum"** means Congoleum Corporation, a Delaware corporation.

**"Congoleum Interests"** means, collectively, all equity interests in Congoleum outstanding immediately prior to the Effective Date including, without limitation, (a) shares of Class A common stock, par value $0.01 per share, and Class B Common Stock, par value $0.01 per share, of Congoleum and (b) any options, warrants, conversion rights, rights of first refusal, or other rights, contractual or otherwise, to acquire or receive any stock or other equity ownership interests in Congoleum.

**"Coverage Action"** means that certain civil action pending in the Superior Court of New Jersey, docket number MID-L-8908-01, as such action exists after giving effect to the Order entered therein on October 30, 2003 that dismissed, without prejudice, certain claims including Environmental Claims, as referenced in such Order.

**"Coverage Litigation"** means (i) the Coverage Action; and (ii) any other action which seeks to determine the extent of insurance coverage for defense of and liability for Asbestos Claims and related issues.

**"Debtor"** means each of Congoleum, Congoleum Sales, Inc. and Congoleum Fiscal, Inc., as debtors-in-possession in the Reorganization Cases, and **"Debtors"** means all of them collectively, and when the context so requires, as post-Confirmation entities reorganized hereunder.

**"Demand"** means a demand for payment against any of the Debtors within the meaning of section 524(g)(5) of the Bankruptcy Code, but excludes any demand in respect of an Asbestos Property Damage Claim or an ABI Asbestos Claim.

**"Direct Action"** means any cause of action or right to bring a cause of action possessed by an Asbestos Claimant against an Asbestos Insurance Company on account of such Asbestos Claimant's Plan Trust Asbestos Claim, whether arising by contract or under the laws of any jurisdiction.

**"Disallowed"** means a Claim or Interest, as the case may be, that is disallowed by the Plan, a Final Order of the District Court, or that is disallowed pursuant to the TDP.

**"Disbursing Agent"** means Reorganized Congoleum or any Person selected by Reorganized Congoleum to hold and distribute the consideration to be distributed to the holders of Allowed Claims (other than Plan Trust Asbestos Claims and Senior Note Claims) under the Plan.

**"DIP Financing Agreements"** means the Existing Credit Agreement as ratified and amended by the Ratification and Amendment Agreement, dated as of January 7, 2004 ("Ratification Agreement"), between Wachovia and Congoleum, as acknowledged by Guarantors (as defined in the Ratification Agreement), as amended, restated, modified and/ or supplemented, together with all agreements, documents and instruments at any time executed and/or delivered in connection therewith or related thereto, including the Reaffirmation and Amendment of Guarantor Documents, dated as of January 7, 2004, between Wachovia and Guarantors, as from time to time amended, modified, supplemented, extended, renewed, restated or replaced.

**"DIP Financing Claim"** means any Claim arising from or in connection with the DIP Financing Order or the DIP Financing Agreements.

**"DIP Financing Lender"** means Wachovia.

"**DIP Financing Order**" means the Final Order (1) Authorizing Debtors' Use of Cash Collateral, (2) Authorizing Debtors to Obtain Post-Petition Financing, (3) Granting Senior Liens and Priority Administrative Expense Status Pursuant to 11 U.S.C. §§105 and 364(c), (4) Modifying the Automatic Stay Pursuant to 11 U.S.C. §362, and (5) Authorizing Debtors to Enter Into Agreements with Congress Financial Corporation (as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced), which was approved by the Bankruptcy Court on February 2, 2004.

"**Discharge Injunction**" means the injunction described in Section 11.4 of the Plan.

"**Disclosure Statement**" means the Disclosure Statement with respect to the Plan, including all exhibits, appendices, schedules and annexes attached thereto, as submitted by the Plan Proponents pursuant to section 1125 of the Bankruptcy Code, as such Disclosure Statement may be further amended, supplemented or modified from time to time.

"**Disclosure Statement Approval Order**" means that certain order of the District Court entered on March 12, 2010, approving the adequacy of the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, as such order may be amended, modified or supplemented thereafter.

"**Disputed Claim**" means any Claim that has not been allowed by a Final Order as to which (a) a Proof of Claim has been filed with the Bankruptcy Court or the District Court, as applicable, and (b) an objection has been or may be timely filed or deemed filed under applicable law and any such objection has not been (i) withdrawn, (ii) overruled or denied by a Final Order or (iii) granted by a Final Order. For purposes of the Plan, a Claim that has not been Allowed by a Final Order shall be considered a Disputed Claim, whether or not an objection has been or may be timely filed, if (A) the amount of the Claim specified in the Proof of Claim exceeds the amount of any corresponding Claim listed in the Schedules, (B) the classification of the Claim specified in the Proof of Claim differs from the classification of any corresponding Claim listed in the Schedules, (C) any corresponding Claim has been listed in the Schedules as disputed, contingent or unliquidated, (D) no corresponding Claim has been listed in the Schedules or (E) such Claim is reflected as unliquidated or contingent in the Proof of Claim filed in respect thereof.

"**Distributions**" means any distribution by the Debtors or Reorganized Congoleum to a Record Holder of an Allowed Claim or Interest.

"**Distribution Date**" means, when used with respect to an Allowed Claim (other than a Plan Trust Asbestos Claim), the date which is as soon as reasonably practicable after the latest of: (a) the Effective Date; (b) the first Business Day of the next calendar month following the date on which the Claim becomes an Allowed Claim; or (c) the first Business Day of the next calendar month upon which the Claim matures and becomes due and payable according to its own terms, unless the Claim becomes Allowed within fifteen (15) Business Days before the first Business Day of the next calendar quarter, in which case the Distribution Date shall be the first Business Day of the next succeeding calendar quarter.

"**District Court**" means the United States District Court for the District of New Jersey, which withdrew the reference from the Bankruptcy Court pursuant to 28 U.S.C. § 157(d) as of August 17, 2009 and assumed authority over the Reorganization Cases.

"**Effective Date**" means the first Business Day after the Confirmation Date immediately following the first day upon which all of the conditions to the occurrence of the Effective Date specified in Section 10.2 of the Plan have been satisfied or waived pursuant to Section 10.3 of the Plan.

"**Entity**" means any Person, estate, trust, Governmental Unit or the United States Trustee.

"**Environmental Laws**" means (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601, *et seq.*, (b) the Resource Conservation and Recovery Act, as amended by the Hazardous and Solid Waste

8

Amendment of 1984, 42 U.S.C. §§ 6901, *et seq.*, (c) the Clean Air Act, 42 U.S.C. §§ 7401, *et seq.*, (d) the Clean Water Act of 1977, 33 U.S.C. §§ 1251, *et seq.*, (e) the Toxic Substances Control Act, 15 U.S.C. §§ 2601, *et seq.*, (f) all statutes or laws issued or promulgated by any Governmental Unit, as they may be amended from time to time, relating to environmental contamination or pollution, air pollution, water pollution, noise control and/or the handling, discharge, existence, release, disposal or recovery of on-site or off-site hazardous, toxic or dangerous wastes, substances, chemicals or materials, and (g) the ordinances, rules, regulations, orders, notices of violation, requests, demands and requirements issued or promulgated by any Governmental Unit in connection with such statutes or laws.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Estate(s)**" means, individually, the estate of each Debtor in the Reorganization Cases and, collectively, the estates of all Debtors in the Reorganization Cases, created pursuant to section 541 of the Bankruptcy Code.

"**Existing Credit Agreement**" means the Loan and Security Agreement between Congoleum, as borrower, and Wachovia, as lender, dated as of December 10, 2001, as amended by Amendment No. 1 to Loan and Security Agreement, dated September 19, 2002, by and between Wachovia and Congoleum, and Amendment No. 2 to Loan and Security Agreement, dated as of February 27, 2003, by and between Wachovia and Congoleum, and as otherwise amended, restated, modified and/or supplemented as of the Petition Date and any related documents.

"**Existing Securities**" means, collectively, the Senior Notes and Interests.

"**Existing Subsidiary Guaranty**" means the Limited Guaranty, dated as of February 27, 2003, executed by Congoleum Fiscal, Inc. and Congoleum Sales, Inc., as amended, restated, modified or supplemented as of the Petition Date.

"**Exit Facility**" means the revolving credit and term loan facility in the aggregate principal amount of $30,000,000 to be provided by lenders acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative in the form of a revolving loan and a term loan to Reorganized Congoleum secured by substantially all of the assets of Reorganized Congoleum and otherwise on terms and conditions, and pursuant to loan documentation, satisfactory and acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative which financing shall be consistent with the Exit Facility Commitment Letter or Term Sheet contained in the Plan Supplement.

"**Exit Facility Commitment Letter or Term Sheet**" means that certain agreement by and between the Debtors and Exit Facility Lenders, detailing the commitment of the Exit Facility Lenders to provide the Exit Facility, a copy of which will be provided in the Plan Supplement.

"**Exit Facility Lenders**" means the lenders who will provide the Exit Facility, with such lenders to be identified in the Exit Facility Commitment Letter or Term Sheet.

"**Final Distribution**" means the Distribution by the Debtors or Reorganized Congoleum that satisfies all Allowed Claims and Interests to the extent provided in accordance with this Plan.

"**Final Order**" means an order or judgment of the Bankruptcy Court or the District Court, as applicable, or other court of competent jurisdiction, the implementation, operation or effect of which has not been stayed and as to which order (or any revision, modification or amendment thereon) the time to appeal or seek review, rehearing or writ of certiorari has expired and as to which no appeal or petition for review, reconsideration, rehearing or certiorari has been taken and is pending.

"**Futures Representative**" means the Person appointed by the Bankruptcy Court to represent the rights and interests of the future Demands, who shall be R. Scott Williams, Esquire, or such other individual appointed by the District Court, pursuant to section 524(g) of the Bankruptcy Code.

"**General Unsecured Claim**" means any Claim against any Debtor arising prior to the Petition Date (regardless of whether such Claim is covered by insurance) to the extent that such Claim is neither secured nor entitled to priority under the Bankruptcy Code or by a Final Order of the Bankruptcy Court or District Court, as applicable (other than any Workers' Compensation Claim, ABI Claim, Senior Note Claim or Asbestos Claim), including, but not limited to: (a) any Claim arising from the rejection of an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and (b) any portion of a Claim to the extent the value of the holder's interest in the applicable Estate's interest in the property securing such Claim is less than the amount of the Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Claim, as determined pursuant to section 506(a) of the Bankruptcy Code; provided, however, General Unsecured Claims do not include claims against the Debtors under the Environmental Laws as set forth in Section 11.9 hereof, which survive the Reorganization Cases.

"**GHR/Kenesis Actions**" means any Causes of Action, including for malpractice, against Gilbert LLP (formerly known as Gilbert Oshinsky LLP, Gilbert Randolph LLP, Gilbert, Heintz & Randolph LLP) or The Kenesis Group LLC.

"**Governmental Unit**" means any domestic, foreign, provincial, federal, state, local or municipal (a) government, or (b) governmental agency, commission, department, bureau, ministry or other governmental entity.

"**Impaired**" means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"**Indenture**" means the Indenture by and between Congoleum Corporation, as Issuer, and First Union National Bank, as Trustee, dated as of August 3, 1998, as supplemented and amended from time to time, relating to the Senior Notes.

"**Indenture Trustee**" means HSBC Bank USA, N.A., as successor to First Union National Bank, not individually but as indenture trustee under the Indenture, and its successors and assigns.

"**Indirect Asbestos Claim**" means (i) any Claim based on a right of contribution, reimbursement, subrogation, or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) arising out of or based on an Asbestos Personal Injury Claim or another Indirect Asbestos Claim, (ii) any other derivative or indirect Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law, equity or admiralty, by reason of an Asbestos Personal Injury Claim or another Indirect Asbestos Claim (including, without limitation, any Claim (A) for attorneys' fees arising or incurred in connection with any Asbestos Personal Injury Claim, another Indirect Direct Asbestos Claim or an Asbestos Insurance Action or (B) arising out of or based on the rejection of any executory contract related to or involving asbestos), and (iii) any Claim arising out of Asbestos Insurance Policies or settlement agreements related thereto, in each case other than ABI Asbestos Claims or Asbestos Property Damage Claims.

"**Injunctions**" means the Discharge Injunction, the Asbestos Channeling Injunction, the Anti-Suit Injunction and any other injunctions entered by order of the Bankruptcy Court or the District Court in the Reorganization Cases (including but not limited to any injunction contained in any Final Order approving any Asbestos Insurance Settlement Agreement).

"**Insurance Transfer Agreement**" means the insurance assignment agreement referenced in Section 5.1(c) of the Plan and substantially in the form attached as Exhibit "B" to the Plan.

"**Intercompany Agreements**" means any and all agreements existing between any of the Debtors and ABI, including without limitation the (i) Joint Venture Agreement, (ii) Personal Services Agreement, (iii) stockholders agreement, made as of March 11, 1993, as amended, (iv) Business Relations Agreement, dated as of March 11, 1993, as amended, (v) Tax Sharing Agreement, dated as of March 11, 1993, (vi) Closing Agreement, dated as of March 11, 1993, (vii) Plan of Repurchase, dated as of February 1, 1995, and (viii) annual intercompany personal computing, desktop and voice and data system support and other information technology services agreements.

"**Intercompany Settlement**" shall have the meaning ascribed to such term in Section 5.17.

"**Interest**" means any equity interest in the Debtors existing immediately prior to the Effective Date, including without limitation, the Congoleum Interests and the Subsidiary Interests.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**Joint Venture Agreement**" means that certain Joint Venture Agreement, dated as of December 16, 1992, by and among American Biltrite Inc., Resilient Holdings Incorporated, Congoleum, Hillside Industries Incorporated and Hillside Capital Incorporated, as amended by the Closing Agreement, dated as of March 11, 1993, by and among the same parties.

"**Lender Secured Claim**" means any Claim of Wachovia arising under or relating to the Existing Credit Agreement, the Existing Subsidiary Guaranty and any related documents.

"**Lien**" means, with respect to any asset or property, any properly perfected and unavoidable mortgage, lien, pledge, charge, security interest, encumbrance or other security device of any kind pertaining to or affecting such asset or property.

"**Litigation Settlement Agreement**" means the compromise and settlement agreement referenced in Section 5.14 of the Plan, approved by the Bankruptcy Court by order dated October 31, 2008, which Litigation Settlement Agreement was amended by the First Amendment to the Litigation Settlement Agreement dated as of October 22, 2009, as the same may be approved by the District Court.

"**Litigation Settlement Claimant**" means a person whose Asbestos Personal Injury Claim was liquidated pursuant to or was subject to liquidation pursuant to the Claimant Agreement or a Pre-Petition Settlement Agreement who executed the Litigation Settlement Agreement.

"**New ABI Agreement**" means the agreement to be entered into between Reorganized Congoleum and ABI, which shall be in form and substance mutually agreeable to the Bondholders' Committee, the Asbestos Claimants' Committee, the Futures Representative, and ABI, and which shall govern the relationship between ABI and Reorganized Congoleum upon the Effective Date, thereby superseding any and all Intercompany Agreements and which agreement shall be substantially in the form attached as Exhibit "I" to the Plan. The New ABI Agreement will be filed with the Plan Supplement.

"**New Common Stock**" means the newly issued shares of Congoleum common stock, par value $.01 per share, to be issued by Reorganized Congoleum as of the Effective Date pursuant to the terms of the Plan.

"**New Indenture**" means the Indenture dated as of the Effective Date relating to the New Senior Notes and which shall be substantially in the form attached as Exhibit "D" to the Plan. The New Indenture will be filed as part of the Plan Supplement.

"**New Senior Notes**" means the Senior Secured Notes to be issued to holders of Allowed Senior Note Claims by Reorganized Congoleum in the initial aggregate principal amount of $33 million on the Effective Date and which shall be due and payable December 31, 2017 . There shall be no interest accruing or due and payable on the principal amount of the New Senior Notes for the first six months after the Effective Date. Thereafter, interest shall accrue on the principal amount of the New Senior Notes at the rate of 9% per annum and be payable semi-annually in cash. At the sole option of Reorganized Congoleum, however, beginning with the interest payment due 12 months after the Effective Date to and including the interest payment due 30 months after the Effective Date (the "PIK Period"), interest may be paid in kind by the issuance of additional New Senior Notes in the aggregate amount of the interest then due and payable on each such payment date within the PIK Period. The option shall be separately exercisable with respect to each of the four semi-annual periods within the PIK Period. If Reorganized Congoleum elects to pay interest in kind during any semi-annual period within the PIK Period, interest shall accrue on all the New Senior Notes during such semi-annual period, including any New Senior Notes issued previously in connection with an interest payment in kind, at the rate of 11% per annum; if the Company does not elect the PIK payment

option on any interest payment date within the PIK period, interest for such semi-annual period shall be calculated at the rate of 9% per annum on all the New Senior Notes during such semi-annual period, including any New Senior Notes issued previously in connection with an interest payment in kind. After the expiration of the PIK Period, the option to pay interest in kind shall expire, and be of no further force and effect, and all interest shall accrue at 9% per annum, payable semi-annually in cash.

Commencing with the end of the Company's Fiscal Year ending December 31, 2011, the Company shall calculate the average annual Consolidated Cash Flow for each of the prior two Fiscal Years for each of the Company's Fiscal Years ending 2011 through 2016 (each such date, a "Determination Date"). The Company shall then calculate an assumed net debt capacity (the "Net Debt Capacity") as of each such Determination Date by multiplying the applicable two-year average annual Consolidated Cash Flow by four. The Company shall issue additional notes ("Additional Notes") to Holders of Notes on the relevant Regular Record Date to the extent that the Net Debt Capacity as of such Determination Date, plus any Cash Equivalents on the Company's balance sheet (plus any undrawn commitment amount under the Company's then outstanding revolving credit facility to the extent available to be drawn on the Determination Date) as of such Determination Date, exceeds the sum of (i) the amount of the outstanding balance of the Company's then outstanding revolving credit facility (determined as the daily average of such loan for the Fiscal Year ending on such Determination Date, and assuming it was fully drawn to the extent available to be drawn on each day of calculation of such daily average); (ii) the $33.0 million of Initial Notes; (iii) the amount of Additional Notes (excluding interest accretion as provided in the penultimate sentence of this paragraph) issued with respect to all prior Determination Dates; and (iv) the amount of other interest-bearing Indebtedness outstanding as of such Determination Date. The calculation of the amount of Additional Notes to be issued shall take place within three months after each Determination Date, and the issuance of such Additional Notes shall take place on the first Interest Payment Date after such calculation. The Company shall pay interest with such Additional Notes in cash upon issuance of such Additional Notes at a rate of 9% per annum on the principal amount of such Additional Notes accrued from the first date of the Fiscal Year following the applicable Determination Date if the Company pays interest in cash on the then existing Notes on such issuance date; and if interest on existing Notes on such issuance date is paid in PIK Notes, the principal amount of Additional Notes shall be increased to include the interest accreted from the first date of the Fiscal Year following the applicable Determination Date to the applicable issuance date at a rate per annum of 11% on the principal amount of Additional Notes otherwise to be issued not taking into account such accretion. In no event shall the cumulative amount of Additional Notes issued under the procedures set forth in this paragraph exceed $37.0 million (excluding interest accretion as provided in the penultimate sentence of this paragraph).

Upon a Change of Control (as defined in the New Indenture as are other terms used in this definition of New Senior Notes), the holders of the New Senior Notes may require Reorganized Congoleum to repurchase the New Senior Notes at an offer price in cash equal to 115% of the aggregate principal amount thereof plus accrued and unpaid interest thereon. Moreover, the New Senior Notes are not optionally redeemable at any time prior to maturity.

The New Senior Notes will be secured by liens or security interests in all the assets of Reorganized Congoleum, which liens or security interests shall be subordinate in priority only to the liens or security interests granted by Reorganized Congoleum under the Exit Facility but shall not otherwise be subordinated to the Exit Facility, and which New Senior Notes liens or security interests shall be *pari passu* with no other security interests or liens. The New Senior Notes shall be in the form set forth in the New Indenture.

**"Non-Asbestos Stock Distribution"** means 49.9% of the New Common Stock.

**"Non-Compensatory Damages"** means any and all damages awarded by a court of competent jurisdiction that are penal in nature, including, without limitation, punitive, punitory, exemplary, vindictive, imaginary or presumptive damages.

**"Omnibus Avoidance Action"** means that certain Adversary Proceeding No. 05-06245 (KCF), which was filed in the Bankruptcy Court on behalf of the Debtors on December 3, 2005, as amended.

**"Other Secured Claim"** means a Secured Claim arising prior to the Petition Date against any of the Debtors other than a Lender Secured Claim.

12

**"PBGC"** shall have the meaning ascribed to such term in Section 8.4(b).

**"Pension Plans"** means, collectively, that certain Congoleum Corporation Hourly Retirement Plan, that certain Congoleum Corporation Retirement Plan for Salaried Employees and that certain Congoleum Corporation Plant 2 Retirement Plan, in each case as the same may be amended from time to time.

**"Person"** means any person, individual, partnership, corporation, limited liability company, joint venture company, association or other entity or being of whatever kind, whether or not operating or existing for profit, including, but not limited to, any "person" as such term is defined in section 101(41) of the Bankruptcy Code, but excluding any Governmental Unit.

**"Personal Services Agreement"** means that certain Personal Services Agreement dated as of March 11, 1993, by and between ABI and Congoleum and all amendments thereto.

**"Petition Date"** means December 31, 2003, the date on which the Debtors filed their petitions for relief commencing the Reorganization Cases.

**"Plan"** means this Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code and all exhibits and schedules annexed hereto or referenced herein, and any amendments or modifications thereto made in accordance with the Bankruptcy Code.

**"Plan Documents"** means the Plan, the Plan Trust Agreement, the TDP, the Exit Facility, the New Senior Notes, the New Indenture, the Registration Rights Agreement, the Amended and Restated Certificate, the Amended and Restated Bylaws, the Stockholders Agreement, the New ABI Agreement, and the Insurance Transfer Agreement, and all exhibits and schedules to any of the foregoing, including any included in a Plan Supplement.

**"Plan Proponents"** means, collectively, the Debtors, the Asbestos Claimants' Committee and the Bondholders' Committee.

**"Plan Supplement"** means the compilation of substantially final forms of documents, including, without limitation, a schedule identifying rejected contracts, the Exit Facility Commitment Letter or Term Sheet, the New ABI Agreement, Registration Rights Agreement, the New Indenture, the Stockholders Agreement, the Amended and Restated Bylaws and the Amended and Restated Certificate and schedules identifying the initial officers and the initial board of directors of Reorganized Congoleum, which the Plan Proponents shall file with the District Court no later than five (5) Business Days prior to the last date for filing objections to Confirmation of the Plan. Notwithstanding the foregoing, the Plan Proponents may amend the Plan Supplement and any attachments thereto through and including the Confirmation Date.

**"Plan Trust"** means the trust to be established pursuant to the Plan Trust Agreement and Section 5.1(a) of the Plan as of any date between (and inclusive of) the Confirmation Date and the Effective Date.

**"Plan Trust Agreement"** means that certain Congoleum Plan Trust Agreement, effective as of any date between (and inclusive of) the Confirmation Date and the Effective Date, substantially in the form attached hereto as Exhibit "E," as it may be modified from time to time in accordance with the terms thereof.

**"Plan Trust Asbestos Claims"** means, collectively, Asbestos Personal Injury Claims, future Demands and Allowed Asbestos Property Damage Claims.

**"Plan Trust Assets"** means the assets to be delivered to the Plan Trust pursuant to the Plan Documents and shall include, without limitation, the following assets and any income and profits thereon, and proceeds derived therefrom: (a) the Plan Trust Common Stock; (b) the Asbestos Insurance Rights; (c) all rights of the Debtors under, and all proceeds of, the Asbestos Insurance Settlement Agreements (except for those certain proceeds of the Asbestos Insurance Settlement Agreement with Liberty Mutual Insurance Company, which are payable to the Debtors as provided in Section 5.1(q) of the Plan); (d) the proceeds of the Asbestos In-Place Insurance Coverage; (e) the proceeds of the Asbestos Insurance Actions; (f) the proceeds of the Asbestos Insurance Action Recoveries; (g)

the rights granted to the Plan Trust pursuant to the Insurance Transfer Agreement; and (h) the Asbestos Property Damage Insurance Rights.

**"Plan Trust Bylaws"** means the bylaws as approved by the Plan Trustee, the Trust Advisory Committee and the Futures Representative, effective as of the effective date of the Plan Trust, as may be modified from time to time with the consent and approval of the Plan Trustee, the Trust Advisory Committee and the Futures Representative.

**"Plan Trust Common Stock"** means a number of shares of common stock of Reorganized Congoleum constituting 50.1% of the New Common Stock.

**"Plan Trust Documents"** means the Plan Trust Agreement, the Plan Trust Bylaws, the TDP and the other agreements, instruments and documents governing the establishment, administration and operation of the Plan Trust, as amended or modified from time to time in accordance with the Plan and such documents.

**"Plan Trust Expenses"** means any liabilities, costs, taxes or expenses of, or imposed upon or in respect of, the Plan Trust or, on and after the Effective Date, the Plan Trust Assets (except for payments to holders of Asbestos Claims on account of such Asbestos Claims).

**"Plan Trustee"** means the Person appointed pursuant to Article V of the Plan and the Plan Trust Agreement for the purpose of acting as Trustee of the Plan Trust in accordance with the terms and conditions contained in the Plan, the Plan Trust Agreement and the Confirmation Order.

**"Post-Petition Interest"** means interest accruing on and after the Petition Date on a Claim.

**"Pre-Petition Settled Claimant"** means a person whose Asbestos Personal Injury Claim was liquidated pursuant to or was subject to liquidation pursuant to the Claimant Agreement or a Pre-Petition Settlement Agreement, as the case may be (other than such persons whose claims have been previously expunged by order of the Bankruptcy Court, it being understood that defendants in the Omnibus Avoidance Action against whom a default has been granted shall not be considered to have had their claims expunged).

**"Pre-Petition Settlement Agreement"** means a settlement agreement, other than the Claimant Agreement, executed prior to the Petition Date to resolve an Asbestos Personal Injury Claim under which some or all of the consideration due has yet to be paid.

**"Priority Claim"** means any Claim (other than an Administrative Claim or a Priority Tax Claim) to the extent such Claim is entitled to a priority in payment under section 507(a) of the Bankruptcy Code.

**"Priority Tax Claim"** means any Claim to the extent that such Claim is entitled to a priority in payment under section 507(a)(8) of the Bankruptcy Code.

**"Professional Fee Claim"** means a Claim of a professional retained in the Reorganization Cases pursuant to sections 327, 328, and 1103 of the Bankruptcy Code, or otherwise, including such Claims of the Futures Representative and its professionals, for compensation or reimbursement of costs and expenses relating to services rendered on and after the Petition Date and prior to and including the Effective Date.

**"Proof of Claim"** means any proof of claim filed with the Bankruptcy Court or District Court or their duly appointed claims agent with respect to the Debtors pursuant to Bankruptcy Rule 3001 or 3002.

**"Pro Rata"** means with reference to any distribution on account of any Claim in any Class, the proportion that the amount of such Claim bears to the aggregate amount of all Claims (including Disputed Claims but excluding Disallowed Claims) in such Class.

**"Protected Party"** means any of the following parties:

(a)     the Debtors and the Reorganized Debtors;

(b)     any Entity that, pursuant to the Plan or after the Confirmation Date, becomes a direct or indirect transferee of, or successor to, the Plan Trust or the Debtors;

(c)     the Persons designated on Exhibit "F" (as such Exhibit may be amended on or before the Confirmation Date) as current distributors of the product lines currently manufactured, sold or otherwise produced by Congoleum; or

(d)     each Settling Asbestos Insurance Company.

**"Record Date"** means the date established in the Disclosure Statement Approval Order or any other Final Order of the District Court for determining the identity of holders of Claims entitled to vote to accept or reject this Plan and/or receive Distributions under this Plan.  If no Record Date is established in the Disclosure Statement Approval Order or any other Final Order of the District Court, then the Record Date shall be the date of the entry of the Disclosure Statement Approval Order.

**"Record Holder"** means the holder of a Claim as of the Record Date.

**"Registration Rights Agreement"** means the agreement described in Section 5.8 of the Plan.

**"Reinstated"** means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the holder of such Claim or Interest so as to leave such Claim or Interest Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim or Interest as such maturity existed before such default; and (iii) compensating the holder of such Claim or Interest for any damages incurred as a result of any legal, equitable or contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest.

**"Reorganization Cases"** means the cases filed by the Debtors under Chapter 11 of the Bankruptcy Code.

**"Reorganized Congoleum"** means reorganized Congoleum (or any successor thereto) on and after the Effective Date.

**"Reorganized Debtors"** means the reorganized Debtors (or any successor thereto) on and after the Effective Date.

**"Representatives"** means, with respect to any Entity, the present and former directors, officers, members, employees, trustees, accountants (including independent certified public accountants), advisors, attorneys, consultants, experts or other agents of that Entity, or any other professionals of that Entity, in each case in their capacity as such; *provided, however,* that in no event shall "Representatives" mean Gilbert LLP (formerly known as Gilbert Oshinsky, LLP, Gilbert Randolph LLP and Gilbert Heintz & Randolph LLP) or Kenesis Group, LLC.

**"Schedules"** means the schedules, statements and lists filed by the Debtors with the Bankruptcy Court or District Court pursuant to Bankruptcy Rule 1007, if such documents are filed, as they have been and may be amended or supplemented from time to time.

 **"Sealed Avoidance Action"** means that certain Adversary Proceeding No. 05-06461 (KCF), as it may be amended, which was filed under seal in the Bankruptcy Court on behalf of the Debtors on December 29, 2005, against (a) Arthur J. Pergament, in his capacity as Collateral Trustee; (b) Joseph F. Rice and the law firm of Motley Rice LLC; (c) Perry Weitz and the law firm of Weitz & Luxenberg, P.C.; and (d) certain holders of pre-petition Asbestos Personal Injury Claims.

"**Secured Claim**" means any Claim (other than an Asbestos Claim) that is (a) secured in whole or part, as of the Petition Date, by a Lien which is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or (b) subject to setoff under section 553 of the Bankruptcy Code, but, with respect to both (a) and (b) above, only to the extent of the value, net of any senior lien, of the Estates' interest in the assets or property securing any such Claim or the amount subject to setoff, as the case may be.

"**Security Agreement**" means that certain Superceding [sic] Security Agreement entered into by Congoleum and the Collateral Trustee, dated June 11, 2003, as the same may be amended from time to time.

"**Senior Note Claim**" means any Claim of a holder of Senior Notes based upon the Senior Notes.

"**Senior Note Distribution**" means the Non-Asbestos Stock Distribution and $33 million initial principal amount of the New Senior Notes.

"**Senior Notes**" means the 8.625% Senior Notes Due 2008 in the original principal amount of $100 million issued by Congoleum and outstanding as of the Petition Date.

"**Settlement and Buyback Agreement**" means that certain Settlement and Buyback Agreement dated as of August 17, 2006 among the Debtors, Century Indemnity Company and the other parties thereto.

"**Settling Asbestos Insurance Company**" means any Asbestos Insurance Company that has, before the conclusion of the Confirmation Hearing before the District Court, entered into an Asbestos Insurance Settlement Agreement that is sufficiently comprehensive and otherwise on terms appropriate in the determination of each of the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative to warrant treatment under section 524(g) of the Bankruptcy Code (including, with respect to any Asbestos Insurance Settlement Agreement that is conditioned in whole or in part on a plan of reorganization proposed by the Debtors, an agreement from such Settling Asbestos Insurance Company in writing, in a form reasonably acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative that all conditions to its performance under its Asbestos Insurance Settlement Agreement based on or related to a plan proposed by the Debtors is satisfied in full by this Plan), which determination by the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative will be indicated by the inclusion of such Asbestos Insurance Company on a schedule of Settling Asbestos Insurance Companies filed by the Plan Proponents as Exhibit "H" to the Plan with the District Court before the conclusion of the Confirmation Hearing and approved by such District Court.

"**Stockholders Agreement**" means that certain stockholders agreement described in Section 5.9 of this Plan, which shall be substantially in the form attached hereto as Exhibit "L." The Stockholders Agreement will be filed as part of the Plan Supplement.

"**Subsidiary Debtors**" means, collectively, Congoleum Sales, Inc. and Congoleum Fiscal, Inc.

"**Subsidiary Interests**" means, collectively, the issued and outstanding shares of stock of the Subsidiary Debtors as of the Petition Date and any options, warrants or other contractual rights to acquire any shares of stock of the Subsidiary Debtors as of the Petition Date.

"**Substantial Contribution Claim**" shall have the meaning ascribed to such term in Section 3.5.

"**Tax Sharing Agreement**" means that certain Tax Sharing Agreement, dated as of November 1, 1996, by and between ABI and Congoleum.

"**TDP**" means the trust distribution procedures for the Plan Trust, substantially in the form attached as Exhibit "G" to the Plan, as it may be modified from time to time in accordance with the terms of the TDP and the Plan Trust Agreement.

"**Trust Advisory Committee**" or "**TAC**" means a Trust Advisory Committee to be formed to represent all holders of Asbestos Personal Injury Claims to advise the Plan Trustee and to approve and consent to certain actions as specified herein and in the Plan Trust Agreement, solely in its capacity as such.

"**United States Trustee**" means the Office of the United States Trustee for Region 3.

"**Unimpaired**" means, with reference to a Claim or Interest, unimpaired within the meaning of section 1124 of the Bankruptcy Code.

"**Unpaid Intercompany Amounts**" means the following intercompany payables, to the extent such payables arise following the Petition Date, are evidenced by invoices or other appropriate supporting documentation and remain unpaid as of the Effective Date: (i) payments due under the Personal Services Agreement, (ii) payments due for purchases of urethane or other products sold intercompany under the Business Relations Agreement, dated as of March 11, 1993, as amended, (iii) payments due under the Canadian Tile exclusivity agreement under the Business Relations Agreement, dated as of March 11, 1993, as amended, (iv) royalty payments due under the non-pvc license agreement dated January 1, 2006, (v) payments due under intercompany personal computing, desktop and voice and data system support and other information technology services agreements between ABI and the Debtors, (vi) payments due for items purchased by ABI and/or an ABI subsidiary for a Debtor and/or Debtor subsidiary, or purchased by a Debtor and/or a Debtor subsidiary for ABI and/or an ABI subsidiary, or purchased jointly by any of them and (vii) intercompany payments due as reimbursement of reasonable and necessary travel expenses incurred (whether by ABI or an ABI subsidiary, or a Debtor or a Debtor subsidiary) in connection with ABI personnel providing management services to any of the Debtors.

"**Voting Agent**" means Logan & Company, Inc.

"**Voting Procedures Order**" means the order entered by the District Court setting the voting procedures for this Plan.

"**Wachovia**" shall mean Wachovia Bank, National Association, successor by merger to Congress Financial Corporation.

"**Workers' Compensation Claim**" means any Claim (a) for benefits under a state-mandated workers' compensation system, that a past, present, or future employee of the Debtors and their predecessors is receiving, or may in the future have a right to receive, and/or (b) for reimbursement brought by any insurance company as a result of payments made to or for the benefit of such employees and fees and expenses incurred under any insurance policies covering such employee claims.

      1.3   **Rules of Interpretation: Application of Definitions, Rules of Construction, and Computation of Time**. Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine and neuter. For purposes of the Plan: (a) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the document shall be substantially in that form or substantially on those terms and conditions; (b) any reference in the Plan to an existing document or exhibit filed or to be filed means the document or exhibit as it may have been or may be amended, modified, or supplemented; (c) unless otherwise specified, all references in the Plan to Sections, Schedules, and Exhibits are references to sections, schedules, and exhibits of or to the Plan. Unless otherwise specified, the words "herein," "hereof," "hereto," "hereunder," and other words of similar meaning refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. The headings in the Plan are for convenience of reference only and shall not expand, limit, or otherwise affect the provisions of the Plan. Unless otherwise indicated herein, all references to dollars are to United States dollars. Unless otherwise expressly provided herein, in computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

      1.4   **Exhibits and Schedules**. All exhibits and schedules are incorporated into and are a part of the Plan as if set forth in full herein.

## ARTICLE II

## CLASSIFICATION OF CLAIMS AND INTERESTS

2.1 **Generally**.  Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of the Class and is classified in a different Class to the extent the Claim or Interest qualifies within the description of that different Class.  Solely for voting purposes, Claims against each Estate are classified as Claims against the Estates as a whole.

2.2 **Unclassified Claims**.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are excluded from the Classes set forth in Section 2.3 of the Plan.  The treatment accorded Administrative Claims, Priority Tax Claims and the DIP Financing Claim is set forth in Article III of the Plan.

2.3 **Classes**.  In accordance with section 1122 of the Bankruptcy Code, the following constitute the Classes of Claims against and Interests in the Debtors:

(a) Class 1 – Priority Claims.  Class 1 consists of all Priority Claims.  Class 1 is Unimpaired.

(b) Class 2 – Lender Secured Claims.  Class 2 consists of the Lender Secured Claims.  Class 2 is Unimpaired.

(c) Class 3 – Other Secured Claims.  Class 3 consists of all Other Secured Claims, each of which will be within a separate subclass, with each such subclass to be deemed a separate Class for all purposes.  Class 3 is (or these subclasses are) Unimpaired.

(d) Class 4 – Senior Note Claims.  Class 4 consists of all Senior Note Claims.  Class 4 is Impaired.

(e) Class 5 – Workers' Compensation Claims.  Class 5 consists of all Workers' Compensation Claims.  Class 5 is Unimpaired.

(f) Class 6 – ABI Claims.  Class 6 consists of all ABI Claims.  Class 6 is Impaired.

(g) Class 7 – Asbestos Personal Injury Claims.  Class 7 consists of all Asbestos Personal Injury Claims, including the unliquidated Asbestos Personal Injury Claims of Pre-Petition Settled Claimants.  Class 7 is Impaired.

(h) Class 8 - Asbestos Property Damage Claims.  Class 8 consists of all Asbestos Property Damage Claims.  Class 8 is Impaired.

(i) Class 9 – General Unsecured Claims.  Class 9 consists of all General Unsecured Claims.  Class 9 is Impaired.

(j) Class 10 – Congoleum Interests.  Class 10 consists of all Congoleum Interests.  Class 10 is Impaired.

(k) Class 11 – Subsidiary Interests.  Class 11 consists of all Subsidiary Interests.  Class 11 is Unimpaired.

Exhibit A--Plan.DOC

## ARTICLE III

### TREATMENT OF ADMINISTRATIVE
### CLAIMS AND PRIORITY TAX CLAIMS

3.1    **Summary**.  Pursuant to section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims against the Debtors are not classified for purposes of voting on, or receiving Distributions under, this Plan.  Similarly, Substantial Contribution Claims are not classified for purposes of voting on, or receiving Distributions under, this Plan.  Holders of such Claims are not entitled to vote on this Plan.  All such Claims are instead treated separately in accordance with this Article III and in accordance with the requirements set forth in section 1129(a)(9)(A) of the Bankruptcy Code.

3.2    **Administrative Claims**.  On the Distribution Date, each holder of an Allowed Administrative Claim, except as otherwise provided for herein, and subject to the requirements of Section 13.14 of the Plan, shall receive, in full satisfaction, settlement, release, extinguishment, and discharge of such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Claim or (b) such different treatment as to which the applicable Debtor and such holder shall have agreed upon in writing; *provided, however*, that Allowed Administrative Claims representing (i) post-petition liabilities incurred in the ordinary course of business by the Debtors and (ii) post-petition contractual liabilities arising under loans or advances to the Debtors, whether or not incurred in the ordinary course of business, shall be paid by Reorganized Congoleum in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto.

3.3    **Priority Tax Claims**.  On the Distribution Date, each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, (a) Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (b) such different treatment as to which the applicable Debtor and such holder shall have agreed upon in writing, or (c) at Reorganized Congoleum's sole discretion, deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim, over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim.

3.4    DIP Financing Claim.

Each holder of an Allowed DIP Financing Claim shall be paid indefeasibly in full on the Effective Date or as soon thereafter as practicable and shall receive in full satisfaction, settlement, release, extinguishment, and discharge of such Allowed DIP Financing Claim, (a)(i) Cash equal to the unpaid portion of such Allowed DIP Financing Claim, together with a release and termination agreement and any accompanying cash collateral, each in form, substance and amounts acceptable to DIP Financing Lender, or (ii) such different treatment as to which DIP Financing Lender shall have agreed to in writing, and (b) shall be released and discharged from any obligation, liability and/ or responsibility to fund or otherwise pay the Professional Fee Carve-Out (as defined in the DIP Financing Order) and /or any other claim or liability of any kind, nature or description that can be brought at any time for any reason against DIP Financing Lender relating to the Professional Fee Carve-Out or any other fees or expenses incurred by any Bankruptcy Professional.  Notwithstanding anything to the contrary contained in the Plan, the Confirmation Order, or otherwise, the Allowed DIP Financing Claim, and the liens and security interests securing such Allowed DIP Financing Claim shall continue in full force and effect in accordance with the terms, conditions and covenants of the DIP Financing Agreements and the DIP Financing Order, shall survive the Confirmation Date and continue in full force and effect in accordance with the terms and conditions of the DIP Financing Agreements and the DIP Financing Order until such time as the Allowed DIP Financing Claim has been indefeasibly paid in full and in Cash.  Each Allowed DIP Financing Claim shall include all interest, fees, costs and charges accrued up to the Effective Date, accrued at the rates provided for in the DIP Financing Agreements.  Pursuant to the DIP Financing Order, upon the indefeasible payment in full of an Allowed DIP Financing Claim, the Debtors shall forever release, discharge and acquit the DIP Financing Lender and its officers, directors, agents, attorneys and predecessors-in-interest of and from any and all claims, demands, liabilities, causes of action, and obligations of every kind with respect to the DIP Financing Agreement and DIP Financing Order.

3.5    **Substantial Contribution Claims**.    Any Entity who requests compensation or expense reimbursement for making a substantial contribution in the Reorganization Cases pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code ("Substantial Contribution Claim") must file an application with the clerk of the

19

District Court on or before a date that is sixty (60) days subsequent to the Effective Date and serve such application on counsel for the Debtors, counsel for the Futures Representative, counsel for the Asbestos Claimants' Committee, counsel for the Bondholders' Committee and on all other parties as otherwise required by the District Court and the Bankruptcy Code, or be forever barred from seeking such compensation or expense reimbursement. All Allowed Substantial Contribution Claims shall be paid by Reorganized Congoleum within sixty (60) days of allowance by the District Court.

## ARTICLE IV

## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

4.1     Claims and Interests

(a)     Class 1 – Priority Claims.  On the Distribution Date, each holder of an Allowed Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Claim, either (i) the Allowed Amount of its Priority Claim, in Cash, or (ii) such different treatment as may be agreed to by such holder and Reorganized Congoleum.  Class 1 is Unimpaired and the holders of Class 1 Claims are deemed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

(b)     Class 2 – Lender Secured Claims.  The Lender Secured Claim shall be deemed Allowed for all purposes in connection with this Plan and shall be deemed to be previously indefeasibly paid in full on the Effective Date and Wachovia shall be released from any and all liabilities and causes of action in accordance with the DIP Financing Agreements and DIP Financing Order.  Class 2 is Unimpaired and the holder of the Class 2 Claim is deemed to have accepted the Plan and, accordingly, is not entitled to vote on the Plan.

(c)     Class 3 – Other Secured Claims.  Each holder of an Allowed Other Secured Claim shall receive one of the following three treatments at Reorganized Congoleum's sole option:  (i) retain unaltered the legal, equitable and contractual rights (including, but not limited to, any Liens that secure such Claim) to which such Claim entitles such holder and such Allowed Other Secured Claim shall be Reinstated on the Effective Date, (ii) the Debtors shall surrender all collateral securing such Claim to the holder thereof, in full satisfaction of such holder's Allowed Class 3 Claim, without representation or warranty by, or recourse against, the Debtors or Reorganized Congoleum or (iii) such holder shall be otherwise treated in a manner so that such Claim shall be rendered Unimpaired. Class 3 is Unimpaired and the holders of Class 3 Claims are deemed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

(d)     Class 4 – Senior Note Claims.  Senior Note Claims shall be Allowed in an aggregate amount equal to at least $103,593,750.00, which shall not be subject to any avoidance, reductions, set off, offset, recharacterization, subordination, counterclaims, defenses, disallowance, impairment or any other challenges under applicable law or regulation by any person or entity.  On the Effective Date, each holder of an Allowed Senior Note Claim shall receive, in full satisfaction of its Senior Note Claim, its Pro Rata share of each of the securities included in the Senior Note Distribution.  Class 4 is Impaired and holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

(e)     Class 5 – Workers' Compensation Claims.  Each holder of an Allowed Workers' Compensation Claim shall be paid in the ordinary course pursuant to such rights that exist under any state workers' compensation system or laws applicable to such Claims.  Class 5 is Unimpaired and the holders of Class 5 Claims are deemed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

(f)     Class 6 – ABI Claims. Pursuant to and in consideration of the Intercompany Settlement and Section 5.17 and other terms of the Plan, on the Effective Date all Intercompany Agreements shall be rejected and all ABI Claims, including without limitation any ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.17(b)(4)(B) of the Plan), shall be deemed Disallowed and expunged.  Class 6 is Impaired and the holder of the Class 6 Claims is entitled to vote to accept or reject the Plan.

(g)     Class 7 – Asbestos Personal Injury Claims.

(i)     As of the Effective Date, all liability for all Asbestos Personal Injury Claims (which includes all Claims in Class 7) as well as liability for all future Demands shall be assumed, automatically and without further act or deed, by the Plan Trust and the Reorganized Debtors shall have no liability therefor.  Each Asbestos Personal Injury Claim and future Demands shall be resolved pursuant to the Plan Trust Agreement and the TDP.  The TDP shall apply to all holders of Asbestos Personal Injury Claims and future Demands, including any such holder who elects to resort to the legal system and obtains a judgment for money damages.

(ii)     As of the Effective Date, pursuant to the Plan, all Pre-Petition Settled Claimants, including the Litigation Settlement Claimants, in full satisfaction of his, her or its Asbestos Personal Injury Claim and any and all rights pursuant to any Pre-Petition Settlement Agreement, Claimant Agreement, Security Agreement, Collateral Trust Agreement or any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003, shall be restored to *status quo ante*, including with respect to any statutes of limitation related to such Asbestos Personal Injury Claim, as of the time each such Claimant initially filed or submitted its Asbestos Claim against the Debtors that resulted in the Claimant's Pre-Petition Settlement Agreement or the Claimant Agreement, respectively, and shall be treated by the Plan Trust as holding unliquidated Asbestos Personal Injury Claims under applicable federal or state law, which claims shall be resolved pursuant to the Plan Trust Agreement and the TDP in the same manner as all other Asbestos Personal Injury Claims in Class 7.  Pre-Petition Settled Claimants in Class 7 shall receive *pari passu* treatment under the Plan without regard to any lien, security interest or other claim to priority treatment whatsoever (*i.e.* it is understood that any such Pre-Petition Settled Claimant will need to reapply to the Plan Trust to satisfy the TDP including medical, exposure, statutes of limitation and other requirements).

(iii)     Class 7 is Impaired.  Holders of Class 7 Claims are entitled to vote with respect to the Plan.

(h)     Class 8 - Asbestos Property Damage Claims.  As of the Effective Date, all liability for all Allowed Asbestos Property Damage Claims shall be assumed, automatically and without further act or deed, by the Plan Trust and the Reorganized Debtors shall have no liability therefor.  Each Allowed Asbestos Property Damage Claim shall be paid solely from the Asbestos Property Damage Claim Sub-Account on account of the unpaid Allowed Amount of such Claim pursuant to the Plan Trust Agreement.  After the assets in the Asbestos Property Damage Claim Sub-Account have been exhausted or transferred therefrom in accordance with the Plan Trust Agreement, the Plan Trust shall have no further liability or obligation for or in respect of any Asbestos Property Damage Claims.  All Asbestos Property Damage Claims as to which a Proof of Claim was not filed prior to the expiration of the Asbestos Property Damage Claim Bar Date shall be deemed Disallowed.  Class 8 is Impaired and the holders of Class 8 Claims are entitled to vote to accept or reject the Plan.

(i)     Class 9 – General Unsecured Claims.  Except to the extent that a holder of an Allowed General Unsecured Claim in Class 9 has been paid by the Debtors prior to the Effective Date or agrees to alternate, less favorable, treatment, each holder of an Allowed Class 9 Claim shall receive, on the Distribution Date, in full and final satisfaction of such Allowed Class 9 Claim, Cash in the amount of $.35 for each $1.00 of such holder's Allowed Class 9 Claim.  Class 9 is Impaired and the holders of Class 9 Claims are entitled to vote to accept or reject the Plan.  General Unsecured Claims do not include Claims against the Debtors under the Environmental Laws as set forth in Section 11.9 hereof, which Claims (other than Claims held by ABI) survive the Reorganization Cases.

(j)     Class 10 – Congoleum Interests.  On the Effective Date, the Congoleum Interests shall be cancelled, the holders of the Congoleum Interests shall retain and receive nothing on account of such Interests.  Class 10 is Impaired and the holders of Class 10 Congoleum Interests are deemed to have rejected the Plan in accordance with the provisions of section 1126(g) of the Bankruptcy Code, and accordingly, their votes are not being solicited.

(k)     Class 11 – Subsidiary Interests.  On the Effective Date, the holder of the Subsidiary Interests shall retain such Subsidiary Interests.  Class 11 is Unimpaired and the holder of Class 11 Subsidiary Interests is deemed to have accepted the Plan, and accordingly, is not entitled to vote on the Plan.

4.2 **Reservation of Rights Regarding Claims**. Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' or Reorganized Congoleum's rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment. Except as otherwise explicitly provided in the Plan, nothing shall affect any of the Plan Trust's rights and defenses, both legal and equitable, with respect to any Asbestos Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

4.3 **Reservation of Fair and Equitable (Cram Down) Power**. The Plan Proponents reserve the right to confirm this Plan as to any impaired Class that does not accept the Plan by the requisite number of votes pursuant to the fair and equitable power of 11 U.S.C. § 1129(b).

## ARTICLE V

## IMPLEMENTATION OF THE PLAN

5.1 The Plan Trust

(a) **Establishment and Purpose of the Plan Trust**. On or prior to the Effective Date, the Plan Trust shall be established in accordance with the Plan Trust Agreement. The Plan Trust is intended to be a "qualified settlement fund" within the meaning of section 468B of the IRC and the Treasury Regulations promulgated thereunder. The purpose of the Plan Trust shall be to, among other things: (i) pay all Plan Trust Asbestos Claims in accordance with the Plan, the Plan Trust Agreement, the TDP and the Confirmation Order; (ii) preserve, hold, manage, and maximize the Plan Trust Assets for use in paying and satisfying Plan Trust Asbestos Claims in accordance with the Plan Trust Agreement and the TDP; (iii) prosecute, settle and manage the disposition of the Asbestos In-Place Insurance Coverage; and (iv) prosecute, settle, and manage Asbestos Insurance Actions and Direct Actions.

(b) **Funding and Receipt of Plan Trust Assets**. On the Effective Date, Reorganized Congoleum shall issue the Plan Trust Common Stock to the Plan Trust in accordance with the Plan and all Plan Trust Assets shall be transferred to, vested in, and assumed by, the Plan Trust free and clear of all Claims, Liens and encumbrances; *provided*, *however*, that to the extent that certain Plan Trust Assets, because of their nature or because they will accrue subsequent to the Effective Date, cannot be transferred to, vested in, and assumed by the Plan Trust on the Effective Date, such Plan Trust Assets shall be transferred to, vested in, and assumed by the Plan Trust free and clear of Claims, Liens and encumbrances, as soon as practicable after the Effective Date.

(c) **Insurance Transfer Agreement**. On the Effective Date, the Debtors shall deliver the Insurance Transfer Agreement attached hereto as Exhibit "B." Such agreement shall be valid, binding and enforceable. The Insurance Transfer Agreement shall transfer claims and rights set forth therein as Debtors may have, subject to any and all Asbestos Insurer Coverage Defenses.

(d) **Creation of Asbestos Property Damage Claim Sub-Account**. On the Effective Date, the Plan Trust shall cause the Asbestos Property Damage Insurance Rights and any proceeds thereof, including $1.2 million from the proceeds of that certain settlement agreement between the Debtors and Liberty Mutual Insurance Company approved by the Bankruptcy Court by order dated July 30, 2004, to be held in the Asbestos Property Damage Claim Sub-Account. In accordance with the terms of the Plan Trust Agreement, the Plan Trustee shall be permitted to transfer monies from the Asbestos Property Damage Claim Sub-Account to the Asbestos Personal Injury Claim Sub-Account, from time to time, to the extent that the funds in the Asbestos Property Damage Claim Sub-Account exceed the aggregate amount of all unpaid Asbestos Property Damage Claims that have been filed prior to the Asbestos Property Damage Claim Bar Date, and a reasonable reserve for Plan Trust Expenses and indemnification costs or expenses, in either case, related to Asbestos Property Damage Claims.

(e) **Assumption of Liabilities by the Plan Trust**. On the Effective Date, all liabilities, obligations and responsibilities relating to all Plan Trust Asbestos Claims shall be transferred to the Plan Trust as set

forth herein and the Plan Trustee, on behalf of the Plan Trust, shall expressly assume all liability for all Plan Trust Asbestos Claims and Demands as set forth herein, subject to the provisions of the Plan Trust Agreement.  With the exception of the liabilities identified hereinabove in this Section 5.1(e), in no event shall the Plan Trust assume any of the liabilities, obligations or responsibilities of the Debtors or Reorganized Congoleum.

(f)     **Discharge of Liabilities to Holders of Asbestos Claims**.  Except as provided in the Plan and the Confirmation Order, the transfer to, vesting in, and assumption by the Plan Trust of the Plan Trust Assets as contemplated by the Plan shall, among other things, discharge the Debtors and the Reorganized Debtors from and in respect of all Plan Trust Asbestos Claims.

(g)     **TDP**.  From and after the Effective Date, the Plan Trust shall pay the Plan Trust Asbestos Claims in accordance with the Plan Trust Agreement and the TDP.  The Plan Trustee shall have the power to administer, amend, supplement or modify the TDP in accordance with the terms thereof.

(h)     **Payment of Allowed Asbestos Property Damage Claims**.  From and after the Effective Date, the Plan Trust shall cause the payment of Allowed Asbestos Property Damage Claims from the Asbestos Property Damage Claim Sub-Account in accordance with the Plan Trust Agreement; *provided, however* that once the assets in the Asbestos Property Damage Claim Sub-Account have been exhausted, the Plan Trust shall have no further liability or obligation for or in respect of any Asbestos Property Damage Claims.

(i)     **Excess Plan Trust Assets**.  To the extent there are any Plan Trust Assets remaining after the payment in full of all Plan Trust Asbestos Claims and all Plan Trust Expenses (or provision has been made therefor) in accordance with the Plan Trust Agreement and the TDP, such excess Plan Trust Assets shall be transferred to a tax-exempt organization qualified under section 501(c)(3) of the IRC, which tax-exempt organization is to be determined by the Plan Trustee; *provided, however*, that the purpose thereof, if practicable, shall be related to the treatment of, research on or the relief of suffering of individuals suffering from asbestos-related lung disorders.

(j)     **Plan Trust Expenses**.  The Plan Trust shall pay all Plan Trust Expenses from the Plan Trust Assets in accordance with the Plan Trust Agreement.  Neither the Debtors, the Reorganized Debtors, nor their Affiliates shall have any obligation to pay any Plan Trust Expenses.  The Plan Trustee, each member of the TAC, the Futures Representative and the Representatives of each of the foregoing will have a lien upon the Plan Trust Assets which will be prior to any lien thereon, and the Plan Trust will grant a security interest in the Plan Trust Assets, all proceeds thereof and all accounts into which such proceeds or the Plan Trust Assets are deposited or maintained to secure payment of amounts payable to them as compensation or indemnification.

(k)     **Appointment of the Initial Plan Trustee**.  Effective as of the Effective Date, the District Court shall appoint the initial Plan Trustee to serve as Plan Trustee in accordance with the Plan Trust Agreement. The Plan Trustee shall be designated no later than thirty (30) days prior to the Confirmation Hearing and shall be mutually acceptable to the Asbestos Claimants' Committee and the Futures Representative.  For purposes of performing his or her duties and fulfilling his or her obligations under the Plan Trust Agreement, the TDP and the Plan, the Plan Trustee shall be deemed to be a party in interest within the meaning of section 1109(b) of the Bankruptcy Code.  The Plan Trustee shall be the "administrator" of the Plan Trust as that term is used in Treas. Reg. Section 1.468B-2(k)(3).

(l)     **The Futures Representative**.  Effective as of the Effective Date, the District Court shall appoint a Person to serve as the Futures Representative from and after the Effective Date pursuant to the terms of the Plan Trust Agreement and who shall have the functions and rights provided in the Plan Trust Documents.

(m)     **Appointment of Trust Advisory Committee Members**.  Effective as of the Effective Date, the District Court shall appoint three initial members of the TAC (and thereupon the TAC shall be formed) to serve as members of the TAC in accordance with the Plan Trust Agreement.

(n)     **Institution and Maintenance of Legal and Other Proceedings**.  As of the Effective Date, the Plan Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other

proceedings related to any asset, liability, or responsibility of the Plan Trust, including, without limitation, the Coverage Action, in each case to the extent not adjudicated, compromised or settled prior to the Effective Date. The Plan Trust shall be empowered to initiate, prosecute, defend, and resolve all such actions in the name of the Debtors and/or Reorganized Congoleum if deemed necessary or appropriate by the Plan Trustee. Except as otherwise provided by law or agreement, the Plan Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred subsequent to the Effective Date arising from or associated with any legal action or other proceeding brought pursuant to this Section 5.1(n) and shall pay or reimburse all deductibles, retrospective premium adjustments, or other charges which may arise from the receipt of insurance proceeds by the Plan Trust. Without in any way limiting the foregoing and subject to any Asbestos Insurer Coverage Defenses, the Plan Trust shall be empowered to elect to (or not to), initiate, prosecute, defend, settle, and resolve all Asbestos Insurance Actions and Direct Actions, and to maintain, administer, preserve, or pursue the Asbestos-In-Place Insurance Coverage, the Asbestos Insurance Action Recoveries, Asbestos Insurance Rights, the Asbestos Insurance Policies and rights under the Asbestos Insurance Settlement Agreements. All Causes of Action other than Asbestos Insurance Actions and Direct Actions shall remain the property of the Reorganized Debtors.

(o) **Preservation of Insurance Claims**. The discharge and releases provided herein, and the injunctive protection provided to the Debtors, the Reorganized Debtors and any Protected Party with respect to Demands as provided herein, shall neither diminish nor impair the enforceability of any of the Asbestos Insurance Policies by any Entity except (i) to the extent that any such Asbestos Insurance Company is also a Settling Asbestos Insurance Company or (ii) that all Asbestos Insurer Coverage Defenses are preserved.

(p) **Indemnification by the Plan Trust**. As and to the extent provided in the Plan Trust Agreement in Sections 1.4 and 4.6, the Plan Trust shall indemnify and hold harmless each of the Debtors, the Reorganized Debtors, the Plan Trustee, any officer and employee of the Plan Trust, the Futures Representative, each member of the TAC and, with respect to each of the foregoing, their respective past, present and future Representatives.

(q) **Reimbursement of Defense and Indemnity Costs Relating to Asbestos Claims**. All defense and indemnity costs incurred by Congoleum with respect to Asbestos Claims prior to the Effective Date shall be reimbursed from the proceeds of the Liberty Mutual Settlement.

5.2 **Certain Mergers**. On the Effective Date, the Subsidiary Debtors shall merge with and into Congoleum, with Reorganized Congoleum as the sole surviving corporation.

5.3 **The Amended and Restated Certificate and the Amended and Restated Bylaws**. The Amended and Restated Certificate and the Amended and Restated Bylaws of Reorganized Congoleum shall be in form and substance acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative and shall be consistent with the provisions of the Plan and the Bankruptcy Code. The Amended and Restated Certificate shall, among other things (a) authorize the issuance of New Common Stock pursuant to Section 5.7 of the Plan, and (b) provide, pursuant to section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-voting common equity securities. The Amended and Restated Bylaws and the Amended and Restated Certificate of Reorganized Congoleum shall be substantially in the form attached hereto as Exhibits "J" and "K", respectively. The Amended and Restated Bylaws and the Amended and Restated Certificate will filed as part of the Plan Supplement.

5.4 **Directors and Officers of Reorganized Congoleum**. The initial board of directors of Reorganized Congoleum shall consist of five (5) directors. One of such directors shall be selected by the Bondholders' Committee, three of such directors shall be selected jointly by the Futures Representative and the Asbestos Claimants' Committee, and one of such directors shall be Reorganized Congoleum's chief executive officer. The identity of such directors shall be disclosed by the Plan Proponents in the Plan Supplement. To the extent any such Person is an Insider (as defined in section 101(31) of the Bankruptcy Code), the nature of any compensation for such Person will also be disclosed prior to the Confirmation Hearing. Each of the Persons on the initial board of directors of Reorganized Congoleum shall serve in accordance with the Amended and Restated Certificate and the Amended and Restated Bylaws of Reorganized Congoleum, as the same may be amended from time to time. Subsequently, Reorganized Congoleum's board of directors shall be elected in accordance with

Reorganized Congoleum's governing documents which governing documents shall be acceptable to the Bondholders' Committee and the Asbestos Claimants' Committee.

The initial officers of Reorganized Congoleum shall be set forth in the Plan Supplement. To the extent any such Person is an Insider (as defined in section 101(31) of the Bankruptcy Code), the nature of any compensation for such Person will also be disclosed at such time. The initial officers shall serve in accordance with the Amended and Restated Certificate and the Amended and Restated Bylaws of Reorganized Congoleum, as the same may be amended from time to time.

5.5 **Cancellation of Existing Securities and Agreements of the Debtors/Discharge of the Indenture Trustee**. Except as set forth in the Plan, upon the Effective Date, the Existing Securities shall be cancelled and the holders thereof shall have no further rights or entitlements in respect thereof against the Debtors except the right to receive any Distributions to be made to such holders under the Plan. To the extent possible, Distributions to be made under the Plan to the beneficial owners of the Senior Notes shall be made through the Depository Trust Company and its participants. The Confirmation Order shall authorize and direct the Indenture Trustee to take whatever action may be necessary or appropriate, in its reasonable discretion, to deliver the Distributions, including, without limitation, obtaining an order of the District Court. On the Effective Date, the Indenture Trustee and its agents shall be discharged of all their obligations associated with (i) the Senior Notes, (ii) the Indenture, and (iii) any related documents, and released from all Claims arising in the Reorganization Cases. As of the Effective Date, the Indenture shall be deemed fully satisfied and cancelled; *provided*, *however*, that the Indenture shall continue in effect solely for the purposes of: (1) allowing holders of the Senior Note Claims to receive distributions under the Plan, (2) allowing and preserving the rights of the Indenture Trustee to (a) make distributions in satisfaction of Allowed Senior Note Claims, (b) exercise its charging liens against any such distributions, and (c) seek compensation and reimbursement for any fees and expenses incurred in making such distributions. Upon completion of all such distributions, the Senior Notes and the Indenture shall terminate completely. From and after the Effective Date, the Indenture Trustee shall have no duties or obligations under the Indenture other than to make distributions pursuant to the Plan.

5.6 Exit Facility. On the Effective Date, Reorganized Congoleum shall obtain exit financing consistent with the terms and conditions set forth in the Exit Facility Commitment Letter or Term Sheet, which shall be filed as part of the Plan Supplement, from the Exit Facility Lenders.

5.7 **Issuance of New Securities and Debt Instruments**

(a) New Common Stock. On the Effective Date, Reorganized Congoleum shall issue the New Common Stock pursuant to the Plan. The Amended and Restated Certificate sets forth the rights and preferences of the New Common Stock. The New Common Stock shall be issued subject to the Stockholders Agreement described below.

(b) New Senior Notes. On the Effective Date, Reorganized Congoleum shall issue $33 million in initial principal amount of 9% New Senior Notes, which shall mature on December 31, 2017. The New Senior Notes shall be governed by the terms and conditions set forth in the New Indenture.

5.8 **Registration Rights Agreement**. In the event the board of directors of Reorganized Congoleum determines in its discretion to register any of the New Common Stock with the Securities and Exchange Commission, or if Reorganized Congoleum is required under the Stockholders Agreement or applicable securities laws to register any of the New Common Stock with the Securities and Exchange Commission, any Person receiving Distributions of the New Common Stock issued on the Effective Date that is not entitled to an exemption from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code, or whose resale of the New Common Stock is otherwise restricted under the securities laws, shall be entitled to become a party to the Registration Rights Agreement. The Registration Rights Agreement shall be satisfactory in form and substance to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative, a substantially similar form of which will be contained in the Plan Supplement.

5.9 **Stockholders Agreement**. On the Effective Date, the Stockholders Agreement will be adopted by Reorganized Congoleum and be binding upon all holders of New Common Stock. All holders of New Common

Stock will be subject to the Stockholders Agreement which will, among other things, govern the access each holder of New Common Stock shall have to information with respect to Reorganized Congoleum and the ability to transfer such holder's New Common Stock. Each certificate representing share(s) of New Common Stock shall bear a legend indicating that the New Common Stock is subject to the Stockholders Agreement. The Stockholders Agreement will be effective as of the Effective Date. The Stockholders Agreement contains customary terms and conditions, including minority stockholder protections, and includes the minority stockholders having both a right of first refusal and right of first offer on the Plan Trust Common Stock. The Stockholders Agreement shall be satisfactory in form and substance to the Bondholders' Committee, the Asbestos Claimants' Committee and the Futures Representative, a substantially similar form of which is attached hereto as Exhibit "L." The Stockholders Agreement will be filed as part of the Plan Supplement.

5.10 **Effectuating Documents/Further Transactions**. Each of the Debtors (subject to the consent of the Bondholders' Committee, the Asbestos Claimants' Committee and the Futures Representative) and Reorganized Congoleum, and their respective officers and designees, is authorized and directed to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be requested by the Plan Proponents, or as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of the Plan, the Exit Facility, or any other Plan Document, or to otherwise comply with applicable law.

5.11 **Exemption from Certain Transfer Taxes and Recording Fees**. Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to Reorganized Congoleum or to any other Person or Entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

5.12 **Section 346 Injunction**. In accordance with section 346 of the Bankruptcy Code for the purposes of any state or local law imposing a tax, income will not be realized by the Estates, the Debtors or the Reorganized Debtors by reason of the forgiveness or discharge of indebtedness resulting from the consummation of the Plan. As a result, each state or local taxing authority is permanently enjoined and restrained, after the Confirmation Date, from commencing, continuing or taking any act to impose, collect or recover in any manner any tax against the Debtors or the Reorganized Debtors arising by reason of the forgiveness or discharge of indebtedness under the Plan.

5.13 **Corporate Action**. All matters provided for under the Plan involving the corporate structure of the Debtors or Reorganized Congoleum, or any corporate action to be taken by, or required of the Debtors or Reorganized Congoleum shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the stockholders or directors of any of such entities.

5.14 **Litigation Settlement Agreement**. (a) The Plan implements a compromise and settlement with respect to each such Litigation Settlement Claimant, pursuant to the Litigation Settlement Agreement, as amended, whose Asbestos Personal Injury Claim was liquidated pursuant to the Claimant Agreement or a Pre-Petition Settlement Agreement, as the case may be. The original Litigation Settlement Agreement was approved by the Bankruptcy Court by an order signed on October 31, 2008. The parties to the Litigation Settlement Agreement agreed to an amendment to conform such agreement to developments in the Reorganization Cases, and approval of such amendment is sought from the District Court under Bankruptcy Rule 9019 in connection with confirmation of this Plan.

(b)    As of the Effective Date of the Plan:

(i)    The Litigation Settlement Claimants shall waive any and all rights with respect to any pre-petition settlement of their Asbestos Personal Injury Claims against the Debtors, whether pursuant to any

Pre-Petition Settlement Agreement or the Claimant Agreement, including the liquidated amounts thereof; provided, however, that:

• any Asbestos Personal Injury Claim against the Debtors held by any such Litigation Settlement Claimant, including with respect to any statutes of limitation related thereto, shall be restored to the *status quo ante* as it existed as of the time the Litigation Settlement Claimant initially filed or submitted its Asbestos Personal Injury Claim against the Debtors that resulted in the Claimant's Pre-Petition Settlement Agreement or the Claimant Agreement (the "Submission Date");

• any statute of limitation with respect to such Asbestos Personal Injury Claim shall be tolled until the later of ninety (90) days after the expiration of any stay imposed due to the filing of the Debtors' chapter 11 cases of such additional time as may be provided pursuant to the TDP incorporated in the Plan (the "Asbestos Tolling Period");

• neither the Asbestos Tolling Period nor any other term or provision of the Litigation Settlement Agreement shall revive any statute of limitations that expired as of the Submission Date; and

• all parties retain the right to assert any statute of limitations defense or other defenses that they could have asserted as of the Submission Date.

(ii)     With respect to the Litigation Settlement Claimants, as amended, the Debtors shall be released from any and all obligations and duties imposed pursuant to any Pre-Petition Settlement Agreement, Claimant Agreement, the Collateral Trust Agreement, Security Agreement and any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003.

(iii)     The Debtors shall be deemed to have forever withdrawn, released, discharged, waived and forgiven the Litigation Settlement Claimants and Claimants' Counsel, and each of their respective assigns, administrators and successors in interest, for and from any and all claims, actions, causes of action, counterclaims, proofs of claim, and any other obligation of any kind or nature arising from or related to the Bankruptcy Code, the Avoidance Actions, and any and all claims related to any Pre-Petition Settlement Agreement, Claimant Agreement, the Collateral Trust Agreement, Security Agreement, pre-petition payments to Claimants Counsel, and any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003, including all pending and potential causes of action, whether accrued or to accrue, whether asserted by way of claim, counterclaim, cross-claim, third-party action, action for indemnity or contribution or otherwise; provided, however, that the foregoing shall not constitute a release of any rights to enforce the terms of the Litigation Settlement Agreement, as amended, or any defenses to Asbestos Personal Injury Claims that may be asserted by the Debtors as contemplated in the Litigation Settlement Agreement, as amended.

(iv)     Except as otherwise provided for in the Litigation Settlement Agreement, as amended, all Litigation Settlement Claimants and Claimants' Counsel shall be deemed to have forever withdrawn, released, discharged, waived and forgiven the Debtors and their respective assigns, administrators and successors in interest, for and from any and all claims, actions, causes of action, counterclaims, proofs of claim, and any other obligation of any kind or nature arising from or related to the Bankruptcy Code, the Avoidance Actions, and any and all claims related to any Pre-Petition Settlement Agreement, Claimant Agreement, the Collateral Trust Agreement, Security Agreement and any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003, including all pending and potential causes of action, whether accrued or to accrue, whether asserted by way of a claim, counterclaim, cross-claim, third-party action, action for indemnity or contribution or otherwise; provided, however, that the foregoing shall not constitute a release of any rights to enforce the terms of the Litigation Settlement Agreement, as amended, and shall not constitute a release by Litigation Settlement Claimants of their Asbestos Personal Injury Claims against the Debtors, the Plan Trust, or any other party or entity.

(c)     Pursuant to the Litigation Settlement Agreement, as amended, and contingent upon confirmation of the Plan, the estates of Comstock, Cook and Arsenault have elected to withdraw their claims against the Debtors and will not seek recovery from the Debtors and/or Plan Trust, or otherwise participate in the Reorganization Cases.

(d)     Within 30 days after the Effective Date of the Plan, the District Court shall enter an order of dismissal of all claims and counterclaims in the Avoidance Actions, with prejudice, and with all parties to bear their own costs and attorneys fees.

(e)     Subject to the terms of this Plan, the mutual releases set forth in the Litigation Settlement Agreement, as amended, shall not abridge the right of Litigation Settlement Claimants to submit and recover upon their Asbestos Personal Injury Claims against the Debtors including as against the Plan Trust.

(f)     Each Litigation Settlement Claimant shall be entitled to submit its Asbestos Personal Injury Claim to the Debtors' bankruptcy estates, including the Plan Trust, as an unliquidated claim for resolution and treatment pursuant to TDP, provided that, any Litigation Settlement Claimant who received a partial payment from the Debtors with respect thereto prior to the Petition Date, including specifically claimants Cook, Arsenault, and Comstock, in addition to the other provisions hereof, hereby agrees to either: (a) not seek any further recovery with respect thereto against the Debtors, including from any Plan Trust, or (b) return and relinquish any such pre-petition partial payment for the benefit of the Plan Trust as a condition precedent to asserting any such further Asbestos Personal Injury Claim against the Debtors or the Plan Trust.

(g)     Pursuant to the Plan, any Pre-Petition Settled Claimant who is not a Litigation Settlement Claimant shall nevertheless receive the same treatment as the Litigation Settlement Claimants.

5.15     Review of Claimants' Counsel Expenses.     The expenses paid pre-petition by the Debtors to the Claimants' Counsel pursuant to the Claimant Agreement shall be subject to approval by the District Court in its discretion.

5.16     Non-Asbestos Reserve Fund

(a)     **Establishment of Reserve Fund**.     The Reorganized Debtors shall create a reserve fund (the "Reserve Fund") for claims, excluding asbestos claims, of any Governmental Units and any other Entities against the Debtors and/or Reorganized Debtors (the "Non-Asbestos Claims").  Within thirty (30) days after the Effective Date, the Plan Trust shall pay $3 million to the Reorganized Debtors for placement in the Reserve Fund (the "Reserve Fund Settlement Funds").  As used herein, the term "Known Insurance Claims" means Non-Asbestos Claims against the Debtors or Reorganized Debtors which arose from the operations of the Debtors prior to December 31, 2003 to the extent such claims survive the Reorganization Cases and claims are known to exist potentially as of the Fifth Anniversary of the Effective Date (the "Fifth Anniversary Date").  The Reserve Fund Settlement Funds shall be deposited in a segregated account and shall be used for the sole purpose of paying defense and indemnity costs incurred by the Reorganized Debtors after the Effective Date arising from Known Insurance Claims that are not paid in full by Liberty Mutual Insurance Company.   The Board of Directors of the Reorganized Debtors shall approve the initial payment made from the Non-Asbestos Reserve Fund.  Following the initial payment, the Board of Directors, in its sole discretion, may require notice before any subsequent payments are made out of the Non-Asbestos Reserve Fund.    The Reorganized Debtors shall provide the Plan Trustee with contemporaneous notice of payments made from the Non-Asbestos Reserve Fund.

(b)     **Termination of Reserve Fund**.     As of the Fifth Anniversary Date, any unused balance of the Reserve Fund shall be transferred by the Reorganized Debtors to the Plan Trust, and the Reserve Fund shall be terminated, provided, however, that to the extent there are any Known Insurance Claims as of the Fifth Anniversary Date that are unresolved, the Reserve Fund shall not be terminated on that date.  In such event, any Reserve Fund balance shall continue to be used to pay defense and indemnity costs incurred by the Reorganized Debtors arising from Known Insurance Claims until those claims are resolved.  In the event that a balance remains in the Reserve Fund after all Known Insurance Claims are resolved, any unused balance of the Reserve Fund shall be transferred by the Reorganized Debtors to the Plan Trust and at such time the Reserve Fund shall be terminated. For avoidance of doubt, in the event that the Reserve Fund continues after the Fifth Anniversary Date because there are Known

Insurance Claims, the Reserve Fund shall not be available for Non-Asbestos Claims for which notice of such Non-Asbestos Claim was first received by the Reorganized Debtors after the Fifth Anniversary Date.

5.17 **Intercompany Settlement**. (a) The Plan implements a compromise and settlement with respect to ABI, the ABI Claims and the Intercompany Agreements (as set forth in this Section 5.17, the "Intercompany Settlement"). Pursuant to Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code and consistent with section 1129 of the Bankruptcy Code, the Plan shall constitute a motion for approval of, and the Confirmation Order shall authorize and constitute District Court approval of, the Intercompany Settlement.

(b) On the Effective Date, pursuant to Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code, in full and final satisfaction of the ABI Claims, and for good and valuable consideration including ABI's agreement to the treatment specified in the Plan for the ABI Claims and the Claims and Interests asserted by other parties in interest, the ABI Settlement shall be effectuated in accordance with the following terms:

1. All ABI Claims, including without limitation ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.17(b)(4)(B) of the Plan), shall be deemed Disallowed and expunged.

2. All Intercompany Agreements shall be deemed rejected, and any and all ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.17(b)(4)(B) of the Plan) arising therefrom shall be deemed Disallowed and expunged.

3. ABI and Reorganized Congoleum shall enter into and effectuate the New ABI Agreement, and which shall govern the relationship between ABI and Reorganized Congoleum upon the Effective Date.

4. The ABI Parties and ABI and their respective Representatives (in their capacities as such) shall be deemed to have received and exchanged mutual general releases with and from the Debtors, their Estates and Reorganized Congoluem, such that:

A. *As of the Effective Date, the Debtors, their Estates and Reorganized Congoleum shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, demands, debts, rights, causes of action and liabilities (other than their rights to enforce the terms of the Intercompany Settlement, the New ABI Agreement and the ABI Canada License Agreement, as amended by Section 5.17(b)(5) of the Plan, and their rights to payment of not more than $2 million on account of net Unpaid Intercompany Amounts remaining after intercompany offsets of Unpaid Intercompany Amounts), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, Reorganized Congoleum, the Reorganization Cases, the Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtors, their Estates or Reorganized Congoleum, as of the Petition Date or thereafter, against the ABI Parties, ABI and/or their respective Representatives (in their capacities as such); and*

B. *As of the Effective Date, the ABI Parties, ABI and their respective Representatives (in their capacities as such) shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, demands, debts, rights, causes of action and liabilities (other than their rights to enforce the terms of the Intercompany Settlement, the New ABI Agreement and the ABI Canada License Agreement, as amended by Section 5.17(b)(5) of the Plan, and their rights to payment of not more than $2 million on account of net Unpaid Intercompany Amounts remaining after intercompany offsets of Unpaid Intercompany Amounts), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, Reorganized Congoleum, the Reorganization Cases, the Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the ABI Parties, ABI and their respective Representatives (in their capacities as such), as of the Petition Date or thereafter, against the Debtors, their Estates or Reorganized Congoleum.*

5.      The ABI Canada License Agreement shall be deemed to have been assumed by Congoleum and become an obligation of Reorganized Congoleum, *provided, however,* that Article 7.02 of the ABI Canada License Agreement shall be modified so that the "Term" thereof shall expire two years from the Effective Date and the ABI Canada License Agreement shall be deemed amended accordingly as of the Effective Date without any further action of any Person or Entity.

5.18   **Deemed Consolidation of Debtors For Plan Purposes Only**.  Subject to the occurrence of the Effective Date, the Debtors shall be deemed consolidated under the Plan for Plan purposes only.  Each and every Claim filed or to be filed against any of the Debtors shall be deemed filed against the deemed consolidated Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Debtors. Such deemed consolidation, however, shall not (other than for purposes related to funding distributions under the Plan and as set forth above in this Section 5.18) affect: (i) the legal and organizational structure of the Debtors; (ii) any Liens that are required to be maintained under the Plan (A) in connection with executory contracts or unexpired leases that were entered into during the Reorganization Cases or that have been or will be assumed, (B) pursuant to the Plan, or (C) in connection with any Exit Facility; or (iii) The Debtors or Reorganized Debtors obligation to pay statutory fees pursuant to 28 U.S.C. § 1930(a)(6) for each of the three Debtors as provided in Article 13.4. Notwithstanding anything contained in the Plan to the contrary, the deemed consolidation of the Debtors shall not have any effect on any of the Claims being reinstated and left unimpaired under the Plan, and the legal, equitable, and contractual rights to which the holders of any such Claims are entitled shall be left unaltered by the Plan.

## ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS WITH RESPECT TO CLAIMS OTHER THAN PLAN TRUST ASBESTOS CLAIMS

6.1    **Plan Distributions**.  The Disbursing Agent shall make all distributions required under the Plan (other than distributions to holders of Plan Trust Asbestos Claims and Senior Note Claims).  Distributions shall be made on the Distribution Date (unless otherwise provided herein or ordered by the District Court) with respect to all Claims except for Plan Trust Asbestos Claims.  Distributions to be made on the Distribution Date shall be deemed actually made on the Distribution Date if made either (a) on the Distribution Date or (b) as soon as practicable thereafter.  With respect to Plan Trust Asbestos Claims, distributions to holders of Plan Trust Asbestos Claims shall be made in accordance with the Plan Trust Agreement and/or the TDP, as applicable.  With respect to Senior Note Claims, Distributions will be made by the Indenture Trustee, whose reasonable fees and expenses in connection with such Distributions shall be paid by Reorganized Congoleum.

6.2    **Distributions of Cash**.  Any Distribution of Cash made by Reorganized Congoleum pursuant to the Plan shall, at Reorganized Congoleum's option, be made by check drawn on a domestic bank or by wire transfer from a domestic bank.

6.3    **No Interest on Claims**.  Unless otherwise specifically provided for in the Plan, the Confirmation Order, or a post-petition agreement in writing between the Debtors and a holder, Post-Petition Interest shall not accrue or be paid on Claims, and no holder shall be entitled to interest accruing on or after the Petition Date. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a Final Distribution is made when and if such Disputed Claim becomes an Allowed Claim.  Notwithstanding the foregoing, this Section 6.3 shall not apply to Plan Trust Asbestos Claims which shall be governed in all cases by the Plan Trust Agreement and the TDP.

6.4    **Delivery of Distributions**.  Distributions to holders of Allowed Claims other than Asbestos Claims shall be made by the Disbursing Agent or the Indenture Trustee, as applicable, (a) at the holder's last known address, or (b) at the address in any written notice of address change delivered to the Disbursing Agent or the Indenture Trustee, as applicable.  If any holder's distribution made by the Disbursing Agent is returned as undeliverable, no further distributions to such holder shall be made, unless and until the Disbursing Agent is notified of such holder's then current address, at which time all missed distributions shall be made to such holder without interest.  Amounts in respect of undeliverable distributions made through the Disbursing Agent shall be returned to Reorganized Congoleum until such distributions are claimed or become unclaimed property pursuant to Section 6.8 of the Plan. With respect to Plan Trust Asbestos Claims, distributions to the holders of Plan Trust Asbestos Claims

shall be made in accordance with the Plan Trust Agreement and/or the TDP, as applicable. With respect to Senior Note Claims, distributions to holders of Senior Note Claims shall be made in accordance with the Indenture.

6.5 **Distributions to Holders as of the Record Date**. All Distributions on Allowed Claims shall be made to the Record Holders of such Claims. As of the close of business on the Record Date, the Claims register maintained by the Voting Agent shall be closed, and there shall be no further changes in the Record Holder of any Claim. Reorganized Congoleum shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. Reorganized Congoleum shall instead be entitled to recognize and deal for all purposes under the Plan with the Record Holders as of the Record Date.

6.6 **Fractional Securities; Fractional Dollars**. Distributions of fractions of shares of New Common Stock will not be made and shall be rounded (up or down) to the nearest whole number, with half shares or less being rounded down. Reorganized Congoleum shall not be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

6.7 **Withholding of Taxes**. The Disbursing Agent shall withhold from any assets or property distributed under the Plan any assets or property that must be withheld pursuant to applicable law.

6.8 **Unclaimed Property.** Any Cash, assets and other property to be distributed on account of any Claim (other than a Plan Trust Asbestos Claim) under the Plan that remain unclaimed (including by an Entity's failure to negotiate a check issued to such Entity) or otherwise not deliverable to the Entity entitled thereto before the later of (a) one year after the date of distribution or (b) 120 calendar days after an order allowing such Entity's Claim becomes a Final Order, shall become vested in, and shall be transferred and delivered to, Reorganized Congoleum. In such event, such Entity's Claim shall no longer be deemed to be Allowed and such Entity shall be deemed to have waived its rights to such payments or distributions under the Plan pursuant to section 1143 of the Bankruptcy Code and shall have no further Claim in respect of such distribution and shall not participate in any further distributions under the Plan with respect to such Claim.

## ARTICLE VII

## RESOLUTION OF DISPUTED CLAIMS

7.1 **Disallowance of Improperly Filed Claims**. Subject to section 502(j) of the Bankruptcy Code and Bankruptcy Rules 3008 and 9006, any Administrative Claim, Asbestos Property Damage Claim or Claim (other than Asbestos Personal Injury Claims) for which the filing of a Proof of Claim, application or motion with the District Court is required under the terms of the Bankruptcy Code, the Bankruptcy Rules, any order of the Bankruptcy Court or District Court, as applicable (including one providing a Bar Date), or the Plan shall be Disallowed if and to the extent that such Proof of Claim (or other filing) is not timely and properly made.

7.2 **Prosecution of Objections to Claims**. Unless otherwise ordered by the District Court after notice and a hearing, after the Effective Date, Reorganized Congoleum, the Bondholders' Committee, the Asbestos Claimants' Committee and the Futures Representative each shall have the right to make and file objections to Proofs of Claims, other than Proofs of Claims in respect of Asbestos Personal Injury Claims and Professional Fee Claims, at any time on or before ninety (90) days after the later of (i) the Effective Date or (ii) the date on which such Claim was filed with the District Court unless no Proof of Claim is required to be filed pursuant to Bankruptcy Rule 3002, the Plan or any order of the District Court; *provided, however,* that (x) this deadline may be extended by the District Court on motion by the Debtors, Reorganized Congoleum, the Bondholders' Committee, the Asbestos Claimants' Committee or the Futures Representative, as applicable, and (y) neither the Debtors, Reorganized Congoleum, the Futures Representative, the Bondholders' Committee, the Asbestos Claimants' Committee, nor any other Person may file an objection to any (1) Claim that was Allowed by a Final Order entered during the Reorganization Cases, or (2) Claim Allowed by the Plan. In addition, unless otherwise ordered by the District Court after notice and a hearing, after the Effective Date Reorganized Congoleum, the Bondholders' Committee, the Asbestos Claimants' Committee and the Futures Representative, subject to Sections 13.8 and 13.14 of the Plan, each shall have the exclusive right to make and file objections to Administrative Claims and to amend the Schedules or to object to any

Claim specified on the Schedules, at any time on or before sixty (60) days after the later of (i) the Effective Date or (ii) the date on which such Claim was filed with the District Court unless no Proof of Claim is required to be filed pursuant to Bankruptcy Rule 3002, the Plan or any order of the District Court; *provided, however,* that (x) this deadline may be extended by the District Court on motion by the Debtors, Reorganized Congoleum, the Bondholders' Committee, the Asbestos Claimants' Committee or the Futures Representative, as applicable, (y) neither the Debtors, Reorganized Congoleum, the Futures Representative, the Bondholders' Committee, the Asbestos Claimants' Committee nor any other Person may file an objection to any (1) Claim that was Allowed by a Final Order entered during the Reorganization Cases, or (2) Claim Allowed by the Plan, and (z) with respect to any Administrative Claim referred to in sub-clause (a)(4) of the definition of Administrative Expense, no objection may be filed with respect to any such Administrative Expense other than with respect to the reasonableness of such Administrative Expense or whether such Administrative Expense was incurred in accordance with Section 6.6 of the Indenture. Without prejudice to the right of any Asbestos Insurance Company to assert any Asbestos Insurer Coverage Defenses, after the Effective Date, only the Plan Trustee shall have the authority to contest Asbestos Personal Injury Claims and Asbestos Property Damage Claims and litigate to judgment, settle or withdraw such objections and each Asbestos Personal Injury Claim and Asbestos Property Damage Claim, whether or not a Proof of Claim was filed with the Bankruptcy Court or District Court, shall be satisfied exclusively in accordance with the Plan Trust Documents.

       7.3   **No Distributions Pending Allowance**. Notwithstanding any other provision hereof, if a Claim or any portion of a Claim (other than an Asbestos Personal Injury Claim) is a Disputed Claim, no payment or distribution shall be made on account of such Disputed Claim, unless and until such Disputed Claim becomes an Allowed Claim.

       7.4   **Distributions After Allowance**. Payments and distributions to each holder of a Claim that is Disputed, or that is not Allowed, to the extent that such Claim ultimately becomes Allowed, shall be made in accordance with the provisions hereof governing the Class of Claims in which such Claim is classified. As soon as practicable after the date that the order or judgment of the District Court allowing any Disputed Claim (other than a disputed Asbestos Claim) becomes a Final Order, Reorganized Congoleum shall distribute to the holder of such Claim any payment or property that would have been distributed to such holder if the Claim had been Allowed as of the Effective Date (or such other date on which such distribution would have been made).

## ARTICLE VIII

## TREATMENT OF EXECUTORY CONTRACTS,
## UNEXPIRED LEASES AND SETTLEMENTS

       8.1   **Assumption of Unexpired Leases and Executory Contracts**

          (a)     Assumption. Except for any unexpired lease or executory contract that the Plan Proponents reject or designate as being subject to rejection on or before the Effective Date, as of the Effective Date, all executory contracts and unexpired leases not previously assumed or rejected by the Debtors pursuant to section 365 of the Bankruptcy Code shall be deemed to have been assumed by the Debtors, and the Plan shall constitute a motion to assume such executory contracts and unexpired leases. Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the District Court shall constitute approval of such assumptions pursuant to section 365(a) of the Bankruptcy Code and a finding by the District Court that each such assumption is in the best interests of the Debtors, the Estates and all parties in interest in the Reorganization Cases. With respect to each such executory contract or unexpired lease assumed by the Debtors, unless otherwise determined by the District Court pursuant to a Final Order or agreed to by the parties thereto on or before the Effective Date, any defaults of the Debtors with respect to such assumed executory contracts or leases existing as of the Effective Date shall be cured in the ordinary course of the Reorganized Debtors' business promptly after any such default becomes known to the Debtors and, if disputed, established pursuant to applicable law by the District Court, and the assumed executory contracts or leases shall be binding upon and enforceable upon the parties thereto, subject to any rights and defenses existing thereunder. Subject to the occurrence of the Effective Date, upon payment of such cure amounts, all defaults of the Debtors existing as of the Confirmation Date with respect to such executory contract or unexpired lease shall be deemed cured.

(b)     Rejection.  Notwithstanding subpart (a) of this Section 8.1, the Plan Proponents may reject those executory contracts and unexpired leases listed on an exhibit to be filed with the District Court as part of the Plan Supplement (as such list may be amended or supplemented up to and including the Confirmation Date).

(c)     ABI Canada License Agreement; Intercompany Agreements.  Pursuant to and in consideration of the Intercompany Settlement and Section 5.17 and other terms of the Plan, on the Effective Date (A) the ABI Canada License Agreement shall be amended as provided in the Intercompany Settlement and deemed to have been assumed by Congoleum and become a contractual obligation of Reorganized Congoleum, and the Plan shall constitute a motion to assume such license agreement and (B) all Intercompany Agreements shall be rejected and all ABI Claims, including without limitation any ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.17(b)(4)(B) of the Plan), shall be deemed Disallowed and expunged.

8.2     **Damages Upon Rejection**.  Except to the extent arising out of or based on the rejection of any executory contract related to or involving asbestos which shall be dealt with under the TDP, the District Court shall determine the dollar amount, if any, of the Claim of any Entity seeking damages by reason of the rejection of any executory contract or unexpired lease; *provided, however*, that such Entity must file a Proof of Claim with the District Court on or before thirty (30) calendar days following the later of the Confirmation Date or the date of rejection of the executory contract or unexpired lease.  To the extent that any such Claim is Allowed by the District Court by Final Order, such Claim shall become, and shall be treated for all purposes under the Plan as, a Class 9 General Unsecured Claim, and the holder thereof shall receive distributions as a holder of an Allowed Claim in such Class pursuant to the Plan unless such Claim is held by ABI, in which case such Claim shall be Disallowed and expunged.

8.3     **Insurance Agreements**.  Except to the extent expressly set forth in any Asbestos Insurance Settlement Agreement, nothing contained in the Plan or any negotiations leading up to the Plan, including this Section 8.3, shall constitute a waiver of:  (i)  any claim, right, or cause of action that any of the Debtors or the Plan Trust, as applicable, may have against any insurer, including under any insurance agreement; or (ii) any Asbestos Insurer Coverage Defenses that any Asbestos Insurance Company may have against the Debtors or the Plan Trust.  The discharge and release provisions contained in the Plan shall neither diminish nor impair the duties or obligations of any Debtor or any other Entity under any Asbestos Insurance Policy or agreement relating thereto (including any Asbestos Insurance Settlement Agreement), nor shall the discharge and release provisions contained in the Plan diminish nor impair the duties, obligations or the Asbestos Insurer Coverage Defenses of any Asbestos Insurance Company under any Asbestos Insurance Policy or agreement relating thereto.  The Reorganized Debtors shall not voluntarily assist any Person in the establishment of any rights, action, cause of action or claim against the Century Entities or any other Settling Asbestos Insurance Company in anyway relating to any Asbestos Claim or other claim released under an Asbestos Insurance Settlement Agreement.

8.4     **Compensation and Benefits Programs**.  (a)  Except for the Congoleum Interests which are treated elsewhere in the Plan, unless otherwise agreed to by the affected parties or modified by order of the Bankruptcy Court or District Court, as applicable, all of the Debtors' obligations under employment and severance policies, and all compensation and benefit plan, policies, and programs shall be treated as though they are executory contracts that are deemed assumed under the Plan.

(b)     As of the Effective Date, the Pension Plans, as well as the collective bargaining agreement by and between the Debtors and Teamsters Local 312, shall be deemed to have been assumed by Reorganized Congoleum.  Reorganized Congoleum shall continue the Pension Plans, satisfy the minimum funding standards pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082, and administer the Pension Plans in accordance with their terms and the provisions of ERISA.  Furthermore, nothing in the Plan shall be construed as discharging, releasing or relieving the Debtors or Reorganized Congoleum, or any party, in any capacity, from any liability imposed under any law or regulatory provision with respect to the Pension Plans, the Pension Benefit Guaranty Corporation ("PBGC") or the Teamsters Pension Trust Fund of Philadelphia Vicinity (the "Teamsters Pension Fund").  The PBGC, the Pension Plans and the Teamsters Pension Fund shall not be enjoined or precluded from enforcing such liability as a result of any provision of the Plan or the Confirmation Order.  Notwithstanding anything in this Section 8.4, the Plan Trust shall not assume any of the liabilities, obligations, or responsibilities of the Debtors or Reorganized Congoleum with respect to the Pension Plans, the PBGC or the Teamster Pension Fund.

8.5 **Retiree Benefits**. Notwithstanding any other provisions of the Plan (other than the last sentence of this Section 8.5), any payments that are due to any individual for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the Debtors prior to the Petition Date shall be continued for the duration of the period, if any, that the Debtors have obligated themselves to provide such benefits. Notwithstanding the foregoing, no employee or retired employee (nor their spouses or dependents and beneficiaries) of the Debtors or the Reorganized Debtors shall be entitled to assert any Asbestos Claim against the Debtors or the Reorganized Debtors.

8.6 **Indemnification of Directors, Officers and Employees**. The obligations of the Debtors to indemnify their current and former directors, officers or employees to the extent provided in the Debtors' constituent documents or required pursuant to applicable general corporation law shall be deemed and treated as obligations that are assumed by Reorganized Congoleum pursuant to the Plan as of the Effective Date; *provided, however,* that (i) with respect to acts or omissions occurring prior to, on or after the Petition Date, the indemnification obligation of Reorganized Congoleum is limited exclusively to the extent of proceeds available under any applicable directors and officers insurance policy for the act(s) and/or omission(s) at issue and (ii) no current or former director, officer or employee shall be indemnified with respect to the gross negligence, fraud or willful misconduct of such party.

# ARTICLE IX

## ACCEPTANCE OR REJECTION OF THE PLAN

9.1 **Classes Entitled to Vote**. The holders of Claims or Interests in each Impaired Class of Claims or Interests, i.e., Classes 4, 6, 7, 8, 9 and 10 whose Claims or Interests are Allowed or temporarily allowed for voting purposes, are entitled to vote to accept or reject the Plan pursuant to the Voting Procedures Order; *provided however* that the holders of Congoleum Interests in Class 10 are deemed to have rejected the Plan in accordance with the provisions of Section 1126(g) of the Bankruptcy Code and, accordingly, their separate vote will not be solicited.

9.2 **Acceptance by Impaired Classes of Claims**. Pursuant to section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if (a) the holders of at least two-thirds in dollar amount of the claims actually voting in such Class (other than Claims held by any holder designated pursuant to section 1126(e) of the Bankruptcy Code) have voted to accept the Plan and (b) more than one-half in number of such claims actually voting in such Class (other than Claims held by any holder designated pursuant to section 1126(e) of the Bankruptcy Code) have voted to accept the Plan.

9.3 **Acceptance by Impaired Class of Interests**. Pursuant to section 1126(d) of the Bankruptcy Code, an Impaired Class of Interests shall have accepted the Plan if the holders of at least two-thirds in amount of the Allowed Interests actually voting in such Class (other than Interests held by any holder designated pursuant to section 1126(e) of the Bankruptcy Code) have voted to accept the Plan. The holders of Congoleum Interests in Class 10 are deemed to have rejected the Plan in accordance with the provisions of section 1126(g) of the Bankruptcy Code.

9.4 **Acceptance Pursuant to Section 524(g) of the Bankruptcy Code**. The Plan shall have been voted upon favorably as required by section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code.

9.5 **Presumed Acceptance of Plan**. Classes 1, 2, 3, 5, and 11 are Unimpaired. Under section 1126(f) of the Bankruptcy Code, the holders of Claims and Interests in such Classes are conclusively presumed to have voted to accept the Plan.

9.6 **Reservation of Rights**. In the event that any Impaired Class fails to accept the Plan by the requisite numbers and amounts required by the Bankruptcy Code, the Plan Proponents reserve the right to seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

# ARTICLE X

## CONDITIONS TO CONFIRMATION AND EFFECTIVENESS

10.1  **Conditions to Confirmation**.  Confirmation of the Plan shall not occur unless each of the following conditions has been satisfied or waived in accordance with Section 10.3 below.  These conditions to Confirmation, which are designed, among other things, to ensure that the Injunctions, releases, and discharges set forth in Article XI shall be effective, binding and enforceable, are as follows:

(a)  The District Court shall have made specific findings and determinations, among others, in substantially the following form:

(i)  The Discharge Injunction and the Asbestos Channeling Injunction are to be implemented in connection with the Plan and the Plan Trust;

(ii)  As of the Petition Date, Congoleum has been named as a defendant in personal injury, wrongful death or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

(iii)  The Plan Trust, upon the Effective Date, shall assume the liabilities of the Debtors with respect to Plan Trust Asbestos Claims and Demands;

(iv)  The Plan Trust is to be funded in part by securities of Reorganized Congoleum in the form of the Plan Trust Common Stock, which constitutes an obligation of Reorganized Congoleum to make future payments to the Plan Trust;

(v)  On the Effective Date, the Plan Trust will own a majority of the voting shares of Reorganized Congoleum;

(vi)  The Plan Trust is to use its assets and income to pay Plan Trust Asbestos Claims and Plan Trust Expenses and otherwise as specifically set forth in the Plan Trust Agreement;

(vii)  Congoleum is likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Plan Trust Asbestos Claims, which are addressed by the Asbestos Channeling Injunction;

(viii)  The actual amounts, numbers and timing of future Demands cannot be determined;

(ix)  Pursuit of Demands outside the procedures prescribed by the Plan and the TDP is likely to threaten the Plan's purpose to deal equitably with Plan Trust Asbestos Claims and future Demands;

(x)  The Plan establishes a separate Class 7 for Asbestos Personal Injury Claims that are to be addressed by the Plan Trust and at least seventy-five percent (75%) of the Asbestos Claimants voting in Class 7 have accepted the Plan;

(xi)  The Plan establishes a separate class of Asbestos Property Damage Claims that are to be addressed by the Plan Trust and at least seventy-five percent (75%) of the claimants voting in such class have accepted the Plan;

(xii)  Pursuant to court orders or otherwise, the Plan Trust shall operate through mechanisms such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims or other comparable mechanisms, that provide reasonable assurance that the Plan Trust shall value, and be in a financial position to pay, Asbestos Personal Injury Claims and Demands therefor in substantially the same manner;

(xiii) The Futures Representative was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Discharge Injunction and the Asbestos Channeling Injunction for the purpose of, among other things, protecting the rights of persons that might subsequently assert Demands of the kind that are addressed in the Discharge Injunction and the Asbestos Channeling Injunction and transferred to the Plan Trust;

(xiv) In light of the benefits provided, or to be provided, to the Plan Trust on behalf of each Protected Party, the Asbestos Channeling Injunction is fair and equitable with respect to the persons that might subsequently assert Demands against any Protected Party;

(xv) The Plan otherwise complies with section 524(g) of the Bankruptcy Code;

(xvi) Congoleum's contributions to the Plan Trust provided for herein, together with the Asbestos Insurance Assignment, the Plan Trust Common Stock, constitute substantial assets of the Plan Trust and the reorganization;

(xvii) The duties and obligations of the insurers that issued policies and their successors and assigns, or, with respect to any insolvent insurers, their liquidators and/or the state insurance guaranty funds that bear responsibility with respect to such rights under such policies which constitute the Asbestos Insurance Rights and Asbestos Property Damage Insurance Rights are not eliminated or diminished by the transfer pursuant to the Plan of the Debtors' rights in the Asbestos Insurance Rights and Asbestos Property Damage Insurance Rights pursuant to the Insurance Assignment Agreement;

(xviii) The Settling Asbestos Insurance Companies are entitled to the benefits of the Asbestos Channeling Injunction with respect to Plan Trust Asbestos Claims;

(xix) After Confirmation, each Asbestos Insurance Settlement Agreement of a Settling Asbestos Insurance Company and each Final Order of the Bankruptcy Court or District Court, as applicable, approving such Settlement Agreements shall be binding upon and inure to the benefit of the Plan Trust and the Plan Trustee, and the Plan Trust shall become fully bound by, and entitled to all of the rights afforded to the Plan Trust and/or the Debtors under, all of the terms and conditions of each such Asbestos Insurance Settlement Agreement without need for further act or documentation of any kind;

(xx) After Confirmation, none of the Debtors, Reorganized Congoleum, the Futures Representative, the Plan Trustee, and the Asbestos Claimants' Committee shall seek to terminate, reduce or limit the scope of the Asbestos Channeling Injunction or any other injunction contained in the Plan that inures to the benefit of any Settling Asbestos Insurance Company;

(xxi) As of the Effective Date, the Insurance Transfer Agreement shall be a valid and binding obligation of each of the parties thereto, shall be in full force and effect and shall be enforceable in accordance with its terms, in each case notwithstanding any anti-assignment provision in or incorporated into any Asbestos Insurance Policy and applicable state law; and

(xxii) The Plan Trust is a "qualified settlement fund" pursuant to Section 468(B) of the IRC and the regulations issued pursuant thereto.

(b) <u>Confirmation Order</u>. The District Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order and any other order entered in conjunction therewith, each of which shall be in form and substance acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative and, insofar as such findings and determinations affect the Financing Order or the rights of Wachovia thereunder, Wachovia.

10.2 **Conditions to Effectiveness**. Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date of the Plan shall not occur unless and until each of the following conditions has been satisfied or waived in accordance with Section 10.3 below:

Exhibit A--Plan.DOC

(a)     Confirmation Order.  The Confirmation Order shall have been entered by the District Court and the Confirmation Order and any order of the District Court shall be in form and substance acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative and the Confirmation Order (and affirming order of the District Court) shall have become a Final Order; *provided, however*, that the Effective Date may occur at a point in time when the Confirmation Order is not a Final Order at the option of the Plan Proponents unless the effectiveness of the Confirmation Order has been stayed, reversed or vacated.  The Effective Date may occur, again at the option of the Plan Proponents, on the first Business Day immediately following the expiration or other termination of any stay of effectiveness of the Confirmation Order.

(b)     Injunctions.  The Discharge Injunction, the Asbestos Channeling Injunction and the Anti-Suit Injunction shall be in full force and effect.

(c)     Exit Facility.  The Exit Facility to be entered into by Reorganized Congoleum, and all documents to be executed in connection with the Exit Facility, shall be in form and substance reasonably satisfactory to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative and shall have been executed and delivered and all conditions precedent to effectiveness thereof shall have been satisfied or waived by the parties thereto.

(d)     New Senior Notes and New Indenture.  The New Indenture shall have been executed and authorized and the New Senior Notes shall have been delivered in accordance with the New Indenture and shall constitute valid senior secured indebtedness of Reorganized Congoleum.

(e)     New Common Stock.  The New Common Stock shall have been issued in accordance with the Plan.

(f)     Plan Documents.  The Plan Documents necessary or appropriate to implement the Plan (which shall include without limitation, the Plan, the Plan Trust Agreement, the TDP, the Exit Facility, the New Senior Notes, the New Indenture, the Registration Rights Agreement, the Amended and Restated Certificate, the Amended and Restated Bylaws, the New ABI Agreement, the Stockholders Agreement, and the Insurance Transfer Agreement) shall have been executed, delivered and, where applicable, filed with the appropriate governmental authorities; all conditions precedent to the effectiveness of each of such Plan Documents shall have been satisfied or waived by the respective parties thereto; and the Plan Documents shall be in full force and effect.  The Plan Documents shall be acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative.

(g)     Other Assurances.  The Debtors or the Plan Proponents shall have obtained either (i) a private letter ruling from the Internal Revenue Service establishing that the Plan Trust is a "qualified settlement fund" pursuant to Section 468(B) of the IRC and the regulations issued pursuant thereto, or (ii) other decisions, opinions or assurances regarding certain tax consequences of the Plan, satisfactory to the Debtors, the Asbestos Claimants' Committee and the Futures Representative.

(h)     The District Court shall have approved pursuant to Bankruptcy Rule 9019 the First Amendment to the Litigation Settlement Agreement.

(i)     Merger.  The District Court will have made a specific finding and determination that the merger of the Subsidiary Debtors with and into Congoleum, with Reorganized Congoleum as the sole surviving corporation, is authorized.

(j)     Judicial Fees.  All fees payable pursuant to 28 U.S.C. § 1930 if and to the extent assessed against the Bankruptcy Estates of the Debtors will have been paid in full.

(k)     [reserved]

(l)     [reserved]

Exhibit A--Plan.DOC

(m) _Other Approvals, Documents and Actions_. All authorizations, consents and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained, and all actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

10.3 **Waiver of Conditions**. Each of the conditions set forth in Sections 10.1 and 10.2 above may be waived in whole or in part by the Plan Proponents without any notice to other parties in interest or the District Court and without a hearing. The failure of the Plan Proponents to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

## ARTICLE XI

## INJUNCTIONS, RELEASES AND DISCHARGE

11.1 **Discharge**. (a) Except as specifically provided in the Plan, the Plan Documents or in the Confirmation Order, as of the Effective Date, Confirmation shall discharge the Debtors and the Reorganized Debtors pursuant to section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims of any nature whatsoever and Demands including, without limitation, any Claims, demands and liabilities that arose before Confirmation, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such Claim was filed or deemed filed under section 501 of the Bankruptcy Code, or such Claim was listed on the Schedules of the Debtors, (b) such Claim is or was Allowed under section 502 of the Bankruptcy Code, or (c) the holder of such Claim has voted on or accepted the Plan. Except as specifically provided in the Plan or Plan Documents, the rights that are provided in the Plan as of the Effective Date shall be in exchange for and in complete satisfaction, settlement and discharge of all Claims (including without limitation Asbestos Claims) or Demands against, Liens on, and interests in the Debtors or the Reorganized Debtors or any of their assets or properties. Notwithstanding anything herein to the contrary, nothing in this Section 11.1 shall affect the right of any Asbestos Insurance Company to assert any Asbestos Insurer Coverage Defenses.

(b) Notwithstanding any other provision of the Plan to the contrary, Confirmation shall not discharge any pre-Petition Date or post-Petition Date, pre-Confirmation Date liability that may be due from any of the Debtors to the Internal Revenue Service as currently set forth in certain Proofs of Claim and Administrative Expense Claim, as amended, filed by the Internal Revenue Service. Should any pre-Petition or post-Petition Date, pre-Confirmation Date tax liabilities be determined by the Internal Revenue Service to be due from any of the Debtors for any of the tax periods reflected by such Proofs of Claim or Administrative Expense Claim, such liabilities shall be determined administratively or in a judicial forum in the manner in which such liabilities would have been resolved had these Reorganization Cases not been commenced. Any resulting liabilities determined pursuant to a Final Order or other final determination shall be paid as if these Reorganization Cases had not been commenced.

11.2 **Exculpation**. As of the Effective Date, (i) the Debtors, the Futures Representative, the Asbestos Claimants' Committee, the Bondholders' Committee and each of their Representatives shall not have or incur any liability to any Entity for any act or omission taken on or after the Petition Date in connection with or arising out of the negotiation of the Plan, any Plan Document or any prior plan of reorganization relating to the Debtors or other related documents, the pursuit of Confirmation of the Plan or any prior plan of reorganization relating to the Debtors, the consummation of the Plan, or the administration of the Plan, or the property to be distributed under the Plan; and (ii) in all respects the Debtors, Futures Representative, the Asbestos Claimants' Committee and the Bondholders' Committee shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and the other Plan Documents. For avoidance of doubt, in no event shall any such party be exculpated from liability under this Section 11.2 in the case of the gross negligence, fraud or willful misconduct of such party. None of the foregoing parties shall be exculpated under this provision with respect to any acts occurring prior to the Petition Date. With respect to officers and directors of the Debtors, this section shall apply only to such officers and directors who were serving in such capacity on and after the Petition Date.

11.3 **Releases by Holders of Plan Trust Asbestos Claims**. Pursuant to this Section 11.3 and the Confirmation Order, (which may include or incorporate by reference release(s) for the benefit of any Settling Asbestos Insurance Company consistent with the terms of this Section 11.3 and the terms of the relevant Asbestos

Insurance Settlement Agreement), any holder of a Plan Trust Asbestos Claim that receives a payment from the Plan Trust shall be deemed to have unconditionally released the Plan Trust and each Settling Asbestos Insurance Company from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, arising from, relating to, or involving the manufacture, sale, distribution, installation, formulation, marketing, transport, handling or any other activity involving any asbestos containing products of Congoleum and any of Congoleum entities identified in the Confirmation Order, which may incorporate the terms of one or more Asbestos Insurance Settlement Agreement, or their premises to the extent such Claim arises from, relates to or involves exposure to asbestos, including without limitation, any operation claims, contribution claims, direct action claims, and insurance coverage claims. For the avoidance of doubt, in no event shall any such party be released under this Section 11.3 in the case of the gross negligence, fraud or willful misconduct of such party.

11.4    **Discharge Injunction**. Except as specifically provided in the Plan Documents to the contrary, the satisfaction, release, and discharge set forth in Section 11.1 shall also operate as an injunction, pursuant to sections 105, 524(g) and 1141 of the Bankruptcy Code, prohibiting and enjoining the commencement or continuation of any action, the employment of process or any act to collect, recover from, or offset (a) any Claim or Demand against or Interest in the Debtors, the Reorganized Debtors, or the Plan Trust by any Entity and (b) any cause of action, whether known or unknown, against the Debtors and the Reorganized Debtors based on such Claim or Interest described in subpart (a) of this Section 11.4.

11.5    **Third Party Releases**. No third party releases are being granted pursuant to the Plan nor are the Plan Proponents seeking approval of any such third party releases, except as set forth specifically in this Plan.

11.6    **Asbestos Channeling Injunction**. The sole recourse of the holder of a Plan Trust Asbestos Claim or Demand on account of such Claim or Demand or of a Person that had or could have asserted an Asbestos Claim or Demand shall be to the Plan Trust pursuant to the provisions of the Asbestos Channeling Injunction, the Plan, the Plan Trust Agreement and the TDP, and such holder shall have no right whatsoever at any time to assert its Plan Trust Asbestos Claim or Demand against the Debtors, the Reorganized Debtors, any other Protected Party, or any property or interest in property of the Debtors, the Reorganized Debtors, or any other Protected Party. Without limiting the foregoing, from and after the Effective Date, the Asbestos Channeling Injunction shall apply to all present and future holders of Plan Trust Asbestos Claims and Demands, and all such holders shall be permanently and forever stayed, restrained, and enjoined from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Plan Trust Asbestos Claims and Demands, other than from the Plan Trust in accordance with the Asbestos Channeling Injunction and pursuant to the Plan, the Plan Trust Agreement and the TDP:

(a)    commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Protected Party or any property or interests in property of any Protected Party;

(b)    enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Protected Party or any property or interests in property of any Protected Party;

(c)    creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance against any Protected Party, or any property or interests in property of any Protected Party;

(d)    setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and

(e)    proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the Plan Trust, except in conformity and compliance with the Plan, the Plan Trust Agreement and the TDP.

Any right, claim or cause of action that an Asbestos Insurance Company may have been entitled to assert against a Settling Asbestos Insurance Company based on or relating to Asbestos Claims shall be channeled to and become a right, claim or cause of action as an offset claim against the Plan Trust and not against the Settling Asbestos Insurance Company in question and all persons, including any Asbestos Insurance Company, shall be enjoined from asserting any such right, claim or cause of action against a Settling Asbestos Insurance Company.

Except as otherwise expressly provided in the Plan, nothing contained in the Plan shall constitute or be deemed a waiver of any claim, right or cause of action that the Debtors, the Reorganized Debtors, or the Plan Trust may have against any Entity in connection with or arising out of or related to an Asbestos Claim. Notwithstanding any other provision in the Plan to the contrary, nothing in the Plan shall be understood to channel, prevent, impair or limit in any way enforcement against the Debtors, Reorganized Congoleum, or any other Protected Party of any rights provided in connection with any Workers' Compensation Claim.

11.7 **Reservation of Rights**. Notwithstanding any other provision of the Plan to the contrary, the satisfaction, release and discharge, and the Injunctions set forth in Article XI, shall not serve to satisfy, discharge, release, or enjoin (a) claims by any Entity (other than the Reorganized Debtors and their Affiliates) against the Plan Trust for payment of Plan Trust Asbestos Claims in accordance with the Plan, the Plan Trust Agreement and the TDP, as applicable, (b) claims by any Entity against the Plan Trust for the payment of Plan Trust Expenses, (c) claims by the Reorganized Debtors, the Plan Trust, or any other Entity to enforce the provisions of any Asbestos Insurance Settlement Agreement or any provision of the Plan or another Plan Document, or (d) the rights of any Asbestos Insurance Company to assert any claim, debt, obligation, cause of action or liability for payment against any other Asbestos Insurance Company that is not a Settling Asbestos Insurance Company.

11.8 **Rights Against Non-Debtors under Securities Laws**. Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan, and/or Confirmation Order, no provision shall release any non-Debtor, including any current and/or former officer and/or director of the Debtors from liability to the United States Securities and Exchange Commission, in connection with any legal action or claim brought by such governmental unit against such Person(s).

11.9 **Rights Against Debtors Under Environmental Laws**. Environmental rights and Claims of Governmental Units and rights and claims of injury, damages, cost recovery contribution, reimbursement and indemnity by other Entities (other than ABI) under applicable Environmental Laws shall survive the Reorganization Cases, shall not be discharged, impaired or adversely affected by the Plan and the Reorganization Cases and shall be determined in the manner and by the administrative or judicial tribunals in which such rights or Claims would have been resolved or adjudicated if the Reorganization Cases had not been commenced. Governmental Units and other Entities, other than ABI whose claims, if any, shall be discharged, need not file any Proofs of Claim under Environmental Laws in the Reorganization Cases in order to preserve Claims under Environmental Laws. Nothing in the Confirmation Order or Plan shall be construed as releasing or relieving any Entity of any liability under any Environmental Law.

11.10 **Disallowed Claims and Disallowed Interests**. On and after the Effective Date, the Debtors shall be fully and finally discharged from any liability or obligation on a Disallowed Claim or a Disallowed Interest and any order creating a Disallowed Claim or a Disallowed Interest that is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 will nevertheless become and be deemed to be a Final Order on the Effective Date. The Confirmation Order, except as otherwise provided herein, or unless the District Court orders otherwise, shall constitute an order: (a) disallowing all Claims (other than Plan Trust Asbestos Claims that have not been previously expunged by Final Order of the Bankruptcy Court or District Court, as applicable, or withdrawn) and Interests to the extent such Claims and Interests are not allowable under any provision of section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims, and Claims for unmatured interest, and (b) disallowing or subordinating, as the case may be, any Claims, or portions of Claims, for penalties or Non-Compensatory Damages.

11.11 **Anti-Suit Injunction**. With respect to any Settling Asbestos Insurance Company, this Section 11.11 and the Confirmation Order, which may include anti-suit injunction(s) for the benefit of any Settling Asbestos Insurance Company consistent with the terms of this Section 11.11 and the terms of the relevant Asbestos Insurance

Settlement Agreement, shall operate as an injunction, pursuant to section 105(a) of the Bankruptcy Code, permanently and forever prohibiting and enjoining the commencement, conduct or continuation of any action or cause of action, whether known or unknown, the employment of process or any act to collect, recover from or offset any non-asbestos claim, Claim or demand against any Settling Asbestos Insurance Company arising out of, relating to, or in connection with an Asbestos Insurance Policy or any other insurance policy or rights under such other insurance policy issued to or insuring the relationship of the relevant Settling Asbestos Insurance Companies with, the relevant Congoleum entities that are insureds under such policies, but such injunction pursuant to section 105(a) of the Bankruptcy Code shall not affect or modify the rights of Persons insured under policies of insurance except to the extent released in an Asbestos Insurance Settlement Agreement and/or enjoined pursuant to any Injunction contained in any order of the Bankruptcy Court or the District Court approving any Asbestos Insurance Settlement Agreement. The injunctions and other relief set forth in this Section 11.11 and elsewhere in this Plan in favor of any Settling Asbestos Insurance Company shall be deemed supplemental and in addition to, and not in lieu of, any injunctive relief, releases and other protections afforded to each Settling Asbestos Insurance Company under its respective Asbestos Insurance Settlement Agreement and any Final Order entered by the District Court approving such Asbestos Insurance Settlement Agreement.

11.12 **Insurance Neutrality**

(a)     Except as otherwise provided in Section 11.12(b):

(i)     Nothing in the Plan, the Plan Documents or the Confirmation Order shall preclude any Entity from asserting in any proceeding any and all claims, defenses, rights or causes of action that it has or may have under or in connection with any Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement with respect thereto;

(ii)     Nothing in the Plan, the Plan Documents or the Confirmation Order shall be deemed to waive any claims, defenses, rights or causes of action that any Entity has or may have under the provisions, terms, conditions, defenses and/or exclusions contained in any Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement with respect thereto, including but not limited to any and all such claims, defenses, rights or causes of action based upon or arising out of Asbestos Personal Injury Claims that are liquidated, resolved, discharged, channeled, or paid in connection with the Plan; and

(iii)     Notwithstanding anything to the contrary in the Confirmation Order, the Plan, or any of the Plan Documents, nothing in the Confirmation Order, the Plan, or any of the Plan Documents (including any other provision that purports to be preemptory or supervening other than Section 11.12(b)), shall in any way operate to impair, or have the effect of impairing, the insurers' legal, equitable, or contractual rights, if any, in any respect; nor shall the Plan, any of the Plan Documents, the Confirmation Order, or the estimation, liquidation or payment of any Claim for purposes of distribution by the Trust in accordance with the Plan and the Plan Documents have any binding effect on any Asbestos Insurance Company or have any res judicata or collateral estoppel effect upon any Asbestos Insurance Company for any other purpose, including without limitation with respect to the amount or the reasonableness of any such Claim, or constitute a binding determination on any issue or the creation of any liquidated claim with respect to any Asbestos Insurance Company. The rights of insurers shall be determined under the applicable Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement with respect thereto.

(b)     Notwithstanding the provisions of Section 11.12(a), Asbestos Insurance Companies shall be bound by the District Court's findings and conclusions with respect to whether, under the Bankruptcy Code, the assignment or transfer of rights under the Asbestos Insurance Assignment is valid and enforceable against each Asbestos Insurance Company notwithstanding any anti-assignment provision in or incorporated into any Asbestos Insurance Policy and applicable state law, and therefore Asbestos Insurance Companies shall be entitled to litigate that issue in connection with Confirmation, and shall retain all rights of appeal with respect thereto. Further, to the extent any Asbestos Insurance Company chooses, notwithstanding the protections provided by Section 11.12(a), to litigate any other issues in connection with Confirmation, and the District Court gives such Asbestos Insurance Company standing to litigate those issues and rules on the merits of those issues, then such Asbestos Insurance Company shall be bound by the District Court's findings and conclusions thereon, subject to any rights of appeal.

For the avoidance of doubt, nothing in Section 11.12(a) shall impair the injunctive relief and other protections afforded to each Settling Asbestos Insurance Company under the Asbestos Channeling Injunction and other provisions of this Plan, the Confirmation Order, and its respective Asbestos Insurance Settlement Agreement and any Final Order entered by the District Court or the Bankruptcy Court approving such Asbestos Insurance Settlement Agreement.

11.13 **No Liability for Solicitation or Participation**. Pursuant to section 1125(e) of the Bankruptcy Code, the Confirmation Order will provide that all of the Persons who have solicited acceptances or rejections of the Plan (including the Bondholders' Committee, the Asbestos Claimants' Committee, the Futures Representative, the Debtors and each of their respective members and Representatives, as applicable, and the Voting Agent) have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and are not liable on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale or purchase of securities.

**ARTICLE XII**

**MATTERS INCIDENT TO PLAN CONFIRMATION**

12.1 **Term of Certain Injunctions and Automatic Stay**

(a) All of the injunctions and/or automatic stays provided for in or in connection with the Reorganization Cases, whether pursuant to section 105, 362, 524(g), or any other provision of the Bankruptcy Code or other applicable law, in existence immediately prior to Confirmation shall remain in full force and effect until the Injunctions become effective, and thereafter if so provided by the Plan, the Confirmation Order, or by their own terms. In addition, on and after Confirmation, the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative may seek such further orders as they may deem necessary to preserve the status quo during the time between Confirmation and the Effective Date.

(b) Each of the Injunctions shall become effective on the Effective Date and shall continue in effect at all times thereafter. Notwithstanding anything to the contrary contained in the Plan, all actions in the nature of those to be enjoined by the Injunctions shall be enjoined during the period between the Confirmation Date and the Effective Date.

12.2 **No Successor Liability**. Except as otherwise expressly provided in the Plan, the Debtors, the Reorganized Debtors, their Affiliates, the Asbestos Claimants' Committee, the Bondholders' Committee, the Plan Trust and the Futures Representative do not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations of the Debtors relating to or arising out of the operations of or assets of the Debtors, whether arising prior to, on, or after the Confirmation Date. Neither the Debtors, the Reorganized Debtors, their Affiliates, nor the Plan Trust is, or shall be, a successor to the Debtors by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that the Reorganized Debtors and the Plan Trust shall assume the obligations specified in the Plan Documents and the Confirmation Order.

12.3 **Revesting**. Except as otherwise expressly provided in the Plan, on the Effective Date, Reorganized Congoleum shall be vested with all of the assets and property of the Estates, free and clear of all Claims, Liens, charges and other interests of holders of Claims or Interests, and may operate its business free of any restrictions imposed by the Bankruptcy Code or by the District Court.

12.4 **Vesting and Enforcement of Causes of Action**. Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, except as otherwise provided in the Plan, Reorganized Congoleum shall be vested with and have the right to enforce against any Entity any and all of the Debtors' Causes of Action other than Causes of Action related to Plan Trust Asbestos Claims and Plan Trust Assets (including the right to pursue such claims, if any, in the name of any Debtor if necessary), with the proceeds of the recovery of any such actions to be property of Reorganized Congoleum; *provided, however*, that nothing herein shall alter, amend, or modify the injunctions (including the Injunctions), releases, or discharges provided herein. Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, except as otherwise provided in the Plan, the Plan Trust shall be vested with and have the right to

enforce against any Entity any and all of the Debtors' Causes of Action relating to any Plan Trust Asbestos Claims or any Plan Trust Assets, including the right to pursue such claims, if any, in the name of any Debtor, if necessary; and for this purpose the Plan Trust shall be designated as a representative of the Estates, with the proceeds of the recovery of any such actions to be property of the Plan Trust; *provided, however,* that nothing herein shall alter, amend, or modify the injunctions (including the Injunctions), releases, or discharges provided herein.

After the Effective Date, Reorganized Congoleum, in its sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Causes of Action (or decline to do any of the foregoing), without further approval of the District Court. Reorganized Congoleum, or any successors, in the exercise of its sole discretion, may pursue such Causes of Action so long as it is in the best interests of Reorganized Congoleum or any successors holding such rights of action. The failure of the Plan Proponents to specifically list any claim, right of action, suit, proceeding or other Causes of Action in the Plan or the Plan Supplement does not, and will not be deemed to, constitute a waiver or release by the Debtors or Reorganized Congoleum of such claim, right of action, suit, proceeding or other Causes of Action, and Reorganized Congoleum will retain the right to pursue such claims, rights of action, suits, proceedings and other Causes of Action in its sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit, proceeding or other Causes of Action upon or after the Confirmation or consummation of the Plan.

12.5 **GHR/Kenesis Actions**.  On the Effective Date, the GHR/Kenesis Actions shall be preserved for enforcement solely by, and for the sole benefit of, Reorganized Congoleum.

## ARTICLE XIII

## MISCELLANEOUS

13.1 **Jurisdiction**.  Until the Reorganization Cases are closed, the District Court shall retain the fullest and most extensive jurisdiction permissible, including that necessary to ensure that the purposes and intent of the Plan are carried out.  Except as otherwise provided in the Plan, the District Court shall retain jurisdiction to hear and determine all Claims against and Interests in the Debtors, and to adjudicate and enforce all other causes of action which may exist on behalf of the Debtors.  Nothing contained herein shall prevent the Debtors, Reorganized Congoleum, or the Plan Trust from taking such action as may be necessary in the enforcement of any cause of action which the Debtors have or may have and which may not have been enforced or prosecuted by the Debtors, which cause of action shall survive Confirmation of the Plan and shall not be affected thereby except as specifically provided herein.  Nothing contained herein concerning the retention of jurisdiction by the District Court shall be deemed to be a retention of exclusive jurisdiction with respect to any Asbestos Insurance Action; rather any court other than the District Court which has jurisdiction over an Asbestos Insurance Action shall have the continuing right to exercise such jurisdiction.

13.2 **General Retention**.  Following the Confirmation of the Plan, the administration of the Reorganization Cases will continue at least until the completion of the transfers contemplated to be accomplished on the Effective Date.  Moreover, the Plan Trust shall be subject to the continuing jurisdiction of the District Court to the extent required by the requirements of section 468B of the IRC and the regulations issued pursuant thereto.  The District Court shall also retain jurisdiction for the purpose of classification of any Claim and the re-examination of Claims that have been Allowed for purposes of voting, and the determination of such objections as may be filed with the District Court with respect to any Claim.  The failure by the Debtors to object to, or examine, any Claim for the purposes of voting, shall not be deemed a waiver of the right of the Debtors, Reorganized Congoleum, or the Plan Trust, as the case may be, to object to or re-examine such Claim in whole or in part.

13.3 Specific Purposes.  In addition to the foregoing, the District Court shall retain jurisdiction for the following specific purposes after Confirmation:

(a) to modify the Plan after Confirmation, pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules;

(b)     to correct any defect, cure any omission, reconcile any inconsistency, or make any other necessary changes or modifications in or to the Plan, the Plan Documents or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance under the Plan Documents in the event that the Effective Date does not occur as provided herein so that the intended effect of the Plan may be substantially realized thereby;

(c)     to assure the performance by the Disbursing Agent, the Indenture Trustee and the Plan Trustee of their respective obligations to make distributions under the Plan;

(d)     to enforce and interpret the terms and conditions of the Plan Documents;

(e)     to enter such orders or judgments, including, but not limited to, injunctions as are necessary to (i) enforce the title, rights, and powers of the Debtors, the Reorganized Debtors, the Plan Trust, the Futures Representative and the Trust Advisory Committee or (ii) enable holders of Claims to pursue their rights against any Entity that may be liable therefor pursuant to applicable law or otherwise, including, but not limited to, Bankruptcy Court or District Court orders;

(f)     to hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits, tax proceedings, and similar or related matters with respect to the Debtors, the Reorganized Debtors, or the Plan Trust relating to tax periods or portions thereof ending on or before the Effective Date, arising on account of transactions contemplated by the Plan Documents, or relating to the period of administration of the Reorganization Cases;

(g)     to hear and determine all applications for compensation of professionals and reimbursement of expenses under sections 330, 331, or 503(b) of the Bankruptcy Code;

(h)     to hear and determine any causes of action arising during the period from the Petition Date through the Effective Date;

(i)     to hear and determine any claim, causes of action, dispute or other matter in any way related to the Plan Documents or the transactions contemplated thereby against the Debtors, the Reorganized Debtors, the Bondholders' Committee, the Asbestos Claimants' Committee, the Trust Advisory Committee, the Plan Trust, the Plan Trustee, or the Futures Representative and each of their respective Representatives;

(j)     to hear and determine any and all motions pending as of Confirmation for the rejection, assumption, or assignment of executory contracts or unexpired leases and the allowance of any Claim resulting therefrom;

(k)     to determine the allowance and/or disallowance of any Claims against the Debtors or their Estates, including, without limitation, any objections to any such Claims and the compromise and settlement of any Claim against the Debtors or their Estates;

(l)     to hear and determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)     to consider and act on the compromise and settlement of any Claim against or Interest in the Debtors or their Estates;

(n)     to hear and determine all questions and disputes regarding title to the assets of the Debtors, their Estates, Reorganized Congoleum or the Plan Trust;

(o)     to hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court or District Court, as applicable, in these Reorganization Cases;

(p)     to retain continuing jurisdiction with regard to the Plan Trust sufficient to satisfy the requirements of the Treasury Regulations promulgated under section 468B of the IRC (including Treas. Reg. Section 1.468B-1(c)(1));

(q)     to hear and determine any and all applications brought by the Plan Trustee to amend, modify, alter, waive, or repeal any provision of the Plan Trust Agreement or the TDP;

(r)     to enter such orders as are necessary to implement and enforce the Injunctions and the other injunctions described herein, including, without limitation, orders extending the protections afforded by section 524(g)(4) of the Bankruptcy Code to the Protected Parties, including without limitation, the Settling Asbestos Insurance Companies; and

(s)     to hear and determine any motions or contested matters involving or related to any GHR/Kenesis Action.

Notwithstanding anything to the contrary in this Section 13.3, (i) the allowance of Plan Trust Asbestos Claims (other than Asbestos Property Damage Claims) and the forum in which such allowance will be determined, shall be governed by and made in accordance with the Plan Trust Agreement and the TDP and (ii) the District Court will have concurrent rather than exclusive jurisdiction with respect to disputes relating to rights under insurance policies included in the Plan Trust Assets.

**13.4**    **Payment of Statutory Fees**.  All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the District Court at the Confirmation Hearing, shall be paid by the Debtors on or before the Effective Date and thereafter by Reorganized Congoleum as due until the Reorganization Cases are closed, converted or dismissed.  The Reorganized Debtors shall pay any quarterly fees payable pursuant to 28 U.S.C. § 1930(a)(6) to the United States Trustee after the Effective Date until such time as the case is converted, dismissed or closed pursuant to a final decree. The Reorganized Debtor shall file post-Effective Date reports, the form of which will be supplied by the United States Trustee.  Nothing contained in this Plan shall relieve the Debtors or Reorganized Debtors from making payments to the United States Trustee when due as required by 28 U.S.C. § 1930(a)(6).

**13.5**    **Securities Law Matters**.  It is an integral and essential element of the Plan that the issuance of the New Common Stock pursuant to the Plan shall be exempt from registration under the Securities Act, pursuant to section 1145 of the Bankruptcy Code and from registration under state securities laws.  Nothing in the Plan is intended to preclude the Securities and Exchange Commission from exercising its police and regulatory powers relating to the Debtors or any other entity.

**13.6**    **Plan Supplement**.  The Plan Supplement will contain, among other things, without limitation, substantially final forms of a schedule identifying rejected contracts, the Exit Facility Commitment Letter or Term Sheet, the Registration Rights Agreement, the New ABI Agreement, the New Indenture, the Stockholders Agreement, the Amended and Restated Bylaws, the Amended and Restated Certificate and schedules identifying the initial officers and the initial board of directors of Reorganized Congoleum, and shall be filed with the District Court no later than five (5) Business Days prior to the last date for filing objections to Confirmation of the Plan. Notwithstanding the foregoing, the Plan Proponents may amend the Plan Supplement and any attachments thereto, through and including the Confirmation Date.

**13.7**    **Allocation of Plan Distributions Between Principal and Interest**.  To the extent that any Allowed Claim entitled to a Distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such Distribution shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest. Notwithstanding the foregoing, no Distribution shall be made on account of Post-Petition Interest.

**13.8**    **The Asbestos Claimants' Committee, the Futures Representative and the Bondholders' Committee**.  As of the Effective Date, the Futures Representative shall (a) continue in existence and the rights,

duties and responsibilities of the Futures Representative appointed by the District Court to serve after the Effective Date shall be as set forth in the Plan Trust Documents and (b) continue in existence for purposes of the Reorganization Cases with respect to any appeal or request for reconsideration or stay pending appeal of the Confirmation Order and any unresolved and then-pending adversary proceedings and have the right to prosecute and/or object to applications for Professional Fee Claims. The Representatives retained by the Futures Representative during the Reorganization Cases shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to, or arising from, the Reorganization Cases on the same date the Futures Representative ceases existence for purposes of the Reorganization Cases. On the Effective Date, the Asbestos Claimants' Committee and the Bondholders' Committee shall be dissolved except for the purposes of: (i) any appeal or request for reconsideration or stay pending appeal of the Confirmation Order; (ii) any unresolved and then-pending adversary proceedings, and (iii) prosecuting and/or objecting to Professional Fee claims. Representatives of the Asbestos Claimants' Committee and the Bondholders Committee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to, or arising from, the Reorganization Cases on the same date the Asbestos Claimants' Committee or the Bondholders' Committee, as applicable, cease to exist for purposes of the Reorganization Cases. Until the Effective Date, the Debtors shall pay the reasonable fees and expenses of the Asbestos Claimants' Committee, the Bondholders' Committee and the Futures Representative in accordance with any applicable fee order in the Reorganization Cases. On the Effective Date, the Trust Advisory Committee will assume those powers, duties, and responsibilities as provided in the Plan Trust Agreement.

13.9 **Revocation of Plan**. The Plan Proponents reserve the right to revoke and withdraw the Plan before the entry of the Confirmation Order. If the Plan Proponents revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then, with respect to all parties in interest, the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or such other Entity in any further proceedings involving the Debtors.

13.10 **Modification of Plan**. The Plan Proponents may propose amendments to or modifications of any of the Plan Documents under § 1127 of the Bankruptcy Code and as herein provided, to the extent applicable law permits. Subject to the limitations contained herein, the Plan Proponents may modify the Plan in accordance with this paragraph, before or after Confirmation, without notice or hearing, or after such notice and hearing as the District Court deems appropriate, if the District Court finds that the modification does not materially and adversely affect the rights of any parties in interest which have not had notice and an opportunity to be heard with regard thereto. After Confirmation, the Plan Proponents may remedy any defects or omissions or reconcile any inconsistencies in the Plan or the Confirmation Order or any other order entered for the purpose of implementing the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan; provided, however, that none of the Debtors, the Reorganized Debtors, ABI, the Futures Representative, the Plan Trustee, the Asbestos Claimants' Committee, and the Bondholders' Committee shall seek to terminate, reduce or limit the scope of the Asbestos Channeling Injunction or any other injunction contained in the Plan that inures to the benefit of any Settling Asbestos Insurance Company. Anything in the Plan or in any Plan Document to the contrary notwithstanding, following Confirmation but prior to the Effective Date, the Plan Documents shall not be modified, supplemented, changed or amended in any material respect except with the written consent of the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative. In the event of any modification on or before Confirmation, any votes to accept or reject the Plan shall be deemed to be votes to accept or reject the Plan as modified, unless the District Court finds that the modification materially and adversely affects the rights of parties in interest which have cast said votes. The Plan Proponents reserve the right in accordance with § 1127 of the Bankruptcy Code to modify the Plan at any time before the Confirmation Date. Subject to § 1127 of the Bankruptcy Code, if the District Court determines at or in connection with the Confirmation Hearing that any provision of the Plan is invalid or unenforceable, the Plan Proponents may, at their discretion, sever such provision from the Plan without affecting the enforceability or operative effect of any or all other provisions of the Plan; provided, however, the Plan Proponents may not sever any provision from the Plan that incorporates or implements the terms of the Litigation Settlement Agreement, as amended, including the Amended Term Sheet attached thereto.

13.11 Modification of Payment Terms. Reorganized Congoleum shall have the right to modify the treatment of any Allowed Claim (other than a Plan Trust Asbestos Claim), as provided in section 1123(a)(4) of the Bankruptcy Code, at any time after the Effective Date upon the consent of the holder of such Allowed Claim.

13.12 <u>Entire Agreement</u>. The Plan Documents and the Plan Trust Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions and documents. No Entity shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein or as may hereafter be agreed to by the parties in writing.

13.13 **Headings**. Headings are utilized in the Plan are for convenience and reference only and shall not constitute a part of the Plan for any other purpose.

13.14 **Professional Fee Claims**. All final requests for payment of Professional Fee Claims must be filed and served on Reorganized Congoleum and their counsel no later than 60 days after the Effective Date, unless otherwise ordered by the District Court. Objections to any application of such Bankruptcy Professionals or other Entities for compensation or reimbursement of expenses must be filed and served on the respective applicant and its counsel no later than the first Business Day following 30 days (or such other period as may be allowed by order of the District Court) after the date on which the applicable application for compensation or reimbursement was received. Reorganized Congoleum may pay the reasonable charges that they incur on and after the Effective Date for Bankruptcy Professionals' fees, disbursements, expenses or related support services without application to the District Court. Reorganized Congoleum shall pay the reasonable fees and expenses of the Bondholders' Committee, Asbestos Claimants' Committee and Futures Representative after the Effective Date in connection with the purposes set forth in Section 13.8 of this Plan, without application to the District Court.

13.15 **Recordable Order**. Upon Confirmation of the Plan, the Confirmation Order shall be deemed to be in recordable form, and shall be accepted by any recording officer for filing and recording purposes without further or additional orders, certifications, or other supporting documents.

13.16 **Preparation of Estates' Returns and Resolution of Tax Claims**. The Debtors or Reorganized Congoleum shall file all tax returns and other filings with governmental authorities and may file determination requests under section 505(b) of the Bankruptcy Code to resolve any Disputed Claim relating to taxes with a governmental authority.

13.17 **No Admission**. Nothing contained in the Plan or in the Disclosure Statement shall be deemed as an admission by the Debtors, the Bondholders' Committee, the Asbestos Claimants' Committee or Futures Representative with respect to any matter set forth herein or therein, including, without limitation, liability on any Claim or the propriety of any Claims classification.

13.18 **Consent to Jurisdiction**. Upon default under the Plan or any Plan Documents, the Debtors, Reorganized Congoleum, the Affiliates, the Plan Trust, the Trust Advisory Committee, the Futures Representative, ABI and the Plan Trustee consent to the jurisdiction of the District Court, or any successor thereto, and agree that it shall be the preferred forum for all proceedings relating to such default.

13.19 **Setoffs**. Subject to the limitations provided in section 553 of the Bankruptcy Code, the Debtors or the Plan Trust, as applicable, may, but shall not be required to, setoff against any Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever the Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such claim that the Debtors may have against such holder; *provided* that Reorganized Congoleum may not offset any obligations under the Plan Trust Common Stock against any claim that Reorganized Congoleum may have against the Plan Trust.

13.20 **Successors and Assigns**. The rights, duties, and obligations of any Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Entity.

13.21 **Non-Debtor Waiver of Rights**. Non-Debtor parties shall have the right to voluntarily waive any rights, benefits or protections that are afforded to them under the provisions of the Plan or any order issued in furtherance of the Plan, and such waiver shall supersede such rights, benefits or protections. Any such waiver shall

47

only be effective if, and then only to the extent that, such party expressly and specifically waives in writing one or more of such rights, benefits or protections.

13.22 **Further Authorizations**.  The Debtors, Reorganized Congoleum, the Bondholders' Committee, Asbestos Claimants' Committee, the Futures Representative and the Plan Trust, if and to the extent necessary, may seek with notice to the others such orders, judgments, injunctions, and rulings that any of them deem necessary to further carry out the intentions and purposes of, and give full effect to the provisions of, the Plan.

13.23 **No Bar to Suits**.  Except as otherwise provided in Article XI of this Plan, neither this Plan nor Confirmation hereof shall operate to bar or estop the Debtors or Reorganized Congoleum from commencing any Cause of Action, including any Bankruptcy Cause of Action, or any other legal action against any holder of a Claim or any  individual, corporation, partnership, trust, venture, governmental unit, or any other form of legal entity, whether such Cause of Action, or any other legal action arose prior to or after the Confirmation Date and whether or not the existence of such Cause of Action, or any other legal action was disclosed in any disclosure statement filed by the Debtors in connection with this Plan or whether or not any payment was made or is made on account of any Claim.

13.24 **Conflicts**.  Unless otherwise provided in the Confirmation Order, in the event of a conflict between the terms or provisions of the Plan and any other Plan Document, the terms of the other Plan Document will control.

13.25 **Notices**.  All notices, requests, elections, or demands in connection with the Plan shall be in writing and shall be mailed by registered or certified mail, return receipt requested, to:

**If to the Debtors:**

Congoleum Corporation
3500 Quakerbridge Road
Hamilton, NJ 08619
Attn:      Howard N. Feist
              CFO

            and

Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, NY 10033-4039
Attn:      Richard L. Epling
              Robin L. Spear
              Kerry A. Brennan

**If to the Futures Representative:**

R. Scott Williams, Esquire
Haskell Slaughter Young & Rediker, L.L.C.
2001 Park Place North, Suite 1400
Birmingham, AL  35203

            and

Orrick, Herrington & Sutcliffe LLP
1152 15th Street, N.W.
Washington, DC  20005
Attn:      Roger Frankel
              Richard Wyron
              Jonathan Guy

**If to the Asbestos Claimants' Committee:**

Caplin & Drysdale, Chtd.
One Thomas Circle, N.W.
Washington, D.C. 20005
Attn:    Peter Van N. Lockwood
         Ronald E. Reinsel

**If to the Bondholders' Committee:**

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attn:    Michael S. Stamer

Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington D.C. 20036
Attn:    James R. Savin


        13.26  **Duty to Cooperate**.  Notwithstanding anything herein to the contrary, nothing in the Plan, the Plan Documents or the Confirmation Order shall relieve (by way of injunction or otherwise) any of the Debtors or Reorganized Congoleum or any other Entity which is or claims to be an insured or entitled to indemnity under an Asbestos Insurance Policy from any duty to cooperate that may be required by any such insurance policy under applicable law with respect to the defense and/or settlement of any Claim for which coverage is sought under such Asbestos Insurance Policy.  To the extent that any entity incurs costs in satisfying such duty to cooperate with respect to Asbestos Personal Injury Claims after the Effective Date, the Plan Trust shall reimburse such entity for all such reasonable out-of-pocket expenses.

        13.27  **Governing Law**.  Except to the extent that federal law (including, but not limited to, the Bankruptcy Code and the Bankruptcy Rules) is applicable or where the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof that would require application of any other law.

Dated:  March 11, 2010


                                        CONGOLEUM CORPORATION

                                        By:          *s/ Howard N. Feist III*
                                        Name:   Howard N. Feist III
                                        Title:    Chief Financial Officer and Secretary

                                        CONGOLEUM SALES, INC.

                                        By:          *s/ Howard N. Feist III*
                                        Name:   Howard N. Feist III
                                        Title:    Vice President

                                        CONGOLEUM FISCAL, INC.

                                        By:          *s/ Howard N. Feist III*
                                        Name:   Howard N. Feist III
                                        Title:    Vice President

ASBESTOS CLAIMANTS' COMMITTEE

By: _____ *s/ Ronald E. Reinsel* _____
Name:   Ronald E. Reinsel
Title:   Counsel for the Asbestos Claimants' Committee

BONDHOLDERS' COMMITTEE

By:     _s/ Paul Kunz_____

Name:   Paul Kunz

Title:    Authorized representative of
        Deutsche Asset Management, not in its individual or
        principal capacity, but solely in its capacity as Chair
        of the Official Committee of Bondholders

FUTURES REPRESENTATIVE

By: *s/ R. Scott Williams*
     R. Scott Williams

# APPENDIX EXHIBIT 3

ANY TERM USED IN CAPITALIZED FORM THAT IS NOT DEFINED HEREIN BUT THAT IS DEFINED IN THE FOURTH AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF THE DEBTORS, THE OFFICIAL ASBESTOS CLAIMANTS' COMMITTEE, THE OFFICIAL COMMITTEE OF BONDHOLDERS FOR CONGOLEUM CORPORATION ("**CONGOLEUM**"), CONGOLEUM SALES, INC. ("**CSI**") AND CONGOLEUM FISCAL, INC. ("**CFI**," AND TOGETHER WITH CONGOLEUM AND CSI, THE "**COMPANY**") AND THE FUTURES REPRESENTATIVE DATED AS OF MARCH 11, 2010 ATTACHED HERETO AS EXHIBIT A, SHALL HAVE THE MEANING ASCRIBED TO SUCH TERM THEREIN AND SUCH DEFINITIONS ARE INCORPORATED HEREIN BY REFERENCE.

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
**1540 Broadway**
**New York, NY 10033-4039**
**Richard L. Epling**
**Robin L. Spear**
**Kerry A. Brennan**

**OKIN, HOLLANDER & DELUCA, LLP**
**PARKER PLAZA**
**400 Kelby Street**
**Fort Lee, NJ 07024**
**Paul S. Hollander**
**James J. DeLuca**

Attorneys for the Debtors

**CAPLIN & DRYSDALE, CHTD.**
**One Thomas Circle, N.W.**
**Washington, D.C. 20005**
**Peter Van N. Lockwood**
**Ronald E. Reinsel**

**GREENBAUM, ROWE, SMITH & DAVIS LLP**
**75 Livingston Avenue**
**Roseland, NJ 07068**
**Nancy Isaacson**

Attorneys for the Asbestos Claimants' Committee

**AKIN GUMP STRAUSS HAUER & FELD LLP**
**One Bryant Park**
**New York, NY 10036**
**Michael S. Stamer**

**TEICH GROH**
**691 State Highway 33**
**Trenton, NJ 08619**
**Michael A. Zindler**

**AKIN GUMP STRAUSS HAUER & FELD LLP**
**1333 New Hampshire Avenue, N.W.**
**Washington D.C. 20036**
**James R. Savin**
**David M. Dunn**
**Joanna F. Newdeck**

Attorneys for the Official Committee of Bondholders

**ORRICK, HERRINGTON & SUTCLIFFE LLP**
**1152 15th Street, N.W.**
**Washington, D.C. 20005**
**Roger Frankel**
**Richard H. Wyron**
**Jonathan Guy**
**Debra L. Felder**

**FORMAN HOLT ELIADES & RAVIN LLC**
**80 Route 4 East, Suite 290**
**Paramus, NJ 07652**
**Stephen Ravin**

Attorneys for R. Scott Williams, as Futures Representative

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| *In re*: | Case No. 09-04371 (JAP) |
| CONGOLEUM CORPORATION, *et al.*, | Chapter 11 |
| Debtors. | Case No. 03-51524 |
| | Jointly Administered |

**DISCLOSURE STATEMENT WITH RESPECT TO THE FOURTH AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF THE DEBTORS, THE OFFICIAL ASBESTOS CLAIMANTS' COMMITTEE, THE OFFICIAL COMMITTEE OF BONDHOLDERS FOR CONGOLEUM CORPORATION, *ET AL*. AND THE FUTURES REPRESENTATIVE DATED AS OF MARCH 11, 2010**

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. PREVAILING EASTERN TIME ON **MAY 5, 2010**, UNLESS OTHERWISE ORDERED BY THE DISTRICT COURT (THE "**VOTING DEADLINE**"). IN ORDER TO BE COUNTED, BALLOTS MUST BE RECEIVED BY LOGAN & COMPANY, INC. (THE "**VOTING AGENT**") AT: LOGAN & COMPANY, INC., RE: CONGOLEUM CORPORATION, 546 VALLEY ROAD, UPPER MONTCLAIR, NEW JERSEY 07043, ON OR BEFORE THE VOTING DEADLINE.

Congoleum Corporation, Congoleum Sales, Inc. and Congoleum Fiscal, Inc. (collectively, the **"Debtors"**), the Official Asbestos Claimants' Committee, the Official Committee of Bondholders and Futures Representative are the proponents of the Plan (the "**Plan Proponents**") and are providing this Disclosure Statement and the Exhibits hereto, the accompanying ballots, and the related materials delivered herewith pursuant to section 1126(b) of the Bankruptcy Code, in connection with the Voting Procedures Order dated _____, 2010 ("**Voting Procedures Order**") for the Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of the Debtors, the Official Asbestos Claimants' Committee, the Official Committee of Bondholders for Congoleum Corporation, *et al.* and the Futures Representative dated as of March 11, 2010 (the "**Fourth Amended Joint Plan**" or "**Plan**"), a copy of which is annexed to this Disclosure Statement as Exhibit A. This Fourth Amended Joint Plan amends the prior Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of the Debtors, the Official Asbestos Claimants' Committee, the Official Committee of Bondholders for Congoleum Corporation, *et al.* and the Futures Representative dated as of February 12, 2010 (the "**Third Amended Joint Plan**").

This Disclosure Statement is to be used solely in connection with an evaluation of the Fourth Amended Joint Plan; use of this Disclosure Statement for any other purpose is not authorized. This Disclosure Statement may not be reproduced or provided to others (other than to those advisors of any recipient of this Disclosure Statement who may review the information contained herein to assist such recipient in his, her or its evaluation of the Fourth Amended Joint Plan) without the prior written consent of the Plan Proponents.

**THE FOURTH AMENDED JOINT PLAN PROVIDES, AMONG OTHER THINGS, FOR THE ISSUANCE OF INJUNCTIONS UNDER SECTION 524(g) OF THE BANKRUPTCY CODE THAT RESULT IN THE CHANNELING OF ALL ASBESTOS RELATED LIABILITIES OF THE COMPANY INTO A TRUST AS MORE FULLY DESCRIBED HEREIN. *SEE* SECTION 6.11(e) – "DISCHARGE INJUNCTION" AND SECTION 6.11(g) – "ASBESTOS CHANNELING INJUNCTION" FOR A DESCRIPTION OF SUCH INJUNCTIONS.**

**THE FOURTH AMENDED JOINT PLAN ALSO PROVIDES FOR THE ISSUANCE OF 50.1% OF THE SHARES OF NEWLY CREATED CONGOLEUM COMMON STOCK TO THE TRUST, AND 49.9% OF THE SHARES OF NEWLY CREATED CONGOLEUM COMMON STOCK TO THE HOLDERS OF ALLOWED SENIOR NOTE CLAIMS.**

Asbestos Personal Injury Claims, Asbestos Property Damage Claims, Senior Note Claims, ABI Claims, General Unsecured Claims and Congoleum Interests are Impaired under the Fourth Amended Joint Plan; the Claims of the Company's other creditors and Interest holders are not Impaired under the Fourth Amended Joint Plan. Acceptance of the Fourth Amended Joint Plan will constitute acceptance of all the provisions thereof. Holders of Asbestos Property Damage Claims cast votes with respect to the Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of the Futures Representative, the Debtors, the Official Asbestos Claimants' committee and the Official Committee of Bondholders for Congoleum Corporation, *et al.,* dated as of February 5, 2008 (the **"February 2008 Joint Plan" or "Joint Plan"**), and pursuant to the Voting Procedures Order, because the treatment of such holders is the same under this Plan as the prior Joint Plan, the votes of such holders of Claims will be deemed cast with respect to the Fourth Amended Joint Plan. All the holders of Asbestos Personal Injury Claims will be entitled to vote on the Plan. Holders of Asbestos Personal Injury Claims will be sent solicitation packages. They will be given the option of allowing their prior vote to accept or reject the Joint Plan to be cast for the Plan, or they can change their vote. Holders of Asbestos Personal Injury claims who do not submit a new vote on this Plan but who did vote on the prior Joint Plan shall have their prior vote, whether accept or reject, deemed cast for this Plan. submit a The holders of Senior Notes Claims will be provided with Solicitation Packages and cast votes anew on the Fourth Amended Joint Plan pursuant to the Voting Procedures Order. The holders of General Unsecured Claims also will be provided with Solicitation Packages and Allowed General Unsecured Claims will be permitted to cast votes on the Fourth Amended Joint Plan pursuant to the Voting Procedures Order.

The effectiveness of the Plan is subject to several material conditions precedent. There can be no assurance that those conditions will be satisfied. The Plan Proponents presently intend to seek to consummate the Plan as promptly as practicable after the Confirmation Date. There can be no assurance, however, as to when or whether the Confirmation Date and the Effective Date actually will occur.

Distributions under the Plan to creditors of the Company (other than distributions to holders of Plan Trust Asbestos Claims) will be the responsibility of Reorganized Congoleum. Pursuant to section 524(g) of the Bankruptcy Code, Distributions under the Plan to holders of Plan Trust Asbestos Claims will be the responsibility of the Plan Trust and the Reorganized Debtors will have no liability therefor.

The Plan Proponents strongly recommend that holders of Claims entitled to vote on the Plan for purposes of sections 1126 and 524(g) of the Bankruptcy Code vote to accept it.

Without approval of the arrangements set forth in the Plan, there can be no assurance that the Company will be able to emerge from Chapter 11 or that the Company will not be forced into liquidation under Chapter 7 of the Bankruptcy Code. The Plan Proponents believe that if the Company is liquidated under Chapter 7, distributions to creditors would be delayed and would be significantly lower than the distributions contemplated by and under the Plan. *See* Section 7.3(a)(1) – "Best Interests Test" below.

THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF THE COMPANY'S CREDITORS (INCLUDING THE HOLDERS OF ASBESTOS PERSONAL INJURY CLAIMS AND ASBESTOS PROPERTY DAMAGE CLAIMS). ACCORDINGLY, CREDITORS ENTITLED TO VOTE IN FAVOR OF THE PLAN FOR PURPOSES OF SECTIONS 1126 OR 524(g) OF THE BANKRUPTCY CODE ARE URGED TO VOTE IN FAVOR OF THE PLAN. TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED, AND ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN 5:00 P.M., PREVAILING EASTERN TIME, ON **MAY 5, 2010** UNLESS OTHERWISE ORDERED BY THE DISTRICT COURT. CREDITORS ARE ENCOURAGED TO READ AND CONSIDER CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN ANNEXED HERETO AS EXHIBIT A, AND THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT UNDER ARTICLE 10, "RISKS OF THE PLAN" AND ARTICLE 11, "ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN," PRIOR TO CASTING THEIR VOTES.

In making a decision, creditors must rely on their own examination of the Company and the terms of the Plan, including the merits and risks involved. Creditors and Interest holders should not construe the contents of this Disclosure Statement as providing any legal, business, financial or tax advice. Each creditor or Interest holder should consult with his, her or its own legal, business, financial and tax advisors with respect to any such matters concerning this Disclosure Statement, the Plan, the Voting Procedures Order and the transactions contemplated thereby.

This Disclosure Statement has not been filed with or reviewed by the Securities and Exchange Commission or any securities regulatory authority of any state under the Securities Act of 1933, as amended, or under any state securities or "blue sky" laws. The Plan has not been approved or disapproved by the Securities and Exchange Commission, and neither the Securities and Exchange Commission nor any state securities commission has passed upon the accuracy or adequacy of the information contained herein. Any representation to the contrary is a criminal offense. This Disclosure Statement does not constitute an offer of securities.

No Person has been authorized by the Plan Proponents in connection with the Plan or this Voting Procedures Order to give any information or to make any representation other than as contained in this Disclosure Statement and the exhibits annexed hereto or incorporated by reference or referred to herein, and, if given or made, such information or representation may not be relied upon as having been authorized or made by the Plan Proponents.

The statements contained in this Disclosure Statement are made as of the date hereof, and the delivery of this Disclosure Statement will not, under any circumstance, create any implication that the information contained herein is correct at any time subsequent to the date hereof. Estimates, if any, in respect of a Claim set forth in this Disclosure Statement or any exhibit hereto may vary from the amount ultimately Allowed in respect of such Claim by the District Court.

THE SUMMARIES OF THE PLAN AND OTHER DOCUMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN ITSELF, THE EXHIBITS THERETO AND ALL DOCUMENTS DESCRIBED HEREIN AND THEREIN. Copies

of any agreement described herein but not provided herewith may be obtained by contacting the Voting Agent in writing at: Logan & Company, Inc., Re: Congoleum Corporation, 546 Valley Road, Upper Montclair, New Jersey 07043.

         The information contained in this Disclosure Statement, including, but not limited to, the information regarding the history, businesses, and operations of the Company, the historical financial information of the Company and the liquidation analysis relating to the Company set forth herein is included herein solely for purposes of soliciting the acceptances required to confirm the Plan under section 1126(c) of the Bankruptcy Code and to obtain the Injunctions set forth in the Plan under section 524(g) of the Bankruptcy Code. As to any contested matters that may arise, however, such information is not to be construed as admissions or stipulations but rather as statements made in settlement negotiations.

**TABLE OF CONTENTS**

Article 1 INTRODUCTION ...................................................................................... 1

    1.1.    The Purpose of this Disclosure Statement ....................................... 1

    1.2.    Voting Procedures ............................................................................ 1

    1.3.    Voting Deadline ............................................................................... 1

    1.4.    Overview of the Reorganization ...................................................... 2

    1.5.    Overview of the Plan ....................................................................... 2

    1.6.    Summary Description of Classes and Distributions ........................ 6

Article 2 GENERAL INFORMATION ....................................................................... 9

    2.1.    Business of the Company Generally ................................................ 9

    2.2.    Factors Leading to the Need for Bankruptcy Relief; Insurance ........ 11

    2.3.    Additional Insurance Issues Relevant to the Chapter 11 Filing......... 15

Article 3 THE PRE-PETITION PROCESS .................................................................. 18

    3.1.    The Prepackaged Plan ...................................................................... 19

    3.2.    Selection of the Futures Representative .......................................... 19

    3.3.    Formation of the Pre-Petition Asbestos Claimants' Committee ......... 20

    3.4.    Pre-Petition Due Diligence Review .................................................. 20

Article 4 THE COMPANY: CORPORATE STRUCTURE AND MANAGEMENT ............... 20

    4.1.    Boards of Directors of the Company ............................................... 20

    4.2.    Management of the Company ........................................................... 21

    4.3.    Directors and Officers of Reorganized Congoleum............................ 23

    4.4.    Employees and Union Contracts...................................................... 23

    4.5.    Debt and Equity Structure ............................................................... 23

    4.6.    Other Matters .................................................................................. 26

    4.7.    Debt Financing After Giving Effect to the Plan ............................. 27

Article 5 EVENTS DURING THE REORGANIZATION CASES................................... 28

    5.1.    Commencement of the Reorganization Cases .................................. 28

    5.2.    Administration of the Reorganization Cases .................................. 28

    5.3.    Asbestos Claimants' Committee and Bondholders' Committee .......... 30

    5.4.    Bankruptcy Court Appointment of Futures Representative................ 31

    5.5.    Retention of Professionals ............................................................... 31

    5.6.    Developments with Regard to Certain Pre-Petition Claims ............. 33

| | | |
|---|---|---|
| 5.7. | Developments With Regard to Certain Proofs of Claim | 34 |
| 5.8. | Vendor Tolling Agreements | 34 |
| 5.9. | Asbestos Personal Injury Claims - Related Avoidance Actions | 35 |
| 5.10. | Settlements with Insurers and Brokers | 39 |
| 5.11. | Fourth Modified Plan and Subsequent Changes | 45 |
| 5.12. | Expiration of Debtors' Exclusivity to File a Plan and Solicit Acceptances Thereof and the Filing of Competing Plans | 46 |
| 5.13. | Mediation and the Consensual Ninth, Tenth and Eleventh Modified Plans | 46 |
| 5.14. | Futures Representative's Plan | 47 |
| 5.15. | The Joint Plan (February 2008 Plan) | 48 |
| 5.16. | The Amended Joint Plan (November 2008 Plan) | 49 |
| 5.17. | The Current Fourth Amended Joint Plan | 50 |
| 5.18. | Standing of Insurers to be Heard | 50 |
| 5.19. | Confirmation Hearing | 50 |
| Article 6 SUMMARY OF THE PLAN | | 50 |
| 6.1. | General | 50 |
| 6.2. | Classification | 50 |
| 6.3. | Treatment of Classified Claims and Interests | 52 |
| 6.4. | Means for Execution of the Plan | 56 |
| 6.5. | Executory Contracts and Unexpired Leases | 63 |
| 6.6. | Insurance Agreements | 63 |
| 6.7. | Compensation and Benefits Programs | 64 |
| 6.8. | Retiree Benefits | 64 |
| 6.9. | Indemnification of Directors, Officers and Employees | 64 |
| 6.10. | Plan Supplement | 64 |
| 6.11. | Injunctions, Releases and Discharge | 65 |
| 6.12. | Matters Incident to Plan Confirmation | 69 |
| 6.13. | Retention of Jurisdiction | 70 |
| 6.14. | Miscellaneous Provisions | 72 |
| Article 7 CONFIRMATION OF THE PLAN | | 77 |
| 7.1. | Acceptance or Rejection of the Plan | 77 |
| 7.2. | Confirmation Hearing | 81 |
| 7.3. | Requirements for Confirmation | 82 |

7.4. Effect of Confirmation ........................................................................ 89

Article 8 IMPLEMENTATION OF THE PLAN ............................................. 89

8.1. Establishment and Purpose of the Plan Trust ...................................... 89

8.2. Funding and Receipt of Plan Trust Assets............................................ 89

8.3. Insurance Assignment Agreement ........................................................ 89

8.4. Creation of Asbestos Property Damage Claim Sub-Account ............... 90

8.5. Assumption of Liabilities by Plan Trust ............................................... 90

8.6. Discharge of Liabilities to Holders of Asbestos Claims....................... 90

8.7. TDP ........................................................................................................ 90

8.8. Payment of Allowed Asbestos Property Damage Claims..................... 90

8.9. Excess Plan Trust Assets ...................................................................... 90

8.10. Plan Trust Expenses .............................................................................. 91

8.11. Appointment of the Initial Plan Trustee............................................... 91

8.12. The Futures Representative .................................................................... 91

8.13. Appointment of Members of the Trust Advisory Committee............... 91

8.14. Institution and Maintenance of Legal and Other Proceedings............. 91

8.15. Preservation of Insurance Claims ......................................................... 91

8.16. Indemnification by the Plan Trust......................................................... 92

8.17. Establishment of the TDP ..................................................................... 92

8.18. [reserved] ............................................................................................... 92

8.19. Certain Mergers .................................................................................... 92

8.20. The Amended and Restated Certificate and the Amended and Restated
      Bylaws.................................................................................................... 92

8.21. Directors and Officers of Reorganized Congoleum.............................. 93

8.22. Cancellation of Existing Securities and Agreements of the
      Debtors/Discharge of the Indenture Trustee. ....................................... 93

8.23. Exit Facility........................................................................................... 94

8.24. Issuance of New Securities and Debt Instruments............................... 94

8.25. Registration Rights Agreement............................................................. 94

8.26. Stockholders Agreement. ...................................................................... 94

8.27. Effectuating Documents/Further Transactions. ................................... 94

8.28. Exemption from Certain Transfer Taxes and Recording Fees............. 95

8.29. Section 346 Injunction. ......................................................................... 95

8.30.  Corporate Action..................................................................... 95

8.31.  Litigation Settlement Agreement.......................................... 95

8.32.  Review of Claimants' Counsel Expenses .............................. 97

8.33.  Non-Asbestos Reserve Fund ................................................. 97

8.34.  Intercompany Settlement. ..................................................... 97

8.35.  Deemed Consolidation of Debtors For Plan Purposes Only.... 98

Article 9 ESTIMATED CLAIMS BY CLASS....................................... 99

9.1.  Claims other than Asbestos Claims ..................................... 99

9.2.  Asbestos Claims.................................................................. 100

Article 10 RISKS OF THE PLAN ...................................................... 100

10.1.  General .............................................................................. 100

10.2.  Confirmation Risks ........................................................... 100

10.3.  Insurance Coverage for Plan Trust Asbestos Claims.......... 101

10.4.  Distributions under the TDP .............................................. 102

10.5.  Risk of Post-Confirmation Default ..................................... 102

10.6.  Exit Facility....................................................................... 102

10.7.  Litigation Settlement Agreement ....................................... 102

Article 11 ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ................................................................................ 102

11.1.  Liquidation under Chapter 7 .............................................. 103

11.2.  Alternative Plan of Reorganization..................................... 103

11.3.  Dismissal of Cases ............................................................ 103

Article 12 CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ......... 103

12.1.  Tax Consequences to Reorganized Congoleum ................. 104

12.2.  Tax Consequences to the Plan Trust................................... 107

12.3.  Tax Consequences to Certain Impaired Holders of Claims.............................. 107

Article 13 FINANCIAL INFORMATION ......................................... 112

13.1.  Historical Financial Statements ......................................... 112

Article 14 SOURCES OF INFORMATION PROVIDED AND THE ACCOUNTING METHOD USED .............................................. 112

14.1.  Sources of Information ...................................................... 112

14.2.  Accounting Method ........................................................... 112

## EXHIBITS

| | |
|---|---|
| Exhibit A | Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of the Debtors, the Official Asbestos Claimants' Committee, the Official Committee of Bondholders for Congoleum Corporation, *et al.* and the Futures Representative dated as of March 11, 2010 |
| Exhibit B | Liquidation Valuation as of January 31, 2010 |
| Exhibit C | Audited Financial Statements of Congoleum Corporation for the Year Ended December 31, 2008 |
| Exhibit D | Unaudited Financial Statements of Congoleum Corporation for the Quarter Ended September 30, 2009 |

# ARTICLE 1
# INTRODUCTION

## 1.1.    The Purpose of this Disclosure Statement

The Plan Proponents transmit this Disclosure Statement, pursuant to section 1126(b) of the Bankruptcy Code, for use in the solicitation of votes pursuant to the Voting Procedures Order in connection with the Plan.

This solicitation is being conducted in order to obtain sufficient acceptances to enable the Plan to be confirmed by the District Court pursuant to the provisions of the Bankruptcy Code.  This Disclosure Statement is being transmitted in order to provide adequate information to enable holders of Asbestos Personal Injury Claims, holders of Senior Note Claims, holders of ABI Claims, and holders of General Unsecured Claims, who are Impaired under the Plan, to make an informed judgment in exercising their right to vote to accept or reject the Plan under section 1126 of the Bankruptcy Code.  In addition, because all Plan Trust Asbestos Claims will be channeled into and addressed by the Plan Trust following the Effective Date of the Plan, this Disclosure Statement is being transmitted in order to provide adequate information to enable holders of Asbestos Personal Injury Claims to make an informed judgment in exercising their right to vote to accept or reject the Plan under section 524(g) of the Bankruptcy Code.

The Plan Proponents strongly recommend the Plan as being a fair and equitable method to address the Company's ongoing asbestos liability issues, and as being fair and equitable to the other creditors of the Company in light of such asbestos liability issues, and encourages the acceptance of the Plan by creditors entitled to vote.

## 1.2.    Voting Procedures

The Plan Proponents are soliciting acceptances of the Plan from (a) all known Asbestos Personal Injury Claimants, (b) all known holders of Senior Note Claims, (c) all known holders of ABI Claims and (d) all known holders of General Unsecured Claims.

The Voting Agent will send solicitation packages, in such format as has been approved by the District Court, containing notice of the time for voting on the Plan, filing objections and the hearing on confirmation, the order approving the Disclosure Statement and Plan, appropriate ballots, and voting instructions in accordance with the Voting Procedures Order.  Holders of Asbestos Personal Injury Claims, Senior Note Claims, ABI Claims and General Unsecured Claims or their counsel should read the solicitation package materials carefully and follow the voting instructions listed on the ballot.  Such holders should only use the appropriate ballot(s) corresponding to the class for which a vote is being cast.  Holders of Asbestos Personal Injury Claims will be given the option of allowing their prior vote to accept or reject the February 2008 Joint Plan to be cast for the Plan or they can change their vote.  Holders of Asbestos Personal Injury Claims who do not submit a new vote on this Plan but who did vote on the prior Joint Plan shall have their prior vote, whether accept or reject, deemed cast for this Plan.

If at least seventy-five percent (75%) of holders of Asbestos Personal Injury Claims and Asbestos Property Damage Claims, respectively, to be channeled into and addressed by the Plan Trust that have voted on the Plan, vote to accept the Plan and such votes are received by the Voting Deadline (the "**Requisite Acceptances**"), the Plan Proponents expect to seek confirmation of the Plan promptly.

## 1.3.    Voting Deadline

IN ORDER TO BE COUNTED FOR VOTING PURPOSES, BALLOTS MUST ACTUALLY BE RECEIVED BY THE VOTING AGENT BY 5:00 P.M. PREVAILING EASTERN TIME ON MAY 5, 2010 UNLESS OTHERWISE ORDERED BY THE DISTRICT COURT, AT THE FOLLOWING ADDRESS:

Logan & Company, Inc.
Re: Congoleum Corporation
546 Valley Road
Upper Montclair, New Jersey 07043

## 1.4.    Overview of the Reorganization

(a)    **Brief Explanation of Chapter 11**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and shareholders.  In addition to permitting rehabilitation of the debtor, Chapter 11 promotes equality of treatment of creditors and equity security holders who hold substantially similar claims against or interests in the debtor and its assets.  In furtherance of these two goals, upon the filing of a petition for relief under Chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the Chapter 11 case.

**THE CONSUMMATION OF A PLAN OF REORGANIZATION IS THE PRINCIPAL OBJECTIVE OF A CHAPTER 11 CASE.  A PLAN OF REORGANIZATION SETS FORTH THE MEANS FOR TREATING CLAIMS AGAINST AND EQUITY INTERESTS IN A DEBTOR.  CONFIRMATION OF A PLAN OF REORGANIZATION BY THE DISTRICT COURT MAKES THE PLAN BINDING UPON THE DEBTOR, ANY PERSON OR ENTITY ACQUIRING PROPERTY UNDER THE PLAN, AND ANY CREDITOR OF, OR INTEREST HOLDER IN, THE DEBTOR, WHETHER OR NOT SUCH CREDITOR OR INTEREST HOLDER (I) IS IMPAIRED UNDER OR HAS ACCEPTED THE PLAN OR (II) RECEIVES OR RETAINS ANY PROPERTY UNDER THE PLAN.  SUBJECT TO CERTAIN LIMITED EXCEPTIONS AND OTHER THAN AS PROVIDED IN THE PLAN ITSELF OR IN THE CONFIRMATION ORDER, THE CONFIRMATION ORDER DISCHARGES THE DEBTOR FROM ANY DEBT THAT AROSE PRIOR TO THE DATE OF CONFIRMATION OF THE PLAN AND SUBSTITUTES THEREFOR THE OBLIGATIONS SPECIFIED UNDER THE CONFIRMED PLAN.**

## 1.5.    Overview of the Plan

The following is a brief summary of certain information contained elsewhere in this Disclosure Statement and in the Plan.  The summary is necessarily incomplete and is qualified in its entirety by reference to the more detailed information appearing elsewhere in this Disclosure Statement, the exhibits hereto and the other Plan Documents.

The Plan is a product of extensive efforts by the Debtors, the Bondholders' Committee, the Asbestos Claimants' Committee and the Futures Representative to propose a plan of reorganization for the Company that is fair and equitable to all parties in interest, that provides for the issuance of an injunction under section 524(g) of the Bankruptcy Code that results in the channeling of asbestos related liabilities of Congoleum to the Plan Trust and that is confirmable taking into account applicable law, including all rulings of the Bankruptcy Court and District Court in the Reorganization Cases.  This Plan is based on earlier efforts of the Futures Representative, the Debtors, the Bondholders' Committee and the Asbestos Claimants' Committee with respect to the Joint Plan, Amended Joint Plan, the Second Amended Joint Plan and the Third Amended Joint Plan.

The Plan provides for, among other things, payment in full of Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Claims, and the establishment of the Plan Trust to satisfy Plan Trust Asbestos Claims.  Lender Secured Claims and Other Secured Claims are not Impaired or affected by the Plan. The Plan shall be binding on all parties holding Claims, whether asserted or not, against the Company.

The essential elements of the reorganization contemplated by the Plan include, among other things:

(a)    the creation of the Plan Trust which is intended to be a "qualified settlement fund" within the meaning of Section 1.468B − 1(a) of the Treasury Regulations promulgated under Section 468B of

the IRC, that will assume the liabilities of the Debtors with respect to all Plan Trust Asbestos Claims and will use Plan Trust Assets and income to pay Plan Trust Asbestos Claims as provided in the Plan and the Plan Trust Documents;

(b)     the funding of the Plan Trust with the Plan Trust Assets;

(c)     the classification of Claims and Interests and the treatment of such Claims and Interests under the Plan;

(d)     the payment of Claims in accordance with the requirements of the Bankruptcy Code;

(e)     the establishment and implementation of the TDP as provided in the Plan Trust Agreement for the resolution of Asbestos Personal Injury Claims;

(f)     the issuance of certain injunctions, including but not limited to, the Discharge Injunction, the Anti-Suit Injunction and the Asbestos Channeling Injunction;

(g)     the issuance by Reorganized Congoleum of the New Senior Notes and the New Common Stock pursuant to the Plan;

(h)     the procedures for addressing and resolving Disputed Claims;

(i)     entry into the Exit Facility;

(j)     the merger of the Subsidiary Debtors with and into Congoleum, with Reorganized Congoleum as the sole surviving entity;

(k)     the governance and management of Reorganized Congoleum;

(l)     the Litigation Settlement Agreement as amended;

(m)     the payment of Allowed General Unsecured Claims; and

(n)     the retention of jurisdiction by the District Court.

<u>Plan Trust</u>.  On the Effective Date of the Plan, all Plan Trust Asbestos Claims will be assumed by and transferred to the Plan Trust.  The Plan Trust will be funded with the Plan Trust Assets which will include, without limitation, the following assets and any income, profits and proceeds derived therefrom:

- the Plan Trust Common Stock;

- the Asbestos Insurance Rights;

- the proceeds of the Asbestos Insurance Settlement Agreements (except as otherwise provided in the Plan);

- the proceeds of the Asbestos In-Place Insurance Coverage;

- the proceeds of the Asbestos Insurance Actions;

- the proceeds of the Asbestos Insurance Action Recoveries;

- the Asbestos Property Damage Insurance Rights; and

- the rights granted to the Plan Trust pursuant to the Insurance Assignment Agreement.

Treatment of Asbestos Personal Injury Claims:  As of the Effective Date, all liability for all Asbestos Personal Injury Claims as well as liability for all future Demands shall be assumed, automatically and without further act or deed, by the Plan Trust and the Reorganized Debtors shall have no liability therefor.  Each Asbestos Personal Injury Claim and future Demand shall be resolved pursuant to the Plan Trust Agreement and the TDP.  The TDP shall apply to all holders of Asbestos Personal Injury Claims and future Demands, including any such holder who elects to resort to the legal system and obtains a judgment for money damages.

As of the Effective Date, pursuant to this Plan, all Pre-Petition Settled Claimants, including the Litigation Settlement Claimants, will, in full satisfaction of his, her or its Asbestos Personal Injury Claim and any and all rights pursuant to any Pre-Petition Settlement Agreement, Claimant Agreement, Security Agreement, Collateral Trust Agreement or any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003, including with respect to any statutes of limitation related to such Asbestos Personal Injury Claim, have been restored to status quo ante as it existed as of the time each such Claimant initially filed or submitted its Asbestos Claim against the Debtors that resulted in the Claimant's Pre-Petition Settlement Agreement or the Claimant Agreement, respectively, and shall be treated by the Plan Trust as holding unliquidated Asbestos Personal Injury Claims under applicable federal or state law which shall be resolved pursuant to the Plan Trust Agreement and the TDP in the same manner as all other Asbestos Personal Injury Claims in Class 7.  Pre-Petition Settled Claimants in Class 7 shall receive pari passu treatment under the Plan without regard to any lien, security interest or other claim to priority treatment whatsoever (i.e. it is understood that any such Pre-Petition Settled Claimants will need to reapply to the Plan Trust to satisfy the TDP including medical, exposure and other requirements).  The Avoidance Actions shall be dismissed with prejudice as of the Effective Date.

TDP:  The TDP to be adopted by the Plan Trust pursuant to the Plan Trust Agreement will establish procedures to assign a value to all Asbestos Personal Injury Claims and determine the timing and amount of payments to be made in respect of all Asbestos Personal Injury Claims.  It is anticipated that the TDP will reduce expenses significantly, which expenses would otherwise reduce Plan Trust Assets available for distribution.  All holders of Plan Trust Asbestos Claims will benefit from such cost savings by maximizing the assets which are to be used for the payment of such Claims.  The TDP filed with the Plan is consistent with the trust distribution procedures approved in other asbestos-related bankruptcy cases.

It is anticipated that the Plan Trust may not be able to pay in full all Asbestos Personal Injury Claims as they are liquidated and may not be able to pay all Asbestos Personal Injury Claims in full over time.  The mechanisms of the Plan Trust, however, have been designed to provide reasonable assurance that the Plan Trust will value, and will be in a financial position to pay, similar present and future Asbestos Personal Injury Claims against the Debtors in substantially the same manner.  The Plan Trust will be administered by the Plan Trustee pursuant to the Plan Trust Agreement and the procedures contained therein.

Treatment of Asbestos Property Damage Claims:  Allowed Asbestos Property Damage Claims will be paid from the Asbestos Property Damage Claim Sub-Account in accordance with procedures established pursuant to the Plan Trust Agreement.

Treatment of Senior Note Claims:  Allowed Senior Notes Claims will be issued their pro rata share of New Senior Notes in their entirety and 49.9% of New Common Stock issued by Reorganized Congoleum. The New Senior Notes shall have an initial aggregate principal amount of $33 million on the Effective Date and shall be due and payable December 31, 2017.  There shall be no interest accruing or due and payable on the principal amount of the New Senior Notes for six months after the Effective Date.  Thereafter, interest shall accrue at the rate of 9% per annum and payable semi-annually in cash.  Congoleum has the option, however, to pay interest by the issuance of additional New Senior Notes for a period beginning with the payment due 12 months after the Effective Date to and including the payment due 30 months after the Effective Date to be set forth in the New Indenture.  The New Senior Notes will be secured by liens or security interests in all assets of Reorganized Congoleum, which liens and security interests will be subordinate in priority to those liens and security interests granted by Reorganized Congoleum pursuant to the Exit Facility.

Treatment of ABI Claims:  Pursuant to and in consideration of the Intercompany Settlement and Section 5.17 of the Plan and other terms of the Plan, on the Effective Date all Intercompany Agreements shall be

rejected and all ABI Claims, including without limitation any ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.17(b)(4)(B) of the Plan), shall be deemed Disallowed and expunged.

Injunctions: The Plan will permit the businesses of the Reorganized Debtors to operate free of asbestos-related claims and litigation, through the operation of the following injunctions pursuant to sections 105, 524(g) and 1141 of the Bankruptcy Code (the "**Injunctions**"):

Discharge Injunction: The Reorganized Debtors will be protected from Claims and litigation by the Debtors' discharge and the Discharge Injunction, which will prohibit and enjoin the taking of any legal action against Congoleum, Reorganized Congoleum or the Plan Trust based upon any Claim, Asbestos Claim or Demand. For a complete description of the Discharge Injunction, *see* Section 11.4 of the Plan.

Asbestos Channeling Injunction: The Plan provides for an injunction pursuant to section 524(g) of the Bankruptcy Code with respect to Plan Trust Asbestos Claims against the Debtors, the Reorganized Debtors and any Protected Party. For a complete description of the Asbestos Channeling Injunction, *see* Section 11.6 of the Plan.

Anti-Suit Injunction: The Plan provides for an injunction pursuant to section 105(a) of the Bankruptcy Code to protect Settling Asbestos Insurance Companies from non-asbestos liability released under any Asbestos Insurance Settlement Agreement. For a complete description of the Anti-Suit Injunction, *see* Section 11.11 of the Plan.

Directors and Officers of Reorganized Congoleum: The initial board of directors of Reorganized Congoleum shall consist of five (5) directors. One of such directors shall be selected by the Bondholders' Committee, three of such directors shall be selected jointly by the Futures Representative and the Asbestos Claimants' Committee, and one of such directors shall be Reorganized Congoleum's chief executive officer. The identity of such directors shall be disclosed by the Plan Proponents in the Plan Supplement. To the extent any such Person is an Insider (as defined in section 101(31) of the Bankruptcy Code), the nature of any compensation for such Person will also be disclosed prior to the Confirmation Hearing. Each of the Persons on the initial board of directors of Reorganized Congoleum shall serve in accordance with the Amended and Restated Certificate and the Amended and Restated Bylaws of Reorganized Congoleum, as the same may be amended from time to time. Subsequently, Reorganized Congoleum's board of directors shall be elected in accordance with Reorganized Congoleum's governing documents, which governing documents shall be acceptable to the Bondholders' Committee and the Asbestos Claimants' Committee.

The initial officers of Reorganized Congoleum shall be set forth in the Plan Supplement. To the extent any such Person is an Insider (as defined in section 101(31) of the Bankruptcy Code), the nature of any compensation for such Person will also be disclosed at such time. The initial officers shall serve in accordance with the Amended and Restated Certificate and the Amended and Restated Bylaws of Reorganized Congoleum, as the same may be amended from time to time.

Notwithstanding the foregoing, as part of the Intercompany Settlement described in Section 8.34 below, ABI shall make the services of Roger Marcus, Richard Marcus and Howard Feist, III available to Reorganized Congoleum for two years after the Effective Date in consideration of a base annual fee of $800,000 and an annual incentive fee. Roger Marcus shall serve as Chief Executive Officer and Director of Reorganized Congoleum. Howard Feist III shall serve as Chief Financial Officer of Reorganized Congoleum. Substantially all of Roger Marcus's time, approximately 25% of Richard Marcus's time, and approximately 50% of Howard Feist III's time, in each case, during normal working hours on an annual basis shall be made available by ABI to Reorganized Congoleum for the two years following the Effective Date.

Further, five percent of Reorganized Congoleum's total authorized number of shares of common stock shall be reserved for issuance by Reorganized Congoleum for equity based compensation and awards to the management team of Reorganized Congoleum with terms to be determined by the Board of Directors of Reorganized Congoleum.

Plan Classes: The Plan divides all Claims and Interests into 11 different Classes. Each Claim will receive the same treatment as all other Claims in the same Class under the Plan, so that the applicable terms of the Plan for each Claim depend upon its classification. Section 1.6 – "Summary Description of Classes and Distributions" below, contains a summary description of the treatment of each Class under the Plan, including whether the Class is Impaired or Unimpaired by the Plan and whether the Claims in the Class are channeled into and addressed by the Plan Trust. If a Class is Impaired by the Plan, the holders of claims in that Class are entitled to vote to accept or reject the Plan under section 1126 of the Bankruptcy Code to the extent such holder's claim is Allowed or temporarily allowed for voting purposes as provided pursuant to the Voting Procedures Order. If the Claims in a Class are channeled to, addressed, processed and paid by the Plan Trust in accordance with the Plan Trust and the TDP, the holders of claims in that Class are entitled to vote in favor of or against the Plan under section 524(g) of the Bankruptcy Code as provided in the Voting Procedures Order. Holders of Congoleum Interests in Class 10 are deemed to have rejected the Plan in accordance with the provisions of section 1126(g) of the Bankruptcy Code and, accordingly, their vote will not be solicited.

**1.6.     Summary Description of Classes and Distributions**

The Distributions to each Class are summarized in the table set forth below. The table is qualified in its entirety by reference to the more detailed and complete descriptions set forth in the Plan and elsewhere in this Disclosure Statement.

(a)     **Treatment of Administrative Claims, Priority Tax Claims and DIP Financing Claim**

| Description of Claims | Description of Distribution or Treatment Under the Plan |
|---|---|
| **Administrative Claims** | Unless the Debtors and the holder of an Allowed Administrative Claim agree to a different treatment, each holder of an Allowed Administrative Claim will receive Cash equal to the unpaid portion of such Allowed Administrative Claim on the Distribution Date. However, Administrative Claims incurred by the Debtors during the Reorganization Cases in the ordinary course of business or under a loan or advance, which are not paid on or before the Effective Date, will be paid by Reorganized Congoleum in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto. |
| **Priority Tax Claims** | Unless the holder of a Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim will either (a) be paid in Cash in full on the Distribution Date or (b) at Reorganized Congoleum's sole discretion, receive deferred Cash payments over a period not to exceed six years after the date of assessment of a value equal to such Allowed Priority Tax Claim as of the Effective Date. |
| **DIP Financing Claim** | Each holder of an Allowed DIP Financing Claim shall be paid indefeasibly in full on the Effective Date or as soon thereafter as practicable and shall receive in full satisfaction, settlement, release, extinguishment, and discharge of such Allowed DIP Financing Claim, (a)(i) Cash equal to the unpaid portion of such Allowed DIP Financing Claim, together with a release and termination agreement and any accompanying cash collateral, each in form, substance and amounts acceptable to DIP Financing Lender, or (ii) such different treatment as to which DIP Financing Lender shall have agreed to in writing, and (b) shall be released and discharged from any obligation, liability and/ or responsibility to fund or otherwise pay the Professional Fee Carve-Out (as defined in the DIP Financing Order) and /or any other claim or liability of any kind, nature or description that can be brought at any time for any reason against DIP Financing Lender relating to the Professional Fee Carve-Out or any other fees or expenses incurred by any Bankruptcy Professional. Notwithstanding anything to the contrary contained in the Plan, the Confirmation Order, or otherwise, the Allowed DIP Financing Claim, and the liens and security |

6

| **Description of Claims** | **Description of Distribution or Treatment Under the Plan** |
|---|---|
| | interests securing such Allowed DIP Financing Claim shall continue in full force and effect in accordance with the terms, conditions and covenants of the DIP Financing Agreements and the DIP Financing Order, shall survive the Confirmation Date and continue in full force and effect in accordance with the terms and conditions of the DIP Financing Agreements and the DIP Financing Order until such time as the Allowed DIP Financing Claim has been indefeasibly paid in full and in Cash. Each Allowed DIP Financing Claim shall include all interest, fees, costs and charges accrued up to the Effective Date, accrued at the rates provided for in the DIP Financing Agreements. Pursuant to the DIP Financing Order, upon the indefeasible payment in full of an Allowed DIP Financing Claim, the Debtors shall forever release, discharge and acquit the DIP Financing Lender and its officers, directors, agents, attorneys and predecessors-in-interest of and from any and all claims, demands, liabilities, causes of action, and obligations of every kind with respect to the DIP Financing Agreement and DIP Financing Order. |

(b)  **Treatment of Classified Claims and Interests**

| **Description of Claims or Interests** | **Description of Distribution or Treatment Under the Plan** |
|---|---|
| **Class 1 – Priority Claims** | Unless Reorganized Congoleum and the holder of an Allowed Priority Claim agree to a different treatment, each Allowed Priority Claim will be paid in full on the Distribution Date. Class 1 is Unimpaired. |
| **Class 2 – Lender Secured Claims** | The Lender Secured Claim shall be paid in full indefeasibly on the Effective Date or as soon thereafter as practicable and Wachovia shall be released from any and all liabilities and causes of action in accordance with the Financing Order. Class 2 is Unimpaired. |
| **Class 3 – Other Secured Claims** | Each holder of an Allowed Other Secured Claim shall receive one of the following three treatments at Reorganized Congoleum's sole option: (i) retain unaltered the legal, equitable and contractual rights (including, but not limited to, any Liens that secure such Claim) to which such Claim entitles such holder and such Allowed Other Secured Claim shall be Reinstated on the Effective Date, (ii) the Debtors shall surrender all collateral securing such Claim to the holder thereof, in full satisfaction of such holder's Allowed Class 3 Claim, without representation or warranty by, or recourse against, the Debtors or Reorganized Congoleum or (iii) such holder shall be otherwise treated in a manner so that such Claim shall be rendered Unimpaired. Class 3 is Unimpaired. |
| **Class 4 – Senior Note Claims** | Senior Note Claims shall be Allowed in an aggregate amount equal to at least $103,593,750.00, which shall not be subject to any avoidance, reductions, set off, offset, recharacterization, subordination, counterclaims, defenses, disallowance, impairment or any other challenges under applicable law or regulation by any person or entity. On the Effective Date, each holder of an Allowed Senior Note Claim shall receive, in full satisfaction of its Senior Note Claim, its Pro Rata share of each of the securities included in the Senior Note Distribution. Class 4 is Impaired and holders of Class 4 Claims are entitled to vote to accept or reject the Plan as set forth in the Voting Procedures Order. |
| **Class 5 – Workers' Compensation Claims** | Each holder of an Allowed Workers' Compensation Claim will be paid in the ordinary course pursuant to such rights that exist under any state workers' |

| **Description of Claims or Interests** | **Description of Distribution or Treatment Under the Plan** |
|---|---|
| | compensation system or laws applicable to such Claims.  Class 5 is Unimpaired. |
| **Class 6 – ABI Claims** | Pursuant to and in consideration of the Intercompany Settlement and Section 5.17 of the Plan and other terms of the Plan, on the Effective Date all Intercompany Agreements shall be rejected and all ABI Claims, including without limitation any ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.17(b)(4)(B) of the Plan), shall be deemed Disallowed and expunged.  Class 6 is Impaired. |
| **Class 7 – Asbestos Personal Injury Claims** | As of the Effective Date, all liability for all Asbestos Personal Injury Claims (which includes all Claims in Class 7) as well as liability for all future Demands shall be assumed, automatically and without further act or deed, by the Plan Trust and the Reorganized Debtors shall have no liability thereof.  Each Asbestos Personal Injury Claim and future Demand shall be resolved pursuant to the Plan Trust Agreement and the TDP.  The TDP shall apply to all holders of Asbestos Personal Injury Claims and future Demands, including any such holder who elects to resort to the legal system and obtains a judgment for money damages. |
| | As of the Effective Date, pursuant to the Plan, all Pre-Petition Settled Claimants, including Litigation Settlement Claimants, will, in full satisfaction of his, her or its Asbestos Personal Injury Claim and any and all rights pursuant to any Pre-Petition Settlement Agreement, Claimant Agreement, Security Agreement, Collateral Trust Agreement or any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003, be, including with respect to any statutes of limitation related to such Asbestos Personal Injury Claim, restored to status quo ante as it existed as of the time each such Claimant initially filed or submitted its Asbestos Claim against the Debtors that resulted in the Claimant's Pre-Petition Asbestos Settlement Agreement or the Claimant Agreement, respectively, and shall be treated by the Plan Trust as holding unliquidated Asbestos Personal Injury Claims under applicable federal or state law which shall be resolved pursuant to the Plan Trust Agreement and the TDP in the same manner as all other Asbestos Personal Injury Claims in Class 7.  Pre-Petition Settled Claimants in Class 7 shall receive pari passu treatment under the Plan without regard to any lien, security interest or other claim to priority treatment whatsoever (i.e. it is understood that any such Pre-Petition Settled Claimants will need to reapply to the Plan Trust to satisfy the TDP including medical, exposure and other requirements).  The Avoidance Actions shall be dismissed with prejudice as of the Effective Date. |
| | Class 7 is Impaired and holders of Asbestos Personal Injury Claims are entitled to vote to accept or reject the Plan as set forth in the Voting Procedures Order. |
| **Class 8 – Asbestos Property Damage Claims** | As of the Effective Date, all liability for all Allowed Asbestos Property Damage Claims will be assumed, automatically and without further act or deed, by the Plan Trust and the Reorganized Debtors will have no liability therefor.  Each Allowed Asbestos Property Damage Claim will be paid solely from the Asbestos Property Damage Claim Sub-Account on account of the unpaid Allowed Amount of such Claim pursuant to the Plan Trust Agreement.  After the assets in the Asbestos Property Damage Claim Sub-Account have |

| Description of Claims or Interests | Description of Distribution or Treatment Under the Plan |
|---|---|
| | been exhausted or transferred therefrom in accordance with the Plan Trust Agreement, the Plan Trust shall have no further liability or obligation for or in respect of any Asbestos Property Damage Claims. All Asbestos Property Damage Claims as to which a Proof of Claim was not filed prior to the expiration of the Asbestos Property Damage Claim Bar Date will be deemed Disallowed. Class 8 is Impaired. |
| **Class 9 – General Unsecured Claims** | Except to the extent that a holder of an Allowed General Unsecured Claim in Class 9 has been paid by the Debtors prior to the Effective Date or agrees to alternate, less favorable, treatment, each holder of an Allowed Class 9 Claim shall receive, on the Distribution Date, in full and final satisfaction of such Allowed Class 9 Claim, Cash in the amount of $.35 for each $1.00 of such holder's Allowed Class 9 Claim. Class 9 is Impaired and the holders of Class 9 Claims are entitled to vote to accept or reject the Plan. General Unsecured Claims do not include Claims against the Debtors under the Environmental Laws as set forth in Section 11.9 of the Plan, which Claims (other than Claims held by ABI) survive the Reorganization Cases. |
| | Class 9 is Impaired and holders of Class 9 Claims are entitled to vote to accept or reject the Plan as set forth in the Voting Procedures Order. |
| **Class 10 – Congoleum Interests** | On the Effective Date, the Congoleum Interests will be cancelled and the holders of the Congoleum Interests will retain and receive nothing on account of such Congoleum Interests. Class 10 is Impaired. |
| **Class 11 – Subsidiary Interests** | On the Effective Date, the holders of the Subsidiary Interests will retain such Interests. Class 11 is Unimpaired. |

## ARTICLE 2
## GENERAL INFORMATION

**2.1. Business of the Company Generally**

(a) **Congoleum**

Congoleum was incorporated in Delaware in 1986, but traces its history in the flooring business back to Nairn Linoleum Co. which began in 1886. Congoleum is the result of a 1986 merger between Resilco, Inc., a then subsidiary of a company previously known as Congoleum Industries, Inc., which subsidiary owned the resilient flooring operations that were later owned by Congoleum, and Resilient Acquisition Inc., a company formed for the purposes of merging with Resilco, Inc. The surviving corporation to that merger changed its name to Congoleum Corporation.

In 1993, the business and assets of Congoleum and those of the Amtico Tile Division of ABI, which consisted of ABI's then existing U.S. flooring division (the "**Tile Division**"), were combined (the "**Acquisition**"). The Acquisition was effected through the organization of a new corporation, Congoleum Holdings Incorporated ("**Congoleum Holdings**"), to which Hillside Industries Incorporated ("**Hillside Industries**") contributed all of the outstanding capital stock of Resilient Holdings Incorporated ("**Resilient**"), the owner of all of the outstanding capital stock of Congoleum, and to which ABI contributed the assets and certain liabilities of the Tile Division. Upon consummation of the Acquisition, Congoleum Holdings owned all of the outstanding capital stock of Resilient, which, in turn, owned all of the outstanding capital stock of Congoleum, and Congoleum owned the Tile Division. The assets and liabilities comprising the Tile Division which were acquired by Congoleum in the Acquisition are held directly by Congoleum.

Pursuant to the Acquisition, subject to certain exceptions, Congoleum is obligated to indemnify ABI for, among other things, all liabilities relating to ABI's former Tile Division, including, among others, liabilities related to product liability asbestos claims, to the extent that insurance proceeds related thereto are not actually recovered by ABI or ABI is not reimbursed or indemnified for those liabilities by any other source or entity (the "**ABI Indemnification**").  As of December 31, 2003, pursuant to the ABI Indemnification, Congoleum had paid ABI an aggregate amount of approximately $2.3 million for indemnified costs, expenses and liabilities incurred by ABI for asbestos-related claims pertaining to ABI's former Tile Division.

In 1995, Congoleum completed a public offering (the "**Offering**") of 4,650,000 shares of its Class A common stock, par value $0.01 per share (the "**Class A Common Stock**").  The Class A Common Stock is entitled to one vote per share.  Upon completion of the Offering, Congoleum implemented a Plan of Repurchase pursuant to which its two-tiered holding company ownership structure was eliminated through the merger of Congoleum Holdings, Resilient and Congoleum, pursuant to which Congoleum was the surviving corporation. Congoleum used most of the proceeds from the Offering to repurchase most of the shares of its Class B common stock, par value $0.01 per share (the "**Class B Common Stock**"), owned by Hillside (the "**Repurchase**"), which was, indirectly, the majority stockholder of Congoleum prior to the Repurchase.  Congoleum's Class B Common Stock is generally entitled to two votes per share.  As a result of the Repurchase, ABI acquired voting control of Congoleum.

Since the Repurchase, ABI's equity ownership interest in Congoleum further increased as a result of Congoleum's repurchases of its common stock combined with open market purchases by ABI of Congoleum's common stock.  As of September 30, 2009, ABI's ownership of 151,100 shares of Class A Common Stock and 4,395,605 shares of Class B common stock represented 69.4% of the voting control of Congoleum.

Congoleum produces both sheet and tile floor covering products with a wide variety of product features, designs and colors.  Congoleum also produces through-chip inlaid products for both residential and commercial markets.  In addition, Congoleum purchases sundries and accessory products for resale.  Congoleum's products serve both the residential and commercial hard-surface flooring markets, and are used in remodeling, manufactured housing, new construction and commercial applications.

Congoleum owns four manufacturing facilities located in Maryland, Pennsylvania and New Jersey and leases corporate and marketing offices in Mercerville, New Jersey, which are described as follows:

| Location | Owned/Leased | Usage | Square Feet |
|----------|--------------|-------|-------------|
| Finksburg, MD | Owned | Felt | 107,000 |
| Marcus Hook, PA | Owned | Sheet Flooring | 1,000,000 |
| Trenton, NJ | Owned | Sheet Flooring | 1,050,000 |
| Trenton, NJ | Owned | Tile Flooring | 282,000 |
| Mercerville, NJ | Leased | Corporate Offices | 46,921 |

The Finksburg facility consists primarily of a 16-foot wide felt production line.

The Marcus Hook facility is capable of manufacturing rotogravure printed sheet flooring in widths of up to 16 feet.  Major production lines at this facility include a 12-foot wide oven, two 16-foot wide ovens, a 12-foot wide printing press and a 16-foot wide printing press.

The Trenton sheet facility is capable of manufacturing rotogravure printed and through-chip inlaid sheet products in widths up to 6 feet.  Major production lines, all six-foot wide, include an oven, a rotary laminating line and a press.  The examination, packing and warehousing of all sheet products (except products for the manufactured housing segment) occur at the Trenton plant distribution center.

The Trenton tile facility consists of three major production lines, a four-foot wide commercial tile line, a two-foot wide residential tile line and a one-foot wide residential tile line.

Productive capacity and extent of utilization of Congoleum's facilities are dependent on a number of factors, including the size, construction, and quantity of product being manufactured, some of which also dictate

which production line(s) must be utilized to make a given product. Congoleum's major production lines were operated an average of 52% of the hours available on a five-day, three-shift basis in 2008, with the corresponding figure for individual production lines ranging from 33% to 66%.

Although many of Congoleum's manufacturing facilities have been substantially depreciated, Congoleum has generally maintained and improved the productive capacity of these facilities over time through a program of regular capital expenditures. Congoleum considers its manufacturing facilities to be adequate for its present and anticipated near-term production needs.

Congoleum is one of many defendants in a large number of actions filed by individuals alleging injuries resulting from exposure to asbestos and asbestos-containing products, including resilient sheet vinyl and tile manufactured by Congoleum and tile manufactured by the Tile Division or, in the worker's compensation cases, from exposure to asbestos in the course of employment with Congoleum. Congoleum discontinued the manufacture of asbestos-containing sheet products in 1983 and asbestos-containing tile products in 1974.

Congoleum purchased liability insurance policies that it believes obligates the insurers to provide coverage for Asbestos Claims. A description of Congoleum's historical asbestos liabilities is set forth in Section 2.2(a) – "Factors Leading to the Need for Bankruptcy Relief; Insurance - Asbestos Claims Against Congoleum" below. A description of certain Congoleum insurance assets relating to Asbestos Claims is located in Section 2.2(b) – "Congoleum's Insurance Coverage for Asbestos-Related Personal Injury Claims" below. A more detailed description of Congoleum's business and other material assets is located in Article 4 – "The Company: Corporate Structure and Management" below.

(b)     **CFI**

CFI was incorporated on January 24, 2003 under the laws of the State of New York as a wholly owned subsidiary of Congoleum Financial Corporation, which was a wholly owned subsidiary of Congoleum. On January 27, 2003, Congoleum Financial Corporation was merged with and into CFI, with CFI surviving the merger, and the separate legal existence of Congoleum Financial Corporation ceased. CFI is a wholly owned subsidiary of Congoleum and a limited guarantor of Congoleum's obligations under the Existing Credit Agreement.

Congoleum Financial Corporation was incorporated on November 12, 1998 under the laws of the State of Delaware. Congoleum Financial Corporation's business included providing debt financing to Congoleum. As of the date of this Disclosure Statement, Congoleum did not have any debt outstanding with CFI.

(c)     **CSI**

CSI was incorporated on January 24, 2003 under the laws of the State of New York as a wholly owned subsidiary of Congoleum. CSI's business includes providing sales and promotion services for the purpose of promoting Congoleum's business. CSI is a limited guarantor of Congoleum's obligations under the Existing Credit Agreement.

**2.2.    Factors Leading to the Need for Bankruptcy Relief; Insurance**

(a)     **Asbestos Claims Against Congoleum**

Congoleum, along with many other manufacturers, including several of its competitor sheet vinyl and tile manufacturers, became the subject of numerous claims by individuals asserting bodily injury as a result of alleged exposure to asbestos-containing products. As a result of the explosion of asbestos claims and litigation in recent years, and the increasing costs of settlement and defense, certain sheet vinyl and tile manufacturers and many others in related industries, including flooring manufacturers similar to Congoleum, have filed Chapter 11 proceedings.

As of December 31, 2000, there were approximately 12,000 known claimants with Asbestos Personal Injury Claims pending against Congoleum. As of December 31, 2001, there were approximately 25,000 known claimants with Asbestos Personal Injury Claims pending against Congoleum. As of December 31, 2002, there were approximately 56,000 known claimants with Asbestos Personal Injury Claims pending against

Congoleum. As of June 30, 2003, there were approximately 91,000 known claimants with Asbestos Personal Injury Claims pending against Congoleum. Thus, the number of known claimants with Asbestos Personal Injury Claims pending against Congoleum doubled from 2001 to 2002, and nearly doubled in the first six months of 2003.

In the spring of 2001, two damages verdicts in the amount of approximately $18.2 million and $15.8 million, respectively, were rendered in favor of plaintiffs in asbestos personal injury claims brought by Kenneth Cook and Richard Arsenault in New York State Supreme Court, New York County. Under the reverse bifurcation procedure then in effect in New York, liability would still have to be established. The liability trial against Congoleum was scheduled for September 2002. Congoleum retained a leading jury consulting firm to conduct a mock trial to assess its likelihood of prevailing at trial. The mock jury trial was conducted in August 2002. Congoleum's defense attorney advised Congoleum that it was likely to lose at trial and that there was a risk for a joint and several finding against Congoleum. During the period following August 2002, Congoleum faced a situation in which its primary insurers claimed that their policies were exhausted (as supported by applicable New Jersey law at the time) while at the same time its excess carriers claimed that the primary layers were not exhausted and that therefore excess coverage was not available. This left Congoleum with no carriers ready and willing to pay claims or defense costs. Thus, Congoleum was placed in an untenable position as a result of the foregoing confluence of events. During the fourth quarter of 2002, Congoleum continued its efforts to attempt to secure insurance coverage from its excess insurance carriers and also began the process of seeking a global resolution in the form of a prepackaged bankruptcy.

During the fourth quarter of 2002, Congoleum engaged an outside actuary to conduct an updated analysis of Congoleum's asbestos-related liabilities. Developments during the latter part of 2002 included a significant increase in claims filed against Congoleum and higher settlement requirements, and the exhaustion of primary insurance coverage combined with a dispute of coverage by certain of its excess insurance carriers. These developments, together with an inability to reach agreement with excess carriers to provide coverage for the pending asbestos claims, led to Congoleum's plan to file a plan of reorganization under Chapter 11 of the Bankruptcy Code.

The study concluded that the minimum gross liability for the 56,567 known claimants at December 31, 2002, using average settlement payments by disease for claims settled in 2001 and 2002, was $310 million. This amount did not include defense costs, liability for the 30,000 additional claimants purportedly existing at December 31, 2002, for which Congoleum did not then have any record, or for future claims, which the study concluded could not be reasonably determined in light of the available data and uncertainty arising from an announcement on January 13, 2003 that Congoleum had decided to pursue a possible resolution of its asbestos crisis through a prepackaged bankruptcy filing. Congoleum's estimated minimum gross liability at the time was substantially in excess of both the total assets of Congoleum (without giving effect to rights under insurance policies) as well as Congoleum's previous estimates made in prior periods of the maximum liability for both known and unasserted claims. Congoleum has stated that it believes that (without giving effect to rights under insurance policies) it does not have the necessary financial resources to litigate and/or fund judgments and/or settlements of the asbestos claims in the ordinary course of business. In addition, Congoleum has stated that it believes that its going concern or liquidation value is substantially less than the minimum gross liability for the known asbestos claims against it.

(b) **Congoleum's Insurance Coverage for Asbestos-Related Personal Injury Claims**

To date, Congoleum has discovered excess insurance policies (in whole or in part), or evidence of excess policies, that were issued to Congoleum beginning in December 1953, and which Congoleum believes cover claims by third parties injured by its activities, including but not limited to claims alleging injury from asbestos. Such policies obligate the insurers to pay amounts that Congoleum becomes liable to pay in connection with, among other things, claims alleging bodily injury. Generally, such policies also obligate the insurers to pay defense costs in connection with claims against Congoleum, either in addition to the applicable limits of liability of the policies, as in the case of primary and some excess policies, or subject to such limits of liability. The discussion in this Section 2.2(b) applies only to policy periods through 1985.

The liability policies purchased by Congoleum generally provide two types of limits of liability. The first type, the "per occurrence" limit, generally limits the amount the insurer will pay in connection with a single "occurrence" to which the limit applies, as the term "occurrence" is defined in the policy. The second type, the

"aggregate" limit, generally limits the total amount the insurer will pay in connection with all occurrences covered by the policy for bodily injury to which the aggregate limit applies.

In the context of asbestos personal injury, the policies purchased by Congoleum generally provide coverage for two fundamental types of claims. The first type consists of claims in which the alleged exposure to asbestos is within the "products hazard" or the "completed operation's hazard" as those terms are defined in the policies. Such claims, referred to herein as "products" claims, include claims alleging exposure to asbestos-containing products manufactured or sold by Congoleum. In many states, asbestos claims within the "products hazard" may be considered a single occurrence subject to annual limits in each insurance policy. In addition, coverage for products claims may be subject to a specified annual aggregate limit of liability under some of the policies purchased by Congoleum.

The second type of claim involves exposure not within the scope of the policies' products hazard or completed operations hazard. Such claims, referred to herein as "non-products" claims, include claims involving alleged exposure to asbestos-containing materials, whether or not manufactured by Congoleum while such materials were present at premises or facilities owned or operated by Congoleum or at locations where asbestos material may have been disposed of by Congoleum. Although non-products claims have been asserted against Congoleum, the vast majority of asbestos-related claims that have been brought to date are products claims.

During the period in which Congoleum produced asbestos-containing products, Congoleum purchased primary and excess insurance policies providing in excess of $1 billion of limits of liability for general and product liability claims. Through August 2002, substantially all asbestos-related claims and defense costs were paid through primary insurance coverage. In February 2001 and then in August 2002, Congoleum received notice from its two lead primary insurance carriers that its primary insurance coverage was exhausted.

The exhaustion of limits by one of the primary insurance companies was based on its contention that limits in successive policies were not cumulative for asbestos claims within the "products hazard" and that Congoleum was limited to only one per occurrence limit for multiple years of coverage for such claims. Certain excess insurance carriers claimed that the non-cumulation provisions of the primary policies were not binding on them and that there remained an additional $13 million in indemnity coverage plus related defense costs before their policies were implicated. On April 10, 2003, the New Jersey Supreme Court ruled in another case involving the same non-cumulation provisions as in the Congoleum primary policies (the "**Spaulding Case**") that the non-cumulation provisions are invalid under New Jersey law and that the primary policies provide coverage for the full amount of their annual limits for all successive policies. Although Congoleum was not a party to this case, the decision in the Spaulding Case was likely binding on Congoleum and its primary insurance company. Thus, based on the Spaulding Case decision, the primary insurance company became obligated to provide the additional $13 million of coverage previously disputed by the excess carriers. After the Spaulding decision was decided, Congoleum entered into settlement negotiations and reached a settlement with the primary insurance company that had previously contended that limits in successive policies were not cumulative for asbestos claims within the "products hazard."

Prior to the decision in the Spaulding Case, Congoleum had entered into settlement agreements with asbestos claimants exceeding the $13 million amount of previously disputed coverage. The excess carriers objected to the reasonableness of these settlements. Congoleum believes that the excess carriers will continue to dispute the reasonableness of the settlements, contend that their policies still are not implicated and dispute their coverage for that and other various reasons in ongoing coverage litigation. The excess carriers have also raised various objections to Congoleum's reorganization strategy and negotiations.

In addition, several of Congoleum's insurers contend that multiple year policies do not provide annual limits, but that stated limits are for the entire policy period, ranging from two years to up to five years. Several of Congoleum's insurers also contend that Congoleum is unable to establish that they issued policies to Congoleum and that policies Congoleum contends they issued were not issued and never existed. If the insurers are correct in their positions, which Congoleum disputes, then the amount of insurance available to pay asbestos liabilities would be substantially less than $1 billion.

(c) <u>**Coverage Litigation Pre-Petition**</u>

Litigation between Congoleum and its excess insurance carriers, and the guaranty funds and associations for the State of New Jersey was initiated on September 15, 2001, by one of Congoleum's excess insurers. Congoleum has reached settlements with its insurance brokers in this litigation. Congoleum has also reached settlements with certain of its insurance carriers, which are described in Section 5.10 – "Settlements with Insurers and Brokers" below.

On February 26, 2003, one of Congoleum's excess insurers filed a motion for preliminary and permanent injunctive relief seeking, among other things, an order enjoining Congoleum from settling any asbestos claims against Congoleum, individually or as part of a global resolution, without insurer consent and compelling Congoleum to allow insurers to participate in the settlement discussions. On March 26, 2003, the court denied, in part, the insurers' request for injunctive relief and granted that portion of the relief sought requiring Congoleum to provide the insurers with certain information fixed by the terms of the court's order in response to the insurers' requests.

The parties conducted extensive discovery. Congoleum produced numerous employees and other representatives for multiple days of depositions and produced hundreds of thousands of pages of documents relating to the Claimant Agreement, the prepackaged bankruptcy proceeding, and other matters. Congoleum also served discovery requests and received discovery responses, and conducted depositions of numerous insurance company employees and representatives.

On or about July 11, 2003, certain upper layer excess insurers (i.e., those in the second excess layer and above) filed a motion for summary judgment seeking to dismiss Congoleum's breach of contract claims as to such upper layer excess carriers. On August 26, 2003, the court granted the defendants' motion. This ruling did not impact the declaratory judgment count of the coverage litigation. The court also held that the ruling is not a determination as to whether Congoleum had a right to enter into the Claimant Agreement and may not be used by the insurers to determine Congoleum's ability to enforce insurance coverage for the Claims addressed in the Claimant Agreement. The court also held that the question of whether there was a sound and reasonable basis for entering into the Claimant Agreement was not and could not be decided by this motion.

On September 10, 2003, one of Congoleum's excess insurers filed a motion for summary judgment seeking a ruling that the Claimant Agreement is unreasonable and was not entered into in good faith as a matter of law. Most of the excess insurers joined in the application. On November 7, 2003, the court denied the insurers' motion for summary judgment in its entirety.

In December 2003, several of Congoleum's excess insurers filed motions for summary judgment seeking a ruling that Congoleum had violated the duty to cooperate, consent to settle and anti-assignment provisions of their insurance policies and, as a result, the Claimant Agreement was not enforceable against them. Most of the excess insurers joined in the application.

## 2.3. Additional Insurance Issues Relevant to the Chapter 11 Filing

### (a) Continuation of Coverage Litigation Post-Petition

On January 6, 2004, certain of Congoleum's insurers filed the Motion of Certain Insurers for Declaration that Section 362(a) of the Bankruptcy Code is not Applicable, or, in the Alternative, for Relief from the Automatic Stay (the "**Stay Motion**"). The Stay Motion sought a declaration from the Bankruptcy Court that the Coverage Litigation between Congoleum and certain of its insurers, described in Section 2.2(c) above, was not subject to the automatic stay provisions of section 362 of the Bankruptcy Code or, in the alternative, requesting that the Bankruptcy Court grant relief from the automatic stay so that the Coverage Litigation could proceed during the pendency of the Reorganization Cases. On March 22, 2004, the Bankruptcy Court entered an order that permitted the claims asserted in the Coverage Litigation (except for certain claims for rescission of insurance policies issued to Congoleum) to proceed. The Bankruptcy Court did not make a finding as to whether or not the automatic stay provisions of section 362 of the Bankruptcy Code applied to the Coverage Litigation.

With respect to the motions for summary judgment filed by insurers pre-petition and described in Section 2.2(c) above, on April 19, 2004, the court denied the insurers' motions for summary judgment in their entirety.

On February 25, 2004, Congoleum filed an application for leave to file a Third Amended Complaint against the excess insurers to allege claims for breach of the implied covenant of good faith and fair dealing and for bad faith. On March 5, 2004, the court granted Congoleum's application to file a Third Amended Complaint in its entirety. On or about March 12, 2004, Congoleum filed the Third Amended Complaint and served each excess insurer with a copy.

On March 22, 2004, Congoleum filed an application for a jury trial during the Phase I trial. On April 19, 2004, the court denied Congoleum's application. Congoleum filed an application for leave to appeal, but the Appellate Division refused to consider the appeal of the jury trial ruling on an interlocutory basis.

On August 12, 2004, the court entered a new case management order with respect to the pending insurance coverage litigation, Case Management Order No. IV ("**CMO IV**"), that divides the trial into three phases. CMO IV sets forth the deadlines for completing fact and expert discovery. CMO IV also established deadlines for dispositive and pre-trial motion practice. A new judge was assigned to the case effective February 23, 2005 and the schedule was modified as a result.

On February 22, 2005, the court ruled on a series of summary judgment motions filed by various insurers. The court denied a motion for summary judgment filed by certain insurers, holding that there were disputed issues of fact regarding the intent of the settling parties and whether the claimants had released Congoleum from any liability for the asbestos bodily injury claims of the claimants who signed the Claimant Agreement and the other settlement agreements.

The court also denied another motion for summary judgment filed by various insurers who argued that they did not have to cover the liability arising from the Claimant Agreement because they had not consented to it.

The court granted summary judgment regarding Congoleum's bad faith claims against excess insurers (other than first-layer excess insurers), holding the refusal of these excess insurers to cover the Claimant Agreement was at least fairly debatable and therefore not in bad faith. Subsequently, bad faith claims against first-layer insurers were dismissed by stipulation. However, Congoleum contends that the court must still determine whether the insurers fairly and honestly considered the Claimant Agreement before refusing to consent to it.

On March 18, 2005, the Debtors filed a motion in the Bankruptcy Court asking the Bankruptcy Court to vacate its prior order lifting the automatic stay in bankruptcy to permit the Coverage Litigation to proceed. The Debtors requested that the Coverage Litigation proceedings be stayed until the Debtors had completed their plan confirmation process in the Bankruptcy Court. A hearing on the Debtors' motion was held on April 12, 2005 and the motion was denied.

The Phase 1 trial in the insurance coverage litigation began on August 2, 2005.  The court defined the scope of the Phase 1 trial as follows:

> All issues and claims relating to whether the insurers are obligated to provide coverage under the policies at issue in the litigation for the global claimant's agreement entered into by Congoleum, including but not limited to all issues and claims relating to both Congoleum's decision and conduct in entering into the Claimant Agreement and filing a pre-packaged bankruptcy and the insurance company defendants' decisions and conduct in opposing the Claimant Agreement and Congoleum's pre-packaged bankruptcy, the reasonableness and good faith of the Claimant Agreement, whether the Claimant Agreement breached any insurance policies and, if so, whether the insurance companies suffered any prejudice, and whether the insurance companies' opposition to the Claimant Agreement and bankruptcy and various other conduct by the insurers has breached their duties of good faith and fair dealing such that they are precluded from asserting that Congoleum's decision to enter into the Claimant Agreement constitutes any breach(es) on the part of Congoleum.

In or about mid-November, 2005, and in early December 2005, certain insurers filed motions for summary judgment on the ground, inter alia, that the decision of the United States Court of Appeals for the Third Circuit reversing the Bankruptcy Court's order approving the retention of Gilbert Heintz & Randolph LLP firm in *In re Congoleum*, 426 F.3d 675 (3d Cir. 2005), and/or Congoleum's filing of avoidance actions in the Bankruptcy Court, entitled them to judgment as a matter of law on the Phase I issues.  On March 16, 2006, the court denied the summary judgment motions filed by insurers, ruling that the motions, which were filed and argued before the close of plaintiff's case, were procedurally not ripe for decision and that there were questions of fact that prevented granting a summary judgment motion.

Congoleum completed the presentation of its case-in-chief on April 28, 2006.  Certain insurers thereafter moved for involuntary dismissal or judgment in their favor (the "**directed verdict motions**"), arguing that the evidence in the case, even when accepted as true and even after giving Congoleum the benefit of all legitimate inferences that may be drawn from such evidence, as New Jersey law requires at the close of the plaintiff's case, was not sufficient to sustain a decision in Congoleum's favor on Phase I.  A variety of theories were advanced by the insurers similar to those previously made in their earlier motions for summary judgment, including but not limited to that (a) the settlements are unreasonable and were not negotiated or made in good faith; (b) the insurers were not in breach of their policies and, therefore, had the right to withhold their consent to the settlements if their objections were reasonable; (c) because the settlements were structured so as to be paid only from insurance proceeds, not by Congoleum, the insurers may avoid coverage entirely under the "legally obligated to pay" language of certain policies; (d) the alleged admissions made in the pleadings filed in support of the Avoidance Actions mandated dismissal; (e) Congoleum cannot establish exhaustion of underlying limits of insurance; and (f) the evidence in the case does not allow for reasonable people to disagree on these points.

Hearings on the directed verdict motions were held on June 2 and June 7, 2006.  On July 13, 2006, the court denied the motions in their entirety as to all defendants.  The court determined that, under the applicable legal standard, which forbids the court from making credibility determinations and requires the evidence and all inferences to be drawn from the evidence to be construed in Congoleum's favor at this stage of the case, there remained fact questions that could only be resolved at the conclusion of the trial.

In addition to the directed verdict motions discussed above, which advanced arguments of general applicability to Congoleum's claims against all of the insurers, two motions were filed by various Century entities at the close of the plaintiff's case and sought relief specific to these Century entities.  In the first motion, Century sought a dismissal as to Insurance Company of North America ("**INA**") Policy XCPGO790870-2, a 1985 INA policy, on the ground that the policy contains an asbestos exclusion set forth in an endorsement issued on May 1, 1985.  The court granted the motion on June 20, 2006, based on the asbestos exclusion, and ordered the dismissal with prejudice and without costs of Congoleum's claims for coverage for all asbestos bodily injury claims with respect to that particular INA policy, as more particularly set forth in the order.  In the second motion, ACE American Insurance Company (formerly CIGNA Insurance Company) and ACE Property and Casualty Insurance Company (formerly CIGNA Property and Casualty Insurance Company) (collectively, the "**Former CIGNA Entities**") sought dismissal of Congoleum's claims against those entities for the reasons stated in the moving parties'

papers, which Congoleum contested. On June 20, 2006, the court granted this motion, dismissing the Former CIGNA Entities, as more particularly set forth in the order. In addition, by stipulation dated June 19, 2006, and filed with the Court on June 20, 2006, the parties stipulated that Century was the successor-in-interest to INA with regard to certain INA insurance policies issued to Congoleum, as more particularly set forth in the stipulation.

At the time it denied the directed verdict motions, the court strongly encouraged the parties to cooperate in completing the remainder of the Phase I trial to avoid unnecessary delays.

On May 18, 2007, the Superior Court of New Jersey issued its decision on the Phase I trial, ruling that the Claimant Agreement is an unreasonable agreement, not made in good faith, and therefore Congoleum's insurers have no coverage obligations for the Claimant Agreement.

A conference was held in the Coverage Action on February 7, 2008 to address Phase II of the trial. At the conference, the insurer defendants sought to expand Phase II of the Coverage Action to include claims and discovery relating to the Joint Plan and Omnibus Claimant Settlement. The Superior Court of New Jersey entered a case management order allowing the insurers to pursue claims and discovery on the Joint Plan and Omnibus Claimant Settlement in addition to the Pre-Petition Settlement Agreements. Congoleum sought to stay Phase II of the Coverage Action trial because of the pendency of the solicitation and balloting and scheduled confirmation hearing on the Joint Plan, but the Bankruptcy Court denied the stay motion. On March 28, 2008, the State Court entered Case Management Order VII setting a discovery schedule with respect to claims relating to insurance coverage under the Omnibus Claimant Settlement and the other pre-petition settlement agreements. Since that time, discovery in the Coverage Action has focused on the negotiations of pending bankruptcy plans during the course of the bankruptcy case.

At a March 11, 2009 status conference, Judge Stroumtsos requested that both Congoleum and the insurers file simultaneous submissions outlining the parties' positions with respect to the scope of Phase II. Congoleum requested that the State Court stay the Coverage Action. Congoleum reiterated its belief that it would be premature to litigate coverage issues with respect to claims settled under the Pre-Petition Settlement Agreements and Claimant Agreement since the settling claimants thereunder have agreed to relinquish their rights under the Amended Joint Plan. In addition, Congoleum informed the State Court that the insurers' attempts to terminate coverage violated the automatic stay in the bankruptcy case. After several rounds of submissions, the State Court denied the stay motion on June 22, 2009. Congoleum moved for leave to appeal, which application was denied on August 4, 2009.

On June 30, 2009, the insurers proposed a new case management order for Phase II. The State Court has not yet entered a new case management order for Phase II but discovery was not completed. The insurers demanded a summary judgment briefing schedule with respect to certain affirmative claims for relief against Congoleum. On July 30, 2009, First State filed a motion for summary judgment which motion was joined by numerous other insurers. CNA filed a separate motion for summary judgment. The insurers seek a declaration that they owe no coverage for (i) asbestos claims that were settled under the Claimant Agreement or (ii) asbestos claims that were the subject of any other agreements Congoleum entered in the past, or may enter in the future (including those that may be resolved pursuant any bankruptcy plan), unless Congoleum first obtains the insurers' consent. CNA seeks a declaration that, by entering into the pre-petition Claimant Agreement, Congoleum materially breached all of its policies, thereby relieving CNA from coverage obligations for all of Congoleum's present and future asbestos claims. First State's and CNA's summary judgment motions were denied. The Phase II trial was scheduled to commence in February 2010. The third and final phase of the trial will address bad faith punitive damages, if appropriate.

A stand down of proceedings in the Coverage Action has been in place since November 2009 while settlement negotiations were being pursued. On January 28 and 29, 2010, Congoleum filed motions to approve the Multi-Insurer Settlement and Seaton Settlement. A hearing on the approval of the Multi-Insurer Settlement and Seaton Settlement was held on February 19, 2010, and the District Court approved the settlement agreements. A stand down in the Coverage Action will continue until certain conditions in the Multi-Insurer Settlement are satisfied. Congoleum's and Seaton's claims against one another have been dismissed without prejudice from the Coverage Action. Pursuant to the Multi-Insurer Settlement, Congoleum's and the settling

insurers' claims will be dismissed with prejudice upon satisfaction of conditions in the settlement agreements and upon payment of the respective settlement amounts.

       (b)    **Congoleum's Insurance Coverage for Asbestos Property Damage Claims**

       The insurance policies purchased by Congoleum also provide coverage for claims asserting property damage. In the context of asbestos property damage, some, but not all, of Congoleum's primary policies provided separate property damage limits, and some policies included property damage limits within a combined single, overall policy aggregate or within the policy's products aggregate limit. Thus, Congoleum contends the property damage limits have been exhausted for some years and not other years under Congoleum's primary policies. Congoleum has identified certain primary insurance policies, set forth on Exhibit B to the Plan, that provide separate property damage coverage limits. Up to approximately $1.25 million is earmarked for the payment of Asbestos Property Damage Claims from the proceeds of the Liberty Settlement.

       (c)    **Congoleum's Insolvent and Certain Run-Off Insurers**

       The following U.S. based insurers of Congoleum that issued policies without asbestos exclusions are the subject of insolvency, liquidation, or rehabilitation proceedings: Midland Insurance Co., Transit Casualty Co., Highlands Insurance Co., Integrity Insurance Co., Mission Insurance Co., Holland-America Insurance Co., Western Employers Insurance Co., Home Insurance Co., and Protective National Insurance Co. of Omaha. A combined total of up to approximately $518 million of policy limits was issued by these insurers to or for the benefit of Congoleum; of these limits, up to approximately $272 million, $72 million, and $68 million were issued by Midland, Transit, and Highlands, respectively. The potentially available limits are in some cases subject to dispute, particularly in respect of policies of other than twelve-month policy periods.

       In March 2006, Congoleum received a Notice of Determination ("**NOD**") denying its claims in the Midland insolvency proceeding. Congoleum thereupon filed a timely objection to the NOD. The liquidator's adverse determination is now subject to judicial review. Congoleum's claims in the Transit proceedings were denied in 2000. According to the Transit liquidator, Congoleum did not challenge that denial, which therefore appears to have become final in 2000.

       The liquidator of Integrity reports that Congoleum's claims in that liquidation were disallowed, although Congoleum continues to pursue a claim against Integrity. However, the running of all appeal periods has been tolled until the resolution of a pending appeal by Integrity's reinsurers. In certain insolvency proceedings, Congoleum may not have filed a timely claim. Although inquiry is ongoing, there do not appear to be claims pending in the liquidations of Mission, Holland-America, and Western Employers, which estates all established bar dates falling more than a decade prior to the Petition Date. Of the remaining insurers mentioned above, inquiry to date shows that Congoleum filed timely claims with the estates of Home and Protective National.

       A number of the London Market insurers of Congoleum that issued policies without asbestos exclusions are the subject of insolvency proceedings. The combined total of aggregate policy limits issued to or for the benefit of Congoleum by such insolvent London Market insurers that were not the subject of pre-petition settlements is approximately $5 million based upon information provided by these insurers. Also, certain of the solvent London Market insurers have proposed so-called solvent schemes of arrangement for the purpose of paying claims under their previously issued policies. Congoleum has received approximately $256,000 pursuant to certain of these solvent schemes of arrangement, which funds are being held in escrow in an account for transfer to the Plan Trust after confirmation.

       Congoleum is continuing to attempt to pursue its claims against insurers in insolvency and rehabilitation proceedings. However, there can be no assurance that Congoleum's claims will be allowed in any such proceedings or, if allowed, that Congoleum or the Plan Trust will receive any distribution on asbestos-related or other claims.

## ARTICLE 3
## THE PRE-PETITION PROCESS

## 3.1.    The Prepackaged Plan

As both the volume of Asbestos Personal Injury Claims and the associated costs of defense and settlements increased, and as its principal insurers refused to make further payments or became insolvent, Congoleum became concerned about its ability to continue in business and to pay fair compensation to claimants allegedly injured by its historical operations.  Beginning in October 2002, Congoleum consulted with its counsel regarding ways to compensate legitimate Asbestos Claimants while preserving Congoleum's business, including utilization of the special provisions of the Bankruptcy Code, including section 524(g), to accomplish this purpose.

In an effort to further reduce the cost and disruption of a bankruptcy filing, and to optimize the potential for preserving value, Congoleum simultaneously negotiated the Claimant Agreement, the Security Agreement and the Collateral Trust Agreement.  Congoleum also structured the plan of reorganization as a prepackaged plan, in which acceptances were solicited prior to filing the Reorganization Cases, in an effort to reduce the duration and expense of the contemplated bankruptcy proceedings and the risk that the contemplated bankruptcy proceedings would have a material adverse impact upon Congoleum's business.

Votes were solicited for the prepackaged plan and the votes received were overwhelmingly in favor of the prepackaged plan.  While the Debtors could have proceeded to seek confirmation of the prepackaged plan, after filing these Chapter 11 cases, the Debtors engaged in negotiations with various constituents in an effort to develop consensual modifications.  However, as described in Sections 5.09, 5.13 and 5.15 below, litigation over the Pre-Petition Settlement Agreements and Claimant Agreement that formed the basis for the prepackaged plan ultimately ensued and, as a result of Court decisions in that litigation, the Debtors were unable to propose a consensual plan of reorganization (either the prepackaged plan or any plan of reorganization since then) which preserved any portion of the Pre-Petition Settlement Agreements or Claimant Agreement that was confirmable as a matter of law.  The Litigation Settlement Agreement and treatment provided to holders of Class 7 Claims under the Plan is intended to resolve the issues in that litigation.

## 3.2.    Selection of the Futures Representative

Congoleum considered candidates to serve as the Futures Representative in the Reorganization Cases to represent the interests of Asbestos Personal Injury Claimants who are presently unknown.  After reviewing the qualifications and potential conflicts of certain candidates, and following careful deliberation, Congoleum asked R. Scott Williams (one of the Plan Proponents) to serve as the Futures Representative.

Mr. Williams is a member of the Litigation Practice Group of Haskell Slaughter Young & Rediker, L.L.C.  Mr. Williams holds degrees from the University of Illinois at Urbana-Champaign (B.A. 1985) and the University of Alabama School of Law (J.D. 1988).  Prior to joining Haskell Slaughter Young & Rediker, L.L.C., Mr. Williams served United States Senator Howell Heflin as counsel to the United States Senate Judiciary Committee and as judicial clerk to the Honorable Sharon Lovelace Blackburn of the United States District Court for the Northern District of Alabama.  Mr. Williams was admitted to the Alabama Bar in 1988 and his practice specializes in bankruptcy and commercial litigation.  Mr. Williams is a frequent lecturer and author on bankruptcy and commercial litigation related topics and he currently serves as a contributing editor to *Collier on Bankruptcy* (15th Ed. Revised).  Mr. Williams is a past president of the Birmingham Bar Bankruptcy and Commercial Law Section and is a former member of the Birmingham Bar Executive Committee.  In addition, Mr. Williams is an active member of the American Bankruptcy Institute and has served in a variety of leadership roles for that organization.

Mr. Williams served as the futures representative in the prepackaged Chapter 11 case of *In re Shook & Fletcher Insulation Co.*, U.S.B.C. N.D. Al., Case No.: 02-02771-BGC-11.  Mr. Williams has never represented a current plaintiff, defendant, or insurer in connection with asbestos litigation against Congoleum, and, other than being selected as the Futures Representative, has never had a relationship with, or connection to, Congoleum or any of its Affiliates.

Mr. Williams' appointment has been approved by the Bankruptcy Court.  *See* Section 5.4 – "Bankruptcy Court Appointment of Futures Representative."

19

### 3.3. Formation of the Pre-Petition Asbestos Claimants' Committee

During the course of the negotiations of the prepackaged plan documents, various representatives of the holders of Asbestos Personal Injury Claims engaged in discussions with the Claimants' Representative concerning the possible pre-packaged bankruptcy filing by the Company. Such discussions culminated in the formation of the Pre-Petition Asbestos Claimants' Committee which consisted of the following members: Perry Weitz, Esquire, Joseph Rice, Esquire, Steve Kazan, Esquire, Russell Budd, Esquire, Bryan Blevins, Esquire, John Cooney, Esquire and Matthew Bergmann, Esquire. The members of the Pre-Petition Asbestos Claimants' Committee represented a majority of the holders of Asbestos Personal Injury Claims and a diverse mix of the types of such Asbestos Claimants.

### 3.4. Pre-Petition Due Diligence Review

The Claimants' Representative engaged L. Tersigni Consulting, P.C. ("**LTC**") to conduct a due diligence investigation of (a) the business affairs of Congoleum, (b) the equity value of Congoleum, and (c) the feasibility of a plan of reorganization. The Pre-Petition Asbestos Claimants' Committee was also apprised of the results of the due diligence investigation undertaken by LTC and considered such results in connection with its review and approval of the prepackaged plan of reorganization. LTC's due diligence review consisted of an investigation of the past and present business activities of Congoleum and the relationship between Congoleum and its Affiliates. Congoleum cooperated with LTC in its investigation and produced numerous documents in response to the requests of LTC. The Futures Representative and his professionals conducted their own due diligence review, including consulting with advisors to the Company and the Claimants' Representative.

## ARTICLE 4
## THE COMPANY: CORPORATE STRUCTURE AND MANAGEMENT

### 4.1. Boards of Directors of the Company

#### (a) Congoleum

The following table sets forth the name and principal occupation of each of the directors of Congoleum.

| Name | Business Experience and Other Directorships |
|---|---|
| Mark N. Kaplan | Of Counsel, Skadden, Arps, Slate, Meagher & Flom LLP, attorneys, since 1999. Director of American Biltrite Inc., Volt Information Sciences, Inc. and Autobytel Inc. Director of Congoleum since 1995. |
| Richard G. Marcus | Vice Chairman of Congoleum (since 1994) and a Director (since 1993). Director (since 1982), President (since 1983) and Chief Operating Officer (since 1992) of American Biltrite Inc. American Biltrite is the control shareholder of Congoleum and owns and operates other businesses selling tape and film, flooring and rubber products, and costume jewelry. |
| Mark S. Newman | Chairman of the Board since 1995, President and Chief Executive Officer since 1994 of DRS Technologies, Inc., a high technology defense electronics systems company and wholly owned subsidiary of Finmeccanica S.P.A. Director of Opticare Health Systems, Inc., SSG Precision Optronics, Governor Aerospace Industries Association, New Jersey Technology Council and REFAC Technology Development Corporation. Past Chairman AEA. Director of Congoleum since 2000. |
| Roger S. Marcus | Director, President and Chief Executive Officer of Congoleum (since 1993) and Chairman (since 1994). Mr. Marcus is also a Director (since 1981), Chairman of the Board (since 1992) and Chief Executive Officer (since 1983) of American |

| Name | Business Experience and Other Directorships |
|------|--------------------------------------------|
| | Biltrite Inc.  From 1983 to 1992, Mr. Marcus served as Vice Chairman of the Board of American Biltrite Inc. |
| Jeffrey H. Coats | President, CEO and Director of Autobytel Inc., an internet automotive marketing services company (since December 2008).  Executive Chairman and Director of Mikronite Technologies Group Inc., an industrial technology company.  Mr. Coats is also a Managing Director of Maverick Associates LLC, a financial consulting and investment company.  Director of Congoleum since 2005. |
| Adam H. Slutsky | Chief Executive Officer of Mimeo.com, an online document production company.  Director of Congoleum since 2005. |
| William M. Marcus | Director, Executive Vice President and Treasurer of American Biltrite Inc. since 1966.  Director of Congoleum since 1993. |
| C. Barnwell Straut | Managing Director of Hillside Capital Incorporated, an investment firm, since 1976.  Director of Congoleum since 1986. |

Roger S. Marcus and Richard G. Marcus are brothers, and William M. Marcus is their cousin. Roger S. Marcus and Richard G. Marcus were executive officers of Congoleum on December 31, 2003, when it filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

      (b)    **CFI**

The directors of CFI are Roger S. Marcus, Richard G. Marcus and Howard N. Feist III.  *See* Section 4.1(a) – "Congoleum" above for information regarding Messrs. Roger and Richard Marcus and Section 4.2(a) – "Management of the Company - Congoleum" below for information regarding Mr. Feist.

      (c)    **CSI**

The directors of CSI are Roger S. Marcus, Richard G. Marcus and Howard N. Feist III.  *See* Section 4.1(a) – "Congoleum" above for information regarding Messrs. Roger and Richard Marcus and Section 4.2(a) – "Management of the Company - Congoleum" below for information regarding Mr. Feist.

**4.2.**    **Management of the Company**

      (a)    **Congoleum**

The following is a list of the executive officers of Congoleum and a brief description of their positions and certain biographical data.

| Name | Position with Congoleum |
|------|------------------------|
| Roger S. Marcus | Chairman of the Board, Chief Executive Officer and President |
| Richard G. Marcus | Vice Chairman |
| Howard N. Feist III | Chief Financial Officer and Secretary |
| Dennis P. Jarosz | Senior Vice President – Sales & Marketing |
| Sidharth Nayar | Senior Vice President – Finance |

| Name | Position with Congoleum |
|------|------------------------|
| John L. Russ III | Senior Vice President – Operations |
| Thomas A. Sciortino | Senior Vice President – Administration |

*Roger S. Marcus*

Roger S. Marcus has been a Director and President and Chief Executive Officer of Congoleum since 1993, and Chairman since 1994. Mr. Marcus is also a Director (since 1981), Chairman of the Board (since 1992) and Chief Executive Officer (since 1983) of ABI. From 1983 to 1992, Mr. Marcus served as Vice Chairman of ABI.

*Richard G. Marcus*

Richard G. Marcus has been Vice Chairman of Congoleum since 1994 and a Director since 1993. Mr. Marcus is also a Director (since 1982) and President (since 1983) and Chief Operating Officer (since 1992) of ABI.

*Howard N. Feist III*

Howard N. Feist III has been Chief Financial Officer and Secretary of Congoleum since 1988. Mr. Feist is also Vice President – Finance and Chief Financial Officer of ABI (since 2000).

*Dennis P. Jarosz*

Dennis P. Jarosz has been Senior Vice President – Sales & Marketing since 2002. Previously, he was Senior Vice President – Marketing since 1995. Prior thereto, he had served as Vice President – Marketing since 1993 and Vice President – Sales & Marketing of the Tile Division of ABI (since 1986).

*Sidharth Nayar*

Sidharth Nayar has been Senior Vice President – Finance of Congoleum since 1999. Prior thereto, he had served as Vice President – Controller since 1994 and prior to that he was Controller since 1990.

*John L. Russ III*

John L. Russ III has been Senior Vice President – Operations since 2002. Prior thereto, he served as Executive Vice President for Borden Chemicals, Inc. (Forest Products Division), a supplier of resins and adhesives, since 1997. Prior to that he was Executive Vice President of Borden Chemicals and Plastics, a specialty resins manufacturer, since 1987.

*Thomas A. Sciortino*

Thomas A. Sciortino has been Senior Vice President – Administration of Congoleum since 1993. Prior thereto, he was Vice President – Finance of the Tile Division of ABI (since 1982).

(b) **CFI**

Roger S. Marcus is the President and Howard N. Feist III is the Vice-President, Treasurer and Secretary of CFI.

(c) **CSI**

Roger S. Marcus is the President and Howard N. Feist III is the Vice-President, Treasurer and Secretary of CSI.

### 4.3.    Directors and Officers of Reorganized Congoleum

On and after the Effective Date, the business and affairs of Reorganized Congoleum will be managed by the board of directors of Reorganized Congoleum.

On the Effective Date, the term of each director of the current board of directors for each Debtor shall expire. The initial board of directors of Reorganized Congoleum shall consist of five (5) directors. One of such directors shall be selected by the Bondholders' Committee, three of such directors shall be selected jointly by the Futures Representative and the Asbestos Claimants' Committee, and one of such directors shall be Reorganized Congoleum's chief executive officer. The identity of such directors shall be disclosed by the Plan Proponents in the Plan Supplement. To the extent any such Person is an Insider (as defined in section 101(31) of the Bankruptcy Code), the nature of any compensation for such Person will also be disclosed prior to the Confirmation Hearing.

The initial officers of Reorganized Congoleum shall be set forth in the Plan Supplement. To the extent any such Person is an Insider (as defined in section 101(31) of the Bankruptcy Code), the nature of any compensation for such Person will also be disclosed at such time.

Notwithstanding the foregoing, as part of the Intercompany Settlement described in Section 8.34 below, ABI shall make the services of Roger Marcus, Richard Marcus and Howard Feist, III available to Reorganized Congoleum for two years after the Effective Date in consideration of a base annual fee of $800,000 and an annual incentive fee. Roger Marcus shall serve as Chief Executive Officer and Director of Reorganized Congoleum. Howard Feist III shall serve as Chief Financial Officer of Reorganized Congoleum. Substantially all of Roger Marcus's time, approximately 25% of Richard Marcus's time, and approximately 50% of Howard Feist III's time, in each case, during normal working hours on an annual basis shall be made available by ABI to Reorganized Congoleum for the two years following the Effective Date.

Further, five percent of Reorganized Congoleum's total authorized number of shares of common stock shall be reserved for issuance by Reorganized Congoleum for equity based compensation and awards to the management team of Reorganized Congoleum with terms to be determined by the Board of Directors of Reorganized Congoleum.

### 4.4.    Employees and Union Contracts

As of December 31, 2009, Congoleum employed a total of approximately 500 personnel. Congoleum has entered into collective bargaining agreements with hourly employees at three of its plants and with the drivers of the trucks that provide interplant transportation. These agreements cover approximately 360 of Congoleum's employees. The Marcus Hook plant has a five-year collective bargaining agreement which expires in November 2013 and a separate five-year collective bargaining agreement which expires in January 2014. The Trenton sheet plant has a five-year collective bargaining agreement which was renewed in February 2006 and expires in January 2011. The Trenton tile plant has a five-year collective bargaining agreement which expires in May 2013. The Finksburg plant has a five-year collective bargaining agreement that expires in January 2015. In the past five years, there have been no significant strikes by employees at Congoleum and Congoleum believes that its employee relations are satisfactory.

### 4.5.    Debt and Equity Structure

(a)    **Summary of Pre-Petition Date Indebtedness**

(1)    **The Credit Facility**

On December 10, 2001, Congoleum entered into a revolving credit agreement (the "**Credit Facility**") with Wachovia which provides for revolving loans and a letter of credit facility in an aggregate principal amount of up to $30,000,000. Interest payable on revolving loans is equal to .25% above a designated prime rate or 2.75% over an adjusted Eurodollar rate, as applicable, depending on meeting the required covenants under the Credit Facility. The Credit Facility contains certain covenants which include a covenant requiring the maintenance of

minimum EBITDA (i.e., earnings before interest, taxes, depreciation and amortization) if borrowing availability falls below a certain level. It also includes restrictions on the incurrence of additional debt and limitations on capital expenditures. The covenants and conditions under the Credit Facility must be met in order for Congoleum to borrow under the Credit Facility. The repayment obligations of Congoleum under the Credit Facility by a grant of a perfected security interest in certain of Congoleum's inventory and accounts receivable. In addition, Congoleum Financial Corporation and Congoleum Intellectual Properties, Inc., wholly owned subsidiaries of Congoleum as of the date of the Credit Facility, each granted a limited guarantee in favor of Wachovia with regard to the obligations of Congoleum under the Credit Facility.

Pursuant to the terms of the Credit Facility, amounts received by Congoleum with regard to its accounts receivable and inventory which are subject to the security interest granted by Congoleum to Wachovia are to be deposited by Congoleum, and Congoleum is obligated to direct its customers to remit payments, into a lockbox or blocked account, which funds are controlled and used by Wachovia to offset outstanding amounts borrowed by Congoleum under the Credit Facility.

In September 2002, Congoleum and Wachovia amended the Credit Facility to revise certain financial and other covenants. In February 2003, Congoleum and Wachovia further amended the Credit Facility to revise certain financial and other covenants on terms negotiated to reflect the transactions contemplated by Congoleum's intended global settlement of its asbestos claims liability. Pursuant to this amendment, CSI and CFI granted a limited guarantee in favor of Wachovia with regard to the obligations of Congoleum under the Credit Facility, which limited guarantee is substantially similar to the limited guarantee that was previously granted by Congoleum Financial Corporation and Congoleum Intellectual Properties, Inc., which entities are no longer in existence. As of the Petition Date, the principal amount of all pre-petition obligations owed by the Debtors to Wachovia, both absolute and contingent, pursuant to the Credit Facility existing as of December 31, 2003 consisted of the principal amount of not less than $14,325,937, plus all interest accrued and accruing thereon and fees, costs, expenses and other charges accrued, accruing or chargeable with respect thereto.

Wachovia has provided debtor-in-possession financing during the pendency of the Reorganization Cases. *See* Section 5.2(b) – "Administration of the Reorganization Cases - DIP Financing".

(2)    **The Senior Notes**

On August 3, 1998, Congoleum issued $100 million in aggregate principal amount of 8⅝% Senior Notes Due 2008 (the "**Senior Notes**") priced at 99.505 to yield 8.70%. Interest was payable on the Senior Notes semi-annually on February 1 and August 1. The Senior Notes matured on August 1, 2008. The Senior Notes were redeemable at the option of Congoleum, in whole or in part, at any time on or after August 1, 2003 at predetermined redemption prices (ranging from 104% to 100%), plus accrued and unpaid interest to the date of redemption. The Indenture under which the notes were issued includes certain restrictions on additional indebtedness and uses of cash, including dividend payments.

In March 2003, Congoleum and the trustee under the Indenture governing the Senior Notes (the "**Indenture Trustee**") amended the Indenture to expressly provide Congoleum, under the terms of that Indenture, with greater flexibility to pursue possible resolutions of its current and future asbestos claims liability, including negotiating a global settlement with current asbestos plaintiffs and the Futures Representative, and soliciting acceptances of and filing a prepackaged plan of reorganization under Chapter 11 of the Bankruptcy Code. Prior to the amendment, holders of a majority in aggregate principal amount of the Senior Notes outstanding as of the record date for determining the holders entitled to vote on the proposed amendment had consented to the amendment.

In August 2003, Congoleum and the Indenture Trustee amended the Indenture to expressly provide Congoleum, under the terms of the Indenture, with greater flexibility to pursue approval of its pre-packaged plan of reorganization under Chapter 11 of the Bankruptcy Code. Prior to the amendment, holders of a majority in aggregate principal amount of the Senior Notes as of the record date for determining the holders entitled to vote on the proposed amendment had consented to the amendment. *See* Section 6.3(d) – "Treatment of Classified Claims and Interests" for a description of the treatment of the Senior Notes under the Plan.

(b)    **Description of Capital Stock**

### (1)     **Congoleum**

Congoleum currently has 31,000,000 shares of capital stock authorized, of which 20,000,000 shares are designated as Class A Common Stock, 10,000,000 shares are designated as Class B Common Stock and 1,000,000 shares are designated as preferred stock (the "**Preferred Stock**").

As of March 13, 2009, 3,663,390 shares of Class A Common Stock, 4,608,945 shares of Class B Common Stock and no shares of Preferred Stock were issued and outstanding. As of that date, ABI held 151,100 shares of Class A Common Stock and 4,395,605 shares of Class B Common Stock.

Upon the filing of amended certificates of incorporation in connection with the Effective Date, the Class A Common Stock, the Class B Common Stock and the Preferred Stock will be eliminated. Congoleum will have authority to issue only common stock and the Debtors will be prohibited from issuing non-voting capital stock in accordance with section 1123(a)(5) of the Bankruptcy Code.

### (A)     **Class A Common Stock**

The Class A Common Stock is entitled to one vote per share and, generally, votes together with the Class B Common Stock as a single class. The Class A Common Stock and Class B Common Stock are on parity on a per share basis with respect to dividend and liquidation rights. The Class A Common Stock will be cancelled under the Plan.

The Company's Class A Stock was delisted by Amex on February 19, 2008 because it did not meet the Amex listing standards for share value, share price, and aggregate market capitalization. The Congoleum shares are currently traded on the OTC Pink Sheets.

Following the Effective Date, unless otherwise determined by the Plan Proponents in accordance with applicable law, Congoleum's common stock will not be publicly traded.

### (B)     **Class B Common Stock**

Generally, the Class B Common Stock is entitled to two votes per share and votes together with the Class A Common Stock as a single class. The Class B Common Stock is only entitled to one vote per share with regard to certain extraordinary transactions. The Class B Common Stock and Class A Common Stock are on parity on a per share basis with respect to dividend and liquidation rights.

A holder of Class B Common Stock may convert any shares of such stock into an equal number of shares of Class A Common Stock at any time at the holder's option. The Class B Common Stock is subject to automatic conversion into Class A Common Stock on a one-for-one basis upon the adoption of a resolution authorizing such conversion approved by the holders of a majority of the outstanding shares of Class B Common Stock voting as a separate class. In addition, any shares of Class B Common Stock sold or otherwise transferred to a person or entity other than an affiliate of the transferor will be automatically converted into an equal number of shares of Class A Common Stock upon such sale or transfer. A pledge of shares of Class B Common Stock is not considered a transfer for this purpose unless and until the pledge is enforced. Also, with respect to shares of Class B Common Stock held by ABI, those shares will automatically be converted into an equal number of shares of Class A Common Stock upon the occurrence of a "change of control" of ABI (as defined under Congoleum's Certificate of Incorporation).

### (2)     **CFI**

CFI has 1,000 shares of common stock, each share having a par value of $0.01, authorized, of which 100 shares are issued and outstanding and owned by Congoleum.

### (3)     **CSI**

CSI has 1,000 shares of common stock, each share having a par value of $0.01, authorized, of which 100 shares are issued and outstanding and owned by Congoleum.

## 4.6.  Other Matters

(a)  **Environmental Proceedings**

Congoleum is named, together with a large number (in most cases, hundreds) of other companies, as a potentially responsible party ("**PRP**") in pending proceedings under the federal Comprehensive Environmental Response, Compensation and Liability Act, as amended ("**CERCLA**"), and similar state laws.  In addition, in four other instances, although not named as a PRP, Congoleum has received a request for information.  The pending proceedings relate to eight disposal sites in New Jersey, Pennsylvania and Maryland in which recovery from generators of hazardous substances is sought for the cost of cleaning up the contaminated waste sites.  Congoleum's ultimate liability in connection with those sites depends on many factors, including the volume of material contributed to the site, the number of other PRPs and their financial viability, the remediation methods and technology to be used and the extent to which costs may be recoverable from insurance.  However, under CERCLA, and certain other laws, Congoleum, as a PRP, can be held jointly and severally liable for all environmental costs associated with a site.

The most significant exposure to which Congoleum has been named a PRP relates to a recycling facility site in Elkton, Maryland (the "**Galaxy/Spectron Superfund Site**").  The PRP group at this site is made up of 81 companies, substantially all of which are large financially solvent entities.  Two removal actions were substantially complete as of December 31, 1998 and a groundwater treatment system was installed thereafter.  The Environmental Protection Agency ("**EPA**") has selected a remedy for the soil and shallow groundwater ("**Operational Unit 1**" or "**OU-1**"); however, the remedial investigation/feasibility study related to the deep groundwater ("**OU-2**") has not been completed.  The PRP group, of which Congoleum is a part, has entered into a Consent Decree to perform the remedy for OU-1 and resolve natural resource damage claims (the "**Consent Decree**").  The Consent Decree also requires the PRPs to perform the OU-2 remedy, assuming that the estimated cost of the remedy is not more than $10 million. If the estimated cost of the OU-2 remedy is more than $10 million, the PRPs may decline to perform it or they may elect to perform anyway.  Cost estimates for the OU-1 and OU-2 work combined (including natural resource damages) range between $22 million and $34 million, with Congoleum's share ranging between approximately $1.0 million and $1.6 million.  This assumes that all parties participate and that none cash-out and pay a premium; those two factors may account for some fluctuation in Congoleum's share.  Fifty percent (50%) of Congoleum's share of the costs is presently being paid by one of its insurance carriers, Liberty Mutual Insurance Company, whose remaining policy limits for this claim will cover approximately $0.3 million in additional costs.  Congoleum expects to fund the balance to the extent further insurance coverage is not available.  The Debtors filed a motion before the Bankruptcy Court seeking authorization and approval of the Consent Decree and related settlement agreements for the Galaxy/Spectron Superfund Site, as well as authorization for Liberty Mutual Insurance Company and Congoleum to make certain payments that have been invoiced to Congoleum with respect to the Consent Decree and related settlement agreements. The Bankruptcy Court approved the motion by Order dated August 22, 2006.

Congoleum also accrues remediation costs for certain of Congoleum's owned facilities on an undiscounted basis.  Congoleum has entered into an administrative consent order with the New Jersey Department of Environmental Protection and has established a remediation trust fund of $100,000 as financial assurance for certain remediation funding obligations.  Estimated total cleanup costs of $1.6 million, including capital outlays and future maintenance costs for soil and groundwater remediation, are primarily based on engineering studies.

Congoleum anticipates that these matters will be resolved over a period of years and that after application of expected insurance recoveries, funding the costs will not have a material adverse impact on Congoleum's liquidity or financial position.  However, unfavorable developments in these matters could result in significant expenses or judgments that could have a material adverse effect on the financial position of Congoleum.

(b)  **Other Matters Material to the Success of Reorganized Congoleum**

The success of Reorganized Congoleum is dependent upon several factors. One factor is the ongoing contributions of senior management employees to be provided by ABI pursuant to the Intercompany Settlement and New ABI Agreement, as well as certain other employees, both management and in the field. In addition, Reorganized Congoleum's continuing commercial relationships with ABI under the New ABI Agreement, and with Congoleum's existing customer base and suppliers will be important to Reorganized Congoleum's success.

## 4.7.    Debt Financing After Giving Effect to the Plan

(a)    **Exit Facility.** On the Effective Date, the Existing Credit Agreement and debtor-in-possession financing with Wachovia will be repaid and replaced by an Exit Facility, which is expected to have an original principal amount of $30 million and to be secured by substantially all of the assets of the Reorganized Debtors. The performance of Reorganized Congoleum depends in part on Reorganized Congoleum's ability to obtain financing, including the Exit Facility, either from its relationship with Wachovia or from alternative sources during the Reorganization Cases and thereafter. Based on discussions with the Company concerning its previous contacts with lenders and the collateral package the Company is offering, the Plan Proponents would expect the Company to be able to obtain financing for the Exit Facility on reasonable terms, which terms will be set forth in the Exit Facility Commitment Letter or Term Sheet to be filed in the Plan Supplement.

(b)    **New Senior Notes.** The New Senior Notes means the Senior Secured Notes to be issued to holders of Allowed Senior Note Claims by Reorganized Congoleum in the initial aggregate principal amount of $33 million on the Effective Date and which shall be due and payable December 31, 2017. There shall be no interest accruing or due and payable on the principal amount of the New Senior Notes for the first six months after the Effective Date. Thereafter, interest shall accrue on the principal amount of the New Senior Notes at the rate of 9% per annum and be payable semi-annually in cash. At the sole option of Reorganized Congoleum, however, beginning with the interest payment due 12 months after the Effective Date to and including the interest payment due 30 months after the Effective Date (the "**PIK Period**"), interest may be paid in kind by the issuance of additional New Senior Notes in the aggregate amount of the interest then due and payable on each such payment date within the PIK Period. The option shall be separately exercisable with respect to each of the four semi-annual periods within the PIK Period. If Reorganized Congoleum elects to pay interest in kind during any semi-annual period within the PIK Period, interest shall accrue on all the New Senior Notes during such semi-annual period, including any New Senior Notes issued previously in connection with an interest payment in kind, at the rate of 11% per annum; if the Company does not elect the PIK payment option on any interest payment date within the PIK period, interest for such semi-annual period shall be calculated at the rate of 9% per annum on all the New Senior Notes during such semi-annual period, including any New Senior Notes issued previously in connection with an interest payment in kind. After the expiration of the PIK Period, the option to pay interest in kind shall expire, and be of no further force and effect, and all interest shall accrue at 9% per annum, payable semi-annually in cash.

The New Indenture shall contain a provision for the annual issue of additional notes ("**Additional Notes**") as follows: Commencing with the end of the Company's Fiscal Year ending December 31, 2011, the Company shall calculate the average annual Consolidated Cash Flow for each of the prior two Fiscal Years for each of the Company's Fiscal Years ending 2011 through 2016 (each such date, a "**Determination Date**"). The Company shall then calculate an assumed net debt capacity (the "**Net Debt Capacity**") as of each such Determination Date by multiplying the applicable two-year average annual Consolidated Cash Flow by four. The Company shall issue Additional Notes to Holders of Notes on the relevant Regular Record Date to the extent that the Net Debt Capacity as of such Determination Date, plus any Cash Equivalents on the Company's balance sheet (plus any undrawn commitment amount under the Company's then outstanding revolving credit facility to the extent available to be drawn on the Determination Date) as of such Determination Date, exceeds the sum of (i) the amount of the outstanding balance of the Company's then outstanding revolving credit facility (determined as the daily average of such loan for the Fiscal Year ending on such Determination Date, and assuming it was fully drawn to the extent available to be drawn on each day of calculation of such daily average); (ii) the $33.0 million of Initial Notes; (iii) the amount of Additional Notes (excluding interest accretion as provided in the penultimate sentence of this paragraph) issued with respect to all prior Determination Dates; and (iv) the amount of other interest-bearing Indebtedness outstanding as of such Determination Date. The calculation of the amount of Additional Notes to be issued shall take place within three months after each Determination Date, and the issuance of such Additional Notes shall take place on the first Interest Payment Date after such calculation. The Company shall pay interest with such Additional Notes in cash upon issuance of such Additional Notes at a rate of 9% per annum on the principal

amount of such Additional Notes accrued from the first date of the Fiscal Year following the applicable Determination Date if the Company pays interest in cash on the then existing Notes on such issuance date; and if interest on existing Notes on such issuance date is paid in PIK Notes, the principal amount of Additional Notes shall be increased to include the interest accreted from the first date of the Fiscal Year following the applicable Determination Date to the applicable issue date at a rate per annum of 11% on the principal amount of Additional Notes otherwise to be issued not taking into account such accretion.  In no event shall the cumulative amount of Additional Notes issued under the procedures set forth in this paragraph exceed $37.0 million (excluding interest accretion as provided in the penultimate sentence of this paragraph).

Upon a Change of Control (as defined in the New Indenture as are other terms used in this definition of New Senior Notes), the holders of the New Senior Notes may require Reorganized Congoleum to repurchase the New Senior Notes at an offer price in cash equal to 115% of the aggregate principal amount thereof plus accrued and unpaid interest thereon.  Moreover, the New Senior Notes are not optionally redeemable at any time prior to maturity.

The New Senior Notes will be secured by liens or security interests in all the assets of Reorganized Congoleum, which liens or security interests shall be subordinate in priority only to the liens or security interests granted by Reorganized Congoleum under the Exit Facility but shall not otherwise be subordinated to the Exit Facility, and which New Senior Notes liens or security interests shall be *pari passu* with no other security interests or liens.  The New Senior Notes shall be in the form set forth in the New Indenture, which will be filed as part of the Plan Supplement.

## ARTICLE 5
## EVENTS DURING THE REORGANIZATION CASES

**5.1.** <u>**Commencement of the Reorganization Cases**</u>

On December 31, 2003 (the "**Petition Date**"), Congoleum, CSI and CFI each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  Each Debtor was authorized to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On or about January 7, 2004, the Bankruptcy Court entered an order providing for the joint administration of the Reorganization Cases.

**5.2.** <u>**Administration of the Reorganization Cases**</u>

(a)  <u>**Payment of Pre-Petition Debt Incurred in the Ordinary Course of Business**</u>

On January 7, 2004, the Bankruptcy Court entered orders that authorized the Company to pay, in its discretion, all undisputed, unsecured pre-petition indebtedness and obligations (other than the Asbestos Claims, Senior Note Claims and any other indebtedness or liabilities that are impaired and to be restructured under the Plan) which were incurred in the ordinary course of business as such indebtedness and obligations mature in accordance with their terms, and to pay salaries, wages, benefits and other amounts owed to employees and consultants as such obligations become due, including obligations that were, or may have been, incurred prior to the Petition Date.

(b)  <u>**DIP Financing**</u>

In order to fund ongoing business operations and to preserve the value of the Debtors' estates, the Debtors entered into a Ratification and Amendment Agreement (the "**Ratification Agreement**") with Wachovia to ratify and amend the Credit Facility in order to provide the Debtors with debtor-in-possession financing.  The Debtors filed a Motion for Interim and Final Orders Pursuant to Sections 363(c) And 364(c) of the Bankruptcy Code and Bankruptcy Rule 4001 (1) Authorizing the Use of Cash Collateral, (2) Authorizing Debtors to Obtain Interim Post-Petition Financing, (3) Granting Senior Liens and Priority Administrative Expense Status, (4) Modifying the Automatic Stay, (5) Authorizing Debtors to Enter into Agreements with Congress Financial Corporation, and (6) Prescribing Form and Manner of Notice and Time for Final Hearing under Bankruptcy Rule 4001(C) (the "**DIP Motion**").  On March 8, 2004, the Bankruptcy Court entered the DIP Financing Order, a Final Order authorizing the Debtors to obtain debtor-in-possession financing on a final basis, effective as of February 2, 2004.

In summary, Wachovia agreed, subject to the terms of the Ratification Agreement, to make post-petition loans to Congoleum in an aggregate principal amount not to exceed $30 million, including a sublimit of $5 million for letters of credit, subject to certain borrowing base and minimum excess availability restrictions. To secure this indebtedness, Wachovia was granted security interests in all of the collateral subject to security interests in the Credit Facility, all present and future accounts, all present and future acquired Inventory and all documents of title. In addition, the DIP Financing Order provides, *inter alia*, that the obligations of the Debtors under the Ratification Agreement will constitute, in accordance with section 364(c)(1) of the Bankruptcy Code, allowed administrative expense claims against the Debtors in the Reorganization Cases, with such claims having priority over all other administrative expense claims and all unsecured claims of the Debtors then existing or thereafter arising, of any kind or nature whatsoever including, without limitation, all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code. Reference should be made to the DIP Motion (including all exhibits thereto) and the Ratification Agreement, copies of which are on file with the Bankruptcy Court, for more details regarding the terms of the financing.

On November 22, 2004, with the consent of Wachovia, the Debtors filed a motion pursuant to Section 364 of the Bankruptcy Code for an Order Approving Amendment to Post-Petition Financing Agreement, which was granted by the Bankruptcy Court by order dated December 14, 2004. This amendment (i) amended the budget; (ii) extended the term of the existing Credit Facility from December 31, 2004 to June 30, 2005; (iii) placed new limitations on capital expenditures; (iv) provided a new minimum EBITDA covenant and (v) eliminated the minimum tangible net worth requirement. A fee of $150,000 was paid to Wachovia upon approval of this amendment by the Bankruptcy Court.

Numerous non-material amendments to the Ratification Agreement have been agreed to, and notice of such amendments were filed with the Bankruptcy Court. Most recently, on November 3, 2009, the Debtors filed a notice of non-material modification and amendment to the Ratification Agreement. This amendment extended the maturity date to the earlier of (a) June 30, 2010 and (b) the date a plan of reorganization in the Debtors' bankruptcy cases, as confirmed by the District Court, becomes effective. In addition, the amendment provided for a modification of the borrowing base and granted Wachovia first priority liens in certain eligible property. The amendment provided for payment of an amendment fee of $60,000 and a $15,000 monthly fee commencing upon entry of order until termination. Congoleum also sought and obtained an approval order with respect to the amendment.

(c)        **Asbestos Property Damage Claim Bar Date**

At the time the Debtors commenced the Reorganization Cases, no Asbestos Property Damage Claims were being asserted against the Debtors. In order to bind holders of Asbestos Property Damage Claims to the Plan, the Debtors needed to ascertain whether any such claims existed, and if so, give such claimants notice and an opportunity to protect their interests. On January 13, 2004, the Debtors filed the Motion re: for Order (i) Establishing Asbestos Property Damage Claim Bar Date; (ii) Approving Property Damage Proof of Claim Form; and (iii) Approving Scope and Form of Notice (the "**Asbestos Property Damage Claim Bar Date Motion**"). The Bankruptcy Court, on February 2, 2004, entered an Order establishing May 3, 2004 as the deadline by which holders of Asbestos Property Damage Claims were required to assert such claims against the Debtors by the filing of an Asbestos Property Damage Proof of Claim Form or be forever barred from asserting any such claim against the Debtors, the Reorganized Debtors, the Plan Trust and other parties protected by the Bankruptcy Court's Orders or the Plan (the "**Asbestos Property Damage Claim Bar Date Order**").

Because the Debtors were unaware of any holders of Asbestos Property Damage Claims, notice of the Asbestos Property Damage Claim Bar Date was provided by publication in certain national newspapers and newspaper inserts, such as *The New York Times* and *Parade Magazine*, as well as trade publications for certain industries. In response, thirty-six (36) Asbestos Property Damage Proofs of Claim were filed which asserted Asbestos Property Damage Claims of approximately $900,000 in the aggregate. After reviewing the Asbestos Property Damage Claims to ensure that such claims were based upon the existence of Congoleum manufactured asbestos-containing products in the buildings for which claims are asserted as well as to ensure that such claims complied in all other respects with the Asbestos Property Damage Claim Bar Date Order, the Debtors filed objections to certain of the claims. By Order dated January 18, 2005, several Asbestos Property Damage Claims

were expunged. As a result, 19 Allowed Asbestos Property Damage Claims remain, which total approximately $133,000 in the aggregate.

        (d)        **Bondholders' Committee's Motion For Bar Date**

On October 12, 2007, the Bondholders' Committee filed a motion seeking the entry of an order establishing January 8, 2008 as the general bar date by which proofs of claim in these Chapter 11 cases, including proofs of claim arising out of asbestos-related claims for which the Debtors allegedly have legal liability, must be filed against the Debtors, and approving the form and manner of notice of the general bar date. Objections to the motion were filed by the Futures Representative, the Asbestos Claimants' Committee, Century Indemnity Company, and counsel to certain asbestos claimants. The Bankruptcy Court held a hearing on November 5, 2007. On February 4, 2008, the Bankruptcy Court entered a Memorandum Opinion and Order denying the motion. The Bondholders' Committee and various insurers separately filed appeals with respect to the Order denying the motion, which appeals were administratively terminated by orders of the Court. Any party to the case may reopen the case and all appellate rights are preserved.

**5.3.**      **Asbestos Claimants' Committee and Bondholders' Committee**

Section 1102 of the Bankruptcy Code authorizes the appointment of a committee of holders of unsecured claims and such other committees as the United States Trustee or the Bankruptcy Court may determine to appoint. On March 23, 2004, a motion was filed requesting that the United States Trustee appoint an official committee of unsecured asbestos-related personal injury claimants. On April 19, 2004, the Bankruptcy Court entered an order requiring the appointment of the Asbestos Claimants' Committee. On April 21, 2004, the United States Trustee appointed the Asbestos Claimants' Committee, which currently consists of the following members: (i) Frank Cettina, c/o Weitz & Luxenberg, P.C.; (ii) Michael Edwards, c/o Baron & Budd, P.C.; (iii) Gerald and Mae Ferro, c/o Kazan, McClain, Abrams, Fernandez, Lyons & Farrise, a Professional Law Corporation; (iv) Harvey Overman, c/o Motley Rice, LLC; and (v) Lois J. Amati, c/o Robert Taylor, II, PC & Assocs. The Asbestos Claimants' Committee requested and obtained authority to employ the following professionals: (i) Caplin & Drysdale, Chartered as counsel to the Asbestos Claimants' Committee; (ii) Goldstein Lem & Isaacson, P.C., which has now been replaced by Greenbaum, Rowe, Smith & Davis LLP, as co-counsel to the Asbestos Claimants' Committee; (iii) LTC as financial advisors, which has now been replaced by Charter Oak Financial Consultants, LLC; (v) Legal Analysis Systems as an asbestos-related bodily injury consultant; and (vi) Charter Oak Financial Consultants, LLC as financial advisors to replace LTC.

On January 27, 2006, the United States Trustee appointed the Bondholders' Committee consisting of Deutsche Asset Management, Wells Capital Management and HSBC Bank USA, N.A., as Successor Indenture Trustee, to represent the interests of the holders of Senior Note Claims. Wells Capital Management has since resigned from the Bondholders' Committee. As described in Section 6.3(d) – "Treatment of Classified Claims and Interests," the Senior Note Claims are Impaired by the Plan. The Bondholders' Committee requested and obtained authority to employ the following professionals: (i) Akin Gump Strauss Hauer & Feld as co-counsel; (ii) Teich Groh as co-counsel; and (iii) Bates White, LLC as an asbestos-related bodily injury consultant.

On October 8, 2007, the United States Trustee filed a motion seeking the entry of an order appointing an examiner to investigate the conduct of LTC and to determine whether the Debtors or the estates have any causes of action against LTC as a result of allegations that LTC improperly billed the estate for time that it did not work. It is alleged that LTC improperly raised its fees in its filed fee applications causing the estates to pay fees to LTC that were not earned. The Debtors also filed a motion on October 8, 2007, which sought an order requiring LTC (i) to disgorge all the fees and expenses it received in connection with its role as financial advisor to the ACC in these Chapter 11 cases due to LTC's improper conduct relating to its billing practices; (ii) prohibit and enjoin LTC from filing further fee applications for unpaid fees and services in these Chapter 11 cases; and (iii) to reimburse the Debtors' estates for the fees and expenses associated with the investigation of this matter by the Debtors and monitoring of the investigation by other estate professionals. LTC filed for bankruptcy in the United States Bankruptcy Court for the District of Connecticut (the "**Tersigni Bankruptcy proceeding**"). The Bankruptcy Court entered an Order Directing the Appointment of an Examiner to investigate the billing practices and related conduct, including an investigation of any fraud, dishonesty, incompetence, or gross mismanagement of the affairs of LTC by management. On January 14 and 16, 2008, respectively, the United States Trustee and the Debtors each withdrew

their motions pending in the Reorganization cases without prejudice. Congoleum filed a proof of claim in the Tersigni Bankruptcy proceeding for the amount of fees paid to LTC in the Congoleum Chapter 11 case on or about March 10, 2008. On June 9, 2009, the Bankruptcy Court approved a settlement among Congoleum, the Asbestos Claimants' Committee, Nancy Tersigni, the estate of Loreto Tersigni, Elizabeth Tersigni and LTC with respect to the estate's and LTC's claims against one another.

## 5.4. Bankruptcy Court Appointment of Futures Representative

On February 18, 2004, the Bankruptcy Court entered an order approving the appointment of R. Scott Williams (also one of the Plan Proponents) as the Futures Representative (the "**Futures Representative Appointment Order**"). Mr. Williams' qualifications to serve as Futures Representative, and the process by which he was selected, are set forth in Section 3.2 – "Selection of the Futures Representative." Mr. Williams requested and obtained the authority to employ the following professionals: (i) Swidler Berlin LLP (formerly Swidler Berlin Shereff Friedman LLP) as co-counsel to Mr. Williams; (ii) Ravin Greenberg PC as co-counsel to Mr. Williams; and (iii) CIBC World Markets Corp. as financial advisor to Mr. Williams. In March 2006, Swidler Berlin LLP withdrew as co-counsel to Mr. Williams and Mr. Williams requested and obtained the authority to retain Orrick, Herrington & Sutcliffe LLP as co-counsel to Mr. Williams. In March 2006, CIBC World Markets Corp. also withdrew as financial advisor to Mr. Williams and Mr. Williams requested and obtained authority to retain Piper Jaffray & Co. as financial advisor to Mr. Williams. On November 5, 2007, the Bankruptcy Court approved the retention of Hamilton, Rabinovitz & Associates, Inc. to serve as an asbestos-related bodily injury consultant to Mr. Williams.

On February 27, 2004, certain insurers of the Debtors appealed the Futures Representative Appointment Order. On August 9, 2004, the District Court entered an order affirming the Futures Representative Appointment Order. On September 8, 2004, the appellants appealed the District Court's order to the United States Court of Appeals for the Third Circuit (the "**Court of Appeals**"). By order dated February 23, 2005, with the agreement of the parties, the Court of Appeals dismissed the appeal.

## 5.5. Retention of Professionals

The Debtors requested and obtained the authority to employ the following professionals: (i) Saul Ewing LLP ("**Saul Ewing**") as counsel to the Debtors; (ii) Gilbert Heintz & Randolph LLP ("**GHR**") as special insurance counsel to the Debtors; (iii) Dughi & Hewit PC (formerly, Dughi Hewit & Palatucci PC) as special insurance counsel to the Debtors; (iv) SSG Capital Advisors, L.P. as financial advisors to the Debtors; (v) Ernst & Young LLP as audit and tax advisors to the Debtors; (vi) Guiliani Capital Advisors LLC (formerly Ernst & Young Corporate Finance LLC) as restructuring advisor to the Debtors; (vii) Peterson Risk Consulting as insurance allocation consultant to the Debtors; (viii) Daley-Hodkin, LLC as appraiser; (ix) Logan & Co., Inc. as official claims, balloting and noticing agent; (x) FTI Consulting as trial support service provider; (xi) Ritchie & Associates as consultants; and (xii) Gelber Organization, LLC as tax consultants.

Certain of the Debtors' insurers appealed the Bankruptcy Court's Orders authorizing the retention of Saul Ewing and GHR. On August 26, 2004 the District Court vacated the Bankruptcy Court's order authorizing the retention of Saul Ewing and remanded the matter to the Bankruptcy Court for further fact finding. A stay of this Order was subsequently entered by the District Court pending an appeal by the Debtors. On September 24, 2004, the Debtors appealed the District Court's order to the Court of Appeals.

While the Debtors and Saul Ewing denied all allegations raised by the insurers challenging Saul Ewing's retention, they decided that further contesting those allegations could entail enduring a costly and potentially distracting appellate process. Saul Ewing, in consultation with and consent of the Debtors, concluded that it should withdraw as the Debtors' counsel in order to avoid any potential distraction to the Debtors' reorganization efforts and potential additional cost to the Debtors' estates. On October 18, 2004, the Bankruptcy Court approved Saul Ewing's withdrawal as counsel to the Debtors and established a transition period during which Saul Ewing would complete certain work for the Debtors. The Debtors requested and obtained the authority to employ Pillsbury Winthrop Shaw Pittman LLP (formerly Pillsbury Winthrop LLP) and Okin, Hollander & DeLuca, LLP as substitute co-counsel to the Debtors.

On August 9, 2004, the District Court affirmed the Bankruptcy Court's Order authorizing the retention of GHR. On September 8, 2004, the appellants appealed the District Court's order to the Court of Appeals.

On October 13, 2005, the Court of Appeals determined that GHR had not obtained effective waivers of certain conflicts of interest, issued a decision disqualifying GHR as counsel to the Debtors (the "**Disqualification Decision**") and remanded the matter to the District Court for further proceedings consistent with its opinion. On December 6, 2005, the Bankruptcy Court entered an Order authorizing the retention of Covington & Burling to represent the Debtors as co-counsel with Dughi & Hewit in the insurance coverage litigation and with respect to insurance settlement matters previously handled by GHR.

As a result of the Disqualification Decision, by motion dated October 28, 2005, GHR sought an order authorizing the withdrawal of GHR as special counsel to the Debtors (the "**Withdrawal Motion**"). In response, certain insurers filed a Cross-Motion For Disgorgement of Fees (the "**Cross-Motion**"), which was contained in the certain insurers' objection to the Withdrawal Motion. The Cross-Motion was joined, in whole or in part, by several other insurers, the Bondholders' Committee and the Office of the United States Trustee. The Debtors sought mediation with respect to, *inter alia*, the Cross-Motion.

The Bankruptcy Court held a hearing on the Cross-Motion on February 6, 2006 and issued an oral decision granting the Cross-Motion on February 7, 2006 (the "**GHR Disgorgement Decision**"). The Bankruptcy Court denied the Withdrawal Motion as moot at a hearing held on March 6, 2006. On February 27, 2006, the Bankruptcy Court stated that it would grant the Motion of United States Trustee for an Order Compelling Disgorgement of Funds Received by Gilbert Heintz & Randolph based on the identical reasoning contained in the GHR Disgorgement Decision. Accordingly, on March 27, 2006, the Bankruptcy Court entered an Order (the "**Disgorgement Order**") compelling GHR to disgorge all fees and expenses paid to it in connection with GHR's First through Sixth Fee Applications, such amounts totaling $9,662,486.71 and denying GHR's request for $3,312,151.53 in connection with its Seventh and Eighth Fee Applications. GHR appealed the Disgorgement Order to the District Court. GHR's request for a stay of the Disgorgement Order pending appeal was denied by the Bankruptcy Court by Order, dated April 27, 2006. On April 28, 2006, GHR filed an Emergency Motion for a stay of the Disgorgement Order pending appeal with the District Court, which was denied by the District Court on May 15, 2006. On May 12, 2006, GHR filed an application with the Bankruptcy Court seeking reimbursement of $1,459,150.55 in expenses (the "**GHR Expense Application**"), which would have been setoff against the $9,662,486.71 ordered to be disgorged pursuant to the Disgorgement Order. On May 26, 2006, the Debtors filed a Cross-Motion to the GHR Expense Application seeking entry of judgment with respect to the Disgorgement Order and authorization to register the judgment in the districts where GHR maintains its assets. On July 27, 2006, the Debtors advised the Bankruptcy Court that the Debtors and the Bondholders' Committee had reached an agreement in principle with GHR, subject to documentation, settling GHR's liability under the Disgorgement Order. The Debtors and GHR subsequently entered into and agreed to the certain Stipulation and Consent Order Resolving Dispute Regarding GHR Disgorgement Order (the "**Stipulation and Consent Order**") under which GHR was to pay Congoleum over time approximately $9.2 million plus interest. The Stipulation and Consent Order was supported by the Bondholders' Committee and the Futures Representative. On October 12, 2006, the Debtors filed a motion for an order pursuant to 11 U.S.C. § 105 and Federal Rule of Bankruptcy Procedure 9019 approving the Stipulation and Consent Order. On April 4, 2007, the Bankruptcy Court held a hearing on the motion for approval of the Stipulation and Consent Order, which motion was granted orally, and an order was entered on April 5, 2007. In April 2008, GHR paid Congoleum cash in full satisfaction of the outstanding settlement amount.

On or about February 19, 2004, the Debtors filed an application to retain The Kenesis Group LLC to perform post-petition services. On April 5, 2004, the Bankruptcy Court denied Kenesis' retention application. On December 8, 2005, certain insurers filed a Motion Seeking Disgorgement of Fees by Kenesis and Authority to Commence an Avoidance Action against Kenesis (the "**Kenesis Disgorgement Motion**") with the Bankruptcy Court. On February 6, 2006, the United States Trustee filed a separate Motion For Disgorgement of Fees by Kenesis and on February 8, 2006, the Debtors filed a Cross-Motion with respect to the Kenesis Disgorgement Motion. The Debtors' Cross-Motion sought disgorgement of fees for services rendered by Kenesis after the Petition Date.

A hearing on the Kenesis Disgorgement Motion and the Debtors' Cross-Motion was held on February 14, 2006 at which the Bankruptcy Court rendered its decision (the "**Kenesis Decision**"). By the Kenesis

Decision, the Bankruptcy Court granted, in part, the Debtors' Cross-Motion and the Kenesis Disgorgement Motion by ordering Kenesis to disgorge all fees related to services performed after the Petition Date. Kenesis was specifically ordered to disgorge the sum of $181,000, and the Debtors were directed to investigate whether additional disgorgement or fee recovery is appropriate under various legal theories. The Bankruptcy Court denied the Kenesis Disgorgement Motion to the extent that it sought disgorgement of fees for services rendered pre-Petition Date and denied the certain insurers' derivative standing to commence an avoidance action against Kenesis. In February 2006, Kenesis paid the Debtors $181,000 on account of the Kenesis Decision.

On March 9, 2006, certain insurers filed a cross-motion to appoint an independent examiner for the GHR matters (the "**Examiner Cross-Motion**"). On April 3, 2006, the Bondholders' Committee filed a Motion for Entry of an Order Granting Leave, Standing and Authority to Prosecute Certain Causes of Actions on Behalf of the Estates Against Gilbert Heintz & Randolph, LLP (the "**Bondholders' Standing Motion**"). In response to the Bondholders' Standing Motion, by Order, dated April 20, 2006, the Bankruptcy Court granted the Bondholders' Committee standing on behalf of the Debtors to investigate and prosecute malpractice claims against GHR and further granted the Bondholders' Committee standing on behalf of the Debtors to investigate and pursue claims against Kenesis. Accordingly, the Debtors are no longer investigating potential additional claims against Kenesis, but have cooperated with the Bondholders' Committee in its investigation and prosecution of claims on the Debtors' behalf. The Bankruptcy Court denied the Examiner Cross-Motion and certain insurers have appealed the order (the "**Examiner Appeal**"). On July 13, 2006, the Debtors filed a motion to dismiss the Examiner Appeal. On July 17, 2006, the Bondholders' Committee filed a motion to dismiss the Examiner Appeal. By Stipulation, dated September 27, 2006, the parties agreed to extend the time to respond to the motion to dismiss to no later than October 30, 2006. By Order dated November 17, 2006, with the agreement of the Debtors, certain insurers, and the Bondholders' Committee, the District Court administratively terminated the Examiner Appeal.

The Debtors, the Bondholders' Committee (on behalf of the estates) and Gilbert LLP (formerly known as Gilbert Oshinsky, LLP, Gilbert Randolph LLP and Gilbert Heintz & Randolph LLP) have entered into several tolling agreements with respect to such malpractice claims and the present tolling agreement continues until June 30, 2010, unless earlier terminated by act of the parties. The Debtors and the Bondholders' Committee filed an adversary proceeding against Kenesis in December 2006 to which Michael Rooney was later joined as a defendant. Subsequently, the Debtors and the Bondholders' Committee (on behalf of the estates) entered into a tolling agreement with Kenesis and Rooney with respect to certain claims, and the present tolling agreement expires on December 31, 2010, unless earlier terminated by act of the parties.

## 5.6.    Developments with Regard to Certain Pre-Petition Claims

On February 28, 2005, the Debtors filed the Objection to Asbestos Personal Injury Claims of Certain Pre-Petition Settled Claimants (First Set) (the "**Claims Objection**") seeking the disallowance and expungement of the Asbestos Personal Injury Claims of certain of the claimants that participated in the Claimant Agreement. The Claims Objection asserted that certain of such claims were potentially invalid because they may have been barred by the statutes of limitations and therefore may not have been filed in good faith. Certain of the claims were withdrawn, and other claimants did not respond. By the Order Concerning Debtors' Objection to Asbestos Personal Injury Claims of Certain Pre-Petition Settled Claimants (First Set), dated April 5, 2005 and the Consent Order Withdrawing Motion Without Prejudice, dated April 27, 2005, the Bankruptcy Court disallowed approximately 580 claims totaling approximately $4.3 million.

On September 20, 2005, the Bankruptcy Court entered a Consent Order between the Debtors and Campbell Cherry in which Campbell Cherry agreed on behalf of certain of its clients to withdraw certain claims that had previously been approved under the Claimant Agreement and to forbear from exercising all rights under the Claimant Agreement with respect to such claims. The Consent Order related to claims with an approximate dollar value of $6.5 million.

On May 2, 2007, the Debtors filed an objection to certain claims pursuant to section 502 of the Bankruptcy Code seeking to disallow and expunge certain pre-petition settlement claimants represented by Campbell Cherry, which the Debtors assert are invalid settled claims because of a failure of one of the conditions for an eligible, qualified claim under the Claimant Agreement. On November 27, 2007, the Bankruptcy Court held a hearing and denied the Debtors' objection.

### 5.7. Developments With Regard to Certain Proofs of Claim

(a) **Wausau**

On or about October 5, 2006, Employers Insurance Company of Wausau f/k/a Employers Insurance of Wausau, a Mutual Company ("**Wausau**") submitted a proof of claim against the Debtors for an unspecified amount. In its proof of claim, Wausau contends that it is entitled to (1) reimbursement for alleged overpayment of indemnity limits, (2) reimbursement of defense cost overpayments on its primary policies, (3) reimbursement for 87% of defense costs paid by Liberty Mutual Insurance Company, and (4) reimbursement for interest attributable to premature payments to the Debtors. On March 27, 2007, the Debtors filed an objection to Wausau's proof of claim. On November 13, 2007, the Bankruptcy Court entered an Amended Joint Scheduling Order regarding Wausau's proof of claim, which set deadlines for completing discovery and filing dispositive motions. Congoleum and Wausau resolved Wausau's proof of claim pursuant to a Stipulation Regarding Settlement of Proof of Claim of Wausau dated as of March 19, 2008.

(b) **Kaplan Storage Company**

On October 3, 2006, Kaplan Storage Company ("**Kaplan**") filed a request for payment of administrative expense in the Debtors' bankruptcy case in the amount of $107,550.62. On March 19, 2007, Kaplan filed an amended request for payment of administrative expense in the amount of $170,020.03. The Debtors' contend that the amount requested in that proof of claim was actually $202,486.61 because Kaplan improperly retained a security deposit paid by the Debtors and deducted it from its claim. By its proof of claim, Kaplan sought payment for certain unbilled charged under a certain lease agreement entered into between Kaplan and the Debtors. On June 25, 2007, the Debtors filed an objection to Kaplan's proof of claim. The Bankruptcy Court held a hearing on the Debtors' objection on November 19, 2007. On December 3, 2007, the Bankruptcy Court entered an order providing that Kaplan (1) has an allowed administrative claim against the Debtors' estates in the amount of $45,860.88 which shall be paid by the Debtors within thirty days from the date of the order, (2) has an allowed non-priority general unsecured claim against the Debtors' estates in the amount of $54,611.70, and (3) is permitted to apply the security deposit held in the amount of $32,466.58 to the general unsecured claim leaving an allowed non-priority general unsecured claim in the amount of $22,145.12.

### 5.8. Vendor Tolling Agreements

On August 10, 2005, the Debtors filed a motion for the entry of an order authorizing and approving the form of tolling agreement ("**Vendor Tolling Agreement**") to be entered into between the Debtors and (i) certain individual directors and officers of the Debtors; (ii) related companies to the Debtors; (iii) professionals employed by the Debtors; and (iv) certain vendors, creditors and other parties that received transfers during the ninety days preceding the Petition Date with an aggregate value of $100,000.00 or greater, pursuant to Bankruptcy Code sections 105(a) and 546(a). The agreements tolled the expiration of the time established by Bankruptcy Code § 546(a) to bring causes of action under Bankruptcy Code §§ 544, 545, 547, 548, 549 or 553 until December 31, 2006. The Bankruptcy Court entered an order on September 8, 2005 granting the motion.

Among others, the Debtors obtained signed tolling agreements from Congoleum Corporation, Congoleum Sales, Inc. and Congoleum Fiscal, Inc. in their corporate capacities (and not as debtors-in-possession); Richard and Roger Marcus; Howard N. Feist, III, Cyril C. Baldwin, Jr., John N. Irwin III, Mark N. Kaplan, Mark S. Newman, and C. Barnwell Straut; American Biltrite, Inc.; Skadden, Arps, Slate, Meagher & Flom; Gilbert, Heintz & Randolph; Dughi Hewit; and Kenesis Group LLC.

The Debtors did not obtain signed tolling agreements from the following entities: Motley Rice, LLC; Weitz & Luxenberg P.C.; Ernst & Young LLP; Liberty Mutual Insurance Group; Eastman Chemical Company; and Neville Chemical Company. The Debtors have named Motley Rice, LLC and Weitz & Luxenberg P.C. as defendants in the Omnibus Avoidance Action, which is discussed, in detail, in Section 5.9 below. Ernst & Young LLP was previously released from its avoidance action liability, and therefore, the Debtors did not seek a tolling agreement from this entity. The Debtors investigated their potential claims against Liberty Mutual Insurance Group, Eastman Chemical Company, and Neville Chemical Company before the expiration of the § 546(a) deadline and determined that the commencement of avoidance actions against these entities was not appropriate.

On September 19, 2006, the Debtors filed a second motion for the entry of an order authorizing and approving a form of amended tolling agreement (the "**Amended Tolling Agreement**") to be entered into between the Debtors and those individuals, related companies, professionals employed by the Debtors, and vendors and creditors who previously executed Vendor Tolling Agreements.  This motion was granted by the Bankruptcy Court by order dated October 17, 2006.  The Amended Tolling Agreements further toll the expiration of the time established by Bankruptcy Code § 546(a) to bring causes of action under Bankruptcy Code §§ 544, 545, 547, 548, 549 or 553 until December 31, 2007.

On September 10, 2007, the Debtors filed a third motion for the entry of an order authorizing and approving a form of amended tolling agreement (the "**Second Amended Tolling Agreement**") to be entered into between the Debtors and those individuals, related companies, professionals employed by the Debtors, and vendors and creditors who previously executed Vendor Tolling Agreements and Amended Tolling Agreements.  This motion was granted by the Bankruptcy Court by order dated October 1, 2007.  The Second Amended Tolling Agreements further toll the expiration of the time established by Bankruptcy Code § 546(a) to bring causes of action under Bankruptcy Code §§ 544, 545, 547, 548, 549 or 553 until December 31, 2008.

On September 29, 2008, the Debtors filed a third motion for the entry of an order authorizing and approving a form of amended tolling agreement (the "**Third Amended Tolling Agreement**") to be entered into between the Debtors and those individuals, related companies, professionals employed by the Debtors, and vendors and creditors who previously executed Vendor Tolling Agreements and Amended Tolling Agreements.  This motion was granted by the Bankruptcy Court by order dated October 20, 2008.  The Third Amended Tolling Agreement further tolls the expiration of the time established by Bankruptcy Code § 546(a) to bring causes of action under Bankruptcy Code §§ 544, 545, 547, 548, 549 or 553 until December 31, 2009.

On October 2, 2009, the Debtors filed a fourth motion for the entry of an order authorizing and approving a form of amended tolling agreement (the "**Fourth Amended Tolling Agreement**") to be entered into between the Debtors and those individuals, related companies, professionals employed by the Debtors, and vendors and creditors who previously executed Vendor Tolling Agreements and Amended Tolling Agreements.  On October 27, 2009, the District Court granted the motion.  The Fourth Amended Tolling Agreement will further toll the expiration of the time established by Bankruptcy Code § 546(a) to bring causes of action under Bankruptcy Code §§ 544, 545, 547, 548, 549 or 553 until December 31, 2010.

**5.9.    Asbestos Personal Injury Claims - Related Avoidance Actions**

(a)    **Congoleum Corporation v. Arthur J. Pergament, *et al.*, Adv. Proc. No. 05-06245 (KCF)**

On December 3, 2005, the Debtors commenced the Omnibus Avoidance Action by filing in the Bankruptcy Court a Complaint to Avoid Pre-Petition Liens, to Avoid and Recover Preferential Transfers of Property and Fraudulent Transfers of Property Pursuant to 11 U.S.C. §§ 544, 547, 548, 549 and 550, and to Disallow Claims Pursuant to 11 U.S.C. § 502(d) against (a) Arthur J. Pergament, in his capacity as Collateral Trustee; (b) Joseph F. Rice and the law firm of Motley Rice LLC; (c) Perry Weitz and the law firm of Weitz & Luxenberg, P.C.; and (d) those holders of Secured Asbestos Claims that did not voluntarily execute an Asbestos Personal Injury Claim Tolling Agreement.

The Debtors commenced the Omnibus Avoidance Action for the purpose of (i) avoiding and recovering certain preferential transfers of property made to the Asbestos Claimants named as defendants; (ii) avoiding and recovering certain fraudulent transfers of property made to the Asbestos Claimants named as defendants; (iii) avoiding and/or determining the validity, priority, or extent of certain pre-petition liens granted to secure the claims of the Asbestos Claimants named as defendants; and (iv) preserving, for the benefit of the Debtors' estates and the Plan Trustee, the claims alleged therein.  The Omnibus Avoidance Action also seeks to avoid and recover certain preferential and/or fraudulent transfers of property made to Joseph Rice and/or Motley Rice, and to avoid and recover certain preferential and/or fraudulent transfers of property made to Perry Weitz and/or Weitz & Luxenberg.

An amended complaint was filed on December 30, 2005, providing additional factual background, clarifying certain language, and including an additional prayer for relief relating to payments made to Asbestos

Claimants named as defendants pursuant to Pre-Petition Settlement Agreements. The amended complaint also corrects an error listing certain Asbestos Claimants named therein under multiple law firms, and removes as defendants certain Asbestos Claimants that executed tolling agreements after the filing of the original complaint.

On December 8, 2005, the Debtors filed a Notice of Plaintiff Congoleum Corporation's Motion Establishing Case Management Procedures and Establishing Briefing and Discovery Schedules, seeking an order with respect to organizing the phases of the action. At a hearing on December 28, 2005, the Bankruptcy Court approved, over certain objections, a case management order for the Omnibus Avoidance Action agreed upon by the Debtors and counsel for certain of the defendants. Pursuant to the case management order, the Omnibus Avoidance Action is divided into three stages. The first stage of the Omnibus Avoidance Action focused on the avoidance of certain of the rights under the Claimant Agreement and other pre-petition settlements as preferential pre-petition and/or unauthorized post-petition transfers of the Debtors in property pursuant to Bankruptcy Code §§ 547 and 549. The second stage of the Omnibus Avoidance Action focused on (i) the avoidance and recovery of certain fraudulent transfers of property made to the Asbestos Claimants named as defendants pursuant to Bankruptcy Code § 548 and applicable state law, and (ii) avoiding and/or determining the validity, priority, or extent of the rights under the Claimant Agreement and other pre-petition settlements granted to secure the claims of all of the Asbestos Claimants named as defendants under Bankruptcy Code § 544. The third stage of the Omnibus Avoidance Action was to focus on the avoidance and recovery of certain preferential and fraudulent transfers of property made to Joseph Rice and/or Motley Rice and Perry Weitz and/or Weitz & Luxenberg pursuant to Bankruptcy Code §§ 547, 548, and 550 and applicable state law, and any additional claims that the Debtors may assert.

On March 16, 2006, the Debtors filed a motion for summary judgment with respect to the issues in Counts I and II of the amended complaint. The motion for summary judgment sought the avoidance of liens and security interests granted to the Asbestos Claimants named as defendants and the allowance of liquidated settlement amounts with respect to these claims during the ninety days before the Petition Date as voidable preferential transfers. The motion also sought the avoidance of liens and security interests granted to the Asbestos Claimants named as defendants and the allowance of liquidated settlement amounts with respect to these claims after the Petition Date, as voidable post-petition transfers.

On March 29, 2006, the Bondholders' Committee filed a motion to intervene in the Omnibus Avoidance Action, which the Bankruptcy Court granted pursuant to an order entered on April 25, 2006. On April 13, 2006, the Futures Representative filed a motion to intervene in the Omnibus Avoidance Action, which the Bankruptcy Court granted pursuant to an order entered on May 9, 2006.

On May 8, 2006, the Bankruptcy Court held a hearing and heard argument from the Debtors, the defendants, the Bondholders' Committee, and the Futures Representative on the defendants' motion for more definite statement and the Debtors' motion for summary judgment. On June 19, 2006, the Bankruptcy Court issued an opinion denying the Debtors' summary judgment motion, and granting summary judgment on Counts I and II in favor of all of the defendants in the Omnibus Adversary Proceeding. The Bankruptcy Court held that the Security Agreement granted a security interest to the Collateral Trustee, not to the individual claimants, but that nothing in the Security Agreement made the grant of the security interest contingent on compliance with the terms of the Claimant Agreement. The Bankruptcy Court further found that the claimants gave value to support the Collateral Trustee's security interest at the time the Claimant Agreement was signed on April 10, 2003, by agreeing to submit their claims for settlement and to enter into a 150-day litigation moratorium. As a result, the Bankruptcy Court held that for the purposes of Bankruptcy Code §§ 547 and 549, the date of the transfer to the Collateral Trustee was June 11, 2003, when the parties signed the Security Agreement, which was before the commencement of the Preference Period and before the Petition Date. The Bankruptcy Court further held that when the claimants' documentation was approved, they did not receive a transfer of a security interest from the Debtors, but rather became beneficiaries of the security interest granted to the Collateral Trustee. An order denying the Debtors' summary judgment motion and granting summary judgment in favor of the defendants on Counts I and II of the amended complaint was entered by the Bankruptcy Court on July 31, 2006.

On April 16, 2007, the Debtors filed a second Motion for Summary Judgment on the Omnibus Avoidance Action seeking to void the security interests and liens securing pre-petition settlements with certain Asbestos Claimants (the "**Summary Judgment Motion**").

On June 7, 2007, the Debtors also filed their Omnibus Objection to Settled Asbestos Personal Injury Claims of all Qualified Pre-Petition Settlement Claimants (Class 2 Claimants) and all Qualified Participating Claimants (Class 3 Claimants) (ECF Doc. #5563) (the "**Omnibus Claims Objection**"), requesting (i) that the Claims settled under the Claimant Agreement or other pre-petition settlement agreements be disallowed and expunged, or (ii) in the alternative, rescinding the Pre-Petition Settlement Agreements, Claimant Agreement, Security Agreement and Collateral Trust Agreement, disallowing and expunging the claims without prejudice and restoring the parties thereto to *status quo ante*.

On July 27, 2007, the Bankruptcy Court issued two decisions regarding the legal status of the settled Claims: the first with respect to the Omnibus Claims Objection (the "**Omnibus Claims Objection Opinion**") and the second with respect to the Summary Judgment Motion (the "**Summary Judgment Opinion**"). Regarding the Omnibus Claims Objection, the Bankruptcy Court held that the relief requested in the Omnibus Claims Objection should be heard in the context of an adversary proceeding in order to ensure that the Bankruptcy Court has jurisdiction over all the affected Claimants and that their due process rights are otherwise protected. The Bankruptcy Court also reiterated and expanded on its view that all the Asbestos Personal Injury Claims, unless they had obtained a final judgment as to liability and damages, are similarly situated and must receive similar treatment in any section 524(g) reorganization plan. On August 14, 2007, the Debtors filed a motion to amend the existing Omnibus Adversary Proceeding along with a proposed amended complaint to assert as causes of action the objections contained in the Omnibus Claims Objection consistent with the Bankruptcy Court's July 27, 2007 Omnibus Claims Objection Opinion.

In its July 27, 2007 Summary Judgment Opinion, the Bankruptcy Court ruled that the security interests in insurance that were granted to the settled Claimants pre-bankruptcy were ineffective and unenforceable against Congoleum's insurance policies or the proceeds of those policies because the attempts to create a security interest were outside the scope of Article 9 of the Uniform Commercial Code; nor could such security interests be considered to be a common law pledge. The Bankruptcy Court therefore granted summary judgment in Congoleum's favor on Counts V and VI of the Omnibus Avoidance Action, which counts sought to void the security interests and liens securing the pre-petition settlements of Asbestos Claims.

On August 14, 2007, the Debtors filed a motion seeking leave to amend the Omnibus Avoidance Action to include additional counts reflective of the relief sought in the Omnibus Claims Objection (the "**Third Amended Complaint**"). On September 4, 2007, the Bankruptcy Court held a hearing on the motion, which was granted. Certain defendants filed answers and counterclaims to the Third Amended Complaint.

On September 17, 2007, First State Insurance Company and Twin City Fire Insurance Company filed a motion to intervene with respect to counts 17, 18, 19 and 20 of the Third Amended Complaint. On October 2, 2007, the Debtors and certain defendants each filed oppositions to the motion to intervene. On October 9, 2007, the Bankruptcy Court held a hearing on the motion, which was denied and an order was entered on October 10, 2007.

On October 9, 2007, the Debtors and Bondholders' Committee filed an application for entries of default judgment against certain defendants for their failure to plead or otherwise defend with respect to the Third Amended Complaint. On October 17, 2007, the Bankruptcy Court entered a default judgment against certain defendants. On November 1, 2007, certain defendants filed motions to vacate the default judgments entered against them because they alleged that such default judgments were entered in error. The motions to vacate the default judgments were granted by the Bankruptcy Court on November 27, 2007. On November 16, 2007, certain other defendants filed a motion to vacate the default judgments entered against them alleging that they are not proper parties to the Omnibus Avoidance Action in the first instance because they did not participate in the Claimant Agreement or the Pre-Petition Settlement Agreements. On December 11, 2007, the court entered a stipulation and order vacating default and default judgment with respect to those certain other defendants.

On November 1, 2007, the Asbestos Claimants' Committee filed a motion to intervene in the Omnibus Avoidance Action. On December 11, 2007, the Bankruptcy Court entered an order approving a stipulation and agreement between the Debtors and the Asbestos Claimants' Committee, which provides, among other things, that the Asbestos Claimants' Committee agrees to withdraw its motion to intervene without prejudice and that it will

have the right to appear and be heard in the Omnibus Avoidance Action regarding any issue that it deems relevant to the rights of its general unsecured asbestos claimant constituency.

On October 12, 2007, the Debtors filed a third motion for summary judgment on the Omnibus Avoidance Action seeking to disallow and expunge with prejudice all claims settled under the Pre-Petition Settlement Agreements and the Claimant Agreement, or alternatively to disallow the asbestos claims settled pursuant to those agreements under the doctrines of legal frustration or equitable disallowance. Objections to the third motion for summary judgment were filed by certain defendants. The Bankruptcy Court held a hearing on the third motion for summary judgment on November 5, 2007 and reserved decision. On December 28, 2007, the Bankruptcy Court denied the third motion for summary judgment and entered an order denying the motion on January 24, 2008. On February 1 and 4, 2008, the Bondholders' Committee and the Debtors, respectively, each filed a notice of appeal to the District Court from the Bankruptcy Court's January 24, 2008 order denying the third motion for summary judgment.

Pursuant to the Omnibus Claimant Settlement and as incorporated in the February 2008 Joint Plan, with respect to any appeal by the Debtors, Bondholders' Committee and/or Futures Representative of the Bankruptcy Court's summary judgment order dated January 24, 2008 (concerning Counts XVII, XVIII, XIX, and XX in the Omnibus Avoidance Action), the asbestos defendants therein consent to a stay of such appeal until sixty (60) days after the Effective Date, but otherwise do not waive any rights with regard thereto, and such appeal shall be terminated within sixty (60) days following the Effective Date. In this regard, if the Debtors, Bondholders' Committee and/or Futures Representative appeal such order, then the defendants in the Omnibus Avoidance Action have stated their intent to cross-appeal the Bankruptcy Court's order dated August 27, 2007 (concerning Counts V and VI of the Omnibus Avoidance Action).

Most of the defendants in the Omnibus Avoidance Action and Sealed Avoidance Action have agreed to a Litigation Settlement Agreement, as amended, with Congoleum compromising and settling those avoidance actions. The Litigation Settlement Agreement, as amended, is more fully described in Sections 5.16 and 8.31 hereof.

After the Litigation Settlement Agreement was filed with the Bankruptcy Court, certain asbestos claimants represented by David C. Thompson, P.C. (the "**Thompson Firm**") and by the Boechler Law Firm (the "**Boechler Firm**") filed an objection to the Litigation Settlement Agreement stating, among other things, that fourteen of their clients who had been identified on the exhibit lists to the Litigation Settlement Agreement were not parties to the Avoidance Actions (collectively, the "**Thompson Claimants**"). Upon investigation, the Debtors determined that the fourteen of the Thompson Claimants had been omitted inadvertently and had not been named as defendants to the Avoidance Actions. On December 9, 2008, the Debtors and the Bondholders' Committee (the "**Plaintiffs**") filed a Joint Motion for Leave to File Amended Complaints in the Avoidance Actions (the **"Motion to Amend"**). In the Motion to Amend, the Plaintiffs sought leave, *inter alia*, (i) to add the Thompson Claimants as defendants in the Avoidance Actions and to have the amendment relate back to the filing of the original complaints to ensure that every Pre-Petition Settled Claimant is a party to the Avoidance Actions, and (ii) to update the client lists submitted by various law firms representing certain of the other defendants in the case. On January 20, 2009, the Bankruptcy Court permitted the Debtors to amend other exhibits to the complaints in the Avoidance Actions, but denied the motion in part, holding that Plaintiffs could not amend the complaints in the Avoidance Actions to add the fourteen Thompson Claimants who had been omitted from the prior complaints and that any such amendment could not relate back to the date of the filing of the original complaints. The Debtors and the Bondholders' Committee filed a joint motion for reconsideration on January 30, 2009 (the "**Reconsideration Motion**"), and the Thompson Firm filed opposing papers on February 17, 2009. The Reconsideration Motion was fully briefed in February 2009.

In light of the then-pending summary judgment briefing with respect to the Debtors' Amended Joint Plan and, ultimately, the Bankruptcy Court's order dated February 26, 2009 dismissing the Debtors' Chapter 11 cases, the Reconsideration Motion was not decided and remained pending. On March 31, 2009, the Bankruptcy Court *sua sponte* entered a notice that the Reconsideration Motion had been "adjourned without date pending appeal," referring to the Debtors' appeal of the Bankruptcy Court's dismissal and summary judgment orders. On August 17, 2009, the District Court entered an order affirming, in part, and reversing, in part, the Bankruptcy Court. On August 27, 2009, the District Court withdrew the reference with respect to the Debtors' Chapter 11 Cases.

On December 9, 2009, the Debtors sent a letter to the District Court requesting that the District Court hear and determine the Reconsideration Motion. On January 21, 2010, the District Court entered an order granting the Reconsideration Motion and authorizing the Plaintiffs to amend the complaints to add the Thompson Claimants to the Avoidance Actions, and to have such amendment relate back to the original filing (the "**Order to Amend**"). Pursuant to the Order to Amend, the Plaintiffs filed a Fifth Amended Complaint in the Omnibus Avoidance Action and Second Amended Sealed Complaint in the Sealed Avoidance Action on February 9, 2010. Pursuant to an order entered by the Bankruptcy Court on October 31, 2008 approving the Litigation Settlement Agreement, the Omnibus Avoidance Action has been stayed (the "**Stay Order**"). The Stay Order remains in place and no party was required to file an answer. The Thompson Firm filed an answer to the Fifth Amended Complaint in the Omnibus Avoidance Action on March 4, 2010. In accordance with the Stay Order, the Debtors do not intend to proceed with the Avoidance Actions at this time.

(b) **Congoleum Corporation v. Arthur J. Pergament, *et al.*, Adv. Proc. No. 05-06461 (KCF)**

On December 30, 2005, the Debtors commenced the Sealed Avoidance Action by filing under seal a Complaint to Avoid and Recover Fraudulent Transfers of Property Pursuant to 11 U.S.C. §§ 544, 548, 550, the Uniform Fraudulent Transfer Act and Applicable State Law against (a) Arthur J. Pergament, in his capacity as Collateral Trustee; and (b) all holders of Secured Asbestos Claims, including those who voluntarily executed an Asbestos Personal Injury Claim Tolling Agreement. The Sealed Avoidance Action has been assigned Adversary Proceeding No. 05-06461 (KCF).

The Debtors commenced the Sealed Avoidance Action for the purpose of (i) avoiding and recovering pursuant to Bankruptcy Code §§ 548(a)(i)(A) and 550(a) transfers of property made to the Asbestos Claimants and (ii) avoiding and recovering pursuant to Bankruptcy Code §§ 544(b) and 550(a), the Uniform Fraudulent Transfer Act, and applicable state law transfers of property made to the Asbestos Claimants. The Sealed Avoidance Action was also commenced for the purpose of preserving, for the benefit of the Debtors' estates and the Plan Trustee, the claims alleged therein.

The Sealed Avoidance Action was also commenced as a separate adversary proceeding in order to resolve a motion to intervene filed by Continental Casualty Company and Continental Insurance Company (and joined by Century Indemnity Company, ACE American Insurance, ACE Property and Casualty Insurance Company) in the Omnibus Avoidance Action. As set forth in the Bankruptcy Court's Stipulation and Order Relating to Preservation of Certain Claims of the Debtor-in-Possession and CNA's Motion to Intervene and Century's Joinder to Such Motion (entered in the Omnibus Avoidance Action on December 28, 2005), the Debtors have not sought issuance of any summonses in the Sealed Avoidance Action and the Bankruptcy Court will not require issuance of a summons in the Sealed Avoidance Action until further order of the Bankruptcy Court. The Sealed Avoidance Action also has been stayed and all deadlines tolled until further order.

On April 13, 2006, Continental Casualty Company and Continental Insurance Company filed a motion to unseal the Sealed Avoidance Action, to which the Debtors filed an objection on May 1, 2006. The Debtors resolved the motion with Continental Casualty Company and Continental Insurance Company without holding a hearing, and the motion was withdrawn on May 18, 2006.

On July 21, 2006, the Bondholders' Committee filed a Motion to Intervene pursuant to 11 U.S.C. § 1109(b) and Bankruptcy Rule 7024(a) in the Sealed Avoidance Action (the "**Bondholders' Intervention Motion**"). On August 14, 2006, the Bankruptcy Court granted the Bondholders' Intervention Motion.

**5.10.** **Settlements with Insurers and Brokers**

(a) **Liberty Mutual Settlement Agreement**

On June 24, 2004, the Debtors filed a motion for approval of a settlement agreement with Liberty Mutual Insurance Company ("**Liberty**"), which provided primary liability insurance coverage to Congoleum including coverage for asbestos-related claims (the "**Liberty Settlement**"). On July 29, 2004, the Bankruptcy Court

entered an order approving the Liberty Settlement. Pursuant to the Liberty Settlement, Liberty paid $14,450,000 ("**Liberty Proceeds**") to the Debtors' Estates. Upon the confirmation order becoming a Final Order, Liberty agreed to contribute an additional $950,000 for the benefit of the Plan Trust. In exchange, the Debtors agreed, among other things, to designate Liberty as a Settling Asbestos Insurance Company, thereby entitling Liberty to the benefit of certain injunctions under their Plan pursuant to sections 105(a) and 524(g) of the Bankruptcy Code. Reference should be made to the Liberty Settlement, which is attached as an exhibit to the motion seeking approval of the Liberty Settlement and which is on file with the Bankruptcy Court for more details regarding the terms of the Liberty Settlement.

Pursuant to an order dated July 18, 2005, the Bankruptcy Court ordered the release of $6,091,247.31 from the Liberty Proceeds to the Debtors consistent with the Liberty Settlement, the Security Agreement and the Fifth Modified Plan. In accordance with an order dated September 28, 2006, the Bankruptcy Court ordered the release of $3,683,782.00 from the Liberty Proceeds to the Debtors consistent with the Liberty Settlement and the Security Agreement.

(b)     **Marsh and Aon Settlements**

On September 28, 2004, the Debtors filed motions for the approval of settlement agreements with Marsh USA, Inc. *et al.* ("**Marsh**") and Aon Corporation *et al.* ("**Aon**"), both of which provided insurance brokerage services to Congoleum with respect to certain of the policies issued to Congoleum that provide coverage for Asbestos Personal Injury Claims (respectively, the "**Marsh Settlement**" and the "**Aon Settlement**"). On October 18, 2004, the Bankruptcy Court approved the Marsh and Aon Settlements. In summary, the Marsh and Aon Settlements provides that Marsh and Aon will contribute $40,000 and $75,000, respectively, for the benefit of the Debtors' Estates. Reference should be made to the Marsh Settlement and the Aon Settlement, which are attached as exhibits to the motions seeking approval of the Marsh and Aon Settlements and which are on file with the Bankruptcy Court for more details regarding the terms of those settlements.

(c)     **AIG Settlement**

On May 13, 2005, the Debtors filed a Motion Pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Section 363 Approving Insurance Settlement Agreement with Certain AIG Companies ("**AIG**") (the "**AIG Settlement**"). On June 28, 2005, the Bankruptcy Court approved the AIG Settlement. AIG provided excess liability insurance coverage to Congoleum for asbestos-related claims. Under the terms of the settlement, AIG will pay $103 million over ten years to the Plan Trust. In exchange, the Debtors agreed, among other things, to designate AIG as a Settling Asbestos Insurance Company, thereby entitling AIG to the benefit of certain injunctions under their Plan pursuant to sections 105(a) and 524(g) of the Bankruptcy Code. The settlement resolves coverage obligations of policies with a total of $114 million in liability limits for asbestos bodily injury claims, and is subject to final approval and effectiveness of a plan that contains a Bankruptcy Code § 524(g) injunction. Reference should be made to the AIG Settlement, which is attached as an exhibit to the motion seeking approval of the AIG Settlement and which is on file with the Bankruptcy Court for more details regarding the terms of the AIG Settlement. An insurer appealed the approval order granted by the Bankruptcy Court to the District Court. The District Court, however, entered an Order on September 8, 2006 that administratively terminated the appeal. AIG has recently reserved the right to argue that a plan, if confirmed, could lead to the possibility that the AIG Settlement may be declared void; for its part, Congoleum has reserved its rights to oppose any such argument. The AIG Settlement further provides that any party may declare that the agreement is null and void if the Confirmation Order fails to become a Final Order by May 10, 2007. Congoleum advised AIG that it understood that AIG may claim the right to declare the AIG Settlement null and void. Further discussions about the AIG Settlement have taken place since 2007, and the Futures Representative and Asbestos Claimants' Committee have been involved in those discussions. On February 8, 2010, the Chartis Companies (formerly known as AIG) notified Congoleum that they were declaring the AIG Settlement null and void. Discussions with the Chartis Companies are continuing.

(d)     **Lloyd's and Equitas Settlement**

On June 27, 2005, the Debtors filed a Motion Pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Section 363 Approving Insurance Settlement Agreement with Certain Underwriters at Lloyd's, London ("**Lloyd's Underwriters**") (the "**Lloyd's Settlement**"). On August 11, 2005, the Bankruptcy Court approved the

Lloyd's Settlement. Lloyd's Underwriters severally subscribed to certain policies of insurance under which Congoleum is an insured (the "**London Policies**"). Under the terms of the settlement, Lloyd's Underwriters paid into escrow a total of $19.950 million. Lloyd's Underwriters and Equitas Limited, Equitas Reinsurance Limited, Equitas Holdings Limited, Equitas Management Services Limited, and Equitas Policyholders Trust Limited (collectively, "**Equitas**"), solely in their capacity as Lloyd's Underwriters' reinsurer and run-off agent, will be designated as Settling Asbestos Insurance Companies, thereby entitling Lloyd's Underwriters and Equitas to certain injunctions under the Debtors' plan pursuant to sections 105(a) and 524(g) of the Bankruptcy Code. The settlement is subject to the effectiveness of a plan that contains the Section 524(g) injunction specified in the Lloyd's Settlement. On November 12, 2007, the Debtors filed a motion seeking Bankruptcy Court approval of an amendment to the Lloyd's Settlement, which, among other things, removes the temporal condition to termination of the agreement by any party in exchange for revised terms relating to disposition of interest and earnings that have accrued and will continue to accrue on the $19.950 million settlement amount being held in an escrow account. On December 3, 2007, the Bankruptcy Court entered an order approving the amendment.

(e)      **Federal Settlement Agreement**

On August 4, 2005, the Debtors filed a Motion for Order Pursuant to Bankruptcy Rule 9019 Approving Insurance Settlement Agreement with Federal Insurance Company ("**Federal**") (the "**Federal Settlement**"). On October 11, 2005, the Bankruptcy Court approved the Federal Settlement. Federal provided certain liability insurance coverage to Congoleum for asbestos-related claims. Under the terms of the Federal Settlement, Federal will pay $4 million to the Plan Trust once a plan of reorganization with the Section 524(g) protection specified in the Federal Settlement agreement goes effective. In exchange, the Debtors agreed, among other things, to designate Federal as a Settling Asbestos Insurance Company, thereby entitling Federal to the benefit of certain injunctions under their plan pursuant to sections 105(a) and 524(g) of the Bankruptcy Code. The Federal Settlement contains a downward adjustment mechanism which will permit Federal to pay a settlement amount less than $4 million if certain market conditions occur. The purpose of the downward adjustment mechanism is to equalize the settlement percentage of Federal's settlement amount to the settlement percentages of other high level excess insurers that are similarly situated to Federal in these bankruptcy cases.

The Futures Representative appealed the approval order granted by the Bankruptcy Court to the District Court. The Debtors, Federal and the Futures Representative entered into negotiations in an effort to resolve the Futures Representative's objection to approval of the Federal Settlement. The parties were successful in that effort and on February 14, 2007, the Debtors filed a Motion for Order Pursuant to Bankruptcy Rule 9019 Approving the Amendment to the Settlement Agreement and Release By, Between and Among Congoleum Corporation, the Plan Trust, and Federal Insurance Company. On March 12, 2007, the Bankruptcy Court approved the amendment to the Federal Settlement (the "**Amended Federal Settlement**"). The Amended Federal Settlement did not include the downward adjustment mechanism, and the original settlement amount of $4 million was adjusted such that Federal will pay $2.1 million to the Plan Trust. Such payment will be made within thirty days of the order approving the Amended Federal Settlement becoming a Final Order, the occurrence of the effective date of the Debtors' plan, the confirmation order becoming a Final Order and Federal being designated as a Settling Asbestos Insurance Company.

On March 12, 2010, the Debtors intend to file a motion with the District Court to approve a further amendment to the Federal Settlement (the "**Second Amended Federal Settlement**"). The Second Amended Federal Settlement preserves the economic terms of the Amended Federal Settlement that were previously approved by the Bankruptcy Court; eliminates the Amended Federal Settlement's sunset provision, which would otherwise have allowed parties to terminate the agreement if a plan of reorganization was not confirmed by a specified date; and restructures the Amended Federal Settlement as a buyback of insurance policies pursuant to section 363 of the Bankruptcy Code. The Debtors intend to request that the approval motion be heard on April 5, 2010.

(f)      **The Mt. McKinley and Everest Settlement**

On October 6, 2005, the Debtors filed a Motion for Order Pursuant to Bankruptcy Rule 9019 Authorizing and Approving Insurance Settlement Agreement Among Debtors, Plan Trust, Mt. McKinley Insurance Company ("**Mt. McKinley**")and Everest Reinsurance Company ("**Everest**") (the "**Mt. McKinley and Everest Settlement**"). Under the terms of the Mt. McKinley and Everest Settlement, Mt. McKinley and Everest paid $21.5 million into an escrow account. In exchange, the Debtors agreed, among other things, to designate Mt. McKinley

and Everest as Settling Asbestos Insurance Companies, thereby entitling Mt. McKinley and Everest to the benefit of certain injunctions under their plan pursuant to sections 105(a) and 524(g) of the Bankruptcy Code. The Bankruptcy Court approved the Mt. McKinley and Everest Settlement on November 18, 2005. The Mt. McKinley and Everest Settlement is subject to the effectiveness of a plan of reorganization that contains a Bankruptcy Code § 524(g) injunction. The Futures Representative appealed the approval order granted by the Bankruptcy Court to the District Court. On June 15, 2007, the District Court entered a Stipulated Order withdrawing the appeal of the Futures Representative with respect to approval of the Mt. McKinley and Everest Settlement.

On January 18, 2008, the Debtors and Mt. McKinley and Everest, with the consent of the Asbestos Claimants' Committee and the Futures Representative, entered in to an Amended and Restated Settlement Agreement and Release (the "**Amended Mt. McKinley and Everest Settlement**"), which amends, among other things, the Mt. McKinley and Everest Settlement by (i) eliminating the sunset provision pursuant to which the Debtors and Mt. McKinley and Everest, in certain circumstances, may terminate the Mt. McKinley and Everest Settlement, (ii) causing the Escrow Agent (as defined in the Amended Mt. McKinley and Everest Settlement) to pay Mt. McKinley and Everest all interest and other income earned in the Escrow Agreement (as defined in the Amended Mt. McKinley and Everest Settlement), net of all applicable fees, taxes and expenses; (iii) restructuring the Mt. McKinley and Everest Settlement as a sale and buyback of the Subject Policies (as defined in the Amended Mt. McKinley and Everest Settlement) pursuant to section 363(f) of the Bankruptcy Code, supplemented by a section 105 injunction; (iv) eliminating the condition precedent of the Confirmation Order (as defined in the Mt. McKinley and Everest Settlement); and (v) modifying the terms of the Mt. McKinley and Everest Settlement as further set forth in the Amended Mt. McKinley and Everest Settlement. The Amended Mt. McKinley and Everest Settlement is not dependent on a section 524 plan of reorganization. On January 28, 2008, the Debtors filed a motion in the Bankruptcy Court seeking entry of an order approving the Amended Mt. McKinley and Everest Settlement. The Bankruptcy Court approved the Amended Mt. McKinley and Everest Settlement in February 2008.

(g)     **The Harper Settlement**

On March 8, 2005, the Debtors filed a Motion for Order Pursuant to Bankruptcy Rule 9019 Authorizing and Approving Insurance Settlement Agreement With Harper Insurance Limited, Formerly Known as Turegum Insurance Company (the "**Harper Settlement**"). On April 4, 2006, the Bankruptcy Court approved the Harper Settlement. Under the terms of the Harper Settlement, Harper Insurance Limited ("**Harper**") has agreed to pay the total amount of $1,375,000 to the Plan Trust within three business days of the Debtors notifying Harper of the order approving the Harper settlement becoming a Final Order, the confirmation order becoming a Final Order and a plan containing a Bankruptcy Code § 524(g) injunction having become effective. In exchange, the Debtors agreed, among other things, to obtain, for the benefit of Harper, an injunction pursuant to section 524(g) of the Bankruptcy Code. Reference should be made to the Harper Settlement, which is attached as an exhibit to the motion seeking approval of the Harper Settlement and which is on file with the Bankruptcy Court for more details regarding the terms of the Harper Settlement.

(h)     **The St. Paul Travelers Settlement and Buyback Agreement**

On May 3, 2006, the Debtors filed a Motion For Order Authorizing and Approving the Settlement and Policy Buyback Agreement and Release Among the Congoleum Entities, the Plan Trust, the ABI Entities and the St. Paul Travelers Entities and Sale of Subject Policies Pursuant to Sections 105, 363, 1107 and 1108 of the Bankruptcy Code and Rules 2002, 6004, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (the "**St. Paul Travelers Settlement and Buyback Agreement**"). The St. Paul Travelers Entities allegedly issued certain policies of insurance under which Congoleum is an insured. Under the terms of the settlement, a total of $25 million was to be paid in two installments to the Plan Trust, or as otherwise ordered by the Bankruptcy Court, within 13 months of the occurrence of certain events, including confirmation of a plan of reorganization for the Debtors containing a section 524(g) plan trust and channeling injunction for Asbestos Claims. In exchange, the Debtors agreed, among other things, to designate the St. Paul Travelers Entities as Settling Asbestos Insurance Companies, thereby entitling the St. Paul Travelers Entities to the benefit of certain injunctions under their plan pursuant to sections 105(a) and 524(g) of the Bankruptcy Code.

The Futures Representative filed an objection to the St. Paul Travelers Settlement and Buyback Agreement, and a hearing to consider approval of the settlement was held on April 12, 2007. On May 11, 2007, the

Bankruptcy Court denied the Debtors' motion to approve the St. Paul Travelers Settlement and Buyback Agreement. The Debtors and the St. Paul Travelers Entities appealed the Bankruptcy Court's decision to the District Court. On March 25, 2008, the District Court issued a decision remanding the matter to the Bankruptcy Court for further consideration of the settlement.

Subsequently, the Debtors, ABI and the St. Paul Travelers Entities entered into a certain letter agreement dated January 28, 2010 confirming that the terms of the St. Paul Travelers Settlement and Buyback Agreement remain in full force and effect as of the original date and conforming certain definitions and provisions to reflect recent events in the Reorganization Cases (the "**Amended St. Paul Travelers Settlement and Buyback Agreement**"). The basic structure and economics remained the same as set forth in the St. Paul Travelers Settlement and Buyback Agreement. On January 28, 2010, Congoleum filed a motion seeking approval of the Amended St. Paul Travelers Settlement and Buyback Agreement. The Futures Representative filed a response stating that he did not support the settlement and reserving all of his rights. A hearing was held in the District Court on February 19, 2010. At that hearing, the Futures Representative raised his objections to the settlement, which objections were considered and overruled by the District Court. The Amended St. Paul Travelers Settlement and Buyback Agreement is subject to the effectiveness of a plan that contains a Bankruptcy Code § 524(g) injunction. Reference should be made to the Amended St. Paul Travelers Settlement and Buyback Agreement, which is attached to the motion seeking approval of the settlement and which is on file with the District Court.

On February 19, 2010, the District Court entered an order approving the Amended St. Paul Travelers Settlement and Buyback Agreement. Unless there is an appeal, such order will become a final order as of March 24, 2010.

(i)    **The Fireman's Fund Settlement**

On May 8, 2006, the Debtors filed their Motion for Order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363(f) Authorizing and Approving Settlement Agreement between Congoleum Corporation and Fireman's Fund Insurance Company (the "**Fireman's Fund Settlement**"). On September 25, 2006, the Bankruptcy Court approved the Fireman's Fund Settlement. Fireman's Fund Insurance Company ("**Fireman's Fund**") issued an insurance policy (the "**Subject Policy**") under which Congoleum is an insured. Under the terms of the settlement, Fireman's Fund will pay to Congoleum, or as otherwise directed by the Plan or the Confirmation Order, a total of $1 million within three (3) business days following the date that the Confirmation Order becomes a Final Order. In exchange, the Debtors will designate Fireman's Fund as Settling Asbestos Insurance Company thereby entitling Fireman's Fund to the benefit of certain injunctions under their plan pursuant to sections 105(a) and 524(g) of the Bankruptcy Code. The settlement resolves coverage obligations under the Subject Policy of all asbestos-related claims. The Fireman's Fund Settlement is subject to final approval and effectiveness of a plan that contains a Bankruptcy Code § 524(g) injunction. Reference should be made to the Fireman's Fund Settlement, which is attached as an exhibit to the motion seeking approval of the Fireman's Fund Settlement and which is on file with the Bankruptcy Court for more details regarding the terms of the Fireman's Fund Settlement.

(j)    **The Century Settlement**

Over an objection by Munich Reinsurance America, Inc., f/k/a American Re-Insurance Company, and Mutual Marine Office, Inc., as managing general agent and attorney-in-fact for Employers Mutual Casualty Company (collectively, the **"Objecting Insurers"**), on September 20, 2006, the Bankruptcy Court entered an Order granting the Debtors' Motion for Order Pursuant to Sections 105, 363, 1107 and 1108 of the Bankruptcy Code and Rules 2002, 6004, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (i) Authorizing Debtor to Enter into a Settlement and Compromise of Certain Claims, (ii) Approving Sale of Certain Insurance Policies Free and Clear of Liens, Claims, Interests and Other Encumbrances, and (iii) Approving the Settlement and Buyback Agreement and Releases by and between the "Congoleum Entities" and the Century Entities (defined below) (the "**Century Settlement and Buyback Agreement**") following a hearing on September 11, 2006. Under the terms of the settlement, certain alleged claims against the Debtors (including any claim for substantial contribution) will be released by Century and a total of $16.95 million will be paid to the Plan Trust, or as otherwise ordered, within three years of the occurrence of certain events, including confirmation of a plan of reorganization for the Debtors containing a section 524(g) plan trust and channeling injunction for asbestos claims. In exchange, the Debtors agreed, among other things, to designate Century Indemnity Company, individually and as successor to CCI

Insurance Company, as successor to Insurance Company of North America and various affiliated described companies as more fully described in the Century Settlement and Buyback Agreement (the "**Century Entities**") as Settling Asbestos Insurance Companies, thereby entitling the Century Entities to the benefit of certain injunctions under their plan pursuant to sections 105(a) and 524(g) of the Bankruptcy Code. The Debtors also agreed that the Reorganized Debtors will not in any way voluntarily assist any person or entity in the establishment of any right, action, cause of action or claim against the Century Entities in any way relating to any asbestos claim or other claim released under the Century Settlement and Buyback Agreement.

The Century Settlement and Buyback Agreement resolves coverage obligations under certain policies of insurance under which Congoleum is an insured with respect to both asbestos and non-asbestos claims. The Century Settlement and Buyback Agreement is subject to, among other conditions, final approval and the effectiveness of a plan that contains a Bankruptcy Code § 524(g) injunction. Reference should be made to the terms of the Century Settlement and Buyback Agreement, which is attached as an exhibit to the motion seeking approval of the Century Settlement and Buyback Agreement and which is on file with the Bankruptcy Court for more details on the Century Settlement and Buyback Agreement.

The Objecting Insurers appealed the Bankruptcy Court's order approving the Century Settlement and Buyback Agreement. On December 6, 2006, the District Court entered a stipulation and settlement among the Objecting Insurers, the Debtors, and Century, which resolved the appeal.

On February 18, 2010, the Debtors and Century entered into a stipulation providing that the terms of the Century Settlement remain in full force and effect and providing for certain amendments. The stipulation was so ordered by the District Court on February 19, 2010.

(k)     **The Protective Settlement**

In February 2008, Congoleum entered into a settlement agreement with Protective National Insurance, which insurer is presently in liquidation. Under the terms of this settlement, Congoleum will receive an allowed claim in the amount of $3 million to be paid over time at the payment percentage in such liquidation proceedings. The settlement was approved by the Bankruptcy Court.

(l)     **The Multi-Insurer Settlement**

On January 28, 2010, the Debtors filed a motion for approval of settlement agreements among (i) the Debtors; (ii) certain Participating Insurers (as defined below), the New Jersey Property-Liability Insurance Guaranty Association ("**NJPLIGA**"), and the New Jersey Surplus Lines Insurance Guaranty Fund ("**NJSLIGF**"); (iii) the Asbestos Claimants' Committee; and (iv) the Claimants' Representative (the "**Multi-Insurer Settlement Agreements**"). Each settlement agreement was also consented to by the Futures Representative and ABI.

The following insurers participated in the Multi-Insurer Settlement Agreements (the "**Participating Insurers**") for their respective share of the $100 million aggregate settlement amount: (i) First State Insurance Company ("**First State**") and Twin City Fire Insurance Company ("**Twin City**" and together with First State, "**Hartford Parties**") for $16,500,000; (ii) Continental Casualty Company ("**Continental Casualty**") and The Continental Insurance Company ("**Continental Insurance**," and together with Continental Casualty, "**CNA**") for $16,500,000; (iii) Nationwide Indemnity Company acting on behalf of Employers Insurance Company of Wausau, f/k/a Employers Insurance of Wausau, A Mutual Company and/or f/k/a Employers Mutual Liability Insurance Company of Wisconsin ("**Wausau**") for $11,500,000; (iv) OneBeacon America Insurance Company f/k/a Employers Commercial Union Insurance Company ("**OneBeacon**") for $10,242,733; (v) Munich Reinsurance America, Inc., f/k/a American Re-Insurance Company ("**Munich Re**") for $8,212,800; (vi) Mutual Marine Office, Inc., as managing general agent and attorney-in-fact for Employers Mutual Casualty Company ("**MMO**") for $7,330,750; (vii) TIG Insurance Company as Successor-By-Mergers to International Surplus Lines Insurance Company ("**TIG**") for $4,849,800; (viii) Certain London Market Insurance Companies ("**London**"), each for its several, allocated share of $4,127,050; (ix) Westport Insurance Corporation, as successor in interest to Puritan Insurance Company ("**Westport**") for $2,988,350; (x) Old Republic Insurance Company ("**Old Republic**") for $1,991,250; (xi) Transport Insurance Company ("**Transport**") for $1,373,508; (xii) Stonewall Insurance Company ("**Stonewall**") for $883,759; (xiii) Colonia Insurance Company, United Reinsurance Corporation of New York and

Navigators Insurance Company (collectively, "**Navigators**") for $400,000; (xiv) United States Fire Insurance Company ("**U.S. Fire**") for $50,000; and (xv) American Centennial Insurance Company ("**American Centennial**") for $50,000.  In addition to the above, NJPLIGA and NJSLIGF settled for a total amount of $13 million.

The settlements with the Participating Insurers are structured as "sale and buyback" agreements whereby, upon payment of the respective settlement amounts, the Debtors will sell the relevant insurance policies back to the relevant insurer free and clear of all claims, liens, encumbrances or interests of any other person or entity pursuant to sections 363(b) and (f) of the Bankruptcy Code, supplemented by a injunction pursuant to section 105 of the Bankruptcy Code.  The effect of this "policy buyback" is to fully and finally extinguish and exhaust all rights, duties, limits and coverage under the relevant policies as if they were never issued.  The settlement with NJPLIGA and NJSLIGF is not structured as a sale and buyback agreement; rather, it is structured as a compromise of the various claims of the Debtors and NJPLIGA and NJSLIGF maintain against one another.

Pursuant to the Multi-Insurer Settlement Agreements, each Participating Insurer and NJPLIGA and NJSLIGF shall make payment of its respective settlement amount within thirty days of the later of (i) the date the District Court order approving its Multi-Insurer Settlement Agreement becomes a Final Order or (ii) the date the order confirming a Chapter 11 plan of reorganization containing a § 524(g) injunction becomes a Final Order. CNA, Munich Re and MMO will pay their respective Settlement Amounts in two parts.  They will pay 50% of their respective settlement amounts within thirty days of the later of (i) the date the District Court order approving its Multi-Insurer Settlement Agreement becomes a Final Order or (ii) the date the order confirming a Chapter 11 plan of reorganization containing a § 524(g) injunction becomes a Final Order.  The balance of those respective settlement amounts shall be paid on or before January 20 of the calendar year immediately following the year in which the first payment was made.

In exchange for such settlement agreements, the Debtors agreed, among other things, to designate each Participating Insurer and NJPLIGA and NJSLIGF as a Settling Asbestos Insurance Company, thereby entitling the Participating Insurers and NJPLIGA and NJSLIGF to the benefit of certain injunctions under their Plan pursuant to sections 105(a) and 524(g) of the Bankruptcy Code.

On February 19, 2010, the District Court entered orders approving the Multi-Insurer Settlement Agreements.  Unless there is an appeal, such orders will become final orders as of March 24, 2010.

      (m)     **The Seaton Settlement**

On January 29, 2010, the Debtors filed a motion for approval of a settlement agreement between the Debtors and Seaton Insurance Company ("**Seaton**") (the "**Seaton Settlement**").  Pursuant to the Seaton Settlement, Seaton paid to the Debtors on behalf of the Plan Trust a total of $2,075,000.00 within five business days of executing the settlement in full and final accord and satisfaction of all disputes between the parties, including all disputes with respect to these Chapter 11 proceedings and the Coverage Action.  This settlement amount, however, shall be held by the Debtors until the earlier of confirmation of a plan of reorganization or the dismissal or conversation of these Chapter 11 cases, and will only be available for the payment of asbestos personal injury claims.

The Seaton Settlement is structured as a "sale and buyback" agreement whereby, upon approval of the settlement and payment of the settlement amount, the Debtors will sell the relevant insurance policy back to Seaton free and clear of all claims, liens, encumbrances or interests of any other person or entity pursuant to sections 363(b) and (f) of the Bankruptcy Code, supplemented by a injunction pursuant to section 105 of the Bankruptcy Code.  In exchange for the settlement amount, the Debtors agreed, among other things, to designate Seaton as a Settling Asbestos Insurance Company, thereby entitling Seaton to the benefit of certain injunctions under their Plan pursuant to sections 105(a) and 524(g) of the Bankruptcy Code.

On February 19, 2010, the District Court entered an order approving the Seaton Settlement. Unless there is an appeal, such order will become a final order as of March 24, 2010.  Seaton has paid the settlement amount to Congoleum.

**5.11.**    **Fourth Modified Plan and Subsequent Changes**

On November 12, 2004, the Debtors filed the Fourth Modified Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of Congoleum Corporation, *et al.* (the "**Fourth Modified Plan**"). The Futures Representative supported confirmation of the Fourth Modified Plan.

In January 2005, the Debtors commenced a solicitation with respect to the Fourth Modified Plan. Votes were solicited from holders of impaired Claims and Interests. Based on the votes received for the solicitation, the Fourth Modified Plan was overwhelmingly supported by a majority of the Debtors' creditors, including the holders of Asbestos Personal Injury Claims.

In April 2005, while the parties were preparing for a contested confirmation hearing on the Fourth Modified Plan, the Debtors met with the Asbestos Claimants' Committee, the Futures Representative and the Claimants' Representative to discuss further modifications to the Fourth Modified Plan to eliminate or minimize certain objections to the Plan. These discussions led to an agreement in principle that holders of Secured Asbestos Claims would permanently forbear from enforcing their lien and/or security interest claims in and to the Plan Trust Assets and such creditors would share *pro rata* with holders of Unsecured Asbestos Personal Injury Claims and Demands from a single, common fund to be held in the Plan Trust.

In July 2005, Congoleum filed an amended plan of reorganization (the "**Sixth Modified Plan**") and related documents with the Bankruptcy Court which reflected the result of these negotiations, as well as other technical modifications. The Futures Representative supported confirmation of the Sixth Modified Plan. The Bankruptcy Court approved the disclosure statement and voting procedures and Congoleum commenced solicitation of acceptances of the Sixth Modified Plan in August 2005. In September 2005, the Debtors learned that certain Claimants holding Asbestos Secured Claims represented by the Weitz & Luxenburg firm no longer supported the Sixth Modified Plan. The Debtors' attempts to negotiate a consensual resolution of the Weitz Claimants' objections proved to be unsuccessful, and on December 13, 2005, the Debtors withdrew the Sixth Modified Plan. Thereafter, the Debtors continued to have contacts and discussions with representatives of the Asbestos Claimants' Committee, the Futures Representative, certain of the insurers, and representatives of the new Bondholders' Committee concerning the elements of a Seventh and Eighth Modified Plan.

On February 3, 2006, the Debtors filed the Seventh Modified Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of Congoleum Corporation, *et al.* (the "**Seventh Modified Plan**"). The Futures Representative did not support approval of the Seventh Modified Plan. As a result of subsequent negotiations with the Asbestos Claimants' Committee and the Bondholders' Committee, on March 17, 2006, the Debtors filed the Eighth Modified Plan. The Futures Representative did not support approval of the Eighth Modified Plan.

**5.12.    Expiration of Debtors' Exclusivity to File a Plan and Solicit Acceptances Thereof and the Filing of Competing Plans**

The Bankruptcy Court had approved several extensions of exclusivity for the Debtors to file a plan and solicit acceptances thereof. On November 9, 2005, the Bankruptcy Court denied the Debtors' motion to extend the periods during which the Debtors had the exclusive right to file a plan and solicit acceptances thereof under section 1121(d) of the Bankruptcy Code (the "**Exclusive Periods**"), thus terminating the Debtors' exclusive right to file a plan of reorganization. As a result of this ruling, on December 2, 2005, Continental Casualty Company and Continental Insurance Company ("**CNA**") filed a Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code for Congoleum Corporation, Congoleum Sales, Inc. and Congoleum Fiscal, Inc.

On February 3, 2006, the Bondholders' Committee filed a Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code for Congoleum Corporation, Congoleum Sales, Inc. and Congoleum Fiscal, Inc. (the "**Bondholders' Plan**"). The Bondholders' Committee subsequently withdrew the Bondholders' Plan.

On August 18, 2006, CNA and the Bondholders' Committee jointly filed a Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code for Congoleum Corporation, Congoleum Sales, Inc. and Congoleum Fiscal, Inc. (the "**CNA/Bondholder Plan**"), which was subsequently withdrawn when the Bondholders' Committee reached agreement with the Debtors.

**5.13.    Mediation and the Consensual Ninth, Tenth and Eleventh Modified Plans**

By the Bankruptcy Court's Order for Mediation, dated May 30, 2006, and with the agreement of the parties with an interest in the resolution of the Debtors' bankruptcy cases and/or the Coverage Litigation, including the non-settling insurance companies, the Asbestos Claimants' Committee, the Futures Representative, the Bondholders' Committee, the Claimants' Representative, ABI and the Debtors, the Bankruptcy Court ordered the mediation (the "**Mediation**") of all issues in the Debtors' bankruptcy cases before the honorable Mark B. Epstein and the honorable Judith H. Wizmur, Chief Judge of the United States Bankruptcy Court for the District of New Jersey. The Mediation, which commenced on June 8, 2006, has continued, both formally and informally, since that time.

On September 11, 2006, the Bankruptcy Court entered an Amended Pre-Trial Order, pursuant to which the Debtors filed the Tenth Modified Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of Congoleum Corporation, *et al.*, and The Asbestos Claimants' Committee, Dated As Of September 15, 2006 (the "**Tenth Modified Plan**") and a related disclosure statement (the "**Tenth Disclosure Statement**") on September 15, 2006. The Tenth Modified Plan was supported by the Bondholders' Committee. Pursuant to the same order, CNA filed its Second Modified Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code for Congoleum Corporation, Congoleum Sales, Inc. and Congoleum Fiscal, Inc. (the "**Second CNA Plan**"). The Amended Pre-Trial Order also established a briefing schedule for the filing and consideration of motions for summary judgment as to whether any of the pending plans were confirmable as a matter of law and objections to disclosure statements.

On October 10, 2006, the Debtors and the Asbestos Claimants' Committee filed a joint summary judgment motion, including a supporting statement of material facts, regarding the confirmability of the Second CNA Plan. In addition to addressing the terms of the Second CNA Plan, the Debtors' and Asbestos Claimants' Committee requested the reinstatement of the Debtors' exclusive rights to file and solicit a plan of reorganization. On October 10, 2006, each of (i) CNA and (ii) First State Insurance Company and Twin City Fire Insurance Company (collectively, "**First State**") filed motions for summary judgment requesting the denial of confirmation of the Tenth Modified Plan.

On October 23, 2006, the Debtor filed the Eleventh Modified Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of Congoleum Corporation, *et al.*, and The Asbestos Claimants' Committee, Dated As Of October 23, 2006 (the "**Eleventh Modified Plan**").

On October 26, 2006, the Bankruptcy Court held a hearing on the summary judgment motions and the adequacy of the disclosure statements filed with respect to the Tenth Modified Plan and the Second CNA Plan. The Bankruptcy Court provisionally approved the disclosure statements filed with respect to the Tenth Modified Plan and the Second CNA Plan pending its decision on the summary judgment motions.

On February 1, 2007, the Bankruptcy Court granted summary judgment in part and denied it in part with respect to First State's motion regarding the Tenth Modified Plan, ruling that the Tenth Modified Plan was not confirmable as a matter of law. The Bankruptcy Court denied summary judgment on the issue of the feasibility of the Second CNA Plan and declined to reinstate the Debtors' exclusivity period.

On February 9, 2007, the Debtors, joined by the Asbestos Claimants' Committee, filed a notice of appeal and a motion for leave to appeal from the Bankruptcy Court's summary judgment decision granting in part and denying in part First State's motion regarding the Tenth Modified Plan. In October 2007, the Debtors advised the Asbestos Claimants' Committee that they were no longer pursuing the appeal. On November 8, 2007, the District Court entered an order administratively terminating the appeal.

## 5.14. Futures Representative's Plan

On July 3, 2007, the Futures Representative filed a plan and supplemental disclosure statement with the Bankruptcy Court. Certain objections were filed in response thereto on behalf of the Debtors, the Bondholders' Committee, the Asbestos Claimants' Committee and ABI. In addition, in response to the Futures Representative's July 3, 2007 filing, certain insurers filed reservations of rights to object to confirmation of the Plan.

On August 30, 2007, the Bankruptcy Court held a hearing on the supplemental disclosure statement and all objections thereto. The Bankruptcy Court ordered the Futures Representative to file an amended

disclosure statement by October 25, 2007.  Objections to the amended disclosure statement were filed on November 1, 2007 on behalf of the Debtors, the Bondholders' Committee, and the Asbestos Claimants' Committee.  The Bankruptcy Court held a hearing on the amended disclosure statement and all objections thereto on November 8, 2007.  At that hearing, the Bankruptcy Court ordered the Futures Representative to address certain issues relating to the plan and amended disclosure statement and to file such changes on December 3, 2007.

## 5.15.   **The Joint Plan (February 2008 Plan)**

Following the Bankruptcy Court's rulings on the Tenth Modified Plan, the Debtors engaged in extensive mediation sessions with the Futures Representative, the Asbestos Claimants' Committee and the Bondholders' Committee.  The product of that mediation was the February 2008 Joint Plan.  The February 2008 Joint Plan proposed to implement a compromise and settlement with respect to each person whose asbestos personal injury claim was settled in a Pre-Petition Settlement Agreement or the Claimant Agreement (the "**Omnibus Claimant Settlement**").  Pursuant to the Omnibus Claimant Settlement, all of the approximately 79,000 claimants who settled their claims under the Claimant Agreement agreed to relinquish all of their rights, claims and interests in such agreement.  Such claimants were classified in the Joint Plan in Class 7A and were to be treated by the Plan Trust as holding unliquidated Asbestos Personal Injury Claims which Claims would be liquidated pursuant to the compensable disease matrix in the Joint Plan's TDP.  Additionally, the Settled Claimants in Class 7A agreed to resubmit their Asbestos Personal Injury Claims to the Plan Trust for processing and payment under the TDP, without regard to any lien, security interest or other claim to priority treatment whatsoever.  Thus, the over 79,000 settled claimants in Class 7A agreed voluntarily to be treated in the same manner as the other current and future Asbestos Personal Injury Claimants and their Claims would be fixed using the same standards and criteria.

As part of the Omnibus Claimant Settlement, each settled claimant who was a party to a Pre-Petition Settlement Agreement was given the option to elect to be treated as (i) a Settled Claimant in Class 7A, or (ii) a Settled Claimant with Litigation Rights in Class 7B.  The Settled Claimants with Litigation Rights could elect to seek declaratory judgment in a continued adversary proceeding that the liquidated amounts under their Pre-Petition settlement Agreements may be recognized and treated in a plan of reorganization that is compliant with § 524(g).  Regardless of the outcome of the continued adversary proceeding, the Settled Claimants with Litigation Rights in Class 7B would be subject to the same Payment Percentage as all other Asbestos Personal Injury Claimants as set forth in the TDP.  The Settled Claimants with Litigation Rights are referred to herein as Former Class 7B Claimants.

The Bankruptcy Court approved the disclosure statement and voting procedures for the Joint Plan in February 2008 and solicitation commenced shortly thereafter.  The Joint Plan received the overwhelming support of all voting creditors, including approximately 95% of all voting asbestos claimants.

The Plan Proponents and the parties who opposed confirmation filed summary judgment motions with respect to certain issues that the parties believed could be decided as a matter of law (the "**Joint Plan Summary Judgment Motions**").  On June 6, 2008, the Bankruptcy Court issued its Joint Plan Opinion with respect to the Joint Plan Summary Judgment Motions.  The Bankruptcy Court held, among other things, that the classification and litigation rights afforded to the former Settled Claimants with Litigation Rights, referred to herein as Former Class 7B Claimants, relating to their Pre-Petition Settlement Agreements did not comply with § 524(g) of the Bankruptcy Code.  A corresponding order was entered on June 13, 2008 (the "**Joint Plan Order**").  The Debtors filed a notice of appeal of the Joint Plan Order on June 20, 2008.

In conjunction with the Joint Plan Opinion, the Bankruptcy Court entered its *sua sponte* Order to Show Cause for Dismissal or Conversion in a Chapter 11 Case which proposed to dismiss the Debtors' Chapter 11 cases or to covert them to liquidation proceedings under Chapter 7.  Upon opposition from Congoleum and from every creditor and claimant constituency in these bankruptcy cases, the Bankruptcy Court issued an opinion that vacated the Order to Show Cause and instructed the parties to propose a confirmable plan by the end of calendar year 2008.

On September 3, 2008, the Bankruptcy Court issued a supplemental opinion with respect to the Joint Plan (the "**Supplemental Joint Plan Opinion**").  The Bankruptcy Court determined that, on the issue of assignability of Congoleum's rights under its insurance policies, such rights may assigned to a plan trust despite the

existence of various anti-assignment provisions in the insurance policies. The Bankruptcy Court further ruled on issues relating to whether the Joint Plan impermissibly altered the non-settling insurers' rights under their insurance policies. The Bankruptcy Court concluded that the Joint Plan did not impair the insurers' contractual rights to cooperation from the Debtors and that the Joint Plan did not impair the right of non-settling insurers to obtain contribution from settling insurers. As to whether the Joint Plan eliminates the insurers' right to object to claims, the Bankruptcy Court denied summary judgment because a determination could not be made in advance as to the underlying nature of all claim objections. Various insurers have filed notices of appeal of the Supplemental Joint Plan Opinion, which appeals were consolidated with the Debtors' appeal of the Joint Plan Order. Pursuant to a stipulation and order dated December 15, 2008, the Debtors and the insurers agreed to administratively terminate the appeal. Either party may reopen the appeal upon written request and all appellate rights are preserved.

### 5.16.    The Amended Joint Plan (November 2008 Plan)

After the Bankruptcy Court's instruction to file a confirmable plan by year-end 2008, the Debtors and certain of their creditor constituencies engaged in further extensive mediation and settlement discussions. As a result, on August 4, 2008, Congoleum, along with the Bondholders' Committee, Asbestos Claimants' Committee and the Futures Representative reached an agreement in principle on certain material terms of a plan of reorganization and a settlement of Congoleum's claims in the Avoidance Actions. The material terms of the settlement in principle were set forth in a term sheet publicly filed with the Bankruptcy Court on August 14, 2008.

Subsequently, the parties negotiated a litigation settlement agreement resolving the Avoidance Actions against asbestos claimants who were parties to certain individual pre-petition asbestos settlements or the Claimant Agreement, collectively the Pre-Petition Settled Claimants, as well as resolving claims with Claimants' Counsel, Joseph Rice and Perry Weitz (the "**Litigation Settlement Agreement**"). The Voting Agent distributed the Litigation Settlement Agreement for execution by claimant law firms. As of October 18, 2008, 79 claimant law firms, representing 87% of the Pre-Petition Settled Claimants had executed the Litigation Settlement Agreement. Congoleum and the Bondholders' Committee filed a joint motion before the Bankruptcy Court seeking approval of the Litigation Settlement Agreement. Certain defendant insurers filed objections to the Litigation Settlement Agreement. Following a hearing on October 18, 2008 at which the motion and all objections were heard, the Bankruptcy Court approved the Litigation Settlement Agreement, but the court reserved until a later date a determination of whether the settlement met the standards required for confirmation of a plan of reorganization. Subsequently, on October 31, 2008, the Bankruptcy Court issued its order approving the Litigation Settlement Agreement.

Thereafter, on November 14, 2008, the Amended Joint Plan, which incorporated the Litigation Settlement Agreement, was filed. In January 2009, certain insurers filed a motion for summary judgment seeking denial of confirmation of the Amended Joint Plan contending that (i) the Amended Joint Plan did not satisfy the equality of distribution principles under the Bankruptcy Code and (ii) the Amended Joint Plan was defective because it lacked an express clause providing for court review of certain payments made to Claimants' Counsel under Code § 1129(a)(4).

On February 26, 2009, the Bankruptcy Court rendered an opinion granting the insurers' motion for summary judgment and denied confirmation of the Amended Joint Plan (the "**Amended Joint Plan Summary Judgment Order**"). In connection with the Amended Joint Plan Summary Judgment Order, the Bankruptcy Court, over objection of all parties-in-interest, entered an Order of Dismissal dismissing Congoleum's bankruptcy case (the "**Dismissal Order**"). On March 3, 2009, the Bankruptcy Court entered an order granting a stay of the Dismissal Order pending entry of a final non-appealable decision affirming the Dismissal Order.

On February 27, 2009, Congoleum and the Bondholders' Committee filed an appeal of the Dismissal Order and the Amended Joint Plan Summary Judgment Order to the District Court. On August 17, 2009, the District Court entered an order and opinion affirming, in part, and reversing, in part, the Bankruptcy Court's Amended Joint Plan Summary Judgment Order (the "**August 17 Order**"). The District Court affirmed the grant of summary judgment to the insurers regarding the payments made to Claimants' Counsel and ruled that such payments would be reviewed for reasonableness pursuant to § 1129(a)(4) of the Bankruptcy Code. The District Court reversed the Amended Joint Plan Summary Judgment Order with respect to the equality of distribution issue, finding that the aspect of the Litigation Settlement Agreement relating to the estates' compromise of the Comstock,

Cook and Arsenault claims was not an impediment to confirmation.  The District Court also reversed the Dismissal Order, finding that the Bankruptcy Court abused its discretion in dismissing the case.  Finally, the District Court withdrew the reference of the case from the Bankruptcy Court pursuant to 28 U.S.C. § 157(d) and assumed authority over all further proceedings.  The District Court then directed the Plan Proponents to file a new plan of reorganization that would provide for court review of the payments made to Claimants' Counsel and requested briefing on additional confirmation issues.

On August 27, 2009, the insurers moved the District Court to amend its August 17 Order by certifying it for potential interlocutory appeal under 28 U.S.C. § 1292(b).  On October 2, 2009, the District Court entered an order refusing to certify the August 17 Order for interlocutory appeal.

The insurers also took the position that the August 17 Order was a final, immediately appealable order.  On September 14, 2009 and September 24, 2009, the insurers filed notices of appeal of the August 17 Order to the Third Circuit Court of Appeals.  On October 9, the Plan Proponents filed a motion to dismiss the appeal for lack of jurisdiction, which is currently pending before the Third Circuit.

### 5.17.  The Current Fourth Amended Joint Plan

As instructed by the District Court in its August 17 Order, the Debtors filed the Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of the Debtors, the Official Asbestos Claimants' Committee and the Official Committee of Bondholders for Congoleum Corporation, *et al.*, dated as of October 22, 2009 (the "**Second Amended Joint Plan**").  In order to address developments since the filing of the Second Amended Joint Plan, the Plan Proponents filed the Third Amended Joint Plan on February 12, 2010.  The Fourth Amended Joint Plan addresses additional developments since the filing of the Third Amended Joint Plan.

### 5.18.  Standing of Insurers to be Heard

The Debtors have filed motions challenging the standing of certain of Congoleum's insurers to raise objections and be heard in the Reorganization Cases.  While the Bankruptcy Court previously determined that the insurers do not have standing to raise objections and be heard with respect to past disclosure statements, the Bankruptcy Court and the District Court have ruled that the insurers have standing to raise objections and be heard with respect to plans of reorganization.

### 5.19.  Confirmation Hearing

The District Court has scheduled the Confirmation Hearing to commence on [May __, 2010], and additional dates will be set as necessary by the Court.  Notice of the Confirmation Hearing will be published in one newspaper of general circulation and counsel for known holders of Claims who are entitled to vote on the Plan also will be sent copies of the Voting Procedures Order, at least 25 days before the date of the Confirmation Hearing, unless the District Court specifies otherwise.  *See* Section 7.2 – "Confirmation Hearing" below.

## ARTICLE 6
## SUMMARY OF THE PLAN

### 6.1.  General

The following is a summary intended as a brief overview of certain provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan, a copy of which is annexed hereto as Exhibit A.  Other provisions of the Plan not summarized in this Article 6 may be summarized elsewhere in this Disclosure Statement, including in Article 8.  Holders of Claims and Interests are respectfully referred to the relevant provisions of the Bankruptcy Code and are encouraged to review the Plan and this Disclosure Statement with their counsel, or other advisors.

### 6.2.  Classification

(a)  **Generally**

Article II of the Plan sets forth an explanation of Claims that are not classified under the Plan and a designation of Classes of Claims and Interests. Subject to the occurrence of the Effective Date, the Debtors shall be deemed consolidated under the Plan for Plan purposes only. Each and every Claim filed or to be filed against any of the Debtors shall be deemed filed against the deemed consolidated Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Debtors. Notwithstanding anything contained in the Plan to the contrary, the deemed consolidation of the Debtors shall not have any effect on any of the Claims being reinstated and left unimpaired under the Plan, and the legal, equitable, and contractual rights to which the holders of any such Claims are entitled shall be left unaltered by the Plan.

(b) **Unclassified Claims**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims and the DIP Financing Claim are not classified and are excluded from the Classes established in Article II of the Plan. The treatment accorded Administrative Claims and Priority Tax Claims is set forth in Article III of the Plan.

(c) **Classes**

For purposes of the Plan, the Claims against and Interests in the Debtors are grouped in the following Classes in accordance with section 1122(a) of the Bankruptcy Code:

Class 1 – Priority Claims

Class 2 –Lender Secured Claims

Class 3 – Other Secured Claims

Class 4 – Senior Note Claims

Class 5 –  Workers' Compensation Claims

Class 6 – ABI Claims

Class 7 – Asbestos Personal Injury Claims

Class 8 – Asbestos Property Damage Claims

Class 9 – General Unsecured Claims

Class 10 – Congoleum Interests

Class 11 – Subsidiary Interests

(d) **Administrative Claims**

On the Distribution Date, each holder of an Allowed Administrative Claim, except as otherwise provided in the Plan and subject to the requirements of Section 13.14 of the Plan, will receive, in full satisfaction, settlement, release, extinguishment, and discharge of such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Claim, or (b) such different treatment as to which the applicable Debtor and such holder shall have agreed upon in writing; *provided, however,* that Allowed Administrative Claims representing (i) post-petition liabilities incurred in the ordinary course of business by the Debtors and (ii) post-petition contractual liabilities arising under loans or advances to the Debtors (whether or not incurred in the ordinary course of business), will be paid by Reorganized Congoleum in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto.

(e) **Priority Tax Claims**

51

On the Distribution Date, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (ii) such different treatment as to which the applicable Debtor and such holder shall have agreed upon in writing, or (iii) at Reorganized Congoleum's sole discretion, deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim, over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim.

(f)   **DIP Financing Claim**

Each holder of an Allowed DIP Financing Claim shall be paid indefeasibly in full on the Effective Date or as soon thereafter as practicable and shall receive in full satisfaction, settlement, release, extinguishment, and discharge of such Allowed DIP Financing Claim, (a)(i) Cash equal to the unpaid portion of such Allowed DIP Financing Claim, together with a release and termination agreement and any accompanying cash collateral, each in form, substance and amounts acceptable to DIP Financing Lender, or (ii) such different treatment as to which DIP Financing Lender shall have agreed to in writing, and (b) shall be released and discharged from any obligation, liability and/ or responsibility to fund or otherwise pay the Professional Fee Carve-Out (as defined in the DIP Financing Order) and /or any other claim or liability of any kind, nature or description that can be brought at any time for any reason against DIP Financing Lender relating to the Professional Fee Carve-Out or any other fees or expenses incurred by any Bankruptcy Professional.  Notwithstanding anything to the contrary contained in the Plan, the Confirmation Order, or otherwise, the Allowed DIP Financing Claim, and the liens and security interests securing such Allowed DIP Financing Claim shall continue in full force and effect in accordance with the terms, conditions and covenants of the DIP Financing Agreements and the DIP Financing Order, shall survive the Confirmation Date and continue in full force and effect in accordance with the terms and conditions of the DIP Financing Agreements and the DIP Financing Order until such time as the Allowed DIP Financing Claim has been indefeasibly paid in full and in Cash.  Each Allowed DIP Financing Claim shall include all interest, fees, costs and charges accrued up to the Effective Date, accrued at the rates provided for in the DIP Financing Agreements. Pursuant to the DIP Financing Order, upon the indefeasible payment in full of an Allowed DIP Financing Claim, the Debtors shall forever release, discharge and acquit the DIP Financing Lender and its officers, directors, agents, attorneys and predecessors-in-interest of and from any and all claims, demands, liabilities, causes of action, and obligations of every kind with respect to the DIP Financing Agreement and DIP Financing Order.

(g)   **Substantial Contribution Claims**

Any Entity who requests compensation or expense reimbursement for making a substantial contribution in the Reorganization Cases pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code ("**Substantial Contribution Claim**") must file an application with the clerk of the District Court on or before a date that is sixty (60) days subsequent to the Effective Date and serve such application on counsel for the Debtors, counsel for the Futures Representative, counsel for the Asbestos Claimants' Committee, counsel for the Bondholders' Committee and on all other parties as otherwise required by the Bankruptcy Court and the Bankruptcy Code, or be forever barred from seeking such compensation or expense reimbursement.  All Allowed Substantial Contribution Claims shall be paid by Reorganized Congoleum within sixty (60) days of allowance by the District Court.

**6.3.**   **Treatment of Classified Claims and Interests**

Allowed Claims and Allowed Interests, as classified in Article II of the Plan, will be treated in the manner set forth in Article IV of the Plan.  The following constitutes a summary of such treatment:

(a)   **Class 1 - Priority Claims**

(1)   **Impairment and Voting**

Class 1 is Unimpaired by the Plan.  Each holder of an Allowed Priority Claim in Class 1 is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan under section 1126 of the Bankruptcy Code.

(2)    **Treatment**

On the Distribution Date, each holder of an Allowed Priority Claim will receive either (i) the Allowed Amount of its Priority Claim in Cash, or (ii) such different treatment as may be agreed to by such holder and Reorganized Congoleum. Reorganized Congoleum will be responsible for payment of Allowed Priority Claims.

(b)    **Class 2 – Lender Secured Claims**

(1)    **Impairment and Voting**

Class 2 is Unimpaired by the Plan. Lender Secured Claims constitute any Claim of Wachovia arising under or relating to the Existing Credit Agreement, the Existing Subsidiary Guaranty and any related documents. Each holder of a Lender Secured Claim in Class 2 is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan under section 1126 of the Bankruptcy Code.

(2)    **Treatment**

The Lender Secured Claim will be deemed to be previously indefeasibly paid in full on the Effective Date and Wachovia shall be released from any and all liabilities and causes of action in accordance with the DIP Financing Agreements and DIP Financing Order.

(c)    **Class 3 – Other Secured Claims**

(1)    **Impairment and Voting**

Class 3 is Unimpaired by the Plan. Each sub-Class of Class 3 Other Secured Claims contains a single Other Secured Claim and is a separate Class for all purposes under the Bankruptcy Code and the Plan. Other Secured Claims include any pre-petition Secured Claim asserted against the Debtors, other than Lender Secured Claims. Each holder of an Other Secured Claim in Class 3 is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan under section 1126 of the Bankruptcy Code.

(2)    **Treatment**

Each holder of an Allowed Other Secured Claim shall receive one of the following three treatments at Reorganized Congoleum's sole option: (i) retain unaltered the legal, equitable and contractual rights (including, but not limited to, any Liens that secure such Claim) to which such Claim entitles such holder and such Allowed Other Secured Claim shall be Reinstated on the Effective Date, (ii) the Debtors shall surrender all collateral securing such Claim to the holder thereof, in full satisfaction of such holder's Allowed Class 3 Claim, without representation or warranty by, or recourse against, the Debtors or Reorganized Congoleum or (iii) such holder shall be otherwise treated in a manner so that such Claim shall be rendered Unimpaired.

(d)    **Class 4 – Senior Note Claims**

(1)    **Impairment and Voting**

Class 4 is Impaired by the Plan. Each holder of an Allowed Senior Note Claim is entitled to vote to accept or reject the Plan under section 1126 of the Bankruptcy Code pursuant to the Voting Procedures Order.

(2)    **Treatment**

Senior Note Claims shall be Allowed in an aggregate amount equal to at least $103,593,750.00, which shall not be subject to any avoidance, reductions, set off, offset, recharacterization, subordination, counterclaims, defenses, disallowance, impairment or any other challenges under applicable law or regulation by any person or entity. On the Distribution Date, each holder of an Allowed Senior Note Claim shall receive, in full satisfaction of its Senior Note Claim, its Pro Rata share of each of the securities included in the Senior Note Distribution.

(e)    **Class 5 – Workers' Compensation Claims**

(1)    **Impairment and Voting**

Class 5 is Unimpaired by the Plan. Each holder of an Allowed Workers' Compensation Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan under section 1126 of the Bankruptcy Code.

(2)    **Treatment**

The holders of Allowed Workers' Compensation Claims will be paid in the ordinary course pursuant to such rights that exist under any state workers' compensation system or laws that apply to such Claims.

(f)    **Class 6 - ABI Claims**

(1)    **Impairment and Voting**

Class 6 is Impaired by the Plan. The holder of the Allowed ABI Claims is entitled to vote to accept or reject the Plan under section 1126 of the Bankruptcy Code pursuant to the Voting Procedures Order.

(2)    **Treatment**

Pursuant to and in consideration of the Intercompany Settlement and Section 5.17 of the Plan and other terms of the Plan, on the Effective Date all Intercompany Claims shall be rejected and all ABI Claims, including without limitation any ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.17(b)(4)(B) of the Plan), shall be deemed Disallowed and expunged.

(g)    **Class 7 – Asbestos Personal Injury Claims**

(1)    **Impairment and Voting**

Class 7 (including each of its subclasses) is Impaired by the Plan. Class 7 consists of all Asbestos Personal Injury Claims. Holders of Asbestos Personal Injury Claim are entitled to vote to accept or reject the Plan under section 1126 of the Bankruptcy Code pursuant to the Voting Procedures Order.

(2)    **Treatment**

As of the Effective Date, all liability for all Asbestos Personal Injury Claims (including all Pre-Petition Settled Claimants) as well as liability for all future Demands shall be assumed, automatically and without further act or deed, by the Plan Trust and the Reorganized Debtors shall have no liability therefor. Each Asbestos Personal Injury Claim and future Demand shall be resolved pursuant to the Plan Trust Agreement and the TDP. The TDP shall apply to all holders of Asbestos Personal Injury Claims and future Demands, including any such holder who elects to resort to the legal system and obtains a judgment for money damages.

As of the Effective Date, pursuant to the Plan, all Pre-Petition Settled Claimants, including Litigation Settlement Claimants, will, in full satisfaction of his, her or its Asbestos Personal Injury Claim and any and all rights pursuant to any Pre-Petition Settlement Agreement, Claimant Agreement, Security Agreement, Collateral Trust Agreement or any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003, be, including with respect to any statutes of limitation related to such Asbestos Personal Injury Claim, restored to status quo ante as it existed as of the time each such Claimant initially filed or submitted its Asbestos Claim against the Debtors that resulted in the Claimant's Pre-Petition Asbestos Settlement Agreement or the Claimant Agreement, respectively, and shall be treated by the Plan Trust as holding an unliquidated Asbestos Personal Injury Claim under applicable federal or state law which shall be resolved pursuant to the Plan Trust Agreement and the TDP in the same manner as all other Asbestos Personal Injury Claims in Class 7. The Pre-Petition Settled Claimants shall receive pari passu treatment

under the Plan without regard to any lien, security interest or other claim to priority treatment whatsoever (i.e. it is understood that any such claimants will need to reapply to the Plan Trust to satisfy the TDP including medical, exposure and other requirements). The Avoidance Actions shall be dismissed with prejudice as of the Effective Date.

(h) **Class 8 - Asbestos Property Damage Claims**

(1) **Impairment and Voting**

Class 8 is Impaired by the Plan. Asbestos Property Damage Claims constitute all Asbestos Property Damage Claims for which Proofs of Claim have been filed prior to the Asbestos Property Damage Claim Bar Date. The holders of Allowed Asbestos Property Damage Claims are entitled to vote to accept or reject the Plan under section 1126 of the Bankruptcy Code.

(2) **Treatment**

As of the Effective Date, all liability for all Allowed Asbestos Property Damage Claims will be assumed, automatically and without further act or deed, by the Plan Trust and the Reorganized Debtors will have no liability therefor. Each Allowed Asbestos Property Damage Claim will be paid solely from the Asbestos Property Damage Claim Sub-Account on account of the unpaid Allowed Amount of such Claim pursuant to the Plan Trust Agreement. After the assets in the Asbestos Property Damage Claim Sub-Account have been exhausted, the Plan Trust shall have no further liability or obligation for or in respect of any Asbestos Property Damage Claims. All Asbestos Property Damage Claims as to which a Proof of Claim was not filed prior to the expiration of the Asbestos Property Damage Claim Bar Date will be deemed Disallowed.

(i) **Class 9 – General Unsecured Claims**

(1) **Impairment and Voting**

Class 9 is Impaired by the Plan. The holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan under section 1126 of the Bankruptcy Code pursuant to the Voting Procedures Order.

(2) **Treatment**

Except to the extent that a holder of an Allowed General Unsecured Claim in Class 9 has been paid by the Debtors prior to the Effective Date or agrees to alternate, less favorable, treatment, each holder of an Allowed Class 9 Claim shall receive, in full and final satisfaction of such Allowed Class 9 Claim, Cash in the amount of $.35 for each $1.00 of such holder's Allowed Class 9 Claim. Class 9 is Impaired and the holders of Class 9 Claims are entitled to vote to accept or reject the Plan. General Unsecured Claims do not include Claims against the Debtors under the Environmental Laws as set forth in Section 11.9 of the Plan, which Claims (other than Claims held by ABI) survive the Reorganization Cases.

(j) **Class 10 – Congoleum Interests**

(1) **Impairment and Voting**

Class 10 is Impaired by the Plan. The holders of the Congoleum Interests are deemed to have rejected the Plan in accordance with section 1126(g) of the Bankruptcy Code and, accordingly, their separate vote will not be solicited.

(2) **Treatment**

On the Effective Date, the Congoleum Interests will be cancelled and the holders of the Congoleum Interests will retain and receive nothing on account of such Congoleum Interests.

(k)     **Class 11 – Subsidiary Interests**

(1)     **Impairment and Voting**

Class 11 is Unimpaired by the Plan.  Each holder of a Subsidiary Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan under section 1126 of the Bankruptcy Code.

(2)     **Treatment**

On the Effective Date, the holders of the Subsidiary Interests will retain such Subsidiary Interests.

**6.4.     Means for Execution of the Plan**

(a)     **Establishment of the Plan Trust**

The Plan Trust will be established in accordance with the Plan Documents on or prior to the Effective Date.  *See* Article 8 – "Implementation of the Plan" for a description of the Plan Trust.  In addition, on the Effective Date, the Plan Trust established pursuant to the Plan Trust Agreement will become solely responsible for the payment of all Plan Trust Asbestos Claims.  *See* Section 5.1 of the Plan for a further description of the Plan Trust.

(b)     **Plan Trust Funding**

(1)     **The New Common Stock**

On the Effective Date, Congoleum will issue shares of its newly created common stock to the Plan Trust in an amount equal to 50.1% of the Congoleum common stock to be issued on the Effective Date.  Such newly created common stock shall have the rights set forth in the Amended and Restated Certificate substantially in the form attached to the Plan as Exhibit K.

(2)     **Proceeds of Insurance Settlements**

Assuming the following settlements remain in place if the Plan becomes effective, the Plan Trust shall receive the following:

(A)     **The Liberty Payment**

Conditioned upon the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and Liberty having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to its settlement agreement with the Debtors, Liberty will contribute $950,000 to the Plan Trust and the Debtors will turn over the balance of the Liberty Proceeds to the Plan Trust, less the reimbursement of defense and indemnity costs for Asbestos Claims incurred by Congoleum prior to the Effective Date pursuant to Section 5.1(q) of the Plan.

(B)     **The Lloyd's and Equitas Payment**

Conditioned upon the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and Lloyd's and Equitas having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to the Debtors' $19.95 million settlement and buyback agreement with Lloyd's and Equitas, the proceeds of the settlement will be contributed to the Plan Trust.

(C)     **The Federal Payment**

Conditioned upon the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and Federal having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to the Debtors' $2.1 million settlement and buyback agreement with Federal, the proceeds of the settlement will be contributed to the Plan Trust.

### (D)     The Mt. McKinley and Everest Payment

Conditioned upon the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and Mt. McKinley and Everest having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to the Debtors' $21.5 million settlement and buyback agreement with Mt. McKinley and Everest, as amended, the proceeds of the settlement will be contributed to the Plan Trust.

### (E)     The Harper Payment

Conditioned upon the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and Harper having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to the Debtors' $1,375,000 settlement agreement with Harper, the proceeds of the settlement will be contributed to the Plan Trust.

### (F)     The Fireman's Fund Payment

Conditioned upon the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and Fireman's Fund having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to the Debtors' $1 million settlement and buyback agreement with Fireman's Fund, the proceeds of the settlement will be contributed to the Plan Trust.

### (G)     The Century Payment

Conditioned upon the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and the Century Entities having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to the Debtors' $16.9 million settlement and buyback agreement with the Century Entities, the proceeds of the settlement will be contributed to the Plan Trust.

### (H)     The Protective National Insurance Payment

Conditioned upon the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order, pursuant to the Debtors settlement agreement with Protective National Insurance, the Debtors will turn over proceeds of their $3 million claim with respect to the liquidation of Protective National Insurance to the Plan Trust.

### (I)     The Marsh and AON Payment

Conditioned upon the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and Marsh and AON having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to the Debtors' $40,000 settlement with Marsh and the Debtors' $75,000 settlement with Aon, the proceeds of the settlement agreement will be contributed to the Plan Trust.

### (J)     The Solvent Scheme Payment

Conditioned upon the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order, the proceeds of the $256,000 payment from certain solvent London Market insurers will be contributed to the Plan Trust.

(K)      **The Hartford Parties Payment**

Conditioned upon District Court approval of the settlement, the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and the Hartford Parties having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to the Debtors' $16.5 million settlement and buyback agreement with the Hartford Parties, the proceeds of the settlement will be contributed to the Plan Trust.

(L)      **The CNA Payment**

Conditioned upon District Court approval of the settlement, the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and CNA having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to the Debtors' $16.5 million settlement and buyback agreement with CNA, the proceeds of the settlement will be contributed to the Plan Trust.

(M)      **The Wausau Payment**

Conditioned upon District Court approval of the settlement, the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and Wausau having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to the Debtors' $11.5 million settlement and buyback agreement with Wausau, the proceeds of the settlement will be contributed to the Plan Trust.

(N)      **The OneBeacon Payment**

Conditioned upon District Court approval of the settlement, the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and OneBeacon having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to the Debtors' $10,242,733 settlement and buyback agreement with OneBeacon, the proceeds of the settlement will be contributed to the Plan Trust.

(O)      **The Munich Re Payment**

Conditioned upon District Court approval of the settlement, the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and Munich Re having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to the Debtors' $8,212,800 settlement and buyback agreement with Munich Re, the proceeds of the settlement will be contributed to the Plan Trust.

(P)      **The MMO Payment**

Conditioned upon District Court approval of the settlement, the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and MMO having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to the Debtors' $7,330,750 settlement and buyback agreement with MMO, the proceeds of the settlement will be contributed to the Plan Trust.

(Q)      **The TIG Payment**

Conditioned upon District Court approval of the settlement, the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and TIG having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to the Debtors' $4,849,800 settlement and buyback agreement with TIG, the proceeds of the settlement will be contributed to the Plan Trust.

(R)     **The London Payment**

Conditioned upon District Court approval of the settlement, the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and London having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to the Debtors' $4,127,050 settlement and buyback agreement with London, the proceeds of the settlement will be contributed to the Plan Trust.

(S)     **The Westport Payment**

Conditioned upon District Court approval of the settlement, the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and Westport having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to the Debtors' $2,988,350 settlement and buyback agreement with Westport, the proceeds of the settlement will be contributed to the Plan Trust.

(T)     **The Old Republic Payment**

Conditioned upon District Court approval of the settlement, the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and Old Republic having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to the Debtors' $1,991,250 settlement and buyback agreement with Old Republic, the proceeds of the settlement will be contributed to the Plan Trust.

(U)     **The Transport Payment**

Conditioned upon District Court approval of the settlement, the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and Transport having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to the Debtors' $1,373,508 settlement and buyback agreement with Transport, the proceeds of the settlement will be contributed to the Plan Trust.

(V)     **The Stonewall Payment**

Conditioned upon District Court approval of the settlement, the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and Stonewall having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to the Debtors' $883,759 settlement and buyback agreement with Stonewall, the proceeds of the settlement will be contributed to the Plan Trust.

(W)     **The Navigators Payment**

Conditioned upon District Court approval of the settlement, the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and Navigators having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to the Debtors' $400,000 settlement and buyback agreement with Navigators, the proceeds of the settlement will be contributed to the Plan Trust.

(X)     **The U.S. Fire Payment**

Conditioned upon District Court approval of the settlement, the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and U.S. Fire having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to the Debtors' $50,000 settlement and buyback agreement with U.S. Fire, the proceeds of the settlement will be contributed to the Plan Trust.

(Y)  **The American Centennial Payment**

Conditioned upon District Court approval of the settlement, the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and American Centennial having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to the Debtors' $50,000 settlement and buyback agreement with American Centennial, the proceeds of the settlement will be contributed to the Plan Trust.

(Z)  **The NJPLIGA and NJSLIGF Payment**

Conditioned upon District Court approval of the settlement, the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and NJPLIGA and NJSLIGF having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to the Debtors' $13 million settlement agreement with NJPLIGA and NJSLIGF, the proceeds of the settlement will be contributed to the Plan Trust.

(AA)  **The Travelers Payment**

Conditioned upon District Court approval of the settlement, the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and Travelers having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to the Debtors' $25 million settlement and buyback agreement with Travelers, as amended, the proceeds of the settlement will be contributed to the Plan Trust.

(BB)  **The Seaton Payment**

Conditioned upon District Court approval of the settlement, the occurrence of the effective date of a section 524(g) plan of reorganization of the Debtors' estates, the confirmation order of such a plan becoming a Final Order and Seaton having obtained the benefit of an injunction pursuant to section 524(g) of the Bankruptcy Code, pursuant to the Debtors' $2,075,000 settlement and buyback agreement with Seaton, the proceeds of the settlement will be contributed to the Plan Trust.

(c)  **Plan Distributions**

The Disbursing Agent shall make all distributions required under the Plan (other than distributions to holders of Plan Trust Asbestos Claims and Senior Note Claims). Distributions shall be made on the Distribution Date (unless otherwise provided by the Plan or ordered) with respect to all Claims except for Plan Trust Asbestos Claims. Distributions to be made on the Distribution Date will be deemed actually made on the Distribution Date if made either (a) on the Distribution Date or (b) as soon as practicable thereafter. With respect to Plan Trust Asbestos Claims, distributions to holders of Plan Trust Asbestos Claims will be made in accordance with the Plan Trust Agreement and/or the TDP, as applicable. With respect to Senior Note Claims, Distributions will be made by the Indenture Trustee, whose reasonable fees and expenses in connection with such Distributions shall be paid by Reorganized Congoleum.

(d)  **Distributions of Cash**

Any Distribution of Cash made by Reorganized Congoleum pursuant to the Plan shall, at Reorganized Congoleum's option, be made by check drawn on a domestic bank or by wire transfer from a domestic bank.

(e)  **No Interest on Claims**

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or a post-petition agreement in writing between the Debtors and a holder, Post-Petition Interest shall not accrue or be paid on Claims, and no holder shall be entitled to Interest accruing on or after the Petition Date. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective

Date to the date a Final Distribution is made when and if such Disputed Claim becomes an Allowed Claim. Notwithstanding the foregoing, this provision shall not apply to Plan Trust Asbestos Claims which shall be governed in all cases by the Plan Trust Agreement and the TDP.

(f) **Delivery of Distributions**

Distributions to holders of Allowed Claims other than Asbestos Claims shall be made by the Disbursing Agent or the Indenture Trustee, as applicable, (a) at the holder's last known address, or (b) at the address in any written notice of address change delivered to the Disbursing Agent or the Indenture Trustee, as applicable. If any holder's distribution made by the Disbursing Agent is returned as undeliverable, no further distributions to such holder shall be made, unless and until the Disbursing Agent is notified of such holder's then current address, at which time all missed distributions shall be made to such holder without interest. Amounts in respect of undeliverable distributions made through the Disbursing Agent shall be returned to Reorganized Congoleum until such distributions are claimed or become unclaimed property pursuant to Section 6.8 of the Plan. With respect to Plan Trust Asbestos Claims, distributions to the holders of Plan Trust Asbestos Claims shall be made in accordance with the Plan Trust Agreement and/or the TDP, as applicable. With respect to Senior Note Claims, distributions to holders of Senior Note Claims shall be made in accordance with the New Indenture.

(g) **Distributions to Holders as of the Record Date**

All Distributions on Allowed Claims shall be made to the Record Holders of such Claims. As of the close of business on the Record Date, the Claims register maintained by the Voting Agent shall be closed, and there shall be no further changes in the Record Holder of any Claim. Reorganized Congoleum shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. Reorganized Congoleum shall instead be entitled to recognize and deal for all purposes under the Plan with the Record Holders as of the Record Date.

(h) **Fractional Securities; Fractional Dollars**

Distributions of fractions of shares of New Common Stock will not be made and shall be rounded (up or down) to the nearest whole number, with half shares or less being rounded down. Reorganized Congoleum shall not be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

(i) **Withholding of Taxes**

The Disbursing Agent shall withhold from any assets or property distributed under the Plan any assets or property that must be withheld pursuant to applicable law.

(j) **Unclaimed Property**

Any Cash, assets and other property to be distributed on account of any Claim (other than a Plan Trust Asbestos Claim) under the Plan that remain unclaimed (including by an Entity's failure to negotiate a check issued to such Entity) or otherwise not deliverable to the Entity entitled thereto before the later of (a) one year after the date of distribution or (b) 120 calendar days after an order allowing such Entity's Claim becomes a Final Order, shall become vested in, and shall be transferred and delivered to, Reorganized Congoleum. In such event, such Entity's Claim shall no longer be deemed to be Allowed and such Entity shall be deemed to have waived its rights to such payments or distributions under the Plan pursuant to section 1143 of the Bankruptcy Code and shall have no further Claim in respect of such distribution and shall not participate in any further distributions under the Plan with respect to such Claim.

(k) **Procedures for the Treatment of Disputed Claims**

(1) **Disallowance of Improperly Filed Claims**

Subject to section 502(j) of the Bankruptcy Code and Bankruptcy Rules 3008 and 9006, any Administrative Claim, Asbestos Property Damage Claim or Claim (other than Asbestos Personal Injury Claims) for which the filing of a Proof of Claim, application or motion with the District Court is required under the terms of the Bankruptcy Code, the Bankruptcy Rules, any order of the Bankruptcy Court or District Court (including one providing a Bar Date) or the Plan will be disallowed if and to the extent that such Proof of Claim (or other filing) is not timely and properly made.

(2)     **Prosecution of Objections to Claims**

Unless otherwise ordered by the District Court after notice and a hearing, after the Effective Date, Reorganized Congoleum, the Bondholders' Committee, the Asbestos Claimants' Committee and the Futures Representative each shall have the right to make and file objections to Proofs of Claims, other than Proofs of Claims in respect of Asbestos Personal Injury Claims and Professional Fee Claims, at any time on or before ninety (90) days after the later of (i) the Effective Date or (ii) the date on which such Claim was filed with the District Court unless no Proof of Claim is required to be filed pursuant to Bankruptcy Rule 3002, the Plan or any order of the District Court; *provided, however,* that (x) this deadline may be extended by the District Court on motion by the Debtors, Reorganized Congoleum, the Bondholders' Committee, the Asbestos Claimants' Committee or the Futures Representative, as applicable, and (y) neither the Debtors, Reorganized Congoleum, the Futures Representative, the Bondholders' Committee, the Asbestos Claimants' Committee, nor any other Person may file an objection to any (1) Claim that was Allowed by a Final Order entered during the Reorganization Cases, or (2) Claim Allowed by the Plan. In addition, unless otherwise ordered by the District Court after notice and a hearing, after the Effective Date Reorganized Congoleum, the Bondholders' Committee, the Asbestos Claimants' Committee and the Futures Representative, subject to Sections 13.8 and 13.14 of the Plan, each shall have the exclusive right to make and file objections to Administrative Claims and to amend the Schedules or to object to any Claim specified on the Schedules, at any time on or before sixty (60) days after the later of (i) the Effective Date or (ii) the date on which such Claim was filed with the District Court unless no Proof of Claim is required to be filed pursuant to Bankruptcy Rule 3002, the Plan or any order of the District Court; *provided, however,* that (x) this deadline may be extended by the District Court on motion by the Debtors, Reorganized Congoleum, the Bondholders' Committee, the Asbestos Claimants' Committee or the Futures Representative, as applicable, (y) neither the Debtors, Reorganized Congoleum, the Futures Representative, the Bondholders' Committee, the Asbestos Claimants' Committee nor any other Person may file an objection to any (1) Claim that was Allowed by a Final Order entered during the Reorganization Cases, or (2) Claim Allowed by the Plan, and (z) with respect to any Administrative Claim referred to in sub-clause (a)(4) of the definition of Administrative Expense, no objection may be filed with respect to any such Administrative Expense other than with respect to the reasonableness of such Administrative Expense or whether such Administrative Expense was incurred in accordance with Section 6.6 of the Indenture. Without prejudice to the right of any Asbestos Insurance Company to assert any Asbestos Insurer Coverage Defenses, after the Effective Date, only the Plan Trustee shall have the authority to contest Asbestos Personal Injury Claims and Asbestos Property Damage Claims and litigate to judgment, settle or withdraw such objections and each Asbestos Personal Injury Claim and Asbestos Property Damage Claim, whether or not a Proof of Claim was filed with the Bankruptcy Court or District Court, shall be satisfied exclusively in accordance with the Plan Trust Documents.

(3)     **No Distributions Pending Allowance**

Notwithstanding any other provision hereof, if a Claim or any portion of a Claim (other than an Asbestos Personal Injury Claim) is a Disputed Claim, no payment or distribution shall be made on account of the Disputed Claim, unless and until such Disputed Claim becomes an Allowed Claim.

(4)     **Distributions After Allowance**

Payments and distributions to each holder of a Claim that is Disputed, or that is not Allowed, to the extent that such Claim ultimately becomes Allowed, shall be made in accordance with the provisions hereof governing the Class of Claims in which such Claim is classified. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim (other than a disputed Asbestos Claim) becomes a Final Order, Reorganized Congoleum shall distribute to the holder of such Claim any payment or property that would have been distributed to such holder if the Claim had been Allowed as of the Effective Date (or such other date on which such distribution would have been made).

62

**6.5.**     **Executory Contracts and Unexpired Leases**

(a)     **Assumption or Rejection of Executory Contracts and Unexpired Leases**

(i)     <u>Assumption</u>.   Except for any unexpired lease or executory contract that the Plan Proponents reject or designate as being subject to rejection on or before the Effective Date, as of the Effective Date, all executory contracts and unexpired leases not previously assumed or rejected by the Debtors pursuant to section 365 of the Bankruptcy Code shall be deemed to have been assumed by the Debtors, and the Plan shall constitute a motion to assume such executory contracts and unexpired leases.   Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the District Court shall constitute approval of such assumptions pursuant to section 365(a) of the Bankruptcy Code and a finding by the District Court that each such assumption is in the best interests of the Debtors, the Estates and all parties in interest in the Reorganization Cases. With respect to each such executory contract or unexpired lease assumed by the Debtors, unless otherwise determined by the District Court pursuant to a Final Order or agreed to by the parties thereto on or before the Effective Date, any defaults of the Debtors with respect to such assumed executory contracts or leases existing as of the Effective Date shall be cured in the ordinary course of the Reorganized Debtors' business promptly after any such default becomes known to the Debtors and, if disputed, established pursuant to applicable law by the District Court, and the assumed executory contracts or leases shall be binding upon and enforceable upon the parties thereto, subject to any rights and defenses existing thereunder.   Subject to the occurrence of the Effective Date, upon payment of such cure amounts, all defaults of the Debtors existing as of the Confirmation Date with respect to such executory contract or unexpired lease shall be deemed cured.

(ii)     <u>Rejection</u>.   Notwithstanding subpart (a) of this Section 6.5, the Plan Proponents may reject those executory contracts and unexpired leases listed on an exhibit to be filed with the District Court as part of the Plan Supplement (as such list may be amended or supplemented up to and including the Confirmation Date).

(iii)     <u>ABI Canada License Agreement; Intercompany Agreements</u>.   Pursuant to and in consideration of the New ABI Agreement and the Intercompany Settlement set forth in Section 5.17 of the Plan and other terms of the Plan, on the Effective Date (A) the ABI Canada License Agreement shall be amended as provided in the Intercompany Settlement and deemed to have been assumed by Congoleum and become a contractual obligation of Reorganized Congoleum, and the Plan shall constitute a motion to assume such license agreement and (B) all Intercompany Agreements shall be rejected and all ABI Claims, including without limitation any ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.17(b)(4)(B) of the Plan), shall be deemed Disallowed and expunged.

(b)     **Damages Upon Rejection**

Except to the extent arising out of or based on the rejection of any executory contract related to or involving asbestos which shall be dealt with under the TDP, the District Court will determine the dollar amount, if any, of the Claim of any Entity seeking damages by reason of the rejection of any executory contract or unexpired lease; *provided, however*, that such Entity must file a Proof of Claim with the District Court on or before thirty (30) calendar days following the later of the Confirmation Date or the date of rejection of the executory contract or unexpired lease.   To the extent that any such Claim is Allowed by the District Court by Final Order, such Claim shall become, and shall be treated for all purposes under the Plan as, a Class 9 General Unsecured Claim, and the holder thereof shall receive distributions as a holder of an Allowed Claim in such Class pursuant to the Plan unless such Claim is held by ABI, in which case such Claim shall be Disallowed and expunged.

**6.6.**     **Insurance Agreements.**

Except to the extent expressly set forth in any Asbestos Insurance Settlement Agreement, nothing contained in the Plan or any negotiations leading up to the Plan, including this Section 6.6, shall constitute a waiver of:   (i)   any claim, right, or cause of action that any of the Debtors or the Plan Trust, as applicable, may have against any insurer, including under any insurance agreement; or (ii) any Asbestos Insurer Coverage Defenses that any Asbestos Insurance Company may have against the Debtors or the Plan Trust.   The discharge and release provisions contained in the Plan shall neither diminish nor impair the duties or obligations of any Debtor or any other Entity under any Asbestos Insurance Policy or agreement relating thereto (including any Asbestos Insurance Settlement

Agreement), nor shall the discharge and release provisions contained in the Plan diminish nor impair the duties, obligations or the Asbestos Insurer Coverage Defenses of any Asbestos Insurance Company under any Asbestos Insurance Policy or agreement relating thereto. The Reorganized Debtors shall not voluntarily assist any Person in the establishment of any rights, action, cause of action or claim against the Century Entities in anyway relating to any Asbestos Claim or other claim released under the Settlement and Buyback Agreement.

### 6.7. Compensation and Benefits Programs

Except for the Congoleum Interests which are treated elsewhere in the Plan, unless otherwise agreed to by the affected parties or modified by order of the District Court, all of the Debtors' obligations under employment and severance policies, and all compensation and benefit plans, policies, and programs shall be treated as though they are executory contracts that are deemed assumed under the Plan.

As of the Effective Date, the Pension Plans as well as the collective bargaining agreement by and between the Debtors and Teamsters Local 312, will be deemed to have been assumed by Reorganized Congoleum. Reorganized Congoleum will continue the Pension Plans, satisfy the minimum funding standards pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082, and administer the Pension Plans in accordance with their terms and the provisions of ERISA. Furthermore, nothing in the Plan will be construed as discharging, releasing or relieving the Debtors or Reorganized Congoleum, or any party, in any capacity, from any liability imposed under any law or regulatory provision with respect to the Pension Plans, the Pension Benefit Guaranty Corporation ("**PBGC**") or the Teamsters Pension Trust Fund of Philadelphia Vicinity (the "**Teamsters Pension Fund**"). The PBGC, the Pension Plans and the Teamsters Pension Fund will not be enjoined or precluded from enforcing such liability as a result of any provision of the Plan or the Confirmation Order. Notwithstanding anything in this Section 6.7, the Plan Trust shall not assume any of the liabilities, obligations, or responsibilities of the Debtors or Reorganized Congoleum with respect to the Pension Plans, the PBGC or the Teamsters Pension Fund.

### 6.8. Retiree Benefits

Notwithstanding any other provisions of the Plan (other than the last sentence of this Section 6.8), any payments that are due to any individual for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the Debtors prior to the Petition Date shall be continued for the duration of the period, if any, that the Debtors have obligated themselves to provide such benefits. Notwithstanding the foregoing, no employee or retired employee (nor their spouses or dependents and beneficiaries) of the Debtors or the Reorganized Debtors shall be entitled to assert any Asbestos Claim against the Debtors or the Reorganized Debtors.

### 6.9. Indemnification of Directors, Officers and Employees

The obligations of the Debtors to indemnify their current and former directors, officers or employees to the extent provided in the Debtors' constituent documents or required pursuant to applicable general corporation law shall be deemed and treated as obligations that are assumed by Reorganized Congoleum pursuant to the Plan as of the Effective Date, *provided, however,* that (i) with respect to acts or omissions occurring prior to, on or after the Petition Date, the indemnification obligation of Reorganized Congoleum is limited exclusively to the extent of proceeds available under any applicable directors and officers insurance policy for the act(s) and/or omission(s) at issue, and (ii) no current or former director, officer or employee shall be indemnified with respect to the gross negligence, fraud or willful misconduct of such party.

### 6.10. Plan Supplement

The Plan Supplement will contain, among other things, without limitation, substantially final forms of a schedule identifying rejected contracts, the Exit Facility Commitment Letter or Term Sheet, the Registration Rights Agreement, the New ABI Agreement, the New Indenture, the Stockholders Agreement, the Amended and Restated Bylaws, the Amended and Restated Certificate and schedules identifying the initial officers and the initial board of directors of Reorganized Congoleum, and shall be filed with the District Court no later than

five (5) Business Days prior to the last date for filing objections to Confirmation of the Plan. Notwithstanding the foregoing, the Plan Proponents may amend the Plan Supplement and any attachments thereto, through and including the Confirmation Date.

**6.11. Injunctions, Releases and Discharge**

    (a)     **Term of Certain Injunctions and Automatic Stay**

        (A)     All of the injunctions and/or automatic stays provided for in or in connection with the Reorganization Cases, whether pursuant to section 105, section 362, section 524(g), or any other provision of the Bankruptcy Code or other applicable law, in existence immediately prior to Confirmation will remain in full force and effect until the Injunctions become effective, and thereafter if so provided by the Plan, the Confirmation Order, or by their own terms. In addition, on and after Confirmation, the Plan Proponents may seek such further orders as they may deem necessary to preserve the status quo during the time between Confirmation and the Effective Date.

        (B)     Each of the Injunctions will become effective on the Effective Date and will continue in effect at all times thereafter. Notwithstanding anything to the contrary contained in the Plan, all actions in the nature of those to be enjoined by the Injunctions will be enjoined during the period between the Confirmation Date and the Effective Date.

    (b)     **Discharge**

        (i)     Except as specifically provided in the Plan, the Plan Documents or in the Confirmation Order, as of the Effective Date, Confirmation will discharge the Debtors and the Reorganized Debtors pursuant to section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims of any nature whatsoever and Demands including, without limitation, any Claims, demands and liabilities that arose before Confirmation, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a Proof of Claim based on such Claim was filed or deemed filed under section 501 of the Bankruptcy Code, or such Claim was listed on the Schedules of the Debtors, (ii) such Claim is or was Allowed under section 502 of the Bankruptcy Code, or (iii) the holder of such Claim has voted on or accepted the Plan. Except as specifically provided in the Plan or Plan Documents, the rights that are provided in the Plan as of the Effective Date will be in exchange for and in complete satisfaction, settlement and discharge of all Claims (including without limitation Asbestos Claims) or Demands against, Liens on, and interests in the Debtors or the Reorganized Debtors or any of their assets or properties. Notwithstanding anything herein to the contrary, nothing in Section 11.1 of the Plan will affect the right of any Asbestos Insurance Company to assert any Asbestos Insurer Coverage Defenses.

        (ii)     Notwithstanding any other provision of the Plan to the contrary, Confirmation will not discharge any pre-Petition Date or post-Petition Date, pre-Confirmation Date liability that may be due from any of the Debtors to the Internal Revenue Service as currently set forth in certain Proofs of Claim and Administrative Expense Claim, as amended, filed by the Internal Revenue Service. Should any pre-Petition Date or post-Petition Date, pre-Confirmation Date tax liabilities be determined by the Internal Revenue Service to be due from any of the Debtors for any of the tax periods reflected by such Proofs of Claim or Administrative Expense Claim, such liabilities will be determined administratively or in a judicial forum in the manner in which such liabilities would have been resolved had the Reorganization Cases not been commenced. Any resulting liabilities determined pursuant to a Final Order or other final determination will be paid as if the Reorganization Cases had not been commenced.

    (c)     **Exculpation**

        As of the Effective Date, (i) the Debtors, the Futures Representative, the Asbestos Claimants' Committee, the Bondholders' Committee, and each of their respective Representatives shall not have or incur any liability to any Entity for any act or omission taken on or after the Petition Date in connection with or arising out of the negotiation of the Plan, any Plan Document or any prior plan of reorganization relating to the Debtors or other related documents, the pursuit of Confirmation of the Plan or any prior plan of reorganization relating to the Debtors, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan; and (ii) in all respects the Debtors, the Futures Representative, the Asbestos Claimants' Committee and the

Bondholders' Committee shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and the other Plan Documents. For the avoidance of doubt, in no event shall any such party be exculpated from liability under Section 11.2 of the Plan in the case of the gross negligence, fraud or willful misconduct of such party. None of the foregoing parties shall be exculpated under this provision with respect to any acts occurring prior to the Petition Date. With respect to officers and directors of the Debtors, this section shall apply only to such officers and directors who were serving in such capacity on and after the Petition Date.

(d)     **Releases by Holders of Claims**

Pursuant to Section 11.3 of the Plan and the Confirmation Order, (which may include or incorporate by reference release(s) for the benefit of any Settling Asbestos Insurance Company consistent with the terms of such Section 11.3 and the terms of the relevant Asbestos Insurance Settlement Agreement), any holder of a Plan Trust Asbestos Claim that receives a payment from the Plan Trust shall be deemed to have unconditionally released the Plan Trust and each Settling Asbestos Insurance Company from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, arising from, relating to, or involving the manufacture, sale, distribution, installation, formulation, marketing, transport, handling or any other activity involving any asbestos containing products of Congoleum and any of Congoleum entities identified in the Confirmation Order, which may incorporate the terms of one or more Asbestos Insurance Settlement Agreement, or their premises to the extent such Claim arises from, relates to or involves exposure to asbestos, including without limitation, any operation claims, contribution claims, direct action claims, and insurance coverage claims. For the avoidance of doubt, in no event shall any such party be released in the case of the gross negligence, fraud or willful misconduct of such party.

(e)     **Discharge Injunction**

Except as specifically provided in the Plan Documents to the contrary, the satisfaction, release, and discharge set forth in Section 11.1 of the Plan will also operate as an injunction, pursuant to sections 105, 524(g) and 1141 of the Bankruptcy Code, prohibiting and enjoining the commencement or continuation of any action, the employment of process or any act to collect, recover from, or offset (i) any Claim or Demand against or Interest in the Debtors, the Reorganized Debtors, or the Plan Trust by any Entity and (ii) any cause of action, whether known or unknown, against the Debtors and the Reorganized Debtors based on such Claim or Interest described in subpart (i) of this clause (e).

(f)     **Third Party Releases**

No third party releases are being granted pursuant to the Plan nor are the Plan Proponents seeking approval of any such third party releases, except as set forth specifically herein.

(g)     **Asbestos Channeling Injunction**

**THE SOLE RECOURSE OF THE HOLDER OF A PLAN TRUST ASBESTOS CLAIM OR DEMAND ON ACCOUNT OF SUCH CLAIM OR DEMAND OR OF A PERSON THAT HAD OR COULD HAVE ASSERTED AN ASBESTOS CLAIM OR DEMAND WILL BE TO THE PLAN TRUST PURSUANT TO THE PROVISIONS OF THE ASBESTOS CHANNELING INJUNCTION, THE PLAN, THE PLAN TRUST AGREEMENT AND THE TDP, AND SUCH HOLDER WILL HAVE NO RIGHT WHATSOEVER AT ANY TIME TO ASSERT ITS PLAN TRUST ASBESTOS CLAIM OR DEMAND AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, ANY OTHER PROTECTED PARTY, OR ANY PROPERTY OR INTEREST IN PROPERTY OF THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY OTHER PROTECTED PARTY. WITHOUT LIMITING THE FOREGOING, FROM AND AFTER THE EFFECTIVE DATE, THE ASBESTOS CHANNELING INJUNCTION WILL APPLY TO ALL PRESENT AND FUTURE HOLDERS OF PLAN TRUST ASBESTOS CLAIMS AND DEMANDS, AND ALL SUCH HOLDERS WILL BE PERMANENTLY AND FOREVER STAYED, RESTRAINED, AND ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS FOR THE PURPOSE OF, DIRECTLY OR INDIRECTLY, COLLECTING, RECOVERING, OR RECEIVING PAYMENT OF, ON, OR WITH RESPECT TO ANY PLAN TRUST ASBESTOS CLAIMS AND DEMANDS, OTHER THAN**

FROM THE PLAN TRUST IN ACCORDANCE WITH THE ASBESTOS CHANNELING INJUNCTION AND PURSUANT TO THE PLAN, THE PLAN TRUST AGREEMENT AND THE TDP:

      (I)    COMMENCING, CONDUCTING, OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION, OR OTHER PROCEEDING (INCLUDING A JUDICIAL, ARBITRATION, ADMINISTRATIVE, OR OTHER PROCEEDING) IN ANY FORUM AGAINST OR AFFECTING ANY PROTECTED PARTY OR ANY PROPERTY OR INTERESTS IN PROPERTY OF ANY PROTECTED PARTY;

      (II)    ENFORCING, LEVYING, ATTACHING (INCLUDING ANY PREJUDGMENT ATTACHMENT), COLLECTING, OR OTHERWISE RECOVERING BY ANY MEANS OR IN ANY MANNER, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR OTHER ORDER AGAINST ANY PROTECTED PARTY OR ANY PROPERTY OR INTERESTS IN PROPERTY OF ANY PROTECTED PARTY;

      (III)    CREATING, PERFECTING, OR OTHERWISE ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ENCUMBRANCE AGAINST ANY PROTECTED PARTY, OR ANY PROPERTY OR INTERESTS IN PROPERTY OF ANY PROTECTED PARTY;

      (IV)    SETTING OFF, SEEKING REIMBURSEMENT OF, CONTRIBUTION FROM, OR SUBROGATION AGAINST, OR OTHERWISE RECOUPING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY AMOUNT AGAINST ANY LIABILITY OWED TO ANY PROTECTED PARTY OR ANY PROPERTY OR INTERESTS IN PROPERTY OF ANY PROTECTED PARTY; AND

      (V)    PROCEEDING IN ANY MANNER IN ANY PLACE WITH REGARD TO ANY MATTER THAT IS SUBJECT TO RESOLUTION PURSUANT TO THE PLAN TRUST, EXCEPT IN CONFORMITY AND COMPLIANCE WITH THE PLAN, THE PLAN TRUST AGREEMENT AND THE TDP.

      ANY RIGHT, CLAIM OR CAUSE OF ACTION THAT AN ASBESTOS INSURANCE COMPANY MAY HAVE BEEN ENTITLED TO ASSERT AGAINST A SETTLING ASBESTOS INSURANCE COMPANY BASED ON OR RELATING TO ASBESTOS CLAIMS WILL BE CHANNELED TO AND BECOME A RIGHT, CLAIM OR CAUSE OF ACTION AS AN OFFSET CLAIM AGAINST THE PLAN TRUST AND NOT AGAINST THE SETTLING ASBESTOS INSURANCE COMPANY IN QUESTION AND ALL PERSONS, INCLUDING ANY ASBESTOS INSURANCE COMPANY, WILL BE ENJOINED FROM ASSERTING ANY SUCH RIGHT, CLAIM OR CAUSE OF ACTION AGAINST A SETTLING ASBESTOS INSURANCE COMPANY.

      EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, NOTHING CONTAINED IN THE PLAN WILL CONSTITUTE OR BE DEEMED A WAIVER OF ANY CLAIM, RIGHT OR CAUSE OF ACTION THAT THE DEBTORS, THE REORGANIZED DEBTORS, OR THE PLAN TRUST MAY HAVE AGAINST ANY ENTITY IN CONNECTION WITH OR ARISING OUT OF OR RELATED TO AN ASBESTOS CLAIM. NOTWITHSTANDING ANY OTHER PROVISION IN THE PLAN TO THE CONTRARY, NOTHING IN THE PLAN WILL BE UNDERSTOOD TO CHANNEL, PREVENT, IMPAIR OR LIMIT IN ANY WAY ENFORCEMENT AGAINST THE DEBTORS, REORGANIZED CONGOLEUM, OR ANY OTHER PROTECTED PARTY OF ANY RIGHTS PROVIDED IN CONNECTION WITH ANY WORKERS' COMPENSATION CLAIM.

    (h)    **Reservation of Rights**

      Notwithstanding any other provision of the Plan to the contrary, the satisfaction, release and discharge, and the Injunctions set forth in Article XI of the Plan, will not serve to satisfy, discharge, release, or enjoin (a) claims by any Entity (other than the Reorganized Debtors and their Affiliates) against the Plan Trust for payment of Plan Trust Asbestos Claims in accordance with the Plan, the Plan Trust Agreement and the TDP, as applicable, (b) claims by any Entity against the Plan Trust for the payment of Plan Trust Expenses, (c) claims by the Reorganized Debtors, the Plan Trust, or any other Entity to enforce the provisions of any Asbestos Insurance

Settlement Agreement or any provision of the Plan or another Plan Document, or (d) the rights of any Asbestos Insurance Company to assert any claim, debt, obligation, cause of action or liability for payment against any other Asbestos Insurance Company that is not a Settling Asbestos Insurance Company.

    (i)    **Rights Against Non-Debtors under Securities Laws**

    Notwithstanding any language to the contrary contained in this Disclosure Statement, the Plan, and/or the Confirmation Order, no provision will release any non-Debtor, including any current and/or former officer and/or director of the Debtors from liability to the United States Securities and Exchange Commission, in connection with any legal action or claim brought by such governmental unit against such Person(s).

    (j)    **Rights Against Debtors under Environmental Laws**

    Environmental rights and Claims of Governmental Units and rights of contribution, reimbursement and indemnity by other Entities (other than ABI) under applicable Environmental Laws will survive the Reorganization Cases, will not be discharged, impaired or adversely affected by the Plan and the Reorganization Cases and will be determined in the manner and by the administrative or judicial tribunals in which such rights or Claims would have been resolved or adjudicated if the Reorganization Cases had not been commenced. Governmental Units and other Entities, other than ABI whose claims, if any, shall be discharged, need not file any Proofs of Claim under Environmental Laws in the Reorganization Cases in order to preserve Claims under Environmental Laws. Nothing in the Confirmation Order or Plan will be construed as releasing or relieving any Entity of any liability under any Environmental Law.

    (k)    **Disallowed Claims and Disallowed Interests**

    On and after the Effective Date, the Debtors will be fully and finally discharged from any liability or obligation on a Disallowed Claim or a Disallowed Interest, and any order creating a Disallowed Claim or a Disallowed Interest that is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 will nevertheless become and be deemed to be a Final Order on the Effective Date. The Confirmation Order, except as otherwise provided in the Plan or ordered by the District Court, will constitute an order: (i) disallowing all Claims (other than Plan Trust Asbestos Claims that have not been previously expunged by Final Order of the Bankruptcy Court, District Court or withdrawn) and Interests to the extent such Claims and Interests are not allowable under any provision of section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims, and Claims for unmatured interest, and (ii) disallowing or subordinating, as the case may be, any Claims, or portions of Claims, for penalties or Non-Compensatory Damages.

    (l)    **Anti-Suit Injunction**

    With respect to any Settling Asbestos Insurance Company, Section 11.11 of the Plan will operate as an injunction, pursuant to section 105(a) of the Bankruptcy Code, permanently and forever prohibiting and enjoining the commencement, conduct or continuation of any action or cause of action, whether known or unknown, the employment of process or any act to collect, recover from or offset any non-asbestos claim, Claim or demand against any Settling Asbestos Insurance Company arising out of, relating to, or in connection with an Asbestos Insurance Policy or any other insurance policy or rights under such other insurance policy issued to or insuring the relationship of the relevant Settling Asbestos Insurance Companies with, the relevant Congoleum entities that are insureds under such policies, but such injunction pursuant to section 105(a) of the Bankruptcy Code will not affect or modify the rights of Persons insured under policies of insurance except to the extent released in an Asbestos Insurance Settlement Agreement and/or enjoined pursuant to any Injunction contained in any order of the Bankruptcy Court or the District Court approving any Asbestos Insurance Settlement Agreement.

    (m)    **Insurance Neutrality**

    Section 11.12(a) of the Plan provides that except as otherwise provided in Section 11.12(b) of the Plan:

(i)        Nothing in the Plan, the Plan Documents or the Confirmation Order shall preclude any Entity from asserting in any proceeding any and all claims, defenses, rights or causes of action that it has or may have under or in connection with any Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement with respect thereto;

(ii)        Nothing in the Plan, the Plan Documents or the Confirmation Order shall be deemed to waive any claims, defenses, rights or causes of action that any Entity has or may have under the provisions, terms, conditions, defenses and/or exclusions contained in any Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement with respect thereto, including but not limited to any and all such claims, defenses, rights or causes of action based upon or arising out of Asbestos Personal Injury Claims that are liquidated, resolved, discharged, channeled, or paid in connection with the Plan; and

(iii)        Notwithstanding anything to the contrary in the Confirmation Order, the Plan, or any of the Plan Documents, nothing in the Confirmation Order, the Plan, or any of the Plan Documents (including any other provision that purports to be preemptory or supervening other than Section 11.12(b)), shall in any way operate to impair, or have the effect of impairing, the insurers' legal, equitable, or contractual rights, if any, in any respect; nor shall the Plan, any of the Plan Documents, the Confirmation Order, or the estimation, liquidation, or payment of any Claim for purposes of distribution by the Trust in accordance with the Plan and the Plan Documents have any binding effect on any Asbestos Insurance Company or have any *res judicata* or collateral estoppel effect upon any Asbestos Insurance Company for any other purpose, including without limitation with respect to the amount or the reasonableness of any such claim, or constitute a binding determination on any issue or creation of any liquidated claim with respect to any Asbestos Insurance Company. The rights of insurers shall be determined under the applicable Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement with respect thereto.

Notwithstanding the foregoing, Section 11.12(b) of the Plan states that Asbestos Insurance Companies shall be bound by the District Court's findings and conclusions with respect to whether, under the Bankruptcy Code, the assignment or transfer of rights under the Asbestos Insurance Assignment is valid and enforceable against each Asbestos Insurance Company notwithstanding any anti-assignment provision in or incorporated into any Asbestos Insurance Policy and applicable state law, and therefore Asbestos Insurance Companies shall be entitled to litigate that issue in connection with Confirmation, and shall retain all rights of appeal with respect thereto. Further, to the extent any Asbestos Insurance Company chooses, notwithstanding the protections provided by Section 11.12(a) of the Plan, to litigate any other issues in connection with Confirmation, and the District Court gives such Asbestos Insurance Company standing to litigate those issues and rules on the merits of those issues, then such Asbestos Insurance Company shall be bound by the District Court's findings and conclusions thereon, subject to any rights of appeal.

(n)      **No Liability for Solicitation or Participation**

Pursuant to section 1125(e) of the Bankruptcy Code, the Confirmation Order will provide that all of the Persons who have solicited acceptances or rejections of the Plan (including the Plan Proponents, and each of their respective members and Representatives, as applicable, and the Voting Agent) have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and are not liable on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale or purchase of securities.

**6.12.**    **Matters Incident to Plan Confirmation**

(a)      **No Successor Liability**

Except as otherwise expressly provided in the Plan, the Debtors, the Reorganized Debtors, their Affiliates, the Asbestos Claimants' Committee, the Bondholders' Committee, and the Futures Representative do not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations of the Debtors relating to or arising out of the operations of or assets of the Debtors, whether arising prior to, on, or after the Confirmation Date. Neither the Debtors, the Reorganized Debtors, their Affiliates, nor the Plan Trust is, or will be, a successor to the Debtors by reason of any theory of law or equity, and none will have any successor or transferee liability of any kind or character, except that the

Reorganized Debtors and the Plan Trust will assume the obligations specified in the Plan and the Confirmation Order.

> (b)  **Revesting of Assets**

Except as otherwise expressly provided in the Plan, on the Effective Date, Reorganized Congoleum will be vested with all of the assets and property of the Estates, free and clear of all Claims, Liens, charges and other interests of holders of Claims or Interests, and may operate its business free of any restrictions imposed by the Bankruptcy Code or by the District Court.

> (c)  **Vesting and Enforcement of Causes of Action**

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, except as otherwise provided in the Plan, Reorganized Congoleum will be vested with and have the right to enforce against any Entity any and all of the Debtors' Causes of Action other than Causes of Action related to Plan Trust Asbestos Claims and Plan Trust Assets (including the right to pursue such claims, if any, in the name of any Debtor if necessary), with the proceeds of the recovery of any such actions to be property of Reorganized Congoleum; *provided, however,* that nothing herein will alter, amend, or modify the injunctions (including the Injunctions), releases, or discharges provided in the Plan. Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, except as otherwise provided in the Plan, the Plan Trust shall be vested with and have the right to enforce against any Entity any and all of the Debtors' Causes of Action relating to any Plan Trust Asbestos Claims or any Plan Trust Assets, including the right to pursue such claims, if any, in the name of any Debtor, if necessary; and for this purpose the Plan Trust will be designated as a representative of the Estates, with the proceeds of the recovery of any such actions to be property of the Plan Trust; *provided further,* that nothing herein will alter, amend, or modify the injunctions (including the Injunctions), releases, or discharges provided in the Plan.

After the Effective Date, Reorganized Congoleum, in its sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Causes of Action (or decline to do any of the foregoing), without further approval of the District Court. Reorganized Congoleum, or any successors, in the exercise of its sole discretion, may pursue such Causes of Action so long as it is in the best interests of Reorganized Congoleum or any successors holding such rights of action. The failure of the Plan Proponents to specifically list any claim, right of action, suit, proceeding or other Causes of Action in the Plan or the Plan Supplement does not, and will not be deemed to, constitute a waiver or release by the Debtors or Reorganized Congoleum of such claim, right of action, suit, proceeding or other Causes of Action, and Reorganized Congoleum will retain the right to pursue such claims, rights of action, suits, proceedings and other Causes of Action in its sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit, proceeding or other Causes of Action upon or after the confirmation or consummation of the Plan.

> (d)  **GHR/Kenesis Actions**

On the Effective Date, the GHR/Kenesis Actions shall be preserved for enforcement solely by, and for the sole benefit of, Reorganized Congoleum.

## 6.13.  **Retention of Jurisdiction**

> (a)  **Jurisdiction**

Until the Reorganization Cases are closed, the District Court will retain the fullest and most extensive jurisdiction permissible, including that necessary to ensure that the purposes and intent of the Plan are carried out. Except as otherwise provided in the Plan, the District Court will retain jurisdiction to hear and determine all Claims against and Interests in the Debtors, and to adjudicate and enforce all other causes of action which may exist on behalf of the Debtors. Nothing contained in the Plan will prevent the Debtors, Reorganized Congoleum, or the Plan Trust from taking such action as may be necessary in the enforcement of any cause of action which any Debtor has or may have and which may not have been enforced or prosecuted by such Debtor, which cause of action will survive Confirmation of the Plan and will not be affected thereby except as specifically provided

in the Plan. Nothing contained in the Plan concerning the retention of jurisdiction by the District Court will be deemed to be a retention of exclusive jurisdiction with respect to any Asbestos Insurance Action; rather any court other than the District Court which has jurisdiction over an Asbestos Insurance Action will have the continuing right to exercise such jurisdiction.

(b)     **General Retention**

Following the Confirmation of the Plan, the administration of the Reorganization Cases will continue at least until the completion of the transfers contemplated to be accomplished on the Effective Date. Moreover, the Plan Trust will be subject to the continuing jurisdiction of the District Court in accordance with the requirements of section 468B of the IRC and the regulations issued pursuant thereto. The District Court will also retain jurisdiction for the purpose of classification of any Claim and the re-examination of Claims that have been Allowed for purposes of voting, and the determination of such objections as may be filed with the District Court with respect to any Claim. The failure by the Debtors to object to, or examine, any Claim for the purposes of voting, will not be deemed a waiver of the right of the Debtors, Reorganized Congoleum, or the Plan Trust, as the case may be, to object to or re-examine such Claim in whole or in part.

(c)     **Specific Purposes**

In addition to the foregoing, the District Court will retain jurisdiction for the following specific purposes after the Confirmation Date:

- to modify the Plan after Confirmation, pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules;

- to correct any defect, cure any omission, reconcile any inconsistency, or make any other necessary changes or modifications in or to the Plan, the Plan Documents or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance under the Plan Documents in the event that the Effective Date does not occur as provided in the Plan so that the intended effect of the Plan may be substantially realized thereby;

- to assure the performance by the Disbursing Agent and the Plan Trustee of their respective obligations to make distributions under the Plan;

- to enforce and interpret the terms and conditions of the Plan Documents;

- to enter such orders or judgments, including, but not limited to, injunctions (i) as are necessary to enforce the title, rights, and powers of the Debtors, the Reorganized Debtors, the Plan Trust, the Futures Representative and the Trust Advisory Committee, or (ii) as are necessary to enable holders of Claims to pursue their rights against any Entity that may be liable therefor pursuant to applicable law or otherwise, including, but not limited to, Bankruptcy Court or District Court orders;

- to hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits, tax proceedings and similar or related matters with respect to the Debtors, the Reorganized Debtors, or the Plan Trust relating to tax periods or portions thereof ending on or before the Effective Date, arising on account of transactions contemplated by the Plan Documents, or relating to the period of administration of the Reorganization Cases;

- to hear and determine all applications for compensation of professionals and reimbursement of expenses under sections 330, 331, or 503(b) of the Bankruptcy Code;

- to hear and determine any causes of action arising during the period from the Petition Date through the Effective Date;

- to hear and determine any claim, causes of action, dispute or other matter in any way related to the Plan Documents or the transactions contemplated thereby against the Debtors, the Reorganized Debtors, the Bondholders' Committee, the Asbestos Claimants' Committee, the Trust Advisory Committee, the Plan Trust, the Plan Trustee, or the Futures Representative and each of their respective Representatives;

- to hear and determine any and all motions pending as of Confirmation for the rejection, assumption, or assignment of executory contracts or unexpired leases and the allowance of any Claim resulting therefrom;

- to determine the allowance and/or disallowance of any Claims against the Debtors or their Estates, including, without limitation, any objections to any such Claims and the compromise and settlement of any Claim against the Debtors or their Estates;

- to hear and determine such other matters and for such other purposes as may be provided in the Confirmation Order;

- to consider and act on the compromise and settlement of any Claim against or Interest in the Debtors or their Estates;

- to hear and determine all questions and disputes regarding title to the assets of the Debtors, their Estates, Reorganized Congoleum or the Plan Trust;

- to hear and determine any other matters related to the Plan, including the implementation and enforcement of all orders entered by the Bankruptcy Court and District Court in the Reorganization Cases;

- to retain continuing jurisdiction with regard to the Plan Trust sufficient to satisfy the requirements of the Treasury Regulations promulgated under section 468B of the IRC (including Treas. Reg. Section 1.468B-1(c)(1));

- to hear and determine any and all applications brought by the Plan Trustee to amend, modify, alter, waive, or repeal any provision of the Plan Trust Agreement or the TDP;

- to enter such orders as are necessary to implement and enforce the Injunctions and the other injunctions described in the Plan, including, without limitation, orders extending the protections afforded by section 524(g)(4) of the Bankruptcy Code to the Protected Parties, including without limitation, the Settling Asbestos Insurance Companies; and

- to hear and determine any motions or contested matters involving or related to any GHR/Kenesis Actions.

## 6.14.   Miscellaneous Provisions

(a)   **Payment of Statutory Fees**

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the District Court at the Confirmation Hearing, shall be paid by the Debtors on or before the Effective Date and thereafter by Reorganized Congoleum as due until the Reorganization Cases are closed, converted or dismissed. The Reorganized Debtors shall pay any quarterly fees payable pursuant to 28 U.S.C. § 1930(a)(6) to the United States Trustee after the Effective Date until such time as the case is converted, dismissed or closed pursuant to a final decree.  The Reorganized Debtor shall file post-Effective Date reports, the form of which will be supplied by

the United States Trustee. Nothing contained in the Plan shall relieve the Debtors or Reorganized Debtors from making payments to the United States Trustee when due as required by 28 U.S.C. § 1930(a)(6).

(b) **Securities Law Matters**

It is an integral and essential element of the Plan that the issuance of the New Common Stock pursuant to the Plan shall be exempt from registration under the Securities Act, pursuant to section 1145 of the Bankruptcy Code and from registration under state securities laws. Nothing in the Plan is intended to preclude the Securities and Exchange Commission from exercising its police and regulatory powers relating to the Debtors or any other entity.

(c) **Allocation of Plan Distributions Between Principal and Interest**

To the extent that any Allowed Claim entitled to a Distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such Distribution shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest. Notwithstanding the foregoing, no Distribution shall be made on account of Post-Petition Interest.

(d) **The Asbestos Claimants' Committee, the Futures Representative and the Bondholders' Committee**

As of the Effective Date, the Futures Representative shall (a) continue in existence and the rights, duties and responsibilities of the Futures Representative appointed by the Bankruptcy Court to serve after the Effective Date shall be as set forth in the Plan Trust Documents and (b) continue in existence for purposes of the Reorganization Cases with respect to any appeal or request for reconsideration or stay pending appeal of the Confirmation Order and have the right to prosecute and/or object to applications for Professional Fee Claims. The Representatives retained by the Futures Representative during the Reorganization Cases shall, be released and discharged of and from all further authority, duties, responsibilities and obligations related to, or arising from, the Reorganization Cases on the same date as the Futures Representative ceases existence for purposes of the Reorganization Cases. On the Effective Date, the Asbestos Claimants' Committee and the Bondholders' Committee shall be dissolved except for the purposes of: (i) any appeal or request for reconsideration or stay pending appeal of the Confirmation Order; (ii) pending adversary proceedings; and (iii) prosecuting and/or objecting to Professional Fee Claims. Representatives of the Asbestos Claimants' Committee and the Bondholders' Committee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to, or arising from, the Reorganization Cases on the same date the Asbestos Claimants' Committee or the Bondholders' Committee, as applicable, cease to exist for purposes of the Reorganization Cases. Until the Effective Date, the Debtors shall pay the reasonable fees and expenses of the Asbestos Claimants' Committee, the Bondholders' Committee and Futures Representative in accordance with any applicable fee order in the Reorganization Cases. On the Effective Date, the Trust Advisory Committee will assume those powers, duties, and responsibilities as provided in the Plan Trust Agreement.

(e) **Modification of the Plan**

The Plan Proponents may propose amendments to or modifications of any of the Plan Documents under § 1127 of the Bankruptcy Code and as herein provided, to the extent applicable law permits. Subject to the limitations contained herein, the Plan Proponents may modify the Plan in accordance with this paragraph, before or after confirmation, without notice or hearing, or after such notice and hearing as the District Court deems appropriate, if the District Court finds that the modification does not materially and adversely affect the rights of any parties in interest which have not had notice and an opportunity to be heard with regard thereto. After Confirmation, the Plan Proponents may remedy any defects or omissions or reconcile any inconsistencies in the Plan or the Confirmation Order or any other order entered for the purpose of implementing the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan, *provided, however,* that none of the Debtors, ABI, Reorganized Congoleum, the Futures Representative, the Plan Trustee, the Asbestos Claimants' Committee, and the Bondholders' Committee shall seek to terminate, reduce or limit the scope of the Asbestos Channeling Injunction or

any other injunction contained in the Plan that inures to the benefit of any Settling Asbestos Insurance Company. Anything in the Plan or in any Plan Document to the contrary notwithstanding, following Confirmation but prior to the Effective Date, the Plan Documents shall not be modified, supplemented, changed or amended in any material respect except with the written consent of the Plan Proponents. In the event of any modification on or before Confirmation, any votes to accept or reject the Plan shall be deemed to be votes to accept or reject the Plan as modified, unless the District Court finds that the modification materially and adversely affects the rights of parties in interest which have cast said votes. The Plan Proponents reserve the right in accordance with section 1127 of the Bankruptcy Code to modify the Plan at any time before the Confirmation Date. Subject to § 1127 of the Bankruptcy Code, if the District Court determines at or in connection with the Confirmation Hearing that any provision of the Plan is invalid or unenforceable, the Plan Proponents may, at their discretion, sever such provision from the Plan without affecting the enforceability or operative effect of any or all other provisions of the Plan; provided, however, the Plan Proponents may not sever any provision from the Plan that incorporates or implements the terms of the Litigation Settlement Agreement, as amended, including the Amended Term Sheet attached thereto.

(f) **Revocation of the Plan**

The Plan Proponents reserve the right to revoke and withdraw the Plan before the entry of the Confirmation Order. If the Plan Proponents revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then, with respect to all parties in interest, the Plan will be deemed null and void and nothing contained therein will be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or such Entity in any further proceedings involving the Debtors.

(g) **Modification of Payment Terms**

Reorganized Congoleum shall have the right to modify the treatment of any Allowed Claim (other than a Plan Trust Asbestos Claim), as provided in section 1123(a)(4) of the Bankruptcy Code, at any time after the Effective Date with the consent of the holder of such Allowed Claim.

(h) **Entire Agreement**

The Plan Documents and the Plan Trust Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions and documents. No Entity shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein or as may hereafter be agreed to by the parties in writing.

(i) **Headings**

Headings are utilized in the Disclosure Statement are for convenience and reference only and shall not constitute a part of the Disclosure Statement for any other purpose.

(j) **Professional Fee Claims**

All final requests for payment of Professional Fee Claims must be filed and served on Reorganized Congoleum and their counsel no later than 60 days after the Effective Date, unless otherwise ordered by the District Court. Objections to any application of such Bankruptcy Professionals or other Entities for compensation or reimbursement of expenses must be filed and served on the respective applicant and its counsel no later than the first Business Day following 30 days (or such other period as may be allowed by order of the District Court) after the date on which the applicable application for compensation or reimbursement was received. Reorganized Congoleum may pay the reasonable charges that they incur on and after the Effective Date for Bankruptcy Professionals' fees, disbursements, expenses or related support services without application to the District Court. Reorganized Congoleum shall pay the reasonable fees and expenses of the Bondholders' Committee, Asbestos Claimants' Committee and Futures Representative after the Effective Date in connection with the purposes set forth in Section 13.8 of the Plan, without application to the District Court.

(k)     **Recordable Order**

Upon Confirmation of the Plan, the Confirmation Order shall be deemed to be in recordable form, and shall be accepted by any recording officer for filing and recording purposes without further or additional orders, certifications, or other supporting documents.

(l)     **Preparation of Estates' Returns and Resolution of Tax Claims.**

The Debtors or Reorganized Congoleum shall file all tax returns and other filings with governmental authorities and may file determination requests under section 505(b) of the Bankruptcy Code to resolve any Disputed Claim relating to taxes with a governmental authority.

(m)     **No Admission**

Nothing contained in the Plan or in the Disclosure Statement shall be deemed as an admission by the Plan Proponents with respect to any matter set forth herein or therein, including, without limitation, liability on any Claim or the propriety of any Claims classification.

(n)     **Consent to Jurisdiction**

Upon default under the Plan or any Plan Documents, the Debtors, Reorganized Congoleum, the Affiliates, the Plan Trust, the Trust Advisory Committee, the Futures Representative, ABI and the Plan Trustee consent to the jurisdiction of the District Court, or any successor thereto, and agree that it shall be the preferred forum for all proceedings relating to such default.

(o)     **Setoffs**

Subject to the limitations provided in section 553 of the Bankruptcy Code, the Debtors or the Plan Trust, as applicable, may, but will not be required to, setoff against any Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever the Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan will constitute a waiver or release by the Debtors of any such claim that the Debtors may have against such holder; *provided* that Reorganized Congoleum may not offset any obligations under the Plan Trust Common Stock against any claim that Reorganized Congoleum may have against the Plan Trust.

(p)     **Successors and Assigns**

The rights, duties, and obligations of any Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Entity.

(q)     **Non-Debtor Waiver of Rights**

Non-Debtor parties shall have the right to voluntarily waive any rights, benefits or protections that are afforded to them under the provisions of the Plan or any order issued in furtherance of the Plan, and such waiver shall supersede such rights, benefits or protections.  Any such waiver shall only be effective if, and then only to the extent that, such party expressly and specifically waives in writing one or more of such rights, benefits or protections.

(r)     **Further Authorizations**

The Debtors, Reorganized Congoleum, the Bondholders' Committee, and the Plan Trust, if and to the extent necessary, may seek with notice to the others such orders, judgments, injunctions, and rulings that any of them deem necessary to further carry out the intentions and purposes of, and give full effect to the provisions of, the Plan.

(s)     **No Bar to Suits**

Except as otherwise provided in Article XI of the Plan, neither the Plan nor Confirmation hereof shall operate to bar or estop the Debtors or Reorganized Congoleum from commencing any Cause of Action, or any other legal action against any holder of a Claim or any individual, corporation, partnership, trust, venture, governmental unit, or any other form of legal entity, whether such Cause of Action, or any other legal action arose prior to or after the Confirmation Date and whether or not the existence of such Cause of Action, or any other legal action was disclosed in any disclosure statement filed by the Debtors in connection with the Plan or whether or not any payment was made or is made on account of any Claim.

    (t)    **Conflicts**

Unless otherwise provided in the Confirmation Order, in the event of a conflict between the terms or provisions of the Plan and any other Plan Document, the terms of the other Plan Document will control.

    (u)    **Notices**

All notices, requests, elections, or demands in connection with the Plan shall be in writing and shall be mailed by registered or certified mail, return receipt requested, to:

**If to the Debtors:**

Congoleum Corporation
3500 Quakerbridge Road
Hamilton, NJ 08619
Attn:    Howard N. Feist
        CFO

    and

Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, NY 10033-4039
Attn:    Richard L. Epling
        Robin L. Spear
        Kerry A. Brennan

**If to the Futures Representative:**

R. Scott Williams, Esquire
Haskell Slaughter Young & Rediker, L.L.C.
2001 Park Place North, Suite 1400
Birmingham, AL  35203

    and

Orrick, Herrington & Sutcliffe LLP
1152 15th Street, N.W.
Washington, D.C.  20005
Attn:    Roger Frankel
        Richard Wyron
        Jonathan Guy

**If to the Asbestos Claimants' Committee:**

Caplin & Drysdale, Chartered
One Thomas Circle, N.W.
Washington, D.C. 20005

Attn:   Peter Van N. Lockwood
          Ronald Reinsel

**If to the Bondholders' Committee:**

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attn:   Michael S. Stamer

Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Attn:   James R. Savin
          David M. Dunn
          Joanna F. Newdeck

     (v)      **Duty to Cooperate**

Notwithstanding anything therein to the contrary, nothing in the Plan, the Plan Documents or the Confirmation Order shall relieve (by way of injunction or otherwise) any of the Debtors or Reorganized Congoleum or any other Entity which is or claims to be an insured or entitled to indemnity under an Asbestos Insurance Policy from any duty to cooperate that may be required by any such insurance policy under applicable law with respect to the defense and/or settlement of any Claim for which coverage is sought under such Asbestos Insurance Policy.  To the extent that any entity incurs costs in satisfying such duty to cooperate with respect to Asbestos Personal Injury Claims after the Effective Date, the Plan Trust shall reimburse such entity for all such reasonable out-of-pocket expenses.

     (w)      **Governing Law**

Except to the extent that federal law (including, but not limited to, the Bankruptcy Code and the Bankruptcy Rules) is applicable or where the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof that would require application of any other law.

## ARTICLE 7
## CONFIRMATION OF THE PLAN

**7.1.**     **Acceptance or Rejection of the Plan**

     (a)      **Persons Entitled to Vote on the Plan**

Pursuant to section 1126 of the Bankruptcy Code, only Classes of Claims and Interests that are impaired under the terms and provisions of the Plan are entitled to vote to accept or reject the Plan.  Generally speaking, under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" under a plan of reorganization unless, with respect to each claim or interest in such class, the plan in question (1) leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default (A) cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of the kind specified in section 365(b)(2) thereof; (B) reinstates the maturity of such claim or interest as such maturity existed before such default; (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.  Only those claimants whose claims are Allowed or have been temporarily allowed for voting purposes will be entitled to vote on the Plan.

Under the Plan, Classes 1, 2, 3, 5, and 11 are Unimpaired; therefore, the holders of Claims and Interests in such Classes are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. The Plan Proponents will not solicit acceptances of the Plan from holders of Claims and Interests in these Classes.

Classes 4, 6, 7, 8, 9 and 10 are Impaired; therefore, the holders of Claims and Interests in Classes 4, 6, 7, 8, 9 and 10 are entitled to vote to accept or reject the Plan pursuant to the Voting Procedures Order; *provided however,* holders of Asbestos Property Damage Claims in Class 8 cast votes on the February 2008 Joint Plan, and pursuant to the Voting Procedures Order, the votes of such holders of Claims will be deemed cast on the Plan because their treatment under the Fourth Amended Joint Plan is the same as the prior February 2008 Joint Plan on which they were entitled to vote. Holders of Asbestos Personal Injury Claims will be sent solicitation packages consistent with the Voting Procedures Order, and such holders will be given the option of allowing their prior vote to accept or reject the February 2008 Joint Plan to be cast for the Plan, or they can change their vote. Holders of Asbestos Personal Injury Claims who do not submit a new vote on this Plan but who did vote on the prior Joint Plan shall have their prior vote, whether accept or reject, deemed cast for this Plan. The holders of Senior Notes Claims in Class 4 will be provided with Solicitation Packages and cast votes anew on the Plan pursuant to the Voting Procedure Order. The holders of General Unsecured Claims in Class 9 will be provided with Solicitation Packages and Allowed General Unsecured Claims will be permitted to cast votes on the Plan pursuant to the Voting Procedures Order. The holders of Congoleum Interests in Class 10 are deemed to have rejected the Plan in accordance with the provisions of section 1126(g) of the Bankruptcy Code and accordingly their votes are not being solicited. Section 524(g) of the Bankruptcy Code permits supplementary injunctions to be issued which channel all asbestos claims to a trust if, among other things, 75% of those claimants voting in the Class or Classes of claimants whose Claims are to be addressed by the trust vote for the plan. Because the Claims in Classes 7 and 8 are to be channeled into the Plan Trust, the Plan Proponents are soliciting acceptances of the Plan for purposes of section 524(g) from these Classes.

The Plan Proponents believe that the Plan provides the best available alternative for maximizing the distributions that holders of Asbestos Claims and other unsecured claims will receive from the Estates.

(b)    **Voting Instructions**

The voting procedures summarized in this Article 7 are based on the Voting Procedures Order of the District Court and the voting procedures which are included with the solicitation package accompanying this Disclosure Statement. You should carefully read the Voting Procedures Order. It establishes, among other things: (1) the deadlines, procedures and instructions for voting to accept or reject the Plan, (2) the applicable standards for tabulating ballots, (3) the deadline for filing objections to confirmation of the Plan, and (4) the date and time of the Confirmation Hearing.

The Voting Procedures Order should be referred to if you have any questions concerning the procedures described herein. If there are any inconsistencies or ambiguities between this Disclosure Statement and the Voting Procedures Order, the Voting Procedures Order will control.

Please note that, in soliciting votes on the Plan, the Plan Proponents have relied on databases created by or on behalf of the Debtors in connection with solicitations of the Debtors' prior plans of reorganization.

(1)    **Completion and Return of Ballots:**

**PLEASE USE THE BALLOT SENT TO YOU WITH THIS DISCLOSURE STATEMENT IN VOTING FOR OR AGAINST THE PLAN. YOU SHOULD COMPLETE AND SIGN THE BALLOT AND RETURN IT TO THE VOTING AGENT, AT THE APPROPRIATE ADDRESS SET FORTH BELOW AND IN THE VOTING INSTRUCTIONS WHICH ACCOMPANY THE ENCLOSED BALLOT, ON OR BEFORE 5:00 P.M., PREVAILING EASTERN TIME, ON <u>MAY 5, 2010</u>, UNLESS OTHERWISE EXTENDED BY THE DISTRICT COURT. ALL BALLOTS WILL BE TABULATED BY THE VOTING AGENT.**

IN ORDER TO BE COUNTED, BALLOTS MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT ON OR BEFORE 5:00 P.M., PREVAILING EASTERN TIME, ON <u>MAY 5, 2010</u>, UNLESS OTHERWISE ORDERED BY THE DISTRICT COURT, AT THE APPROPRIATE ADDRESS SET FORTH BELOW AND IN THE VOTING INSTRUCTIONS WHICH ACCOMPANY THE ENCLOSED BALLOT.

HOLDERS OF ASBESTOS CLAIMS IN CLASS 7 HAVE THE OPTION OF ALLOWING THEIR VOTE, WHETHER ACCEPT OR REJECT, ON THE FEBRUARY 2008 JOINT PLAN TO BE DEEMED CAST FOR THIS PLAN OR THEY MAY VOTE ANEW AND CHANGE THEIR VOTE.  IF SUCH HOLDERS DO NOT VOTE ON THE JOINT PLAN BUT DID VOTE ON THE PRIOR FEBRUARY 2008 JOINT PLAN, THEIR PRIOR VOTE WILL BE DEEMED CAST FOR THIS PLAN.

(2)    <u>Place to Send Completed Ballots:</u>

All ballots should be returned by mail, hand-delivery or overnight courier to:

> Logan & Company, Inc.
> Re: Congoleum Corporation – Plan Ballots
> 546 Valley Road
> Upper Montclair, NJ  07043

(3)    <u>Deadline for Receiving Completed Ballots:</u>

ALL BALLOTS MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT BY THE VOTING DEADLINE. THE VOTING AGENT WILL NOT ACCEPT BALLOTS SUBMITTED BY FACSIMILE OR ELECTRONIC TRANSMISSION.

(4)    The Voting Agent will date and time-stamp all ballots received before and after the Voting Deadline.

(5)    Ballots will be made available for inspection and copying at the inspecting party's cost at the offices of the Voting Agent beginning on a date specified by the Voting Agent.

(6)    <u>Claimant's Allowance Motions</u>

Only claimants whose Claims (i) are treated as Impaired under the Plan, (ii) are not in a Class that is deemed to have accepted and/or rejected the Plan, (iii) are known to the Plan Proponents as of the Record Date, and (iv) are not the subject of an objection that is pending as of the Record Date may vote on the Plan.

Any claimant who is not entitled to vote because such claimant's claim is the subject of an objection pending before the District Court, or otherwise, or who seeks a determination from the District Court, for purposes of voting only, the amount to be used to tabulate acceptance or rejection of the Plan, may file an allowance motion (a "**Claimant's Allowance Motion**").  A Claimant's Allowance Motion must be filed by the dated specified in the Voting Procedures Order, an objection to such motion must be filed by the dated specified in the Voting Procedures Order, and a hearing to address unresolved objections will be held on the dated specified in the Voting Procedures Order. As to any claimant filing such a motion, such claimant's ballot will not be counted unless temporarily allowed by the District Court for voting purposes, after notice and a hearing.

(7)    **Tabulation of Votes -- Ballots Excluded:**

Any ballot pertaining to a Claim will not be counted if any of the following, without limitation, applies to such ballot:

(i)    The ballot attempts to vote a Claim that is not entitled to vote pursuant to the Voting Procedures.

(ii)    The ballot is not *actually received* by the Voting Agent by the Voting Deadline.

(iii)    The ballot is returned to the Voting Agent indicating acceptance or rejection of the Plan but is unsigned.

(iv)    The ballot is received after the Voting Deadline, regardless of when it is postmarked.

(v)    The ballot is illegible or contains insufficient information (such as the failure to include the last five digits of social security numbers for holders of Asbestos Personal Injury Claims) to permit the identification of the claimant.

(vi)    The ballot is transmitted to the Voting Agent by facsimile or other electronic means.

(vii)    A vote is submitted on a ballot other than provided with the solicitation package.

(viii)    A ballot that is incomplete, including, without limitation, because of the failure to make the required certifications.

(ix)    A ballot to the extent that it purports to vote on the behalf of a holder of a Previously Expunged or Withdrawn Claim.

(8)    **Tabulation of Votes – General Voting Procedures and Standard Assumptions:**

In addition to the foregoing, the following voting procedures and standard assumptions will be used in tabulating ballots:

(i)    The holder of a Claim may not split a vote.  Accordingly, (a) each Claim holder will have a single vote within a particular Class, (b) the full claim amount of the Claim holder within a particular Class will be deemed to have been voted either to accept or reject a Plan, and (c) any ballot that partially rejects and partially accepts the Plan will not be counted.

(ii)    The Voting Agent, in its discretion, may contact voters or their counsel to cure any defects in a client list or ballot.

(iii)    There shall be a rebuttable presumption that any claimant who submits a properly completed superseding ballot on or before the Voting Deadline has sufficient cause, within the meaning of Bankruptcy Rule 3018(a), to change or withdraw such claimant's  previous acceptance or rejection of the Plan.

(iv)    A ballot that is completed, but on which the claimant did not note whether to accept or reject the Plan, shall not be counted as a vote to accept or reject the Plan.

(v)     A ballot that is complete, but on which the claimant noted both an acceptance and rejection of the Plan, shall not be counted.

(vi)     If multiple ballots are received from a holder of a Claim and someone purporting to be such holder's attorney or agent, the ballot received from the holder of the Claim will be the ballot that is counted, and the vote of the purported attorney or agent will not be counted.

(vii)     If a holder of a Claim casts more than one ballot voting the same Claim before the Voting Deadline, the last-dated ballot received before the Voting Deadline will be deemed to reflect the voter's intent and thus will supersede any prior ballots.

(9)     **The Solicitation Period**

The solicitation period for ballots with respect to the Plan will expire at 5:00 p.m., Prevailing Eastern Time, on May 5, 2010 unless otherwise ordered by the District Court. Except to the extent allowed by the District Court, ballots that are received after the Voting Deadline may not be accepted or used by the Plan Proponents in connection with its request for Confirmation of the Plan or any modification thereof.

(10)     **Ballot Retention**

The original ballots will be maintained by the Voting Agent for a period of two (2) years following the Effective Date, unless otherwise instructed by the Plan Proponents, in writing, or otherwise ordered by the District Court.

(c)     **Class Acceptance Requirement**

Chapter 11 of the Bankruptcy Code does not require that each holder of a Claim vote in favor of the Plan for it to be confirmed by the District Court. Instead, the Bankruptcy Code defines acceptance of the Plan by a Class of Claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the claims of that Class that have voted on the Plan, excluding any holders of Claims designated pursuant to section 1126(e) of the Bankruptcy Code. Acceptance by a Class of Interests is defined as acceptance by holders of at least two-thirds in amount of the Allowed Interests of that Class held by holders of such Interests that have voted on the Plan, excluding any holders of Interests designated pursuant to section 1126(e) of the Bankruptcy Code. Section 1126(e) provides that a vote may be disregarded if the District Court determines, after notice and a hearing, that an Entity's acceptance or rejection of the Plan was not in good faith, or was not solicited or procured in good faith, or in accordance with the provisions of the Bankruptcy Code.

(d)     **Acceptance Pursuant to Section 524(g) of the Bankruptcy Code**

In accordance with section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code, a supplementary injunction may be issued if, among other things, 75% of those voting in the Class or Classes of claimants addressed by the Plan Trust vote in favor of the Plan.

**7.2.**     **Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the court, after notice, to hold a hearing on confirmation of a plan. Notice of the Confirmation Hearing will be provided to all creditors and equity holders or their representatives. The Confirmation Hearing may be adjourned from time to time by the District Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objecting party, the nature and amount of Claims or Interests held

or asserted by the objectant against the Debtor or property, the basis for the objection and the specific grounds therefor, and must be filed with the District Court by the date and time set forth in the notice of the Confirmation Hearing, and served upon the parties and their counsel, so as to be received no later than the date and time for service of the objections, all as designated in the notice of the Confirmation Hearing.

## 7.3.  Requirements for Confirmation

### (a)  Confirmation Under Section 1129(a) of the Bankruptcy Code

At the Confirmation Hearing, the District Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied, in which event the District Court will enter the Confirmation Order.  Such requirements include, among others:

(i)  That the Plan complies with applicable provisions of the Bankruptcy Code.

(ii)  That the Plan Proponents have complied with the applicable provisions of the Bankruptcy Code.

(iii)  That the Plan has been proposed in good faith and not by any means forbidden by law.

(iv)  That any payment made by the Debtors or promised under the Plan to any Entity for services, costs or expenses in or in connection with the Reorganization Cases or the Plan has been approved by or is subject to approval by the District Court as reasonable.

(v)  That the Plan Proponents have disclosed the identity and affiliations of any individual proposed to serve as a director or an officer of the Reorganized Debtors after confirmation of the Plan and that the appointment to, or continuance in, such office by such individual is consistent with the interests of holders of Claims and Interests and with public policy.

(vi)  That the Plan is in the best interests of the holders of Claims and Interests; that is, each holder of an Allowed Claim or Allowed Interest either has accepted the Plan or will receive or retain on account of its Claim or Equity Interest property with a value, as of the Effective Date, that is not less than the amount that the holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

(vii)  Each Class of Claims or Interests has either accepted the Plan or is not impaired under the Plan; *provided, however*, that if such requirement is not met, the Plan may be confirmed pursuant to section 1129(b) of the Bankruptcy Code.

(viii)  The Plan does not discriminate unfairly, and is fair and equitable, with respect to each Class, if any, of Claims and Interests that is impaired under and has not accepted the Plan.

(ix)  Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Allowed Administrative Expense Claims and Allowed Priority Claims will be paid in full on the Effective Date and that Allowed Priority Tax Claims will be either paid in full on the Effective Date or will receive on account of such Claims deferred cash payments, over a period not exceeding six years after the date of assessment of such Claims, of a value, as of the Effective Date, equal to the Allowed Amount of such Claims.

(x)  At least one Impaired Class of Claims has accepted the Plan, without regard to the votes of any insiders.

(xi)  That the Plan is feasible; that is, confirmation is not likely to be followed by the need for liquidation or further reorganization of the Reorganized Debtors.

(xii)   All fees comparable to the fees payable under section 1930 of title 28 of the U.S. Code, if and to the extent due, have been paid on or prior to the Effective Date.

(xiii)   The Plan provides for the continuation after the Effective Date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, without modification by the Plan, thereby complying with section 1114 of the Bankruptcy Code.

The Plan Proponents believe that the Plan satisfies all applicable requirements of section 1129(a) of the Bankruptcy Code. A discussion of the reasons the Plan Proponents believe the Plan satisfies certain of such requirements is set forth below:

(1)   **Best Interests Test**

Under the best interests test, the Plan may be confirmed if, with respect to each Impaired Class of Claims or Interests, each holder of an Allowed Claim or Allowed Interest in such Class either (A) has accepted the Plan or (B) will receive or retain under the Plan, on account of its Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Company were to be liquidated under Chapter 7 of the Bankruptcy Code.

To determine what the holders in each Class of Claims or Interests would receive if the Company were to be liquidated, the District Court must estimate the dollar amount that would be generated from the liquidation of the Company's assets and properties in the context of a Chapter 7 liquidation case. The cash amount that would be available for satisfaction of the Allowed Claims and Allowed Interests of the Company would consist of the proceeds resulting from the disposition of the assets of the Company, augmented by the cash held by the Company at the time of the commencement of a Chapter 7 case. Such cash amount would be reduced by the costs and expenses of the liquidation and by any additional Administrative Claims and Priority Claims that would result from the termination of the Company's business and the use of a Chapter 7 proceeding for the purposes of liquidation. *See* Exhibit B (Liquidation Valuation). The Liquidation Valuation was prepared by SSG Capital Advisors, LLC and is based on the estimated values of the Company's assets as of January 31, 2010.

The timing of distributions under a Chapter 7 case would be delayed and the amount of distributions that would be made in a Chapter 7 case would be materially less than the distributions contemplated by the Plan. In addition, the ability of the trustee in a Chapter 7 case to negotiate settlements with insurance companies without the benefit of the section 524(g) injunctions is likely to be impaired, with the result that fewer settlements are likely to be achieved, and the terms of any such settlements are likely to be less favorable to Asbestos Claimants than settlements achievable in the Reorganization Cases. Furthermore, unlike the Plan Trust in the Reorganization Cases, a Chapter 7 trustee would not receive the benefits of the Plan Trust Common Stock.

The Plan Proponents believe that the members of each Class of Impaired Claims will receive more under the Plan than they would receive if the Company was liquidated under Chapter 7 and that the holders of Congoleum Interests would not recover anything if the Company was liquidated under Chapter 7. The Plan Proponents therefore believe that the Plan is in the best interests of all holders of Claims and Interests.

(2)   **Feasibility of the Plan**

In order for the Plan to be confirmed, the District Court also must determine that the Plan is feasible -- that is, that the need for further reorganization or a subsequent liquidation of the Company is not likely to result following confirmation of the Plan. In determining whether a plan of reorganization is feasible, a court will consider (A) the adequacy of the proposed capital structure of the reorganized entity, (B) its earning power, (C) the overall economic conditions in which it will operate, (D) the capability of its management, (E) the continuity of its management and (F) any other factors the court deems relevant to the successful operation of the reorganized entity to perform the provisions of the plan of reorganization.

The Reorganized Debtors will be discharged from Asbestos Claims and otherwise in general will be free of pre-petition and other debt, other than indebtedness in respect of or under (1) the Exit Facility effected to refinance the Lender Secured Claim, (2) Other Secured Claims and (3) the New Senior Notes, as well as ongoing

business expenses and reorganization costs. The Plan Proponents believe that the cash flow generated by Reorganized Congoleum's business and assets will be sufficient to pay their ongoing obligations under their long-term debt and business expenses.

The Plan Proponents, therefore, believe that the Plan is feasible.

(3) **Acceptance by an Impaired Class**

Because the Plan impairs several Classes of Claims (Classes 4, 6, 7, 8, 9 and 10), section 1129(a)(10) of the Bankruptcy Code requires that for the Plan to be confirmed, at least one Impaired Class of Claims must accept the Plan by the requisite vote. As more fully described in Section 7.1(c) – "Acceptance or Rejection of the Plan - Class Acceptance Requirement," an Impaired Class of Claims will have accepted the Plan if and only if at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class that vote have voted to accept the Plan. Holders of Congoleum Interests are deemed to have rejected the Plan in accordance with the provisions of section 1126(g) of the Bankruptcy Code and their votes are not being solicited. Accordingly, if at least one voting Class accepts the Plan, the Plan Proponents will seek to confirm the Plan under the "cram down" provision of section 1129(b) with respect to Congoleum Interests and with respect to any other non-accepting Class, to the extent that section is applicable.

(4) **Unfair Discrimination and Fair and Equitable Tests**

To obtain confirmation of the Plan, it must be demonstrated that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, non-accepting Class. The Bankruptcy Code provides the following non-exclusive definition of the phrase "fair and equitable," as it applies to unsecured creditors and equity holders:

(i) **Unsecured Creditors**

With respect to any class of unsecured claims that rejects a plan, the Bankruptcy Code requires that either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the rejecting class of unsecured creditors will not receive or retain any property under the plan. This test will be applicable if any of Class 4 (Senior Note Claims), Class 6 (ABI Claims), Class 7 (Asbestos Personal Injury Claims), Class 8 (Asbestos Property Damage Claims), or Class 9 (General Unsecured Claims) rejects the Plan.

(ii) **Equity Holders**

With respect to any class of equity interests that rejects a plan, the Bankruptcy Code requires that either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest, or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan. Holders of Congoleum Interests are deemed to have rejected the Plan. Nevertheless, the Plan Proponents believe that the Plan satisfies clause (ii) of the foregoing test because there is no junior class to the Congoleum Interests. It follows that no interest junior to Congoleum Interests will receive any property under the Plan.

(b) **Conditions to Confirmation**

Confirmation of the Plan will not occur unless each of the following conditions has been satisfied or waived in accordance with Section 10.3 the Plan. These conditions to Confirmation, which are designed, among other things, to ensure that the Injunctions, releases, and discharges set forth in Article XI of the Plan will be effective, binding and enforceable, are as follows:

(i) The District Court will have made specific findings and determinations, among others, in substantially the following form:

(A)     The Discharge Injunction and the Asbestos Channeling Injunction are to be implemented in connection with the Plan and the Plan Trust;

(B)     As of the Petition Date, Congoleum has been named as a defendant in personal injury, wrongful death or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

(C)     The Plan Trust, upon the Effective Date, will assume the liabilities of the Debtors with respect to Plan Trust Asbestos Claims and Demands;

(D)     The Plan Trust is to be funded in part by securities of Reorganized Congoleum in the form of the Plan Trust Common Stock, which constitute an obligation of Reorganized Congoleum to make future payments to the Plan Trust;

(E)     On the Effective Date, the Plan Trust will own a majority of the voting shares of Reorganized Congoleum;

(F)     The Plan Trust is to use its assets and income to pay Plan Trust Asbestos Claims and Plan Trust Expenses and otherwise as specifically set forth in the Plan Trust Agreement;

(G)     Congoleum is likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Plan Trust Asbestos Claims, which are addressed by the Asbestos Channeling Injunction;

(H)     The actual amounts, numbers and timing of future Demands cannot be determined;

(I)     Pursuit of Demands outside the procedures prescribed by the Plan and the TDP is likely to threaten the Plan's purpose to deal equitably with Plan Trust Asbestos Claims and future Demands;

(J)     The Plan establishes a separate Class 7 for Asbestos Personal Injury Claims that are to be addressed by the Plan Trust and at least seventy-five percent (75%) of the Asbestos Claimants voting in each of Class 7A and Class 7B have accepted the Plan;

(K)     The Plan establishes a separate class of Asbestos Property Damage Claims that are to be addressed by the Plan Trust and at least seventy-five percent (75%) of the claimants voting in such class have accepted the Plan;

(L)     Pursuant to court orders or otherwise, the Plan Trust will operate through mechanisms such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims or other comparable mechanisms, that provide reasonable assurance that the Plan Trust will value, and be in a financial position to pay, Asbestos Personal Injury Claims and Demands therefor in substantially the same manner;

(M)     The Futures Representative was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Discharge Injunction and the Asbestos Channeling Injunction for the purpose of, among other things, protecting the rights of persons that might subsequently assert Demands of the kind that are addressed in the Discharge Injunction and the Asbestos Channeling Injunction and transferred to the Plan Trust;

(N)     In light of the benefits provided, or to be provided, to the Plan Trust on behalf of each Protected Party, the Asbestos Channeling Injunction is fair and equitable with respect to the persons that might subsequently assert Demands against any Protected Party;

(O)     The Plan otherwise complies with section 524(g) of the Bankruptcy Code;

(P)     Congoleum's contribution to the Plan Trust provided for in the Plan, including the Asbestos Insurance Assignment and the Plan Trust Common Stock, constitute substantial assets of the Plan Trust and the reorganization;

(Q)     The duties and obligations of the insurers that issued policies and their successors and assigns, or, with respect to any insolvent insurers, their liquidators and/or the state insurance guaranty funds that bear responsibility with respect to such rights under such policies which constitute the Asbestos Insurance Rights and Asbestos Property Damage Insurance Rights are not eliminated or diminished by the transfer pursuant to the Plan of the Debtors' rights in the Asbestos Insurance Rights and Asbestos Property Damage Insurance Rights pursuant to the Insurance Assignment Agreement;

(R)     The Settling Asbestos Insurance Companies are entitled to the benefits of the Asbestos Channeling Injunction with respect to Plan Trust Asbestos Claims;

(S)     After Confirmation, each Asbestos Insurance Settlement Agreement of a Settling Asbestos Insurance Company and each Final Order of the Bankruptcy Court or the District Court approving such Settlement Agreements will be binding upon and inure to the benefit of the Plan Trust and the Plan Trustee, and the Plan Trust will become fully bound by, and entitled to all of the rights afforded to the Plan Trust and/or the Debtors under, all of the terms and conditions of each such Asbestos Insurance Settlement Agreement without need for further act or documentation of any kind;

(T)     After Confirmation, none of the Debtors, Reorganized Congoleum, the Futures Representative, the Plan Trustee, and the Asbestos Claimants' Committee, will seek to terminate, reduce or limit the scope of the Asbestos Channeling Injunction or any other injunction contained in the Plan that inures to the benefit of any Settling Asbestos Insurance Company;

(U)     As of the Effective Date, the Insurance Assignment Agreement shall be a valid and binding obligation of each of the parties thereto, shall be in full force and effect and shall be enforceable in accordance with its terms, in each case notwithstanding any anti-assignment provision in or incorporated into any Asbestos Insurance Policy and applicable state law; and

(V)     The Plan Trust is a "qualified settlement fund" pursuant to Section 468(B) of the IRC and the regulations issued pursuant thereto.

(ii)     The District Court will have made such findings and determinations regarding the Plan as will enable the entry of the Confirmation Order and any other order entered in conjunction therewith, each of which will be in form and substance acceptable to Plan Proponents, and, insofar as such findings and determinations affect the Financing Order or the rights of Wachovia thereunder, Wachovia.

(c)     **Conditions for Effective Date**

Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date of the Plan will not occur unless and until each of the following conditions has been satisfied or, if applicable, waived in accordance with Section 10.3 of the Plan:

(1)     **Confirmation Order**

The Confirmation Order will have been entered by the District Court, and the Confirmation Order and any order of the District Court will be in form and substance acceptable to the Plan Proponents, and the Confirmation Order will have become a Final Order; *provided, however,* that the Effective Date may occur at a point in time when the Confirmation Order is not a Final Order at the option of the Plan Proponents unless the effectiveness of the Confirmation Order has been stayed, reversed or vacated. The Effective Date may occur, again at the option of the Plan Proponents, on the first Business Day immediately following the expiration or other termination of any stay of effectiveness of the Confirmation Order.

(2)     **Injunctions**

The Discharge Injunction, the Asbestos Channeling Injunction and the Anti-Suit Injunction will be in full force and effect.

(3) **Exit Facility**

The Exit Facility to be entered into by Reorganized Congoleum, and all documents to be executed in connection with the Exit Facility, shall be in form and substance reasonably satisfactory to the Plan Proponents and shall have been executed and delivered and all conditions precedent to effectiveness thereof shall have been satisfied or waived by the parties thereto.

(4) **New Senior Notes and New Indenture**

The New Indenture shall have been executed and authorized and the New Senior Notes shall have been delivered in accordance with the New Indenture and shall constitute valid senior secured indebtedness of Reorganized Congoleum.

(5) **New Common Stock**

The New Common Stock shall have been issued in accordance with the Plan.

(6) **Plan Documents**

The Plan Documents necessary or appropriate to implement the Plan (which shall include without limitation, the Plan, the Plan Trust Agreement, the TDP, the Exit Facility, the New Senior Notes, the New Indenture, the Registration Rights Agreement, the Amended and Restated Certificate, the Amended and Restated Bylaws, the New ABI Agreement, the Stockholders Agreement, and the Insurance Assignment Agreement) shall have been executed, delivered and, where applicable, filed with the appropriate governmental authorities; all conditions precedent to the effectiveness of each of such Plan Documents shall have been satisfied or waived by the respective parties thereto; and the Plan Documents shall be in full force and effect. The Plan Documents shall be acceptable to the Plan Proponents.

(7) **Other Assurances**

The Plan Proponents will have obtained either (i) a private letter ruling from the Internal Revenue Service establishing that the Plan Trust is a "qualified settlement fund" pursuant to Section 468(B) of the IRC and the regulations issued pursuant thereto, or (ii) other decisions, opinions or assurances regarding certain tax consequences of the Plan, satisfactory to the Debtors and the Asbestos Claimants' Committee.

(8) **Merger**

The District Court will have made a specific finding and determined that the merger of the Subsidiary Debtors with and into Congoleum, with Reorganized Congoleum as the sole surviving corporation, is authorized.

(9) **Judicial Fees**

All fees payable pursuant to 28 U.S.C. § 1930 if and to the extent assessed against the Bankruptcy Estates of the Debtors will have been paid in full.

(10) **Other Approvals, Documents and Actions**

All authorizations, consents and regulatory approvals required, if any, in connection with the consummation of the Plan will have been obtained, and all actions, documents, and agreements necessary to implement the Plan will have been effected or executed.

(d) **Waiver of Conditions**

Each of the conditions set forth in Sections 10.1 and 10.2 of the Plan may be waived in whole or in part by the Plan Proponents without any notice to other parties in interest or the District Court and without a hearing. The failure of the Plan Proponents to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

(e)      **Nonconsensual Confirmation Under Section 1129(b) of the Bankruptcy Code**

Although section 1129(a)(8) of the Bankruptcy Code requires that a plan be accepted by each class that is impaired by such plan, section 1129(b) of the Bankruptcy Code provides that the Plan may be confirmed if all requirements of section 1129(a) other than section 1129(a)(8) are met and if, with respect to each Class of Claims or Interests that is impaired under the Plan and has not voted to accept the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." A plan confirmed on the basis of this provision is commonly referred to as a "cramdown" plan. A cramdown plan is only available pursuant to section 1129(a)(10) of the Bankruptcy Code if at least one impaired class of claims accepts the plan. In the event there is no Impaired accepting Class, the Plan Proponents could not seek cramdown confirmation of the Plan because the Plan would not comply with the requirements of section 1129(a)(10) of the Bankruptcy Code. For a more detailed description of Bankruptcy Code Section 1129(b)'s "unfair discrimination" and "fair and equitable" tests, *see* Section 7.3 – "Requirements for Confirmation" above.

(f)      **Injunction Under Section 524(g) of the Bankruptcy Code**

Section 524(g) of the Bankruptcy Code authorizes a Bankruptcy Court or District Court to enjoin Entities from taking action to collect, recover or receive payment or recovery with respect to any Claim or Demand that is to be paid in whole or in part by a trust created by a plan of reorganization that satisfies the requirements of the Bankruptcy Code. The injunction may also bar any action based on such Claims or Demands against Congoleum that are directed at third parties.

To obtain the injunction, a trust must be established that (1) assumes Congoleum's Plan Trust Asbestos Claims; (2) is funded in whole or in part by securities of Congoleum and with an obligation by Congoleum to make future payments; (3) owns or is entitled to own if specified contingencies occur, a majority of the voting shares of Congoleum; and (4) uses its assets or income to satisfy claims and demands.

As a requirement before issuing an injunction under section 524(g) of the Bankruptcy Code, the Bankruptcy Court or District Court must determine that (1) Congoleum is likely to be subject to substantial Demands for payment arising out of the same or similar conduct or events that give rise to the Claims that are addressed by the injunction; (2) the actual amounts, numbers and timing of such Demands cannot be determined; (3) pursuit of such Demands outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with Claims and Demands; and (4) the Plan Trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Claims and Demands, or other comparable mechanisms that provide reasonable assurance that the Plan Trust will value, and be in a financial position to pay, Claims and Demands that involve similar Claims in substantially the same manner.

The Bankruptcy Court or District Court must also ensure that the terms of any proposed section 524(g) injunction are set forth in the plan and disclosure statement and that a separate Class or Classes of claimants whose Claims are to be addressed by the trust established and vote, by at least seventy-five percent (75%) of those voting in such Class or Classes, in favor of the Plan. Moreover, the injunction will be valid and enforceable as to future claimants only if a legal representative is appointed to protect their rights in the proceedings and if the court determines that applying the injunction to future claimants in favor of the beneficiaries of the injunction is fair and equitable with respect to the Persons that might subsequently assert such Demands, in light of the benefits provided, or to be provided, to the Plan Trust on behalf of Congoleum or a beneficiary of the third party injunction.

The order confirming the Plan must be issued or affirmed by the District Court that has jurisdiction over the Reorganization Cases.

The Plan Proponents believe that they will be able to satisfy the requirements of section 524(g) of the Bankruptcy Code if the requisite number of claimants in Class 7 and Class 8 vote in favor of the Plan.

Under the jurisdictional scheme applicable to bankruptcy courts, jurisdiction over bankruptcy cases and proceedings arising under the Bankruptcy Code or arising in or related to bankruptcy cases is vested in the district courts. However, the district courts may refer them to the bankruptcy judges of the district. In most districts, the district court has entered a standing order referring all such matters to the bankruptcy judges.

The Company filed the Reorganization Cases with the Bankruptcy Court of the District of New Jersey. However, the District Court withdrew the reference from the Bankruptcy Court pursuant to 28 U.S.C. § 157(d) as of August 17, 2009 and assumed authority over the Reorganization Cases. Accordingly, the District Court will conduct the Confirmation Hearing and enter the Confirmation Order. In this case, the section 524(g) injunctions will be enforceable upon the District Court's issuance of the Confirmation Order.

## 7.4.  Effect of Confirmation

Upon the District Court's entry of the Confirmation Order, and subject to the occurrence of the Effective Date, the Plan will be binding upon the Company, all holders of Claims and Interests and all other parties in interest, regardless of whether they have accepted the Plan.

## ARTICLE 8
## IMPLEMENTATION OF THE PLAN

THE FOLLOWING INCLUDES A SUMMARY OF CERTAIN SIGNIFICANT FEATURES OF THE PLAN TRUST AND OTHER PROVISIONS MATERIAL TO IMPLEMENTATION OF THE PLAN. THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE COMPLETE TEXT OF THE PLAN TRUST DOCUMENTS AND THE PLAN.

## 8.1.  Establishment and Purpose of the Plan Trust

On or prior to the Effective Date, the Plan Trust shall be established in accordance with the Plan Trust Agreement. The Plan Trust is intended to be a "qualified settlement fund" within the meaning of section 468B of the IRC and the Treasury Regulations promulgated thereunder. The purpose of the Plan Trust shall be to, among other things: (i) pay all Plan Trust Asbestos Claims in accordance with the Plan, the Plan Trust Agreement, the TDP and the Confirmation Order; (ii) preserve, hold, manage, and maximize the Plan Trust Assets for use in paying and satisfying Plan Trust Asbestos Claims in accordance with the Plan Trust Agreement and the TDP; (iii) prosecute, settle and manage the disposition of the Asbestos In-Place Insurance Coverage; and (iv) prosecute, settle, and manage Asbestos Insurance Actions and Direct Actions.

All Plan Trust Asbestos Claims, including the future Asbestos Claims and Demands of Plan Trust Asbestos Claimants that are presently unknown, will be resolved pursuant to the Plan, the Plan Trust Agreement and the TDP.

## 8.2.  Funding and Receipt of Plan Trust Assets

On the Effective Date, Reorganized Congoleum shall issue the Plan Trust Common Stock to the Plan Trust in accordance with the Plan and all Plan Trust Assets shall be transferred to, vested in, and assumed by the Plan Trust free and clear of all Claims, Liens and encumbrances; *provided, however*, that to the extent that certain Plan Trust Assets, because of their nature or because they will accrue subsequent to the Effective Date, cannot be transferred to, vested in, and assumed by the Plan Trust on the Effective Date, such Plan Trust Assets shall be transferred to, vested in, and assumed by the Plan Trust free and clear of Claims, Liens and encumbrances, as soon as practicable after the Effective Date.

## 8.3.  Insurance Assignment Agreement

On the Effective Date, the Debtors shall deliver the Insurance Assignment Agreement attached to the Plan as Exhibit B. Such agreement shall be valid, binding and enforceable. The Insurance Assignment Agreement shall transfer claims and rights set forth therein as Debtors may have, subject to any and all Asbestos Insurer Coverage Defenses.

**8.4. <u>Creation of Asbestos Property Damage Claim Sub-Account</u>**

On the Effective Date, the Plan Trust shall cause the Asbestos Property Damage Insurance Rights and any proceeds thereof, including $1.2 million from the proceeds of that certain settlement agreement between the Debtors and Liberty Mutual Insurance Company approved by the Bankruptcy Court by order dated July 30, 2004, to be held in the Asbestos Property Damage Claim Sub-Account. In accordance with the terms of the Plan Trust Agreement, the Plan Trustee shall be permitted to transfer monies from the Asbestos Property Damage Claim Sub-Account to the Asbestos Personal Injury Claim Sub-Account, from time to time, to the extent that the funds in the Asbestos Property Damage Claim Sub-Account exceed the aggregate amount of all unpaid Asbestos Property Damage Claims that have been filed prior to the Asbestos Property Damage Claim Bar Date, and a reasonable reserve for Plan Trust Expenses and indemnification costs or expenses, in either case, related to Asbestos Property Damage Claims.

**8.5. <u>Assumption of Liabilities by Plan Trust</u>**

On the Effective Date, all liabilities, obligations and responsibilities relating to all Plan Trust Asbestos Claims shall be transferred to the Plan Trust as set forth herein and the Plan Trustee, on behalf of the Plan Trust, shall expressly assume all liability for all Plan Trust Asbestos Claims and Demands as set forth herein, subject to the provisions of the Plan Trust Agreement. With the exception of the liabilities identified in the preceding sentence, the Plan Trust shall not assume any of the liabilities, obligations or responsibilities of the Debtors or Reorganized Congoleum.

**8.6. <u>Discharge of Liabilities to Holders of Asbestos Claims</u>**

Except as provided in the Plan and the Confirmation Order, the transfer to, vesting in, and assumption by the Plan Trust of the Plan Trust Assets as contemplated by the Plan shall, among other things, discharge the Debtors and the Reorganized Debtors from and in respect of all Plan Trust Asbestos Claims.

**8.7. <u>TDP</u>**

From and after the Effective Date, the Plan Trust shall pay the Plan Trust Asbestos Claims in accordance with the Plan Trust Agreement and the TDP. The Plan Trustee shall have the power to administer, amend, supplement or modify the TDP in accordance with the terms thereof.

**8.8. <u>Payment of Allowed Asbestos Property Damage Claims</u>**

From and after the Effective Date, the Plan Trust shall cause the payment of Allowed Asbestos Property Damage Claims from the Asbestos Property Damage Claim Sub-Account in accordance with the Plan Trust Agreement, *provided, however* that once the assets in the Asbestos Property Damage Claim Sub-Account have been exhausted, the Plan Trust shall have no further liability or obligation for or in respect of any Asbestos Property Damage Claims.

**8.9. <u>Excess Plan Trust Assets</u>**

To the extent there are any Plan Trust Assets remaining after the payment in full of all Plan Trust Asbestos Claims and all Plan Trust Expenses (or provision has been made therefor) in accordance with the Plan Trust Agreement and the TDP, such excess Plan Trust Assets will be transferred to a tax-exempt organization qualified under section 501(c)(3) of the IRC, which is to be determined by the Plan Trustee; *provided, however*, that the purpose thereof, if practicable, will be related to the treatment of or research regarding asbestos-related disorders.

**8.10.** __Plan Trust Expenses__

The Plan Trust shall pay all Plan Trust Expenses from the Plan Trust Assets in accordance with the Plan Trust Agreement. Neither the Debtors, the Reorganized Debtors, nor their Affiliates shall have any obligation to pay any Plan Trust Expenses. The Plan Trustee, each member of the TAC, the Futures Representative and the Representatives of each of the foregoing will have a lien upon the Plan Trust Assets which will be prior to any lien thereon, and the Plan Trust will grant a security interest in the Plan Trust Assets, all proceeds thereof and all accounts into which such proceeds or the Plan Trust Assets are deposited or maintained to secure payment of amounts payable to them as compensation or indemnification.

**8.11.** __Appointment of the Initial Plan Trustee__

Effective as of the Effective Date, the District Court shall appoint the initial Plan Trustee to serve as Plan Trustee in accordance with the Plan Trust Agreement. The Plan Trustee shall be designated no later than thirty (30) days prior to the Confirmation Hearing and shall be mutually acceptable to the Asbestos Claimants' Committee and the Futures Representative. For purposes of performing his or her duties and fulfilling his or her obligations under the Plan Trust Agreement, the TDP and the Plan, the Plan Trustee shall be deemed to be a party in interest within the meaning of section 1109(b) of the Bankruptcy Code. The Plan Trustee shall be the "administrator" of the Plan Trust as that term is used in Treas. Reg. Section 1.468B-2(k)(3).

**8.12.** __The Futures Representative__

Effective as of the Effective Date, the District Court shall appoint a Person to serve as the Futures Representative from and after the Effective Date pursuant to the terms of the Plan Trust Agreement and who shall have the functions and rights provided in the Plan Trust Documents.

**8.13.** __Appointment of Members of the Trust Advisory Committee__

Effective as of the Effective Date, the District Court shall appoint five initial members of the TAC (and thereupon the TAC shall be formed) to serve as members of the TAC in accordance with the Plan Trust Agreement.

**8.14.** __Institution and Maintenance of Legal and Other Proceedings__

As of the Effective Date, the Plan Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Plan Trust, including, without limitation, the Coverage Action, in each case to the extent not adjudicated, compromised or settled prior to the Effective Date. The Plan Trust shall be empowered to initiate, prosecute, defend, and resolve all such actions in the name of the Debtors and/or Reorganized Congoleum if deemed necessary or appropriate by the Plan Trustee. Except as otherwise provided by law or agreement, the Plan Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred subsequent to the Effective Date arising from or associated with any legal action or other proceeding brought pursuant to this Section 8.14 and shall pay or reimburse all deductibles, retrospective premium adjustments, or other charges which may arise from the receipt of insurance proceeds by the Plan Trust. Without in any way limiting the foregoing and subject to any Asbestos Insurer Coverage Defenses, the Plan Trust shall be empowered to elect to (or not to), initiate, prosecute, defend, settle, and resolve all Asbestos Insurance Actions and Direct Actions, and to maintain, administer, preserve, or pursue the Asbestos-In-Place Insurance Coverage, the Asbestos Insurance Action Recoveries, Asbestos Insurance Rights, the Asbestos Insurance Policies and rights under the Asbestos Insurance Settlement Agreements. All Causes of Action other than Asbestos Insurance Actions and Direct Actions shall remain the property of the Reorganized Debtors.

**8.15.** __Preservation of Insurance Claims__

The discharge and releases provided herein, and the injunctive protection provided to the Debtors, the Reorganized Debtors and any Protected Party with respect to Demands as provided in the Plan, shall neither diminish nor impair the enforceability of any of the Asbestos Insurance Policies by any Entity except (i) to the

extent that any such Asbestos Insurance Company is also a Settling Asbestos Insurance Company or (ii) that all Asbestos Insurer Coverage Defenses are preserved.

**8.16.   Indemnification by the Plan Trust**

Pursuant to sections 1.4 and 4.6 of the Plan Trust Agreement, the Plan Trust shall indemnify and defend the Plan Trustee, the members of the TAC and the Futures Representative in the performance of their duties under the Plan Trust Agreement to the fullest extent that a statutory trust or corporation organized under the laws of the state of Delaware is from time to time entitled to indemnify and defend such persons against any and all liabilities, expenses, claims, damages or losses incurred by them in the performance of their duties under the Plan Trust Agreement or in connection with activities undertaken by them prior to the Effective Date in connection with the formation, establishment, or funding of the Plan Trust.  The Plan Trust shall indemnify any of the Additional Indemnitees (as defined in the Plan Trust Agreement) in the performance of their duties under the Plan Trust Agreement to the fullest extent that a statutory trust or corporation organized under the laws of the Plan Trust's jurisdiction of organization is from time to time entitled to indemnify and defend such persons against any and all liabilities, expenses, claims, damages or losses incurred by them in the performance of their duties under the Plan Trust Agreement or in connection with activities undertaken by them prior to the Effective Date in connection with the formation, establishment or funding of the Plan Trust.  Notwithstanding the foregoing, the Plan Trustee and the Additional Indemnitees shall not be indemnified or defended in any way for any liability, expense, claim, damage, or loss for which he, she or it is ultimately liable under Section 4.4 of the Plan Trust Agreement.

Pursuant to section 1.4(d) of the Plan Trust Agreement, the Plan Trust shall also indemnify, defend and hold harmless each of the Debtors, the Reorganized Debtors and their past, present and future Representatives for any expenses, costs and fees (including reasonable attorneys' fees and costs, but excluding any such expenses, costs and fees incurred prior to the Effective Date), judgments, settlements or other liabilities arising from or incurred in connection with, any Plan Trust Asbestos Claim, including but not limited to indemnification or contribution for Plan Trust Asbestos Claims prosecuted against the Reorganized Debtors after the Effective Date but excluding (i) any amounts paid prior to or on the Effective Date by the Debtors or their past or present Representatives and (ii) any amounts paid or incurred by any Reorganized Debtor or its Representatives, whether before or after the Effective Date, in connection with defending, objecting to, or otherwise related to any proceedings to determine whether an Asbestos Property Damage Claim is or should be Allowed.

**8.17.   Establishment of the TDP**

Following the Effective Date, the Plan Trustee will promptly implement the TDP.  The TDP sets forth the procedures for resolving Plan Trust PI Asbestos Claims.  The TDP also provides mechanisms such as structured, periodic or supplemental payments, pro rata distributions, or periodic review of estimates of the numbers and values of present Unsecured Asbestos Personal Injury Claims and future Demands, or other comparable mechanisms, that provide reasonable assurance that the Plan Trust will value and be in a financial position to pay similar Asbestos Personal Injury Claims in substantially the same manner.  The TDP may be modified prior to the Effective Date and after the Effective Date from time to time in accordance with the terms of the TDP and the Trust Agreement.

**8.18.   [reserved]**

**8.19.   Certain Mergers**

On the Effective Date, the Subsidiary Debtors shall merge with and into Congoleum, with Reorganized Congoleum as the sole surviving corporation.

**8.20.   The Amended and Restated Certificate and the Amended and Restated Bylaws.**

The Amended and Restated Certificate and the Amended and Restated Bylaws of Reorganized Congoleum shall be in form and substance acceptable to the Plan Proponents and shall be consistent with the provisions of the Plan and the Bankruptcy Code.  The Amended and Restated Certificate shall, among other things (a) authorize the issuance of New Common Stock pursuant to Section 5.7 of the Plan, and (b) provide, pursuant to

section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-voting common equity securities. The Amended and Restated Bylaws and the Amended and Restated Certificate of Reorganized Congoleum shall be substantially in the form attached to the Plan as Exhibits J and K and will be filed as part of the Plan Supplement.

## 8.21. Directors and Officers of Reorganized Congoleum

The initial board of directors of Reorganized Congoleum shall consist of five (5) directors. One of such directors shall be selected by the Bondholders' Committee, three of such directors shall be selected jointly by the Futures Representative and the Asbestos Claimants' Committee, and one of such directors shall be Reorganized Congoleum's chief executive officer. The identity of such directors shall be disclosed by the Plan Proponents in the Plan Supplement. To the extent any such Person is an Insider (as defined in section 101(31) of the Bankruptcy Code), the nature of any compensation for such Person will also be disclosed prior to the Confirmation Hearing. Each of the Persons on the initial board of directors of Reorganized Congoleum shall serve in accordance with the Amended and Restated Certificate and the Amended and Restated Bylaws of Reorganized Congoleum, as the same may be amended from time to time. Subsequently, Reorganized Congoleum's board of directors shall be elected in accordance with Reorganized Congoleum's governing documents, which governing documents shall be acceptable to the Bondholders' Committee and the Asbestos Claimants' Committee.

The initial officers of Reorganized Congoleum shall be set forth in the Plan Supplement. To the extent any such Person is an Insider (as defined in section 101(31) of the Bankruptcy Code), the nature of any compensation for such Person will also be disclosed at such time. The initial officers shall serve in accordance with the Amended and Restated Certificate and the Amended and Restated Bylaws of Reorganized Congoleum, as the same may be amended from time to time.

Notwithstanding the foregoing, as part of the Intercompany Settlement described in Section 8.34 below, ABI shall make the services of Roger Marcus, Richard Marcus and Howard Feist, III available to Reorganized Congoleum for two years after the Effective Date in consideration of a base annual fee of $800,000 and an annual incentive fee. Roger Marcus shall serve as Chief Executive Officer and Director of Reorganized Congoleum. Howard Feist III shall serve as Chief Financial Officer of Reorganized Congoleum. Substantially all of Roger Marcus's time, approximately 25% of Richard Marcus's time, and approximately 50% of Howard Feist III's time, in each case, during normal working hours on an annual basis shall be made available by ABI to Reorganized Congoleum for the two years following the Effective Date.

Further, five percent of Reorganized Congoleum's total authorized number of shares of common stock shall be reserved for issuance by Reorganized Congoleum for equity based compensation and awards to the management team of Reorganized Congoleum with terms to be determined by the Board of Directors of Reorganized Congoleum.

## 8.22. Cancellation of Existing Securities and Agreements of the Debtors/Discharge of the Indenture Trustee.

Except as set forth in the Plan, upon the Effective Date, the Existing Securities shall be cancelled and the holders thereof shall have no further rights or entitlements in respect thereof against the Debtors except the right to receive any Distributions to be made to such holders under the Plan. To the extent possible, Distributions to be made under the Plan to the beneficial owners of the Senior Notes shall be made through the Depository Trust Company and its participants. The Confirmation Order shall authorize and direct the Indenture Trustee to take whatever action may be necessary or appropriate, in its reasonable discretion, to deliver the Distributions, including, without limitation, obtaining an order of the District Court. On the Effective Date, the Indenture Trustee and its agents shall be discharged of all their obligations associated with (i) the Senior Notes, (ii) the Indenture, and (iii) any related documents, and released from all Claims arising in the Reorganization Cases. As of the Effective Date, the Indenture shall be deemed fully satisfied and cancelled; *provided, however,* that the Indenture shall continue in effect solely for the purposes of: (1) allowing holders of the Senior Note Claims to receive distributions under the Plan, (2) allowing and preserving the rights of the Indenture Trustee to (a) make distributions in satisfaction of Allowed Senior Note Claims, (b) exercise its charging liens against any such distributions, and (c) seek compensation and reimbursement for any fees and expenses incurred in making such distributions. Upon

completion of all such distributions, the Senior Notes and the Indenture shall terminate completely. From and after the Effective Date, the Indenture Trustee shall have no duties or obligations under the Indenture other than to make distributions pursuant to the Plan.

**8.23.** **Exit Facility.**

On the Effective Date, Reorganized Congoleum shall obtain exit financing consistent with the terms and conditions set forth in the Exit Facility Commitment Letter or Term Sheet, which shall be filed as part of the Plan Supplement, from the Exit Facility Lenders.

**8.24.** **Issuance of New Securities and Debt Instruments.**

       (a)    New Common Stock

On the Effective Date, Reorganized Congoleum shall issue the New Common Stock pursuant to the Plan. The Amended and Restated Certificate, a substantially similar form of which is attached to the Plan as Exhibit K, sets forth the rights and preferences of the New Common Stock. The New Common Stock shall be issued subject to the Stockholders Agreement described below.

       (b)    New Senior Notes

On the Effective Date, Reorganized Congoleum shall issue $33 million in initial principal amount of 9% New Senior Notes, which shall mature on December 31, 2017. The New Senior Notes shall be governed by the terms and conditions set forth in the New Indenture.

**8.25.** **Registration Rights Agreement.**

In the event the board of directors of Reorganized Congoleum determines in its discretion to register any of the New Common Stock with the Securities and Exchange Commission, or if Reorganized Congoleum is required under the Stockholders Agreement or applicable securities laws to register any of the New Common Stock with the Securities and Exchange Commission, any Person receiving Distributions of the New Common Stock issued on the Effective Date that is not entitled to an exemption from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code, or whose resale of the New Common Stock is otherwise restricted under the securities laws, shall be entitled to become a party to the Registration Rights Agreement. The Registration Rights Agreement shall be satisfactory in form and substance to the Plan Proponents, a substantially similar form of which will be filed in the Plan Supplement.

**8.26.** **Stockholders Agreement.**

On the Effective Date, the Stockholders Agreement will be adopted by Reorganized Congoleum and be binding upon all holders of New Common Stock. All Holders of New Common Stock will be subject to the Stockholders Agreement which will, among other things, govern the access each holder of New Common Stock shall have to information with respect to Reorganized Congoleum and the ability to transfer such holder's New Common Stock. Each certificate representing share(s) of New Common Stock shall bear a legend indicating that the New Common Stock is subject to the Stockholders Agreement. The Stockholders Agreement will be effective as of the Effective Date. The Stockholders Agreement contains customary terms and conditions, including minority stockholder protections, and includes the minority stockholders having both a right of first refusal and right of first offer on the Plan Trust Common Stock. The Stockholders Agreement shall be satisfactory in form and substance to the Bondholders' Committee, and the Asbestos Claimants' Committee, a substantially similar form of which is attached to the Plan as Exhibit "L," which will be filed as part of the Plan Supplement.

**8.27.** **Effectuating Documents/Further Transactions.**

Each of the Debtors (subject to the consent of the Bondholders' Committee and the Asbestos Claimants' Committee) and Reorganized Congoleum, and their respective officers and designees, is authorized and directed to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or

documents, and take such actions as may be requested by the Plan Proponents, or as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of the Plan, the Exit Facility, or any other Plan Document, or to otherwise comply with applicable law.

**8.28.** **Exemption from Certain Transfer Taxes and Recording Fees.**

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to Reorganized Congoleum or to any other Person or entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**8.29.** **Section 346 Injunction.**

In accordance with section 346 of the Bankruptcy Code for the purposes of any state or local law imposing a tax, income will not be realized by the Estates, the Debtors or the Reorganized Debtors by reason of the forgiveness or discharge of indebtedness resulting from the consummation of the Plan. As a result, each state or local taxing authority is permanently enjoined and restrained, after the Confirmation Date, from commencing, continuing or taking any act to impose, collect or recover in any manner any tax against the Debtors or the Reorganized Debtors arising by reason of the forgiveness or discharge of indebtedness under the Plan.

**8.30.** **Corporate Action.**

All matters provided for under the Plan involving the corporate structure of the Debtors or Reorganized Congoleum, or any corporate action to be taken by, or required of the Debtors or Reorganized Congoleum shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the stockholders or directors of any of such entities.

**8.31.** **Litigation Settlement Agreement.**

(a) Pursuant to the Litigation Settlement Agreement, as amended, he Plan implements a compromise and settlement with respect to each such Litigation Settlement Claimant whose Asbestos Personal Injury Claim was liquidated pursuant to the Claimant Agreement or a Pre-Petition Settlement Agreement, as the case may be. The Litigation Settlement Agreement was approved by the Court by an order signed on October 31, 2008. The parties to the Litigation Settlement Agreement agreed to an amendment to conform such agreement to developments in the Reorganization Cases, and approval of such amendment is sought from the District Court under Bankruptcy Rule 9019 in connection with confirmation of the Plan.

(b) As of the Effective Date of the Plan,

(i) The Litigation Settlement Claimants shall waive any and all rights with respect to any pre-petition settlement of their Asbestos Personal Injury Claims against the Debtors, whether pursuant to any Pre-Petition Settlement Agreement or the Claimant Agreement, including the liquidated amounts thereof; provided, however, that:

● any Asbestos Personal Injury Claim against the Debtors held by any such Litigation Settlement Claimant, including with respect to any statutes of limitation related thereto, shall be restored to the *status quo ante* as it existed as of the time the Litigation Settlement Claimant initially filed or submitted its Asbestos Personal Injury Claim against the Debtors that resulted in the Claimant's Pre-Petition Settlement Agreement or the Claimant Agreement (the "**Submission Date**");

- any statute of limitation with respect to such Asbestos Personal Injury Claim shall be tolled until the later of ninety (90) days after the expiration of any stay imposed due to the filing of the Debtors' chapter 11 cases of such additional time as may be provided pursuant to the TDP incorporated in the Plan (the "**Asbestos Tolling Period**");

- neither the Asbestos Tolling Period nor any other term or provision of the Litigation Settlement Agreement shall revive any statute of limitations that expired as of the Submission Date; and

- all parties retain the right to assert any statute of limitations defense or other defenses that they could have asserted as of the Submission Date.

(ii)    With respect to the Litigation Settlement Claimants, the Debtors shall be released from any and all obligations and duties imposed pursuant to any Pre-Petition Settlement Agreement, Claimant Agreement, the Collateral Trust Agreement, Security Agreement and any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003.

(iii)    The Debtors shall be deemed to have forever withdrawn, released, discharged, waived and forgiven the Litigation Settlement Claimants and Claimants' Counsel, and each of their respective assigns, administrators and successors in interest, for and from any and all claims, actions, causes of action, counterclaims, proofs of claim, and any other obligation of any kind or nature arising from or related to the Bankruptcy Code, the Avoidance Actions, and any and all claims related to any Pre-Petition Settlement Agreement, Claimant Agreement, the Collateral Trust Agreement, Security Agreement, pre-petition payments to Claimants Counsel, and any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003, including all pending and potential causes of action, whether accrued or to accrue, whether asserted by way of claim, counterclaim, cross-claim, third-party action, action for indemnity or contribution or otherwise; provided, however, that the foregoing shall not constitute a release of any rights to enforce the terms of the Litigation Settlement Agreement, as amended, or any defenses to Asbestos Personal Injury Claims that may be asserted by the Debtors as contemplated in the Litigation Settlement Agreement, as amended.

(iv)    Except as otherwise provided for in the Litigation Settlement Agreement, as amended, all Litigation Settlement Claimants and Claimants' Counsel shall be deemed to have forever withdrawn, released, discharged, waived and forgiven the Debtors and their respective assigns, administrators and successors in interest, for and from any and all claims, actions, causes of action, counterclaims, proofs of claim, and any other obligation of any kind or nature arising from or related to the Bankruptcy Code, the Avoidance Actions, and any and all claims related to any Pre-Petition Settlement Agreement, Claimant Agreement, the Collateral Trust Agreement, Security Agreement and any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003, including all pending and potential causes of action, whether accrued or to accrue, whether asserted by way of a claim, counterclaim, cross-claim, third-party action, action for indemnity or contribution or otherwise; provided, however, that the foregoing shall not constitute a release of any rights to enforce the terms of the Litigation Settlement Agreement, as amended, and shall not constitute a release by Litigation Settlement Claimants of their Asbestos Personal Injury Claims against the Debtors, the Plan Trust, or any other party or entity.

(c)    Pursuant to the Litigation Settlement Agreement, as amended, and contingent upon confirmation of the Plan, the estates of Comstock, Cook and Arsenault have elected to withdraw their claims against the Debtors and will not seek recovery from the Debtors and/or Plan Trust, or otherwise participate in the Reorganization Cases.

(d)    Within 30 days after the Effective Date of the Plan, the Bankruptcy Court shall enter an order of dismissal of all claims and counterclaims in the Avoidance Actions, with prejudice, and with all parties to bear their own costs and attorneys fees.

(e)     Subject to the terms of this Plan, the mutual releases set forth in the Litigation Settlement Agreement, as amended, shall not abridge the right of Litigation Settlement Claimants to submit and recover upon their Asbestos Personal Injury Claims against the Debtors including as against the Plan Trust.

(f)     Each Litigation Settlement Claimant shall be entitled to submit its Asbestos Personal Injury Claim to the Debtors' bankruptcy estates, including the Plan Trust, as an unliquidated claim for resolution and treatment pursuant to TDP, provided that, any Litigation Settlement Claimant who received a partial payment from the Debtors with respect thereto prior to the Petition Date, including specifically claimants Cook, Arsenault, and Comstock, in addition to the other provisions hereof, hereby agrees to either: (a) not seek any further recovery with respect thereto against the Debtors, including from any Plan Trust, or (b) return and relinquish any such pre-petition partial payment for the benefit of the Plan Trust as a condition precedent to asserting any such further Asbestos Personal Injury Claim against the Debtors or the Plan Trust.

(g)     Pursuant to the Plan, any Pre-Petition Settled Claimant who is not a Litigation Settlement Claimant shall nevertheless receive the same treatment as the Litigation Settlement Claimants.

**8.32.    Review of Claimants' Counsel Expenses**

The expenses paid pre-petition by the Debtors to the Claimants' Counsel pursuant to the Claimant Agreement shall be subject to approval by the District Court in its discretion.  The result of the District Court's review may impact Litigation Settlement Agreement.

**8.33.    Non-Asbestos Reserve Fund**

(a)     Establishment of Reserve Fund.

The Reorganized Debtors shall establish a reserve fund (the "**Reserve Fund**") for claims, excluding asbestos claims, of any Governmental Units and any other Entities against the Debtors and/or Reorganized Debtors (the "**Non-Asbestos Claims**").  Within thirty (30) days after the Effective Date, the Plan Trust shall pay $3 million to the Reorganized Debtors for placement in the Reserve Fund (the "**Reserve Fund Settlement Funds**").  The Reserve Fund Settlement Funds shall be deposited in a segregated account and shall be used for the sole purpose of paying defense and indemnity costs incurred by the Reorganized Debtors after the Effective Date arising from Known Insurance Claims that are not paid in full by Liberty Mutual Insurance Company.

(b)     Termination of Reserve Fund.

As of the Fifth Anniversary Date, any unused balance of the Reserve Fund shall be transferred by the Reorganized Debtors to the Plan Trust, and the Reserve Fund shall be terminated, provided, however, that to the extent there are any Known Insurance Claims as of the Fifth Anniversary Date that are unresolved, the Reserve Fund shall not be terminated on that date.  In such event, any Reserve Fund balance shall continue to be used to pay defense and indemnity costs incurred by the Reorganized Debtors arising from Known Insurance Claims until those claims are resolved.  In the event that a balance remains in the Reserve Fund after all Known Insurance Claims are resolved, any unused balance of the Reserve Fund shall be transferred by the Reorganized Debtors to the Plan Trust and at such time the Reserve Fund shall be terminated.

**8.34.    Intercompany Settlement.**

(a)     The Plan implements a compromise and settlement with respect to ABI, the ABI Claims and the Intercompany Agreements (as set forth in Section 5.17 of the Plan, the "**Intercompany Settlement**").  Pursuant to Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code and consistent with section 1129 of the Bankruptcy Code, the Plan shall constitute a motion for approval of, and the Confirmation Order shall authorize and constitute District Court approval of, the Intercompany  Settlement.

(b)     On the Effective Date, pursuant to Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code, in full and final satisfaction of the ABI Claims, and for good and valuable consideration including

ABI's agreement to the treatment specified in the Plan for the ABI Claims and the Claims and Interests asserted by other parties in interest, the ABI Settlement shall be effectuated in accordance with the following terms:

      1.     All ABI Claims, including without limitation ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.17(b)(4)(B) of the Plan), shall be deemed Disallowed and expunged.

      2.     All Intercompany Agreements shall be deemed rejected, and any and all ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.17(b)(4)(B) of the Plan) arising therefrom shall be deemed Disallowed and expunged.

      3.     ABI and Reorganized Congoleum shall enter into and effectuate the New ABI Agreement, and which shall govern the relationship between ABI and Reorganized Congoleum upon the Effective Date.

      4.     The ABI Parties and ABI and their respective Representatives (in their capacities as such) shall be deemed to have received and exchanged mutual general releases with and from the Debtors, their Estates and Reorganized Congoleum, such that:

      A.     *As of the Effective Date, the Debtors, their Estates and Reorganized Congoleum shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, demands, debts, rights, causes of action and liabilities (other than their rights to enforce the terms of the Intercompany Settlement, the New ABI Agreement and the ABI Canada License Agreement, as amended by Section 5.17(b)(5) of the Plan, and their rights to payment of not more than $2 million on account of net Unpaid Intercompany Amounts remaining after intercompany offsets of Unpaid Intercompany Amounts), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, Reorganized Congoleum, the Reorganization Cases, the Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtors, their Estates or Reorganized Congoleum, as of the Petition Date or thereafter, against the ABI Parties, ABI and/or their respective Representatives (in their capacities as such); and*

      B.     *As of the Effective Date, the ABI Parties, ABI and their respective Representatives (in their capacities as such) shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, demands, debts, rights, causes of action and liabilities (other than their rights to enforce the terms of the Intercompany Settlement, the New ABI Agreement and the ABI Canada License Agreement, as amended by Section 5.17(b)(5) of the Plan, and their rights to payment of not more than $2 million on account of net Unpaid Intercompany Amounts remaining after intercompany offsets of Unpaid Intercompany Amounts), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, Reorganized Congoleum, the Reorganization Cases, the Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the ABI Parties, ABI and their respective Representatives (in their capacities as such), as of the Petition Date or thereafter, against the Debtors, their Estates or Reorganized Congoleum.*

      5.     The ABI Parties Canada License Agreement shall be deemed to have been assumed by Congoleum and become an obligation of Reorganized Congoleum, *provided, however,* that Article 7.02 of the ABI Canada License Agreement shall be modified so that the "Term" thereof shall expire two years from the Effective Date and the ABI Canada License Agreement shall be deemed amended accordingly as of the Effective Date without any further action of any Person or Entity.

## 8.35.    Deemed Consolidation of Debtors For Plan Purposes Only.

Subject to the occurrence of the Effective Date, the Debtors shall be deemed consolidated under the Plan for Plan purposes only. Each and every Claim filed or to be filed against any of the Debtors shall be deemed filed against the deemed consolidated Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Debtors. Such deemed consolidation, however, shall not (other than for purposes related to funding distributions under the Plan and as set forth in this Section 8.35) affect: (i) the legal and organizational structure of the Debtors; or (ii) any Liens that are required to be maintained under the Plan (A) in connection with executory contracts or unexpired leases that were entered into during the Reorganization Cases or that have been or will be assumed, (B) pursuant to the Plan, or (C) in connection with any Exit Facility. Notwithstanding anything contained in the Plan to the contrary, the deemed consolidation of the Debtors shall not have any effect on any of the Claims being reinstated and left unimpaired under the Plan, and the legal, equitable, and contractual rights to which the holders of any such Claims are entitled shall be left unaltered by the Plan.

## ARTICLE 9
## ESTIMATED CLAIMS BY CLASS

The Company and its professionals have attempted to determine the number and amount of Asbestos Claims likely to be asserted in the case. There are such inherent difficulties in doing so that no representation can be made as to the precise accuracy of such information. Nonetheless, the Company provided estimates of Claims against the Company in the Tenth Disclosure Statement which the Plan Proponents have incorporated below into the relevant classes under the Plan.

### 9.1. Claims other than Asbestos Claims

(a) **Administrative Expense Claims**

The post-petition costs and expenses of the Reorganization Cases to date (including the post-petition costs and expenses of the Coverage Action) is approximately $103 million, including the costs of professionals retained during the Reorganization Cases.

(b) **Priority Tax Claims**

The Company has stated it is likely that there will be few, if any, Priority Tax Claims.

(c) **DIP Financing Claim**

The Company has estimated that the Allowed DIP Financing Claim total approximately $12.1 million as of March 10, 2010.

(d) **Priority Claims (Class 1)**

The Company obtained approval of the Bankruptcy Court to pay Priority Claims in the ordinary course of business, including wages due to employees and contributions on its employees' behalf to employee benefit plans. The Company has stated that there will be few, if any, Priority Claims remaining unpaid at the Effective Date.

(e) **Lender Secured Claims (Class 2)**

The Lender Secured Claims (Class 2) have been indefeasibly paid and thus for plan purposes they are estimated at $0.

(f) **Senior Note Claims (Class 4)**

The Company noted that it expects that the Senior Note Claims total approximately $100 million, plus accrued pre-petition interest.

(g) **Workers' Compensation Claims (Class 5)**

According to the Company, as of the Petition Date, the current incurred liability was estimated to be approximately $3.2 million.

(h) **ABI Claims (Class 6)**

The Company has estimated such Claims total approximately $1.8 million.

(h) **General Unsecured Claims (Class 9)**

As described in Section 5.7 above, the Plan Proponents understand that there are several General Unsecured Claims relating to pre-petition periods that remain unpaid.

The Company obtained authority from the Bankruptcy Court at the beginning of the Reorganization Cases to pay operating expenses and trade claims in the ordinary course of business, when such claims become due. In addition, all executory contracts (other than contracts with ABI which are treated in the Class of ABI Claims) will be assumed.

The Company has estimated that the General Unsecured Claims asserted against it total approximately $3 million.

## 9.2. Asbestos Claims

(a) **Asbestos Property Damage Claims (Class 8)**

According to the Company, the aggregate amount of Allowed Asbestos Property Damage Claims is approximately $133,000 and does not exceed the amount of proceeds from insurance coverage available for such Claims.

(b) **Asbestos Personal Injury Claims (Class 7)**

Consistent with the disclosure statements previously filed by the Debtors and other Plan Proponents and approved by the Bankruptcy Court, the Plan Proponents have not provided an estimate of Asbestos Personal Injury Claims due to the uncertainties and difficulties inherent in determining the number and amount of Asbestos Personal Injury Claims. However, the Debtors have asserted that as of the Petition Date there were approximately 22,000 pending lawsuits (including workers' compensation cases) involving approximately 106,000 individuals alleging personal injury or death from exposure to asbestos or asbestos-containing products. Moreover, under the terms of the Claimant Agreement, 79,630 claims meeting the requirements of the Claimant Agreement with a settlement value in excess of $466 million were processed. In addition, other Pre-Petition Settlement Agreements total approximately $25 million. Pursuant to this Plan, these claimants will receive the treatment provided for Asbestos Personal Injury Claims in Class 7. As a result of tabulating ballots on its Fourth Modified Plan in the first quarter of 2005, the Company became aware of additional claims by claimants whose claims were not determined under the Claimant Agreement or Pre-Petition Settlement Agreements and such claimants have submitted ballots asserting claims with a value of approximately $512 million. Additional new claimants submitted ballots asserting new claims in connection with the February 2008 Joint Plan. The Plan Proponents believe that the classification and treatment provided by the Plan complies with applicable law and is fair and equitable.

## ARTICLE 10
## RISKS OF THE PLAN

### 10.1. General

The following is intended as a summary of certain risks associated with the Plan, but is not exhaustive and must be supplemented by the analysis and evaluation of the Plan and this Disclosure Statement as a whole by each holder of a Claim with such holder's own counsel and other advisors.

### 10.2. Confirmation Risks

For the Plan to be confirmed, each Impaired Class of Claims is given the opportunity to vote to accept or reject the Plan or will have its prior votes from the February 2008 Joint Plan deemed cast on this Plan pursuant to the Voting Procedures Order.  With regard to the Impaired Classes which vote on the Plan, the Plan will be deemed accepted by a Class of Impaired Claims if the Plan is accepted by holders of Claims of such Class who hold at least two-thirds in dollar amount and more than one-half in number of the total Allowed Claims of such Class actually voting on the Plan. Only those members of a Class who vote to accept or reject the Plan will be counted for voting purposes.  The Plan must also comply with the requirements of section 524(g) of the Bankruptcy Code.  Thus, if votes of holders of Claims in Classes 4, 6, 7, 8 and 9 are received in number and amount sufficient to enable the District Court to confirm the Plan and issue a supplemental injunction under section 524(g) of the Bankruptcy Code, the Plan Proponents intend to seek, as promptly as practicable, confirmation of the Plan.

Any objection to the Plan by a party in interest could either prevent, or delay for a significant period of time, Confirmation of the Plan.

Moreover, although the Plan Proponents believe that the Plan will satisfy all requirements necessary for confirmation by the District Court (including the cramdown requirements specified in Section 7.3(a)(4)(ii) above with respect to Congoleum Interests which have been deemed to reject the Plan), there can be no assurance that the District Court will reach the same conclusion.

### 10.3.  Insurance Coverage for Plan Trust Asbestos Claims

Congoleum's insurers have asserted that Congoleum does not have the right to negotiate or agree to claims resolution criteria and bankruptcy trust distribution procedures as part of its plan of reorganization over their objections and/or without their consent and/or without their participation and that Congoleum has breached and continues to breach the terms of its insurance policies when it negotiates claims resolution criteria as part of its plan of reorganization and bankruptcy trust distribution procedures without their participation or consent. According to Congoleum's insurers, Congoleum has violated numerous provisions in its insurance policies by negotiating claims resolution criteria as part of its plan of reorganization and bankruptcy trust distribution procedures without insurers' participation or consent, including consent-to-settlement clauses, cooperation clauses, consent-to-assignment clauses, and other clauses.  In addition, the insurers have asserted that the claims resolution criteria in the plan of reorganization and bankruptcy trust distribution procedures are unfair and unreasonable and were not and are not being negotiated in good faith and are the result of improper "collusion" among counsel representing Asbestos Claimants and Congoleum and that, for these reasons as well as others, the insurers do not and will not owe coverage for any claims resolved and/or paid under the bankruptcy trust distribution procedures.  Various insurers have written letters objecting to Congoleum's plan and trust distribution procedures and stating various reasons for contending that Congoleum was and is in breach of insurance policies and various reasons for contending that the insurers will not owe coverage for claims resolved or paid under terms of Congoleum's plan.

Because of the risks involved with respect to the effects of various potential rulings by the District Court or an appeal thereof, as well as the uncertainty in the resolution of any present or future Asbestos Insurance Action, including the Coverage Litigation, the ultimate value of the insurance proceeds that will be available to the Plan Trust is uncertain.  The Plan Proponents have addressed the potential impact of this uncertainty on the Plan Trust by authorizing the Plan Trustee, with the consent of the TAC and the Futures Representative, to amend the TDP and/or the Plan Trust Agreement under certain circumstances.  Moreover, the possibility that one or more of the insurance companies may become insolvent in the future may impact the value of Congoleum's insurance coverage, and thus the value of the Plan Trust Assets.

As noted in Section 2.3(a) above, on May 18, 2007, the Superior Court of New Jersey issued its decision on the Phase I trial, ruling that the Claimant Agreement is an unreasonable agreement, not made in good faith, and therefore Congoleum's insurers have no coverage obligations for the Claimant Agreement.  The Confirmation condition and risk discussed in Section 10.2 above should eliminate coverage issues with respect to the Claimant Agreement.  However, while the Plan Proponents have attempted to address insurer objections in the TDP associated with the Plan, there can be no assurance that insurer objections similar to those noted above with respect to plans proposed by Congoleum will not be made with respect to such TDP.  The Chartis Companies, formerly known as AIG, have filed objections to the Plan.  The Chartis Companies, the only remaining unsettled insurer of the Debtors, contend that confirmation of the Plan may result in voiding certain insurance coverage.  In

addition, although the Bankruptcy Court determined, among other things, that Congoleum's rights under its insurance policies may be assigned to a plan trust, *see* discussion of the Supplemental Joint Plan Opinion in Section 5.15 hereof, the Chartis Companies contend that the Plan would violate various provisions of certain insurance policies, including the right to participate or consent in settlement of claims, the right to cooperation from Congoleum and the right to withhold consent to the assignment of policies.

### 10.4. Distributions under the TDP

Payments that will be made on Plan Trust Asbestos Claims will be determined under the TDP, the Plan and the Plan Trust Agreement and will be based on one hand, upon estimates of the number, types and amount of present and expected future Plan Trust Asbestos Claims and, on the other hand, on the value of the Plan Trust Assets, the liquidity of the Plan Trust Assets, the Plan Trust's expected future expenses and income, as well as other material matters that are reasonable and likely to affect the sufficiency of funds to pay all holders of Plan Trust Asbestos Claims. There can be no certainty as to the precise amounts that will be distributed by the Plan Trust in any particular time period or when Plan Trust Asbestos Claims will be paid by the Plan Trust.

### 10.5. Risk of Post-Confirmation Default

Although no guarantees can be given, the Plan Proponents believe that the cash flow generated by the Reorganized Debtors' business and assets will be sufficient to pay their ongoing obligations under their long-term debt and business expenses. At the Confirmation Hearing, the District Court will be required to make a judicial determination that the Plan is feasible in order to confirm the Plan.

Congoleum is subject to the effects of general economic conditions. A sustained general economic slowdown could have serious negative consequences for Congoleum's business, results of operations and financial condition. Moreover, Congoleum's business is cyclical and is affected by the economic factors that affect the remodeling and housing industries in general and the manufactured housing industry specifically, including the availability of credit, consumer confidence, changes in interest rates, market demand and general economic conditions. Congoleum has experienced a significant decline in sales as a result of weakness in the housing market and general economy. Congoleum may experience further sales declines resulting from continued deterioration in the housing market.

### 10.6. Exit Facility

There can be no assurance that the Company will be able to reach terms with lenders to provide the Exit Facility needed for the Company to emerge from bankruptcy. Confirmation of any plan of reorganization will depend on Congoleum obtaining exit financing to provide it with sufficient liquidity to fund obligations upon the plan becoming effective. If Congoleum's cash flow from operations is materially less than anticipated and/or if the costs of seeking confirmation of this Plan or any plan of reorganization or in connection with the Coverage Litigation are materially more than anticipated, Congoleum may be unable to obtain exit financing which, when combined with net cash provided from operating activities, would provide it with sufficient funds.

### 10.7. Litigation Settlement Agreement

The Litigation Settlement Agreement, as amended, is an integral part of the Plan. Although the Bankruptcy Court approved the Litigation Settlement Agreement pursuant to Bankruptcy Rule 9019, there can be no assurance that the District Court will determine that any of the components of the Litigation Settlement Agreement, as amended, as incorporated into the Plan will satisfy the requirements for confirmation, as put forth in the Bankruptcy Code.

### ARTICLE 11
### ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include (a) liquidation of the Company under Chapter 7 of the Bankruptcy Code; (b) an alternative plan of reorganization, including a plan of reorganization proposed by the CNA or other parties in interest, and (c) dismissal of the Reorganization Cases.

### 11.1. Liquidation under Chapter 7

If no plan can be confirmed, the Reorganization Cases may be converted to cases under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a Chapter 7 liquidation would have on the recovery of holders of Claims and Equity Interests and a Liquidation Valuation with respect to the Debtors are set forth above in Section 7.3(a)(1) – "Best Interests Test." The Plan Proponents agree that the timing of the distributions under a Chapter 7 case would be delayed and the amount of distributions that would be made in a Chapter 7 case would be materially less than the distributions contemplated by the Plan, because, among other things, (a) a Chapter 7 trustee would not receive the benefits of the enterprise value represented by the shares of the New Senior Notes and the New Common Stock to be issued by Reorganized Congoleum to the Plan Trust, and (b) the ability of the trustee in a Chapter 7 case to negotiate settlements with Asbestos Insurance Companies is likely to be impaired.

Attached hereto as Exhibit B is a Liquidation Valuation, which was prepared based on asset valuations provided by the Debtors, which assumes that a bankruptcy case under Chapter 7 is commenced immediately and that the Debtors' assets are liquidated by a Chapter 7 trustee in an orderly liquidation. The Liquidation Valuation is based upon a number of estimates and assumptions which, are inherently beyond the control of the Plan Proponents or any Chapter 7 trustee. Accordingly, there can be no assurances that the values reflected in the Liquidation Valuation would be realized if the Debtors were to undergo such a Chapter 7 liquidation; actual results could vary materially from those shown in Exhibit B. In addition, any liquidation would necessarily take place in the future under circumstances which presently cannot be predicted. Accordingly, if the Estates were liquidated, the actual liquidation proceeds could be materially lower or higher than the amounts set forth in Exhibit B, and no representation or warranty can be made with respect to the actual proceeds that could be received in a Chapter 7 liquidation.

### 11.2. Alternative Plan of Reorganization

The Plan Proponents believe that the Plan provides a greater recovery to the holders of valid Claims than any plan filed or proposed to date and is otherwise in the best interests of the Debtors' Estates, but holders of Claims must rely on their own examination of the terms of any plan of reorganization that is filed and has not been ruled to be unconfirmable as a matter of law.

### 11.3. Dismissal of Cases

Under Section 1112(b) of the Bankruptcy Code, the District Court can dismiss the Reorganization Cases if it finds that dismissal is in the best interests of creditors and the Estates. After dismissal, Claims against the Debtors would be resolved in accordance with applicable nonbankruptcy law. The Plan Proponents believe that the Debtors lack sufficient assets to pay all Asbestos Personal Injury Claims and other Claims.

THE PLAN PROPONENTS BELIEVE THAT THE CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS PREFERABLE TO ANY OF THE ALTERNATIVES BECAUSE IT SHOULD PROVIDE GREATER RECOVERIES THAN THOSE AVAILABLE IN LIQUIDATION OR UNDER ANY ALTERNATIVE PLAN.

## ARTICLE 12
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

TO ENSURE COMPLIANCE WITH U.S. TREASURY DEPARTMENT CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF UNITED STATES FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS OF CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS OF CLAIMS UNDER THE IRC; (B) SUCH DISCUSSION IS INCLUDED HEREIN IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF U.S. TREASURY DEPARTMENT CIRCULAR 230) OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS

**SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISER. HOLDERS OF CONGOLEUM INTERESTS ARE NOT BEING SOLICITED PURSUANT TO THIS DISCLOSURE STATEMENT AND THEREFORE THE CONSEQUENCES OF THE CANCELLATION OF CONGOLEUM INTERESTS TO THE HOLDERS THEREOF IS NOT ADDRESSED HEREIN.**

A summary description of certain United States federal income tax consequences of the Plan is provided below. This summary is for informational purposes only and should not be relied upon for purposes of determining the specific tax consequences of the Plan to a particular holder of a Claim. Only the principal United States federal income tax consequences of the Plan to Reorganized Congoleum, the Plan Trust and impaired holders of Claims are described below. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. No rulings or determinations of the Internal Revenue Service or any other taxing authority have been sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the Internal Revenue Service or any other taxing authority. No assurance can be given that the Internal Revenue Service or any other taxing authority would not assert, or that a court would not sustain, a different position from any discussed herein.

This summary is based upon existing United States federal income tax law, which is subject to change, possibly with retroactive effect. This summary does not address all aspects of United States federal income taxation that may be important to a particular holder of a Claim in light of such holder's individual investment circumstances or to certain types of holders of Claims subject to special tax rules (e.g., financial institutions, insurance companies, broker-dealers, tax-exempt organizations, and foreign persons), all of whom may be subject to tax rules that differ significantly from those summarized below. This summary does not discuss any foreign, state, or local tax considerations. In addition, this summary does not address the possible application of IRC provisions and United States Treasury regulations concerning reportable transactions, which include transactions with respect to which, under certain circumstances, taxpayers claim losses.

**This summary is not intended to constitute a complete analysis of all tax considerations relevant to a particular holder of a Claim. Each holder of a Claim should seek advice from its own independent tax advisors concerning the United States federal, state, local, foreign income and other tax consequences of the Plan to them in light of their particular circumstances.**

## 12.1.   Tax Consequences to Reorganized Congoleum

(a)      **Discharge of Indebtedness; New Senior Notes**

In general, a taxpayer must include in gross income the amount of any indebtedness that is cancelled ("**COD Income**") during the taxable year. However, Section 108(a)(1)(A) of the IRC provides an exception to this rule where a taxpayer is subject to the jurisdiction of a court overseeing a bankruptcy case and the cancellation of indebtedness is granted by, or effected pursuant to, a plan approved by such court, as would be the case upon the confirmation of the Plan. In this event, rather than being included in gross income, the COD Income is applied to reduce the following tax attributes of the taxpayer in the following order: net operating losses, business and minimum tax credit carry forwards, capital loss carry forwards, the basis of the taxpayer's assets, and foreign tax credit carry forwards (collectively, the "**Tax Attributes**"). Under Section 108(b)(5) of the IRC, a taxpayer may elect to first apply the reduction to the basis of the taxpayer's depreciable assets, with any remaining balance applied to the other Tax Attributes in the order stated above. Additionally, Section 108(e)(2) of the IRC provides that no COD Income is realized to the extent that the taxpayer's satisfaction of the cancelled debt would have given rise to a tax deduction for United States federal income tax purposes. The effect of Section 108(e)(2) of the IRC, where applicable, is to allow the taxpayer's debt to be cancelled without the recognition of income by the taxpayer and without reduction of its Tax Attributes. Furthermore, under Section 108(e)(8) of the IRC, a corporation that acquires its debt in exchange for stock is deemed to have satisfied the indebtedness with an amount of money equal to the fair market value of the stock. The effect of Section 108(e)(8) will also be to reduce the level of the recognition of income by the taxpayer and the reduction of Tax Attributes.

Pursuant to the Plan, although an amount of Asbestos Claims will be paid, holders of Asbestos Claims may receive less than 100% of the face value of their Claims and thus an amount of Asbestos Claims also

may be cancelled. However, such cancellation of Asbestos Claims generally will not result in COD Income to Reorganized Congoleum because payment of the Asbestos Claims would have given rise to tax deductions for Reorganized Congoleum.

Any forgiveness of accrued and unpaid interest on the Senior Notes will likely result in COD Income to Reorganized Congoleum to the extent that such accrued and unpaid interest has been previously deducted by Congoleum for United States federal income tax purposes. The Plan provides that a Distribution on an Allowed Claim, including a Senior Note Claim, will, to the extent permitted by applicable law, be allocated for United States federal income tax purposes first to the principal amount of the Allowed Claim and then to accrued and unpaid interest thereon. There can be no assurance that the Internal Revenue Service will not successfully challenge that position. Further, exchange of Senior Notes for New Senior Notes and New Common Stock pursuant to the Plan will result in COD Income to the extent that, among other things, the sum of the aggregate "issue price" of the New Senior Notes and the aggregate fair market value of the New Common Stock allocated to the principal amount of the Senior Notes is less than the aggregate principal amount of the Senior Notes. The issue price of the New Senior Notes will be their fair market value at the time of the exchange if a substantial amount of Senior Notes or New Senior Notes are "traded on an established market" within the meaning of applicable Treasury regulations. If neither are so traded, because the New Senior Notes will be treated as "contingent payment debt instruments," as discussed below, the issue price of the New Senior Notes will be the lesser of the instrument's noncontingent principal payments and the sum of the present values of the noncontingent payments (as calculated pursuant to the applicable Treasury regulations). Further, increases in the principal amount of the New Senior Notes (by the issuance of additional New Senior Notes based on EBITDA of the Reorganized Congoleum) may result is a loss or other deduction to offset COD Income. The Plan Proponents anticipate that the sum of the aggregate issue price of the New Senior Notes (including additional New Senior Notes based on EBITDA of the Reorganized Congoleum) and the aggregate fair market value of the New Common Stock allocated to the principal amount of the Senior Notes will be less than the aggregate principal amount of the Senior Notes and, therefore, Reorganized Congoleum will recognize COD Income from the exchange.

Because the New Senior Notes will be treated as "contingent payment debt instruments," the New Senior Notes will be issued with "original issue discount" ("**OID**") for federal income tax purposes. In general, Reorganized Congoleum will be entitled to deduct OID under complex contingent payment debt instrument rules. However, under the "applicable high yield debt obligation" rules, Reorganized Congoleum may be required to defer, or may be denied, deductions for OID in whole or in part, as discussed below.

Although the terms of the Exit Facility have not yet been determined, the Plan Proponents believe it unlikely that replacement of the Existing Credit Agreement with the Exit Facility will result in COD Income to Reorganized Congoleum.

Notwithstanding the foregoing, in the event that the discharge of indebtedness pursuant to the Plan were to cause Reorganized Congoleum to recognize COD Income, the Plan Proponents have not determined whether Reorganized Congoleum would make the election under Section 108(b)(5) of the IRC to apply any required Tax Attribute reduction first to depreciable property, with any excess next applied to reduce other Tax Attributes. In this regard, as of December 31, 2008, Congoleum reported that it had net operating losses ("**NOLs**") of approximately $21.4 million.

    (b)    **Net Operating Losses**

Congoleum has indicated that it is uncertain as to whether Reorganized Congoleum will have an NOL after emerging from bankruptcy, taking into account any COD Income. The following discussion would apply should Reorganized Congoleum have an NOL after emergence.

The extent to which Reorganized Congoleum will be able to utilize its NOLs after emerging from bankruptcy will depend on Section 382 of the IRC, which generally imposes an annual limitation (the "**Section 382 Limitation**") on a corporation's use of its NOLs (and may limit a corporation's use of certain built-in losses recognized within a five-year period following an ownership change) if a corporation undergoes an ownership change. The annual Section 382 Limitation on the use of pre-change losses (the NOLs and built-in losses recognized within the five year post-ownership change period) in any "post-change year" is generally equal to the

product of the fair market value of the loss corporation's outstanding stock immediately before the ownership change multiplied by the long-term tax-exempt rate in effect for the month in which the ownership change occurs. The long-term tax-exempt rate is published monthly by the Internal Revenue Service and is intended to reflect current interest rates on long-term tax-exempt debt obligations. For November 2009, the rate is 4.33%. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. As discussed below, however, a special exception from these rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

In general, an ownership change occurs when the percentage of the corporation's stock owned by certain "5 percent shareholders" increases by more than 50 percentage points in the aggregate over the lowest percentage owned by them at any time during the applicable "testing period" (generally, the shorter of (a) the 36-month period preceding the testing date or (b) the period of time since the most recent ownership change of the corporation). Reorganized Congoleum will experience an ownership change under Section 382 of the IRC as a result of the consummation of the Plan.

Even though such an ownership change occurs, it may not give rise to any limitation on Reorganized Congoleum's ability to use its NOLs after emergence from bankruptcy. Section 382(1)(5) of the IRC provides a special rule applicable in the case of a bankruptcy reorganization (the "**Section 382(1)(5) Exception**"). If a corporation qualifies for the Section 382(1)(5) Exception, the annual Section 382 Limitation will not apply to the corporation's NOLs. The Section 382(1)(5) Exception does, however, require that the corporation's NOL carryovers be computed without taking into account the aggregate amount of all interest deductions in respect of debt exchanged for the corporation's stock during the three prior taxable years and the portion of the current taxable year ending on the date of the ownership change. Further, Section 382(1)(5) of the IRC provides that if a company that utilizes the Section 382(1)(5) Exception undergoes another ownership change within two years, that company's NOL is reduced to zero.

A corporation that is reorganized in bankruptcy will qualify for the Section 382(1)(5) Exception if the corporation's pre-bankruptcy shareholders and holders of certain debt ("**Qualifying Debt**") own at least 50% of the stock of the corporation after the reorganization, and the corporation does not "elect out" of the Section 382(1)(5) Exception. Qualifying Debt is a claim which (i) was held by the same creditor for at least 18 months prior to the bankruptcy filing or (ii) arose in the ordinary course of a corporation's trade or business and has been owned, at all times, by the same creditor. Indebtedness will be treated as arising in the ordinary course of a corporation's trade or business if such indebtedness is incurred by the corporation in connection with the normal, usual or customary conduct of the corporation's business. It is not clear whether the Reorganized Congoleum would be eligible for the Section 382(1)(5) Exception, and the Plan Proponents have not determined whether Reorganized Congoleum would avail itself of the Section 382(1)(5) Exception, should it be available.

(c)    **Transfers to the Plan Trust**

The Treasury regulations promulgated under Section 468B of the IRC provide that a fund, account, or trust will constitute a qualified settlement fund ("**QSF**") if it satisfies three conditions. First, the fund, account, or trust must be established pursuant to an order of or be approved by a government authority, including a court, and must be subject to the continuing jurisdiction of that government authority. Second, the fund, account, or trust must be established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event or related series of events that has occurred and that has given rise to at least one claim asserting liability arising from, among other things, a tort. Third, the fund, account, or trust must be a trust under applicable state law or have its assets physically segregated from the other assets of the transferor and persons related to the transferor.

A payment to a QSF generally is deductible when made, assuming that such payment otherwise constitutes an ordinary and necessary business expense. A transferor is generally entitled to a deduction in an amount equal to the fair market value of its equity transferred to a QSF. The issuance of a transferor's equity to the QSF generally does not result in gain or loss to the transferor. Additionally, no deduction is allowed with respect to the transfer of insurance proceeds to a QSF to the extent the transferred amounts are excludable from gross income of the transferor. If the settlement of an insurance claim occurs after the transfer of such claim to the QSF and a

deduction has been taken with respect to such transfer, then the transferor must include in income the amounts received from the settlement of the insurance claim to the extent of the deduction.

Assuming confirmation of the Plan, the Plan Trust will be established to satisfy Plan Trust Asbestos Claims alleged to arise out of a tort or torts, will be a trust under state law, and will be approved by the District Court and subject to its continuing jurisdiction. Accordingly, based on those assumptions and on the completion of certain filings, the Plan Trust should constitute a QSF after confirmation of the Plan. Certain insurance proceeds and certain rights under insurance coverage will be transferred to the Plan Trust, and Reorganized Congoleum also will transfer the Plan Trust Common Stock to the Plan Trust. Although amounts transferred to a QSF generally are deductible, no deduction will be allowed to Reorganized Congoleum with respect to the transfer of insurance proceeds to the extent the transferred amounts are excludable from gross income of Reorganized Congoleum. Further, if the settlement of an insurance claim occurs after the transfer of such claim to the QSF and Reorganized Congoleum has taken a deduction with respect to such transfer, then Reorganized Congoleum will be required to include in income the amounts received from the settlement of the insurance claim to the extent of the deduction.

(d) **Alternative Minimum Tax**

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income from AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation undergoes an ownership change, within the meaning of Section 382 of the IRC and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's aggregate tax basis in its assets would be adjusted for certain AMT purposes to reflect the fair market value of such assets as of the change date.

**12.2.** **Tax Consequences to the Plan Trust**

Assuming that, as expected, the Plan Trust qualifies as a QSF, the Plan Trust will be required to pay federal income tax on its modified gross income, as defined in the Treasury regulations promulgated under Section 468B of the IRC, at the highest rate applicable to estates and trusts. The Plan Trust generally will not be required to include in income amounts transferred to it pursuant to the Plan. Any sale, exchange or distribution of Plan Trust property generally will result in gain or loss equal to the difference between the consideration received (or the fair market value of the property) on the date of such sale, exchange or distribution and the adjusted tax basis of such property. For this purpose, the tax basis of property received by the Plan Trust will be its fair market value at the time of receipt. The Plan Trust will not be entitled to deduct amounts that it pays with respect to Plan Trust Asbestos Claims, but will be entitled to deduct amounts paid for administrative costs and other incidental costs of the Plan Trust. Dividends on the Plan Trust Common Stock will be includible in gross income by the Plan Trust.

**12.3.** **Tax Consequences to Certain Impaired Holders of Claims**

The United States federal income tax consequences to a holder of a Claim that is impaired and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for thereby will be determined by reference to the Claim in respect of which the distribution is made and as if the distribution were made directly by Reorganized Congoleum and accordingly will depend upon, among other things: (1) the nature of the Claim, (2) the manner in which a holder acquired the Claim, (3) the length of time the Claim has been held, (4) whether the Claim was acquired at a discount, (5) whether the holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years, (6) whether the holder has previously included in income accrued but unpaid interest with respect to the Claim, (7) the method of tax accounting of the holder, and (8) whether the Claim constitutes a security for United States federal income tax purposes. Accordingly, each holder of a Claim is urged to consult its tax advisor regarding the tax consequences of the Plan to it.

    (a)     **Holders of Asbestos Claims**

        Under Section 104 of the IRC, to the extent that a payment from the Plan Trust to a holder of an Asbestos Personal Injury Claim constitutes damages on account of personal physical injuries or physical sickness of such holder, such payment will not constitute gross income to such holder, except to the extent that the payment is attributable to medical expense deductions taken under Section 213 of the IRC for a prior taxable year. A payment from the Plan Trust to a holder of an Asbestos Personal Injury Claim other than on account of personal physical injuries or physical sickness generally will be includible in gross income of such holder.

        A payment to a holder of an Allowed Asbestos Property Damage Claim generally will result in a non-taxable return of capital, and a corresponding decrease in the holder's tax basis in the damaged property, and will generate income or gain, if any, to the holder in an amount equal to the excess of the payment received over such holder's tax basis in the damaged property.

    (b)     **Holders of Senior Note Claims**

        The Plan provides for an exchange for United States federal income tax purposes of Senior Notes held by holders of Senior Note Claims for New Senior Notes and New Common Stock. On the Effective Date, holders of Allowed Senior Note Claims shall receive, in the aggregate, the entire issue of New Senior Notes and 49.9% of New Common Stock. The discussion below may differ to the extent that a holder of Senior Notes has claimed a bad debt or worthless security deduction in respect of the Senior Notes. Such holders should consult their own tax advisors regarding the consequences of the exchange of Senior Note Claims for New Senior Notes and New Common Stock in light of their particular circumstances.

        The New Senior Notes provide for the issuance of additional New Senior Notes based on EBITDA of the Reorganized Congoleum. Applicable Treasury regulations (the "**Contingent Debt Regulations**") provide that a debt instrument that provides for one or more contingent payments, is subject to certain exceptions, treated as a "contingent payment debt instrument" or "CPDI." Accordingly, Reorganized Congoleum will treat the New Senior Notes as CPDIs for U.S. federal income tax purposes. However, the application of the Contingent Debt Regulations to instruments such as the New Senior Notes is uncertain in several respects, and no rulings have been sought from the IRS or a court with respect to any of the tax consequences discussed below. Accordingly, no assurance can be given that the IRS or a court will agree with the treatment described herein. Any differing treatment could affect the amount, timing and character of income, gain or loss in respect of the New Senior Notes and in respect of the exchange of Senior Note Claims for New Senior Notes and New Common Stock. In particular, a holder might be required to accrue OID at a different rate and might recognize capital gain or loss upon a taxable disposition of its New Senior Notes. Holders should consult their own tax advisors concerning the tax treatment of the acquisition, ownership and disposition of New Senior Notes and the consequences of the exchange of Senior Note Claims for New Senior Notes and New Common Stock.

    (c)     **Exchange of Senior Notes for New Senior Notes**

        The United States federal income tax consequences of the exchange of Senior Notes for New Senior Notes and New Common Stock pursuant to the Plan will depend on whether or not the Senior Notes and the New Senior Notes are treated as "securities" for United States federal income tax purposes. The term "security" is not defined in the IRC or applicable Treasury regulations and has not been clearly defined in court decisions. Although several factors are relevant in determining whether a debt instrument is a security, one important factor is the debt instrument's original term to maturity. As a general rule, a debt instrument with an original term to maturity of ten years or more is likely to be considered a security, while a debt instrument with an original term to maturity of five years or less may not be considered a security (although a recent Internal Revenue Service ruling suggests that, in certain circumstances, a debt instrument with a term of five years or less may be considered a security). Reorganized Congoleum intends to take the position, and the following summary assumes, that the Senior Notes are securities for United States federal income tax purposes, but there can be no assurance that the Internal Revenue Service will not successfully challenge that position. The New Senior Notes mature on March 31, 2017. Holders of Senior Notes should consult their own tax advisors regarding whether or not the Senior Notes and the New Senior Notes will be treated as securities for United States federal income tax purposes.

If the New Senior Notes are treated as securities, a holder of a Senior Note Claim should not recognize gain or loss upon the exchange to the extent that New Senior Notes and New Common Stock are allocated to the principal amount of the Senior Notes (assuming that the principal amount of New Senior Notes so allocated does not exceed the principal amount of Senior Notes so exchanged). Holders should consult their own tax advisors concerning "principal amount" of the New Senior Notes because they will be treated as CPDIs. The holder will have an aggregate initial tax basis in the New Senior Notes and New Common Stock so allocated equal to the holder's aggregate adjusted tax basis in the Senior Notes immediately before the exchange, and the holder's holding period for the New Senior Notes and New Common Stock so allocated will include the holder's holding period for the Senior Notes.

If the New Senior Notes are not treated as securities, a holder of a Senior Note Claim will recognize gain, but not loss, upon the exchange in an amount equal to the lesser of (i) the difference between the amount realized on the exchange and the holder's adjusted tax basis in the Senior Notes and (ii) the value of the New Senior Notes allocated to the principal amount of the Senior Notes. For this purpose, it is unclear whether the "value" of the New Senior Notes will be the fair market value or the issue price of the New Senior Notes. In addition, there will be other considerations arising from the treatment of the New Senior Notes as CPDIs (and depending upon whether, at the time of the exchange, a substantial amount of Senior Notes or New Senior Notes are "traded on an established market" within the meaning of applicable Treasury regulations) and if the installment method were to apply to the New Senior Notes. Except to the extent of any accrued market discount not previously included in income, as described below, such gain or loss will be long-term capital gain or loss if the Senior Notes have been held as capital assets for more than one year. Net long-term capital gains of individuals are eligible for preferential rates of United States federal income taxation. The deductibility of capital losses is subject to limitations. The holder will have an initial tax basis in New Common Stock so allocated equal to the holder's adjusted tax basis in the Senior Notes immediately before the exchange (increased by the amount of gain, if any, recognized and decreased by the value (determined as described above) of the New Senior Notes so allocated) and the holding period for such New Common Stock will include the holder's holding period for the Senior Notes. The holder should have an initial tax basis in the portion of New Senior Notes so allocated equal to the value (as determined above) of such New Senior Notes, and the holder's holding period for such New Senior Notes should not include the holder's holding period for the Senior Notes. In addition, there will be other considerations arising from the treatment of the New Senior Notes as CPDIs (and depending upon whether the, at the time of the exchange, a substantial amount of Senior Notes or New Senior Notes are "traded on an established market" within the meaning of applicable Treasury regulations). Holders of New Senior Notes should consult their own tax advisers regarding the treatment of the exchange of the Senior Note Claims for the New Senior Notes and New Common Stock.

The applicable Treasury regulations governing CPDIs determine the income tax consequences to a holder of New Senior Note depending upon whether the, at the time of the exchange, a substantial amount of Senior Notes or New Senior Notes are "traded on an established market" within the meaning of applicable Treasury regulations. At this time, the Debtors do not believe as substantial amount of the Senior Notes are "traded on an established market."

If a substantial amount of Senior Notes or New Senior Notes are not so traded, Reorganized Congoleum would be required to calculate income and OID includible by a holder based on the method of Treasury regulation section 1.1275-4(c). These methods are very complex and holders of Senior Note Claims should consult their tax advisors regarding application of these rules, including the interaction of these rules and exchange of the Senior Notes for New Senior Note Claims and the treatment of sale, exchange or retirement of New Senior Notes. A brief summary of this method follows.

Under this Treasury regulation, when debt instruments are issued in exchange for property that is not publicly traded, the contingent and noncontingent payments are treated as separate instruments, and OID is computed separately for these two instruments. The noncontingent payments on the New Senior Notes issued on the Effective Date are treated as a separate, noncontingent debt instrument. The initial issue price of a New Senior Note would be equal to the lesser of (1) its noncontingent principal payments or (2) the sum of the present values of the noncontingent payments determined by discounting at a test rate under a method specified in the Treasury regulations, provided that it is not treated as issued in a potentially abusive situation. The difference between the amount of the payment and its present value is treated as interest (here, the stated interest), which is includable in the

holder's gross income and deductible, subject to the AHYDO rules described below, by Reorganized Congoleum in their respective taxable years in which the amount of the payment becomes fixed.

When an additional New Senior Note is issued due to satisfying the EBITDA tests, such contingent payment is treated as a payment of principal and some interest on the underlying New Senior Note. If the New Senior Notes issued for reaching the EBITDA targets have a maturity in excess of six months, they would be treated as if Reorganized Congoleum issued a separate debt instrument for property with an issue price equal to the present value of the payments under the additional New Senior Notes, determined by discounting at the test rate described above. The amount of the issue price would then be discounted back to the issue date of the underlying New Senior Notes at an appropriate test rate, with a portion treated as interest at the time, and the balance allocated to principal and treated as a principal payment on the underlying New Senior Notes as of the date the contingent payment New Senior Note became fixed.

If a holder's basis in a New Senior Note is different from its adjusted issue price (and the holder is not reporting the income from the exchange on the installment method), including as a result of a tax-free exchange described above, the holder must allocate its basis in the New Senior Note first to the noncontingent component and to any related separate debt instruments described above for additional New Senior Notes whose maturity is in excess of 6 months up to their adjusted issue prices. The difference, if any, between the allocated basis and adjusted issue price of the New Senior Notes is taken into account under the normal rules for market discount, premium, and acquisition premium that apply to noncontingent debt instruments.

Any basis that is not allocated to the noncontingent component above is then allocated to the right to contingent payments. When a contingent payment is subsequently made, the holder's basis in the contingent component is reduced by the portion the payment treated as principal. If the holder's basis is reduced to zero, any additional principal payments on the contingent component that is issued constitute gain from the sale or exchange of the debt instrument. Any basis remaining on the contingent component when the final contingent payment is made increases the holder's adjusted basis in the noncontingent component (or, if there are no remaining noncontingent payments, is treated as loss from the sale or exchange of the debt instrument).

If a substantial amount of Senior Notes or New Senior Notes are "traded on an established market," Reorganized Congoleum would be required to calculate income and OID includible by a holder pursuant to the "noncontingent bond method" of Treasury regulation section 1.1275-4(b). Under the "noncontingent bond method," interest is generally treated as paid or received according to a projected payment schedule established when the debt instrument is issued. Actual deviations from the schedule are taken into account by means of separate adjustments that do not change the schedule. Additionally, under the noncontingent bond method, interest on a debt instrument must be taken into account whether or not the amount of any payment is fixed or determinable in the tax year. The amount of interest that is taken into account for each accrual period is determined by constructing a projected payment schedule for the debt instrument and applying rules similar to those for accruing OID on a noncontingent debt instrument. If the actual amount of a contingent payment is not equal to the projected amount, appropriate adjustments are made to reflect the difference.

**Sale, exchange or retirement of New Senior Notes.**

Assuming, as we have above, that a substantial amount of Senior Notes or New Senior Notes are not treated as "traded on an established market, then upon the sale, exchange, retirement, or other taxable disposition of a New Senior Note, a holder will generally recognize gain or loss equal to the difference between the amount realized upon the sale, exchange, retirement, or other taxable disposition and the adjusted tax basis of the New Senior Note, subject to the market discount rules described below. The holder must allocate the amount received from a sale, exchange, retirement, or other taxable disposition of a debt instrument that is not "traded on an established market" first to the noncontingent component and to any separate debt instruments in an amount up to the total of the adjusted issue price of the noncontingent component and the adjusted issue prices of the separate debt instruments. This amount is treated as an amount realized from the sale, exchange, retirement, or other taxable disposition of the noncontingent component or separate debt instrument. The balance is allocated to the contingent component and is treated as a contingent payment made on the date of the sale, exchange, retirement, or other taxable disposition and is characterized as interest and principal.

In the event that a substantial amount of Senior Notes or New Senior Notes are treated as "traded on an established market," upon the sale, exchange, retirement, or other taxable disposition of a New Senior Note (or of any PIK Note), a Holder generally will recognize gain or loss equal to the difference between the amount realized upon the sale, exchange, retirement, or other taxable disposition and the adjusted tax basis of the New Senior Note (or the PIK Note). Any gain recognized on the sale, exchange, retirement or other taxable disposition of a New Senior Note generally will be treated as ordinary income. Loss from the disposition of a New Senior Note will be treated as ordinary loss to the extent of a Holder's prior net OID inclusions with respect to the New Senior Note. Any loss in excess of that amount will be treated as capital loss. The deductibility of capital losses by individuals and corporations is subject to limitations. Special rules apply in determining the adjusted tax basis of a New Senior Note.

### Accrued but Unpaid Interest

To the extent that any portion of New Senior Notes and New Common Stock received by a holder of a Senior Note Claim under the Plan is allocable to accrued interest that was not previously included in the holder's gross income, such amount should be taxable to the holder as interest income. Conversely, a holder of a Senior Note Claim may be able to recognize a deductible loss (or possibly a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Senior Notes was previously included in the holder's gross income but was not paid in full under the Plan. The Plan provides that a Distribution on Allowed Claims, including a Senior Note Claim, will to the extent permitted by applicable law, be allocated for United States federal income tax purposes first to the principal amount of the Allowed Claim and then to accrued and unpaid interest thereon. There can be no assurance that the Internal Revenue Service will not successfully challenge that position. The holder should consult his or her tax advisor regarding the initial tax basis in the portion of New Senior Notes and New Common Stock, if any, allocable to accrued and untaxed interest on the Senior Notes and the holder's holding period for that portion of New Senior Notes and New Common Stock should not include the holder's holding period for the Senior Notes.

### Market Discount

Notwithstanding the foregoing, if a holder purchased a Senior Note at a price less than its principal amount, the difference generally would constitute "market discount" for United States federal income tax purposes. If a holder holds a Senior Note with market discount, any gain recognized on the exchange of the Senior Note for New Senior Notes and New Common Stock pursuant to the Plan will be treated as ordinary income to the extent of any accrued market discount not previously included in income. In addition, if New Senior Notes are treated as securities for United States federal income tax purposes and a Senior Note has unrecognized market discount in the hands of a holder, New Senior Notes and/or New Common Stock received in exchange for the Senior Note may be treated as having market discount (which may result in the recognition of ordinary income upon a disposition of the New Senior Note and/or New Common Stock). The market discount rules are complex. Holders of Senior Notes with market discount should consult their own tax advisors regarding the application of the market discount rules to them in light of their particular circumstances.

### Applicable High Yield Interest Obligations

Any interest or OID on the New Senior Notes generally would be deductible by Reorganized Congoleum under the Contingent Debt Regulations, unless the New Senior Notes are treated as applicable high yield discount obligations ("**AHYDOs**") within the meaning of Section 163(e)(5) of the Tax Code. If the AHYDO rules apply, Reorganized Congoleum may claim an interest deduction only up to the amount of OID that is paid. To the extent that Reorganized Congoleum is denied a deduction for a portion of the interest or OID, that portion may be treated as a dividend to corporate holders of such notes, which may be entitled to a dividends-received deduction for such amount. In general, an AHYDO is any debt instrument with "significant original issue discount," a maturity date that is more than five years from the issue date and a yield to maturity that is at least five percentage points higher than the applicable federal rate on the issue date. For this purpose, OID is significant if, immediately before the close of any accrual period ending more than five years after issue, "the aggregate amount" that has been included "in gross income with respect to such instrument" will exceed the sum of (1) all interest paid on the instrument and (2) the product of the instrument's issue price and yield to maturity. For purposes of the latter test, it is assumed that each interest payment will be made on the last day permitted under the instrument. A payment in the

form of stock or another obligation of the issuer or a related person is treated as made only when the stock or other obligation is required to be redeemed for cash or property other than stock and debt.

In addition, if notes are treated as AHYDOs, then the issuer may permanently be denied a deduction for a portion of the original issue discount on such notes and may claim an interest deduction as to the remainder of the original issue discount only when such portion is paid. To the extent that the issuer is denied a deduction for a portion of the original issue discount, that portion may be treated as a dividend to corporate holders of such notes, which may be entitled to a dividends-received deduction for such amount.

The determination of whether the AHYDO rules will apply is complex. It is not yet possible to determine whether the AHYDO rules will apply to the New Senior Notes. Moreover, since the applicable federal rate to likely to be different if and when additional New Senior Notes might be issued, it is impossible to determine how the AHYDO rules will apply to each such note, when issued. An exception to the AHYDO rules was provided in the American Recovery and Reinvestment Act of 2009, but Debtors do not expect the New Senior Notes to qualify as the exception does not apply to any obligation the interest of which is interest from contingent debt instruments as described in IRC section 871(h)(4). As the New Senior Notes will be treated as contingent payment debt instruments under the CPDI Regulations, it is also anticipated that the New Notes would be treated as a contingent debt instruments as described in IRC section 871(h)(4).

(c)     **Information Reporting and Backup Withholding**

Payments of Allowed Claims under the Plan (including payments and distributions to the Plan Trust) may be subject to applicable information reporting and backup withholding (at the applicable rate). Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the Internal Revenue Service (generally, a United States federal income tax return).

## ARTICLE 13
## FINANCIAL INFORMATION

### 13.1.     Historical Financial Statements

An analysis of the Company's financial condition appears in the financial statements prepared by the Company for the year ended December 31, 2008 (attached hereto as Exhibit C) and for the quarter ended September 30, 2009 (attached hereto as Exhibit D). These financial statements were obtained from the Company's filings with the Securities and Exchange Commission (the "**SEC**"). Updated financial statements, if available, will be posted at the website of Debtor's voting agent Logan & Company, Inc. at www.loganandco.com or at Congoleum's website at www.congoleum.com/investors.html.

The Company is required to file monthly operating reports in the Reorganization Cases and such information is publicly available. In addition, Congoleum continues to make filings required by the Securities Exchange Act of 1934, as amended.

## ARTICLE 14
## SOURCES OF INFORMATION PROVIDED AND
## THE ACCOUNTING METHOD USED

### 14.1.     Sources of Information

The information set forth in this Disclosure Statement was provided by and/or prepared in consultation with the Company and/or is based on publicly available information.

### 14.2.     Accounting Method

The Company maintains its books and records on an accrual basis, in accordance with generally accepted accounting principles. The financial statements of the Company have been audited by the accounting firm of Ernst & Young LLP through December 31, 2008.

## RECOMMENDATION AND CONCLUSION

The Plan Proponents recommend that all holders of Claims in Classes 4, 6, 7, 8 and 9 vote to accept the Plan, and urges each of them to evidence such acceptance and approval, by instructing the holder of any proxy for them to vote to accept the Plan on their behalf, or by returning their ballots so that they will be received on or before the Voting Deadline.

In the view of the Plan Proponents, the Plan provides the best available alternative for maximizing the distributions that holders of Asbestos Claims and other unsecured claims will receive from the Estates.

The undersigned has executed this Disclosure Statement as of the _____ day of March, 2010.

Respectfully submitted,

CONGOLEUM CORPORATION

By: _____
Name: Howard N. Feist III
Title: Chief Financial Officer and Secretary

CONGOLEUM SALES, INC.

By: _____
Name: Howard N. Feist III
Title: Vice President, Treasurer and Secretary

CONGOLEUM FISCAL, INC.

By: _____
Name: Howard N. Feist III
Title: Vice President, Treasurer and Secretary

**PILLSBURY WINTHROP SHAW PITTMAN LLP**          **OKIN, HOLLANDER & DELUCA, LLP**
1540 Broadway                                    Parker Plaza
New York, NY 10033-4039                          400 Kelby Street
Richard L. Epling                                Fort Lee, NJ 07024
Robin L. Spear                                   Paul S. Hollander
Kerry A. Brennan                                 James J. DeLuca

Attorneys for the Debtors

ASBESTOS CLAIMANTS' COMMITTEE

By: _____
Name: Ronald E. Reinsel

113

Title:   Counsel for the Asbestos Claimants'
Committee

**CAPLIN & DRYSDALE, CHTD.**
One Thomas Circle, N.W.
Washington, D.C. 20005
Peter Van N. Lockwood
Ronald Reinsel

**GREENBAUM, ROWE, SMITH & DAVIS LLP**
75 Livingston Avenue
Roseland, NJ 07068
Nancy Isaacson

Attorneys for the Asbestos Claimants' Committee

BONDHOLDERS' COMMITTEE

By:   _____

Name:   Paul Kunz
Title:   Authorized representative of Deutsche
Asset Management, not in its individual or
principal capacity, but solely in its capacity
as Chair of the Official Committee of
Bondholders

**AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, NY 10036
Michael S. Stamer

**AKIN GUMP STRAUSS HAUER & FELD LLP**
1333 New Hampshire Avenue, N.W.
Washington D.C. 20036
James R. Savin
David M. Dunn
Joanna F. Newdeck

**TEICH GROH**
691 State Highway 33
Trenton, NJ 08619
Michael A. Zindler

Attorneys for the Official Committee of Bondholders

FUTURES REPRESENTATIVE

By:   _____

Name:  R. Scott Williams
Title:

| **ORRICK, HERRINGTON & SUTCLIFFE LLP**<br>1152 15th Street, N.W.<br>Washington, D.C.  20005<br>Roger Frankel<br>Richard H. Wyron<br>Jonathan Guy<br>Debra L. Felder | **FORMAN HOLT ELIADES & RAVIN LLC**<br>80 Route 4 East, Suite 290<br>Paramus, NJ  07652<br>Stephen Ravin |
|---|---|
| Attorneys for R. Scott Williams, as Futures Representative | |

# APPENDIX EXHIBIT 4

Order Filed on
**9/20/2006**
by Clerk U.S. Bankruptcy
Court District of New Jersey

**UNITED STATES BANKRUPTCY CO**
**FOR THE DISTRICT OF NEW JERS**

| | |
|---|---|
| In re: | Case No. 03-5 |
| CONGOLEUM CORPORATION, *et al.*, | Jointly Admini......... |
| Debtors. | Chapter 11 |

**ORDER PURSUANT TO SECTIONS 105, 363, 1107 AND 1108 OF THE BANKRUPTCY CODE AND RULES 2002, 6004, 9014 AND 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (I) AUTHORIZING DEBTOR TO ENTER INTO A SETTLEMENT AND COMPROMISE OF CERTAIN CLAIMS, (II) APPROVING SALE OF CERTAIN INSURANCE POLICIES FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND OTHER  ENCUMBRANCES, AND (III) APPROVING THE SETTLEMENT AND BUYBACK AGREEMENT AND RELEASES BY AND BETWEEN THE CONGOLEUM ENTITIES AND THE CENTURY ENTITIES**

The relief set forth on the following pages, numbered two (2) through nineteen (17) is

hereby **ORDERED.**

**DATED: 9/20/2006**

_____
Honorable Kathryn C. Ferguson
United States Bankruptcy Judge

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century Entities

This matter came before the Court on the Motion for Order Approving Settlement and Policy Buyback Agreement and Release with the Century Entities, *et al.* (the "*Motion*"), filed by Congoleum Corp., Congoleum Sales, Inc., and Congoleum Fiscal, Inc., the debtors and debtors-in-possession herein (the "*Debtors*"), seeking approval of the Settlement and Policy Buyback Agreement and Release, dated as of August 8, 2006 (attached hereto as Exhibit 1 and as it may be amended, supplemented or otherwise modified from time to time in writing, the "*Settlement and Buyback Agreement*"), and the settlements, releases, compromises and policy buyback contained therein pursuant to Bankruptcy Code Sections 105, 363, 1107 and 1108 and Rules 2002, 6004, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*").  All capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Settlement and Buyback Agreement.  Capitalized terms that are not defined in this Approval Order or in the Settlement and Buyback Agreement are given the meanings designated in the Eighth Modified Joint Plan of Reorganization, dated as of March 17, 2006.

Adequate notice of the Motion and of the hearing on the Motion was given by mailing, or emailing in the case of the Master E-Mail service list defined below, a copy of the Motion and notice of the hearing on the Motion to:  (a) the "Core Service List" and the "Master Service List," each as defined in the Order Establishing Case Management and Administrative Procedures, dated February 25, 2004, and the "Master E-Mail Service List," as defined in the Order (1) Amending The Order Establishing Case Management and Administrative Procedures Entered On February 25, 2004 And The Order Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of Professionals Entered On February 10, 2004 And (2) Allowing Notice By E-Mail And Establishing Procedures Therefor, dated September 6,

*Approved by Judge Kathryn C. Ferguson  September  20, 2006*

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century Entities

2005; (b) the Claimants' Representative; (c) the Office of the United States Trustee; (d) the FCR and counsel to the FCR; (e) counsel to the members of the ACC and the ACC's counsel; (f) parties who have filed a notice of appearance in these Chapter 11 Cases; (g) the Collateral Trustee (the "Collateral Trustee") of the Congoleum Collateral Trust (the "Collateral Trust") established pursuant to a Collateral Trust Agreement dated April 16, 2003; (h) ABI and counsel to ABI; (i) counsel to all known holders of Asbestos Claims as reflected in the Rule 2019 Statements filed in these Chapter 11 Cases, claims submitted in connection with the Settlement Between Congoleum Corporation and Various Asbestos Claimants attached as Exhibit E to the Disclosure Statement with respect to the Plan (the "Claimant Agreement"), or ballots submitted in connection with these Chapter 11 Cases; (j) all known holders of Asbestos Claims whose counsel is not included within the preceding clause who, as of at least ten (10) Business Days prior to the Hearing, became known through filing of a proof of claim; and (k) the members of the Bondholders' Committee and counsel to such Committee and such other Persons as are listed on the Certificate of Service filed by the Debtors.

Further, notice of the motion and this hearing was made by publication in the national and international editions of *USA Today* and such publication notice, together with the notices described in the preceding paragraph, are adequate and reasonable under the circumstances and no other or further notice is required or need be sent.

A hearing on the Motion was held on September 11, 2006 (the "Approval Hearing"), to consider approval of the Settlement and Buyback Agreement and all interested parties were given an opportunity to be heard and to present evidence and object to the Motion.  Based upon the record of the Approval Hearing and of these Chapter 11 Cases, the Court having reviewed

3

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century Entities

the Motion and determined that the relief requested in the Motion is in the best interests of the

Debtors, its estate, its creditors and other parties in interest, and after due deliberation thereon,

and good and sufficient cause appearing therefor:

The Court hereby FINDS[1] that:

        A.      This Court has jurisdiction to hear and determine the Motion pursuant to

28 U.S.C. §§ 157 and 1334.  This Motion presents a core proceeding pursuant to 28 U.S.C.

§§ 157(b)(2)(A), (N) and (O).  Venue in this District is proper under 28 U.S.C. §§ 1408 and

1409.

        B.      The notice of the Motion, the deadline to object to the Motion, and the

hearing on the Motion described above constitutes due, sufficient and timely notice to all persons

entitled thereto in accordance with the requirements of the Bankruptcy Code, the Bankruptcy

Rules and the local rules for the U.S. District Court for the District of New Jersey and the

Bankruptcy Court, and of due process.  No other or further notice of the Motion, the hearing on

the Motion, or the request for entry of this Approval Order, is or shall be required.  This Court

hereby further finds that notice to an attorney for the holder of an Asbestos Claim constitutes

notice to such holder for purposes of notice of the Motion, the Approval Hearing, the Settlement

and Buyback Agreement, and the Approval Order.

        C.      This Approval Order is "final" within the meaning of 28 U.S.C.

§ 158(a)(1).

        D.      A reasonable opportunity to object or be heard with respect to the motion

and the relief requested therein has been afforded to all parties in interest.  To the extent that any

---

[1] Findings of fact shall be construed as conclusions of law and conclusions of law as findings of fact when appropriate in accordance with Bankruptcy Rule 7052.

4

*Approved by Judge Kathryn C. Ferguson  September  20, 2006*

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century
Entities

Person (i) either (a) received proper notice of these matters (or is represented by a Person,

including, without limitation, the FCR or counsel, that received such notice) or (b) having had

notice of these Chapter 11 Cases, elected not to request notices regarding these Chapter 11

Cases, and (ii) failed to object to the Motion and the entry of this Approval Order, then such

Persons, including without limitation, the Debtors and the Plan Trust (or, to the extent that it has

not yet been formed or does not yet exist, its predecessor(s) in interest), the FCR, the Claimants'

Representatives and the ACC, hereby shall have no right to file or prosecute an appeal of this

Approval Order.

   E.  The Congoleum Entities and the Century Entities negotiated at arm's

length and in good faith to reach a settlement on the matters resolved through the Settlement and

Buyback Agreement.

   F.  The Subject Policies are property of the Debtors' estates, and this Court

has the jurisdiction and power to approve the Settlement and Buyback Agreement and the

compromises and releases contained therein.

   G.  The Debtors have due and proper corporate authority to enter into the

Settlement and Buyback Agreement and perform all of their obligations thereunder.  No consents

or approvals, other than this Approval Order, are required for the Debtors to perform all of their

obligations thereunder, including the sale and transfer of the Subject Policies.  The

consummation of the Settlement and Buyback Agreement by the Debtors and the Plan Trust does

not conflict, contravene, or cause a breach, default or violation of any law, rule, regulation,

contractual obligation or organizational or formation document.

NY1:1653568.26

*Approved by Judge Kathryn C. Ferguson  September  20, 2006*

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century Entities

H.      The compromises contained in the Settlement and Buyback Agreement are a valid and proper exercise of the reasonable business judgment of the Congoleum Entities and represent an exchange for reasonably equivalent value.  The releases to be made by the Congoleum Entities pursuant to Section VI of the Settlement and Buyback Agreement are appropriate and should be approved.  The Century Entities would not have entered into the Settlement and Buyback Agreement or any of the compromises and settlements contained therein, or agreed to pay the Settlement and Buyback Amount, without the benefit of obtaining the releases contained in the Settlement and Buyback Agreement and the injunctions contained or to be contained in the Plan and the Confirmation Order and in this Approval Order.

I.      The Settlement and Buyback Agreement results in substantial benefits to the Debtors' estate and holders of Claims, including Asbestos Claims, by (i) settling complex litigation; and (ii) receiving payment of the Settlement and Buyback Amount from the Century Entities for the benefit of the estate and holders of Asbestos Claims.  The Settlement and Buyback Agreement is fair and equitable with respect to the Debtors and the Plan Trust and the persons who have asserted, and who might subsequently assert, Claims, including Asbestos Claims, against the Debtors and/or the Plan Trust and/or the Century Entities and/or the Subject Policies.

J.      Each of the following factors has been taken into account by the Parties in reaching the compromises embodied in the Settlement and Buyback Agreement, and each factor supports approval of the Settlement and Buyback Agreement and the entry of this Approval Order pursuant to Bankruptcy Rule 9019:

6

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century
Entities

        (a)       the probability of success in the litigation of the claims between the

Debtors and the Century Entities, including the ranges of recoverable damages;

        (b)       the likelihood that even if the Debtors were successful in the Coverage

Action, the Century Entities would exhaust their appellate rights thereby delaying collection of

any judgment;

        (c)       the complexity of the litigation between the Debtors and the Century

Entities, and the expense, inconvenience and delay necessarily attending it;

        (d)       the paramount interest of creditors and proper deference to their

reasonable views regarding the Settlement and Buyback Agreement; and

        (e)       whether the conclusion of the litigation promotes the integrity of the

judicial system.

        K.       Furthermore, the Debtors have demonstrated that the probability of

success for the Debtors in litigation over the matters resolved by the Settlement and Buyback

Agreement, including without limitation issues related to the Coverage Action, is uncertain; that

the litigation of the matters resolved by the Settlement and Buyback Agreement would be

complex, costly to the estate, and would delay the Debtors' reorganization under Chapter 11; and

that the entry into the Settlement and Buyback Agreement is necessary and appropriate to assist

the Debtors' reorganization and is in the best interests of the Debtors, their estates and the

Debtors' creditors, including, without limitation, the persons who have asserted, and who might

subsequently assert, Claims, including Asbestos Claims, against the Debtors, the Plan Trust, the

Century Entities and/or the Subject Policies, and all parties in interest, because, among other

*Approved by Judge Kathryn C. Ferguson  September  20, 2006*

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century
Entities

reasons, of the Settlement and Buyback Amount that Century Indemnity Company will pay  to

the Trust.

        L.      Considering all of the factors set forth in *In re Martin*, 91 F.3d 389, 393

(3d Cir. 1996), as discussed in the Motion, the provisions and conditions of the Settlement and

Buyback Agreement are in the best interests of the Debtors, their estates, their creditors, holders

of Demands, the Plan Trust, and all other parties in interest.  The Debtors have demonstrated

good, sufficient and sound business purposes, causes and justifications for the relief requested in

the Motion and the approval of the transactions contemplated thereby.

        M.     The terms of the compromise and exchanges of consideration, as set forth

in the Settlement and Buyback Agreement, including, without limitation, the sale of the Subject

Policies free and clear of any and all Interests: (i) are in the best interests of the Congoleum

Entities, including the Debtors, their respective estates and all of their respective creditors and

other parties in interest; and (ii) are entered into in good faith.  Neither the Debtors nor the

Century Entities have engaged in any conduct that would cause or permit the Settlement and

Buyback Agreement to be avoided under Section 363(n) of the Bankruptcy Code.  The Century

Entities are not "insiders" as that term is defined in Section 101(31) of the Bankruptcy Code.

        N.     Pursuant to Sections 105 and 363  of the Bankruptcy Code, the sale of the

Subject Policies free and clear of any Interest is permitted, and the issuance of the channeling

injunction effective upon the First Payment Date, permanently enjoining the prosecution,

continuation or commencement of any Claim by any Person who has asserted, and who might

subsequently assert, Claims, including Plan Trust Asbestos Claims, against the Century Entities

relating to or arising out of the Subject Policies, is and will be proper, and that no such Claim can

NY1:1653568.26

*Approved by Judge Kathryn C. Ferguson  September  20, 2006*

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century Entities

be asserted against any of the Century Entities.  <u>See</u>, <u>e.g.</u>, <u>MacArthur Co. v. Johns-Manville</u>

<u>Corp.</u>, 837 F.2d 89, 93 (2nd Cir. 1988).  The interests of creditors will be protected in that the

Settlement and Buyback Amount will be paid to the Trust.

       O.      Neither the Settlement and Buyback Agreement, nor the transactions

contemplated thereby, are subject to avoidance under Section 363(n) of the Bankruptcy Code.

Neither the Debtors, the Century Entities, nor any of their representatives, has engaged in any

conduct that would cause or permit the Settlement and Buyback Agreement, or the sale of the

Subject Policies contemplated therein, to be avoided under Section 363(n) of the Bankruptcy

Code or that would prevent the application of Section 363(m) of the Bankruptcy Code.

       P.      Century Indemnity Company is a good faith purchaser within the meaning

of Section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections

afforded thereby.  The Century Entities, including Century Indemnity Company, have acted and

will be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in

effecting the buyback of the Subject Policies contemplated by the Settlement and Buyback

Agreement at all times after the entry of this Approval Order.

       Q.      The terms and conditions of the Settlement and Buyback Agreement and

the Settlement and Buyback Amount to be paid to the Plan Trust, or as otherwise directed by the

Court consistent with the terms of the Settlement and Buyback Agreement, on behalf of the

Century Entities (i) are fair and reasonable; (ii) constitute reasonably equivalent value and fair

consideration for the Subject Policies; and (iii) are within the range of reasonableness required

for approval of the Settlement and Buyback Agreement under the Bankruptcy Code and

applicable law.  The sale of the Subject Policies to Century Indemnity Company under the

NY1:1653568.26

*Approved by Judge Kathryn C. Ferguson  September  20, 2006*

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century Entities

Settlement and Buyback Agreement will constitute transfers for reasonably equivalent value under Section 548 of the Bankruptcy Code and comparable provisions of non-bankruptcy law.

R.    The sale and transfer of the Subject Policies will (i) be a legal, valid, and effective transfer of all of the rights and interests in and to the Subject Policies to the Century Entities and (ii) vest the Century Entities with good title to, and all of the rights and interests in and to, the Subject Policies free and clear of all Claims, Liens, encumbrances and interests of any kind or nature whatsoever because the standards set forth in Sections 363(f)(1), (f)(2) and (f)(5) of the Bankruptcy Code have been satisfied.  Any and all non-debtor holders of Claims, Liens, encumbrances and/or interests of any kind or nature whatsoever in the Subject Policies, if any, who did not object to the Motion and to the sale and transfer of the Subject Policies, or who withdrew their objections, are deemed to have consented pursuant to Section 363(f)(2) of the Bankruptcy Code.  Any holder of a Secured Claim or Asbestos Secured Claim who did object to the Motion falls within Sections 363(f)(1) or 363(f)(5) of the Bankruptcy Code and is adequately protected by having its interests, if any, attach to the Settlement and Buyback Amount.

S.    Consummation of the sale of the Subject Policies will not subject the Century Entities to any debts, liabilities, obligations or Claims of any kind or nature whatsoever, whether known or unknown, contingent or otherwise, existing as of the date hereof or hereafter arising, of or against the Debtors, the other Congoleum Entities or any other Person by reason of such sale of the Subject Policies, including, without limitation, based on any theory of successor or transferee liability.

T.    By entering into the Settlement and Buyback Agreement, the Congoleum Entities and the Century Entities have compromised their positions and have not admitted to or

10

*Approved by Judge Kathryn C. Ferguson  September  20, 2006*

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century Entities

waived any legal, factual or other positions with respect to the Coverage Action, or other

disputes between the Congoleum Entities and the Century Entities, the Subject Policies, the

insurance relationship between the Congoleum Entities and the Century Entities, or any other

matters.

        U.     The Settlement Agreement is an Asbestos Insurance Settlement

Agreement.

     NOW, THEREFORE, pursuant to Bankruptcy Code Sections 105(a), 363(b) and (f),

1107 and 1108 and Bankruptcy Rules 2002, 6004, 9014 and 9019(a), IT IS HEREBY

ORDERED, ADJUDGED AND DECREED THAT:

     1.     The Motion shall be and hereby is GRANTED in all respects, and the Settlement

and Buyback Agreement is hereby approved in all respects.  For the reasons set forth herein and

on the record at the hearing on the Motion, all objections that have not been withdrawn, resolved,

waived or settled are hereby overruled on the merits and all reservations of rights included

therein, are overruled on the merits.

     2.     The failure specifically to include or reference any particular term or provision of

the Settlement and Buyback Agreement in this Approval Order shall not diminish or impair the

effectiveness of such term and provision, it being the intent of the Court that the Settlement and

Buyback Agreement be authorized and approved in its entirety.

     3.     The terms and provisions of the Settlement and Buyback Agreement, together

with the terms and provisions of this Approval Order, shall be binding in all respects upon all

Entities, including each of the Debtors, their respective Estates, any and all Chapter 7 and

Chapter 11 trustees thereof, the Plan Trust, the Plan Trustee, the FCR and each of the Entities

11

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century
Entities

whose interests he represents, the Collateral Trust, the Collateral Trustee, the Claimants'

Representatives and the Persons who have asserted, and who might subsequently assert, Claims,

including Asbestos Claims, against the Debtors, the Plan Trust, the Century Entities and/or the

Subject Policies, the Debtors' other creditors, shareholders of any of the Debtors, all Persons

claiming an interest under or in the Subject Policies, and all interested parties, administrative

agencies, governmental units, federal, state and local officials maintaining any authority with

respect to the Settlement and Buyback Amount, and their respective successors and assigns.

4.      The Debtors are hereby authorized, empowered and directed to take all necessary

and appropriate acts to carry out and implement the Settlement and Buyback Agreement in

accordance with its terms without further order of the Court, including designating the Century

Entities as Settling Asbestos Insurance Companies and Protected Parties in the Confirmation

Order, and after the Effective Date of the Plan occurs, treating the Century Entities as Settling

Asbestos Insurance Companies and Protected Parties under the Plan for all purposes in these

Chapter 11 Cases.  The designation of the Century Entities as Settling Asbestos Insurance

Companies shall entitle the Century Entities to the rights and benefits afforded to Settling

Asbestos Insurance Companies under the Plan, including the rights and benefits of the Asbestos

Channeling Injunction and any other Section 105 and 524(g) injunctions granted under the Plan

and the Confirmation Order with respect to all Claims, including all Plan Trust Asbestos Claims.

5.      The Settlement and Buyback Agreement and this Approval Order constitute valid

and binding obligations of the Debtors, their Estates and the Plan Trust, which shall be

enforceable in accordance with the terms thereof and shall be binding on the Debtors and their

Estates, and any and all successors to and assigns of the Debtors, including the Plan Trust, any

NY1:1653568.26

*Approved by Judge Kathryn C. Ferguson  September  20, 2006*

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century Entities

Plan Trustee appointed in these Chapter 11 Cases or any other case or proceeding, and all present and future holders of Claims, including without limitation, Plan Trust Asbestos Claims and Demands and any Person who has asserted, and who might subsequently assert, Claims, including Asbestos Claims, against the Debtors, the Plan Trust, the Century Entities and/or the Subject Policies, and all other parties in interest, as set forth in the Settlement and Buyback Agreement.  The Confirmation Order and the Plan Trust Agreement shall include as an obligation of the Plan Trust, effective from the creation of the Plan Trust, that such trust shall be subject to and bound by the Settlement and Buyback Agreement and the Approval Order.  Upon its creation, the Plan Trust, without further order of any court or action by any Entity, shall be automatically deemed to be  a party to the Settlement and Buyback Agreement.

6.      The releases contained in Section VI of the Settlement and Buyback Agreement are hereby approved in all respects and shall be effective in accordance with the terms of the Settlement and Buyback Agreement.  All Claims released pursuant to the Settlement and Buyback Agreement shall be deemed dismissed and forever released as of the First Payment Date.

7.      Pursuant to Section 363(b) of the Bankruptcy Code, the Debtors and the Century Entities are further authorized to consummate the provisions of the Settlement and Buyback Agreement that concern the sale, transfer and conveyance of the Subject Policies, free and clear of any Interests to Century Indemnity Company, in accordance with the terms and subject only to the conditions specified herein and in the Settlement and Buyback Agreement.

8.      Accordingly, pursuant to Sections 105(a) and 363(b) and (f) of the Bankruptcy Code, upon the First Payment Date the Debtors will sell, transfer and convey, and will be

13

*Approved by Judge Kathryn C. Ferguson  September  20, 2006*

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century
Entities

deemed to have sold, transferred and conveyed, the Subject Policies to Century Indemnity

Company free and clear of all Claims, liens, encumbrances and interests of any kind or nature

whatsoever, including without limitation any Claims for contribution, indemnity or other liability

under the Subject Policies against any of the Century Entities, whether arising prior to, during, or

subsequent to the Bankruptcy Case.  The sale, transfer and conveyance of these rights and

interest shall constitute a legal, valid and effective transfer of the Subject Policies.

9.       The transactions contemplated by the Settlement and Buyback Agreement

including, without limitation the sale of the Subject Policies to Century Indemnity Company free

and clear of all Interests, are undertaken by the Century Entities in good faith, as that term is

used in Section 363(m) of the Bankruptcy Code.  Century Indemnity Company shall be deemed a

"good faith, purchaser" under Section 363(m) of the Bankruptcy Code of the rights and interests

in the Subject Policies and all of the Century Entities are entitled to the protection provided by

such designation without further order of this Court.  Accordingly, effective upon the First

Payment Date but subject to the satisfaction of the conditions precedent to the Trigger Date, in

addition to the injunctions granted under the Plan and the Confirmation Order that will protect

the Century Entities as Settling Asbestos Insurance Companies, all Persons and Entities shall be

hereby forever enjoined, barred and estopped from asserting any Claims, liens, encumbrances or

interests of any kind or nature with respect to the Subject Policies against the Century Entities

and their respective property and assets, including the Subject Policies.

10.     The reversal or modification on appeal of the authorization to consummate the

sale of the Subject Policies and the transactions contemplated by the Settlement and Buyback

Agreement shall not affect the validity of the sale of the Subject Policies to Century Indemnity

*Approved by Judge Kathryn C. Ferguson  September  20, 2006*

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century Entities

Company or the other transactions contemplated by the Settlement and Buyback Agreement, unless such authorization is duly stayed pending such appeal.

11.     The Century Entities are not, and shall not be deemed to be, successors to the Debtors and/or their respective bankruptcy estates by reason of any theory of law or equity as a result of consummation of the transactions provided in the Settlement and Buyback Agreement or otherwise.  None of the Century Entities shall assume any liabilities of the Debtors or their estates by virtue of having entered into the Settlement and Buyback Agreement.  Except to enforce or for breach of the Settlement and Buyback Agreement, the transfer of the Subject Policies to Century Indemnity Company pursuant to the Agreement does not and will not subject or expose any of the Century Entities to any liability, claim, cause of action or remedy.

12.     The Century Entities are not obligated to perform under the Settlement and Buyback Agreement and/or the Settlement and Buyback Agreement shall become null and void, except for Sections I, IV.H, V, IX, XII, XVI and XVII (which Sections shall remain in full force and effect) if, among other things, any of the provisions of a plan of reorganization proposed or filed by the Debtors are inconsistent with the rights and benefits provided to the Century Entities under the Settlement and Buyback Agreement and/or with the duties and obligations of, and releases provided by, the Congoleum Entities under the Settlement and Buyback Agreement and/or otherwise would have a material adverse effect on the interests of the Century Entities under the Settlement and Buyback Agreement.  This Order and Settlement and Buyback Agreement will be deemed part of any plan of reorganization for the Debtors and shall be incorporated by reference as if set forth in full.  No part of any plan offered by the Debtors shall be interpreted in a manner inconsistent with this Order and Settlement and Buyback Agreement.

NY1:1653568.26

*Approved by Judge Kathryn C. Ferguson  September  20, 2006*

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century Entities

      13.     The Plan, in furtherance of the sale, transfer and conveyance of the Subject Policies to Century Indemnity Company, free and clear of all Interests, shall provide for, as of the Effective Date, the establishment of the Trust and the effectiveness of the Channeling Injunction in favor of the Century Entities, and the other benefits and protections provided for in the Settlement and Buyback Agreement.  In addition, to the extent that any such Plan or other order approving an insurer settlement provides for any additional release, injunction, injunctive protection, covenant not to sue, bar or defense against, from or on any Claim of any Person that may be granted pursuant to the Plan and/or other order to any other insurer that settles with the Debtors, the Century Entities shall be entitled to the full protection, covenant, bar or defense.

      14.     This Court shall retain jurisdiction to enforce this Approval Order and to decide any disputes arising with respect to the sale, transfer or conveyance of the Subject Policies, the Settlement and Buyback Agreement and the transactions contemplated therein, and the terms and conditions of this Order.  Such jurisdiction shall be retained even if a plan of reorganization is confirmed for the Debtors and/or the bankruptcy case is closed, and the bankruptcy case may be reopened for such purpose.

      15.     The Settlement and Buyback Agreement shall govern and control in the event of any conflict or inconsistency between the Settlement and Buyback Agreement and the Plan or any other plan of reorganization or liquidation or order of any type entered in (i) these Chapter 11 Cases, (ii) any subsequent chapter 7 case into which the Chapter 11 Cases may be converted, or (iii) any related proceeding subsequent to entry of this Approval Order.  The provisions of this Approval Order are nonseverable and mutually dependent.

*Approved by Judge Kathryn C. Ferguson  September  20, 2006*

Debtor:  Congoleum Corp., *et al.*

Case No:  03-51524

Caption:  Order Authorizing and Approving Settlement and Policy Buyback Agreement and Release with Century Entities

  16.  Any Claims' that the Century Entities may have against ABI and its predecessors and successors and their officers, directors and employees shall be fully preserved regardless of any contrary terms that may be included in any other plan of reorganization or confirmation order.

  17.  This Approval Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing and shall not be stayed under Bankruptcy Rule 6004(g).

     [The remainder of page is intentionally left blank]

*Approved by Judge Kathryn C. Ferguson  September  20, 2006*

SETTLEMENT AND BUYBACK
AGREEMENT EXHIBIT F

*Approved by Judge Kathryn C. Ferguson  September  20, 2006*

# APPENDIX EXHIBIT 5

NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | : | Bankruptcy Case No. 03-51524 |
| | : | |
| CONGOLEUM CORPORATION, et al., | : | Chapter 11 |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| | : | Hearing Date: February 5, 2009 |
| | : | Document Number 7124 |

**OPINION REGARDING THE MOTION OF FIRST STATE INSURANCE COMPANY
AND TWIN CITY FIRE INSURANCE COMPANY FOR SUMMARY JUDGMENT
DENYING CONFIRMATION OF THE AMENDED JOINT PLAN OF
REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE
OF THE DEBTORS, THE OFFICIAL ASBESTOS CLAIMANTS' COMMITTEE AND
THE OFFICIAL COMMITTEE OF BONDHOLDERS FOR CONGOLEUM
CORPORATION, ET Al., DATED AS OF NOVEMBER 14, 2008**

The Debtors, the Official Asbestos Creditors Committee, and the Official Committee of Bondholders filed an Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code dated  November 14, 2008 ("Amended Joint Plan"). The Future Claims Representative, who was among the proponents of the prior Joint Plan, is no longer a plan proponent.  In January 2009, First State Insurance Company and Twin City Fire Insurance Company[1] filed a motion for summary judgment seeking denial of confirmation of the Amended Joint Plan.  The Court took oral argument on the motion on February 5, 2009.  This is the third time that this Court has ruled on motions for summary judgment regarding the confirmability of various Chapter 11 plans[2]. Despite the guidance contained in the Court's previous summary judgment opinions, and explicit warnings that this would be the final Chapter 11 plan the Court would consider, the Plan Proponents have still submitted a facially unconfirmable plan.

As a result of the previous summary judgment opinions, only two issues remain that are ripe for summary judgment.  The fact that this ruling addresses only two issues should not be mistaken for a finding by the Court that these two issues are the only remaining barriers to confirmation; rather, they are the only two issues that are currently ripe for summary judgment.[3]

---

[1]The motion is joined by all of the insurers listed in Doc. No. 7124 as well as Travelers' and St. Pauls' [Doc. Nos. 7129, 7163].

[2]The Court hereby incorporates its previous summary judgment opinions into the record: Tenth Modified Plan Opinion (2/1/07) [Doc. No. 5091]; CNA Plan Opinion (2/1/07) [Doc. No. 5092]; Joint Plan Opinion (6/5/08) [Doc. No. 6575]; and Supplemental Joint Plan Opinion (9/2/08) [Doc. No. 6776].

[3]Factual issues regarding confirmation include, among others, the propriety of the non-debtor releases (including the Court's jurisdiction to entertain such releases), the acceptability of the Trust Distribution Procedures, the impact of the Court's recent ruling regarding adding additional defendants to the Pergament Adversary proceedings, whether a 524(g) injunction would be "fair and equitable", and good faith.

## I. Summary judgment standard

Summary judgment is not lightly granted.  The Federal Rules provide that summary judgment should be granted only when the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  *Fed. R. Civ. Pro.* 56(c). The party moving for summary judgment has the burden of establishing the nonexistence of any genuine issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  The Third Circuit has stated that whenever there is even the "slightest doubt regarding the facts of a case, summary judgment should not be granted." Tomalewski v. State Farm Life Ins, Co., 494 F.2d 882, 884 (3d Cir. 1984).  Facts must be viewed in the light most favorable to the party against whom summary judgment is sought. Tran v. Metropolitan Life Ins. Co., 408 F.3d 130, 135 (3d Cir. 2005).

That does not mean that summary judgment is never appropriate.  When a party opposes a summary judgment motion it may not rely on vague allegations or denials.  The pivotal language in the Rule is that the nonmoving party must come forward with "specific facts showing that there is a **genuine** issue for trial." *Fed. R. Civ. Proc.* 56(e) (emphasis added). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986);  In re CitX Corp., Inc., 448 F.3d 672 (3d Cir. 2006).

## II. Standing

The Plan Proponents once again raise the issue of Insurer standing because they claim that the landscape has changed as a result of this Court's Supplemental Joint Plan Opinion.  The

Court will address this issue again because standing is a threshold issue that can be raised at any point in a proceeding.  Warth v. Seldin, 422 U.S. 490 (1975).

Although the Plan Proponents claim that the Insurers are seeking to assert the rights of third parties, the Court does not view it that way.  If it did, then the Plan Proponents could probably achieve their goal of excluding the Insurers from these proceedings.  *See*, In re Combustion Engineering, Inc., 391 F.3d 190, 220 n. 28 (3d Cir. 2004) ("We have generally taken a restrictive view of third-party prudential standing in the bankruptcy context.); *see also*, In re PWS Holding Corp., 228 F.3d 224, 248 (3d Cir. 2000) ("Third-party standing is of special concern in the bankruptcy context, where ... one constituency ... seeks to disturb a plan of reorganization based on the rights of third-parties[.] In this context ... courts have often denied standing as to any claim that asserts only third-party rights.").  Despite the Supplemental Joint Plan Opinion, this Court continues to believe that the Insurers have their own injury and are not merely asserting rights belonging to third-parties.  In fact, the Supplemental Joint Plan Opinion makes that injury even more apparent, because the Court held that the anti-assignment and cooperation provisions in the Insurers' policies could be preempted under federal bankruptcy law.  The preemption of those rights is an injury-in-fact.

The Court also rejects the other basis for denying standing to the Insurers - the Insurance Neutrality provision in § 11.12 of the Amended Joint Plan.  This slightly tweaked section purports to provide unqualified assurance to the Insurers that their rights are utterly unaffected.  As this Court hoped it had made clear before, if the Plan Proponents want to bar the door to the courtroom to the Insurers then that assurance must be truly unqualified.  Section 11.12 still falls short of that goal.  It is strong on protecting the Insurers' contract defenses but less stalwart on protecting the Insurers from the Debtors' use of any express or implied findings in the

4

bankruptcy case in the Coverage Action.  That is a real danger to the Insurers, because this plan

still attempts to address many of the same claims that had been liquidated under the Claimant

Agreement that Judge Stroumtsos in the Coverage Action found to be invalid and fraudulent.

Even if the Court is incorrect on the Insurer standing issue, it still has an independent

obligation to ensure that a plan meets the requirements of § 1129.  The Court finds the Amended

Joint Plan unconfirmable separate and apart from any objection raised by a party.

### III. Amended Joint Plan's treatment of payments to Weitz and Rice

The first substantive issue the Court wishes to address is the Amended Joint Plan's

treatment of $2 million in payments to Mr. Weitz and Mr. Rice ("Claimants' Counsel") provided

for by the pre-petition Claimant Agreement.[4]  During the course of this case these payments have

been called everything from "facilitation fees"[5] to "payoffs"[6].  Claimants' Counsel was able to

---

[4]The Claimant Agreement provided that:
Congoleum will pay $1,000,000 to each Claimants' Counsel [defined herein as Weitz and Rice] ("Expense Payments').  Expense Payments will be used by Claimants' Counsel to pay all out-of-pocket expenses, reasonable professional's fees and expenses, and other costs that Claimants' Counsel may have incurred or may incur (i) in connection with the negotiation and implementation of this Claimant Agreement and the related Collateral Trust Agreement and Security Agreement, (ii) in connection with the negotiation of a possible 'pre-packaged' chapter 11 plan of reorganization for Congoleum, and/or (iii) in connection with due diligence investigations related to a possible chapter 11 plan of reorganization.
*Claimant Agreement* § VI.

[5]"The $2 million payments to Rice and Weitz authorized by the Claimant Agreement were the result of negotiations after Rice and Weitz had originally demanded a $30 million 'facilitation fee' in November 2002."  *Fourth Amended Complaint* ¶ 178 [Adv. Proc. No. 05-6245; Doc. No. 325, Ex. A]

[6]In an opinion issued in Congoleum's state court insurance coverage action, Judge Stroumtsos noted that "Congloleum's representatives characterized the proposed fee to be paid to Weitz and Rice as a 'payoff'".  Congoleum Corp. v. Ace Am. Ins. Co., No. MID-L-8908-01 (N.J. Super. Ct. May 18, 2007).

exact this tribute from the Debtors because § 524(g)(2)(B)(ii)((IV)(bb) requires that a § 524(g) plan be approved by at least 75% of the voting claimants.  Thus, from the Debtors' perspective, it would be difficult, if not impossible, for the Debtors to confirm a plan unless Claimants' Counsel delivered the votes of their clients .[7]

Since early in the case, this Court has highlighted the problematic nature of these payments.  In the Court's first summary judgment opinion addressing confirmation, it noted that:

> The Court has serious concerns about the independence of judgment being exercised when it comes to Messrs. Rice and Weitz. For instance, buried in the Plan in § 13.5 is the provision that "any Plan Trust Bankruptcy Cause of Action, including counts VII and XVI of the Omnibus Avoidance Action, arising from the advance of two million dollars ($2,000,000) to the Claimants' Representative prior to the Petition Date on account of the Claimants' Representatives' fees and expenses, shall not be assigned to the Plan Trust and shall be unconditionally released by the Debtors and their Estates in accordance with Section 12.3 of the Plan." The Debtors offer no explanation for this munificence. So while on the one hand the Debtors insist that there is no problem with the prosecution or settlement of the avoidance actions by the Plan Trust because the settlements will be subject to court approval, they then release a potential $2 million cause of action in the same adversary proceeding without seeking separate approval of the Court. The Debtors could have filed a Notice of Settlement regarding the settlement of Counts VII and XVI of the Avoidance Action, as the Debtors did with all of the insurance settlements, but instead the Debtors chose to simply insert it into the Plan, perhaps in the hope it would attract less attention that way.

*Tenth Modified Plan Opinion* at 27 n. 14.  Later in the same opinion, the Court stated that "the claimants representatives were the architects of the Claimants Agreement, which provided for uneven treatment of asbestos creditors and created many of the confirmation problems that have plagued this case." *Opinion* at 42.   The Court noted in its second summary judgment opinion that:

---

[7]"The realities of securing favorable votes from thousands of claimants to meet the 75% approval requirement forces debtors to work closely with the few attorneys who represent large numbers of injured claimants."  In re Congoleum Corp., 426 F.3d 675, 680 (3d Cir. 2005).

> The proposed payment mechanism in § 5.14(h) of the Joint Plan [which did not require Court review of the Claimants' Counsel fees] is simply not consistent with the language of § 1129(a)(4) or how the Bankruptcy Code treats other payments made by the estate. *See, e.g.*, 11 U.S.C. § 330, 503. The language of § 1129(a)(4) makes clear that the court must approve the payment itself as reasonable. It is not enough for the Court to merely approve of the mechanism by which the payment is reviewed. [...] Given the evidence of undue influence on the parts of Messrs. Rice and Weitz in this case, the need for independent court review of any fees paid to them is paramount.

*Joint Plan Opinion* at 21. Apparently that still was not enough to get the message through that multi-million dollar payments to adversaries in connection with a bankruptcy case, even if made pre-petition, must be subject to court review. As a result, as late as October 2008 when the Court issued its opinion approving the settlement of the Pergament I and Pergament II adversary proceedings, the issue was again before the Court. In a final effort to guide the parties toward a confirmable plan, the Court stated:

> To clarify the record, however, the Court must note that approval of this settlement does not include a finding that any piece of the settlement meets the standards required for confirmation. For example, the litigation settlement provides that Joseph Rice and his firm and Perry Weitz and his firm will be allowed to keep the $1 million payments made to them pre-petition in connection with negotiation of the Claimant Agreement and pre-packaged bankruptcy plan. *See,* Motion ¶ 45; Ex. A at 7. The Movants argue that this settlement is consistent with the Court's prior rulings because any **additional** fees and expenses sought will require application to, and approval by, the bankruptcy court. The Movants also contend that § 1129(a)(4) is not the correct standard to review these payments. The persuasive force that argument is not apparent. Section 1129(a)(4) does not limit a bankruptcy court's review of fees paid by a debtor to future payments, or even post petition payments: By its plain language it includes any payments made "in connection with the case, or in connection with the plan and incident to the case". *See,* <u>In re Cajun Elec. Power Co-op, Inc</u>., 150 F.3d 503 (5th Cir. 1998); Collier on Bankruptcy ¶ 1129.03[4] (15th ed. rev.) Although the court has not yet been presented with support for how these fees accrued, the parties have consistently represented that they are based on services rendered in negotiating the plan initially put forth by the Debtors in this case. Therefore, those payments would still be subject to court review at confirmation.
>
>     The Movants cite <u>In re Western Asbestos</u>, 313 B.R. 859 (N.D. Cal. 2004) for the proposition that the bankruptcy court has no authority to review prepetition fees, but that case is readily distinguishable. In <u>Western Asbestos</u>, the bankruptcy

judge reviewed a $12.3 million dollar prepetition payment that had been made by the debtor's insurer to claimants' counsel under § 1129(a)(4) and found that it was not reasonable. On appeal, the District Court found that the bankruptcy court did not have core jurisdiction over the fees that were paid because the payment "at its most basic level, had little to do with the Debtor's bankruptcy ...." Id. at 863. In contrast, the payments proposed in this case are to come directly from the Debtors rather than from a third-party and the work that is allegedly being compensated for is closely tied to the bankruptcy filing. In this very case, the Third Circuit Court of Appeals admonished this court for refusing to scrutinize pre-petition negotiations where those negotiations were related to the bankruptcy filing. In re Congoleum Corp., 426 F.3d 675 (3d Cir. 2005). It seems unlikely that the Third Circuit would take a different view of the relevance of pre-petition negotiations in this case in the context of § 1129(a)(4).

*Litigation Settlement Opinion* at 3-5.

The Court provides this extensive background of its previous opinions so that the manner in which the current plan was drafted may be viewed in the proper context. The Amended Joint Plan provides that:

> As of the Effective Date of the Plan, the Debtors shall be deemed to have forever withdrawn, released, discharged, waived and forgiven … Claimants' Counsel[8] … for and from any and all claims, actions, causes of action, counterclaims, proofs of claim, and any other obligation or any kind or nature arising from or related to the Bankruptcy Code, the Avoidance Actions, and any and all claims related to any Pre-Petition Settlement Agreement, Claimant Agreement, the Collateral Trust Agreement, Security Agreement, **pre-petition payment to Claimants Counsel**, and any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003, including all pending and potential causes of action, whether accrued or to accrue …

*Amended Joint Plan* § 5.14(b)(iii) (emphasis added). The Amended Joint Plan further contemplates that the bankruptcy court will issue an order dismissing all those claims with prejudice. *Amended Joint Plan* § 5.14(c). By stark contrast, with regard to future payments to Claimants's Counsel the Amended Joint Plan provides that: "Any claim by Claimants' Counsel

---

[8]Section 1.2 of the Amended Joint Plan defines "Claimants' Counsel" as Mr. Weitz and Mr. Rice.

for the payment of **additional** fees and expenses shall be subject to application to, and approval by, the Bankruptcy Court." *Amended Joint Plan* § 5.14(e) (emphasis added).

Despite the clear language of § 5.14(b)(iii) that seeks to release any estate claims to the pre-petition payments made to Claimants' Counsel, the Plan Proponents argue that the inclusion of § 5.14(b)(iii) in the Plan does not render it unconfirmable. The Plan Proponents contend that no specific plan provision regarding court review of the pre-petition payments is necessary because the Court has already decided to review the payments under § 1129(a). *See, Plan Proponents Brief* at 67 ("It is unnecessary to add a provision to the Amended Joint Plan that would simply re-state the Bankruptcy Code and what this Court already has held will occur and the statutory basis for its ability to act."). If the Plan Proponents truly believed that, then the inclusion of § 5.14(e) specifically granting the Court authority to approve additional fees is superfluous. It would also run contrary to cases cited by the Plan Proponents that have held that a bankruptcy court's ability to approve fees does not need to be explicitly provided for in a Chapter 11 plan. Those cases are inapposite at any rate because they involved Chapter 11 plans that were silent as to fee approval, as opposed to this Plan that has express provisions that would negate the Court's ability to review fees meaningfully. The Court's ability to review fees under § 1129(a)(4) may be implicit, but the inclusion of § 5.14(b)(iii) in the Plan seeks to make that review a nullity. With no express provision in the Amended Joint Plan for recapturing any fees the Court might disapprove under § 1129(a)(4), the Plan Proponents -- over whom Claimants' Counsel hold considerable sway -- have set up a perfect situation for Claimants' Counsel to safeguard their million dollar payments.

Moreover, the inclusion of § 5.14(b)(iii) in the Plan is an odd way to acknowledge this Court's previous rulings on this issue. Had the Plan Proponents actually intended to give

deference to this Court's previous ruling, they could have simply deleted the word "additional" from § 5.14(e).  Instead, the plan submitted guarantees that if this Court were to disallow the payments to Claimants' Counsel, then the Amended Joint Plan would have to be redrafted.  At a minimum, the proposed plan demonstrates a callous disregard for conservation of estate assets.  More likely, given how this case has been conducted, the Plan was drafted this way to give Claimants' Counsel a toehold to argue that they do not have to return the payments to the estate no matter what finding the bankruptcy court may make under § 1129(a)(4).  If a plan were confirmed with the § 5.14(b)(iii) language proposed,  any review by this Court of the pre-petition payments would be illusory, the Plan Proponents assurances to the contrary at oral argument notwithstanding.  At the end of the day, it is the words of the plan itself that govern, not the assurances of counsel that the words do not mean what they say.

The Plan Proponents' equivocation on this issue speaks volumes.  In one breath they state that the "Plan Proponents accept that this Court plans to review such expenses at confirmation or at any other appropriate time," and that "the Court identified § 1129(a)(4) of the Bankruptcy Code as the correct standard to review the Claimants Counsel Expenses."  *Plan Proponents Brief* at 65, 66.  Yet in another breath they state that "[t]he Plan Proponents also acknowledge that Rice and Weitz may submit that the Claimants' Counsel Expenses or the estates' settlement of the claims related thereto are subject to a standard of review other than § 1129(a)(4)."  *Plan Proponents Brief* at 69 n. 23.   This gamesmanship highlights the ease with which the parties believe they can evade rulings of this Court with which they disagree.

Simply stated, the Plan Proponents explanation for how the Amended Joint Plan is consistent with the Court's prior rulings[9] does not pass muster. Summary judgment will be granted in favor of the Insurers on this issue.

## IV. Equality of distribution among creditors

The Third Circuit Court of Appeals has made abundantly clear that equality of distribution among asbestos claimants must be the backbone of any confirmable § 524(g) plan of reorganization. <u>Combustion Engineering</u>, 391 F.3d 190, 239 (3d Cir. 2004) ("[e]quality of distribution among creditors is a central policy of the Bankruptcy Code."). The parties admittedly did not have the benefit of the Third Circuit's ruling in <u>Combustion</u> when they drafted the Pre-Packaged Plan. Since that time, however, the parties have still failed to put forth a plan consistent with that fundamental concept.

The inequality remaining in the Amended Joint Plan centers on the payments made to three asbestos claimants: Edward Comstock, Kenneth Cook, and Richard Arsenault. In 2002, Mr. Comstock's claim was settled for $225,000, of which $168,577.34 was paid to him pre-petition[10]. The balance of the claim in the amount of $56,422.66 was included as a claim in the bankruptcy and Mr. Comstock was designated as a Class 2 claimant in Congoleum's Pre-Packaged Plan. His claim has been included in every subsequent plan. Also in 2002, Congoleum

---

[9]Given the procedural context in which they arose, it might be argued that some of the Court's rulings on this issue were dicta. That does not change the result; the parties flouted this Court's clear direction at their own peril. *Compare,* <u>In re Cybergenics</u>, 330 F.3d 548 (3d Cir. 2003) (considered statements made by a court should not be idly ignored, even if dicta).

[10]Mr. Comstock was represented by Brayton Purcell LLP.

settled the claims of Mr. Cook and Mr. Arsenault for $8 million a piece[11].  The identical
settlements consisted of $800,000 in cash, which was paid pre-petition, and an assignment of
insurance proceeds for the balance of $7.2 million.   The balance of Messrs. Cook and
Arsenault's claims were included in the bankruptcy and they were designated as Class 2
claimants in Congoleum's Pre-Packaged Plan, and their claims have been included in every
subsequent plan.  The Plan Proponents report that these three creditors have now exercised the
option offered to them in the Amended Joint Plan and have elected to retain in full their pre-
petition payments rather than pursue recovery of the remainder of their claims from the Plan
Trust.  *Plan Proponents Brief* at 29.

  The Plan Proponents contend that the Amended Joint Plan provides for equality of
treatment because all of the asbestos personal injury claims are placed in the same class. While it
is true that all asbestos personal injury claimants are placed in Class 7 in the current plan, not all
the creditors in Class 7 can avail themselves of the option available to Messrs. Cook, Arsenault
and Comstock.   The Amended Joint Plan, which incorporates the Litigation Settlement
Agreement, provides that:

> Each Litigation Settlement Claimant shall be entitled to submit its Asbestos
> Personal Injury Claim to the Debtors' bankruptcy estates, including the Plan
> Trust, as an unliquidated claim for resolution and treatment pursuant to the TDP,
> provided that, any Litigation Settlement Claimant who received partial payment
> from the Debtors with respect thereto prior to the Petition Date, including
> specifically claimants Cook, Arsenault and Comstock, in addition to the other
> provisions hereof, hereby agrees to either (a) not seek further recovery with
> respect thereto against the Debtors, including from the Plan Trust, or (b) return
> and relinquish any such pre-petition partial payment for the benefit of the Plan
> Trust as a condition precedent to asserting any such further Asbestos Personal
> Injury Claim against the Debtors or the Plan Trust.

---

[11]Messrs. Cook and Arsenault were represented by Mr. Weitz and his firm Weitz &
Luxenberg.

*Amended Joint Plan* § 5.14(f). Once again, it the existence of an option that is only relevant to a tiny fraction of the overall asbestos claimants that makes the treatment unequal.[12] For truly equal treatment the plan could have provided that claimants Cook, Arsenault and Comstock must relinquish any pre-petition payments and apply to the Plan Trust on the same terms as all other asbestos creditors. Of course, to accomplish that result the Debtors and Bondholders Committee would have to be successful in the adversary proceedings. There is apparently some skepticism about that result among the Plan Proponents. The reality is that this litigation hurdle is a self-created problem. The Debtors, along with their attorney Scott Gilbert and Claimants' Counsel, orchestrated the Pre-Packaged Plan, Claimant Agreement, and Pre-Petition Settlement Agreement to try to make the settlements unassailable once the bankruptcy petition was filed. The ground arguably shifted under their feet with the <u>Combustion</u> decision, but the Court may not now turn a blind eye to any resulting inequities.

To get around the obvious infirmity in the Amended Joint Plan, the Plan Proponents offer several rationales. One is that "[t]hese settlements - at least as to the portion paid in cash - are analogous to the numerous other settlements made in the regular course of Congoleum's settlement of claims in the tort system." *Plan Proponents Brief* at 50. The Court has already rejected that argument. When the Debtors advanced that rationale to defend its disparate treatment of the Pre-Petition Settlement creditors in the Tenth Modified Plan, the Court

---

[12]The Joint Plan also offered the Pre-Petition Settlement creditors an option not available to other asbestos creditors. *See,* Joint Plan § 5.14(e)(1). In rejecting that treatment, this Court held: "[g]ranting the Class 7B claimants [which included Cook, Arsenault and Comstock] that option renders the Joint Plan unconfirmable because it relies on the pre-petition liquidation of the Class 7B claims as a basis to treat them differently from other asbestos claimants. Such a distinction is in direct contravention of this Court's prior rulings and the precepts of § 524(g)." The Amended Joint Plan relies on the fact that some amounts were paid pre-petition to treat those claimants differently.

13

explained that the playing field changed when the Debtors chose to file for bankruptcy.[13]  That remains true.  Had the settlements with these three creditors been fully consummated pre-petition, unrelated to the bankruptcy filing, then the vastly superior settlement amounts would not be at issue.  That is not the case; these settlements were not fully consummated pre-petition, the remainder of the amounts owed on the settlements was included in the Pre-Packaged Plan and subsequent plans up to and including this one.  The Plan Proponents attempts to divorce the cash payment made pre-petition from the unpaid amount of the settlements is not intellectually defensible.  Each settlement arose from a single alleged injury from exposure to asbestos in a Congoleum product; therefore, there was not separate consideration for the pre and post-petition portions of the claims.

Plan Proponents grudgingly acknowledge that the Court has already found that allowing Messrs. Cook and Arsenault to retain their $800,000 pre-petition payments was one of the reasons that the Joint Plan was found to be unconfirmable.  *See, Joint Plan Opinion* at 7 n. 7.  They brush that ruling aside, however, because that "opinion predated the Litigation Settlement Agreement and thus did not address factors relating to the resources - time and costs - of prosecuting claims for return of such funds, the unpredictable nature of the litigation and the uncertain outcome of the causes of action asserted or the risks of collection even if a successful outcome was attained."  *Plan Proponents Brief* at 41.  Those factors are only relevant to whether a settlement of the litigation was reasonable, they have absolutely no bearing on whether the

---

[13]"It was stated at oral argument that the settlements embodied in Class 7B were customary settlements in the tort system. That may or may not be the case, but when Congoleum chose to stop litigating its asbestos liability in the tort system and to deal with it through the bankruptcy system the rules of the game changed."  *Joint Plan Opinion* at 8-9.

treatment of Cook and Arsenault's claims satisfies the standards of § 542(g).  That is why the Court could approve the Litigation Settlement as falling above the lowest point in the range of reasonableness while at the same time cautioning that such a finding had no bearing on whether a plan that incorporated that settlement met the standards for confirmation under § 1129.  Thus, the Plan Proponents attempt to shift the focus of the inquiry to the reasonableness of settling with these three claimants and Claimants' Counsel is not persuasive.  No matter how eminently reasonable a settlement may be, affecting outcomes through settlement that could not be accomplished directly through provisions of the Bankruptcy Code is unacceptable.  Parties may not do an end run around the Bankruptcy Code by calling something a settlement.  The Court thought it had made that clear when on summary judgment on the Joint Plan it noted that: "The Plan Proponents' overall theory seems to be that disparate treatment of creditors is acceptable as long as it was part of a settlement that was negotiated post-petition. The Omnibus Claimant Settlement is not a silver bullet.  A finding that the Omnibus Claimant Settlement meets the very low threshold of Rule 9019 does not excuse compliance with the requirements of § 1129 or § 524." *Joint Plan Opinion* at 10.  So, even if that argument had merit, it is the law of the case that the $1.6 million in pre-petition payments to Messrs. Cook and Arsenault render the plan unconfirmable.

Alternatively, the Plan Proponents argue that because Mssers. Cook, Arsenault and Comstock have elected to forego the remainder of their claims and the right to vote on confirmation of the Amended Joint Plan they "are not present claimants ... [and] [t]heir retention of the paid portion of the pre-petition settlements is not relevant for purposes of a § 524(g)(2)(B)(ii)(V) analysis." *Plan Proponent Brief* at 43.  Such an argument appears to fly in the face of the Third Circuit's holding that  a "pre-petition transfer ... [can] implicate[] the

fundamental bankruptcy policy of 'equality of distribution among creditors.'" In re Combustion Engineering, Inc., 391 F.3d 190, 241 (3d Cir. 2004), not to mention the Third Circuit's admonition that bankruptcy courts must give "careful scrutiny to pre-petition procedures in pre-packaged plans." In re Congoleum Corp., 426 F.3d 675, 692 (3d Cir. 2005).  Perhaps in recognition of that weakness, the Plan Proponents maintain that "[t]he individual settlements with Cook, Arsenault and Comstock were not entered into as part of any integrated bankruptcy scheme ...." *Plan Proponents Brief* at 49.  The Court rejects this alternative argument as well. Even under standards requiring all inferences to be drawn in favor of the party opposing summary judgment, the record of this case unequivocally supports a finding that, at least for Messrs. Cook and Arsenault, the consummation of the settlements was part of an integrated bankruptcy scheme.

The Cook and Arsenault settlements had their genesis in the reverse bifurcation trial in New York State Supreme Court that resulted in a damages verdict of $18.1 million for Mr. Cook and $15.8 million for Mr. Arsenault.  In the Plan Proponents own words, the settlements resulted when "Marcus[14] and Mahoney[15] believed they had exhausted their ability to lower Weitz's demands, Congoleum followed Weitz's suggestion and sought the counsel of Scott Gilbert." *Plan Proponents Brief* at 37.  In October, 2002 Mr. Gilbert then settled the claims for $800,000 in cash and an assignment of insurance proceeds for $7.2 million.  Mr. Gilbert was hired for his expertise in negotiating prepackaged bankruptcies; therefore, it is difficult to comprehend how it can seriously be argued that the settlement was unrelated to the eventual bankruptcy filing.

---

[14]Richard G. Marcus, Congoleum's Vice Chairman.

[15]Congoleum's national counsel for asbestos matters from 1997 through 2003.

Since Congoleum admits that it had hit a wall in trying to negotiate a settlement with Mr. Weitz unrelated to the bankruptcy, *ipso facto* the settlements were able to be reached because the hiring of Mr. Gilbert signaled that a prepackaged bankruptcy filing that would safeguard the assignment of insurance proceeds was on the horizon.  That conclusion is borne out by the fact that when the prepackaged plan and its attendant agreements were finalized in the middle of 2003, the Cook and Arsenault claims were part of the Pre-Petition Settlement Agreement and Messrs. Cook and Arsenault were designated as Class 2 Claimants in the plan.

The Plan Proponents acknowledge that this Court has already determined that the Security Agreement and Collateral Trust Agreement  - which attempted to grant a security interest to the Collateral Trustee for the benefit of Cook and Arsenault and other claimants who entered into Pre-Petition Settlement Agreements - was part of an integrated bankruptcy scheme. *See, Tenth Plan Opinion* at 22-24.  Once again, the Plan Proponents parse one of the Court's prior ruling to the point of absurdity and argue that the Court only found that the **unpaid** portion of the Pre-Petition Settlement Agreements became an integrated part of Congoleum's pre-packaged bankruptcy.  The legal basis for this metaphysical distinction between the cash and insurance components of the settlements is not apparent to the Court.  There was only one lawsuit each filed by Messrs. Cook and Arsenault against Congoleum, and only one settlement of those lawsuits in the amount of $8 million each.  The fact that the terms of those settlements called for a bifurcated payment structure does not transform them into two utterly unrelated settlements: one for $800,000 cash and one for $7.2 million in insurance proceeds.  If that were the case,  Congoleum would have a serious good faith problem because that would mean that the assignments of $16.4 million in insurance proceeds were not supported by any consideration

because the lawsuits had been settled "long since" by the two $800,000 payments. *See*, *Plan Proponents Brief* at 40.

Plan Proponents importune that if the Insurers disagree with their version of the facts then there is a genuine issue of material fact that must be addressed at a confirmation hearing. The Court disagrees because to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 322 (7th Cir. 1992). The evidence that the non-moving party produces to show the existence of a genuine issue must be of sufficient quantum and quality to allow a rational and fair-minded fact finder to return a verdict in favor of the non-movant, bearing in mind the applicable standard of proof that would apply at trial on the merits. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). Facts that could alter the outcome are material and disputes are genuine if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct. Horowitz v. Federal Kemper Life Assurance Co. 57 F.3d 300, 302 n. 1 (Fed. Cir. 1995). Even viewing the facts in the light most favorable to the Plan Proponents, it could not be said that a rational trier of fact could be persuaded that the pre-petition payment of $800,000 on the $8 million settlement amount bore no relationship to the post-petition treatment of the remainder of the settlement amount. The interrelatedness of the two halves of the settlements can in seen in the language the Debtors themselves use in their Fourth Amended Complaint: "Ultimately, Richard Marcus and Mr. Gilbert negotiated the settlement of the Cook and Arsenault cases for a settlement of $800,000 in cash for each case and an agreement to provide a security interest in insurance

proceeds for the balance. A follow up letter documenting the settlement in principle was sent shortly thereafter." *Fourth Amended Complaint* at ¶ 119.

For all of the foregoing reasons, the Court finds that the treatment of the claims provided for in § 5.14(f) is an additional reason the Amended Joint Plan is unconfirmable as a matter of law[16].

## V.  Conversion or dismissal pursuant to 11 U.S.C. § 1112(b)

After the 1986 amendment to § 105(a), it is clear that a bankruptcy court may *sua sponte* raise the issue of dismissal or conversion under § 1112(b). 5 COLLIER ON BANKRUPTCY § 1112.03[4] (15th ed. rev. 2006).  Section 105(a) now provides that "[n]o provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."  *See*, In re Finney, 992 F.2d 43, 45 (4th Cir.1993) ("A bankruptcy court may act under § 1112(b) on the motion of a party in interest or sua sponte as 'necessary and appropriate' under § 105(a)."); In re Starmark Clinics, LP, 388 B.R. 729, 735 (Bankr. S.D. Tex. 2008); In re Munteanu, 2007 WL 1987783 (E.D.N.Y. 2007); *Cf.* In re Moog, 774 F.2d 1073 (11th Cir. 1985)(pre-amendment to § 105 case that found that bankruptcy court had no *sua sponte* authority to dismiss or convert).

At oral argument, Debtors' counsel suggested that the Court could not dismiss or convert the case without formal notice to all creditors.  The Bankruptcy Rules provide that "the clerk, or

---

[16]The Insurers also point to the Trust Distribution Procedures - specifically the medical evidentiary requirements and "sequencing adjustments"- as further evidence of unequal treatment in the Plan, but those issues involve factual disputes that are not amenable to resolution by summary judgment.

some other person as the court may direct, shall give the debtor, trustee, all creditors and

indenture trustees at least 20 days notice by mail of ... the hearing on the dismissal of the case or

the conversion of the case to another chapter ...." *Fed. R. Bankr. Pro.* 2002(a)(4). The rules of

construction for title 11 provide that when the Bankruptcy Rules call for notice to be given it

means "such notice as is appropriate in the particular circumstances, and such opportunity for a

hearing as is appropriate in the particular circumstances". 11 U.S.C. § 102(1)(A). The Court is

confident that the notice and opportunity to be heard that has been provided in this instance

satisfies the Rules. As part of its opinion denying confirmation of the penultimate plan, the

Court stated its intention to issue an Order to Show Cause Why the Case Should Not Be

Converted or Dismissed. On June 6, 2008, the clerk issued that Order to Show Cause and

electronic notice was sent to all parties that have appeared in the case. The hearing on the Order

to Show Cause was held on June 26, 2008. At that hearing, due in no small measure to the

Court's concern for the welfare of the Debtors' employees, the Court elected not to dismiss or

convert at that time but to provide the Debtors with one final opportunity to present a plan that

was acceptable to the Court. At the close of the Disclosure Statement hearing on December 18,

2008, the Court reiterated that the plan that had been recently filed would be the final one it

would consider and invited any parties that wanted to be heard on the issue of dismissal or

conversion to submit their positions to the Court. The Future Claimants' Representative, the

Plan Proponents, the Insurers, and Certain Defendants all availed themselves of the opportunity

to do that. Under the circumstances, the Court does not think that additional notice is necessary

or would prove beneficial. *See also*, 9 COLLIER ON BANKRUPTCY ¶ 2002.02[6][d] (15th ed. rev.

2006) ("[I]n appropriate circumstances, the court may act *sua sponte*, without notice or hearing,

and dismiss or convert the case when ... the case is irremediably defective."). Section 1112(b)[17] provides that, on request from a party in interest, the court may dismiss a case "for cause" and then provides an illustrative list of causes. The Third Circuit has recognized that the "list is not exhaustive" and courts should "consider other factors as they arise." In re Brown, 951 F.2d 564, 572 (3d Cir. 1991) (quoting S. Rep. No. 989, 95th Cong., 2d Sess. 117 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5903; H.R. Rep. No. 595, 95th Cong., 1st Sess. 406 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6362.). Two of the delineated causes are pertinent here: "continuing loss or diminution of the estate and absence of a reasonable likelihood of rehabilitation" and "denial of confirmation of every proposed plan and denial of a request made for additional time for filing another plan or a modification of a plan". 11 U.S.C. § 1112(b)(1), (5).

It is self-evident that cause exists under § 1112(b)(5) because the Court has denied confirmation of every proposed plan, and has made clear its intent to deny any request for additional time to file a further amended plan. [see Section VI]

Cause can also be found under § 1112(b)(1) because there is continuing loss or diminution of the estate in the form of mounting professional fees. The Plan Proponents stress the fact that this case should not be dismissed or converted because the Debtors have had positive EBITDA of $74 million since filing. That number, while large, is significantly less than the professional fees that have been generated in this case since it was filed. It is also less, by orders of magnitude, than any amount of cash that the Debtors have proposed to contribute to the Plan Trust. Those numbers, and not the EBITDA, are what underlie the Court's determination that it is no longer beneficial for the Debtors to remain in Chapter 11. The Plan Proponents'

---

[17] 11 U.S.C. § 1112 was amended as part of BAPCPA but this case was filed prior to the effective date of those amendments.

brief suggests that conversion or dismissal is never an option if a debtor is a profitable business. That position is patently ludicrous. Courts do not have to allow a debtor to remain in Chapter 11 indefinitely and propose endless plans of reorganization,[18] particularly when a debtor refuses to either pursue an appeal or act in a manner consistent with the court's rulings.

Beyond the examples of cause enumerated in § 1112(b), the Court also finds cause exists to convert or dismiss based on the failed mediation attempts. This case had the benefit of extensive mediation sessions with two extremely capable jurists, one of whom had previously presided over the coverage action. The Court finds it quite telling that despite those efforts the parties could not be moved toward proposing a confirmable plan.

The Plan Proponents appear to be under the mistaken belief that it is the mere length of time that this Chapter 11 proceeding has been pending that is motivating the Court to consider conversion or dismissal. That skewed view is not supported by the history of this case, and the Court attempted to dispel that misconception at the Order to Show Cause hearing[19]. For example, the Court stated that it "issued the Order to Show Cause for a wide variety of reasons well beyond the duration of the case to date" and that "it is not just the calendar that inspired the Court's decision. It's what's gone on in those four-and-a-half years." *Tr. of 6/28/08 OSC hearing* at 43. Apparently that made no impression, since the Plan Proponents are still insisting that this is not an unusual length of time for a complicated asbestos case to be in Chapter 11.

---

[18]By the Court's count this is the 24th plan overall and the 14th plan that the Debtors have been a party to. *See*, Appendix A [confirmation history].

[19]The Court hereby incorporates into the record the transcript of the hearing on the Court's Order to Show Cause Why the Case Should Not Be Converted Or Dismissed (6/26/08) [Doc. No. 6653].

At oral argument, counsel for the Bondholders Committee made an eloquent plea to the Court, as a court of equity, to be reasonable and not allow this reorganization to be derailed over $3.6 million in payments, which even if recovered would have little impact on the recovery for creditors. While the practical import of that argument is not lost on the Court, the extent of this Court's equitable powers is cabined by the Code itself. As the Third Circuit has noted, "the equitable powers authorized by § 105(a) are not without limitation, and courts have cautioned that this section ... 'does not constitute a roving commission to do equity.' " In re Combustion Engineering, Inc., 391 F.3d 190, 236 (3d Cir. 2004) (internal citations omitted). If the Debtors' pre-petition structuring of their asbestos liabilities now makes it difficult to propose a confirmable plan, the Court is not free to use § 105 to help the Debtors circumvent the confirmation requirements. For better or worse, the Court is not authorized to confirm a plan merely because it would be practical to do so.

Since the Court has determined that the Amended Joint Plan is not confirmable, the only remaining question is whether dismissal or conversion is the more prudent course of action. Based on the submissions of the parties, the answer to that question appears clear that dismissal of the case is the preferred course of action. The Court agrees, largely for the reasons stated in the Future Claimants' Representatives' Statement Regarding Conversion or Dismissal. The Debtors are able to pay their immediate expenses on a short term basis. Conversion would result in a convulsive disruption of both cash flow and employment. Conversion would also add a significant layer of expense, as a Chapter 7 Trustee would be forced to start from scratch evaluating all of the Debtors' the assets and liabilities, including some very complex litigation. Dismissal would leave the Debtors free to continue the ongoing coverage litigation in the state

23

court and to negotiate in what the parties seem to agree is a tort litigation environment that has changed quite a bit since these Chapter 11s were filed.

Finally, the Court notes that the Debtors repeatedly state that if the case is dismissed they will have no choice but to immediately refile another bankruptcy petition. *See*, *Plan Proponent Brief* at 70, 86, 89. The Debtors should be aware that refilling without significantly changed circumstances may be found to be bad faith.

## VI. Request for additional time to file further amended plans

Plan Proponents request that if the Court determines that dismissal or conversion is warranted that they be given a 30 day period "to proffer a solution in conformance with the Bankruptcy Code and file an amended plan." *Plan Proponents Brief* at 100. The Plan Proponents have already been given 7 months to proffer such a solution. As the parties will recall, at the hearing on the Order to Show Cause Why the Case Should not be Converted or Dismissed, the Court said:

> I'm not going to keep nibbling away at this. I'm not going to essentially draft a plan, through opinions, that I believe comports with the applicable law. I don't have the time, and more importantly, the company doesn't have the money to follow that course. The debtors should make their best offer, not the minimum they think they can get way with, because if the next plan isn't confirmed, this is your notice that I will convert or dismiss the case.

*Transcript of 6/28/08 hearing on OSC to dismiss or convert* at 48.

Even had the Court not explicitly indicated that this would be the final plan considered, the Debtors' ability to make the necessary changes is far from clear. The first Summary Judgment Opinion was issued over two years ago. The parties have been actively negotiating since that time. There is absolutely no indication that an additional 30 days would be more fruitful than the last 700 or so. The Plan Proponents tout the severance clause as evidence of

24

their ability to conform the Amended Joint Plan into one acceptable to the Court; however, Certain Defendants, including Joseph Rice and Perry Weitz, filed a reply to the summary judgment motion pointing out that the inclusion of a severance clause in the Amended Joint Plan is at odds with the terms of the parties' settlement. The Settlement Agreement provides that it is an integrated whole and not divisible. Thus, without the Certain Defendants' consent, any attempt to sever provisions of the Amended Joint Plan could render the Litigation Settlement Agreement null and void.

More importantly, the history of this case convinces the Court that permitting further amendment would be an exercise in futility and a further waste of estate assets. The Debtors and the other Plan Proponents have shown a marked inability to change course in response to evolving case law or rulings of this Court.

<u>Conclusion</u>

The Court understands that many of the parties to the case disagree with various rulings of this Court. This Court has never claimed infallibility and fully expected, and continues to expect, appeals from its orders. What the Court cannot countenance is for appeals to be "administratively terminated" and subsequent plans filed in which this Court's rulings are largely ignored. In the Court's view, the real benefit to the bankruptcy estate of dismissal of this case is that it will force the parties to follow through on an appeal that will resolve these issues once and for all. Given the accrual of time and administrative expense while the Plan Proponents continue to file plans that advance the same agenda rejected by the Court, it is indisputably in the best interest of the estate to get a ruling that the parties will respect. Either the Appellate Courts will agree that this and previous plans are unconfirmable as a matter of law,

or everyone can proceed to confirmation with better clarity about what, exactly, is required to confirm a plan in this case.

The Court will enter an order dismissing the case effective twenty days from the date of this opinion. That will enable any party in interest to seek a stay of the Order of Dismissal pending the outcome of the appeal.

*/s/ **Kathryn C. Ferguson**
KATHRYN C. FERGUSON
US Bankruptcy Judge

Dated: February 26, 2009

# Appendix A

Confirmation history for 03-51524
Congoleum Corp., et al.

| Doc # | Date | Plan Proponent | Comment |
|---|---|---|---|
| 176 | 1/22/04 | Debtor | plan withdrawn |
| 181 | 1/22/04 | Debtor 1st Modified | Disclosure Statement app'd 5/14/04 [Doc. #698] |
| 709 | 5/18/04 | Debtor 2d Modified | plan withdrawn |
| 1494 | 11/0/04 | Debtor 3d Modified | |
| 1521 | 11/12/04 | Debtor 4th Modified | DS app'd 12/17/04 [Doc. #1722 ] plan withdrawn 2/29/05 [Doc. # 2435] after confirmation hearing began |
| 2590 | 6/10/05 | Debtor 5th Modified | |
| 2730 | 7/22/05 | Debtor 6th Modified | DS app'd 8/10/05 [Doc. #2832] |
| 3326 | 12/2/05 | CNA | |
| 3560 | 12/3/05 | Debtor 7th Modified | |
| 3568 | 2/3/06 | Bondholders Committee | |
| 3748 | 3/17/06 | Debtor 8th Modified | |
| 3830 | 3/31/06 | Bondholders 1st Modified | |
| 4074 | 5/17/06 | CNA 1st Modified | |
| 4402 | 8/11/06 | Debtor 9th Modified | |
| 4435 | 8/18/06 | CNA/Bondholders Joint Plan | |
| 4564 | 9/15/06 | Debtor 10th Modified | |
| 4617 | 9/25/06 | CNA/Bondholders 1st Modified | |
| 4804 | 10/23/06 | Debtor 11th Modified | Note: this was filed while the summary judgment motion on 10th was pending |
| 5648 | 7/3/07 | Future Claimants Rep. | |
| 5883 | 10/25/07 | FCR 1st Modified | |

| 6809 | 1/17/07 | FCR 2d Modified | |
| 6117 | 1/25/08 | FCR 3d Modified | |
| 6166 | 2/5/08 | Debtor/Bondholders/Asbestos Committee/FCR Joint Plan | DS  app'd 2/15/08<br>SJ denying confirmation entered 6/13/08 [Doc. # 6509] |
| 6998 | 11/14/09 | Joint 1st Modified | summary judgment on confirmation pending |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

NOTES:
total of 24 plans, Debtor a party to 14
3 Disclosure Statement approvals, 1 pending
3 summary judgment motions

# APPENDIX EXHIBIT 6

Order Filed on
**3/3/2009**
by Clerk U.S. Bankruptcy
Court District of New Jersey

| |
|---|
| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY |
| **Caption in Compliance with D.N.J. LBR 9004-2(c)** |
| |

| | |
|---|---|
| In re: | Chapter 11 |
| **CONGOLEUM CORPORATION, et al.,** | Case No. 03-51524 (KCF) Jointly Administered |
| Debtors and Debtors in possession. | Judge: Honorable Kathryn C. Ferguson |

## ORDER GRANTING STAY PENDING APPEAL

The relief set forth on the following page, numbered (1), is hereby ORDERED.

**DATED: 3/3/2009**

Honorable Kathryn C. Ferguson
United States Bankruptcy Judge

| Debtors: | Congoleum Corporation, *et al.* |
|----------|----------------------------------|
| Case No.: | 03-51524 |
| Caption: | Order Granting Stay Pending Appeal |

This matter coming before the Court on the Emergency Motion for a Stay Pending Appeal, dated February 27, 2009 (the "Emergency Motion") (ECF No. 7226) with respect to this Court's Order of Dismissal Effective Twenty Days from the Date of this Order, entered on February 26, 2009 (the "Dismissal Order") (ECF No. 7219); the Court having reviewed the Emergency Motion; and for good cause shown;

It is hereby ORDERED that:

1.       The Dismissal Order is stayed; and

2.       No order dismissing the above-captioned Chapter 11 cases shall be made effective until 20 days after a final non-appealable order is entered affirming the Dismissal Order.

1

*Approved by Judge Kathryn C. Ferguson  March  03, 2009*

# APPENDIX EXHIBIT 7

**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                            :
                                            :        Civil Action No. 09-1337 (JAP)
In re: CONGOLEUM CORPORATION,               :
                                            :
        Debtors.                            :        **ORDER**
                                            :
_____:

Before the Court is an appeal from two Orders of the Bankruptcy Court denying

confirmation of an Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy

Code dated November 14, 2008 (the "Plan"), submitted by the Plan Proponents[1]/Appellants, and

dismissing the Debtors' bankruptcy cases.  This Court has jurisdiction to hear the instant appeal

pursuant to 28 U.S.C. § 158(a).  Oral argument was held on this matter on July 1, 2009.  For the

reasons stated in the accompanying Opinion,

        **IT IS** on this 17th day of August, 2009,

        **ORDERED** that the Order of the Bankruptcy Court dated February 27, 2009, granting

summary judgment and denying confirmation of the Twelfth Amended Joint Plan of

Reorganization Under Chapter 11 of the Bankruptcy Code, is hereby **AFFIRMED IN PART** and

**REVERSED IN PART**, consistent with the accompanying Opinion; and it is,

        **FURTHER ORDERED** that the Order of the Bankruptcy Court dated February 26,

2009, dismissing Debtors' bankruptcy case is hereby **REVERSED;** and it is,

---

[1]        "Plan Proponents" shall be used to refer to the following parties: Congoleum
Corp., Congoleum Sales, Inc., Congoleum Fiscal, Inc. (collectively, "Company," "Congoleum"
or "Debtors"), the Asbestos Claimants' Committee (the official committee of asbestos claimants
appointed in the Debtors' bankruptcy cases), and the Bondholders' Committee (the official
committee of bondholders appointed in the Debtors' bankruptcy cases).

**FURTHER ORDERED** that this Court withdraws the reference for this proceeding

pursuant to 28 U.S.C. § 157(d).

**SO ORDERED.**



/s/      JOEL A. PISANO
United States District Judge

FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                                       :
                                                       :        Civil Action No. 09-1337 (JAP)
                                                       :
In re: CONGOLEUM CORPORATION,          :
                                                       :
             Debtors.                              :        **OPINION**
                                                       :
_____:

PISANO, District Judge:

On February 27, 2009, Judge Ferguson of the Bankruptcy Court denied confirmation of

the fourteenth plan of reorganization[1] (the "Plan") submitted over the last five years by the Plan

Proponents[2]/Appellants.  She then dismissed the bankruptcy case.  It is the appeal of those two

Orders that is currently before the Court.  This Court has jurisdiction to hear the instant appeal

pursuant to 28 U.S.C. § 158(a).  Oral argument was held on this matter on July 1, 2009.  For the

reasons stated below, this Court reverses in part and affirms in part the Bankruptcy Court's Order

denying confirmation of the Plan, and reverses and vacates the Order dismissing the Debtors'

bankruptcy cases.  Further, this Court withdraws the reference pursuant to 28 U.S.C. § 157(d) for

this matter and will conduct additional hearings on the case.

## I.    Background

_____

[1]    This Plan is the Twelfth Amended Joint Plan of Reorganization Under Chapter 11
of the Bankruptcy Code dated November 14, 2008.

[2]    "Plan Proponents" shall be used to refer to the following parties: Congoleum
Corp., Congoleum Sales, Inc., Congoleum Fiscal, Inc. (collectively, "Company," "Congoleum"
or "Debtors"), the Asbestos Claimants' Committee (the official committee of asbestos claimants
appointed in the Debtors' bankruptcy cases), and the Bondholders' Committee (the official
committee of bondholders appointed in the Debtors' bankruptcy cases).

A.     **The Debtors' Asbestos Liability and Prior Litigation**

Congoleum is a manufacturer of floor tile and other products based in Mercerville, New

Jersey.  The company owns and operates four plants, two of which are located in New Jersey, and

employs approximately 600 employees.  "Since 2005, Congoleum has generated cumulative

earnings before interest, taxation, and amortization ('EBITDA') of approximately $74 million,

including the generation of approximately $7 million during 2008 despite a recession and severe

downturn in its end markets of residential and manufactured housing."  (Declaration of Howard

N. Feist, III, Joint Appendix, Vol. I., A169, ¶ 4.)[3]

Before 1974, Congoleum's floor tiles contained asbestos fibers within them, and

Congoleum stopped producing asbestos-containing sheet vinyl products in 1983.  Beginning in

1981 and continuing through 2002, Congoleum was subject to approximately 70,000 tort suits

alleging bodily injury due to exposure to its asbestos-containing floor tiles.  (*See* A1390-92.)

Congoleum's primary insurance carriers settled some 33,000 of these claims, at a cost of about

$13.5 million.  (*Id.*)  "As of September 30, 2002, over 99% of claims incurred by [Congoleum]

have settled, on average, for amounts less than $102 per claimant."  (*Id.* at A1392.)  Most of

these claims were settled by Congoleum's primary insurers, all of whom subsequently claimed

Congoleum had exhausted its coverage by August 2002.  (*See* A170-71, ¶¶ 11-14.)

Counsel for the Debtors noted at oral argument that settlement of asbestos claims was

particularly difficult because of the frequent latent nature of asbestos-related injuries.  (Transcript

---

[3]     All citations to the Joint Appendix will be referenced by "A__."

of Oral Argument at 9, *In re Congoleum Corp.*, 09-1337 (July 1, 2009).)[4]  As a result of this

latency issue and the claimed exhaustion of Congoleum's primary insurance coverage, in

February 2001, Congoleum sought to enter into a "coverage in place" agreement with its excess

insurers, under which the parties could agree on how asserted claims against Congoleum would

be handled and paid by its insurers.  After a series of unsuccessful negotiations, some of

Congoleum's excess insurers initiated insurance coverage litigation in the Superior Court of New

Jersey, seeking a declaration that the excess insurers had no obligation to defend or indemnify

Congoleum's asbestos claims (the "Coverage Action").

   Throughout the pendency of the Coverage Action, Congoleum continued its efforts at

settling the various asbestos cases percolating throughout the tort system.  In July 2001, a New

York jury returned damages-only verdicts for asbestos claimants Kenneth Cook and Richard

Arseneault in the amounts of $18.1 million and $15.8 million, respectively, during the first phase

of a reverse, bifurcated trial (i.e. before liability was determined) against Congoleum and other

defendants.  Perry Weitz, an attorney based in New York, represented Cook and Arseneault at the

damages-trial.  Discovery for the liability phase of the case concluded in September 2002, shortly

after Congoleum's primary insurers claimed exhaustion of its coverage limits.

   On August 26, 2002, Congoleum provided its excess insurers with a report regarding its

asbestos claims and reiterated its desire to enter into a coverage-in-place agreement.  After its

primary insurers claimed exhaustion on August 28, 2002, "Congoleum settled 131 . . . trial-listed

cases in the tort system solely for a promise to pay and/or assignment of insurance rights" (the

---

[4]      All citations to the transcript of the oral argument held on July 1, 2009 will be
referenced as "Tr. __."  The transcript can be found at Docket Entry No. 67.

"Pre-Petition Settlement Agreements") for a total of approximately $25 million to be secured by

Congoleum's insurance recoveries.  (A174, ¶ 24; Letter from Don Golemme, Congoleum Risk

Manager, to Arthur Pergament, Pergament Advisors, dated Feb. 12, 2004, A1075-1079.)  For

example, Congoleum reached a settlement in principle with Richard Comstock, an asbestos

claimant, for $225,000 in August 2002 ("Comstock settlement").  Of that sum, one of

Congoleum's primary insurers paid $168,577.34 to Comstock.  Payment of Comstock's claim

exhausted Congoleum's primary insurance coverage limits so the $56,422.66 balance owed to

Comstock under the settlement remained unpaid.  Congoleum's attempts to obtain a coverage-

in-place agreement were unsuccessful.

### B.     The Pre-Packaged Bankruptcy Scheme

As of October 2002, Congoleum's negotiations with its insurers remained stalled.  By

October 2002, Congoleum's excess insurers had not disbursed any funds for payments of

asbestos claims and were instead awaiting a decision in the Coverage Action to assess their

exposure.[5]  Therefore, "[i]n October 2002, Congoleum began simultaneously seeking coverage

---

[5]     The court takes judicial notice of the state court proceedings "insofar as they are
relevant here."  *In re: Congoleum Corp.*, 426 F.3d 675, 679 n.1 (3d Cir. 2005) (citing *Furnari v.
Warden, Allenwood Federal Correctional Inst.*, 218 F.3d 250, 255 (3d Cir. 2000)).  Judge
Stroumtsos rendered a judgment in May 2007 in the Coverage Action that held the insurers had
no coverage obligations with regards to the Claimants' Agreement because it was an
unreasonable agreement that was not executed in good faith (the "Coverage Decision").
(Coverage Decision, A1297, 1307.)   In finding the agreement to have been executed in bad faith,
Judge Stroumtsos admonished Congoleum for excluding the insurers from the settlement
negotiations that lead to the Claimants' Agreement, and for entering into the agreement over its
insurers' objections.  Further, he found that "the Claimants' Agreement was the product of
negotiations by conflicted counsel" because "[Gilbert, Heintz & Randolph, LLP ("GHR")]
colluded with [Joseph] Rice and Weitz to create a framework that would provide Congoleum
with both the insurance money and also protect against the asbestos liability, while having the
insurance companies . . . bear the costs."  (A1302.)

-4-

and considering the option of a pre-packaged bankruptcy for resolving its . . . asbestos

liabilities." (A181, ¶ 46.) This decision coincided with Congoleum's settlement with Cook and

Arseneault. Weitz had rejected Congoleum's initial offer of $2 million for each plaintiff in early

September 2002, and had indicated that he was unwilling to settle for less than $10 million per

plaintiff. On the eve of the liability trial, due in part to a poor outcome with a mock jury trial and

differing, pessimistic predictions from experts about Congoleum's anticipated liability,

Congoleum agreed to Weitz's settlement demand of $8 million each for Cook and Arseneault.

However, at a September 23, 2002 meeting, Howard Feist, III, Congoleum's Chief Financial

Officer, informed Weitz that "Congoleum did not have the financial resources exclusive of its

insurance to pay a settlement in [that] amount." (A177, ¶ 33.) Per Weitz's recommendation,

Congoleum contacted Scott Gilbert, of GHR, a purported expert in pre-packaged bankruptcies.

Gilbert and GHR were retained by Congoleum on October 1, 2002. (A177, ¶ 35.) On that same

day, October 1, 2002, Gilbert and Weitz agreed to an $8 million settlement for both Cook and

Arseneault, with $800,000 to be paid in cash, and an assignment of insurance proceeds for the

remaining $7.2 million for each case. These settlements were finalized in writing on October 21,

2002. (*See* Cook and Arseneault Settlement Agreement and executed releases, A226-32.)[6]

    Shortly after the Cook and Arseneault settlements were finalized in late October, GHR

contacted Weitz and Joseph Rice, an attorney who also represented many asbestos claimants

(Weitz and Rice together, "Claimants' Counsel"), presumably in order to discuss obtaining

---

[6]    These settlements, along with the settlement Congoleum entered into with
Comstock, comprise the "Pre-Petition Settlement Agreements."

plaintiff approval of a pre-packaged bankruptcy plan.[7]  A press release dated November 1, 2002, which was drafted but not issued, described Congoleum's ongoing efforts at filing a pre-packaged bankruptcy.  (*See* Coverage Decision, A1297.)  A general meeting with GHR and several claimants' representatives, including Claimants' Counsel, was held in New York on November 19, 2002 "to discuss the concept of an inventory settlement and a pre-packaged bankruptcy with representatives of certain claimants."  (A182, ¶ 47.)  Congoleum also had a December meeting with its lender on about a pre-packaged bankruptcy and debtor-in-possession financing, and notes from this meeting indicate that the parties discussed the payment of "facilitation fees" to Messrs. Weitz and Rice.  Discussions concerning a pre-packaged bankruptcy plan continued through January 13, 2003, at which point Congoleum's Board of Directors expressly authorized counsel to proceed with negotiations with Claimants' Counsel regarding a pre-packaged bankruptcy.  On that same day, Congoleum issued a press release stating that it intended to enter into a pre-packaged bankruptcy plan and that discussion with counsel for the asbestos claimants was ongoing.

In April 2003, Congoleum entered into a "global settlement" agreement under which claimants were entitled to an assignment of insurance rights to secure 75% of their claim amount in exchange for submitting their claims to the § 524(g) channeling trust (the "Claimants' Agreement").  The other 25% of the claim would be treated as an unsecured claim.  Under the Claimants' Agreement, "Congoleum granted a security interest in its insurance assets to a

---

[7]     11 U.S.C. § 524(g) permits a company to obtain an injunction that "channels" all current and future asbestos claims against the company to a trust funded with the company's stock and other assets, including insurance assets. § 524(g)(2)(B)(ii)(IV) requires 75% of asbestos claimants to approve of the injunction and the bankruptcy plan prior to its implementation.

'Collateral Trust' it formed before the bankruptcy, giving Cook and Arseneault and the other

parties to the Pre-Petition Settlement Agreements and Claimants Agreement secured claims."

(Appellee Br. at 11; Security Agreement, A359; Collateral Trust Agreement, A369.)  The

Collateral Trust Agreement and Security Agreement were executed contemporaneously with the

Claimants' Agreement, "form[ing] the cornerstones of the Debtors' pre-packaged plan."  *In re

Congoleum Corp.*, 362 B.R. 167, 185  (Bankr. D.N.J. 2007) (A992).  Under these agreements,

the Trust was to be funded primarily by Congoleum's insurers.  (Pre-Packaged Bankruptcy Plan,

§§ 5.1(b), (d), Docket Entry No. 176, Case No. 03-51524.)  The Claimants' Agreement also

provided for $2 million in "facilitation fees" to Weitz and Rice, to be paid by Congoleum itself

(i.e. not using any insurance monies).

Asbestos claimants were invited to submit their claims by July 2003 to be covered under

the Claimants' Agreement.  (Claimants' Agreement, A340, 343.)  In November 2002, GHR had

retained the Kenesis Group, LLP, a claim reviewing company majority owned by GHR.[8]  The

Claimants' Agreement contemplated that Kenesis/Clearinghouse would review the submitted

asbestos claims to determine which warranted payment.  Claimants needed to provide evidence

of injury and exposure to Congoleum products in order to qualify for compensation, and

Kenesis/Clearinghouse would be compensated on a per-claim basis.  (Coverage Decision,

A1297-98.)  By October 2003, the number of claimants under this agreement totaled

approximately 79,000 claims.  (Letter from Russell Hewit, Counsel to Kenesis/Clearinghouse, to

Insurance Company Counsel dated Nov. 5, 2003, A1105-106.)

---

[8]      Kenesis merged with Clearinghouse in 2003, a claim reviewing firm owned by
Rice's paralegal.

C.        Bankruptcy Proceedings and Plan Amendments

Congoleum filed its petition for relief under Chapter 11 of the Bankruptcy Code on

December 31, 2003.  Congoleum had structured its reorganization plan as a pre-packaged plan

pursuant to § 524(g), and under its terms, parties to the Pre-Petition Settlement Agreements (i.e.

Arseneault, Cook, Comstock) were classified as Class 2 claimants, while parties to the

Claimants' Agreement were characterized as Class 3 claimants.[9]  The effect of these

classifications was that the Collateral Trust would use the first $225 million in insurance

recoveries to satisfy the Cook and Arseneault settlements, the Pre-Petition Settlement claimants,

and the Claimants' Agreement settlements, in that order.  (Pre-Packaged Bankruptcy Plan §§

2.3(a), (b), and (c).)

Although Congoleum had solicited, and received, acceptance of the plan from some

constituents prior to filing the bankruptcy petition, Congoleum's insurers, the United States

Trustee, and other disfavored claimants objected to the pre-packaged plan.  Further, the

Bankruptcy Court ruled that the Coverage Action initiated by Congoleum's excess insurers,

which was then proceeding through the state courts, would not be stayed pursuant to 11 U.S.C. §

362, thereby permitting the excess insurers to litigate certain aspects of the Claimants'

Agreement.

In February 2005, the Third Circuit rendered its decision in *In re: Combustion*

*Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2005), which altered the landscape governing pre-

packaged bankruptcy plans involving asbestos claims under § 524(g).  In that case, the court

---

[9]        For ease of reference, the Court will refer to these parties collectively as the
"favored claimants," though the Court does not intend for such a label to indicate that they are
legally preferred creditors.

reviewed a pre-packaged bankruptcy plan in which certain asbestos claimants had received compensation pursuant to pre-petition agreements.  The court held that the Bankruptcy Code's fundamental requirement of equal distribution among past and present claimants was violated by the plan's differing treatment of the claimants who were parties to the pre-petition agreements and those who could only apply for compensation through the plan's trust.  In reaching this conclusion, the court found that the pre-petition payments were part of the integrated whole of the pre-packaged scheme, and thus could not be exempted from the Code's requirements.

In light of the *Combustion Engineering* decision, the parties had to re-convene to discuss the framework of a new pre-packaged plan, including compliance with the fundamental requirements of equal distribution between past and present claimants and that any pre-petition payments be reviewed by the court with reference to the "integrated whole" pre-packaged bankruptcy scheme.  As a result, Congoleum withdrew the pre-packaged plan in April 2005 and subsequently announced yet another agreement in principle with various claimants.  Under this new agreement, Cook, Arseneault and the other favored claimants agreed to waive any rights to their security interests in the Collateral Trust, and would instead share the common fund *pro rata* with other, unsecured, asbestos claimants.  (A185, ¶¶ 56-58.)

Congoleum filed an amended plan of reorganization in July 2005 reflecting the new agreement-in-principle.  However, "[i]n September 2005, the Debtors learned that certain settled claimants represented by [Perry Weitz] no longer supported" the newly amended plan.  (A186, ¶ 60.)  Congoleum subsequently withdrew this amended plan in December 2005 and, allegedly at the insistence of its insurers, initiated an omnibus avoidance action against Cook, Arseneault, and the claimants to the Pre-Petition Settlement Agreement and Claimants' Agreement in an effort to

have these favored claimants set aside their security interests, and to recover the $2 million in

facilitation fees furnished to Weitz and Rice ("Avoidance Action" or "Adversary Proceeding").[10]

As the Avoidance Action progressed, Congoleum continued to negotiate with its creditors

for a confirmable plan of reorganization.  In May 2006, the Bankruptcy Court ordered the

mediation of all issues in the bankruptcy cases.  Over the course of the mediation, Congoleum,

the Asbestos Claimants' Committee,[11] the Future Claimants' Representative,[12] the Bondholders'

Committee,[13] and Messrs. Weitz and Rice eventually reached an agreement-in-principle which

formed the basis for another amended plan of reorganization (the "Tenth Modified Plan").  Under

the Tenth Modified Plan, the Avoidance Action would be dismissed, and the Pre-Petition

Settlement Agreement claimants would release any security interests securing their settlements,

and would reduce any asbestos claims to 50% of their settled amounts.  (Tenth Modified Plan,

Docket No. 4564, § 2.1.)  Claimants under the Claimants' Agreement, in contrast, would have

the option of either receiving a one-time payment of $250 or participating in the plan's

distribution procedures on the same level as other present and future asbestos claimants.  (*Id*. §

---

[10]     That summer, in July 2006, the Bankruptcy Court avoided Cook and Arseneault's security interests in the insurance collateral as invalidly perfected under state law.  Judge Ferguson held that when the claimants' documentation was approved, Arseneault and Cook had not received a transfer of security interest from Congoleum but instead became beneficiaries of a security interest granted to the Collateral Trustee.

[11]     The Asbestos Claimants' Committee is the official committee of asbestos claimants appointed in Congoleum's bankruptcy cases on April 19, 2004.

[12]     The Future Claimants' Representative represents the rights and interests of the future demands for compensation from the Plan Trust.

[13]     The Official Bondholders' Committee is the official committee of bondholders appointed in the bankruptcy case on January 27, 2006.

2.2.)

Congoleum's insurers challenged the Tenth Modified Plan, and on February 1, 2007, the

Bankruptcy Court granted summary judgment to the insurers and denied confirmation of the

plan. *In re Congoleum Corp.*, 362 B.R. 167 (Bankr. D.N.J. 2007). The Bankruptcy Court held

that the Tenth Modified Plan was unconfirmable on its face because the plan contemplated

payments to Cook and Arseneault (approximately $4 million each), that were considerably larger

than those available for other asbestos personal injury creditors. Such a disparity, the Court held,

violated the requirement of equality of distribution among creditors described in *Combustion*

*Engineering* and codified in § 524(g). *See* 11 U.S.C. § 524(g)(2)(B)(ii)(V) (requiring that

"present claims and future demands . . . that involve similar claims" must be paid "in

substantially the same manner"). The Court noted the possibility that under the Tenth Modified

Plan, although Arseneault and Cook could receive $4 million, even the most gravely ill

unsecured asbestos claimants suffering from mesothelioma could have their recoveries capped at

$265,000. *In re Congoleum, Corp.*, 362 B.R. at 186 & n.12. Judge Ferguson took particular

issue with the structure and timing of the Pre-Petition Settlement Agreements and the Claimants'

Agreement, finding that the agreements are part of the integrated whole bankruptcy case, and

"that the Debtors granted pre-petition security interests to certain favored creditors and then

purposefully waited more than 90 days to file in order to protect those security interests evinces a

scheme designed to circumvent the Code's equal distribution requirements." *Id.* at 186. Further,

Judge Ferguson entertained "serious concerns about the independence of judgment being

exercised when it comes to Messrs. Rice and Weitz," noting that the facilitation fees to

Claimants' counsel were "buried in the Plan" and that the Plan failed to provide for court

approval of those fees.  *Id.* at 187 n.14.  Although Congoleum initially appealed this decision, it

ultimately permitted the appeal to be administratively terminated.

 Mediation efforts continued between all parties following Judge Ferguson's denial of

confirmation of the Tenth Modified Plan.  After "extensive further mediation sessions," the

Future Claimants' Representative, the Asbestos Claimants' Committee, the Bondholders'

Committee, and the Debtors agreed on another plan (the "Eleventh Modified Plan"), which was

submitted to the Bankruptcy Court in February 2008.  However, in June 2008, Judge Ferguson

granted summary judgment denying confirmation of the Eleventh Modified Plan, again finding

that the plan violated the requirement that current and future asbestos claimants be treated

equally with those claimants who were parties to the Claimants' Agreement or the Pre-Petition

Settlement Agreement.  The Court also found that the plan omitted any judicial approval

provision regarding the $2 million "facilitation fee" payments to Claimants' Counsel, in violation

of 11 U.S.C. § 1129(a)(4) ("Any payment made or to be made by the proponent . . . for services

or for costs and expenses in or in connection with the case, or in connection with the plan and

incident to the case, has been approved by, or is subject to the approval of, the court as

reasonable.").

 Frustrated with facing similar defects in each subsequently filed plan, the Bankruptcy

Court issued, *sua sponte*, an order to show cause why Congoleum's Chapter 11 case should not

be converted into Chapter 7 (i.e. liquidation) or dismissed.  At the June 26, 2008 hearing, after

noting that although the Court had considered eleven prior plans the latest plan failed to reflect

any of the court's prior rulings denying plan confirmation, Judge Ferguson vacated the order to

show cause and gave the parties until December 31, 2008 to file a confirmable plan.  (*See*

*generally* A544-93.)  If the parties failed to file a confirmable plan by the end of the year, Judge

Ferguson stated on the record her intention to "convert or dismiss the case."  (*Id.* at A591.)

Throughout the summer, the parties engaged in settlement negotiations.  These efforts

ultimately culminated in a global litigation settlement (the "Settlement") and an amended plan of

reorganization (the "Plan") that is the subject of the instant appeal.   The Settlement, the

effectiveness of which was contingent upon plan confirmation, resolved the pending Avoidance

Actions and was agreed to by the Debtors, the Bondholders' Committee, the Asbestos Claimants'

Committee, the Future Claimants' Representative, Claimants' Counsel, the Collateral Trustee,

and nearly 90% of the claimants to the Pre-Petition Settlement Agreement.  Under the terms of

the Settlement, in exchange for dismissal of the Avoidance Actions against Weitz, Rice,

Arseneault, Cook, Comstock and claimants under the Pre-Petition Settlement Agreements and

Claimants' Agreement, the favored claimants would waive their claims under the Pre-Petition

Settlement Agreements and Claimants' Agreement and would instead submit their claims for

resolution under the plan, effectively eliminating these two agreements.  As to Arseneault, Cook,

and Comstock, the Settlement contemplated that these three claimants could either retain the

payments they had received prior to the filing of the bankruptcy petition but waive any right to

the additional sums owed, or "relinquish the partial payment received pre-petition for the benefit

of the Plan Trust and apply for treatment by the Plan Trust under the same conditions as all other

present" and future claimants.  (A194, ¶ 80.)  The Avoidance Action against Weitz and Rice to

recover the $2 million in fees would be dismissed.  (*See* Litigation Settlement Agreement, A001-

009.)

On October 22, 2008, Judge Ferguson approved the Settlement under § 105 of the Code

and Bankruptcy Rule 9019, observing that the Settlement "falls above the lowest point in the range of reasonableness." (Settlement Decision, A101.)  However, Judge Ferguson specifically noted in her Order "that approval of this settlement does not include a finding that any piece of the settlement meets the standards required for confirmation."  (*Id.*)  In particular, the court described the facilitation fees to Weitz and Rice and the absence of a provision requiring court approval of those fees as "issues the court is **not** deciding on this motion."  (*Id.* at A103 (emphasis in original).)

### D.     The Orders and Opinion of the Bankruptcy Court on Appeal

The Plan Proponents filed the Twelfth Modified Amended Plan in November 2008, following approval of the Settlement.  The insurers and disfavored asbestos claimants objected to confirmation of the Plan.  The Bankruptcy Court held confirmation hearings in December 2008, and Judge Ferguson warned the Plan Proponents that "if Summary Judgment is granted on an issue that precludes confirmation I'm going to dismiss or convert the case," as she had indicated at the Order to Show Cause hearing some six months prior.  In order to accommodate this threat, the Plan Proponents belatedly included a severance clause to be inserted in the plan, which provided for severance of any plan provision invalidated by the Bankruptcy Court so long as the Plan Proponents so consented.

On February 27, 2009, the Bankruptcy Court granted the insurers' motion for summary judgment denying confirmation of the Plan (the "Summary Judgement Opinion" or "Summary Judgment Order").  After rejecting the Plan Proponents' arguments that the insurers lacked standing to contest the confirmability of the Plan, Judge Ferguson found that the Plan was unconfirmable as a matter of law for two  reasons: (1) the Plan failed to expressly contemplate

judicial review of the $2 million in "facilitation fees" paid to Weitz and Rice; and (2) the Plan treats similarly situated creditors, the asbestos claimants, unequally by virtue of the pre-petition payments to claimants Arseneault, Cook, and Comstock.   Due to these defects, and as promised, Judge Ferguson opined that cause existed to warrant dismissal of the case under 11 U.S.C. § 1112(b) and ordered the case dismissed in accordance with her opinion (the "Dismissal Order").

The Plan Proponents have appealed both the Confirmation and Dismissal Orders, which this Court consolidated on April 21, 2009.  Century Indemnity Company, ACE American Insurance Company, and ACE Property and Casualty Company (collectively, "Century") also filed an appeal of the Dismissal Order (the "Century Appeal"), arguing that the Bankruptcy Court erred by dismissing the case "without notice and without holding an evidentiary hearing." (Century Br. 3.)   This Court held an on-the-record status conference and oral argument in this matter on July 1, 2009.

## II.    Discussion

### A.    Issues on Appeal

This Court must determine the following issues: (1) Did the Bankruptcy Court err by reaching the merits of the Plan where the Plan Proponents alleged that the insurers lacked standing to challenge the confirmability of the Plan?; (2) Was the Bankruptcy Court correct to hold the Plan unconfirmable based on Congoleum's pre-petition settlements to certain asbestos claimants?[14]; (3) Was the Bankruptcy Court correct in holding the Plan unconfirmable based on

---

[14]    The Bankruptcy Court focused its analysis on the pre-petition payments to claimants Arseneault, Cook, and Comstock.  As the parties have made no arguments relating to other "favored" claimants, the Court makes no findings as to confirmability with respect to other "favored" claimants.

the absence of a court-approval provision for certain fees paid to Messrs. Weitz and Rice; and

finally, (4) Did the Bankruptcy Court abuse its discretion by *sua sponte* dismissing the Debtors'

bankruptcy cases?  The Court will address each issue in turn.

### B.    Jurisdiction and Standard of Review

This Court has jurisdiction to hear appeals from final orders of the bankruptcy court.  28

U.S.C. § 158(a).  Such appeals are a matter of right.

Legal conclusions of a bankruptcy court are reviewed by the district court *de novo*, while

factual findings may be set aside only if they are clearly erroneous.  *In re Sharon Steel Corp.*, 871

F.2d 1217, 1222-23 (3d Cir. 1989).  "[B]ecause summary judgment may only be granted where

there is no genuine issue of material fact, any purported 'factual findings' of the bankruptcy court

cannot be 'factual findings' as to disputed issues of fact, but rather are conclusions as a matter of

law that no genuine issue of material fact exists; such conclusions of law are, of course, subject

to plenary review."  *Rosen v. Bezner*, 996 F.2d 1527, 1530 n.2 (3d Cir. 1995).

### C.    Standing of Insurers

The first argument appellants raise in this appeal is that the insurer-appellees lacked

standing to contest the confirmability of the Plan because they are not truly creditors of the

Debtors.  The appellees counter that (1) the Bankruptcy Court had an independent obligation to

consider the confirmability of the Plan under 11 U.S.C. § 1129(a), separate and apart from

objections made by any party; and (2) the insurers do have standing because the Plan "threatened

serious harm to the insurers' financial and contractual interests."  (Appellees' Br. 30.)

### 1.    The Court's Independent Obligation to Review a Plan for Compliance with the Bankruptcy Code

-16-

Under 11 U.S.C. § 1129(a), a bankruptcy court must determine that a proposed plan of reorganization complies with all relevant sections of the Bankruptcy Code prior to confirming a plan, even where no creditor objects to the proposed plan.  While the appellants may be correct that a court should not consider objections to confirmation of a plan made by parties without standing, in the instant case, the Bankruptcy Court found the plan facially unconfirmable without considering the insurers' objections.  Rather, the court found the Plan unconfirmable for two of the same reasons it had found previous plans unconfirmable: the Plan's omission of an express judicial-approval provision to review the payments to Weitz and Rice violated § 1129(a)(4), and the pre-petition payments to Arseneault, Cook, and Comstock violated the requirement of equality of distribution among creditors.  As she stated in the Summary Judgment Opinion, "[the Bankruptcy Court] has an independent obligation to ensure that a plan meets the requirements of § 1129.  The Court finds the Amended Joint Plan unconfirmable separate and apart from any objection raised by a party."  (Summ. J. Op., A139.)

This Court agrees that the Bankruptcy Court had an independent duty to determine the confirmability of the Plan, and therefore, this Court is empowered to reach the merits of the appeal on that basis alone.  However, because this Court affirms in part the Bankruptcy Court's ruling regarding the unconfirmability of the Plan (*see infra* at II.E.), the issue of standing to object to confirmation may again become relevant.

## 2.    Standing of Insurers to Object to Plan Confirmation

Standing under Article III of the Constitution is evaluated on an issue-by-issue basis and "need not be financial and only need be fairly traceable to the alleged illegal action."  *In re: Congoleum, Corp.*, 426 F.3d at 685.  The Bankruptcy Code affords standing to object to the

confirmation of a reorganization plan to any "party in interest," which has been construed

broadly to encompass anyone with a "practical stake in the outcome of the proceedings." *In re*

*Amatax Corp.*, 755 F.2d 1034, 1041-42 (3d Cir. 1985).  Standing to appeal from an order of the

Bankruptcy Court is subject to a more restrictive, prudential limitation (the "person aggrieved"

standard) than is applicable for general standing to participate in the early stage of a bankruptcy

proceeding.  *See Combustion Eng'g*, 391 F.3d at 214 n.21 ("Th[e "person aggrieved"] approach

to bankruptcy appellate standing contrasts with the broad right of participation in the early stages

of a bankruptcy proceeding. Under Bankruptcy Code § 1128(b), any 'party in interest' may object

to plan confirmation during the confirmation hearing . . . and § 1109(b) has been construed to

create a broad right of participation in Chapter 11 cases.")  Generally, any creditor in a

bankruptcy case is understood to have the requisite standing to challenge any aspect of a plan's

confirmation.  *See* 11 U.S.C. § 1109(b).

      Typically, in asbestos bankruptcy cases, personal injury claims are submitted in

accordance with an asbestos personal injury trust's distribution procedures.  The insurers either

pay the claim or challenge coverage in a state court coverage action.  In *Combustion*

*Engineering*, the Third Circuit addressed the standing of insurers to object to confirmation of a

plan of reorganization, and endorsed certain language to be used in these plans to protect insurers

from any impairment of defenses to be asserted in a coverage action.  Such language renders a

plan "insurance neutral" for confirmation purposes.  *Combustion Eng'g*, 391 F.3d at 217-18.

      Although Judge Ferguson recognized the Bankruptcy Court's inherent power to review

plans for compliance with the Bankruptcy Code, she also held that the insurers have standing to

object to the confirmation of the Plan because the Plan threatened substantial harm to the

insurers' financial and contractual interests.  Specifically, Judge Ferguson held that "[t]he

preemption of [the insurers' anti-assignment and cooperation provisions in the insurers'

policies by the Code] is an injury-in-fact."  (Summ. J. Op., A138.)  Judge Ferguson also held

that the Plan was not "insurance neutral" under Combustion Engineering because the provision

in the Plan that purported to protect the rights of the insurers in the Coverage Action (§ 11.12)

failed to preclude the Debtors from using any express or implied findings from the Bankruptcy

Court case in the Coverage Action.  (*Id.* A138-39 (stating, "That [omission] is a real danger to

the Insurers, because this plan still attempts to address many of the same claims that had been

liquidated under the Claimant Agreement that Judge Stroumtsos in the Coverage Action found

to be invalid and fraudulent.").)

This is the seventh time a court has confronted this issue.  Without fail, each successive

and different court has found that the insurers have standing to challenge the Plan due to their

fundamental stake in the outcome of the bankruptcy proceedings.  *See, e.g., In re: Congoleum

Corp.*, 426 F.3d at 685-87; *Baron & Budd, P.C. v. Unsecured Asbestos Claimants' Comm.*, 321

B.R. 147, 157-62 (D.N.J. 2005) (holding that the insurers had standing to object to plan

confirmation because "[t]he principal source of funding for the Plan trust (and distributions to

asbestos claimants) is insurance proceeds"); *In re Congoleum Corp.*, 362 B.R. 167, 173-75

(Bankr. D.N.J. 2007); (Summ. J. Op., A137-39); (Hrg. Tr., Apr. 19, 2004, A947-56); (Hrg. Tr.,

June 7, 2004, A958-65); (Memorandum Op., dated Mar. 24, 2005, A967-73).  As these courts

have noted, the insurers' injury in fact is based on "the unfairness of a plan which binds them

contractually and which directly impacts their financial interests, unfairness which is traceable to

conflicts of interest among Claimants' counsel . . . The alleged injury is redressable by the

Bankruptcy Court through a favorable decision, such as amendment of the Plan or denial of

confirmation." *Baron & Budd*, 321 B.R. at 161. As the court observed in *Baron & Budd*,

> The totality of the facts before the Bankruptcy Court suggest the opportunity for
> abuse of fee sharing relationships, involving attorneys in connection with the
> prepetition process, to the end of conferring preferential security interests on
> [certain favored claimants]. To the extent that these relationships are inextricable
> from the overall fairness of the reorganization plan, the Insurers are parties-in-
> interest under § 1109.

*Id.* at 160. This Court agrees and concludes that the insurers are parties in interest and have

standing to challenge confirmation.

### D.    Confirmation of the Plan – Pre-Petition Settlements

The Third Circuit made clear in *Combustion Engineering* that "[e]quality of distribution

among creditors is a central policy of the Bankruptcy Code." *Combustion Eng'g*, 391 F.3d at

239. In that case, the Third Circuit examined whether a pre-packaged bankruptcy plan under §

524(g) was confirmable where the debtor had transferred $400 million to a settlement trust in

order to process and compensate hundreds of thousands of asbestos claimants shortly before

filing its bankruptcy petition. Some of these asbestos claimants retained "stub claims" for the

balance owed to them. After filing for bankruptcy, the expectation was that the participants in

the pre-petition trust who held stub claims would recover from an asbestos personal injury trust

established post-petition. The Circuit ultimately held that the Code's fundamental requirement

of equal treatment for current and future asbestos claimants was violated by this arrangement

because claimants with the stub claims were also creditors in the bankruptcy case and would

receive preferential treatment to other asbestos claimants whose recoveries were limited to the

post-petition asbestos personal injury trust. *Id.* at 201 ("The remaining . . . 'stub claims'

provided prepetition trust participants with creditor status under the Bankruptcy Code.").  The

Third Circuit stated that it must

> consider the bankruptcy scheme as an integrated whole in order to evaluate
> whether Plan confirmation is warranted.  Viewing the Combustion Engineering
> pre-pack bankruptcy as a whole, the record reveals that it may lack the requisite
> equality of distribution among creditors. The Plan, as it relates to asbestos
> claimants, consists of two elements: the pre-petition CE Settlement Trust and the
> post-petition Asbestos PI Trust. Under this interdependent, two-trust framework,
> the Certain Cancer Claimants, the future asbestos claimants, and other non-parties
> to the pre-petition settlement appear to receive a demonstrably unequal share of
> the limited Combustion Engineering fund.

*Id*. at 241-42.

In this case, the Plan provides as follows: for any claimants who had received a partial

payment from Congoleum prior to the petition date, "including specifically claimants Cook,

Arseneault, and Comstock," the section of the Plan incorporating the Settlement provided that

these claimants agreed to either: "(a) not seek any further recovery with respect thereto against

the Debtors, including from any Asbestos Trust, or (b) return and relinquish any such pre-petition

partial payment for the benefit of the Asbestos Trust or as a condition precedent to asserting any

such further Asbestos Claim against the Debtors or the Asbestos Trust."  (Twelfth Modified Plan,

A114, § 5.14(f).)

The Bankruptcy Court in the instant case held that because the 2002 payments to

Arseneault, Cook, and Comstock were not fully consummated, since they might be entitled to

apply for further compensation from the Debtors' estate, these pre-petition payments could not be

considered unrelated from the bankruptcy case. (A148.)   Judge Ferguson further observed that

although the Plan classified Arseneault, Cook, and Comstock as Class 7 creditors with all the

other asbestos claimants,

Case 1:03-cv-05524-JHR Doc 12-1 Filed 06/17/05 Entered 06/17/05 09:16:25 Desc
Case 03-51524 JHR Doc 720 Filed 06/17/05 Page 22 of 28

Opinion    Page 22 of 28

it is the existence of an option that is only relevant to a tiny fraction of the overall
asbestos claimants that makes the treatment unequal.  For truly equal treatment the
plan could have provided that claimants Cook, Arseneault and Comstock must
relinquish any pre-petition payments and apply to the Plan Trust on the same
terms as all other asbestos creditors.

(A147.)[15]   The Bankruptcy Court next explained that even though it had approved the Settlement

under the "reasonableness" standard of 9019, "[n]o matter how eminently reasonable a settlement

may be, affecting outcomes through settlement that could not be accomplished directly through

provisions of the Bankruptcy Code is unacceptable."  (A149.)

There are several distinguishing factors between the instant case and *Combustion*

*Engineering* that lead this Court to conclude that these pre-petition transfers did not render

Arseneault, Cook, and Comstock present creditors subject to equality of distribution required by

the Code.  Arseneault, Cook, and Comstock retain no "stub claims" chargeable to the Debtors'

estate because they have, as a practical matter, "relinquished" any right to future payments in the

Settlement.  As they are all deceased, the Court presumes that they each retained their pre-

petition settlements and their estates have no claim against the Asbestos Trust.  In addition, the

Settlement was the result of arm's length negotiations, and the Bankruptcy Court has already

approved the Settlement as reasonable.

Therefore, the Court concludes, as a result of these distinguishing factors, that the section

of the Plan which incorporated the Settlement is not an impediment to confirmation, at least with

---

[15]      The Bankruptcy Court did not explain how it would go about having the claimants
"relinquish any pre-petition payments."  As discussed *infra*, those payments were made years ago
to claimants now deceased.  In addition, at oral argument, counsel for Congoleum suggested that
the estates of these claimants are likely to be judgment proof.  (Tr. at 25:11-16 ("They may be
judgment proof, we don't know that. We've not gotten to that stage of the litigation where we can
know whether the estates have distributed all their money to individual heirs. I rather suspect
that's true and that we'd have to chase down individuals.".)

respect to the pre-petition payments to Arseneault, Cook, and Comstock.

### E.    Confirmation of the Plan – Fees Paid to Messrs. Weitz and Rice

11 U.S.C. § 1129(a)(4) requires that a court approve as "reasonable" "[a]ny payment made or to be made . . . by the debtor . . . for services or for costs and expenses in or in connection with the case."  As the Fifth Circuit observed,

> What constitutes a reasonable payment will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate. . . . Where the Bankruptcy Court has determined that the payment at issue was for an expense that is routine in the confection and confirmation of a plan (e.g., for legal or accounting services, expert witness fees, printing, etc.) and that the payment has not been made from and will not be reimbursed by the bankruptcy estate, the court will ordinarily have little reason to inquire further with respect to the amount charged.

*In re Cajun Elec. Power Co-Op, Inc.*, 150 F.3d 503, 517 (5th Cir. 1998).

Judge Ferguson held that the Plan's omission of an express provision for court approval of the fees to Messrs. Weitz and Rice precluded her from confirming the Plan.  In so holding, Judge Ferguson highlighted the three prior occasions on which she had communicated to the Debtors and all parties to the bankruptcy case the Court's serious concerns about these fees and their potential for running afoul of § 1129(a)(4), the most recent of which was in her opinion approving the Settlement under Rule 9019.   Judge Ferguson found that the broad release of any claims against the Debtors' estate detailed in § 5.14(b)(iii), including the "pre-petition payment to Claimants Counsel," when combined with the Plan's inclusion of "additional" to describe the fees the court was authorized to review, revealed that the intention was for the court to *not* review the already-disbursed $2 million in fees, noting

the court's ability to review fees under § 1129(a)(4) may be implicit but the

> inclusion of § 5.14(b)(iii) in the Plan seeks to make that review a nullity. . . Had
> the Plan Proponents actually intended to give deference to this court's previous
> ruling, they could have simply deleted the word "additional" from § 5.14(e).
> Instead, the Plan submitted guarantees that if this court were to disallow the
> payments to Claimants' Counsel, then the [Plan] would have to be redrafted.

(A143-44.)

This Court agrees that these fees were subject to the court's approval under § 1129(a)(4).

Although appellants argue that § 5.14(b)(iii) of the Plan specifically references the fees

Congoleum paid to Weitz and Rice, they fail to address the Bankruptcy Court's primary

reservation regarding that section and its interplay with § 5.14(e); namely, the inclusion of

"additional" indicates that fees incurred by Claimants' Counsel will be subject to court approval

on a prospective basis only.  Therefore, in an effort to avoid further confusion, the Court directs

the parties to strike the "additional" from any subsequent plan with a provision like § 5.14(e).

When assessing the reasonableness of the fees during consideration of a plan of reorganization,

this Court will consider the totality of the circumstances surrounding the payment of those fees.

### F.    Dismissal Order

Because Century appeals the Dismissal Order for substantially the same reasons as do the

appellants, both appeals are addressed here.  Appellants' final argument on appeal is that the

Bankruptcy Court abused its discretion by dismissing the Debtors' case without cause, in

contravention of 11 U.S.C. § 1112(b).  First, appellants argue that Judge Ferguson erred in

dismissing the case because she failed to provide notice and an evidentiary hearing prior to

entering the Dismissal Order.  Further, at oral argument, the appellants suggested that dismissal

would result in numerous substantial consequences, including Congoleum's defaulting on a

working capital loan, which would become immediately due and payable, the potential for

immediate enforcement of the liens on Debtors' property held by its secured creditors, and the immediate seizure of Congoleum's assets by its bondholders. In short, the effect of dismissal of the case at this juncture could be "cataclysm[ic]." (Tr. at 35:24-25.) The appellees have suggested that the "cataclysm" invoked by the appellants is overstated as Congoleum remains a cash-flow positive company "generating tens of millions of dollars" every year (Tr. at 58:4-5), and that the Bankruptcy Court had cause to dismiss the case, namely the accumulation over five years of over $100 million in professional fees that have failed to produce a confirmable plan.

A court may dismiss or convert into a Chapter 7 liquidation any bankruptcy proceeding where the court finds "cause" to do so, so long as the conversion or dismissal is in the best interests of the creditors and the debtors' estate. 11 U.S.C. § 1112(b)[16] ("the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause"). The statute enumerates a non-exhaustive list of circumstances which could constitute "cause" for dismissal.[17]

---

[16]    This section of the statute was amended in 2005 but as the case was filed before the effective date of those amendments, this Court will interpret the older version of the statute as did the Bankruptcy Court.

[17]    The statute recognized "cause" in the following circumstances: "(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation; (2) inability to effectuate a plan; (3) unreasonable delay by the debtor that is prejudicial to creditors; (4) failure to propose a plan under section 1121 of this title within any time fixed by the court; (5) denial of confirmation of every proposed plan and denial of a request made for additional time for filing another plan or a modification of a plan; (6) revocation of an order of confirmation under section 1144 of this title, and denial of confirmation of another plan or a modified plan under section 1129 of this title; (7) inability to effectuate substantial consummation of a confirmed plan; (8) material default by the debtor with respect to a confirmed plan; (9) termination of a plan by reason of the occurrence of a condition specified in the plan; (10) nonpayment of any fees or charges required under chapter 123 of title 28." 11 U.S.C. § 1112(b) (2004).

If a bankruptcy or district court finds "cause" for dismissal or conversion, the next step requires the court to determine which action, conversion or dismissal, is appropriate. *See In re SGL Carbon Corp.*, 200 F.3d 154, 159 n.8 (3d Cir. 1999). Under § 105(a), a court may convert or dismiss a case for cause *sua sponte*, though Federal Bankruptcy Rule 2002(a)(4) requires that the parties in interest be afforded twenty days notice of "the hearing on the dismissal of the case or the conversion of the case to another chapter."   The decision to dismiss or convert is entrusted to the discretion of the bankruptcy court. *See In re SGL Carbon Corp.*, 200 F.3d at 159.

Judge Ferguson found that two categories of statutory "cause" were implicated in the instant case: "continuing loss or diminution of the estate" in the form of mounting professional fees and the denial of confirmation of every submitted plan "and denial of request made for additional time for filing another plan or modification of a plan." 11 U.S.C. § 1112(b)(1), (5); (Summ. J. Op., A155.)  However, in so holding without a hearing, the Bankruptcy Court did not adequately take into account whether the parties could submit a confirmable plan consistent with the court's objections, and instead presumed that they could not.  In particular, Judge Ferguson was continuously troubled by the equality of distribution issues as they related to the pre-petition payments to Arseneault, Cook, and Comstock, and her conclusion of law on this issue (discussed *supra* at II.D) might have contributed to her finding that the submission of a confirmable plan was not a realistic expectation.  Second, Judge Ferguson held no hearing necessary to adequately take into account the consequences of the dismissal, instead focusing backwards on the continued and significant difficulties in drafting an acceptable plan.  In so holding, Judge Ferguson failed to acknowledge or credit arguments from interested parties as to the dismissal of the case.  The Dismissal Order effectively sanctioned the Plan Proponents for failing to produce a plan

-26-

acceptable to her, instead of evaluating whether dismissal would be in the best interests of Congoleum's creditors or the Company.

The Court finds that reversing the Dismissal Order better preserves Congoleum as a going concern, and that appellants' alarm regarding the significant, negative effects of dismissal is well-founded. Dismissal would also affect Congoleum's financing, thus erecting a significant barrier to continued operations at Congoleum's various facilities, and it presents the potential to push Congoleum into defaulting on its Senior Notes owed to its bondholders. Dismissal is not in the best interest of Congoleum's creditors and therefore, this Court holds that the Bankruptcy Court abused its discretion by dismissing the case. Accordingly, the Dismissal Order is reversed.

## III.    Conclusion

At oral argument, counsel for appellants requested "clear guidance" on how this Court anticipates handling the remainder of the case. Therefore, the Court now withdraws the reference pursuant to 28 U.S.C. § 157(d) and will assume authority over the remaining proceedings in the Debtors' case. The Court takes this action in the interests of judicial economy and to avoid potential repetitive appeals and piecemeal litigation.

The parties are to submit a new plan to the Court for confirmation. Because the Court has reversed the Bankruptcy Court's holding denying confirmation of the Plan based on the pre-petition payments to Arseneault, Cook, and Comstock, the Court is satisfied that these pre-petition transfers do not present an impediment to confirmation. However, any proposed plan should expressly provide for court approval of the "facilitation fees" and court review should not be limited to "additional" fees incurred by the Claimants' Counsel, as was the case with the Plan reviewed in this Opinion.

This Court intends to hold a confirmation hearing for the next plan submitted. In advance

of the confirmation hearing, the parties are directed to brief the following issues: the Trust

Distribution Procedures' compliance with the Code including its treatment of any other

"favored" claimants, the adequacy of funding for the Plan, and the good faith requirement. The

parties should also be prepared to present evidence regarding the reasonableness of the fees to

Claimants' Counsel, based on the totality of the circumstances surrounding the payments. At

oral argument, counsel for the Future Claimants' Committee suggested that a substantial portion

of these facilitation fees reflected reimbursement for costs incurred by Claimants' Counsel.

Claimants' Counsel are therefore invited to provide evidence regarding the costs incurred

warranting the $2 million in fees.

Finally, to the extent there are other objections to the new plan, the Court will entertain

further proceedings as may be required.

An appropriate Order accompanies this Opinion.


Dated:        August 17, 2009                              /s/      JOEL A. PISANO
                                                           United States District Judge


-28-

# **APPENDIX EXHIBIT 8**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| _____ | : | Civil No. 09-4371 |
| | : | |
| In re: | : | Chapter 11 |
| | : | Case No. 03-51524 (consolidated cases |
| | : | 03-51525, 03-51526) |
| CONGOLEUM, CORP. | : | |
| | : | |
| _____ | : | **ADMINISTRATIVE ORDER** |

The Court has withdrawn the reference in this bankruptcy proceeding pursuant to 28

U.S.C. § 157 in this Court's Order dated August 17, 2009 (*see* Exhibit A appended to this

Order). Accordingly,

**IT IS** on this 27th day of August, 2009,

**ORDERED** that the reference is withdrawn, pursuant to § 157, as to all remaining

adversary proceedings pending in the Bankruptcy Court: 05-6245, 05-6461, 07-1371, 08-1128;

and it is further

**ORDERED** that the Clerk's Office for the District Court of New Jersey open a new civil

action number for this case bearing the docket number 09-4371, and that the filing fee for

opening this new civil docket is deemed waived; and it is further

**ORDERED** that counsel shall file all documents both on the docket of the United States

Bankruptcy Court in Docket No. 03-51524 and on the docket of the District Court in Civil

Action No. 09-4371; and it is further

**ORDERED** that for each document filed, the attorney filing shall enter a notice of

appearance in the Civil Action even if that attorney has previously entered an appearance in

either the Bankruptcy Court docket or the Civil Docket Number 09-1337.

**SO ORDERED.**

/s/     Joel A. Pisano
United States District Judge

# APPENDIX EXHIBIT 9

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | ) | Case No. 09-04371 (JAP) |
| | ) | |
| CONGOLEUM CORPORATION, | ) | Chapter 11 |
| CONGOLEUM SALES, INC., and | ) | Case No. 03-51524 |
| CONGOLEUM FISCAL, INC., | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## SECOND AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF THE DEBTORS, THE OFFICIAL ASBESTOS CLAIMANTS' COMMITTEE AND THE OFFICIAL COMMITTEE OF BONDHOLDERS FOR CONGOLEUM CORPORATION, ET AL., DATED AS OF OCTOBER 22, 2009

**THIS PLAN PROVIDES, AMONG OTHER THINGS, FOR THE ISSUANCE OF INJUNCTIONS UNDER SECTION 524(g) OF THE BANKRUPTCY CODE THAT RESULT IN THE CHANNELING OF ALL ASBESTOS-RELATED LIABILITIES OF CONGOLEUM CORPORATION AND THE PROTECTED PARTIES SET FORTH HEREIN INTO A TRUST AS MORE FULLY DESCRIBED HEREIN.**

PILLSBURY WINTHROP SHAW PITTMAN LLP
1540 Broadway
New York, NY 10033-4039
Richard L. Epling
Robin L. Spear
Kerry A. Brennan

**Attorneys for the Debtors**

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Michael S. Stamer

AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue, N.W.
Washington D.C. 20036
James R. Savin
David M. Dunn
Joanna F. Newdeck

**Attorneys for the Official Committee of Bondholders**

CAPLIN & DRYSDALE, CHTD.
One Thomas Circle, N.W.
Washington, D.C. 20005
Peter Van N. Lockwood
Ronald Reinsel

**Attorneys for the Asbestos Claimants' Committee**

OKIN, HOLLANDER & DELUCA, LLP
PARKER PLAZA
400 Kelby Street
Fort Lee, NJ 07024
Paul S. Hollander
James J. DeLuca

TEICH GROH
691 State Highway 33
Trenton, NJ 08619
Michael A. Zindler

GOLDSTEIN ISAACSON, PC
100 Morris Avenue, 3rd Floor
Springfield, NJ 07081
Nancy Isaacson

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME...........................1

   1.1   Scope of Definitions...........................1

   1.2   Definitions...........................1

   1.3   Rules of Interpretation:  Application of Definitions, Rules of Construction, and Computation of Time ...........................17

   1.4   Exhibits and Schedules ...........................17

ARTICLE II CLASSIFICATION OF CLAIMS AND INTERESTS ...........................17

   2.1   Generally...........................17

   2.2   Unclassified Claims ...........................17

   2.3   Classes ...........................17

ARTICLE III TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS ...........................18

   3.1   Summary ...........................18

   3.2   Administrative Claims ...........................18

   3.3   Priority Tax Claims ...........................18

   3.4   Substantial Contribution Claims ...........................18

ARTICLE IV TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ...........................19

   4.1   Claims and Interests ...........................19

   4.2   Reservation of Rights Regarding Claims. ...........................21

ARTICLE V IMPLEMENTATION OF THE PLAN ...........................21

   5.1   The Plan Trust ...........................21

   5.2   Certain Mergers ...........................23

   5.3   The Amended and Restated Certificate and the Amended and Restated Bylaws ...........................23

   5.4   Directors and Officers of Reorganized Congoleum ...........................23

   5.5   Cancellation of Existing Securities and Agreements of the Debtors/Discharge of the Indenture Trustee ...........................24

   5.6   Exit Facility ...........................24

   5.7   Issuance of New Securities and Debt Instruments ...........................24

   5.8   Registration Rights Agreement ...........................24

   5.9   Stockholders Agreement ...........................24

   5.10   Effectuating Documents/Further Transactions ...........................25

   5.11   Exemption from Certain Transfer Taxes and Recording Fees ...........................25

   5.12   Section 346 Injunction ...........................25

   5.13   Corporate Action ...........................25

   5.14   Litigation Settlement Agreement. ...........................25

   5.15   Review of Claimants' Counsel Expenses ...........................27

5.16    Intercompany Settlement .................................................................................... 27

5.17    Deemed Consolidation of Debtors For Plan Purposes Only ............................... 28

ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS WITH RESPECT TO CLAIMS  OTHER
          THAN PLAN TRUST ASBESTOS CLAIMS ................................................... 29

6.1    Plan Distributions.............................................................................................. 29

6.2    Distributions of Cash ......................................................................................... 29

6.3    No Interest on Claims ........................................................................................ 29

6.4    Delivery of Distributions ................................................................................... 29

6.5    Distributions to Holders as of the Record Date.................................................. 29

6.6    Fractional Securities; Fractional Dollars ............................................................ 29

6.7    Withholding of Taxes........................................................................................ 29

6.8    Unclaimed Property. ......................................................................................... 30

ARTICLE VII RESOLUTION OF DISPUTED CLAIMS ................................................... 30

7.1    Disallowance of Improperly Filed Claims ......................................................... 30

7.2    Prosecution of Objections to Claims .................................................................. 30

7.3    No Distributions Pending Allowance.................................................................. 30

7.4    Distributions After Allowance ........................................................................... 31

ARTICLE VIII TREATMENT OF EXECUTORY CONTRACTS, UNEXPIRED LEASES AND
          SETTLEMENTS................................................................................................ 31

8.1    Assumption of Unexpired Leases and Executory Contracts ............................... 31

8.2    Damages Upon Rejection................................................................................... 31

8.3    Insurance Agreements ....................................................................................... 32

8.4    Compensation and Benefits Programs ............................................................... 32

8.5    Retiree Benefits................................................................................................. 32

8.6    Indemnification of Directors, Officers and Employees....................................... 32

ARTICLE IX ACCEPTANCE OR REJECTION OF THE PLAN .......................................... 33

9.1    Classes Entitled to Vote .................................................................................... 33

9.2    Acceptance by Impaired Classes of Claims ....................................................... 33

9.3    Acceptance by Impaired Class of Interests ........................................................ 33

9.4    Acceptance Pursuant to Section 524(g) of the Bankruptcy Code ....................... 33

9.5    Presumed Acceptance of Plan ........................................................................... 33

9.6    Reservation of Rights........................................................................................ 33

ARTICLE X CONDITIONS TO CONFIRMATION AND EFFECTIVENESS ........................ 33

10.1    Conditions to Confirmation ............................................................................. 33

10.2    Conditions to Effectiveness ............................................................................. 35

10.3    Waiver of Conditions ...................................................................................... 36

ARTICLE XI INJUNCTIONS, RELEASES AND DISCHARGE.......................................... 36

11.1    Discharge ........................................................................................................ 37

| | | |
|---|---|---|
| 11.2 | Exculpation | 37 |
| 11.3 | Releases by Holders of Plan Trust Asbestos Claims | 37 |
| 11.4 | Discharge Injunction | 38 |
| 11.5 | Third Party Releases | 38 |
| 11.6 | Asbestos Channeling Injunction | 38 |
| 11.7 | Reservation of Rights | 39 |
| 11.8 | Rights Against Non-Debtors under Securities Laws | 39 |
| 11.9 | Rights Against Debtors Under Environmental Laws | 39 |
| 11.10 | Disallowed Claims and Disallowed Interests | 39 |
| 11.11 | Anti-Suit Injunction | 39 |
| 11.12 | Insurance Neutrality | 40 |
| 11.13 | No Liability for Solicitation or Participation | 40 |
| ARTICLE XII MATTERS INCIDENT TO PLAN CONFIRMATION | | 40 |
| 12.1 | Term of Certain Injunctions and Automatic Stay | 40 |
| 12.2 | No Successor Liability | 41 |
| 12.3 | Revesting | 41 |
| 12.4 | Vesting and Enforcement of Causes of Action | 41 |
| 12.5 | GHR/Kenesis Actions | 41 |
| ARTICLE XIII MISCELLANEOUS | | 42 |
| 13.1 | Jurisdiction | 42 |
| 13.2 | General Retention | 42 |
| 13.3 | Specific Purposes | 42 |
| 13.4 | Payment of Statutory Fees | 43 |
| 13.5 | Securities Law Matters | 44 |
| 13.6 | Plan Supplement | 44 |
| 13.7 | Allocation of Plan Distributions Between Principal and Interest | 44 |
| 13.8 | The Asbestos Claimants' Committee, the Futures Representative and the Bondholders' Committee | 44 |
| 13.9 | Revocation of Plan | 44 |
| 13.10 | Modification of Plan | 45 |
| 13.11 | Modification of Payment Terms | 45 |
| 13.12 | Entire Agreement | 45 |
| 13.13 | Headings | 45 |
| 13.14 | Professional Fee Claims | 45 |
| 13.15 | Recordable Order | 46 |
| 13.16 | Preparation of Estates' Returns and Resolution of Tax Claims | 46 |
| 13.17 | No Admission | 46 |

13.18   Consent to Jurisdiction ...................................................................... 46

13.19   Setoffs .................................................................................................. 46

13.20   Successors and Assigns ....................................................................... 46

13.21   Non-Debtor Waiver of Rights .............................................................. 46

13.22   Further Authorizations ........................................................................ 46

13.23   No Bar to Suits ..................................................................................... 46

13.24   Conflicts ............................................................................................... 46

13.25   Notices ................................................................................................. 47

13.26   Duty to Cooperate ............................................................................... 48

13.27   Governing Law ..................................................................................... 48

# INTRODUCTION

The Plan Proponents hereby propose this plan of reorganization pursuant to the provisions of Chapter 11 of the United States Bankruptcy Code.  Capitalized terms used herein are defined in Article I below.

Reference is made to the Disclosure Statement distributed contemporaneously herewith for a discussion of the history, businesses, properties and results of operations of the Debtors and the risks associated with the Plan.  All holders of Claims and Interests entitled to vote on the Plan are encouraged to read the Plan and Disclosure Statement in their entirety before voting to accept or reject the Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and Sections 13.6 and 13.7 of the Plan, the Plan Proponents reserve the right to alter, amend, modify, revoke or withdraw the Plan prior to its substantial consummation.

# ARTICLE I

## DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

### 1.1    Scope of Definitions

All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in Section 1.2 of the Plan.  Any term used in the Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

### 1.2    Definitions

"**ABI**" means American Biltrite Inc., a Delaware corporation.

"**ABI Asbestos Claim**" means any Asbestos Claim that may be asserted by ABI now or in the future other than an ABI Asbestos Indemnity Claim.

"**ABI Asbestos Indemnity Claim**" means any ABI Asbestos Personal Injury Indemnity Claim or ABI Asbestos Property Damage Indemnity Claim.

"**ABI Asbestos Personal Injury Indemnity Claim**" means any asbestos personal injury indemnification Claim or Demand that may be asserted by ABI against Congoleum at any time under the Joint Venture Agreement.

"**ABI Asbestos Property Damage Indemnity Claim**" means any asbestos related property damage indemnification Claim or Demand that may be asserted by ABI against Congoleum at any time under the Joint Venture Agreement.

"**ABI Canada License Agreement**" means the License Agreement, effective January 1, 2006, between Congoleum and American Biltrite (Canada) Ltd., as amended on the Effective Date pursuant to the Intercompany Settlement.

"**ABI Claim**" means any Claim or Demand at any time that may be asserted by ABI at any time against any Debtor, including without limitation ABI Asbestos Claims, ABI Rejection Damages Claims, and ABI Asbestos Indemnity Claims.

"**ABI Parties**" means any current or former officers, directors and employees of ABI, in their capacity as such.

"**ABI Rejection Damages Claims**" means any and all rejection damages claims that might arise upon the deemed rejection of the Intercompany Agreements provided for in Section 5.15 of the Plan.

"**Administrative Claim**" means any Claim for the payment of an Administrative Expense.  The term "Administrative Claim" shall not include Asbestos Claims.

"**Administrative Expense**" means (a) any cost or expense of administration of the Reorganization Cases under section 503(b) of the Bankruptcy Code including, but not limited to, (1) any actual and necessary post-petition cost or expense of preserving the Estates or operating the Debtors' assets and businesses, (2) any payment to be made under the Plan to cure a default on an assumed executory contract or unexpired lease, (3) any post-petition cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of business, (4) the outstanding fees and expenses of the Indenture Trustee incurred in accordance with Section 6.6 of the Indenture relating to the Senior Notes, including the reasonable fees and expenses of counsel to the Indenture Trustee, and (5) compensation or reimbursement of expenses of professionals to the extent allowed by the Bankruptcy Court or the District Court under section 327, 328, 330(a), 331, 503(b) or 1103 of the Bankruptcy Code, including, without limitation, the Debtors and their professionals, the Futures Representative and its professionals, the Bondholders' Committee and its professionals, and the Asbestos Claimants' Committee and its professionals and (b) any fee or charge assessed against the Estates under 28 U.S.C. § 1930.

"**Affiliate**" shall have the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

"**Allowed**" means:

(a)      With respect to an Administrative Claim:

(i)      such amount that represents a Claim of a professional person employed under sections 327, 328, 524(g)(4)(B)(i) or 1103 of the Bankruptcy Code who is required to apply to the Bankruptcy Court or the District Court for the allowance of compensation and reimbursement of expenses pursuant to section 330 of the Bankruptcy Code, to the extent such Claim is allowed by a Final Order of the Bankruptcy Court or the District Court under sections 330 or 331 of the Bankruptcy Code;

(ii)      such amount that represents the reasonable fees and expenses of the Indenture Trustee and its counsel that were otherwise incurred in accordance with the terms of the Indenture and are outstanding on the Effective Date; and

(iii)      other than with respect to a Claim described in clauses (a)(i) and (a)(ii) of this definition, such amount that represents an actual or necessary expense of preserving the Estates or operating the business of any of the Debtors, any such Claim to the extent that it constitutes an Allowed Administrative Claim, or if such Claim is a Disputed Claim, any such Claim to the extent it is allowed in whole or in part by a Final Order of the Bankruptcy Court or the District Court and only to the extent that such allowed portion is deemed, pursuant to a Final Order of the Bankruptcy Court or the District Court, to constitute a cost or expense of administration under section 503 or 1114 of the Bankruptcy Code;

(b)      With respect to an Asbestos Property Damage Claim that was filed prior to the expiration of the Asbestos Property Damage Claim Bar Date, such amount as is liquidated and allowed by the Bankruptcy Cour or the District Courtt; and

(c)      With respect to any Claim other than a Plan Trust Asbestos Claim, an Asbestos Property Damage Claim or an Administrative Claim, such Claim or any portion thereof (i) that has been allowed in whole or in part by a Final Order of the Bankruptcy Court or the District Court; (ii) that has been expressly allowed in the Plan; (iii) as to which, on or before the Effective Date, (A) no Proof of Claim has been filed with the Bankruptcy Court or the District Court and (B) the Claim is listed in the Schedules (as they may be amended) and not listed as disputed, contingent, or unliquidated; or (iv) for which a Proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court or District Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court or the District Court, or other applicable bankruptcy law, and as to which either (A) no objection to its allowance has been filed within the periods of limitation fixed by the Plan, the Bankruptcy Code, or any order of the Bankruptcy Court or District Court, or (B) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order.

2

"**Allowed Amount**" means the sum at which a Claim is Allowed.

"**Amended and Restated Bylaws**" means the Amended and Restated Bylaws of Reorganized Congoleum to become effective on the Effective Date, which shall be substantially in the form attached hereto as Exhibit "J". The Amended and Restated Bylaws will be filed as part of the Plan Supplement.

"**Amended and Restated Certificate**" means the Amended and Restated Certificate of Incorporation of Reorganized Congoleum to become effective on the Effective Date, which shall be substantially in the form attached hereto as Exhibit "K".  The Amended and Restated Certificate will be filed as part of the Plan Supplement.

 "**Anti-Suit Injunction**" means the injunction described in Section 11.11 of the Plan.

"**Asbestos Channeling Injunction**" means the injunction described in Section 11.6 of the Plan.

"**Asbestos Claimant**" means the holder of an Asbestos Personal Injury Claim.

"**Asbestos Claimants' Committee**" means the official committee of the representatives of holders of present unsecured Asbestos Personal Injury Claims, solely in its capacity as such, which committee as of the date hereof consists of the following representatives of the holders of present unsecured Asbestos Personal Injury Claims: Perry Weitz, Esquire, Joseph Rice, Esquire, Steven Kazan, Esquire, Russell Budd, Esquire and Robert Taylor, II, Esquire.

"**Asbestos Claims**" means, collectively, Plan Trust Asbestos Claims and ABI Asbestos Claims.

"**Asbestos In-Place Insurance Coverage**" means any insurance coverage, not reduced to Cash settlement proceeds, available for the payment or reimbursement of liability, indemnity or defense costs arising from or related to Asbestos Claims or Demands or Plan Trust Expenses under any Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement.

"**Asbestos Insurance Action**" means any claim, cause of action, or right of any Debtor against any Asbestos Insurance Company, including without limitation, the Coverage Litigation, arising from or related to: (a) any such Asbestos Insurance Company's failure to provide or pay under Asbestos In-Place Insurance Coverage, (b) the refusal of any Asbestos Insurance Company to compromise and settle any Asbestos Claim under or pursuant to any Asbestos Insurance Policy, or (c) the interpretation or enforcement of the terms of any Asbestos Insurance Policy with respect to any Asbestos Claim.

"**Asbestos Insurance Action Recoveries**" means (a) Cash derived from and paid pursuant to Asbestos Insurance Settlement Agreements, (b) the right to receive proceeds of Asbestos In-Place Insurance Coverage, and (c) the right to receive the proceeds or benefits of any Asbestos Insurance Action.

"**Asbestos Insurance Assignment**" means the transfer, grant and assignment of the Asbestos Insurance Rights to the Plan Trust described in Article V of the Plan, which will be effectuated pursuant to the Insurance Assignment Agreement.

"**Asbestos Insurance Company**" means any insurance company, insurance broker, guaranty association, liquidator, rehabilitator or any other Entity with demonstrated or potential liability to any of the Debtors, the Reorganized Debtors, or the Plan Trust under or related to an Asbestos Insurance Policy.

"**Asbestos Insurance Policy**" means any insurance policy issued to or for the benefit of any of the Debtors in effect at any time on or before the Effective Date that may afford any of the Debtors indemnity or insurance coverage, upon which any claim has been or may be made with respect to any Asbestos Claim.

"**Asbestos Insurance Rights**" means any and all rights, titles, privileges, interests, claims, demands or entitlements to any proceeds, payments, initial or supplemental dividends, scheme payments, supplemental scheme payments, causes of action and choses in action related to Asbestos In-Place Insurance Coverage, whether now

existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, including but not limited to:

(i)        any and all rights to pursue or receive payments with respect to Asbestos Claims under any Asbestos In-Place Insurance Coverage, whether for liability, defense or otherwise;

(ii)       any and all rights to pursue or receive payments related to any Asbestos In-Place Insurance Coverage that was entered into by any domestic or foreign insolvent insurance company, whether in receivership, liquidation, rehabilitation, run-off, scheme of arrangement or any other form of proceeding;

(iii)      any and all rights to pursue or receive payments related to any Asbestos In-Place Insurance Coverage from any state insurance guaranty association in connection with any state insurance guaranty association statute; *provided, however,* that Asbestos Insurance Rights shall not include any rights or obligations under any insurance policy or settlement agreement to which the Debtors are a party insofar as such insurance policy or settlement agreement relates to Workers' Compensation Claims; and

(iv)       any and all rights to pursue any Causes of Action against, or to receive payments related to any Asbestos In-Place Insurance Coverage from, any Asbestos Insurance Company.

"**Asbestos Insurance Settlement Agreement**" means any settlement agreement between or among any of the Debtors and a Settling Asbestos Insurance Company relating to any Asbestos Claim or Asbestos Insurance Action.

"**Asbestos Insurer Coverage Defenses**" means all defenses at law or in equity that an Asbestos Insurance Company may have under any Asbestos Insurance Policy or applicable law to provide Asbestos In-Place Insurance Coverage to or for Asbestos Personal Injury Claims or Plan Trust Expenses that have been channeled to or assumed by or incurred by the Plan Trust pursuant to the Plan; *provided, however,* that in the event there is a Final Order determining that the Bankruptcy Code authorizes the Asbestos Insurance Assignment by preempting any terms of any Asbestos Insurance Policy or provisions of applicable non-bankruptcy law that otherwise might prohibit the Asbestos Insurance Assignment, "Asbestos Insurer Coverage Defenses" shall not include any defense that the Asbestos Insurance Assignment is prohibited by any Asbestos Insurance Policy or applicable non-bankruptcy law.

"**Asbestos Personal Injury Claim**" means (a) any claim, demand or lawsuit (including, but not limited to, any Claim or Demand), whenever and wherever arising or asserted against any of the Debtors or their respective present or former officers, directors or employees in their capacities as such and (b) any debt, obligation or liability (whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, bonded, secured or unsecured), whenever and wherever arising or asserted, of the Debtors or their respective present or former officers, directors or employees in their capacities as such (including, but not limited to, all thereof in the nature of or sounding in tort, contract, warranty, or any other theory of law, equity or admiralty); in either case (a) or (b) for, based on or arising by reason of, directly or indirectly, physical, emotional, bodily or other personal injury, sickness, disease, death or damages based on the foregoing (including, but not limited to, any claim or demand for compensatory damages, loss of consortium, proximate, consequential, general, special or punitive damages, reimbursement, indemnity, warranty, contribution or subrogation) whether or not diagnosable or manifested before the Confirmation of the Plan or the close of the Reorganization Cases, (x) caused or allegedly caused, in whole or part, directly or indirectly: (i) by exposure to asbestos or asbestos-containing products manufactured, supplied, distributed, handled, fabricated, stored, sold, installed, or removed by any Debtor and/or its predecessors; or (ii) by services, actions, or operations provided, completed or taken by any Debtor and/or its predecessors in connection with asbestos or asbestos-containing products or (y) caused or allegedly caused by asbestos for which any Debtor or its predecessors, are alleged to be liable under any applicable law including, but not limited to, Indirect Asbestos Claims, *provided* that Asbestos Personal Injury Claim shall not include Workers' Compensation Claims, ABI Asbestos Claims or Asbestos Property Damage Claims.

"**Asbestos Personal Injury Claim Sub-Account**" means that portion of the Plan Trust Assets to be made available for payment of Plan Trust Asbestos Claims (and related Plan Trust Expenses) other than Allowed Asbestos Property Damage Claims.

4

"**Asbestos Property Damage Claim**" means any Claim or remedy or liability for damage to property (whether or not such Claim, remedy or liability is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty or otherwise), for which the Debtors are alleged to be or may be responsible by judgment, order or settlement and that (1) arises from or relates to any building or other real property in which asbestos was or is, or asbestos-containing products were or are, alleged to have been installed prior to the Petition Date; and (2) seeks monetary or other relief for injury to, destruction, loss of use, diminution in value, and/or asbestos-related repair or maintenance of such property or for the cost of inspection, encapsulation, decontamination, containment, removal, or other abatement of the asbestos or asbestos-containing products installed or allegedly installed in such property. Asbestos Property Damage Claim also includes any such Claims, remedies or liabilities as described immediately above that seek (a) compensatory damages (such as proximate, consequential, general and special damages) and punitive damages; and/or (b) reimbursement, indemnification, subrogation and/or contribution, including, without limitation, any Asbestos Property Damage Contribution Claim. Notwithstanding the foregoing, Asbestos Property Damage Claim does not include any ABI Asbestos Claim or Asbestos Personal Injury Claim.

"**Asbestos Property Damage Claim Bar Date**" means May 3, 2004, the date designated by the Bankruptcy Court as the last date for filing Proofs of Claim on account of an Asbestos Property Damage Claim against the Debtors.

"**Asbestos Property Damage Claim Sub-Account**" means that portion of the Plan Trust Assets, consisting solely of the Asbestos Property Damage Insurance Rights, to be made available for payment of Allowed Asbestos Property Damage Claims.

"**Asbestos Property Damage Contribution Claim**" means any Claim or remedy or liability for damage to property asserted against the Debtors (whether or not such Claim, remedy or liability is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty or otherwise) that is: (1) held by any Entity or assignee or transferee thereof which has been, is, or may be a defendant in an action alleging damage to property that (i) arises from or relates to any building or other real property in which asbestos was or is, or asbestos-containing products were or are, alleged to have been installed prior to the Petition Date, and (ii) seeks monetary or other relief for injury to, destruction, loss of use, diminution in value, and/or asbestos-related repair or maintenance of such property or for the cost of inspection, encapsulation, decontamination, containment, removal, or other abatement of the asbestos or asbestos-containing products installed or allegedly installed in such property; and (2) on account of alleged liability by the Debtors for reimbursement, indemnification, subrogation, or contribution of any portion of any damages such Entity (or assignee or transferee thereof) has paid or may pay to the plaintiff in such action. Notwithstanding anything herein to the contrary, Asbestos Property Damage Contribution Claim does not include any ABI Asbestos Claims or Asbestos Personal Injury Claims.

"**Asbestos Property Damage Insurance Rights**" means all rights arising under all insurance policies, issued to or for the benefit of any of the Debtors that may afford any of the Debtors indemnity or insurance coverage solely for Asbestos Property Damage Claims, which policies are set forth on Exhibit "A" attached hereto. The foregoing includes, but is not limited to, rights under insurance policies, rights under settlement agreements made with respect to such insurance policies, rights against the estates of insolvent insurers that issued such policies or entered into such settlements, and rights against state insurance guaranty associations arising out of any such insurance policies issued by insolvent insurers.

"**Avoidance Actions**" means, collectively, the Omnibus Avoidance Action and the Sealed Avoidance Action.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*., as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Reorganization Cases.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of New Jersey.

"**Bankruptcy Professional**" means any Person (a) employed pursuant to an order of the Bankruptcy Court or District Court, as applicable, in accordance with section 327 or 1103 of the Bankruptcy Code and to be compensated for services pursuant to sections 327, 328, 329, 330 and/or 331 of the Bankruptcy Code, or (b) who applies to the District Court for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Reorganization Cases.

"**Bar Dates**" means the date(s), if any, designated by the Bankruptcy Court or the District Court as the last date(s) for filing Proofs of Claim against the Debtors.

"**Bondholders' Committee**" means the official committee bondholders appointed in these Reorganization Cases on January 27, 2006, as reconstituted from time to time, solely in its capacity as such.

"**Business Day**" means any day other than a Saturday, Sunday or a legal holiday (as such term is defined in Bankruptcy Rule 9006(a)) on which commercial banks are open for business in New York, New York.

"**Cash**" means lawful currency of the United States of America and its equivalents.

"**Causes of Action**" means, without limitation, any and all rights, remedies, claims, causes of action, liabilities, obligations, suits, debts, sums of money, damages, judgments, and demands whatsoever, whether known or unknown, in law, equity, or otherwise which may be brought by or on behalf of the Debtors and/or the Estates, arising under any provision of the Bankruptcy Code or other applicable law, including the GHR/Kenesis Actions.

"**Century Entities**" shall have the meaning ascribed to such term in the Settlement and Buyback Agreement.

"**Claim**" means a claim against the Debtors (or any of them), whether or not asserted, as defined in section 101(5) of the Bankruptcy Code, and further shall include, but is not limited to, Asbestos Claims.

"**Claimant Agreement**" means that certain Settlement Agreement Between Congoleum and Various Asbestos Claimants, as amended by the first amendment thereto, entered into by Congoleum and certain Asbestos Claimants, through their counsel, prior to the Petition Date, as amended from time to time in accordance with its terms.

"**Claimants' Counsel**" means Joseph F. Rice, Esquire and Perry Weitz, Esquire, collectively, in their capacity under the Claimant Agreement as the representatives of certain holders of Asbestos Personal Injury Claims.

"**Class**" means a category of Claims or Interests, as classified in Article II of the Plan pursuant to section 1122(a)(1) of the Bankruptcy Code.

"**Collateral Trust**" means the Collateral Trust established pursuant to the Collateral Trust Agreement, the Security Agreement and the Claimant Agreement.

"**Collateral Trust Agreement**" means that certain irrevocable trust agreement entered into by Congoleum and Arthur J. Pergament and Wilmington Trust Company, as amended by the first amendment thereto, and any further modifications or amendments thereto.

"**Collateral Trustee**" means the Trustee as defined and named in the Collateral Trust Agreement.

"**Confirmation**" means the approval of the Plan by the District Court pursuant to section 1129 and other applicable sections of the Bankruptcy Code.

**"Confirmation Date"** means the date on which the Confirmation Order is entered on the docket of the District Court.

**"Confirmation Hearing"** means the hearing(s) which will be held before the District Court, as appropriate, at which the Plan Proponents will seek Confirmation of the Plan.

**"Confirmation Order"** means the order of the District Court confirming the Plan pursuant to section 1129 and other applicable sections of the Bankruptcy Code.

**"Congoleum"** means Congoleum Corporation, a Delaware corporation.

**"Congoleum Interests"** means, collectively, all equity interests in Congoleum outstanding immediately prior to the Effective Date including, without limitation, (a) shares of Class A common stock, par value $0.01 per share, and Class B Common Stock, par value $0.01 per share, of Congoleum and (b) any options, warrants, conversion rights, rights of first refusal, or other rights, contractual or otherwise, to acquire or receive any stock or other equity ownership interests in Congoleum.

**"Coverage Action"** means that certain civil action pending in the Superior Court of New Jersey, docket number MID-L-8908-01, as such action exists after giving effect to the Order entered therein on October 30, 2003 that dismissed, without prejudice, certain claims including Environmental Claims, as referenced in such Order.

**"Coverage Litigation"** means (i) the Coverage Action; and (ii) any other action which seeks to determine the extent of insurance coverage for defense of and liability for Asbestos Claims and related issues.

**"Debtor"** means each of Congoleum, Congoleum Sales, Inc. and Congoleum Fiscal, Inc., as debtors-in-possession in the Reorganization Cases, and **"Debtors"** means all of them collectively, and when the context so requires, as post-Confirmation entities reorganized hereunder.

**"Demand"** means a demand for payment against any of the Debtors within the meaning of section 524(g)(5) of the Bankruptcy Code, but excludes any demand in respect of an Asbestos Property Damage Claim or an ABI Asbestos Claim.

**"Direct Action"** means any cause of action or right to bring a cause of action possessed by an Asbestos Claimant against an Asbestos Insurance Company on account of such Asbestos Claimant's Plan Trust Asbestos Claim, whether arising by contract or under the laws of any jurisdiction.

**"Disallowed"** means a Claim or Interest, as the case may be, that is disallowed by the Plan, a Final Order of the District Court, or that is disallowed pursuant to the TDP.

**"Disbursing Agent"** means Reorganized Congoleum or any Person selected by Reorganized Congoleum to hold and distribute the consideration to be distributed to the holders of Allowed Claims (other than Plan Trust Asbestos Claims and Senior Note Claims) under the Plan.

**"Discharge Injunction"** means the injunction described in Section 11.4 of the Plan.

**"Disclosure Statement"** means the Disclosure Statement with respect to the Plan, including all exhibits, appendices, schedules and annexes attached thereto, as submitted by the Plan Proponents pursuant to section 1125 of the Bankruptcy Code, as such Disclosure Statement may be further amended, supplemented or modified from time to time.

**"Disclosure Statement Approval Order"** means that certain order of the District Court entered on _____, 2009, approving the adequacy of the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, as such order may be amended, modified or supplemented thereafter.

"**Disputed Claim**" means any Claim that has not been allowed by a Final Order as to which (a) a Proof of Claim has been filed with the Bankruptcy Court or the District Court, as applicable, and (b) an objection has been or may be timely filed or deemed filed under applicable law and any such objection has not been (i) withdrawn, (ii) overruled or denied by a Final Order or (iii) granted by a Final Order. For purposes of the Plan, a Claim that has not been Allowed by a Final Order shall be considered a Disputed Claim, whether or not an objection has been or may be timely filed, if (A) the amount of the Claim specified in the Proof of Claim exceeds the amount of any corresponding Claim  listed in the Schedules, (B) the classification of the Claim specified in the Proof of Claim differs from the classification of any corresponding Claim listed in the Schedules, (C) any corresponding Claim has been listed in the Schedules as disputed, contingent or unliquidated, (D) no corresponding Claim has been listed in the Schedules or (E) such Claim is reflected as unliquidated or contingent in the Proof of Claim filed in respect thereof.

"**Distributions**" means any distribution by the Debtors or Reorganized Congoleum to a Record Holder of an Allowed Claim or Interest.

"**Distribution Date**" means, when used with respect to an Allowed Claim (other than a Plan Trust Asbestos Claim), the date which is as soon as reasonably practicable after the latest of:  (a) the Effective Date; (b) the first Business Day of the next calendar month following the date on which the Claim becomes an Allowed Claim; or (c) the first Business Day of the next calendar month upon which the Claim matures and becomes due and payable according to its own terms, unless the Claim becomes Allowed within fifteen (15) Business Days before the first Business Day of the next calendar quarter, in which case the Distribution Date shall be the first Business Day of the next succeeding calendar quarter.

"**District Court**" means the United States District Court for the District of New Jersey, which withdrew the reference from the Bankruptcy Court pursuant to 28 U.S.C. § 157(d) as of August 17, 2009 and assumed authority over the Reorganization Cases.

"**Effective Date**" means the first Business Day after the Confirmation Date immediately following the first day upon which all of the conditions to the occurrence of the Effective Date specified in Section 10.2 of the Plan have been satisfied or waived pursuant to Section 10.3 of the Plan.

 "**Entity**" means any Person, estate, trust, Governmental Unit or the United States Trustee.

"**Environmental Laws**" means (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601, *et seq*., (b) the Resource Conservation and Recovery Act, as amended by the Hazardous and Solid Waste Amendment of 1984, 42 U.S.C. §§ 6901, *et seq*., (c) the Clean Air Act, 42 U.S.C. §§ 7401, *et seq*., (d) the Clean Water Act of 1977, 33 U.S.C. §§ 1251, *et seq*., (e) the Toxic Substances Control Act, 15 U.S.C. §§ 2601, *et seq*., (f) all statutes or laws issued or promulgated by any Governmental Unit, as they may be amended from time to time, relating to environmental contamination or pollution, air pollution, water pollution, noise control and/or the handling, discharge, existence, release, disposal or recovery of on-site or off-site hazardous, toxic or dangerous wastes, substances, chemicals or materials, and (g) the ordinances, rules, regulations, orders, notices of violation, requests, demands and requirements issued or promulgated by any Governmental Unit in connection with such statutes or laws.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Estate(s)**" means, individually, the estate of each Debtor in the Reorganization Cases and, collectively, the estates of all Debtors in the Reorganization Cases, created pursuant to section 541 of the Bankruptcy Code.

"**Existing Credit Agreement**" means the Loan and Security Agreement between Congoleum, as borrower, and Wachovia, as lender, dated as of December 10, 2001, as amended by Amendment No. 1 to Loan and Security Agreement, dated September 19, 2002, by and between Wachovia and Congoleum, and Amendment No. 2 to Loan and Security Agreement, dated as of February 27, 2003, by and between Wachovia and Congoleum, and as otherwise amended, restated, modified and/or supplemented as of the Petition Date and any related documents.

"**Existing Securities**" means, collectively, the Senior Notes and Interests.

"**Existing Subsidiary Guaranty**" means the Limited Guaranty, dated as of February 27, 2003, executed by Congoleum Fiscal, Inc. and Congoleum Sales, Inc., as amended, restated, modified or supplemented as of the Petition Date.

"**Exit Facility**" means the revolving credit and term loan facility in the aggregate principal amount of $30,000,000 to be provided by lenders acceptable to the Bondholders' Committee, the Debtors and the Asbestos Claimants' Committee in the form of a revolving loan and a term loan to Reorganized Congoleum secured by substantially all of the assets of Reorganized Congoleum and otherwise on terms and conditions, and pursuant to loan documentation, satisfactory and acceptable to the Bondholders' Committee, the Debtors and the Asbestos Claimants' Committee which financing shall be consistent with the Exit Facility Commitment Letter or Term Sheet contained in the Plan Supplement.

"**Exit Facility Commitment Letter or Term Sheet**" means that certain agreement by and between the Debtors and Exit Facility Lenders, detailing the commitment of the Exit Facility Lenders to provide the Exit Facility, a copy of which will be provided in the Plan Supplement.

"**Exit Facility Lenders**" means the lenders who will provide the Exit Facility, with such lenders to be identified in the Exit Facility Commitment Letter or Term Sheet.

"**Final Distribution**" means the Distribution by the Debtors or Reorganized Congoleum that satisfies all Allowed Claims and Interests to the extent provided in accordance with this Plan.

"**Final Order**" means an order or judgment of the Bankruptcy Court or the District Court, as applicable, or other court of competent jurisdiction, the implementation, operation or effect of which has not been stayed and as to which order (or any revision, modification or amendment thereon) the time to appeal or seek review, rehearing or writ of certiorari has expired and as to which no appeal or petition for review, reconsideration, rehearing or certiorari has been taken and is pending.

"**Financing Order**" shall have the meaning ascribed to such term in Section 4.1(b).

"**Futures Representative**" means the Person appointed by the Bankruptcy Court to represent the rights and interests of the future Demands, who shall be R. Scott Williams, Esquire, or such other individual appointed by the District Court, pursuant to section 524(g) of the Bankruptcy Code.

"**General Unsecured Claim**" means any Claim against any Debtor arising prior to the Petition Date (regardless of whether such Claim is covered by insurance) to the extent that such Claim is neither secured nor entitled to priority under the Bankruptcy Code or by a Final Order of the Bankruptcy Court or District Court, as applicable (other than any Workers' Compensation Claim, ABI Claim, Senior Note Claim or Asbestos Claim), including, but not limited to: (a) any Claim arising from the rejection of an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and (b) any portion of a Claim to the extent the value of the holder's interest in the applicable Estate's interest in the property securing such Claim is less than the amount of the Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Claim, as determined pursuant to section 506(a) of the Bankruptcy Code; provided, however, General Unsecured Claims do not include claims against the Debtors under the Environmental Laws as set forth in Section 11.9 hereof, which survive the Reorganization Cases.

"**GHR/Kenesis Actions**" means any Causes of Action, including for malpractice, against Gilbert LLP (formerly known as Gilbert Oshinsky LLP, Gilbert Randolph LLP, Gilbert, Heintz & Randolph LLP) or The Kenesis Group LLC.

"**Governmental Unit**" means any domestic, foreign, provincial, federal, state, local or municipal (a) government, or (b) governmental agency, commission, department, bureau, ministry or other governmental entity.

**"Impaired"** means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

**"Indenture"** means the Indenture by and between Congoleum Corporation, as Issuer, and First Union National Bank, as Trustee, dated as of August 3, 1998, as supplemented and amended from time to time, relating to the Senior Notes.

**"Indenture Trustee"** means HSBC Bank USA, N.A., as successor to First Union National Bank, not individually but as indenture trustee under the Indenture, and its successors and assigns.

**"Indirect Asbestos Claim"** means (i) any Claim based on a right of contribution, reimbursement, subrogation, or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) arising out of or based on an Asbestos Personal Injury Claim or another Indirect Asbestos Claim, (ii) any other derivative or indirect Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law, equity or admiralty, by reason of an Asbestos Personal Injury Claim or another Indirect Asbestos Claim (including, without limitation, any Claim (A) for attorneys' fees arising or incurred in connection with any Asbestos Personal Injury Claim, another Indirect Direct Asbestos Claim or an Asbestos Insurance Action or (B) arising out of or based on the rejection of any executory contract related to or involving asbestos), and (iii) any Claim arising out of Asbestos Insurance Policies or settlement agreements related thereto, in each case other than ABI Asbestos Claims or Asbestos Property Damage Claims.

**"Injunctions"** means the Discharge Injunction, the Asbestos Channeling Injunction, the Anti-Suit Injunction and any other injunctions entered by order of the Bankruptcy Court or the District Court in the Reorganization Cases (including but not limited to any injunction contained in any Final Order approving any Asbestos Insurance Settlement Agreement).

**"Insurance Assignment Agreement"** means the insurance assignment agreement referenced in Section 5.1(c) of the Plan and substantially in the form attached as Exhibit "B" to the Plan.

**"Intercompany Agreements"** means any and all agreements existing between any of the Debtors and ABI, including without limitation the (i) Joint Venture Agreement, (ii) Personal Services Agreement, (iii) stockholders agreement, made as of March 11, 1993, as amended, (iv) Business Relations Agreement, dated as of March 11, 1993, as amended, (v) Tax Sharing Agreement, (vi) Closing Agreement, dated as of March 11, 1993, (vii) Plan of Repurchase, dated as of February 1, 1995, and (viii) annual intercompany personal computing, desktop and voice and data system support and other information technology services agreements.

**"Intercompany Settlement"** shall have the meaning ascribed to such term in Section 5.15.

**"Interest"** means any equity interest in the Debtors existing immediately prior to the Effective Date, including without limitation, the Congoleum Interests and the Subsidiary Interests.

**"IRC"** means the Internal Revenue Code of 1986, as amended.

**"Joint Venture Agreement"** means that certain Joint Venture Agreement, dated as of December 16, 1992, by and among American Biltrite Inc., Resilient Holdings Incorporated, Congoleum, Hillside Industries Incorporated and Hillside Capital Incorporated, as amended by the Closing Agreement, dated as of March 11, 1993, by and among the same parties.

**"Lender Secured Claim"** means any Claim of Wachovia arising under or relating to the Existing Credit Agreement, the Existing Subsidiary Guaranty and any related documents.

**"Lien"** means, with respect to any asset or property, any properly perfected and unavoidable mortgage, lien, pledge, charge, security interest, encumbrance or other security device of any kind pertaining to or affecting such asset or property.

"Litigation Settlement Agreement" means the compromise and settlement agreement referenced in Section 5.14 of the Plan, approved by the Bankruptcy Court by order dated October 31, 2008.

"Litigation Settlement Claimant" means a person whose Asbestos Personal Injury Claim was liquidated pursuant to or was subject to liquidation pursuant to the Claimant Agreement or a Pre-Petition Settlement Agreement who executed the Litigation Settlement Agreement.

"New ABI Agreement" means the agreement to be entered into between Reorganized Congoleum and ABI, which shall be in form and substance mutually agreeable to the Bondholders' Committee, the Asbestos Claimants' Committee and ABI, and which shall govern the relationship between ABI and Reorganized Congoleum upon the Effective Date, thereby superseding any and all Intercompany Agreements and which agreement shall be substantially in the form attached as Exhibit "I" to the Plan. The New ABI Agreement will be filed with the Plan Supplement.

"New Common Stock" means the newly issued shares of Congoleum common stock, par value $.01 per share, to be issued by Reorganized Congoleum as of the Effective Date pursuant to the terms of the Plan.

"New Indenture" means the Indenture by and between Congoleum Corporation, as Issuer, and HSBC Bank USA, N.A., as trustee, dated as of the Effective Date relating to the New Senior Notes and which shall be substantially in the form attached as Exhibit "D" to the Plan. The New Indenture will be filed as part of the Plan Supplement.

"New Senior Notes" means the Senior Secured Notes to be issued to holders of Allowed Senior Note Claims by Reorganized Congoleum in the initial aggregate principal amount of $33 million on the Effective Date and which shall be due and payable December 31, 2017 . There shall be no interest accruing or due and payable on the principal amount of the New Senior Notes for the first six months after the Effective Date. Thereafter, interest shall accrue on the principal amount of the New Senior Notes at the rate of 9% per annum and be payable semi-annually in cash. At the sole option of Reorganized Congoleum, however, beginning with the interest payment due 12 months after the Effective Date to and including the interest payment due 30 months after the Effective Date (the "PIK Period"), interest may be paid in kind by the issuance of additional New Senior Notes in the aggregate amount of the interest then due and payable on each such payment date within the PIK Period. The option shall be separately exercisable with respect to each of the four semi-annual periods within the PIK Period. If Reorganized Congoleum elects to pay interest in kind during any semi-annual period within the PIK Period, interest shall accrue on all the New Senior Notes outstanding at the beginning of such semi-annual period, including any New Senior Notes issued previously in connection with an interest payment in kind, at the rate of 11% per annum; if the Company does not elect the PIK payment option on any interest payment date within the PIK period, interest for such semi-annual period shall be calculated at the rate of 9% per annum on all the New Senior Notes outstanding at the beginning of such semi-annual period, including any New Senior Notes issued previously in connection with an interest payment in kind. After the expiration of the PIK Period, the option to pay interest in kind shall expire, and be of no further force and effect, and all interest shall accrue at 9% per annum, payable semi-annually in cash.

The New Indenture also shall contain a provision for the annual issuance of additional New Senior Notes ("Additional Notes"), with the amount of Additional Notes to be issued being determined as of the end of Reorganized Congoleum's fiscal year ending December 31, 2011 , and on an annual basis at the end of each of the succeeding five years (each such date, a "Determination Date"), according to the following procedure. As soon as practicable after each Determination Date, the average EBITDA for the two-year period ending on the Determination Date shall be calculated. An assumed net debt capacity ("Net Debt Capacity") shall then be determined as of each such Determination Date by multiplying this two-year average annual EBITDA by four. Additional Notes shall be issuable to holders of New Senior Notes with respect to a Determination Date to the extent that the Net Debt Capacity as of such Determination Date, plus any cash amount on Congoleum's balance sheet as of such Determination Date, exceeds the sum of (i) the amount of the balance of Reorganized Congoleum's working capital loan (determined as the daily average of such loan for the year ending on such Determination Date ); (ii) the $33 million of New Senior Notes to be issued on the Effective Date; (iii) the amount of Additional Notes issued with respect to all prior Determination Dates; and (iv) the amount of other interest-bearing debt outstanding as of such Determination Date. The calculation of the amount of Additional Notes to be issued shall take place within three

11

months after each Determination Date, and the issuance of such Additional Notes shall be deemed to have occurred as of the first day of the fiscal year following the Determination Date. In no event shall the cumulative amount of Additional Notes issued under the procedures set forth in this paragraph exceed $37 million.

The New Senior Notes will be secured by liens or security interests in all the assets of Reorganized Congoleum, which liens or security interests shall be subordinate in priority only to the liens or security interests granted by Reorganized Congoleum under the Exit Facility but shall not otherwise be subordinated to the Exit Facility, and which New Senior Notes liens or security interests shall be *pari passu* with no other security interests or liens. The New Senior Notes shall be in the form set forth in the New Indenture.

**"Non-Asbestos Stock Distribution"** means 49.9% of the New Common Stock.

**"Non-Compensatory Damages"** means any and all damages awarded by a court of competent jurisdiction that are penal in nature, including, without limitation, punitive, punitory, exemplary, vindictive, imaginary or presumptive damages.

**"Omnibus Avoidance Action"** means that certain Adversary Proceeding No. 05-06245 (KCF), which was filed in the Bankruptcy Court on behalf of the Debtors on December 3, 2005, as amended.

**"Other Secured Claim"** means a Secured Claim arising prior to the Petition Date against any of the Debtors other than a Lender Secured Claim.

**"PBGC"** shall have the meaning ascribed to such term in Section 8.4(b).

**"Pension Plans"** means, collectively, that certain Congoleum Corporation Hourly Retirement Plan, that certain Congoleum Corporation Retirement Plan for Salaried Employees and that certain Congoleum Corporation Plant 2 Retirement Plan, in each case as the same may be amended from time to time.

**"Person"** means any person, individual, partnership, corporation, limited liability company, joint venture company, association or other entity or being of whatever kind, whether or not operating or existing for profit, including, but not limited to, any "person" as such term is defined in section 101(41) of the Bankruptcy Code, but excluding any Governmental Unit.

**"Personal Services Agreement"** means that certain Personal Services Agreement dated as of March 11, 1993, by and between ABI and Congoleum and all amendments thereto.

**"Petition Date"** means December 31, 2003, the date on which the Debtors filed their petitions for relief commencing the Reorganization Cases.

**"Plan"** means this Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code and all exhibits and schedules annexed hereto or referenced herein, and any amendments or modifications thereto made in accordance with the Bankruptcy Code.

**"Plan Documents"** means the Plan, the Plan Trust Agreement, the TDP, the Exit Facility, the New Senior Notes, the New Indenture, the Registration Rights Agreement, the Amended and Restated Certificate, the Amended and Restated Bylaws, the Stockholders Agreement, the New ABI Agreement, and the Insurance Assignment Agreement, and all exhibits and schedules to any of the foregoing, including any included in a Plan Supplement.

**"Plan Proponents"** means, collectively, the Debtors, the Asbestos Claimants' Committee and the Bondholders' Committee.

**"Plan Supplement"** means the compilation of substantially final forms of documents, including, without limitation, a schedule identifying rejected contracts, the Exit Facility Commitment Letter or Term Sheet, the New ABI Agreement, Registration Rights Agreement, the New Indenture, the Stockholders Agreement, the Amended and Restated Bylaws and the Amended and Restated Certificate and schedules identifying the initial officers and the initial board of directors of Reorganized Congoleum, which the Plan Proponents shall file with the District Court no

later than ten (10) Business Days prior to the last date for filing objections to Confirmation of the Plan. Notwithstanding the foregoing, the Plan Proponents may amend the Plan Supplement and any attachments thereto through and including the Confirmation Date.

"**Plan Trust**" means the trust to be established pursuant to the Plan Trust Agreement and Section 5.1(a) of the Plan as of any date between (and inclusive of) the Confirmation Date and the Effective Date.

"**Plan Trust Agreement**" means that certain Congoleum Plan Trust Agreement, effective as of any date between (and inclusive of) the Confirmation Date and the Effective Date, substantially in the form attached hereto as Exhibit "E," as it may be modified from time to time in accordance with the terms thereof.

"**Plan Trust Asbestos Claims**" means, collectively, Asbestos Personal Injury Claims, future Demands and Allowed Asbestos Property Damage Claims.

"**Plan Trust Assets**" means the assets to be delivered to the Plan Trust pursuant to the Plan Documents and shall include, without limitation, the following assets and any income and profits thereon, and proceeds derived therefrom: (a) the Plan Trust Common Stock; (b) the Asbestos Insurance Rights; (c) all rights of the Debtors under, and all proceeds of, the Asbestos Insurance Settlement Agreements (except for those certain proceeds of the Asbestos Insurance Settlement Agreement with Liberty Mutual Insurance Company, which are payable to the Debtors as provided in Section 5.1(q) of the Plan); (d) the proceeds of the Asbestos In-Place Insurance Coverage; (e) the proceeds of the Asbestos Insurance Actions; (f) the proceeds of the Asbestos Insurance Action Recoveries; (g) the rights granted to the Plan Trust pursuant to the Insurance Assignment Agreement; and (h) the Asbestos Property Damage Insurance Rights.

"**Plan Trust Bylaws**" means the bylaws as approved by the Plan Trustee, the Trust Advisory Committee and the Futures Representative, effective as of the effective date of the Plan Trust, as may be modified from time to time with the consent and approval of the Plan Trustee, the Trust Advisory Committee and the Futures Representative.

"**Plan Trust Common Stock**" means a number of shares of common stock of Reorganized Congoleum constituting 50.1% of the New Common Stock.

"**Plan Trust Documents**" means the Plan Trust Agreement, the Plan Trust Bylaws, the TDP and the other agreements, instruments and documents governing the establishment, administration and operation of the Plan Trust, as amended or modified from time to time in accordance with the Plan and such documents.

"**Plan Trust Expenses**" means any liabilities, costs, taxes or expenses of, or imposed upon or in respect of, the Plan Trust or, on and after the Effective Date, the Plan Trust Assets (except for payments to holders of Asbestos Claims on account of such Asbestos Claims).

"**Plan Trustee**" means the Person appointed pursuant to Article V of the Plan and the Plan Trust Agreement for the purpose of acting as Trustee of the Plan Trust in accordance with the terms and conditions contained in the Plan, the Plan Trust Agreement and the Confirmation Order.

"**Post-Petition Interest**" means interest accruing on and after the Petition Date on a Claim.

"**Pre-Petition Settled Claimant**" means a person whose Asbestos Personal Injury Claim was liquidated pursuant to or was subject to liquidation pursuant to the Claimant Agreement or a Pre-Petition Settlement Agreement, as the case may be (other than such persons whose claims have been previously expunged by order of the Bankruptcy Court, it being understood that defendants in the Omnibus Avoidance Action against whom a default has been granted shall not be considered to have had their claims expunged).

"**Pre-Petition Settlement Agreement**" means a settlement agreement, other than the Claimant Agreement, executed prior to the Petition Date to resolve an Asbestos Personal Injury Claim under which some or all of the consideration due has yet to be paid.

"**Priority Claim**" means any Claim (other than an Administrative Claim or a Priority Tax Claim) to the extent such Claim is entitled to a priority in payment under section 507(a) of the Bankruptcy Code.

"**Priority Tax Claim**" means any Claim to the extent that such Claim is entitled to a priority in payment under section 507(a)(8) of the Bankruptcy Code.

"**Professional Fee Claim**" means a Claim of a professional retained in the Reorganization Cases pursuant to sections 327, 328, and 1103 of the Bankruptcy Code, or otherwise, including such Claims of the Futures Representative and its professionals, for compensation or reimbursement of costs and expenses relating to services rendered on and after the Petition Date and prior to and including the Effective Date.

"**Proof of Claim**" means any proof of claim filed with the Bankruptcy Court or District Court or their duly appointed claims agent with respect to the Debtors pursuant to Bankruptcy Rule 3001 or 3002.

"**Pro Rata**" means with reference to any distribution on account of any Claim in any Class, the proportion that the amount of such Claim bears to the aggregate amount of all Claims (including Disputed Claims but excluding Disallowed Claims) in such Class.

"**Protected Party**" means any of the following parties:

(a)      the Debtors and the Reorganized Debtors;

(b)      any Entity that, pursuant to the Plan or after the Confirmation Date, becomes a direct or indirect transferee of, or successor to, the Plan Trust or the Debtors;

(c)      the Persons designated on Exhibit "F" (as such Exhibit may be amended on or before the Confirmation Date) as current distributors of the product lines currently manufactured, sold or otherwise produced by Congoleum; or

(d)      each Settling Asbestos Insurance Company.

"**Record Date**" means the date established in the Disclosure Statement Approval Order or any other Final Order of the District Court for determining the identity of holders of Claims entitled to vote to accept or reject this Plan and/or receive Distributions under this Plan. If no Record Date is established in the Disclosure Statement Approval Order or any other Final Order of the District Court, then the Record Date shall be the date of the entry of the Disclosure Statement Approval Order.

"**Record Holder**" means the holder of a Claim as of the Record Date.

"**Registration Rights Agreement**" means the agreement described in Section 5.8 of the Plan.

"**Reinstated**" means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the holder of such Claim or Interest so as to leave such Claim or Interest Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim or Interest as such maturity existed before such default; and (iii) compensating the holder of such Claim or Interest for any damages incurred as a result of any legal, equitable or contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest.

"**Reorganization Cases**" means the cases filed by the Debtors under Chapter 11 of the Bankruptcy Code.

"**Reorganized Congoleum**" means reorganized Congoleum (or any successor thereto) on and after the Effective Date.

"**Reorganized Debtors**" means the reorganized Debtors (or any successor thereto) on and after the Effective Date.

"**Representatives**" means, with respect to any Entity, the present and former directors, officers, members, employees, trustees, accountants (including independent certified public accountants), advisors, attorneys, consultants, experts or other agents of that Entity, or any other professionals of that Entity, in each case in their capacity as such; *provided, however,* that in no event shall "Representatives" mean Gilbert LLP (formerly known as Gilbert Oshinsky, LLP, Gilbert Randolph LLP and Gilbert Heintz & Randolph LLP) or Kenesis Group, LLC.

"**Schedules**" means the schedules, statements and lists filed by the Debtors with the Bankruptcy Court or District Court pursuant to Bankruptcy Rule 1007, if such documents are filed, as they have been and may be amended or supplemented from time to time.

"**Sealed Avoidance Action**" means that certain Adversary Proceeding No. 05-06461 (KCF), as it may be amended, which was filed under seal in the Bankruptcy Court on behalf of the Debtors on December 29, 2005, against (a) Arthur J. Pergament, in his capacity as Collateral Trustee; (b) Joseph F. Rice and the law firm of Motley Rice LLC; (c) Perry Weitz and the law firm of Weitz & Luxenberg, P.C.; and (d) certain holders of pre-petition Asbestos Personal Injury Claims.

"**Secured Claim**" means any Claim (other than an Asbestos Claim) that is (a) secured in whole or part, as of the Petition Date, by a Lien which is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or (b) subject to setoff under section 553 of the Bankruptcy Code, but, with respect to both (a) and (b) above, only to the extent of the value, net of any senior lien, of the Estates' interest in the assets or property securing any such Claim or the amount subject to setoff, as the case may be.

"**Security Agreement**" means that certain Superseding Security Agreement entered into by Congoleum and the Collateral Trustee, dated June 11, 2003, as the same may be amended from time to time.

"**Senior Note Claim**" means any Claim of a holder of Senior Notes based upon the Senior Notes.

"**Senior Note Distribution**" means the Non-Asbestos Stock Distribution and $33 million initial principal amount of the New Senior Notes.

"**Senior Notes**" means the 8.625% Senior Notes Due 2008 in the original principal amount of $100 million issued by Congoleum and outstanding as of the Petition Date.

"**Settlement and Buyback Agreement**" means that certain Settlement and Buyback Agreement dated as of August 17, 2006 among the Debtors, Century Indemnity Company and the other parties thereto.

"**Settling Asbestos Insurance Company**" means any Asbestos Insurance Company that has, before the conclusion of the Confirmation Hearing before the District Court, entered into an Asbestos Insurance Settlement Agreement that is sufficiently comprehensive and otherwise on terms appropriate in the determination of each of the Bondholders' Committee, the Debtors and the Asbestos Claimants' Committee to warrant treatment under section 524(g) of the Bankruptcy Code (including, with respect to any Asbestos Insurance Settlement Agreement that is conditioned in whole or in part on a plan of reorganization proposed by the Debtors, an agreement from such Settling Asbestos Insurance Company in writing, in a form reasonably acceptable to the Bondholders' Committee, the Debtors and the Asbestos Claimants' Committee that all conditions to its performance under its Asbestos Insurance Settlement Agreement based on or related to a plan proposed by the Debtors is satisfied in full by this Plan), which determination by the Bondholders' Committee, the Debtors and the Asbestos Claimants' Committee will be indicated by the inclusion of such Asbestos Insurance Company on a schedule of Settling Asbestos Insurance Companies filed by the Plan Proponents as Exhibit "H" to the Plan with the District Court before the conclusion of the Confirmation Hearing and approved by such District Court.

"**Stockholders Agreement**" means that certain stockholders agreement described in Section 5.9 of this Plan, which shall be substantially in the form attached hereto as Exhibit "L." The Stockholders Agreement will be filed as part of the Plan Supplement.

"**Subsidiary Debtors**" means, collectively, Congoleum Sales, Inc. and Congoleum Fiscal, Inc.

"**Subsidiary Interests**" means, collectively, the issued and outstanding shares of stock of the Subsidiary Debtors as of the Petition Date and any options, warrants or other contractual rights to acquire any shares of stock of the Subsidiary Debtors as of the Petition Date.

"**Substantial Contribution Claim**" shall have the meaning ascribed to such term in Section 3.4.

"**Tax Sharing Agreement**" means that certain Tax Sharing Agreement, dated as of November 1, 1996, by and between ABI and Congoleum.

"**TDP**" means the trust distribution procedures for the Plan Trust, substantially in the form attached as Exhibit "G" to the Plan, as it may be modified from time to time in accordance with the terms of the TDP and the Plan Trust Agreement.

"**Trust Advisory Committee**" or "**TAC**" means a Trust Advisory Committee to be formed to represent all holders of Asbestos Personal Injury Claims to advise the Plan Trustee and to approve and consent to certain actions as specified herein and in the Plan Trust Agreement, solely in its capacity as such.

"**United States Trustee**" means the Office of the United States Trustee for Region 3.

"**Unimpaired**" means, with reference to a Claim or Interest, unimpaired within the meaning of section 1124 of the Bankruptcy Code.

"**Unpaid Intercompany Amounts**" means the following intercompany payables, to the extent such payables arise following the Petition Date, are evidenced by invoices or other appropriate supporting documentation and remain unpaid as of the Effective Date: (i) payments due under the Personal Services Agreement, (ii) payments due for purchases of urethane or other products sold intercompany under the Business Relations Agreement, dated as of March 11, 1993, as amended, (iii) payments due under the Canadian Tile exclusivity agreement under the Business Relations Agreement, dated as of March 11, 1993, as amended, (iv) royalty payments due under the non-pvc license agreement dated January 1, 2006, (v) payments due under intercompany personal computing, desktop and voice and data system support and other information technology services agreements between ABI and the Debtors, (vi) payments due for items purchased by ABI and/or an ABI subsidiary for a Debtor and/or Debtor subsidiary, or purchased by a Debtor and/or a Debtor subsidiary for ABI and/or an ABI subsidiary, or purchased jointly by any of them and (vii) intercompany payments due as reimbursement of reasonable and necessary travel expenses incurred (whether by ABI or an ABI subsidary, or a Debtor or a Debtor subsidiary) in connection with ABI personnel providing management services to any of the Debtors.

"**Voting Agent**" means Logan & Company, Inc.

"**Voting Procedures Order**" means the order entered by the District Court setting the voting procedures for this Plan.

"**Wachovia**" shall mean Wachovia Bank, National Association, successor by merger to Congress Financial Corporation.

"**Workers' Compensation Claim**" means any Claim (a) for benefits under a state-mandated workers' compensation system, that a past, present, or future employee of the Debtors and their predecessors is receiving, or may in the future have a right to receive, and/or (b) for reimbursement brought by any insurance company as a result of payments made to or for the benefit of such employees and fees and expenses incurred under any insurance policies covering such employee claims.

16

**1.3** **Rules of Interpretation: Application of Definitions, Rules of Construction, and Computation of Time**. Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine and neuter. For purposes of the Plan: (a) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the document shall be substantially in that form or substantially on those terms and conditions; (b) any reference in the Plan to an existing document or exhibit filed or to be filed means the document or exhibit as it may have been or may be amended, modified, or supplemented; (c) unless otherwise specified, all references in the Plan to Sections, Schedules, and Exhibits are references to sections, schedules, and exhibits of or to the Plan. Unless otherwise specified, the words "herein," "hereof," "hereto," "hereunder," and other words of similar meaning refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. The headings in the Plan are for convenience of reference only and shall not expand, limit, or otherwise affect the provisions of the Plan. Unless otherwise indicated herein, all references to dollars are to United States dollars. Unless otherwise expressly provided herein, in computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**1.4** **Exhibits and Schedules**. All exhibits and schedules are incorporated into and are a part of the Plan as if set forth in full herein.

## ARTICLE II

## CLASSIFICATION OF CLAIMS AND INTERESTS

**2.1** **Generally**. Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of the Class and is classified in a different Class to the extent the Claim or Interest qualifies within the description of that different Class. Solely for voting purposes, Claims against each Estate are classified as Claims against the Estates as a whole.

**2.2** **Unclassified Claims**. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are excluded from the Classes set forth in Section 2.3 of the Plan. The treatment accorded Administrative Claims and Priority Tax Claims is set forth in Article III of the Plan.

**2.3** **Classes**. In accordance with section 1122 of the Bankruptcy Code, the following constitute the Classes of Claims against and Interests in the Debtors:

      (a)     Class 1 – Priority Claims. Class 1 consists of all Priority Claims. Class 1 is Unimpaired.

      (b)     Class 2 – Lender Secured Claims. Class 2 consists of the Lender Secured Claims. Class 2 is Unimpaired.

      (c)     Class 3 – Other Secured Claims. Class 3 consists of all Other Secured Claims, each of which will be within a separate subclass, with each such subclass to be deemed a separate Class for all purposes. Class 3 is (or these subclasses are) Unimpaired.

      (d)     Class 4 – Senior Note Claims. Class 4 consists of all Senior Note Claims. Class 4 is Impaired.

      (e)     Class 5 – Workers' Compensation Claims. Class 5 consists of all Workers' Compensation Claims. Class 5 is Unimpaired.

      (f)     Class 6 – ABI Claims. Class 6 consists of all ABI Claims. Class 6 is Impaired.

(g)     Class 7 – Asbestos Personal Injury Claims.  Class 7 consists of all Asbestos Personal Injury Claims, including the unliquidated Asbestos Personal Injury Claims of Pre-Petition Settled Claimants.  Class 7 is Impaired.

(h)     Class 8 - Asbestos Property Damage Claims.  Class 8 consists of all Asbestos Property Damage Claims.  Class 8 is Impaired.

(i)     Class 9 – General Unsecured Claims.  Class 9 consists of all General Unsecured Claims.  Class 9 is Impaired.

(j)     Class 10 – Congoleum Interests.  Class 10 consists of all Congoleum Interests.  Class 10 is Impaired.

(k)     Class 11 – Subsidiary Interests.  Class 11 consists of all Subsidiary Interests.  Class 11 is Unimpaired.

## ARTICLE III

## TREATMENT OF ADMINISTRATIVE
## CLAIMS AND PRIORITY TAX CLAIMS

**3.1     Summary**.  Pursuant to section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims against the Debtors are not classified for purposes of voting on, or receiving Distributions under, this Plan.  Similarly, Substantial Contribution Claims are not classified for purposes of voting on, or receiving Distributions under, this Plan.  Holders of such Claims are not entitled to vote on this Plan.  All such Claims are instead treated separately in accordance with this Article III and in accordance with the requirements set forth in section 1129(a)(9)(A) of the Bankruptcy Code.

**3.2     Administrative Claims**.  On the Distribution Date, each holder of an Allowed Administrative Claim, except as otherwise provided for herein, and subject to the requirements of Section 13.14 of the Plan, shall receive, in full satisfaction, settlement, release, extinguishment, and discharge of such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Claim or (b) such different treatment as to which the applicable Debtor and such holder shall have agreed upon in writing; *provided, however*, that Allowed Administrative Claims representing (i) post-petition liabilities incurred in the ordinary course of business by the Debtors and (ii) post-petition contractual liabilities arising under loans or advances to the Debtors, whether or not incurred in the ordinary course of business, shall be paid by Reorganized Congoleum in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto.

**3.3     Priority Tax Claims**.  On the Distribution Date, each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, (a) Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (b) such different treatment as to which the applicable Debtor and such holder shall have agreed upon in writing, or (c) at Reorganized Congoleum's sole discretion, deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim, over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim.

**3.4     Substantial Contribution Claims**.  Any Entity who requests compensation or expense reimbursement for making a substantial contribution in the Reorganization Cases pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code ("**Substantial Contribution Claim**") must file an application with the clerk of the District Court on or before a date that is sixty (60) days subsequent to the Effective Date and serve such application on counsel for the Debtors, counsel for the Futures Representative, counsel for the Asbestos Claimants' Committee, counsel for the Bondholders' Committee and on all other parties as otherwise required by the District Court and the Bankruptcy Code, or be forever barred from seeking such compensation or expense reimbursement.  All Allowed Substantial Contribution Claims shall be paid by Reorganized Congoleum within sixty (60) days of allowance by the District Court.

# ARTICLE IV

## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

**4.1**    **Claims and Interests**

(a)    Class 1 – Priority Claims.  On the Distribution Date, each holder of an Allowed Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Claim, either (i) the Allowed Amount of its Priority Claim, in Cash, or (ii) such different treatment as may be agreed to by such holder and Reorganized Congoleum.  Class 1 is Unimpaired and the holders of Class 1 Claims are deemed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

(b)    Class 2 – Lender Secured Claims.  The Lender Secured Claim shall be paid in full indefeasibly on the Effective Date or as soon thereafter as practicable and Wachovia shall be released from any and all liabilities and causes of action in accordance with the Final Order (1) Authorizing Debtors' Use of Cash Collateral, (2) Authorizing Debtors to Obtain Post-Petition Financing, (3) Granting Senior Liens and Priority Administrative Expense Status Pursuant to 11 U.S.C. §§105 and 364(c), (4) Modifying the Automatic Stay Pursuant to 11 U.S.C. §362, and (5) Authorizing Debtors to Enter into Agreements with Congress Financial Corporation (the "**Financing Order**").  Nothing herein requires that Wachovia permit the use of collateral, including cash collateral, or finance the Debtors after the Effective Date other than with Wachovia's prior written consent.  Class 2 is Unimpaired and the holder of the Class 2 Claim is deemed to have accepted the Plan and, accordingly, is not entitled to vote on the Plan.  Notwithstanding anything to the contrary contained in the Plan, the Confirmation Order, or otherwise, the Obligations under and as defined in the Existing Credit Agreement (as the same has heretofore been or may hereafter be amended, modified, ratified, restated, extended, renewed or replaced) and all the rights, claims, liens and priorities and other protections provided to Wachovia shall survive the Confirmation Date and continue in full force and effect in accordance with the terms and conditions of the Financing Order and the Existing Credit Agreement.

(c)    Class 3 – Other Secured Claims.  Each holder of an Allowed Other Secured Claim shall receive one of the following three treatments at Reorganized Congoleum's sole option:  (i) retain unaltered the legal, equitable and contractual rights (including, but not limited to, any Liens that secure such Claim) to which such Claim entitles such holder and such Allowed Other Secured Claim shall be Reinstated on the Effective Date, (ii) the Debtors shall surrender all collateral securing such Claim to the holder thereof, in full satisfaction of such holder's Allowed Class 3 Claim, without representation or warranty by, or recourse against, the Debtors or Reorganized Congoleum or (iii) such holder shall be otherwise treated in a manner so that such Claim shall be rendered Unimpaired. Class 3 is Unimpaired and the holders of Class 3 Claims are deemed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

(d)    Class 4 – Senior Note Claims.  Senior Note Claims shall be Allowed in an aggregate amount equal to at least $103,593,750.00, which shall not be subject to any avoidance, reductions, set off, offset, recharacterization, subordination, counterclaims, defenses, disallowance, impairment or any other challenges under applicable law or regulation by any person or entity.  On the Effective Date, each holder of an Allowed Senior Note Claim shall receive, in full satisfaction of its Senior Note Claim, its Pro Rata share of each of the securities included in the Senior Note Distribution.  Class 4 is Impaired and holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

(e)    Class 5 – Workers' Compensation Claims.  Each holder of an Allowed Workers' Compensation Claim shall be paid in the ordinary course pursuant to such rights that exist under any state workers' compensation system or laws applicable to such Claims.  Class 5 is Unimpaired and the holders of Class 5 Claims are deemed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

(f)    Class 6 – ABI Claims. Pursuant to and in consideration of the Intercompany Settlement and Section 5.15 and other terms of the Plan, on the Effective Date all Intercompany Agreements shall be rejected and all ABI Claims, including without limitation any ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.15(b)(4)(B)

19

of the Plan), shall be deemed Disallowed and expunged. Class 6 is Impaired and the holder of the Class 6 Claims is entitled to vote to accept or reject the Plan.

(g)     Class 7 – Asbestos Personal Injury Claims.

(i)     As of the Effective Date, all liability for all Asbestos Personal Injury Claims (which includes all Claims in Class 7) as well as liability for all future Demands shall be assumed, automatically and without further act or deed, by the Plan Trust and the Reorganized Debtors shall have no liability therefor. Each Asbestos Personal Injury Claim and future Demands shall be resolved pursuant to the Plan Trust Agreement and the TDP. The TDP shall apply to all holders of Asbestos Personal Injury Claims and future Demands, including any such holder who elects to resort to the legal system and obtains a judgment for money damages.

(ii)     As of the Effective Date, pursuant to the Plan, all Pre-Petition Settled Claimants, including the Litigation Settlement Claimants, in full satisfaction of his, her or its Asbestos Personal Injury Claim and any and all rights pursuant to any Pre-Petition Settlement Agreement, Claimant Agreement, Security Agreement, Collateral Trust Agreement or any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003, shall be restored to *status quo ante,* including with respect to any statutes of limitation related to such Asbestos Personal Injury Claim, as of the time each such Claimant initially filed or submitted its Asbestos Claim against the Debtors that resulted in the Claimant's Pre-Petition Settlement Agreement or the Claimant Agreement, respectively, and shall be treated by the Plan Trust as holding unliquidated Asbestos Personal Injury Claims under applicable federal or state law, which claims shall be resolved pursuant to the Plan Trust Agreement and the TDP in the same manner as all other Asbestos Personal Injury Claims in Class 7. Pre-Petition Settled Claimants in Class 7 shall receive *pari passu* treatment under the Plan without regard to any lien, security interest or other claim to priority treatment whatsoever (*i.e.* it is understood that any such Pre-Petition Settled Claimant will need to reapply to the Plan Trust to satisfy the TDP including medical, exposure, statutes of limitation and other requirements).

(iii)     Class 7 is Impaired. Holders of Class 7 Claims are entitled to vote with respect to the Plan.

(h)     Class 8 - Asbestos Property Damage Claims. As of the Effective Date, all liability for all Allowed Asbestos Property Damage Claims shall be assumed, automatically and without further act or deed, by the Plan Trust and the Reorganized Debtors shall have no liability therefor. Each Allowed Asbestos Property Damage Claim shall be paid solely from the Asbestos Property Damage Claim Sub-Account on account of the unpaid Allowed Amount of such Claim pursuant to the Plan Trust Agreement. After the assets in the Asbestos Property Damage Claim Sub-Account have been exhausted or transferred therefrom in accordance with the Plan Trust Agreement, the Plan Trust shall have no further liability or obligation for or in respect of any Asbestos Property Damage Claims. All Asbestos Property Damage Claims as to which a Proof of Claim was not filed prior to the expiration of the Asbestos Property Damage Claim Bar Date shall be deemed Disallowed. Class 8 is Impaired and the holders of Class 8 Claims are entitled to vote to accept or reject the Plan.

(i)     Class 9 – General Unsecured Claims. Except to the extent that a holder of an Allowed General Unsecured Claim in Class 9 has been paid by the Debtors prior to the Effective Date or agrees to alternate, less favorable, treatment, each holder of an Allowed Class 9 Claim shall receive, on the Distribution Date, in full and final satisfaction of such Allowed Class 9 Claim, Cash in the amount of $.35 for each $1.00 of such holder's Allowed Class 9 Claim. Class 9 is Impaired and the holders of Class 9 Claims are entitled to vote to accept or reject the Plan. General Unsecured Claims do not include Claims against the Debtors under the Environmental Laws as set forth in Section 11.9 hereof, which Claims (other than Claims held by ABI) survive the Reorganization Cases.

(j)     Class 10 – Congoleum Interests. On the Effective Date, the Congoleum Interests shall be cancelled, the holders of the Congoleum Interests shall retain and receive nothing on account of such Interests. Class 10 is Impaired and the holders of Class 10 Congoleum Interests are deemed to have rejected the Plan in accordance with the provisions of section 1126(g) of the Bankruptcy Code, and accordingly, their votes are not being solicited.

(k)     Class 11 – Subsidiary Interests. On the Effective Date, the holder of the Subsidiary

Interests shall retain such Subsidiary Interests. Class 11 is Unimpaired and the holder of Class 11 Subsidiary Interests is deemed to have accepted the Plan, and accordingly, is not entitled to vote on the Plan.

        **4.2**     **Reservation of Rights Regarding Claims.** Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' or Reorganized Congoleum's rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment. Except as otherwise explicitly provided in the Plan, nothing shall affect any of the Plan Trust's rights and defenses, both legal and equitable, with respect to any Asbestos Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

**ARTICLE V**

**IMPLEMENTATION OF THE PLAN**

        **5.1**     **The Plan Trust**

        (a)     **Establishment and Purpose of the Plan Trust**. On or prior to the Effective Date, the Plan Trust shall be established in accordance with the Plan Trust Agreement. The Plan Trust is intended to be a "qualified settlement fund" within the meaning of section 468B of the IRC and the Treasury Regulations promulgated thereunder. The purpose of the Plan Trust shall be to, among other things: (i) pay all Plan Trust Asbestos Claims in accordance with the Plan, the Plan Trust Agreement, the TDP and the Confirmation Order; (ii) preserve, hold, manage, and maximize the Plan Trust Assets for use in paying and satisfying Plan Trust Asbestos Claims in accordance with the Plan Trust Agreement and the TDP; (iii) prosecute, settle and manage the disposition of the Asbestos In-Place Insurance Coverage; and (iv) prosecute, settle, and manage Asbestos Insurance Actions and Direct Actions.

        (b)     **Funding and Receipt of Plan Trust Assets**. On the Effective Date, Reorganized Congoleum shall issue the Plan Trust Common Stock to the Plan Trust in accordance with the Plan and all Plan Trust Assets shall be transferred to, vested in, and assumed by, the Plan Trust free and clear of all Claims, Liens and encumbrances; *provided*, *however*, that to the extent that certain Plan Trust Assets, because of their nature or because they will accrue subsequent to the Effective Date, cannot be transferred to, vested in, and assumed by the Plan Trust on the Effective Date, such Plan Trust Assets shall be transferred to, vested in, and assumed by the Plan Trust free and clear of Claims, Liens and encumbrances, as soon as practicable after the Effective Date.

        (c)     **Insurance Assignment Agreement**. On the Effective Date, the Debtors shall deliver the Insurance Assignment Agreement attached hereto as Exhibit "B." Such agreement shall be valid, binding and enforceable. The Insurance Assignment Agreement shall transfer claims and rights set forth therein as Debtors may have, subject to any and all Asbestos Insurer Coverage Defenses.

        (d)     **Creation of Asbestos Property Damage Claim Sub-Account**. On the Effective Date, the Plan Trust shall cause the Asbestos Property Damage Insurance Rights and any proceeds thereof, including $1.2 million from the proceeds of that certain settlement agreement between the Debtors and Liberty Mutual Insurance Company approved by the Bankruptcy Court by order dated July 30, 2004, to be held in the Asbestos Property Damage Claim Sub-Account. In accordance with the terms of the Plan Trust Agreement, the Plan Trustee shall be permitted to transfer monies from the Asbestos Property Damage Claim Sub-Account to the Asbestos Personal Injury Claim Sub-Account, from time to time, to the extent that the funds in the Asbestos Property Damage Claim Sub-Account exceed the aggregate amount of all unpaid Asbestos Property Damage Claims that have been filed prior to the Asbestos Property Damage Claim Bar Date, and a reasonable reserve for Plan Trust Expenses and indemnification costs or expenses, in either case, related to Asbestos Property Damage Claims.

        (e)     **Assumption of Liabilities by the Plan Trust**. On the Effective Date, all liabilities, obligations and responsibilities relating to all Plan Trust Asbestos Claims shall be transferred to the Plan Trust as set forth herein and the Plan Trustee, on behalf of the Plan Trust, shall expressly assume all liability for all Plan Trust Asbestos Claims and Demands as set forth herein, subject to the provisions of the Plan Trust Agreement. With the exception of the liabilities identified hereinabove in this Section 5.1(e), in no event shall the Plan Trust assume any of the liabilities, obligations or responsibilities of the Debtors or Reorganized Congoleum.

21

(f)     **Discharge of Liabilities to Holders of Asbestos Claims**.  Except as provided in the Plan and the Confirmation Order, the transfer to, vesting in, and assumption by the Plan Trust of the Plan Trust Assets as contemplated by the Plan shall, among other things, discharge the Debtors and the Reorganized Debtors from and in respect of all Plan Trust Asbestos Claims.

(g)     **TDP**.  From and after the Effective Date, the Plan Trust shall pay the Plan Trust Asbestos Claims in accordance with the Plan Trust Agreement and the TDP.  The Plan Trustee shall have the power to administer, amend, supplement or modify the TDP in accordance with the terms thereof.

(h)     **Payment of Allowed Asbestos Property Damage Claims**.  From and after the Effective Date, the Plan Trust shall cause the payment of Allowed Asbestos Property Damage Claims from the Asbestos Property Damage Claim Sub-Account in accordance with the Plan Trust Agreement; *provided, however* that once the assets in the Asbestos Property Damage Claim Sub-Account have been exhausted, the Plan Trust shall have no further liability or obligation for or in respect of any Asbestos Property Damage Claims.

(i)     **Excess Plan Trust Assets**.  To the extent there are any Plan Trust Assets remaining after the payment in full of all Plan Trust Asbestos Claims and all Plan Trust Expenses (or provision has been made therefor) in accordance with the Plan Trust Agreement and the TDP, such excess Plan Trust Assets shall be transferred to a tax-exempt organization qualified under section 501(c)(3) of the IRC, which tax-exempt organization is to be determined by the Plan Trustee; *provided, however*, that the purpose thereof, if practicable, shall be related to the treatment of, research on or the relief of suffering of individuals suffering from asbestos-related lung disorders.

(j)     **Plan Trust Expenses**.  The Plan Trust shall pay all Plan Trust Expenses from the Plan Trust Assets in accordance with the Plan Trust Agreement.  Neither the Debtors, the Reorganized Debtors, nor their Affiliates shall have any obligation to pay any Plan Trust Expenses.  The Plan Trustee, each member of the TAC, the Futures Representative and the Representatives of each of the foregoing will have a lien upon the Plan Trust Assets which will be prior to any lien thereon, and the Plan Trust will grant a security interest in the Plan Trust Assets, all proceeds thereof and all accounts into which such proceeds or the Plan Trust Assets are deposited or maintained to secure payment of amounts payable to them as compensation or indemnification.

(k)     **Appointment of the Initial Plan Trustee**.  Effective as of the Effective Date, the District Court shall appoint the initial Plan Trustee to serve as Plan Trustee in accordance with the Plan Trust Agreement.  The Plan Trustee shall be designated no later than thirty (30) days prior to the Confirmation Hearing and shall be mutually acceptable to the Asbestos Claimants' Committee and the Futures Representative.  For purposes of performing his or her duties and fulfilling his or her obligations under the Plan Trust Agreement, the TDP and the Plan, the Plan Trustee shall be deemed to be a party in interest within the meaning of section 1109(b) of the Bankruptcy Code.  The Plan Trustee shall be the "administrator" of the Plan Trust as that term is used in Treas. Reg. Section 1.468B-2(k)(3).

(l)     **The Futures Representative**.  Effective as of the Effective Date, the District Court shall appoint a Person to serve as the Futures Representative from and after the Effective Date pursuant to the terms of the Plan Trust Agreement and who shall have the functions and rights provided in the Plan Trust Documents.

(m)     **Appointment of Trust Advisory Committee Members**.  Effective as of the Effective Date, the District Court shall appoint five initial members of the TAC (and thereupon the TAC shall be formed) to serve as members of the TAC in accordance with the Plan Trust Agreement.

(n)     **Institution and Maintenance of Legal and Other Proceedings**.  As of the Effective Date, the Plan Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Plan Trust, including, without limitation, the Coverage Action, in each case to the extent not adjudicated, compromised or settled prior to the Effective Date. The Plan Trust shall be empowered to initiate, prosecute, defend, and resolve all such actions in the name of the Debtors and/or Reorganized Congoleum if deemed necessary or appropriate by the Plan Trustee.  Except as otherwise provided by law or agreement, the Plan Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred subsequent to the Effective Date arising

22

from or associated with any legal action or other proceeding brought pursuant to this Section 5.1(n) and shall pay or reimburse all deductibles, retrospective premium adjustments, or other charges which may arise from the receipt of insurance proceeds by the Plan Trust.  Without in any way limiting the foregoing and subject to any Asbestos Insurer Coverage Defenses, the Plan Trust shall be empowered to elect to (or not to), initiate, prosecute, defend, settle, and resolve all Asbestos Insurance Actions and Direct Actions, and to maintain, administer, preserve, or pursue the Asbestos-In-Place Insurance Coverage, the Asbestos Insurance Action Recoveries, Asbestos Insurance Rights, the Asbestos Insurance Policies and rights under the Asbestos Insurance Settlement Agreements.  All Causes of Action other than Asbestos Insurance Actions and Direct Actions shall remain the property of the Reorganized Debtors.

(o)  **Preservation of Insurance Claims**.  The discharge and releases provided herein, and the injunctive protection provided to the Debtors, the Reorganized Debtors and any Protected Party with respect to Demands as provided herein, shall neither diminish nor impair the enforceability of any of the Asbestos Insurance Policies by any Entity except (i) to the extent that any such Asbestos Insurance Company is also a Settling Asbestos Insurance Company or (ii) that all Asbestos Insurer Coverage Defenses are preserved.

(p)  **Indemnification by the Plan Trust**.  As and to the extent provided in the Plan Trust Agreement in Sections 1.4 and 4.6, the Plan Trust shall indemnify and hold harmless each of the Debtors, the Reorganized Debtors, the Plan Trustee, any officer and employee of the Plan Trust, the Futures Representative, each member of the TAC and, with respect to each of the foregoing, their respective past, present and future Representatives.

(q)  **Reimbursement of Defense and Indemnity Costs Relating to Asbestos Claims**.  All defense and indemnity costs incurred by Congoleum with respect to Asbestos Claims prior to the Effective Date shall be reimbursed from the proceeds of the Liberty Mutual Settlement.

**5.2  Certain Mergers**.  On the Effective Date, the Subsidiary Debtors shall merge with and into Congoleum, with Reorganized Congoleum as the sole surviving corporation.

**5.3  The Amended and Restated Certificate and the Amended and Restated Bylaws**.  The Amended and Restated Certificate and the Amended and Restated Bylaws of Reorganized Congoleum shall be in form and substance acceptable to the Bondholders' Committee, the Debtors and the Asbestos Claimants' Committee and shall be consistent with the provisions of the Plan and the Bankruptcy Code.  The Amended and Restated Certificate shall, among other things (a) authorize the issuance of New Common Stock pursuant to Section 5.7 of the Plan, and (b) provide, pursuant to section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-voting common equity securities.  The  Amended and Restated Bylaws and the Amended and Restated Certificate of Reorganized Congoleum shall be substantially in the form attached hereto as Exhibits "J" and "K", respectively.  The Amended and Restated Bylaws and the Amended and Restated Certificate will filed as part of the Plan Supplement.

**5.4  Directors and Officers of Reorganized Congoleum**.  The initial board of directors of Reorganized Congoleum shall consist of five (5) directors.  One of such directors shall be selected by the Bondholders' Committee, three of such directors shall be selected jointly by the Futures Representative and the Asbestos Claimants' Committee, and one of such directors shall be Reorganized Congoleum's chief executive officer.  The identity of such directors shall be disclosed by the Plan Proponents in the Plan Supplement.  To the extent any such Person is an Insider (as defined in section 101(31) of the Bankruptcy Code), the nature of any compensation for such Person will also be disclosed prior to the Confirmation Hearing.  Each of the Persons on the initial board of directors of Reorganized Congoleum shall serve in accordance with the Amended and Restated Certificate and the Amended and Restated Bylaws of Reorganized Congoleum, as the same may be amended from time to time.  Subsequently, Reorganized Congoleum's board of directors shall be elected in accordance with Reorganized Congoleum's governing documents which governing documents shall be acceptable to the Bondholders' Committee and the Asbestos Claimants' Committee.

The initial officers of Reorganized Congoleum shall be set forth in the Plan Supplement.  To the extent any such Person is an Insider (as defined in section 101(31) of the Bankruptcy Code), the nature of any compensation for such Person will also be disclosed at such time.  The initial officers shall serve in accordance with the Amended and

Restated Certificate and the Amended and Restated Bylaws of Reorganized Congoleum, as the same may be amended from time to time.

**5.5**  **Cancellation of Existing Securities and Agreements of the Debtors/Discharge of the Indenture Trustee**.  Except as set forth in the Plan, upon the Effective Date, the Existing Securities shall be cancelled and the holders thereof shall have no further rights or entitlements in respect thereof against the Debtors except the right to receive any Distributions to be made to such holders under the Plan.  To the extent possible, Distributions to be made under the Plan to the beneficial owners of the Senior Notes shall be made through the Depository Trust Company and its participants.  The Confirmation Order shall authorize and direct the Indenture Trustee to take whatever action may be necessary or appropriate, in its reasonable discretion, to deliver the Distributions, including, without limitation, obtaining an order of the District Court.  On the Effective Date, the Indenture Trustee and its agents shall be discharged of all their obligations associated with (i) the Senior Notes, (ii) the Indenture, and (iii) any related documents, and released from all Claims arising in the Reorganization Cases.  As of the Effective Date, the Indenture shall be deemed fully satisfied and cancelled; *provided*, *however*, that the Indenture shall continue in effect solely for the purposes of: (1) allowing holders of the Senior Note Claims to receive distributions under the Plan, (2) allowing and preserving the rights of the Indenture Trustee to (a) make distributions in satisfaction of Allowed Senior Note Claims, (b) exercise its charging liens against any such distributions, and (c) seek compensation and reimbursement for any fees and expenses incurred in making such distributions.  Upon completion of all such distributions, the Senior Notes and the Indenture shall terminate completely.  From and after the Effective Date, the Indenture Trustee shall have no duties or obligations under the Indenture other than to make distributions pursuant to the Plan.

**5.6**  **Exit Facility**.  On the Effective Date, Reorganized Congoleum shall obtain exit financing consistent with the terms and conditions set forth in the Exit Facility Commitment Letter or Term Sheet, which shall be filed as part of the Plan Supplement, from the Exit Facility Lenders.

**5.7**  **Issuance of New Securities and Debt Instruments**

(a)  New Common Stock.  On the Effective Date, Reorganized Congoleum shall issue the New Common Stock pursuant to the Plan.  The Amended and Restated Certificate sets forth the rights and preferences of the New Common Stock.  The New Common Stock shall be issued subject to the Stockholders Agreement described below.

(b)  New Senior Notes.  On the Effective Date, Reorganized Congoleum shall issue $33 million in initial principal amount of 9% New Senior Notes, which shall mature on December 31, 2017.  The New Senior Notes shall be governed by the terms and conditions set forth in the New Indenture.

**5.8**  **Registration Rights Agreement**.  In the event the board of directors of Reorganized Congoleum determines in its discretion to register any of the New Common Stock with the Securities and Exchange Commission, or if Reorganized Congoleum is required under the Stockholders Agreement or applicable securities laws to register any of the New Common Stock with the Securities and Exchange Commission, any Person receiving Distributions of the New Common Stock issued on the Effective Date that is not entitled to an exemption from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code, or whose resale of the New Common Stock is otherwise restricted under the securities laws, shall be entitled to become a party to the Registration Rights Agreement.  The Registration Rights Agreement shall be satisfactory in form and substance to the Bondholders' Committee, the Debtors and the Asbestos Claimants' Committee, a substantially similar form of which will be contained in the Plan Supplement.

**5.9**  **Stockholders Agreement**.  On the Effective Date, the Stockholders Agreement will be adopted by Reorganized Congoleum and be binding upon all holders of New Common Stock.  All holders of New Common Stock will be subject to the Stockholders Agreement which will, among other things, govern the access each holder of New Common Stock shall have to information with respect to Reorganized Congoleum and the ability to transfer such holder's New Common Stock.  Each certificate representing share(s) of New Common Stock shall bear a legend indicating that the New Common Stock is subject to the Stockholders Agreement.  The Stockholders Agreement will be effective as of the Effective Date.  The Stockholders Agreement contains customary terms and conditions, including minority stockholder protections, and includes the minority stockholders having both a right of

first refusal and right of first offer on the Plan Trust Common Stock. The Stockholders Agreement shall be satisfactory in form and substance to the Bondholders' Committee and the Asbestos Claimants' Committee, a substantially similar form of which is attached hereto as Exhibit "L." The Stockholders Agreement will be filed as part of the Plan Supplement.

**5.10 Effectuating Documents/Further Transactions**. Each of the Debtors (subject to the consent of the Bondholders' Committee and the Asbestos Claimants' Committee) and Reorganized Congoleum, and their respective officers and designees, is authorized and directed to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be requested by the Plan Proponents, or as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of the Plan, the Exit Facility, or any other Plan Document, or to otherwise comply with applicable law.

**5.11 Exemption from Certain Transfer Taxes and Recording Fees**. Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to Reorganized Congoleum or to any other Person or Entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**5.12 Section 346 Injunction**. In accordance with section 346 of the Bankruptcy Code for the purposes of any state or local law imposing a tax, income will not be realized by the Estates, the Debtors or the Reorganized Debtors by reason of the forgiveness or discharge of indebtedness resulting from the consummation of the Plan. As a result, each state or local taxing authority is permanently enjoined and restrained, after the Confirmation Date, from commencing, continuing or taking any act to impose, collect or recover in any manner any tax against the Debtors or the Reorganized Debtors arising by reason of the forgiveness or discharge of indebtedness under the Plan.

**5.13 Corporate Action**. All matters provided for under the Plan involving the corporate structure of the Debtors or Reorganized Congoleum, or any corporate action to be taken by, or required of the Debtors or Reorganized Congoleum shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the stockholders or directors of any of such entities.

**5.14 Litigation Settlement Agreement**. (a) The Plan implements a compromise and settlement with respect to each such Litigation Settlement Claimant whose Asbestos Personal Injury Claim was liquidated pursuant to the Claimant Agreement or a Pre-Petition Settlement Agreement, as the case may be, and the Litigation Settlement Agreement, which was approved by the Court by an order signed on October 31, 2008, shall be binding on the parties thereto.

(b)     As of the Effective Date of the Plan:

(i)     The Litigation Settlement Claimants shall waive any and all rights with respect to any pre-petition settlement of their Asbestos Personal Injury Claims against the Debtors, whether pursuant to any Pre-Petition Settlement Agreement or the Claimant Agreement, including the liquidated amounts thereof; provided, however, that:

- any Asbestos Personal Injury Claim against the Debtors held by any such Litigation Settlement Claimant, including with respect to any statutes of limitation related thereto, shall be restored to the *status quo ante* as it existed as of the time the Litigation Settlement Claimant initially filed or submitted its Asbestos Personal Injury Claim against the Debtors that resulted in the Claimant's Pre-Petition Settlement Agreement or the Claimant Agreement (the "Submission Date");

25

- any statute of limitation with respect to such Asbestos Personal Injury Claim shall be tolled until the later of ninety (90) days after the expiration of any stay imposed due to the filing of the Debtors' chapter 11 cases of such additional time as may be provided pursuant to the TDP incorporated in the Plan (the "Asbestos Tolling Period");

- neither the Asbestos Tolling Period nor any other term or provision of the Litigation Settlement Agreement shall revive any statute of limitations that expired as of the Submission Date; and

- all parties retain the right to assert any statute of limitations defense or other defenses that they could have asserted as of the Submission Date.

(ii)     With respect to the Litigation Settlement Claimants, the Debtors shall be released from any and all obligations and duties imposed pursuant to any Pre-Petition Settlement Agreement, Claimant Agreement, the Collateral Trust Agreement, Security Agreement and any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003.

(iii)     The Debtors shall be deemed to have forever withdrawn, released, discharged, waived and forgiven the Litigation Settlement Claimants and Claimants' Counsel, and each of their respective assigns, administrators and successors in interest, for and from any and all claims, actions, causes of action, counterclaims, proofs of claim, and any other obligation of any kind or nature arising from or related to the Bankruptcy Code, the Avoidance Actions, and any and all claims related to any Pre-Petition Settlement Agreement, Claimant Agreement, the Collateral Trust Agreement, Security Agreement, pre-petition payments to Claimants Counsel, and any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003, including all pending and potential causes of action, whether accrued or to accrue, whether asserted by way of claim, counterclaim, cross-claim, third-party action, action for indemnity or contribution or otherwise; provided, however, that the foregoing shall not constitute a release of any rights to enforce the terms of the Litigation Settlement Agreement or any defenses to Asbestos Personal Injury Claims that may be asserted by the Debtors as contemplated in the Litigation Settlement Agreement.

(iv)     Except as otherwise provided for in the Litigation Settlement Agreement, all Litigation Settlement Claimants and Claimants' Counsel shall be deemed to have forever withdrawn, released, discharged, waived and forgiven the Debtors and their respective assigns, administrators and successors in interest, for and from any and all claims, actions, causes of action, counterclaims, proofs of claim, and any other obligation of any kind or nature arising from or related to the Bankruptcy Code, the Avoidance Actions, and any and all claims related to any Pre-Petition Settlement Agreement, Claimant Agreement, the Collateral Trust Agreement, Security Agreement and any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003, including all pending and potential causes of action, whether accrued or to accrue, whether asserted by way of a claim, counterclaim, cross-claim, third-party action, action for indemnity or contribution or otherwise; provided, however, that the foregoing shall not constitute a release of any rights to enforce the terms of the Litigation Settlement Agreement and shall not constitute a release by Litigation Settlement Claimants of their Asbestos Personal Injury Claims against the Debtors, the Plan Trust, or any other party or entity.

(c)     Pursuant to the Litigation Settlement Agreement and contingent upon confirmation of the Plan, the estates of Comstock, Cook and Arsenault have elected to forgo any further distribution from the Debtors and/or Plan Trust.

(d)     Within 30 days after the Effective Date of the Plan, the District Court shall enter an order of dismissal of all claims and counterclaims in the Avoidance Actions, with prejudice, and with all parties to bear their own costs and attorneys fees.

(e)     Subject to the terms of this Plan, the mutual releases set forth in the Litigation Settlement Agreement shall not abridge the right of Litigation Settlement Claimants to submit and recover upon their Asbestos Personal Injury Claims against the Debtors including as against the Plan Trust.

(f)     Any claim by Claimants' Counsel for the payment of fees and expenses shall be subject to application to, and approval by, the District Court.

(g)     Each Litigation Settlement Claimant shall be entitled to submit its Asbestos Personal Injury Claim to the Debtors' bankruptcy estates, including the Plan Trust, as an unliquidated claim for resolution and treatment pursuant to TDP, provided that, any Litigation Settlement Claimant who received a partial payment from the Debtors with respect thereto prior to the Petition Date, including specifically claimants Cook, Arsenault, and Comstock, in addition to the other provisions hereof, hereby agrees to either: (a) not seek any further recovery with respect thereto against the Debtors, including from any Plan Trust, or (b) return and relinquish any such pre-petition partial payment for the benefit of the Plan Trust as a condition precedent to asserting any such further Asbestos Personal Injury Claim against the Debtors or the Plan Trust.

(h)     Pursuant to the Plan, any Pre-Petition Settled Claimant that is not a Litigation Settlement Claimant shall nevertheless receive the same treatment as the Litigation Settlement Claimants.

**5.15     Review of Claimants' Counsel Expenses.**     The expenses paid pre-petition by the Debtors to the Claimant's Counsel pursuant to the Claimant Agreement shall be subject to approval by the District Court under § 1129(a)(4) of the Bankruptcy Code.

**5.16     Intercompany Settlement.**     (a)     The Plan implements a compromise and settlement with respect to ABI, the ABI Claims and the Intercompany Agreements (as set forth in this Section 5.16, the "Intercompany Settlement"). Pursuant to Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code and consistent with section 1129 of the Bankruptcy Code, the Plan shall constitute a motion for approval of, and the Confirmation Order shall authorize and constitute District Court approval of, the Intercompany Settlement.

(b)     On the Effective Date, pursuant to Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code, in full and final satisfaction of the ABI Claims, and for good and valuable consideration including ABI's agreement to the treatment specified in the Plan for the ABI Claims and the Claims and Interests asserted by other parties in interest, the ABI Settlement shall be effectuated in accordance with the following terms:

1.     All ABI Claims, including without limitation ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.15(b)(4)(B) of the Plan), shall be deemed Disallowed and expunged.

2.     All Intercompany Agreements shall be deemed rejected, and any and all ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.16(b)(4)(B) of the Plan) arising therefrom shall be deemed Disallowed and expunged.

3.     ABI and Reorganized Congoleum shall enter into and effectuate the New ABI Agreement, and which shall govern the relationship between ABI and Reorganized Congoleum upon the Effective Date.

4.     The ABI Parties and ABI and their respective Representatives (in their capacities as such) shall be deemed to have received and exchanged mutual general releases with and from the Debtors, their Estates and Reorganized Congoluem, such that:

A.     *As of the Effective Date, the Debtors, their Estates and Reorganized Congoleum shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, demands, debts, rights, causes of action and liabilities (other than their rights to enforce the terms of the Intercompany Settlement, the New ABI Agreement and the ABI Canada License Agreement, as amended by Section 5.16(b)(5) of the Plan, and their*

27

rights to payment of not more than $2 million on account of net Unpaid Intercompany Amounts remaining after intercompany offsets of Unpaid Intercompany Amounts), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, Reorganized Congoleum, the Reorganization Cases, the Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtors, their Estates or Reorganized Congoleum, as of the Petition Date or thereafter, against the ABI Parties, ABI and/or their respective Representatives (in their capacities as such); and

B. *As of the Effective Date, the ABI Parties, ABI and their respective Representatives (in their capacities as such) shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, demands, debts, rights, causes of action and liabilities (other than their rights to enforce the terms of the Intercompany Settlement, the New ABI Agreement and the ABI Canada License Agreement, as amended by Section 5.16(b)(5) of the Plan, and their rights to payment of not more than $2 million on account of net Unpaid Intercompany Amounts remaining after intercompany offsets of Unpaid Intercompany Amounts), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, Reorganized Congoleum, the Reorganization Cases, the Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the ABI Parties, ABI and their respective Representatives (in their capacities as such), as of the Petition Date or thereafter, against the Debtors, their Estates or Reorganized Congoleum.*

5.  The ABI Canada License Agreement shall be deemed to have been assumed by Congoleum and become an obligation of Reorganized Congoleum, *provided, however,* that Article 7.02 of the ABI Canada License Agreement shall be modified so that the "Term" thereof shall expire two years from the Effective Date and the ABI Canada License Agreement shall be deemed amended accordingly as of the Effective Date without any further action of any Person or Entity.

**5.17**     **Deemed Consolidation of Debtors For Plan Purposes Only**.  Subject to the occurrence of the Effective Date, the Debtors shall be deemed consolidated under the Plan for Plan purposes only.  Each and every Claim filed or to be filed against any of the Debtors shall be deemed filed against the deemed consolidated Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Debtors. Such deemed consolidation, however, shall not (other than for purposes related to funding distributions under the Plan and as set forth above in this Section 5.17) affect: (i) the legal and organizational structure of the Debtors; or (ii) any Liens that are required to be maintained under the Plan (A) in connection with executory contracts or unexpired leases that were entered into during the Reorganization Cases or that have been or will be assumed, (B) pursuant to the Plan, or (C) in connection with any Exit Facility. Notwithstanding anything contained in the Plan to the contrary, the deemed consolidation of the Debtors shall not have any effect on any of the Claims being reinstated and left unimpaired under the Plan, and the legal, equitable, and contractual rights to which the holders of any such Claims are entitled shall be left unaltered by the Plan.

# ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS WITH RESPECT TO CLAIMS
## OTHER THAN PLAN TRUST ASBESTOS CLAIMS

**6.1     Plan Distributions**.  The Disbursing Agent shall make all distributions required under the Plan (other than distributions to holders of Plan Trust Asbestos Claims and Senior Note Claims).  Distributions shall be made on the Distribution Date (unless otherwise provided herein or ordered by the District Court) with respect to all Claims except for Plan Trust Asbestos Claims.  Distributions to be made on the Distribution Date shall be deemed actually made on the Distribution Date if made either (a) on the Distribution Date or (b) as soon as practicable thereafter.  With respect to Plan Trust Asbestos Claims, distributions to holders of Plan Trust Asbestos Claims shall be made in accordance with the Plan Trust Agreement and/or the TDP, as applicable.  With respect to Senior Note Claims, Distributions will be made by the Indenture Trustee, whose reasonable fees and expenses in connection with such Distributions shall be paid by Reorganized Congoleum.

**6.2     Distributions of Cash**.  Any Distribution of Cash made by Reorganized Congoleum pursuant to the Plan shall, at Reorganized Congoleum's option, be made by check drawn on a domestic bank or by wire transfer from a domestic bank.

**6.3     No Interest on Claims**.   Unless  otherwise  specifically  provided  for  in  the  Plan,  the Confirmation Order, or a post-petition agreement in writing between the Debtors and a holder, Post-Petition Interest shall not accrue or be paid on Claims, and no holder shall be entitled to interest accruing on or after the Petition Date.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a Final Distribution is made when and if such Disputed Claim becomes an Allowed Claim.  Notwithstanding the foregoing, this Section 6.3 shall not apply to Plan Trust Asbestos Claims which shall be governed in all cases by the Plan Trust Agreement and the TDP.

**6.4     Delivery of Distributions**.  Distributions to holders of Allowed Claims other than Asbestos Claims shall be made by the Disbursing Agent or the Indenture Trustee, as applicable, (a) at the holder's last known address, or (b) at the address in any written notice of address change delivered to the Disbursing Agent or the Indenture Trustee, as applicable.  If any holder's distribution made by the Disbursing Agent is returned as undeliverable, no further distributions to such holder shall be made, unless and until the Disbursing Agent is notified of such holder's then current address, at which time all missed distributions shall be made to such holder without interest.  Amounts in respect of undeliverable distributions made through the Disbursing Agent shall be returned to Reorganized Congoleum until such distributions are claimed or become unclaimed property pursuant to Section 6.8 of the Plan. With respect to Plan Trust Asbestos Claims, distributions to the holders of Plan Trust Asbestos Claims shall be made in accordance with the Plan Trust Agreement and/or the TDP, as applicable.  With respect to Senior Note Claims, distributions to holders of Senior Note Claims shall be made in accordance with the Indenture.

**6.5     Distributions to Holders as of the Record Date**.  All Distributions on Allowed Claims shall be made to the Record Holders of such Claims.  As of the close of business on the Record Date, the Claims register maintained by the Voting Agent shall be closed, and there shall be no further changes in the Record Holder of any Claim.  Reorganized Congoleum shall have no obligation to recognize any transfer of any Claim occurring after the Record Date.  Reorganized Congoleum shall instead be entitled to recognize and deal for all purposes under the Plan with the Record Holders as of the Record Date.

**6.6     Fractional Securities; Fractional Dollars**.   Distributions  of  fractions  of  shares  of  New Common Stock will not be made and shall be rounded (up or down) to the nearest whole number, with half shares or less being rounded down.  Reorganized Congoleum shall not be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

**6.7     Withholding of Taxes**.  The Disbursing Agent shall withhold from any assets or property distributed under the Plan any assets or property that must be withheld pursuant to applicable law.

**6.8** **Unclaimed Property.** Any Cash, assets and other property to be distributed on account of any Claim (other than a Plan Trust Asbestos Claim) under the Plan that remain unclaimed (including by an Entity's failure to negotiate a check issued to such Entity) or otherwise not deliverable to the Entity entitled thereto before the later of (a) one year after the date of distribution or (b) 120 calendar days after an order allowing such Entity's Claim becomes a Final Order, shall become vested in, and shall be transferred and delivered to, Reorganized Congoleum. In such event, such Entity's Claim shall no longer be deemed to be Allowed and such Entity shall be deemed to have waived its rights to such payments or distributions under the Plan pursuant to section 1143 of the Bankruptcy Code and shall have no further Claim in respect of such distribution and shall not participate in any further distributions under the Plan with respect to such Claim.

# ARTICLE VII

# RESOLUTION OF DISPUTED CLAIMS

**7.1** **Disallowance of Improperly Filed Claims**. Subject to section 502(j) of the Bankruptcy Code and Bankruptcy Rules 3008 and 9006, any Administrative Claim, Asbestos Property Damage Claim or Claim (other than Asbestos Personal Injury Claims) for which the filing of a Proof of Claim, application or motion with the District Court is required under the terms of the Bankruptcy Code, the Bankruptcy Rules, any order of the Bankruptcy Court or District Court, as applicable (including one providing a Bar Date), or the Plan shall be Disallowed if and to the extent that such Proof of Claim (or other filing) is not timely and properly made.

**7.2** **Prosecution of Objections to Claims**. Unless otherwise ordered by the District Court after notice and a hearing, after the Effective Date Reorganized Congoleum, the Bondholders' Committee and the Asbestos Claimants' Committee each shall have the right to make and file objections to Proofs of Claims, other than Proofs of Claims in respect of Asbestos Personal Injury Claims and Professional Fee Claims, at any time on or before ninety (90) days after the later of (i) the Effective Date or (ii) the date on which such Claim was filed with the Bankruptcy Court or District Court, as applicable, unless no Proof of Claim is required to be filed pursuant to Bankruptcy Rule 3002, the Plan or any order of the Bankruptcy Court or District Court, as applicable; *provided, however,* that (x) this deadline may be extended by the District Court on motion by the Debtors, Reorganized Congoleum, the Bondholders' Committee, or the Asbestos Claimants' Committee as applicable, and (y) neither the Debtors, Reorganized Congoleum, the Futures Representative, the Bondholders' Committee, the Asbestos Claimants' Committee nor any other Person may file an objection to any (1) Claim that was Allowed by a Final Order entered during the Reorganization Cases, or (2) Claim Allowed by the Plan. In addition, unless otherwise ordered by the District Court after notice and a hearing, after the Effective Date Reorganized Congoleum, the Bondholders' Committee and the Asbestos Claimants' Committee, subject to Sections 13.8 and 13.14 of the Plan, each shall have the exclusive right to make and file objections to Administrative Claims and to amend the Schedules or to object to any Claim specified on the Schedules, at any time on or before sixty (60) days after the later of (i) the Effective Date or (ii) the date on which such Claim was filed with the District Court unless no Proof of Claim is required to be filed pursuant to Bankruptcy Rule 3002, the Plan or any order of the District Court; *provided, however,* that (x) this deadline may be extended by the District Court on motion by the Debtors, Reorganized Congoleum, the Bondholders' Committee or the Asbestos Claimants' Committee, as applicable, (y) neither the Debtors, Reorganized Congoleum, the Futures Representative, the Bondholders' Committee, the Asbestos Claimants' Committee nor any other Person may file an objection to any (1) Claim that was Allowed by a Final Order entered during the Reorganization Cases, or (2) Claim Allowed by the Plan, and (z) with respect to any Administrative Claim referred to in sub-clause (a)(4) of the definition of Administrative Expense, no objection may be filed with respect to any such Administrative Expense other than with respect to the reasonableness of such Administrative Expense or whether such Administrative Expense was incurred in accordance with Section 6.6 of the Indenture. Without prejudice to the right of any Asbestos Insurance Company to assert any Asbestos Insurer Coverage Defenses, after the Effective Date, only the Plan Trustee shall have the authority to contest Asbestos Personal Injury Claims and Asbestos Property Damage Claims and litigate to judgment, settle or withdraw such objections and each Asbestos Personal Injury Claim and Asbestos Property Damage Claim, whether or not a Proof of Claim was filed with the Bankruptcy Court or District Court, as applicable, shall be satisfied exclusively in accordance with the Plan Trust Documents.

**7.3** **No Distributions Pending Allowance**. Notwithstanding any other provision hereof, if a Claim or any portion of a Claim (other than an Asbestos Personal Injury Claim) is a Disputed Claim, no payment or

distribution shall be made on account of such Disputed Claim, unless and until such Disputed Claim becomes an Allowed Claim.

       **7.4**    **Distributions After Allowance**.  Payments and distributions to each holder of a Claim that is Disputed, or that is not Allowed, to the extent that such Claim ultimately becomes Allowed, shall be made in accordance with the provisions hereof governing the Class of Claims in which such Claim is classified.  As soon as practicable after the date that the order or judgment of the District Court allowing any Disputed Claim (other than a disputed Asbestos Claim) becomes a Final Order, Reorganized Congoleum shall distribute to the holder of such Claim any payment or property that would have been distributed to such holder if the Claim had been Allowed as of the Effective Date (or such other date on which such distribution would have been made).

**ARTICLE VIII**

**TREATMENT OF EXECUTORY CONTRACTS,
UNEXPIRED LEASES AND SETTLEMENTS**

       **8.1**    **Assumption of Unexpired Leases and Executory Contracts**

       (a)    _Assumption_.  Except for any unexpired lease or executory contract that the Plan Proponents reject or designate as being subject to rejection on or before the Effective Date, as of the Effective Date, all executory contracts and unexpired leases not previously assumed or rejected by the Debtors pursuant to section 365 of the Bankruptcy Code shall be deemed to have been assumed by the Debtors, and the Plan shall constitute a motion to assume such executory contracts and unexpired leases.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the District Court shall constitute approval of such assumptions pursuant to section 365(a) of the Bankruptcy Code and a finding by the District Court that each such assumption is in the best interests of the Debtors, the Estates and all parties in interest in the Reorganization Cases.  With respect to each such executory contract or unexpired lease assumed by the Debtors, unless otherwise determined by the District Court pursuant to a Final Order or agreed to by the parties thereto on or before the Effective Date, any defaults of the Debtors with respect to such assumed executory contracts or leases existing as of the Effective Date shall be cured in the ordinary course of the Reorganized Debtors' business promptly after any such default becomes known to the Debtors and, if disputed, established pursuant to applicable law by the District Court, and the assumed executory contracts or leases shall be binding upon and enforceable upon the parties thereto, subject to any rights and defenses existing thereunder.  Subject to the occurrence of the Effective Date, upon payment of such cure amounts, all defaults of the Debtors existing as of the Confirmation Date with respect to such executory contract or unexpired lease shall be deemed cured.

       (b)    _Rejection_.  Notwithstanding subpart (a) of this Section 8.1, the Plan Proponents may reject those executory contracts and unexpired leases listed on an exhibit to be filed with the District Court as part of the Plan Supplement (as such list may be amended or supplemented up to and including the Confirmation Date).

       (c)    _ABI Canada License Agreement; Intercompany Agreements_.  Pursuant to and in consideration of the Intercompany Settlement and Section 5.15 and other terms of the Plan, on the Effective Date (A) the ABI Canada License Agreement shall be amended as provided in the Intercompany Settlement and deemed to have been assumed by Congoleum and become a contractual obligation of Reorganized Congoleum, and the Plan shall constitute a motion to assume such license agreement and (B) all Intercompany Agreements shall be rejected and all ABI Claims, including without limitation any ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.15(b)(4)(B) of the Plan), shall be deemed Disallowed and expunged.

       **8.2**    **Damages Upon Rejection**.  Except to the extent arising out of or based on the rejection of any executory contract related to or involving asbestos which shall be dealt with under the TDP, the District Court shall determine the dollar amount, if any, of the Claim of any Entity seeking damages by reason of the rejection of any executory contract or unexpired lease; _provided, however_, that such Entity must file a Proof of Claim with the District Court on or before thirty (30) calendar days following the later of the Confirmation Date or the date of rejection of the executory contract or unexpired lease.  To the extent that any such Claim is Allowed by the District Court by Final Order, such Claim shall become, and shall be treated for all purposes under the Plan as, a Class 9

31

General Unsecured Claim, and the holder thereof shall receive distributions as a holder of an Allowed Claim in such Class pursuant to the Plan unless such Claim is held by ABI, in which case such Claim shall be Disallowed and expunged.

**8.3** **Insurance Agreements**. Except to the extent expressly set forth in any Asbestos Insurance Settlement Agreement, nothing contained in the Plan or any negotiations leading up to the Plan, including this Section 8.3, shall constitute a waiver of: (i) any claim, right, or cause of action that any of the Debtors or the Plan Trust, as applicable, may have against any insurer, including under any insurance agreement; or (ii) any Asbestos Insurer Coverage Defenses that any Asbestos Insurance Company may have against the Debtors or the Plan Trust. The discharge and release provisions contained in the Plan shall neither diminish nor impair the duties or obligations of any Debtor or any other Entity under any Asbestos Insurance Policy or agreement relating thereto (including any Asbestos Insurance Settlement Agreement), nor shall the discharge and release provisions contained in the Plan diminish nor impair the duties, obligations or the Asbestos Insurer Coverage Defenses of any Asbestos Insurance Company under any Asbestos Insurance Policy or agreement relating thereto. The Reorganized Debtors shall not voluntarily assist any Person in the establishment of any rights, action, cause of action or claim against the Century Entities in anyway relating to any Asbestos Claim or other claim released under the Settlement and Buyback Agreement.

**8.4** **Compensation and Benefits Programs** (a) Except for the Congoleum Interests which are treated elsewhere in the Plan, unless otherwise agreed to by the affected parties or modified by order of the Bankruptcy Court or District Court, as applicable, all of the Debtors' obligations under employment and severance policies, and all compensation and benefit plan, policies, and programs shall be treated as though they are executory contracts that are deemed assumed under the Plan.

(b) As of the Effective Date, the Pension Plans, as well as the collective bargaining agreement by and between the Debtors and Teamsters Local 312, shall be deemed to have been assumed by Reorganized Congoleum. Reorganized Congoleum shall continue the Pension Plans, satisfy the minimum funding standards pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082, and administer the Pension Plans in accordance with their terms and the provisions of ERISA. Furthermore, nothing in the Plan shall be construed as discharging, releasing or relieving the Debtors or Reorganized Congoleum, or any party, in any capacity, from any liability imposed under any law or regulatory provision with respect to the Pension Plans, the Pension Benefit Guaranty Corporation ("**PBGC**") or the Teamsters Pension Trust Fund of Philadelphia Vicinity (the "Teamsters Pension Fund"). The PBGC, the Pension Plans and the Teamsters Pension Fund shall not be enjoined or precluded from enforcing such liability as a result of any provision of the Plan or the Confirmation Order. Notwithstanding anything in this Section 8.4, the Plan Trust shall not assume any of the liabilities, obligations, or responsibilities of the Debtors or Reorganized Congoleum with respect to the Pension Plans, the PBGC or the Teamster Pension Fund.

**8.5** **Retiree Benefits**. Notwithstanding any other provisions of the Plan (other than the last sentence of this Section 8.5), any payments that are due to any individual for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the Debtors prior to the Petition Date shall be continued for the duration of the period, if any, that the Debtors have obligated themselves to provide such benefits. Notwithstanding the foregoing, no employee or retired employee (nor their spouses or dependents and beneficiaries) of the Debtors or the Reorganized Debtors shall be entitled to assert any Asbestos Claim against the Debtors or the Reorganized Debtors.

**8.6** **Indemnification of Directors, Officers and Employees** The obligations of the Debtors to indemnify their current and former directors, officers or employees to the extent provided in the Debtors' constituent documents or required pursuant to applicable general corporation law shall be deemed and treated as obligations that are assumed by Reorganized Congoleum pursuant to the Plan as of the Effective Date; *provided, however,* that (i) with respect to acts or omissions occurring prior to, on or after the Petition Date, the indemnification obligation of Reorganized Congoleum is limited exclusively to the extent of proceeds available under any applicable directors and

officers insurance policy for the act(s) and/or omission(s) at issue and (ii) no current or former director, officer or employee shall be indemnified with respect to the gross negligence, fraud or willful misconduct of such party.

## ARTICLE IX

### ACCEPTANCE OR REJECTION OF THE PLAN

**9.1** **Classes Entitled to Vote**. The holders of Claims or Interests in each Impaired Class of Claims or Interests, i.e., Classes 4, 6, 7, 8, 9 and 10 whose Claims or Interests are Allowed or temporarily allowed for voting purposes, are entitled to vote to accept or reject the Plan pursuant to the Voting Procedures Order; *provided however* that the holders of Congoleum Interests in Class 10 are deemed to have rejected the Plan in accordance with the provisions of Section 1126(g) of the Bankruptcy Code and, accordingly, their separate vote will not be solicited.

**9.2** **Acceptance by Impaired Classes of Claims**. Pursuant to section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if (a) the holders of at least two-thirds in dollar amount of the claims actually voting in such Class (other than Claims held by any holder designated pursuant to section 1126(e) of the Bankruptcy Code) have voted to accept the Plan and (b) more than one-half in number of such claims actually voting in such Class (other than Claims held by any holder designated pursuant to section 1126(e) of the Bankruptcy Code) have voted to accept the Plan.

**9.3** **Acceptance by Impaired Class of Interests**. Pursuant to section 1126(d) of the Bankruptcy Code, an Impaired Class of Interests shall have accepted the Plan if the holders of at least two-thirds in amount of the Allowed Interests actually voting in such Class (other than Interests held by any holder designated pursuant to section 1126(e) of the Bankruptcy Code) have voted to accept the Plan. The holders of Congoleum Interests in Class 10 are deemed to have rejected the Plan in accordance with the provisions of Section 1126(g) of the Bankruptcy Code.

**9.4** **Acceptance Pursuant to Section 524(g) of the Bankruptcy Code**. The Plan shall have been voted upon favorably as required by section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code.

**9.5** **Presumed Acceptance of Plan**. Classes 1, 2, 3, 5, and 11 are Unimpaired. Under section 1126(f) of the Bankruptcy Code, the holders of Claims and Interests in such Classes are conclusively presumed to have voted to accept the Plan.

**9.6** **Reservation of Rights**. In the event that any Impaired Class fails to accept the Plan by the requisite numbers and amounts required by the Bankruptcy Code, the Plan Proponents reserve the right to seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

## ARTICLE X

### CONDITIONS TO CONFIRMATION AND EFFECTIVENESS

**10.1** **Conditions to Confirmation**. Confirmation of the Plan shall not occur unless each of the following conditions has been satisfied or waived in accordance with Section 10.3 below. These conditions to Confirmation, which are designed, among other things, to ensure that the Injunctions, releases, and discharges set forth in Article XI shall be effective, binding and enforceable, are as follows:

(a) The District Court shall have made specific findings and determinations, among others, in substantially the following form:

(i) The Discharge Injunction and the Asbestos Channeling Injunction are to be implemented in connection with the Plan and the Plan Trust;

(ii) As of the Petition Date, Congoleum has been named as a defendant in personal injury, wrongful death or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

(iii) The Plan Trust, upon the Effective Date, shall assume the liabilities of the Debtors with respect to Plan Trust Asbestos Claims and Demands;

(iv) The Plan Trust is to be funded in part by securities of Reorganized Congoleum in the form of the Plan Trust Common Stock, which constitutes an obligation of Reorganized Congoleum to make future payments to the Plan Trust;

(v) On the Effective Date, the Plan Trust will own a majority of the voting shares of Reorganized Congoleum;

(vi) The Plan Trust is to use its assets and income to pay Plan Trust Asbestos Claims and Plan Trust Expenses;

(vii) Congoleum is likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Plan Trust Asbestos Claims, which are addressed by the Asbestos Channeling Injunction;

(viii) The actual amounts, numbers and timing of future Demands cannot be determined;

(ix) Pursuit of Demands outside the procedures prescribed by the Plan and the TDP is likely to threaten the Plan's purpose to deal equitably with Plan Trust Asbestos Claims and future Demands;

(x) The Plan establishes a separate Class 7 for Asbestos Personal Injury Claims that are to be addressed by the Plan Trust and at least seventy-five percent (75%) of the Asbestos Claimants voting in Class 7 have accepted the Plan;

(xi) The Plan establishes a separate class of Asbestos Property Damage Claims that are to be addressed by the Plan Trust and at least seventy-five percent (75%) of the claimants voting in such class have accepted the Plan;

(xii) Pursuant to court orders or otherwise, the Plan Trust shall operate through mechanisms such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims or other comparable mechanisms, that provide reasonable assurance that the Plan Trust shall value, and be in a financial position to pay, Asbestos Personal Injury Claims and Demands therefor in substantially the same manner;

(xiii) The Futures Representative was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Discharge Injunction and the Asbestos Channeling Injunction for the purpose of, among other things, protecting the rights of persons that might subsequently assert Demands of the kind that are addressed in the Discharge Injunction and the Asbestos Channeling Injunction and transferred to the Plan Trust;

(xiv) In light of the benefits provided, or to be provided, to the Plan Trust on behalf of each Protected Party, the Asbestos Channeling Injunction is fair and equitable with respect to the persons that might subsequently assert Demands against any Protected Party;

(xv) The Plan otherwise complies with section 524(g) of the Bankruptcy Code;

(xvi)     Congoleum's contributions to the Plan Trust provided for herein, together with the Asbestos Insurance Assignment, the Plan Trust Common Stock, constitute substantial assets of the Plan Trust and the reorganization;

(xvii)     The duties and obligations of the insurers that issued policies and their successors and assigns, or, with respect to any insolvent insurers, their liquidators and/or the state insurance guaranty funds that bear responsibility with respect to such rights under such policies which constitute the Asbestos Insurance Rights and Asbestos Property Damage Insurance Rights are not eliminated or diminished by the transfer pursuant to the Plan of the Debtors' rights in the Asbestos Insurance Rights and Asbestos Property Damage Insurance Rights pursuant to the Insurance Assignment Agreement;

(xviii)     The Settling Asbestos Insurance Companies are entitled to the benefits of the Asbestos Channeling Injunction with respect to Plan Trust Asbestos Claims;

(xix)     After Confirmation, each Asbestos Insurance Settlement Agreement of a Settling Asbestos Insurance Company and each Final Order of the Bankruptcy Court or District Court, as applicable, approving such Settlement Agreements shall be binding upon and inure to the benefit of the Plan Trust and the Plan Trustee, and the Plan Trust shall become fully bound by, and entitled to all of the rights afforded to the Plan Trust and/or the Debtors under, all of the terms and conditions of each such Asbestos Insurance Settlement Agreement without need for further act or documentation of any kind;

(xx)     After Confirmation, none of the Debtors,  Reorganized Congoleum, the Futures Representative, the Plan Trustee, and the Asbestos Claimants' Committee shall seek to terminate, reduce or limit the scope of the Asbestos Channeling Injunction or any other injunction contained in the Plan that inures to the benefit of any Settling Asbestos Insurance Company;

(xxi)     As of the Effective Date, the Insurance Assignment Agreement shall be a valid and binding obligation of each of the parties thereto, shall be in full force and effect and shall be enforceable in accordance with its terms, in each case notwithstanding any anti-assignment provision in or incorporated into any Asbestos Insurance Policy and applicable state law; and

(xxii)     The Plan Trust is a "qualified settlement fund" pursuant to Section 468(B) of the IRC and the regulations issued pursuant thereto.

(b)     Confirmation Order.   The District Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order and any other order entered in conjunction therewith, each of which shall be in form and substance acceptable to the Bondholders' Committee, the Debtors and the Asbestos Claimants' Committee and, insofar as such findings and determinations affect the Financing Order or the rights of Wachovia thereunder, Wachovia.

10.2     **Conditions to Effectiveness**.   Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date of the Plan shall not occur unless and until each of the following conditions has been satisfied or waived in accordance with Section 10.3 below:

(a)     Confirmation Order.   The Confirmation Order shall have been entered by the District Court and the Confirmation Order and any order of the District Court shall be in form and substance acceptable to the Bondholders' Committee, the Debtors and the Asbestos Claimants' Committee and the Confirmation Order (and affirming order of the District Court) shall have become a Final Order; *provided, however,* that the Effective Date may occur at a point in time when the Confirmation Order is not a Final Order at the option of the Plan Proponents unless the effectiveness of the Confirmation Order has been stayed, reversed or vacated.  The Effective Date may occur, again at the option of the Plan Proponents, on the first Business Day immediately following the expiration or other termination of any stay of effectiveness of the Confirmation Order.

(b)     Injunctions.  The Discharge Injunction, the Asbestos Channeling Injunction and the Anti-Suit Injunction shall be in full force and effect.

(c)    Exit Facility.  The Exit Facility to be entered into by Reorganized Congoleum, and all documents to be executed in connection with the Exit Facility, shall be in form and substance reasonably satisfactory to the Bondholders' Committee, the Debtors and the Asbestos Claimants' Committee and shall have been executed and delivered and all conditions precedent to effectiveness thereof shall have been satisfied or waived by the parties thereto.

(d)    New Senior Notes and New Indenture.  The New Indenture shall have been executed and authorized and the New Senior Notes shall have been delivered in accordance with the New Indenture and shall constitute valid senior secured indebtedness of Reorganized Congoleum.

(e)    New Common Stock.  The New Common Stock shall have been issued in accordance with the Plan.

(f)    Plan Documents.  The Plan Documents necessary or appropriate to implement the Plan (which shall include without limitation, the Plan, the Plan Trust Agreement, the TDP, the Exit Facility, the New Senior Notes, the New Indenture, the Registration Rights Agreement, the Amended and Restated Certificate, the Amended and Restated Bylaws, the New ABI Agreement, the Stockholders Agreement, and the Insurance Assignment Agreement) shall have been executed, delivered and, where applicable, filed with the appropriate governmental authorities; all conditions precedent to the effectiveness of each of such Plan Documents shall have been satisfied or waived by the respective parties thereto; and the Plan Documents shall be in full force and effect. The Plan Documents shall be acceptable to the Bondholders' Committee, the Debtors and the Asbestos Claimants' Committee.

(g)    Other Assurances.  The Debtors or the Plan Proponents shall have obtained either (i) a private letter ruling from the Internal Revenue Service establishing that the Plan Trust is a "qualified settlement fund" pursuant to Section 468(B) of the IRC and the regulations issued pursuant thereto, or (ii) other decisions, opinions or assurances regarding certain tax consequences of the Plan, satisfactory to the Debtors and the Asbestos Claimants' Committee.

(h)    [reserved]

(i)    Merger.  The District Court will have made a specific finding and determination that the merger of the Subsidiary Debtors with and into Congoleum, with Reorganized Congoleum as the sole surviving corporation, is authorized.

(j)    Judicial Fees.  All fees payable pursuant to 28 U.S.C. § 1930 if and to the extent assessed against the Bankruptcy Estates of the Debtors will have been paid in full.

(k)    [reserved]

(l)    [reserved]

(m)    Other Approvals, Documents and Actions.  All authorizations, consents and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained, and all actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

10.3    Waiver of Conditions.  Each of the conditions set forth in Sections 10.1 and 10.2 above may be waived in whole or in part by the Plan Proponents without any notice to other parties in interest or the District Court and without a hearing.  The failure of the Plan Proponents to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

# ARTICLE XI

## INJUNCTIONS, RELEASES AND DISCHARGE

36

**11.1    Discharge**.    (a)    Except as specifically provided in the Plan, the Plan Documents or in the Confirmation Order, as of the Effective Date, Confirmation shall discharge the Debtors and the Reorganized Debtors pursuant to section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims of any nature whatsoever and Demands including, without limitation, any Claims, demands and liabilities that arose before Confirmation, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such Claim was filed or deemed filed under section 501 of the Bankruptcy Code, or such Claim was listed on the Schedules of the Debtors, (b) such Claim is or was Allowed under section 502 of the Bankruptcy Code, or (c) the holder of such Claim has voted on or accepted the Plan. Except as specifically provided in the Plan or Plan Documents, the rights that are provided in the Plan as of the Effective Date shall be in exchange for and in complete satisfaction, settlement and discharge of all Claims (including without limitation Asbestos Claims) or Demands against, Liens on, and interests in the Debtors or the Reorganized Debtors or any of their assets or properties.  Notwithstanding anything herein to the contrary, nothing in this Section 11.1 shall affect the right of any Asbestos Insurance Company to assert any Asbestos Insurer Coverage Defenses.

(b)    Notwithstanding any other provision of the Plan to the contrary, Confirmation shall not discharge any pre-Petition Date or post-Petition Date, pre-Confirmation Date liability that may be due from any of the Debtors to the Internal Revenue Service as currently set forth in certain Proofs of Claim and Administrative Expense Claim, as amended, filed by the Internal Revenue Service.  Should any pre-Petition Date or post-Petition Date, pre-Confirmation Date tax liabilities be determined by the Internal Revenue Service to be due from any of the Debtors for any of the tax periods reflected by such Proofs of Claim or Administrative Expense Claim, such liabilities shall be determined administratively or in a judicial forum in the manner in which such liabilities would have been resolved had these Reorganization Cases not been commenced.  Any resulting liabilities determined pursuant to a Final Order or other final determination shall be paid as if these Reorganization Cases had not been commenced.

**11.2    Exculpation**As of the Effective Date, (i) the Debtors, the Futures Representative, the Asbestos Claimants' Committee, the Bondholders' Committee and each of their Representatives shall not have or incur any liability to any Entity for any act or omission taken on or after the Petition Date in connection with or arising out of the negotiation of the Plan, any Plan Document or any prior plan of reorganization relating to the Debtors or other related documents, the pursuit of Confirmation of the Plan or any prior plan of reorganization relating to the Debtors, the consummation of the Plan, or the administration of the Plan, or the property to be distributed under the Plan; and (ii) in all respects the Debtors, Futures Representative, the Asbestos Claimants' Committee and the Bondholders' Committee shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and the other Plan Documents.  For avoidance of doubt, in no event shall any such party be exculpated from liability under this Section 11.2 in the case of the gross negligence, fraud or willful misconduct of such party.  None of the foregoing parties shall be exculpated under this provision with respect to any acts occurring prior to the Petition Date.  With respect to officers and directors of the Debtors, this section shall apply only to such officers and directors who were serving in such capacity on and after the Petition Date.

**11.3    Releases by Holders of Plan Trust Asbestos Claims**.  Pursuant to this Section 11.3 and the Confirmation Order, which may include release(s) for the benefit of any Settling Asbestos Insurance Company consistent with the terms of this Section 11.3 and the terms of the relevant Asbestos Insurance Settlement Agreement, any holder of a Plan Trust Asbestos Claim that receives a payment from the Plan Trust shall be deemed to have unconditionally released the Plan Trust and each Settling Asbestos Insurance Company from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, arising from, relating to, or involving the manufacture, sale, distribution, installation, formulation, marketing, transport, handling or any other activity involving any asbestos containing products of Congoleum and any of Congoleum entities identified in the Confirmation Order, which may incorporate the terms of one or more Asbestos Insurance Settlement Agreement, or their premises to the extent such Claim arises from, relates to or involves exposure to asbestos, including without limitation, any operation claims, contribution claims, direct action claims, and insurance coverage claims.  For the avoidance of doubt, in no event shall any such party be released under this Section 11.3 in the case of the gross negligence, fraud or willful misconduct of such party.

**11.4** **Discharge Injunction**. Except as specifically provided in the Plan Documents to the contrary, the satisfaction, release, and discharge set forth in Section 11.1 shall also operate as an injunction, pursuant to sections 105, 524(g) and 1141 of the Bankruptcy Code, prohibiting and enjoining the commencement or continuation of any action, the employment of process or any act to collect, recover from, or offset (a) any Claim or Demand against or Interest in the Debtors, the Reorganized Debtors, or the Plan Trust by any Entity and (b) any cause of action, whether known or unknown, against the Debtors and the Reorganized Debtors based on such Claim or Interest described in subpart (a) of this Section 11.4.

**11.5** **Third Party Releases**. Notwithstanding anything set forth in the Plan, no third party releases are being granted pursuant to the Plan nor are the Plan Proponents seeking approval of any such third party releases.

**11.6** **Asbestos Channeling Injunction**. The sole recourse of the holder of a Plan Trust Asbestos Claim or Demand on account of such Claim or Demand or of a Person that had or could have asserted an Asbestos Claim or Demand shall be to the Plan Trust pursuant to the provisions of the Asbestos Channeling Injunction, the Plan, the Plan Trust Agreement and the TDP, and such holder shall have no right whatsoever at any time to assert its Plan Trust Asbestos Claim or Demand against the Debtors, the Reorganized Debtors, any other Protected Party, or any property or interest in property of the Debtors, the Reorganized Debtors, or any other Protected Party. Without limiting the foregoing, from and after the Effective Date, the Asbestos Channeling Injunction shall apply to all present and future holders of Plan Trust Asbestos Claims and Demands, and all such holders shall be permanently and forever stayed, restrained, and enjoined from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Plan Trust Asbestos Claims and Demands, other than from the Plan Trust in accordance with the Asbestos Channeling Injunction and pursuant to the Plan, the Plan Trust Agreement and the TDP:

        (a)    commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Protected Party or any property or interests in property of any Protected Party;

        (b)    enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Protected Party or any property or interests in property of any Protected Party;

        (c)    creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance against any Protected Party, or any property or interests in property of any Protected Party;

        (d)    setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and

        (e)    proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the Plan Trust, except in conformity and compliance with the Plan, the Plan Trust Agreement and the TDP.

Any right, claim or cause of action that an Asbestos Insurance Company may have been entitled to assert against a Settling Asbestos Insurance Company based on or relating to Asbestos Claims shall be channeled to and become a right, claim or cause of action as an offset claim against the Plan Trust and not against the Settling Asbestos Insurance Company in question and all persons, including any Asbestos Insurance Company, shall be enjoined from asserting any such right, claim or cause of action against a Settling Asbestos Insurance Company.

Except as otherwise expressly provided in the Plan, nothing contained in the Plan shall constitute or be deemed a waiver of any claim, right or cause of action that the Debtors, the Reorganized Debtors, or the Plan Trust may have against any Entity in connection with or arising out of or related to an Asbestos Claim. Notwithstanding any other provision in the Plan to the contrary, nothing in the Plan shall be understood to channel, prevent, impair or

limit in any way enforcement against the Debtors, Reorganized Congoleum, or any other Protected Party of any rights provided in connection with any Workers' Compensation Claim.

**11.7    Reservation of Rights**. Notwithstanding any other provision of the Plan to the contrary, the satisfaction, release and discharge, and the Injunctions set forth in Article XI, shall not serve to satisfy, discharge, release, or enjoin (a) claims by any Entity (other than the Reorganized Debtors and their Affiliates) against the Plan Trust for payment of Plan Trust Asbestos Claims in accordance with the Plan, the Plan Trust Agreement and the TDP, as applicable, (b) claims by any Entity against the Plan Trust for the payment of Plan Trust Expenses, (c) claims by the Reorganized Debtors, the Plan Trust, or any other Entity to enforce the provisions of any Asbestos Insurance Settlement Agreement or any provision of the Plan or another Plan Document, or (d) the rights of any Asbestos Insurance Company to assert any claim, debt, obligation, cause of action or liability for payment against any other Asbestos Insurance Company that is not a Settling Asbestos Insurance Company.

**11.8    Rights Against Non-Debtors under Securities Laws**. Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan, and/or Confirmation Order, no provision shall not release any non-Debtor, including any current and/or former officer and/or director of the Debtors from liability to the United States Securities and Exchange Commission, in connection with any legal action or claim brought by such governmental unit against such Person(s).

**11.9    Rights Against Debtors Under Environmental Laws**. Environmental rights and Claims of Governmental Units and rights of contribution, reimbursement and indemnity by other Entities (other than ABI) under applicable Environmental Laws shall survive the Reorganization Cases, shall not be discharged, impaired or adversely affected by the Plan and the Reorganization Cases and shall be determined in the manner and by the administrative or judicial tribunals in which such rights or Claims would have been resolved or adjudicated if the Reorganization Cases had not been commenced. Governmental Units and other Entities, other than ABI whose claims, if any, shall be discharged, need not file any Proofs of Claim under Environmental Laws in the Reorganization Cases in order to preserve Claims under Environmental Laws. Nothing in the Confirmation Order or Plan shall be construed as releasing or relieving any Entity of any liability under any Environmental Law.

**11.10    Disallowed Claims and Disallowed Interests**. On and after the Effective Date, the Debtors shall be fully and finally discharged from any liability or obligation on a Disallowed Claim or a Disallowed Interest and any order creating a Disallowed Claim or a Disallowed Interest that is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 will nevertheless become and be deemed to be a Final Order on the Effective Date. The Confirmation Order, except as otherwise provided herein, or unless the District Court orders otherwise, shall constitute an order: (a) disallowing all Claims (other than Plan Trust Asbestos Claims that have not been previously expunged by Final Order of the Bankruptcy Court or District Court, as applicable, or withdrawn) and Interests to the extent such Claims and Interests are not allowable under any provision of section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims, and Claims for unmatured interest, and (b) disallowing or subordinating, as the case may be, any Claims, or portions of Claims, for penalties or Non-Compensatory Damages.

**11.11    Anti-Suit Injunction**. With respect to any Settling Asbestos Insurance Company, this Section 11.11 and the Confirmation Order, which may include anti-suit injunction(s) for the benefit of any Settling Asbestos Insurance Company consistent with the terms of this Section 11.10 and the terms of the relevant Asbestos Insurance Settlement Agreement, shall operate as an injunction, pursuant to section 105(a) of the Bankruptcy Code, permanently and forever prohibiting and enjoining the commencement, conduct or continuation of any action or cause of action, whether known or unknown, the employment of process or any act to collect, recover from or offset any non-asbestos claim, Claim or demand against any Settling Asbestos Insurance Company arising out of, relating to, or in connection with an Asbestos Insurance Policy or any other insurance policy or rights under such other insurance policy issued to or insuring the relationship of the relevant Settling Asbestos Insurance Companies with, the relevant Congoleum entities that are insureds under such policies, but such injunction pursuant to section 105(a) of the Bankruptcy Code shall not affect or modify the rights of Persons insured under policies of insurance except to the extent released in an Asbestos Insurance Settlement Agreement.

**11.12**    **Insurance Neutrality**

(a)    Except as otherwise provided in Section 11.12(b):

(i)    Nothing in the Plan, the Plan Documents or the Confirmation Order shall preclude any Entity from asserting in any proceeding any and all claims, defenses, rights or causes of action that it has or may have under or in connection with any Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement with respect thereto;

(ii)    Nothing in the Plan, the Plan Documents or the Confirmation Order shall be deemed to waive any claims, defenses, rights or causes of action that any Entity has or may have under the provisions, terms, conditions, defenses and/or exclusions contained in any Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement with respect thereto, including but not limited to any and all such claims, defenses, rights or causes of action based upon or arising out of Asbestos Personal Injury Claims that are liquidated, resolved, discharged, channeled, or paid in connection with the Plan; and

(iii)    Notwithstanding anything to the contrary in the Confirmation Order, the Plan, or any of the Plan Documents, nothing in the Confirmation Order, the Plan, or any of the Plan Documents (including any other provision that purports to be preemptory or supervening other than Section 11.12(b)), shall in any way operate to impair, or have the effect of impairing, the insurers' legal, equitable, or contractual rights, if any, in any respect; nor shall the Plan, any of the Plan Documents, the Confirmation Order, or the estimation, liquidation or payment of any Claim for purposes of distribution by the Trust in accordance with the Plan and the Plan Documents have any binding effect on any Asbestos Insurance Company or have any res judicata or collateral estoppel effect upon any Asbestos Insurance Company for any other purpose, including without limitation with respect to the amount or the reasonableness of any such Claim, or constitute a binding determination on any issue or the creation of any liquidated claim with respect to any Asbestos Insurance Company. The rights of insurers shall be determined under the applicable Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement with respect thereto.

(b)    Notwithstanding the provisions of Section 11.12(a), Asbestos Insurance Companies shall be bound by the District Court's findings and conclusions with respect to whether, under the Bankruptcy Code, the assignment or transfer of rights under the Asbestos Insurance Assignment is valid and enforceable against each Asbestos Insurance Company notwithstanding any anti-assignment provision in or incorporated into any Asbestos Insurance Policy and applicable state law, and therefore Asbestos Insurance Companies shall be entitled to litigate that issue in connection with Confirmation, and shall retain all rights of appeal with respect thereto. Further, to the extent any Asbestos Insurance Company chooses, notwithstanding the protections provided by Section 11.11(a), to litigate any other issues in connection with Confirmation, and the District Court gives such Asbestos Insurance Company standing to litigate those issues and rules on the merits of those issues, then such Asbestos Insurance Company shall be bound by the District Court's findings and conclusions thereon, subject to any rights of appeal.

**11.13**    **No Liability for Solicitation or Participation**. Pursuant to section 1125(e) of the Bankruptcy Code, the Confirmation Order will provide that all of the Persons who have solicited acceptances or rejections of the Plan (including the Bondholders' Committee, the Asbestos Claimants' Committee, the Debtors and each of their respective members and Representatives, as applicable, and the Voting Agent) have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and are not liable on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale or purchase of securities.

## ARTICLE XII

## MATTERS INCIDENT TO PLAN CONFIRMATION

**12.1**    **Term of Certain Injunctions and Automatic Stay**

(a)    All of the injunctions and/or automatic stays provided for in or in connection with the Reorganization Cases, whether pursuant to section 105, 362, 524(g), or any other provision of the Bankruptcy Code

or other applicable law, in existence immediately prior to Confirmation shall remain in full force and effect until the Injunctions become effective, and thereafter if so provided by the Plan, the Confirmation Order, or by their own terms. In addition, on and after Confirmation, the Bondholders' Committee, the Debtors and the Asbestos Claimants' Committee may seek such further orders as they may deem necessary to preserve the status quo during the time between Confirmation and the Effective Date.

(b) Each of the Injunctions shall become effective on the Effective Date and shall continue in effect at all times thereafter. Notwithstanding anything to the contrary contained in the Plan, all actions in the nature of those to be enjoined by the Injunctions shall be enjoined during the period between the Confirmation Date and the Effective Date.

**12.2** **No Successor Liability**. Except as otherwise expressly provided in the Plan, the Debtors, the Reorganized Debtors, their Affiliates, the Asbestos Claimants' Committee, the Bondholders' Committee, the Plan Trust and the Futures Representative do not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations of the Debtors relating to or arising out of the operations of or assets of the Debtors, whether arising prior to, on, or after the Confirmation Date. Neither the Debtors, the Reorganized Debtors, their Affiliates, nor the Plan Trust is, or shall be, a successor to the Debtors by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that the Reorganized Debtors and the Plan Trust shall assume the obligations specified in the Plan Documents and the Confirmation Order.

**12.3** **Revesting**. Except as otherwise expressly provided in the Plan, on the Effective Date, Reorganized Congoleum shall be vested with all of the assets and property of the Estates, free and clear of all Claims, Liens, charges and other interests of holders of Claims or Interests, and may operate its business free of any restrictions imposed by the Bankruptcy Code or by the District Court.

**12.4** **Vesting and Enforcement of Causes of Action**. Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, except as otherwise provided in the Plan, Reorganized Congoleum shall be vested with and have the right to enforce against any Entity any and all of the Debtors' Causes of Action other than Causes of Action related to Plan Trust Asbestos Claims and Plan Trust Assets (including the right to pursue such claims, if any, in the name of any Debtor if necessary), with the proceeds of the recovery of any such actions to be property of Reorganized Congoleum; *provided, however*, that nothing herein shall alter, amend, or modify the injunctions (including the Injunctions), releases, or discharges provided herein. Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, except as otherwise provided in the Plan, the Plan Trust shall be vested with and have the right to enforce against any Entity any and all of the Debtors' Causes of Action relating to any Plan Trust Asbestos Claims or any Plan Trust Assets, including the right to pursue such claims, if any, in the name of any Debtor, if necessary; and for this purpose the Plan Trust shall be designated as a representative of the Estates, with the proceeds of the recovery of any such actions to be property of the Plan Trust; *provided, however*, that nothing herein shall alter, amend, or modify the injunctions (including the Injunctions), releases, or discharges provided herein.

After the Effective Date, Reorganized Congoleum, in its sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Causes of Action (or decline to do any of the foregoing), without further approval of the District Court. Reorganized Congoleum, or any successors, in the exercise of its sole discretion, may pursue such Causes of Action so long as it is in the best interests of Reorganized Congoleum or any successors holding such rights of action. The failure of the Plan Proponents to specifically list any claim, right of action, suit, proceeding or other Causes of Action in the Plan or the Plan Supplement does not, and will not be deemed to, constitute a waiver or release by the Debtors or Reorganized Congoleum of such claim, right of action, suit, proceeding or other Causes of Action, and Reorganized Congoleum will retain the right to pursue such claims, rights of action, suits, proceedings and other Causes of Action in its sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit, proceeding or other Causes of Action upon or after the Confirmation or consummation of the Plan.

**12.5** **GHR/Kenesis Actions**. On the Effective Date, the GHR/Kenesis Actions shall be preserved for enforcement solely by, and for the sole benefit of, Reorganized Congoleum.

# ARTICLE XIII

# MISCELLANEOUS

**13.1** **Jurisdiction**. Until the Reorganization Cases are closed, the District Court shall retain the fullest and most extensive jurisdiction permissible, including that necessary to ensure that the purposes and intent of the Plan are carried out. Except as otherwise provided in the Plan, the District Court shall retain jurisdiction to hear and determine all Claims against and Interests in the Debtors, and to adjudicate and enforce all other causes of action which may exist on behalf of the Debtors. Nothing contained herein shall prevent the Debtors, Reorganized Congoleum, or the Plan Trust from taking such action as may be necessary in the enforcement of any cause of action which the Debtors have or may have and which may not have been enforced or prosecuted by the Debtors, which cause of action shall survive Confirmation of the Plan and shall not be affected thereby except as specifically provided herein. Nothing contained herein concerning the retention of jurisdiction by the District Court shall be deemed to be a retention of exclusive jurisdiction with respect to any Asbestos Insurance Action; rather any court other than the District Court which has jurisdiction over an Asbestos Insurance Action shall have the continuing right to exercise such jurisdiction.

**13.2** **General Retention**. Following the Confirmation of the Plan, the administration of the Reorganization Cases will continue at least until the completion of the transfers contemplated to be accomplished on the Effective Date. Moreover, the Plan Trust shall be subject to the continuing jurisdiction of the District Court to the extent required by the requirements of section 468B of the IRC and the regulations issued pursuant thereto. The District Court shall also retain jurisdiction for the purpose of classification of any Claim and the re-examination of Claims that have been Allowed for purposes of voting, and the determination of such objections as may be filed with the District Court with respect to any Claim. The failure by the Debtors to object to, or examine, any Claim for the purposes of voting, shall not be deemed a waiver of the right of the Debtors, Reorganized Congoleum, or the Plan Trust, as the case may be, to object to or re-examine such Claim in whole or in part.

**13.3** **Specific Purposes**. In addition to the foregoing, the District Court shall retain jurisdiction for the following specific purposes after Confirmation:

(a) to modify the Plan after Confirmation, pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules;

(b) to correct any defect, cure any omission, reconcile any inconsistency, or make any other necessary changes or modifications in or to the Plan, the Plan Documents or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance under the Plan Documents in the event that the Effective Date does not occur as provided herein so that the intended effect of the Plan may be substantially realized thereby;

(c) to assure the performance by the Disbursing Agent, the Indenture Trustee and the Plan Trustee of their respective obligations to make distributions under the Plan;

(d) to enforce and interpret the terms and conditions of the Plan Documents;

(e) to enter such orders or judgments, including, but not limited to, injunctions as are necessary to (i) enforce the title, rights, and powers of the Debtors, the Reorganized Debtors, the Plan Trust, the Futures Representative and the Trust Advisory Committee or (ii) enable holders of Claims to pursue their rights against any Entity that may be liable therefor pursuant to applicable law or otherwise, including, but not limited to, Bankruptcy Court or District Court orders;

(f) to hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits, tax proceedings, and similar or related matters with respect to the Debtors, the Reorganized Debtors, or the Plan Trust relating to tax periods or portions thereof ending on or before the Effective Date, arising on account of transactions contemplated by the Plan Documents, or relating to the period of administration of the Reorganization Cases;

500392306v3

(g)     to hear and determine all applications for compensation of professionals and reimbursement of expenses under sections 330, 331, or 503(b) of the Bankruptcy Code;

(h)     to hear and determine any causes of action arising during the period from the Petition Date through the Effective Date;

(i)     to hear and determine any claim, causes of action, dispute or other matter in any way related to the Plan Documents or the transactions contemplated thereby against the Debtors, the Reorganized Debtors, the Bondholders' Committee, the Asbestos Claimants' Committee, the Trust Advisory Committee, the Plan Trust, the Plan Trustee, or the Futures Representative and each of their respective Representatives;

(j)     to hear and determine any and all motions pending as of Confirmation for the rejection, assumption, or assignment of executory contracts or unexpired leases and the allowance of any Claim resulting therefrom;

(k)     to determine the allowance and/or disallowance of any Claims against the Debtors or their Estates, including, without limitation, any objections to any such Claims and the compromise and settlement of any Claim against the Debtors or their Estates;

(l)     to hear and determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)     to consider and act on the compromise and settlement of any Claim against or Interest in the Debtors or their Estates;

(n)     to hear and determine all questions and disputes regarding title to the assets of the Debtors, their Estates, Reorganized Congoleum or the Plan Trust;

(o)     to hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court or District Court, as applicable, in these Reorganization Cases;

(p)     to retain continuing jurisdiction with regard to the Plan Trust sufficient to satisfy the requirements of the Treasury Regulations promulgated under section 468B of the IRC (including Treas. Reg. Section 1.468B-1(c)(1));

(q)     to hear and determine any and all applications brought by the Plan Trustee to amend, modify, alter, waive, or repeal any provision of the Plan Trust Agreement or the TDP;

(r)     to enter such orders as are necessary to implement and enforce the Injunctions and the other injunctions described herein, including, without limitation, orders extending the protections afforded by section 524(g)(4) of the Bankruptcy Code to the Protected Parties, including without limitation, the Settling Asbestos Insurance Companies; and

(s)     to hear and determine any motions or contested matters involving or related to any GHR/Kenesis Action.

Notwithstanding anything to the contrary in this Section 13.3, (i) the allowance of Plan Trust Asbestos Claims (other than Asbestos Property Damage Claims) and the forum in which such allowance will be determined, shall be governed by and made in accordance with the Plan Trust Agreement and the TDP and (ii) the District Court will have concurrent rather than exclusive jurisdiction with respect to disputes relating to rights under insurance policies included in the Plan Trust Assets.

**13.4     Payment of Statutory Fees.**  All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the District Court at the Confirmation Hearing, shall be paid by the Debtors on or

before the Effective Date and thereafter by Reorganized Congoleum as due until the Reorganization Cases are closed, converted or dismissed. The Reorganized Debtors shall pay any quarterly fees payable pursuant to 28 U.S.C. § 1930(a)(6) to the United States Trustee after the Effective Date until such time as the case is converted, dismissed or closed pursuant to a final decree. The Reorganized Debtor shall file post-Effective Date reports, the form of which will be supplied by the United States Trustee. Nothing contained in this Plan shall relieve the Debtors or Reorganized Debtors from making payments to the United States Trustee when due as required by 28 U.S.C. § 1930(a)(6).

13.5 **Securities Law Matters**. It is an integral and essential element of the Plan that the issuance of the New Common Stock pursuant to the Plan shall be exempt from registration under the Securities Act, pursuant to Section 1145 of the Bankruptcy Code and from registration under state securities laws. Nothing in the Plan is intended to preclude the Securities and Exchange Commission from exercising its police and regulatory powers relating to the Debtors or any other entity.

13.6 **Plan Supplement**. The Plan Supplement will contain, among other things, without limitation, substantially final forms of a schedule identifying rejected contracts, the Exit Facility Commitment Letter or Term Sheet, the Registration Rights Agreement, the New ABI Agreement, the New Indenture, the Stockholders Agreement, the Amended and Restated Bylaws, the Amended and Restated Certificate and schedules identifying the initial officers and the initial board of directors of Reorganized Congoleum, and shall be filed with the District Court no later than ten (10) Business Days prior to the last date for filing objections to Confirmation of the Plan. Notwithstanding the foregoing, the Plan Proponents may amend the Plan Supplement and any attachments thereto, through and including the Confirmation Date.

13.7 **Allocation of Plan Distributions Between Principal and Interest**. To the extent that any Allowed Claim entitled to a Distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such Distribution shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest. Notwithstanding the foregoing, no Distribution shall be made on account of Post-Petition Interest.

13.8 **The Asbestos Claimants' Committee, the Futures Representative and the Bondholders' Committee**. As of the Effective Date, the Futures Representative shall (a) continue in existence and the rights, duties and responsibilities of the Futures Representative appointed by the District Court to serve after the Effective Date shall be as set forth in the Plan Trust Documents and (b) continue in existence for purposes of the Reorganization Cases with respect to any appeal or request for reconsideration or stay pending appeal of the Confirmation Order and have the right to prosecute and/or object to applications for Professional Fee Claims. The Representatives retained by the Futures Representative during the Reorganization Cases shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to, or arising from, the Reorganization Cases on the same date the Futures Representative ceases existence for purposes of the Reorganization Cases. On the Effective Date, the Asbestos Claimants' Committee and the Bondholders' Committee shall be dissolved except for the purposes of: (i) any appeal or request for reconsideration or stay pending appeal of the Confirmation Order; (ii) pending adversary proceedings, and (iii) prosecuting and/or objecting to Professional Fee claims. Representatives of the Asbestos Claimants' Committee and the Bondholders Committee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to, or arising from, the Reorganization Cases on the same date the Asbestos Claimants' Committee or the Bondholders' Committee, as applicable, cease to exist for purposes of the Reorganization Cases. Until the Effective Date, the Debtors shall pay the reasonable fees and expenses of the Asbestos Claimants' Committee, the Bondholders' Committee and the Futures Representative in accordance with any applicable fee order in the Reorganization Cases. On the Effective Date, the Trust Advisory Committee will assume those powers, duties, and responsibilities as provided in the Plan Trust Agreement.

13.9 **Revocation of Plan**. The Plan Proponents reserve the right to revoke and withdraw the Plan before the entry of the Confirmation Order. If the Plan Proponents revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then, with respect to all parties in interest, the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the

Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or such other Entity in any further proceedings involving the Debtors.

       **13.10**    **Modification of Plan**.  The Plan Proponents may propose amendments to or modifications of any of the Plan Documents under § 1127 of the Bankruptcy Code and as herein provided, to the extent applicable law permits.  Subject to the limitations contained herein, the Plan Proponents may modify the Plan in accordance with this paragraph, before or after Confirmation, without notice or hearing, or after such notice and hearing as the District Court deems appropriate, if the District Court finds that the modification does not materially and adversely affect the rights of any parties in interest which have not had notice and an opportunity to be heard with regard thereto.  After Confirmation, the Plan Proponents may remedy any defects or omissions or reconcile any inconsistencies in the Plan or the Confirmation Order or any other order entered for the purpose of implementing the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan; provided, however, that none of the Debtors, the Reorganized Debtors, ABI, the Futures Representative, the Plan Trustee, the Asbestos Claimants' Committee, and the Bondholders' Committee shall seek to terminate, reduce or limit the scope of the Asbestos Channeling Injunction or any other injunction contained in the Plan that inures to the benefit of any Settling Asbestos Insurance Company.  Anything in the Plan or in any Plan Document to the contrary notwithstanding, following Confirmation but prior to the Effective Date, the Plan Documents shall not be modified, supplemented, changed or amended in any material respect except with the written consent of the Bondholders' Committee, the Debtors and the Asbestos Claimants' Committee.  In the event of any modification on or before Confirmation, any votes to accept or reject the Plan shall be deemed to be votes to accept or reject the Plan as modified, unless the District Court finds that the modification materially and adversely affects the rights of parties in interest which have cast said votes.  The Plan Proponents reserve the right in accordance with § 1127 of the Bankruptcy Code to modify the Plan at any time before the Confirmation Date.  Subject to § 1127 of the Bankruptcy Code, if the District Court determines at or in connection with the Confirmation Hearing that any provision of the Plan is invalid or unenforceable, such provision, to the extent the Plan Proponents agree, shall be severable from the Plan and null and void, and, in such event, such determination shall in no way limit or affect the enforceability or operative effect of any or all other provisions of the Plan.

       **13.11**    **Modification of Payment Terms**.  Reorganized Congoleum shall have the right to modify the treatment of any Allowed Claim (other than a Plan Trust Asbestos Claim), as provided in section 1123(a)(4) of the Bankruptcy Code, at any time after the Effective Date upon the consent of the holder of such Allowed Claim.

       **13.12**    **Entire Agreement**.  The Plan Documents and the Plan Trust Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions and documents. No Entity shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein or as may hereafter be agreed to by the parties in writing.

       **13.13**    **Headings**.  Headings are utilized in the Plan are for convenience and reference only and shall not constitute a part of the Plan for any other purpose.

       **13.14**    **Professional Fee Claims**.  All final requests for payment of Professional Fee Claims must be filed and served on Reorganized Congoleum and their counsel no later than 60 days after the Effective Date, unless otherwise ordered by the District Court.  Objections to any application of such Bankruptcy Professionals or other Entities for compensation or reimbursement of expenses must be filed and served on the respective applicant and its counsel no later than the first Business Day following 30 days (or such other period as may be allowed by order of the District Court) after the date on which the applicable application for compensation or reimbursement was received.  Reorganized Congoleum may pay the reasonable charges that they incur on and after the Effective Date for Bankruptcy Professionals' fees, disbursements, expenses or related support services without application to the District Court.  Reorganized Congoleum shall pay the reasonable fees and expenses of the Bondholders' Committee, Asbestos Claimants' Committee and Futures Representative after the Effective Date in connection with the purposes set forth in Section 13.8 of this Plan, without application to the District Court.

**13.15    Recordable Order**.  Upon Confirmation of the Plan, the Confirmation Order shall be deemed to be in recordable form, and shall be accepted by any recording officer for filing and recording purposes without further or additional orders, certifications, or other supporting documents.

**13.16    Preparation of Estates' Returns and Resolution of Tax Claims**.  The Debtors or Reorganized Congoleum shall file all tax returns and other filings with governmental authorities and may file determination requests under section 505(b) of the Bankruptcy Code to resolve any Disputed Claim relating to taxes with a governmental authority.

**13.17    No Admission**.  Nothing contained in the Plan or in the Disclosure Statement shall be deemed as an admission by the Debtors, the Bondholders' Committee or the Asbestos Claimants' Committee with respect to any matter set forth herein or therein, including, without limitation, liability on any Claim or the propriety of any Claims classification.

**13.18    Consent to Jurisdiction**.  Upon default under the Plan or any Plan Documents, the Debtors, Reorganized Congoleum, the Affiliates, the Plan Trust, the Trust Advisory Committee, the Futures Representative, ABI and the Plan Trustee consent to the jurisdiction of the District Court, or any successor thereto, and agree that it shall be the preferred forum for all proceedings relating to such default.

**13.19    Setoffs**.  Subject to the limitations provided in section 553 of the Bankruptcy Code, the Debtors or the Plan Trust, as applicable, may, but shall not be required to, setoff against any Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever the Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such claim that the Debtors may have against such holder; *provided* that Reorganized Congoleum may not offset any obligations under the Plan Trust Common Stock against any claim that Reorganized Congoleum may have against the Plan Trust.

**13.20    Successors and Assigns**.  The rights, duties, and obligations of any Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Entity.

**13.21    Non-Debtor Waiver of Rights**.  Non-Debtor parties shall have the right to voluntarily waive any rights, benefits or protections that are afforded to them under the provisions of the Plan or any order issued in furtherance of the Plan, and such waiver shall supersede such rights, benefits or protections.  Any such waiver shall only be effective if, and then only to the extent that, such party expressly and specifically waives in writing one or more of such rights, benefits or protections.

**13.22    Further Authorizations**.  The Debtors, Reorganized Congoleum, the Bondholders' Committee, and the Plan Trust, if and to the extent necessary, may seek with notice to the others such orders, judgments, injunctions, and rulings that any of them deem necessary to further carry out the intentions and purposes of, and give full effect to the provisions of, the Plan.

**13.23    No Bar to Suits**.  Except as otherwise provided in Article XI of this Plan, neither this Plan nor Confirmation hereof shall operate to bar or estop the Debtors or Reorganized Congoleum from commencing any Cause of Action, including any Bankruptcy Cause of Action, or any other legal action against any holder of a Claim or any  individual, corporation, partnership, trust, venture, governmental unit, or any other form of legal entity, whether such Cause of Action, or any other legal action arose prior to or after the Confirmation Date and whether or not the existence of such Cause of Action, or any other legal action was disclosed in any disclosure statement filed by the Debtors in connection with this Plan or whether or not any payment was made or is made on account of any Claim.

**13.24    Conflicts**.  Unless otherwise provided in the Confirmation Order, in the event of a conflict between the terms or provisions of the Plan and any other Plan Document, the terms of the other Plan Document will control.

**13.25** **Notices.** All notices, requests, elections, or demands in connection with the Plan shall be in writing and shall be mailed by registered or certified mail, return receipt requested, to:

**If to the Debtors:**

Congoleum Corporation
3500 Quakerbridge Road
Hamilton, NJ 08619
Attn:    Howard N. Feist
           CFO

           and

Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, NY 10033-4039
Attn:    Richard L. Epling
           Robin L. Spear
           Kerry A. Brennan

**If to the Futures Representative:**

R. Scott Williams, Esquire
Haskell Slaughter Young & Rediker, L.L.C.
2001 Park Place North, Suite 1400
Birmingham, AL  35203

           and

Orrick, Herrington & Sutcliffe LLP
1152 15th Street, N.W.
Washington, DC  20005
Attn:    Roger Frankel
           Richard Wyron
           Jonathan Guy

**If to the Asbestos Claimants' Committee:**

Caplin & Drysdale, Chtd.
One Thomas Circle, N.W.
Washington, D.C. 20005
Attn:    Peter Van N. Lockwood
           Ronald E. Reinsel

**If to the Bondholders' Committee:**

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attn:     Michael S. Stamer

Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington D.C. 20036
Attn:     James R. Savin

47

**13.26** **Duty to Cooperate**.  Notwithstanding anything herein to the contrary, nothing in the Plan, the Plan Documents or the Confirmation Order shall relieve (by way of injunction or otherwise) any of the Debtors or Reorganized Congoleum or any other Entity which is or claims to be an insured or entitled to indemnity under an Asbestos Insurance Policy from any duty to cooperate that may be required by any such insurance policy under applicable law with respect to the defense and/or settlement of any Claim for which coverage is sought under such Asbestos Insurance Policy.  To the extent that any entity incurs costs in satisfying such duty to cooperate with respect to Asbestos Personal Injury Claims after the Effective Date, the Plan Trust shall reimburse such entity for all such reasonable out-of-pocket expenses.

**13.27** **Governing Law**.  Except to the extent that federal law (including, but not limited to, the Bankruptcy Code and the Bankruptcy Rules) is applicable or where the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof that would require application of any other law.

Dated:  October  22, 2009

CONGOLEUM CORPORATION

By: _____
Name:    Howard N. Feist III
Title:     Chief Financial Officer and Secretary

CONGOLEUM SALES, INC.

By: _____
Name:    Howard N. Feist III
Title:     Vice President

CONGOLEUM FISCAL, INC.

By: _____
Name:    Howard N. Feist III
Title:     Vice President

ASBESTOS CLAIMANTS' COMMITTEE

By: _____
Name:   Ronald E. Reinsel
Title:    Counsel for the Asbestos Claimants' Committee

BONDHOLDERS' COMMITTEE

By: _____

Name: Paul Kunz

Title: Authorized representative of
Deutsche Asset Management, not in its individual or
principal capacity, but solely in its capacity as Chair
of the Official Committee of Bondholders

# APPENDIX EXHIBIT 10

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| IN RE: | ) | Case No. 09-04371 (JAP) |
|  | ) |  |
| **CONGOLEUM CORPORATION,** | ) | **Chapter 11** |
| **CONGOLEUM SALES, INC., and** | ) | **Case No. 03-51524** |
| **CONGOLEUM FISCAL, INC.,** | ) |  |
| Debtors. | ) | **Jointly Administered** |
|  | ) |  |

## THIRD AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF THE DEBTORS, THE OFFICIAL ASBESTOS CLAIMANTS' COMMITTEE, THE OFFICIAL COMMITTEE OF BONDHOLDERS FOR CONGOLEUM CORPORATION, ET AL. AND THE FUTURES REPRESENTATIVE DATED AS OF FEBRUARY 12, 2010

**THIS PLAN PROVIDES, AMONG OTHER THINGS, FOR THE ISSUANCE OF INJUNCTIONS UNDER SECTION 524(g) OF THE BANKRUPTCY CODE THAT RESULT IN THE CHANNELING OF ALL ASBESTOS-RELATED LIABILITIES OF CONGOLEUM CORPORATION AND THE PROTECTED PARTIES SET FORTH HEREIN INTO A TRUST AS MORE FULLY DESCRIBED HEREIN.**

PILLSBURY WINTHROP SHAW PITTMAN LLP
1540 Broadway
New York, NY 10033-4039
Richard L. Epling
Robin L. Spear
Kerry A. Brennan

**Attorneys for the Debtors**

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Michael S. Stamer

AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue, N.W.
Washington D.C. 20036
James R. Savin
David M. Dunn
Joanna F. Newdeck

**Attorneys for the Official Committee of Bondholders**

CAPLIN & DRYSDALE, CHTD.
One Thomas Circle, N.W.
Washington, D.C. 20005
Peter Van N. Lockwood
Ronald Reinsel

**Attorneys for the Asbestos Claimants' Committee**

ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, D.C. 20005
Roger Frankel
Richard H. Wyron
Jonathan Guy
Debra L. Felder

**Attorneys for R. Scott Williams, as Futures Representative**

OKIN, HOLLANDER & DELUCA, LLP
PARKER PLAZA
400 Kelby Street
Fort Lee, NJ 07024
Paul S. Hollander
James J. DeLuca

TEICH GROH
691 State Highway 33
Trenton, NJ 08619
Michael A. Zindler

GOLDSTEIN ISAACSON, PC
100 Morris Avenue, 3rd Floor
Springfield, NJ 07081
Nancy Isaacson

FORMAN HOLT ELIADES & RAVIN LLC
80 Route 4 East, Suite 290
Paramus, NJ 07652
Stephen Ravin

# TABLE OF CONTENTS

Page

ARTICLE I  DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME...................... 1

   1.1    Scope of Definitions.................................................................................................... 1

   1.2    Definitions.................................................................................................................... 1

   1.3    Rules of Interpretation:  Application of Definitions, Rules of Construction, and
         Computation of Time ................................................................................................. 16

   1.4    Exhibits and Schedules .............................................................................................. 17

ARTICLE II  CLASSIFICATION OF CLAIMS AND INTERESTS ................................................. 17

   2.1    Generally..................................................................................................................... 17

   2.2    Unclassified Claims .................................................................................................... 17

   2.3    Classes ........................................................................................................................ 17

ARTICLE III  TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS ................... 18

   3.1    Summary..................................................................................................................... 18

   3.2    Administrative Claims ............................................................................................... 18

   3.3    Priority Tax Claims .................................................................................................... 18

   3.4    Substantial Contribution Claims ................................................................................ 18

ARTICLE IV  TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ................................... 18

   4.1    Claims and Interests ................................................................................................... 18

   4.2    Reservation of Rights Regarding Claims. .................................................................. 20

ARTICLE V  IMPLEMENTATION OF THE PLAN ................................................................. 21

   5.1    The Plan Trust ............................................................................................................ 21

   5.2    Certain Mergers ......................................................................................................... 23

   5.3    The Amended and Restated Certificate and the Amended and Restated Bylaws ....... 23

   5.4    Directors and Officers of Reorganized Congoleum ................................................... 23

   5.5    Cancellation of Existing Securities and Agreements of the Debtors/Discharge of the
         Indenture Trustee ....................................................................................................... 24

   5.6    Exit Facility ............................................................................................................... 24

   5.7    Issuance of New Securities and Debt Instruments ..................................................... 24

   5.8    Registration Rights Agreement .................................................................................. 24

   5.9    Stockholders Agreement ............................................................................................ 24

   5.10   Effectuating Documents/Further Transactions .......................................................... 25

   5.11   Exemption from Certain Transfer Taxes and Recording Fees .................................... 25

   5.12   Section 346 Injunction .............................................................................................. 25

   5.13   Corporate Action ....................................................................................................... 25

   5.14   Litigation Settlement Agreement. .............................................................................. 25

   5.15   Review of Claimants' Counsel Expenses ................................................................... 27

| 5.16 | Non-Asbestos Reserve Fund | 27 |
| 5.17 | Intercompany Settlement | 27 |
| 5.18 | Deemed Consolidation of Debtors For Plan Purposes Only | 29 |

ARTICLE VI  PROVISIONS GOVERNING DISTRIBUTIONS WITH RESPECT TO CLAIMS  OTHER THAN PLAN TRUST ASBESTOS CLAIMS ... 29

| 6.1 | Plan Distributions | 29 |
| 6.2 | Distributions of Cash | 29 |
| 6.3 | No Interest on Claims | 29 |
| 6.4 | Delivery of Distributions | 29 |
| 6.5 | Distributions to Holders as of the Record Date | 30 |
| 6.6 | Fractional Securities; Fractional Dollars | 30 |
| 6.7 | Withholding of Taxes | 30 |
| 6.8 | Unclaimed Property. | 30 |

ARTICLE VII  RESOLUTION OF DISPUTED CLAIMS ... 30

| 7.1 | Disallowance of Improperly Filed Claims | 30 |
| 7.2 | Prosecution of Objections to Claims | 30 |
| 7.3 | No Distributions Pending Allowance | 31 |
| 7.4 | Distributions After Allowance | 31 |

ARTICLE VIII  TREATMENT OF EXECUTORY CONTRACTS, UNEXPIRED LEASES AND SETTLEMENTS ... 31

| 8.1 | Assumption of Unexpired Leases and Executory Contracts | 31 |
| 8.2 | Damages Upon Rejection | 32 |
| 8.3 | Insurance Agreements | 32 |
| 8.4 | Compensation and Benefits Programs | 32 |
| 8.5 | Retiree Benefits | 32 |
| 8.6 | Indemnification of Directors, Officers and Employees | 33 |

ARTICLE IX  ACCEPTANCE OR REJECTION OF THE PLAN ... 33

| 9.1 | Classes Entitled to Vote | 33 |
| 9.2 | Acceptance by Impaired Classes of Claims | 33 |
| 9.3 | Acceptance by Impaired Class of Interests | 33 |
| 9.4 | Acceptance Pursuant to Section 524(g) of the Bankruptcy Code | 33 |
| 9.5 | Presumed Acceptance of Plan | 33 |
| 9.6 | Reservation of Rights | 33 |

ARTICLE X  CONDITIONS TO CONFIRMATION AND EFFECTIVENESS ... 34

| 10.1 | Conditions to Confirmation | 34 |
| 10.2 | Conditions to Effectiveness | 35 |
| 10.3 | Waiver of Conditions | 37 |

ARTICLE XI  INJUNCTIONS, RELEASES AND DISCHARGE ........................................................ 37

    11.1    Discharge ........................................................................................................ 37

    11.2    Exculpation ..................................................................................................... 37

    11.3    Releases by Holders of Plan Trust Asbestos Claims ...................................... 37

    11.4    Discharge Injunction ...................................................................................... 38

    11.5    Third Party Releases ....................................................................................... 38

    11.6    Asbestos Channeling Injunction .................................................................... 38

    11.7    Reservation of Rights ..................................................................................... 39

    11.8    Rights Against Non-Debtors under Securities Laws ....................................... 39

    11.9    Rights Against Debtors Under Environmental Laws ....................................... 39

    11.10   Disallowed Claims and Disallowed Interests ................................................. 39

    11.11   Anti-Suit Injunction ....................................................................................... 39

    11.12   Insurance Neutrality ....................................................................................... 40

    11.13   No Liability for Solicitation or Participation .................................................. 40

ARTICLE XII  MATTERS INCIDENT TO PLAN CONFIRMATION ........................................ 41

    12.1    Term of Certain Injunctions and Automatic Stay ........................................... 41

    12.2    No Successor Liability .................................................................................... 41

    12.3    Revesting ........................................................................................................ 41

    12.4    Vesting and Enforcement of Causes of Action ............................................... 41

    12.5    GHR/Kenesis Actions ..................................................................................... 42

ARTICLE XIII  MISCELLANEOUS .......................................................................................... 42

    13.1    Jurisdiction ..................................................................................................... 42

    13.2    General Retention ........................................................................................... 42

    13.3    Specific Purposes ........................................................................................... 42

    13.4    Payment of Statutory Fees .............................................................................. 44

    13.5    Securities Law Matters ................................................................................... 44

    13.6    Plan Supplement ............................................................................................. 44

    13.7    Allocation of Plan Distributions Between Principal and Interest ................... 44

    13.8    The Asbestos Claimants' Committee, the Futures Representative and the Bondholders' Committee ...................................................................................................... 44

    13.9    Revocation of Plan ......................................................................................... 45

    13.10   Modification of Plan ....................................................................................... 45

    13.11   Modification of Payment Terms ...................................................................... 45

    13.12   Entire Agreement ........................................................................................... 45

    13.13   Headings ......................................................................................................... 45

    13.14   Professional Fee Claims ................................................................................. 45

    13.15   Recordable Order ........................................................................................... 46

13.16    Preparation of Estates' Returns and Resolution of Tax Claims ............................................ 46

13.17    No Admission ............................................................................................................ 46

13.18    Consent to Jurisdiction ............................................................................................ 46

13.19    Setoffs ...................................................................................................................... 46

13.20    Successors and Assigns............................................................................................ 46

13.21    Non-Debtor Waiver of Rights ................................................................................ 46

13.22    Further Authorizations ............................................................................................ 46

13.23    No Bar to Suits ........................................................................................................ 46

13.24    Conflicts .................................................................................................................. 47

13.25    Notices .................................................................................................................... 47

13.26    Duty to Cooperate .................................................................................................. 48

13.27    Governing Law ........................................................................................................ 48

## INTRODUCTION

The Plan Proponents hereby propose this plan of reorganization pursuant to the provisions of Chapter 11 of the United States Bankruptcy Code. Capitalized terms used herein are defined in Article I below.

Reference is made to the Disclosure Statement distributed contemporaneously herewith for a discussion of the history, businesses, properties and results of operations of the Debtors and the risks associated with the Plan. All holders of Claims and Interests entitled to vote on the Plan are encouraged to read the Plan and Disclosure Statement in their entirety before voting to accept or reject the Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and Sections 13.6 and 13.10 of the Plan, the Plan Proponents reserve the right to alter, amend, modify, revoke or withdraw the Plan prior to its substantial consummation.

## ARTICLE I

## DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

### 1.1    Scope of Definitions

All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in Section 1.2 of the Plan. Any term used in the Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

### 1.2    Definitions

**"ABI"** means American Biltrite Inc., a Delaware corporation.

**"ABI Asbestos Claim"** means any Asbestos Claim that may be asserted by ABI now or in the future other than an ABI Asbestos Indemnity Claim.

**"ABI Asbestos Indemnity Claim"** means any ABI Asbestos Personal Injury Indemnity Claim or ABI Asbestos Property Damage Indemnity Claim.

**"ABI Asbestos Personal Injury Indemnity Claim"** means any asbestos personal injury indemnification Claim or Demand that may be asserted by ABI against Congoleum at any time under the Joint Venture Agreement.

**"ABI Asbestos Property Damage Indemnity Claim"** means any asbestos related property damage indemnification Claim or Demand that may be asserted by ABI against Congoleum at any time under the Joint Venture Agreement.

**"ABI Canada License Agreement"** means the License Agreement, effective January 1, 2006, between Congoleum and American Biltrite (Canada) Ltd., as amended on the Effective Date pursuant to the Intercompany Settlement.

**"ABI Claim"** means any Claim or Demand at any time that may be asserted by ABI at any time against any Debtor, including without limitation ABI Asbestos Claims, ABI Rejection Damages Claims, and ABI Asbestos Indemnity Claims.

**"ABI Parties"** means any current or former officers, directors and employees of ABI, in their capacity as such.

**"ABI Rejection Damages Claims"** means any and all rejection damages claims that might arise upon the deemed rejection of the Intercompany Agreements provided for in Section 5.15 of the Plan.

"**Administrative Claim**" means any Claim for the payment of an Administrative Expense. The term "Administrative Claim" shall not include Asbestos Claims.

"**Administrative Expense**" means (a) any cost or expense of administration of the Reorganization Cases under section 503(b) of the Bankruptcy Code including, but not limited to, (1) any actual and necessary post-petition cost or expense of preserving the Estates or operating the Debtors' assets and businesses, (2) any payment to be made under the Plan to cure a default on an assumed executory contract or unexpired lease, (3) any post-petition cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of business, (4) the outstanding fees and expenses of the Indenture Trustee incurred in accordance with Section 6.6 of the Indenture relating to the Senior Notes, including the reasonable fees and expenses of counsel to the Indenture Trustee, and (5) compensation or reimbursement of expenses of professionals to the extent allowed by the Bankruptcy Court or the District Court under section 327, 328, 330(a), 331, 503(b) or 1103 of the Bankruptcy Code, including, without limitation, the Debtors and their professionals, the Futures Representative and its professionals, the Bondholders' Committee and its professionals, and the Asbestos Claimants' Committee and its professionals and (b) any fee or charge assessed against the Estates under 28 U.S.C. § 1930.

"**Affiliate**" shall have the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

"**Allowed**" means:

(a)    With respect to an Administrative Claim:

(i)    such amount that represents a Claim of a professional person employed under sections 327, 328, 524(g)(4)(B)(i) or 1103 of the Bankruptcy Code who is required to apply to the Bankruptcy Court or the District Court for the allowance of compensation and reimbursement of expenses pursuant to section 330 of the Bankruptcy Code, to the extent such Claim is allowed by a Final Order of the Bankruptcy Court or the District Court under sections 330 or 331 of the Bankruptcy Code;

(ii)    such amount that represents the reasonable fees and expenses of the Indenture Trustee and its counsel that were otherwise incurred in accordance with the terms of the Indenture and are outstanding on the Effective Date; and

(iii)    other than with respect to a Claim described in clauses (a)(i) and (a)(ii) of this definition, such amount that represents an actual or necessary expense of preserving the Estates or operating the business of any of the Debtors, any such Claim to the extent that it constitutes an Allowed Administrative Claim, or if such Claim is a Disputed Claim, any such Claim to the extent it is allowed in whole or in part by a Final Order of the Bankruptcy Court or the District Court and only to the extent that such allowed portion is deemed, pursuant to a Final Order of the Bankruptcy Court or the District Court, to constitute a cost or expense of administration under section 503 or 1114 of the Bankruptcy Code;

(b)    With respect to an Asbestos Property Damage Claim that was filed prior to the expiration of the Asbestos Property Damage Claim Bar Date, such amount as is liquidated and allowed by the Bankruptcy Court or the District Court; and

(c)    With respect to any Claim other than a Plan Trust Asbestos Claim, an Asbestos Property Damage Claim or an Administrative Claim, such Claim or any portion thereof (i) that has been allowed in whole or in part by a Final Order of the Bankruptcy Court or the District Court; (ii) that has been expressly allowed in the Plan; (iii) as to which, on or before the Effective Date, (A) no Proof of Claim has been filed with the Bankruptcy Court or the District Court and (B) the Claim is listed in the Schedules (as they may be amended) and not listed as disputed, contingent, or unliquidated; or (iv) for which a Proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court or District Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court or the District Court, or other applicable bankruptcy law, and as to which either (A) no objection to its allowance has been filed within the periods of limitation fixed by the Plan, the Bankruptcy Code, or any order of the Bankruptcy Court or District Court, or (B) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order.

"**Allowed Amount**" means the sum at which a Claim is Allowed.

"**Amended and Restated Bylaws**" means the Amended and Restated Bylaws of Reorganized Congoleum to become effective on the Effective Date, which shall be substantially in the form attached hereto as Exhibit "J". The Amended and Restated Bylaws will be filed as part of the Plan Supplement.

"**Amended and Restated Certificate**" means the Amended and Restated Certificate of Incorporation of Reorganized Congoleum to become effective on the Effective Date, which shall be substantially in the form attached hereto as Exhibit "K". The Amended and Restated Certificate will be filed as part of the Plan Supplement.

"**Anti-Suit Injunction**" means the injunction described in Section 11.11 of the Plan.

"**Asbestos Channeling Injunction**" means the injunction described in Section 11.6 of the Plan.

"**Asbestos Claimant**" means the holder of an Asbestos Personal Injury Claim.

"**Asbestos Claimants' Committee**" means the official committee of the representatives of holders of present unsecured Asbestos Personal Injury Claims, solely in its capacity as such, which committee as of the date hereof consists of the following representatives of the holders of present unsecured Asbestos Personal Injury Claims: Perry Weitz, Esquire, Joseph Rice, Esquire, Steven Kazan, Esquire, Russell Budd, Esquire and Robert Taylor, II, Esquire.

"**Asbestos Claims**" means, collectively, Plan Trust Asbestos Claims and ABI Asbestos Claims.

"**Asbestos In-Place Insurance Coverage**" means any insurance coverage, not reduced to Cash settlement proceeds, available for the payment or reimbursement of liability, indemnity or defense costs arising from or related to Asbestos Claims or Demands or Plan Trust Expenses under any Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement.

"**Asbestos Insurance Action**" means any claim, cause of action, or right of any Debtor against any Asbestos Insurance Company, including without limitation, the Coverage Litigation, arising from or related to: (a) any such Asbestos Insurance Company's failure to provide or pay under Asbestos In-Place Insurance Coverage, (b) the refusal of any Asbestos Insurance Company to compromise and settle any Asbestos Claim under or pursuant to any Asbestos Insurance Policy, or (c) the interpretation or enforcement of the terms of any Asbestos Insurance Policy with respect to any Asbestos Claim.

"**Asbestos Insurance Action Recoveries**" means (a) Cash derived from and paid pursuant to Asbestos Insurance Settlement Agreements, (b) the right to receive proceeds of Asbestos In-Place Insurance Coverage, and (c) the right to receive the proceeds or benefits of any Asbestos Insurance Action.

"**Asbestos Insurance Assignment**" means the transfer, grant and assignment of the Asbestos Insurance Rights to the Plan Trust described in Article V of the Plan, which will be effectuated pursuant to the Insurance Assignment Agreement.

"**Asbestos Insurance Company**" means any insurance company, insurance broker, guaranty association, liquidator, rehabilitator or any other Entity with demonstrated or potential liability to any of the Debtors, the Reorganized Debtors, or the Plan Trust under or related to an Asbestos Insurance Policy.

"**Asbestos Insurance Policy**" means any insurance policy issued to or for the benefit of any of the Debtors in effect at any time on or before the Effective Date that may afford any of the Debtors indemnity or insurance coverage, upon which any claim has been or may be made with respect to any Asbestos Claim.

"**Asbestos Insurance Rights**" means any and all rights, titles, privileges, interests, claims, demands or entitlements to any proceeds, payments, initial or supplemental dividends, scheme payments, supplemental scheme payments, causes of action and choses in action related to Asbestos In-Place Insurance Coverage, whether now

3

existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, including but not limited to:

(i) any and all rights to pursue or receive payments with respect to Asbestos Claims under any Asbestos In-Place Insurance Coverage, whether for liability, defense or otherwise;

(ii) any and all rights to pursue or receive payments related to any Asbestos In-Place Insurance Coverage that was entered into by any domestic or foreign insolvent insurance company, whether in receivership, liquidation, rehabilitation, run-off, scheme of arrangement or any other form of proceeding;

(iii) any and all rights to pursue or receive payments related to any Asbestos In-Place Insurance Coverage from any state insurance guaranty association in connection with any state insurance guaranty association statute; *provided, however,* that Asbestos Insurance Rights shall not include any rights or obligations under any insurance policy or settlement agreement to which the Debtors are a party insofar as such insurance policy or settlement agreement relates to Workers' Compensation Claims; and

(iv) any and all rights to pursue any Causes of Action against, or to receive payments related to any Asbestos In-Place Insurance Coverage from, any Asbestos Insurance Company.

"**Asbestos Insurance Settlement Agreement**" means any settlement agreement between or among any of the Debtors and a Settling Asbestos Insurance Company relating to any Asbestos Claim or Asbestos Insurance Action.

"**Asbestos Insurer Coverage Defenses**" means all defenses at law or in equity that an Asbestos Insurance Company may have under any Asbestos Insurance Policy or applicable law to provide Asbestos In-Place Insurance Coverage to or for Asbestos Personal Injury Claims or Plan Trust Expenses that have been channeled to or assumed by or incurred by the Plan Trust pursuant to the Plan; *provided, however,* that in the event there is a Final Order determining that the Bankruptcy Code authorizes the Asbestos Insurance Assignment by preempting any terms of any Asbestos Insurance Policy or provisions of applicable non-bankruptcy law that otherwise might prohibit the Asbestos Insurance Assignment, "Asbestos Insurer Coverage Defenses" shall not include any defense that the Asbestos Insurance Assignment is prohibited by any Asbestos Insurance Policy or applicable non-bankruptcy law.

"**Asbestos Personal Injury Claim**" means (a) any claim, demand or lawsuit (including, but not limited to, any Claim or Demand), whenever and wherever arising or asserted against any of the Debtors or their respective present or former officers, directors or employees in their capacities as such and (b) any debt, obligation or liability (whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, bonded, secured or unsecured), whenever and wherever arising or asserted, of the Debtors or their respective present or former officers, directors or employees in their capacities as such (including, but not limited to, all thereof in the nature of or sounding in tort, contract, warranty, or any other theory of law, equity or admiralty); in either case (a) or (b) for, based on or arising by reason of, directly or indirectly, physical, emotional, bodily or other personal injury, sickness, disease, death or damages based on the foregoing (including, but not limited to, any claim or demand for compensatory damages, loss of consortium, proximate, consequential, general, special or punitive damages, reimbursement, indemnity, warranty, contribution or subrogation) whether or not diagnosable or manifested before the Confirmation of the Plan or the close of the Reorganization Cases, (x) caused or allegedly caused, in whole or part, directly or indirectly: (i) by exposure to asbestos or asbestos-containing products manufactured, supplied, distributed, handled, fabricated, stored, sold, installed, or removed by any Debtor and/or its predecessors; or (ii) by services, actions, or operations provided, completed or taken by any Debtor and/or its predecessors in connection with asbestos or asbestos-containing products or (y) caused or allegedly caused by asbestos for which any Debtor or its predecessors, are alleged to be liable under any applicable law including, but not limited to, Indirect Asbestos Claims, *provided* that Asbestos Personal Injury Claim shall not include Workers' Compensation Claims, ABI Asbestos Claims or Asbestos Property Damage Claims.

"**Asbestos Personal Injury Claim Sub-Account**" means that portion of the Plan Trust Assets to be made available for payment of Plan Trust Asbestos Claims (and related Plan Trust Expenses) other than Allowed Asbestos Property Damage Claims.

"**Asbestos Property Damage Claim**" means any Claim or remedy or liability for damage to property (whether or not such Claim, remedy or liability is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty or otherwise), for which the Debtors are alleged to be or may be responsible by judgment, order or settlement and that (1) arises from or relates to any building or other real property in which asbestos was or is, or asbestos-containing products were or are, alleged to have been installed prior to the Petition Date; and (2) seeks monetary or other relief for injury to, destruction, loss of use, diminution in value, and/or asbestos-related repair or maintenance of such property or for the cost of inspection, encapsulation, decontamination, containment, removal, or other abatement of the asbestos or asbestos-containing products installed or allegedly installed in such property. Asbestos Property Damage Claim also includes any such Claims, remedies or liabilities as described immediately above that seek (a) compensatory damages (such as proximate, consequential, general and special damages) and punitive damages; and/or (b) reimbursement, indemnification, subrogation and/or contribution, including, without limitation, any Asbestos Property Damage Contribution Claim. Notwithstanding the foregoing, Asbestos Property Damage Claim does not include any ABI Asbestos Claim or Asbestos Personal Injury Claim.

"**Asbestos Property Damage Claim Bar Date**" means May 3, 2004, the date designated by the Bankruptcy Court as the last date for filing Proofs of Claim on account of an Asbestos Property Damage Claim against the Debtors.

"**Asbestos Property Damage Claim Sub-Account**" means that portion of the Plan Trust Assets, consisting solely of the Asbestos Property Damage Insurance Rights, to be made available for payment of Allowed Asbestos Property Damage Claims.

"**Asbestos Property Damage Contribution Claim**" means any Claim or remedy or liability for damage to property asserted against the Debtors (whether or not such Claim, remedy or liability is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty or otherwise) that is: (1) held by any Entity or assignee or transferee thereof which has been, is, or may be a defendant in an action alleging damage to property that (i) arises from or relates to any building or other real property in which asbestos was or is, or asbestos-containing products were or are, alleged to have been installed prior to the Petition Date, and (ii) seeks monetary or other relief for injury to, destruction, loss of use, diminution in value, and/or asbestos-related repair or maintenance of such property or for the cost of inspection, encapsulation, decontamination, containment, removal, or other abatement of the asbestos or asbestos-containing products installed or allegedly installed in such property; and (2) on account of alleged liability by the Debtors for reimbursement, indemnification, subrogation, or contribution of any portion of any damages such Entity (or assignee or transferee thereof) has paid or may pay to the plaintiff in such action. Notwithstanding anything herein to the contrary, Asbestos Property Damage Contribution Claim does not include any ABI Asbestos Claims or Asbestos Personal Injury Claims.

"**Asbestos Property Damage Insurance Rights**" means all rights arising under all insurance policies, issued to or for the benefit of any of the Debtors that may afford any of the Debtors indemnity or insurance coverage solely for Asbestos Property Damage Claims, which policies are set forth on Exhibit "A" attached hereto. The foregoing includes, but is not limited to, rights under insurance policies, rights under settlement agreements made with respect to such insurance policies, rights against the estates of insolvent insurers that issued such policies or entered into such settlements, and rights against state insurance guaranty associations arising out of any such insurance policies issued by insolvent insurers.

"**Avoidance Actions**" means, collectively, the Omnibus Avoidance Action and the Sealed Avoidance Action.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Reorganization Cases.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of New Jersey.

**"Bankruptcy Professional"** means any Person (a) employed pursuant to an order of the Bankruptcy Court or District Court, as applicable, in accordance with section 327 or 1103 of the Bankruptcy Code and to be compensated for services pursuant to sections 327, 328, 329, 330 and/or 331 of the Bankruptcy Code, or (b) who applies to the District Court for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code.

**"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Reorganization Cases.

**"Bar Dates"** means the date(s), if any, designated by the Bankruptcy Court or the District Court as the last date(s) for filing Proofs of Claim against the Debtors.

**"Bondholders' Committee"** means the official committee bondholders appointed in these Reorganization Cases on January 27, 2006, as reconstituted from time to time, solely in its capacity as such.

**"Business Day"** means any day other than a Saturday, Sunday or a legal holiday (as such term is defined in Bankruptcy Rule 9006(a)) on which commercial banks are open for business in New York, New York.

**"Cash"** means lawful currency of the United States of America and its equivalents.

**"Causes of Action"** means, without limitation, any and all rights, remedies, claims, causes of action, liabilities, obligations, suits, debts, sums of money, damages, judgments, and demands whatsoever, whether known or unknown, in law, equity, or otherwise which may be brought by or on behalf of the Debtors and/or the Estates, arising under any provision of the Bankruptcy Code or other applicable law, including the GHR/Kenesis Actions.

**"Century Entities"** shall have the meaning ascribed to such term in the Settlement and Buyback Agreement.

**"Claim"** means a claim against the Debtors (or any of them), whether or not asserted, as defined in section 101(5) of the Bankruptcy Code, and further shall include, but is not limited to, Asbestos Claims.

**"Claimant Agreement"** means that certain Settlement Agreement Between Congoleum and Various Asbestos Claimants, as amended by the first amendment thereto, entered into by Congoleum and certain Asbestos Claimants, through their counsel, prior to the Petition Date, as amended from time to time in accordance with its terms.

**"Claimants' Counsel"** means Joseph F. Rice, Esquire and Perry Weitz, Esquire, collectively, in their capacity under the Claimant Agreement as the representatives of certain holders of Asbestos Personal Injury Claims.

**"Class"** means a category of Claims or Interests, as classified in Article II of the Plan pursuant to section 1122(a)(1) of the Bankruptcy Code.

**"Collateral Trust"** means the Collateral Trust established pursuant to the Collateral Trust Agreement, the Security Agreement and the Claimant Agreement.

**"Collateral Trust Agreement"** means that certain irrevocable trust agreement entered into by Congoleum and Arthur J. Pergament and Wilmington Trust Company, as amended by the first amendment thereto, and any further modifications or amendments thereto.

**"Collateral Trustee"** means the Trustee as defined and named in the Collateral Trust Agreement.

**"Confirmation"** means the approval of the Plan by the District Court pursuant to section 1129 and other applicable sections of the Bankruptcy Code.

**"Confirmation Date"** means the date on which the Confirmation Order is entered on the docket of the District Court.

**"Confirmation Hearing"** means the hearing(s) which will be held before the District Court, as appropriate, at which the Plan Proponents will seek Confirmation of the Plan.

**"Confirmation Order"** means the order of the District Court confirming the Plan pursuant to section 1129 and other applicable sections of the Bankruptcy Code.

**"Congoleum"** means Congoleum Corporation, a Delaware corporation.

**"Congoleum Interests"** means, collectively, all equity interests in Congoleum outstanding immediately prior to the Effective Date including, without limitation, (a) shares of Class A common stock, par value $0.01 per share, and Class B Common Stock, par value $0.01 per share, of Congoleum and (b) any options, warrants, conversion rights, rights of first refusal, or other rights, contractual or otherwise, to acquire or receive any stock or other equity ownership interests in Congoleum.

**"Coverage Action"** means that certain civil action pending in the Superior Court of New Jersey, docket number MID-L-8908-01, as such action exists after giving effect to the Order entered therein on October 30, 2003 that dismissed, without prejudice, certain claims including Environmental Claims, as referenced in such Order.

**"Coverage Litigation"** means (i) the Coverage Action; and (ii) any other action which seeks to determine the extent of insurance coverage for defense of and liability for Asbestos Claims and related issues.

**"Debtor"** means each of Congoleum, Congoleum Sales, Inc. and Congoleum Fiscal, Inc., as debtors-in-possession in the Reorganization Cases, and **"Debtors"** means all of them collectively, and when the context so requires, as post-Confirmation entities reorganized hereunder.

**"Demand"** means a demand for payment against any of the Debtors within the meaning of section 524(g)(5) of the Bankruptcy Code, but excludes any demand in respect of an Asbestos Property Damage Claim or an ABI Asbestos Claim.

**"Direct Action"** means any cause of action or right to bring a cause of action possessed by an Asbestos Claimant against an Asbestos Insurance Company on account of such Asbestos Claimant's Plan Trust Asbestos Claim, whether arising by contract or under the laws of any jurisdiction.

**"Disallowed"** means a Claim or Interest, as the case may be, that is disallowed by the Plan, a Final Order of the District Court, or that is disallowed pursuant to the TDP.

**"Disbursing Agent"** means Reorganized Congoleum or any Person selected by Reorganized Congoleum to hold and distribute the consideration to be distributed to the holders of Allowed Claims (other than Plan Trust Asbestos Claims and Senior Note Claims) under the Plan.

**"Discharge Injunction"** means the injunction described in Section 11.4 of the Plan.

**"Disclosure Statement"** means the Disclosure Statement with respect to the Plan, including all exhibits, appendices, schedules and annexes attached thereto, as submitted by the Plan Proponents pursuant to section 1125 of the Bankruptcy Code, as such Disclosure Statement may be further amended, supplemented or modified from time to time.

**"Disclosure Statement Approval Order"** means that certain order of the District Court entered on _____, 2010, approving the adequacy of the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, as such order may be amended, modified or supplemented thereafter.

"**Disputed Claim**" means any Claim that has not been allowed by a Final Order as to which (a) a Proof of Claim has been filed with the Bankruptcy Court or the District Court, as applicable, and (b) an objection has been or may be timely filed or deemed filed under applicable law and any such objection has not been (i) withdrawn, (ii) overruled or denied by a Final Order or (iii) granted by a Final Order. For purposes of the Plan, a Claim that has not been Allowed by a Final Order shall be considered a Disputed Claim, whether or not an objection has been or may be timely filed, if (A) the amount of the Claim specified in the Proof of Claim exceeds the amount of any corresponding Claim listed in the Schedules, (B) the classification of the Claim specified in the Proof of Claim differs from the classification of any corresponding Claim listed in the Schedules, (C) any corresponding Claim has been listed in the Schedules as disputed, contingent or unliquidated, (D) no corresponding Claim has been listed in the Schedules or (E) such Claim is reflected as unliquidated or contingent in the Proof of Claim filed in respect thereof.

"**Distributions**" means any distribution by the Debtors or Reorganized Congoleum to a Record Holder of an Allowed Claim or Interest.

"**Distribution Date**" means, when used with respect to an Allowed Claim (other than a Plan Trust Asbestos Claim), the date which is as soon as reasonably practicable after the latest of: (a) the Effective Date; (b) the first Business Day of the next calendar month following the date on which the Claim becomes an Allowed Claim; or (c) the first Business Day of the next calendar month upon which the Claim matures and becomes due and payable according to its own terms, unless the Claim becomes Allowed within fifteen (15) Business Days before the first Business Day of the next calendar quarter, in which case the Distribution Date shall be the first Business Day of the next succeeding calendar quarter.

"**District Court**" means the United States District Court for the District of New Jersey, which withdrew the reference from the Bankruptcy Court pursuant to 28 U.S.C. § 157(d) as of August 17, 2009 and assumed authority over the Reorganization Cases.

"**Effective Date**" means the first Business Day after the Confirmation Date immediately following the first day upon which all of the conditions to the occurrence of the Effective Date specified in Section 10.2 of the Plan have been satisfied or waived pursuant to Section 10.3 of the Plan.

"**Entity**" means any Person, estate, trust, Governmental Unit or the United States Trustee.

"**Environmental Laws**" means (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601, *et seq.*, (b) the Resource Conservation and Recovery Act, as amended by the Hazardous and Solid Waste Amendment of 1984, 42 U.S.C. §§ 6901, *et seq.*, (c) the Clean Air Act, 42 U.S.C. §§ 7401, *et seq.*, (d) the Clean Water Act of 1977, 33 U.S.C. §§ 1251, *et seq.*, (e) the Toxic Substances Control Act, 15 U.S.C. §§ 2601, *et seq.*, (f) all statutes or laws issued or promulgated by any Governmental Unit, as they may be amended from time to time, relating to environmental contamination or pollution, air pollution, water pollution, noise control and/or the handling, discharge, existence, release, disposal or recovery of on-site or off-site hazardous, toxic or dangerous wastes, substances, chemicals or materials, and (g) the ordinances, rules, regulations, orders, notices of violation, requests, demands and requirements issued or promulgated by any Governmental Unit in connection with such statutes or laws.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Estate(s)**" means, individually, the estate of each Debtor in the Reorganization Cases and, collectively, the estates of all Debtors in the Reorganization Cases, created pursuant to section 541 of the Bankruptcy Code.

"**Existing Credit Agreement**" means the Loan and Security Agreement between Congoleum, as borrower, and Wachovia, as lender, dated as of December 10, 2001, as amended by Amendment No. 1 to Loan and Security Agreement, dated September 19, 2002, by and between Wachovia and Congoleum, and Amendment No. 2 to Loan and Security Agreement, dated as of February 27, 2003, by and between Wachovia and Congoleum, and as otherwise amended, restated, modified and/or supplemented as of the Petition Date and any related documents.

"**Existing Securities**" means, collectively, the Senior Notes and Interests.

"**Existing Subsidiary Guaranty**" means the Limited Guaranty, dated as of February 27, 2003, executed by Congoleum Fiscal, Inc. and Congoleum Sales, Inc., as amended, restated, modified or supplemented as of the Petition Date.

"**Exit Facility**" means the revolving credit and term loan facility in the aggregate principal amount of $30,000,000 to be provided by lenders acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative in the form of a revolving loan and a term loan to Reorganized Congoleum secured by substantially all of the assets of Reorganized Congoleum and otherwise on terms and conditions, and pursuant to loan documentation, satisfactory and acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative which financing shall be consistent with the Exit Facility Commitment Letter or Term Sheet contained in the Plan Supplement.

"**Exit Facility Commitment Letter or Term Sheet**" means that certain agreement by and between the Debtors and Exit Facility Lenders, detailing the commitment of the Exit Facility Lenders to provide the Exit Facility, a copy of which will be provided in the Plan Supplement.

"**Exit Facility Lenders**" means the lenders who will provide the Exit Facility, with such lenders to be identified in the Exit Facility Commitment Letter or Term Sheet.

"**Final Distribution**" means the Distribution by the Debtors or Reorganized Congoleum that satisfies all Allowed Claims and Interests to the extent provided in accordance with this Plan.

"**Final Order**" means an order or judgment of the Bankruptcy Court or the District Court, as applicable, or other court of competent jurisdiction, the implementation, operation or effect of which has not been stayed and as to which order (or any revision, modification or amendment thereon) the time to appeal or seek review, rehearing or writ of certiorari has expired and as to which no appeal or petition for review, reconsideration, rehearing or certiorari has been taken and is pending.

"**Financing Order**" shall have the meaning ascribed to such term in Section 4.1(b).

"**Futures Representative**" means the Person appointed by the Bankruptcy Court to represent the rights and interests of the future Demands, who shall be R. Scott Williams, Esquire, or such other individual appointed by the District Court, pursuant to section 524(g) of the Bankruptcy Code.

"**General Unsecured Claim**" means any Claim against any Debtor arising prior to the Petition Date (regardless of whether such Claim is covered by insurance) to the extent that such Claim is neither secured nor entitled to priority under the Bankruptcy Code or by a Final Order of the Bankruptcy Court or District Court, as applicable (other than any Workers' Compensation Claim, ABI Claim, Senior Note Claim or Asbestos Claim), including, but not limited to: (a) any Claim arising from the rejection of an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and (b) any portion of a Claim to the extent the value of the holder's interest in the applicable Estate's interest in the property securing such Claim is less than the amount of the Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Claim, as determined pursuant to section 506(a) of the Bankruptcy Code; provided, however, General Unsecured Claims do not include claims against the Debtors under the Environmental Laws as set forth in Section 11.9 hereof, which survive the Reorganization Cases.

"**GHR/Kenesis Actions**" means any Causes of Action, including for malpractice, against Gilbert LLP (formerly known as Gilbert Oshinsky LLP, Gilbert Randolph LLP, Gilbert, Heintz & Randolph LLP) or The Kenesis Group LLC.

"**Governmental Unit**" means any domestic, foreign, provincial, federal, state, local or municipal (a) government, or (b) governmental agency, commission, department, bureau, ministry or other governmental entity.

**"Impaired"** means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

**"Indenture"** means the Indenture by and between Congoleum Corporation, as Issuer, and First Union National Bank, as Trustee, dated as of August 3, 1998, as supplemented and amended from time to time, relating to the Senior Notes.

**"Indenture Trustee"** means HSBC Bank USA, N.A., as successor to First Union National Bank, not individually but as indenture trustee under the Indenture, and its successors and assigns.

**"Indirect Asbestos Claim"** means (i) any Claim based on a right of contribution, reimbursement, subrogation, or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) arising out of or based on an Asbestos Personal Injury Claim or another Indirect Asbestos Claim, (ii) any other derivative or indirect Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law, equity or admiralty, by reason of an Asbestos Personal Injury Claim or another Indirect Asbestos Claim (including, without limitation, any Claim (A) for attorneys' fees arising or incurred in connection with any Asbestos Personal Injury Claim, another Indirect Direct Asbestos Claim or an Asbestos Insurance Action or (B) arising out of or based on the rejection of any executory contract related to or involving asbestos), and (iii) any Claim arising out of Asbestos Insurance Policies or settlement agreements related thereto, in each case other than ABI Asbestos Claims or Asbestos Property Damage Claims.

**"Injunctions"** means the Discharge Injunction, the Asbestos Channeling Injunction, the Anti-Suit Injunction and any other injunctions entered by order of the Bankruptcy Court or the District Court in the Reorganization Cases (including but not limited to any injunction contained in any Final Order approving any Asbestos Insurance Settlement Agreement).

**"Insurance Assignment Agreement"** means the insurance assignment agreement referenced in Section 5.1(c) of the Plan and substantially in the form attached as Exhibit "B" to the Plan.

**"Intercompany Agreements"** means any and all agreements existing between any of the Debtors and ABI, including without limitation the (i) Joint Venture Agreement, (ii) Personal Services Agreement, (iii) stockholders agreement, made as of March 11, 1993, as amended, (iv) Business Relations Agreement, dated as of March 11, 1993, as amended, (v) Tax Sharing Agreement, (vi) Closing Agreement, dated as of March 11, 1993, (vii) Plan of Repurchase, dated as of February 1, 1995, and (viii) annual intercompany personal computing, desktop and voice and data system support and other information technology services agreements.

**"Intercompany Settlement"** shall have the meaning ascribed to such term in Section 5.15.

**"Interest"** means any equity interest in the Debtors existing immediately prior to the Effective Date, including without limitation, the Congoleum Interests and the Subsidiary Interests.

**"IRC"** means the Internal Revenue Code of 1986, as amended.

**"Joint Venture Agreement"** means that certain Joint Venture Agreement, dated as of December 16, 1992, by and among American Biltrite Inc., Resilient Holdings Incorporated, Congoleum, Hillside Industries Incorporated and Hillside Capital Incorporated, as amended by the Closing Agreement, dated as of March 11, 1993, by and among the same parties.

**"Lender Secured Claim"** means any Claim of Wachovia arising under or relating to the Existing Credit Agreement, the Existing Subsidiary Guaranty and any related documents.

**"Lien"** means, with respect to any asset or property, any properly perfected and unavoidable mortgage, lien, pledge, charge, security interest, encumbrance or other security device of any kind pertaining to or affecting such asset or property.

**"Litigation Settlement Agreement"** means the compromise and settlement agreement referenced in Section 5.14 of the Plan, approved by the Bankruptcy Court by order dated October 31, 2008, which Litigation Settlement Agreement was amended by the First Amendment to the Litigation Settlement Agreement dated as of October 22, 2009, as the same may be approved by the District Court.

**"Litigation Settlement Claimant"** means a person whose Asbestos Personal Injury Claim was liquidated pursuant to or was subject to liquidation pursuant to the Claimant Agreement or a Pre-Petition Settlement Agreement who executed the Litigation Settlement Agreement.

**"New ABI Agreement"** means the agreement to be entered into between Reorganized Congoleum and ABI, which shall be in form and substance mutually agreeable to the Bondholders' Committee, the Asbestos Claimants' Committee, the Futures Representative, and ABI, and which shall govern the relationship between ABI and Reorganized Congoleum upon the Effective Date, thereby superseding any and all Intercompany Agreements and which agreement shall be substantially in the form attached as Exhibit "I" to the Plan. The New ABI Agreement will be filed with the Plan Supplement.

**"New Common Stock"** means the newly issued shares of Congoleum common stock, par value $.01 per share, to be issued by Reorganized Congoleum as of the Effective Date pursuant to the terms of the Plan.

**"New Indenture"** means the Indenture dated as of the Effective Date relating to the New Senior Notes and which shall be substantially in the form attached as Exhibit "D" to the Plan. The New Indenture will be filed as part of the Plan Supplement.

**"New Senior Notes"** means the Senior Secured Notes to be issued to holders of Allowed Senior Note Claims by Reorganized Congoleum in the initial aggregate principal amount of $33 million on the Effective Date and which shall be due and payable December 31, 2017 . There shall be no interest accruing or due and payable on the principal amount of the New Senior Notes for the first six months after the Effective Date. Thereafter, interest shall accrue on the principal amount of the New Senior Notes at the rate of 9% per annum and be payable semi-annually in cash. At the sole option of Reorganized Congoleum, however, beginning with the interest payment due 12 months after the Effective Date to and including the interest payment due 30 months after the Effective Date (the "PIK Period"), interest may be paid in kind by the issuance of additional New Senior Notes in the aggregate amount of the interest then due and payable on each such payment date within the PIK Period. The option shall be separately exercisable with respect to each of the four semi-annual periods within the PIK Period. If Reorganized Congoleum elects to pay interest in kind during any semi-annual period within the PIK Period, interest shall accrue on all the New Senior Notes during such semi-annual period, including any New Senior Notes issued previously in connection with an interest payment in kind, at the rate of 11% per annum; if the Company does not elect the PIK payment option on any interest payment date within the PIK period, interest for such semi-annual period shall be calculated at the rate of 9% per annum on all the New Senior Notes during such semi-annual period, including any New Senior Notes issued previously in connection with an interest payment in kind. After the expiration of the PIK Period, the option to pay interest in kind shall expire, and be of no further force and effect, and all interest shall accrue at 9% per annum, payable semi-annually in cash.

Upon a Change of Control (as defined in the New Indenture as are other terms used in this definition of New Senior Notes), the holders of the New Senior Notes may require Reorganized Congoleum to repurchase the New Senior Notes at an offer price in cash equal to 115% of the aggregate principal amount thereof plus accrued and unpaid interest thereon. Moreover, the New Senior Notes are not optionally redeemable at any time prior to maturity.

The New Senior Notes will be secured by liens or security interests in all the assets of Reorganized Congoleum, which liens or security interests shall be subordinate in priority only to the liens or security interests granted by Reorganized Congoleum under the Exit Facility but shall not otherwise be subordinated to the Exit Facility, and which New Senior Notes liens or security interests shall be *pari passu* with no other security interests or liens. The New Senior Notes shall be in the form set forth in the New Indenture.

**"Non-Asbestos Stock Distribution"** means 49.9% of the New Common Stock.

**"Non-Compensatory Damages"** means any and all damages awarded by a court of competent jurisdiction that are penal in nature, including, without limitation, punitive, punitory, exemplary, vindictive, imaginary or presumptive damages.

**"Omnibus Avoidance Action"** means that certain Adversary Proceeding No. 05-06245 (KCF), which was filed in the Bankruptcy Court on behalf of the Debtors on December 3, 2005, as amended.

**"Other Secured Claim"** means a Secured Claim arising prior to the Petition Date against any of the Debtors other than a Lender Secured Claim.

**"PBGC"** shall have the meaning ascribed to such term in Section 8.4(b).

**"Pension Plans"** means, collectively, that certain Congoleum Corporation Hourly Retirement Plan, that certain Congoleum Corporation Retirement Plan for Salaried Employees and that certain Congoleum Corporation Plant 2 Retirement Plan, in each case as the same may be amended from time to time.

**"Person"** means any person, individual, partnership, corporation, limited liability company, joint venture company, association or other entity or being of whatever kind, whether or not operating or existing for profit, including, but not limited to, any "person" as such term is defined in section 101(41) of the Bankruptcy Code, but excluding any Governmental Unit.

**"Personal Services Agreement"** means that certain Personal Services Agreement dated as of March 11, 1993, by and between ABI and Congoleum and all amendments thereto.

**"Petition Date"** means December 31, 2003, the date on which the Debtors filed their petitions for relief commencing the Reorganization Cases.

**"Plan"** means this Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code and all exhibits and schedules annexed hereto or referenced herein, and any amendments or modifications thereto made in accordance with the Bankruptcy Code.

**"Plan Documents"** means the Plan, the Plan Trust Agreement, the TDP, the Exit Facility, the New Senior Notes, the New Indenture, the Registration Rights Agreement, the Amended and Restated Certificate, the Amended and Restated Bylaws, the Stockholders Agreement, the New ABI Agreement, and the Insurance Assignment Agreement, and all exhibits and schedules to any of the foregoing, including any included in a Plan Supplement.

**"Plan Proponents"** means, collectively, the Debtors, the Asbestos Claimants' Committee and the Bondholders' Committee.

**"Plan Supplement"** means the compilation of substantially final forms of documents, including, without limitation, a schedule identifying rejected contracts, the Exit Facility Commitment Letter or Term Sheet, the New ABI Agreement, Registration Rights Agreement, the New Indenture, the Stockholders Agreement, the Amended and Restated Bylaws and the Amended and Restated Certificate and schedules identifying the initial officers and the initial board of directors of Reorganized Congoleum, which the Plan Proponents shall file with the District Court no later than ten (10) Business Days prior to the last date for filing objections to Confirmation of the Plan. Notwithstanding the foregoing, the Plan Proponents may amend the Plan Supplement and any attachments thereto through and including the Confirmation Date.

**"Plan Trust"** means the trust to be established pursuant to the Plan Trust Agreement and Section 5.1(a) of the Plan as of any date between (and inclusive of) the Confirmation Date and the Effective Date.

**"Plan Trust Agreement"** means that certain Congoleum Plan Trust Agreement, effective as of any date between (and inclusive of) the Confirmation Date and the Effective Date, substantially in the form attached hereto as Exhibit "E," as it may be modified from time to time in accordance with the terms thereof.

"**Plan Trust Asbestos Claims**" means, collectively, Asbestos Personal Injury Claims, future Demands and Allowed Asbestos Property Damage Claims.

"**Plan Trust Assets**" means the assets to be delivered to the Plan Trust pursuant to the Plan Documents and shall include, without limitation, the following assets and any income and profits thereon, and proceeds derived therefrom: (a) the Plan Trust Common Stock; (b) the Asbestos Insurance Rights; (c) all rights of the Debtors under, and all proceeds of, the Asbestos Insurance Settlement Agreements (except for those certain proceeds of the Asbestos Insurance Settlement Agreement with Liberty Mutual Insurance Company, which are payable to the Debtors as provided in Section 5.1(q) of the Plan); (d) the proceeds of the Asbestos In-Place Insurance Coverage; (e) the proceeds of the Asbestos Insurance Actions; (f) the proceeds of the Asbestos Insurance Action Recoveries; (g) the rights granted to the Plan Trust pursuant to the Insurance Assignment Agreement; and (h) the Asbestos Property Damage Insurance Rights.

"**Plan Trust Bylaws**" means the bylaws as approved by the Plan Trustee, the Trust Advisory Committee and the Futures Representative, effective as of the effective date of the Plan Trust, as may be modified from time to time with the consent and approval of the Plan Trustee, the Trust Advisory Committee and the Futures Representative.

"**Plan Trust Common Stock**" means a number of shares of common stock of Reorganized Congoleum constituting 50.1% of the New Common Stock.

"**Plan Trust Documents**" means the Plan Trust Agreement, the Plan Trust Bylaws, the TDP and the other agreements, instruments and documents governing the establishment, administration and operation of the Plan Trust, as amended or modified from time to time in accordance with the Plan and such documents.

"**Plan Trust Expenses**" means any liabilities, costs, taxes or expenses of, or imposed upon or in respect of, the Plan Trust or, on and after the Effective Date, the Plan Trust Assets (except for payments to holders of Asbestos Claims on account of such Asbestos Claims).

"**Plan Trustee**" means the Person appointed pursuant to Article V of the Plan and the Plan Trust Agreement for the purpose of acting as Trustee of the Plan Trust in accordance with the terms and conditions contained in the Plan, the Plan Trust Agreement and the Confirmation Order.

"**Post-Petition Interest**" means interest accruing on and after the Petition Date on a Claim.

"**Pre-Petition Settled Claimant**" means a person whose Asbestos Personal Injury Claim was liquidated pursuant to or was subject to liquidation pursuant to the Claimant Agreement or a Pre-Petition Settlement Agreement, as the case may be (other than such persons whose claims have been previously expunged by order of the Bankruptcy Court, it being understood that defendants in the Omnibus Avoidance Action against whom a default has been granted shall not be considered to have had their claims expunged).

"**Pre-Petition Settlement Agreement**" means a settlement agreement, other than the Claimant Agreement, executed prior to the Petition Date to resolve an Asbestos Personal Injury Claim under which some or all of the consideration due has yet to be paid.

"**Priority Claim**" means any Claim (other than an Administrative Claim or a Priority Tax Claim) to the extent such Claim is entitled to a priority in payment under section 507(a) of the Bankruptcy Code.

"**Priority Tax Claim**" means any Claim to the extent that such Claim is entitled to a priority in payment under section 507(a)(8) of the Bankruptcy Code.

"**Professional Fee Claim**" means a Claim of a professional retained in the Reorganization Cases pursuant to sections 327, 328, and 1103 of the Bankruptcy Code, or otherwise, including such Claims of the Futures Representative and its professionals, for compensation or reimbursement of costs and expenses relating to services rendered on and after the Petition Date and prior to and including the Effective Date.

"**Proof of Claim**" means any proof of claim filed with the Bankruptcy Court or District Court or their duly appointed claims agent with respect to the Debtors pursuant to Bankruptcy Rule 3001 or 3002.

"**Pro Rata**" means with reference to any distribution on account of any Claim in any Class, the proportion that the amount of such Claim bears to the aggregate amount of all Claims (including Disputed Claims but excluding Disallowed Claims) in such Class.

"**Protected Party**" means any of the following parties:

(a)　　　the Debtors and the Reorganized Debtors;

(b)　　　any Entity that, pursuant to the Plan or after the Confirmation Date, becomes a direct or indirect transferee of, or successor to, the Plan Trust or the Debtors;

(c)　　　the Persons designated on Exhibit "F" (as such Exhibit may be amended on or before the Confirmation Date) as current distributors of the product lines currently manufactured, sold or otherwise produced by Congoleum; or

(d)　　　each Settling Asbestos Insurance Company.

"**Record Date**" means the date established in the Disclosure Statement Approval Order or any other Final Order of the District Court for determining the identity of holders of Claims entitled to vote to accept or reject this Plan and/or receive Distributions under this Plan.  If no Record Date is established in the Disclosure Statement Approval Order or any other Final Order of the District Court, then the Record Date shall be the date of the entry of the Disclosure Statement Approval Order.

"**Record Holder**" means the holder of a Claim as of the Record Date.

"**Registration Rights Agreement**" means the agreement described in Section 5.8 of the Plan.

"**Reinstated**" means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the holder of such Claim or Interest so as to leave such Claim or Interest Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim or Interest as such maturity existed before such default; and (iii) compensating the holder of such Claim or Interest for any damages incurred as a result of any legal, equitable or contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest.

"**Reorganization Cases**" means the cases filed by the Debtors under Chapter 11 of the Bankruptcy Code.

"**Reorganized Congoleum**" means reorganized Congoleum (or any successor thereto) on and after the Effective Date.

"**Reorganized Debtors**" means the reorganized Debtors (or any successor thereto) on and after the Effective Date.

"**Representatives**" means, with respect to any Entity, the present and former directors, officers, members, employees, trustees, accountants (including independent certified public accountants), advisors, attorneys, consultants, experts or other agents of that Entity, or any other professionals of that Entity, in each case in their capacity as such; *provided, however,* that in no event shall "Representatives" mean Gilbert LLP (formerly known as Gilbert Oshinsky, LLP, Gilbert Randolph LLP and Gilbert Heintz & Randolph LLP) or Kenesis Group, LLC.

"**Schedules**" means the schedules, statements and lists filed by the Debtors with the Bankruptcy Court or District Court pursuant to Bankruptcy Rule 1007, if such documents are filed, as they have been and may be amended or supplemented from time to time.

"**Sealed Avoidance Action**" means that certain Adversary Proceeding No. 05-06461 (KCF), as it may be amended, which was filed under seal in the Bankruptcy Court on behalf of the Debtors on December 29, 2005, against (a) Arthur J. Pergament, in his capacity as Collateral Trustee; (b) Joseph F. Rice and the law firm of Motley Rice LLC; (c) Perry Weitz and the law firm of Weitz & Luxenberg, P.C.; and (d) certain holders of pre-petition Asbestos Personal Injury Claims.

"**Secured Claim**" means any Claim (other than an Asbestos Claim) that is (a) secured in whole or part, as of the Petition Date, by a Lien which is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or (b) subject to setoff under section 553 of the Bankruptcy Code, but, with respect to both (a) and (b) above, only to the extent of the value, net of any senior lien, of the Estates' interest in the assets or property securing any such Claim or the amount subject to setoff, as the case may be.

"**Security Agreement**" means that certain Superceding [sic] Security Agreement entered into by Congoleum and the Collateral Trustee, dated June 11, 2003, as the same may be amended from time to time.

"**Senior Note Claim**" means any Claim of a holder of Senior Notes based upon the Senior Notes.

"**Senior Note Distribution**" means the Non-Asbestos Stock Distribution and $33 million initial principal amount of the New Senior Notes.

"**Senior Notes**" means the 8.625% Senior Notes Due 2008 in the original principal amount of $100 million issued by Congoleum and outstanding as of the Petition Date.

"**Settlement and Buyback Agreement**" means that certain Settlement and Buyback Agreement dated as of August 17, 2006 among the Debtors, Century Indemnity Company and the other parties thereto.

"**Settling Asbestos Insurance Company**" means any Asbestos Insurance Company that has, before the conclusion of the Confirmation Hearing before the District Court, entered into an Asbestos Insurance Settlement Agreement that is sufficiently comprehensive and otherwise on terms appropriate in the determination of each of the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative to warrant treatment under section 524(g) of the Bankruptcy Code (including, with respect to any Asbestos Insurance Settlement Agreement that is conditioned in whole or in part on a plan of reorganization proposed by the Debtors, an agreement from such Settling Asbestos Insurance Company in writing, in a form reasonably acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative that all conditions to its performance under its Asbestos Insurance Settlement Agreement based on or related to a plan proposed by the Debtors is satisfied in full by this Plan), which determination by the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative will be indicated by the inclusion of such Asbestos Insurance Company on a schedule of Settling Asbestos Insurance Companies filed by the Plan Proponents as Exhibit "H" to the Plan with the District Court before the conclusion of the Confirmation Hearing and approved by such District Court.

"**Stockholders Agreement**" means that certain stockholders agreement described in Section 5.9 of this Plan, which shall be substantially in the form attached hereto as Exhibit "L." The Stockholders Agreement will be filed as part of the Plan Supplement.

"**Subsidiary Debtors**" means, collectively, Congoleum Sales, Inc. and Congoleum Fiscal, Inc.

"**Subsidiary Interests**" means, collectively, the issued and outstanding shares of stock of the Subsidiary Debtors as of the Petition Date and any options, warrants or other contractual rights to acquire any shares of stock of the Subsidiary Debtors as of the Petition Date.

15

"**Substantial Contribution Claim**" shall have the meaning ascribed to such term in Section 3.4.

"**Tax Sharing Agreement**" means that certain Tax Sharing Agreement, dated as of November 1, 1996, by and between ABI and Congoleum.

"**TDP**" means the trust distribution procedures for the Plan Trust, substantially in the form attached as Exhibit "G" to the Plan, as it may be modified from time to time in accordance with the terms of the TDP and the Plan Trust Agreement.

"**Trust Advisory Committee**" or "**TAC**" means a Trust Advisory Committee to be formed to represent all holders of Asbestos Personal Injury Claims to advise the Plan Trustee and to approve and consent to certain actions as specified herein and in the Plan Trust Agreement, solely in its capacity as such.

"**United States Trustee**" means the Office of the United States Trustee for Region 3.

"**Unimpaired**" means, with reference to a Claim or Interest, unimpaired within the meaning of section 1124 of the Bankruptcy Code.

"**Unpaid Intercompany Amounts**" means the following intercompany payables, to the extent such payables arise following the Petition Date, are evidenced by invoices or other appropriate supporting documentation and remain unpaid as of the Effective Date: (i) payments due under the Personal Services Agreement, (ii) payments due for purchases of urethane or other products sold intercompany under the Business Relations Agreement, dated as of March 11, 1993, as amended, (iii) payments due under the Canadian Tile exclusivity agreement under the Business Relations Agreement, dated as of March 11, 1993, as amended, (iv) royalty payments due under the non-pvc license agreement dated January 1, 2006, (v) payments due under intercompany personal computing, desktop and voice and data system support and other information technology services agreements between ABI and the Debtors, (vi) payments due for items purchased by ABI and/or an ABI subsidiary for a Debtor and/or Debtor subsidiary, or purchased by a Debtor and/or a Debtor subsidiary for ABI and/or an ABI subsidiary, or purchased jointly by any of them and (vii) intercompany payments due as reimbursement of reasonable and necessary travel expenses incurred (whether by ABI or an ABI subsidiary, or a Debtor or a Debtor subsidiary) in connection with ABI personnel providing management services to any of the Debtors.

"**Voting Agent**" means Logan & Company, Inc.

"**Voting Procedures Order**" means the order entered by the District Court setting the voting procedures for this Plan.

"**Wachovia**" shall mean Wachovia Bank, National Association, successor by merger to Congress Financial Corporation.

"**Workers' Compensation Claim**" means any Claim (a) for benefits under a state-mandated workers' compensation system, that a past, present, or future employee of the Debtors and their predecessors is receiving, or may in the future have a right to receive, and/or (b) for reimbursement brought by any insurance company as a result of payments made to or for the benefit of such employees and fees and expenses incurred under any insurance policies covering such employee claims.

**1.3  Rules of Interpretation:  Application of Definitions, Rules of Construction, and Computation of Time**.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine and neuter.  For purposes of the Plan: (a) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the document shall be substantially in that form or substantially on those terms and conditions; (b) any reference in the Plan to an existing document or exhibit filed or to be filed means the document or exhibit as it may have been or may be amended, modified, or supplemented; (c) unless otherwise specified, all references in the Plan to Sections, Schedules, and Exhibits are references to sections, schedules, and exhibits of or to

16

the Plan. Unless otherwise specified, the words "herein," "hereof," "hereto," "hereunder," and other words of similar meaning refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. The headings in the Plan are for convenience of reference only and shall not expand, limit, or otherwise affect the provisions of the Plan. Unless otherwise indicated herein, all references to dollars are to United States dollars. Unless otherwise expressly provided herein, in computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

        **1.4**    **Exhibits and Schedules**. All exhibits and schedules are incorporated into and are a part of the Plan as if set forth in full herein.

## ARTICLE II

## CLASSIFICATION OF CLAIMS AND INTERESTS

        **2.1**    **Generally**. Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of the Class and is classified in a different Class to the extent the Claim or Interest qualifies within the description of that different Class. Solely for voting purposes, Claims against each Estate are classified as Claims against the Estates as a whole.

        **2.2**    **Unclassified Claims**. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are excluded from the Classes set forth in Section 2.3 of the Plan. The treatment accorded Administrative Claims and Priority Tax Claims is set forth in Article III of the Plan.

        **2.3**    **Classes**. In accordance with section 1122 of the Bankruptcy Code, the following constitute the Classes of Claims against and Interests in the Debtors:

        (a)    Class 1 – Priority Claims. Class 1 consists of all Priority Claims. Class 1 is Unimpaired.

        (b)    Class 2 – Lender Secured Claims. Class 2 consists of the Lender Secured Claims. Class 2 is Unimpaired.

        (c)    Class 3 – Other Secured Claims. Class 3 consists of all Other Secured Claims, each of which will be within a separate subclass, with each such subclass to be deemed a separate Class for all purposes. Class 3 is (or these subclasses are) Unimpaired.

        (d)    Class 4 – Senior Note Claims. Class 4 consists of all Senior Note Claims. Class 4 is Impaired.

        (e)    Class 5 – Workers' Compensation Claims. Class 5 consists of all Workers' Compensation Claims. Class 5 is Unimpaired.

        (f)    Class 6 – ABI Claims. Class 6 consists of all ABI Claims. Class 6 is Impaired.

        (g)    Class 7 – Asbestos Personal Injury Claims. Class 7 consists of all Asbestos Personal Injury Claims, including the unliquidated Asbestos Personal Injury Claims of Pre-Petition Settled Claimants. Class 7 is Impaired.

        (h)    Class 8 - Asbestos Property Damage Claims. Class 8 consists of all Asbestos Property Damage Claims. Class 8 is Impaired.

        (i)    Class 9 – General Unsecured Claims. Class 9 consists of all General Unsecured Claims. Class 9 is Impaired.

(j)      <u>Class 10 – Congoleum Interests</u>.  Class 10 consists of all Congoleum Interests.  Class 10 is Impaired.

(k)      <u>Class 11 – Subsidiary Interests</u>.  Class 11 consists of all Subsidiary Interests.  Class 11 is Unimpaired.

## ARTICLE III

### TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

**3.1**    **Summary**.  Pursuant to section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims against the Debtors are not classified for purposes of voting on, or receiving Distributions under, this Plan.  Similarly, Substantial Contribution Claims are not classified for purposes of voting on, or receiving Distributions under, this Plan.  Holders of such Claims are not entitled to vote on this Plan.  All such Claims are instead treated separately in accordance with this Article III and in accordance with the requirements set forth in section 1129(a)(9)(A) of the Bankruptcy Code.

**3.2**    **Administrative Claims**.  On the Distribution Date, each holder of an Allowed Administrative Claim, except as otherwise provided for herein, and subject to the requirements of Section 13.14 of the Plan, shall receive, in full satisfaction, settlement, release, extinguishment, and discharge of such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Claim or (b) such different treatment as to which the applicable Debtor and such holder shall have agreed upon in writing; *provided, however,* that Allowed Administrative Claims representing (i) post-petition liabilities incurred in the ordinary course of business by the Debtors and (ii) post-petition contractual liabilities arising under loans or advances to the Debtors, whether or not incurred in the ordinary course of business, shall be paid by Reorganized Congoleum in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto.

**3.3**    **Priority Tax Claims**.  On the Distribution Date, each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, (a) Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (b) such different treatment as to which the applicable Debtor and such holder shall have agreed upon in writing, or (c) at Reorganized Congoleum's sole discretion, deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim, over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim.

**3.4**    **Substantial Contribution Claims**.  Any Entity who requests compensation or expense reimbursement for making a substantial contribution in the Reorganization Cases pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code ("**Substantial Contribution Claim**") must file an application with the clerk of the District Court on or before a date that is sixty (60) days subsequent to the Effective Date and serve such application on counsel for the Debtors, counsel for the Futures Representative, counsel for the Asbestos Claimants' Committee, counsel for the Bondholders' Committee and on all other parties as otherwise required by the District Court and the Bankruptcy Code, or be forever barred from seeking such compensation or expense reimbursement.  All Allowed Substantial Contribution Claims shall be paid by Reorganized Congoleum within sixty (60) days of allowance by the District Court.

## ARTICLE IV

### TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

**4.1**    **Claims and Interests**

(a)      <u>Class 1 – Priority Claims</u>.  On the Distribution Date, each holder of an Allowed Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Claim, either (i) the Allowed Amount of its Priority Claim, in Cash, or (ii) such different treatment as may

be agreed to by such holder and Reorganized Congoleum. Class 1 is Unimpaired and the holders of Class 1 Claims are deemed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

(b)    Class 2 – Lender Secured Claims.  The Lender Secured Claim shall be paid in full indefeasibly on the Effective Date or as soon thereafter as practicable and Wachovia shall be released from any and all liabilities and causes of action in accordance with the Final Order (1) Authorizing Debtors' Use of Cash Collateral, (2) Authorizing Debtors to Obtain Post-Petition Financing, (3) Granting Senior Liens and Priority Administrative Expense Status Pursuant to 11 U.S.C. §§105 and 364(c), (4) Modifying the Automatic Stay Pursuant to 11 U.S.C. §362, and (5) Authorizing Debtors to Enter into Agreements with Congress Financial Corporation (the "**Financing Order**").  Nothing herein requires that Wachovia permit the use of collateral, including cash collateral, or finance the Debtors after the Effective Date other than with Wachovia's prior written consent. Class 2 is Unimpaired and the holder of the Class 2 Claim is deemed to have accepted the Plan and, accordingly, is not entitled to vote on the Plan.  Notwithstanding anything to the contrary contained in the Plan, the Confirmation Order, or otherwise, the Obligations under and as defined in the Existing Credit Agreement (as the same has heretofore been or may hereafter be amended, modified, ratified, restated, extended, renewed or replaced) and all the rights, claims, liens and priorities and other protections provided to Wachovia shall survive the Confirmation Date and continue in full force and effect in accordance with the terms and conditions of the Financing Order and the Existing Credit Agreement.

(c)    Class 3 – Other Secured Claims.  Each holder of an Allowed Other Secured Claim shall receive one of the following three treatments at Reorganized Congoleum's sole option: (i) retain unaltered the legal, equitable and contractual rights (including, but not limited to, any Liens that secure such Claim) to which such Claim entitles such holder and such Allowed Other Secured Claim shall be Reinstated on the Effective Date, (ii) the Debtors shall surrender all collateral securing such Claim to the holder thereof, in full satisfaction of such holder's Allowed Class 3 Claim, without representation or warranty by, or recourse against, the Debtors or Reorganized Congoleum or (iii) such holder shall be otherwise treated in a manner so that such Claim shall be rendered Unimpaired. Class 3 is Unimpaired and the holders of Class 3 Claims are deemed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

(d)    Class 4 – Senior Note Claims.  Senior Note Claims shall be Allowed in an aggregate amount equal to at least $103,593,750.00, which shall not be subject to any avoidance, reductions, set off, offset, recharacterization, subordination, counterclaims, defenses, disallowance, impairment or any other challenges under applicable law or regulation by any person or entity.  On the Effective Date, each holder of an Allowed Senior Note Claim shall receive, in full satisfaction of its Senior Note Claim, its Pro Rata share of each of the securities included in the Senior Note Distribution.  Class 4 is Impaired and holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

(e)    Class 5 – Workers' Compensation Claims.  Each holder of an Allowed Workers' Compensation Claim shall be paid in the ordinary course pursuant to such rights that exist under any state workers' compensation system or laws applicable to such Claims.  Class 5 is Unimpaired and the holders of Class 5 Claims are deemed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

(f)    Class 6 – ABI Claims.  Pursuant to and in consideration of the Intercompany Settlement and Section 5.17 and other terms of the Plan, on the Effective Date all Intercompany Agreements shall be rejected and all ABI Claims, including without limitation any ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.17(b)(4)(B) of the Plan), shall be deemed Disallowed and expunged.  Class 6 is Impaired and the holder of the Class 6 Claims is entitled to vote to accept or reject the Plan.

(g)    Class 7 – Asbestos Personal Injury Claims.

(i)    As of the Effective Date, all liability for all Asbestos Personal Injury Claims (which includes all Claims in Class 7) as well as liability for all future Demands shall be assumed, automatically and without further act or deed, by the Plan Trust and the Reorganized Debtors shall have no liability therefor.  Each Asbestos Personal Injury Claim and future Demands shall be resolved pursuant to the Plan Trust Agreement and the

TDP. The TDP shall apply to all holders of Asbestos Personal Injury Claims and future Demands, including any such holder who elects to resort to the legal system and obtains a judgment for money damages.

(ii) As of the Effective Date, pursuant to the Plan, all Pre-Petition Settled Claimants, including the Litigation Settlement Claimants, in full satisfaction of his, her or its Asbestos Personal Injury Claim and any and all rights pursuant to any Pre-Petition Settlement Agreement, Claimant Agreement, Security Agreement, Collateral Trust Agreement or any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003, shall be restored to *status quo ante,* including with respect to any statutes of limitation related to such Asbestos Personal Injury Claim, as of the time each such Claimant initially filed or submitted its Asbestos Claim against the Debtors that resulted in the Claimant's Pre-Petition Settlement Agreement or the Claimant Agreement, respectively, and shall be treated by the Plan Trust as holding unliquidated Asbestos Personal Injury Claims under applicable federal or state law, which claims shall be resolved pursuant to the Plan Trust Agreement and the TDP in the same manner as all other Asbestos Personal Injury Claims in Class 7. Pre-Petition Settled Claimants in Class 7 shall receive *pari passu* treatment under the Plan without regard to any lien, security interest or other claim to priority treatment whatsoever (*i.e.* it is understood that any such Pre-Petition Settled Claimant will need to reapply to the Plan Trust to satisfy the TDP including medical, exposure, statutes of limitation and other requirements).

(iii) Class 7 is Impaired. Holders of Class 7 Claims are entitled to vote with respect to the Plan.

(h) <u>Class 8 - Asbestos Property Damage Claims</u>. As of the Effective Date, all liability for all Allowed Asbestos Property Damage Claims shall be assumed, automatically and without further act or deed, by the Plan Trust and the Reorganized Debtors shall have no liability therefor. Each Allowed Asbestos Property Damage Claim shall be paid solely from the Asbestos Property Damage Claim Sub-Account on account of the unpaid Allowed Amount of such Claim pursuant to the Plan Trust Agreement. After the assets in the Asbestos Property Damage Claim Sub-Account have been exhausted or transferred therefrom in accordance with the Plan Trust Agreement, the Plan Trust shall have no further liability or obligation for or in respect of any Asbestos Property Damage Claims. All Asbestos Property Damage Claims as to which a Proof of Claim was not filed prior to the expiration of the Asbestos Property Damage Claim Bar Date shall be deemed Disallowed. Class 8 is Impaired and the holders of Class 8 Claims are entitled to vote to accept or reject the Plan.

(i) <u>Class 9 – General Unsecured Claims</u>. Except to the extent that a holder of an Allowed General Unsecured Claim in Class 9 has been paid by the Debtors prior to the Effective Date or agrees to alternate, less favorable, treatment, each holder of an Allowed Class 9 Claim shall receive, on the Distribution Date, in full and final satisfaction of such Allowed Class 9 Claim, Cash in the amount of $.35 for each $1.00 of such holder's Allowed Class 9 Claim. Class 9 is Impaired and the holders of Class 9 Claims are entitled to vote to accept or reject the Plan. General Unsecured Claims do not include Claims against the Debtors under the Environmental Laws as set forth in Section 11.9 hereof, which Claims (other than Claims held by ABI) survive the Reorganization Cases.

(j) <u>Class 10 – Congoleum Interests</u>. On the Effective Date, the Congoleum Interests shall be cancelled, the holders of the Congoleum Interests shall retain and receive nothing on account of such Interests. Class 10 is Impaired and the holders of Class 10 Congoleum Interests are deemed to have rejected the Plan in accordance with the provisions of section 1126(g) of the Bankruptcy Code, and accordingly, their votes are not being solicited.

(k) <u>Class 11 – Subsidiary Interests</u>. On the Effective Date, the holder of the Subsidiary Interests shall retain such Subsidiary Interests. Class 11 is Unimpaired and the holder of Class 11 Subsidiary Interests is deemed to have accepted the Plan, and accordingly, is not entitled to vote on the Plan.

**4.2** <u>**Reservation of Rights Regarding Claims**</u>. Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' or Reorganized Congoleum's rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment. Except as otherwise explicitly provided in the Plan, nothing shall affect any of the Plan Trust's rights and defenses, both legal and equitable, with respect to any Asbestos Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

**4.3    Reservation of Fair and Equitable (Cram Down) Power**.  The Plan Proponents reserve the right to confirm this Plan as to any impaired Class that does not accept the Plan by the requisite number of votes pursuant to the fair and equitable power of 11 U.S.C. § 1129(b).

# ARTICLE V

# IMPLEMENTATION OF THE PLAN

**5.1    The Plan Trust**

(a)    **Establishment and Purpose of the Plan Trust**.  On or prior to the Effective Date, the Plan Trust shall be established in accordance with the Plan Trust Agreement.  The Plan Trust is intended to be a "qualified settlement fund" within the meaning of section 468B of the IRC and the Treasury Regulations promulgated thereunder.  The purpose of the Plan Trust shall be to, among other things: (i) pay all Plan Trust Asbestos Claims in accordance with the Plan, the Plan Trust Agreement, the TDP and the Confirmation Order; (ii) preserve, hold, manage, and maximize the Plan Trust Assets for use in paying and satisfying Plan Trust Asbestos Claims in accordance with the Plan Trust Agreement and the TDP; (iii) prosecute, settle and manage the disposition of the Asbestos In-Place Insurance Coverage; and (iv) prosecute, settle, and manage Asbestos Insurance Actions and Direct Actions.

(b)    **Funding and Receipt of Plan Trust Assets**.  On the Effective Date, Reorganized Congoleum shall issue the Plan Trust Common Stock to the Plan Trust in accordance with the Plan and all Plan Trust Assets shall be transferred to, vested in, and assumed by, the Plan Trust free and clear of all Claims, Liens and encumbrances; *provided*, *however*, that to the extent that certain Plan Trust Assets, because of their nature or because they will accrue subsequent to the Effective Date, cannot be transferred to, vested in, and assumed by the Plan Trust on the Effective Date, such Plan Trust Assets shall be transferred to, vested in, and assumed by the Plan Trust free and clear of Claims, Liens and encumbrances, as soon as practicable after the Effective Date.

(c)    **Insurance Assignment Agreement**.  On the Effective Date, the Debtors shall deliver the Insurance Assignment Agreement attached hereto as Exhibit "B."  Such agreement shall be valid, binding and enforceable.  The Insurance Assignment Agreement shall transfer claims and rights set forth therein as Debtors may have, subject to any and all Asbestos Insurer Coverage Defenses.

(d)    **Creation of Asbestos Property Damage Claim Sub-Account**.  On the Effective Date, the Plan Trust shall cause the Asbestos Property Damage Insurance Rights and any proceeds thereof, including $1.2 million from the proceeds of that certain settlement agreement between the Debtors and Liberty Mutual Insurance Company approved by the Bankruptcy Court by order dated July 30, 2004, to be held in the Asbestos Property Damage Claim Sub-Account.  In accordance with the terms of the Plan Trust Agreement, the Plan Trustee shall be permitted to transfer monies from the Asbestos Property Damage Claim Sub-Account to the Asbestos Personal Injury Claim Sub-Account, from time to time, to the extent that the funds in the Asbestos Property Damage Claim Sub-Account exceed the aggregate amount of all unpaid Asbestos Property Damage Claims that have been filed prior to the Asbestos Property Damage Claim Bar Date, and a reasonable reserve for Plan Trust Expenses and indemnification costs or expenses, in either case, related to Asbestos Property Damage Claims.

(e)    **Assumption of Liabilities by the Plan Trust**.  On the Effective Date, all liabilities, obligations and responsibilities relating to all Plan Trust Asbestos Claims shall be transferred to the Plan Trust as set forth herein and the Plan Trust, on behalf of the Plan Trust, shall expressly assume all liability for all Plan Trust Asbestos Claims and Demands as set forth herein, subject to the provisions of the Plan Trust Agreement.  With the exception of the liabilities identified hereinabove in this Section 5.1(e), in no event shall the Plan Trust assume any of the liabilities, obligations or responsibilities of the Debtors or Reorganized Congoleum.

(f)    **Discharge of Liabilities to Holders of Asbestos Claims**.  Except as provided in the Plan and the Confirmation Order, the transfer to, vesting in, and assumption by the Plan Trust of the Plan Trust Assets as

contemplated by the Plan shall, among other things, discharge the Debtors and the Reorganized Debtors from and in respect of all Plan Trust Asbestos Claims.

(g)       **TDP**.  From and after the Effective Date, the Plan Trust shall pay the Plan Trust Asbestos Claims in accordance with the Plan Trust Agreement and the TDP.  The Plan Trustee shall have the power to administer, amend, supplement or modify the TDP in accordance with the terms thereof.

(h)       **Payment of Allowed Asbestos Property Damage Claims**.  From and after the Effective Date, the Plan Trust shall cause the payment of Allowed Asbestos Property Damage Claims from the Asbestos Property Damage Claim Sub-Account in accordance with the Plan Trust Agreement; *provided, however* that once the assets in the Asbestos Property Damage Claim Sub-Account have been exhausted, the Plan Trust shall have no further liability or obligation for or in respect of any Asbestos Property Damage Claims.

(i)       **Excess Plan Trust Assets**.  To the extent there are any Plan Trust Assets remaining after the payment in full of all Plan Trust Asbestos Claims and all Plan Trust Expenses (or provision has been made therefor) in accordance with the Plan Trust Agreement and the TDP, such excess Plan Trust Assets shall be transferred to a tax-exempt organization qualified under section 501(c)(3) of the IRC, which tax-exempt organization is to be determined by the Plan Trustee; *provided, however*, that the purpose thereof, if practicable, shall be related to the treatment of, research on or the relief of suffering of individuals suffering from asbestos-related lung disorders.

(j)       **Plan Trust Expenses**.  The Plan Trust shall pay all Plan Trust Expenses from the Plan Trust Assets in accordance with the Plan Trust Agreement.  Neither the Debtors, the Reorganized Debtors, nor their Affiliates shall have any obligation to pay any Plan Trust Expenses.  The Plan Trustee, each member of the TAC, the Futures Representative and the Representatives of each of the foregoing will have a lien upon the Plan Trust Assets which will be prior to any lien thereon, and the Plan Trust will grant a security interest in the Plan Trust Assets, all proceeds thereof and all accounts into which such proceeds or the Plan Trust Assets are deposited or maintained to secure payment of amounts payable to them as compensation or indemnification.

(k)       **Appointment of the Initial Plan Trustee**.  Effective as of the Effective Date, the District Court shall appoint the initial Plan Trustee to serve as Plan Trustee in accordance with the Plan Trust Agreement. The Plan Trustee shall be designated no later than thirty (30) days prior to the Confirmation Hearing and shall be mutually acceptable to the Asbestos Claimants' Committee and the Futures Representative.  For purposes of performing his or her duties and fulfilling his or her obligations under the Plan Trust Agreement, the TDP and the Plan, the Plan Trustee shall be deemed to be a party in interest within the meaning of section 1109(b) of the Bankruptcy Code.  The Plan Trustee shall be the "administrator" of the Plan Trust as that term is used in Treas. Reg. Section 1.468B-2(k)(3).

(l)       **The Futures Representative**.  Effective as of the Effective Date, the District Court shall appoint a Person to serve as the Futures Representative from and after the Effective Date pursuant to the terms of the Plan Trust Agreement and who shall have the functions and rights provided in the Plan Trust Documents.

(m)       **Appointment of Trust Advisory Committee Members**.  Effective as of the Effective Date, the District Court shall appoint five initial members of the TAC (and thereupon the TAC shall be formed) to serve as members of the TAC in accordance with the Plan Trust Agreement.

(n)       **Institution and Maintenance of Legal and Other Proceedings**.  As of the Effective Date, the Plan Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Plan Trust, including, without limitation, the Coverage Action, in each case to the extent not adjudicated, compromised or settled prior to the Effective Date. The Plan Trust shall be empowered to initiate, prosecute, defend, and resolve all such actions in the name of the Debtors and/or Reorganized Congoleum if deemed necessary or appropriate by the Plan Trustee.  Except as otherwise provided by law or agreement, the Plan Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred subsequent to the Effective Date arising from or associated with any legal action or other proceeding brought pursuant to this Section 5.1(n) and shall pay or reimburse all deductibles, retrospective premium adjustments, or other charges which may arise from the receipt of

22

insurance proceeds by the Plan Trust. Without in any way limiting the foregoing and subject to any Asbestos Insurer Coverage Defenses, the Plan Trust shall be empowered to elect to (or not to), initiate, prosecute, defend, settle, and resolve all Asbestos Insurance Actions and Direct Actions, and to maintain, administer, preserve, or pursue the Asbestos-In-Place Insurance Coverage, the Asbestos Insurance Action Recoveries, Asbestos Insurance Rights, the Asbestos Insurance Policies and rights under the Asbestos Insurance Settlement Agreements. All Causes of Action other than Asbestos Insurance Actions and Direct Actions shall remain the property of the Reorganized Debtors.

(o) **Preservation of Insurance Claims**. The discharge and releases provided herein, and the injunctive protection provided to the Debtors, the Reorganized Debtors and any Protected Party with respect to Demands as provided herein, shall neither diminish nor impair the enforceability of any of the Asbestos Insurance Policies by any Entity except (i) to the extent that any such Asbestos Insurance Company is also a Settling Asbestos Insurance Company or (ii) that all Asbestos Insurer Coverage Defenses are preserved.

(p) **Indemnification by the Plan Trust**. As and to the extent provided in the Plan Trust Agreement in Sections 1.4 and 4.6, the Plan Trust shall indemnify and hold harmless each of the Debtors, the Reorganized Debtors, the Plan Trustee, any officer and employee of the Plan Trust, the Futures Representative, each member of the TAC and, with respect to each of the foregoing, their respective past, present and future Representatives.

(q) **Reimbursement of Defense and Indemnity Costs Relating to Asbestos Claims**. All defense and indemnity costs incurred by Congoleum with respect to Asbestos Claims prior to the Effective Date shall be reimbursed from the proceeds of the Liberty Mutual Settlement.

**5.2    Certain Mergers**. On the Effective Date, the Subsidiary Debtors shall merge with and into Congoleum, with Reorganized Congoleum as the sole surviving corporation.

**5.3    The Amended and Restated Certificate and the Amended and Restated Bylaws**. The Amended and Restated Certificate and the Amended and Restated Bylaws of Reorganized Congoleum shall be in form and substance acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative and shall be consistent with the provisions of the Plan and the Bankruptcy Code. The Amended and Restated Certificate shall, among other things (a) authorize the issuance of New Common Stock pursuant to Section 5.7 of the Plan, and (b) provide, pursuant to section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-voting common equity securities. The Amended and Restated Bylaws and the Amended and Restated Certificate of Reorganized Congoleum shall be substantially in the form attached hereto as Exhibits "J" and "K", respectively. The Amended and Restated Bylaws and the Amended and Restated Certificate will filed as part of the Plan Supplement.

**5.4    Directors and Officers of Reorganized Congoleum**. The initial board of directors of Reorganized Congoleum shall consist of five (5) directors. One of such directors shall be selected by the Bondholders' Committee, three of such directors shall be selected jointly by the Futures Representative and the Asbestos Claimants' Committee, and one of such directors shall be Reorganized Congoleum's chief executive officer. The identity of such directors shall be disclosed by the Plan Proponents in the Plan Supplement. To the extent any such Person is an Insider (as defined in section 101(31) of the Bankruptcy Code), the nature of any compensation for such Person will also be disclosed prior to the Confirmation Hearing. Each of the Persons on the initial board of directors of Reorganized Congoleum shall serve in accordance with the Amended and Restated Certificate and the Amended and Restated Bylaws of Reorganized Congoleum, as the same may be amended from time to time. Subsequently, Reorganized Congoleum's board of directors shall be elected in accordance with Reorganized Congoleum's governing documents which governing documents shall be acceptable to the Bondholders' Committee and the Asbestos Claimants' Committee.

The initial officers of Reorganized Congoleum shall be set forth in the Plan Supplement. To the extent any such Person is an Insider (as defined in section 101(31) of the Bankruptcy Code), the nature of any compensation for such Person will also be disclosed at such time. The initial officers shall serve in accordance with the Amended and Restated Certificate and the Amended and Restated Bylaws of Reorganized Congoleum, as the same may be amended from time to time.

**5.5     Cancellation of Existing Securities and Agreements of the Debtors/Discharge of the Indenture Trustee**.  Except as set forth in the Plan, upon the Effective Date, the Existing Securities shall be cancelled and the holders thereof shall have no further rights or entitlements in respect thereof against the Debtors except the right to receive any Distributions to be made to such holders under the Plan.  To the extent possible, Distributions to be made under the Plan to the beneficial owners of the Senior Notes shall be made through the Depository Trust Company and its participants.  The Confirmation Order shall authorize and direct the Indenture Trustee to take whatever action may be necessary or appropriate, in its reasonable discretion, to deliver the Distributions, including, without limitation, obtaining an order of the District Court.  On the Effective Date, the Indenture Trustee and its agents shall be discharged of all their obligations associated with (i) the Senior Notes, (ii) the Indenture, and (iii) any related documents, and released from all Claims arising in the Reorganization Cases.  As of the Effective Date, the Indenture shall be deemed fully satisfied and cancelled; *provided*, *however*, that the Indenture shall continue in effect solely for the purposes of: (1) allowing holders of the Senior Note Claims to receive distributions under the Plan, (2) allowing and preserving the rights of the Indenture Trustee to (a) make distributions in satisfaction of Allowed Senior Note Claims, (b) exercise its charging liens against any such distributions, and (c) seek compensation and reimbursement for any fees and expenses incurred in making such distributions.  Upon completion of all such distributions, the Senior Notes and the Indenture shall terminate completely.  From and after the Effective Date, the Indenture Trustee shall have no duties or obligations under the Indenture other than to make distributions pursuant to the Plan.

**5.6     Exit Facility**.  On the Effective Date, Reorganized Congoleum shall obtain exit financing consistent with the terms and conditions set forth in the Exit Facility Commitment Letter or Term Sheet, which shall be filed as part of the Plan Supplement, from the Exit Facility Lenders.

**5.7     Issuance of New Securities and Debt Instruments**

     (a)     New Common Stock.  On the Effective Date, Reorganized Congoleum shall issue the New Common Stock pursuant to the Plan.  The Amended and Restated Certificate sets forth the rights and preferences of the New Common Stock.  The New Common Stock shall be issued subject to the Stockholders Agreement described below.

     (b)     New Senior Notes.  On the Effective Date, Reorganized Congoleum shall issue $33 million in initial principal amount of 9% New Senior Notes, which shall mature on December 31, 2017.  The New Senior Notes shall be governed by the terms and conditions set forth in the New Indenture.

**5.8     Registration Rights Agreement**.  In the event the board of directors of Reorganized Congoleum determines in its discretion to register any of the New Common Stock with the Securities and Exchange Commission, or if Reorganized Congoleum is required under the Stockholders Agreement or applicable securities laws to register any of the New Common Stock with the Securities and Exchange Commission, any Person receiving Distributions of the New Common Stock issued on the Effective Date that is not entitled to an exemption from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code, or whose resale of the New Common Stock is otherwise restricted under the securities laws, shall be entitled to become a party to the Registration Rights Agreement.  The Registration Rights Agreement shall be satisfactory in form and substance to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative, a substantially similar form of which will be contained in the Plan Supplement.

**5.9     Stockholders Agreement**.  On the Effective Date, the Stockholders Agreement will be adopted by Reorganized Congoleum and be binding upon all holders of New Common Stock.  All holders of New Common Stock will be subject to the Stockholders Agreement which will, among other things, govern the access each holder of New Common Stock shall have to information with respect to Reorganized Congoleum and the ability to transfer such holder's New Common Stock.  Each certificate representing share(s) of New Common Stock shall bear a legend indicating that the New Common Stock is subject to the Stockholders Agreement.  The Stockholders Agreement will be effective as of the Effective Date.  The Stockholders Agreement contains customary terms and conditions, including minority stockholder protections, and includes the minority stockholders having both a right of first refusal and right of first offer on the Plan Trust Common Stock.  The Stockholders Agreement shall be satisfactory in form and substance to the Bondholders' Committee, the Asbestos Claimants' Committee and the

Futures Representative, a substantially similar form of which is attached hereto as Exhibit "L." The Stockholders Agreement will be filed as part of the Plan Supplement.

**5.10** **Effectuating Documents/Further Transactions**. Each of the Debtors (subject to the consent of the Bondholders' Committee, the Asbestos Claimants' Committee and the Futures Representative) and Reorganized Congoleum, and their respective officers and designees, is authorized and directed to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be requested by the Plan Proponents, or as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of the Plan, the Exit Facility, or any other Plan Document, or to otherwise comply with applicable law.

**5.11** **Exemption from Certain Transfer Taxes and Recording Fees**. Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to Reorganized Congoleum or to any other Person or Entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**5.12** **Section 346 Injunction**. In accordance with section 346 of the Bankruptcy Code for the purposes of any state or local law imposing a tax, income will not be realized by the Estates, the Debtors or the Reorganized Debtors by reason of the forgiveness or discharge of indebtedness resulting from the consummation of the Plan. As a result, each state or local taxing authority is permanently enjoined and restrained, after the Confirmation Date, from commencing, continuing or taking any act to impose, collect or recover in any manner any tax against the Debtors or the Reorganized Debtors arising by reason of the forgiveness or discharge of indebtedness under the Plan.

**5.13** **Corporate Action**. All matters provided for under the Plan involving the corporate structure of the Debtors or Reorganized Congoleum, or any corporate action to be taken by, or required of the Debtors or Reorganized Congoleum shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the stockholders or directors of any of such entities.

**5.14** **Litigation Settlement Agreement**. (a) The Plan implements a compromise and settlement with respect to each such Litigation Settlement Claimant, pursuant to the Litigation Settlement Agreement, as amended, whose Asbestos Personal Injury Claim was liquidated pursuant to the Claimant Agreement or a Pre-Petition Settlement Agreement, as the case may be. The original Litigation Settlement Agreement was approved by the Bankruptcy Court by an order signed on October 31, 2008. The parties to the Litigation Settlement Agreement agreed to an amendment to conform such agreement to developments in the Reorganization Cases, and approval of such amendment is sought from the District Court under Bankruptcy Rule 9019 in connection with confirmation of this Plan.

(b)     As of the Effective Date of the Plan:

(i)     The Litigation Settlement Claimants shall waive any and all rights with respect to any pre-petition settlement of their Asbestos Personal Injury Claims against the Debtors, whether pursuant to any Pre-Petition Settlement Agreement or the Claimant Agreement, including the liquidated amounts thereof; provided, however, that:

- any Asbestos Personal Injury Claim against the Debtors held by any such Litigation Settlement Claimant, including with respect to any statutes of limitation related thereto, shall be restored to the *status quo ante* as it existed as of the time the Litigation Settlement Claimant initially filed

25

or submitted its Asbestos Personal Injury Claim against the Debtors that resulted in the Claimant's Pre-Petition Settlement Agreement or the Claimant Agreement (the "Submission Date");

- any statute of limitation with respect to such Asbestos Personal Injury Claim shall be tolled until the later of ninety (90) days after the expiration of any stay imposed due to the filing of the Debtors' chapter 11 cases of such additional time as may be provided pursuant to the TDP incorporated in the Plan (the "Asbestos Tolling Period");

- neither the Asbestos Tolling Period nor any other term or provision of the Litigation Settlement Agreement shall revive any statute of limitations that expired as of the Submission Date; and

- all parties retain the right to assert any statute of limitations defense or other defenses that they could have asserted as of the Submission Date.

(ii)     With respect to the Litigation Settlement Claimants, as amended, the Debtors shall be released from any and all obligations and duties imposed pursuant to any Pre-Petition Settlement Agreement, Claimant Agreement, the Collateral Trust Agreement, Security Agreement and any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003.

(iii)     The Debtors shall be deemed to have forever withdrawn, released, discharged, waived and forgiven the Litigation Settlement Claimants and Claimants' Counsel, and each of their respective assigns, administrators and successors in interest, for and from any and all claims, actions, causes of action, counterclaims, proofs of claim, and any other obligation of any kind or nature arising from or related to the Bankruptcy Code, the Avoidance Actions, and any and all claims related to any Pre-Petition Settlement Agreement, Claimant Agreement, the Collateral Trust Agreement, Security Agreement, pre-petition payments to Claimants Counsel, and any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003, including all pending and potential causes of action, whether accrued or to accrue, whether asserted by way of claim, counterclaim, cross-claim, third-party action, action for indemnity or contribution or otherwise; provided, however, that the foregoing shall not constitute a release of any rights to enforce the terms of the Litigation Settlement Agreement, as amended, or any defenses to Asbestos Personal Injury Claims that may be asserted by the Debtors as contemplated in the Litigation Settlement Agreement, as amended.

(iv)     Except as otherwise provided for in the Litigation Settlement Agreement, as amended, all Litigation Settlement Claimants and Claimants' Counsel shall be deemed to have forever withdrawn, released, discharged, waived and forgiven the Debtors and their respective assigns, administrators and successors in interest, for and from any and all claims, actions, causes of action, counterclaims, proofs of claim, and any other obligation of any kind or nature arising from or related to the Bankruptcy Code, the Avoidance Actions, and any and all claims related to any Pre-Petition Settlement Agreement, Claimant Agreement, the Collateral Trust Agreement, Security Agreement and any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003, including all pending and potential causes of action, whether accrued or to accrue, whether asserted by way of a claim, counterclaim, cross-claim, third-party action, action for indemnity or contribution or otherwise; provided, however, that the foregoing shall not constitute a release of any rights to enforce the terms of the Litigation Settlement Agreement, as amended, and shall not constitute a release by Litigation Settlement Claimants of their Asbestos Personal Injury Claims against the Debtors, the Plan Trust, or any other party or entity.

(c)     Pursuant to the Litigation Settlement Agreement, as amended, and contingent upon confirmation of the Plan, the estates of Comstock, Cook and Arsenault have elected to withdraw their claims against the Debtors and will not seek recovery from the Debtors and/or Plan Trust, or otherwise participate in the Reorganization Cases.

(d)     Within 30 days after the Effective Date of the Plan, the District Court shall enter an order of dismissal of all claims and counterclaims in the Avoidance Actions, with prejudice, and with all parties to bear their own costs and attorneys fees.

(e)     Subject to the terms of this Plan, the mutual releases set forth in the Litigation Settlement Agreement, as amended, shall not abridge the right of Litigation Settlement Claimants to submit and recover upon their Asbestos Personal Injury Claims against the Debtors including as against the Plan Trust.

(f)     Each Litigation Settlement Claimant shall be entitled to submit its Asbestos Personal Injury Claim to the Debtors' bankruptcy estates, including the Plan Trust, as an unliquidated claim for resolution and treatment pursuant to TDP, provided that, any Litigation Settlement Claimant who received a partial payment from the Debtors with respect thereto prior to the Petition Date, including specifically claimants Cook, Arsenault, and Comstock, in addition to the other provisions hereof, hereby agrees to either: (a) not seek any further recovery with respect thereto against the Debtors, including from any Plan Trust, or (b) return and relinquish any such pre-petition partial payment for the benefit of the Plan Trust as a condition precedent to asserting any such further Asbestos Personal Injury Claim against the Debtors or the Plan Trust.

(g)     Pursuant to the Plan, any Pre-Petition Settled Claimant who is not a Litigation Settlement Claimant shall nevertheless receive the same treatment as the Litigation Settlement Claimants.

**5.15    Review of Claimants' Counsel Expenses**.  The expenses paid pre-petition by the Debtors to the Claimants' Counsel pursuant to the Claimant Agreement shall be subject to approval by the District Court in its discretion.

**5.16    Non-Asbestos Reserve Fund**

(a)     **Establishment of Reserve Fund**.  The Reorganized Debtors shall create a reserve fund (the "Reserve Fund") for claims, excluding asbestos claims, of any Governmental Units and any other Entities against the Debtors and/or Reorganized Debtors (the "Non-Asbestos Claims").  Within thirty (30) days after the Effective Date, the Plan Trust shall pay $3 million to the Reorganized Debtors for placement in the Reserve Fund (the "Reserve Fund Settlement Funds").  As used herein, the term "Known Insurance Claims" means Non-Asbestos Claims against the Debtors or Reorganized Debtors which arose from the operations of the Debtors prior to December 31, 2003 to the extent such claims survive the Reorganization Cases and claims are known to exist potentially as of the Fifth Anniversary of the Effective Date (the "Fifth Anniversary Date").  The Reserve Fund Settlement Funds shall be deposited in a segregated account and shall be used for the sole purpose of paying defense and indemnity costs incurred by the Reorganized Debtors after the Effective Date arising from Known Insurance Claims that are not paid in full by Liberty Mutual Insurance Company.  The Board of Directors of the Reorganized Debtors shall approve the initial payment made from the Non-Asbestos Reserve Fund.  Following the initial payment, the Board of Directors, in its sole discretion, may require notice before any subsequent payments are made out of the Non-Asbestos Reserve Fund.  The Reorganized Debtors shall provide the Plan Trustee with contemporaneous notice of payments made from the Non-Asbestos Reserve Fund.

(b)     **Termination of Reserve Fund**.  As of the Fifth Anniversary Date, any unused balance of the Reserve Fund shall be transferred by the Reorganized Debtors to the Plan Trust, and the Reserve Fund shall be terminated, provided, however, that to the extent there are any Known Insurance Claims as of the Fifth Anniversary Date that are unresolved, the Reserve Fund shall not be terminated on that date.  In such event, any Reserve Fund balance shall continue to be used to pay defense and indemnity costs incurred by the Reorganized Debtors arising from Known Insurance Claims until those claims are resolved.  In the event that a balance remains in the Reserve Fund after all Known Insurance Claims are resolved, any unused balance of the Reserve Fund shall be transferred by the Reorganized Debtors to the Plan Trust and at such time the Reserve Fund shall be terminated.  For avoidance of doubt, in the event that the Reserve Fund continues after the Fifth Anniversary Date because there are Known Insurance Claims, the Reserve Fund shall not be available for Non-Asbestos Claims for which notice of such Non-Asbestos Claim was first received by the Reorganized Debtors after the Fifth Anniversary Date.

**5.17    Intercompany Settlement**.  (a)  The Plan implements a compromise and settlement with respect to ABI, the ABI Claims and the Intercompany Agreements (as set forth in this Section 5.17, the "Intercompany

27

Settlement"). Pursuant to Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code and consistent with section 1129 of the Bankruptcy Code, the Plan shall constitute a motion for approval of, and the Confirmation Order shall authorize and constitute District Court approval of, the Intercompany Settlement.

(b)     On the Effective Date, pursuant to Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code, in full and final satisfaction of the ABI Claims, and for good and valuable consideration including ABI's agreement to the treatment specified in the Plan for the ABI Claims and the Claims and Interests asserted by other parties in interest, the ABI Settlement shall be effectuated in accordance with the following terms:

1.     All ABI Claims, including without limitation ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.15(b)(4)(B) of the Plan), shall be deemed Disallowed and expunged.

2.     All Intercompany Agreements shall be deemed rejected, and any and all ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.17(b)(4)(B) of the Plan) arising therefrom shall be deemed Disallowed and expunged.

3.     ABI and Reorganized Congoleum shall enter into and effectuate the New ABI Agreement, and which shall govern the relationship between ABI and Reorganized Congoleum upon the Effective Date.

4.     The ABI Parties and ABI and their respective Representatives (in their capacities as such) shall be deemed to have received and exchanged mutual general releases with and from the Debtors, their Estates and Reorganized Congoluem, such that:

A.     *As of the Effective Date, the Debtors, their Estates and Reorganized Congoleum shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, demands, debts, rights, causes of action and liabilities (other than their rights to enforce the terms of the Intercompany Settlement, the New ABI Agreement and the ABI Canada License Agreement, as amended by Section 5.17(b)(5) of the Plan, and their rights to payment of not more than $2 million on account of net Unpaid Intercompany Amounts remaining after intercompany offsets of Unpaid Intercompany Amounts), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, Reorganized Congoleum, the Reorganization Cases, the Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtors, their Estates or Reorganized Congoleum, as of the Petition Date or thereafter, against the ABI Parties, ABI and/or their respective Representatives (in their capacities as such); and*

B.     *As of the Effective Date, the ABI Parties, ABI and their respective Representatives (in their capacities as such) shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, demands, debts, rights, causes of action and liabilities (other than their rights to enforce the terms of the Intercompany Settlement, the New ABI Agreement and the ABI Canada License Agreement, as amended by Section 5.17(b)(5) of the Plan, and their rights to payment of not more than $2 million on account of net Unpaid Intercompany Amounts remaining after intercompany offsets of Unpaid Intercompany Amounts), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, Reorganized Congoleum, the Reorganization Cases, the Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the ABI Parties, ABI and their respective Representatives (in their capacities as such), as of the Petition Date or thereafter, against the Debtors, their Estates or Reorganized Congoleum.*

5.     The ABI Canada License Agreement shall be deemed to have been assumed by Congoleum and become an obligation of Reorganized Congoleum, *provided, however,* that Article 7.02 of the ABI Canada License Agreement shall be modified so that the "Term" thereof shall expire two years from the Effective

28

Date and the ABI Canada License Agreement shall be deemed amended accordingly as of the Effective Date without any further action of any Person or Entity.

**5.18    Deemed Consolidation of Debtors For Plan Purposes Only.**  Subject to the occurrence of the Effective Date, the Debtors shall be deemed consolidated under the Plan for Plan purposes only.  Each and every Claim filed or to be filed against any of the Debtors shall be deemed filed against the deemed consolidated Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Debtors.  Such deemed consolidation, however, shall not (other than for purposes related to funding distributions under the Plan and as set forth above in this Section 5.18) affect: (i) the legal and organizational structure of the Debtors; or (ii) any Liens that are required to be maintained under the Plan (A) in connection with executory contracts or unexpired leases that were entered into during the Reorganization Cases or that have been or will be assumed, (B) pursuant to the Plan, or (C) in connection with any Exit Facility. Notwithstanding anything contained in the Plan to the contrary, the deemed consolidation of the Debtors shall not have any effect on any of the Claims being reinstated and left unimpaired under the Plan, and the legal, equitable, and contractual rights to which the holders of any such Claims are entitled shall be left unaltered by the Plan.

## ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS WITH RESPECT TO CLAIMS OTHER THAN PLAN TRUST ASBESTOS CLAIMS

**6.1    Plan Distributions.**  The Disbursing Agent shall make all distributions required under the Plan (other than distributions to holders of Plan Trust Asbestos Claims and Senior Note Claims).  Distributions shall be made on the Distribution Date (unless otherwise provided herein or ordered by the District Court) with respect to all Claims except for Plan Trust Asbestos Claims.  Distributions to be made on the Distribution Date shall be deemed actually made on the Distribution Date if made either (a) on the Distribution Date or (b) as soon as practicable thereafter.  With respect to Plan Trust Asbestos Claims, distributions to holders of Plan Trust Asbestos Claims shall be made in accordance with the Plan Trust Agreement and/or the TDP, as applicable.  With respect to Senior Note Claims, Distributions will be made by the Indenture Trustee, whose reasonable fees and expenses in connection with such Distributions shall be paid by Reorganized Congoleum.

**6.2    Distributions of Cash.**  Any Distribution of Cash made by Reorganized Congoleum pursuant to the Plan shall, at Reorganized Congoleum's option, be made by check drawn on a domestic bank or by wire transfer from a domestic bank.

**6.3    No Interest on Claims.**  Unless otherwise specifically provided for in the Plan, the Confirmation Order, or a post-petition agreement in writing between the Debtors and a holder, Post-Petition Interest shall not accrue or be paid on Claims, and no holder shall be entitled to interest accruing on or after the Petition Date. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a Final Distribution is made when and if such Disputed Claim becomes an Allowed Claim.  Notwithstanding the foregoing, this Section 6.3 shall not apply to Plan Trust Asbestos Claims which shall be governed in all cases by the Plan Trust Agreement and the TDP.

**6.4    Delivery of Distributions.**  Distributions to holders of Allowed Claims other than Asbestos Claims shall be made by the Disbursing Agent or the Indenture Trustee, as applicable, (a) at the holder's last known address, or (b) at the address in any written notice of address change delivered to the Disbursing Agent or the Indenture Trustee, as applicable.  If any holder's distribution made by the Disbursing Agent is returned as undeliverable, no further distributions to such holder shall be made, unless and until the Disbursing Agent is notified of such holder's then current address, at which time all missed distributions shall be made to such holder without interest.  Amounts in respect of undeliverable distributions made through the Disbursing Agent shall be returned to Reorganized Congoleum until such distributions are claimed or become unclaimed property pursuant to Section 6.8 of the Plan. With respect to Plan Trust Asbestos Claims, distributions to the holders of Plan Trust Asbestos Claims shall be made in accordance with the Plan Trust Agreement and/or the TDP, as applicable.  With respect to Senior Note Claims, distributions to holders of Senior Note Claims shall be made in accordance with the Indenture.

**6.5** **Distributions to Holders as of the Record Date**. All Distributions on Allowed Claims shall be made to the Record Holders of such Claims. As of the close of business on the Record Date, the Claims register maintained by the Voting Agent shall be closed, and there shall be no further changes in the Record Holder of any Claim. Reorganized Congoleum shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. Reorganized Congoleum shall instead be entitled to recognize and deal for all purposes under the Plan with the Record Holders as of the Record Date.

**6.6** **Fractional Securities; Fractional Dollars**. Distributions of fractions of shares of New Common Stock will not be made and shall be rounded (up or down) to the nearest whole number, with half shares or less being rounded down. Reorganized Congoleum shall not be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

**6.7** **Withholding of Taxes**. The Disbursing Agent shall withhold from any assets or property distributed under the Plan any assets or property that must be withheld pursuant to applicable law.

**6.8** **Unclaimed Property.** Any Cash, assets and other property to be distributed on account of any Claim (other than a Plan Trust Asbestos Claim) under the Plan that remain unclaimed (including by an Entity's failure to negotiate a check issued to such Entity) or otherwise not deliverable to the Entity entitled thereto before the later of (a) one year after the date of distribution or (b) 120 calendar days after an order allowing such Entity's Claim becomes a Final Order, shall become vested in, and shall be transferred and delivered to, Reorganized Congoleum. In such event, such Entity's Claim shall no longer be deemed to be Allowed and such Entity shall be deemed to have waived its rights to such payments or distributions under the Plan pursuant to section 1143 of the Bankruptcy Code and shall have no further Claim in respect of such distribution and shall not participate in any further distributions under the Plan with respect to such Claim.

**ARTICLE VII**

**RESOLUTION OF DISPUTED CLAIMS**

**7.1** **Disallowance of Improperly Filed Claims**. Subject to section 502(j) of the Bankruptcy Code and Bankruptcy Rules 3008 and 9006, any Administrative Claim, Asbestos Property Damage Claim or Claim (other than Asbestos Personal Injury Claims) for which the filing of a Proof of Claim, application or motion with the District Court is required under the terms of the Bankruptcy Code, the Bankruptcy Rules, any order of the Bankruptcy Court or District Court, as applicable (including one providing a Bar Date), or the Plan shall be Disallowed if and to the extent that such Proof of Claim (or other filing) is not timely and properly made.

**7.2** **Prosecution of Objections to Claims**. Unless otherwise ordered by the District Court after notice and a hearing, after the Effective Date, Reorganized Congoleum, the Bondholders' Committee, the Asbestos Claimants' Committee and the Futures Representative each shall have the right to make and file objections to Proofs of Claims, other than Proofs of Claims in respect of Asbestos Personal Injury Claims and Professional Fee Claims, at any time on or before ninety (90) days after the later of (i) the Effective Date or (ii) the date on which such Claim was filed with the District Court unless no Proof of Claim is required to be filed pursuant to Bankruptcy Rule 3002, the Plan or any order of the District Court; *provided, however,* that (x) this deadline may be extended by the District Court on motion by the Debtors, Reorganized Congoleum, the Bondholders' Committee, the Asbestos Claimants' Committee or the Futures Representative, as applicable, and (y) neither the Debtors, Reorganized Congoleum, the Futures Representative, the Bondholders' Committee, the Asbestos Claimants' Committee, nor any other Person may file an objection to any (1) Claim that was Allowed by a Final Order entered during the Reorganization Cases, or (2) Claim Allowed by the Plan. In addition, unless otherwise ordered by the District Court after notice and a hearing, after the Effective Date Reorganized Congoleum, the Bondholders' Committee, the Asbestos Claimants' Committee and the Futures Representative, subject to Sections 13.8 and 13.14 of the Plan, each shall have the exclusive right to make and file objections to Administrative Claims and to amend the Schedules or to object to any Claim specified on the Schedules, at any time on or before sixty (60) days after the later of (i) the Effective Date or (ii) the date on which such Claim was filed with the District Court unless no Proof of Claim is required to be filed pursuant to Bankruptcy Rule 3002, the Plan or any order of the District Court; *provided, however,* that (x) this

30

deadline may be extended by the District Court on motion by the Debtors, Reorganized Congoleum, the Bondholders' Committee, the Asbestos Claimants' Committee or the Futures Representative, as applicable, (y) neither the Debtors, Reorganized Congoleum, the Futures Representative, the Bondholders' Committee, the Asbestos Claimants' Committee nor any other Person may file an objection to any (1) Claim that was Allowed by a Final Order entered during the Reorganization Cases, or (2) Claim Allowed by the Plan, and (z) with respect to any Administrative Claim referred to in sub-clause (a)(4) of the definition of Administrative Expense, no objection may be filed with respect to any such Administrative Expense other than with respect to the reasonableness of such Administrative Expense or whether such Administrative Expense was incurred in accordance with Section 6.6 of the Indenture. Without prejudice to the right of any Asbestos Insurance Company to assert any Asbestos Insurer Coverage Defenses, after the Effective Date, only the Plan Trustee shall have the authority to contest Asbestos Personal Injury Claims and Asbestos Property Damage Claims and litigate to judgment, settle or withdraw such objections and each Asbestos Personal Injury Claim and Asbestos Property Damage Claim, whether or not a Proof of Claim was filed with the Bankruptcy Court or District Court, shall be satisfied exclusively in accordance with the Plan Trust Documents.

   **7.3 No Distributions Pending Allowance**. Notwithstanding any other provision hereof, if a Claim or any portion of a Claim (other than an Asbestos Personal Injury Claim) is a Disputed Claim, no payment or distribution shall be made on account of such Disputed Claim, unless and until such Disputed Claim becomes an Allowed Claim.

   **7.4 Distributions After Allowance**. Payments and distributions to each holder of a Claim that is Disputed, or that is not Allowed, to the extent that such Claim ultimately becomes Allowed, shall be made in accordance with the provisions hereof governing the Class of Claims in which such Claim is classified. As soon as practicable after the date that the order or judgment of the District Court allowing any Disputed Claim (other than a disputed Asbestos Claim) becomes a Final Order, Reorganized Congoleum shall distribute to the holder of such Claim any payment or property that would have been distributed to such holder if the Claim had been Allowed as of the Effective Date (or such other date on which such distribution would have been made).

**ARTICLE VIII**

**TREATMENT OF EXECUTORY CONTRACTS,**
**UNEXPIRED LEASES AND SETTLEMENTS**

   **8.1 Assumption of Unexpired Leases and Executory Contracts**

    (a) Assumption. Except for any unexpired lease or executory contract that the Plan Proponents reject or designate as being subject to rejection on or before the Effective Date, as of the Effective Date, all executory contracts and unexpired leases not previously assumed or rejected by the Debtors pursuant to section 365 of the Bankruptcy Code shall be deemed to have been assumed by the Debtors, and the Plan shall constitute a motion to assume such executory contracts and unexpired leases. Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the District Court shall constitute approval of such assumptions pursuant to section 365(a) of the Bankruptcy Code and a finding by the District Court that each such assumption is in the best interests of the Debtors, the Estates and all parties in interest in the Reorganization Cases. With respect to each such executory contract or unexpired lease assumed by the Debtors, unless otherwise determined by the District Court pursuant to a Final Order or agreed to by the parties thereto on or before the Effective Date, any defaults of the Debtors with respect to such assumed executory contracts or leases existing as of the Effective Date shall be cured in the ordinary course of the Reorganized Debtors' business promptly after any such default becomes known to the Debtors and, if disputed, established pursuant to applicable law by the District Court, and the assumed executory contracts or leases shall be binding upon and enforceable upon the parties thereto, subject to any rights and defenses existing thereunder. Subject to the occurrence of the Effective Date, upon payment of such cure amounts, all defaults of the Debtors existing as of the Confirmation Date with respect to such executory contract or unexpired lease shall be deemed cured.

    (b) Rejection. Notwithstanding subpart (a) of this Section 8.1, the Plan Proponents may reject those executory contracts and unexpired leases listed on an exhibit to be filed with the District Court as part of the Plan Supplement (as such list may be amended or supplemented up to and including the Confirmation Date).

31

(c)     <u>ABI Canada License Agreement; Intercompany Agreements</u>.  Pursuant to and in consideration of the Intercompany Settlement and Section 5.15 and other terms of the Plan, on the Effective Date (A) the ABI Canada License Agreement shall be amended as provided in the Intercompany Settlement and deemed to have been assumed by Congoleum and become a contractual obligation of Reorganized Congoleum, and the Plan shall constitute a motion to assume such license agreement and (B) all Intercompany Agreements shall be rejected and all ABI Claims, including without limitation any ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.15(b)(4)(B) of the Plan), shall be deemed Disallowed and expunged.

**8.2**     <u>Damages Upon Rejection</u>.  Except to the extent arising out of or based on the rejection of any executory contract related to or involving asbestos which shall be dealt with under the TDP, the District Court shall determine the dollar amount, if any, of the Claim of any Entity seeking damages by reason of the rejection of any executory contract or unexpired lease; *provided, however,* that such Entity must file a Proof of Claim with the District Court on or before thirty (30) calendar days following the later of the Confirmation Date or the date of rejection of the executory contract or unexpired lease.  To the extent that any such Claim is Allowed by the District Court by Final Order, such Claim shall become, and shall be treated for all purposes under the Plan as, a Class 9 General Unsecured Claim, and the holder thereof shall receive distributions as a holder of an Allowed Claim in such Class pursuant to the Plan unless such Claim is held by ABI, in which case such Claim shall be Disallowed and expunged.

**8.3**     <u>Insurance Agreements</u>.  Except to the extent expressly set forth in any Asbestos Insurance Settlement Agreement, nothing contained in the Plan or any negotiations leading up to the Plan, including this Section 8.3, shall constitute a waiver of: (i) any claim, right, or cause of action that any of the Debtors or the Plan Trust, as applicable, may have against any insurer, including under any insurance agreement; or (ii) any Asbestos Insurer Coverage Defenses that any Asbestos Insurance Company may have against the Debtors or the Plan Trust. The discharge and release provisions contained in the Plan shall neither diminish nor impair the duties or obligations of any Debtor or any other Entity under any Asbestos Insurance Policy or agreement relating thereto (including any Asbestos Insurance Settlement Agreement), nor shall the discharge and release provisions contained in the Plan diminish nor impair the duties, obligations or the Asbestos Insurer Coverage Defenses of any Asbestos Insurance Company under any Asbestos Insurance Policy or agreement relating thereto. The Reorganized Debtors shall not voluntarily assist any Person in the establishment of any rights, action, cause of action or claim against the Century Entities in anyway relating to any Asbestos Claim or other claim released under the Settlement and Buyback Agreement.

**8.4**     <u>Compensation and Benefits Programs</u>.  (a)  Except for the Congoleum Interests which are treated elsewhere in the Plan, unless otherwise agreed to by the affected parties or modified by order of the Bankruptcy Court or District Court, as applicable, all of the Debtors' obligations under employment and severance policies, and all compensation and benefit plan, policies, and programs shall be treated as though they are executory contracts that are deemed assumed under the Plan.

(b)     As of the Effective Date, the Pension Plans, as well as the collective bargaining agreement by and between the Debtors and Teamsters Local 312, shall be deemed to have been assumed by Reorganized Congoleum. Reorganized Congoleum shall continue the Pension Plans, satisfy the minimum funding standards pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082, and administer the Pension Plans in accordance with their terms and the provisions of ERISA.  Furthermore, nothing in the Plan shall be construed as discharging, releasing or relieving the Debtors or Reorganized Congoleum, or any party, in any capacity, from any liability imposed under any law or regulatory provision with respect to the Pension Plans, the Pension Benefit Guaranty Corporation ("**PBGC**") or the Teamsters Pension Trust Fund of Philadelphia Vicinity (the "Teamsters Pension Fund"). The PBGC, the Pension Plans and the Teamsters Pension Fund shall not be enjoined or precluded from enforcing such liability as a result of any provision of the Plan or the Confirmation Order.  Notwithstanding anything in this Section 8.4, the Plan Trust shall not assume any of the liabilities, obligations, or responsibilities of the Debtors or Reorganized Congoleum with respect to the Pension Plans, the PBGC or the Teamster Pension Fund.

**8.5**     <u>Retiree Benefits</u>.  Notwithstanding any other provisions of the Plan (other than the last sentence of this Section 8.5), any payments that are due to any individual for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents for medical, surgical, or hospital care benefits, or

benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the Debtors prior to the Petition Date shall be continued for the duration of the period, if any, that the Debtors have obligated themselves to provide such benefits. Notwithstanding the foregoing, no employee or retired employee (nor their spouses or dependents and beneficiaries) of the Debtors or the Reorganized Debtors shall be entitled to assert any Asbestos Claim against the Debtors or the Reorganized Debtors.

**8.6    Indemnification of Directors, Officers and Employees**.  The obligations of the Debtors to indemnify their current and former directors, officers or employees to the extent provided in the Debtors' constituent documents or required pursuant to applicable general corporation law shall be deemed and treated as obligations that are assumed by Reorganized Congoleum pursuant to the Plan as of the Effective Date; *provided, however,* that (i) with respect to acts or omissions occurring prior to, on or after the Petition Date, the indemnification obligation of Reorganized Congoleum is limited exclusively to the extent of proceeds available under any applicable directors and officers insurance policy for the act(s) and/or omission(s) at issue and (ii) no current or former director, officer or employee shall be indemnified with respect to the gross negligence, fraud or willful misconduct of such party.

# ARTICLE IX

## ACCEPTANCE OR REJECTION OF THE PLAN

**9.1    Classes Entitled to Vote**.  The holders of Claims or Interests in each Impaired Class of Claims or Interests, i.e., Classes 4, 6, 7, 8, 9 and 10 whose Claims or Interests are Allowed or temporarily allowed for voting purposes, are entitled to vote to accept or reject the Plan pursuant to the Voting Procedures Order; *provided however* that the holders of Congoleum Interests in Class 10 are deemed to have rejected the Plan in accordance with the provisions of Section 1126(g) of the Bankruptcy Code and, accordingly, their separate vote will not be solicited.

**9.2    Acceptance by Impaired Classes of Claims**.  Pursuant to section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if (a) the holders of at least two-thirds in dollar amount of the claims actually voting in such Class (other than Claims held by any holder designated pursuant to section 1126(e) of the Bankruptcy Code) have voted to accept the Plan and (b) more than one-half in number of such claims actually voting in such Class (other than Claims held by any holder designated pursuant to section 1126(e) of the Bankruptcy Code) have voted to accept the Plan.

**9.3    Acceptance by Impaired Class of Interests**.  Pursuant to section 1126(d) of the Bankruptcy Code, an Impaired Class of Interests shall have accepted the Plan if the holders of at least two-thirds in amount of the Allowed Interests actually voting in such Class (other than Interests held by any holder designated pursuant to section 1126(e) of the Bankruptcy Code) have voted to accept the Plan.  The holders of Congoleum Interests in Class 10 are deemed to have rejected the Plan in accordance with the provisions of Section 1126(g) of the Bankruptcy Code.

**9.4    Acceptance Pursuant to Section 524(g) of the Bankruptcy Code**.  The Plan shall have been voted upon favorably as required by section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code.

**9.5    Presumed Acceptance of Plan**.  Classes 1, 2, 3, 5, and 11 are Unimpaired.  Under section 1126(f) of the Bankruptcy Code, the holders of Claims and Interests in such Classes are conclusively presumed to have voted to accept the Plan.

**9.6    Reservation of Rights**.  In the event that any Impaired Class fails to accept the Plan by the requisite numbers and amounts required by the Bankruptcy Code, the Plan Proponents reserve the right to seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

# ARTICLE X

## CONDITIONS TO CONFIRMATION AND EFFECTIVENESS

**10.1** **Conditions to Confirmation**.  Confirmation of the Plan shall not occur unless each of the following conditions has been satisfied or waived in accordance with Section 10.3 below.  These conditions to Confirmation, which are designed, among other things, to ensure that the Injunctions, releases, and discharges set forth in Article XI shall be effective, binding and enforceable, are as follows:

(a)     The District Court shall have made specific findings and determinations, among others, in substantially the following form:

(i)     The Discharge Injunction and the Asbestos Channeling Injunction are to be implemented in connection with the Plan and the Plan Trust;

(ii)     As of the Petition Date, Congoleum has been named as a defendant in personal injury, wrongful death or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

(iii)     The Plan Trust, upon the Effective Date, shall assume the liabilities of the Debtors with respect to Plan Trust Asbestos Claims and Demands;

(iv)     The Plan Trust is to be funded in part by securities of Reorganized Congoleum in the form of the Plan Trust Common Stock, which constitutes an obligation of Reorganized Congoleum to make future payments to the Plan Trust;

(v)     On the Effective Date, the Plan Trust will own a majority of the voting shares of Reorganized Congoleum;

(vi)     The Plan Trust is to use its assets and income to pay Plan Trust Asbestos Claims and Plan Trust Expenses and otherwise as specifically set forth in the Plan Trust Agreement;

(vii)     Congoleum is likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Plan Trust Asbestos Claims, which are addressed by the Asbestos Channeling Injunction;

(viii)     The actual amounts, numbers and timing of future Demands cannot be determined;

(ix)     Pursuit of Demands outside the procedures prescribed by the Plan and the TDP is likely to threaten the Plan's purpose to deal equitably with Plan Trust Asbestos Claims and future Demands;

(x)     The Plan establishes a separate Class 7 for Asbestos Personal Injury Claims that are to be addressed by the Plan Trust and at least seventy-five percent (75%) of the Asbestos Claimants voting in Class 7 have accepted the Plan;

(xi)     The Plan establishes a separate class of Asbestos Property Damage Claims that are to be addressed by the Plan Trust and at least seventy-five percent (75%) of the claimants voting in such class have accepted the Plan;

(xii)     Pursuant to court orders or otherwise, the Plan Trust shall operate through mechanisms such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims or other comparable mechanisms, that provide reasonable assurance that the Plan Trust shall value, and be in a financial position to pay, Asbestos Personal Injury Claims and Demands therefor in substantially the same manner;

34

(xiii)     The Futures Representative was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Discharge Injunction and the Asbestos Channeling Injunction for the purpose of, among other things, protecting the rights of persons that might subsequently assert Demands of the kind that are addressed in the Discharge Injunction and the Asbestos Channeling Injunction and transferred to the Plan Trust;

(xiv)     In light of the benefits provided, or to be provided, to the Plan Trust on behalf of each Protected Party, the Asbestos Channeling Injunction is fair and equitable with respect to the persons that might subsequently assert Demands against any Protected Party;

(xv)     The Plan otherwise complies with section 524(g) of the Bankruptcy Code;

(xvi)     Congoleum's contributions to the Plan Trust provided for herein, together with the Asbestos Insurance Assignment, the Plan Trust Common Stock, constitute substantial assets of the Plan Trust and the reorganization;

(xvii)     The duties and obligations of the insurers that issued policies and their successors and assigns, or, with respect to any insolvent insurers, their liquidators and/or the state insurance guaranty funds that bear responsibility with respect to such rights under such policies which constitute the Asbestos Insurance Rights and Asbestos Property Damage Insurance Rights are not eliminated or diminished by the transfer pursuant to the Plan of the Debtors' rights in the Asbestos Insurance Rights and Asbestos Property Damage Insurance Rights pursuant to the Insurance Assignment Agreement;

(xviii)     The Settling Asbestos Insurance Companies are entitled to the benefits of the Asbestos Channeling Injunction with respect to Plan Trust Asbestos Claims;

(xix)     After Confirmation, each Asbestos Insurance Settlement Agreement of a Settling Asbestos Insurance Company and each Final Order of the Bankruptcy Court or District Court, as applicable, approving such Settlement Agreements shall be binding upon and inure to the benefit of the Plan Trust and the Plan Trustee, and the Plan Trust shall become fully bound by, and entitled to all of the rights afforded to the Plan Trust and/or the Debtors under, all of the terms and conditions of each such Asbestos Insurance Settlement Agreement without need for further act or documentation of any kind;

(xx)     After Confirmation, none of the Debtors, Reorganized Congoleum, the Futures Representative, the Plan Trustee, and the Asbestos Claimants' Committee shall seek to terminate, reduce or limit the scope of the Asbestos Channeling Injunction or any other injunction contained in the Plan that inures to the benefit of any Settling Asbestos Insurance Company;

(xxi)     As of the Effective Date, the Insurance Assignment Agreement shall be a valid and binding obligation of each of the parties thereto, shall be in full force and effect and shall be enforceable in accordance with its terms, in each case notwithstanding any anti-assignment provision in or incorporated into any Asbestos Insurance Policy and applicable state law; and

(xxii)     The Plan Trust is a "qualified settlement fund" pursuant to Section 468(B) of the IRC and the regulations issued pursuant thereto.

(b)     <u>Confirmation Order</u>.     The District Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order and any other order entered in conjunction therewith, each of which shall be in form and substance acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative and, insofar as such findings and determinations affect the Financing Order or the rights of Wachovia thereunder, Wachovia.

**10.2  Conditions to Effectiveness**.   Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date of the Plan shall not occur unless and until each of the following conditions has been satisfied or waived in accordance with Section 10.3 below:

(a)     Confirmation Order.  The Confirmation Order shall have been entered by the District Court and the Confirmation Order and any order of the District Court shall be in form and substance acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative and the Confirmation Order (and affirming order of the District Court) shall have become a Final Order; *provided, however*, that the Effective Date may occur at a point in time when the Confirmation Order is not a Final Order at the option of the Plan Proponents unless the effectiveness of the Confirmation Order has been stayed, reversed or vacated.  The Effective Date may occur, again at the option of the Plan Proponents, on the first Business Day immediately following the expiration or other termination of any stay of effectiveness of the Confirmation Order.

(b)     Injunctions.  The Discharge Injunction, the Asbestos Channeling Injunction and the Anti-Suit Injunction shall be in full force and effect.

(c)     Exit Facility.  The Exit Facility to be entered into by Reorganized Congoleum, and all documents to be executed in connection with the Exit Facility, shall be in form and substance reasonably satisfactory to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative and shall have been executed and delivered and all conditions precedent to effectiveness thereof shall have been satisfied or waived by the parties thereto.

(d)     New Senior Notes and New Indenture.  The New Indenture shall have been executed and authorized and the New Senior Notes shall have been delivered in accordance with the New Indenture and shall constitute valid senior secured indebtedness of Reorganized Congoleum.

(e)     New Common Stock.  The New Common Stock shall have been issued in accordance with the Plan.

(f)     Plan Documents.  The Plan Documents necessary or appropriate to implement the Plan (which shall include without limitation, the Plan, the Plan Trust Agreement, the TDP, the Exit Facility, the New Senior Notes, the New Indenture, the Registration Rights Agreement, the Amended and Restated Certificate, the Amended and Restated Bylaws, the New ABI Agreement, the Stockholders Agreement, and the Insurance Assignment Agreement) shall have been executed, delivered and, where applicable, filed with the appropriate governmental authorities; all conditions precedent to the effectiveness of each of such Plan Documents shall have been satisfied or waived by the respective parties thereto; and the Plan Documents shall be in full force and effect. The Plan Documents shall be acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative.

(g)     Other Assurances.  The Debtors or the Plan Proponents shall have obtained either (i) a private letter ruling from the Internal Revenue Service establishing that the Plan Trust is a "qualified settlement fund" pursuant to Section 468(B) of the IRC and the regulations issued pursuant thereto, or (ii) other decisions, opinions or assurances regarding certain tax consequences of the Plan, satisfactory to the Debtors, the Asbestos Claimants' Committee and the Futures Representative.

(h)     The District Court shall have approved pursuant to Bankruptcy Rule 9019 the First Amendment to the Litigation Settlement Agreement.

(i)     Merger.  The District Court will have made a specific finding and determination that the merger of the Subsidiary Debtors with and into Congoleum, with Reorganized Congoleum as the sole surviving corporation, is authorized.

(j)     Judicial Fees.  All fees payable pursuant to 28 U.S.C. § 1930 if and to the extent assessed against the Bankruptcy Estates of the Debtors will have been paid in full.

(k)     [reserved]

(l)     [reserved]

(m)    Other Approvals, Documents and Actions.  All authorizations, consents and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained, and all actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

**10.3  Waiver of Conditions**.  Each of the conditions set forth in Sections 10.1 and 10.2 above may be waived in whole or in part by the Plan Proponents without any notice to other parties in interest or the District Court and without a hearing.  The failure of the Plan Proponents to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

**ARTICLE XI**

**INJUNCTIONS, RELEASES AND DISCHARGE**

**11.1  Discharge**.  (a)  Except as specifically provided in the Plan, the Plan Documents or in the Confirmation Order, as of the Effective Date, Confirmation shall discharge the Debtors and the Reorganized Debtors pursuant to section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims of any nature whatsoever and Demands including, without limitation, any Claims, demands and liabilities that arose before Confirmation, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such Claim was filed or deemed filed under section 501 of the Bankruptcy Code, or such Claim was listed on the Schedules of the Debtors, (b) such Claim is or was Allowed under section 502 of the Bankruptcy Code, or (c) the holder of such Claim has voted on or accepted the Plan.  Except as specifically provided in the Plan or Plan Documents, the rights that are provided in the Plan as of the Effective Date shall be in exchange for and in complete satisfaction, settlement and discharge of all Claims (including without limitation Asbestos Claims) or Demands against, Liens on, and interests in the Debtors or the Reorganized Debtors or any of their assets or properties.  Notwithstanding anything herein to the contrary, nothing in this Section 11.1 shall affect the right of any Asbestos Insurance Company to assert any Asbestos Insurer Coverage Defenses.

(b)    Notwithstanding any other provision of the Plan to the contrary, Confirmation shall not discharge any pre-Petition Date or post-Petition Date, pre-Confirmation Date liability that may be due from any of the Debtors to the Internal Revenue Service as currently set forth in certain Proofs of Claim and Administrative Expense Claim, as amended, filed by the Internal Revenue Service.  Should any pre-Petition Date or post-Petition Date, pre-Confirmation Date tax liabilities be determined by the Internal Revenue Service to be due from any of the Debtors for any of the tax periods reflected by such Proofs of Claim or Administrative Expense Claim, such liabilities shall be determined administratively or in a judicial forum in the manner in which such liabilities would have been resolved had these Reorganization Cases not been commenced.  Any resulting liabilities determined pursuant to a Final Order or other final determination shall be paid as if these Reorganization Cases had not been commenced.

**11.2  Exculpation**.  As of the Effective Date, (i) the Debtors, the Futures Representative, the Asbestos Claimants' Committee, the Bondholders' Committee and each of their Representatives shall not have or incur any liability to any Entity for any act or omission taken on or after the Petition Date in connection with or arising out of the negotiation of the Plan, any Plan Document or any prior plan of reorganization relating to the Debtors or other related documents, the pursuit of Confirmation of the Plan or any prior plan of reorganization relating to the Debtors, the consummation of the Plan, or the administration of the Plan, or the property to be distributed under the Plan; and (ii) in all respects the Debtors, Futures Representative, the Asbestos Claimants' Committee and the Bondholders' Committee shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and the other Plan Documents.  For avoidance of doubt, in no event shall any such party be exculpated from liability under this Section 11.2 in the case of the gross negligence, fraud or willful misconduct of such party.  None of the foregoing parties shall be exculpated under this provision with respect to any acts occurring prior to the Petition Date.  With respect to officers and directors of the Debtors, this section shall apply only to such officers and directors who were serving in such capacity on and after the Petition Date.

**11.3  Releases by Holders of Plan Trust Asbestos Claims**.  Pursuant to this Section 11.3 and the Confirmation Order, which may include release(s) for the benefit of any Settling Asbestos Insurance Company consistent with the terms of this Section 11.3 and the terms of the relevant Asbestos Insurance Settlement

37

Agreement, any holder of a Plan Trust Asbestos Claim that receives a payment from the Plan Trust shall be deemed to have unconditionally released the Plan Trust and each Settling Asbestos Insurance Company from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, arising from, relating to, or involving the manufacture, sale, distribution, installation, formulation, marketing, transport, handling or any other activity involving any asbestos containing products of Congoleum and any of Congoleum entities identified in the Confirmation Order, which may incorporate the terms of one or more Asbestos Insurance Settlement Agreement, or their premises to the extent such Claim arises from, relates to or involves exposure to asbestos, including without limitation, any operation claims, contribution claims, direct action claims, and insurance coverage claims.  For the avoidance of doubt, in no event shall any such party be released under this Section 11.3 in the case of the gross negligence, fraud or willful misconduct of such party.

**11.4   Discharge Injunction**.  Except as specifically provided in the Plan Documents to the contrary, the satisfaction, release, and discharge set forth in Section 11.1 shall also operate as an injunction, pursuant to sections 105, 524(g) and 1141 of the Bankruptcy Code, prohibiting and enjoining the commencement or continuation of any action, the employment of process or any act to collect, recover from, or offset (a) any Claim or Demand against or Interest in the Debtors, the Reorganized Debtors, or the Plan Trust by any Entity and (b) any cause of action, whether known or unknown, against the Debtors and the Reorganized Debtors based on such Claim or Interest described in subpart (a) of this Section 11.4.

**11.5   Third Party Releases**.  Notwithstanding anything set forth in the Plan, no third party releases are being granted pursuant to the Plan nor are the Plan Proponents seeking approval of any such third party releases.

**11.6   Asbestos Channeling Injunction**.  The sole recourse of the holder of a Plan Trust Asbestos Claim or Demand on account of such Claim or Demand or of a Person that had or could have asserted an Asbestos Claim or Demand shall be to the Plan Trust pursuant to the provisions of the Asbestos Channeling Injunction, the Plan, the Plan Trust Agreement and the TDP, and such holder shall have no right whatsoever at any time to assert its Plan Trust Asbestos Claim or Demand against the Debtors, the Reorganized Debtors, any other Protected Party, or any property or interest in property of the Debtors, the Reorganized Debtors, or any other Protected Party.  Without limiting the foregoing, from and after the Effective Date, the Asbestos Channeling Injunction shall apply to all present and future holders of Plan Trust Asbestos Claims and Demands, and all such holders shall be permanently and forever stayed, restrained, and enjoined from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Plan Trust Asbestos Claims and Demands, other than from the Plan Trust in accordance with the Asbestos Channeling Injunction and pursuant to the Plan, the Plan Trust Agreement and the TDP:

(a)   commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Protected Party or any property or interests in property of any Protected Party;

(b)   enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Protected Party or any property or interests in property of any Protected Party;

(c)   creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance against any Protected Party, or any property or interests in property of any Protected Party;

(d)   setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and

(e)   proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the Plan Trust, except in conformity and compliance with the Plan, the Plan Trust Agreement and the TDP.

Any right, claim or cause of action that an Asbestos Insurance Company may have been entitled to assert against a Settling Asbestos Insurance Company based on or relating to Asbestos Claims shall be channeled to and become a right, claim or cause of action as an offset claim against the Plan Trust and not against the Settling Asbestos Insurance Company in question and all persons, including any Asbestos Insurance Company, shall be enjoined from asserting any such right, claim or cause of action against a Settling Asbestos Insurance Company.

Except as otherwise expressly provided in the Plan, nothing contained in the Plan shall constitute or be deemed a waiver of any claim, right or cause of action that the Debtors, the Reorganized Debtors, or the Plan Trust may have against any Entity in connection with or arising out of or related to an Asbestos Claim. Notwithstanding any other provision in the Plan to the contrary, nothing in the Plan shall be understood to channel, prevent, impair or limit in any way enforcement against the Debtors, Reorganized Congoleum, or any other Protected Party of any rights provided in connection with any Workers' Compensation Claim.

**11.7 Reservation of Rights**. Notwithstanding any other provision of the Plan to the contrary, the satisfaction, release and discharge, and the Injunctions set forth in Article XI, shall not serve to satisfy, discharge, release, or enjoin (a) claims by any Entity (other than the Reorganized Debtors and their Affiliates) against the Plan Trust for payment of Plan Trust Asbestos Claims in accordance with the Plan, the Plan Trust Agreement and the TDP, as applicable, (b) claims by any Entity against the Plan Trust for the payment of Plan Trust Expenses, (c) claims by the Reorganized Debtors, the Plan Trust, or any other Entity to enforce the provisions of any Asbestos Insurance Settlement Agreement or any provision of the Plan or another Plan Document, or (d) the rights of any Asbestos Insurance Company to assert any claim, debt, obligation, cause of action or liability for payment against any other Asbestos Insurance Company that is not a Settling Asbestos Insurance Company.

**11.8 Rights Against Non-Debtors under Securities Laws**. Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan, and/or Confirmation Order, no provision shall release any non-Debtor, including any current and/or former officer and/or director of the Debtors from liability to the United States Securities and Exchange Commission, in connection with any legal action or claim brought by such governmental unit against such Person(s).

**11.9 Rights Against Debtors Under Environmental Laws**. Environmental rights and Claims of Governmental Units and rights and claims of injury, damages, cost recovery contribution, reimbursement and indemnity by other Entities (other than ABI) under applicable Environmental Laws shall survive the Reorganization Cases, shall not be discharged, impaired or adversely affected by the Plan and the Reorganization Cases and shall be determined in the manner and by the administrative or judicial tribunals in which such rights or Claims would have been resolved or adjudicated if the Reorganization Cases had not been commenced. Governmental Units and other Entities, other than ABI whose claims, if any, shall be discharged, need not file any Proofs of Claim under Environmental Laws in the Reorganization Cases in order to preserve Claims under Environmental Laws. Nothing in the Confirmation Order or Plan shall be construed as releasing or relieving any Entity of any liability under any Environmental Law.

**11.10 Disallowed Claims and Disallowed Interests**. On and after the Effective Date, the Debtors shall be fully and finally discharged from any liability or obligation on a Disallowed Claim or a Disallowed Interest and any order creating a Disallowed Claim or a Disallowed Interest that is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 will nevertheless become and be deemed to be a Final Order on the Effective Date. The Confirmation Order, except as otherwise provided herein, or unless the District Court orders otherwise, shall constitute an order: (a) disallowing all Claims (other than Plan Trust Asbestos Claims that have not been previously expunged by Final Order of the Bankruptcy Court or District Court, as applicable, or withdrawn) and Interests to the extent such Claims and Interests are not allowable under any provision of section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims, and Claims for unmatured interest, and (b) disallowing or subordinating, as the case may be, any Claims, or portions of Claims, for penalties or Non-Compensatory Damages.

**11.11 Anti-Suit Injunction**. With respect to any Settling Asbestos Insurance Company, this Section 11.11 and the Confirmation Order, which may include anti-suit injunction(s) for the benefit of any Settling Asbestos Insurance Company consistent with the terms of this Section 11.11 and the terms of the relevant Asbestos Insurance

Settlement Agreement, shall operate as an injunction, pursuant to section 105(a) of the Bankruptcy Code, permanently and forever prohibiting and enjoining the commencement, conduct or continuation of any action or cause of action, whether known or unknown, the employment of process or any act to collect, recover from or offset any non-asbestos claim, Claim or demand against any Settling Asbestos Insurance Company arising out of, relating to, or in connection with an Asbestos Insurance Policy or any other insurance policy or rights under such other insurance policy issued to or insuring the relationship of the relevant Settling Asbestos Insurance Companies with, the relevant Congoleum entities that are insureds under such policies, but such injunction pursuant to section 105(a) of the Bankruptcy Code shall not affect or modify the rights of Persons insured under policies of insurance except to the extent released in an Asbestos Insurance Settlement Agreement.

**11.12 Insurance Neutrality**

(a)     Except as otherwise provided in Section 11.12(b):

(i)     Nothing in the Plan, the Plan Documents or the Confirmation Order shall preclude any Entity from asserting in any proceeding any and all claims, defenses, rights or causes of action that it has or may have under or in connection with any Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement with respect thereto;

(ii)     Nothing in the Plan, the Plan Documents or the Confirmation Order shall be deemed to waive any claims, defenses, rights or causes of action that any Entity has or may have under the provisions, terms, conditions, defenses and/or exclusions contained in any Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement with respect thereto, including but not limited to any and all such claims, defenses, rights or causes of action based upon or arising out of Asbestos Personal Injury Claims that are liquidated, resolved, discharged, channeled, or paid in connection with the Plan; and

(iii)     Notwithstanding anything to the contrary in the Confirmation Order, the Plan, or any of the Plan Documents, nothing in the Confirmation Order, the Plan, or any of the Plan Documents (including any other provision that purports to be preemptory or supervening other than Section 11.12(b)), shall in any way operate to impair, or have the effect of impairing, the insurers' legal, equitable, or contractual rights, if any, in any respect; nor shall the Plan, any of the Plan Documents, the Confirmation Order, or the estimation, liquidation or payment of any Claim for purposes of distribution by the Trust in accordance with the Plan and the Plan Documents have any binding effect on any Asbestos Insurance Company or have any res judicata or collateral estoppel effect upon any Asbestos Insurance Company for any other purpose, including without limitation with respect to the amount or the reasonableness of any such Claim, or constitute a binding determination on any issue or the creation of any liquidated claim with respect to any Asbestos Insurance Company. The rights of insurers shall be determined under the applicable Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement with respect thereto.

(b)     Notwithstanding the provisions of Section 11.12(a), Asbestos Insurance Companies shall be bound by the District Court's findings and conclusions with respect to whether, under the Bankruptcy Code, the assignment or transfer of rights under the Asbestos Insurance Assignment is valid and enforceable against each Asbestos Insurance Company notwithstanding any anti-assignment provision in or incorporated into any Asbestos Insurance Policy and applicable state law, and therefore Asbestos Insurance Companies shall be entitled to litigate that issue in connection with Confirmation, and shall retain all rights of appeal with respect thereto. Further, to the extent any Asbestos Insurance Company chooses, notwithstanding the protections provided by Section 11.12(a), to litigate any other issues in connection with Confirmation, and the District Court gives such Asbestos Insurance Company standing to litigate those issues and rules on the merits of those issues, then such Asbestos Insurance Company shall be bound by the District Court's findings and conclusions thereon, subject to any rights of appeal.

**11.13 No Liability for Solicitation or Participation**. Pursuant to section 1125(e) of the Bankruptcy Code, the Confirmation Order will provide that all of the Persons who have solicited acceptances or rejections of the Plan (including the Bondholders' Committee, the Asbestos Claimants' Committee, the Futures Representative, the Debtors and each of their respective members and Representatives, as applicable, and the Voting Agent) have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and are not liable on

account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale or purchase of securities.

## ARTICLE XII

## MATTERS INCIDENT TO PLAN CONFIRMATION

### 12.1   Term of Certain Injunctions and Automatic Stay

(a)      All of the injunctions and/or automatic stays provided for in or in connection with the Reorganization Cases, whether pursuant to section 105, 362, 524(g), or any other provision of the Bankruptcy Code or other applicable law, in existence immediately prior to Confirmation shall remain in full force and effect until the Injunctions become effective, and thereafter if so provided by the Plan, the Confirmation Order, or by their own terms.  In addition, on and after Confirmation, the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative may seek such further orders as they may deem necessary to preserve the status quo during the time between Confirmation and the Effective Date.

(b)      Each of the Injunctions shall become effective on the Effective Date and shall continue in effect at all times thereafter.  Notwithstanding anything to the contrary contained in the Plan, all actions in the nature of those to be enjoined by the Injunctions shall be enjoined during the period between the Confirmation Date and the Effective Date.

### 12.2   No Successor Liability.  Except as otherwise expressly provided in the Plan, the Debtors, the Reorganized Debtors, their Affiliates, the Asbestos Claimants' Committee, the Bondholders' Committee, the Plan Trust and the Futures Representative do not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations of the Debtors relating to or arising out of the operations of or assets of the Debtors, whether arising prior to, on, or after the Confirmation Date.  Neither the Debtors, the Reorganized Debtors, their Affiliates, nor the Plan Trust is, or shall be, a successor to the Debtors by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that the Reorganized Debtors and the Plan Trust shall assume the obligations specified in the Plan Documents and the Confirmation Order.

### 12.3   Revesting.  Except as otherwise expressly provided in the Plan, on the Effective Date, Reorganized Congoleum shall be vested with all of the assets and property of the Estates, free and clear of all Claims, Liens, charges and other interests of holders of Claims or Interests, and may operate its business free of any restrictions imposed by the Bankruptcy Code or by the District Court.

### 12.4   Vesting and Enforcement of Causes of Action.  Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, except as otherwise provided in the Plan, Reorganized Congoleum shall be vested with and have the right to enforce against any Entity any and all of  the Debtors' Causes of Action other than Causes of Action related to Plan Trust Asbestos Claims and Plan Trust Assets (including the right to pursue such claims, if any, in the name of any Debtor if necessary), with the proceeds of the recovery of any such actions to be property of Reorganized Congoleum; *provided, however*, that nothing herein shall alter, amend, or modify the injunctions (including the Injunctions), releases, or discharges provided herein.  Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, except as otherwise provided in the Plan, the Plan Trust shall be vested with and have the right to enforce against any Entity any and all of the Debtors' Causes of Action relating to any Plan Trust Asbestos Claims or any Plan Trust Assets, including the right to pursue such claims, if any, in the name of any Debtor, if necessary; and for this purpose the Plan Trust shall be designated as a representative of the Estates, with the proceeds of the recovery of any such actions to be property of the Plan Trust; *provided, however*, that nothing herein shall alter, amend, or modify the injunctions (including the Injunctions), releases, or discharges provided herein.

After the Effective Date, Reorganized Congoleum, in its sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Causes of Action (or decline to do any of the foregoing), without further approval of the District Court. Reorganized Congoleum, or any successors, in the exercise of its sole discretion, may pursue such Causes of Action so long as it is in the best interests of Reorganized Congoleum or any successors holding such rights of action. The failure of the Plan Proponents to specifically list any claim, right of

41

action, suit, proceeding or other Causes of Action in the Plan or the Plan Supplement does not, and will not be deemed to, constitute a waiver or release by the Debtors or Reorganized Congoleum of such claim, right of action, suit, proceeding or other Causes of Action, and Reorganized Congoleum will retain the right to pursue such claims, rights of action, suits, proceedings and other Causes of Action in its sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit, proceeding or other Causes of Action upon or after the Confirmation or consummation of the Plan.

**12.5    GHR/Kenesis Actions**.  On the Effective Date, the GHR/Kenesis Actions shall be preserved for enforcement solely by, and for the sole benefit of, Reorganized Congoleum.

## ARTICLE XIII

## MISCELLANEOUS

**13.1    Jurisdiction**.  Until the Reorganization Cases are closed, the District Court shall retain the fullest and most extensive jurisdiction permissible, including that necessary to ensure that the purposes and intent of the Plan are carried out.  Except as otherwise provided in the Plan, the District Court shall retain jurisdiction to hear and determine all Claims against and Interests in the Debtors, and to adjudicate and enforce all other causes of action which may exist on behalf of the Debtors.  Nothing contained herein shall prevent the Debtors, Reorganized Congoleum, or the Plan Trust from taking such action as may be necessary in the enforcement of any cause of action which the Debtors have or may have and which may not have been enforced or prosecuted by the Debtors, which cause of action shall survive Confirmation of the Plan and shall not be affected thereby except as specifically provided herein.  Nothing contained herein concerning the retention of jurisdiction by the District Court shall be deemed to be a retention of exclusive jurisdiction with respect to any Asbestos Insurance Action; rather any court other than the District Court which has jurisdiction over an Asbestos Insurance Action shall have the continuing right to exercise such jurisdiction.

**13.2    General Retention**.    Following the Confirmation of the Plan, the administration of the Reorganization Cases will continue at least until the completion of the transfers contemplated to be accomplished on the Effective Date.  Moreover, the Plan Trust shall be subject to the continuing jurisdiction of the District Court to the extent required by the requirements of section 468B of the IRC and the regulations issued pursuant thereto.  The District Court shall also retain jurisdiction for the purpose of classification of any Claim and the re-examination of Claims that have been Allowed for purposes of voting, and the determination of such objections as may be filed with the District Court with respect to any Claim.  The failure by the Debtors to object to, or examine, any Claim for the purposes of voting, shall not be deemed a waiver of the right of the Debtors, Reorganized Congoleum, or the Plan Trust, as the case may be, to object to or re-examine such Claim in whole or in part.

**13.3    Specific Purposes**.  In addition to the foregoing, the District Court shall retain jurisdiction for the following specific purposes after Confirmation:

(a)    to modify the Plan after Confirmation, pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules;

(b)    to correct any defect, cure any omission, reconcile any inconsistency, or make any other necessary changes or modifications in or to the Plan, the Plan Documents or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance under the Plan Documents in the event that the Effective Date does not occur as provided herein so that the intended effect of the Plan may be substantially realized thereby;

(c)    to assure the performance by the Disbursing Agent, the Indenture Trustee and the Plan Trustee of their respective obligations to make distributions under the Plan;

(d)    to enforce and interpret the terms and conditions of the Plan Documents;

(e)     to enter such orders or judgments, including, but not limited to, injunctions as are necessary to (i) enforce the title, rights, and powers of the Debtors, the Reorganized Debtors, the Plan Trust, the Futures Representative and the Trust Advisory Committee or (ii) enable holders of Claims to pursue their rights against any Entity that may be liable therefor pursuant to applicable law or otherwise, including, but not limited to, Bankruptcy Court or District Court orders;

(f)     to hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits, tax proceedings, and similar or related matters with respect to the Debtors, the Reorganized Debtors, or the Plan Trust relating to tax periods or portions thereof ending on or before the Effective Date, arising on account of transactions contemplated by the Plan Documents, or relating to the period of administration of the Reorganization Cases;

(g)     to hear and determine all applications for compensation of professionals and reimbursement of expenses under sections 330, 331, or 503(b) of the Bankruptcy Code;

(h)     to hear and determine any causes of action arising during the period from the Petition Date through the Effective Date;

(i)     to hear and determine any claim, causes of action, dispute or other matter in any way related to the Plan Documents or the transactions contemplated thereby against the Debtors, the Reorganized Debtors, the Bondholders' Committee, the Asbestos Claimants' Committee, the Trust Advisory Committee, the Plan Trust, the Plan Trustee, or the Futures Representative and each of their respective Representatives;

(j)     to hear and determine any and all motions pending as of Confirmation for the rejection, assumption, or assignment of executory contracts or unexpired leases and the allowance of any Claim resulting therefrom;

(k)     to determine the allowance and/or disallowance of any Claims against the Debtors or their Estates, including, without limitation, any objections to any such Claims and the compromise and settlement of any Claim against the Debtors or their Estates;

(l)     to hear and determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)     to consider and act on the compromise and settlement of any Claim against or Interest in the Debtors or their Estates;

(n)     to hear and determine all questions and disputes regarding title to the assets of the Debtors, their Estates, Reorganized Congoleum or the Plan Trust;

(o)     to hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court or District Court, as applicable, in these Reorganization Cases;

(p)     to retain continuing jurisdiction with regard to the Plan Trust sufficient to satisfy the requirements of the Treasury Regulations promulgated under section 468B of the IRC (including Treas. Reg. Section 1.468B-1(c)(1));

(q)     to hear and determine any and all applications brought by the Plan Trustee to amend, modify, alter, waive, or repeal any provision of the Plan Trust Agreement or the TDP;

(r)     to enter such orders as are necessary to implement and enforce the Injunctions and the other injunctions described herein, including, without limitation, orders extending the protections afforded by section 524(g)(4) of the Bankruptcy Code to the Protected Parties, including without limitation, the Settling Asbestos Insurance Companies; and

43

(s)     to hear and determine any motions or contested matters involving or related to any GHR/Kenesis Action.

Notwithstanding anything to the contrary in this Section 13.3, (i) the allowance of Plan Trust Asbestos Claims (other than Asbestos Property Damage Claims) and the forum in which such allowance will be determined, shall be governed by and made in accordance with the Plan Trust Agreement and the TDP and (ii) the District Court will have concurrent rather than exclusive jurisdiction with respect to disputes relating to rights under insurance policies included in the Plan Trust Assets.

**13.4    Payment of Statutory Fees**.  All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the District Court at the Confirmation Hearing, shall be paid by the Debtors on or before the Effective Date and thereafter by Reorganized Congoleum as due until the Reorganization Cases are closed, converted or dismissed.  The Reorganized Debtors shall pay any quarterly fees payable pursuant to 28 U.S.C. § 1930(a)(6) to the United States Trustee after the Effective Date until such time as the case is converted, dismissed or closed pursuant to a final decree.  The Reorganized Debtor shall file post-Effective Date reports, the form of which will be supplied by the United States Trustee.  Nothing contained in this Plan shall relieve the Debtors or Reorganized Debtors from making payments to the United States Trustee when due as required by 28 U.S.C. § 1930(a)(6).

**13.5    Securities Law Matters**.  It is an integral and essential element of the Plan that the issuance of the New Common Stock pursuant to the Plan shall be exempt from registration under the Securities Act, pursuant to Section 1145 of the Bankruptcy Code and from registration under state securities laws.  Nothing in the Plan is intended to preclude the Securities and Exchange Commission from exercising its police and regulatory powers relating to the Debtors or any other entity.

**13.6    Plan Supplement**.  The Plan Supplement will contain, among other things, without limitation, substantially final forms of a schedule identifying rejected contracts, the Exit Facility Commitment Letter or Term Sheet, the Registration Rights Agreement, the New ABI Agreement, the New Indenture, the Stockholders Agreement, the Amended and Restated Bylaws, the Amended and Restated Certificate and schedules identifying the initial officers and the initial board of directors of Reorganized Congoleum, and shall be filed with the District Court no later than ten (10) Business Days prior to the last date for filing objections to Confirmation of the Plan. Notwithstanding the foregoing, the Plan Proponents may amend the Plan Supplement and any attachments thereto, through and including the Confirmation Date.

**13.7    Allocation of Plan Distributions Between Principal and Interest**.  To the extent that any Allowed Claim entitled to a Distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such Distribution shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest. Notwithstanding the foregoing, no Distribution shall be made on account of Post-Petition Interest.

**13.8    The Asbestos Claimants' Committee, the Futures Representative and the Bondholders' Committee**.  As of the Effective Date, the Futures Representative shall (a) continue in existence and the rights, duties and responsibilities of the Futures Representative appointed by the District Court to serve after the Effective Date shall be as set forth in the Plan Trust Documents and (b) continue in existence for purposes of the Reorganization Cases with respect to any appeal or request for reconsideration or stay pending appeal of the Confirmation Order and any unresolved and then-pending adversary proceedings and have the right to prosecute and/or object to applications for Professional Fee Claims.   The Representatives retained by the Futures Representative during the Reorganization Cases shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to, or arising from, the Reorganization Cases on the same date the Futures Representative ceases existence for purposes of the Reorganization Cases.  On the Effective Date, the Asbestos Claimants' Committee and the Bondholders' Committee shall be dissolved except for the purposes of: (i) any appeal or request for reconsideration or stay pending appeal of the Confirmation Order; (ii) any unresolved and then-pending adversary proceedings,  and (iii) prosecuting and/or objecting to Professional Fee claims. Representatives of the Asbestos Claimants' Committee and the Bondholders Committee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to, or arising from, the

44

Reorganization Cases on the same date the Asbestos Claimants' Committee or the Bondholders' Committee, as applicable, cease to exist for purposes of the Reorganization Cases. Until the Effective Date, the Debtors shall pay the reasonable fees and expenses of the Asbestos Claimants' Committee, the Bondholders' Committee and the Futures Representative in accordance with any applicable fee order in the Reorganization Cases. On the Effective Date, the Trust Advisory Committee will assume those powers, duties, and responsibilities as provided in the Plan Trust Agreement.

**13.9  Revocation of Plan**.  The Plan Proponents reserve the right to revoke and withdraw the Plan before the entry of the Confirmation Order. If the Plan Proponents revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then, with respect to all parties in interest, the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or such other Entity in any further proceedings involving the Debtors.

**13.10  Modification of Plan**.  The Plan Proponents may propose amendments to or modifications of any of the Plan Documents under § 1127 of the Bankruptcy Code and as herein provided, to the extent applicable law permits. Subject to the limitations contained herein, the Plan Proponents may modify the Plan in accordance with this paragraph, before or after Confirmation, without notice or hearing, or after such notice and hearing as the District Court deems appropriate, if the District Court finds that the modification does not materially and adversely affect the rights of any parties in interest which have not had notice and an opportunity to be heard with regard thereto. After Confirmation, the Plan Proponents may remedy any defects or omissions or reconcile any inconsistencies in the Plan or the Confirmation Order or any other order entered for the purpose of implementing the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan; provided, however, that none of the Debtors, the Reorganized Debtors, ABI, the Futures Representative, the Plan Trustee, the Asbestos Claimants' Committee, and the Bondholders' Committee shall seek to terminate, reduce or limit the scope of the Asbestos Channeling Injunction or any other injunction contained in the Plan that inures to the benefit of any Settling Asbestos Insurance Company. Anything in the Plan or in any Plan Document to the contrary notwithstanding, following Confirmation but prior to the Effective Date, the Plan Documents shall not be modified, supplemented, changed or amended in any material respect except with the written consent of the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative. In the event of any modification on or before Confirmation, any votes to accept or reject the Plan shall be deemed to be votes to accept or reject the Plan as modified, unless the District Court finds that the modification materially and adversely affects the rights of parties in interest which have cast said votes. The Plan Proponents reserve the right in accordance with § 1127 of the Bankruptcy Code to modify the Plan at any time before the Confirmation Date. Subject to § 1127 of the Bankruptcy Code, if the District Court determines at or in connection with the Confirmation Hearing that any provision of the Plan is invalid or unenforceable, the Plan Proponents may, at their discretion, sever such provision from the Plan without affecting the enforceability or operative effect of any or all other provisions of the Plan; *provided, however,* the Plan Proponents may not sever any provision from the Plan that incorporates or implements the terms of the Litigation Settlement Agreement, as amended, including the Amended Term Sheet attached thereto.

**13.11  Modification of Payment Terms**.  Reorganized Congoleum shall have the right to modify the treatment of any Allowed Claim (other than a Plan Trust Asbestos Claim), as provided in section 1123(a)(4) of the Bankruptcy Code, at any time after the Effective Date upon the consent of the holder of such Allowed Claim.

**13.12  Entire Agreement**.  The Plan Documents and the Plan Trust Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions and documents. No Entity shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein or as may hereafter be agreed to by the parties in writing.

**13.13  Headings**.  Headings are utilized in the Plan are for convenience and reference only and shall not constitute a part of the Plan for any other purpose.

**13.14  Professional Fee Claims**.  All final requests for payment of Professional Fee Claims must be filed and served on Reorganized Congoleum and their counsel no later than 60 days after the Effective Date, unless otherwise ordered by the District Court. Objections to any application of such Bankruptcy Professionals or other

Entities for compensation or reimbursement of expenses must be filed and served on the respective applicant and its counsel no later than the first Business Day following 30 days (or such other period as may be allowed by order of the District Court) after the date on which the applicable application for compensation or reimbursement was received. Reorganized Congoleum may pay the reasonable charges that they incur on and after the Effective Date for Bankruptcy Professionals' fees, disbursements, expenses or related support services without application to the District Court. Reorganized Congoleum shall pay the reasonable fees and expenses of the Bondholders' Committee, Asbestos Claimants' Committee and Futures Representative after the Effective Date in connection with the purposes set forth in Section 13.8 of this Plan, without application to the District Court.

**13.15 Recordable Order**. Upon Confirmation of the Plan, the Confirmation Order shall be deemed to be in recordable form, and shall be accepted by any recording officer for filing and recording purposes without further or additional orders, certifications, or other supporting documents.

**13.16 Preparation of Estates' Returns and Resolution of Tax Claims**. The Debtors or Reorganized Congoleum shall file all tax returns and other filings with governmental authorities and may file determination requests under section 505(b) of the Bankruptcy Code to resolve any Disputed Claim relating to taxes with a governmental authority.

**13.17 No Admission**. Nothing contained in the Plan or in the Disclosure Statement shall be deemed as an admission by the Debtors, the Bondholders' Committee, the Asbestos Claimants' Committee or Futures Representative with respect to any matter set forth herein or therein, including, without limitation, liability on any Claim or the propriety of any Claims classification.

**13.18 Consent to Jurisdiction**. Upon default under the Plan or any Plan Documents, the Debtors, Reorganized Congoleum, the Affiliates, the Plan Trust, the Trust Advisory Committee, the Futures Representative, ABI and the Plan Trustee consent to the jurisdiction of the District Court, or any successor thereto, and agree that it shall be the preferred forum for all proceedings relating to such default.

**13.19 Setoffs**. Subject to the limitations provided in section 553 of the Bankruptcy Code, the Debtors or the Plan Trust, as applicable, may, but shall not be required to, setoff against any Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever the Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such claim that the Debtors may have against such holder; *provided* that Reorganized Congoleum may not offset any obligations under the Plan Trust Common Stock against any claim that Reorganized Congoleum may have against the Plan Trust.

**13.20 Successors and Assigns**. The rights, duties, and obligations of any Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Entity.

**13.21 Non-Debtor Waiver of Rights**. Non-Debtor parties shall have the right to voluntarily waive any rights, benefits or protections that are afforded to them under the provisions of the Plan or any order issued in furtherance of the Plan, and such waiver shall supersede such rights, benefits or protections. Any such waiver shall only be effective if, and then only to the extent that, such party expressly and specifically waives in writing one or more of such rights, benefits or protections.

**13.22 Further Authorizations**. The Debtors, Reorganized Congoleum, the Bondholders' Committee, Asbestos Claimants' Committee, the Futures Representative and the Plan Trust, if and to the extent necessary, may seek with notice to the others such orders, judgments, injunctions, and rulings that any of them deem necessary to further carry out the intentions and purposes of, and give full effect to the provisions of, the Plan.

**13.23 No Bar to Suits**. Except as otherwise provided in Article XI of this Plan, neither this Plan nor Confirmation hereof shall operate to bar or estop the Debtors or Reorganized Congoleum from commencing any Cause of Action, including any Bankruptcy Cause of Action, or any other legal action against any holder of a Claim or any individual, corporation, partnership, trust, venture, governmental unit, or any other form of legal entity, whether such Cause of Action, or any other legal action arose prior to or after the Confirmation Date and whether or

not the existence of such Cause of Action, or any other legal action was disclosed in any disclosure statement filed by the Debtors in connection with this Plan or whether or not any payment was made or is made on account of any Claim.

       **13.24 Conflicts**.  Unless otherwise provided in the Confirmation Order, in the event of a conflict between the terms or provisions of the Plan and any other Plan Document, the terms of the other Plan Document will control.

       **13.25 Notices**.  All notices, requests, elections, or demands in connection with the Plan shall be in writing and shall be mailed by registered or certified mail, return receipt requested, to:

**If to the Debtors:**

Congoleum Corporation
3500 Quakerbridge Road
Hamilton, NJ 08619
Attn:    Howard N. Feist
       CFO

       and

Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, NY 10033-4039
Attn:    Richard L. Epling
       Robin L. Spear
       Kerry A. Brennan

**If to the Futures Representative:**

R. Scott Williams, Esquire
Haskell Slaughter Young & Rediker, L.L.C.
2001 Park Place North, Suite 1400
Birmingham, AL  35203

       and

Orrick, Herrington & Sutcliffe LLP
1152 15th Street, N.W.
Washington, DC  20005
Attn:    Roger Frankel
       Richard Wyron
       Jonathan Guy

**If to the Asbestos Claimants' Committee:**

Caplin & Drysdale, Chtd.
One Thomas Circle, N.W.
Washington, D.C. 20005
Attn:    Peter Van N. Lockwood
       Ronald E. Reinsel

**If to the Bondholders' Committee:**

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attn:   Michael S. Stamer

Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington D.C. 20036
Attn:   James R. Savin


     **13.26  Duty to Cooperate**.  Notwithstanding anything herein to the contrary, nothing in the Plan, the Plan Documents or the Confirmation Order shall relieve (by way of injunction or otherwise) any of the Debtors or Reorganized Congoleum or any other Entity which is or claims to be an insured or entitled to indemnity under an Asbestos Insurance Policy from any duty to cooperate that may be required by any such insurance policy under applicable law with respect to the defense and/or settlement of any Claim for which coverage is sought under such Asbestos Insurance Policy.  To the extent that any entity incurs costs in satisfying such duty to cooperate with respect to Asbestos Personal Injury Claims after the Effective Date, the Plan Trust shall reimburse such entity for all such reasonable out-of-pocket expenses.

     **13.27  Governing Law**.  Except to the extent that federal law (including, but not limited to, the Bankruptcy Code and the Bankruptcy Rules) is applicable or where the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof that would require application of any other law.

Dated:  February __, 2010

                                  CONGOLEUM CORPORATION

                                  By:  _____
                                  Name:   Howard N. Feist III
                                  Title:    Chief Financial Officer and Secretary

                                  CONGOLEUM SALES, INC.

                                  By:  _____
                                  Name:   Howard N. Feist III
                                  Title:    Vice President

                                    CONGOLEUM FISCAL, INC.

                                  By:  _____
                                  Name:   Howard N. Feist III
                                  Title:    Vice President

ASBESTOS CLAIMANTS' COMMITTEE

By: _____

Name:    Ronald E. Reinsel

Title:    Counsel for the Asbestos Claimants' Committee

BONDHOLDERS' COMMITTEE

By: _____

Name: Paul Kunz

Title: Authorized representative of
Deutsche Asset Management, not in its individual or
principal capacity, but solely in its capacity as Chair
of the Official Committee of Bondholders

FUTURES REPRESENTATIVE

By: _____
     R. Scott Williams

# APPENDIX EXHIBIT 11

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | ) | **Case No. 09-04371 (JAP)** |
| | ) | |
| **CONGOLEUM CORPORATION,** | ) | **Chapter 11** |
| **CONGOLEUM SALES, INC., and** | ) | **Case No. 03-51524** |
| **CONGOLEUM FISCAL, INC.,** | ) | |
| Debtors. | ) | **Jointly Administered** |
| | ) | |

## FOURTH AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF THE DEBTORS, THE OFFICIAL ASBESTOS CLAIMANTS' COMMITTEE, THE OFFICIAL COMMITTEE OF BONDHOLDERS FOR CONGOLEUM CORPORATION, ET AL. AND THE FUTURES REPRESENTATIVE DATED AS OF MARCH 11, 2010

**THIS PLAN PROVIDES, AMONG OTHER THINGS, FOR THE ISSUANCE OF INJUNCTIONS UNDER SECTION 524(g) OF THE BANKRUPTCY CODE THAT RESULT IN THE CHANNELING OF ALL ASBESTOS-RELATED LIABILITIES OF CONGOLEUM CORPORATION AND THE PROTECTED PARTIES SET FORTH HEREIN INTO A TRUST AS MORE FULLY DESCRIBED HEREIN.**

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
**1540 Broadway**
**New York, NY 10033-4039**
**Richard L. Epling**
**Robin L. Spear**
**Kerry A. Brennan**

Attorneys for the Debtors

**AKIN GUMP STRAUSS HAUER & FELD LLP**
**One Bryant Park**
**New York, NY 10036**
**Michael S. Stamer**

**AKIN GUMP STRAUSS HAUER & FELD LLP**
**1333 New Hampshire Avenue, N.W.**
**Washington D.C. 20036**
**James R. Savin**
**David M. Dunn**
**Joanna F. Newdeck**

Attorneys for the Official Committee of Bondholders

**CAPLIN & DRYSDALE, CHTD.**
**One Thomas Circle, N.W.**
**Washington, D.C. 20005**
**Peter Van N. Lockwood**
**Ronald Reinsel**

Attorneys for the Asbestos Claimants' Committee

**ORRICK, HERRINGTON & SUTCLIFFE LLP**
**1152 15th Street, N.W.**
**Washington, D.C. 20005**
**Roger Frankel**
**Richard H. Wyron**
**Jonathan Guy**
**Debra L. Felder**

Attorneys for R. Scott Williams, as Futures Representative

**OKIN, HOLLANDER & DELUCA, LLP**
**PARKER PLAZA**
**400 Kelby Street**
**Fort Lee, NJ 07024**
**Paul S. Hollander**
**James J. DeLuca**

**TEICH GROH**
**691 State Highway 33**
**Trenton, NJ 08619**
**Michael A. Zindler**

**GREENBAUM, ROWE, SMITH & DAVIS LLP**
**75 Livingston Avenue**
**Roseland, NJ 07068**
**Nancy Isaacson**

**FORMAN HOLT ELIADES & RAVIN LLC**
**80 Route 4 East, Suite 290**
**Paramus, NJ 07652**
**Stephen Ravin**

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME.......................... 1

    1.1     Scope of Definitions................................................................................................. 1

    1.2     Definitions.................................................................................................................. 1

    1.3     Rules of Interpretation:  Application of Definitions, Rules of Construction, and Computation of Time .............................................................................................. 17

    1.4     Exhibits and Schedules .......................................................................................... 17

ARTICLE II CLASSIFICATION OF CLAIMS AND INTERESTS ................................................. 18

    2.1     Generally.................................................................................................................. 18

    2.2     Unclassified Claims ................................................................................................ 18

    2.3     Classes ..................................................................................................................... 18

ARTICLE III TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS .................. 19

    3.1     Summary.................................................................................................................. 19

    3.2     Administrative Claims ............................................................................................ 19

    3.3     Priority Tax Claims ................................................................................................. 19

    3.4     DIP Financing Claim. ............................................................................................. 19

    3.5     Substantial Contribution Claims ............................................................................ 19

ARTICLE IV TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ..................................... 20

    4.1     Claims and Interests ............................................................................................... 20

    4.2     Reservation of Rights Regarding Claims ............................................................... 22

    4.3     Reservation of Fair and Equitable (Cram Down) Power........................................ 22

ARTICLE V IMPLEMENTATION OF THE PLAN ................................................................... 22

    5.1     The Plan Trust......................................................................................................... 22

    5.2     Certain Mergers ...................................................................................................... 24

    5.3     The Amended and Restated Certificate and the Amended and Restated Bylaws ........................ 24

    5.4     Directors and Officers of Reorganized Congoleum ............................................... 24

    5.5     Cancellation of Existing Securities and Agreements of the Debtors/Discharge of the Indenture Trustee ............................................................................................. 25

    5.6     Exit Facility ............................................................................................................. 25

    5.7     Issuance of New Securities and Debt Instruments ................................................. 25

    5.8     Registration Rights Agreement ............................................................................... 25

    5.9     Stockholders Agreement ......................................................................................... 25

    5.10    Effectuating Documents/Further Transactions ...................................................... 26

    5.11    Exemption from Certain Transfer Taxes and Recording Fees ............................... 26

    5.12    Section 346 Injunction ............................................................................................ 26

    5.13    Corporate Action..................................................................................................... 26

5.14    Litigation Settlement Agreement. .......................................................................... 26

5.15    Review of Claimants' Counsel Expenses ............................................................. 28

5.16    Non-Asbestos Reserve Fund ................................................................................ 28

5.17    Intercompany Settlement ..................................................................................... 29

5.18    Deemed Consolidation of Debtors For Plan Purposes Only ............................... 30

ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS WITH RESPECT TO CLAIMS  OTHER THAN PLAN TRUST ASBESTOS CLAIMS ............................................................... 30

6.1    Plan Distributions ................................................................................................ 30

6.2    Distributions of Cash .......................................................................................... 30

6.3    No Interest on Claims .......................................................................................... 30

6.4    Delivery of Distributions ..................................................................................... 30

6.5    Distributions to Holders as of the Record Date ................................................... 31

6.6    Fractional Securities; Fractional Dollars ............................................................ 31

6.7    Withholding of Taxes .......................................................................................... 31

6.8    Unclaimed Property. ............................................................................................ 31

ARTICLE VII RESOLUTION OF DISPUTED CLAIMS ......................................................... 31

7.1    Disallowance of Improperly Filed Claims .......................................................... 31

7.2    Prosecution of Objections to Claims ................................................................... 31

7.3    No Distributions Pending Allowance .................................................................. 32

7.4    Distributions After Allowance ............................................................................ 32

ARTICLE VIII TREATMENT OF EXECUTORY CONTRACTS, UNEXPIRED LEASES AND SETTLEMENTS ..................................................................................................................... 32

8.1    Assumption of Unexpired Leases and Executory Contracts ............................... 32

8.2    Damages Upon Rejection ..................................................................................... 33

8.3    Insurance Agreements ......................................................................................... 33

8.4    Compensation and Benefits Programs ................................................................ 33

8.5    Retiree Benefits ................................................................................................... 34

8.6    Indemnification of Directors, Officers and Employees ....................................... 34

ARTICLE IX ACCEPTANCE OR REJECTION OF THE PLAN ............................................. 34

9.1    Classes Entitled to Vote ...................................................................................... 34

9.2    Acceptance by Impaired Classes of Claims ........................................................ 34

9.3    Acceptance by Impaired Class of Interests ......................................................... 34

9.4    Acceptance Pursuant to Section 524(g) of the Bankruptcy Code ....................... 34

9.5    Presumed Acceptance of Plan ............................................................................. 34

9.6    Reservation of Rights .......................................................................................... 34

ARTICLE X CONDITIONS TO CONFIRMATION AND EFFECTIVENESS ......................... 35

10.1    Conditions to Confirmation ................................................................................. 35

10.2    Conditions to Effectiveness ................................................................................. 36

| | 10.3 | Waiver of Conditions | 38 |
|---|---|---|---|
| **ARTICLE XI INJUNCTIONS, RELEASES AND DISCHARGE** | | | **38** |
| | 11.1 | Discharge | 38 |
| | 11.2 | Exculpation | 38 |
| | 11.3 | Releases by Holders of Plan Trust Asbestos Claims | 38 |
| | 11.4 | Discharge Injunction | 39 |
| | 11.5 | Third Party Releases | 39 |
| | 11.6 | Asbestos Channeling Injunction | 39 |
| | 11.7 | Reservation of Rights | 40 |
| | 11.8 | Rights Against Non-Debtors under Securities Laws | 40 |
| | 11.9 | Rights Against Debtors Under Environmental Laws | 40 |
| | 11.10 | Disallowed Claims and Disallowed Interests | 40 |
| | 11.11 | Anti-Suit Injunction | 40 |
| | 11.12 | Insurance Neutrality | 41 |
| | 11.13 | No Liability for Solicitation or Participation | 41 |
| **ARTICLE XII MATTERS INCIDENT TO PLAN CONFIRMATION** | | | **42** |
| | 12.1 | Term of Certain Injunctions and Automatic Stay | 42 |
| | 12.2 | No Successor Liability | 42 |
| | 12.3 | Revesting | 42 |
| | 12.4 | Vesting and Enforcement of Causes of Action | 42 |
| | 12.5 | GHR/Kenesis Actions | 43 |
| **ARTICLE XIII MISCELLANEOUS** | | | **43** |
| | 13.1 | Jurisdiction | 43 |
| | 13.2 | General Retention | 43 |
| | 13.3 | Specific Purposes | 43 |
| | 13.4 | Payment of Statutory Fees | 45 |
| | 13.5 | Securities Law Matters | 45 |
| | 13.6 | Plan Supplement | 45 |
| | 13.7 | Allocation of Plan Distributions Between Principal and Interest | 45 |
| | 13.8 | The Asbestos Claimants' Committee, the Futures Representative and the Bondholders' Committee | 45 |
| | 13.9 | Revocation of Plan | 46 |
| | 13.10 | Modification of Plan | 46 |
| | 13.11 | Modification of Payment Terms | 46 |
| | 13.12 | Entire Agreement | 46 |
| | 13.13 | Headings | 46 |
| | 13.14 | Professional Fee Claims | 46 |

| | | |
|---|---|---|
| 13.15 | Recordable Order | 47 |
| 13.16 | Preparation of Estates' Returns and Resolution of Tax Claims | 47 |
| 13.17 | No Admission | 47 |
| 13.18 | Consent to Jurisdiction | 47 |
| 13.19 | Setoffs | 47 |
| 13.20 | Successors and Assigns | 47 |
| 13.21 | Non-Debtor Waiver of Rights | 47 |
| 13.22 | Further Authorizations | 47 |
| 13.23 | No Bar to Suits | 47 |
| 13.24 | Conflicts | 48 |
| 13.25 | Notices | 48 |
| 13.26 | Duty to Cooperate | 49 |
| 13.27 | Governing Law | 49 |

## INTRODUCTION

The Plan Proponents hereby propose this plan of reorganization pursuant to the provisions of Chapter 11 of the United States Bankruptcy Code. Capitalized terms used herein are defined in Article I below.

Reference is made to the Disclosure Statement distributed contemporaneously herewith for a discussion of the history, businesses, properties and results of operations of the Debtors and the risks associated with the Plan. All holders of Claims and Interests entitled to vote on the Plan are encouraged to read the Plan and Disclosure Statement in their entirety before voting to accept or reject the Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and Sections 13.6, 13.9 and 13.10 of the Plan, the Plan Proponents reserve the right to alter, amend, modify, revoke or withdraw the Plan prior to its substantial consummation.

## ARTICLE I

### DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

#### 1.1 Scope of Definitions

All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in Section 1.2 of the Plan. Any term used in the Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

#### 1.2 Definitions

"**ABI**" means American Biltrite Inc., a Delaware corporation.

"**ABI Asbestos Claim**" means any Asbestos Claim that may be asserted by ABI now or in the future other than an ABI Asbestos Indemnity Claim.

"**ABI Asbestos Indemnity Claim**" means any ABI Asbestos Personal Injury Indemnity Claim or ABI Asbestos Property Damage Indemnity Claim.

"**ABI Asbestos Personal Injury Indemnity Claim**" means any asbestos personal injury indemnification Claim or Demand that may be asserted by ABI against Congoleum at any time under the Joint Venture Agreement.

"**ABI Asbestos Property Damage Indemnity Claim**" means any asbestos related property damage indemnification Claim or Demand that may be asserted by ABI against Congoleum at any time under the Joint Venture Agreement.

"**ABI Canada License Agreement**" means the License Agreement, effective January 1, 2006, between Congoleum and American Biltrite (Canada) Ltd., as amended on the Effective Date pursuant to the Intercompany Settlement.

"**ABI Claim**" means any Claim or Demand at any time that may be asserted by ABI at any time against any Debtor, including without limitation ABI Asbestos Claims, ABI Rejection Damages Claims, and ABI Asbestos Indemnity Claims.

"**ABI Parties**" means any current or former officers, directors and employees of ABI, in their capacity as such.

"**ABI Rejection Damages Claims**" means any and all rejection damages claims that might arise upon the deemed rejection of the Intercompany Agreements provided for in Section 5.17 of the Plan.

"**Administrative Claim**" means any Claim for the payment of an Administrative Expense. The term "Administrative Claim" shall not include Asbestos Claims.

"**Administrative Expense**" means (a) any cost or expense of administration of the Reorganization Cases under section 503(b) of the Bankruptcy Code including, but not limited to, (1) any actual and necessary post-petition cost or expense of preserving the Estates or operating the Debtors' assets and businesses, (2) any payment to be made under the Plan to cure a default on an assumed executory contract or unexpired lease, (3) any post-petition cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of business, (4) the outstanding fees and expenses of the Indenture Trustee incurred in accordance with Section 6.6 of the Indenture relating to the Senior Notes, including the reasonable fees and expenses of counsel to the Indenture Trustee, and (5) compensation or reimbursement of expenses of professionals to the extent allowed by the Bankruptcy Court or the District Court under section 327, 328, 330(a), 331, 503(b) or 1103 of the Bankruptcy Code, including, without limitation, the Debtors and their professionals, the Futures Representative and its professionals, the Bondholders' Committee and its professionals, and the Asbestos Claimants' Committee and its professionals and (b) any fee or charge assessed against the Estates under 28 U.S.C. § 1930.

"**Affiliate**" shall have the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

"**Allowed**" means:

(a)       With respect to an Administrative Claim:

(i)       such amount that represents a Claim of a professional person employed under sections 327, 328, 524(g)(4)(B)(i) or 1103 of the Bankruptcy Code who is required to apply to the Bankruptcy Court or the District Court for the allowance of compensation and reimbursement of expenses pursuant to section 330 of the Bankruptcy Code, to the extent such Claim is allowed by a Final Order of the Bankruptcy Court or the District Court under sections 330 or 331 of the Bankruptcy Code;

(ii)       such amount that represents the reasonable fees and expenses of the Indenture Trustee and its counsel that were otherwise incurred in accordance with the terms of the Indenture and are outstanding on the Effective Date; and

(iii)       other than with respect to a Claim described in clauses (a)(i) and (a)(ii) of this definition, such amount that represents an actual or necessary expense of preserving the Estates or operating the business of any of the Debtors, any such Claim to the extent that it constitutes an Allowed Administrative Claim, or if such Claim is a Disputed Claim, any such Claim to the extent it is allowed in whole or in part by a Final Order of the Bankruptcy Court or the District Court and only to the extent that such allowed portion is deemed, pursuant to a Final Order of the Bankruptcy Court or the District Court, to constitute a cost or expense of administration under section 503 or 1114 of the Bankruptcy Code;

(b)       With respect to an Asbestos Property Damage Claim that was filed prior to the expiration of the Asbestos Property Damage Claim Bar Date, such amount as is liquidated and allowed by the Bankruptcy Court or the District Court; and

(c)       With respect to any Claim other than a Plan Trust Asbestos Claim, an Asbestos Property Damage Claim or an Administrative Claim, such Claim or any portion thereof (i) that has been allowed in whole or in part by a Final Order of the Bankruptcy Court or the District Court; (ii) that has been expressly allowed in the Plan; (iii) as to which, on or before the Effective Date, (A) no Proof of Claim has been filed with the Bankruptcy Court or the District Court and (B) the Claim is listed in the Schedules (as they may be amended) and not listed as disputed, contingent, or unliquidated; or (iv) for which a Proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court or District Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court or the District Court, or other applicable bankruptcy law, and as to which either (A) no objection to its allowance has been filed within the periods of limitation fixed by the Plan, the Bankruptcy Code, or any order of the Bankruptcy Court or District Court, or (B) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order.

2

"**Allowed Amount**" means the sum at which a Claim is Allowed.

"**Amended and Restated Bylaws**" means the Amended and Restated Bylaws of Reorganized Congoleum to become effective on the Effective Date, which shall be substantially in the form attached hereto as Exhibit "J". The Amended and Restated Bylaws will be filed as part of the Plan Supplement.

"**Amended and Restated Certificate**" means the Amended and Restated Certificate of Incorporation of Reorganized Congoleum to become effective on the Effective Date, which shall be substantially in the form attached hereto as Exhibit "K". The Amended and Restated Certificate will be filed as part of the Plan Supplement.

"**Anti-Suit Injunction**" means the injunction described in Section 11.11 of the Plan.

"**Asbestos Channeling Injunction**" means the injunction described in Section 11.6 of the Plan.

"**Asbestos Claimant**" means the holder of an Asbestos Personal Injury Claim.

"**Asbestos Claimants' Committee**" means the official committee of the representatives of holders of present unsecured Asbestos Personal Injury Claims, solely in its capacity as such, which committee as of the date hereof consists of the following representatives of the holders of present unsecured Asbestos Personal Injury Claims: Perry Weitz, Esquire, Joseph Rice, Esquire, Steven Kazan, Esquire, Russell Budd, Esquire and Robert Taylor, II, Esquire.

"**Asbestos Claims**" means, collectively, Plan Trust Asbestos Claims and ABI Asbestos Claims.

"**Asbestos In-Place Insurance Coverage**" means any insurance coverage, not reduced to Cash settlement proceeds, available for the payment or reimbursement of liability, indemnity or defense costs arising from or related to Asbestos Claims or Demands or Plan Trust Expenses under any Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement.

"**Asbestos Insurance Action**" means any claim, cause of action, or right of any Debtor against any Asbestos Insurance Company, including without limitation, the Coverage Litigation, arising from or related to: (a) any such Asbestos Insurance Company's failure to provide or pay under Asbestos In-Place Insurance Coverage, (b) the refusal of any Asbestos Insurance Company to compromise and settle any Asbestos Claim under or pursuant to any Asbestos Insurance Policy, or (c) the interpretation or enforcement of the terms of any Asbestos Insurance Policy with respect to any Asbestos Claim.

"**Asbestos Insurance Action Recoveries**" means (a) Cash derived from and paid pursuant to Asbestos Insurance Settlement Agreements, (b) the right to receive proceeds of Asbestos In-Place Insurance Coverage, and (c) the right to receive the proceeds or benefits of any Asbestos Insurance Action.

"**Asbestos Insurance Assignment**" means the transfer, grant and assignment of the Asbestos Insurance Rights to the Plan Trust described in Article V of the Plan, which will be effectuated pursuant to the Insurance Assignment Agreement.

"**Asbestos Insurance Company**" means any insurance company, insurance broker, guaranty association, liquidator, rehabilitator or any other Entity with demonstrated or potential liability to any of the Debtors, the Reorganized Debtors, or the Plan Trust under or related to an Asbestos Insurance Policy.

"**Asbestos Insurance Policy**" means any insurance policy issued to or for the benefit of any of the Debtors in effect at any time on or before the Effective Date that may afford any of the Debtors indemnity or insurance coverage, upon which any claim has been or may be made with respect to any Asbestos Claim.

"**Asbestos Insurance Rights**" means any and all rights, titles, privileges, interests, claims, demands or entitlements to any proceeds, payments, initial or supplemental dividends, scheme payments, supplemental scheme payments, causes of action and choses in action related to Asbestos In-Place Insurance Coverage, whether now

3

existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, including but not limited to:

(i)       any and all rights to pursue or receive payments with respect to Asbestos Claims under any Asbestos In-Place Insurance Coverage, whether for liability, defense or otherwise;

(ii)      any and all rights to pursue or receive payments related to any Asbestos In-Place Insurance Coverage that was entered into by any domestic or foreign insolvent insurance company, whether in receivership, liquidation, rehabilitation, run-off, scheme of arrangement or any other form of proceeding;

(iii)     any and all rights to pursue or receive payments related to any Asbestos In-Place Insurance Coverage from any state insurance guaranty association in connection with any state insurance guaranty association statute; *provided, however,* that Asbestos Insurance Rights shall not include any rights or obligations under any insurance policy or settlement agreement to which the Debtors are a party insofar as such insurance policy or settlement agreement relates to Workers' Compensation Claims; and

(iv)     any and all rights to pursue any Causes of Action against, or to receive payments related to any Asbestos In-Place Insurance Coverage from, any Asbestos Insurance Company.

**"Asbestos Insurance Settlement Agreement"** means any settlement agreement between or among any of the Debtors and a Settling Asbestos Insurance Company relating to any Asbestos Claim or Asbestos Insurance Action.

**"Asbestos Insurer Coverage Defenses"** means all defenses at law or in equity that an Asbestos Insurance Company may have under any Asbestos Insurance Policy or applicable law to provide Asbestos In-Place Insurance Coverage to or for Asbestos Personal Injury Claims or Plan Trust Expenses that have been channeled to or assumed by or incurred by the Plan Trust pursuant to the Plan; *provided, however,* that in the event there is a Final Order determining that the Bankruptcy Code authorizes the Asbestos Insurance Assignment by preempting any terms of any Asbestos Insurance Policy or provisions of applicable non-bankruptcy law that otherwise might prohibit the Asbestos Insurance Assignment, "Asbestos Insurer Coverage Defenses" shall not include any defense that the Asbestos Insurance Assignment is prohibited by any Asbestos Insurance Policy or applicable non-bankruptcy law.

**"Asbestos Personal Injury Claim"** means (a) any claim, demand or lawsuit (including, but not limited to, any Claim or Demand), whenever and wherever arising or asserted against any of the Debtors or their respective present or former officers, directors or employees in their capacities as such and (b) any debt, obligation or liability (whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, bonded, secured or unsecured), whenever and wherever arising or asserted, of the Debtors or their respective present or former officers, directors or employees in their capacities as such (including, but not limited to, all thereof in the nature of or sounding in tort, contract, warranty, or any other theory of law, equity or admiralty); in either case (a) or (b) for, based on or arising by reason of, directly or indirectly, physical, emotional, bodily or other personal injury, sickness, disease, death or damages based on the foregoing (including, but not limited to, any claim or demand for compensatory damages, loss of consortium, proximate, consequential, general, special or punitive damages, reimbursement, indemnity, warranty, contribution or subrogation) whether or not diagnosable or manifested before the Confirmation of the Plan or the close of the Reorganization Cases, (x) caused or allegedly caused, in whole or part, directly or indirectly: (i) by exposure to asbestos or asbestos-containing products manufactured, supplied, distributed, handled, fabricated, stored, sold, installed, or removed by any Debtor and/or its predecessors; or (ii) by services, actions, or operations provided, completed or taken by any Debtor and/or its predecessors in connection with asbestos or asbestos-containing products or (y) caused or allegedly caused by asbestos for which any Debtor or its predecessors, are alleged to be liable under any applicable law including, but not limited to, Indirect Asbestos Claims, *provided* that Asbestos Personal Injury Claim shall not include Workers' Compensation Claims, ABI Asbestos Claims or Asbestos Property Damage Claims.

**"Asbestos Personal Injury Claim Sub-Account"** means that portion of the Plan Trust Assets to be made available for payment of Plan Trust Asbestos Claims (and related Plan Trust Expenses) other than Allowed Asbestos Property Damage Claims.

"**Asbestos Property Damage Claim**" means any Claim or remedy or liability for damage to property (whether or not such Claim, remedy or liability is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty or otherwise), for which the Debtors are alleged to be or may be responsible by judgment, order or settlement and that (1) arises from or relates to any building or other real property in which asbestos was or is, or asbestos-containing products were or are, alleged to have been installed prior to the Petition Date; and (2) seeks monetary or other relief for injury to, destruction, loss of use, diminution in value, and/or asbestos-related repair or maintenance of such property or for the cost of inspection, encapsulation, decontamination, containment, removal, or other abatement of the asbestos or asbestos-containing products installed or allegedly installed in such property. Asbestos Property Damage Claim also includes any such Claims, remedies or liabilities as described immediately above that seek (a) compensatory damages (such as proximate, consequential, general and special damages) and punitive damages; and/or (b) reimbursement, indemnification, subrogation and/or contribution, including, without limitation, any Asbestos Property Damage Contribution Claim. Notwithstanding the foregoing, Asbestos Property Damage Claim does not include any ABI Asbestos Claim or Asbestos Personal Injury Claim.

"**Asbestos Property Damage Claim Bar Date**" means May 3, 2004, the date designated by the Bankruptcy Court as the last date for filing Proofs of Claim on account of an Asbestos Property Damage Claim against the Debtors.

"**Asbestos Property Damage Claim Sub-Account**" means that portion of the Plan Trust Assets, consisting solely of the Asbestos Property Damage Insurance Rights, to be made available for payment of Allowed Asbestos Property Damage Claims.

"**Asbestos Property Damage Contribution Claim**" means any Claim or remedy or liability for damage to property asserted against the Debtors (whether or not such Claim, remedy or liability is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty or otherwise) that is: (1) held by any Entity or assignee or transferee thereof which has been, is, or may be a defendant in an action alleging damage to property that (i) arises from or relates to any building or other real property in which asbestos was or is, or asbestos-containing products were or are, alleged to have been installed prior to the Petition Date, and (ii) seeks monetary or other relief for injury to, destruction, loss of use, diminution in value, and/or asbestos-related repair or maintenance of such property or for the cost of inspection, encapsulation, decontamination, containment, removal, or other abatement of the asbestos or asbestos-containing products installed or allegedly installed in such property; and (2) on account of alleged liability by the Debtors for reimbursement, indemnification, subrogation, or contribution of any portion of any damages such Entity (or assignee or transferee thereof) has paid or may pay to the plaintiff in such action. Notwithstanding anything herein to the contrary, Asbestos Property Damage Contribution Claim does not include any ABI Asbestos Claims or Asbestos Personal Injury Claims.

"**Asbestos Property Damage Insurance Rights**" means all rights arising under all insurance policies, issued to or for the benefit of any of the Debtors that may afford any of the Debtors indemnity or insurance coverage solely for Asbestos Property Damage Claims, which policies are set forth on Exhibit "A" attached hereto. The foregoing includes, but is not limited to, rights under insurance policies, rights under settlement agreements made with respect to such insurance policies, rights against the estates of insolvent insurers that issued such policies or entered into such settlements, and rights against state insurance guaranty associations arising out of any such insurance policies issued by insolvent insurers.

"**Avoidance Actions**" means, collectively, the Omnibus Avoidance Action and the Sealed Avoidance Action.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*., as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Reorganization Cases.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of New Jersey.

5

"**Bankruptcy Professional**" means any Person (a) employed pursuant to an order of the Bankruptcy Court or District Court, as applicable, in accordance with section 327 or 1103 of the Bankruptcy Code and to be compensated for services pursuant to sections 327, 328, 329, 330 and/or 331 of the Bankruptcy Code, or (b) who applies to the District Court for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Reorganization Cases.

"**Bar Dates**" means the date(s), if any, designated by the Bankruptcy Court or the District Court as the last date(s) for filing Proofs of Claim against the Debtors.

"**Bondholders' Committee**" means the official committee of bondholders appointed in these Reorganization Cases on January 27, 2006, as reconstituted from time to time, solely in its capacity as such.

"**Business Day**" means any day other than a Saturday, Sunday or a legal holiday (as such term is defined in Bankruptcy Rule 9006(a)) on which commercial banks are open for business in New York, New York.

"**Cash**" means lawful currency of the United States of America and its equivalents.

"**Causes of Action**" means, without limitation, any and all rights, remedies, claims, causes of action, liabilities, obligations, suits, debts, sums of money, damages, judgments, and demands whatsoever, whether known or unknown, in law, equity, or otherwise which may be brought by or on behalf of the Debtors and/or the Estates, arising under any provision of the Bankruptcy Code or other applicable law, including the GHR/Kenesis Actions.

"**Century Entities**" shall have the meaning ascribed to such term in the Settlement and Buyback Agreement.

"**Claim**" means a claim against the Debtors (or any of them), whether or not asserted, as defined in section 101(5) of the Bankruptcy Code, and further shall include, but is not limited to, Asbestos Claims.

"**Claimant Agreement**" means that certain Settlement Agreement Between Congoleum and Various Asbestos Claimants, as amended by the first amendment thereto, entered into by Congoleum and certain Asbestos Claimants, through their counsel, prior to the Petition Date, as amended from time to time in accordance with its terms.

"**Claimants' Counsel**" means Joseph F. Rice, Esquire and Perry Weitz, Esquire, collectively, in their capacity under the Claimant Agreement as the representatives of certain holders of Asbestos Personal Injury Claims.

"**Class**" means a category of Claims or Interests, as classified in Article II of the Plan pursuant to section 1122(a)(1) of the Bankruptcy Code.

"**Collateral Trust**" means the Collateral Trust established pursuant to the Collateral Trust Agreement, the Security Agreement and the Claimant Agreement.

"**Collateral Trust Agreement**" means that certain irrevocable trust agreement entered into by Congoleum and Arthur J. Pergament and Wilmington Trust Company, as amended by the first amendment thereto, and any further modifications or amendments thereto.

"**Collateral Trustee**" means the Trustee as defined and named in the Collateral Trust Agreement.

"**Confirmation**" means the approval of the Plan by the District Court pursuant to section 1129 and other applicable sections of the Bankruptcy Code.

**"Confirmation Date"** means the date on which the Confirmation Order is entered on the docket of the District Court.

**"Confirmation Hearing"** means the hearing(s) which will be held before the District Court, as appropriate, at which the Plan Proponents will seek Confirmation of the Plan.

**"Confirmation Order"** means the order of the District Court confirming the Plan pursuant to section 1129 and other applicable sections of the Bankruptcy Code.

**"Congoleum"** means Congoleum Corporation, a Delaware corporation.

**"Congoleum Interests"** means, collectively, all equity interests in Congoleum outstanding immediately prior to the Effective Date including, without limitation, (a) shares of Class A common stock, par value $0.01 per share, and Class B Common Stock, par value $0.01 per share, of Congoleum and (b) any options, warrants, conversion rights, rights of first refusal, or other rights, contractual or otherwise, to acquire or receive any stock or other equity ownership interests in Congoleum.

**"Coverage Action"** means that certain civil action pending in the Superior Court of New Jersey, docket number MID-L-8908-01, as such action exists after giving effect to the Order entered therein on October 30, 2003 that dismissed, without prejudice, certain claims including Environmental Claims, as referenced in such Order.

**"Coverage Litigation"** means (i) the Coverage Action; and (ii) any other action which seeks to determine the extent of insurance coverage for defense of and liability for Asbestos Claims and related issues.

**"Debtor"** means each of Congoleum, Congoleum Sales, Inc. and Congoleum Fiscal, Inc., as debtors-in-possession in the Reorganization Cases, and **"Debtors"** means all of them collectively, and when the context so requires, as post-Confirmation entities reorganized hereunder.

**"Demand"** means a demand for payment against any of the Debtors within the meaning of section 524(g)(5) of the Bankruptcy Code, but excludes any demand in respect of an Asbestos Property Damage Claim or an ABI Asbestos Claim.

**"Direct Action"** means any cause of action or right to bring a cause of action possessed by an Asbestos Claimant against an Asbestos Insurance Company on account of such Asbestos Claimant's Plan Trust Asbestos Claim, whether arising by contract or under the laws of any jurisdiction.

**"Disallowed"** means a Claim or Interest, as the case may be, that is disallowed by the Plan, a Final Order of the District Court, or that is disallowed pursuant to the TDP.

**"Disbursing Agent"** means Reorganized Congoleum or any Person selected by Reorganized Congoleum to hold and distribute the consideration to be distributed to the holders of Allowed Claims (other than Plan Trust Asbestos Claims and Senior Note Claims) under the Plan.

**"DIP Financing Agreements"** means the Existing Credit Agreement as ratified and amended by the Ratification and Amendment Agreement, dated as of January 7, 2004 ("Ratification Agreement"), between Wachovia and Congoleum, as acknowledged by Guarantors (as defined in the Ratification Agreement), as amended, restated, modified and/ or supplemented, together with all agreements, documents and instruments at any time executed and/or delivered in connection therewith or related thereto, including the Reaffirmation and Amendment of Guarantor Documents, dated as of January 7, 2004, between Wachovia and Guarantors, as from time to time amended, modified, supplemented, extended, renewed, restated or replaced.

**"DIP Financing Claim"** means any Claim arising from or in connection with the DIP Financing Order or the DIP Financing Agreements.

**"DIP Financing Lender"** means Wachovia.

**"DIP Financing Order"** means the Final Order (1) Authorizing Debtors' Use of Cash Collateral, (2) Authorizing Debtors to Obtain Post-Petition Financing, (3) Granting Senior Liens and Priority Administrative Expense Status Pursuant to 11 U.S.C. §§105 and 364(c), (4) Modifying the Automatic Stay Pursuant to 11 U.S.C. §362, and (5) Authorizing Debtors to Enter Into Agreements with Congress Financial Corporation (as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced), which was approved by the Bankruptcy Court on February 2, 2004.

**"Discharge Injunction"** means the injunction described in Section 11.4 of the Plan.

**"Disclosure Statement"** means the Disclosure Statement with respect to the Plan, including all exhibits, appendices, schedules and annexes attached thereto, as submitted by the Plan Proponents pursuant to section 1125 of the Bankruptcy Code, as such Disclosure Statement may be further amended, supplemented or modified from time to time.

**"Disclosure Statement Approval Order"** means that certain order of the District Court entered on _____, 2010, approving the adequacy of the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, as such order may be amended, modified or supplemented thereafter.

**"Disputed Claim"** means any Claim that has not been allowed by a Final Order as to which (a) a Proof of Claim has been filed with the Bankruptcy Court or the District Court, as applicable, and (b) an objection has been or may be timely filed or deemed filed under applicable law and any such objection has not been (i) withdrawn, (ii) overruled or denied by a Final Order or (iii) granted by a Final Order. For purposes of the Plan, a Claim that has not been Allowed by a Final Order shall be considered a Disputed Claim, whether or not an objection has been or may be timely filed, if (A) the amount of the Claim specified in the Proof of Claim exceeds the amount of any corresponding Claim listed in the Schedules, (B) the classification of the Claim specified in the Proof of Claim differs from the classification of any corresponding Claim listed in the Schedules, (C) any corresponding Claim has been listed in the Schedules as disputed, contingent or unliquidated, (D) no corresponding Claim has been listed in the Schedules or (E) such Claim is reflected as unliquidated or contingent in the Proof of Claim filed in respect thereof.

**"Distributions"** means any distribution by the Debtors or Reorganized Congoleum to a Record Holder of an Allowed Claim or Interest.

**"Distribution Date"** means, when used with respect to an Allowed Claim (other than a Plan Trust Asbestos Claim), the date which is as soon as reasonably practicable after the latest of: (a) the Effective Date; (b) the first Business Day of the next calendar month following the date on which the Claim becomes an Allowed Claim; or (c) the first Business Day of the next calendar month upon which the Claim matures and becomes due and payable according to its own terms, unless the Claim becomes Allowed within fifteen (15) Business Days before the first Business Day of the next calendar quarter, in which case the Distribution Date shall be the first Business Day of the next succeeding calendar quarter.

**"District Court"** means the United States District Court for the District of New Jersey, which withdrew the reference from the Bankruptcy Court pursuant to 28 U.S.C. § 157(d) as of August 17, 2009 and assumed authority over the Reorganization Cases.

**"Effective Date"** means the first Business Day after the Confirmation Date immediately following the first day upon which all of the conditions to the occurrence of the Effective Date specified in Section 10.2 of the Plan have been satisfied or waived pursuant to Section 10.3 of the Plan.

**"Entity"** means any Person, estate, trust, Governmental Unit or the United States Trustee.

**"Environmental Laws"** means (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601, *et seq.*, (b) the Resource Conservation and Recovery Act, as amended by the Hazardous and Solid Waste

Amendment of 1984, 42 U.S.C. §§ 6901, *et seq*., (c) the Clean Air Act, 42 U.S.C. §§ 7401, *et seq*., (d) the Clean Water Act of 1977, 33 U.S.C. §§ 1251, *et seq*., (e) the Toxic Substances Control Act, 15 U.S.C. §§ 2601, *et seq*., (f) all statutes or laws issued or promulgated by any Governmental Unit, as they may be amended from time to time, relating to environmental contamination or pollution, air pollution, water pollution, noise control and/or the handling, discharge, existence, release, disposal or recovery of on-site or off-site hazardous, toxic or dangerous wastes, substances, chemicals or materials, and (g) the ordinances, rules, regulations, orders, notices of violation, requests, demands and requirements issued or promulgated by any Governmental Unit in connection with such statutes or laws.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Estate(s)**" means, individually, the estate of each Debtor in the Reorganization Cases and, collectively, the estates of all Debtors in the Reorganization Cases, created pursuant to section 541 of the Bankruptcy Code.

"**Existing Credit Agreement**" means the Loan and Security Agreement between Congoleum, as borrower, and Wachovia, as lender, dated as of December 10, 2001, as amended by Amendment No. 1 to Loan and Security Agreement, dated September 19, 2002, by and between Wachovia and Congoleum, and Amendment No. 2 to Loan and Security Agreement, dated as of February 27, 2003, by and between Wachovia and Congoleum, and as otherwise amended, restated, modified and/or supplemented as of the Petition Date and any related documents.

"**Existing Securities**" means, collectively, the Senior Notes and Interests.

"**Existing Subsidiary Guaranty**" means the Limited Guaranty, dated as of February 27, 2003, executed by Congoleum Fiscal, Inc. and Congoleum Sales, Inc., as amended, restated, modified or supplemented as of the Petition Date.

"**Exit Facility**" means the revolving credit and term loan facility in the aggregate principal amount of $30,000,000 to be provided by lenders acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative in the form of a revolving loan and a term loan to Reorganized Congoleum secured by substantially all of the assets of Reorganized Congoleum and otherwise on terms and conditions, and pursuant to loan documentation, satisfactory and acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative which financing shall be consistent with the Exit Facility Commitment Letter or Term Sheet contained in the Plan Supplement.

"**Exit Facility Commitment Letter or Term Sheet**" means that certain agreement by and between the Debtors and Exit Facility Lenders, detailing the commitment of the Exit Facility Lenders to provide the Exit Facility, a copy of which will be provided in the Plan Supplement.

"**Exit Facility Lenders**" means the lenders who will provide the Exit Facility, with such lenders to be identified in the Exit Facility Commitment Letter or Term Sheet.

"**Final Distribution**" means the Distribution by the Debtors or Reorganized Congoleum that satisfies all Allowed Claims and Interests to the extent provided in accordance with this Plan.

"**Final Order**" means an order or judgment of the Bankruptcy Court or the District Court, as applicable, or other court of competent jurisdiction, the implementation, operation or effect of which has not been stayed and as to which order (or any revision, modification or amendment thereon) the time to appeal or seek review, rehearing or writ of certiorari has expired and as to which no appeal or petition for review, reconsideration, rehearing or certiorari has been taken and is pending.

"**Futures Representative**" means the Person appointed by the Bankruptcy Court to represent the rights and interests of the future Demands, who shall be R. Scott Williams, Esquire, or such other individual appointed by the District Court, pursuant to section 524(g) of the Bankruptcy Code.

"**General Unsecured Claim**" means any Claim against any Debtor arising prior to the Petition Date (regardless of whether such Claim is covered by insurance) to the extent that such Claim is neither secured nor entitled to priority under the Bankruptcy Code or by a Final Order of the Bankruptcy Court or District Court, as applicable (other than any Workers' Compensation Claim, ABI Claim, Senior Note Claim or Asbestos Claim), including, but not limited to: (a) any Claim arising from the rejection of an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and (b) any portion of a Claim to the extent the value of the holder's interest in the applicable Estate's interest in the property securing such Claim is less than the amount of the Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Claim, as determined pursuant to section 506(a) of the Bankruptcy Code; provided, however, General Unsecured Claims do not include claims against the Debtors under the Environmental Laws as set forth in Section 11.9 hereof, which survive the Reorganization Cases.

"**GHR/Kenesis Actions**" means any Causes of Action, including for malpractice, against Gilbert LLP (formerly known as Gilbert Oshinsky LLP, Gilbert Randolph LLP, Gilbert, Heintz & Randolph LLP) or The Kenesis Group LLC.

"**Governmental Unit**" means any domestic, foreign, provincial, federal, state, local or municipal (a) government, or (b) governmental agency, commission, department, bureau, ministry or other governmental entity.

"**Impaired**" means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"**Indenture**" means the Indenture by and between Congoleum Corporation, as Issuer, and First Union National Bank, as Trustee, dated as of August 3, 1998, as supplemented and amended from time to time, relating to the Senior Notes.

"**Indenture Trustee**" means HSBC Bank USA, N.A., as successor to First Union National Bank, not individually but as indenture trustee under the Indenture, and its successors and assigns.

"**Indirect Asbestos Claim**" means (i) any Claim based on a right of contribution, reimbursement, subrogation, or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) arising out of or based on an Asbestos Personal Injury Claim or another Indirect Asbestos Claim, (ii) any other derivative or indirect Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law, equity or admiralty, by reason of an Asbestos Personal Injury Claim or another Indirect Asbestos Claim (including, without limitation, any Claim (A) for attorneys' fees arising or incurred in connection with any Asbestos Personal Injury Claim, another Indirect Direct Asbestos Claim or an Asbestos Insurance Action or (B) arising out of or based on the rejection of any executory contract related to or involving asbestos), and (iii) any Claim arising out of Asbestos Insurance Policies or settlement agreements related thereto, in each case other than ABI Asbestos Claims or Asbestos Property Damage Claims.

"**Injunctions**" means the Discharge Injunction, the Asbestos Channeling Injunction, the Anti-Suit Injunction and any other injunctions entered by order of the Bankruptcy Court or the District Court in the Reorganization Cases (including but not limited to any injunction contained in any Final Order approving any Asbestos Insurance Settlement Agreement).

"**Insurance Assignment Agreement**" means the insurance assignment agreement referenced in Section 5.1(c) of the Plan and substantially in the form attached as Exhibit "B" to the Plan.

"**Intercompany Agreements**" means any and all agreements existing between any of the Debtors and ABI, including without limitation the (i) Joint Venture Agreement, (ii) Personal Services Agreement, (iii) stockholders agreement, made as of March 11, 1993, as amended, (iv) Business Relations Agreement, dated as of March 11, 1993, as amended, (v) Tax Sharing Agreement, (vi) Closing Agreement, dated as of March 11, 1993, (vii) Plan of Repurchase, dated as of February 1, 1995, and (viii) annual intercompany personal computing, desktop and voice and data system support and other information technology services agreements.

"**Intercompany Settlement**" shall have the meaning ascribed to such term in Section 5.17.

"**Interest**" means any equity interest in the Debtors existing immediately prior to the Effective Date, including without limitation, the Congoleum Interests and the Subsidiary Interests.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**Joint Venture Agreement**" means that certain Joint Venture Agreement, dated as of December 16, 1992, by and among American Biltrite Inc., Resilient Holdings Incorporated, Congoleum, Hillside Industries Incorporated and Hillside Capital Incorporated, as amended by the Closing Agreement, dated as of March 11, 1993, by and among the same parties.

"**Lender Secured Claim**" means any Claim of Wachovia arising under or relating to the Existing Credit Agreement, the Existing Subsidiary Guaranty and any related documents.

"**Lien**" means, with respect to any asset or property, any properly perfected and unavoidable mortgage, lien, pledge, charge, security interest, encumbrance or other security device of any kind pertaining to or affecting such asset or property.

"**Litigation Settlement Agreement**" means the compromise and settlement agreement referenced in Section 5.14 of the Plan, approved by the Bankruptcy Court by order dated October 31, 2008, which Litigation Settlement Agreement was amended by the First Amendment to the Litigation Settlement Agreement dated as of October 22, 2009, as the same may be approved by the District Court.

"**Litigation Settlement Claimant**" means a person whose Asbestos Personal Injury Claim was liquidated pursuant to or was subject to liquidation pursuant to the Claimant Agreement or a Pre-Petition Settlement Agreement who executed the Litigation Settlement Agreement.

"**New ABI Agreement**" means the agreement to be entered into between Reorganized Congoleum and ABI, which shall be in form and substance mutually agreeable to the Bondholders' Committee, the Asbestos Claimants' Committee, the Futures Representative, and ABI, and which shall govern the relationship between ABI and Reorganized Congoleum upon the Effective Date, thereby superseding any and all Intercompany Agreements and which agreement shall be substantially in the form attached as Exhibit "I" to the Plan. The New ABI Agreement will be filed with the Plan Supplement.

"**New Common Stock**" means the newly issued shares of Congoleum common stock, par value $.01 per share, to be issued by Reorganized Congoleum as of the Effective Date pursuant to the terms of the Plan.

"**New Indenture**" means the Indenture dated as of the Effective Date relating to the New Senior Notes and which shall be substantially in the form attached as Exhibit "D" to the Plan. The New Indenture will be filed as part of the Plan Supplement.

"**New Senior Notes**" means the Senior Secured Notes to be issued to holders of Allowed Senior Note Claims by Reorganized Congoleum in the initial aggregate principal amount of $33 million on the Effective Date and which shall be due and payable December 31, 2017 . There shall be no interest accruing or due and payable on the principal amount of the New Senior Notes for the first six months after the Effective Date. Thereafter, interest shall accrue on the principal amount of the New Senior Notes at the rate of 9% per annum and be payable semi-annually in cash. At the sole option of Reorganized Congoleum, however, beginning with the interest payment due 12 months after the Effective Date to and including the interest payment due 30 months after the Effective Date (the "PIK Period"), interest may be paid in kind by the issuance of additional New Senior Notes in the aggregate amount of the interest then due and payable on each such payment date within the PIK Period. The option shall be separately exercisable with respect to each of the four semi-annual periods within the PIK Period. If Reorganized Congoleum elects to pay interest in kind during any semi-annual period within the PIK Period, interest shall accrue on all the New Senior Notes during such semi-annual period, including any New Senior Notes issued previously in connection with an interest payment in kind, at the rate of 11% per annum; if the Company does not elect the PIK payment

option on any interest payment date within the PIK period, interest for such semi-annual period shall be calculated at the rate of 9% per annum on all the New Senior Notes during such semi-annual period, including any New Senior Notes issued previously in connection with an interest payment in kind. After the expiration of the PIK Period, the option to pay interest in kind shall expire, and be of no further force and effect, and all interest shall accrue at 9% per annum, payable semi-annually in cash.

Commencing with the end of the Company's Fiscal Year ending December 31, 2011, the Company shall calculate the average annual Consolidated Cash Flow for each of the prior two Fiscal Years for each of the Company's Fiscal Years ending 2011 through 2016 (each such date, a "Determination Date"). The Company shall then calculate an assumed net debt capacity (the "Net Debt Capacity") as of each such Determination Date by multiplying the applicable two-year average annual Consolidated Cash Flow by four. The Company shall issue additional notes ("Additional Notes") to Holders of Notes on the relevant Regular Record Date to the extent that the Net Debt Capacity as of such Determination Date, plus any Cash Equivalents on the Company's balance sheet (plus any undrawn commitment amount under the Company's then outstanding revolving credit facility to the extent available to be drawn on the Determination Date) as of such Determination Date, exceeds the sum of (i) the amount of the outstanding balance of the Company's then outstanding revolving credit facility (determined as the daily average of such loan for the Fiscal Year ending on such Determination Date, and assuming it was fully drawn to the extent available to be drawn on each day of calculation of such daily average); (ii) the $33.0 million of Initial Notes; (iii) the amount of Additional Notes (excluding interest accretion as provided in the penultimate sentence of this paragraph) issued with respect to all prior Determination Dates; and (iv) the amount of other interest-bearing Indebtedness outstanding as of such Determination Date. The calculation of the amount of Additional Notes to be issued shall take place within three months after each Determination Date, and the issuance of such Additional Notes shall take place on the first Interest Payment Date after such calculation. The Company shall pay interest with such Additional Notes in cash upon issuance of such Additional Notes at a rate of 9% per annum on the principal amount of such Additional Notes accrued from the first date of the Fiscal Year following the applicable Determination Date if the Company pays interest in cash on the then existing Notes on such issuance date; and if interest on existing Notes on such issuance date is paid in PIK Notes, the principal amount of Additional Notes shall be increased to include the interest accreted from the first date of the Fiscal Year following the applicable Determination Date to the applicable issuance date at a rate per annum of 11% on the principal amount of Additional Notes otherwise to be issued not taking into account such accretion. In no event shall the cumulative amount of Additional Notes issued under the procedures set forth in this paragraph exceed $37.0 million (excluding interest accretion as provided in the penultimate sentence of this paragraph).

Upon a Change of Control (as defined in the New Indenture as are other terms used in this definition of New Senior Notes), the holders of the New Senior Notes may require Reorganized Congoleum to repurchase the New Senior Notes at an offer price in cash equal to 115% of the aggregate principal amount thereof plus accrued and unpaid interest thereon. Moreover, the New Senior Notes are not optionally redeemable at any time prior to maturity.

The New Senior Notes will be secured by liens or security interests in all the assets of Reorganized Congoleum, which liens or security interests shall be subordinate in priority only to the liens or security interests granted by Reorganized Congoleum under the Exit Facility but shall not otherwise be subordinated to the Exit Facility, and which New Senior Notes liens or security interests shall be *pari passu* with no other security interests or liens. The New Senior Notes shall be in the form set forth in the New Indenture.

**"Non-Asbestos Stock Distribution"** means 49.9% of the New Common Stock.

**"Non-Compensatory Damages"** means any and all damages awarded by a court of competent jurisdiction that are penal in nature, including, without limitation, punitive, punitory, exemplary, vindictive, imaginary or presumptive damages.

**"Omnibus Avoidance Action"** means that certain Adversary Proceeding No. 05-06245 (KCF), which was filed in the Bankruptcy Court on behalf of the Debtors on December 3, 2005, as amended.

**"Other Secured Claim"** means a Secured Claim arising prior to the Petition Date against any of the Debtors other than a Lender Secured Claim.

**"PBGC"** shall have the meaning ascribed to such term in Section 8.4(b).

**"Pension Plans"** means, collectively, that certain Congoleum Corporation Hourly Retirement Plan, that certain Congoleum Corporation Retirement Plan for Salaried Employees and that certain Congoleum Corporation Plant 2 Retirement Plan, in each case as the same may be amended from time to time.

**"Person"** means any person, individual, partnership, corporation, limited liability company, joint venture company, association or other entity or being of whatever kind, whether or not operating or existing for profit, including, but not limited to, any "person" as such term is defined in section 101(41) of the Bankruptcy Code, but excluding any Governmental Unit.

**"Personal Services Agreement"** means that certain Personal Services Agreement dated as of March 11, 1993, by and between ABI and Congoleum and all amendments thereto.

**"Petition Date"** means December 31, 2003, the date on which the Debtors filed their petitions for relief commencing the Reorganization Cases.

**"Plan"** means this Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code and all exhibits and schedules annexed hereto or referenced herein, and any amendments or modifications thereto made in accordance with the Bankruptcy Code.

**"Plan Documents"** means the Plan, the Plan Trust Agreement, the TDP, the Exit Facility, the New Senior Notes, the New Indenture, the Registration Rights Agreement, the Amended and Restated Certificate, the Amended and Restated Bylaws, the Stockholders Agreement, the New ABI Agreement, and the Insurance Assignment Agreement, and all exhibits and schedules to any of the foregoing, including any included in a Plan Supplement.

**"Plan Proponents"** means, collectively, the Debtors, the Asbestos Claimants' Committee and the Bondholders' Committee.

**"Plan Supplement"** means the compilation of substantially final forms of documents, including, without limitation, a schedule identifying rejected contracts, the Exit Facility Commitment Letter or Term Sheet, the New ABI Agreement, Registration Rights Agreement, the New Indenture, the Stockholders Agreement, the Amended and Restated Bylaws and the Amended and Restated Certificate and schedules identifying the initial officers and the initial board of directors of Reorganized Congoleum, which the Plan Proponents shall file with the District Court no later than five (5) Business Days prior to the last date for filing objections to Confirmation of the Plan. Notwithstanding the foregoing, the Plan Proponents may amend the Plan Supplement and any attachments thereto through and including the Confirmation Date.

**"Plan Trust"** means the trust to be established pursuant to the Plan Trust Agreement and Section 5.1(a) of the Plan as of any date between (and inclusive of) the Confirmation Date and the Effective Date.

**"Plan Trust Agreement"** means that certain Congoleum Plan Trust Agreement, effective as of any date between (and inclusive of) the Confirmation Date and the Effective Date, substantially in the form attached hereto as Exhibit "E," as it may be modified from time to time in accordance with the terms thereof.

**"Plan Trust Asbestos Claims"** means, collectively, Asbestos Personal Injury Claims, future Demands and Allowed Asbestos Property Damage Claims.

**"Plan Trust Assets"** means the assets to be delivered to the Plan Trust pursuant to the Plan Documents and shall include, without limitation, the following assets and any income and profits thereon, and proceeds derived therefrom: (a) the Plan Trust Common Stock; (b) the Asbestos Insurance Rights; (c) all rights of the Debtors under, and all proceeds of, the Asbestos Insurance Settlement Agreements (except for those certain proceeds of the Asbestos Insurance Settlement Agreement with Liberty Mutual Insurance Company, which are payable to the Debtors as provided in Section 5.1(q) of the Plan); (d) the proceeds of the Asbestos In-Place Insurance Coverage; (e) the proceeds of the Asbestos Insurance Actions; (f) the proceeds of the Asbestos Insurance Action Recoveries; (g)

the rights granted to the Plan Trust pursuant to the Insurance Assignment Agreement; and (h) the Asbestos Property Damage Insurance Rights.

**"Plan Trust Bylaws"** means the bylaws as approved by the Plan Trustee, the Trust Advisory Committee and the Futures Representative, effective as of the effective date of the Plan Trust, as may be modified from time to time with the consent and approval of the Plan Trustee, the Trust Advisory Committee and the Futures Representative.

**"Plan Trust Common Stock"** means a number of shares of common stock of Reorganized Congoleum constituting 50.1% of the New Common Stock.

**"Plan Trust Documents"** means the Plan Trust Agreement, the Plan Trust Bylaws, the TDP and the other agreements, instruments and documents governing the establishment, administration and operation of the Plan Trust, as amended or modified from time to time in accordance with the Plan and such documents.

**"Plan Trust Expenses"** means any liabilities, costs, taxes or expenses of, or imposed upon or in respect of, the Plan Trust or, on and after the Effective Date, the Plan Trust Assets (except for payments to holders of Asbestos Claims on account of such Asbestos Claims).

**"Plan Trustee"** means the Person appointed pursuant to Article V of the Plan and the Plan Trust Agreement for the purpose of acting as Trustee of the Plan Trust in accordance with the terms and conditions contained in the Plan, the Plan Trust Agreement and the Confirmation Order.

**"Post-Petition Interest"** means interest accruing on and after the Petition Date on a Claim.

**"Pre-Petition Settled Claimant"** means a person whose Asbestos Personal Injury Claim was liquidated pursuant to or was subject to liquidation pursuant to the Claimant Agreement or a Pre-Petition Settlement Agreement, as the case may be (other than such persons whose claims have been previously expunged by order of the Bankruptcy Court, it being understood that defendants in the Omnibus Avoidance Action against whom a default has been granted shall not be considered to have had their claims expunged).

**"Pre-Petition Settlement Agreement"** means a settlement agreement, other than the Claimant Agreement, executed prior to the Petition Date to resolve an Asbestos Personal Injury Claim under which some or all of the consideration due has yet to be paid.

**"Priority Claim"** means any Claim (other than an Administrative Claim or a Priority Tax Claim) to the extent such Claim is entitled to a priority in payment under section 507(a) of the Bankruptcy Code.

**"Priority Tax Claim"** means any Claim to the extent that such Claim is entitled to a priority in payment under section 507(a)(8) of the Bankruptcy Code.

**"Professional Fee Claim"** means a Claim of a professional retained in the Reorganization Cases pursuant to sections 327, 328, and 1103 of the Bankruptcy Code, or otherwise, including such Claims of the Futures Representative and its professionals, for compensation or reimbursement of costs and expenses relating to services rendered on and after the Petition Date and prior to and including the Effective Date.

**"Proof of Claim"** means any proof of claim filed with the Bankruptcy Court or District Court or their duly appointed claims agent with respect to the Debtors pursuant to Bankruptcy Rule 3001 or 3002.

**"Pro Rata"** means with reference to any distribution on account of any Claim in any Class, the proportion that the amount of such Claim bears to the aggregate amount of all Claims (including Disputed Claims but excluding Disallowed Claims) in such Class.

**"Protected Party"** means any of the following parties:

14

(a) the Debtors and the Reorganized Debtors;

(b) any Entity that, pursuant to the Plan or after the Confirmation Date, becomes a direct or indirect transferee of, or successor to, the Plan Trust or the Debtors;

(c) the Persons designated on Exhibit "F" (as such Exhibit may be amended on or before the Confirmation Date) as current distributors of the product lines currently manufactured, sold or otherwise produced by Congoleum; or

(d) each Settling Asbestos Insurance Company.

**"Record Date"** means the date established in the Disclosure Statement Approval Order or any other Final Order of the District Court for determining the identity of holders of Claims entitled to vote to accept or reject this Plan and/or receive Distributions under this Plan. If no Record Date is established in the Disclosure Statement Approval Order or any other Final Order of the District Court, then the Record Date shall be the date of the entry of the Disclosure Statement Approval Order.

**"Record Holder"** means the holder of a Claim as of the Record Date.

**"Registration Rights Agreement"** means the agreement described in Section 5.8 of the Plan.

**"Reinstated"** means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the holder of such Claim or Interest so as to leave such Claim or Interest Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim or Interest as such maturity existed before such default; and (iii) compensating the holder of such Claim or Interest for any damages incurred as a result of any legal, equitable or contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest.

**"Reorganization Cases"** means the cases filed by the Debtors under Chapter 11 of the Bankruptcy Code.

**"Reorganized Congoleum"** means reorganized Congoleum (or any successor thereto) on and after the Effective Date.

**"Reorganized Debtors"** means the reorganized Debtors (or any successor thereto) on and after the Effective Date.

**"Representatives"** means, with respect to any Entity, the present and former directors, officers, members, employees, trustees, accountants (including independent certified public accountants), advisors, attorneys, consultants, experts or other agents of that Entity, or any other professionals of that Entity, in each case in their capacity as such; *provided, however,* that in no event shall "Representatives" mean Gilbert LLP (formerly known as Gilbert Oshinsky, LLP, Gilbert Randolph LLP and Gilbert Heintz & Randolph LLP) or Kenesis Group, LLC.

**"Schedules"** means the schedules, statements and lists filed by the Debtors with the Bankruptcy Court or District Court pursuant to Bankruptcy Rule 1007, if such documents are filed, as they have been and may be amended or supplemented from time to time.

**"Sealed Avoidance Action"** means that certain Adversary Proceeding No. 05-06461 (KCF), as it may be amended, which was filed under seal in the Bankruptcy Court on behalf of the Debtors on December 29, 2005, against (a) Arthur J. Pergament, in his capacity as Collateral Trustee; (b) Joseph F. Rice and the law firm of Motley Rice LLC; (c) Perry Weitz and the law firm of Weitz & Luxenberg, P.C.; and (d) certain holders of pre-petition Asbestos Personal Injury Claims.

"**Secured Claim**" means any Claim (other than an Asbestos Claim) that is (a) secured in whole or part, as of the Petition Date, by a Lien which is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or (b) subject to setoff under section 553 of the Bankruptcy Code, but, with respect to both (a) and (b) above, only to the extent of the value, net of any senior lien, of the Estates' interest in the assets or property securing any such Claim or the amount subject to setoff, as the case may be.

"**Security Agreement**" means that certain Superceding [sic] Security Agreement entered into by Congoleum and the Collateral Trustee, dated June 11, 2003, as the same may be amended from time to time.

"**Senior Note Claim**" means any Claim of a holder of Senior Notes based upon the Senior Notes.

"**Senior Note Distribution**" means the Non-Asbestos Stock Distribution and $33 million initial principal amount of the New Senior Notes.

"**Senior Notes**" means the 8.625% Senior Notes Due 2008 in the original principal amount of $100 million issued by Congoleum and outstanding as of the Petition Date.

"**Settlement and Buyback Agreement**" means that certain Settlement and Buyback Agreement dated as of August 17, 2006 among the Debtors, Century Indemnity Company and the other parties thereto.

"**Settling Asbestos Insurance Company**" means any Asbestos Insurance Company that has, before the conclusion of the Confirmation Hearing before the District Court, entered into an Asbestos Insurance Settlement Agreement that is sufficiently comprehensive and otherwise on terms appropriate in the determination of each of the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative to warrant treatment under section 524(g) of the Bankruptcy Code (including, with respect to any Asbestos Insurance Settlement Agreement that is conditioned in whole or in part on a plan of reorganization proposed by the Debtors, an agreement from such Settling Asbestos Insurance Company in writing, in a form reasonably acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative that all conditions to its performance under its Asbestos Insurance Settlement Agreement based on or related to a plan proposed by the Debtors is satisfied in full by this Plan), which determination by the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative will be indicated by the inclusion of such Asbestos Insurance Company on a schedule of Settling Asbestos Insurance Companies filed by the Plan Proponents as Exhibit "H" to the Plan with the District Court before the conclusion of the Confirmation Hearing and approved by such District Court.

"**Stockholders Agreement**" means that certain stockholders agreement described in Section 5.9 of this Plan, which shall be substantially in the form attached hereto as Exhibit "L." The Stockholders Agreement will be filed as part of the Plan Supplement.

"**Subsidiary Debtors**" means, collectively, Congoleum Sales, Inc. and Congoleum Fiscal, Inc.

"**Subsidiary Interests**" means, collectively, the issued and outstanding shares of stock of the Subsidiary Debtors as of the Petition Date and any options, warrants or other contractual rights to acquire any shares of stock of the Subsidiary Debtors as of the Petition Date.

"**Substantial Contribution Claim**" shall have the meaning ascribed to such term in Section 3.5.

"**Tax Sharing Agreement**" means that certain Tax Sharing Agreement, dated as of November 1, 1996, by and between ABI and Congoleum.

"**TDP**" means the trust distribution procedures for the Plan Trust, substantially in the form attached as Exhibit "G" to the Plan, as it may be modified from time to time in accordance with the terms of the TDP and the Plan Trust Agreement.

**"Trust Advisory Committee"** or **"TAC"** means a Trust Advisory Committee to be formed to represent all holders of Asbestos Personal Injury Claims to advise the Plan Trustee and to approve and consent to certain actions as specified herein and in the Plan Trust Agreement, solely in its capacity as such.

**"United States Trustee"** means the Office of the United States Trustee for Region 3.

**"Unimpaired"** means, with reference to a Claim or Interest, unimpaired within the meaning of section 1124 of the Bankruptcy Code.

**"Unpaid Intercompany Amounts"** means the following intercompany payables, to the extent such payables arise following the Petition Date, are evidenced by invoices or other appropriate supporting documentation and remain unpaid as of the Effective Date: (i) payments due under the Personal Services Agreement, (ii) payments due for purchases of urethane or other products sold intercompany under the Business Relations Agreement, dated as of March 11, 1993, as amended, (iii) payments due under the Canadian Tile exclusivity agreement under the Business Relations Agreement, dated as of March 11, 1993, as amended, (iv) royalty payments due under the non-pvc license agreement dated January 1, 2006, (v) payments due under intercompany personal computing, desktop and voice and data system support and other information technology services agreements between ABI and the Debtors, (vi) payments due for items purchased by ABI and/or an ABI subsidiary for a Debtor and/or Debtor subsidiary, or purchased by a Debtor and/or a Debtor subsidiary for ABI and/or an ABI subsidiary, or purchased jointly by any of them and (vii) intercompany payments due as reimbursement of reasonable and necessary travel expenses incurred (whether by ABI or an ABI subsidiary, or a Debtor or a Debtor subsidiary) in connection with ABI personnel providing management services to any of the Debtors.

**"Voting Agent"** means Logan & Company, Inc.

**"Voting Procedures Order"** means the order entered by the District Court setting the voting procedures for this Plan.

**"Wachovia"** shall mean Wachovia Bank, National Association, successor by merger to Congress Financial Corporation.

**"Workers' Compensation Claim"** means any Claim (a) for benefits under a state-mandated workers' compensation system, that a past, present, or future employee of the Debtors and their predecessors is receiving, or may in the future have a right to receive, and/or (b) for reimbursement brought by any insurance company as a result of payments made to or for the benefit of such employees and fees and expenses incurred under any insurance policies covering such employee claims.

**1.3**   **Rules of Interpretation:  Application of Definitions, Rules of Construction, and Computation of Time**.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine and neuter.  For purposes of the Plan: (a) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the document shall be substantially in that form or substantially on those terms and conditions; (b) any reference in the Plan to an existing document or exhibit filed or to be filed means the document or exhibit as it may have been or may be amended, modified, or supplemented; (c) unless otherwise specified, all references in the Plan to Sections, Schedules, and Exhibits are references to sections, schedules, and exhibits of or to the Plan.  Unless otherwise specified, the words "herein," "hereof," "hereto," "hereunder," and other words of similar meaning refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan.  The headings in the Plan are for convenience of reference only and shall not expand, limit, or otherwise affect the provisions of the Plan.  Unless otherwise indicated herein, all references to dollars are to United States dollars.  Unless otherwise expressly provided herein, in computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**1.4**   **Exhibits and Schedules**.  All exhibits and schedules are incorporated into and are a part of the Plan as if set forth in full herein.

500392306v7

# ARTICLE II

## CLASSIFICATION OF CLAIMS AND INTERESTS

**2.1    Generally**.  Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of the Class and is classified in a different Class to the extent the Claim or Interest qualifies within the description of that different Class.  Solely for voting purposes, Claims against each Estate are classified as Claims against the Estates as a whole.

**2.2    Unclassified Claims**.    In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are excluded from the Classes set forth in Section 2.3 of the Plan.  The treatment accorded Administrative Claims, Priority Tax Claims and the DIP Financing Claim is set forth in Article III of the Plan.

**2.3    Classes**.  In accordance with section 1122 of the Bankruptcy Code, the following constitute the Classes of Claims against and Interests in the Debtors:

(a)    Class 1 – Priority Claims.  Class 1 consists of all Priority Claims.  Class 1 is Unimpaired.

(b)    Class 2 – Lender Secured Claims.  Class 2 consists of the Lender Secured Claims.  Class 2 is Unimpaired.

(c)    Class 3 – Other Secured Claims.  Class 3 consists of all Other Secured Claims, each of which will be within a separate subclass, with each such subclass to be deemed a separate Class for all purposes.  Class 3 is (or these subclasses are) Unimpaired.

(d)    Class 4 – Senior Note Claims.  Class 4 consists of all Senior Note Claims.  Class 4 is Impaired.

(e)    Class 5 – Workers' Compensation Claims.    Class 5 consists of all Workers' Compensation Claims.  Class 5 is Unimpaired.

(f)    Class 6 – ABI Claims.  Class 6 consists of all ABI Claims.  Class 6 is Impaired.

(g)    Class 7 – Asbestos Personal Injury Claims.  Class 7 consists of all Asbestos Personal Injury Claims, including the unliquidated Asbestos Personal Injury Claims of Pre-Petition Settled Claimants.  Class 7 is Impaired.

(h)    Class 8 - Asbestos Property Damage Claims.  Class 8 consists of all Asbestos Property Damage Claims.  Class 8 is Impaired.

(i)    Class 9 – General Unsecured Claims.  Class 9 consists of all General Unsecured Claims.  Class 9 is Impaired.

(j)    Class 10 – Congoleum Interests.  Class 10 consists of all Congoleum Interests.  Class 10 is Impaired.

(k)    Class 11 – Subsidiary Interests.  Class 11 consists of all Subsidiary Interests.  Class 11 is Unimpaired.

18

# ARTICLE III

## TREATMENT OF ADMINISTRATIVE
## CLAIMS AND PRIORITY TAX CLAIMS

**3.1    Summary**.  Pursuant to section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims against the Debtors are not classified for purposes of voting on, or receiving Distributions under, this Plan.  Similarly, Substantial Contribution Claims are not classified for purposes of voting on, or receiving Distributions under, this Plan.  Holders of such Claims are not entitled to vote on this Plan.  All such Claims are instead treated separately in accordance with this Article III and in accordance with the requirements set forth in section 1129(a)(9)(A) of the Bankruptcy Code.

**3.2    Administrative Claims**.  On the Distribution Date, each holder of an Allowed Administrative Claim, except as otherwise provided for herein, and subject to the requirements of Section 13.14 of the Plan, shall receive, in full satisfaction, settlement, release, extinguishment, and discharge of such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Claim or (b) such different treatment as to which the applicable Debtor and such holder shall have agreed upon in writing; *provided, however,* that Allowed Administrative Claims representing (i) post-petition liabilities incurred in the ordinary course of business by the Debtors and (ii) post-petition contractual liabilities arising under loans or advances to the Debtors, whether or not incurred in the ordinary course of business, shall be paid by Reorganized Congoleum in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto.

**3.3    Priority Tax Claims**.  On the Distribution Date, each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, (a) Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (b) such different treatment as to which the applicable Debtor and such holder shall have agreed upon in writing, or (c) at Reorganized Congoleum's sole discretion, deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim, over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim.

**3.4    DIP Financing Claim.**

        Each holder of an Allowed DIP Financing Claim shall be paid indefeasibly in full on the Effective Date or as soon thereafter as practicable and shall receive in full satisfaction, settlement, release, extinguishment, and discharge of such Allowed DIP Financing Claim, (a)(i) Cash equal to the unpaid portion of such Allowed DIP Financing Claim, together with a release and termination agreement and any accompanying cash collateral, each in form, substance and amounts acceptable to DIP Financing Lender, or (ii) such different treatment as to which DIP Financing Lender shall have agreed to in writing, and (b) shall be released and discharged from any obligation, liability and/ or responsibility to fund or otherwise pay the Professional Fee Carve-Out (as defined in the DIP Financing Order) and /or any other claim or liability of any kind, nature or description that can be brought at any time for any reason against DIP Financing Lender relating to the Professional Fee Carve-Out or any other fees or expenses incurred by any Bankruptcy Professional.  Notwithstanding anything to the contrary contained in the Plan, the Confirmation Order, or otherwise, the Allowed DIP Financing Claim, and the liens and security interests securing such Allowed DIP Financing Claim shall continue in full force and effect in accordance with the terms, conditions and covenants of the DIP Financing Agreements and the DIP Financing Order, shall survive the Confirmation Date and continue in full force and effect in accordance with the terms and conditions of the DIP Financing Agreements and the DIP Financing Order until such time as the Allowed DIP Financing Claim has been indefeasibly paid in full and in Cash.  Each Allowed DIP Financing Claim shall include all interest, fees, costs and charges accrued up to the Effective Date, accrued at the rates provided for in the DIP Financing Agreements.  Pursuant to the DIP Financing Order, upon the indefeasible payment in full of an Allowed DIP Financing Claim, the Debtors shall forever release, discharge and acquit the DIP Financing Lender and its officers, directors, agents, attorneys and predecessors-in-interest of and from any and all claims, demands, liabilities, causes of action, and obligations of every kind with respect to the DIP Financing Agreement and DIP Financing Order.

**3.5    Substantial Contribution Claims**.  Any Entity who requests compensation or expense reimbursement for making a substantial contribution in the Reorganization Cases pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code ("Substantial Contribution Claim") must file an application with the clerk of the

19

District Court on or before a date that is sixty (60) days subsequent to the Effective Date and serve such application on counsel for the Debtors, counsel for the Futures Representative, counsel for the Asbestos Claimants' Committee, counsel for the Bondholders' Committee and on all other parties as otherwise required by the District Court and the Bankruptcy Code, or be forever barred from seeking such compensation or expense reimbursement. All Allowed Substantial Contribution Claims shall be paid by Reorganized Congoleum within sixty (60) days of allowance by the District Court.

## ARTICLE IV

## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

### 4.1    Claims and Interests

(a)    Class 1 – Priority Claims.  On the Distribution Date, each holder of an Allowed Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Claim, either (i) the Allowed Amount of its Priority Claim, in Cash, or (ii) such different treatment as may be agreed to by such holder and Reorganized Congoleum.  Class 1 is Unimpaired and the holders of Class 1 Claims are deemed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

(b)    Class 2 – Lender Secured Claims.  The Lender Secured Claim shall be deemed Allowed for all purposes in connection with this Plan and shall be deemed to be previously indefeasibly paid in full on the Effective Date and Wachovia shall be released from any and all liabilities and causes of action in accordance with the DIP Financing Agreements and DIP Financing Order.  Class 2 is Unimpaired and the holder of the Class 2 Claim is deemed to have accepted the Plan and, accordingly, is not entitled to vote on the Plan.

(c)    Class 3 – Other Secured Claims.  Each holder of an Allowed Other Secured Claim shall receive one of the following three treatments at Reorganized Congoleum's sole option:  (i) retain unaltered the legal, equitable and contractual rights (including, but not limited to, any Liens that secure such Claim) to which such Claim entitles such holder and such Allowed Other Secured Claim shall be Reinstated on the Effective Date, (ii) the Debtors shall surrender all collateral securing such Claim to the holder thereof, in full satisfaction of such holder's Allowed Class 3 Claim, without representation or warranty by, or recourse against, the Debtors or Reorganized Congoleum or (iii) such holder shall be otherwise treated in a manner so that such Claim shall be rendered Unimpaired. Class 3 is Unimpaired and the holders of Class 3 Claims are deemed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

(d)    Class 4 – Senior Note Claims.  Senior Note Claims shall be Allowed in an aggregate amount equal to at least $103,593,750.00, which shall not be subject to any avoidance, reductions, set off, offset, recharacterization, subordination, counterclaims, defenses, disallowance, impairment or any other challenges under applicable law or regulation by any person or entity.  On the Effective Date, each holder of an Allowed Senior Note Claim shall receive, in full satisfaction of its Senior Note Claim, its Pro Rata share of each of the securities included in the Senior Note Distribution.  Class 4 is Impaired and holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

(e)    Class 5 – Workers' Compensation Claims.  Each holder of an Allowed Workers' Compensation Claim shall be paid in the ordinary course pursuant to such rights that exist under any state workers' compensation system or laws applicable to such Claims.  Class 5 is Unimpaired and the holders of Class 5 Claims are deemed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

(f)    Class 6 – ABI Claims. Pursuant to and in consideration of the Intercompany Settlement and Section 5.17 and other terms of the Plan, on the Effective Date all Intercompany Agreements shall be rejected and all ABI Claims, including without limitation any ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.17(b)(4)(B) of the Plan), shall be deemed Disallowed and expunged.  Class 6 is Impaired and the holder of the Class 6 Claims is entitled to vote to accept or reject the Plan.

(g)    Class 7 – Asbestos Personal Injury Claims.

(i)    As of the Effective Date, all liability for all Asbestos Personal Injury Claims (which includes all Claims in Class 7) as well as liability for all future Demands shall be assumed, automatically and without further act or deed, by the Plan Trust and the Reorganized Debtors shall have no liability therefor. Each Asbestos Personal Injury Claim and future Demands shall be resolved pursuant to the Plan Trust Agreement and the TDP. The TDP shall apply to all holders of Asbestos Personal Injury Claims and future Demands, including any such holder who elects to resort to the legal system and obtains a judgment for money damages.

(ii)    As of the Effective Date, pursuant to the Plan, all Pre-Petition Settled Claimants, including the Litigation Settlement Claimants, in full satisfaction of his, her or its Asbestos Personal Injury Claim and any and all rights pursuant to any Pre-Petition Settlement Agreement, Claimant Agreement, Security Agreement, Collateral Trust Agreement or any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003, shall be restored to *status quo ante,* including with respect to any statutes of limitation related to such Asbestos Personal Injury Claim, as of the time each such Claimant initially filed or submitted its Asbestos Claim against the Debtors that resulted in the Claimant's Pre-Petition Settlement Agreement or the Claimant Agreement, respectively, and shall be treated by the Plan Trust as holding unliquidated Asbestos Personal Injury Claims under applicable federal or state law, which claims shall be resolved pursuant to the Plan Trust Agreement and the TDP in the same manner as all other Asbestos Personal Injury Claims in Class 7. Pre-Petition Settled Claimants in Class 7 shall receive *pari passu* treatment under the Plan without regard to any lien, security interest or other claim to priority treatment whatsoever (*i.e.* it is understood that any such Pre-Petition Settled Claimant will need to reapply to the Plan Trust to satisfy the TDP including medical, exposure, statutes of limitation and other requirements).

(iii)    Class 7 is Impaired. Holders of Class 7 Claims are entitled to vote with respect to the Plan.

(h)    Class 8 - Asbestos Property Damage Claims. As of the Effective Date, all liability for all Allowed Asbestos Property Damage Claims shall be assumed, automatically and without further act or deed, by the Plan Trust and the Reorganized Debtors shall have no liability therefor. Each Allowed Asbestos Property Damage Claim shall be paid solely from the Asbestos Property Damage Claim Sub-Account on account of the unpaid Allowed Amount of such Claim pursuant to the Plan Trust Agreement. After the assets in the Asbestos Property Damage Claim Sub-Account have been exhausted or transferred therefrom in accordance with the Plan Trust Agreement, the Plan Trust shall have no further liability or obligation for or in respect of any Asbestos Property Damage Claims. All Asbestos Property Damage Claims as to which a Proof of Claim was not filed prior to the expiration of the Asbestos Property Damage Claim Bar Date shall be deemed Disallowed. Class 8 is Impaired and the holders of Class 8 Claims are entitled to vote to accept or reject the Plan.

(i)    Class 9 – General Unsecured Claims. Except to the extent that a holder of an Allowed General Unsecured Claim in Class 9 has been paid by the Debtors prior to the Effective Date or agrees to alternate, less favorable, treatment, each holder of an Allowed Class 9 Claim shall receive, on the Distribution Date, in full and final satisfaction of such Allowed Class 9 Claim, Cash in the amount of $.35 for each $1.00 of such holder's Allowed Class 9 Claim. Class 9 is Impaired and the holders of Class 9 Claims are entitled to vote to accept or reject the Plan. General Unsecured Claims do not include Claims against the Debtors under the Environmental Laws as set forth in Section 11.9 hereof, which Claims (other than Claims held by ABI) survive the Reorganization Cases.

(j)    Class 10 – Congoleum Interests. On the Effective Date, the Congoleum Interests shall be cancelled, the holders of the Congoleum Interests shall retain and receive nothing on account of such Interests. Class 10 is Impaired and the holders of Class 10 Congoleum Interests are deemed to have rejected the Plan in accordance with the provisions of section 1126(g) of the Bankruptcy Code, and accordingly, their votes are not being solicited.

(k)    Class 11 – Subsidiary Interests. On the Effective Date, the holder of the Subsidiary Interests shall retain such Subsidiary Interests. Class 11 is Unimpaired and the holder of Class 11 Subsidiary Interests is deemed to have accepted the Plan, and accordingly, is not entitled to vote on the Plan.

**4.2** **Reservation of Rights Regarding Claims**. Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' or Reorganized Congoleum's rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment. Except as otherwise explicitly provided in the Plan, nothing shall affect any of the Plan Trust's rights and defenses, both legal and equitable, with respect to any Asbestos Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

**4.3** **Reservation of Fair and Equitable (Cram Down) Power**. The Plan Proponents reserve the right to confirm this Plan as to any impaired Class that does not accept the Plan by the requisite number of votes pursuant to the fair and equitable power of 11 U.S.C. § 1129(b).

## ARTICLE V

## IMPLEMENTATION OF THE PLAN

**5.1** **The Plan Trust**

(a) **Establishment and Purpose of the Plan Trust**. On or prior to the Effective Date, the Plan Trust shall be established in accordance with the Plan Trust Agreement. The Plan Trust is intended to be a "qualified settlement fund" within the meaning of section 468B of the IRC and the Treasury Regulations promulgated thereunder. The purpose of the Plan Trust shall be to, among other things: (i) pay all Plan Trust Asbestos Claims in accordance with the Plan, the Plan Trust Agreement, the TDP and the Confirmation Order; (ii) preserve, hold, manage, and maximize the Plan Trust Assets for use in paying and satisfying Plan Trust Asbestos Claims in accordance with the Plan Trust Agreement and the TDP; (iii) prosecute, settle and manage the disposition of the Asbestos In-Place Insurance Coverage; and (iv) prosecute, settle, and manage Asbestos Insurance Actions and Direct Actions.

(b) **Funding and Receipt of Plan Trust Assets**. On the Effective Date, Reorganized Congoleum shall issue the Plan Trust Common Stock to the Plan Trust in accordance with the Plan and all Plan Trust Assets shall be transferred to, vested in, and assumed by, the Plan Trust free and clear of all Claims, Liens and encumbrances; *provided*, *however*, that to the extent that certain Plan Trust Assets, because of their nature or because they will accrue subsequent to the Effective Date, cannot be transferred to, vested in, and assumed by the Plan Trust on the Effective Date, such Plan Trust Assets shall be transferred to, vested in, and assumed by the Plan Trust free and clear of Claims, Liens and encumbrances, as soon as practicable after the Effective Date.

(c) **Insurance Assignment Agreement**. On the Effective Date, the Debtors shall deliver the Insurance Assignment Agreement attached hereto as Exhibit "B." Such agreement shall be valid, binding and enforceable. The Insurance Assignment Agreement shall transfer claims and rights set forth therein as Debtors may have, subject to any and all Asbestos Insurer Coverage Defenses.

(d) **Creation of Asbestos Property Damage Claim Sub-Account**. On the Effective Date, the Plan Trust shall cause the Asbestos Property Damage Insurance Rights and any proceeds thereof, including $1.2 million from the proceeds of that certain settlement agreement between the Debtors and Liberty Mutual Insurance Company approved by the Bankruptcy Court by order dated July 30, 2004, to be held in the Asbestos Property Damage Claim Sub-Account. In accordance with the terms of the Plan Trust Agreement, the Plan Trustee shall be permitted to transfer monies from the Asbestos Property Damage Claim Sub-Account to the Asbestos Personal Injury Claim Sub-Account, from time to time, to the extent that the funds in the Asbestos Property Damage Claim Sub-Account exceed the aggregate amount of all unpaid Asbestos Property Damage Claims that have been filed prior to the Asbestos Property Damage Claim Bar Date, and a reasonable reserve for Plan Trust Expenses and indemnification costs or expenses, in either case, related to Asbestos Property Damage Claims.

(e) **Assumption of Liabilities by the Plan Trust**. On the Effective Date, all liabilities, obligations and responsibilities relating to all Plan Trust Asbestos Claims shall be transferred to the Plan Trust as set

500392306v7

forth herein and the Plan Trustee, on behalf of the Plan Trust, shall expressly assume all liability for all Plan Trust Asbestos Claims and Demands as set forth herein, subject to the provisions of the Plan Trust Agreement.  With the exception of the liabilities identified hereinabove in this Section 5.1(e), in no event shall the Plan Trust assume any of the liabilities, obligations or responsibilities of the Debtors or Reorganized Congoleum.

(f)     **Discharge of Liabilities to Holders of Asbestos Claims**.  Except as provided in the Plan and the Confirmation Order, the transfer to, vesting in, and assumption by the Plan Trust of the Plan Trust Assets as contemplated by the Plan shall, among other things, discharge the Debtors and the Reorganized Debtors from and in respect of all Plan Trust Asbestos Claims.

(g)     **TDP**.  From and after the Effective Date, the Plan Trust shall pay the Plan Trust Asbestos Claims in accordance with the Plan Trust Agreement and the TDP.  The Plan Trustee shall have the power to administer, amend, supplement or modify the TDP in accordance with the terms thereof.

(h)     **Payment of Allowed Asbestos Property Damage Claims**.  From and after the Effective Date, the Plan Trust shall cause the payment of Allowed Asbestos Property Damage Claims from the Asbestos Property Damage Claim Sub-Account in accordance with the Plan Trust Agreement; *provided, however* that once the assets in the Asbestos Property Damage Claim Sub-Account have been exhausted, the Plan Trust shall have no further liability or obligation for or in respect of any Asbestos Property Damage Claims.

(i)     **Excess Plan Trust Assets**.  To the extent there are any Plan Trust Assets remaining after the payment in full of all Plan Trust Asbestos Claims and all Plan Trust Expenses (or provision has been made therefor) in accordance with the Plan Trust Agreement and the TDP, such excess Plan Trust Assets shall be transferred to a tax-exempt organization qualified under section 501(c)(3) of the IRC, which tax-exempt organization is to be determined by the Plan Trustee; *provided, however*, that the purpose thereof, if practicable, shall be related to the treatment of, research on or the relief of suffering of individuals suffering from asbestos-related lung disorders.

(j)     **Plan Trust Expenses**.  The Plan Trust shall pay all Plan Trust Expenses from the Plan Trust Assets in accordance with the Plan Trust Agreement.  Neither the Debtors, the Reorganized Debtors, nor their Affiliates shall have any obligation to pay any Plan Trust Expenses.  The Plan Trustee, each member of the TAC, the Futures Representative and the Representatives of each of the foregoing will have a lien upon the Plan Trust Assets which will be prior to any lien thereon, and the Plan Trust will grant a security interest in the Plan Trust Assets, all proceeds thereof and all accounts into which such proceeds or the Plan Trust Assets are deposited or maintained to secure payment of amounts payable to them as compensation or indemnification.

(k)     **Appointment of the Initial Plan Trustee.**  Effective as of the Effective Date, the District Court shall appoint the initial Plan Trustee to serve as Plan Trustee in accordance with the Plan Trust Agreement.  The Plan Trustee shall be designated no later than thirty (30) days prior to the Confirmation Hearing and shall be mutually acceptable to the Asbestos Claimants' Committee and the Futures Representative.  For purposes of performing his or her duties and fulfilling his or her obligations under the Plan Trust Agreement, the TDP and the Plan, the Plan Trustee shall be deemed to be a party in interest within the meaning of section 1109(b) of the Bankruptcy Code.  The Plan Trustee shall be the "administrator" of the Plan Trust as that term is used in Treas. Reg. Section 1.468B-2(k)(3).

(l)     **The Futures Representative**.  Effective as of the Effective Date, the District Court shall appoint a Person to serve as the Futures Representative from and after the Effective Date pursuant to the terms of the Plan Trust Agreement and who shall have the functions and rights provided in the Plan Trust Documents.

(m)     **Appointment of Trust Advisory Committee Members**.  Effective as of the Effective Date, the District Court shall appoint five initial members of the TAC (and thereupon the TAC shall be formed) to serve as members of the TAC in accordance with the Plan Trust Agreement.

(n)     **Institution and Maintenance of Legal and Other Proceedings**.  As of the Effective Date, the Plan Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other

23

proceedings related to any asset, liability, or responsibility of the Plan Trust, including, without limitation, the Coverage Action, in each case to the extent not adjudicated, compromised or settled prior to the Effective Date. The Plan Trust shall be empowered to initiate, prosecute, defend, and resolve all such actions in the name of the Debtors and/or Reorganized Congoleum if deemed necessary or appropriate by the Plan Trustee. Except as otherwise provided by law or agreement, the Plan Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred subsequent to the Effective Date arising from or associated with any legal action or other proceeding brought pursuant to this Section 5.1(n) and shall pay or reimburse all deductibles, retrospective premium adjustments, or other charges which may arise from the receipt of insurance proceeds by the Plan Trust. Without in any way limiting the foregoing and subject to any Asbestos Insurer Coverage Defenses, the Plan Trust shall be empowered to elect to (or not to), initiate, prosecute, defend, settle, and resolve all Asbestos Insurance Actions and Direct Actions, and to maintain, administer, preserve, or pursue the Asbestos-In-Place Insurance Coverage, the Asbestos Insurance Action Recoveries, Asbestos Insurance Rights, the Asbestos Insurance Policies and rights under the Asbestos Insurance Settlement Agreements. All Causes of Action other than Asbestos Insurance Actions and Direct Actions shall remain the property of the Reorganized Debtors.

(o)    **Preservation of Insurance Claims**.  The discharge and releases provided herein, and the injunctive protection provided to the Debtors, the Reorganized Debtors and any Protected Party with respect to Demands as provided herein, shall neither diminish nor impair the enforceability of any of the Asbestos Insurance Policies by any Entity except (i) to the extent that any such Asbestos Insurance Company is also a Settling Asbestos Insurance Company or (ii) that all Asbestos Insurer Coverage Defenses are preserved.

(p)    **Indemnification by the Plan Trust**.  As and to the extent provided in the Plan Trust Agreement in Sections 1.4 and 4.6, the Plan Trust shall indemnify and hold harmless each of the Debtors, the Reorganized Debtors, the Plan Trustee, any officer and employee of the Plan Trust, the Futures Representative, each member of the TAC and, with respect to each of the foregoing, their respective past, present and future Representatives.

(q)    **Reimbursement of Defense and Indemnity Costs Relating to Asbestos Claims**.  All defense and indemnity costs incurred by Congoleum with respect to Asbestos Claims prior to the Effective Date shall be reimbursed from the proceeds of the Liberty Mutual Settlement.

**5.2    Certain Mergers**.  On the Effective Date, the Subsidiary Debtors shall merge with and into Congoleum, with Reorganized Congoleum as the sole surviving corporation.

**5.3    The Amended and Restated Certificate and the Amended and Restated Bylaws**.  The Amended and Restated Certificate and the Amended and Restated Bylaws of Reorganized Congoleum shall be in form and substance acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative and shall be consistent with the provisions of the Plan and the Bankruptcy Code. The Amended and Restated Certificate shall, among other things (a) authorize the issuance of New Common Stock pursuant to Section 5.7 of the Plan, and (b) provide, pursuant to section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-voting common equity securities.  The Amended and Restated Bylaws and the Amended and Restated Certificate of Reorganized Congoleum shall be substantially in the form attached hereto as Exhibits "J" and "K", respectively.  The Amended and Restated Bylaws and the Amended and Restated Certificate will filed as part of the Plan Supplement.

**5.4    Directors and Officers of Reorganized Congoleum**.  The initial board of directors of Reorganized Congoleum shall consist of five (5) directors.  One of such directors shall be selected by the Bondholders' Committee, three of such directors shall be selected jointly by the Futures Representative and the Asbestos Claimants' Committee, and one of such directors shall be Reorganized Congoleum's chief executive officer.  The identity of such directors shall be disclosed by the Plan Proponents in the Plan Supplement. To the extent any such Person is an Insider (as defined in section 101(31) of the Bankruptcy Code), the nature of any compensation for such Person will also be disclosed prior to the Confirmation Hearing.  Each of the Persons on the initial board of directors of Reorganized Congoleum shall serve in accordance with the Amended and Restated Certificate and the Amended and Restated Bylaws of Reorganized Congoleum, as the same may be amended from time to time.  Subsequently, Reorganized Congoleum's board of directors shall be elected in accordance with

24

Reorganized Congoleum's governing documents which governing documents shall be acceptable to the Bondholders' Committee and the Asbestos Claimants' Committee.

The initial officers of Reorganized Congoleum shall be set forth in the Plan Supplement. To the extent any such Person is an Insider (as defined in section 101(31) of the Bankruptcy Code), the nature of any compensation for such Person will also be disclosed at such time. The initial officers shall serve in accordance with the Amended and Restated Certificate and the Amended and Restated Bylaws of Reorganized Congoleum, as the same may be amended from time to time.

**5.5** **Cancellation of Existing Securities and Agreements of the Debtors/Discharge of the Indenture Trustee**. Except as set forth in the Plan, upon the Effective Date, the Existing Securities shall be cancelled and the holders thereof shall have no further rights or entitlements in respect thereof against the Debtors except the right to receive any Distributions to be made to such holders under the Plan. To the extent possible, Distributions to be made under the Plan to the beneficial owners of the Senior Notes shall be made through the Depository Trust Company and its participants. The Confirmation Order shall authorize and direct the Indenture Trustee to take whatever action may be necessary or appropriate, in its reasonable discretion, to deliver the Distributions, including, without limitation, obtaining an order of the District Court. On the Effective Date, the Indenture Trustee and its agents shall be discharged of all their obligations associated with (i) the Senior Notes, (ii) the Indenture, and (iii) any related documents, and released from all Claims arising in the Reorganization Cases. As of the Effective Date, the Indenture shall be deemed fully satisfied and cancelled; *provided*, *however*, that the Indenture shall continue in effect solely for the purposes of: (1) allowing holders of the Senior Note Claims to receive distributions under the Plan, (2) allowing and preserving the rights of the Indenture Trustee to (a) make distributions in satisfaction of Allowed Senior Note Claims, (b) exercise its charging liens against any such distributions, and (c) seek compensation and reimbursement for any fees and expenses incurred in making such distributions. Upon completion of all such distributions, the Senior Notes and the Indenture shall terminate completely. From and after the Effective Date, the Indenture Trustee shall have no duties or obligations under the Indenture other than to make distributions pursuant to the Plan.

**5.6** **Exit Facility**. On the Effective Date, Reorganized Congoleum shall obtain exit financing consistent with the terms and conditions set forth in the Exit Facility Commitment Letter or Term Sheet, which shall be filed as part of the Plan Supplement, from the Exit Facility Lenders.

**5.7** **Issuance of New Securities and Debt Instruments**

(a) New Common Stock. On the Effective Date, Reorganized Congoleum shall issue the New Common Stock pursuant to the Plan. The Amended and Restated Certificate sets forth the rights and preferences of the New Common Stock. The New Common Stock shall be issued subject to the Stockholders Agreement described below.

(b) New Senior Notes. On the Effective Date, Reorganized Congoleum shall issue $33 million in initial principal amount of 9% New Senior Notes, which shall mature on December 31, 2017. The New Senior Notes shall be governed by the terms and conditions set forth in the New Indenture.

**5.8** **Registration Rights Agreement**. In the event the board of directors of Reorganized Congoleum determines in its discretion to register any of the New Common Stock with the Securities and Exchange Commission, or if Reorganized Congoleum is required under the Stockholders Agreement or applicable securities laws to register any of the New Common Stock with the Securities and Exchange Commission, any Person receiving Distributions of the New Common Stock issued on the Effective Date that is not entitled to an exemption from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code, or whose resale of the New Common Stock is otherwise restricted under the securities laws, shall be entitled to become a party to the Registration Rights Agreement. The Registration Rights Agreement shall be satisfactory in form and substance to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative, a substantially similar form of which will be contained in the Plan Supplement.

**5.9** **Stockholders Agreement**. On the Effective Date, the Stockholders Agreement will be adopted by Reorganized Congoleum and be binding upon all holders of New Common Stock. All holders of New Common

Stock will be subject to the Stockholders Agreement which will, among other things, govern the access each holder of New Common Stock shall have to information with respect to Reorganized Congoleum and the ability to transfer such holder's New Common Stock. Each certificate representing share(s) of New Common Stock shall bear a legend indicating that the New Common Stock is subject to the Stockholders Agreement. The Stockholders Agreement will be effective as of the Effective Date. The Stockholders Agreement contains customary terms and conditions, including minority stockholder protections, and includes the minority stockholders having both a right of first refusal and right of first offer on the Plan Trust Common Stock. The Stockholders Agreement shall be satisfactory in form and substance to the Bondholders' Committee, the Asbestos Claimants' Committee and the Futures Representative, a substantially similar form of which is attached hereto as Exhibit "L." The Stockholders Agreement will be filed as part of the Plan Supplement.

**5.10 Effectuating Documents/Further Transactions**. Each of the Debtors (subject to the consent of the Bondholders' Committee, the Asbestos Claimants' Committee and the Futures Representative) and Reorganized Congoleum, and their respective officers and designees, is authorized and directed to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be requested by the Plan Proponents, or as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of the Plan, the Exit Facility, or any other Plan Document, or to otherwise comply with applicable law.

**5.11 Exemption from Certain Transfer Taxes and Recording Fees**. Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to Reorganized Congoleum or to any other Person or Entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**5.12 Section 346 Injunction**. In accordance with section 346 of the Bankruptcy Code for the purposes of any state or local law imposing a tax, income will not be realized by the Estates, the Debtors or the Reorganized Debtors by reason of the forgiveness or discharge of indebtedness resulting from the consummation of the Plan. As a result, each state or local taxing authority is permanently enjoined and restrained, after the Confirmation Date, from commencing, continuing or taking any act to impose, collect or recover in any manner any tax against the Debtors or the Reorganized Debtors arising by reason of the forgiveness or discharge of indebtedness under the Plan.

**5.13 Corporate Action**. All matters provided for under the Plan involving the corporate structure of the Debtors or Reorganized Congoleum, or any corporate action to be taken by, or required of the Debtors or Reorganized Congoleum shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the stockholders or directors of any of such entities.

**5.14 Litigation Settlement Agreement**. (a) The Plan implements a compromise and settlement with respect to each such Litigation Settlement Claimant, pursuant to the Litigation Settlement Agreement, as amended, whose Asbestos Personal Injury Claim was liquidated pursuant to the Claimant Agreement or a Pre-Petition Settlement Agreement, as the case may be. The original Litigation Settlement Agreement was approved by the Bankruptcy Court by an order signed on October 31, 2008. The parties to the Litigation Settlement Agreement agreed to an amendment to conform such agreement to developments in the Reorganization Cases, and approval of such amendment is sought from the District Court under Bankruptcy Rule 9019 in connection with confirmation of this Plan.

(b) As of the Effective Date of the Plan:

(i) The Litigation Settlement Claimants shall waive any and all rights with respect to any pre-petition settlement of their Asbestos Personal Injury Claims against the Debtors, whether pursuant to any

500392306v7

Pre-Petition Settlement Agreement or the Claimant Agreement, including the liquidated amounts thereof; provided, however, that:

- any Asbestos Personal Injury Claim against the Debtors held by any such Litigation Settlement Claimant, including with respect to any statutes of limitation related thereto, shall be restored to the *status quo ante* as it existed as of the time the Litigation Settlement Claimant initially filed or submitted its Asbestos Personal Injury Claim against the Debtors that resulted in the Claimant's Pre-Petition Settlement Agreement or the Claimant Agreement (the "Submission Date");

- any statute of limitation with respect to such Asbestos Personal Injury Claim shall be tolled until the later of ninety (90) days after the expiration of any stay imposed due to the filing of the Debtors' chapter 11 cases of such additional time as may be provided pursuant to the TDP incorporated in the Plan (the "Asbestos Tolling Period");

- neither the Asbestos Tolling Period nor any other term or provision of the Litigation Settlement Agreement shall revive any statute of limitations that expired as of the Submission Date; and

- all parties retain the right to assert any statute of limitations defense or other defenses that they could have asserted as of the Submission Date.

(ii)     With respect to the Litigation Settlement Claimants, as amended, the Debtors shall be released from any and all obligations and duties imposed pursuant to any Pre-Petition Settlement Agreement, Claimant Agreement, the Collateral Trust Agreement, Security Agreement and any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003.

(iii)     The Debtors shall be deemed to have forever withdrawn, released, discharged, waived and forgiven the Litigation Settlement Claimants and Claimants' Counsel, and each of their respective assigns, administrators and successors in interest, for and from any and all claims, actions, causes of action, counterclaims, proofs of claim, and any other obligation of any kind or nature arising from or related to the Bankruptcy Code, the Avoidance Actions, and any and all claims related to any Pre-Petition Settlement Agreement, Claimant Agreement, the Collateral Trust Agreement, Security Agreement, pre-petition payments to Claimants Counsel, and any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003, including all pending and potential causes of action, whether accrued or to accrue, whether asserted by way of claim, counterclaim, cross-claim, third-party action, action for indemnity or contribution or otherwise; provided, however*, that the foregoing shall not constitute a release of any of its rights to enforce the terms of the Litigation Settlement Agreement, as amended, or any defenses to Asbestos Personal Injury Claims that may be asserted by the Debtors as contemplated in the Litigation Settlement Agreement, as amended.

(iv)     Except as otherwise provided for in the Litigation Settlement Agreement, as amended, all Litigation Settlement Claimants and Claimants' Counsel shall be deemed to have forever withdrawn, released, discharged, waived and forgiven the Debtors and their respective assigns, administrators and successors in interest, for and from any and all claims, actions, causes of action, counterclaims, proofs of claim, and any other obligation of any kind or nature arising from or related to the Bankruptcy Code, the Avoidance Actions, and any and all claims related to any Pre-Petition Settlement Agreement, Claimant Agreement, the Collateral Trust Agreement, Security Agreement and any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003, including all pending and potential causes of action, whether accrued or to accrue, whether asserted by way of a claim, counterclaim, cross-claim, third-party action, action for indemnity or contribution or otherwise; provided, however, that the foregoing shall not constitute a release of any of its rights to enforce the terms of the Litigation Settlement Agreement, as amended, and shall not constitute a release by Litigation Settlement Claimants of their Asbestos Personal Injury Claims against the Debtors, the Plan Trust, or any other party or entity.

(c)     Pursuant to the Litigation Settlement Agreement, as amended, and contingent upon confirmation of the Plan, the estates of Comstock, Cook and Arsenault have elected to withdraw their claims against the Debtors and will not seek recovery from the Debtors and/or Plan Trust, or otherwise participate in the Reorganization Cases.

(d)     Within 30 days after the Effective Date of the Plan, the District Court shall enter an order of dismissal of all claims and counterclaims in the Avoidance Actions, with prejudice, and with all parties to bear their own costs and attorneys fees.

(e)     Subject to the terms of this Plan, the mutual releases set forth in the Litigation Settlement Agreement, as amended, shall not abridge the right of Litigation Settlement Claimants to submit and recover upon their Asbestos Personal Injury Claims against the Debtors including as against the Plan Trust.

(f)     Each Litigation Settlement Claimant shall be entitled to submit its Asbestos Personal Injury Claim to the Debtors' bankruptcy estates, including the Plan Trust, as an unliquidated claim for resolution and treatment pursuant to TDP, provided that, any Litigation Settlement Claimant who received a partial payment from the Debtors with respect thereto prior to the Petition Date, including specifically claimants Cook, Arsenault, and Comstock, in addition to the other provisions hereof, hereby agrees to either: (a) not seek any further recovery with respect thereto against the Debtors, including from any Plan Trust, or (b) return and relinquish any such pre-petition partial payment for the benefit of the Plan Trust as a condition precedent to asserting any such further Asbestos Personal Injury Claim against the Debtors or the Plan Trust.

(g)     Pursuant to the Plan, any Pre-Petition Settled Claimant who is not a Litigation Settlement Claimant shall nevertheless receive the same treatment as the Litigation Settlement Claimants.

**5.15    Review of Claimants' Counsel Expenses**.  The expenses paid pre-petition by the Debtors to the Claimants' Counsel pursuant to the Claimant Agreement shall be subject to approval by the District Court in its discretion.

**5.16    Non-Asbestos Reserve Fund**

(a)     **Establishment of Reserve Fund**.  The Reorganized Debtors shall create a reserve fund (the "Reserve Fund") for claims, excluding asbestos claims, of any Governmental Units and any other Entities against the Debtors and/or Reorganized Debtors (the "Non-Asbestos Claims").  Within thirty (30) days after the Effective Date, the Plan Trust shall pay $3 million to the Reorganized Debtors for placement in the Reserve Fund (the "Reserve Fund Settlement Funds").  As used herein, the term "Known Insurance Claims" means Non-Asbestos Claims against the Debtors or Reorganized Debtors which arose from the operations of the Debtors prior to December 31, 2003 to the extent such claims survive the Reorganization Cases and claims are known to exist potentially as of the Fifth Anniversary of the Effective Date (the "Fifth Anniversary Date").  The Reserve Fund Settlement Funds shall be deposited in a segregated account and shall be used for the sole purpose of paying defense and indemnity costs incurred by the Reorganized Debtors after the Effective Date arising from Known Insurance Claims that are not paid in full by Liberty Mutual Insurance Company.   The Board of Directors of the Reorganized Debtors shall approve the initial payment made from the Non-Asbestos Reserve Fund.  Following the initial payment, the Board of Directors, in its sole discretion, may require notice before any subsequent payments are made out of the Non-Asbestos Reserve Fund.   The Reorganized Debtors shall provide the Plan Trustee with contemporaneous notice of payments made from the Non-Asbestos Reserve Fund.

(b)     **Termination of Reserve Fund**.  As of the Fifth Anniversary Date, any unused balance of the Reserve Fund shall be transferred by the Reorganized Debtors to the Plan Trust, and the Reserve Fund shall be terminated, provided, however, that to the extent there are any Known Insurance Claims as of the Fifth Anniversary Date that are unresolved, the Reserve Fund shall not be terminated on that date.  In such event, any Reserve Fund balance shall continue to be used to pay defense and indemnity costs incurred by the Reorganized Debtors arising from Known Insurance Claims until those claims are resolved.  In the event that a balance remains in the Reserve Fund after all Known Insurance Claims are resolved, any unused balance of the Reserve Fund shall be transferred by the Reorganized Debtors to the Plan Trust and at such time the Reserve Fund shall be terminated. For avoidance of doubt, in the event that the Reserve Fund continues after the Fifth Anniversary Date because there are Known

Insurance Claims, the Reserve Fund shall not be available for Non-Asbestos Claims for which notice of such Non-Asbestos Claim was first received by the Reorganized Debtors after the Fifth Anniversary Date.

    **5.17    Intercompany Settlement**.  (a)  The Plan implements a compromise and settlement with respect to ABI, the ABI Claims and the Intercompany Agreements (as set forth in this Section 5.17, the "Intercompany Settlement").  Pursuant to Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code and consistent with section 1129 of the Bankruptcy Code, the Plan shall constitute a motion for approval of, and the Confirmation Order shall authorize and constitute District Court approval of, the Intercompany  Settlement.

    (b)    On the Effective Date, pursuant to Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code, in full and final satisfaction of the ABI Claims, and for good and valuable consideration including ABI's agreement to the treatment specified in the Plan for the ABI Claims and the Claims and Interests asserted by other parties in interest, the ABI Settlement shall be effectuated in accordance with the following terms:

    1.    All ABI Claims, including without limitation ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.17(b)(4)(B) of the Plan), shall be deemed Disallowed and expunged.

    2.    All Intercompany Agreements shall be deemed rejected, and any and all ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.17(b)(4)(B) of the Plan) arising therefrom shall be deemed Disallowed and expunged.

    3.    ABI and Reorganized Congoleum shall enter into and effectuate the New ABI Agreement,  and which shall govern the relationship between ABI and Reorganized Congoleum upon the Effective Date.

    4.    The ABI Parties and ABI and their respective Representatives (in their capacities as such) shall be deemed to have received and exchanged mutual general releases with and from the Debtors, their Estates and Reorganized Congoluem, such that:

    A.    *As of the Effective Date, the Debtors, their Estates and Reorganized Congoleum shall be deemed to forever release, waive and discharge all claims, obligations, suits,  judgments, demands, debts, rights, causes of action and liabilities (other than their rights to enforce the terms of the Intercompany Settlement, the New ABI Agreement and the ABI Canada License Agreement, as amended by Section 5.17(b)(5) of the Plan, and their rights to payment of not more than $2 million on account of net Unpaid Intercompany Amounts remaining after intercompany offsets of Unpaid Intercompany Amounts), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, Reorganized Congoleum, the Reorganization Cases, the Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtors, their Estates or Reorganized Congoleum, as of the Petition Date or thereafter, against the ABI Parties, ABI and/or their respective Representatives (in their capacities as such); and*

    B.    *As of the Effective Date, the ABI Parties, ABI and their respective Representatives (in their capacities as such) shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, demands, debts, rights, causes of action and liabilities (other than their rights to enforce the terms of the Intercompany Settlement, the New ABI Agreement and the ABI Canada License Agreement, as amended by Section 5.17(b)(5) of the Plan, and their rights to payment of not more than $2 million on account of net Unpaid Intercompany Amounts remaining after intercompany offsets of Unpaid Intercompany Amounts), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, Reorganized Congoleum, the Reorganization Cases, the Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the ABI Parties, ABI and their respective Representatives (in their capacities as such), as of the Petition Date or thereafter, against the Debtors, their Estates or Reorganized Congoleum.*

5.    The ABI Canada License Agreement shall be deemed to have been assumed by Congoleum and become an obligation of Reorganized Congoleum, *provided, however,* that Article 7.02 of the ABI Canada License Agreement shall be modified so that the "Term" thereof shall expire two years from the Effective Date and the ABI Canada License Agreement shall be deemed amended accordingly as of the Effective Date without any further action of any Person or Entity.

**5.18    Deemed Consolidation of Debtors For Plan Purposes Only**.  Subject to the occurrence of the Effective Date, the Debtors shall be deemed consolidated under the Plan for Plan purposes only.  Each and every Claim filed or to be filed against any of the Debtors shall be deemed filed against the deemed consolidated Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Debtors.  Such deemed consolidation, however, shall not (other than for purposes related to funding distributions under the Plan and as set forth above in this Section 5.18) affect: (i) the legal and organizational structure of the Debtors; or (ii) any Liens that are required to be maintained under the Plan (A) in connection with executory contracts or unexpired leases that were entered into during the Reorganization Cases or that have been or will be assumed, (B) pursuant to the Plan, or (C) in connection with any Exit Facility.  Notwithstanding anything contained in the Plan to the contrary, the deemed consolidation of the Debtors shall not have any effect on any of the Claims being reinstated and left unimpaired under the Plan, and the legal, equitable, and contractual rights to which the holders of any such Claims are entitled shall be left unaltered by the Plan.

## ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS WITH RESPECT TO CLAIMS OTHER THAN PLAN TRUST ASBESTOS CLAIMS

**6.1    Plan Distributions**.  The Disbursing Agent shall make all distributions required under the Plan (other than distributions to holders of Plan Trust Asbestos Claims and Senior Note Claims).  Distributions shall be made on the Distribution Date (unless otherwise provided herein or ordered by the District Court) with respect to all Claims except for Plan Trust Asbestos Claims.  Distributions to be made on the Distribution Date shall be deemed actually made on the Distribution Date if made either (a) on the Distribution Date or (b) as soon as practicable thereafter.  With respect to Plan Trust Asbestos Claims, distributions to holders of Plan Trust Asbestos Claims shall be made in accordance with the Plan Trust Agreement and/or the TDP, as applicable.  With respect to Senior Note Claims, Distributions will be made by the Indenture Trustee, whose reasonable fees and expenses in connection with such Distributions shall be paid by Reorganized Congoleum.

**6.2    Distributions of Cash**.  Any Distribution of Cash made by Reorganized Congoleum pursuant to the Plan shall, at Reorganized Congoleum's option, be made by check drawn on a domestic bank or by wire transfer from a domestic bank.

**6.3    No Interest on Claims**.  Unless otherwise specifically provided for in the Plan, the Confirmation Order, or a post-petition agreement in writing between the Debtors and a holder, Post-Petition Interest shall not accrue or be paid on Claims, and no holder shall be entitled to interest accruing on or after the Petition Date.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a Final Distribution is made when and if such Disputed Claim becomes an Allowed Claim.  Notwithstanding the foregoing, this Section 6.3 shall not apply to Plan Trust Asbestos Claims which shall be governed in all cases by the Plan Trust Agreement and the TDP.

**6.4    Delivery of Distributions**.  Distributions to holders of Allowed Claims other than Asbestos Claims shall be made by the Disbursing Agent or the Indenture Trustee, as applicable, (a) at the holder's last known address, or (b) at the address in any written notice of address change delivered to the Disbursing Agent or the Indenture Trustee, as applicable.  If any holder's distribution made by the Disbursing Agent is returned as undeliverable, no further distributions to such holder shall be made, unless and until the Disbursing Agent is notified of such holder's then current address, at which time all missed distributions shall be made to such holder without interest.  Amounts in respect of undeliverable distributions made through the Disbursing Agent shall be returned to Reorganized Congoleum until such distributions are claimed or become unclaimed property pursuant to Section 6.8 of the Plan. With respect to Plan Trust Asbestos Claims, distributions to the holders of Plan Trust Asbestos Claims

shall be made in accordance with the Plan Trust Agreement and/or the TDP, as applicable. With respect to Senior Note Claims, distributions to holders of Senior Note Claims shall be made in accordance with the Indenture.

> **6.5    Distributions to Holders as of the Record Date**. All Distributions on Allowed Claims shall be made to the Record Holders of such Claims. As of the close of business on the Record Date, the Claims register maintained by the Voting Agent shall be closed, and there shall be no further changes in the Record Holder of any Claim. Reorganized Congoleum shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. Reorganized Congoleum shall instead be entitled to recognize and deal for all purposes under the Plan with the Record Holders as of the Record Date.

> **6.6    Fractional Securities; Fractional Dollars**. Distributions of fractions of shares of New Common Stock will not be made and shall be rounded (up or down) to the nearest whole number, with half shares or less being rounded down. Reorganized Congoleum shall not be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

> **6.7    Withholding of Taxes**. The Disbursing Agent shall withhold from any assets or property distributed under the Plan any assets or property that must be withheld pursuant to applicable law.

> **6.8    Unclaimed Property.** Any Cash, assets and other property to be distributed on account of any Claim (other than a Plan Trust Asbestos Claim) under the Plan that remain unclaimed (including by an Entity's failure to negotiate a check issued to such Entity) or otherwise not deliverable to the Entity entitled thereto before the later of (a) one year after the date of distribution or (b) 120 calendar days after an order allowing such Entity's Claim becomes a Final Order, shall become vested in, and shall be transferred and delivered to, Reorganized Congoleum. In such event, such Entity's Claim shall no longer be deemed to be Allowed and such Entity shall be deemed to have waived its rights to such payments or distributions under the Plan pursuant to section 1143 of the Bankruptcy Code and shall have no further Claim in respect of such distribution and shall not participate in any further distributions under the Plan with respect to such Claim.

## ARTICLE VII

## RESOLUTION OF DISPUTED CLAIMS

> **7.1    Disallowance of Improperly Filed Claims**. Subject to section 502(j) of the Bankruptcy Code and Bankruptcy Rules 3008 and 9006, any Administrative Claim, Asbestos Property Damage Claim or Claim (other than Asbestos Personal Injury Claims) for which the filing of a Proof of Claim, application or motion with the District Court is required under the terms of the Bankruptcy Code, the Bankruptcy Rules, any order of the Bankruptcy Court or District Court, as applicable (including one providing a Bar Date), or the Plan shall be Disallowed if and to the extent that such Proof of Claim (or other filing) is not timely and properly made.

> **7.2    Prosecution of Objections to Claims**. Unless otherwise ordered by the District Court after notice and a hearing, after the Effective Date, Reorganized Congoleum, the Bondholders' Committee, the Asbestos Claimants' Committee and the Futures Representative each shall have the right to make and file objections to Proofs of Claims, other than Proofs of Claims in respect of Asbestos Personal Injury Claims and Professional Fee Claims, at any time on or before ninety (90) days after the later of (i) the Effective Date or (ii) the date on which such Claim was filed with the District Court unless no Proof of Claim is required to be filed pursuant to Bankruptcy Rule 3002, the Plan or any order of the District Court; *provided, however,* that (x) this deadline may be extended by the District Court on motion by the Debtors, Reorganized Congoleum, the Bondholders' Committee, the Asbestos Claimants' Committee or the Futures Representative, as applicable, and (y) neither the Debtors, Reorganized Congoleum, the Futures Representative, the Bondholders' Committee, the Asbestos Claimants' Committee, nor any other Person may file an objection to any (1) Claim that was Allowed by a Final Order entered during the Reorganization Cases, or (2) Claim Allowed by the Plan. In addition, unless otherwise ordered by the District Court after notice and a hearing, after the Effective Date Reorganized Congoleum, the Bondholders' Committee, the Asbestos Claimants' Committee and the Futures Representative, subject to Sections 13.8 and 13.14 of the Plan, each shall have the exclusive right to make and file objections to Administrative Claims and to amend the Schedules or to object to any

Claim specified on the Schedules, at any time on or before sixty (60) days after the later of (i) the Effective Date or (ii) the date on which such Claim was filed with the District Court unless no Proof of Claim is required to be filed pursuant to Bankruptcy Rule 3002, the Plan or any order of the District Court; *provided, however,* that (x) this deadline may be extended by the District Court on motion by the Debtors, Reorganized Congoleum, the Bondholders' Committee, the Asbestos Claimants' Committee or the Futures Representative, as applicable, (y) neither the Debtors, Reorganized Congoleum, the Futures Representative, the Bondholders' Committee, the Asbestos Claimants' Committee nor any other Person may file an objection to any (1) Claim that was Allowed by a Final Order entered during the Reorganization Cases, or (2) Claim Allowed by the Plan, and (z) with respect to any Administrative Claim referred to in sub-clause (a)(4) of the definition of Administrative Expense, no objection may be filed with respect to any such Administrative Expense other than with respect to the reasonableness of such Administrative Expense or whether such Administrative Expense was incurred in accordance with Section 6.6 of the Indenture. Without prejudice to the right of any Asbestos Insurance Company to assert any Asbestos Insurer Coverage Defenses, after the Effective Date, only the Plan Trustee shall have the authority to contest Asbestos Personal Injury Claims and Asbestos Property Damage Claims and litigate to judgment, settle or withdraw such objections and each Asbestos Personal Injury Claim and Asbestos Property Damage Claim, whether or not a Proof of Claim was filed with the Bankruptcy Court or District Court, shall be satisfied exclusively in accordance with the Plan Trust Documents.

**7.3    No Distributions Pending Allowance**.  Notwithstanding any other provision hereof, if a Claim or any portion of a Claim (other than an Asbestos Personal Injury Claim) is a Disputed Claim, no payment or distribution shall be made on account of such Disputed Claim, unless and until such Disputed Claim becomes an Allowed Claim.

**7.4    Distributions After Allowance**.  Payments and distributions to each holder of a Claim that is Disputed, or that is not Allowed, to the extent that such Claim ultimately becomes Allowed, shall be made in accordance with the provisions hereof governing the Class of Claims in which such Claim is classified.  As soon as practicable after the date that the order or judgment of the District Court allowing any Disputed Claim (other than a disputed Asbestos Claim) becomes a Final Order, Reorganized Congoleum shall distribute to the holder of such Claim any payment or property that would have been distributed to such holder if the Claim had been Allowed as of the Effective Date (or such other date on which such distribution would have been made).

## ARTICLE VIII

## TREATMENT OF EXECUTORY CONTRACTS, UNEXPIRED LEASES AND SETTLEMENTS

### 8.1    Assumption of Unexpired Leases and Executory Contracts

(a)    Assumption.  Except for any unexpired lease or executory contract that the Plan Proponents reject or designate as being subject to rejection on or before the Effective Date, as of the Effective Date, all executory contracts and unexpired leases not previously assumed or rejected by the Debtors pursuant to section 365 of the Bankruptcy Code shall be deemed to have been assumed by the Debtors, and the Plan shall constitute a motion to assume such executory contracts and unexpired leases.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the District Court shall constitute approval of such assumptions pursuant to section 365(a) of the Bankruptcy Code and a finding by the District Court that each such assumption is in the best interests of the Debtors, the Estates and all parties in interest in the Reorganization Cases. With respect to each such executory contract or unexpired lease assumed by the Debtors, unless otherwise determined by the District Court pursuant to a Final Order or agreed to by the parties thereto on or before the Effective Date, any defaults of the Debtors with respect to such assumed executory contracts or leases existing as of the Effective Date shall be cured in the ordinary course of the Reorganized Debtors' business promptly after any such default becomes known to the Debtors and, if disputed, established pursuant to applicable law by the District Court, and the assumed executory contracts or leases shall be binding upon and enforceable upon the parties thereto, subject to any rights and defenses existing thereunder.  Subject to the occurrence of the Effective Date, upon payment of such cure amounts, all defaults of the Debtors existing as of the Confirmation Date with respect to such executory contract or unexpired lease shall be deemed cured.

(b)  Rejection.  Notwithstanding subpart (a) of this Section 8.1, the Plan Proponents may reject those executory contracts and unexpired leases listed on an exhibit to be filed with the District Court as part of the Plan Supplement (as such list may be amended or supplemented up to and including the Confirmation Date).

(c)  ABI Canada License Agreement; Intercompany Agreements.  Pursuant to and in consideration of the Intercompany Settlement and Section 5.17 and other terms of the Plan, on the Effective Date (A) the ABI Canada License Agreement shall be amended as provided in the Intercompany Settlement and deemed to have been assumed by Congoleum and become a contractual obligation of Reorganized Congoleum, and the Plan shall constitute a motion to assume such license agreement and (B) all Intercompany Agreements shall be rejected and all ABI Claims, including without limitation any ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.17(b)(4)(B) of the Plan), shall be deemed Disallowed and expunged.

**8.2  Damages Upon Rejection**.  Except to the extent arising out of or based on the rejection of any executory contract related to or involving asbestos which shall be dealt with under the TDP, the District Court shall determine the dollar amount, if any, of the Claim of any Entity seeking damages by reason of the rejection of any executory contract or unexpired lease; *provided, however*, that such Entity must file a Proof of Claim with the District Court on or before thirty (30) calendar days following the later of the Confirmation Date or the date of rejection of the executory contract or unexpired lease.  To the extent that any such Claim is Allowed by the District Court by Final Order, such Claim shall become, and shall be treated for all purposes under the Plan as, a Class 9 General Unsecured Claim, and the holder thereof shall receive distributions as a holder of an Allowed Claim in such Class pursuant to the Plan unless such Claim is held by ABI, in which case such Claim shall be Disallowed and expunged.

**8.3  Insurance Agreements**.  Except to the extent expressly set forth in any Asbestos Insurance Settlement Agreement, nothing contained in the Plan or any negotiations leading up to the Plan, including this Section 8.3, shall constitute a waiver of:  (i)  any claim, right, or cause of action that any of the Debtors or the Plan Trust, as applicable, may have against any insurer, including under any insurance agreement; or (ii) any Asbestos Insurer Coverage Defenses that any Asbestos Insurance Company may have against the Debtors or the Plan Trust.  The discharge and release provisions contained in the Plan shall neither diminish nor impair the duties or obligations of any Debtor or any other Entity under any Asbestos Insurance Policy or agreement relating thereto (including any Asbestos Insurance Settlement Agreement), nor shall the discharge and release provisions contained in the Plan diminish nor impair the duties, obligations or the Asbestos Insurer Coverage Defenses of any Asbestos Insurance Company under any Asbestos Insurance Policy or agreement relating thereto.  The Reorganized Debtors shall not voluntarily assist any Person in the establishment of any rights, action, cause of action or claim against the Century Entities or any other Settling Asbestos Insurance Company in anyway relating to any Asbestos Claim or other claim released under an Asbestos Insurance Settlement Agreement.

**8.4  Compensation and Benefits Programs**.  (a)  Except for the Congoleum Interests which are treated elsewhere in the Plan, unless otherwise agreed to by the affected parties or modified by order of the Bankruptcy Court or District Court, as applicable, all of the Debtors' obligations under employment and severance policies, and all compensation and benefit plan, policies, and programs shall be treated as though they are executory contracts that are deemed assumed under the Plan.

(b)  As of the Effective Date, the Pension Plans, as well as the collective bargaining agreement by and between the Debtors and Teamsters Local 312, shall be deemed to have been assumed by Reorganized Congoleum.  Reorganized Congoleum shall continue the Pension Plans, satisfy the minimum funding standards pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082, and administer the Pension Plans in accordance with their terms and the provisions of ERISA.  Furthermore, nothing in the Plan shall be construed as discharging, releasing or relieving the Debtors or Reorganized Congoleum, or any party, in any capacity, from any liability imposed under any law or regulatory provision with respect to the Pension Plans, the Pension Benefit Guaranty Corporation ("PBGC") or the Teamsters Pension Trust Fund of Philadelphia Vicinity (the "Teamsters Pension Fund").  The PBGC, the Pension Plans and the Teamsters Pension Fund shall not be enjoined or precluded from enforcing such liability as a result of any provision of the Plan or the Confirmation Order.  Notwithstanding anything in this Section 8.4, the Plan Trust shall not assume any of the liabilities, obligations, or responsibilities of the Debtors or Reorganized Congoleum with respect to the Pension Plans, the PBGC or the Teamster Pension Fund.

**8.5  Retiree Benefits**.  Notwithstanding any other provisions of the Plan (other than the last sentence of this Section 8.5), any payments that are due to any individual for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the Debtors prior to the Petition Date shall be continued for the duration of the period, if any, that the Debtors have obligated themselves to provide such benefits.  Notwithstanding the foregoing, no employee or retired employee (nor their spouses or dependents and beneficiaries) of the Debtors or the Reorganized Debtors shall be entitled to assert any Asbestos Claim against the Debtors or the Reorganized Debtors.

**8.6  Indemnification of Directors, Officers and Employees**.  The obligations of the Debtors to indemnify their current and former directors, officers or employees to the extent provided in the Debtors' constituent documents or required pursuant to applicable general corporation law shall be deemed and treated as obligations that are assumed by Reorganized Congoleum pursuant to the Plan as of the Effective Date; *provided, however,* that (i) with respect to acts or omissions occurring prior to, on or after the Petition Date, the indemnification obligation of Reorganized Congoleum is limited exclusively to the extent of proceeds available under any applicable directors and officers insurance policy for the act(s) and/or omission(s) at issue and (ii) no current or former director, officer or employee shall be indemnified with respect to the gross negligence, fraud or willful misconduct of such party.

# ARTICLE IX

## ACCEPTANCE OR REJECTION OF THE PLAN

**9.1  Classes Entitled to Vote**.  The holders of Claims or Interests in each Impaired Class of Claims or Interests, i.e., Classes 4, 6, 7, 8, 9 and 10 whose Claims or Interests are Allowed or temporarily allowed for voting purposes, are entitled to vote to accept or reject the Plan pursuant to the Voting Procedures Order; *provided however* that the holders of Congoleum Interests in Class 10 are deemed to have rejected the Plan in accordance with the provisions of Section 1126(g) of the Bankruptcy Code and, accordingly, their separate vote will not be solicited.

**9.2  Acceptance by Impaired Classes of Claims**.  Pursuant to section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if (a) the holders of at least two-thirds in dollar amount of the claims actually voting in such Class (other than Claims held by any holder designated pursuant to section 1126(e) of the Bankruptcy Code) have voted to accept the Plan and (b) more than one-half in number of such claims actually voting in such Class (other than Claims held by any holder designated pursuant to section 1126(e) of the Bankruptcy Code) have voted to accept the Plan.

**9.3  Acceptance by Impaired Class of Interests**.  Pursuant to section 1126(d) of the Bankruptcy Code, an Impaired Class of Interests shall have accepted the Plan if the holders of at least two-thirds in amount of the Allowed Interests actually voting in such Class (other than Interests held by any holder designated pursuant to section 1126(e) of the Bankruptcy Code) have voted to accept the Plan.  The holders of Congoleum Interests in Class 10 are deemed to have rejected the Plan in accordance with the provisions of section 1126(g) of the Bankruptcy Code.

**9.4  Acceptance Pursuant to Section 524(g) of the Bankruptcy Code**.  The Plan shall have been voted upon favorably as required by section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code.

**9.5  Presumed Acceptance of Plan**.  Classes 1, 2, 3, 5, and 11 are Unimpaired.  Under section 1126(f) of the Bankruptcy Code, the holders of Claims and Interests in such Classes are conclusively presumed to have voted to accept the Plan.

**9.6  Reservation of Rights**.  In the event that any Impaired Class fails to accept the Plan by the requisite numbers and amounts required by the Bankruptcy Code, the Plan Proponents reserve the right to seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

# ARTICLE X

## CONDITIONS TO CONFIRMATION AND EFFECTIVENESS

    **10.1** <u>**Conditions to Confirmation**</u>.  Confirmation of the Plan shall not occur unless each of the following conditions has been satisfied or waived in accordance with Section 10.3 below.  These conditions to Confirmation, which are designed, among other things, to ensure that the Injunctions, releases, and discharges set forth in Article XI shall be effective, binding and enforceable, are as follows:

        (a)    The District Court shall have made specific findings and determinations, among others, in substantially the following form:

        (i)    The Discharge Injunction and the Asbestos Channeling Injunction are to be implemented in connection with the Plan and the Plan Trust;

        (ii)    As of the Petition Date, Congoleum has been named as a defendant in personal injury, wrongful death or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

        (iii)    The Plan Trust, upon the Effective Date, shall assume the liabilities of the Debtors with respect to Plan Trust Asbestos Claims and Demands;

        (iv)    The Plan Trust is to be funded in part by securities of Reorganized Congoleum in the form of the Plan Trust Common Stock, which constitutes an obligation of Reorganized Congoleum to make future payments to the Plan Trust;

        (v)    On the Effective Date, the Plan Trust will own a majority of the voting shares of Reorganized Congoleum;

        (vi)    The Plan Trust is to use its assets and income to pay Plan Trust Asbestos Claims and Plan Trust Expenses and otherwise as specifically set forth in the Plan Trust Agreement;

        (vii)    Congoleum is likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Plan Trust Asbestos Claims, which are addressed by the Asbestos Channeling Injunction;

        (viii)    The actual amounts, numbers and timing of future Demands cannot be determined;

        (ix)    Pursuit of Demands outside the procedures prescribed by the Plan and the TDP is likely to threaten the Plan's purpose to deal equitably with Plan Trust Asbestos Claims and future Demands;

        (x)    The Plan establishes a separate Class 7 for Asbestos Personal Injury Claims that are to be addressed by the Plan Trust and at least seventy-five percent (75%) of the Asbestos Claimants voting in Class 7 have accepted the Plan;

        (xi)    The Plan establishes a separate class of Asbestos Property Damage Claims that are to be addressed by the Plan Trust and at least seventy-five percent (75%) of the claimants voting in such class have accepted the Plan;

        (xii)    Pursuant to court orders or otherwise, the Plan Trust shall operate through mechanisms such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims or other comparable mechanisms, that provide reasonable assurance that the Plan Trust shall value, and be in a financial position to pay, Asbestos Personal Injury Claims and Demands therefor in substantially the same manner;

(xiii)     The Futures Representative was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Discharge Injunction and the Asbestos Channeling Injunction for the purpose of, among other things, protecting the rights of persons that might subsequently assert Demands of the kind that are addressed in the Discharge Injunction and the Asbestos Channeling Injunction and transferred to the Plan Trust;

(xiv)     In light of the benefits provided, or to be provided, to the Plan Trust on behalf of each Protected Party, the Asbestos Channeling Injunction is fair and equitable with respect to the persons that might subsequently assert Demands against any Protected Party;

(xv)     The Plan otherwise complies with section 524(g) of the Bankruptcy Code;

(xvi)     Congoleum's contributions to the Plan Trust provided for herein, together with the Asbestos Insurance Assignment, the Plan Trust Common Stock, constitute substantial assets of the Plan Trust and the reorganization;

(xvii)     The duties and obligations of the insurers that issued policies and their successors and assigns, or, with respect to any insolvent insurers, their liquidators and/or the state insurance guaranty funds that bear responsibility with respect to such rights under such policies which constitute the Asbestos Insurance Rights and Asbestos Property Damage Insurance Rights are not eliminated or diminished by the transfer pursuant to the Plan of the Debtors' rights in the Asbestos Insurance Rights and Asbestos Property Damage Insurance Rights pursuant to the Insurance Assignment Agreement;

(xviii)     The Settling Asbestos Insurance Companies are entitled to the benefits of the Asbestos Channeling Injunction with respect to Plan Trust Asbestos Claims;

(xix)     After Confirmation, each Asbestos Insurance Settlement Agreement of a Settling Asbestos Insurance Company and each Final Order of the Bankruptcy Court or District Court, as applicable, approving such Settlement Agreements shall be binding upon and inure to the benefit of the Plan Trust and the Plan Trustee, and the Plan Trust shall become fully bound by, and entitled to all of the rights afforded to the Plan Trust and/or the Debtors under, all of the terms and conditions of each such Asbestos Insurance Settlement Agreement without need for further act or documentation of any kind;

(xx)     After Confirmation, none of the Debtors, Reorganized Congoleum, the Futures Representative, the Plan Trustee, and the Asbestos Claimants' Committee shall seek to terminate, reduce or limit the scope of the Asbestos Channeling Injunction or any other injunction contained in the Plan that inures to the benefit of any Settling Asbestos Insurance Company;

(xxi)     As of the Effective Date, the Insurance Assignment Agreement shall be a valid and binding obligation of each of the parties thereto, shall be in full force and effect and shall be enforceable in accordance with its terms, in each case notwithstanding any anti-assignment provision in or incorporated into any Asbestos Insurance Policy and applicable state law; and

(xxii)     The Plan Trust is a "qualified settlement fund" pursuant to Section 468(B) of the IRC and the regulations issued pursuant thereto.

(b)     Confirmation Order.     The District Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order and any other order entered in conjunction therewith, each of which shall be in form and substance acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative and, insofar as such findings and determinations affect the Financing Order or the rights of Wachovia thereunder, Wachovia.

10.2  **Conditions to Effectiveness**.  Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date of the Plan shall not occur unless and until each of the following conditions has been satisfied or waived in accordance with Section 10.3 below:

36

(a)    <u>Confirmation Order</u>.  The Confirmation Order shall have been entered by the District Court and the Confirmation Order and any order of the District Court shall be in form and substance acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative and the Confirmation Order (and affirming order of the District Court) shall have become a Final Order; *provided, however*, that the Effective Date may occur at a point in time when the Confirmation Order is not a Final Order at the option of the Plan Proponents unless the effectiveness of the Confirmation Order has been stayed, reversed or vacated.  The Effective Date may occur, again at the option of the Plan Proponents, on the first Business Day immediately following the expiration or other termination of any stay of effectiveness of the Confirmation Order.

(b)    <u>Injunctions</u>.  The Discharge Injunction, the Asbestos Channeling Injunction and the Anti-Suit Injunction shall be in full force and effect.

(c)    <u>Exit Facility</u>.  The Exit Facility to be entered into by Reorganized Congoleum, and all documents to be executed in connection with the Exit Facility, shall be in form and substance reasonably satisfactory to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative and shall have been executed and delivered and all conditions precedent to effectiveness thereof shall have been satisfied or waived by the parties thereto.

(d)    <u>New Senior Notes and New Indenture</u>.  The New Indenture shall have been executed and authorized and the New Senior Notes shall have been delivered in accordance with the New Indenture and shall constitute valid senior secured indebtedness of Reorganized Congoleum.

(e)    <u>New Common Stock</u>.  The New Common Stock shall have been issued in accordance with the Plan.

(f)    <u>Plan Documents</u>.  The Plan Documents necessary or appropriate to implement the Plan (which shall include without limitation, the Plan, the Plan Trust Agreement, the TDP, the Exit Facility, the New Senior Notes, the New Indenture, the Registration Rights Agreement, the Amended and Restated Certificate, the Amended and Restated Bylaws, the New ABI Agreement, the Stockholders Agreement, and the Insurance Assignment Agreement) shall have been executed, delivered and, where applicable, filed with the appropriate governmental authorities; all conditions precedent to the effectiveness of each of such Plan Documents shall have been satisfied or waived by the respective parties thereto; and the Plan Documents shall be in full force and effect. The Plan Documents shall be acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative.

(g)    <u>Other Assurances</u>.  The Debtors or the Plan Proponents shall have obtained either (i) a private letter ruling from the Internal Revenue Service establishing that the Plan Trust is a "qualified settlement fund" pursuant to Section 468(B) of the IRC and the regulations issued pursuant thereto, or (ii) other decisions, opinions or assurances regarding certain tax consequences of the Plan, satisfactory to the Debtors, the Asbestos Claimants' Committee and the Futures Representative.

(h)    The District Court shall have approved pursuant to Bankruptcy Rule 9019 the First Amendment to the Litigation Settlement Agreement.

(i)    <u>Merger</u>.  The District Court will have made a specific finding and determination that the merger of the Subsidiary Debtors with and into Congoleum, with Reorganized Congoleum as the sole surviving corporation, is authorized.

(j)    <u>Judicial Fees</u>.  All fees payable pursuant to 28 U.S.C. § 1930 if and to the extent assessed against the Bankruptcy Estates of the Debtors will have been paid in full.

(k)    <u>[reserved]</u>

(l)    <u>[reserved]</u>

(m)     Other Approvals, Documents and Actions.  All authorizations, consents and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained, and all actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

**10.3   Waiver of Conditions**.  Each of the conditions set forth in Sections 10.1 and 10.2 above may be waived in whole or in part by the Plan Proponents without any notice to other parties in interest or the District Court and without a hearing.  The failure of the Plan Proponents to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

# ARTICLE XI

## INJUNCTIONS, RELEASES AND DISCHARGE

**11.1   Discharge**.  (a)  Except as specifically provided in the Plan, the Plan Documents or in the Confirmation Order, as of the Effective Date, Confirmation shall discharge the Debtors and the Reorganized Debtors pursuant to section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims of any nature whatsoever and Demands including, without limitation, any Claims, demands and liabilities that arose before Confirmation, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such Claim was filed or deemed filed under section 501 of the Bankruptcy Code, or such Claim was listed on the Schedules of the Debtors, (b) such Claim is or was Allowed under section 502 of the Bankruptcy Code, or (c) the holder of such Claim has voted on or accepted the Plan.  Except as specifically provided in the Plan or Plan Documents, the rights that are provided in the Plan as of the Effective Date shall be in exchange for and in complete satisfaction, settlement and discharge of all Claims (including without limitation Asbestos Claims) or Demands against, Liens on, and interests in the Debtors or the Reorganized Debtors or any of their assets or properties.  Notwithstanding anything herein to the contrary, nothing in this Section 11.1 shall affect the right of any Asbestos Insurance Company to assert any Asbestos Insurer Coverage Defenses.

(b)     Notwithstanding any other provision of the Plan to the contrary, Confirmation shall not discharge any pre-Petition Date or post-Petition Date, pre-Confirmation Date liability that may be due from any of the Debtors to the Internal Revenue Service as currently set forth in certain Proofs of Claim and Administrative Expense Claim, as amended, filed by the Internal Revenue Service.  Should any pre-Petition Date or post-Petition Date, pre-Confirmation Date tax liabilities be determined by the Internal Revenue Service to be due from any of the Debtors for any of the tax periods reflected by such Proofs of Claim or Administrative Expense Claim, such liabilities shall be determined administratively or in a judicial forum in the manner in which such liabilities would have been resolved had these Reorganization Cases not been commenced.  Any resulting liabilities determined pursuant to a Final Order or other final determination shall be paid as if these Reorganization Cases had not been commenced.

**11.2   Exculpation**.  As of the Effective Date, (i) the Debtors, the Futures Representative, the Asbestos Claimants' Committee, the Bondholders' Committee and each of their Representatives shall not have or incur any liability to any Entity for any act or omission taken on or after the Petition Date in connection with or arising out of the negotiation of the Plan, any Plan Document or any prior plan of reorganization relating to the Debtors or other related documents, the pursuit of Confirmation of the Plan or any prior plan of reorganization relating to the Debtors, the consummation of the Plan, or the administration of the Plan, or the property to be distributed under the Plan; and (ii) in all respects the Debtors, Futures Representative, the Asbestos Claimants' Committee and the Bondholders' Committee shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and the other Plan Documents.  For avoidance of doubt, in no event shall any such party be exculpated from liability under this Section 11.2 in the case of the gross negligence, fraud or willful misconduct of such party.  None of the foregoing parties shall be exculpated under this provision with respect to any acts occurring prior to the Petition Date.  With respect to officers and directors of the Debtors, this section shall apply only to such officers and directors who were serving in such capacity on and after the Petition Date.

**11.3   Releases by Holders of Plan Trust Asbestos Claims**.  Pursuant to this Section 11.3 and the Confirmation Order, (which may include or incorporate by reference release(s) for the benefit of any Settling Asbestos Insurance Company consistent with the terms of this Section 11.3 and the terms of the relevant Asbestos

Insurance Settlement Agreement), any holder of a Plan Trust Asbestos Claim that receives a payment from the Plan Trust shall be deemed to have unconditionally released the Plan Trust and each Settling Asbestos Insurance Company from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, arising from, relating to, or involving the manufacture, sale, distribution, installation, formulation, marketing, transport, handling or any other activity involving any asbestos containing products of Congoleum and any of Congoleum entities identified in the Confirmation Order, which may incorporate the terms of one or more Asbestos Insurance Settlement Agreement, or their premises to the extent such Claim arises from, relates to or involves exposure to asbestos, including without limitation, any operation claims, contribution claims, direct action claims, and insurance coverage claims. For the avoidance of doubt, in no event shall any such party be released under this Section 11.3 in the case of the gross negligence, fraud or willful misconduct of such party.

**11.4 <u>Discharge Injunction</u>**. Except as specifically provided in the Plan Documents to the contrary, the satisfaction, release, and discharge set forth in Section 11.1 shall also operate as an injunction, pursuant to sections 105, 524(g) and 1141 of the Bankruptcy Code, prohibiting and enjoining the commencement or continuation of any action, the employment of process or any act to collect, recover from, or offset (a) any Claim or Demand against or Interest in the Debtors, the Reorganized Debtors, or the Plan Trust by any Entity and (b) any cause of action, whether known or unknown, against the Debtors and the Reorganized Debtors based on such Claim or Interest described in subpart (a) of this Section 11.4.

**11.5 <u>Third Party Releases</u>**. No third party releases are being granted pursuant to the Plan nor are the Plan Proponents seeking approval of any such third party releases, except as set forth specifically in this Plan.

**11.6 <u>Asbestos Channeling Injunction</u>**. <u>The sole recourse of the holder of a Plan Trust Asbestos Claim or Demand on account of such Claim or Demand or of a Person that had or could have asserted an Asbestos Claim or Demand shall be to the Plan Trust pursuant to the provisions of the Asbestos Channeling Injunction, the Plan, the Plan Trust Agreement and the TDP, and such holder shall have no right whatsoever at any time to assert its Plan Trust Asbestos Claim or Demand against the Debtors, the Reorganized Debtors, any other Protected Party, or any property or interest in property of the Debtors, the Reorganized Debtors, or any other Protected Party. Without limiting the foregoing, from and after the Effective Date, the Asbestos Channeling Injunction shall apply to all present and future holders of Plan Trust Asbestos Claims and Demands, and all such holders shall be permanently and forever stayed, restrained, and enjoined from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Plan Trust Asbestos Claims and Demands, other than from the Plan Trust in accordance with the Asbestos Channeling Injunction and pursuant to the Plan, the Plan Trust Agreement and the TDP:</u>

(a) <u>commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Protected Party or any property or interests in property of any Protected Party;</u>

(b) <u>enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Protected Party or any property or interests in property of any Protected Party;</u>

(c) <u>creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance against any Protected Party, or any property or interests in property of any Protected Party;</u>

(d) <u>setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and</u>

(e) <u>proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the Plan Trust, except in conformity and compliance with the Plan, the Plan Trust Agreement and the TDP.</u>

Any right, claim or cause of action that an Asbestos Insurance Company may have been entitled to assert against a Settling Asbestos Insurance Company based on or relating to Asbestos Claims shall be channeled to and become a right, claim or cause of action as an offset claim against the Plan Trust and not against the Settling Asbestos Insurance Company in question and all persons, including any Asbestos Insurance Company, shall be enjoined from asserting any such right, claim or cause of action against a Settling Asbestos Insurance Company.

Except as otherwise expressly provided in the Plan, nothing contained in the Plan shall constitute or be deemed a waiver of any claim, right or cause of action that the Debtors, the Reorganized Debtors, or the Plan Trust may have against any Entity in connection with or arising out of or related to an Asbestos Claim. Notwithstanding any other provision in the Plan to the contrary, nothing in the Plan shall be understood to channel, prevent, impair or limit in any way enforcement against the Debtors, Reorganized Congoleum, or any other Protected Party of any rights provided in connection with any Workers' Compensation Claim.

**11.7 Reservation of Rights**. Notwithstanding any other provision of the Plan to the contrary, the satisfaction, release and discharge, and the Injunctions set forth in Article XI, shall not serve to satisfy, discharge, release, or enjoin (a) claims by any Entity (other than the Reorganized Debtors and their Affiliates) against the Plan Trust for payment of Plan Trust Asbestos Claims in accordance with the Plan, the Plan Trust Agreement and the TDP, as applicable, (b) claims by any Entity against the Plan Trust for the payment of Plan Trust Expenses, (c) claims by the Reorganized Debtors, the Plan Trust, or any other Entity to enforce the provisions of any Asbestos Insurance Settlement Agreement or any provision of the Plan or another Plan Document, or (d) the rights of any Asbestos Insurance Company to assert any claim, obligation, cause of action or liability for payment against any other Asbestos Insurance Company that is not a Settling Asbestos Insurance Company.

**11.8 Rights Against Non-Debtors under Securities Laws**. Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan, and/or Confirmation Order, no provision shall release any non-Debtor, including any current and/or former officer and/or director of the Debtors from liability to the United States Securities and Exchange Commission, in connection with any legal action or claim brought by such governmental unit against such Person(s).

**11.9 Rights Against Debtors Under Environmental Laws**. Environmental rights and Claims of Governmental Units and rights and claims of injury, damages, cost recovery contribution, reimbursement and indemnity by other Entities (other than ABI) under applicable Environmental Laws shall survive the Reorganization Cases, shall not be discharged, impaired or adversely affected by the Plan and the Reorganization Cases and shall be determined in the manner and by the administrative or judicial tribunals in which such rights or Claims would have been resolved or adjudicated if the Reorganization Cases had not been commenced. Governmental Units and other Entities, other than ABI whose claims, if any, shall be discharged, need not file any Proofs of Claim under Environmental Laws in the Reorganization Cases in order to preserve Claims under Environmental Laws. Nothing in the Confirmation Order or Plan shall be construed as releasing or relieving any Entity of any liability under any Environmental Law.

**11.10 Disallowed Claims and Disallowed Interests**. On and after the Effective Date, the Debtors shall be fully and finally discharged from any liability or obligation on a Disallowed Claim or a Disallowed Interest and any order creating a Disallowed Claim or a Disallowed Interest that is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 will nevertheless become and be deemed to be a Final Order on the Effective Date. The Confirmation Order, except as otherwise provided herein, or unless the District Court orders otherwise, shall constitute an order: (a) disallowing all Claims (other than Plan Trust Asbestos Claims that have not been previously expunged by Final Order of the Bankruptcy Court or District Court, as applicable, or withdrawn) and Interests to the extent such Claims and Interests are not allowable under any provision of section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims, and Claims for unmatured interest, and (b) disallowing or subordinating, as the case may be, any Claims, or portions of Claims, for penalties or Non-Compensatory Damages.

**11.11 Anti-Suit Injunction**. With respect to any Settling Asbestos Insurance Company, this Section 11.11 and the Confirmation Order, which may include anti-suit injunction(s) for the benefit of any Settling Asbestos Insurance Company consistent with the terms of this Section 11.11 and the terms of the relevant Asbestos Insurance

Settlement Agreement, shall operate as an injunction, pursuant to section 105(a) of the Bankruptcy Code, permanently and forever prohibiting and enjoining the commencement, conduct or continuation of any action or cause of action, whether known or unknown, the employment of process or any act to collect, recover from or offset any non-asbestos claim, Claim or demand against any Settling Asbestos Insurance Company arising out of, relating to, or in connection with an Asbestos Insurance Policy or any other insurance policy or rights under such other insurance policy issued to or insuring the relationship of the relevant Settling Asbestos Insurance Companies with, the relevant Congolean entities that are insureds under such policies, but such injunction pursuant to section 105(a) of the Bankruptcy Code shall not affect or modify the rights of Persons insured under policies of insurance except to the extent released in an Asbestos Insurance Settlement Agreement and/or enjoined pursuant to any Injunction contained in any order of the Bankruptcy Court or the District Court approving any Asbestos Insurance Settlement Agreement.

### 11.12  Insurance Neutrality

(a)      Except as otherwise provided in Section 11.12(b):

(i)      Nothing in the Plan, the Plan Documents or the Confirmation Order shall preclude any Entity from asserting in any proceeding any and all claims, defenses, rights or causes of action that it has or may have under or in connection with any Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement with respect thereto;

(ii)      Nothing in the Plan, the Plan Documents or the Confirmation Order shall be deemed to waive any claims, defenses, rights or causes of action that any Entity has or may have under the provisions, terms, conditions, defenses and/or exclusions contained in any Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement with respect thereto, including but not limited to any and all such claims, defenses, rights or causes of action based upon or arising out of Asbestos Personal Injury Claims that are liquidated, resolved, discharged, channeled, or paid in connection with the Plan; and

(iii)      Notwithstanding anything to the contrary in the Confirmation Order, the Plan, or any of the Plan Documents, nothing in the Confirmation Order, the Plan, or any of the Plan Documents (including any other provision that purports to be preemptory or supervening other than Section 11.12(b)), shall in any way operate to impair, or have the effect of impairing, the insurers' legal, equitable, or contractual rights, if any, in any respect; nor shall the Plan, any of the Plan Documents, the Confirmation Order, or the estimation, liquidation or payment of any Claim for purposes of distribution by the Trust in accordance with the Plan and the Plan Documents have any binding effect on any Asbestos Insurance Company or have any res judicata or collateral estoppel effect upon any Asbestos Insurance Company for any other purpose, including without limitation with respect to the amount or the reasonableness of any such Claim, or constitute a binding determination on any issue or the creation of any liquidated claim with respect to any Asbestos Insurance Company.  The rights of insurers shall be determined under the applicable Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement with respect thereto.

(b)      Notwithstanding the provisions of Section 11.12(a), Asbestos Insurance Companies shall be bound by the District Court's findings and conclusions with respect to whether, under the Bankruptcy Code, the assignment or transfer of rights under the Asbestos Insurance Assignment is valid and enforceable against each Asbestos Insurance Company notwithstanding any anti-assignment provision in or incorporated into any Asbestos Insurance Policy and applicable state law, and therefore Asbestos Insurance Companies shall be entitled to litigate that issue in connection with Confirmation, and shall retain all rights of appeal with respect thereto. Further, to the extent any Asbestos Insurance Company chooses, notwithstanding the protections provided by Section 11.12(a), to litigate any other issues in connection with Confirmation, and the District Court gives such Asbestos Insurance Company standing to litigate those issues and rules on the merits of those issues, then such Asbestos Insurance Company shall be bound by the District Court's findings and conclusions thereon, subject to any rights of appeal.

### 11.13  No Liability for Solicitation or Participation.  Pursuant to section 1125(e) of the Bankruptcy Code, the Confirmation Order will provide that all of the Persons who have solicited acceptances or rejections of the Plan (including the Bondholders' Committee, the Asbestos Claimants' Committee, the Futures Representative, the Debtors and each of their respective members and Representatives, as applicable, and the Voting Agent) have acted

in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and are not liable on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale or purchase of securities.

## ARTICLE XII

## MATTERS INCIDENT TO PLAN CONFIRMATION

### 12.1   Term of Certain Injunctions and Automatic Stay

(a)     All of the injunctions and/or automatic stays provided for in or in connection with the Reorganization Cases, whether pursuant to section 105, 362, 524(g), or any other provision of the Bankruptcy Code or other applicable law, in existence immediately prior to Confirmation shall remain in full force and effect until the Injunctions become effective, and thereafter if so provided by the Plan, the Confirmation Order, or by their own terms.  In addition, on and after Confirmation, the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative may seek such further orders as they may deem necessary to preserve the status quo during the time between Confirmation and the Effective Date.

(b)     Each of the Injunctions shall become effective on the Effective Date and shall continue in effect at all times thereafter.  Notwithstanding anything to the contrary contained in the Plan, all actions in the nature of those to be enjoined by the Injunctions shall be enjoined during the period between the Confirmation Date and the Effective Date.

### 12.2   No Successor Liability.   Except as otherwise expressly provided in the Plan, the Debtors, the Reorganized Debtors, their Affiliates, the Asbestos Claimants' Committee, the Bondholders' Committee, the Plan Trust and the Futures Representative do not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations of the Debtors relating to or arising out of the operations of or assets of the Debtors, whether arising prior to, on, or after the Confirmation Date.  Neither the Debtors, the Reorganized Debtors, their Affiliates, nor the Plan Trust is, or shall be, a successor to the Debtors by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that the Reorganized Debtors and the Plan Trust shall assume the obligations specified in the Plan Documents and the Confirmation Order.

### 12.3   Revesting.   Except as otherwise expressly provided in the Plan, on the Effective Date, Reorganized Congoleum shall be vested with all of the assets and property of the Estates, free and clear of all Claims, Liens, charges and other interests of holders of Claims or Interests, and may operate its business free of any restrictions imposed by the Bankruptcy Code or by the District Court.

### 12.4   Vesting and Enforcement of Causes of Action.   Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, except as otherwise provided in the Plan, Reorganized Congoleum shall be vested with and have the right to enforce against any Entity any and all of  the Debtors' Causes of Action other than Causes of Action related to Plan Trust Asbestos Claims and Plan Trust Assets (including the right to pursue such claims, if any, in the name of any Debtor if necessary), with the proceeds of the recovery of any such actions to be property of Reorganized Congoleum; *provided, however,* that nothing herein shall alter, amend, or modify the injunctions (including the Injunctions), releases, or discharges provided herein.  Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, except as otherwise provided in the Plan, the Plan Trust shall be vested with and have the right to enforce against any Entity any and all of the Debtors' Causes of Action relating to any Plan Trust Asbestos Claims or any Plan Trust Assets, including the right to pursue such claims, if any, in the name of any Debtor, if necessary; and for this purpose the Plan Trust shall be designated as a representative of the Estates, with the proceeds of the recovery of any such actions to be property of the Plan Trust; *provided, however,* that nothing herein shall alter, amend, or modify the injunctions (including the Injunctions), releases, or discharges provided herein.

After the Effective Date, Reorganized Congoleum, in its sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Causes of Action (or decline to do any of the foregoing), without further approval of the District Court. Reorganized Congoleum, or any successors, in the exercise of its sole discretion, may pursue such Causes of Action so long as it is in the best interests of Reorganized Congoleum or any

successors holding such rights of action. The failure of the Plan Proponents to specifically list any claim, right of action, suit, proceeding or other Causes of Action in the Plan or the Plan Supplement does not, and will not be deemed to, constitute a waiver or release by the Debtors or Reorganized Congoleum of such claim, right of action, suit, proceeding or other Causes of Action, and Reorganized Congoleum will retain the right to pursue such claims, rights of action, suits, proceedings and other Causes of Action in its sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit, proceeding or other Causes of Action upon or after the Confirmation or consummation of the Plan.

**12.5  GHR/Kenesis Actions**.  On the Effective Date, the GHR/Kenesis Actions shall be preserved for enforcement solely by, and for the sole benefit of, Reorganized Congoleum.

## ARTICLE XIII

## MISCELLANEOUS

**13.1  Jurisdiction**.  Until the Reorganization Cases are closed, the District Court shall retain the fullest and most extensive jurisdiction permissible, including that necessary to ensure that the purposes and intent of the Plan are carried out.  Except as otherwise provided in the Plan, the District Court shall retain jurisdiction to hear and determine all Claims against and Interests in the Debtors, and to adjudicate and enforce all other causes of action which may exist on behalf of the Debtors.  Nothing contained herein shall prevent the Debtors, Reorganized Congoleum, or the Plan Trust from taking such action as may be necessary in the enforcement of any cause of action which the Debtors have or may have and which may not have been enforced or prosecuted by the Debtors, which cause of action shall survive Confirmation of the Plan and shall not be affected thereby except as specifically provided herein.  Nothing contained herein concerning the retention of jurisdiction by the District Court shall be deemed to be a retention of exclusive jurisdiction with respect to any Asbestos Insurance Action; rather any court other than the District Court which has jurisdiction over an Asbestos Insurance Action shall have the continuing right to exercise such jurisdiction.

**13.2  General Retention**.  Following the Confirmation of the Plan, the administration of the Reorganization Cases will continue at least until the completion of the transfers contemplated to be accomplished on the Effective Date.  Moreover, the Plan Trust shall be subject to the continuing jurisdiction of the District Court to the extent required by the requirements of section 468B of the IRC and the regulations issued pursuant thereto.  The District Court shall also retain jurisdiction for the purpose of classification of any Claim and the re-examination of Claims that have been Allowed for purposes of voting, and the determination of such objections as may be filed with the District Court with respect to any Claim.  The failure by the Debtors to object to, or examine, any Claim for the purposes of voting, shall not be deemed a waiver of the right of the Debtors, Reorganized Congoleum, or the Plan Trust, as the case may be, to object to or re-examine such Claim in whole or in part.

**13.3  Specific Purposes**.  In addition to the foregoing, the District Court shall retain jurisdiction for the following specific purposes after Confirmation:

(a)  to modify the Plan after Confirmation, pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules;

(b)  to correct any defect, cure any omission, reconcile any inconsistency, or make any other necessary changes or modifications in or to the Plan, the Plan Documents or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance under the Plan Documents in the event that the Effective Date does not occur as provided herein so that the intended effect of the Plan may be substantially realized thereby;

(c)  to assure the performance by the Disbursing Agent, the Indenture Trustee and the Plan Trustee of their respective obligations to make distributions under the Plan;

(d)  to enforce and interpret the terms and conditions of the Plan Documents;

(e)  to enter such orders or judgments, including, but not limited to, injunctions as are necessary to (i) enforce the title, rights, and powers of the Debtors, the Reorganized Debtors, the Plan Trust, the Futures Representative and the Trust Advisory Committee or (ii) enable holders of Claims to pursue their rights against any Entity that may be liable therefor pursuant to applicable law or otherwise, including, but not limited to, Bankruptcy Court or District Court orders;

(f)  to hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits, tax proceedings, and similar or related matters with respect to the Debtors, the Reorganized Debtors, or the Plan Trust relating to tax periods or portions thereof ending on or before the Effective Date, arising on account of transactions contemplated by the Plan Documents, or relating to the period of administration of the Reorganization Cases;

(g)  to hear and determine all applications for compensation of professionals and reimbursement of expenses under sections 330, 331, or 503(b) of the Bankruptcy Code;

(h)  to hear and determine any causes of action arising during the period from the Petition Date through the Effective Date;

(i)  to hear and determine any claim, causes of action, dispute or other matter in any way related to the Plan Documents or the transactions contemplated thereby against the Debtors, the Reorganized Debtors, the Bondholders' Committee, the Asbestos Claimants' Committee, the Trust Advisory Committee, the Plan Trust, the Plan Trustee, or the Futures Representative and each of their respective Representatives;

(j)  to hear and determine any and all motions pending as of Confirmation for the rejection, assumption, or assignment of executory contracts or unexpired leases and the allowance of any Claim resulting therefrom;

(k)  to determine the allowance and/or disallowance of any Claims against the Debtors or their Estates, including, without limitation, any objections to any such Claims and the compromise and settlement of any Claim against the Debtors or their Estates;

(l)  to hear and determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)  to consider and act on the compromise and settlement of any Claim against or Interest in the Debtors or their Estates;

(n)  to hear and determine all questions and disputes regarding title to the assets of the Debtors, their Estates, Reorganized Congoleum or the Plan Trust;

(o)  to hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court or District Court, as applicable, in these Reorganization Cases;

(p)  to retain continuing jurisdiction with regard to the Plan Trust sufficient to satisfy the requirements of the Treasury Regulations promulgated under section 468B of the IRC (including Treas. Reg. Section 1.468B-1(c)(1));

(q)  to hear and determine any and all applications brought by the Plan Trustee to amend, modify, alter, waive, or repeal any provision of the Plan Trust Agreement or the TDP;

(r)  to enter such orders as are necessary to implement and enforce the Injunctions and the other injunctions described herein, including, without limitation, orders extending the protections afforded by section 524(g)(4) of the Bankruptcy Code to the Protected Parties, including without limitation, the Settling Asbestos Insurance Companies; and

44

(s)     to hear and determine any motions or contested matters involving or related to any GHR/Kenesis Action.

Notwithstanding anything to the contrary in this Section 13.3, (i) the allowance of Plan Trust Asbestos Claims (other than Asbestos Property Damage Claims) and the forum in which such allowance will be determined, shall be governed by and made in accordance with the Plan Trust Agreement and the TDP and (ii) the District Court will have concurrent rather than exclusive jurisdiction with respect to disputes relating to rights under insurance policies included in the Plan Trust Assets.

**13.4    Payment of Statutory Fees**.  All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the District Court at the Confirmation Hearing, shall be paid by the Debtors on or before the Effective Date and thereafter by Reorganized Congoleum as due until the Reorganization Cases are closed, converted or dismissed.  The Reorganized Debtors shall pay any quarterly fees payable pursuant to 28 U.S.C. § 1930(a)(6) to the United States Trustee after the Effective Date until such time as the case is converted, dismissed or closed pursuant to a final decree.  The Reorganized Debtor shall file post-Effective Date reports, the form of which will be supplied by the United States Trustee.  Nothing contained in this Plan shall relieve the Debtors or Reorganized Debtors from making payments to the United States Trustee when due as required by 28 U.S.C. § 1930(a)(6).

**13.5    Securities Law Matters**.  It is an integral and essential element of the Plan that the issuance of the New Common Stock pursuant to the Plan shall be exempt from registration under the Securities Act, pursuant to section 1145 of the Bankruptcy Code and from registration under state securities laws.  Nothing in the Plan is intended to preclude the Securities and Exchange Commission from exercising its police and regulatory powers relating to the Debtors or any other entity.

**13.6    Plan Supplement**.  The Plan Supplement will contain, among other things, without limitation, substantially final forms of a schedule identifying rejected contracts, the Exit Facility Commitment Letter or Term Sheet, the Registration Rights Agreement, the New ABI Agreement, the New Indenture, the Stockholders Agreement, the Amended and Restated Bylaws, the Amended and Restated Certificate and schedules identifying the initial officers and the initial board of directors of Reorganized Congoleum, and shall be filed with the District Court no later than five (5) Business Days prior to the last date for filing objections to Confirmation of the Plan.  Notwithstanding the foregoing, the Plan Proponents may amend the Plan Supplement and any attachments thereto, through and including the Confirmation Date.

**13.7    Allocation of Plan Distributions Between Principal and Interest**.  To the extent that any Allowed Claim entitled to a Distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such Distribution shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.  Notwithstanding the foregoing, no Distribution shall be made on account of Post-Petition Interest.

**13.8    The Asbestos Claimants' Committee, the Futures Representative and the Bondholders' Committee**.  As of the Effective Date, the Futures Representative shall (a) continue in existence and the rights, duties and responsibilities of the Futures Representative appointed by the District Court to serve after the Effective Date shall be as set forth in the Plan Trust Documents and (b) continue in existence for purposes of the Reorganization Cases with respect to any appeal or request for reconsideration or stay pending appeal of the Confirmation Order and any unresolved and then-pending adversary proceedings and have the right to prosecute and/or object to applications for Professional Fee Claims.  The Representatives retained by the Futures Representative during the Reorganization Cases shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to, or arising from, the Reorganization Cases on the same date the Futures Representative ceases existence for purposes of the Reorganization Cases.  On the Effective Date, the Asbestos Claimants' Committee and the Bondholders' Committee shall be dissolved except for the purposes of: (i) any appeal or request for reconsideration or stay pending appeal of the Confirmation Order; (ii) any unresolved and then-pending adversary proceedings,  and (iii) prosecuting and/or objecting to Professional Fee claims.  Representatives of the Asbestos Claimants' Committee and the Bondholders Committee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to, or arising from, the

Reorganization Cases on the same date the Asbestos Claimants' Committee or the Bondholders' Committee, as applicable, cease to exist for purposes of the Reorganization Cases. Until the Effective Date, the Debtors shall pay the reasonable fees and expenses of the Asbestos Claimants' Committee, the Bondholders' Committee and the Futures Representative in accordance with any applicable fee order in the Reorganization Cases. On the Effective Date, the Trust Advisory Committee will assume those powers, duties, and responsibilities as provided in the Plan Trust Agreement.

**13.9  Revocation of Plan**.  The Plan Proponents reserve the right to revoke and withdraw the Plan before the entry of the Confirmation Order.  If the Plan Proponents revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then, with respect to all parties in interest, the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or such other Entity in any further proceedings involving the Debtors.

**13.10  Modification of Plan**.  The Plan Proponents may propose amendments to or modifications of any of the Plan Documents under § 1127 of the Bankruptcy Code and as herein provided, to the extent applicable law permits.  Subject to the limitations contained herein, the Plan Proponents may modify the Plan in accordance with this paragraph, before or after Confirmation, without notice or hearing, or after such notice and hearing as the District Court deems appropriate, if the District Court finds that the modification does not materially and adversely affect the rights of any parties in interest which have not had notice and an opportunity to be heard with regard thereto.   After Confirmation, the Plan Proponents may remedy any defects or omissions or reconcile any inconsistencies in the Plan or the Confirmation Order or any other order entered for the purpose of implementing the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan; provided, however, that none of the Debtors, the Reorganized Debtors, ABI, the Futures Representative, the Plan Trustee, the Asbestos Claimants' Committee, and the Bondholders' Committee shall seek to terminate, reduce or limit the scope of the Asbestos Channeling Injunction or any other injunction contained in the Plan that inures to the benefit of any Settling Asbestos Insurance Company.   Anything in the Plan or in any Plan Document to the contrary notwithstanding, following Confirmation but prior to the Effective Date, the Plan Documents shall not be modified, supplemented, changed or amended in any material respect except with the written consent of the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative.  In the event of any modification on or before Confirmation, any votes to accept or reject the Plan shall be deemed to be votes to accept or reject the Plan as modified, unless the District Court finds that the modification materially and adversely affects the rights of parties in interest which have cast said votes.  The Plan Proponents reserve the right in accordance with § 1127 of the Bankruptcy Code to modify the Plan at any time before the Confirmation Date.  Subject to § 1127 of the Bankruptcy Code, if the District Court determines at or in connection with the Confirmation Hearing that any provision of the Plan is invalid or unenforceable, the Plan Proponents may, at their discretion, sever such provision from the Plan without affecting the enforceability or operative effect of any or all other provisions of the Plan; *provided, however,* the Plan Proponents may not sever any provision from the Plan that incorporates or implements the terms of the Litigation Settlement Agreement, as amended, including the Amended Term Sheet attached thereto.

**13.11  Modification of Payment Terms**.  Reorganized Congoleum shall have the right to modify the treatment of any Allowed Claim (other than a Plan Trust Asbestos Claim), as provided in section 1123(a)(4) of the Bankruptcy Code, at any time after the Effective Date upon the consent of the holder of such Allowed Claim.

**13.12  Entire Agreement**.  The Plan Documents and the Plan Trust Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions and documents. No Entity shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein or as may hereafter be agreed to by the parties in writing.

**13.13  Headings**.  Headings are utilized in the Plan are for convenience and reference only and shall not constitute a part of the Plan for any other purpose.

**13.14  Professional Fee Claims**.  All final requests for payment of Professional Fee Claims must be filed and served on Reorganized Congoleum and their counsel no later than 60 days after the Effective Date, unless otherwise ordered by the District Court.  Objections to any application of such Bankruptcy Professionals or other

Entities for compensation or reimbursement of expenses must be filed and served on the respective applicant and its counsel no later than the first Business Day following 30 days (or such other period as may be allowed by order of the District Court) after the date on which the applicable application for compensation or reimbursement was received. Reorganized Congoleum may pay the reasonable charges that they incur on and after the Effective Date for Bankruptcy Professionals' fees, disbursements, expenses or related support services without application to the District Court. Reorganized Congoleum shall pay the reasonable fees and expenses of the Bondholders' Committee, Asbestos Claimants' Committee and Futures Representative after the Effective Date in connection with the purposes set forth in Section 13.8 of this Plan, without application to the District Court.

13.15  **Recordable Order**. Upon Confirmation of the Plan, the Confirmation Order shall be deemed to be in recordable form, and shall be accepted by any recording officer for filing and recording purposes without further or additional orders, certifications, or other supporting documents.

13.16  **Preparation of Estates' Returns and Resolution of Tax Claims**. The Debtors or Reorganized Congoleum shall file all tax returns and other filings with governmental authorities and may file determination requests under section 505(b) of the Bankruptcy Code to resolve any Disputed Claim relating to taxes with a governmental authority.

13.17  **No Admission**. Nothing contained in the Plan or in the Disclosure Statement shall be deemed as an admission by the Debtors, the Bondholders' Committee, the Asbestos Claimants' Committee or Futures Representative with respect to any matter set forth herein or therein, including, without limitation, liability on any Claim or the propriety of any Claims classification.

13.18  **Consent to Jurisdiction**. Upon default under the Plan or any Plan Documents, the Debtors, Reorganized Congoleum, the Affiliates, the Plan Trust, the Trust Advisory Committee, the Futures Representative, ABI and the Plan Trustee consent to the jurisdiction of the District Court, or any successor thereto, and agree that it shall be the preferred forum for all proceedings relating to such default.

13.19  **Setoffs**. Subject to the limitations provided in section 553 of the Bankruptcy Code, the Debtors or the Plan Trust, as applicable, may, but shall not be required to, setoff against any Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever the Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such claim that the Debtors may have against such holder; *provided* that Reorganized Congoleum may not offset any obligations under the Plan Trust Common Stock against any claim that Reorganized Congoleum may have against the Plan Trust.

13.20  **Successors and Assigns**. The rights, duties, and obligations of any Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Entity.

13.21  **Non-Debtor Waiver of Rights**. Non-Debtor parties shall have the right to voluntarily waive any rights, benefits or protections that are afforded to them under the provisions of the Plan or any order issued in furtherance of the Plan, and such waiver shall supersede such rights, benefits or protections. Any such waiver shall only be effective if, and then only to the extent that, such party expressly and specifically waives in writing one or more of such rights, benefits or protections.

13.22  **Further Authorizations**. The Debtors, Reorganized Congoleum, the Bondholders' Committee, Asbestos Claimants' Committee, the Futures Representative and the Plan Trust, if and to the extent necessary, may seek with notice to the others such orders, judgments, injunctions, and rulings that any of them deem necessary to further carry out the intentions and purposes of, and give full effect to the provisions of, the Plan.

13.23  **No Bar to Suits**. Except as otherwise provided in Article XI of this Plan, neither this Plan nor Confirmation hereof shall operate to bar or estop the Debtors or Reorganized Congoleum from commencing any Cause of Action, including any Bankruptcy Cause of Action, or any other legal action against any holder of a Claim or any individual, corporation, partnership, trust, venture, governmental unit, or any other form of legal entity, whether such Cause of Action, or any other legal action arose prior to or after the Confirmation Date and whether or

not the existence of such Cause of Action, or any other legal action was disclosed in any disclosure statement filed by the Debtors in connection with this Plan or whether or not any payment was made or is made on account of any Claim.

       **13.24 <u>Conflicts</u>**.  Unless otherwise provided in the Confirmation Order, in the event of a conflict between the terms or provisions of the Plan and any other Plan Document, the terms of the other Plan Document will control.

       **13.25 <u>Notices</u>**.  All notices, requests, elections, or demands in connection with the Plan shall be in writing and shall be mailed by registered or certified mail, return receipt requested, to:

**If to the Debtors:**

Congoleum Corporation
3500 Quakerbridge Road
Hamilton, NJ 08619
Attn:    Howard N. Feist
       CFO

       and

Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, NY 10033-4039
Attn:    Richard L. Epling
       Robin L. Spear
       Kerry A. Brennan

**If to the Futures Representative:**

R. Scott Williams, Esquire
Haskell Slaughter Young & Rediker, L.L.C.
2001 Park Place North, Suite 1400
Birmingham, AL  35203

       and

Orrick, Herrington & Sutcliffe LLP
1152 15th Street, N.W.
Washington, DC  20005
Attn:    Roger Frankel
       Richard Wyron
       Jonathan Guy

**If to the Asbestos Claimants' Committee:**

Caplin & Drysdale, Chtd.
One Thomas Circle, N.W.
Washington, D.C. 20005
Attn:    Peter Van N. Lockwood
       Ronald E. Reinsel

**If to the Bondholders' Committee:**

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attn:    Michael S. Stamer

Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington D.C. 20036
Attn:    James R. Savin

     **13.26 <u>Duty to Cooperate</u>**.  Notwithstanding anything herein to the contrary, nothing in the Plan, the Plan Documents or the Confirmation Order shall relieve (by way of injunction or otherwise) any of the Debtors or Reorganized Congoleum or any other Entity which is or claims to be an insured or entitled to indemnity under an Asbestos Insurance Policy from any duty to cooperate that may be required by any such insurance policy under applicable law with respect to the defense and/or settlement of any Claim for which coverage is sought under such Asbestos Insurance Policy.  To the extent that any entity incurs costs in satisfying such duty to cooperate with respect to Asbestos Personal Injury Claims after the Effective Date, the Plan Trust shall reimburse such entity for all such reasonable out-of-pocket expenses.

     **13.27 <u>Governing Law</u>**.  Except to the extent that federal law (including, but not limited to, the Bankruptcy Code and the Bankruptcy Rules) is applicable or where the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof that would require application of any other law.

Dated:  March __, 2010

                    CONGOLEUM CORPORATION

                    By:    _____
                    Name:  Howard N. Feist III
                    Title:    Chief Financial Officer and Secretary

                    CONGOLEUM SALES, INC.

                    By:    _____
                    Name:  Howard N. Feist III
                    Title:    Vice President

                    CONGOLEUM FISCAL, INC.

                    By:    _____
                    Name:  Howard N. Feist III
                    Title:    Vice President

ASBESTOS CLAIMANTS' COMMITTEE

By: _____
Name:    Ronald E. Reinsel
Title:    Counsel for the Asbestos Claimants' Committee

50

BONDHOLDERS' COMMITTEE

By: _____

Name:  Paul Kunz

Title:  Authorized representative of
Deutsche Asset Management, not in its individual or
principal capacity, but solely in its capacity as Chair
of the Official Committee of Bondholders

FUTURES REPRESENTATIVE

By: _____
     R. Scott Williams

# APPENDIX EXHIBIT 12

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Caption in Compliance with D.N.J. LBR 9004-2(c)

**FORMAN HOLT ELIADES & RAVIN LLC**
Stephen B. Ravin (SBR-7074)
80 Route 4 East
Suite 290
Paramus, NJ 07652
Telephone: (201) 845-1000

**ORRICK, HERRINGTON & SUTCLIFFE LLP**
Roger Frankel (admitted *pro hac vice*)
Richard H. Wyron (admitted *pro hac vice*)
Jonathan P. Guy (admitted *pro hac vice*)
1152 15th Street, NW
Washington, DC 20005
Telephone: (202) 339-8400

*Attorneys for the Future Claimants'*
*Representative*

| | |
|---|---|
| In re:<br><br>CONGOLEUM CORPORATION, et al.,<br><br>                                       Debtors. | Chapter 11<br>Case No. 03-51524 (KCF)<br>Jointly Administered<br><br>Honorable Kathryn C. Ferguson |

**NOTICE OF FILING OF VERIFICATION OF PUBLICATION OF NOTICE OF (A)
ENTRY OF REVISED ORDER (I) APPROVING DISCLOSURE STATEMENT WITH
RESPECT TO JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE
BANKRUPTCY CODE OF THE FUTURES REPRESENTATIVE, THE DEBTORS, THE
OFFICIAL ASBESTOS CLAIMANTS' COMMITTEE AND THE OFFICIAL
COMMITTEE OF BONDHOLDERS FOR CONGOLEUM CORPORATION, *ET AL.*,
DATED AS OF FEBRUARY 5, 2008, (II) SETTING BRIEFING SCHEDULE WITH
RESPECT TO INSURERS' STANDING TO OBJECT TO CONFIRMATION OF THE
PROPOSED PLAN, AND (III) SCHEDULING CONFIRMATION HEARING; AND
(B) PROCEDURES AND DEADLINE FOR VOTING ON THE PROPOSED PLAN**

PLEASE TAKE NOTICE that on April 10, 2008, R. Scott Williams, the Court-

appointed legal representative for future asbestos personal injury claimants (the "FCR") caused

the Notice of (A) Entry of Revised Order (I) Approving Disclosure Statement with Respect to

Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of the Futures

Representative, the Debtors, the Official Asbestos Claimants' Committee and the Official

Committee of Bondholders for Congoleum Corporation, *et al.*, Dated as of February 5, 2008, (II)

Setting Briefing Schedule With Respect to Insurers' Standing to Object to Confirmation of the

Proposed Plan, and (III) Scheduling Confirmation Hearing; and (B) Procedures and Deadline for

Voting on the Proposed Plan (the "Notice") to be published in the National Edition of USA

Today, a copy of which is attached hereto as <u>Exhibit A</u>.  A copy of the Verification of Publication

from the Principal Clerk of USA Today is attached hereto as <u>Exhibit B</u>.


Dated:  April 17, 2008                    Respectfully submitted,


                          */s/ Stephen B. Ravin*
                          Stephen B. Ravin (SBR7074)
                          FORMAN HOLT ELIADES & RAVIN LLC
                          80 Route 4 East
                          Suite 290
                          Paramus, NJ 07652
                          (201) 845-1000

                          and

                          Roger Frankel (admitted *pro hac vice*)
                          Richard H. Wyron (admitted *pro hac vice*)
                          Jonathan P. Guy (admitted *pro hac vice*)
                          ORRICK, HERRINGTON & SUTCLIFFE LLP
                          1152 15th St., N.W.
                          Washington, DC 20005-1706
                          (202) 339-8400

                          *Counsel for the Future Claimants' Representative*

# Exhibit A

**USA TODAY**
usatoday.com

**MA**
www.marketplace.usa

## NOTICES

### LEGAL NOTICES

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-2(c)

**ORRICK, HERRINGTON & SUTCLIFFE LLP**
Roger Frankel
Richard H. Wyron
Jonathan P. Guy
1152 15th Street, N.W.
Washington, D.C. 20005
Telephone: (202) 339-8400
Facsimile: (202) 339-8500

**FORMAN HOLT ELIADES & RAVIN LLC**
Stephen B. Ravin (SBR-7074)
80 Route 4 East
Suite 290
Paramus, N10 7652
Telephone: (201) 845-1000
Facsimile: (201) 845-9112

*Attorneys for R. Scott Williams,
Future Claimants' Representative*

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1540 Broadway
New York, NY 10033-4039
Richard L. Epling
Robin L. Spear
Kerry A. Brennan

**ORIN, HOLLANDER & DELUCA, LLP**
Parker Plaza
400 Kelby Street
Fort Lee, NJ 07024
Paul S. Hollander
James J. DeLuca

*Attorneys for the Debtors*

**CAPLIN & DRYSDALE, CHTD.**
One Thomas Circle, N.W.
Washington, D.C. 20005
Peter Van N. Lockwood
Ronald Reinsel

**GOLDSTEIN ISAACSOR, PC**
100 Morris Avenue, 3rd Floor
Springfield, NJ 07081
Nancy Isaacson

*Attorneys for the Official Asbestos
Claimants' Committee*

**AKIN GUMP STRAUSS HAUER &
FELD LLP**
590 Madison Avenue
New York, NY 10022
Michael S. Stamer

**AKIN GUMP STRAUSS HAUER &
FELD LLP**
1333 New Hampshire Avenue, N.W.
Washington D.C. 20036
James E. Savin

**TEICH GROH**
691 State Highway 33
Trenton, NJ 08619
Michael A. Zindler

*Attorneys for Official Committee of
Bondholders*

In re:                          ) Chapter 11
**CONGOLEUM CORPORATION, et al.,**  ) Case No. 03-51524 (KCF)
    Debtors and Debtors-in-Possession.  ) (Jointly Administered)
                                ) Judge: Kathryn C. Ferguson

**NOTICE OF (I) ENTRY OF REVISED ORDER (I) APPROVING DISCLOSURE STATEMENT
WITH RESPECT TO JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF
THE BANKRUPTCY CODE OF THE FUTURES REPRESENTATIVE, THE DEBTORS, THE
OFFICIAL ASBESTOS CLAIMANTS' COMMITTEE AND THE OFFICIAL COMMITTEE OF
BONDHOLDERS FOR CONGOLEUM CORPORATION, ET AL., DATED AS OF FEBRUARY
5, 2008, (II) SETTING BRIEFING SCHEDULE WITH RESPECT TO INSURERS' STANDING
TO OBJECT TO CONFIRMATION OF THE PROPOSED PLAN, AND (III) SCHEDULING
CONFIRMATION HEARING; AND (B) PROCEDURES AND DEADLINE FOR VOTING ON
THE PROPOSED PLAN**

**PLEASE TAKE NOTICE that:**

1. **Approval of Disclosure Statement.** By order dated February 20, 2008, (the "Order Approving the Disclosure Statement"), the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") approved the Disclosure Statement With Respect to the Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of the Futures Representative, the Debtors, the Official Asbestos Claimants' Committee and the Official Committee of Bondholders for Congoleum Corporation, et al., Dated As Of February 5, 2008 (as it may be amended, supplemented or modified from time to time, the "Disclosure Statement") filed by R. Scott Williams, the Court-appointed legal representative for future asbestos personal injury claimants (the "FCR"), Congoleum Corporation, Congoleum Sales, Inc., and Congoleum Fiscal, Inc. (collectively, the "Debtors"), the Official Asbestos Claimants' Committee and the Official Committee of Bondholders (collectively, the "Plan Proponents"). Copies of the Order Approving the Disclosure Statement, the Disclosure Statement, and the Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of the Futures Representative, the Debtors, the Official Asbestos Claimants' Committee and the Official Committee of Bondholders for Congoleum Corporation, et al., Dated As Of February 5, 2008 (as it may be amended, supplemented or modified from time to time, the "Plan"), and their respective exhibits, may be obtained by contacting the FCR's Voting Agent (the "Voting Agent"), Logan & Company, Inc., Re: Congoleum Corporation – Plan Balloting, 546 Valley Road, Upper Montclair, New Jersey 07043, or by telephoning the Voting Agent at 1-800-224-7654. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Plan.

2. **Confirmation Hearing.** A hearing (the "Confirmation Hearing") to consider the confirmation of the Plan will be held at **11:00 a.m. (Prevailing Eastern Time) on JUNE 26, 2008**, before the Honorable Kathryn C. Ferguson, United States Bankruptcy Judge, Clarkson S. Fisher U.S. Courthouse, Courtroom 2, 402 East State Street, Trenton, New Jersey 08608. The Confirmation Hearing may be continued from time to time without further notice other than the announcement by the Plan Proponents of the adjourned date(s) at the Confirmation Hearing or any continued hearing, and the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to interested parties.

3. **Approval of Voting Procedures.** By order dated February 15, 2008 (the "Order Approving Voting Procedures"), the Bankruptcy Court directed the Plan Proponents to solicit votes with regard to the approval or rejection of the Plan and annexed as an exhibit to the Disclosure Statement.

4. **Voting Deadline.** The Bankruptcy Court has further established a deadline of **MAY 12, 2008 at 5:00 p.m. (Prevailing Eastern Time)** for voting on the Plan. If you hold a Claim (as defined in the Plan) against the Debtors as of February 21, 2008, the Record Date as established in the Order Approving Voting Procedures, and are entitled to vote on the Plan, an appropriate ballot form has been included in the package of materials containing this Notice. You must return your ballot to the address specified in the instructions thereto so that it is received by the FCR's Voting Agent no later than **MAY 12, 2008 at 5:00 p.m. (Prevailing Eastern Time). If you do not return your ballot so that it is received by the Voting Agent by MAY 12, 2008 at 5:00 p.m., your vote will not be counted.** Any failure to follow the voting instructions included with the ballot may disqualify your ballot and your vote. If you believe you may be entitled to vote on the Plan, but did not receive a ballot, you should (a) contact the FCR's Voting Agent and/or (b) file a motion with the Bankruptcy Court seeking to allow your claim for voting purposes by no later than April 11, 2008.

5. **Objections to Confirmation.** If you want to object to the Plan, you can do so by filing your objection in writing with the Bankruptcy Court no later than **APRIL 9, 2008, at 5:00 p.m. (Prevailing Eastern Time)(the "Objection Deadline")**. Objections, if any, to the confirmation of the Plan shall be (i) in writing, (ii) filed with the Bankruptcy Court, and (iii) served on counsel for each of the Plan Proponents: (a) Orrick, Herrington & Sutcliffe LLP, Columbia Center, 1152 15th Street, NW, Washington, DC 20005 (Attention: Richard H. Wyron, Esq.) and Forman Holt Eliades & Ravin LLC, 80 Route 4 East, Suite 290, Paramus, NJ 07652 (Attention: Stephen B. Ravin, Esq.); (b) Akin Gump Strauss Hauer & Feld LLP, 590 Madison Avenue, NW, New York, NY 10022 (Attention: Michael S. Stamer, Esq.), Akin Gump Strauss Hauer & Feld LLP, 1333 New Hampshire Avenue, NW, Washington, DC 20036 (Attention: James Savin, Esq.), and Teich Groh, 691 State Highway 33, Trenton, NJ 08619 (Attention: Michael A. Zindler, Esq.); (c) Pillsbury Winthrop Shaw Pittman LLP, 1540 Broadway, New York, NY 10033-4039 (Attention: Richard L. Epling, Esq.) and Okin, Hollander & DeLuca, LLP Parker Plaza, 400 Kelby Street, Fort Lee, NJ 07024 (Attention: Paul Hollander, Esq.) and (d) Caplin & Drysdale, Chartered, One Thomas Circle, NW, Washington, DC 20005 (Attention: Peter Van N. Lockwood, Esq.) and Goldstein Isaacson, PC, 100 Morris Avenue, 3rd Floor, Springfield, NJ 07081 (Attention: Nancy Isaacson, Esq.) so as to be received no later than **APRIL 9, 2008, by 5:00 p.m. (Prevailing Eastern Time). Objections not timely filed and served in the manner set forth shall not be considered and shall be overruled.**

6. **The Plan** proposes certain releases and injunctions, pursuant to which certain parties are released from liability for a variety of claims. Included among these is an injunction effectively releasing the Debtors from all liability for Asbestos Personal Injury Claims (pursuant to the terms of, and as defined in, the Plan) and channeling the Debtors' liability for such claims to a Trust to be established for the payment of such claims. You should read the Plan carefully to determine how it may affect your rights.

7. **Additional Information.** If you would like additional copies of any documents relating to the Plan, you may obtain those documents in the following manner: (i) by telephoning the FCR's Voting Agent at 1-800-224-7654, (ii) by writing to the FCR's Voting Agent at Logan & Company, Inc., Re: Congoleum Corporation – Plan Balloting, 546 Valley Road, Upper Montclair, New Jersey 07043, or (iii) by viewing such documents by accessing the Voting Agent's website at www.loganandco.com.

Dated: March 20, 2008

# Exhibit B



7950 Jones Branch Drive • McLean, Virginia 22108
(703) 854-3400



**VERIFICATION OF PUBLICATION**

**COMMONWEALTH OF VIRGINIA
COUNTY OF FAIRFAX**

Being duly sworn, Marcus Edmonds says that he is the principal clerk of USA TODAY, and is duly authorized by USA TODAY to make this affidavit, and is fully acquainted with the facts stated herein: April 10th 2008 on the following legal advertisement- **In re: CONGOLEUM CORPORATION, et al.**  published in the national edition of  **USA Today.**

Principal Clerk of USA TODAY
April 10 2008

This 10 day of ___April___ month
2008 year.

Notary Public

Commonwealth of Virginia
Karen R. Levy - Notary Public
Commission No. 287084
My Commission Expires 02/29/2012

# APPENDIX EXHIBIT 13

SIEGAL & NAPIERKOWSKI
533 Fellowship Road, Suite 120
Mt. Laurel, N.J. 08054
(856) 380-8900

O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036
(212) 326-2000

Attorneys for Century Indemnity Company

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE:<br><br>CONGOLEUM CORPORATION, CONGOLEUM SALES, INC. and CONGOLEUM FISCAL, INC.,<br><br>Debtors. | Chapter 11<br><br>Case No. 03-51524 (KCF)<br><br>Jointly Administered |

**NOTICE OF VERIFICATION OF PUBLICATION GIVING NOTICE OF HEARING ON CENTURY'S SETTLEMENT AGREEMENT FILED AT DOCKET NO. 4439**

Century Indemnity Company hereby gives notice of the filing of the attached verification of publication. The verification confirms publication of the notice of hearing by USA Today concerning Debtors' Motion for Order Approving the Settlement and Buyback Agreement and Releases by and between the Congoleum Entities and Century. The Worldwide service of USA Today referenced in the verification includes the domestic and international publications of USA Today which are distributed among other places in North America, Europe and Asia. A copy of the verification of publication is attached hereto as Exhibit 1. Century has attached as Exhibit 2 a certificate of service confirming the supplementation of the Debtors' original service list with service on the firms identified in the certificate. These firms have not to our knowledge made an appearance in the this case or given notice that they represent claimants against Congoleum.

Dated:     September 7, 2006
           New York, New York

By:     _____/s/ Barbara M. Almeida_____
             Barbara M. Almeida
Tancred V. Schiavoni (TS 8986)
Barbara M. Almeida (BA 7239)
O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
(212) 326-2000
–and–
Martin F. Siegal (MS 2208)
SIEGAL & NAPIERKOWSKI
533 Fellowship Road, Suite 120
Mt. Laurel, N.J. 08054
(856) 380-8900
*Attorneys for Century Indemnity Company*

# EXHIBIT 1



7950 Jones Branch Drive • McLean, Virginia 22108
1-800-872-3433



GANNETT

## VERIFICATION OF PUBLICATION

**COMMONWEALTH OF VIRGINIA**
**COUNTY OF FAIRFAX**

_____

Being duly sworn Kristen Cunningham says that she is the principal clerk of USA
TODAY, and is duly authorized by USA TODAY to make this affidavit, and is
fully acquainted with the facts stated herein: on <u>Thursday, August 24, 2006 and
Monday, August 28, 2006</u> the following advertisement- <u>In re: CONGOLEUM
CORPORATION, et al.,</u> was published in **USA TODAY WORLDWIDE.**

_____
Principal Clerk of USA TODAY
Wednesday, September 06, 2006

_____
Subscribed and sworn to before me
This _____ day of _____ month
_____ year.

_____
Notary Public

My Commission Expires September 30, 2009

Case 2:13-15214-KCF MDoc 4-47 Filed 09/07/06 Entered 09/07/06 15:05:59 Main Document Page 5 of 9

## Health

Rice futures at the Chicago Board of Trade fell by more than 5% Wednesday, the sharpest one-day decline in years. The developments follow the discovery last week of tiny amounts of genetically engineered rice in the commercial U.S. crop.

Europe imports 264,000 tons of long-grain rice from the USA each year, accord-

- 25% insect-resistant
- 21% herbicide-tolerant
- 15% both

**Other crops:**
- Papaya: 53%, ringspot virus-resistant
- Squash: 15%, virus-resistant
- Canola: 75%, herbicide-tolerant

Sources: The U.S. Department of Agriculture; the National Center for Food and Agricultural Policy

no safety concerns."

The contamination in January by a custom a rice-growers coope sas. Over the ensui were collected and time such rice has b commercial rice crop

This week, Japan grain rice imports fi

---

 MARKETPLAC

www.marketplace.usatoday.com | Hours of operation: Mon.-Fri., 8:30 am - 7:0

## NOTICES

### LEGAL NOTICES

UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY

In re: CONGOLEUM CORPORATION, et al.,
Debtors and Debtors-in-Possession.

Chapter 11
Case No.: 03-51524 (KCF)

**NOTICE OF HEARING**

On August 21, 2006, Congoleum Corporation, Congoleum Sales, Inc. and Congoleum Fiscal, Inc., debtor and debtors-in-possession (the "Debtors"), filed their Motion for an Order under 11 U.S.C. §§ 105, 363, 1107 and 1108, and Fed. R. Bankr. P. 2002, 6004, 9014 and 9019 (1) authorizing and approving the Settlement and Policy Buyback Agreement and Release (together with the exhibits thereto, the "Agreement") dated as of August 17, 2006 among (a) Congoleum, individually and on behalf of all of the Congoleum Entities; (b) upon its creation, the Plan Trust; (c) Century Indemnity Company ("Century"); (2) authorizing and approving the sale, transfer and assignment of the Subject Policies to Century, free and clear of all interests; (3) finding that Century is a good faith purchaser of the Subject Policies; and (4) providing that the Agreement is fully binding on all Persons including the Debtors and the Plan Trust (the "Settlement Transactions"). Capitalized terms not otherwise defined herein are used with the same meanings as in the Motion and/or the Agreement.

A hearing (the "Hearing") to consider the relief requested in the Motion, including without limitation approval of the Agreement and the Settlement Transactions, has been scheduled for 2:30 p.m. on Sept. 11, 2006 before Judge Kathryn Ferguson in the Bankruptcy Court for the District of New Jersey, 402 East State St., Trenton, NJ. Only objections made in writing and timely filed and received as provided for in the next paragraph, will be considered by the Bankruptcy Court at the Hearing. The Hearing may be continued from time to time without further notice other than by announcement at the Hearing and any continued hearing.

Objections, if any, to the relief sought in the Motion must be in writing and must be (i) filed with the Bankruptcy Court in accordance with all Bankruptcy Court Rules and Procedures (a) electronically, by registered users of the Court's case filing system, or (b) on a 3.5 inch disk (in PDF, or any other Windows-based word processing format), by all other parties in interest; (ii) submitted in hard-copy form to the chambers of Judge Ferguson; and (iii) served upon (a) Pillsbury Winthrop Shaw Pittman LLP, 1540 Broadway, NY, NY 10036 (Attn: Mr. Epling) and (b) the Office of the U.S. Trustee, One Newark Center, Newark, NJ 07102 (Attn: Mr. Hausman). Objections must be received by 4:00 p.m. on Sept. 4, 2006.

Copies of the Motion and the Agreement may be obtained upon written request from Pillsbury Winthrop Shaw Pittman LLP, Attn: Ms. Altenburg, 1540 Broadway, NY, NY 10036. Copies are also available from the Bankruptcy Court's website at http://ecf.njb.uscourts.gov (registration required). This Notice provides a summary of certain provisions of the Agreement. In the event of any inconsistency between the terms of this Notice and the Agreement, the Agreement shall control.

On Dec. 31, 2003, the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business as debtors-in-possession. Asbestos-related Claims, including, but not limited to asbestos personal injury and property damage claims, have been asserted against certain of the Congoleum Entities. The Debtors initiated coverage litigation against various insurers including Century. By the Motion, the Debtors seek entry of an order (among other things) authorizing and approving the Agreement and Settlement Transactions. The Agreement provides that, upon satisfaction of the terms and conditions set forth therein, including without limitation entry of a final nonappealable order (the "Confirmation Order") confirming the Debtors' plan of reorganization (the "Plan"), Century will pay the Buyback Amount specified in the Agreement to the Trust that will be formed pursuant to the confirmed Plan (the date on which all such terms and conditions have been satisfied and the Buyback Amount has been paid as more fully defined in the Agreement, the "First Payment Date").

It is contemplated that the Confirmation Order will channel, among other things, (i) all Plan Trust Asbestos Claims, which shall include, without limitation, all such Claims against any of the Debtors in their individual capacity and as successors in interest to any Congoleum Entity that engaged at any time in the Congoleum Flooring Business, whether named as such or by operation of law, and (ii) all Asbestos Personal Injury Claims, which shall include all Claims allegedly caused by asbestos for which any predecessors of the Debtors are otherwise liable of any Person against the Century Entities relating to the Subject Policies that in any way arise out of activity involving the products or premises of the Congoleum Entities, into the Trust to be established and (b) permanently enjoin the prosecution, continuation or commencement of any such Claims against, among other Persons, any of the Century Entities.

Pursuant to §§ 105(a) and 363(b) and (f) of the Bankruptcy Code, upon the First Payment Date the Debtors will be deemed to have sold, transferred and conveyed, the Subject Policies (including policies XBC1838, XBC40971, XCP3904, XBC43099, XCP3956, XBC155083, XCPGO7908702, XLP GO 790915-9, and XLPGO9026824) to Century free and clear of all Claims, liens, encumbrances and interests of any kind or nature whatsoever, including without limitation any Claims for contribution, indemnity or other liability under the Subject Policies against any of the Century Entities, whether arising prior to, during, or subsequent to the Bankruptcy Case including such interests as may have been claimed by the predecessors of the Debtors (including Congoleum-Nairn, Inc., Congoleum Corporation, Congoleum Incorporated, Congoleum Industries, Inc., Congoleum Holdings, Inc., Tri-State Floors, Inc.). The sale of these rights and interests shall constitute a legal, valid and effective transfer of the Subject Policies. Century shall be deemed a "good faith purchaser" under § 363(m) of the Bankruptcy Code. As to the Subject Policies and all of the Century Entities will be entitled to the protection provided by such designation without further order of this Court. Accordingly, effective upon the First Payment Date but subject to the satisfaction of the conditions precedent to the Trigger Date, in addition to the injunctions granted under the Plan and the Confirmation Order that will protect the Century Entities, all Persons and Entities shall be hereby forever enjoined, barred and estopped from asserting any Claims, liens, encumbrances or interests of any kind or nature with respect to the Subject Policies against the Century Entities and their respective property and assets, including the Subject Policies. The Bankruptcy Court will consider confirmation of the Plan and entry of the Confirmation Order at a later hearing which has not yet been scheduled.

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
*Attorneys for Debtors and Debtors-in-Possession*

BUSINESS

TWO BARS
Venue Gay - Full
atmos.incl. land
& equip. 8

BUS
OPPOR

$1.99 DI
PARTY l
Complete turn
877-8
www.dp

Acquire F
You Find. We R
Out! Free Info l

Are You L
THE NEXT
Our exclusive pr
zero competition
entrepreneurs
tremendous de
dollar industry. B
you can expect
figure income
$12,900 usually
CALL 1-8

BANKCA
• $10,000 Signing
• FREE Equipment
• Direct Leasing
• EXP. REQ. 1-80

Dollar
USA's Lar
Dollar St
Complete t
Inventory
Dollar & D
1-800
usa.dollarst

Equipme
Start your ow
Equipment Lea
800-4

EXPERIENCED
EARN Prepaid

# EXHIBIT 2

SIEGAL & NAPIERKOWSKI
Martin F. Siegal (MFS 2208)
533 Fellowship Road, Suite 120
Mt. Laurel, N.J. 08054
(856) 380-8900

O'MELVENY & MYERS LLP
Tancred V. Schiavoni (TVS 8986)
Barbara M. Almeida (BMA 7239)
Times Square Tower
7 Times Square
New York, New York 10036
(212) 326-2000

Attorneys for Century Indemnity Company

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IN RE: | Chapter 11 |
| CONGOLEUM CORPORATION, CONGOLEUM SALES, INC. and CONGOLEUM FISCAL, INC., | Case No. 03-51524 (KCF) |
|  | Jointly Administered |
| Debtors. |  |

### CERTIFICATE OF SUPPLEMENTAL SERVICE

**ROSS A. NEGLIA** being of full age hereby certifies:

1.      I am a legal assistant with the law firm of O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, New York, New York 10036, attorneys for Century Indemnity Company in the above-captioned matter.

2.      I caused a copy of  (1) Notice of Debtors' Motion for Order Pursuant to Sections 105, 363, 1107 and 1108 of the Bankruptcy Code and Rules 2002, 6004, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtor to Enter Into A Settlement And Compromise Of Certain Claims, (II) Approving Sale of Certain Insurance Policies Free and

Clear of Liens, Claims, Interests and Other Encumbrances, and (III) Approving the Settlement

and Buyback Agreement and Releases By and Between the Congoleum Entities and the Century

Entities; (2) Debtors' Motion for Order Pursuant to Sections 105, 363, 1107 and 1108 of the

Bankruptcy Code and Rules 2002, 6004, 9014 and 9019 of the Federal Rules of Bankruptcy

Procedure (I) Authorizing Debtor to Enter Into A Settlement And Compromise Of Certain

Claims, (II) Approving Sale of Certain Insurance Policies Free and Clear of Liens, Claims,

Interests and Other Encumbrances, and (III) Approving the Settlement and Buyback Agreement

and Releases By and Between the Congoleum Entities and the Century Entities; and (3)

Declaration of Maria Matteo Thompson in Support of Debtors' Motion For Order Authorizing

and Approving Settlement and Policy Buyback Agreement and Release Among the Congoleum

Entities, The Plan Trust, and the Century Entities and Sale of Subject Policies Pursuant to

Sections 105, 363, 1107 and 1108 of the Bankruptcy Code and Rules 2002, 6004, 9014, and

9019 of the Federal Rules of Bankruptcy Procedure to be served by Federal Express overnight

delivery on:

Lipsitz & Ponterio, LLC
135 Delaware Avenue
Suite 210
Buffalo, NY 14202-2410

-and-

Law Firm of Paul T. Benton
181 Main St.
Biloxi, MS 39533-3807

-and-

James F. Humphreys & Associates
500 Virginia St. East, Suite 800
Charleston, WV 25301

-and-

Martzell & Bickford
338 Lafayette St.
New Orleans, LA 70130

-and-

Reaud, Morgan & Quinn, LLP
801 Laurel
Beaumont, Texas 77701

-and-

Caroselli Beachler McTiernan & Conboy  LLC
312 Boulevard of the Allies, 8th Floor,
Pittsburgh, PA  15222-1916

I hereby certify that the foregoing statements made by me are true.  I am aware that if any

of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated:     New York, New  York
               September 7, 2006

_____/s/ Ross Neglia_____
Ross Neglia

# APPENDIX EXHIBIT 14

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Civil Action No. 09-4371 (JAP) |
| CONGOLEUM CORPORATION, et al., | Bankr. Case No. 03-51524 |
| Reorganized Debtors. | Jointly Administered |

**NOTICE OF (A) OCCURRENCE OF EFFECTIVE DATE;**
**(B) SUBSTANTIAL CONSUMMATION OF THE PLAN; AND (C) BAR DATES**
**FOR CERTAIN ADMINISTRATIVE CLAIMS AND PROFESSIONAL CLAIMS**

**PLEASE TAKE NOTICE that:**

1.      ***Confirmation of the Plan.***  Congoleum Corporation and its affiliated debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors" and, as a reorganized entity after emergence, "Reorganized Debtors" or "Reorganized Congoleum"), hereby give notice that, on June 7, 2010 (the "Confirmation Date"), the Honorable Joel A. Pisano, at the United States District Court for the District of New Jersey (the "District Court"), entered an order (the "Confirmation Order") confirming the Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of Congoleum Corporation, *et al.* the Official Asbestos Claimants Committee, the Official Committee of Bondholders for Congoleum Corporation, *et al.,* and the Futures Representative dated as of March 11, 2010 (as amended, the "Plan").  All capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

2.      ***Effective Date.***  Pursuant to the Confirmation Order, Reorganized Congoleum hereby certifies and gives notice that the Plan became effective in accordance with its terms, and the Effective Date occurred as of **July 1, 2010**.  All conditions contained in Section 10.2 of the Plan have been satisfied or waived.

3.      ***Substantial Consummation.***  Reorganized Congoleum hereby gives notice that, pursuant to § 1102(2) of the Bankruptcy Code, the Plan has been substantially consummated.

4.      ***Discharge of Liability***.  Except as specifically provided in the Plan, the Plan Documents or in the Confirmation Order, as of the Effective Date, pursuant to § 1141(d)(1)(A) of the Bankruptcy Code, the Debtors and Reorganized Congoleum are discharged from any and all Claims of any nature whatsoever and Demands including, without limitation, any Claims, demands and liabilities that arose before Confirmation, and all debts of the kind specified in § 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such Claim was filed or deemed filed under § 501 of the Bankruptcy Code, or such Claim was listed on the Schedules of the Debtors, (b) such Claim is or was Allowed under § 502 of the Bankruptcy Code, or (c) the holder of such Claim has voted on or accepted the Plan.  Except as specifically provided in the Plan or Plan Documents, the rights that are provided in the Plan as of the Effective Date shall be in exchange for and in complete satisfaction, settlement and discharge of all Claims (including without limitation Asbestos Claims) or Demands against, Liens on, and interests in the Debtors or Reorganized Congoleum or any of their assets or Properties.

5.      ***Asbestos Channeling Injunction.***  The sole recourse of the holder of a Plan Trust Asbestos Claim or Demand on account of such Claim or Demand or of a Person that had or could have asserted an Asbestos Claim or Demand shall be to the Plan Trust pursuant to the provisions of the Asbestos Channeling Injunction, the Plan, the Plan Trust Agreement and the TDP, and such holder shall have no right whatsoever at any time to assert its Plan Trust Asbestos Claim or Demand against the Debtors, Reorganized Congoleum, any other Protected Party, or any property or interest in property of the Debtors, Reorganized Congoleum, or any other Protected Party.  Without limiting the foregoing, from and after the Effective Date, the Asbestos Channeling Injunction shall apply to all present and future holders of Plan Trust Asbestos Claims and Demands, and all such holders shall be permanently

and forever stayed, restrained, and enjoined from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Plan Trust Asbestos Claims and Demands, other than from the Plan Trust in accordance with the Asbestos Channeling Injunction and pursuant to the Plan, the Plan Trust Agreement and the TDP:

      (a)      commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Protected Party or any property or interests in property of any Protected Party;

      (b)      enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Protected Party or any property or interests in property of any Protected Party;

      (c)      creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance against any Protected Party, or any property or interests in property of any Protected Party;

      (d)      setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and

      (e)      proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the Plan Trust, except in conformity and compliance with the Plan, the Plan Trust Agreement and the TDP.

For purposes of the Asbestos Channeling Injunction, the Protected Parties shall consist of all of the following:

      (i)      the Debtors and Reorganized Congoleum;

      (ii)      any Entity that, pursuant to the Plan or after the Confirmation Date, becomes a direct or indirect transferee of, or successor to, the Plan Trust or the Debtors;

      (iii)      the Persons designated on Exhibit F to the Plan as current distributors of the product lines currently manufactured, sold or otherwise produced by Congoleum; or

      (iv)      each Settling Asbestos Insurance Company designated on Exhibit H to the Plan.

Any right, claim or cause of action that an Asbestos Insurance Company may have been entitled to assert against a Settling Asbestos Insurance Company based on or relating to Asbestos Claims shall be channeled to and become a right, claim or cause of action as an offset claim against the Plan Trust and not against the Settling Asbestos Insurance Company in question and all persons, including any Asbestos Insurance Company, shall be enjoined from asserting any such right, claim or cause of action against a Settling Asbestos Insurance Company.

      6.      ***Anti-Suit Injunction.***  With respect to any Settling Asbestos Insurance Company, as of the Effective Date, the Plan shall operate as an injunction, pursuant to § 105(a) of the Bankruptcy Code, permanently and forever prohibiting and enjoining the commencement, conduct or continuation of any action or cause of action, whether known or unknown, the employment of process or any act to collect, recover from or offset any non-asbestos claim, Claim or demand against any Settling Asbestos Insurance Company arising out of, relating to, or in connection with an Asbestos Insurance Policy or any other insurance policy or rights under such other insurance policy issued to or insuring the relationship of the relevant Settling Asbestos Insurance Companies with, the relevant Congoleum entities that are insureds under such policies, but such injunction pursuant to § 105(a) of the Bankruptcy Code shall not affect or modify the rights of Persons insured under policies of insurance except to the extent released in an Asbestos Insurance Settlement Agreement and/or enjoined pursuant to any Injunction contained in any order of the Bankruptcy Court or the District Court approving any Asbestos Insurance Settlement Agreement.

7.     ***Bar Date for Administrative Claims.***  All requests for payment of any Administrative Claim (other than a Professional Fee Claim or Substantial Contribution Claim, or an Administrative Claim Allowed by the Plan) against any of the Debtors shall be filed with the Court and served upon counsel to the Debtors, the Bondholders' Committee, the Asbestos Claimants' Committee and the Futures Representative at the addresses set forth in Section 13.25 of the Plan not later than **August 2, 2010 (*i.e.*, thirty (30) days after the Effective Date) (the** "Administrative Claims Bar Date"). If an Entity does not submit a request for payment of an Administrative Expense on or before the Administrative Claims Bar Date, such Entity shall be forever barred from seeking payment of such Administrative Expense from any Reorganized Debtor, or any of its successors or assigns, or out of the property of any of them. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim which is paid or payable by the Debtors or Reorganized Congoleum in the ordinary course of business

8.     ***Bar Date for Professional Fee Claims.***  All final requests for payment of the fees of any professional retained in the Reorganization Cases pursuant to §§ 327, 328, and 1103 of the Bankruptcy Code, or otherwise, for compensation or reimbursement of costs and expenses relating to services rendered on and after the Petition Date and prior to and including the Effective Date, shall be filed and served on Reorganized Congoleum and their counsel no later than **August 30, 2010 (*i.e.*, sixty (60) days after the Effective Date)**, unless otherwise ordered by the District Court (the "Professional Fee Bar Date"). If a Professional or other entity does not submit a request for payment of a Professional Fee Claim on account of services rendered to the Estate on or before the Professional Fee Bar Date, such Entity shall be forever barred from seeking payment of such Professional Fee Claim from any Reorganized Debtor, or any of its successors or assigns, or out of the property of any of them.

9.     ***Bar Date for Substantial Contribution Claims.***  Any Entity who requests compensation or expense reimbursement for making a substantial contribution in the Reorganization Cases pursuant to §§ 503(b)(3), (4) and (5) of the Bankruptcy Code ("Substantial Contribution Claim") must file an application with the clerk of the District Court on or before **August 30, 2010 (*i.e.*, sixty (60) days after the Effective Date)**, (the "Substantial Contribution Bar Date") and serve such application on counsel for Reorganized Congoleum, counsel for the Futures Representative, counsel for the Asbestos Claimants' Committee, counsel for the Bondholders' Committee and on all other parties as otherwise required by the District Court and the Bankruptcy Code, or be forever barred from seeking such compensation or expense reimbursement.

10.    ***Bar Date for Claims Arising from Rejection of Executory Contracts or Unexpired Leases.***  If the rejection by a Debtor, pursuant to the Plan, of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor, or the properties of any of them, unless a Proof of Claim is filed with the District Court on or before thirty (30) calendar days following the later of the Confirmation Date or the date of rejection of the executory contract or unexpired lease (the "Rejection Damages Bar Date"). Such Proof of Claim shall be treated in accordance with Section 8.2 of the Plan.

11.    ***Copies of the Plan and Confirmation Order.***  Any party-in-interest who wishes to obtain a copy of the Plan, any Exhibits to the Plan, or the Confirmation Order may view and download such documents on the website of the Debtors' voting agent, Logan & Company, Inc., at www.loganandco.com.

Dated: July 2, 2010

| | |
|---|---|
| **OKIN, HOLLANDER & DELUCA, L.L.P.** | **PILLSBURY WINTHROP SHAW PITTMAN LLP** |
| Gregory S. Kinoian (GK-7386) | Richard L. Epling (*pro hac vice* admission) |
| Paul S. Hollander (PH-2681) | Kerry A. Brennan (*pro hac vice* admission) |
| One Parker Plaza | 1540 Broadway |
| Fort Lee, New Jersey 07024 | New York, New York 10036 |
| (201) 947-7500 | (212) 858-1000 |

Attorneys for Congoleum Corporation, et al., Reorganized Debtors

# APPENDIX EXHIBIT 15

# <u>Exhibit A</u>

## Confirmation Brief

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: CONGOLEUM CORPORATION,<br><br>Debtors. | Civil Action No. 09-4371 (JAP)<br><br>Bankr. Case No. 03-51524 |

## PLAN PROPONENTS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THE FOURTH AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF <u>THE BANKRUPTCY CODE DATED AS OF MARCH 11, 2010</u>

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................1

FACTS .............................................................................................................3

    A.   Overview of the Plan .............................................................3

    B.   Acceptance of the Plan .........................................................6

    C.   Objections to Confirmation of the Plan.........................8

ARGUMENT ..................................................................................................9

I.    The Plan Satisfies the Requirements of § 1129 of the Bankruptcy Code...................................................................................9

    A.   The Plan Meets Each Requirement for Confirmation Under § 1129(a) of the Bankruptcy Code ...............................9

        1.   Section 1129(a)(1): The Plan Satisfies the Requirements of §§ 1122 and 1123 of the Bankruptcy Code ..................................................................10

        2.   Section 1129(a)(2):  The Plan Proponents Have Complied with the Requirements of the Bankruptcy Code ..................................................................18

        3.   Section 1129(a)(3):  The Plan Has Been Proposed in Good Faith and Not By Any Means Forbidden by Law ..................................................................20

        4.   Section 1129(a)(4):  The Plan Provides that Payments Made by the Debtors for Services or Costs and Expenses Are Subject to Court Approval ............................24

        5.   Section 1129(a)(5):  The Plan Proponents Have Disclosed or Will Disclose All Necessary Information Regarding Directors, Officers and Insiders .........................25

        6.   Section 1129(a)(6):  The Plan Does Not Contain Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission ..............................27

        7.   Section 1129(a)(7):  The Plan Is in the Best Interests of the Debtors' Creditors and Interest Holders....................27

        8.   Section 1129(a)(8):  The Plan Is Supported by Impaired Classes Entitled To Vote ......................................34

i

9.    Section 1129(a)(9):  The Plan Provides for Payment in Full of All Allowed Priority Claims .....................................37

10.    Section 1129(a)(10):  At Least One Class of Impaired Claims Has Accepted the Plan...............................................39

11.    Section 1129(a)(11):  The Plan Is Feasible .........................40

12.    Section 1129(a)(12):  All Statutory Fees Have Been or Will Be Paid................................................................................40

13.    Section 1129(a)(13):  The Plan Adequately and Properly Treats Retiree Benefits.........................................41

B.    The Plan Meets Each Requirement for Confirmation Under §§ 1129(b) and (d) of the Bankruptcy Code ..............................41

1.    Section 1129(b):  The Plan Satisfies the "Cram Down" Requirements of the Bankruptcy Code ..................41

2.    Section 1129(d):  The Plan's Purpose Is Consistent with the Bankruptcy Code ...................................................45

II.    The Modifications to the Plan Are Immaterial and Do Not Require Resolicitation of the Plan.........................................................................45

III.    The Plan Satisfies the Requirements for Entry of the Asbestos Channeling Injunction Under § 524(g) of the Bankruptcy Code............47

A.    The Plan Trust Satisfies the Structure and Funding Requirements of § 524(g)(2)(B)(i) of the Bankruptcy Code ...............................................................................................47

1.    The Plan Trust Will Assume the Liabilities of the Debtors................................................................................48

2.    The Plan Trust Will Be Funded in Part by Securities of the Debtors................................................................49

3.    The Plan Trust Will Own a Majority of the Voting Shares of Reorganized Congoleum ....................................50

4.    The Plan Trust Will Use Its Assets To Pay Claims and Demands .........................................................................50

B.  The Debtors' History, the Nature of Asbestos-Related Litigation and the Facts of These Chapter 11 Cases Support the Findings of Fact Required for the Court To Issue the Asbestos Channeling Injunction Pursuant to § 524(g) of the Bankruptcy Code ..................................51

1.  Section 524(g)(2)(B)(ii)(II):  The Debtors Are Likely To Be Subject to Substantial Future Demands for Payment....................................................................51

2.  Section 524(g)(2)(B)(ii)(II):  The Actual Amounts, Numbers, and Timing of Future Demands Cannot be Determined.............................................................53

3.  Section 524(g)(2)(B)(ii)(III):  The Pursuit of Future Demands Outside the Procedures Prescribed by the Plan Is Likely To Threaten the Plan's Purpose To Deal Equitably with Claims and Future Demands ..............54

C.  The Plan Trust Satisfies the Disclosure, Claimant-Support and Equality of Treatment Requirements of § 524(g)(2)(B)(ii) of the Bankruptcy Code ..................................56

1.  Section 524(g)(2)(B)(ii)(IV)(aa):  The Terms of the § 524(g) Injunction Are Set Out in the Plan and Disclosure Statement ............................................56

2.  Section 524(g)(2)(B)(ii)(IV)(bb):  A Separate Class of Claimants Whose Claims Are To Be Addressed by the Plan Trust Has Been Established and at Least 75% of Such Claimants Have Voted in Favor of the Plan ..............57

3.  The Plan Complies with § 524(g)(2)(B)(ii)(V) and Operates Through Mechanisms To Ensure that Present Claims and Future Demands Are Treated in Substantially the Same Manner ...........................................57

D.  The Plan's Asbestos Channeling Injunction Complies with the Requirements of § 524(g) of the Bankruptcy Code ..............60

1.  The Court May Extend the Asbestos Channeling Injunction to Third Parties ..................................61

2.  Entry of the Asbestos Channeling Injunction Is Fair and Equitable with Respect to Future Asbestos Claimants ..............................................................64

iii

  E. The Plan Trust Has the Elements of a Qualified Settlement Fund (QSF) ................................................................66

IV. The Anti-Suit Injunction Satisfies the Requirements of § 105(a) of the Bankruptcy Code ..........................................................68

V. The Assumption or Rejection of Executory Contracts and Unexpired Leases Under the Plan Should Be Approved .......................74

VI. The Settlements Made During the Reorganization Are Fair and Reasonable and Satisfy the Requirements of § 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019 ..........................................76

  A. The Litigation Settlement Agreement, As Amended, Should be Approved ...................................................79

  B. The Intercompany Settlement Should be Approved ...................83

VII. The Plan's Release, Exculpation and Related Provisions Are Reasonable and Comply with Applicable Law .......................................85

  A. The Plan's Discharge and the Discharge Injunction Should Be Approved .......................................................86

  B. The Plan's Exculpation Provision Should be Approved .............87

  C. The Plan's Release of Holders of Plan Trust Asbestos Claims Should Be Approved ......................................................90

VIII. Objections of Certain Claimants Who Were Parites to Either Pre-Petition Settlement Agreements or the Claimant Agreement Should Be Overruled ....................................................................................92

  A. Background of Settlements with the Shein and Thompson Claimants ...................................................................95

  B. Summary of Objections .......................................................... 101

  C. The Plan Properly Classifies the Claims of the Thompson and Shein Claimants Pursuant to the Law of the Case ..............103

  D. The Thompson Claimants and the Shein Claimants Have Been Bound by Class Vote to the Treatment in the Plan ..........108

  E. The Due Process Objections Are Without Merit and Should Be Overruled ...............................................................112

CONCLUSION ....................................................................................113

500522999v5

# TABLE OF AUTHORITIES

*In re 203 North LaSalle Street Ltd. P'ship*,
190 B.R. 567 (Bankr. N.D. Ill. 1995) ...................................................................43

*In re 11,111, Inc.*,
117 B.R. 471 (Bankr. D. Minn. 1990) .................................................................43

*In re ABB Lummus Global Inc.*,
No. 06-10401, 2006 WL 2052409 (Bankr. D. Del. June 29, 2006) .......... 11, 103

*In re Adelphia Communications*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007)............................................................. 7, 37

*AL Tech Specialty Steel Corp. v. Allegheny International Credit Corp.*,
104 F.3d 601 (3d Cir. 1997) ........................................................................... 107

*Allied Technology, Inc. v. R.B. Brunemann & Sons, Inc.*,
25 B.R. 484 (Bankr. D. Ohio 1982)...................................................................75

*In re American Family Enterprises*,
256 B.R. 377 (D.N.J. 2000) ..................................................................... 71, 102

*In re American Solar King Corp.*,
90 B.R. 808 (Bankr. W.D. Tex. 1988)................................................................46

*In re AOV Industries, Inc.*,
792 F.2d 1140 (D.C. Cir. 1986) .........................................................................11

*Arizona v. California*,
460 U.S. 605 (1983)....................................................................................... 107

*In re Armstrong World Industries, Inc.*,
432 F.3d 507 (3d Cir. 2005) .................................................................... 42, 44

*In re Armstrong World Industries, Inc.*,
348 B.R. 136 (D. Del. 2006)......................................................... 86, 88, 104

v

*In re Arrowmill Development Corp.*,
211 B.R. 497 (Bankr. D.N.J. 1997) ............................................................ 91, 92

*Bank of America National Trust & Savings Association v. 203 North LaSalle Street P'ship*,
526 U.S. 434 (1999) .............................................................................................27

*In re Barney & Carey Co.*,
170 B.R. 17 (Bankr. D. Mass 1994) .....................................................................43

*In re Best Products Co.*,
177 B.R. 791 (S.D.N.Y.1995) ...............................................................................77

*Brewster v. Board of Education of Lynwood Unified School District*,
149 F.3d 971 (9th Cir. 1998) ............................................................................ 111

*In re Cajun Electric Power Cooperative, Inc.*,
230 B.R. 715 (Bankr. M.D. La. 1999) ..................................................................77

*In re Celotex Corp.*,
204 B.R. 586 (Bankr. M.D. Fla. 1996) .................................................................46

*In re Chateaugay Corp.*,
89 F.3d 942 (2d Cir. 1996) ............................................................................... 103

*In re Combustion Engineering, Inc.*,
391 F.3d 190 (3d Cir. 2004) ...................................................................... *passim*

*In re Congoleum Corp.*,
362 B.R. 167 (Bankr. D.N.J. 2007) ........................................................... *passim*

*In re Congoleum Corp.*,
No. 03-51524, 2009 WL 499262 (Bankr. D.N.J. Feb. 26, 2009) .......................99

*In re Congoleum Corp.*,
No. 033-51524, 2008 WL 4186899 (Bankr. D.N.J. Sept. 2, 2008) ................. 110

*In re Congoleum Corp.*,
No. 03-51524, 2007 WL 2177680 (Bankr. D.N.J. July 27, 2007) ............. 13, 94

vi

*In re Congoleum Corp.*,
    Adv. Pro. No. 05-06245, 2007 WL 4571086 (Bankr. D.N.J. Dec. 28, 2007). 100

*In re Continental Airlines*,
    203 F.3d 203 (3d Cir. 2000) ........................................................ 72, 90

*In re Coram Healthcare Corp.*,
    315 B.R. 321 (Bankr. D. Del. 2004) .................................................91

*CoreStates Bank v. United Chemical Technologies, Inc.*,
    202 B.R. 33 (E.D. Pa. 1996) ............................................................22

*In re Drexel Burnham Lambert Group, Inc.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992) .............................................23

*Elliot v. Kiesewetter*,
    98 F.3d 47 (3d Cir. 1994) ............................................................ 112

*Eastern Pilots Merger Committee v. Continental Airlines, Inc. (In re Continental Airlines, Inc.)*,
    279 F.3d 226 (3d Cir. 2002) ........................................................ 107

*In re Federal Mogul Global, Inc.*,
    293 B.R. 124 (Bankr. D. Del. 2003) .................................................75

*In re G-1 Holdings, Inc.*,
    420 B.R. 216 (D.N.J. 2009) ................................................. 78, 86, 88

*In re Genesis Health Ventures, Inc.*,
    266 B.R. 591 (Bankr. D. Del. 2001) ...................................................9

*In re Great Bay Hotel & Casino, Inc.*,
    251 B.R. 213 (Bankr. D.N.J. 2000) .......................................... *passim*

*Group of Institutional Investors v. Chicago, Milwaukee, St. Paul, & Pacific R.R. Co.*,
    318 U.S. 523 (1943) ........................................................................75

*Heins v. Ruti-Sweetwater, Inc. (In re Ruti-Sweetwater, Inc.)*,
    836 F.2d 1263, (10th Cir. 1988) ................................................ 7, 37

*In re Holywell Corp.*,
913 F.2d 873 (11th Cir. 1990) ................................................................. 11, 103

*In re Jasmine, Ltd.*,
258 B.R. 119 (D.N.J. 2000) ................................................................. 78, 82, 85

*In re Jersey City Medical Center*,
817 F.2d 1055 (3d Cir. 1987) ..................................................................... 11

*John Hancock Mutual Life Insurance Co. v. Route 37 Business Park Associates*,
987 F.2d 154 (3d Cir. 1993) ....................................................................... 10

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986) ........................................................... 18

*In re Kaiser Aluminum Corp.*,
No. 02-10429 (Bankr. D. Del. Feb. 6, 2006) ............................................... 71

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
843 F.2d 636 (2d Cir. 1988) ....................................................................... 10

*In re Lisanti Foods, Inc.*,
329 B.R. 491 (D.N.J. 2005) ........................................................................ 9

*In re Longardner & Associates, Inc.*,
855 F.2d 455 (7th Cir. 1988) .................................................................... 112

*In re Market Square Inn, Inc.*,
978 F.2d 116 (3d Cir. 1992) ....................................................................... 75

*In re Martin*,
91 F.3d 389 (3d Cir. 1996) ................................................................. 77, 82, 85

*McCormick v. Banc One Leasing Corp. (In re McCormick)*,
49 F.3d 1524 (11th Cir. 1995) .................................................................... 22

*In re Monclava Care Ctr., Inc.*,
254 B.R. 167, 171 (Bankr. N.D. Ohio 2000) ............................................. 111

viii

*In re Montgomery Ward Holding Corp.*,
   306 B.R. 489 (Bankr. D. Del. 2004) ............................................................... 112

*In re Mount Vernon Plaza Community Urban Redevelopment Corp. I*,
   79 B.R. 305 (Bankr. S.D. Ohio 1987) ..............................................................46

*In re Neshaminy Office Building Associates*,
   62 B.R. 798 (E.D. Pa.1986) .............................................................................78

*In re New Century TRS Holdings*,
   390 B.R. 140 (Bankr. D. Del. 2008) .................................................................77

*In re Ngan Gung Restaurant*,
   254 B.R. 566 (Bankr. S.D.N.Y. 2000) ..............................................................21

*NLRB v. Bildisco & Bildisco*,
   465 U.S. 513 (1984) ................................................................................... 21, 75

*In re Nutritional Sourcing Corp.*,
   398 B.R. 816 (Bankr. D. Del. 2008) .................................................................77

*In re Oakwood Homes Corp.*,
   449 F.3d 588 (3d Cir. 2006) .............................................................................27

*In re Owens Corning*,
   No. 00-03837 (Bankr. D. Del. Sept. 26, 2006)........................................... 71, 88

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v.
   Anderson*,
   390 U.S. 414 (1968)..........................................................................................77

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000) ................................................................. 88, 89, 90

*SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert
   Group, Inc.)*,
   130 B.R. 910 (S.D.N.Y. 1991) .........................................................................71

*In re Specialty Equipment Companies*,
   3 F.3d 1043 (7th Cir. 1993) .............................................................................90

500522999v5

*In re Szostek*,
  886 F.2d 1405 (3d Cir. 1989) ............................................................................37

*Tindall v. Mavrode (In re Mavrode)*,
  205 B.R. 716 (Bankr. D.N.J. 1997) ..................................................................78

*In re Toy & Sports Warehouse, Inc.*,
  37 B.R. 141 (Bankr. S.D.N.Y. 1984).................................................................18

*In re TransWorld Airlines, Inc.*,
  185 B.R. 302 (Bankr. E.D. Mo. 1995)................................................................46

*United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.)*,
  315 F.3d 217 (3d Cir. 2003) ...................................................................... 72, 90

*In re U.S. Mineral Products Co.*,
  No. 01-2471, 2005 WL 5898300 (Bankr. D. Del. Nov. 29, 2005).....................11

*In re USA Commercial Mortgage Co.*,
  No. 06-10725, 2007 WL 2571947 (D. Nev. Aug. 29, 2007).................. 110, 111

*In re Winn-Dixie Stores, Inc.*,
  356 B.R. 813 (Bankr. M.D. Fla. 2006) ................................................ 9, 104, 110

*In re Zenith Electronics Corp.*,
  241 B.R. 92 (Bankr. D. Del. 1999) ........................................................ 21, 91

## STATUTES

11 U.S.C. § 105 ................................................................................ *passim*

11 U.S.C. § 330 ............................................................................................24

11 U.S.C. § 331 ............................................................................................24

11 U.S.C. § 363 ............................................................................................68

11 U.S.C. § 365 ............................................................................................74

11 U.S.C. § 503 ................................................................ 24, 38

11 U.S.C. § 507 ....................................................................38

11 U.S.C. § 524 ............................................................ *passim*

11 U.S.C. § 1103 ...................................................................89

11 U.S.C. § 1122 .......................................................... *passim*

11 U.S.C. § 1123 .......................................................... *passim*

11 U.S.C. § 1125 ............................................................ 18, 19

11 U.S.C. § 1126 .......................................................... *passim*

11 U.S.C. § 1127 .................................................... 45, 46, 47

11 U.S.C. § 1129 .......................................................... *passim*

11 U.S.C. § 1141 .......................................................... *passim*

28 U.S.C. § 1930 ........................................................... 40, 41

Banruptcy Abuse Prevention & Consumer Prvention Act of 2005, Pub. L. 109-8, 119 Stat. 23 (2005) ..................................................................38

## RULES

Fed. R. Bankr. P. 3019 ........................................... 45, 46, 47

Fed. R. Bankr. P. 9019 ................................................ *passim*

## OTHER AUTHORITIES

26 C.F.R. § 1.468B-1 ..............................................................67

H.R. REP. NO. 95-595 (1977) ......................................... 10, 18

500522999v5

H.R. REP. NO. 103-835 (1994)......................................................................48

S. REP. NO. 95-989 (1978) ................................................................ 10, 18

7 *Collier on Bankruptcy* ¶ 1129 (15th ed. rev. 2008) .............................. 9, 108, 111

Stephen J. Carroll, *et al.*, *Asbestos Litigation,* RAND Institute for Civil Justice, 2005..............................................................................................54

Steven J. Parent, *Judicial Creativity in Dealing with Mass Torts in Bankruptcy*, 13 GEORGE MASON U. L. REV. 381 (1990).........................................................53

500522999v5

## PRELIMINARY STATEMENT

The Plan represents the culmination of numerous rulings by this Court and Bankruptcy Court, court-supervised mediation efforts, and substantial settlements and compromises among the Debtors, their creditor constituencies and others to reach a fair and equitable resolution of the myriad of complex issues presented by this asbestos reorganization. Over the course of these Reorganization Cases,[1] the Debtors and each of their creditor constituencies, the Official Asbestos Claimants' Committee (the "Asbestos Claimants' Committee"), the Official Committee of Bondholders for Congoleum Corporation *et al.* (the "Bondholders' Committee"), and the legal representative for future asbestos demands (the "Futures Representative"), have worked diligently to address and resolve the key issues in order to formulate and confirm a § 524(g) plan of reorganization. After years of complex and hotly-contested litigation, the efforts of all of these parties have led to numerous settlements and compromises, many of which have already been court approved.

The Plan seeks to provide the greatest and fairest recovery for all of the estates' creditors while at the same time maintaining the company's operations for the benefit of all. The cornerstone of the Plan is a global settlement providing for the resolution and equal treatment of all present asbestos claims and future

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

demands and the provision of approximately $235 million in insurance proceeds and 50.1% of Reorganized Congoleum's equity to the Plan Trust for the benefit of such claimants.  In addition, as will be demonstrated in connection with the Confirmation Hearing, the Plan comprehensively restructures the Debtors' balance sheet and will allow the Debtors to emerge from bankruptcy with less debt and free of any asbestos liability, which will be channeled to the Plan Trust.  Under the Plan, the cash and liquidity from Reorganized Congoleum's business operations will permit it to pay the Bondholders, who have agreed to reduce their claims under the Senior Notes, and to resolve other non-asbestos liabilities.  Congoleum will be able to emerge from bankruptcy as a viable, profitable company and more than 500 jobs in the Trenton, New Jersey area will be preserved.

Creditors have had substantial input into the development of the settlements and compromises that comprise the Plan and have accepted it in overwhelming numbers.  In fact, the Plan received a greater than 90% acceptance rate in all Classes of those voting in both number and amount.  The overwhelming support of creditors demonstrates the Plan Proponents' good faith in proposing the Plan.  Moreover, following the distribution of Plan solicitation materials to more than 150,000 parties with estimated claims aggregating billions of dollars, only two objections to the Plan were filed, and one of the objectors failed to file a final objection.  As will be demonstrated herein, the lone objecting party's arguments

2

500522999v5

are legally unsupportable and contrary to the law of these Reorganization Cases. Numerous prior rulings in these cases have held that all holders of Asbestos Personal Injury Claims are "substantially similar" and should be classified in a single class. The Asbestos Personal Injury Claims in Class 7 have overwhelmingly approved the Plan, and such class vote binds dissenting members of that class. As a result, the objections should be overruled.

For each of the reasons set forth herein, the Plan Proponents submit that the Plan can, and should, be confirmed.

## **FACTS**

The pertinent and salient facts relating to the Debtors' Chapter 11 cases and the Plan are set forth in the Disclosure Statement, the Plan, and the Declaration of Howard N. Feist, III (the "Feist Decl."). The detailed background of these Reorganization Cases and the Plan are not repeated here, but relevant facts, as necessary, will be referred to in connection with the discussion of applicable legal principles.[2]

### A.    Overview of the Plan

Consistent with a global settlement negotiated among the Debtors, the Bondholders' Committee, the Futures Representative, the Asbestos Claimants Committee, and Claimants' Counsel, the Plan provides for a reorganization of

---

[2]  "Ex. __" shall refer to the exhibits contained in the Confirmation Hearing Exhibit Appendix (the "Confirmation Appendix").

Congoleum that is supported by every official committee or representative appointed to represent the Debtors' various creditor constituencies and future asbestos claims. Among other things, the Plan will establish and adequately fund the Plan Trust, which will resolve all Asbestos Personal Injury Claims pursuant to standard trust distribution procedures. The Plan also permits Congoleum to reorganize with sustainable debt levels for the benefit of all parties-in-interest. The key terms of the Plan are summarized below:

    (i)    <u>Ownership of Reorganized Congoleum</u>. The Debtors shall convey 100% ownership of Reorganized Congoleum, together with all of the assets of Reorganized Congoleum, to the Plan Trust and the holders of the Senior Note Claims. 50.1% of the New Common Stock of Reorganized Congoleum shall be issued to the Plan Trust for the benefit of holders of Asbestos Personal Injury Claims. 49.9% of the New Common Stock shall be issued to holders Senior Note Claims on a pro rata basis.

    (ii)    <u>New Senior Notes</u>. On the Effective Date, Reorganized Congoleum shall issue to holders of Senior Note Claims, on a pro rata basis, new 9% senior secured notes due December 31, 2017 (the "<u>New Senior Notes</u>") in the principal amount of $33 million. There shall be no interest accruing or due and payable on the principal amount of the New Senior Notes for the first six months after the Effective Date.

    (iii)    <u>Plan Trust Funding</u>. On the Effective Date of the Plan, the Plan Trust shall own 50.1% of Reorganized Congoleum, including 50.1% of all of the assets of Reorganized Congoleum. The Plan Trust shall also receive payments, some over time, totaling approximately $235 million from

4

court-approved Asbestos Insurance Settlement Agreements.[3]
In addition, pursuant to the Insurance Assignment Agreement,
the Plan Trust shall receive all of the Debtors' rights to
additional asbestos coverage that are not the subject of any
settlement.

(iv) <u>Treatment of Asbestos Claims</u>.  All Asbestos Personal Injury
Claims are classified in Class 7 and all holders of Asbestos
Personal Injury Claims shall have their claims resolved by the
Plan Trust in the same manner.  Specifically, all Pre-Petition
Settled Claimants, including the Litigation Settlement
Claimants, in full satisfaction of each Asbestos Personal
Injury Claim and any and all rights pursuant to any Pre-
Petition Settlement Agreement, Claimant Agreement, Security
Agreement, Collateral Trust Agreement or any and all other
agreements and amendments thereto with respect to the pre-
packaged plan of reorganization filed by the Debtors on
December 31, 2003 (the "<u>Pre-Packaged Plan</u>"), shall be
restored to the *status quo ante* and treated in the same manner
as all other holders of Asbestos Personal Injury Claims in
Class 7.  The Pre-Petition Settled Claimants in Class 7 shall
receive *pari passu* treatment under the Plan without regard to
any lien, security interest or other claim to priority treatment
whatsoever (each Pre-Petition Settled Claimant will need to
reapply to the Plan Trust to satisfy the TDP including
medical, exposure, statutes of limitation and other
requirements).

(v) <u>Avoidance Actions</u>.  The Omnibus Avoidance Action and
Sealed Avoidance Action—complex, hotly contested and
lengthy litigations with respect to the propriety of the Pre-

---

[3] The District Court approved a $25 million settlement between the Debtors and
Travelers Casualty and Surety Company formerly known as The Aetna Casualty
and Surety Company, and St. Paul Fire and Marine Insurance Company (the
"<u>Travelers Settlement</u>") [Dkt. No. 468].  The Futures Representative did not
consent to the Travelers Settlement, has reserved all rights in that regard on
behalf of future asbestos claimants, and has filed an appeal of the order
approving the Travelers Settlement, which is currently pending before the United
States Court of Appeals for the Third Circuit.

Petition Settlement Agreements and Claimant Agreement that
formed the basis of Congoleum's Pre-Packaged Plan—have
been resolved pursuant to the terms of the Litigation
Settlement Agreement, as amended, and will be dismissed
within 30 days after the Effective Date.

For the reasons discussed herein, the Plan Proponents submit that the Plan
satisfies the confirmation requirements of the Bankruptcy Code.

### B.  Acceptance of the Plan

The Plan has received the overwhelming support of the Debtors' creditors,
including the holders of Asbestos Personal Injury Claims.  As discussed herein, on
March 12, 2010, after notice and a hearing, this Court approved the Debtors'
proposed Disclosure Statement and the Debtors' proposed voting procedures with
respect to the Plan.  *See* Orders Approving Disclosure Statement and Voting
Procedures, Exs. 26, 28.  In accordance with this Court's orders and the
requirements of the Bankruptcy Code, the Voting Agent sent solicitation packages,
including the Plan, Disclosure Statement, a ballot and other material, to all known
holders of Claims entitled to vote on the Plan, including to all known holders of
Asbestos Personal Injury Claims.  *See* Declaration of Kathleen M. Logan
Certifying Methodology for Tabulating Votes, and Results of Voting on Fourth
Amended Joint Plan, dated May 20, 2010 (the "Ballot Certification"), Ex. 17.

Pursuant to § 1129(a)(8) of the Bankruptcy Code, all Classes of Claims and
Equity Interests in which there were Claims or Equity Interests that voted on the

6

Plan have either accepted the Plan or are unimpaired.  *See* Ballot Certification, Ex.
17 ¶¶ 22-23.  Pursuant to § 1126(c) of the Bankruptcy Code, a class of claims has
accepted a plan if such plan has been accepted by creditors "that hold at least two-
thirds in amount and more than one-half in number of the allowed claims of such
class held by creditors . . . ."  11 U.S.C. § 1126(c).  The following Classes of
Claims and Equity Interests voted to accept the Plan by at least two-thirds in
amount and more than one-half in number:  (i) Class 4 (Senior Note Claims); (ii)
Class 6 (ABI Claims) (iii) Class 7 (Asbestos Personal Injury Claims); and (iv)
Class 8 (Asbestos Property Damage Claims).  *See* Ballot Certification, Ex. 17 ¶¶
22-23.  No valid ballots were cast by Class 9 Claimants.  *See id.* ¶ 24.  However, an
impaired class that fails to vote on a plan and does not object to confirmation is
deemed to accept the plan for purposes of meeting the requirements of §
1129(a)(8).  *See Heins v. Ruti-Sweetwater, Inc. (In re Ruti-Sweetwater, Inc.)*, 836
F.2d 1263, 1266 (10th Cir. 1988) (non-voting, non-objecting members of a class
are deemed to accept the plan); *In re Adelphia Commc'ns*, 368 B.R. 140, 261-62
(Bankr. S.D.N.Y. 2007) (same).  Accordingly, § 1129(a)(8) of the Bankruptcy
Code has been satisfied with respect to all such Classes of Claims and Equity
Interests.

In addition, because the Plan contemplates the issuance of an injunction
pursuant to § 524(g) of the Bankruptcy Code, § 524(g)(2)(B)(ii)(IV) requires that

separate classes of asbestos-related claims accept the Plan by at least 75% of those voting. The Plan provides for two separate classes that address asbestos claims: (i) Class 7 (Asbestos Personal Injury Claims); and (ii) Class 8 (Asbestos Property Damage Claims). As set forth in the Ballot Certification, over 95% of those voting in Class 7 voted to accept the Plan, and over 92% of those voting in Class 8 voted to accept the Plan. *See* Ballot Certification, Ex. 17 ¶ 23. Accordingly, the super-majority acceptance requirements of § 524(g) have also been satisfied.

### C. Objections to Confirmation of the Plan

The Debtors received a timely final objection to confirmation of the Plan from David C. Thompson, P.C. (the "Thompson Objection"), Ex. 23. The Shein Law Center, Ltd. filed a preliminary objection to confirmation (the "Shein Preliminary Objection") (Ex. 21), but did not file a final objection as required by the Pre-Trial Order (Ex. 29). The parties filing preliminary and final objections represent a small minority of holders of Asbestos Personal Injury Claims that entered into Pre-Petition Settlement Agreements and the Claimant Agreement with the Debtors. As discussed in more fully *infra* in Part VIII, the Plan Proponents submit that the Objections are wholly without merit and should be overruled.[4]

---

[4] The Debtors also received a timely objection from Travelers (Ex. 24) solely concerning a footnote in Exhibit H to the Plan (Ex. 8) (Schedule of Settling Asbestos Insurance Companies) in which the Futures Representative reserves his rights. Travelers does not object to confirmation of the Plan.

8

# **ARGUMENT**

## I. THE PLAN SATISFIES THE REQUIREMENTS OF § 1129 OF THE BANKRUPTCY CODE

### A. The Plan Meets Each Requirement for Confirmation Under § 1129(a) of the Bankruptcy Code

In order for this Court to confirm the Plan, the Plan Proponents must establish, by a preponderance of the evidence, that each of the requirements of § 1129(a) of the Bankruptcy Code has been satisfied. *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 598-99 (Bankr. D. Del. 2001) ("To confirm a proposed Chapter 11 plan of reorganization, the proponent bears the burden of establishing the plan's compliance with each of the thirteen elements of 11 U.S.C. § 1129(a)."); *In re Lisanti Foods, Inc.*, 329 B.R. 491, 497 (D.N.J. 2005) ("Section 1129(a) contains thirteen paragraphs, each of which contains a separate requirement that must be met in order to confirm the plan.") (quoting 7 *Collier on Bankruptcy* ¶ 1129.01). As the evidence proffered in connection with the Confirmation Hearing will demonstrate, all applicable requirements of § 1129(a) of the Bankruptcy Code have been satisfied by a preponderance of the evidence. *See In re Winn-Dixie Stores, Inc.*, 356 B.R. 813, 817 (Bankr. M.D. Fla. 2006) ("The Debtors have met their burden of proving each of the elements of Bankruptcy Code section 1129 by a preponderance of the evidence, which is the applicable standard."). Accordingly, the Plan should be confirmed.

500522999v5

> 1. **Section 1129(a)(1): The Plan Satisfies the Requirements of §§ 1122 and 1123 of the Bankruptcy Code**

Section 1129(a)(1) of the Bankruptcy Code provides that a plan of reorganization may be confirmed only if the plan "complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). Legislative history and case law instruct that this provision requires that a plan comply with §§ 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and interests and the contents of a plan. *See* H.R. REP. NO. 95-595, at 412 (1977) ("Paragraph (1) [of section 1129(a)] requires that the plan comply with the applicable provisions of chapter 11, such as section 1122 and 1123, governing classification and contents of plan."); S. REP. NO. 95-989, at 126 (1978) (same). *See also John Hancock Mut. Life Ins. Co. v. Rte. 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993) (addressing compliance with §§ 1122 and 1123 in the context of plan confirmation); *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 648-49 (2d Cir. 1988) (reciting legislative history). As demonstrated below, the Plan complies fully with the requirements of both §§ 1122 and 1123 of the Bankruptcy Code.

> a. *The Plan Complies with § 1122 of the Bankruptcy Code: Substantially Similar Classification of Claims*

Section 1122(a) of the Bankruptcy Code provides that a plan may group claims and interests in several separate classes so long as all claims or interests in a

particular class are "substantially similar" to the other claims or interests in such

class.  Specifically, § 1122 provides:

> (a) Except as provided in subsection (b) of this section, a plan may
> place a claim or an interest in a particular class only if such claim or
> interest is substantially similar to the other claims or interests in such
> class.

11 U.S.C. § 1122.  Claims or interests in a single class need not be identical,

but rather should be similar in legal character or effect with respect to the

debtor.  *See In re AOV Indus., Inc.*, 792 F.2d 1140, 1150-51 (D.C. Cir. 1986)

("Foremost among [the classification requirements] is the notion that the

focus of the classification is the legal character of the claim as it relates to

the assets of the debtor.") (emphasis removed).

Generally, courts are permitted "considerable discretion to classify claims

and interests according to the facts and circumstances of the case."  *In re Greate

Bay Hotel & Casino, Inc.*, 251 B.R. 213, 224 (Bankr. D.N.J. 2000) (quoting *In re

Holywell Corp.*, 913 F.2d 873, 880 (11th Cir. 1990)).  Courts in the Third Circuit

will uphold a plan's classification of claims and interests so long as there is a

"reasonable basis" for the classification and such is "fair and reasonable."  *See*,

*e.g.*, *In re ABB Lummus Global Inc.*, No. 06-10401, 2006 WL 2052409, at *13

(Bankr. D. Del. June 29, 2006); *In re U.S. Mineral Prods. Co.*, No. 01-2471, 2005

WL 5898300, at *18 (Bankr. D. Del. Nov. 29, 2005).  *See also In re Jersey City

Med. Ctr.*, 817 F.2d 1055, 1060-61 (3d Cir. 1987).

The Plan properly classifies claims and interests in accordance with § 1122. The Plan designates the following nine Classes of Claims based upon the differences in the Claims' legal nature and/or priority:  Class 1 (Priority Claims), Class 2 (Lender Secured Claims), Class 3 (Other Secured Claims), Class 4 (Senior Note Claims), Class 5 (Workers' Compensation Claims), Class 6 (ABI Claims), Class 7 (Asbestos Personal Injury Claims), Class 8 (Asbestos Property Damage Claims) and Class 9 (General Unsecured Claims).  The Plan also designates two classes of interests:  Class 10 (Congoleum Interests) and Class 11 (Subsidiary Interests).

The number of Classes reflects the diverse characteristics of the Claims against and Interests in the Debtors.  In addition, the legal rights under the Bankruptcy Code of each member within a particular Class are substantially similar to the other members of such Class.  The Thompson and Shein Claimants (defined below) argue, without citing any legal support or addressing the Bankruptcy Court's prior rulings that, because they entered into either Pre-Petition Settlement Agreements or the Claimant Agreement with the Debtors, they are not similar to the holders of other Asbestos Personal Injury Claims, should be classified separately, and they imply that they should receive different treatment.  *See* Thompson Objection, Ex. 23 at 11-15; *see also* Shein Preliminary Objection, Ex. 21 at 2-3.  This Court should overrule these unfounded arguments.  For the

12

reasons set forth herein, the classification of all Asbestos Personal Injury Claims together in Class 7 is not only permissible under § 1122(a) of the Bankruptcy Code, but is required pursuant to prior orders of the Bankruptcy Court, which are now law of the case. *See In re Congoleum Corp.*, No. 03-51524, 2007 WL 2177680, at * 2 (Bankr. D.N.J. July 27, 2007) Ex. 51 (July 2007 Objection Decision) ("[T]he Court regards all pre-judgment asbestos claims as similarly situated. The only proper criterion for differentiating between the pre-judgment claims is their disease level."); *see also In re Congoleum Corp.*, 362 B.R. 167, 183 (Bankr. D.N.J. 2007), Ex. 48 ("<u>Tenth Plan Opinion</u>") (holding that regardless of whether claimants entered into pre-petition settlements with Congoleum, "[t]he legal character of these claims is the same for those cases that were on the eve of trial and those that may arise in the future: they are personal injury claims based on alleged exposure to asbestos contained in Congoleum products").

The Plan Proponents submit that the Plan's classification of Claims and Interests—including the classification of all Asbestos Personal Injury Claims into Class 7—is fair and reasonable and complies with the requirements of § 1122 of the Bankruptcy Code and the prior rulings of the Bankruptcy Court.

> b. *The Plan Complies with § 1123(a) of the Bankruptcy Code: Mandatory Plan Provisions*

Section 1123(a) of the Bankruptcy Code sets forth seven mandatory provisions that a plan must include. Specifically, § 1123(a) requires that a plan:

13

(i) designate classes of claims and interests; (ii) specify unimpaired classes of claims and interests; (iii) specify treatment of impaired classes of claims and interests; (iv) provide for equality of treatment within each class; (v) provide adequate means for the plan's implementation; (vi) prohibit the issuance of nonvoting equity securities and provide an appropriate distribution of voting power among the classes of securities; and (vii) contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of the reorganized company's officers and directors. *See* 11 U.S.C. § 1123(a). As explained below, the Plan includes each of the provisions mandated by § 1123(a) of the Bankruptcy Code.

### (i) Section 1123(a)(1)-(4): Classification and Treatment of Claims

Article II of the Plan designates Classes of Claims and Interests as required by § 1123(a)(1) of the Bankruptcy Code.[5] *See* Plan § 2.3. Section 2.3 of the Plan specifies that Classes 1, 2, 3, 5, and 11 are unimpaired by the Plan, as required by § 1123(a)(2). *See id.* Section 4.1 of the Plan specifies that Claims and Interests in Classes 4, 6, 7, 8, 9, and 10 are impaired and describes the treatment of each such Class in accordance with § 1123(a)(3) of the Bankruptcy Code. Finally, as

---

[5]  Section 1123(a)(1) of the Bankruptcy Code provides that classes of Administrative Claims and Priority Tax Claims not be classified separately. The treatment accorded Administrative Claims and Priority Tax Claims is set forth in Article III of the Plan.

required by § 1123(a)(4) of the Bankruptcy Code, the treatment of each Claim or

Interest within a Class is the same as the treatment as each other Claim or Interest

in such Class, unless the holder of a Claim or Interest agrees to less favorable

treatment. *See* Plan Art. IV.

> (ii)  *Section 1123(a)(5):  Adequate Means for Implementation*
> *of the Plan*

Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide

"adequate means for the plan's implementation."  11 U.S.C. § 1123(a)(5).  Article

V of the Plan describes the corporate governance of Reorganized Congoleum, the

creation of the Plan Trust, the transfer of consideration to the Plan Trust and other

information relating to the creation and operation of the Plan Trust.  In addition,

implementation of the Plan Trust and distributions by the Plan Trust to holders of

Asbestos Claims are ensured by the mechanisms set forth in the Plan Trust

Agreement and the TDP.  Article VI of the Plan implements the mechanism by

which non-asbestos claims will be paid under the Plan.  Further, other Plan

provisions, such as Article VIII regarding the treatment of executory contracts and

unexpired leases and settlements, set forth various transactions that will enable the

Debtors to effectuate the Plan's terms.  Each of the above Plan provisions, together

with the Plan Documents, ensure that the Plan can be implemented successfully.

Accordingly, the Plan satisfies the requirements of § 1123(a)(5) of the Bankruptcy

Code.

500522999v5

>       (iii)   *Section 1123(a)(6):  Prohibition Against the Issuance of*
>               *Nonvoting Equity Securities and Adequate Provisions for*
>               *Voting Power of Classes of Securities*

Section 1123(a)(6) requires that a plan provide that the charter of the reorganized debtor will include a provision "prohibiting the issuance of nonvoting equity securities" and requires that there will be "an appropriate distribution of voting power" with respect to the reorganized debtor.  11 U.S.C. § 1123(a)(6).  The Amended and Restated Certificate provides, among other things, that Reorganized Congoleum "shall not issue nonvoting capital stock to the extent prohibited by Section 1123 of the Bankruptcy Code."  *See* Exhibit K to Plan (Amended and Restated Certificate), Ex. 11 at 3; *see also* Plan § 5.3.  In addition, the Stockholders Agreement provides that there will be only one class of equity in Reorganized Congoleum, and that each share of the New Common Stock is entitled to equal voting rights.  *See* Exhibit L to Plan (Stockholders' Agreement), Ex. 12 at § 5.3.  Accordingly, the Plan satisfies the requirements of § 1123(a)(6) of the Bankruptcy Code.

>       (iv)    *Section 1123(a)(7):  Selection of Directors and Officers*
>               *in a Manner Consistent with the Interests of Creditors*
>               *and Security Holders and Public Policy*

Section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or

trustee under the plan and any successor to such officer, director, or trustee." 11

U.S.C. § 1123(a)(7). Pursuant to Section 5.4 of the Plan, the initial board of

directors of Reorganized Congoleum shall consist of five directors. One of such

directors shall be selected by the Bondholders' Committee, three of such directors

shall be selected jointly by the Futures Representative and the Asbestos Claimants'

Committee, and one of such directors shall be Reorganized Congoleum's chief

executive officer. The identity of four out of five of the initial board members was

disclosed in the Plan Supplement filed on May 5, 2010 and the final member will

be disclosed prior to confirmation. Each member of the initial board is required to

serve in accordance with the Amended and Restated Certificate and the Amended

and Restated Bylaws of Reorganized Congoleum, as the same may be amended

from time to time. Subsequently, Reorganized Congoleum's board of directors

shall be elected in accordance with Reorganized Congoleum's governing

documents. Accordingly, the Plan satisfies the requirements of § 1123(a)(7) of the

Bankruptcy Code.

> c. *The Plan Complies with § 1123(d) of the Bankruptcy Code: Cure of Defaults*

Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a

plan to cure a default the amount necessary to cure the default shall be determined

in accordance with the underlying agreement and applicable nonbankruptcy law."

11 U.S.C. § 1123(d). Section 8.1 of the Plan provides that any defaults of the

500522999v5

Debtors with respect to such assumed executory contracts or leases existing as of the Effective Date shall be cured in the ordinary course of Reorganized Congoleum's business promptly after any such default becomes known. All default disputes (if any) with respect to executory contracts and unexpired lease assumed by Reorganized Congoleum will be resolved pursuant to applicable law. Accordingly, the Plan complies with § 1123(d) of the Bankruptcy Code.

      2.      Section 1129(a)(2):  The Plan Proponents Have Complied with the Requirements of the Bankruptcy Code

Section 1129(a)(2) focuses on the process by which a plan was proposed. Section 1129(a)(2) of the Bankruptcy Code requires that a plan proponent "compl[y] with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(2).  Legislative history and case law instruct that the principal purpose of § 1129(a)(2) is to ensure that a plan proponent complies with the disclosure and solicitation requirements set forth in §§ 1125 and 1126 of the Bankruptcy Code. *See* H.R. REP. NO. 95-595, at 412 (1977); S. REP. NO. 95-989, at 126 (1978).  *See also In re Johns-Manville Corp.*, 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984).

Section 1125(b) of the Bankruptcy Code permits solicitation of a plan only upon "adequate information" having been disclosed to creditors, as such term is defined in § 1125(a) to require, among other things, such information that would

18

enable a hypothetical investor of the debtor to make an informed judgment about the plan. Specifically, § 1125(b) provides:

> An acceptance or rejection of a plan may not be solicited after the commencement of the case under [the Bankruptcy Code] from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information . . . .

11 U.S.C. § 1125(b). By order dated March 12, 2010 (the "Disclosure Statement Order") (Ex. 26), after notice and a hearing, this Court approved the Disclosure Statement with respect to the Plan pursuant to § 1125(b) of the Bankruptcy Code. In addition, by another order dated March 12, 2010 (the "Voting Procedures Order") (Ex. 28), after notice and a hearing, this Court approved the Debtors' proposed voting procedures with respect to the Plan, including: (i) the scope of solicitation for the Plan; (ii) the procedures for voting and tabulation of ballots; (iii) the forms of the ballots; (iv) the contents of the solicitation package (the "Solicitation Materials") and the service thereof; (v) the form of notice of the Confirmation Hearing; and (vi) the procedures for allowance of claims for voting purposes in connection with the solicitations of the Plan.

In accordance with the Voting Procedures Order, the Debtors commenced solicitation of the Plan on or about March 26, 2010. *See* Ballot Certification, Ex. 17 ¶ 7. The Solicitation Materials, including, among other things, the Plan,

19

Disclosure Statement, a ballot and other materials, were transmitted to each holder of a Claim or Interest entitled to vote on the Plan as required by the Voting Procedures Order.  The Plan Proponents did not solicit acceptances of the Plan from any creditor or equity interest holder prior to the transmission of the Solicitation Materials, as approved by this Court.  Feist Decl. ¶ 76.

The Debtors have complied with all solicitation and disclosure requirements set forth in the Bankruptcy Code, the Bankruptcy Rules, and the Voting Procedures Order.  Such compliance is evidenced in the record by, among other things, the Certificates of Services with Respect to Solicitation of the Fourth Amended Joint Plan, dated April 16, 2010 (Ex. 18) and the Ballot Certification (Ex. 17).  Based upon the foregoing, the requirements of § 1129(a)(2) of the Bankruptcy Code have been satisfied.

3. Section 1129(a)(3):  The Plan Has Been Proposed in Good Faith and Not By Any Means Forbidden by Law

Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  Although the Code does not define "good faith" in the context of § 1129(a)(3), the Third Circuit has stated that "[f]or purposes of determining good faith under § 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 247 (3d Cir.

20

2004) (citations omitted); *see also Greate Bay Hotel & Casino*, 251 B.R. at 238 ("Courts have found a plan to be proposed in good faith where it: (1) fosters a result consistent with the Code's objectives, (2) has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected, or (3) is supportable based on the totality of the circumstances.") (citations omitted); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 107 (Bankr. D. Del. 1999) ("The good faith standard requires that the plan be proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code.").

In this regard, the Supreme Court has held that "[t]he fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984). Indeed, courts have stressed the importance of payment of creditors in Chapter 11 cases. *See In re Ngan Gung Rest.*, 254 B.R. 566, 571 (Bankr. S.D.N.Y. 2000) ("[A] clear purpose of Chapter 11 is to benefit all parties, including the debtor and its creditors, by providing a breathing space to enable a debtor to reorganize . . . [in which] the debtor proposes a plan . . . to maximize value for the general benefit of all creditors, thus avoiding a mad scramble for assets.").

500522999v5

The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the formulation of a Chapter 11 plan.  *See McCormick v. Banc One Leasing Corp. (In re McCormick)*, 49 F.3d 1524, 1526 (11th Cir. 1995) ("The focus of a court's inquiry is the plan itself, and courts must look to the totality of the circumstances surrounding the plan, . . . keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start."); *CoreStates Bank v. United Chem. Techs., Inc.*, 202 B.R. 33, 57 (E.D. Pa. 1996) (applying totality of circumstances standard).

The Plan satisfies these requirements of § 1129(a)(3).  The Plan, the culmination of more than six years of vigorously contested litigation and numerous prior attempts at consensual reorganization, fairly achieves a result that is wholly consistent with the objectives and purposes of the Bankruptcy Code.  The objectives of § 524(g) of the Bankruptcy Code are (i) to channel asbestos-related liability to an adequately funded trust to permit an equitable resolution of claims, and (ii) to preserve value by permitting the debtor-company to continue its operations.  As set forth in the Plan, pursuant to § 524(g) of the Bankruptcy Code, all of the Debtors' liability for Asbestos Claims will be channeled to the Plan Trust, which will be adequately funded by approximately $235 million from insurance settlements, other rights to insurance, as well as over 50% of the equity of Reorganized Congoleum.  Meanwhile, the company's operations will be

22

preserved for the benefit of all creditors (asbestos and non-asbestos creditors alike), and nearly six hundred jobs will be maintained here in New Jersey. These objectives of § 524(g) will be achieved openly and fairly by this Plan.

As the evidence proffered in connection with the Confirmation Hearing will demonstrate, the Plan is a result of vigorous, arm's-length bargaining among and between the Debtors, the Asbestos Claimants Committee, the Futures Representative and the Bondholders' Committee. Indeed, the official representatives of each creditor constituency and future asbestos claimants in these cases are Plan Proponents and support the Plan fully. Each of these parties-in-interest, along with the Claimants' Counsel, worked tirelessly to create a global compromise that would allow the Debtors to emerge from bankruptcy as a viable company and to provide the best possible return for all of their creditors.

Moreover, the Plan has been accepted by creditors in numbers far in excess of the statutory requirements. The fact that the creditors have voted to accept the Plan—and have done so in overwhelming numbers—argues powerfully in favor of the Plan's good faith. *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 769 (Bankr. S.D.N.Y. 1992) (finding that the fact that the plan was accepted overwhelmingly by all classes of impaired creditors and two out of three classes of equity holders was an important factor leading to a determination of good faith).

The Plan itself, the arm's-length negotiations among the Debtors and the other Plan Proponents leading to the Plan's formulation, including the negotiation of the Litigation Settlement Agreement, as amended, and the various Asbestos Insurance Settlement Agreements, as well as the overwhelming support of creditors all demonstrate the Plan Proponents' good faith in proposing the Plan. For each of the reasons set forth herein, the Plan Proponents submit that the Plan has been proposed in good faith and complies with the requirements of § 1129(a)(3) of the Bankruptcy Code.

> 4. Section 1129(a)(4): The Plan Provides that Payments Made by the Debtors for Services or Costs and Expenses Are Subject to Court Approval

Section 1129(a)(4) of the Bankruptcy Code requires that:

> Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4). All fees incurred in these Chapter 11 cases either have been, or will be, fully disclosed and subject to Court approval. Section 13.3(g) of the Plan provides that the Court will retain jurisdiction after the Effective Date to hear and determine all applications for allowance of compensation for professionals and the reimbursement of expenses under §§ 330, 331 and 503(b) of the Bankruptcy Code. Plan § 13.3(g).

In addition, Article III of the Plan provides for the payment of various Administrative Claims, including Claims for professional fees, which are subject to Bankruptcy Court approval and the standards of the Bankruptcy Code.  In addition, the Plan also provides that the Indenture Trustee's receipt of reasonable compensation and the reimbursement of actual and necessary expenses pursuant to the terms of the Indenture, which are payable by the Debtors pursuant to Article III of the Plan, shall be subject to a "reasonableness" standard, and upon any objection, review by the Court.  Plan § 7.2.

Pursuant to Section 5.15 of the Plan, the Court also held a hearing on April 20, 2010 to determine the reasonableness of the expenses paid pre-petition by the Debtors to the Claimants' Counsel pursuant to the Claimant Agreement.  By an opinion and order dated May 7, 2010 [Dkt. Nos. 599, 600], this Court determined that the Debtors' payment of these expenses was, and is, reasonable pursuant to § 1129(a)(4) of the Bankruptcy Code.  Accordingly, for the foregoing reasons, the Plan Proponents submit that the Plan complies with the requirements of § 1129(a)(4) of the Bankruptcy Code.

5.    Section 1129(a)(5):  The Plan Proponents Have Disclosed or Will Disclose All Necessary Information Regarding Directors, Officers and Insiders

Section 1129(a)(5) of the Bankruptcy Code requires that a plan disclose the identity of those individuals who will serve as directors and officers of the

25

reorganized debtor, the identity of any insider to be employed or retained by the reorganized debtor, and the nature of any compensation proposed to be paid to such insider. In addition, under § 1129(a)(5)(A)(ii) of the Bankruptcy Code, the appointment or continuation in office of any directors or officers must be consistent with the interests of creditors, equity security holders and public policy.

As noted *supra* in Part I.A.1 discussing § 1123(a)(7) of the Bankruptcy Code, pursuant to Section 5.4 of the Plan, the initial board of directors of Reorganized Congoleum shall consist of five directors. One of such directors shall be selected by the Bondholders' Committee, three of such directors shall be selected jointly by the Futures Representative and the Asbestos Claimants' Committee, and one of such directors shall be Reorganized Congoleum's chief executive officer. The identity of four out of five of the initial board members was disclosed in the Plan Supplement filed on May 5, 2010. The identity of the final director will be disclosed prior to confirmation. In addition, the identities of the officers of Reorganized Congoleum were also disclosed in the Plan Supplement filed on May 5, 2010. Accordingly, the Plan satisfies the requirements of § 1129(a)(5) of the Bankruptcy Code.

6.    Section 1129(a)(6):  The Plan Does Not Contain Rate Changes
       Subject to the Jurisdiction of Any Governmental Regulatory
       Commission

Section 1129(a)(6) of the Bankruptcy Code requires that "[a]ny

governmental regulatory commission with jurisdiction, after confirmation of the

plan, over the rates of the debtor has approved any rate change provided for in the

plan, or such rate change is expressly conditioned on such approval."  11 U.S.C. §

1129(a)(6).  Section 1129(a)(6) is not applicable to the Plan because the Debtors'

businesses do not involve the establishment of rates over which any regulatory

commission has jurisdiction or will have jurisdiction after Confirmation.

7.    Section 1129(a)(7):  The Plan Is in the Best Interests of the
       Debtors' Creditors and Interest Holders

Section 1129(a)(7) of the Bankruptcy Code requires that a plan must be in

the "best interests" of creditors and interest holders.  11 U.S.C. § 1129(a)(7).  The

"best interests" test requires that, with respect to each impaired class of claims or

interests, each member of such class either (i) has accepted the plan or (ii) will

receive or retain property of a value not less than what such holder would receive

or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

*See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S.

434, 440 (1999); *In re Oakwood Homes Corp.*, 449 F.3d 588, 597-98 (3d Cir.

2006).

27

As § 1129(a)(7) itself makes clear, the best interests test is applicable only to non-accepting holders of impaired claims and interests. *See* 11 U.S.C. § 1129(a)(7). The Court, therefore, must determine whether holders of Impaired Claims and Interests would fare better under the Plan, or under a Chapter 7 liquidation. In order to make this determination, the Court must estimate the dollar amount that would be generated from the liquidation of the Company's assets and properties in the context of a Chapter 7 liquidation case. The cash amount that would be available for satisfaction of the Allowed Claims and Allowed Interests of the Company would consist of the proceeds resulting from the disposition of the assets of the Company, augmented by the cash held by the Company at the time of the commencement of a Chapter 7 case. Such cash amount would be reduced by the costs and expenses of the liquidation and by any additional Administrative Claims and Priority Claims that would result from the termination of the Company's business and the use of a Chapter 7 proceeding for the purposes of liquidation.

The Debtors retained SSG Capital Advisors, LLC ("SSG") to prepare a liquidation analysis of the Company's assets as of January 31, 2010 (the "Liquidation Analysis"), Ex. 14. SSG determined that the net liquidation value of the Company would range between $55 million and $72 million. Ex. 14 at 1. It is important to note, however, that the Liquidation Analysis does not take into

28

account the effect of the Company's asbestos liability upon any liquidating asset sale.  Feist Decl. ¶ 79.  Thus, the liquidation value of Congoleum could be substantially less than the $55 to $72 million estimation because it could be difficult to sell the assets of a debtor that has present and future asbestos liabilities. *Id.*

Liquidation under Chapter 7 would trigger substantial additional claims against these estates that have not yet been asserted in these cases.  Feist Decl. ¶ 79.  For example, the following additional new claims would be asserted against the estates in a liquidation case (the "New Claims"):[6]

| Type of Claim | Value of Claim |
| --- | --- |
| Non-Current Pension Liability | $26,286,000 |
| Post-Retirement Liability | $11,117,000 |
| Other Liabilities | $12,268,000 |
| | |
| Total Additional New Claims | $49,671,000 |

Thus, approximately $49,671,000 in New Claims—claims that would otherwise be paid over time or waived in a reorganization—could be asserted against the estates in a liquidation.  Feist Decl. ¶ 80.

---

[6] A breakdown of the New Claims was given in Congoleum's last annual report. *See* Congoleum's 2009 Annual Report on Form 10-K for the year ending December 31, 2009 (the "2009 Annual Report"), Ex. 69.  In addition to the New Claims listed above, pursuant to the Intercompany Agreement, ABI has agreed to waive its claims against the estates, estimated at $1.8 million, which could be asserted in a Chapter 7 liquidation.

29

The New Claims would be in addition to the claims that already are being addressed under the Plan. Feist Decl. ¶ 80. For example, in a liquidation scenario, the Debtors will be in immediate default under the terms of the Indenture governing the Old Senior Notes. *Id.* ¶ 79. Under the terms of the Indenture, the Debtors are obligated to pay at least the entire $100 million principal amount which was due in 2008. *Id.* The claims of the Bondholders, together with the New Claims, alone will be well in excess of the $55 to $72 million in value that may be received in a Chapter 7 liquidation.

Moreover, these numbers do not take into account asbestos Claims and future Demands. Although estimates of the value of the Debtors' asbestos liability have varied widely, a recent indicator of the magnitude of Congoleum's present and future asbestos liability can be seen from the Ballot Certification. *See* Ballot Certification, Ex. 17. Approximately 80,000 holders of Asbestos Personal Injury Claims cast ballots to accept or reject the Plan or prior Joint Plan. *Id.* ¶ 22. The claimants selected a disease level with a corresponding dollar value as provided for in the TDP. The dollar amount accepting the Plan was approximately $1.7 billion, while approximately $59 million voted to reject the Plan. *Id.* The Debtors acknowledge that such dollar amounts were used for voting purposes only and the evidence in support of such claims and their disease level has not been scrutinized; however, it is indicative of the magnitude of claims that may be asserted against

Congoleum. Moreover, these amounts reflect only the *present claimants who actually voted* on the Plan. The Debtors are aware of approximately 65,000 other present claimants who requested solicitation packages, but did not vote on the Joint Plan. Feist Decl. ¶ 81. Thus, the dollar amount of the present asbestos claims (not including future claims) would likely be in excess of $1 billion.

While there are presently insurance settlements in the amount of $235 million that would be paid to the Plan Trust pursuant to this § 524(g) Plan, many of those settlements are contingent upon confirming a § 524(g) plan of reorganization that treats claimants equally, although some of those insurers have the option to contribute their respective settlement amounts to the estate in a liquidation scenario. In a Chapter 7 liquidation, it is likely that any recovery by asbestos creditors would be diminished in comparison to their recovery under the Plan. The asbestos creditors would lose the equity they would receive in Reorganized Congoleum and the ongoing value of such equity. There would undoubtedly be long term contested litigation on many fronts with respect to the distribution of available insurance proceeds including: (i) intra-creditor disputes as to whether certain asbestos creditors with pre-petition settlement agreement should receive priority over other asbestos creditors, (ii) the resumption of the Avoidance Actions and commencement of other avoidance actions by the potential Chapter 7 trustee to set aside the Pre-Petition Settlement Agreements, Claimant Agreement and other

31

agreements relating to the Pre-Packaged Plan, (iii) the continuation of the Coverage Action and refusal by insurers, based on certain decisions in the Coverage Action, to allow any insurance proceeds to be used to fund any claims settled in the Pre-Petition Settlement Agreements or Claimant Agreement, and (iv) the commencement anew of additional coverage litigation against certain of the Debtors' insurers who decline to settle. It could be years before the insurance pool is determined and distribution mechanisms agreed. The transaction costs of such multi-faceted litigation would diminish the likely recovery of asbestos creditors from such insurance assets.

In a liquidation, all liabilities—including the costs associated with administering the Chapter 7 estate—would have to be satisfied out of the same pool of finite resources. Given the massive amount of liabilities that would be asserted against the estates in a liquidation, it is abundantly clear that such pool of assets would not be sufficient to satisfy the present claims that will be asserted against the Debtors' estates. Creditors would not receive the benefit of Reorganized Congoleum's annual cash flow, and the Company would not be able to pay even post-petition claims in the ordinary course. Feist Decl. ¶ 82. Such claims would have to be satisfied out of the same pool of finite assets that would be used to pay administrative claims, asbestos claims and pre-petition non-asbestos

claims that would no longer be reduced to their compromised amounts set forth in the Plan.

In contrast, all creditors, including asbestos personal injury creditors, will receive a superior recovery under the Plan than in a Chapter 7 liquidation proceeding. Under the Plan, the Debtors will be in a position to use their cash flow to pay their post-petition and some pre-petition unsecured claims in the ordinary course, such as (i) employee claims; (ii) unfunded pension liabilities; (iii) post-retirement benefit liabilities; (iv) workers compensation claims; (v) environmental clean-up costs; (vi) contract claims; (vii) lease obligations; and (viii) other indebtedness such as trade claims. Feist Decl. ¶ 83. Under the Plan, the Bondholders have agreed to reduce their claims under the Senior Notes and will receive an approximately 33% recovery, plus the value of their 49.9% equity ownership of Reorganized Congoleum, in full satisfaction of the Senior Note Claims. *See* Plan §§ 4.1(d), 1.2. Under the Plan, all holders of Asbestos Personal Injury Claims—including future claimants—will submit their claims to the Plan Trust, which will be funded by, among other things, 50.1% of Reorganized Congoleum. The Plan Trust will determine the allowed value of such claims based on the criteria set forth in the TDP. All holders of Asbestos Personal Injury Claims will then receive a certain Payment Percentage of their allowed claim, which Payment Percentage will be established by the Plan Trustee in accordance with the

33

TDP.  Accordingly, at present it cannot be determined what percentage recovery holders of Asbestos Personal Injury Claims will receive under the Plan, although others have suggested that the holders of Asbestos Personal Injury Claims will receive no more than 10-15% on account of their claims.  While members of Class 10 (Congoleum Interests) will receive no recovery under the Plan, the Plan Proponents submit that such interest holders would also receive no recovery in the event of the Debtors' liquidation pursuant to Chapter 7.

It is apparent that all creditors will fare far better under the Plan than in a Chapter 7 liquidation.  The Plan Proponents submit that the members of each Class of Impaired Claims will receive more under the Plan than they would receive if the Debtors were liquidated under Chapter 7.  Accordingly, the Plan satisfies the best interests test with respect to every dissenting member of every impaired class and therefore satisfies the requirements of § 1129(a)(7) of the Bankruptcy Code.

        8.      Section 1129(a)(8):  The Plan Is Supported by Impaired Classes Entitled To Vote

As discussed previously in Section B, a plan can be confirmed if each class votes to accept the plan or is not impaired under the plan.  *See* § 1129(a)(8).  As discussed more fully below in Part I.B.1, to the extent any class of claims or interests rejects, or is deemed to reject the plan, confirmation is available pursuant to the "cram down" provisions of § 1129(b).  A class of claims accepts a plan if the holders of at least two-thirds in dollar amount and more than one-half in number

vote to accept the plan, counting only those creditors that actually vote.  11 U.S.C.

§ 1126(c).  A class of interests accepts a plan if holders of at least two-thirds of the

amount of interests vote to accept the plan, counting only those interest holders

that actually vote.  11 U.S.C. § 1126(d).  In addition, with respect to Class 7

(Asbestos Personal Injury Claims), § 524(g) of the Bankruptcy Code provides that,

of the claimants who vote, at least 75% must vote to accept the Plan.

Class 1 (Priority Claims), Class 2 (Lender Secured Claims), Class 3 (Other

Secured Claims), Class 5 (Workers' Compensation Claims) and Class 11

(Subsidiary Interests) are unimpaired and are conclusively deemed to have

accepted the Plan pursuant to § 1126(f) of the Bankruptcy Code.  Accordingly, as

to such Unimpaired and accepting Classes, the requirements of § 1129(a)(8) of the

Bankruptcy Code have been satisfied.

Class 4 (Senior Note Claims), Class 6 (ABI Claims), Class 7 (Asbestos

Personal Injury Claims), and Class 8 (Asbestos Property Damage Claims) are

impaired and were entitled to vote to accept or reject the Plan.  As set forth in the

chart below, all of these Classes voted to accept the Plan by more than one-half in

number and two-thirds in dollar amount pursuant to § 1126(c) of the Bankruptcy

Code.  In addition, Class 7 (Asbestos Personal Injury Claims) voted to accept the

Plan in excess of 75% as required by § 524(g).  Accordingly, with respect to Class

4 (Senior Note Claims), Class 6 (ABI Claims), Class 7 (Asbestos Personal Injury

Claims), and Class 8 (Asbestos Property Damage Claims), the voting requirements of § 1129(a)(8) of the Bankruptcy Code have been satisfied.

The following summarizes the results of such tabulation:

| VOTING CLASS | Number of Holders Accepting | % of Holders Accepting | Dollar ($) Amount Accepting | % of $ Amount Accepting |
|---|---|---|---|---|
| Class 4 (Senior Note Claims) | 33 | 100% | $96,150,000 | 100% |
| Class 6 (ABI Claims) | 1 | 100% | $1,000,000 | 100% |
| Class 7 (Asbestos Personal Injury Claims) | 77,116 | 95.01% | $1,681,896,600 | 96.6% |
| Class 8 (Asbestos Property Damage Claims) | 12 | 92.31% | $123,932.77 | 90.52% |

See Ballot Certification, Ex. 17 ¶¶ 22-23.

Class 9 (General Unsecured Claims) is also impaired and was entitled to vote to accept or reject the Plan. Only two ballots were received from Class 9 Claimants. Ballot Certification, Ex. 17 ¶ 24. While both ballots were cast in favor of the Plan, they could not be counted under the Voting Procedures Order because the claimants were required to file a motion for temporary allowance of his or claims and did not do so. See id. A class that does not cast any votes on a plan of

36

reorganization is deemed to accept the plan for the purposes of § 1129(a)(8). *See*

*In re Ruti-Sweetwater, Inc.*, 836 F.2d at 1266 (deeming non-voting, non-objecting

class to accept plan); *In re Adelphia Commc'ns*, 368 B.R. at 261-62 (determining

that non-voting class would be deemed an accepting class because "creditor

democracy" should not be "frozen as a consequence of the disinterest of others");

*In re Szostek*, 886 F.2d 1405, 1413 (3d Cir. 1989) (adopting *Ruti-Sweetwater*'s

treatment of non-voting classes as accepting class). In this case, no General

Unsecured Claimant has objected to confirmation or voted to reject the Plan.

Accordingly, the Plan Proponents submit that § 1129(a)(8) of the Bankruptcy Code

has been satisfied with respect to Class 9 (General Unsecured Claims).

Finally, Class 10 (Congoleum Interests) is not receiving or retaining any

property under the Plan. As a result, Class 10 is deemed to have rejected the Plan

pursuant to § 1126(g) of the Bankruptcy Code. As discussed *infra* in Part I.B, the

Plan may be "crammed down" on the Class of Interests.

> 9.    Section 1129(a)(9):  The Plan Provides for Payment in Full of
>        All Allowed Priority Claims

Section 1129(a)(9) of the Bankruptcy Code requires that certain priority

claims be paid in full on the effective date of a plan, unless parties agree to

different treatment of their claims.[7]  In particular, pursuant to § 1129(a)(9)(A), holders of claims of a kind specified in §§ 507(a)(1) and (a)(2)—generally administrative claims allowed under § 503(b)—must receive cash equal to the allowed amount of such claims on the effective date of the plan, unless such holders agree to different treatment.  *See* 11 U.S.C. § 1129(a)(9)(A).

Section 1129(a)(9)(B) requires that each holder of a claim of a kind specified in §§ 507(a)(3), (a)(4), (a)(5), (a)(6) and (a)(7)—generally wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments under the Plan of a value equal to the allowed amount of such claim.  *See* 11 U.S.C. § 1129(a)(9)(B)(i).  Finally, § 1129(a)(9)(C) provides that the holder of a claim of a kind specified in § 507(a)(8)—i.e., priority tax claims—must receive deferred cash payments over a period not to exceed six years after the date of assessment of the claim, the present value of which equals the allowed amount of the claim.  *See* 11 U.S.C. § 1129(a)(9)(C).

The Plan satisfies these requirements.  Section 3.2 of the Plan provides that each holder of an Allowed Administrative Claim shall receive cash equal to the

---

[7]  The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 enacted certain amendments to the Bankruptcy Code including, § 1129(a)(9).  *See* Pub. L. No. 109-008, 119 Stat. 23 (2005).  The majority of these amendments, including the amendments to § 1129(a)(9), only apply to cases filed after October 17, 2005, and therefore do not apply to these Chapter 11 cases.  For the convenience of this Court, Ex. 35 provides a the text of §§ 1129(a)(9), 503 and 507 that were in effect before the 2005 amendments were made and that are applicable to this case.

unpaid portion of such Allowed Administrative Claim upon the Distribution Date unless such holder agrees to a lesser amount. In addition, pursuant to Section 3.3 of the Plan, and in accordance with § 1129(a)(9)(C) of the Bankruptcy Code, all Allowed Priority Tax Claims shall be paid (i) cash equal to the unpaid portion of such claim upon the Distribution Date; (ii) such other amount as to which the applicable Debtor and such holder agree in writing; or (iii) deferred cash payments having a value equal to such claim over a period not exceeding six years after the date of the assessment of such claim.

As also discussed *infra* in Part I.A.11, to assist Reorganized Congoleum's emergence from Chapter 11, the Debtors have proposed a payment plan with counsel to the Debtors, the Asbestos Claimants' Committee, the Bondholders' Committee and the Futures Representative pursuant to which certain attorneys' fees and expenses would be paid pursuant to a promissory note. If the parties agree to such proposal, the consensual resolution of the parties' administrative claims would be consistent with § 1129(a)(9), which specifically permits a creditor to agree to different treatment. *See* 11 U.S.C. § 1129(a)(9). Accordingly, the Plan satisfies § 1129(a)(9) of the Bankruptcy Code.

> 10. **Section 1129(a)(10): At Least One Class of Impaired Claims Has Accepted the Plan**

Section 1129(a)(10) of the Bankruptcy Code requires that at least one Impaired Class of Claims must accept the Plan by the requisite vote. As shown in

39

the Ballot Certification, each Impaired Class of creditors entitled to vote has voted in favor of the Plan. Accordingly, the Plan satisfies § 1129(a)(10) of the Bankruptcy Code.

11.    Section 1129(a)(11):  The Plan Is Feasible

Section 1129(a)(11) of the Bankruptcy Code provides that a plan of reorganization may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). The Debtors currently are preparing updated cash flow projections that will be proffered in connection with confirmation. In addition, the Debtors have retained SSG to perform a feasibility analysis when the projections have been completed. The projections and feasibility analysis will be filed prior to confirmation. As the evidence proffered in connection with the Confirmation Hearing will demonstrate, confirmation of the Plan is not likely to be followed by the liquidation of, or need for further financial reorganization of, the Debtors, Reorganized Congoleum or any successor to Reorganized Congoleum under the Plan.

12.    Section 1129(a)(12):  All Statutory Fees Have Been or Will Be Paid

Section 1129(a)(12) of the Bankruptcy Code requires payment of "[a]ll fees payable under § 1930 of title 28, as determined by the court at the hearing on

40

confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan." 11 U.S.C. § 1129(a)(12). Section 13.4 of the Plan provides that all fees payable pursuant 28 U.S.C. § 1930 "shall be paid by the Debtors on or before the Effective Date and thereafter by Reorganized Congoleum as due until the Reorganization Cases are closed, converted or dismissed." Accordingly, the Plan satisfies § 1129(a)(12) of the Bankruptcy Code.

> 13. Section 1129(a)(13): The Plan Adequately and Properly Treats Retiree Benefits

Section 1129(a)(13) of the Bankruptcy Code requires that a plan provide for "the continuation after its effective date of payment of all retiree benefits." 11 U.S.C. § 1129(a)(13). Section 8.5 of the Plan provides that Reorganized Congoleum shall continue all retiree benefits after the Effective Date for the duration of the period that the Debtors originally obligated themselves to provide such benefits. Accordingly, the Plan satisfies § 1129(a)(13) of the Bankruptcy Code.

## B. The Plan Meets Each Requirement for Confirmation Under §§ 1129(b) and (d) of the Bankruptcy Code

> 1. Section 1129(b): The Plan Satisfies the "Cram Down" Requirements of the Bankruptcy Code

Class 10 (Congoleum Interests) consists of all the equity interests in Congoleum outstanding immediately prior to the Effective Date, including shares of common stock and any options, warrants, or other rights to acquire equity

ownership interests in Congoleum. *See* Plan § 1.2 (definition of Congoleum Interests). Class 10 is receiving no recovery pursuant to the Plan. *See* Plan § 4.1(j). As a result, Class 10 is deemed to have rejected the Plan. *See* 11 U.S.C. § 1126(g). Under § 1129(b), even if an impaired class is deemed to reject the plan, or if an impaired class votes to reject a plan, the court nevertheless may "cram down" the plan over the dissenting vote of an impaired class as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes. *See* 11 U.S.C. § 1129(b).

It is commonplace in Chapter 11 cases that equity receives no recovery under a plan. The only circumstance in which the shareholders of a debtor would be entitled to any distribution under a Chapter 11 plan is if all unsecured creditors receive a full recovery on account of their pre-petition claims. *See generally* 11 U.S.C. § 1129(b)(2)(B); *see also In re Armstrong World Indus., Inc.*, 432 F.3d 507, 512 (3d Cir. 2005) (creditors must be paid in full before equity interests can retain any interests for any purpose). In the present case, Congoleum's unsecured claims—i.e., Class 4 (Senior Note Claims) and Class 7 (Asbestos Personal Injury Claims—are receiving far less than a full recovery. As set forth below, the Court may confirm the Plan because it does not "discriminate unfairly" and is "fair and equitable" with respect to Class 10 (Congoleum Interests). *See* 11 U.S.C. § 1129(b).

42

a.    *The Plan Does Not Discriminate Unfairly Against the Class 10 Congoleum Interests*

The unfair discrimination standard of § 1129(b) ensures that a plan does not unfairly discriminate against a dissenting class with respect to the value it will receive under a plan when compared to the value given to all other similarly situated classes.  *In re Barney & Carey Co.*, 170 B.R. 17, 25 (Bankr. D. Mass 1994).  Section 1129(b)(1) does not prohibit discrimination between classes. Rather, it prohibits discrimination that is unfair.  *See In re 11,111, Inc.*, 117 B.R. 471, 478 (Bankr. D. Minn. 1990).  The Bankruptcy Code does not provide a definition of "unfair discrimination," leaving courts to determine what might be "unfair" on a case-by-case basis.  *See In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established"), *rev'd on other grounds*, 526 U.S. 434 (1999).  The weight of judicial authority, however, holds that a plan discriminates unfairly in violation of § 1129(b) only if similar claims are treated differently without a reasonable basis for the disparate treatment.  *See Greate Bay Hotel & Casino*, 251 B.R. at 228 ("The hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination.").

43

In the present case, the members of Class 10 (Congoleum Interests) are dissimilar to the members of every other Class under the Plan. No other Class holds Congoleum's equity interests. Pursuant to the Plan, the Congoleum Interests shall be cancelled and the holders of the Congoleum Interests shall retain and receive nothing on account of such Interests. As explained below, if unsecured claims are impaired under a plan, the Bankruptcy Code requires that *all* equity interests must be canceled. *See* 11 U.S.C. § 1129(b)(2)(ii); *see also In re Armstrong World Indus.*, 432 F.3d at 512 (referred to as the "absolute priority rule," the rule requires that "creditors . . . be paid before the stockholders could retain [equity interests] for any purpose whatever."). In the present case, the Plan's treatment of Class 10 is necessary because all of the other unsecured claims in the case are impaired and are receiving a recovery of less than 100%. Accordingly, the Plan and does not unfairly discriminate within the meaning of § 1129(b)(1) of the Bankruptcy Code.

> b. *The Plan is Fair and Equitable with Respect to the Class 10 Congoleum Interests*

Pursuant to § 1129(b)(2)(ii) of the Bankruptcy Code, a plan is "fair and equitable" with respect to dissenting equity interest holders if "the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan." 11 U.S.C. § 1129(b)(2)(ii); *In re Armstrong World Indus.*, 432 F.3d at 513 ("The plain language of the statute makes it clear that a

44

plan cannot give property to junior claimants over the objection of a more senior class that is impaired.").  In the instant case, there is no class junior to Class 10 (Congoleum Interests).  Accordingly, the Plan is fair and equitable within the meaning of § 1129(b)(2) of the Bankruptcy Code with respect to the Class 10 Congoleum Interests.

        2.     Section 1129(d):  The Plan's Purpose Is Consistent with the Bankruptcy Code

Section 1129(d) of the Bankruptcy Code provides that a court may not confirm a plan if the principal purpose of the plan is to avoid taxes or the application of Section 5 of the Securities Act of 1933.  The Plan satisfies § 1129(d) because its principal purpose is not to avoid taxes or the application of Section 5 of the Securities Act of 1933.

## II. MODIFICATIONS TO THE PLAN ARE IMMATERIAL AND DO NOT REQUIRE RESOLICITATION OF THE PLAN

The Plan Proponents hereby request a determination from the Court that the modifications to the Plan (the "Modifications") that were filed with the Court on May 5, 2010 as part of the Plan Supplement do not require the resolicitation of any holders of Claims or Interests.  Section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019 allow the proponent of a plan to modify a plan at any time before confirmation as long as the plan as modified satisfies all requirements concerning plan contents, the classification of claims an interests and disclosure

requirements. 11 U.S.C. §§ 1127(a), (c). Once modified, "the plan as modified

becomes the plan." 11 U.S.C. § 1127(a). Section 1127(d) further provides that

"any holder of a claim or interest that has accepted or rejected a plan is deemed to

have accepted or rejected, as the case may be, such plan as modified, unless, within

the time fixed by the court, such holder changes such holder's previous acceptance

or rejection." 11. U.S.C. § 1127(d).

Bankruptcy Rule 3019 explains when it is necessary to resolicit parties who

have previously voted on the plan:

> In a . . . chapter 11 case, after a plan has been accepted and before its
> confirmation, the proponent may file a modification of the plan. If the
> court finds after hearing on notice . . . that the proposed modification
> does not adversely change the treatment of the claim of any creditor
> . . . who has not accepted in writing the modification, it shall be
> deemed accepted by all creditors . . . who have previously accepted
> the plan.

Fed. R. Bankr. P. 3019; *see also In re Am. Solar King Corp.*, 90 B.R. 808. 825

(Bankr. W.D. Tex. 1988). Courts interpreting Bankruptcy Rule 3019 have held

that the resolicitation of acceptances on a plan of reorganization is not required

with respect to a modified plan unless the modifications "materially and adversely

affect" the treatment of claims or equity interests. *See*, *e.g.*, *In re Celotex Corp.*,

204 B.R. 586, 608-09 (Bankr. M.D. Fla. 1996); *In re TransWorld Airlines, Inc.*,

185 B.R. 302, 322 (Bankr. E.D. Mo. 1995); *In re Mount Vernon Plaza Cmty.*

*Urban Redev. Corp. I*, 79 B.R. 305, 306 (Bankr. S.D. Ohio 1987).

46

As is evidenced by the Modifications themselves, which were set forth in detail in the Plan Supplement filed on May 5, 2010, such Modifications are technical changes or clarifications that have been made by the Plan Proponents in their continuing review of the Plan or in response to informal requests for clarification made by parties-in-interest. The Modifications do not materially or adversely affect or change the treatment of any Claim against or Interest in any Debtor.

Moreover, the Modifications were filed seven days before the deadline to file objections to the Plan, thereby providing adequate notice and opportunity to object. No party has objected to the Modifications. The impaired Classes entitled to vote on the Plan are not adversely affected by the Modifications in any way, and no other Claim or Interest is impaired as a result of the Modifications. Accordingly, the Plan Proponents request that the Court, pursuant to § 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, determine that the Modifications do not require resolicitation of previously-cast votes to accept or reject the Plan.

## III. THE PLAN SATISFIES THE REQUIREMENTS FOR ENTRY OF THE ASBESTOS CHANNELING INJUNCTION UNDER § 524(g) OF THE BANKRUPTCY CODE

### A. The Plan Trust Satisfies the Structure and Funding Requirements of § 524(g)(2)(B)(i) of the Bankruptcy Code

Section 524(g) of the Bankruptcy Code provides a court with the authority to enjoin entities from taking legal action to recover, either directly or indirectly,

47

from a debtor and certain non-debtor parties, any asbestos claim or demand, if the plan of reorganization establishes a trust to resolve and pay such claims. 11 U.S.C. § 524(g)(1). This provision was enacted by Congress in 1994 and is designed to facilitate the granting of the broad-ranging injunctive relief required to resolve a company's significant asbestos-related liabilities in a fair, comprehensive, and global manner. H.R. REP. NO. 103-835, at 40-41 (1994). To receive such an injunction, the trust to which such claims and demands are channeled must meet the structure and funding requirements of § 524(g)(2)(B)(i) of the Bankruptcy Code. For the reasons set forth below, the Plan and the Plan Trust satisfy those requirements.

1.   <u>The Plan Trust Will Assume the Liabilities of the Debtors</u>

*First*, § 524(g)(2)(B)(i)(I) requires that an asbestos trust assume the asbestos liabilities of a debtor that, as of the Petition Date, has been named as a defendant in actions to recover damages for asbestos-related claims. 11 U.S.C. § 524(g)(2)(B)(i)(I). This requirement is satisfied because the Plan Trust will, by the terms of the Plan Documents, assume all of the Debtors' liabilities for all Asbestos Personal Injury Claims that have been asserted against the Debtors. *See* Plan § 5.1(e); *see also* Exhibit E to Plan (Plan Trust Agreement), Ex. 5. In addition, as of the Petition Date, over 91,000 unresolved Asbestos Personal Injury Claims were pending against Congoleum. *See* Feist Decl. ¶ 7.

48

### 2. The Plan Trust Will Be Funded in Part by Securities of the Debtors

*Second*, § 524(g)(2)(B)(i)(II) requires that an asbestos-claims trust "be funded in whole or in part by the securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends." 11 U.S.C. § 524(g)(2)(B)(i)(II). In accordance with this subsection, the Plan provides that the Plan Trust is to be funded by the Plan Trust Assets, which include, among other things (and subject to the provisions of the Plan): (i) the Plan Trust Common Stock to be distributed under the Plan, which comprises 50.1% of the New Common Stock of Reorganized Congoleum; (ii) the Asbestos Insurance Rights; (iii) all rights of the Debtors under, and all proceeds of, the Asbestos Insurance Settlement Agreements; (iv) the proceeds of the Asbestos In-Place Insurance Coverage; (v) the proceeds of the Asbestos Insurance Actions; (vi) the proceeds of the Asbestos Insurance Action Recoveries; (vii) the rights granted to the Plan Trust pursuant to the Insurance Assignment Agreement; and (viii) the Asbestos Property Damage Insurance Rights. *See* Plan § 1.2 (definition of Plan Trust Assets). Because the Plan Trust is to be funded with a majority of the common stock of Reorganized Congoleum and will have all rights to receive dividends or other distributions on account of such stock ownership, the requirements of § 524(g)(2)(B)(i)(II) have been satisfied.

49

### 3. The Plan Trust Will Own a Majority of the Voting Shares of Reorganized Congoleum

*Third*, § 524(g)(2)(B)(i)(III) requires that the asbestos trust own (or, by the exercise of rights granted under the Plan, be entitled to own if specified contingencies occur) a majority of the voting shares of the reorganized debtor, its parent or its subsidiary. 11 U.S.C. § 524(g)(2)(B)(i)(III). As set forth in Section 5.1(b) of the Plan, on the Effective Date or as soon thereafter as possible, Reorganized Congoleum shall issue the Plan Trust Common Stock to the Plan Trust in accordance with the Plan. Plan § 5.1. The Plan Trust Common Stock will consist of 50.1% of the New Common Stock of Reorganized Congoleum and will constitute the majority of the voting shares of Reorganized Congoleum. *See* Exhibit L to Plan (Stockholders' Agreement), Ex. 12 at § 5.3. Thus, the distribution of the Plan Trust Common Stock to the Plan Trust satisfies the requirements of § 524(g)(2)(B)(i)(III) because the Plan Trust will own a majority of the voting shares of Reorganized Congoleum.

### 4. The Plan Trust Will Use Its Assets To Pay Claims and Demands

*Fourth*, § 524(g)(2)(B)(i)(IV) requires an asbestos trust to "use its assets or income to pay claims and demands." 11 U.S.C. § 524(g)(2)(B)(i)(IV). This requirement is satisfied because the Plan provides that the Plan Trust will assume all liability and responsibility for all Asbestos Personal Injury Claims and will use

its assets to satisfy such claims in accordance with the Plan, Plan Trust Agreement, and the TDP. *See* Exhibit E to Plan (Plan Trust Agreement), Ex. 5 §§ 2.2, 2.3; *see also* Plan § 5.1(e). Accordingly, based on the foregoing provisions of the Plan and the other Plan Documents, the Plant Trust satisfies the structure and funding requirements for an asbestos trust set forth in § 524(g)(2)(B)(i) of the Bankruptcy Code.

**B.      The Debtors' History, the Nature of Asbestos-Related Litigation and the Facts of These Chapter 11 Cases Support the Findings of Fact Required for the Court To Issue the Asbestos Channeling Injunction Pursuant to § 524(g) of the Bankruptcy Code**

Section 524(g)(2)(B)(ii) of the Bankruptcy Code requires that the court make certain factual findings to support the issuance of a channeling injunction under § 524(g)(1)(A). As set forth below, the Debtors' history, the nature of asbestos-related litigation and the facts of these Chapter 11 cases all support the findings required for the issuance of the Asbestos Channeling Injunction pursuant to § 524(g)(1)(A) of the Bankruptcy Code.

**1.      Section 524(g)(2)(B)(ii)(II): The Debtors Are Likely To Be Subject to Substantial Future Demands for Payment**

To support entry of a channeling injunction under § 524(g)(1)(A), a court must find that the Debtors will be "subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the injunction." 11 U.S.C. § 524(g)(2)(B)(ii)(I). As

set forth in the Feist Declaration, the Debtors' history as a defendant in asbestos-

related litigation supports this finding. In response to the bankruptcy filings of

many previously targeted asbestos defendants in the late 1990s, the asbestos

plaintiffs' bar began targeting companies that were historically on the periphery of

asbestos litigation.[8] Feist Decl. ¶ 5. As of December 31, 1999, there were

approximately 6,000 known claimants with Asbestos Personal Injury Claims

pending against Congoleum. The number of known claimants with pending

asbestos personal injury claims against the Company doubled from 2000 to 2001,

and doubled again from 2001 to 2002. Feist Decl. ¶ 7. By June 2003, Congoleum

faced approximately 91,000 known asbestos personal injury claims and by

February 2004, that number had grown to approximately 103,000. *Id.* In the years

since Congoleum filed for bankruptcy, the number of known claimants with

asbestos personal injury claims against Congoleum has increased significantly.

Feist Decl. ¶ 9. As a result of the solicitation process for prior plans and this Plan,

---

[8]   In 2000, Owens Corning, E.J. Bartells, Burns & Roe Enterprises, Babcock &
      Wilcox and Armstrong World Industries declared bankruptcy; in 2001
      Washington Group International, W.R. Grace, U.S. Mineral, U.S. Gypsum, Swan
      Transportation, Skinner Engine, G-1 Holdings, Federal Mogul, Eastco Industrial
      Safety Corp. and Bethlehem Steel declared bankruptcy; in 2002 Shook &
      Fletcher, Porter Hayden, Plibrico, North American Refractories, MacArthur
      Companies, Kaiser Aluminum and Chemical, J.T. Thorpe, ARTRA, ACandS, A-
      Best and A.P. Green declared bankruptcy; and in 2003 Muralo Co. and
      Combustion Engineering declared bankruptcy.

500522999v5

the database maintained by the Voting Agent contains approximately 200,000 unique social security numbers for asbestos claimants.  *Id.*

Based on the long latency period of asbestos-related disease and the substantial number of unresolved asbestos personal injury claims pending as of the Petition Date, Congoleum undoubtedly will be subject to substantial future demands for payment arising out of the same conduct or events that gave rise to the Asbestos Personal Injury Claims if reorganization pursuant to § 524(g) were unavailable.  *See also* Steven J. Parent, *Judicial Creativity in Dealing with Mass Torts in Bankruptcy*, 13 GEORGE MASON U. L. REV. 381, 382 (1990) ("Because of the countless number of individuals exposed to asbestos, the long latency period, and the variety of asbestos-related diseases, the demands of mature asbestos tort litigation challenge the traditional notion that civil litigation focuses on individual rights and victim compensation.").  Accordingly, the Plan's Asbestos Channeling Injunction satisfies the requirements of § 524(g)(2)(B)(ii)(I) of the Bankruptcy Code.

> 2.   Section 524(g)(2)(B)(ii)(II):  The Actual Amounts, Numbers, and Timing of Future Demands Cannot be Determined

To support entry of a channeling injunction, the court must also find that the actual amounts, numbers, and timing of such future demands cannot be determined.  11 U.S.C. § 524(g)(2)(B)(ii)(II).  The long latency period of asbestos-related diseases and the substantial number of asbestos personal injury claims that

53

had been asserted in the past and that remained unresolved on the Petition Date makes clear that the actual number and amount of future Demands in respect of alleged asbestos-related personal injuries to which the Debtors would be subject, and the timing of the assertion of such Demands, cannot be determined definitively by the Debtors or their advisors.  Feist Decl. ¶ 81.  *See also* Stephen J. Carroll, *et al.*, *Asbestos Litigation*, RAND Institute for Civil Justice (2005), Ex. 70 at xix ("[E]stimating the numbers of asbestos-related deaths and diseases is complicated by the long latency periods associated with asbestos injuries.  Typically, 20 to 40 years elapse between the first exposure to asbestos and disease manifestation.").  Accordingly, there is support for the finding required by § 524(g)(2)(B)(ii)(II) of the Bankruptcy Code.

> 3.  Section 524(g)(2)(B)(ii)(III):  The Pursuit of Future Demands Outside the Procedures Prescribed by the Plan Is Likely To Threaten the Plan's Purpose To Deal Equitably with Claims and Future Demands

Section 524(g)(2)(B)(ii)(III) of the Bankruptcy Code requires the Bankruptcy Court to find that "pursuit of such demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose of dealing equitably with claims, including future demands."  11 U.S.C. § 524(g)(2)(B)(ii)(III).  In the present case, if the holders of Asbestos Personal Injury Claims and Demands were to pursue such claims and demands outside the procedures set forth in the Plan, the Debtors would be forced back into the tort system as unusually prominent

54

500522999v5

defendants as a result of the Reorganization Cases. The Debtors could reasonably expect large numbers of lawsuits to be asserted against them in short order, given that the automatic stay has prevented the assertion of such claims against any of the Debtors for nearly six years. Those lawsuits would present the Debtors with an enormous burden immediately upon their departure from Chapter 11.

Moreover, given the inherent nature of mass tort litigation, each lawsuit against a Debtor would present the potential for a massive adverse judgment that could, by itself or in tandem with other judgments, severely impact the Debtors' businesses and the value of the stock contributed to the Plan Trust, including causing defaults under whatever financing the Debtors were able to obtain without addressing their asbestos liabilities. It is precisely to address this risk that the Debtors commenced the Reorganization Cases in the first place, and it is precisely to ensure that such risk is resolved in these cases that issuance of the § 524(g) injunction is a necessary condition to both confirmation and effectiveness of the Plan. Put simply, absent the iron-clad protection afforded by a § 524(g) injunction, the Debtors cannot complete a successful reorganization, and would almost certainly face further insolvency proceedings in the near term, with attendant costs and inefficiencies that can only harm creditors of the Debtors, including holders of Asbestos Personal Injury Claims and Demands.

500522999v5

### C. The Plan Trust Satisfies the Disclosure, Claimant-Support and Equality of Treatment Requirements of § 524(g)(2)(B)(ii) of the Bankruptcy Code

In addition to the requirements concerning the debtor's history with respect to asbestos-related claims and evidence of future demands, § 524(g)(2)(B)(ii) of the Bankruptcy Code requires that the asbestos trust satisfy certain disclosure, claimant-support and equality of treatment requirements. As discussed below, the Plan satisfies the Bankruptcy Code's requirements for the entry of the Asbestos Channeling Injunction pursuant to § 524(g)(1)(A) of the Bankruptcy Code.

1. Section 524(g)(2)(B)(ii)(IV)(aa): The Terms of the § 524(g) Injunction Are Set Out in the Plan and Disclosure Statement

The Bankruptcy Code requires a court to find that the terms of the proposed asbestos channeling injunction, including provisions barring actions against third parties, are set out in the Plan and in any disclosure statement supporting the plan. 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(aa). Section 11.6 of the Plan and Section 6.11(g) of the Disclosure Statement plainly set out the provisions of the proposed Asbestos Channeling Injunction. The description of the Asbestos Channeling Injunction either appears in bold letters or is underlined in a manner designed to bring attention to the provision. Accordingly, the Plan and Disclosure Statement satisfy the disclosure requirements of § 524(g)(2)(B)(ii)(IV)(aa) of the Bankruptcy Code.

500522999v5

2.     Section 524(g)(2)(B)(ii)(IV)(bb):  A Separate Class of Claimants Whose Claims Are To Be Addressed by the Plan Trust Has Been Established and at Least 75% of Such Claimants Have Voted in Favor of the Plan

The Bankruptcy Code requires that the Plan establish a separate class or classes of claimants whose claims are to be addressed by the asbestos trust, and that at least 75% of those voting in each such class vote in favor of the Plan.  11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).  The Plan classified together all holders of Asbestos Personal Injury Claims (Class 7), and classified together all holders of Asbestos Property Damage Claims (Class 8).  As set forth in the Ballot Certification, over 95% of those voting in Class 7 voted to accept the Plan, and over 92% of those voting in Class 8 voted to accept the Plan.  *See* Ballot Certification, Ex. 17 ¶ 23.  Accordingly, the Plan satisfies the claimant-support requirements of § 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code.

3.     The Plan Complies with § 524(g)(2)(B)(ii)(V) and Operates Through Mechanisms To Ensure that Present Claims and Future Demands Are Treated in Substantially the Same Manner

Pursuant to § 524(g)(2)(B)(ii)(V) of the Bankruptcy Code, in order to enter an asbestos channeling injunction, a court is required to find that:

the trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands, or other comparable mechanisms, that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner.

57

11 U.S.C. § 524(g)(2)(B)(ii)(V).

The operation and payment mechanisms of the Plan Trust have been carefully crafted to permit the Plan Trust to compensate fairly holders of Asbestos Personal Injury Claims while at the same time preserving funds for future Demands.  As set forth in Section 4.1(g) of the Plan, the TDP (Exhibit G to the Plan) (Ex. 7), and the Plan Trust Agreement (Exhibit E to the Plan) (Ex. 5), all Asbestos Personal Injury Claims, regardless of whether the holders of such Claims are Pre-Petition Settled Claimants, shall be determined and paid in the same manner pursuant to the terms of the Plan Trust Agreement and the TDP.  The TDP contains mechanisms that provide reasonable assurance that the Plan Trust will value, and be in a financial position to pay, present Claims in substantially the same manner as future Demands that involve similar Claims.

For example, the TDP establishes a schedule of eight asbestos-related diseases, along with specific liquidated values, anticipated average values and caps on liquidated values, to further the Plan Trust's goal of "paying all claimants over time as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system."  *See* Exhibit G to Plan (TDP), Ex. 7 § 2.1.  Payments to holders of Asbestos Personal Injury Claims for all but one of the eight asbestos-related diseases will be based on the liquidated value of such claim times the Payment Percentage then in effect.  *See*

58

TDP § 5.3.[9]  The Payment Percentage will be established upon the creation of the Plan Trust and will be reevaluated periodically based on (i) current estimates of the number, types and values of Asbestos Personal Injury Claims; (ii) the value of the assets then-available to the Plan Trust for payment on account of Asbestos Personal Injury Claims; (iii) all anticipated administrative and legal expenses; and (iv) any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of full value to all holders of Asbestos Personal Injury Claims.  *See* Exhibit G to Plan (TDP), Ex. 7 § 5.2.  If the Plan Trustee later determines that the Payment Percentage should be adjusted upward, the Plan Trust shall make supplemental payments to claimants who previously liquidated their claims against the Plan Trust and received payments based on a lower Payment Percentage.  *See id.*

The TDP in this case is substantially similar to those that have been proposed, and approved, in numerous other asbestos bankruptcies in this Circuit and elsewhere.  *See*, *e.g.*, *In re G-1 Holdings, Inc.*, No. 01-30135 (Bankr. D.N.J. Oct. 6, 2009) [Dkt. No. 9648], Ex. 73 (the "G-1 TDP"); *In re Owens Corning*, No. 00-03837 (Bankr. D. Del. Sept. 26, 2006) [Dkt. No. 19366], Ex. 81 (the "Owens

---

[9]  The only disease category that will not be subject to the Payment Percentage is Disease Level I—Cash Discount.  Claimants who satisfy the minimum medical and exposure criteria of Disease Level I will be paid a one time cash payment of $250.  This will save the Plan Trust the added time and expense attendant with ongoing analysis and management of the lowest level of claims.

Corning TDP"); *In re Armstrong World Indus., Inc.*, No. 00-4471 (Bankr. D. Del. Aug. 18, 2006) [Dkt. No. 9116], Ex. 77 (the "Armstrong TDP").

Accordingly, the Plan Trust and the TDP, according to their express terms, shall operate through mechanisms such as the structured, periodic or supplemental payments, pro rata distributions, the periodic review of estimates of the numbers and values of present Asbestos Personal Injury Claims and future Demands, and other comparable mechanisms that are necessary to provide reasonable assurance that the Plan Trust will value, and be in a financial position to pay, Asbestos Personal Injury Claims and Demands in substantially the same manner. As a result, the Plan and the TDP satisfy the equality of treatment requirements of § 524(g)(2)(B)(ii)(V) of the Bankruptcy Code.

## D. The Plan's Asbestos Channeling Injunction Complies with the Requirements of § 524(g) of the Bankruptcy Code

Section 524(g) of the Bankruptcy Code sets forth certain requirements for an asbestos channeling injunction. Specifically, §§ 524(g)(3)(A) and 524(g)(4)(A)(ii) identify requirements for extension of the channeling injunction to third parties and § 524(g)(4)(B)(ii) requires that the channeling injunction be fair and equitable with respect to future asbestos claimants. The Asbestos Channeling Injunction provided in Section 11.6 of the Plan satisfies all applicable requirements of § 524(g) of the Bankruptcy Code and should be approved.

1.   **The Court May Extend the Asbestos Channeling Injunction to Third Parties**

Sections 524(g)(3)(A) and 524(g)(4)(A)(ii) of the Bankruptcy Code

designate certain entities that may be protected by a § 524(g) channeling

injunction.  Specifically, § 524(g)(3)(A) provides that:

> (ii) no entity that pursuant to such plan or thereafter becomes a direct or indirect transferee of, or successor to any assets of, a debtor or trust that is the subject of the injunction shall be liable with respect to any claim or demand made against such entity by reason of its becoming such a transferee or successor; and

> (iii) no entity that pursuant to such plan or thereafter makes a loan to such a debtor or trust or to such a successor or transferee shall, by reason of making the loan, be liable with respect to any claim or demand made against such entity, nor shall any pledge of assets made in connection with such a loan be upset or impaired for that reason.

11 U.S.C. § 524(g)(3)(A).

Section 524(g)(4)(A)(ii) also provides that a channeling injunction:

> may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of—

> (I) the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;

> (II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;

> (III) the third party's provision of insurance to the debtor or a related party; or

500522999v5

(IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to—

(aa) involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or

(bb) acquiring or selling a financial interest in an entity as part of such a transaction.

Consistent with these provisions, the Plan provides that the Asbestos Channeling Injunction will bar actions against all "Protected Parties." Plan § 11.6.

The "Protected Parties" include the following:

(a)  the Debtors and Reorganized Congoleum;

(b)  any Entity that, pursuant to the Plan or after the Confirmation Date, becomes a direct or indirect transferee of, or successor to, the Plan Trust or the Debtors;

(c)  the Persons designated on Exhibit "F" (as such Exhibit may be amended on or before the Confirmation Date) as current distributors of the product lines currently manufactured, sold or otherwise produced by Congoleum; or

(d)  each Settling Asbestos Insurance Company, identified on Exhibit H to the Plan.

*See* Plan § 1.2 (definition of Protected Party). In addition, § 524(g)(1)(B) provides that the channeling injunction may be used to enjoin entities from taking legal action for the purpose of "directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any claim or demand" that will be addressed by the Plan Trust. 11 U.S.C. § 524(g)(1)(B). Each Protected Party under the Plan is identifiable from the terms of the Asbestos Channeling Injunction by name or as

62

part of an identifiable group and falls within the groups designated in §§

524(g)(4)(A)(ii) and 524(g)(3)(A) as third parties to whom a channeling injunction

may be extended. *See* Plan § 1.2 (definition of Protected Party); Exhibit F to Plan

(Schedule of Distributor Protected Parties), Ex. 6; Exhibit H to Plan (Schedule of

Settling Asbestos Insurance Companies), Ex. 8. Both the definition of Protected

Party in Section 1.2 of the Plan and each of the schedules mentioned above have

been heavily vetted with assistance and input from each of the Plan Proponents and

certain other parties in interest. Indentifying or describing each Protected Party in

the Asbestos Channeling Injunction is fair and equitable with respect to persons

that might subsequently assert Demands against each such Protected Party, in light

of the benefits provided, or to be provided, to the Plan Trust. This Court may

extend the Asbestos Channeling Injunction to shield all Protected Parties from

liability for any Asbestos Personal Injury Claims and future asbestos-related

Demands. *See* Plan §§ 11.6, 1.2. Accordingly, the Court should authorize and

approve the application of the Asbestos Channeling Injunction to protect all

Protected Parties from liability for any Asbestos Personal Injury Claims, including

any future asbestos-related Demands in accordance with the terms and conditions

of the Plan.

500522999v5

## 2. Entry of the Asbestos Channeling Injunction Is Fair and Equitable with Respect to Future Asbestos Claimants

Section 524(g)(4)(B)(ii) of the Bankruptcy Code requires this Court to find, as a condition to extending the Asbestos Channeling Injunction to third parties, that (1) a representative of future demands has been appointed and (2) the contributions made to the Plan Trust by or on behalf of protected third parties are fair and equitable to the holders of future demands whose claims will be channeled to the Plan Trust.  11 U.S.C. § 524(g)(4)(B)(ii).

*First*, on February 18, 2004 [Dkt. No. 355], the Bankruptcy Court appointed R. Scott Williams as the Futures Representative to act on behalf of all holders of Demands affected by the Asbestos Channeling Injunction, thus satisfying the first subsection.  Mr. Williams has vigorously protected the rights of future asbestos claimants throughout these cases.  The Futures Representative will continue its work post-confirmation as provided in the Plan Trust Agreement and the TDP.  *See* Exhibit E to Plan (Plan Trust Agreement), Ex. 5; Exhibit G to Plan (TDP), Ex. 7. *Second*, Reorganized Congoleum, on behalf of all of the Protected Parties, are contributing substantial assets to the Plan Trust.  *See* Plan § 5.1(b) (Funding and Receipt of Plan Trust Assets).  On the Effective Date, Reorganized Congoleum will irrevocably transfer and assign to the Plan Trust (i) the Plan Trust Common Stock, representing 50.1% of the Common Stock of Reorganized Congoleum; (ii) the Asbestos Insurance Rights; (iii) all rights of the Debtors under, and all proceeds

64

of, the Asbestos Insurance Settlement Agreements, which presently total approximately $235 million; (iv) the proceeds of the Asbestos In-Place Insurance Coverage; (v) the proceeds of the Asbestos Insurance Actions; (vi) the proceeds of the Asbestos Insurance Action Recoveries; (vii) the rights granted to the Plan Trust pursuant to the Insurance Assignment Agreement; and (viii) the Asbestos Property Damage Insurance Rights.

Moreover, Congoleum's current distributors have distributed Congoleum products for many years, and have continued to distribute such products during the course of the Reorganization Cases. Feist Decl. ¶ 86. The distributors are an integral part to Congoleum's business model, and without them, Congoleum's businesses would grind to a halt. *Id.* If the distributors are not protected by the Asbestos Channeling Injunction, such current distributors could be targeted by third parties for having distributed in the past Congoleum products containing asbestos. *Id.* Those distributors would, in turn, would be forced to pursue Congoleum for indemnification. *Id.* Such suits against Congoleum's current distributors would be an attempt to circumvent the Asbestos Channeling Injunction against the Debtors and Reorganized Congoleum. Even worse, however, if the distributors were to refuse to carry Congoleum's products, Congoleum's on-going business operations could be damaged. *Id.* One of the main goals of § 524(g) is to enjoin parties from collecting, either directly or indirectly, with respect to asbestos

65

claims and demands that are to be addressed by the Plan Trust. *See* 11 U.S.C. §
524(g)(1)(B). The Plan Proponents submit that it is fair and equitable to extend the
Asbestos Channeling Injunction to the distributors identified on Exhibit F to the
Plan so that third-parties may not try to circumvent the protections afforded in §
524(g) of the Bankruptcy Code.

Thus, in light of the substantial contributions to be made to the Plan Trust on
behalf of all Protected Parties, entry of the Asbestos Channeling Injunction, and
the naming of the Protected Parties therein, is fair and equitable with respect to
persons that might subsequently assert future asbestos-related Demands.
Accordingly, the Asbestos Channeling Injunction satisfies the requirements of §
524(g)(4)(B)(ii) of the Bankruptcy Code.

### E.    The Plan Trust Has the Elements of a Qualified Settlement Fund (QSF)

In order to approve the Asbestos Channeling Injunction, the Court also must
also find that the Plan Trust satisfies the elements of a "qualified settlement fund"
pursuant to Section 468(B) of the Internal Revenue Code and the regulations
issued pursuant thereto (a "QSF"). If the Plan Trust does not satisfy these
elements, the Debtors and Reorganized Congoleum would be required by
applicable law to defer certain tax deductions to subsequent years. As set forth in
the following paragraphs, the Plan Trust satisfies the elements of a QSF.

500522999v5

*First*, the Plan Trust must be established pursuant to an order of, or approved by, a court of law and be subject to the continuing jurisdiction of that court. 26 C.F.R. § 1.468B-1(c)(1). This requirement is satisfied because the Plan Trust will be established pursuant to an order confirming the Plan and the Court will have continuing jurisdiction over the Plan Trust. *See* Plan § 13.2. *Second*, the Plan Trust must be established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event (or related series of events) that has occurred and that has given rise to at least one claim asserting tort liability. 26 C.F.R. § 1.468B-1(c)(2). This element is also clearly satisfied. The Plan Trust will be established to resolve or satisfy in excess of 100,000 contested or uncontested asbestos tort claims that have resulted (or may result) from a series of related events that has occurred. *Third*, the Plan Trust must be a trust under applicable state law, or its assets must be otherwise segregated from other assets of the transferor (and related persons). 26 C.F.R. § 1.468B-1(c)(3). This requirement is satisfied because the Plan Trust will be formed and administered in accordance with Delaware law. Accordingly, the Plan Trust satisfies the elements of a QSF within the meaning of Section 468(B) of the Internal Revenue Code.

500522999v5

## IV. THE ANTI-SUIT INJUNCTION SATISFIES THE REQUIREMENTS OF § 105(a) OF THE BANKRUPTCY CODE

During the course of the Reorganization Cases, this Court and the

Bankruptcy Court have approved the Debtors' entry into various Asbestos

Insurance Settlement Agreements. Certain of these Asbestos Insurance Settlement

Agreements were structured as "sale and buyback" agreements whereby, upon

payment of the respective settlement amounts, the Debtors will sell the relevant

insurance policies back to the insurer free and clear of all claims, liens,

encumbrances or interests of any other person or entity pursuant to §§ 363(b) and

(f) of the Bankruptcy Code, supplemented by a injunction pursuant to § 105 of the

Bankruptcy Code. The effect of these "policy buybacks" is to fully and finally

extinguish and exhaust all rights, duties, limits and coverage under the relevant

policies as if they were never issued.

In some cases, the policies sold back, or which will be sold back, by the

Debtors pursuant to these sale and buyback agreements included insurance

coverage for both asbestos and non-asbestos claims. Feist Decl. ¶ 72. The settling

insurers with policies that covered non-asbestos claims indicated that they would

not buy back their respective policies or pay any settlement amounts unless they

received a full release for their non-asbestos claims, as well as their asbestos

claims. *Id*. Accordingly, in connection with the approval of various Asbestos

Insurance Settlement Agreements, the Debtors sought, and this Court and the

Bankruptcy Court issued orders providing for supplemental injunctions pursuant to

§ 105(a) of the Bankruptcy Code that permanently enjoin any cause of action or act

to collect on account of a non-asbestos claim that arises out of, or relates to, the

insurance policies that were the subject of the various settlement agreements (the

"105(a) Injunctions").[10]  *Id.*  The 105(a) Injunctions were fully described in each

motion seeking approval of the respective settlement agreements containing the

injunction, and no party-in-interested objected to their entry.  As a result, both this

Court and the Bankruptcy Court issued various orders creating 105(a) Injunctions

---

[10] For an example, *see* First State/Twin City Settlement and Order, dated February
19, 2010, *In re Congoleum Corp.*, No. 09-04371 (D.N.J.) [Dkt. No. 375]
("Hartford Order") (Ex. 68), which provides the following:  "Pursuant to and to
the fullest extent permitted by sections 105(a) and 363 of the Bankruptcy Code
and subject to the consummation, as of the Approval Date (but subject to
payment of the Settlement Amount under the Agreement), of the sale of the
Subject Policies as provided under the Agreement, all Persons that have held or
asserted, that hold or assert, or that may in the future hold or assert any Claim or
Interest of any kind or nature against or in any of the Debtors' bankruptcy
estates, the Congoleum-Related Parties, the Subject Policies, or the Hartford-
Related Parties based upon, arising out of, derived from or attributable in any
way (a) to the Subject Policies or (b) to any matters or claims that fall within the
scope of the releases set forth in Section V of the Agreement (including, but not
limited to, any Asbestos-Released Claim, any Extra-Contractual Claim, any
Insurance Coverage Claim or any Direct-Action Claim), whenever or wherever
arising or asserted (including all thereof in the nature of or sounding in tort,
contract, warranty or any other theory of law, equity or admiralty), shall be and
hereby are barred, estopped and permanently enjoined from asserting any such
Claims or Interests against any of the Hartford-Related Parties or against the
Subject Policies and from continuing, commencing, or otherwise proceeding or
taking any action against the Hartford-Related Parties to enforce such Interests or
Claims or for the purpose of directly or indirectly collecting, recovering or
receiving payments from any Hartford-Related Party to recover with respect to
any such Claim or Interest."  Hartford Order, Ex. 68 ¶ 7.

to protect Settling Asbestos Insurance Companies from non-asbestos liability that may arise under the insurance policies that were the subject of the sale and buyback settlement agreements.

In addition to the 105(a) Injunctions that were issued pursuant to the respective orders approving the settlement agreements, the terms of such settlements also obligate the Debtors to include a supplemental 105(a) injunction in the Plan itself. Accordingly, Section 11.11 of the Plan provides for an injunction to protect certain Settling Asbestos Insurance Companies from non-asbestos liability released under any Asbestos Insurance Settlement Agreement (the "Anti-Suit Injunction"). *See* Plan § 11.11.

Section 11.11 provides that, pursuant to § 105(a) of the Bankruptcy Code, the Anti-Suit Injunction:

> shall operate as an injunction permanently and forever prohibiting and enjoining the commencement, conduct or continuation of any action or cause of action, whether known or unknown, the employment of process or any act to collect, recover from or offset any non-asbestos claim, Claim or demand against any Settling Asbestos Insurance Company arising out of, relating to, or in connection with an Asbestos Insurance Policy or any other insurance policy or rights under such other insurance policy issued to or insuring the relationship of the relevant Settling Asbestos Insurance Companies with, the relevant Congoleum entities that are insureds under such policies....

Plan § 11.11.

Section 1123(b)(6) of the Bankruptcy Code authorizes a plan of reorganization to "include any other appropriate provision not inconsistent with the

70

applicable provisions of this title." 11 U.S.C. § 1123(b)(6). Based on § 1123(b)(6) and on the Court's expansive equitable authority under § 105(a) of the Bankruptcy Code, which authorizes a court "to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," numerous courts have held that issuance of a non-debtor channeling injunction is authorized in appropriate circumstances "where a material benefit results to the Debtors' estates and advances consummation of a Plan." *SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 130 B.R. 910, 928 (S.D.N.Y. 1991). *See In re Owens Corning*, No. 00-3837 (Bankr. D. Del. Sept. 26, 2006) Order Confirming Plan [Dkt. No. 19366], Ex. 79 at 47-48 (confirming plan of reorganization providing for § 105(a) injunctions against claims of certain holders of bank claims and insurance entities). *See also In re Kaiser Aluminum Corp.*, No. 02-10429 (Bankr. D. Del. Feb. 6, 2006) Order Confirming Plan [Dkt. No. 8225] at 46-49 (confirming plan of reorganization providing for a § 105(a) injunction against claims or demands against certain insurance entities); *In re American Family Enters.*, 256 B.R. 377, 405-08 (D.N.J. 2000) (issuing a channeling injunction pursuant to § 105(a) of the Bankruptcy Code as part of a Chapter 11 plan of reorganization in aid of a settlement, enjoining prosecution of a class action suit against the debtors and related third parties).

71

Although the power of the bankruptcy courts to issue injunctive relief is not unlimited, § 105(a) of the Bankruptcy Code permits a court to issue injunctive relief in favor of non-debtor parties in circumstances where "fairness, necessity to the reorganization, and specific factual findings to support these conclusions" were shown. *See In re Continental Airlines*, 203 F.3d 203, 214 (3d Cir. 2000). "Added to these requirements is that the releases 'were given in exchange for fair consideration.'" *United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.)*, 315 F.3d 217, 227 (3d Cir. 2003) (citing *Continental Airlines*, 203 F.3d at 214).

In this case, the Anti-Suit Injunction is fair, is necessary to the reorganization, and has been supported by fair consideration. The Anti-Suit Injunction merely incorporates into the Plan relief that has already been approved pursuant to the various court orders authorizing 105(a) Injunctions. Congoleum provided *extensive* notice of the settlements providing for 105(a) Injunctions. Feist Decl. ¶ 72. Indeed, in connection with numerous settlements, Congoleum or the insurer published notice of such settlements in newspapers with national circulation, and no party objected to sale and buy back of the agreements, nor did any party notify Congoleum or the insurer of potential claims against the policies or proceeds thereof. *Id.*

72

In addition, the Anti-Suit Injunction is necessary to the reorganization. The Settling Asbestos Insurance Companies indicated that they would not be willing to enter into a settlement agreement absent a supplemental injunction issued pursuant to § 105(a) of the Bankruptcy Code. *See*, *e.g.*, Hartford Order, Ex. 68 ¶ Q. The Asbestos Insurance Settlement Agreements have been critical to the success of this reorganization. Without such settlements, the Debtors would have been faced with a lengthy confirmation process and probable appeals.

Moreover, the Settling Asbestos Insurance Companies have provided critical financial contributions to the Plan Trust. The Plan Trust is funded almost entirely with the proceeds of the Asbestos Insurance Settlement Agreements (approximately $235 million). If the Debtors had not been able to secure their various Asbestos Insurance Settlement Agreements, a § 524(g) plan of reorganization would not have been problematic.

The Debtors fully disclosed the terms of the Anti-Suit Injunction in the Plan and Disclosure Statement, and the overwhelming majority of creditors have voted in favor of the Plan. Accordingly, after weighing and balancing the equities of this specific case and the evidence supporting the Anti-Suit Injunction, it is clear that the issuance of the Anti-Suit Injunction is fair, equitable, and proper under the Bankruptcy Code.

500522999v5

## V. THE ASSUMPTION OR REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES UNDER THE PLAN SHOULD BE APPROVED

The Plan provides that the Debtors will assume the bulk of their executory contracts and unexpired leases. As of the Effective Date, as set forth in Section 8.1 of the Plan, the Debtors will assume each executory contract and unexpired lease to which it is a party, unless such contract or lease (i) was previously assumed or rejected by the Debtors; (ii) previously expired or terminated pursuant to its own terms; or (iii) is listed on an exhibit to the Plan Supplement as being an executory contract or unexpired lease to be rejected. In addition, as set forth in Section 8.1(c) of the Plan, and in connection with the Intercompany Settlement in Section 5.17 of the Plan, the Debtors have determined to assume the ABI Canada License Agreement and to reject all Intercompany Agreements. *See* Plan §§ 8.1(c), 5.17.

Section 1123(b)(2) of the Bankruptcy Code provides that a plan may, "subject to section 365 [of the Bankruptcy Code], provide for the assumption, rejection, or assignment of any executory contract or unexpired lease." 11 U.S.C. § 1123(b)(2). Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease . . . ." 11 U.S.C. § 365(a). Courts routinely approve motions to assume, assume and assign, or reject executory contracts or unexpired leases upon a showing that the debtor's decision to take such action will benefit the debtor's

74

estate and is an exercise of sound business judgment. *See*, *e.g.*, *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Group of Inst'l Investors v. Chicago, Milwaukee, St. Paul, & Pacific R.R. Co.*, 318 U.S. 523, 550 (1943); *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (the "resolution of th[e] issue of assumption or rejection will be a matter of business judgment by the bankruptcy court . . . .").

The "business judgment" test is not a strict standard; it merely requires a showing that either assumption or rejection of the executory contract or unexpired lease will benefit the debtor's estate. *See*, *e.g.*, *Allied Tech., Inc. v. R.B. Brunemann & Sons, Inc.*, 25 B.R. 484, 495 (Bankr. S.D. Ohio 1982) ("As long as assumption of a lease appears to enhance a debtor's estate, Court approval of a debtor in possession's decision to assume the lease should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code . . . ."); *In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003).

The Debtors have reviewed their existing executory contracts and unexpired leases and determined, in their business judgment that, with the exception of the rejected Intercompany Agreement set forth in the Plan Supplement, all of the Debtors' existing executory contracts and unexpired leases should be assumed by Reorganized Congoleum.  Feist Decl. ¶ 84.  The assumption of these executory

75

contracts and unexpired leases is both beneficial and necessary to the Debtors' and Reorganized Congoleum's business operations upon and subsequent to emergence from Chapter 11. *Id.* Accordingly, the assumption and rejection of executory contracts and unexpired leases proposed by the Plan should be approved.

Based upon, among other things, Reorganized Congoleum's anticipated financial wherewithal after the Effective Date, including, without limitation, the operating cash and liquidity available to Reorganized Congoleum under the Exit Facility to fund its post-emergence business operations, Reorganized Congoleum will be fully capable of performing under the terms and conditions of all contracts and/or leases to be assumed. Feist Decl. ¶ 85.

## VI. THE SETTLEMENTS MADE DURING THE REORGANIZATION ARE FAIR AND REASONABLE AND SATISFY THE REQUIREMENTS OF § 1123(b) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019

Section 1123(b)(3)(A) of the Bankruptcy Code allows a plan to provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A). As part of the Plan, the Plan Proponents have submitted for approval as part of the confirmation process two settlement agreements pursuant to § 1123(b)(3)(A): (i) the Litigation Settlement Agreement, as amended (*see* Plan § 5.14); and (ii) the Intercompany Settlement Agreement (*see* Plan § 5.17).

As bankruptcy courts have noted, "the standards for approving settlements as part of a plan of reorganization [under § 1123(b)(3)(A)] are the same as the standards for approving settlements under [Bankruptcy Rule] 9019." *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 832 (Bankr. D. Del. 2008) (citing *In re New Century TRS Holdings*, 390 B.R. 140, 167 (Bankr. D. Del. 2008)). *See In re Best Prods. Co.*, 177 B.R. 791, 794 (S.D.N.Y.1995), *aff'd*, 68 F.3d 26 (2d Cir. 1995); *In re Cajun Elec. Power Co-op., Inc.*, 230 B.R. 715, 751 n.101 (Bankr. M.D. La. 1999) ("The standard under 11 U.S.C. § 1123(b)(3) is the same as the standard for approval of settlements under Rule 9019.") (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)). Accordingly, when evaluating the propriety of the First Amendment to the Litigation Settlement Agreement and the Intercompany Settlement Agreement, this Court should analyze the settlements in accordance with Bankruptcy Rule 9019.

The Third Circuit has set forth four criteria that should be considered when evaluating whether a proposed settlement should be approved pursuant to Bankruptcy Rule 9019 as fair and equitable: (i) the probability of success in litigation; (ii) the likely difficulties of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (iv) the paramount interest of the creditors. *In re Martin*, 91 F.3d 389, 393

77

(3d Cir. 1996); *see also Tindall v. Mavrode (In re Mavrode)*, 205 B.R. 716, 721

(Bankr. D.N.J. 1997) (applying the *Martin* test in determining whether a proposed

settlement was "fair and equitable"). In determining whether to approve a

proposed settlement, a bankruptcy court need not decide the numerous issues of

law and fact raised by the settlement, but should instead "canvass the issues and

see whether the settlement falls below the lowest point in the range of

reasonableness." *In re Jasmine*, *Ltd.*, 258 B.R. 119, 123 (D.N.J. 2000) (quoting *In

re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa.1986)).

It is standard practice in complex Chapter 11 cases for a settlement to

resolve a central dispute and then be incorporated into a plan of reorganization.

*See*, *e.g.*, *G-1 Holdings, Inc.*, 420 B.R. 216, 256-57 (D.N.J. 2009) (approving

global settlement of asbestos personal injury claims, which settlement was "the

product of over eight years of arms-length bargaining" and was "[a]t the heart" of

the debtors' § 524(g) plan of reorganization). In the present case, the settlements

and compromises reached in the Litigation Settlement Agreement, as amended,

and the Intercompany Settlement are the foundation upon which the current Plan is

built. As the evidence proffered in connection with the Confirmation Hearing will

demonstrate, the Litigation Settlement Agreement, as amended, and the

Intercompany Settlement should be approved pursuant to § 1123(b)(3) of the

Bankruptcy Code and Bankruptcy Rule 9019.

## A.   The Litigation Settlement Agreement, As Amended, Should be Approved

In August 2008, the Debtors, the Bondholders' Committee, the Futures Representative, the Asbestos Claimants' Committee, and the Claimants' Counsel reached a global settlement that resolved certain of the material terms of a plan of reorganization and a settlement of the Avoidance Actions.  Feist Decl. ¶ 59.  The terms of the settlement were documented in a global litigation settlement (the "Original Litigation Settlement Agreement"), which was incorporated into the Amended Joint Plan, dated November 14, 2008.  *Id.*

The Original Litigation Settlement Agreement represented a comprehensive settlement and compromise of the fundamental equality of distribution issues. Feist Decl. ¶ 60.  Counsel representing 87% of asbestos claimants who were parties to the Pre-Petition Asbestos Agreements executed the Original Litigation Settlement Agreement; the remainder either did not respond or declined to execute the agreement on behalf of their clients.  *Id.*  The Original Litigation Settlement Agreement provides that the parties that executed asbestos personal injury settlements with Congoleum for future insurance proceeds prior to the Petition Date (the "Litigation Settlement Claimants") shall waive any and all rights with respect to their pre-petition settlements, including the liquidated amounts thereof. *Id.*  Instead, Litigation Settlement Claimants will submit their claims to the Plan Trust for resolution in accordance with the TDP and will be treated the same as all

79

other present and future asbestos personal injury claimants. *Id.* In exchange, Congoleum was to be released from all of its obligations under the Pre-Petition Settlement Agreements, the Claimant Agreement, the Security Agreement, the Collateral Trust Agreement and any and all other agreements and amendments thereto with respect to the Pre-Packaged Plan. *Id.*

On October 22, 2008, overruling various objections, the Bankruptcy Court issued an opinion pursuant to Bankruptcy Rule 9019 approving the Original Litigation Settlement Agreement, holding that it was "fairly easy to conclude" that the settlement "falls above the lowest point in the range of reasonableness" ("Litigation Settlement Opinion") [Dkt. No. 6941], Ex. 60 at 3. While reserving judgment on whether the Original Litigation Settlement Agreement would satisfy confirmation requirements, the Bankruptcy Court went on to state that the Original Litigation Settlement Agreement "sets the stage for proposing a confirmable plan because it eliminates the disparity of treatment of similarly situated creditors that had been created through the pre-petition settlements and the Claimant Agreement." *See id.* at 3.

As a result of various rulings from the Bankruptcy Court and the District Court, the Plan Proponents made certain modifications to the current Plan that differed from those terms outlined in the Original Litigation Settlement Agreement. Feist Decl. ¶ 66. As a result of these changes and others, the Asbestos

Claimants' Committee requested that the parties amend the Original Litigation Settlement Agreement to account for such changes. *Id.* The First Amendment, however, does not alter the material terms of the Original Litigation Settlement Agreement, which are reflected in Section 5.14 of the Plan. *Id.*

The parties circulated a First Amendment to the Original Litigation Settlement Agreement dated October 22, 2009 for approval (the "First Amendment"). Feist Decl. ¶ 67; Ex. 61. The First Amendment was accepted by the Debtors, the Bondholders' Committee, the Futures Representative, the Asbestos Claimants Committee, Claimants' Counsel and the Collateral Trustee, and counsel representing 84% of all parties who entered into Pre-Petition Settlement Agreements with Congoleum. Feist Decl. ¶ 67.

The Plan Proponents continue to believe that the Original Settlement Agreement, as amended by the First Amendment (collectively, the "Litigation Settlement Agreement"), is fair, reasonable, and in the overwhelmingly best interests of these estates. Feist Decl. ¶ 68. Through the negotiation of the Litigation Settlement Agreement, the Debtors and the Bondholders' Committee have evaluated the merits of the Avoidance Actions, the relative costs and benefits associated with the prosecution of such actions, and the potential outcomes from such litigation. *Id.* The Debtors and the Bondholders' Committee have concluded that the benefits of the Litigation Settlement Agreement substantially outweigh the

81

potential costs, risks, distractions and delay in connection with prosecuting the Avoidance Actions. *Id.*

Moreover, as observed by the Bankruptcy Court in its approval of the Original Litigation Settlement Agreement, the Litigation Settlement Agreement eliminates one of the biggest stumbling blocks to confirmation that the Debtors had faced—namely, the disparity of treatment between present and future asbestos claimants, and those claimants who were parties to Pre-Petition Settlement Agreements or the Claimant Agreement. By consensually eliminating the Pre-Petition Settlement Agreements and the Claimant Agreement, the Litigation Settlement Agreement allows for confirmation of the Plan and for the equal treatment of all holders of Asbestos Personal Injury Claims by a Plan Trust funded by approximately $235 million in insurance settlements and 50.1% of the equity of Reorganized Congoleum.

As the evidence proffered in connection with the Confirmation Hearing will demonstrate, the Litigation Settlement Agreement, as amended, is clearly above "the lowest point in the range of reasonableness" and, therefore, Section 5.14 of the Plan should be approved pursuant to § 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019. *See Jasmine*, 258 B.R. at 123; *Martin*, 91 F.3d at 393.

82

## B.     The Intercompany Settlement Should be Approved

The Intercompany Settlement sets forth the new operational relationship between Reorganized Congoleum and ABI, Congoleum's parent company.  The Intercompany Settlement provides that, on the Effective Date of the Plan, all of ABI's claims against the Debtors, estimated at $1.8 million (*see* Disclosure Statement § 9.1(h)), shall be deemed disallowed, and all Intercompany Agreements between ABI and Congoleum shall be deemed rejected.[11]  The Intercompany Settlement also provides for consensual releases with respect to intercompany causes of action between ABI and Congoleum, but such releases will not affect rights to payment of up to $2 million based on Unpaid Intercompany Amounts arising from ABI and Congoleum's ordinary course of business.  In exchange, the parties shall enter into and effectuate the New ABI Agreement (Exhibit I to the Plan), which shall govern the relationship between ABI and Reorganized Congoleum upon the Effective Date.  Pursuant to the Intercompany Settlement and New ABI Agreement, ABI will provide Reorganized Congoleum with senior management personnel.  The terms of the New ABI Agreement are mutually agreeable to the Debtors, the Bondholders' Committee, the Asbestos Claimants'

---

[11] Notwithstanding the foregoing, the Intercompany Settlement provides that the ABI Parties Canada License Agreement, as amended pursuant to the Intercompany Settlement, shall be deemed to have been assumed by Reorganized Congoleum on the Effective Date.

83

Committee, the Futures Representative and ABI.  *See* Plan § 1.2 (definition of New ABI Agreement).

The Debtors submit that the Intercompany Settlement is fair, reasonable, and in the best interests of these estates.  Feist Decl. ¶ 87.  The Plan Proponents have evaluated the merits of the causes of action between Congoleum and ABI, if any, the relative costs and benefits associated with the prosecution and defense of such actions, and the potential outcomes from such litigation.  *Id.*  The Plan Proponents have concluded that the benefits of the Intercompany Settlement substantially outweigh the potential costs, risks, distractions and delay in connection with prosecuting these potential causes of action, if any.  *Id.*  Specifically, the Plan Proponents have concluded that it is much more advantageous to the estates that the Intercompany Settlement be approved and that Reorganized Congoleum continue a beneficial operational relationship with ABI, rather than pursue inchoate causes of action.  *Id.*

The Debtors submit that both the Intercompany Settlement and the New ABI Agreement are vital to the future success of Reorganized Congoleum.  Feist Decl. ¶ 88.  Reorganized Congoleum will benefit from ABI's ongoing contributions of senior management employees in accordance with the Intercompany Settlement and the New ABI Agreement.  *Id.*  In addition, the Debtors believe that Reorganized Congoleum's continuing commercial relationships with ABI under

84

the New ABI Agreement will be important to Reorganized Congoleum's success, especially given Congoleum's existing customer base and suppliers. *Id.*

Accordingly, as the evidence proffered in connection with the Confirmation Hearing will demonstrate, the Intercompany Settlement set forth in Section 5.17 of the Plan is above "the lowest point in the range of reasonableness" and should be approved pursuant to § 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019. *See Jasmine*, 258 B.R. at 123; *Martin*, 91 F.3d at 393.

## VII.   THE PLAN'S RELEASE, EXCULPATION AND RELATED PROVISIONS ARE REASONABLE AND COMPLY WITH APPLICABLE LAW

Article 11 of the Plan provides for certain injunctions, releases, and an exculpation for the Plan Proponents. *See* Plan §§ 11.1 and 11.4 (providing for the Debtors' fresh-start discharge); § 11.2 (exculpation of Plan Proponents for acts taken in connection with plan formulation); § 11.3 (releases by holders of Plan Trust Asbestos Claims who receive payment from Plan Trust); § 11.6 (Asbestos Channeling Injunction);[12] and § 11.11 (Anti-Suit Injunction).[13]  No party in interest has objected to any of the injunctions, releases and exculpations provided for in the

---

[12] *See supra* at Part III for a discussion of the Asbestos Channeling Injunction.

[13] *See supra* at Part IV for a discussion of the Anti-Suit Injunction.

500522999v5

Plan.[14]  In addition, courts in the Third Circuit have routinely upheld similar

provisions in other asbestos bankruptcies.  *See*, *e.g.*, *G-1 Holdings*, 420 B.R. at

282; *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 170 (D. Del. 2006).  As the

evidence proffered in connection with the Confirmation Hearing will demonstrate,

the injunctions, releases and exculpation provided for in the Plan are fair,

reasonable and proper and should be approved.  *See G-1 Holdings*, 420 B.R. at

282; *Armstrong World Indus.*, 348 B.R. at 170.

> ### A.    The Plan's Discharge and the Discharge Injunction Should Be Approved

Section 11.1 of the Plan provides that, pursuant to § 1141(d) of the

Bankruptcy Code, the Debtors and Reorganized Congoleum will be discharged

"from any and all Claims of any nature whatsoever and Demands."  In addition,

Section 11.4 of the Plan provides for a discharge injunction "prohibiting and

---

[14] The U.S. Trustee and others objected to the scope of the exculpation and releases provisions in certain prior plans.  With respect to the Joint Plan in particular, the Bankruptcy Court determined that the Joint Plan's release of non-debtor third parties was not consistent with Third Circuit precedent.  *See* Joint Plan Opinion, Ex. 55 at 10-11.  In addition, the Bankruptcy Court stated that the exculpation clause provided for in the Joint Plan could be problematic, but determined that the issue was not appropriate for summary judgment.  *See id.* at 14-15.  In order to address the Bankruptcy Court's concerns, the Plan Proponents substantially modified the release and exculpation provisions in the current Plan.  As set forth in the new Section 11.5, no third party releases are being granted pursuant to the Plan, other than those specifically permitted under §§ 524(g) and 105(a) of the Bankruptcy Code.  No party has objected to the revised release and exculpation provisions in the current Plan.

500522999v5

enjoining" causes of action against the Debtors and Reorganized Congoleum pursuant to §§ 105, 524(g) and 1141 of the Bankruptcy Code.[15]

Sections 11.1 and 11.4 of the Plan are customary provisions that do nothing more than re-state and implement the fresh-start discharge of liability that all Chapter 11 debtors receive upon confirmation of a plan of reorganization. Section 1141(d)(1)(A) of the Bankruptcy Code provides: "[e]xcept as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan discharges the debtor from any debt that arose before the date of such confirmation . . . ." 11 U.S.C. § 1141(d)(1)(A). *See also* 11 U.S.C. §§ 524(a)(2), (3). To the extent that the Plan Proponents otherwise satisfy the requirements for confirmation under §§ 1129 and 524(g) of the Bankruptcy Code, the Plan Proponents submit that the discharge and injunction provided in Sections 11.1 and 11.4 of the Plan are appropriate and should be approved.

### B. The Plan's Exculpation Provision Should be Approved

Section 11.2 of the Plan (the "Exculpation Provision") is a customary and standard provision in Chapter 11 plans. It limits the liability of certain parties—the Debtors, the official court-appointed committees, and their respective Representatives—for any acts after the Petition Date related to the negotiation of

---

[15] There are certain exceptions from the discharge injunction expressly provided in the Plan, including claims against the Debtors under Environmental Laws. *See* Plan § 11.9.

the Plan or any prior plan, or the pursuit of confirmation of the Plan, or any other prior plan. *See* Plan § 11.2. As is customary in substantial commercial Chapter 11 cases of this nature and complexity, the Exculpation Provision relieves the Plan Proponents from exposure to legal liability for their conduct during or in connection with the Debtors' reorganization proceedings, provided, however, that no party is exculpated for gross negligence, fraud or willful misconduct. In addition, such exculpation only applies to the officers and directors of the Debtors serving on or after the Petition Date." *See* Plan § 11.2. Exculpation provisions similar to Section 11.2 of the Plan are regularly approved in this Circuit as fair, reasonable, and equitable. *See*, *e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 245-47 (3d Cir. 2000) (*see infra* n.16 for text); *G-1 Holdings*, 420 B.R. at 282 (Ex. 71); *In re Owens Corning*, No. 00-03837 (Bankr. D. Del. Sept. 26, 2006) [Dkt. Nos. 19366], Ex. 79; *In re Armstrong World Indus.*, 348 B.R. at 170 (Ex. 75).

The Exculpation Provision falls squarely within the scope of the exculpation provision that was approved by the Third Circuit in *PWS Holding Corp.*, 228 F.3d at 245-47. In that case, the Third Circuit approved an exculpation and limitation of liability clause that is almost identical to the Exculpation Provision contained in

88

Section 11.2 of the Plan.[16] *PWS Holding*, 228 F.3d at 245-47. In *PWS Holding*, the Third Circuit approved the exculpation clause at issue, stating that such "a commonplace provision in Chapter 11 plans, does not affect the liability of these parties, but rather states the standard of liability under the Code, and thus does not come within the meaning of § 524(e)." *Id.* at 245. The Third Circuit noted that § 1103 of the Bankruptcy Code, which grants to the official committees broad authority to formulate a plan and perform "such other services as are in the interest of those represented," 11 U.S.C. § 1103(c), "has been interpreted to imply both a fiduciary duty to committee constituents and a limited grant of immunity to committee members." *Id.* at 246. The Court further noted that "committee members and the debtor are entitled to retain professional services to assist in the

---

[16] Paragraph 58 of PWS Holding's plan of reorganization specifically provided:
    [n]one of the Debtors, the Reorganized Debtors, New Bruno's, the Creditor Representative, the Committee or any of their respective members, officers, directors, employees, advisors, professionals or agents shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan or the Administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Debtors, the Reorganized Debtors, New Bruno's, the Creditor Representative, the Committee and each of their respective members, officers, directors, employees, advisors, professionals and agents shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the plan.

Ex. 83 at 246.

reorganization" and that this immunity covers such parties "for actions within the scope of their duties." *Id.*; *see also United Artists Theatre Co. v. Walton*, 315 F.3d at 231 ("[T]he most that Delaware law requires of directors, though they are fiduciaries, is that they not be grossly negligent."). Thus, the *PWS Holding* court determined that the exculpation clause was appropriate. *PWS Holding*, 228 F.3d at 247.

The Plan Proponents submit that the Exculpation Clause provided in Section 11.2 of the Plan is substantially similar to provisions approved in other cases and complies fully with applicable Third Circuit law. Accordingly, consistent with the Third Circuit's rationale in *PWS Holding*, the Plan's Exculpation Clause should be approved.

## C. The Plan's Release of Holders of Plan Trust Asbestos Claims Should Be Approved

Section 11.3 of the Plan provides that any asbestos claimant that receives a payment from the Plan Trust shall be deemed to have unconditionally released the Plan Trust and each Settling Asbestos Insurance Company from any liability with respect to such party's asbestos claims. Plan § 11.3. Consensual releases of creditors' claims against non-debtor parties under a debtor's plan of reorganization are permissible. *See Continental Airlines*, 203 F.3d at 211; *see also In re Specialty Equip. Cos.*, 3 F.3d 1043, 1047 (7th Cir. 1993) ("[C]ourts have found releases that

90

are consensual and non-coercive to be in accordance with the strictures of the Bankruptcy Code.").

A release is considered consensual if the releasing party affirmatively consents to the release, either by settlement or contract, or if the affected creditor votes in favor of the debtor's plan of reorganization. *See*, *e.g.*, *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506-07 (Bankr. D.N.J. 1997) ("Where the creditor consents to the release, and presumably receives consideration in exchange for that agreement, it has not been forced by virtue of the discharge provisions of the code . . . . [A]s the settlements arise by agreement and not by operation of law, they do not run afoul of § 524(e)."); *In re Coram Healthcare Corp.*, 315 B.R. 321, 336 (Bankr. D. Del. 2004) (approving consensual releases provided for in a plan " to the extent creditors or shareholders voted in favor of [the plan], which provides for the release of claims"); *Zenith Elecs.*, 241 B.R. at 111-12 (finding that releases do not run afoul of the Bankruptcy Code where the released parties affirmatively accept the plan).

In this case, the release in Section 11.3 should be treated as releases provided in any other settlement or contract. If an asbestos claimant receives a payment from the Plan Trust, such claimant will not be permitted to initiate litigation against the Plan Trust or a Settling Asbestos Insurance Company seeking a second recovery on that party's claim. To the extent that an asbestos claimant

91

does not accept a payment from the Plan Trust, such claimant will retain whatever claim that he or she may have, subject to the Debtors' discharge of liability under §§ 1141 and 524(g) of the Bankruptcy Code. Thus, the only way in which the release set forth in Section 11.3 will take effect is if an asbestos creditor specifically consents to it. Accordingly, because the releases contained in Section 11.3 of the Plan are purely consensual, the Plan Proponents submit that Section 11.3 of the Plan is fair, reasonable, and should be approved pursuant to Bankruptcy Code §§ 1123(b)(6) and 105(a). *See*, *e.g.*, *Arrowmill Dev. Corp.*, 211 B.R. at 506-07.

## VIII. OBJECTIONS OF CERTAIN CLAIMANTS WHO WERE PARTIES TO EITHER PRE-PETITION SETTLEMENT AGREEMENTS OR THE CLAIMANT AGREEMENT SHOULD BE OVERRULED

The Debtors received a final objection to confirmation of the Plan from David C. Thompson, P.C. ("Thompson"). *See* Thompson Objection, Ex. 23. The Shein Law Center, Ltd. ( "Shein") filed its Preliminary Objection to confirmation (Ex. 21), but did not file a final objection as required by the Pre-Trial Order (Ex. 29). As a result, the Plan Proponents request that any objection asserted by Shein be overruled as untimely. In any event, the Thompson Objection and the Shein Preliminary Objection (collectively, the "Objections") are groundless, devoid of

any legal merit and contrary to the law of these Reorganization Cases. As a result, the Objections should be overruled.[17]

Thompson and Shein principally object to the Plan's classification of their clients' claims in Class 7 (Asbestos Personal Injury Claims) with other similarly situated asbestos claimants. Thompson Objection, Ex. 23 at 11-15;[18] Shein Preliminary Objection, Ex. 21 at 2-3. Pursuant to Section 2.3(g) of the Plan, Class 7 (Asbestos Personal Injury Claims) includes all claims with respect to the 131 claimants that entered into Pre-Petition Settlement Agreements, the approximately 79,000 claimants that participated in the Claimant Agreement, and all other present holders of Asbestos Personal Injury Claims. *See* Plan § 2.3(g). Thompson and

---

[17] In addition to the Thompson Objection, Thompson also served the Plan Proponents with a "Pre-Trial Brief" on May 19, 2010 (the "Thompson Brief"). The Thompson Brief echoes several of the arguments set forth in the Thompson Objection and also requests that this Court overrule its January 2010 decision authorizing the Debtors to amend the Avoidance Actions to add the Thompson Claimants as defendants. *See* Opinion, dated January 21, 2010, *In re Congoleum Corp.*, No. 09-04371 (D.N.J) [Dkt. No. 296] ("Reconsideration Decision"), Ex. 44. Thompson did not appeal or seek any other relief with respect to the Reconsideration Decision and his request to overturn that decision is not an appropriate objection to Plan confirmation and should not be addressed. As discussed herein, it is the law of the case that the Thompson Claimants are similarly situated with all other holders of Asbestos Personal Injury Claims, and therefore the classification of the Thompson Claimants in Class 7 (Asbestos Personal Injury Claims) is fair and appropriate. Whether or not the Thompson Claimants are defendants in the Avoidance Actions, they are holders of Asbestos Personal Injury Claims and properly classified in Class 7 of the Plan. Accordingly, any objections to confirmation of the Plan set forth in the Thompson Brief should be overruled.

[18] The Plan Proponents found the Thompson Objection difficult to comprehend and have tried their best to summarize it.

Shein argue that because certain of their clients entered into Pre-Petition Settlement Agreements or participated in the Claimant Agreement, such claimants have contract claims against Congoleum that cannot be classified in Class 7 (Asbestos Personal Injury Claims). Shein also argues that because certain of his clients received damages verdicts (but not liability verdicts or judgments) with respect to their asbestos claims against Congoleum, such claims are further precluded from classification in Class 7 (Asbestos Personal Injury Claims).

It is the law of the case that the Thompson Claimants, the Shein Claimants and all other holders of Asbestos Personal Injury Claims are "substantially similar" and should be classified in a single class. *See In re Congoleum Corp.*, No. 03-51524, 2007 WL 2177680, at *2 (Bankr. D.N.J. July 27, 2007), Ex. 51 ("July 2007 Objection Decision") (stating that "the Court regards all pre-judgment asbestos claims as similarly situated"). *See also* Opinion Regarding Joint Plan, dated June 5, 2008, *In re Congoleum Corp.*, No. 03-51524 (Bankr. D.N.J.) [Dkt No. 6575] ("Joint Plan Opinion"), Ex. 55 at 10 ("The [parties that settled pursuant to the Pre-Petition Settlement Agreement and the Claimant Agreement] are not dissimilar from other asbestos claimants simply because their claims were liquidated through inchoate pre-petition settlement agreements."). Moreover, neither Thompson nor Shein have been able to cite a single case or authority to support their position, nor do they complain that the Bankruptcy Court's prior rulings are incorrect.

94

The Plan has received the overwhelming support of all members of Class 7 (Asbestos Personal Injury Claims), including other similarly classified claimants that either entered into Pre-Petition Settlement Agreements or participated in the Claimant Agreement. *See* Ballot Certification, Ex. 17 ¶¶ 23 and 24. Pursuant to the Bankruptcy Code, a class vote binds dissenting members of a class. *See* 11 U.S.C. § 1126(c) (providing a creditor class accepts a plan if at least two-thirds in amount and more than one-half in number vote in favor of a plan, counting only those creditors that actually vote); 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) (requiring a super-majority of 75% approval with respect to § 524(g) plans). Thompson and Shein fail to present any legally supportable argument as to why their clients should not be bound by the overwhelming class vote in support of confirmation of the Plan. Accordingly, for the reasons set forth herein, the Thompson Objection and Shein Preliminary Objection should be overruled.

### A. Background of Settlements with the Shein and Thompson Claimants

As discussed in the Feist Declaration, prior to the Petition Date, Congoleum faced a situation where its primary insurers had claimed exhaustion of coverage, its excess insurers refused to provide coverage and were litigating against the company in the Coverage Action, and Congoleum could not afford to pay its asbestos-related costs without prompt reimbursement from its excess insurers. Feist Decl. ¶¶ 16, 21. As a result, in order to conserve needed cash, Congoleum

95

sought to postpone settlements or, when necessary, to settle pending asbestos cases for non-cash consideration in the form of assignments of future insurance proceeds, whenever possible. Feist Decl. ¶ 22. In late 2002 and early 2003, Congoleum settled 131 trial-listed cases in the tort system for cash, promises to pay and/or an assignment of insurance rights (the "Pre-Petition Settlement Agreements"). *Id.* All claims were settled based on Congoleum's understanding that these cases had upcoming trial dates or, in a few cases, were settled together with other cases that had upcoming trial dates. *Id.*

Shein asserts its objection on behalf of four clients—Mr. Weinert , Mr. Buckley, Mr. Eck and Mr. Marsilio (collectively, the "Shein Claimants")—that had filed complaints against Congoleum in 2002 and 2003 (the "Shein Complaints"). Feist Decl. ¶ 23; Ex. 36. In November 2002, two of the Shein Claimants, Mr. Eck and Mr. Marsilio, had obtained damages verdicts in the amount of $3,790,000 and $4,828,000, respectively. Feist Decl. ¶ 23. Both of these cases were tried to a jury in a reverse bifurcated fashion, with damages being tried in phase I and with liability determined in phase II. *Id.* The Eck case was settled for $275,000 and the Marsilio case was settled for $200,000. *Id.* Both settlements were reached after the damages verdicts, but before the liability phase of the trial had commenced. *Id.*

At the time the Weinert case was set for trial on March 10, 2003, the Eck and Marsilio settlements had not been paid. Feist Decl. ¶ 24. Congoleum

96

attempted to negotiate a settlement of the Weinert claim based on an assignment of insurance proceeds and, in connection with these settlement discussions, Shein requested payment of the Eck and Marsilio settlements.  *Id.*  Shein agreed to settle Weinert based on an assignment of insurance proceeds and agreed to accept an assignment of insurance proceeds on the Eck and Marsilio claims in lieu of the prior agreement for a cash payment.  *Id.*  Shein also requested that a settlement of the Buckley case, which had a trial date of May 5, 2003, be included with the settlement of the Weinert cases.  *Id.*  The Buckley case was settled for $125,000 and the Weinert case was settled for $200,000.  *Id.*  On or about March 11, 2003, Congoleum reached an agreement with the Shein Claimants resolving their asbestos personal injury causes of action for the assignment of future insurance proceeds (the "Shein Settlement").  Feist Decl. ¶ 24; Ex. 37.  The Shein Settlement constitutes four of Congoleum's 131 Pre-Petition Settlement Agreements.

At the same time that Congoleum had been discussing the settlements with Shein (on or around March 2003), Congoleum had been negotiating a global claimant settlement with asbestos claimants' counsel, primarily Joe Rice and Perry Weitz.  Feist Decl. ¶ 29.  On April 10, 2003, one month after the Shein Settlement was executed, the global claimant settlement was memorialized in the Claimant Agreement, the Security Agreement and the Collateral Trust Agreement.  *Id.*

97

Approximately 79,000 asbestos personal injury claims were settled under the terms of the Claimant Agreement.  Feist Decl. ¶ 31.

Fourteen claimants represented by Thompson (the "Thompson Claimants") participated with approximately 79,000 other asbestos claimants in the Claimant Agreement, which, along with the Security Agreement and the Collateral Trust Agreement formed the basis of Congoleum's pre-packaged plan of reorganization (the "Pre-Packaged Plan").  Feist Decl. ¶ 32.  As was customary in asbestos reorganizations at the time, the Pre-Packaged Plan provided different treatment for claimants that settled pursuant to Pre-Petition Settlement Agreements, claimants that settled pursuant to the Claimant Agreement, and all other holders of Asbestos Personal Injury Claims or Demands.  *Id.*  The payment distribution system in the Pre-Packaged Plan was governed by the Collateral Trust Agreement.  *Id.*  The Collateral Trust Agreement provided that those claimants who entered Pre-Petition Settlement Agreement or who participated in the Claimant Agreement would be paid before other present and future asbestos claimants by the Collateral Trustee from insurance process and such claimants would not be governed by the Trust Distribution Procedures (TDP).  *Id.*

While the Debtors were soliciting acceptance of the Fourth Plan, dated as of November 12, 2004, which had modified the payment distribution structure of the Pre-Packaged Plan, the Third Circuit issued its decision in *Combustion*

98

*Engineering*, 391 F.3d 190 (3d Cir. 2005) (Ex. 45), which addressed, among other things, equality of distribution issues implicated by § 524(g) and the Bankruptcy Code generally. Feist Decl. ¶ 37.[19] Thereafter, a new plan was negotiated in an effort to accord the *Combustion Engineering* decision, only for such plan to be withdrawn when certain settled claimants represented by Weitz & Luxenburg withdrew their support. Feist Decl. ¶ 39. Extended mediation among the parties commencing in the summer of 2006 resulted in the consensual Tenth Plan, although such plan was held to be unconfirmable as a matter of law by the Bankruptcy Court in February 2007 based, in part, on its interpretation of *Combustion Engineering*. Feist Decl. ¶¶ 44-46; *see In re Congoleum Corp.*, 362 B.R. at 182, Ex. 48. Unable to reach a negotiated compromise after additional meditation, litigation was resumed in the Omnibus Avoidance Action by the Debtors to avoid the Pre-Petition Settlement Agreements, Claimant Agreement and related documents, which litigation was ongoing in 2008. Feist Decl. ¶ 58; *see In*

---

[19] The Bankruptcy Court later described this decision as "shifting the ground" with respect to Congoleum's reorganization efforts. *In re Congoleum Corp.*, No. 03-51524, 2009 WL 499262, at *7 (Bankr. D.N.J. Feb. 26, 2009), Ex. 62 (Amended Joint Plan Opinion).

500522999v5

*re Congoleum Corp.*, Adv. Pro. No. 05-06245, 2007 WL 4571086 (Bankr. D.N.J. Dec. 28, 2007), Ex. 52 (Dec. 2007 Avoidance Decision).[20]

Ultimately, in August 2008, a global settlement including the Original Litigation Settlement Agreement was agreed to among the Debtors, the Bondholders' Committee, the Futures Representative, the Asbestos Claimants' Committee, Claimants' Counsel and approximately 87% of the asbestos claimants who were parties to the Pre-Petition Settlement Agreements. Feist Decl. ¶ 60; *see* Litigation Settlement Opinion, Ex. 60. The Original Litigation Settlement Agreement was subsequently amended to account for certain developments that had occurred in the case. Feist Decl.¶¶ 66-67; *see* Litigation Settlement Agreement, as amended, Ex. 61. As discussed more fully *supra* in Part VI, approximately 84% of all parties to the Pre-Petition Settlement Agreements have agreed to the Litigation Settlement Agreement, as amended, which has been incorporated into Section 5.14 of the Plan. However, both the Thompson

---

[20] The Omnibus Avoidance Action was successful in avoiding the security interests in insurance proceeds that were purportedly granted by the Pre-Petition Settlement Agreements and the Security Agreement. Feist Decl. ¶ 48; *see* Memorandum Opinion Regarding Security Interests, dated July 9, 2007, *In re Congoleum Corp.*, Adv. Pro. No. 05-06245 (Bankr. D.N.J.) [Dkt. No. 147] Ex. 50 (Security Interest Avoidance Decision). However, the Debtors' other claims to set aside the Claimant Agreement and other agreements relating to the Pre-Packaged Plan were not successful and became the subject of appeals that have been stayed.

Claimants and the Shein Claimants have not agreed to the settlement.  Feist Decl. ¶ 67.

The Plan specifically provides that *all* holders of Asbestos Personal Injury Claims—regardless of whether such claimants may have had a pre-petition settlement agreement—will be treated the same as required by § 524(g) of the Bankruptcy Code.  *See* Plan § 2.3(g) (providing that "Class 7 consists of all Asbestos Personal Injury Claims, including the unliquidated Asbestos Personal Injury Claims of Pre-Petition Settled Claimants").  Pursuant to the Plan, all parties to the Pre-Petition Settlement Agreements and the Claimant Agreement, in full satisfaction of their Asbestos Personal Injury Claims and any and all rights pursuant to any Pre-Petition Settlement Agreement, Claimant Agreement, Security Agreement, Collateral Trust Agreement, shall be restored to *status quo ante* as such claims existed at the time the Claimant initially submitted its Claim against Congoleum, and such Claim shall be resolved and paid pursuant to the Plan Trust Agreement and the TDP in the same manner as all other Asbestos Personal Injury Claims in Class 7.  *Id.*

## B.    Summary of Objections

Both Thompson and Shein argue that (i) the Pre-Petition Settlement Agreements and the Claimant Agreement are valid contractual agreements that the Plan cannot disturb; and (ii) as a result, the Thompson Claimants and the Shein

101

Claimants are not properly classified in Class 7 (Asbestos Personal Injury Claims) and are deprived of their supposed property rights.  Specifically, the Shein Preliminary Objection provides, in pertinent part, that:

> To the extent the [Plan] classifies the claims of the Shein Law Center Claimants as prepetition tort claims and/or as Asbestos Personal Injury Claims, and not as contract claims, and purports to channel these contract claims to the Asbestos Plan Trust, the Fourth Amended Plan does not properly classify and treat these contract claims and deprives the Shein Law Center Claimants of their contractual property rights without due process.

Shein Preliminary Objection, Ex. 21 at 2.  The Thompson Objection provides that: "The [Thompson Claimants] specifically object to [the Plan] to the extent that it [incorporates] a proposal . . . to invalidate the as-yet non-avoided status of the [Thompson Claimants' contract claims] . . . ."  Thompson Objection, Ex. 23 at 14.  As set forth below, both the Thompson Objection and the Shein Preliminary Objection are without merit and should be overruled.  Moreover, because Shein has apparently abandoned its objections to confirmation of the Plan, the Shein Preliminary Objection also should be overruled as procedurally deficient.  *See*, *e.g.*, *American Family Enters.*, 256 B.R. at 429 (overruling various confirmation objections for being untimely, unclear or unintelligible).  However, as a precaution and for the avoidance of any doubt, the Plan Proponents address the Shein Preliminary Objection below.

500522999v5

## C. The Plan Properly Classifies the Claims of the Thompson and Shein Claimants Pursuant to the Law of the Case

Section 1122(a) of the Bankruptcy Code states that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a) (emphasis added). Classification "is constrained by two straight-forward rules: Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason." *In re Chateaugay Corp.*, 89 F.3d 942, 949 (2d Cir. 1996)). Plan proponents, however, are permitted "considerable discretion to classify claims and interests according to the facts and circumstances of the case." *Greate Bay Hotel & Casino*, 251 B.R. at 224 (quoting *Holywell*, 913 F.2d at 880). Courts in the Third Circuit will uphold a plan's classification of claims and interests so long as there is a "reasonable basis" for the classification and such is "fair and reasonable." *See*, *e.g.*, *ABB Lummus Global*, 2006 WL 2052409, at *13 (classifying asbestos personal injury claims separately from other general unsecured claims is fair and reasonable).

It is the law of this case that all holders of Asbestos Personal Injury Claims can be placed in a single class and that a § 524(g) plan mandates equal treatment among asbestos claimants whether they hold contract or tort claims. *See* Joint Plan Opinion, Ex. 55 at 5 ("It is law of the case that all pre-judgment creditors at the same disease level must be treated similarly . . . ."). It is "fair and reasonable" to

classify all holders of Asbestos Personal Injury Claims in the same class because, as the Bankruptcy Court made clear, all members of Class 7 (Asbestos Personal Injury Claims) have claims of the same legal character, namely "personal injury claims based on alleged exposure to asbestos contained in Congoleum products." *In re Congoleum Corp.*, 362 B.R. at 188, Ex. 48 (holding that regardless of whether claimants entered into pre-petition settlements with Congoleum, "[t]he legal character of these claims is the same for those cases that were on the eve of trial and those that may arise in the future").  As a result, the Plan's classification of the Thompson and Shein Claimants in Class 7 (Asbestos Personal Injury Claims) is proper notwithstanding the alleged settlement claims possessed by only certain members of the Class.  *See Armstrong World Indus.*, 348 B.R. at 159-60 (District Court's Findings of Fact and Conclusions of Law:  "Because all Asbestos Personal Injury Claims in Class 7 (including Indirect PI Trust Claims) relate, directly or indirectly, to [the debtor's] liability for asbestos-related personal injury and wrongful death claims, *whether arising under tort law* (as is the case with direct Asbestos Personal Injury Claims and may be the case with Indirect PI Trust Claims) *or under contract* (as may be the case with certain direct Asbestos Personal Injury Claims and certain Indirect PI Trust Claims), a reasonable basis exists for the classification of the Asbestos Personal Injury Claims together in a single class.") (emphasis added).  *See also In re Winn-Dixie Stores, Inc.*, 356 B.R.

104

239, 247-51 (Bankr. M.D. Fla. 2006) (approving similar classification and treatment of landlord creditors despite the fact that only certain of such creditors possessed guarantee claims).

Moreover, the Plan's classification is "fair and reasonable" because the Bankruptcy Court has held that the "separate classification [would] render the Plan unconfirmable on its face" and would violate the equality of treatment requirements of § 524(g). *See In re Congoleum Corp.*, 362 B.R. at 182. Section 524(g) requires that an asbestos trust treat "present claims and future demands that involve similar claims in substantially the same manner." 11 U.S.C. § 524(g)(2)(B)(ii)(V). As the Bankruptcy Court has made clear, the fact that certain claimants entered into Pre-Petition Settlement Agreements (as did the Shein Claimants) or entered into the Claimant Agreement (as did the Thompson Claimants), does not entitle such claimants to different treatment under the Bankruptcy Code. *See In re Congoleum Corp.*, 362 B.R. at 182-83.

In a ruling in the Omnibus Avoidance Action, the Bankruptcy Court took another opportunity to reiterate its prior holding regarding the nature of the claims held pursuant to the Pre-Petition Settlement Agreement and the Claimant Agreement. *See* July 2007 Objection Decision, Ex. 51. In the July 2007 Objection Decision, the Bankruptcy Court stated:

> As far as the Court is aware, none of the [claimants with Pre-Petition Settlement Agreements] in this case had obtained a final judgment as

105

> to both liability and damages.  Certain objectors emphasize the fact that some claimants had pre-petition damages verdicts in their favor; however, *a damages verdict without a finding of liability is meaningless*. While it may prove a useful tool for the parties in positioning themselves for settlement, it is an inchoate ruling that only gains any legal significance upon a finding of liability.

July 2007 Objection Decision, Ex. 51 at 2.  The Bankruptcy Court also stated that:

"*it should be clear that the Court regards all pre-judgment asbestos claims as similarly situated.  The only proper criterion for differentiating between the pre-judgment claims is their disease level*."  *Id.* (emphasis added).

In yet another ruling, the Bankruptcy Court held that all asbestos personal injury claimants must be classified within a single class and must receive equal treatment, regardless of whether such claimants were parties to Pre-Petition Settlement Agreements.  Joint Plan Opinion, Ex. 55 at 10.  In the Joint Plan, proposed in 2008, the 131 claimants who had executed individual Pre-Petition Settlement Agreements were afforded certain "litigation rights" that were not given to other asbestos claimants.  Feist Decl. ¶ 57.  The Bankruptcy Court ruled that this provision rendered the Joint Plan unconfirmable "because it relies on the pre-petition liquidation of the [claims settled pursuant to the Pre-Petition Settlement Agreements and the Claimant Agreement] as a basis to treat them differently from other asbestos claimants.  Such a distinction is in direct contravention of this Court's prior rulings and the precepts of § 524(g)."  Joint Plan Opinion, Ex. 55 at 4.  The Bankruptcy Court stated further that "[t]he [parties that settled pursuant to

106

the Pre-Petition Settlement Agreement and the Claimant Agreement] are not dissimilar from other asbestos claimants simply because their claims were liquidated through inchoate pre-petition settlement agreements." *Id.* at 10.

The Thompson and Shein Claimants are now attempting to re-litigate that which has already been decided by the Bankruptcy Court on at least three separate occasions. As set forth above, it is unequivocally law of this case that all holders of Asbestos Personal Injury Claims are similarly situated pursuant to § 1122(a) of the Bankruptcy Code and should be classified in a single class. *See* Joint Plan Opinion, Ex. 55 at 5 ("It is law of the case that all pre-judgment creditors at the same disease level must be treated similarly . . . ."). Accordingly, the Objections should be overruled. *See*, *e.g.*, *Arizona v. California*, 460 U.S. 605, 618 (1983) ("The doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."); *Eastern Pilots Merger Comm. v. Continental Airlines, Inc. (In re Continental Airlines, Inc.)*, 279 F.3d 226, 232-33 (3d Cir. 2002) (confirmation order which reduced pilots' seniority rights to money judgment which was discharged in the bankruptcy was law of the case); *AL Tech Specialty Steel Corp. v. Allegheny Int'l Credit Corp.*, 104 F.3d 601, 605-06 (3d Cir. 1997) (holding that it would be inappropriate for the court to reexamine the validity of a claim when earlier decision necessarily decided that claim was valid).

500522999v5

### D. The Thompson Claimants and the Shein Claimants Have Been Bound by Class Vote to the Treatment in the Plan

The Bankruptcy Code provides that a plan of reorganization will bind dissenting members of a class of creditors, so long as such class is comprised of similarly situated claims and the plan is duly confirmed. *See* 7 *Collier* ¶ 1129.02 ("The entire thrust of chapter 11 is that a majority can bind a minority so long as members of the majority *and* minority are similarly situated."). *See also* 11 U.S.C. § 1126(c) (providing a creditor class accepts a plan if at least two-thirds in amount and more than one-half in number vote in favor of a plan, counting only those creditors that actually vote); 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) (requiring a super-majority of 75% approval with respect to § 524(g) plans); 11 U.S.C. § 1123(a)(4) (a plan "shall provide the same treatment for each claim or interest of a particular class"). Without the ability to bind dissenting members, each member of every class would hold virtual veto power over any plan of reorganization, which would render the Chapter 11 process unworkable. The Bankruptcy Code rejects this approach. Instead, consensual confirmation refers to consent "by class of creditors." 7 *Collier* ¶ 1129.01. In other words, "a plan is said to be confirmed consensually if all classes of creditors vote in favor, even if some classes have dissenting creditors." *Id.*

In the present case, the Litigation Settlement Agreement, the centerpiece of the Plan, was negotiated by the Debtors, the Asbestos Claimants' Committee, the

108

Futures Representative and the Claimants' Counsel. The Asbestos Claimants' Committee, in particular, maintains a fiduciary duty to all of the present holders of Asbestos Personal Injury Claims, including those claimants that entered into Pre-Petition Settlement Agreements or the Claimant Agreement. This is how the Chapter 11 process is designed to work: representatives of all major constituencies negotiated openly to agree on framework pursuant to which all estate creditors would have their claims resolved. After years of litigation and substantial negotiation, the Debtors and all of the official committees and representatives appointed in these Reorganization Cases, along with Claimants' Counsel, agreed that all holders of Asbestos Personal Injury Claims would be classified in a single class, receive equal treatment and that no priority or preferential treatment would be accorded the parties that entered into Pre-Petition Settlement Agreements or participated in the Claimant Agreement, which agreements were executed in the year prior to the Petition Date.

Like all other holders of Asbestos Personal Injury Claims, the Thompson and Shein Claimants were entitled to vote on the Plan. They do not, however, possess the power to veto confirmation; rather, they must abide by the consensus vote of their Class. Indeed, as the Bankruptcy Court has noted with respect to certain contractual arguments asserted by Congoleum's insurers in these cases, "[w]hile the Bankruptcy Code is not a license to trample on all non-debtors' rights,

instances are legion in which 'distinct and valuable' rights of non-debtors are lost or redefined in a bankruptcy case." *In re Congoleum Corp.*, No. 03-51524, 2008 WL 4186899, at *9 (Bankr. D.N.J. Sept. 2, 2008), Ex. 58 (Supplemental Joint Plan Opinion).

Other bankruptcy courts have expressly rejected similar arguments. For example, in *Winn-Dixie*, the creditors' committee and the debtors agreed to a global settlement that would, among other things, resolve issues pertaining to a class of landlord claims. The settlement agreement was incorporated into the plan pursuant to § 1123(b)(3). *See Winn-Dixie Stores*, 356 B.R. at 245. Approximately 77% of the landlords within the class accepted the plan. *Id.* at 250. Certain dissenting landlords, however, objected to the settlement claiming that the debtors and the committee could not "settle away" their rights. *Id.* at 248. Noting that the settlement was negotiated by the creditors committee who had a fiduciary obligation to all of the unsecured creditors of the estate, the court held that "every affected creditor need not consent to a settlement for it to be binding on all creditors." *Id.* at 249. Because a majority of the landlords voted in favor of the plan, the court determined that the settlement agreement embodied in the class treatment for the landlord creditors was binding on the dissenting creditors. *Id.*

Similarly, in *In re USA Commercial Mortg. Co.*, No. 06-10725, 2007 WL 2571947 (D. Nev. Aug. 29, 2007), the debtor reached a settlement with the

110

majority of its direct lenders, which settlement was negotiated by a committee of direct lenders and included in a plan of reorganization. *Id.* at \*2. The class of direct lenders voted in favor of the plan. *Id.* at \*11. Dissenting lenders objected to confirmation arguing that their due process rights had been violated because an adversary proceeding against them had not been filed and the settlement agreed to by others could not become binding on them without their consent. *Id.* As an initial matter, the court summarily rejected the due process concerns because all parties received an opportunity to be heard with respect to the confirmation hearing. *Id.* (citing *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 984 (9th Cir. 1998)). The court also rejected the dissenting lenders' attempt to avoid their class's treatment finding that "[i]t is the class vote to accept the plan that binds even non-consenting creditors to claim treatment." *Id.* at \*13.

Once a plan under Chapter 11 is confirmed, a creditor can no longer enforce its preconfirmation rights, but is limited to the rights granted in the plan. *See In re Monclava Care Ctr., Inc.*, 254 B.R. 167, 171 (Bankr. N.D. Ohio 2000), *rev'd on other grounds*, 266 B.R. 792 (N.D. Ohio 2001) ("A fundamental principle with regards to a confirmed Chapter 11 Plan, which is really nothing more than a new contract between the parties, is that all the prior obligations and rights of the parties subject to the plan are extinguished and replaced by the terms of the Plan."); 7 *Collier* ¶ 1129.01[1] ("In essence, a valid plan substitutes, in much the same way

111

as a common law novation would, the obligations as stated in the plan for all preconfirmation claims and interests."). *See also* 11 U.S.C. § 1141(d)(A) (confirmation of a plan "discharges the debtor from any debt that arose before the date of such confirmation."); *In re Montgomery Ward Holding Corp.*, 306 B.R. 489, 495 (Bankr. D. Del. 2004) ("The new indebtedness [pursuant to a confirmed plan] is in essence a new and binding contract between the debtor and the creditors."). Accordingly, the Objections regarding the treatment of the Thompson and Shein Claimants under the Plan should be overruled.

### E.   The Due Process Objections Are Without Merit and Should Be Overruled

Both Thompson and Shein have argued that they have been deprived of their contractual property rights without due process of law. *See* Thompson Objection at 12; Shein Preliminary Objection at 2. In general, "notice of the pendency of a hearing to consider confirmation of the plan is sufficient to satisfy due process requirements." *In re Longardner & Assocs., Inc.*, 855 F.2d 455, 465 (7th Cir. 1988). *See Elliot v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir. 1994) (noting due process merely requires notice and an opportunity to be heard). *See also Combustion Eng'g*, 391 F.3d at 245 n.64 ("Minimal due process requirements extend to bankruptcy proceedings."). In the present case, both Shein and Thompson have had ample opportunity to raise objections and to be heard with respect to their objections to confirmation of the Plan and approval of the Litigation Settlement

Agreement, as amended. Thompson has actively participated in these Chapter 11 cases and timely filed objections to the Plan. Exs. 22, 23. Shein also raised preliminary objections to the Plan (Ex. 21), although such objections apparently have been abandoned since Shein did not file a final objection as required by this Court's Pre-Trial Order (Ex. 29). Because both Thompson and Shein have had an opportunity to file objections and be heard with respect to confirmation of the Plan, due process has been satisfied.

For each of the reasons set forth herein, the Plan Proponents respectfully request that this Court overrule the Thompson Objection and the Shein Preliminary Objection in their entirety.

## CONCLUSION

WHEREFORE, the Plan Proponents submit that (i) the Plan, as modified, fully satisfies all applicable requirements of the Bankruptcy Code and should be confirmed by the Court, (ii) all pending objections to confirmation should be overruled. Accordingly, the Plan Proponents respectfully request that the Court enter an order confirming the Plan in substantially the same form as the proposed Confirmation Order and Findings of Fact and Conclusions of Law, and grant the Plan Proponents such other and further relief as this Court may deem just and proper.

Dated: May 20, 2010

Respectfully submitted,

**OKIN, HOLLANDER & DeLUCA, L.L.P.**
/s/ *Gregory S. Kinoian*
One Parker Plaza
Fort Lee, New Jersey 07024
(201) 947-7500
Paul S. Hollander (PH-2681)
Gregory S. Kinoian (GK-7386)

and

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1540 Broadway
New York, New York 10036
(212) 858-1000
Richard L. Epling (*pro hac vice* admission)
John F. Pritchard (*pro hac vice* admission)
Kerry A. Brennan (*pro hac vice* admission)
Erica E. Carrig
Brandon R. Johnson
Kent P. Woods

*Attorneys for Congoleum Corporation, et al.,*
*Debtors and Debtors-in-Possession*

**FORMAN HOLT ELIADES & RAVIN LLC**
/s/ *Stephen B. Ravin*
80 Route 4 East, Suite 290
Paramus, NJ 07652
Telephone: (201) 845-1000
Stephen B. Ravin, Esq. (SBR7074)

and

500522999v5

**ORRICK, HERRINGTON & SUTCLIFFE LLP**
Columbia Center
1152 15th Street, N.W.
Washington, DC 20005-1706
Telephone: (202) 339-8400
Jonathan P. Guy, Esq. (admitted *pro hac vice*)
Richard H. Wyron, Esq. (admitted *pro hac vice*)
Roger Frankel, Esq. (admitted *pro hac vice*)

*Counsel to R. Scott Williams,*
*Futures Representative*

**TEICH GROH**
*/s/ Michael A. Zindler*
691 State Highway 33
Trenton, NJ 08619
Michael A. Zindler, Esq. (MZ-0178)

and

**AKIN GUMP STRAUSS HAUER & FELD LLP**
133 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone:  202-887-4000
Facsimile:  202-872-1002
James R. Savin, Esq. (admitted *pro hac vice*)
Michele A. Roberts, Esq. (admitted *pro hac vice*)
David Dunn, Esq. (admitted *pro hac vice*)

One Bryant Park
New York, New York
Telephone:  212-872-1000
Facsimile:  202-872-1002
Michael S. Stamer, Esq. (MS-5900)

*Attorneys for the Official Committee of*
*Bondholders of Congoleum Corporation, et al.*

115

500522999v5

**GREENBAUM, ROWE, SMITH & DAVIS LLP**
*/s/ Nancy Isaacson*
75 Livingston Avenue
Roseland, New Jersey 07068
(973) 535-1600
Nancy Isaacson, Esq. (NI/1325)

**CAPLIN & DRYSDALE, CHTD.**
375 Park Avenue, 35th floor
New York, New York 10152-3500
(212) 319-7125
Elihu Inselbuch, Esq. (EI/2843)
Rita C. Tobin, Esq. (RCT/5413)

and

One Thomas Circle, N.W., Suite 1100
Washington, D.C. 20005
(202) 862-5000
Ronald E. Reinsel., Esq.
Kevin C. Maclay, Esq.

*Attorneys for Unsecured Asbestos Claimants' Committee*

116