# <u>APPENDIX EXHIBIT 2 (CORRECTED)</u>

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: CONGOLEUM CORPORATION,<br><br>Debtors. | Civil Action No. 09-4371 (JAP)<br><br>Bankr. Case No. 03-51524 |

**ORDER CONFIRMING FOURTH AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF THE DEBTORS, THE OFFICIAL ASBESTOS CLAIMANTS' COMMITTEE, THE OFFICIAL COMMITTEE OF BONDHOLDERS FOR CONGOLEUM CORPORATION, _ET AL._ AND THE FUTURES <u>REPRESENTATIVE DATED AS OF MARCH 11, 2010 (AS MODIFIED)</u>**

# TABLE OF CONTENTS

Page

INTRODUCTION..................................................................................................................1

I.  FINDINGS OF FACT.................................................................................................6

    A.    BACKGROUND CONCERNING THE DEBTORS' BUSINESSES.............................................................................................6

        1.    Overview of the Company ..........................................................6

    B.    HISTORY AND NUMBER OF ASBESTOS PERSONAL INJURY CLAIMS ASSERTED AGAINST THE DEBTORS .............6

        1.    Congoleum's Pre-Bankruptcy Asbestos Liability ....................6

    C.    EVENTS LEADING UP TO THE BANKRUPTCY FILING...........7

        1.    Background of Congoleum's Insurance Coverage ....................7

        2.    Excess Insurers Commence the Coverage Action ....................8

        3.    The Pre-Petition Settlements....................................................9

        4.    The Claimant Agreement and Related Documentation ...........10

    D.    THE DEBTORS' CHAPTER 11 CASES AND COMBUSTION ENGINEERING ..............................................................................11

        1.    Initiation of the Adversary Proceedings .................................12

        2.    The Settlement of the Omnibus Avoidance Action .................14

        3.    The Amended Joint Plan and Appeal.......................................16

    E.    DEVELOPMENT AND NEGOTIATION OF THE PLAN...............18

    F.    COMPLIANCE WITH THE REQUIREMENTS OF § 1129 OF THE BANKRUPTCY CODE.......................................................19

        1.    Section 1129(a)(1)—Compliance of the Plan with Applicable Provisions of the Bankruptcy Code...............................19

        2.    Section 1129(a)(2)—Compliance with  Applicable Provisions of the Bankruptcy Code .........................................25

        3.    Section 1129(a)(3)—Proposal of the Plan in Good Faith.........................25

        4.    Section 1129(a)(4)—Court Approval of Certain Payments as Reasonable ................................................26

        5.    Section 1129(a)(5)—Disclosure of Identity of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy ................................................27

        6.    Section 1129(a)(6)—Approval of Rate Changes......................27

        7.    Section 1129(a)(7)—Best Interests of Holders of Claims and Equity Interests ....................................27

|   | 8. | Section 1129(a)(8)—Acceptance of the Plan by Each Impaired Class | 28 |
|---|----|---|---|
|   | 9. | Section 1129(a)(9)—Treatment of Claims Entitled to Priority Pursuant to § 507(a) of the Bankruptcy Code | 29 |
|   | 10. | Section 1129(a)(10)—Acceptance By at Least One Impaired, Non-Insider Class | 30 |
|   | 11. | Section 1129(a)(11)—Feasibility of the Plan | 30 |
|   | 12. | Section 1129(a)(12)—All Statutory Fees Have Been or Will Be Paid | 31 |
|   | 13. | Section 1129(a)(13)—Retiree Benefits | 31 |
|   | 14. | Section 1129(d)—Purpose of Plan | 32 |
| G. | | THE PLAN SATISFIES THE "CRAM DOWN" REQUIREMENTS OF § 1129(b) WITH RESPECT TO EACH CLASS OF CLAIMS OR INTERESTS THAT IS IMPAIRED UNDER, AND HAS NOT ACCEPTED, THE PLAN | 32 |
| H. | | THE PLAN TRUST AND THE ASBESTOS CHANNELING INJUNCTION COMPLY WITH § 524(g) OF THE BANKRUPTCY CODE | 33 |
|   | 1. | The Plan Trust Satisfies the Requirements of § 524(g)(2)(B)(i) of the Bankruptcy Code | 33 |
|   | 2. | The Plan Trust Satisfies the Requirements of § 524(g)(2)(B)(ii) of the Bankruptcy Code | 35 |
|   | 3. | The Extension of the Asbestos Channeling Injunction to Third Parties is Appropriate Pursuant to § 524(g)(4) of the Bankruptcy Code | 38 |
|   | 4. | The Interests of Future Asbestos Claimants were Properly Represented by the Futures Representative | 39 |
|   | 5. | Entry of the Asbestos Channeling Injunction is Fair and Equitable with Respect to Future Asbestos Claimants | 39 |
|   | 6. | The Plan Trust Satisfies the Elements of a Qualified Settlement Fund (QSF) | 40 |
| I. | | THE ANTI-SUIT INJUNCTION SATISFIES THE REQUIREMENTS OF § 105(a) OF THE BANKRUPTCY CODE | 40 |
| J. | | CREATION OF THE RESERVE FUND | 42 |
| K. | | SPECIFIC FINDINGS OF FACT RELATING TO SETTLEMENTS | 43 |
|   | 1. | The Litigation Settlement Agreement as Amended | 43 |
|   | 2. | The Intercompany Settlement | 45 |
|   | 3. | The Century Settlement | 46 |
| L. | | COMPREHENSIVE SETTLEMENT OF CLAIMS AND CONTROVERSIES | 47 |
| M. | | SATISFACTION OF CONDITIONS TO CONFIRMATION | 48 |

| | | |
|---|---|---|
| **II.** | **CONCLUSIONS OF LAW** ............................................................... | **52** |
| | A. | JURISDICTION AND VENUE ............................................. 52 |
| | B. | MODIFICATIONS TO THE PLAN ....................................... 53 |
| | C. | EXEMPTIONS FROM TAXATION ...................................... 53 |
| | D. | EXEMPTIONS FROM SECURITIES LAWS ........................ 54 |
| | E. | COMPLIANCE WITH § 1129 OF THE BANKRUPTCY CODE ...... 54 |
| | F. | COMPLIANCE WITH § 524(g) OF THE BANKRUPTCY CODE..... 54 |
| | G. | PROPRIETY OF VARIOUS AGREEMENTS AND PLAN DOCUMENTS........................................................................ 54 |
| | H. | GOOD FAITH NEGOTIATION, IMPLEMENTATION AND CONSUMMATION ............................................................... 55 |
| | I. | ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................................................ 56 |
| | J. | APPROVAL OF THE DISCHARGES, RELEASES, INJUNCTIONS, INDEMNIFICATIONS AND EXCULPATIONS PROVIDED UNDER THE PLAN ................................................ 56 |
| | K. | OBJECTIONS TO THE PLAN .............................................. 57 |
| **III.** | **ORDER** ........................................................................................... | **59** |
| | A. | GENERAL PROVISIONS REGARDING CONFIRMATION OF THE PLAN AND APPROVAL OF PLAN-RELATED DOCUMENTS........................................................................ 59 |
| | | 1. CONFIRMATION OF THE PLAN............................... 59 |
| | | 2. MODIFICATIONS TO THE PLAN ............................ 59 |
| | | 3. CONDITIONS TO CONFIRMATION AND CONSUMMATION OF THE PLAN ............................. 60 |
| | | 4. EFFECTS OF CONFIRMATION ............................... 60 |
| | | 5. APPROVAL, MODIFICATION AND EXECUTION OF PLAN DOCUMENTS .................................. 60 |
| | B. | CLAIMS BAR DATES AND OTHER CLAIMS MATTERS ............. 62 |
| | | 1. GENERAL BAR DATE PROVISIONS FOR ADMINISTRATIVE CLAIMS ................................. 62 |
| | | 2. BAR DATE FOR PROFESSIONAL FEES ............... 62 |
| | | 3. BAR DATE FOR SUBSTANTIAL CONTRIBUTION CLAIMS ...................................................... 63 |
| | | 4. BAR DATE FOR REJECTION DAMAGES CLAIMS ............. 64 |
| | C. | APPROVAL OF EXECUTORY CONTRACT AND UNEXPIRED  LEASE PROVISIONS AND RELATED PROCEDURES.................................................................. 64 |
| | | 1. ASSUMED CONTRACTS AND LEASES AND RELATED PROCEDURES ................................ 64 |

|  | 2. | REJECTED CONTRACTS AND LEASES | 65 |
|  | 3. | ABI CANADA LICENSE AGREEMENT; INTERCOMPANY AGREEMENTS | 65 |
|  | 4. | COMPENSATION AND BENEFIT PROGRAMS | 66 |
| D. | MATTERS RELATING TO IMPLEMENTATION OF THE PLAN | | 66 |
|  | 1. | ACTIONS IN FURTHERANCE OF THE PLAN | 66 |
|  | 2. | DIRECTORS AND OFFICERS OF REORGANIZED DEBTORS | 68 |
|  | 3. | APPROVAL OF EXIT FACILITY | 68 |
|  | 4. | CANCELLATION OF EXISTING SECURITIES AND AGREEMENTS/DISCHARGE OF INDENTURE TRUSTEE | 72 |
|  | 5. | ISSUANCE OF NEW INSTRUMENTS | 72 |
|  | 6. | CREATION OF PLAN TRUST | 72 |
|  | 7. | TRANSFERS OF PROPERTY TO AND ASSUMPTION OF CERTAIN LIABILITIES BY THE PLAN TRUST | 73 |
| E. | CERTAIN MERGERS AND VESTING OF PROPERTY | | 76 |
| F. | EXEMPTIONS FROM TAXATION | | 76 |
| G. | EXEMPTIONS FROM SECURITIES LAWS | | 77 |
| H. | DISTRIBUTION TO RECORD HOLDERS OF ALLOWED CLAIMS | | 77 |
| I. | DELIVERY OF DOCUMENTS | | 77 |
| J. | APPROVAL OF SETTLEMENT AGREEMENTS | | 78 |
| K. | RELEASES AND EXCULPATION PROVISIONS | | 78 |
| L. | DISCHARGE, INJUNCTIONS AND RELATED MATTERS | | 79 |
|  | 1. | DISCHARGE OF CLAIMS | 79 |
|  | 2. | DISCHARGE INJUNCTION | 80 |
|  | 3. | ASBESTOS CHANNELING INJUNCTION AND ANTI-SUIT INJUNCTION | 80 |
|  | 4. | ANTI-SUIT INJUNCTION | 83 |
| M. | SECTION 346 INJUNCTION | | 84 |
| N. | OBJECTIONS TO CONFIRMATION | | 84 |
| O. | CONTINUED EXISTENCE OF ASBESTOS CLAIMANTS' COMMITTEE, THE FUTURES REPRESENTATIVE AND THE BONDHOLDERS' COMMITTEE | | 84 |
| P. | RETENTION OF JURISDICTION BY THE DISTRICT COURT | | 85 |
| Q. | NOTICE OF ENTRY OF CONFIRMATION ORDER | | 85 |
| R. | EFFECT OF REVERSAL | | 86 |
| S. | NO JUST CAUSE FOR DELAY | | 86 |

## TABLE OF EXHIBITS

**EXHIBIT**      **EXHIBIT NAME**

A.          Plan (including technical Modifications dated May 5, 2010)

B.          Confirmation Notice

# INTRODUCTION[1]

WHEREAS, Congoleum Corporation ("Congoleum"), Congoleum Sales, Inc. and

Congoleum Fiscal, Inc. (collectively, the "Debtors" and, as reorganized entities after emergence,

"Reorganized Congoleum"), together with the Official Asbestos Claimants' Committee (the

"ACC"), the Official Committee of Bondholders for Congoleum Corporation, *et al.*

("Bondholders' Committee") and the Futures Representative (the "Futures Representative" and,

collectively with the Debtors, the ACC, and the Bondholders' Committee, the "Plan

Proponents") have proposed the Fourth Amended Joint Plan of Reorganization Under Chapter 11

of the Bankruptcy Code of the Debtors, the Official Asbestos Claimants' Committee, the Official

Committee of Bondholders for Congoleum Corporation, *et al.* and the Futures Representative

dated as of March 11, 2010 (as modified by the Plan Supplement and the Modifications (defined

below) and as it may be further modified hereafter in accordance with the terms thereof, the

"Plan");[2]

WHEREAS, on March 12, 2010, after notice and a hearing, the Court entered the Order

Approving Disclosure Statement with Respect to the Plan pursuant to § 1125(b) of the

Bankruptcy Code (the "Disclosure Statement Approval Order") [Dkt. 445], Ex. 26.;

---

[1] Capitalized terms and phrases used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan. The rules of interpretation set forth in Section 1.3 of the Plan apply to the Findings of Fact and Conclusions of Law (the "Findings and Conclusions") and this Order (the "Confirmation Order"). In addition, any term used in the Plan, the Findings and Conclusions, or this Confirmation Order that is not defined in the Plan, the Findings and Conclusions or this Confirmation Order, but that is used in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), shall have the meaning ascribed to such term in the Bankruptcy Code or Bankruptcy Rules, as applicable.

[2] A copy of the Plan (without exhibits) and Modifications are attached hereto as Exhibit A and are incorporated herein by reference.

WHEREAS, on March 12, 2010, after notice and a hearing, the Court entered the Order Approving the Procedures for Voting and Tabulation of Ballots with Respect to the Plan (the "Voting Procedures Order") [Dkt. No. 448], by which the Court, among other things, established procedures for the solicitation and tabulation of votes to accept or reject the Plan, including:  (i) the scope of solicitation for the Plan; (ii) the procedures for voting and tabulation of ballots; (iii) the forms of the ballots; (iv) the contents of the solicitation package and the service thereof; (v) the form of notice of the Confirmation Hearing; and (vi) the procedures for allowance of claims for voting purposes in connection with the solicitations of the Plan.

WHEREAS, on March 12, 2010, the Court entered the Amended Pre-Trial Order Scheduling Supplemental Discovery, Pre-Trial Motions and hearing on Confirmation Relating to Fourth Amended Joint Plan of Reorganization (the "Pre-Trial Order") [Dkt. No. 446], by which the Court, among other things, scheduled a confirmation hearing with respect to the Plan to commence on June 7, 2010 at 10:00 a.m. (ET) and to continue on June 15 and 16, 2010 as may become necessary (the "Confirmation Hearing"), and established certain other deadlines with respect to the Confirmation Hearing;

WHEREAS, on or about March 26, 2010, the Debtors, through Logan and Company, Inc. ("Logan" or the "Voting Agent"), the court-approved solicitation and tabulation agent, commenced solicitation of the Plan in accordance with the Voting Procedures Order;

WHEREAS, on March 29, 2010, the Court scheduled an evidentiary hearing for April 20, 2010 at 9:30 a.m. (Prevailing Eastern Time) regarding the expenses paid pre-petition by the Debtors to the Claimants' Counsel pursuant to the Claimant Agreement (the "Rice and Weitz Payments");

WHEREAS, on March 29, 2010, the United States Trustee ("UST") filed its Preliminary Objection by United States Trustee to Confirmation of the Fourth Amended Plan of Reorganization (the "UST Objection") [Dkt. No. 488], by which the UST objected to the Plan solely on the basis of the Plan's proposed treatment of the Rice and Weitz Payments;

WHEREAS, after an evidentiary hearing was held on April 20, 2010, and upon consideration of the filings submitted in connection therewith, on May 7, 2010, the Court issued an Opinion and Order (the "Rice and Weitz Payments Decision") [Dkt. Nos. 599, 600] approving the Rice and Weitz Payments as reasonable under the totality of the circumstances pursuant to § 1129(a)(4) of the Bankruptcy Code;

WHEREAS, the Rice and Weitz Payments Decision resolved the UST Objection to the Plan;

WHEREAS, on April 16, 2010, Logan filed Affidavits of Service with respect to the mailing of notice of the Confirmation Hearing and solicitation materials in accordance with the Voting Procedures Order and the Disclosure Statement Order (collectively, the "Affidavits of Service") [Dkt. No. 554], Ex. 18;

WHEREAS, on May 5, 2010, the Plan Proponents filed the Plan Supplement with respect to the Plan [Dkt. No. 592], which included a compilation of certain Plan-related documents in their substantial final form, and by which the Plan Proponents, among other things, made certain technical, non-material modifications to the Plan (the "Modifications");

WHEREAS, on May 20, 2010, the Declaration of Kathleen M. Logan Certifying Methodology for Tabulating Votes, and Results of Voting, on the Plan (the "Ballot Certification") was filed [Dkt. No. 624];

WHEREAS, as indicated in the Ballot Certification every Impaired Class entitled to vote on the Plan voted to accept the Plan in the requisite amount and number, with the exception of Class 9 (General Unsecured Claimants) in which no valid ballots were submitted;

WHEREAS, the Plan Proponents have received the following unresolved objections to confirmation of the Plan (collectively, the "Objections"): (i) Preliminary Objections by Certain Asbestos Claimants Represented by the Shein Law Center, Ltd. (the "Shein Claimants") to Fourth Amended Plan of Reorganization, dated March 29, 2010 [Dkt. No. 487] (the "Shein Preliminary Objection"), and (ii) Objections filed by David C. Thompson, P.C. on behalf of Certain "New Pergament Defendant" Non-Avoided Asbestos Settlement Contract Creditors (the "Thompson Claimants") to the Fourth Amended Chapter 11 Joint Plan or Reorganization, dated May 11, 2010 [Dkt. No. 610] (the "Thompson Objection");

WHEREAS, on May 12, 2010, Travelers Casualty and Surety Company, formerly known as The Aetna Casualty and Surety Company ("Travelers") and St. Paul Fire and Marine Insurance Company ("St. Paul") (collectively, the "St. Paul Travelers Entities") filed an Objection [Dkt. No. 608] to the Reservation of Rights filed by the Futures Representative with respect to the proposed schedule of Settling Asbestos Insurance Companies designated as Exhibit H to the Plan;

WHEREAS, the Plan Proponents have filed the following in support of confirmation of the Plan and in response to the Objections: (i) Plan Proponents' Memorandum of Law in Support of Confirmation of the Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code dated as of March 11, 2010 [Dkt. No. 632]; (ii) Declaration of Howard N. Feist, III in Support of Confirmation of the Fourth Amended Joint Plan (the "Feist Decl.") [Dkt. No. 625]; (iii) Declaration of Kerry A. Brennan in Support of Confirmation of the Fourth

4

Amended Joint Plan [Dkt. No. 625]; (iv) Supplemental Declaration of Howard N. Feist, III. (the "Supp. Feist Decl.") [Dkt. No. 637]; (v) Declaration of Michael S. Goodman, Managing Director of SSG Capital Advisors, LLC [Dkt. No. 639], Ex. 118; (vi) the Appendix of Confirmation Hearing Exhibits; and (vii) the Ballot Certification (collectively, the "Plan Proponents' Supporting Material");

WHEREAS, the Court has reviewed the Plan (including, for the avoidance of doubt, the Plan Supplement and the Modifications), the Objections, the Plan Proponents' Supporting Material, and all other papers and materials before the Court in connection with the Confirmation Hearing;

WHEREAS, the Court has (i) heard the statements of counsel relating to Confirmation, (ii) taken judicial notice of the papers and pleadings on file in this Court and the Bankruptcy Court in these Reorganization Cases, and (iii) considered all evidence proffered in connection with the Confirmation Hearing;

WHEREAS, after due deliberation, the Court having determined that the relief requested and granted herein is in the best interests of the Debtors, their estates, and their creditors; and good and sufficient notice being given; and good and sufficient cause having been shown;

NOW, THEREFORE, this Court hereby enters the following Findings of Fact and Conclusions of Law with respect to Confirmation of the Plan:[3]

---

[3] These Findings of Fact and Conclusions of Law constitute the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. Any finding of fact shall constitute a finding of fact even if it is referred to as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is referred to as a finding of fact.

## I.  FINDINGS OF FACT

### A.  BACKGROUND CONCERNING THE DEBTORS' BUSINESSES

#### 1.  *Overview of the Company*

1.      Congoleum was incorporated in Delaware in 1986 but traces its corporate history back to the Nairn Linoleum Co., which commenced operations in 1886.  Feist Decl. ¶ 2.  Congoleum is currently a leading manufacturer of resilient sheet and tile flooring serving both the residential and commercial markets.  *Id.*  It produces both sheet and tile floor covering products sold primarily to wholesale distributors and major retailers in the United States and Canada.  *Id.*  Congoleum is a partially owned subsidiary of American Biltrite, Inc. ("ABI"), which is not a debtor in these Chapter 11 cases.  *Id.*

2.      Congoleum owns and operates two manufacturing plants in Trenton, New Jersey, making it a large employer in the Trenton area.  Feist Decl. ¶ 3.  Congoleum also owns and operates plants in Marcus Hook, Pennsylvania and Finksburg, Maryland.  *Id.*  The Company's executive offices are located in Mercerville, New Jersey.  *Id.*  Congoleum currently has approximately 525 employees.  *Id.* ¶ 4.

### B.  HISTORY AND NUMBER OF ASBESTOS PERSONAL INJURY CLAIMS ASSERTED AGAINST THE DEBTORS

#### 1.  *Congoleum's Pre-Bankruptcy Asbestos Liability*

3.      Congoleum was largely able to avoid the avalanche of asbestos litigation during the 1980s and most of the 1990s, but ultimately, it could not escape.  Feist Decl. ¶ 5.  In response to the bankruptcy filings of many previously targeted asbestos defendants in the late 1990s, the asbestos plaintiffs' bar began targeting companies that were historically on the periphery of asbestos litigation.  *Id.*  As a result, Congoleum, along with its primary competitors, was beset by thousands of new asbestos claims.  Feist Decl. ¶ 6.

4. Specifically, as of December 31, 1999, there were approximately 6,000 known claimants with Asbestos Personal Injury Claims pending against Congoleum. Feist Decl. ¶ 7. As of December 31, 2000, there were approximately 12,000 known claimants with Asbestos Personal Injury Claims pending against Congoleum. *Id*. As of December 31, 2001, the number of known claimants with Asbestos Personal Injury Claims pending against Congoleum had increased to approximately 25,000. *Id*. As of December 31, 2002, there were approximately 56,000 known claimants with Asbestos Personal Injury Claims pending against Congoleum. *Id*. As of June 30, 2003, there were approximately 91,000 known claimants with Asbestos Personal Injury Claims pending against Congoleum. *Id*. By February 2004, approximately 103,000 known claimants had Asbestos Personal Injury Claims pending against Congoleum. *Id*.

5. During these few years, Congoleum's average defense and settlement costs increased substantially. Feist Decl. ¶ 8. Cases that settled for $500 in the 1980s and early 1990s now demanded $15,000 or $20,000 to settle. *Id*. Despite Congoleum's retention of highly qualified defense counsel and experts, even in cases with minimal evidence of product exposure, Congoleum was facing multi-million dollar liability verdicts. *Id*.

6. In the years since Congoleum filed for bankruptcy, the number of known claimants with Asbestos Personal Injury Claims against Congoleum has increased significantly. Feist Decl. ¶ 9. As a result of the solicitation process for prior plans and this Plan, the database maintained by the Voting Agent contains approximately 200,000 unique social security numbers for asbestos claimants. *Id*.

## C. EVENTS LEADING UP TO THE BANKRUPTCY FILING

### 1. *Background of Congoleum's Insurance Coverage*

7. Congoleum, before it was the target of the asbestos plaintiffs' bar, had purchased substantial amounts of insurance. Feist Decl. ¶ 10. The Company's insurance policies, in

aggregate, provide for over $1 billion in coverage for general and product liability claims, including asbestos-related claims. *Id.* These insurance policies were acquired so that the Company could transfer risk of litigation, such as asbestos litigation, that it did not have the resources to handle itself. *Id.*

8.      Despite the large amount of total coverage, Congoleum was not able to obtain the protection it thought it had purchased when that protection was needed. Feist Decl. ¶ 11. When the Company's asbestos liability first arose, Congoleum had three primary insurers and dozens of excess insurers (over several layers). *Id.* As the primary insurance was approaching exhaustion, certain London market excess insurers (the "London Market Insurers") decided to bring litigation against Congoleum instead of providing coverage. *Id.*

2.      *Excess Insurers Commence the Coverage Action*

9.      While negotiations were ongoing between Congoleum and its insurers, in September 2001, the London Market Insurers initiated the Coverage Action in the Superior Court of New Jersey (the "State Court"). Feist Decl. ¶ 16. The London Market Insurers sought a declaration that they had no obligation to defend or indemnify Congoleum with respect to its asbestos-related liability. *Id.* The Company's other excess insurers were made parties to the litigation, and those to which tenders had been made, either disclaimed their obligations to provide coverage or asserted a reservation of rights to deny coverage. *Id.* Despite multiple settlement offers and specific warnings that the Company could not survive financially without insurance coverage for asbestos claims, the first layer excess insurers continued to reject Congoleum's proposals. *Id.*

10.     Congoleum continued to face trial dates in its mounting asbestos cases, and none of its insurers to which claims had been tendered, stepped forward to provide coverage in the form of defense or indemnity payments. Feist Decl. ¶ 21. Despite the Company's best efforts to

obtain a coverage-in-place agreement with its first layer excess carriers (either individually or as a group), no coverage-in-place agreement was reached. *Id.* Congoleum advised the insurers of the steady increase in claims filings and reiterated that the increased claims filings underscored the need for the first layer excess insurers to participate in Congoleum's defense and indemnity on an immediate basis. *Id.* The excess insurers continued to reserve their rights, actively litigating against the Company in the Coverage Action and directing Congoleum to act in its own best interests. *Id.*

### 3. *The Pre-Petition Settlements*

11.  Before Congoleum's primary insurers claimed exhaustion of coverage, they had paid substantially all of the Company's asbestos-related defense and settlement costs. Feist Decl. ¶ 22. After its primary coverage became exhausted, Congoleum could not afford to pay its asbestos-related costs without prompt reimbursement from its first layer excess insurers. *Id.* As a result, in order to conserve needed cash, Congoleum sought whenever possible to postpone settlements or, when necessary, to settle pending asbestos cases for non-cash consideration in the form of assignments of future insurance proceeds. *Id.* In late 2002 and early 2003, Congoleum settled 131 trial-listed cases in the tort system for cash, promises to pay and/or an assignment of insurance rights, including the Comstock, Cook and Arsenault cases. *Id.* All claims were settled based on Congoleum's understanding that these cases had upcoming trial dates or, in a few cases, were settled together with other cases that had upcoming trial dates. *Id.*

12.  In October 2002, while Congoleum was pursuing a coverage-in-place settlement with its first layer excess insurers, it also began to explore its other options for resolving its rapidly expanding asbestos liability. Feist Decl. ¶ 25. However, with no credible evidence that a coverage-in-place agreement would be ever reached, it became acutely urgent for Congoleum to develop a backup course of action. *Id.* Congoleum requested that its counsel at the time, Gilbert

Heintz & Randolph LLP ("GHR"), help it explore the possibility of filing a pre-packaged plan of reorganization under Chapter 11. *Id*. In November 2002, GHR reached out on Congoleum's behalf to two prominent plaintiff's attorneys—Joseph Rice and Perry Weitz— to discuss the feasibility of a pre-packaged bankruptcy plan. *Id*. Meetings with Rice and Weitz continued in early January 2003. *Id*. ¶ 28. Rice and Weitz later agreed to act as Claimants' Counsel—i.e., in a representative capacity on behalf of certain holders of Asbestos Personal Injury Claims against Congoleum. *Id*. ¶ 27. On January 13, 2003, the Congoleum Board authorized the Company to pursue "negotiating a global settlement" with respect to its pending asbestos-related claims. *Id*. ¶ 28.

4.    *The Claimant Agreement and Related Documentation*

13.    In an effort to reduce the cost and disruption of a bankruptcy filing and to optimize the potential for preserving value, Congoleum ultimately negotiated a global claimant settlement with asbestos claimants' counsel, primarily Rice and Weitz. Feist Decl. 29. On April 10, 2003, the claimant settlement was memorialized in the Claimant Agreement, the Security Agreement and the Collateral Trust Agreement. *Id*; *see also* Exs. 38, 39, and 40.

14.    The Claimant Agreement provided for a review and qualification procedure for asbestos claimants to participate in the global settlement set forth in the Claimant Agreement. Feist Decl. ¶ 30. The Claims Reviewer reviewed the documentation submitted by each potential participating claimant in order to ensure its completeness and adequacy under the claims criteria. Feist Decl. ¶ 31. As of October 25, 2003, the initial processing of claims had been completed. *Id*. At that time, approximately 56,000 claims had been approved and 46,000 claims had been rejected. *Id*. Ultimately, approximately 79,000 Asbestos Personal Injury Claims were settled under the terms of the Claimant Agreement. *Id*.

15. The Claimant Agreement, along with the Security Agreement and the Collateral Trust Agreement formed the basis of Congoleum's pre-packaged plan of reorganization (the "Pre-Packaged Plan"). Feist Decl. ¶ 32. As was customary in asbestos reorganizations at the time, the Pre-Packaged Plan provided different treatment for claimants that settled pursuant to Pre-Petition Settlement Agreements, claimants that settled pursuant to the Claimant Agreement, and all other holders of Asbestos Personal Injury Claims or Demands. *Id.* The payment distribution system in the Pre-Packaged Plan was governed by the Collateral Trust Agreement. *Id.* The Collateral Trust Agreement provided that those claimants who entered Pre-Petition Settlement Agreement or who participated in the Claimant Agreement would be paid before other present and future asbestos claimants by the Collateral Trustee from insurance process and such claimants would not be governed by the Trust Distribution Procedures. *Id.*

16. The Pre-Packaged Plan classified certain asbestos claimants differently. Feist Decl. ¶ 33. Separate classification of asbestos claimants along these lines was routinely employed in asbestos bankruptcies during this time. *Id.* Votes were solicited for the Pre-Packaged Plan prior to the Petition Date. *Id.* The Pre-Packaged Plan was supported by a majority of the Debtors' creditors, including the holders of Asbestos Personal Injury Claims. *Id.*

D. **THE DEBTORS' CHAPTER 11 CASES AND COMBUSTION ENGINEERING**

17. Congoleum, along with Congoleum Sales, Inc. and Congoleum Fiscal Inc., filed for relief under Chapter 11 of the Bankruptcy Code on December 31, 2003. Feist Decl. ¶ 34. The Bankruptcy Court appointed R. Scott Williams as Futures Representative on February 18, 2004. *Id.* ¶ 35. The Asbestos Claimants Committee was appointed by the United States Trustee on April 21, 2004. *Id.*

18. While the Debtors were prepared to seek confirmation of the Pre-Packaged Plan

without delay, negotiations were ultimately undertaken with various constituents, including the Asbestos Claimants Committee and the Futures Representative, in an effort to develop consensual modifications to the Pre-Packaged Plan. Feist Decl. ¶ 36. On November 12, 2004, after further negotiations among the Debtors, Futures Representative and the Asbestos Claimants Committee, the Debtors filed their Fourth Modified Plan of Reorganization Under Chapter 11 of the Bankruptcy Code dated as of November 12, 2004. *Id*. ¶ 37. The Bankruptcy Court approved solicitation of the Fourth Plan and based on the votes received, the plan was overwhelmingly supported by a majority of the Debtors' creditors, including the holders of Asbestos Personal Injury Claims. *Id*. However, before solicitation had been completed, the Third Circuit issued its decision in *In re Combustion Engineering, Inc*., 391 F.3d 190 (3d Cir. 2005), which addressed, among other things, equality of distribution issues implicated by § 524(g) and the Bankruptcy Code generally. *Id*. The Bankruptcy Court later described this decision as "shifting the ground" with respect to Congoleum's reorganization efforts. *Id*. Since that time, the Debtors and their various creditor constituencies have been working to propose a plan that complied with the Third Circuit's ruling in *Combustion Engineering*. *See, e.g*., Feist Decl. ¶¶ 38, 39, 44-46, 53-55, 57.

*1.* <u>Initiation of the Adversary Proceedings</u>

19. In late 2005, because, among other things, the statute of limitations on certain causes of action provided for in the Bankruptcy Code would expire at the end of the year, Congoleum needed to manage and address various claims on behalf of the estate. Feist Decl. ¶ 40. In addition, Congoleum initiated an adversary proceeding to preserve the estates' rights and claims and to contest the validity of the individual Pre-Petition Settlement Agreements and the Claimant Agreement. *Id*. On December 2, 2005, Congoleum filed the original complaint initiating the "Omnibus Avoidance Action," docketed as Adv. Pro. No. 05-06245 (Bankr. D.N.J.). *Id*. The purpose of the Omnibus Avoidance Action was to avoid certain transfers and

obligations incurred with respect to the Pre-Packaged Plan, including the avoidance of the Claimant Agreement, and to recover the Rice and Weitz Payments (defined below). *Id.*

20.     Pursuant to a case management order approved by the Bankruptcy Court, the Omnibus Avoidance Action was to be tried in three stages. Feist Decl. ¶ 41. The first stage focused on the avoidance of certain rights and obligations under the Pre-Petition Asbestos Agreements as preferential pre-petition and/or unauthorized post-petition transfers pursuant to §§ 547 and 549 of the Bankruptcy Code. *Id.* The second stage was intended to focus on (i) the avoidance and recovery of certain fraudulent transfers of property made pursuant to § 548 of the Bankruptcy Code and applicable state law, and (ii) avoiding and/or determining the validity, priority, or extent of the rights under the Pre-Petition Asbestos Agreements under § 544 of the Bankruptcy Code. *Id.* The third stage was to address the avoidance and recovery of the expenses paid pre-petition by the Debtors to the Claimants' Counsel pursuant to the Claimant Agreement (the "Rice and Weitz Payments"). *Id.* On December 29, 2005, Congoleum also filed a complaint initiating the Sealed Avoidance Action, docketed as Adv. Pro. No. 05-06461 (Bankr. D.N.J.) (the "Sealed Avoidance Action," and together with the Omnibus Avoidance Action, the "Avoidance Actions"). Feist Decl. ¶ 42. The Sealed Avoidance Action has been stayed during the pendency of the bankruptcy cases, except that certain orders were issued tolling all the statutes of limitations with respect to any estate claims against the defendants in such proceeding.

21.     Congoleum's success in the Omnibus Avoidance Action was varied. For example, the Bankruptcy Court ruled against Congoleum with respect to the first phase of the Omnibus Avoidance Action. The Bankruptcy Court held that the rights acquired by the asbestos claimants in the Claimant Agreement could not be avoided as preferential transfers under § 547

of the Bankruptcy Code, or as improper post-petition transfers under § 549 of the Bankruptcy Code (the "June 2006 Preference Decision"). Feist Decl. ¶ 43; *see also In re Congoleum Corp.*, Adv. Pro. No. 05-06245, 2006 WL 2085428 (Bankr. D.N.J. June 19, 2006), Ex. 47. Later the next year, however, the Bankruptcy Court granted partial summary judgment in favor of Congoleum, ruling that the security interests in Congoleum's insurance proceeds that were granted to asbestos claimants in connection with any Pre-Petition Asbestos Agreements were invalid (the "Security Interest Avoidance Decision"). Feist Decl. ¶ 48; *see also In re Congoleum Corp.*, Adv. Pro. No. 05-06245 (Bankr. D.N.J. July 27, 2007) [Dkt. No. 147], Ex. 50. In the fall of 2007, the Debtors had again moved for summary judgment seeking, among other things, to disallow and expunge with prejudice all claims settled under the Pre-Petition Asbestos Agreements and to rescind the Pre-Petition Asbestos Agreements, the Security Agreement and the Collateral Trust Agreement on the ground that they have been legally frustrated by intervening events. Feist Decl. ¶ 52. The Bankruptcy Court, however, ruled against Congoleum and denied all relief requested by the Debtors. *Id.*; *see also In re Congoleum Corp.*, Adv. Pro. 05-0624, 2007 WL 4571086 (Bankr. D.N.J. Dec. 28, 2007), Ex. 52.

2. *The Settlement of the Omnibus Avoidance Action*

22. In the summer of 2008, the Debtors, the Bondholders' Committee and the Futures Representative engaged in extensive negotiations with Claimants' Counsel and the Asbestos Claimants' Committee regarding the treatment of the asbestos claimants under a plan. Feist Decl. ¶ 59. The negotiations were contentious and at times difficult. *Id.* In August 2008, the Debtors, the Bondholders' Committee, the Futures Representative, the Asbestos Claimants' Committee, and Claimants' Counsel reached a global settlement that resolved certain of the material terms of a plan of reorganization and settled the Avoidance Actions. *Id.* The terms of the settlement were documented in a global litigation settlement (the "Original Litigation

Settlement"). *Id.*, Ex. 59.

23. The Original Litigation Settlement Agreement represented a comprehensive settlement and compromise of the fundamental equality of distribution issues that the parties had been grappling with since the *Combustion Engineering* decision in 2004. Counsel representing 87% of asbestos claimants who were parties to the Pre-Petition Settlement Agreements executed the Original Litigation Settlement Agreement; the remainder either did not respond or declined to execute the agreement on behalf of their clients. Feist Decl. ¶ 60. The Original Litigation Settlement Agreement provides that the parties that executed asbestos personal injury settlements with Congoleum for future insurance proceeds prior to the Petition Date (the "Litigation Settlement Claimants") shall waive any and all rights with respect to their pre-petition settlements, including the liquidated amounts thereof. *Id.* Instead, Litigation Settlement Claimants will submit their claims to the Plan Trust for resolution in accordance with the TDP and will be treated the same as all other present and future asbestos personal injury claimants. *Id.* In exchange, Congoleum was to be released from all of its obligations under the Pre-Petition Settlement Agreements, the Claimant Agreement, the Security Agreement, the Collateral Trust Agreement and any and all other agreements and amendments thereto with respect to the Pre-Packaged Plan. *Id.*

24. The Original Litigation Settlement Agreement eliminated the Claimant Agreement and the Pre-Petition Settlement Agreements, the most significant obstacles to a confirmable § 524(g) plan in the Debtors' bankruptcy cases. Feist Decl. ¶ 61. As a result of the agreement, the Debtors were able to move towards confirmation of a § 524(g) plan of reorganization that would treat all holders of Asbestos Personal Injury Claims in substantially the same manner, and that was support by every major creditor-constituency in the bankruptcy case.

*Id.*

25.    On October 22, 2008, overruling various objections, the Bankruptcy Court issued an opinion pursuant to Bankruptcy Rule 9019 approving the Original Litigation Settlement Agreement (the "Litigation Settlement Opinion"), holding that it was "fairly easy to conclude" that the settlement "falls above the lowest point in the range of reasonableness." Feist Decl. ¶ 62, Ex. 60 at 3. The Bankruptcy Court went on to state that the Original Litigation Settlement Agreement "sets the stage for proposing a confirmable plan because it eliminates the disparity of treatment of similarly situated creditors that had been created through the pre-petition settlements and the Claimant Agreement." Ex. 60 at 3. The Bankruptcy Court, however, reserved determination as to whether the Original Litigation Settlement Agreement satisfied requirements for confirmation under §§ 1129 and 524(g) of the Bankruptcy Code. Ex. 60 at 5.

### 3.    *The Amended Joint Plan and Appeal*

26.    On November 14, 2008, the Debtors filed the Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code dated as of November 14, 2008, which incorporated the Original Litigation Settlement Agreement. Feist Decl. ¶ 63. On January 8, 2009, certain of Congoleum's insurers moved for summary judgment with respect to discrete issues concerning the Amended Joint Plan. *Id.* On February 26, 2009, after responsive papers from the Plan Proponents, but without holding any evidentiary hearing, the Bankruptcy Court issued its decision granting summary judgment for the insurers (the "Amended Joint Plan Opinion"). *Id*; *see also In re Congoleum Corp.*, No. 03-51524, 2009 WL 499262 (Bankr. D.N.J. Feb. 26, 2009), Ex. 62. The Bankruptcy Court held, among other things, that because the Amended Joint Plan did not require three claimants who received partial settlement payments pre-petition—namely, Cook ($168,577.34), Arsenault ($800,000) and Comstock ($800,000) and who originally had claims against the estate which were withdrawn—to return those payments,

the plan was unconfirmable as a matter of law pursuant to the equality of distribution requirements of § 524(g) of the Bankruptcy Code as applied by the Third Circuit in *Combustion Engineering*. *See id*. at *10. The Bankruptcy Court also held that because the Amended Joint Plan failed to include a specific provision providing for the review of the Rice and Weitz Payments under § 1129(a)(4), the plan was not confirmable as a matter of law. *Id*. at *6.

27. The Bankruptcy Court entered two orders in conjunction with the Amended Joint Plan Decision, an order dismissing the Debtors' Chapter 11 cases effective twenty days after entry (the "Dismissal Order") [Dkt. No. 7219] (Ex. 64), and a separate order setting forth that the Amended Joint Plan was found unconfirmable as a matter of law (the "Summary Judgment Order") [Dkt. No. 7219] (Ex. 63). On February 27, 2009, the Debtors appealed the Summary Judgment Order and the Dismissal Order.

28. After appellate briefing and oral argument on July 1, 2009, this Court issued a decision on August 17, 2009 reversing in part and affirming in part the Amended Joint Plan Decision (the "District Court Appellate Opinion"). *See In re Congoleum Corp*., 414 B.R. 44 (D.N.J. 2009), Ex. 66. Among other things, the Court held that Cook, Arsenault and Comstock's retention of certain pre-petition settlement payments in exchange for their settlement of their claims against the estate did not render the plan unconfirmable. *See id*. at 59. Also, the Court instructed the Debtors to redraft certain provisions of the plan to make explicit that the Rice and Weitz Payments would be subject to review under § 1129(a)(4) of the Bankruptcy Code. *Id*. at 59-60. The Court also held that the Dismissal Order was an abuse of discretion. *Id*. at 61. Subsequently, on August 27, 2009, the Court withdrew the reference in Congoleum's bankruptcy proceedings pursuant to 28 U.S.C. § 157 (the "District Court Order Withdrawing Reference"), Ex. 67.

## E.  DEVELOPMENT AND NEGOTIATION OF THE PLAN

29.  After this Court entered its order withdrawing the reference from the Bankruptcy Court, the Debtors and its various creditor constituencies again resumed negotiations culminating in a global deal that is reflected in the current Plan.  The Plan is now supported by every official committee or representative appointed to represent the Debtors' various creditor constituencies and future asbestos demands.  Among other things, the Plan will establish and adequately fund the Plan Trust, which will resolve all Asbestos Personal Injury Claims pursuant to standard trust distribution procedures.  The Plan also permits Congoleum to reorganize with sustainable debt levels for the benefit of all parties-in-interest.  The key terms of the Plan are summarized below:

(i)  Ownership of Reorganized Congoleum.  The Debtors shall convey 100% ownership of Reorganized Congoleum, to the Plan Trust and the holders of the Senior Note Claims.  50.1% of the New Common Stock of Reorganized Congoleum shall be issued to the Plan Trust for the benefit of holders of Asbestos Personal Injury Claims.  49.9% of the New Common Stock shall be issued to holders Senior Note Claims on a pro rata basis.

(ii)  New Senior Notes.  On the Effective Date, Reorganized Congoleum shall issue to holders of Senior Note Claims, on a pro rata basis, new 9% senior secured notes due December 31, 2017 (the "New Senior Notes") in the principal amount of $33 million.  There shall be no interest accruing or due and payable on the principal amount of the New Senior Notes for the first six months after the Effective Date.

(iii)  Plan Trust Funding.  On the Effective Date of the Plan, the Plan Trust shall own 50.1% of  the common stock of Reorganized Congoleum.  The Plan Trust shall also receive payments, some over time, totaling approximately $235 million from court-approved Asbestos Insurance Settlement Agreements.  In addition, pursuant to the Insurance Transfer Agreement, the Plan Trust shall receive all of the Debtors' rights to additional asbestos coverage that are not the subject of any settlement.

(iv)  Treatment of Asbestos Claims.  All Asbestos Personal Injury Claims are classified in Class 7 and all holders of Asbestos Personal Injury Claims shall have their claims resolved by the Plan Trust in the same manner.  Specifically, all Pre-Petition Settled Claimants, including the Litigation Settlement Claimants, in full satisfaction of each Asbestos Personal Injury Claim and any and all rights pursuant to any Pre-Petition Settlement Agreement, Claimant Agreement, Security Agreement, Collateral Trust

Agreement or any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003 (the "Pre-Packaged Plan"), shall be restored to the *status quo ante* and treated in the same manner as all other holders of Asbestos Personal Injury Claims in Class 7. The Pre-Petition Settled Claimants in Class 7 shall receive *pari passu* treatment under the Plan without regard to any lien, security interest or other claim to priority treatment whatsoever (each Pre-Petition Settled Claimant will need to reapply to the Plan Trust to satisfy the TDP including medical, exposure, statutes of limitation and other requirements).

30.     The Debtors and certain of the other Plan Proponents have also reached settlement agreements with all of the Debtors' solvent insurers who were parties to the State Court Coverage Litigation or objectors at any point in these Reorganization Cases. Thus, the Debtors have resolved the insurers' objections to confirmation of the Plan and the State Court Coverage Litigation, which is currently suspended, but will be dismissed with prejudice pursuant to the terms of certain Asbestos Insurance Settlement Agreements. Feist Decl. ¶¶ 69, 70.

31.     The Plan has been accepted by classes of impaired creditors entitled to vote on the Plan, including over 95% of Asbestos Personal Injury Claimants and 100% of the Bondholder Claimants. Ballot Certification, Ex. 17 ¶ 23.

**F.      COMPLIANCE WITH THE REQUIREMENTS OF § 1129 OF THE BANKRUPTCY CODE**

*1.      Section 1129(a)(1)—Compliance of the Plan with Applicable Provisions of the Bankruptcy Code*

32.     The Plan complies with all applicable provisions of the Bankruptcy Code, as required by § 1129(a)(1) of the Bankruptcy Code, including §§ 1122 and 1123 of the Bankruptcy Code as set forth below.

33.     In accordance with § 1122(a) of the Bankruptcy Code, Article II of the Plan classifies each Claim against and Equity Interest in each of the Debtors into a Class containing only substantially similar Claims or Equity Interests. Specifically, Article II of the Plan

designates eleven (11) classes of Claims and Equity Interests.  Plan Art. II.  In accordance with

§ 1123(a)(1) of the Bankruptcy Code, Article II of the Plan properly classifies all Claims and

Interests that require classification.  Plan Art. II.  In particular, Article II of the Plan segregates

into separate classes the following Claims and Interests:

| | |
|---------|--------------------------------|
| Class 1 | Priority Claims |
| Class 2 | Lender Secured Claims |
| Class 3 | Other Secured Claims |
| Class 4 | Senior Note Claims |
| Class 5 | Workers' Compensation Claims |
| Class 6 | ABI Claims |
| Class 7 | Asbestos Personal Injury Claims |
| Class 8 | Asbestos Property Damage Claims |
| Class 9 | General Unsecured Claims |
| Class 10 | Congoleum Interests |
| Class 11 | Subsidiary Interests |

34.     The number of classes reflects the diverse characteristics of those Claims against

and Interests in the various Debtors, and the legal rights under the Bankruptcy Code of each of

the holders of Claims or Interests within a particular Class are substantially similar to other

holders of Claims or Interests within that Class.  In accordance with § 1123(a)(2) of the

Bankruptcy Code, Article II of the Plan identifies and describes each Class of Claims or Interests

that is not impaired under the Plan.  In particular, Article II of the Plan indicates that Classes 1,

2, 3, 5 and 11 are unimpaired.  In accordance with § 1123(a)(3) of the Bankruptcy Code, Article

II of the Plan also identifies and describes each Class of Claims or Interests that is impaired

under the Plan.  In particular, Article II of the Plan indicates that Classes 4, 6, 7, 8, 9 and 10 are

impaired and describes the treatment of each such Class.

35.     In accordance with § 1123(a)(4) of the Bankruptcy Code, the treatment of each

Claim or Interest within a Class is the same as the treatment of each other Claim or Interest in

such Class unless the holder of such a Claim or Interest agrees to less favorable treatment.

### a. Section 1123(a)(5)—Adequate Means for Implementation of the Plan

36.     In accordance with § 1123(a)(5) of the Bankruptcy Code, the Plan, including Article V of the Plan, provides adequate means for its implementation, including, among other things: (i) the continued corporate existence of the Debtors under Article V of the Plan and the vesting of assets in Reorganized Congoleum under Section 12.4 of the Plan; (ii) the adoption of the corporate documents that will govern Reorganized Congoleum and the identification of its initial board of directors and officers (Plan §§ 5.3, 5.4, 5.10, 5.13); (iii) the cancellation of the existing Securities and the issuance of New Securities and Debt Instruments to be distributed in accordance with the Plan (Plan §§ 5.5, 5.7); (iv) the entry of Reorganized Congoleum into the Exit Facility (Plan § 5.6); (v) the retention of certain rights of action by Reorganized Congoleum as set forth in Section 12.4 of the Plan; (vi) the continuation of certain employee compensation and benefit programs (Plan § 8.4); (vii) the assumption or rejection of executory contracts and unexpired leases to which the Debtors are a party (Plan Art. VIII); (viii) the various discharges, releases, injunctions, indemnifications and exculpations provided under the Plan, including those set forth in Article XI of the Plan; and (ix) the creation of, transfer of certain assets to, and assumption of Asbestos Personal Injury Claims by, the Plan Trust and the appointment of the Trust Advisory Committee, as detailed in Section 5.1 of the Plan.

### b. Section 1123(a)(6)—Prohibition Against the Issuance of Nonvoting Equity Securities and Adequate Provisions for Voting Power of Classes of Securities

37.     In accordance with § 1123(a)(6) of the Bankruptcy Code, Reorganized Congoleum's charter, bylaws or similar constituent documents (including those set forth in Exhibits J and K of the Plan), contain provisions prohibiting the issuance of non-voting equity securities and provide for the appropriate distribution of voting power among all classes of

equity securities authorized for issuance, in each case to the extent required by § 1123(a)(6). In particular, Section 5.3 of the Plan provides that the Amended and Restated Certificate of Incorporation shall contain a provision prohibiting the issuance of non-voting common equity securities. Plan § 5.3. In addition, the Stockholders Agreement provides that there will be only one class of equity in Reorganized Congoleum, and that each share of the New Common Stock is entitled to equal voting rights.

> c. *Section 1123(a)(7)—Selection of Directors and Officers in a Manner Consistent with the Interests of Creditors and Equity Security Holders*

38. In accordance with § 1123(a)(7) of the Bankruptcy Code, the provisions of the Plan and Reorganized Congoleum's charter, bylaws and similar constituent documents regarding the manner of selection of officers and directors of Reorganized Congoleum are consistent with the interests of creditors and equity security holders and with public policy. Section 5.4 of the Plan provides that, the initial board of directors of Reorganized Congoleum shall consist of five directors. One of such directors shall be selected by the Bondholders' Committee, three of such directors shall be selected jointly by the Futures Representative and the Asbestos Claimants' Committee, and one of such directors shall be Reorganized Congoleum's chief executive officer. The identity of four out of five the members of the initial board was disclosed in the Plan Supplement on May 5, 2010 and the final member was disclosed before the Confirmation Hearing. Each member of the initial board is required to serve in accordance with the Amended and Restated Certificate of Incorporation and the Amended and Restated Bylaws of Reorganized Congoleum, as the same may be amended from time to time. Subsequently, Reorganized Congoleum's board of directors shall be elected in accordance with Reorganized Congoleum's governing documents. Plan § 5.4.

    d.  *Section 1123(b)(1)—Impairment of Claims and Equity Interests*

39. As permitted by § 1123(b)(1) of the Bankruptcy Code, Article III of the Plan provides for the impairment of certain Classes of Claims and Interests, while leaving other Classes unimpaired. The Plan thus modifies the rights of the holders of certain Claims and Interests and leaves the rights of others unaffected.

    e.  *Section 1123(b)(2)—Assumption or Rejection of Executory Contracts and Unexpired Leases*

40. In accordance with § 1123(b)(2) of the Bankruptcy Code, Article VIII of the Plan and other provisions of the Plan and this Confirmation Order provide for the assumption, assumption and assignment, or rejection of the executory contracts and unexpired leases of the Debtors that have not been assumed or rejected previously pursuant to § 365 of the Bankruptcy Code; provided, however, that the Debtors reserve the right, at any time prior to the Effective Date, to designate any executory contract or unexpired lease for rejection or assumption, thus providing for such executory contract or unexpired lease's assumption or rejection as applicable.

    f.  *Section 1123(b)(3)—Retention, Enforcement and Settlement of Claims Held by the Debtors*

41. In accordance with § 1123(b)(3) of the Bankruptcy Code, Section 11.6 of the Plan provides that, except as otherwise expressly provided in the Plan, nothing contained in the Plan shall constitute or be deemed a waiver of any claim, right or cause of action that the Debtors, Reorganized Congoleum, or the Plan Trust may have against any Entity in connection with or arising out of or related to an Asbestos Claim. Section 11.6 of the Plan also provides that notwithstanding any other provision in the Plan to the contrary, nothing in the Plan shall be understood to channel, prevent, impair or limit in any way enforcement against the Debtors, Reorganized Congoleum, or any other Protected Party of any rights provided in connection with any Workers' Compensation Claim. In addition, Section 12.4 of the Plan provides that the

failure of the Plan Documents to provide specifically that a certain cause of action is retained by the estate shall not constitute the waiver of such cause of action.

> g.     *Section 1123(b)(5)—Modification of Rights of Holders of Claims*

42.     Articles III and IV of the Plan, together with other provisions of the Plan, modifies or leaves unaffected, as the case may be, the rights of holders of each class of Claims and Interests.

> h.     *Section 1123(b)(6)—Other Provisions Not Inconsistent*
> *with Applicable Provisions of the Bankruptcy Code*

43.     In accordance with § 1123(b)(6) of the Bankruptcy Code, the Plan includes additional appropriate provisions that are not inconsistent with the applicable provisions of the Bankruptcy Code, including:  (i) the provisions of Articles III and IV governing treatment on account of Allowed Claims; (ii) the provisions of Articles IV and V of the Plan governing the Trust and the treatment of Asbestos Personal Injury Claims; (iii) the provisions of Article VI governing distributions under the Plan; (iv) the provisions of Article VII establishing procedures for resolving Disputed Claims and making distributions on account of such Disputed Claims once resolved; (v) the provisions of Article XIII of the Plan regarding retention of jurisdiction of the District Court over certain matters after the Effective Date; (vi) the provisions of Article V governing implementation of the Plan; and (vii) the provisions of Article XI of the Plan concerning the injunctions, releases and discharge to be effected by the Plan.

> i.     *Section 1123(d)—Cure of Defaults*

44.     In accordance with § 1123(d) of the Bankruptcy Code, Section 8.1 of the Plan and this Confirmation Order provides that all defaults with respect to executory contracts and unexpired leases assumed by Reorganized Congoleum shall be cured in the ordinary course of Reorganized Congoleum's business promptly after any such default becomes known to the

Debtors.  All cure amounts will be determined in accordance with the underlying agreements and applicable nonbankruptcy law.  Plan § 8.1.

>    2.    *Section 1129(a)(2)—Compliance with*
>        *Applicable Provisions of the Bankruptcy Code*

45.    The Plan Proponents have complied with all applicable provisions of the Bankruptcy Code, as required by § 1129(a)(2), including § 1125 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.  The Disclosure Statement and the procedures by which the Ballots for acceptance or rejection of the Plan were solicited and tabulated were fair, properly conducted and in accordance with §§ 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, the Voting Procedures Order and the Disclosure Statement Order.  Votes with respect to the Plan were solicited in good faith and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules, the Voting Procedures Order and the Disclosure Statement Order.  No further solicitation or notice is required in connection with the Plan (as modified by the Modifications).  Each of the Plan Proponents, together with (where applicable) their respective members and each of their respective directors, officers, employees, agents and professionals, acting in such capacity, have acted in "good faith," within the meaning of § 1125(e) of the Bankruptcy Code.

>    3.    *Section 1129(a)(3)—Proposal of the Plan in Good Faith*

46.    The Plan Proponents proposed the Plan in good faith and not by any means forbidden by law.  In determining that the Plan has been proposed in good faith, the Court has examined the terms of the Plan, as well as the totality of the circumstances surrounding the formulation of the Plan.  Based on the evidence proffered in connection with Confirmation, the Court finds and concludes that the Plan has been proposed with the legitimate purpose of reorganizing the affairs of each of the Debtors and maximizing the returns available to creditors

and other parties-in-interest.  Consistent with the overriding purpose of Chapter 11 of the
Bankruptcy Code, the Plan is designed to allow each of the Debtors to reorganize by resolving
certain pending disputes and proceedings and providing Reorganized Congoleum with a capital
structure that will allow it to satisfy its obligations with sufficient liquidity and capital resources
to fund necessary capital expenditures and otherwise conduct its businesses.  In particular, the
Plan achieves a global resolution of Asbestos Personal Injury Claims through the assumption of
such Claims (including Demands) by the Plan Trust, subject to the terms of the Plan.

47.     Moreover, the Plan itself and the arms' length negotiations among the Debtors,
the other Plan Proponents and the Settling Asbestos Insurance Companies leading to the Plan's
formulation, including the Litigation Settlement Agreement (as amended), the Intercompany
Settlement and the various Asbestos Insurer Settlement Agreements, as well as the
overwhelming support of creditors and Interest holders for the Plan, provide independent
evidence of the Debtors' and the other Plan Proponents' good faith in proposing the Plan.

### 4. Section 1129(a)(4)—Court Approval of Certain Payments as Reasonable

48.     In accordance with § 1129(a)(4) of the Bankruptcy Code, Section 13.3(g) of the
Plan provides that the Court will retain jurisdiction after the Effective Date to hear and determine
all applications for allowance of compensation of professionals or reimbursement of expenses
thereof under §§ 330, 331 or 1105(b) of the Bankruptcy Code.

49.     Pursuant to Section 5.15 of the Plan, the Court also held a hearing on April 20,
2010 to determine the reasonableness of the Rice and Weitz Payments.  By an Opinion and
Order dated May 7, 2010 [Dkt. Nos. 599, 600], this Court determined that the Debtors' payment
of these expenses was, and is, reasonable pursuant to § 1129(a)(4) of the Bankruptcy Code.

      5.     *Section 1129(a)(5)—Disclosure of Identity of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy*

50.     In the Disclosure Statement, the Plan, and the Plan Supplement (as such was modified or supplemented at or prior to the Confirmation Hearing), the Debtors have disclosed all necessary information regarding the proposed officers and directors of Reorganized Congoleum and, for the officers of Reorganized Congoleum who may constitute insiders, the compensation paid or to be paid as of the Effective Date. *See* Schedule of Initial Officers and Directors of Reorganized Congoleum, Exs. 126, 127. The appointment or continuance of the proposed directors and officers is consistent with the interests of the holders of Claims and Interests and with public policy.

      6.     *Section 1129(a)(6)—Approval of Rate Changes*

51.     The Debtors' current businesses do not involve the establishment of rates over which any regulatory commission has or will have jurisdiction after Confirmation.

      7.     *Section 1129(a)(7)—Best Interests of Holders of Claims and Equity Interests*

52.     As set forth in the Liquidation Analysis attached to the Disclosure Statement as Exhibit B (Ex. 14), as well as the evidence proffered in connection with Confirmation, all creditors will fare as well as, or far better under the Plan than they otherwise would in a Chapter 7 liquidation. See Feist Decl. ¶¶ 79-83. As required by § 1129(a)(7) of the Bankruptcy Code, each holder of an impaired Claim that has not accepted the Plan will, on account of such Claim, receive or retain property under the Plan having a value, as of the Effective Date, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

8. _Section 1129(a)(8)—Acceptance of the Plan by Each Impaired Class_

53. Pursuant to § 1129(a)(8) of the Bankruptcy Code, all Classes of Claims and Interests in which there were Claims or Interests that voted on the Plan either have accepted the Plan or are unimpaired. Specifically, the following Classes of Claims voted to accept the Plan by at least two-thirds in amount and more than one-half in number of Claims (in accordance with § 1126(c) of the Bankruptcy Code):

| Voting Class | Percentage of Holders Accepting | Percentage of Dollar Amount Accepting |
|---|---|---|
| Class 4 (Senior Note Claims) | 100% | 100% |
| Class 6 (ABI Claims) | 100% | 100% |
| Class 7 (Asbestos Personal Injury Claims) | 95.01% | 96.6% |
| Class 8 (Asbestos Property Damage Claims) | 92.31% | 90.52% |

Ballot Certification ¶¶ 22, 23.

54. With respect to the General Unsecured Claimants in Class 9, no valid ballots were cast on the Plan. Ballot Certification ¶ 24. A total of two ballots were cast by Class 9 Claimants, both to accept the Plan. _Id._ Neither ballot, however, could be counted in accordance with the terms of the Voting Procedures Order. _Id._ In the present case, no Class 9 Claimant has objected to confirmation or voted to reject the Plan. Accordingly, Class 9 is deemed to accept the plan for purposes of meeting the requirements of § 1129(a)(8). In addition, as described below, the Plan satisfies the requirements of § 1129(b) with respect to Class 9.

28

55.     In addition to the foregoing, the following Classes of Claims and Interests are unimpaired under the Plan and are therefore deemed to have accepted the Plan:

| Class 1 | Priority Claims |
|---------|-----------------|
| Class 2 | Lender Secured Claims |
| Class 3 | Other Secured Claims |
| Class 5 | Workers' Compensation Claims |
| Class 11 | Subsidiary Interests |

Plan Art. II.

56.     Class 10 (Congoleum Interests) is impaired and deemed to have rejected the Plan pursuant to § 1126(g) of the Bankruptcy Code.  As described below, the Plan satisfies the requirements of § 1129(b) with respect to Class 10.

> 9.     *Section 1129(a)(9)—Treatment of Claims Entitled to*
> *Priority Pursuant to § 507(a) of the Bankruptcy Code*

57.     The Plan also meets the requirements regarding the payment of Administrative Claims, Priority Tax Claims and Other Priority Claims, as set forth in § 1129(a)(9) of the Bankruptcy Code.  In particular, Section 3.2 of the Plan provides that each holder of an Allowed Administrative Claim shall receive cash equal to the unpaid portion of such Allowed Administrative Claim upon the Distribution Date unless such holder agrees to a lesser amount. Plan § 3.2.  In addition, certain of the legal professionals of the Debtors, the Bondholders' Committee, Asbestos Claimants' Committee and the Futures Representative have agreed to a promissory note whereby certain fees and expenses incurred by such professionals will be paid by Reorganized Congoleum in quarterly installments, with the full balance to be paid by December 31, 2012.  Section 3.3 of the Plan also provides that all Allowed Priority Tax Claims shall be paid either (a) cash equal to the unpaid portion of such claim upon the Distribution Date, (b) such other amount as to which the applicable Debtor and such holder agree in writing, or (c)

deferred cash payments having a value equal to such claim over a period not exceeding six years after the date of the assessment of such claim.  Plan § 3.3.

> 10. *Section 1129(a)(10)—Acceptance By at*
> *Least One Impaired, Non-Insider Class*

58.     As indicated in the Ballot Certification and as reflected in the record of the Confirmation Hearing, at least one Class of Claims that is impaired under the Plan has voted to accept the Plan, determined without including the acceptance by any insider, with respect to all Reorganized Debtors under the Plan.

> 11. *Section 1129(a)(11)—Feasibility of the Plan*

59.     As demonstrated by the evidence proffered in connection with confirmation, including the expert report (the "Feasibility Expert Report") (Goodman Decl., Ex. 118 at Ex. C) submitted by SSG Capital Advisors, LLC ("SSG"), confirmation of the Plan is not likely to be followed by the liquidation of, or the need for further financial reorganization of, the Debtors, Reorganized Congoleum or any successor to Reorganized Congoleum under the Plan.  Supp. Feist Decl. ¶ 5.  Reorganized Congoleum will be discharged from Asbestos Claims and will otherwise be free of pre-petition debt, other than indebtedness in respect of or under (1) the Exit Facility effected to refinance the Lender Secured Claim, (2) Other Secured Claims and (3) the New Senior Notes, as well as ongoing business expenses and reorganization costs.

60.     The Plan comprehensively restructures the Debtors' balance sheet and conclusively addresses the Debtors' liability for Asbestos Claims.  As a result, the Debtors will emerge from bankruptcy de-leveraged and free of any past, present or future asbestos liability. The cash and liquidity that will be available to Reorganized Congoleum from its business operations and from the Exit Facility will be sufficient to, among other things, (i) refinance the DIP Facility as part of the Exit Facility; (ii) meet its other financial obligations under the Plan;

and (iii) provide adequate working capital for the Debtors' businesses.  *See* Feasibility Expert
Report, Ex. 118 at Ex. C.  Based upon all of the evidence in the record, including the Feasibility
Expert Report, upon the Effective Date, Reorganized Congoleum will have sufficient operating
cash and liquidity to meet their financial obligations under the Plan and to fund ongoing business
operations.  *Id.;* Goodman Decl. ¶¶ 10-14.

61.     The Plan additionally provides for a comprehensive resolution of the Debtors'
liability for Asbestos Personal Injury Claims through the discharge of all such liability on the
part of the Debtors and the assumption of liability for all Asbestos Personal Injury Claims
against the Debtors by the Trust.  The assumption of liability for Asbestos Personal Injury
Claims by the Trust and the discharge of the Debtors from such liability on the terms set forth in
the Plan are essential to ensuring that confirmation of the Plan is not likely to be followed by the
liquidation, or the need for further financial reorganization, of the Debtors.

### 12.     *Section 1129(a)(12)—All Statutory Fees Have Been or Will Be Paid*

62.     Section 13.4 of the Plan provides that all fees payable pursuant to § 1930 of title
28 of the United States Code, as determined by the District Court at the Confirmation Hearing,
shall be paid by the Debtors on or before the Effective Date and thereafter by Reorganized
Congoleum as due until the Reorganization Cases are closed, converted or dismissed.
Reorganized Congoleum shall pay any quarterly fees payable pursuant to 28 U.S.C. § 1930(a)(6)
to the United States Trustee after the Effective Date until such time as the case is converted,
dismissed or closed pursuant to a final decree.  Plan § 13.4.

### 13.     *Section 1129(a)(13)—Retiree Benefits*

63.     Section 8.5 of the Plan provides that Reorganized Congoleum shall continue all
retiree benefits after the Effective Date for the duration of the period that the Debtors originally
obligated themselves to provide such benefits.  Accordingly, the Plan satisfies § 1129(a)(13) of

the Bankruptcy Code.

### 14. Section 1129(d)—Purpose of Plan

64. The principal purpose of the Plan is not avoidance of taxes or avoidance of the requirements of § 5 of the Securities Act of 1933, and there has been no filing by any governmental unit asserting such avoidance. Accordingly, the Plan complies with the provisions of § 1129(d) of the Bankruptcy Code.

### G. THE PLAN SATISFIES THE "CRAM DOWN" REQUIREMENTS OF § 1129(b) WITH RESPECT TO EACH CLASS OF CLAIMS OR INTERESTS THAT IS IMPAIRED UNDER, AND HAS NOT ACCEPTED, THE PLAN

65. Pursuant to § 1129(b)(1) of the Bankruptcy Code, the Plan may be confirmed notwithstanding that Class 9 (General Unsecured Claims) is Impaired and no ballots were cast by Class 9 Claimants that could be counted in accordance with the terms of the Voting Procedures Order. 11 U.S.C. § 1129(b)(1). In the present case, the Plan satisfies the requirement that there is no "unfair discrimination" with respect to Class 9 because there are no other classes with similar legal rights to those of Class 9. Accordingly, the Plan's separate classification and treatment of Class 9 (General Unsecured Claims) is consistent with the legal entitlements and priorities of such General Unsecured Claims, and the Plan does not discriminate unfairly with respect to Class 9.

66. In addition, the Plan satisfies the "fair and equitable" requirement of § 1129(b)(2) because there are no classes junior to Class 9 that will receive any distributions under the Plan. Based upon the foregoing, the requirements of § 1129(b) are satisfied with respect to Class 9.

67. Pursuant to § 1129(b)(1) of the Bankruptcy Code, the Plan may be confirmed notwithstanding that Class 10 (Congoleum Interests) is Impaired and deemed to have rejected the Plan pursuant to § 1126(g) of the Bankruptcy Code. 11 U.S.C. § 1129(b)(1). In the present case,

the Plan satisfies the requirement that there is no "unfair discrimination" with respect to Class 10 because there are no other classes with similar legal rights to those of Class 10. No other class holds the equity interests of Congoleum. Accordingly, the Plan's separate classification and treatment of Class 10 (Congoleum Interests) is consistent with the legal entitlements and priorities of such Interests, and the Plan does not discriminate unfairly with respect to Class 10.

68.     In addition, the Plan satisfies the "fair and equitable" requirement of § 1129(b)(2) because there are no classes junior to Class 10 that will receive any distributions under the Plan. Based upon the foregoing, the requirements of § 1129(b) are satisfied with respect to Class 10.

## H.     THE PLAN TRUST AND THE ASBESTOS CHANNELING INJUNCTION COMPLY WITH § 524(g) OF THE BANKRUPTCY CODE

69.     The Plan comports with the Bankruptcy Code's requirements for issuance of an injunction to enjoin entities from taking legal action to recover, directly or indirectly, payment in respect of asbestos-related claims or Demands against Reorganized Congoleum or its property.

### 1.     *The Plan Trust Satisfies the Requirements of § 524(g)(2)(B)(i) of the Bankruptcy Code*

70.     The Discharge Injunction and the Asbestos Channeling Injunction are to be implemented in connection with the Plan and the Plan Trust. Plan §§ 5.1(a), 11.4, and 11.6.

71.     As of the Petition Date, Congoleum has been named as a defendant in personal injury, wrongful death or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products. Feist Decl. ¶ 7. Subject to the provisions of Article V of the Plan and any other relevant provisions of the Plan, upon the Effective Date, the Plan Trust shall assume the liabilities of the Debtors with respect to Plan Trust Asbestos Claims and Demands. Accordingly, the Plan satisfies § 524(g)(2)(B)(i)(I) of the Bankruptcy Code.

33

72. On the Effective Date, the Plan Trust will be funded by the Plan Trust Assets, which include, among other things: (a) the Plan Trust Common Stock; (b) the Asbestos Insurance Rights; (c) all rights of the Debtors under, and all proceeds, net of taxes, of the Asbestos Insurance Settlement Agreements (except for those certain proceeds of the Asbestos Insurance Settlement Agreement with Liberty Mutual Insurance Company, which are payable to the Debtors as provided in Section 5.1(q) of the Plan); (d) the proceeds of the Asbestos In-Place Insurance Coverage; (e) the proceeds of the Asbestos Insurance Actions; (f) the proceeds of the Asbestos Insurance Action Recoveries; (g) the rights granted to the Plan Trust pursuant to the Insurance Transfer Agreement; and (h) the Asbestos Property Damage Insurance Rights. Plan § 5.1(b). The Plan Trust is to be funded in part by securities of Reorganized Congoleum in the form of Plan Trust Common Stock, which constitutes an obligation of Reorganized Congoleum to make future payments, including dividends, to the Plan Trust. Plan § 5.1(b). Accordingly, the Plan satisfies § 524(g)(2)(B)(i)(II) of the Bankruptcy Code.

73. On the Effective Date, the Plan Trust will be funded, in part, by the Plan Trust Common Stock, which constitutes 50.1% of the New Common Stock of Reorganized Congoleum. Plan § 1.2 (definitions of Plan Trust Assets and Plan Trust Common Stock). Thus, on the Effective Date, the Plan Trust will own a majority of the voting shares of Reorganized Congoleum in satisfaction of § 524(g)(2)(B)(i)(III) of the Bankruptcy Code.

74. The Plan Trust will use its assets and income to pay Plan Trust Asbestos Claims and Plan Trust Expenses as set forth in the Plan Trust Agreement. Plan Trust Agreement § 1.2. Accordingly, the Plan satisfies § 524(g)(2)(B)(i)(IV) of the Bankruptcy Code.

75.     Congoleum's contributions to the Plan Trust provided for in the Plan, together with the Asbestos Insurance Assignment, the Plan Trust Common Stock, constitute substantial assets of the Plan Trust and the reorganization.

2.     *The Plan Trust Satisfies the Requirements of § 524(g)(2)(B)(ii) of the Bankruptcy Code*

76.     The findings of fact set forth in sections I.A through I.E hereof are incorporated herein by reference.

77.     Satisfaction of § 524(g)(2)(B)(ii)(I) Requirements.  Based on the long latency period of asbestos-related diseases and the substantial number of asbestos-related personal injury lawsuits that had been asserted against Congoleum in the past and that remained unresolved on the Petition Date, and the additional claimants who alleged similar injuries post-petition, the Debtors, either directly or indirectly, likely would be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the asbestos claims that were pending against the Debtors on the Petition Date and that are addressed by the Asbestos Channeling Injunction.  Feist Decl. ¶¶ 7-9, 81.

78.     Satisfaction of § 524(g)(2)(B)(ii)(II) Requirements.  In light of (i) the long latency period of asbestos-related diseases, (ii) the inherent uncertainties regarding asbestos-related claims and demands, (iii) the substantial number and amounts of asbestos-related personal injury claims asserted against the Debtors prior to the Petition Date, and (iv) the additional claimants who alleged similar injuries post-petition, the actual amounts, numbers and timing of future Demands cannot be determined.  Feist Decl. ¶¶ 7-9, 81.

79.     Satisfaction of § 524(g)(2)(B)(ii)(III) Requirements.  If the holders of asbestos-related Demands are able to pursue such Demands outside of the procedures set forth in the Plan, the Debtors would be forced back into the tort system as prominent defendants.  The Debtors

could reasonably expect large numbers of lawsuits to be asserted against them in short order, given that the automatic stay has prevented the assertion of such claims against any of the Debtors for approximately six years. Those lawsuits would present the Debtors with an enormous burden immediately upon their departure from Chapter 11.

80.    If the holders of asbestos-related Demands are able to pursue such Demands outside of the Plan Trust and the TDP, the holders of such Demands would have to pursue their claims in the tort system on an individual basis, which could produce inconsistent results. Feist Decl. ¶¶7-9. Certain of these lawsuits against a Debtor could present the potential for an adverse judgment that could, by itself, or in tandem with other judgments, severely impact the Debtors' businesses and the value of the stock contributed to the Plan Trust, including causing defaults under whatever financing the Debtors were able to obtain without addressing their asbestos liabilities. *Id.* ¶¶ 18-19, 23, 78-82. Absent the protection afforded by a § 524(g) injunction, the Debtors cannot complete a successful reorganization, and would almost certainly face further insolvency proceedings, the attendant costs and inefficiencies that can only harm creditors of the Debtors, including holders of asbestos-related Demands. *Id.* ¶ 78-82. Accordingly, pursuit of Demands outside the procedures prescribed by the Plan and the TDP is likely to threaten the Plan's purpose to deal equitably with Asbestos Personal Injury Claims and future Demands.

81.    <u>Satisfaction of § 524(g)(2)(B)(ii)(IV) Requirements</u>. The terms of the Asbestos Channeling Injunction, including any provisions barring actions against third parties (i.e., the Protected Parties) pursuant to § 524(g)(4)(A) of the Bankruptcy Code, are set out in conspicuous language in the Plan and the Disclosure Statement as required by § 524(g)(2)(B)(ii)(IV)(aa). Plan § 11.5; Disclosure Statement § 6.11. The description of the Asbestos Channeling Injunction is either set out in bold letters or is underlined to bring attention to the Injunction.

82.     As required by § 524(g)(2)(B)(ii)(IV)(bb), the Plan classified together all holders of Asbestos Personal Injury Claims (Class 7), and classified together all holders of Asbestos Property Damage Claims (Class 8). As set forth in the Ballot Certification, over 95% of those voting in Class 7 voted to accept the Plan, and over 92% of those voting in Class 8 voted to accept the Plan. See Ballot Certification, Ex. 17 ¶ 23.  Accordingly, § 524(g)(2)(B)(ii)(IV) of the Bankruptcy Code has been satisfied.

83.     Satisfaction of § 524(g)(2)(B)(ii)(V).  On the Effective Date, the Plan Trust will be established, and all Asbestos Personal Injury Claims will be paid in accordance with the Plan Trust Agreement and the TDP.  Plan § 4.1(g).  All Asbestos Personal Injury Claims, including the future Demands that are presently unknown, will be determined and liquidated pursuant to the Plan, the Plan Trust Agreement and the TDP.  *Id.*  Following the Effective Date, the Plan Trustee will implement the Plan Trust Agreement and the TDP, which describes in greater detail the mechanisms governing the valuation, payment and administration of Asbestos Personal Injury Claims, including unknown future Demands.  *See* TDP (Exhibit G to the Plan); Plan Trust Agreement (Exhibit E to the Plan).  Pursuant to the Plan Trust and TDP, the Plan Trust shall operate through mechanisms such as the structured, periodic or supplemental payments, pro rata distributions, or periodic review of estimates of the numbers and values of present Asbestos Personal Injury Claims and future Demands or other comparable mechanisms that are necessary to provide reasonable assurance that the Plan Trust will value, and be in a financial position to pay, Asbestos Personal Injury Claims and Demands in substantially the same manner. Accordingly, the Plan satisfies § 524(g)(2)(B)(ii)(V) of the Bankruptcy Code.

3. *The Extension of the Asbestos Channeling Injunction to Third Parties is Appropriate Pursuant to § 524(g)(4) of the Bankruptcy Code*

84. Section 11.6 of the Plan contemplates that, in addition to protecting the Debtors and Reorganized Congoleum, the Asbestos Channeling Injunction will be extended to protect the following nondebtor-related parties and third parties:

(i) any Entity that, pursuant to the Plan or after the Confirmation Date, becomes a direct or indirect transferee of, or successor to, the Plan Trust or the Debtors;

(ii) the Persons designated on Exhibit F to the Plan (as such Exhibit may be amended on or before the Confirmation Date) as current distributors of the product lines currently manufactured, sold or otherwise produced by Congoleum; or

(iii) each Settling Asbestos Insurance Company that is identified on Exhibit H to the Plan.

85. Each Protected Party is identifiable from the terms of the Asbestos Channeling Injunction by name or as part of an identifiable group. Plan §§ 11.6; 1.2 (definition of Protected Parties). All of the Protected Parties are, or may be alleged to be, liable for the liabilities of the Debtors based upon conduct of, Claims against or Demands on a Debtor. Identifying or describing each Protected Party in the Asbestos Channeling Injunction is fair and equitable with respect to persons that might subsequently assert Demands against each such Protected Party in light of the benefits provided, or to be provided, to the Plan Trust by or on behalf of any such Protected Party.

86. The extension of the Asbestos Channeling Injunction to third parties is consistent with § 524(g)(4)(A)(ii) of the Bankruptcy Code.

### 4. The Interests of Future Asbestos Claimants were _Properly Represented by the Futures Representative_

87.     In accordance with § 524(g)(4)(B)(i) of the Bankruptcy Code, the Futures

Representative was appointed by the Bankruptcy Court as part of the proceedings leading to the

issuance of the Discharge Injunction and the Asbestos Channeling Injunction for the purpose of,

among other things, protecting the rights of persons that might subsequently assert Demands of

the kind that are addressed in the Discharge Injunction and the Asbestos Channeling Injunction

and transferred to the Plan Trust.  The Futures Representative has fulfilled his duties,

responsibilities, and obligations as the futures representative in accordance with § 524(g) of the

Bankruptcy Code.

### 5. _Entry of the Asbestos Channeling Injunction is Fair and_ _Equitable with Respect to Future Asbestos Claimants_

88.     Reorganized Congoleum, on behalf of all of the Protected Parties, is contributing

substantial assets to the Plan Trust.  Plan § 5.1(b) (Funding and Receipt of Plan Trust Assets).

On the Effective Date, Reorganized Congoleum will irrevocably transfer and assign to the Plan

Trust (i) the Plan Trust Common Stock, representing 50.1% of the Common Stock of

Reorganized Congoleum; (ii) the Asbestos Insurance Rights; (iii) all rights of the Debtors under,

and all proceeds of, the Asbestos Insurance Settlement Agreements, which total approximately

$235 million; (iv) the proceeds of the Asbestos In-Place Insurance Coverage; (v) the proceeds of

Asbestos Insurance Actions; (vi) the proceeds of the Asbestos Insurance Action Recoveries; (vii)

the rights granted to the Plan Trust pursuant to the Insurance Transfer Agreement; and (viii) the

Asbestos Property Damage Insurance Rights.  In light of the derivative nature of their claims

and/or the substantial contributions to be made to the Plan Trust by or on behalf of the Protected

Parties, entry of the Asbestos Channeling Injunction, and the naming of the Protected Parties

therein, is fair and equitable with respect to persons that might subsequently assert future asbestos-related Demands.

<em>6. The Plan Trust Satisfies the Elements<br>of a Qualified Settlement Fund (QSF)</em>

89. The Plan Trust satisfies the elements of a "qualified settlement fund" pursuant to Section 468(B) of the Internal Revenue Code and the regulations issued pursuant thereto. The Plan Trust will be established pursuant to an order confirming the Plan and the Court will have continuing jurisdiction over the Plan Trust. *See* 26 CFR § 1.468B-1(c)*1. The Plan Trust will be established to resolve or satisfy in excess of 100,000 contested or uncontested asbestos tort claims that have resulted (or may result) from a series of related events that has occurred. *See* 26 CFR § 1.468B-1(c)(2). In addition, the Plan Trust will be formed and administered in accordance with Delaware law. *See* 26 CFR § 1.468B-1(c)(3).

## I. THE ANTI-SUIT INJUNCTION SATISFIES THE REQUIREMENTS OF § 105(a) OF THE BANKRUPTCY CODE

90. During the course of the Reorganization Cases, this Court and the Bankruptcy Court have approved the Debtors' entry into various Asbestos Insurance Settlement Agreements. Certain of these Asbestos Insurance Settlement Agreements were structured as "sale and buyback" agreements whereby, upon payment of the respective settlement amounts, the Debtors will sell the relevant insurance policies back to the insurer free and clear of all claims, liens, encumbrances or interests of any other person or entity pursuant to §§ 363(b) and (f) of the Bankruptcy Code, supplemented by an injunction pursuant to § 105(a) of the Bankruptcy Code (the "105(a) Injunctions"). Accordingly, in connection with the approval of such Asbestos Insurance Settlement Agreements, the Debtors sought, and this Court and the Bankruptcy Court issued, orders providing for the 105(a) Injunctions that permanently enjoin any cause of action or

act to collect on account of a non-asbestos claim that arises out of, or relates to, the insurance policies that were the subject of the various settlement agreements.

91.    In order to preserve and promote the Asbestos Insurance Settlement Agreements that have been approved by the Bankruptcy Court and District Court, and to supplement, where necessary, the protections afforded by 105(a) Injunctions and other provisions of the Asbestos Insurance Settlement Agreements, and the discharge provided in §§ 1141 and 524 of the Bankruptcy Code, Section 11.11 of the Plan provides for the Anti-Suit Injunction.  As described in Section 11.11 of the Plan, the Anti-Suit Injunction shall operate as an injunction, pursuant to § 105(a) of the Bankruptcy Code, permanently and forever prohibiting and enjoining the commencement, conduct or continuation of any action or cause of action, whether known or unknown, the employment of process or any act to collect, recover from or offset any non-asbestos claim, Claim or demand against any Settling Asbestos Insurance Company arising out of, relating to, or in connection with an Asbestos Insurance Policy or any other insurance policy or rights under such other insurance policy issued to or insuring the relationship of the relevant Settling Asbestos Insurance Companies with, the relevant Congoleum entities that are insureds under such policies.

92.    Congoleum provided extensive notice of the 105(a) Injunctions in connection with the motions seeking approval of the various settlement agreements, including notice by publication in newspapers with national circulation.  Feist Decl. ¶ 72.  No party objected to the sale and buy back of the agreements, nor did any party notify Congoleum or the insurer of potential claims against the policies or proceeds thereof.  *Id*.  In addition, the Debtors fully disclosed the terms of the Anti-Suit Injunction in the Plan and Disclosure Statement, and the

overwhelming majority of creditors have voted in favor of the Plan. No party has objected to the issuance or entry of the Anti-Suit Injunction.

93.     The Anti-Suit Injunction is necessary to the reorganization. The Settling Asbestos Insurance Companies indicated that they would not be willing to enter into a settlement agreement unless they received a full release for their non-asbestos claims, as well as their asbestos claims. Feist Decl. ¶ 72. The Asbestos Insurance Settlement Agreements have been critical to the success of this reorganization, and the Settling Asbestos Insurance Companies have provided crucial financial contributions to the Plan Trust. Based upon the foregoing, the issuance of the Anti-Suit Injunction is fair, necessary to preserve and promote the reorganization, has been supported by fair consideration, and is appropriate under § 105(a) of the Bankruptcy Code.

## J.     CREATION OF THE RESERVE FUND

94.     As set forth in Section 5.16 of the Plan, the Reorganized Debtors shall create a reserve fund (the "Reserve Fund") for claims, excluding asbestos claims, of any Governmental Units and any other Entities against the Debtors and/or Reorganized Debtors (the "Non-Asbestos Claims"). Within thirty (30) days after the Effective Date, the Plan Trust shall pay $3 million to the Reorganized Debtors for placement in the Reserve Fund (the "Reserve Fund Settlement Funds"). The Reserve Fund Settlement Funds shall be deposited in a segregated account and shall be used for the sole purpose of paying defense and indemnity costs incurred by the Reorganized Debtors after the Effective Date arising from Known Insurance Claims (as defined in Section 5.16) that are not paid in full by Liberty Mutual Insurance Company.

95.     As of the fifth anniversary of the Effective Date, any unused balance of the Reserve Fund shall be transferred by the Reorganized Debtors to the Plan Trust, and the Reserve Fund shall be terminated, provided, however, that to the extent there are any Known Insurance

Claims as of the fifth anniversary date that are unresolved, the Reserve Fund shall not be terminated on that date. In such event, any Reserve Fund balance shall continue to be used to pay defense and indemnity costs incurred by the Reorganized Debtors arising from Known Insurance Claims until those claims are resolved.

### K.   SPECIFIC FINDINGS OF FACT RELATING TO SETTLEMENTS

#### 1.   *The Litigation Settlement Agreement as Amended*

96.   The Plan Proponents seek to implement through the Plan a compromise and settlement with respect to each Litigation Settlement Claimant pursuant to the Litigation Settlement Agreement, as amended, whose Asbestos Personal Injury Claim was liquidated pursuant to the Claimant Agreement or a Pre-Petition Settlement Agreement, as the case may be. In August 2008, the Debtors, the Bondholders' Committee, the Futures Representative, the Asbestos Claimants' Committee, and Claimants' Counsel entered into the Original Litigation Settlement Agreement, a global settlement that resolved certain of the material terms of a plan of reorganization and a settlement of the Avoidance Actions. Feist Decl. ¶ 59.

97.   The Original Litigation Settlement Agreement represented a comprehensive settlement and compromise of the fundamental equality of distribution issues. Counsel representing 87% of asbestos claimants who were parties to the Pre-Petition Settlement Agreements executed the Original Litigation Settlement Agreement; the remainder either did not respond or declined to execute the agreement on behalf of their clients. Feist Decl. ¶ 60. The Original Litigation Settlement Agreement provides that the parties that executed asbestos personal injury settlements with Congoleum for future insurance proceeds prior to the Petition Date (the "Litigation Settlement Claimants") shall waive any and all rights with respect to their pre-petition settlements, including the liquidated amounts thereof. *Id.* Instead, Litigation Settlement Claimants will submit their claims to the Plan Trust for resolution in accordance with

the TDP and will be treated the same as all other present and future asbestos personal injury claimants. *Id.* In exchange, Congoleum was to be released from all of its obligations under the Pre-Petition Settlement Agreements, the Claimant Agreement, the Security Agreement, the Collateral Trust Agreement and any and all other agreements and amendments thereto with respect to the Pre-Packaged Plan. *Id.*

98. Overruling various objections, the Bankruptcy Court issued an order on October 31, 2008 approving the Original Litigation Settlement Agreement, holding that it was "fairly easy to conclude" that the settlement "falls above the lowest point in the range of reasonableness." Feist Decl. ¶ 62. The Bankruptcy Court, however, reserved determination as to whether the Original Litigation Settlement Agreement satisfied requirements for confirmation under §§ 1129 and 524(g) of the Bankruptcy Code. *Id.*

99. The Original Litigation Settlement Agreement included a term sheet that set forth the terms of the Amended Joint Plan. As a result of various rulings from this Court and the Bankruptcy Court, the Plan Proponents made certain modifications to the current Plan that differed from those terms outlined in the Original Litigation Settlement. Feist Decl. ¶ 66. Included in those changes was this Court's direction in its August 17, 2009 District Court Appellate Opinion that required the Plan Proponents to revise certain provisions of the plan to make explicit that the Rice and Weitz Payments would be subject to review under § 1129(a)(4) of the Bankruptcy Code. *Id.* ¶ 65; *see also In re Congoleum Corp.,* 414 B.R. 44 (D.N.J. 2009). The Plan Proponents, therefore, circulated a First Amendment to the Original Litigation Settlement Agreement in order to conform the Original Litigation Settlement Agreement to the terms of the new plan (the "First Amendment"). Feist Decl. ¶ 67, Ex. 61. The First Amendment did not alter the material terms of the Original Litigation Settlement Agreement. Feist Decl. ¶

66.  The First Amendment, dated as of October 22, 2009, was executed by the Debtors, the

Bondholders' Committee, the Asbestos Claimants' Committee, the Futures Representative, the

Claimants' Counsel, and counsel representing over 84% of the Pre-Petition Settled Claimants.

*Id*. ¶ 67.  The terms of the Litigation Settlement Agreement, as amended by the First Amendment

to the Litigation Settlement Agreement (collectively referred to in the Plan as the "<u>Litigation

Settlement Agreement</u>"), is set forth in Section 5.14 of the Plan.  *Id.* ¶ 66.

100.    The Litigation Settlement Agreement has been proposed in good faith, is a fair

and reasonable resolution of the claims by and between the Plan Proponents, Claimants'

Counsel, the Collateral Trustee and the Litigation Settlement Claimants, and is in the best

interests of the estates.  The Litigation Settlement Agreement resolves the fundamental equality

of distribution issues in the Plan, and represents a fair resolution of the Avoidance Actions.  As a

result of the foregoing, the First Amendment to the Litigation Settlement Agreement is fair,

reasonable, and meets the standards for approval pursuant to § 1123(b)(3) of the Bankruptcy

Code, Bankruptcy Rule 9019 and applicable United States Supreme Court and Third Circuit law.

*See Protective Comm. for Indep. Stockholders of TMT Ferry, Inc. v. Anderson*, 390 U.S. 414,

424 (1968); *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996).  In addition, the Court concludes that

the Litigation Settlement Agreement comports with the confirmation requirements set forth in §§

1129 and 524(g) of the Bankruptcy Code.

## 2. *The Intercompany Settlement*

101.    The Plan Proponents seek to implement through the Plan a compromise and

settlement with respect to Congoleum's parent company, American Biltrite Inc. ("<u>ABI</u>"), the

ABI Claims and the Intercompany Agreements, as set forth in Section 5.17 of the Plan (the

"<u>Intercompany Settlement</u>").  The Intercompany Settlement sets forth the new operational

relationship between Reorganized Congoleum and ABI.  It provides that, on the Effective Date

of the Plan, all of ABI's claims against the Debtors (estimated at $1.8 million) shall be deemed disallowed, and all Intercompany Agreements shall be deemed rejected. In exchange, the parties shall enter into and effectuate the New ABI Agreement (Exhibit 4 to the Plan Supplement) (Ex. 9), which shall govern the relationship between ABI and Reorganized Congoleum after the Effective Date. Pursuant to the Intercompany Settlement and the New ABI Agreement, ABI shall provide Reorganized Congoleum with senior management personnel.

102.    The Intercompany Settlement has been proposed in good faith, is a fair and reasonable resolution of the claims by and between the Debtors and ABI, and is in the best interests of the estates. As a result of the foregoing, the Intercompany Settlement is fair, reasonable, and meets the standards for approval pursuant to § 1123(b)(3) of the Bankruptcy Code, Bankruptcy Rule 9019 and applicable United States Supreme Court and Third Circuit law. *See Protective Comm. for Indep. Stockholders of TMT Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996)

### *3.    The Century Settlement*

103.    In August 2006, the Debtors filed a motion seeking approval to enter into a certain Settlement and Policy Buyback Agreement and Release with Century Indemnity Company ( the "Century Settlement") (Ex. 108) pursuant to §§ 363 and 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 (the "Century Approval Motion"), Ex. 111. The Debtors provided extensive notice of the Century Approval Motion to all parties-in-interest, including to all known holders of asbestos claims or their counsel, and to all parties who is, or asserts to be, a named insured, additional insured or is qualified as an insured party (as further defined in the Century Settlement, the "Additional Named Insureds") under the insurance policies that were subject to the Century Settlement (the "Century Subject Policies"). *See* Affidavits of Service with respect to Century Approval Motion, [Dkt. Nos. 4469, 4544], Ex. 111. In addition, notice

of the Century Settlement was published in *USA Today*. *See* Notice of Publication [Dkt. No. 4521], Ex. 111. None of the Additional Named Insureds or holders of asbestos personal injury claims objected to the Century Settlement, or otherwise asserted rights with respect to the Century Subject Policies. As a result, on September 20, 2006, the Bankruptcy Court entered an Order approving the Century Settlement, which order became a final order (the "Century Approval Order"), Ex. 108.

104. In support of the Century Settlement and the Century Approval Order, the Court finds that the following Century Additional Named Insureds have no responsibility for any of the liabilities of the Congoleum Flooring Business (as defined in the Century Settlement): Relax-o-Lounger, Inc., Kinder Manufacturing Company, Inc., Lewis Carpet Mills, Inc., Lewis Carpet Mills, Inc., Pennsylvania Crusher Corporation, Mersman Brothers Division, Webb Furniture Corporation, Coronet Manufacturing Co., Inc., Howard Parlor Furniture Co., Howard Parlor Furniture Co. of Texas, Inc., Howard Frame Co., Edson, Incorporated, J. Isenberg & Son, Inc. and Bath Iron Works Corp.

## L. COMPREHENSIVE SETTLEMENT OF CLAIMS AND CONTROVERSIES

105. Based upon the representations and arguments of counsel for the Plan Proponents and all other testimony either actually given or proffered at the Confirmation Hearing or prior hearings and the full record of these Chapter 11 Cases, the findings and conclusions of which are hereby incorporated by reference as if fully set forth herein, the Court finds that, pursuant to § 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan, including the injunctions, releases, exculpations, indemnifications and discharges set forth in Article XI of the Plan, constitute a good faith compromise and settlement of all claims or controversies relating to

the rights that a holder of a claim or Interest may have with respect to any Claim, Asbestos Personal Injury Claim or Interest or any distribution to be made pursuant to the Plan on account of any Allowed Claim, Asbestos Personal Injury Claim or Interest.

106. Moreover, based upon the Plan Proponents' Supporting Material and the representations and arguments of counsel for the Plan Proponents, and all other testimony either actually given or proffered at the Confirmation Hearing or prior hearings relating to the negotiations leading to, among other things, the Litigation Settlement Agreement as amended, the Intercompany Settlement, and ultimately the Plan, the Plan constitutes a fair and reasonable, good faith settlement and compromise of all claims or controversies relating to the rights of holders of Claims against and Interests in the Debtors.

107. Finally, each of the injunctions, releases, exculpations, indemnifications and discharges set forth in Article XI of the Plan is implemented in accordance with applicable law, is consensual, and/or is supported by substantial consideration.

## M. SATISFACTION OF CONDITIONS TO CONFIRMATION

108. Section 10.1 of the Plan contains conditions precedent to Confirmation that must be satisfied or duly waived by the Plan Proponents. Pursuant to these Findings of Fact and Conclusions of Law and the Confirmation Order each of the conditions precedent set forth in Section 10.1(a)(i)-(xxii) of the Plan has been satisfied or duly waived. Concerning the establishment of the Plan Trust and the issuance of the Asbestos Channeling Injunction and the Anti-suit Injunction, among other things, the Court specifically finds:

        (i)      The Discharge Injunction and the Asbestos Channeling Injunction are to be implemented in connection with the Plan and the Plan Trust;

(ii)     As of the Petition Date, Congoleum was named as a defendant in personal injury, wrongful death or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

(iii)     The Plan Trust, upon the Effective Date, shall assume the liabilities of the Debtors with respect to Plan Trust Asbestos Claims and Demands;

(iv)     The Plan Trust is to be funded in part by securities of Reorganized Congoleum in the form of the Plan Trust Common Stock, which constitutes an obligation of Reorganized Congoleum to make future payments to the Plan Trust;

(v)     On the Effective Date, the Plan Trust will own a majority of the voting shares of Reorganized Congoleum;

(vi)     The Plan Trust is to use its assets and income to pay Plan Trust Asbestos Claims and Plan Trust Expenses and otherwise as specifically set forth in the Plan Trust Agreement;

(vii)     Congoleum is likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Plan Trust Asbestos Claims, which are addressed by the Asbestos Channeling Injunction;

(viii)     The actual amounts, numbers and timing of future Demands cannot be determined;

(ix)     Pursuit of Demands outside the procedures prescribed by the Plan and the TDP is likely to threaten the Plan's purpose to deal equitably with Plan Trust Asbestos Claims and future Demands;

(x)     The Plan establishes a separate Class 7 for Asbestos Personal Injury Claims that are to be addressed by the Plan Trust and at least seventy-five percent (75%) of the Asbestos Claimants voting in Class 7 have accepted the Plan;

(xi)    The Plan establishes a separate class of Asbestos Property Damage Claims that are to be addressed by the Plan Trust and at least seventy-five percent (75%) of the claimants voting in such class have accepted the Plan;

(xii)   Pursuant to court orders or otherwise, the Plan Trust shall operate through mechanisms such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims or other comparable mechanisms, that provide reasonable assurance that the Plan Trust shall value, and be in a financial position to pay, Asbestos Personal Injury Claims and Demands therefor in substantially the same manner;

(xiii)  The Futures Representative was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Discharge Injunction and the Asbestos Channeling Injunction for the purpose of, among other things, protecting the rights of persons that might subsequently assert Demands of the kind that are addressed in the Discharge Injunction and the Asbestos Channeling Injunction and transferred to the Plan Trust;

(xiv)   In light of the benefits provided, or to be provided, to the Plan Trust on behalf of each Protected Party, the Asbestos Channeling Injunction is fair and equitable with respect to the persons that might subsequently assert Demands against any Protected Party;

(xv)    The Plan otherwise complies with § 524(g) of the Bankruptcy Code.

(xvi)    Congoleum's contributions to the Plan Trust provided for in the Plan, together with the Asbestos Insurance Assignment, the Plan Trust Common Stock, constitute substantial assets of the Plan Trust and the reorganization;

(xvii)    The duties and obligations of the insurers that issued policies and their successors and assigns, or, with respect to any insolvent insurers, their liquidators and/or the state insurance guaranty funds that bear responsibility with respect to such rights under such policies which constitute the Asbestos Insurance Rights and Asbestos Property Damage Insurance Rights are not eliminated or diminished by the transfer pursuant to the Plan of the Debtors' rights in the Asbestos Insurance Rights and Asbestos Property Damage Insurance Rights pursuant to the Insurance Transfer Agreement;

(xviii)    The Settling Asbestos Insurance Companies[4] are entitled to the benefits of the Asbestos Channeling Injunction with respect to Plan Trust Asbestos Claims;

(xix)    After Confirmation, each Asbestos Insurance Settlement Agreement of a Settling Asbestos Insurance Company and each Final Order of the Bankruptcy Court or District Court, as applicable, approving such Settlement Agreements shall be binding upon and inure to the benefit of the Plan Trust and the Plan Trustee, and the Plan Trust shall become fully bound by, and entitled to all of the rights afforded to the Plan Trust and/or the Debtors under, all of the terms and conditions of each such Asbestos Insurance Settlement Agreement without need for further act or documentation of any kind.

---

[4]  The District Court approved a $25 million settlement between the Debtors and the St. Paul Travelers Entities (the "Travelers Settlement") [Dkt. No. 468]. The Futures Representative did not consent to the Travelers Settlement and has filed an appeal of the order approving the Travelers Settlement, which is currently pending before the United States Court of Appeals for the Third Circuit.

(xx)     After Confirmation, none of the Debtors, Reorganized Congoleum, the Futures Representative, the Plan Trustee, and the Asbestos Claimants' Committee shall seek to terminate, reduce or limit the scope of the Asbestos Channeling Injunction or any other injunction contained in the Plan that inures to the benefit of any Settling Asbestos Insurance Company.[5]

(xxi)    As of the Effective Date, the Insurance Transfer Agreement shall be a valid and binding obligation of each of the parties thereto, shall be in full force and effect and shall be enforceable in accordance with its terms, in each case notwithstanding any anti-assignment provision in or incorporated into any Asbestos Insurance Policy and applicable state law.

(xxii)   The Plan Trust is a "qualified settlement fund" pursuant to Section 468(B) of the Internal Revenue Code and the regulations issued pursuant thereto.

## II.     CONCLUSIONS OF LAW

### A.     JURISDICTION AND VENUE

109.    The District Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Each of the Debtors was and is qualified to be a debtor under § 109 of the Bankruptcy Code. Venue of the Chapter 11 Cases in the United States Court for the District of New Jersey was proper as of the Petition Date, pursuant to 28 U.S.C. § 1408, and continues to be proper.  The

---

[5]  If the Travelers Settlement becomes a Final Order and all other conditions precedent to the Travelers Settlement are satisfied or waived, neither the Claimants' Counsel nor the ABI Entities (as defined in the Travelers Settlement) shall seek to terminate, reduce or limit the scope of the Asbestos Channeling Injunction or any other injunction contained in the Plan that inures to the benefit of the St. Paul Travelers Entities (as defined in the Travelers Settlement).

District Court has jurisdiction to enter a final order with respect thereto, including with respect to the requirements of § 524(g) of the Bankruptcy Code.

### B.  MODIFICATIONS TO THE PLAN

110.  The Modifications do not materially or adversely affect or change the treatment of any Claim against or Interest in any Debtor.  Pursuant to § 1127(b) of the Bankruptcy Code and Bankruptcy Rule 3019, the Modifications do not require additional disclosure under § 1125 of the Bankruptcy Code or the resolicitation of acceptances or rejections of the Plan under § 1126 of the Bankruptcy Code, nor do they require that holders of Claims against or Interests in the Debtors be afforded an opportunity to change previously cast acceptances or rejections of the Plan as filed with the Court.  Disclosure of the Modifications as part of the Plan Supplement on May 5, 2010 constitutes due and sufficient notice thereof under the circumstances of the Chapter 11 Cases.  Accordingly, the Plan (as modified by the Modifications) is properly before the Court and all votes cast with respect to the Plan prior to the Modifications shall be binding and shall be deemed to be cast with respect to the Plan as modified by the Modifications.

### C.  EXEMPTIONS FROM TAXATION

111.  Pursuant to § 1146 of the Bankruptcy Code, any transfers from a Debtor to Reorganized Congoleum or to any other Person or Entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and (ii) the appropriate state or local governmental officials or agents are hereby directed to forego the collection of any such tax or governmental assessment and to accept for

filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### D. EXEMPTIONS FROM SECURITIES LAWS

112. The issuance and distribution of the New Common Stock shall be, and shall be deemed to be, exempt from registration under any applicable federal or state securities law to the fullest extent permissible under applicable non-bankruptcy law and under bankruptcy law, including, without limitation, § 1145 of the Bankruptcy Code.

### E. COMPLIANCE WITH § 1129 OF THE BANKRUPTCY CODE

113. As set forth in Section I.F and I.G above, the Plan complies in all respects with the applicable requirements of § 1129 of the Bankruptcy Code.

### F. COMPLIANCE WITH § 524(g) OF THE BANKRUPTCY CODE

114. As set forth in Section I.H above, the Plan complies in all respects with the applicable requirements of § 524(g) of the Bankruptcy Code.

### G. PROPRIETY OF VARIOUS AGREEMENTS AND PLAN DOCUMENTS

115. In light of the extensive litigation in these Reorganization Cases, and based on the evidentiary record presented at the Confirmation Hearing, including the Plan Proponents' Supporting Material, and in light of all of the circumstances and the Reorganization Cases, the terms of the various settlements are fair, reasonable and adequate, and are in accordance with applicable United States Supreme Court and Third Circuit law. *See Protective Comm. for Indep. Stockholders of TMT Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re Martin*, 91 F.3d 389, 393 (3d. Cir. 1996).

116. In light of all of the circumstances and the record in the Reorganization Cases, each of the transactions contemplated by or referenced in the Plan Documents, including the creation of the Plan Trust and the Non-Asbestos Reserve Fund, is integral to the terms,

conditions and settlements contained in the Plan and is critical to the effectuation of the purposes

of the Plan, subject to the terms and conditions of the Plan and the Plan Documents. All

contracts, instruments, releases, agreements and documents related to, or necessary to

implement, effectuate and consummate, the terms and conditions of the Plan, the Exit Facility,

the New Notes, any other Plan Document, or the Asbestos Insurance Settlement Agreements

comply with applicable law.

### H. GOOD FAITH NEGOTIATION, IMPLEMENTATION AND CONSUMMATION

117. The Debtors, the Asbestos Claimants' Committee, the Bondholders' Committee,

the Futures Representative, the Claimants' Counsel, ABI, Wells Fargo Bank, National

Association ("Wells Fargo"), and all other parties entering into settlements embodied in the Plan,

as applicable, participated in good faith in negotiating, at arm's length, the Plan, the Plan

Documents, and all other documents related to or necessary to implement, effectuate and

consummate the Plan, including, without limitation, (a) the Plan Trust Agreement, (b) the TDP,

(c) the Exit Facility Term Sheet, (d) the New Senior Notes, (e) the New Indenture, (f) the

Registration Rights Agreement, (g) the Amended and Restated Certificate, (h) the Amended and

Restated Bylaws, (i) the Stockholders Agreement, (j) the New ABI Agreement, (k) the Insurance

Transfer Agreement and all other contracts, instruments, agreements and documents to be

executed and delivered by any Debtor or Reorganized Congoleum in connection therewith.

118. Each of the Debtors, the Asbestos Claimants' Committee, the Bondholders'

Committee, the Futures Representative, the Claimants' Counsel, ABI, Wells Fargo, and all other

parties entering into settlements embodied in the Plan, as applicable, also participated in good

faith in each of the actions taken to bring about, and in satisfying each of the conditions

precedent to, confirmation and consummation. In so determining, the Court has examined,

among other things, the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the record of this proceeding and the Plan and all related pleadings, exhibits, statements and comments regarding Confirmation.

### I.     ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

119.     The assumption by the Debtors of all existing executory contracts and unexpired leases, with the exception of any contracts or leases that have been rejected or designated as being subject to rejection on or before the Effective Date, is both beneficial and necessary to the Debtors' and Reorganized Congoleum's business operations upon and subsequent to emergence from Chapter 11.  The assumption of such executory contracts and unexpired leases pursuant to the Plan is a sound exercise of the Debtors' business judgment and is in the best interest of the Debtors, their estates, and their creditors.  Based upon, among other things, Reorganized Congoleum's anticipated financial wherewithal after the Effective Date, including, without limitation, the operating cash and liquidity available to Reorganized Congoleum under the proposed Exit Facility to fund its post-emergence business operations, each Reorganized Debtor that is assuming a contract or lease pursuant to the Plan has demonstrated that it will be fully capable of performing under the terms and conditions of the respective contract or lease to be assumed or assumed and assigned on a going-forward basis.

### J.     APPROVAL OF THE DISCHARGES, RELEASES, INJUNCTIONS, INDEMNIFICATIONS AND EXCULPATIONS PROVIDED UNDER THE PLAN

120.     Each of the discharges, releases, injunctions, indemnifications and exculpations provided under the Plan, including those set forth in Article XI of the Plan, is (1) integral to the terms, conditions and settlements contained in the Plan, (2) appropriate in connection with the reorganization of the Debtors and (3) supported by reasonable consideration.  In light of all of

the circumstances and the record in these Reorganization Cases, each of the discharges, releases, injunctions, indemnifications and exculpations provided under the Plan is fair and reasonable to all parties in interest. Each of the discharge, release, injunctive, indemnification and exculpation provisions set forth in the Plan and this Confirmation Order is: (i) within the jurisdiction of the Court under 28 U.S.C. §§ 1334(a), 1334(b) and 1334(d); (ii) an essential means of implementing the Plan pursuant to § 1123(a)(6) of the Bankruptcy Code; (iii) an integral element of the transactions incorporated into the Plan; (iv) beneficial to, and in the best interests of, the Debtors, their estates and their creditors; (v) critical to the overall objectives of the Plan to finally resolve all Claims among or against the parties-in-interest in the Reorganization Cases with respect to each of the Debtors; and (vi) consistent with §§ 105, 363, 1123, 1129 and other applicable provisions of the Bankruptcy Code.

**K.    OBJECTIONS TO THE PLAN**

121.    Based upon the record of these Reorganization Cases, the Court hereby determines that all of the objections to Confirmation, whether informal or filed, not otherwise withdrawn at or prior to the Confirmation Hearing should be, and hereby are, overruled for the reasons articulated by the Court on the record at the Confirmation Hearing and/or set forth in the Plan Proponents' Memorandum of Law in support of confirmation of the Plan.

122.    It is law of the case that the Thompson Claimants, the Shein Claimants and all other holders of Asbestos Personal Injury Claims are substantially similar and should be classified in a single class. *See, e.g., In re Congoleum Corp.,* No. 03-51524, 2007 WL 2177680, at *2 (Bankr. D.N.J. July 27, 2007), Ex. 51; Opinion Regarding Joint Plan, dated June 5, 2008, *In re Congoleum Corp.,* No. 03-51524 (Bankr. D.N.J.) [Dkt. No. 6575]. The Plan has received the overwhelming support of all members of Class 7 (Asbestos Personal Injury Claims), including other similarly classified claimants that either entered into Pre-Petition Settlement Agreements or

participated in the Claimant Agreement. *See* Ballot Certification, Ex. 17 ¶¶ 23 and 24. Pursuant to the Bankruptcy Code, a class vote binds dissenting members of a class. 11 U.S.C. § 1126(c) (providing a creditor class accepts a plan if at least two-thirds in amount and more than one-half in number vote in favor of a plan, counting only those creditors who actually vote); 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) (requiring a super-majority of 75% approval with respect to § 524(g) plans). Neither Thompson nor Shein presented any legally supportable argument as to why their clients should not be bound by the overwhelming class vote in support of confirmation of the Plan. Accordingly, the Thompson Objection and the Shein Preliminary Objection are overruled.

## III.    ORDER

**THE COURT HEREBY ORDERS, ADJUDGES AND DECREES THAT**:

### A.    GENERAL PROVISIONS REGARDING CONFIRMATION OF THE PLAN AND APPROVAL OF PLAN-RELATED DOCUMENTS

#### 1.    *CONFIRMATION OF THE PLAN*

1.      The Plan, a copy of which is attached hereto as Exhibit A, and each of its provisions (whether or not specifically approved herein), as modified by the Modifications, and all exhibits and schedules thereto, and separate findings of fact and conclusions of law, are CONFIRMED in each and every respect pursuant to §§ 1129 and 524(g) of the Bankruptcy Code. If there is any direct conflict between the terms of the Plan or any exhibit thereto and the terms of this Confirmation Order, the terms of the Confirmation Order shall control; provided, however, nothing in this Confirmation Order shall supersede the provisions of Section 11.12 of the Plan. This Confirmation Order shall supersede any prior orders of this Court or the Bankruptcy Court that may be inconsistent herewith.

#### 2.    *MODIFICATIONS TO THE PLAN*

2.      The modifications contained in the Plan and the Plan Documents filed by the Plan Proponents on or about May 5, 2010 (and such further modifications to the Plan and the Plan Documents as were identified to the Court at the Confirmation Hearing or otherwise identified to the Court prior to the entry of this Confirmation Order), are deemed to be either technical changes or clarifications that do not adversely change the treatment of the Claim of any creditor of the Debtors or have been consented to by the entities affected thereby and approved in all respects. The Plan, as modified by the Modifications, shall be deemed accepted by all holders of Claims who previously accepted the Plan.

### 3. CONDITIONS TO CONFIRMATION AND CONSUMMATION OF THE PLAN

3. Nothing in this Confirmation Order or in the Findings and Conclusions shall in any way affect the provisions of Sections 10.1, 10.2 and 10.3 of the Plan, which include provisions regarding (1) the conditions precedent to the Confirmation of the Plan, (2) the conditions precedent to the Effective Date of the Plan and (3) the waiver of any such conditions.

### 4. EFFECTS OF CONFIRMATION

4. In accordance with § 1141(a) of the Bankruptcy Code, and subject to this Confirmation Order and notwithstanding any otherwise applicable law, immediately upon the entry of this Confirmation Order, the terms of the Plan and this Confirmation Order shall be binding upon all Persons, including the Debtors, Reorganized Congoleum, any and all holders of Claims, Demands or Interests (irrespective of whether such Claims or Interests are impaired under the Plan or whether the holders of such Claims or Interests accepted, rejected or are deemed to have accepted or rejected the Plan), any and all non-Debtor parties to executory contracts and unexpired leases with any of the Debtors and any and all Persons who are parties to or are subject to the settlements, compromises, releases, waivers, discharges and injunctions described herein, and in the Findings and Conclusions or in the Plan and the respective heirs, executors, administrators, trustees, affiliates, officers, directors, agents, representatives, attorneys, beneficiaries, guardians, successors or assigns, if any, of any of the foregoing.

### 5. APPROVAL, MODIFICATION AND EXECUTION OF PLAN DOCUMENTS

5. The Plan and all exhibits and schedules thereto, substantially in the form as they exist at the time of the entry of this Confirmation Order, including, without limitation, the documents relating to the Plan Trust, and each of the other Plan Documents, are ratified and

approved in all respects.  All relevant parties are authorized, without further action by the Court,

to enter into, effectuate, and perform any and all obligations under the Plan Documents,

notwithstanding the efficacy of such documents may be subject to the occurrence of the Effective

Date or some other date thereafter.

6.       The Plan Proponents may propose amendments to or modifications of any of the

Plan Documents, but only in accordance with § 1127 of the Bankruptcy Code and Section 13.10

of the Plan.  After Confirmation, the Plan Proponents may remedy any defects or omissions or

reconcile any inconsistencies in the Plan or the Confirmation Order or any other order entered

for the purpose of implementing the Plan in such manner as may be necessary to carry out the

purposes and intent of the Plan; provided, however, that none of the Plan Proponents, ABI or the

Plan Trustee shall seek to terminate, reduce or limit the scope of the Asbestos Channeling

Injunction or any other injunction contained in the Plan that inures to the benefit of any Settling

Asbestos Insurance Company.  Anything in the Plan or in any Plan Document to the contrary

notwithstanding, following Confirmation, but prior to the Effective Date, the Plan Documents

shall not be modified, supplemented, changed or amended in any material respect except with the

written consent of the Bondholders' Committee, the Debtors, the Asbestos Claimants'

Committee and the Futures Representative.

7.       The failure to reference or discuss any particular provision of the Plan in this

Confirmation Order shall have no effect on the validity, binding effect, and enforceability of

such provision and such provision shall have the same validity, binding effect, and enforceability

as every other provision of the Plan.

## B. CLAIMS BAR DATES AND OTHER CLAIMS MATTERS

### 1. *GENERAL BAR DATE PROVISIONS FOR ADMINISTRATIVE CLAIMS*

8.　　　In accordance with Article VII of the Plan, all requests for payment of an Administrative Claim (other than a Professional Fee Claim or Substantial Contribution Claim, each as defined below, or an Administrative Claim Allowed by the Plan) against any of the Debtors shall be filed with the Court and served upon counsel to the Debtors, the Bondholders' Committee, the Asbestos Claimants' Committee and the Futures Representative at the addresses set forth in Section 13.25 of the Plan not later than thirty (30) days after the Effective Date (the "Administrative Claims Bar Date").  Reorganized Congoleum, the Bondholders' Committee, the Asbestos Claimants' Committee and the Futures Representative each shall have the right to make and file objections to Proofs of Administrative Claims, at any time on or before sixty (60) days after the later of (i) the Effective Date or (ii) the date on which such Claim was filed with the District Court unless no Proof of Claim is required to be filed pursuant to Bankruptcy Rule 3002, the Plan or any order of the District Court, provided that such 60-day period of review may be extended by the Court upon request of any of the Plan Proponents.  If an Entity does not submit a request for payment of an Administrative Expense on or before the Administrative Claims Bar Date, such Entity shall be forever barred from seeking payment of such Administrative Expense from any Reorganized Debtor, or any of its successors or assigns, or out of the property of any of them.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim which is paid or payable by the Debtors in the ordinary course of business.

### 2. *BAR DATE FOR PROFESSIONAL FEES*

9.　　　All final requests for payment of the fees of any professional retained in the Reorganization Cases pursuant to §§ 327, 328, and 1103 of the Bankruptcy Code, or otherwise,

including such Claims of the Futures Representative and its professionals, for compensation or reimbursement of costs and expenses relating to services rendered on and after the Petition Date and prior to and including the Effective Date, shall be filed and served on Reorganized Congoleum and their counsel no later than sixty (60) days after the Effective Date, unless otherwise ordered by the District Court (the "Professional Fee Bar Date"). The procedures for processing final requests for compensation or reimbursement of any Professional Fee Claim as set forth in Section 13.14 of the Plan are approved. If a Professional or other entity does not submit a request for payment of a Professional Fee Claim on account of services rendered to the Estate on or before the Professional Fee Bar Date, such Entity shall be forever barred from seeking payment of such Professional Fee Claim from any Reorganized Debtor, or any of its successors or assigns, or out of the property of any of them.

10.     Without limiting the foregoing, each Reorganized Debtor and any successor thereto may pay the charges that it incurs on or after the Effective Date for professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to the District Court or otherwise.

### 3.     BAR DATE FOR SUBSTANTIAL CONTRIBUTION CLAIMS

11.     Any Entity who requests compensation or expense reimbursement for making a substantial contribution in the Reorganization Cases pursuant to §§ 503(b)(3), (4) and (5) of the Bankruptcy Code ("Substantial Contribution Claim") must file an application with the clerk of the District Court on or before a date that is sixty (60) days subsequent to the Effective Date (the "Substantial Contribution Bar Date") and serve such application on counsel for the Debtors, counsel for the Futures Representative, counsel for the Asbestos Claimants' Committee, counsel for the Bondholders' Committee and on all other parties as otherwise required by the District

Court and the Bankruptcy Code, or be forever barred from seeking such compensation or expense reimbursement.

4. *BAR DATE FOR REJECTION DAMAGES CLAIMS*

12. If the rejection by a Debtor, pursuant to the Plan, of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor, or the properties of any of them, unless a Proof of Claim is filed with the District Court on or before thirty (30) calendar days following the later of the Confirmation Date or the date of rejection of the executory contract or unexpired lease. Such Proof of Claim shall be treated in accordance with Section 8.2 of the Plan.

13. The Plan constitutes due and proper notice of the bar date for filing a Proof of Claim to Entities that may assert a Claim for damages from the rejection of an executory contract or unexpired lease.

**C. APPROVAL OF EXECUTORY CONTRACT AND UNEXPIRED LEASE PROVISIONS AND RELATED PROCEDURES**

1. *ASSUMED CONTRACTS AND LEASES AND RELATED PROCEDURES*

14. The treatment of executory contracts, unexpired leases and settlements described in Article VIII of the Plan is specifically approved. Except for any unexpired lease or executory contract that the Plan Proponents reject or designate as being subject to rejection on or before the Effective Date, as of the Effective Date, all executory contracts and unexpired leases not previously assumed or rejected by the Debtors pursuant to § 365 of the Bankruptcy Code shall be, and are, hereby assumed by the relevant Debtor. This Confirmation Order shall constitute an order of the Court approving the assumptions and assumptions and assignments described in Section 8.1(a) of the Plan pursuant to § 365 of the Bankruptcy Code as of the Effective Date. Each such assumption is a sound exercise of the Debtors' business judgment and is in the best

interests of the Debtors, the Estates and all parties in interest in the Reorganization Cases. To the extent there are any defaults by the Debtors with respect to a particular assumed executory contract or unexpired leases, the Debtors shall cure such default in the ordinary course of the Reorganized Debtors' business promptly after any such default becomes known to them. Upon payment of such cure amounts, and subject to the occurrence of the Effective Date, all defaults shall be deemed cured.

15.    If there is a dispute regarding the nature or amount of any cure amount by the counterparty to any unexpired lease or executory contract, then, subject to Section 7.2 of the Plan, the counterparty to such unexpired lease or executory contract may file an appropriate objection with the Court. Payment of the cure amount, if any, will occur following the entry of a Final Order of the Court resolving such objection and approving the assumption.

2.    <u>REJECTED CONTRACTS AND LEASES</u>

16.    On the Effective Date, each executory contract and unexpired lease that is identified as part of the Plan Supplement (as such list may be amended or supplemented up to and including the Confirmation Date), is hereby rejected pursuant to § 365 of the Bankruptcy Code. Any claims for damages relating to the rejection of any executory contract or unexpired lease must be filed in accordance with this Confirmation Order and Section 8.2 of the Plan.

3.    <i>ABI CANADA LICENSE AGREEMENT;<br><u>INTERCOMPANY AGREEMENTS</u></i>

17.    Pursuant to and in consideration of the Intercompany Settlement and Section 5.17 of the Plan, on the Effective Date, (a) the ABI Canada License Agreement shall be amended as provided in the Intercompany Settlement and shall be assumed, as amended, pursuant to § 365 of the Bankruptcy Code, and (b) all Intercompany Agreements shall be rejected pursuant to § 365 of the Bankruptcy Code, and all ABI Claims, including without limitation any ABI Rejection

Damages Claims, are hereby disallowed and expunged in accordance with the terms of ABI's treatment under the Plan.

> ### 4. *COMPENSATION AND BENEFIT PROGRAMS*

18.     All of the Debtors' obligations under employment and severance policies, and all compensation and benefit plan, policies, and programs shall be treated as though they are executory contracts that are deemed assumed under the Plan.

19.     As of the Effective Date, the Pension Plans, as well as the collective bargaining agreement by and between the Debtors and Teamsters Local 312, shall be deemed to have been assumed by Reorganized Congoleum. Reorganized Congoleum shall continue the Pension Plans, satisfy the minimum funding standards pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082, and administer the Pension Plans in accordance with their terms and the provisions of ERISA. Furthermore, nothing in the Plan or this Confirmation Order shall be construed as discharging, releasing or relieving the Debtors or Reorganized Congoleum, or any party, in any capacity, from any liability imposed under any law or regulatory provision with respect to the Pension Plans, the Pension Benefit Guaranty Corporation ("PBGC") or the Teamsters Pension Trust Fund of Philadelphia Vicinity (the "Teamsters Pension Fund"). The PBGC, the Pension Plans and the Teamsters Pension Fund shall not be enjoined or precluded from enforcing such liability as a result of any provision of the Plan or this Confirmation Order.

**D.     MATTERS RELATING TO IMPLEMENTATION OF THE PLAN**

> ### 1. *ACTIONS IN FURTHERANCE OF THE PLAN*

20.     Pursuant to §§ 1123 and 1142 of the Bankruptcy Code, § 303 of the Delaware General Corporation Law and any comparable provisions of the business corporation law of any other state (collectively, the "Reorganization Effectuation Statutes"), without further action by the Court or the stockholders, members, managers or board of directors of any Debtor,

Reorganized Debtor, each of the Debtors and the Reorganized Debtors, as well as each of the

Chief Executive Officer, President, Executive Vice President, Chief Financial Officer, Chief,

Operating Officer, Executive Vice President, Senior Vice President, any Vice President or any

other appropriate officer of the appropriate Debtor or Reorganized (collectively, the

"Responsible Officers"), is hereby authorized to:  (a) take any and all actions necessary or

appropriate to implement, effectuate and consummate the Plan, the Plan Documents, this

Confirmation Order and the transactions contemplated thereby or hereby; and (b) enter into,

execute and deliver, assign, or adopt, as the case may be, the Plan Documents in accordance with

their terms.

21.     To the extent that, under applicable non-bankruptcy law, any of the foregoing

actions would otherwise require the consent or approval of the stockholders, members,

managers, or directors of any of the Debtors or Reorganized Debtors, this Confirmation Order

shall, pursuant to §§ 1123(a)(5) and 1142 of the Bankruptcy Code and the Reorganization

Effectuation Statutes, constitute such consent or approval, and such actions are deemed to have

been taken by unanimous action of the stockholders, members, managers or directors, as the case

may be, of the appropriate Debtor or Reorganized Debtor.

22.     The authorizations specifically set forth in this Confirmation Order are non-

exclusive and are not intended to limit the authority of any Debtor or Reorganized Debtor or any

officer thereof to take any and all actions necessary or appropriate to implement, effectuate and

consummate the Plan, this Confirmation Order, the Plan Documents or the transactions

contemplated thereby or hereby.  In addition to the authority to execute and deliver, or adopt, as

the case may be, the contracts, instruments, releases and other agreements, including, without

limitation, the Plan Documents, specifically granted in this Confirmation Order, each of the

Debtors and the Reorganized Debtors is authorized and directed, without further action by the Court or further action or consent by its directors, managers, trustees, members or stockholders, to take any and all such actions as any of its Responsible Officers may determine are necessary or appropriate to implement, effectuate and consummate the Plan, this Confirmation Order, the Plan Documents or the transactions contemplated thereby or hereby.

23. To the extent any approval of the Court is required for any of the Plan Proponents to enter into any of the Plan Documents, or to take any actions thereunder or to consummate any of the transactions contemplated thereby, such approvals are hereby granted.

### 2. *DIRECTORS AND OFFICERS OF REORGANIZED DEBTORS*

24. The appointment of the initial members of the board of directors of Reorganized Congoleum, as set forth in Section 5.4 of the Plan, is hereby approved. The initial board of directors of Reorganized Congoleum shall consist of the five (5) persons identified in the Plan Supplement: (i) Eugene Davis; (ii) Roger S. Marcus; (iii) D. Clark Ogle; (iv) John P. Whittington, and (v) Reggie Chesson.

### 3. *APPROVAL OF EXIT FACILITY*

25. Without further action by the Court or the directors, managers, trustees, partners, members and stockholders of any Reorganized Debtor or further notice to any entity, each applicable Reorganized Debtor is authorized, as of the Effective Date, to execute, deliver, file, record and implement the Exit Facility. In addition to the foregoing, each applicable Reorganized Debtor is authorized, as of the Effective Date, to grant such liens and security interests as necessary to provide security for the Exit Facility.

26. In the event that Wells Fargo, successor by merger to Wachovia Bank, National Association, successor by merger to Congress Financial Corporation, is selected by the Debtors

to provide or arrange for exit financing under the Exit Facility, then, notwithstanding anything to the contrary contained in this Confirmation Order or the Plan, as of and after the Effective Date,

(i)       (A) all Obligations (as defined in the DIP Financing Order) arising under or in connection with the DIP Financing Agreements and/or the DIP Financing Order shall in all respects continue on and after the Effective Date and be added to, and made a part of the obligations, liabilities and indebtedness owing by the Reorganized Debtors under, and in connection with, the Exit Facility; (B) all of the claims, liens, interests, rights, priorities, protections and remedies afforded to the DIP Financing Lender pursuant to or in connection with the DIP Financing Agreements and/or the DIP Financing Order, including, without limitation, the right to receive full payment in respect of all Obligations (as defined in the DIP Financing Order), shall, and shall be deemed to, continue and survive in full force and effect as against the Reorganized Debtors in accordance with the terms of the Exit Facility, and shall not be discharged, released, terminated or otherwise impaired in any way as a result of, among other things, the entry of this Confirmation Order, the occurrence of the Confirmation Date or the occurrence of the Effective Date; (C) all security interests and liens in favor of the DIP Financing Lender in and on the assets and properties of the Debtors (including without limitation, the security interests and liens of the DIP Financing Lender in and on the Collateral (as defined in the DIP Financing Order)) shall, and shall be deemed to, continue and survive in full force and effect as against the Reorganized Debtors in accordance with the terms of the Exit Facility, and shall not be discharged, released, terminated or otherwise impaired in any way as a result of, among other things, the entry of this Confirmation Order, the occurrence of the Confirmation Date or the occurrence of the Effective Date; and (D) all of the terms and conditions of the DIP Financing Agreements and the DIP Financing Order, as amended and restated by the Exit

Facility, shall in all respects constitute the legal, valid, binding and enforceable obligations of the Reorganized Debtors in accordance with the terms and provisions of the Exit Facility.

(ii)     On or before the Effective Date, the Reorganized Debtors and Wells Fargo, as Agent and Lender under the Exit Facility, as well as certain other financial institutions that may, from time to time, become parties to the Exit Facility, shall enter into the Exit Facility and all other agreements, documents and instruments executed and/or delivered in connection therewith, which shall be in form and substance acceptable to Agent and Lenders (collectively, the "Exit Facility Agreements"); provided, however, that pursuant to Section 10.2(c) of the Plan, such Exit Facility Agreements shall be in form and substance reasonably satisfactory to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative.  Pursuant to § 1142(b) of the Bankruptcy Code and without further action by the Court, or by the shareholders and directors of the Reorganized Debtors, but subject to the provisions of Section 10.2(c) of the Plan, the Reorganized Debtors shall be authorized to (1) enter into the Exit Facility and the other Exit Facility Agreements, (2) ratify, amend and restate the DIP Financing Agreements in accordance with the Exit Facility Agreements, (3) perform all of their obligations under the DIP Financing Agreements, as amended and restated by the Exit Facility Agreements, and (4) execute and deliver all documents, agreements and instruments necessary or appropriate to enter into and perform all obligations under the Exit Facility and the other Exit Facility Agreements, and to take all other actions and execute, deliver, record and file all other such agreements, documents, instruments, financing statements, releases, applications, registration statements, reports and any changes, additions and modifications thereto in connection with the consummation of the transactions contemplated by the Exit Facility and the Exit Facility Agreements, including, without limitation, the making of such filings or the

recording of any security interests, as may be required by such Exit Facility and/or Exit Facility Agreements as Wells Fargo may determine or require in its discretion. In the event of any conflict between the terms of the DIP Financing Agreements and the Exit Facility or the Exit Facility Agreements, the terms of the Exit Facility and the Exit Facility Agreements shall control.

(iii)     Notwithstanding the entry of this Confirmation Order, the DIP Financing Order, the DIP Financing Agreements, and all of the claims, liens, interests, rights, priorities, protections and remedies afforded to the DIP Financing Lender thereunder, shall each remain in full force and effect, and shall constitute, and continue to constitute, the legal, valid, binding and enforceable obligations of the Debtors and shall not be impaired, prejudiced or modified in any way (without the express prior written consent of the DIP Financing Lender) at any time prior to the Effective Date. Any loans, advances, letters of credit accommodations or other financial or credit accommodations made or provided by the DIP Financing Lender at any time after entry of this Confirmation Order, but prior to the Effective Date, shall be fully protected and entitled to the rights, claims, priorities, remedies and protections afforded under the DIP Financing Order and the DIP Financing Agreements.

(iv)     As of the Effective Date, the DIP Financing Lender shall be released from any and all liability, responsibility, and/or obligation to hold, reserve for, or otherwise fund or ensure the funding of the Professional Fee Carve-Out (as defined in the DIP Financing Order) or any other expenses included within the Professional Fee Carve-Out, and from any obligation, responsibility or liability to the Debtors, any of the Professionals (as defined in the DIP Financing Order), or any other third party to pay, fund or otherwise satisfy the fees and expenses of such Professionals.

### 4. CANCELLATION OF EXISTING SECURITIES AND AGREEMENTS/DISCHARGE OF INDENTURE TRUSTEE

27.     Upon the Effective Date, the Existing Securities shall be cancelled and the holders thereof shall have no further rights or entitlements in respect thereof against the Debtors except the right to receive any Distributions to be made to such holders under the Plan.  The Indenture Trustee is authorized and directed to take whatever action may be necessary or appropriate, in his reasonable discretion, to deliver the Distributions, with the reasonable fees and expenses of the Indenture Trustee incurred in connection with such Distributions to be paid by Reorganized Congoleum.  Subject to Section 5.5 of the Plan, as of the Effective Date, the Indenture shall be deemed fully satisfied and canceled.

### 5. ISSUANCE OF NEW INSTRUMENTS

28.     All instruments to be issued under the Plan (including, without limitation, the New Common Stock and the New Senior Notes) shall upon issuance be duly authorized and validly issued, fully paid, and non-assessable, and any conditions precedent to issuance shall be deemed satisfied.

### 6. CREATION OF PLAN TRUST

29.     On the Effective Date, the Plan Trust shall be created in accordance with the terms and conditions of the Plan and the Plan Trust Agreement.  The Plan Trust and the Trustee thereof are authorized and empowered to receive the property to be transferred to the Plan Trust pursuant to Section 5.1 of the Plan.

30.     Pursuant to the Reorganization Effectuation Statutes, as applicable, and other appropriate provisions of applicable state laws governing corporations or other legal entities and § 1142(b) of the Bankruptcy Code, without further action by the Court or the directors, managers, partners, members or stockholders of any Reorganized Debtor or further notice to any

entities, the Reorganized Debtors are authorized and directed to execute, deliver and perform

their obligations under the Plan Trust Agreement and to execute, deliver, file, record and

implement all such other contracts, instruments, agreements or documents and take all such other

actions as any of the Responsible Officers of the Reorganized Debtors may determine are

necessary, appropriate or desirable in connection therewith. The Plan Trust Agreement and the

Trust Distribution Procedures, as in effect on the Effective Date, shall be substantially in the

forms attached to the Plan as Exhibit "E" and Exhibit "G".

31.    On the Effective Date, all right, title and interest in and to the Plan Trust Assets

and any proceeds or causes of action thereunder shall be transferred automatically and assigned

to, and indefeasibly vested in, the Plan Trust free and clear of all Claims, interests,

encumbrances, and other interests of any Entity without further action of any Entity.

32.    During these Reorganization Cases, both the Bankruptcy Court and this Court

have issued orders approving certain settlement agreements pursuant to Bankruptcy Rule 9019,

which such orders have become Final Orders, that require the Plan Trust to be bound by such

settlements. Accordingly, the Plan Trust shall be bound as provided in those settlements without

any further action by the Court, the Plan Trust or any other Entity.

## 7.    TRANSFERS OF PROPERTY TO AND ASSUMPTION OF CERTAIN LIABILITIES BY THE PLAN TRUST

### a.    Funding of the Plan Trust

33.    Reorganized Congoleum shall fund the Plan Trust in accordance with Section

5.1(b) of the Plan.

### b.    Insurance Transfer Agreement

34.    The Insurance Transfer Agreement constitutes a valid and binding obligation of

each of the parties thereto, in full force and effect, and is enforceable in accordance with its

terms, in each case notwithstanding any anti-assignment provision in or incorporated into any Asbestos Insurance Policy and applicable state law.  On the Effective Date, the Debtors shall deliver the Insurance Transfer Agreement that is substantially in the form attached to the Plan as Exhibit "B".

35.     Upon execution and delivery of the Insurance Transfer Agreement, the Asbestos Insurance Rights shall be irrevocably transferred to and vested in the Plan Trust in accordance with the Insurance Transfer Agreement.  Asbestos Insurance Rights shall be so vested free and clear of all encumbrances, liens, security interests, and other Claims or causes of action.

          *c.      Creation of Asbestos Property Damage Claim Sub-Account*

36.     On the Effective Date, the Plan Trust shall create and establish the Asbestos Property Damage Claim Sub-Account as set forth in Section 5.1(d) of the Plan.

          *d.      Assumption of Liability for Asbestos Personal Injury
                Claims by the Trust*

37.     Subject to the terms and conditions of the Article V of the Plan and the Plan Trust Agreement, on the Effective Date, all liabilities, obligations and responsibilities relating to all Plan Trust Asbestos Claims shall be transferred to the Plan Trust and the Plan Trustee, on behalf of the Plan Trust, shall expressly assume all liability for all Plan Trust Asbestos Claims and Demands, and each of the Debtors, the Reorganized Debtors, and the Protected Parties shall have no further financial or other obligation, responsibility or liability therefore whatsoever.

          *e.      Appointment of Trustee*

38.     The appointment of Alfred M. Wolin as the initial Plan Trustee to serve as Plan Trustee is hereby approved.  Effective on the Effective Date, the initial Trustee shall serve as Plan Trustee in accordance with the Plan Trust Agreement.  The Plan Trustee shall be deemed to be a "party in interest" under § 1109 of the Bankruptcy Code.

### f. *Appointment of TAC Members*

39.     The appointment of Robert Taylor II, Esq., Russell W. Budd, Esq. and Steven Kazan, Esq. as the initial members of the TAC be, and hereby is, approved.  Effective on the Effective Date, the initial members of the TAC shall serve as members of the TAC in accordance with the Plan Trust Agreement.

### g. *Appointment of Futures Representative*

40.     The appointment of R. Scott Williams as the initial Futures Representative under the Plan Trust Agreement is hereby approved.  Effective on the Effective Date, R. Scott Williams shall serve as the Futures Representative in accordance with the terms of the Plan Trust Agreement.

### h. *Indemnity Obligations of the Trust*

41.     The Plan Trust shall be bound by the indemnity obligations set forth in the Plan and the Plan Trust Documents, including, without limitation, those indemnity obligations set forth in Sections 5.1(p) and 5.1(q) of the Plan.

### i. *TDP*

42.     From and after the Effective Date, the Plan Trust shall pay the Plan Trust Asbestos Claims in accordance with the Plan Trust Agreement and the TDP.

### j. *Institution and Maintenance of Legal and Other Proceedings*

43.     As of the Effective Date, the Plan Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Plan Trust, including, without limitation, the Coverage Action, in each case to the extent not adjudicated, compromised or settled prior to the Effective Date.  Except as otherwise provided by law or agreement, the Plan Trust shall be responsible for the payment of

all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred subsequent to the Effective Date arising from or associated with any legal action or other proceeding brought pursuant to Section 5.1(n) of the Plan and shall pay or reimburse all deductibles, retrospective premium adjustments, or other charges which may arise from the receipt of insurance proceeds by the Plan Trust.

### k. *Qualified Settlement Fund*

44.    The Plan Trust is a "qualified settlement fund" pursuant to Section 468(B) of the Internal Revenue Code of 1986, as amended, and the regulations issued pursuant thereto.

### E.    CERTAIN MERGERS AND VESTING OF PROPERTY

45.    On the Effective Date, the Subsidiary Debtors shall merge with and into Congoleum, with Reorganized Congoleum as the sole surviving corporation.  Except as otherwise expressly provided in the Plan, on the Effective Date, Reorganized Congoleum shall be vested with all of the assets and property of the Estates, free and clear of all Claims, Liens, charges and other interests of holders of Claims or Interests, and may operate its business free of any restrictions imposed by the Bankruptcy Code or by the District Court.

### F.    EXEMPTIONS FROM TAXATION

46.    Pursuant to § 1146 of the Bankruptcy Code, any transfers from a Debtor to Reorganized Congoleum or to any other Person or Entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and (ii) the appropriate state or local governmental officials or agents are hereby directed to forego the collection of any such tax or governmental assessment and to accept for

filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### G.     EXEMPTIONS FROM SECURITIES LAWS

47.     The issuance and distribution of the New Common Stock and the New Senior Notes shall be, and shall be deemed to be, exempt from registration under any applicable federal or state securities law to the fullest extent permissible under applicable non-bankruptcy law and under bankruptcy law, including, without limitation, § 1145 of the Bankruptcy Code.

### H.     DISTRIBUTION TO RECORD HOLDERS OF ALLOWED CLAIMS

48.     All Distributions on Allowed Claims shall be made to the Record Holders of such Claims.  As of the close of business on the Record Date, the Claims register maintained by the Voting Agent shall be closed, and there shall be no further changes in the Record Holder of any Claim.  Reorganized Congoleum and the Indenture Trustee (for purposes of any Distribution to Holders of Senior Notes) shall have no obligation to recognize any transfer of any Claim occurring after the Record Date.  Reorganized Congoleum shall instead be entitled to recognize and deal for all purposes under the Plan with the Record Holders as of the Record Date.  The Indenture Trustee is deemed to have acted prudently and reasonably and in a manner consistent with its fiduciary duties to the Holders of Senior Note Claims under the Indenture with respect to its actions and conduct in connection with these Reorganization Cases, the Plan and the Distributions thereunder; provided, however, that objections, if any, to the fees and expenses of the Indenture Trustee incurred in connection with these Reorganization Cases are preserved in accordance with Section 7.2 of the Plan.

### I.     DELIVERY OF DOCUMENTS

49.     Pursuant to § 1142 of the Bankruptcy Code, all entities holding Claims against or Interests in the Debtors that are treated under the Plan shall be, and they hereby are, directed to

execute, deliver, file or record any document, and to take any action necessary to implement, consummate and otherwise effect the Plan in accordance with its terms, and all such entities shall be bound by the terms and provisions of all documents executed and delivered by them in connection with the Plan.

### J.    APPROVAL OF SETTLEMENT AGREEMENTS

50.    For each of the reasons set forth on the record at the Confirmation Hearing, and in the Findings and Conclusions, each settlement agreement incorporated into the Plan, including, without limitation, (i) the Litigation Settlement Agreement, (ii) the First Amendment to the Litigation Settlement Agreement, (iii) the Intercompany Settlement, and (iv) the ABI Settlement are fair, equitable and reasonable, are in the best interests of the Debtors and their respective Estates and creditors and are expressly approved pursuant to § 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

51.    In connection with the Litigation Settlement Agreement and the First Amendment to the Litigation Settlement Agreement, and as set forth in Section 5.14 of the Plan, as of the Effective Date:  (i) the Debtors shall be released from any and all obligations and duties imposed pursuant to any Pre-Petition Settlement Agreement, Claimant Agreement, the Collateral Trust Agreement, Security Agreement and any and all other agreements and amendments thereto with respect to the Pre-Packaged Plan filed by the Debtors on December 31, 2003; and (ii) all claims and counterclaims in the Avoidance Action shall be dismissed with prejudice, and all parties shall bear their own costs and attorneys fees.

### K.    RELEASES AND EXCULPATION PROVISIONS

52.    Each of the release and exculpation provisions set forth in the Plan (including, without limitation, Sections 11.2 and 11.3 of the Plan), is hereby approved in all respects, in incorporated herein in its entirety, is so ordered and shall be effective immediately on the

Effective Date of the Plan without further action or notice by the Court, any of the parties to such releases or any other party.

### L.      DISCHARGE, INJUNCTIONS AND RELATED MATTERS

#### 1.    *DISCHARGE OF CLAIMS*

53.     Except as specifically provided in the Plan, the Plan Documents or in the Confirmation Order, as of the Effective Date, Confirmation shall discharge the Debtors and the Reorganized Debtors pursuant to § 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims of any nature whatsoever and Demands including, without limitation, any Claims, demands and liabilities that arose before Confirmation, and all debts of the kind specified in §§ 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such Claim was filed or deemed filed under § 501 of the Bankruptcy Code, or such Claim was listed on the Schedules of the Debtors, (b) such Claim is or was Allowed under § 502 of the Bankruptcy Code, or (c) the holder of such Claim has voted on or accepted the Plan. Except as specifically provided in the Plan or Plan Documents, the rights that are provided in the Plan as of the Effective Date shall be in exchange for and in complete satisfaction, settlement and discharge of all Claims (including without limitation Asbestos Claims) or Demands against, Liens on, and interests in the Debtors or the Reorganized Debtors or any of their assets or properties.

54.     Notwithstanding any other provision of the Plan to the contrary, Confirmation shall not discharge any pre-Petition Date or post-Petition Date, pre-Confirmation Date liability that may be due from any of the Debtors to the Internal Revenue Service as currently set forth in certain Proofs of Claim and Administrative Expense Claim, as amended, filed by the Internal Revenue Service.

## 2. DISCHARGE INJUNCTION

55.    Except as specifically provided in the Plan Documents or this Confirmation Order to the contrary, as of the Effective Date, all Persons or Entities that hold, have held, or may hold a Claim, Demand or other debt liability that is discharged pursuant to the Plan and the Bankruptcy Code, or an Equity Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan, are permanently enjoined from the commencement or continuation of any action, the employment of process or any act to collect, recover from, or offset (a) any Claim or Demand against or Interest in the Debtors, the Reorganized Debtors, or the Plan Trust by any Entity and (b) any cause of action, whether known or unknown, against the Debtors and the Reorganized Debtors based on such Claim or Interest described in subpart (a).

### 3. ASBESTOS CHANNELING INJUNCTION AND ANTI-SUIT INJUNCTION

56.    In addition to conduct otherwise enjoined under the Bankruptcy Code, and in order to supplement the injunctive effect of the Discharge Injunction contained in the Plan, the Plan provides for the following injunctions, as set forth in Sections 11.6 and 11.11 of the Plan, which are hereby approved and authorized in all respects and which shall take effect as of the Effective Date:

#### a.    Asbestos Channeling Injunction

##### i. Terms

57.    The sole recourse of the holder of a Plan Trust Asbestos Claim or Demand on account of such Claim or Demand or of a Person that had or could have asserted an Asbestos Claim or Demand shall be to the Plan Trust pursuant to the provisions of the Asbestos Channeling Injunction, the Plan, the Plan Trust Agreement and the TDP, and such holder shall have no right whatsoever at any time to assert its Plan Trust Asbestos Claim or Demand against

the Debtors, the Reorganized Debtors, any other Protected Party, or any property or interest in property of the Debtors, the Reorganized Debtors, or any other Protected Party. Without limiting the foregoing, from and after the Effective Date, the Asbestos Channeling Injunction shall apply to all present and future holders of Plan Trust Asbestos Claims and Demands, and all such holders shall be permanently and forever stayed, restrained, and enjoined from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Plan Trust Asbestos Claims and Demands, other than from the Plan Trust in accordance with the Asbestos Channeling Injunction and pursuant to the Plan, the Plan Trust Agreement and the TDP:

(a)     commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Protected Party or any property or interests in property of any Protected Party;

(b)     enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Protected Party or any property or interests in property of any Protected Party;

(c)     creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance against any Protected Party, or any property or interests in property of any Protected Party;

(d)     setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and

(e)     proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the Plan Trust, except in conformity and compliance with the Plan, the Plan Trust Agreement and the TDP.

58.     Any right, claim or cause of action that an Asbestos Insurance Company may have been entitled to assert against a Settling Asbestos Insurance Company based on or relating to Asbestos Claims shall be channeled to and become a right, claim or cause of action as an

offset claim against the Plan Trust and not against the Settling Asbestos Insurance Company in question and all persons, including any Asbestos Insurance Company, shall be enjoined from asserting any such right, claim or cause of action against a Settling Asbestos Insurance Company. Except as otherwise expressly provided in the Plan, nothing contained in the Plan shall constitute or be deemed a waiver of any claim, right or cause of action that the Debtors, the Reorganized Debtors, or the Plan Trust may have against any Entity in connection with or arising out of or related to an Asbestos Claim. Notwithstanding any other provision in the Plan to the contrary, nothing in the Plan shall be understood to channel, prevent, impair or limit in any way enforcement against the Debtors, Reorganized Congoleum, or any other Protected Party of any rights provided in connection with any Workers' Compensation Claim.

## ii. *Reservation of Rights*

59. Notwithstanding any other provision of the Plan to the contrary, the satisfaction, release and discharge, and the Injunctions set forth in Article XI, shall not serve to satisfy, discharge, release, or enjoin (a) claims by any Entity (other than the Reorganized Debtors and their Affiliates) against the Plan Trust for payment of Plan Trust Asbestos Claims in accordance with the Plan, the Plan Trust Agreement and the TDP, as applicable, (b) claims by any Entity against the Plan Trust for the payment of Plan Trust Expenses, (c) claims by the Reorganized Debtors, the Plan Trust, any Settling Asbestos Insurance Company or any other Entity to enforce the provisions of any Asbestos Insurance Settlement Agreement or any provision of the Plan or another Plan Document, or (d) the rights of any Asbestos Insurance Company to assert any claim, debt, obligation, cause of action or liability for payment against any other Asbestos Insurance Company that is not a Settling Asbestos Insurance Company.

## iii. *Protected Parties*

82

60.     For purposes of the Asbestos Channeling Injunction, the Protected Parties shall consist of any and all of the following parties:

(a)     the Debtors and the Reorganized Debtors;

(b)     any Entity that, pursuant to the Plan or after the Confirmation Date, becomes a direct or indirect transferee of, or successor to, the Plan Trust or the Debtors;

(c)     the Persons designated on Exhibit "F" (as such Exhibit may be amended on or before the Confirmation Date) as current distributors of the product lines currently manufactured, sold or otherwise produced by Congoleum; or

(d)     each Settling Asbestos Insurance Company designated on Exhibit "H."

4.     *ANTI-SUIT INJUNCTION*

61.     With respect to any Settling Asbestos Insurance Company, any and all Entities are permanently enjoined, and forever prohibited from, the commencement, conduct or continuation of any action or cause of action, whether known or unknown, the employment of process or any act to collect, collect, recover from or offset any non-asbestos claim, Claim or demand against any Settling Asbestos Insurance Company arising out of, relating to, or in connection with an Asbestos Insurance Policy or any other insurance policy or rights under such other insurance policy issued to or insuring the relationship of the relevant Settling Asbestos Insurance Companies with, the relevant Congoleum entities that are insureds under such policies, provided, however, this Anti-Suit Injunction pursuant to § 105(a) of the Bankruptcy Code shall not affect or modify the rights of Persons insured under policies of insurance except to the extent released in an Asbestos Insurance Settlement Agreement and/or enjoined pursuant to any Injunction contained in any order of the Bankruptcy Court or the District Court approving any Asbestos Insurance Settlement Agreement.

## M.   SECTION 346 INJUNCTION

62.    In accordance with § 346 of the Bankruptcy Code for the purposes of any state or local law imposing a tax, income will not be realized by the Estates, the Debtors or the Reorganized Debtors by reason of the forgiveness or discharge of indebtedness resulting from the consummation of the Plan.  As a result, each state or local taxing authority is permanently enjoined and restrained, after the Confirmation Date, from commencing, continuing or taking any act to impose, collect or recover in any manner any tax against the Debtors or the Reorganized Debtors arising by reason of the forgiveness or discharge of indebtedness under the Plan.

## N.   OBJECTIONS TO CONFIRMATION

63.    All Objections not otherwise addressed herein or previously withdrawn are hereby overruled for the reasons set forth on the record at the Confirmation Hearing and in the Findings and Conclusions.

## O.   CONTINUED EXISTENCE OF ASBESTOS CLAIMANTS' COMMITTEE, THE FUTURES REPRESENTATIVE AND THE BONDHOLDERS' COMMITTEE

64.    As of the Effective Date, the Futures Representative shall (a) continue in existence and the rights, duties and responsibilities of the Futures Representative appointed by the Court to serve after the Effective Date shall be as set forth in the Plan Trust Documents and (b) continue in existence for purposes of the Reorganization Cases with respect to any appeal or request for reconsideration or stay pending appeal of the Confirmation Order and any unresolved and then-pending adversary proceedings and have the right to prosecute and/or object to applications for Professional Fee Claims.  The Representatives retained by the Futures Representative during the Reorganization Cases shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to, or arising from, the

Reorganization Cases on the same date the Futures Representative ceases existence for purposes of the Reorganization Cases. On the Effective Date, the Asbestos Claimants' Committee and the Bondholders' Committee shall be dissolved except for the purposes of: (i) any appeal or request for reconsideration or stay pending appeal of the Confirmation Order; (ii) any unresolved and then-pending adversary proceedings, and (iii) prosecuting and/or objecting to Professional Fee claims. Representatives of the Asbestos Claimants' Committee and the Bondholders Committee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to, or arising from, the Reorganization Cases on the same date the Asbestos Claimants' Committee or the Bondholders' Committee, as applicable, cease to exist for purposes of the Reorganization Cases. Until the Effective Date, the Debtors shall pay the reasonable fees and expenses of the Asbestos Claimants' Committee, the Bondholders' Committee and the Futures Representative in accordance with any applicable fee order in the Reorganization Cases. On the Effective Date, the Trust Advisory Committee will assume those powers, duties, and responsibilities as provided in the Plan Trust Agreement.

## P.    RETENTION OF JURISDICTION BY THE DISTRICT COURT

65.    Notwithstanding the entry of this Confirmation Order and the occurrence of the Effective Date, the Court shall retain such jurisdiction over the Reorganization Cases after the Effective Date as is legally permissible, including jurisdiction over the matters set forth in Article XIII of the Plan, which provisions are incorporated herein by reference.

## Q.    NOTICE OF ENTRY OF CONFIRMATION ORDER

66.    Pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c), the Reorganizing Debtors or the Reorganized Debtors are directed to serve, within twenty (20) Business Days after the entry of this Confirmation Order, a notice of the entry of this Confirmation Order, which shall include notice of the bar dates established by the Plan and this Confirmation Order and, if it has

occurred, notice of the Effective Date, substantially in the form of Exhibit B attached hereto and incorporated herein by reference (the "Confirmation Notice"), on all parties that received notice of the Confirmation Hearing; provided, however, that, with respect to the holders of Asbestos Personal Injury Claims, the Debtors or the Reorganized Debtors shall serve the Confirmation Notice upon counsel to known holders of such claims, and such notice shall be adequate and sufficient and no further notice is necessary.

67.    As soon as practicable after the entry of this Confirmation Order, the Debtors shall make copies of this Confirmation Order and the Confirmation Notice available on Congoleum's website at www.congoleum.com/investors.html.

## R.    EFFECT OF REVERSAL

68.    If any or all provisions of the Confirmation Order are reversed, modified, or vacated by subsequent order, such act shall not affect the validity of acts or obligations taken or incurred under the Plan, Plan Documents or this Confirmation Order prior to provision to the Plan Proponents of notice of such reversal, modification, or vacation.

## S.    NO JUST CAUSE FOR DELAY

69.    This Court determines that there is no just cause for delay, and that this Confirmation Order shall take effect immediately upon entry, notwithstanding anything to the contrary in Federal Rules of Bankruptcy Procedure 3020(e) or 7062(a).

THIS ORDER IS HEREBY DECLARED TO BE IN RECORDABLE FORM AND SHALL BE ACCEPTED BY ANY RECORDING OFFICER FOR FILING AND RECORDING PURPOSES WITHOUT FURTHER OR ADDITIONAL ORDERS, CERTIFICATIONS OR OTHER SUPPORTING DOCUMENTS.

Dated: June 7, 2010,          /s/ JOEL A. PISANO
       Trenton, New Jersey    THE HONORABLE JOEL A. PISANO
                              UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| IN RE: | ) | Case No. 09-04371 (JAP) |
| | ) | |
| CONGOLEUM CORPORATION, | ) | Chapter 11 |
| CONGOLEUM SALES, INC., and | ) | Case No. 03-51524 |
| CONGOLEUM FISCAL, INC., | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**FOURTH AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF THE DEBTORS, THE OFFICIAL ASBESTOS CLAIMANTS' COMMITTEE, THE OFFICIAL COMMITTEE OF BONDHOLDERS FOR CONGOLEUM CORPORATION, ET AL. AND THE FUTURES REPRESENTATIVE DATED AS OF MARCH 11, 2010**

THIS PLAN PROVIDES, AMONG OTHER THINGS, FOR THE ISSUANCE OF INJUNCTIONS UNDER SECTION 524(g) OF THE BANKRUPTCY CODE THAT RESULT IN THE CHANNELING OF ALL ASBESTOS-RELATED LIABILITIES OF CONGOLEUM CORPORATION AND THE PROTECTED PARTIES SET FORTH HEREIN INTO A TRUST AS MORE FULLY DESCRIBED HEREIN.

PILLSBURY WINTHROP SHAW PITTMAN LLP
1540 Broadway
New York, NY 10033-4039
Richard L. Epling
Robin L. Spear
Kerry A. Brennan

Attorneys for the Debtors

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Michael S. Stamer

AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue, N.W.
Washington D.C. 20036
James R. Savin
David M. Dunn
Joanna F. Newdeck

Attorneys for the Official Committee of Bondholders

CAPLIN & DRYSDALE, CHTD.
One Thomas Circle, N.W.
Washington, D.C. 20005
Peter Van N. Lockwood
Ronald Reinsel

Attorneys for the Asbestos Claimants' Committee

ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, D.C. 20005
Roger Frankel
Richard H. Wyron
Jonathan Guy
Debra L. Felder

Attorneys for R. Scott Williams, as Futures Representative

OKIN, HOLLANDER & DELUCA, LLP
PARKER PLAZA
400 Kelby Street
Fort Lee, NJ 07024
Paul S. Hollander
James J. DeLuca

TEICH GROH
691 State Highway 33
Trenton, NJ 08619
Michael A. Zindler

GREENBAUM, ROWE, SMITH & DAVIS LLP
75 Livingston Avenue
Roseland, NJ 07068
Nancy Isaacson

FORMAN HOLT ELIADES & RAVIN LLC
80 Route 4 East, Suite 290
Paramus, NJ 07652
Stephen Ravin

Exhibit A--Plan.DOC

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME.......................... 1
    1.1    Scope of Definitions.................................................................................................. 1
    1.2    Definitions................................................................................................................ 1
    1.3    Rules of Interpretation:  Application of Definitions, Rules of Construction, and
            Computation of Time ............................................................................................. 17
    1.4    Exhibits and Schedules .......................................................................................... 17

ARTICLE II CLASSIFICATION OF CLAIMS AND INTERESTS ............................................................ 18
    2.1    Generally ................................................................................................................ 18
    2.2    Unclassified Claims ............................................................................................... 18
    2.3    Classes ................................................................................................................... 18

ARTICLE III TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS ...................... 19
    3.1    Summary ................................................................................................................ 19
    3.2    Administrative Claims ........................................................................................... 19
    3.3    Priority Tax Claims ................................................................................................ 19
    3.4    DIP Financing Claim. ............................................................................................ 19
    3.5    Substantial Contribution Claims ........................................................................... 19

ARTICLE IV TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ............................................... 20
    4.1    Claims and Interests .............................................................................................. 20
    4.2    Reservation of Rights Regarding Claims .............................................................. 22
    4.3    Reservation of Fair and Equitable (Cram Down) Power....................................... 22

ARTICLE V IMPLEMENTATION OF THE PLAN ............................................................................... 22
    5.1    The Plan Trust ....................................................................................................... 22
    5.2    Certain Mergers .................................................................................................... 24
    5.3    The Amended and Restated Certificate and the Amended and Restated Bylaws ....................... 24
    5.4    Directors and Officers of Reorganized Congoleum ............................................. 24
    5.5    Cancellation of Existing Securities and Agreements of the Debtors/Discharge of the
            Indenture Trustee .................................................................................................. 25
    5.6    Exit Facility ........................................................................................................... 25
    5.7    Issuance of New Securities and Debt Instruments ............................................... 25
    5.8    Registration Rights Agreement ............................................................................. 25
    5.9    Stockholders Agreement ........................................................................................ 25
    5.10   Effectuating Documents/Further Transactions ..................................................... 26
    5.11   Exemption from Certain Transfer Taxes and Recording Fees .............................. 26
    5.12   Section 346 Injunction .......................................................................................... 26
    5.13   Corporate Action ................................................................................................... 26

5.14   Litigation Settlement Agreement. ................................................................ 26

5.15   Review of Claimants' Counsel Expenses ................................................. 28

5.16   Non-Asbestos Reserve Fund ..................................................................... 28

5.17   Intercompany Settlement ........................................................................... 29

5.18   Deemed Consolidation of Debtors For Plan Purposes Only ..................... 30

ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS WITH RESPECT TO CLAIMS  OTHER THAN PLAN TRUST ASBESTOS CLAIMS ................................................................. 30

6.1   Plan Distributions ...................................................................................... 30

6.2   Distributions of Cash ................................................................................. 30

6.3   No Interest on Claims ................................................................................ 30

6.4   Delivery of Distributions ........................................................................... 30

6.5   Distributions to Holders as of the Record Date ........................................ 31

6.6   Fractional Securities; Fractional Dollars ................................................... 31

6.7   Withholding of Taxes ................................................................................ 31

6.8   Unclaimed Property. .................................................................................. 31

ARTICLE VII RESOLUTION OF DISPUTED CLAIMS ................................................... 31

7.1   Disallowance of Improperly Filed Claims ................................................ 31

7.2   Prosecution of Objections to Claims ......................................................... 31

7.3   No Distributions Pending Allowance ........................................................ 32

7.4   Distributions After Allowance .................................................................. 32

ARTICLE VIII TREATMENT OF EXECUTORY CONTRACTS, UNEXPIRED LEASES AND SETTLEMENTS ............................................................................................................... 32

8.1   Assumption of Unexpired Leases and Executory Contracts ..................... 32

8.2   Damages Upon Rejection ........................................................................... 33

8.3   Insurance Agreements ................................................................................ 33

8.4   Compensation and Benefits Programs ....................................................... 33

8.5   Retiree Benefits ......................................................................................... 34

8.6   Indemnification of Directors, Officers and Employees ............................. 34

ARTICLE IX ACCEPTANCE OR REJECTION OF THE PLAN ...................................... 34

9.1   Classes Entitled to Vote ............................................................................ 34

9.2   Acceptance by Impaired Classes of Claims .............................................. 34

9.3   Acceptance by Impaired Class of Interests ............................................... 34

9.4   Acceptance Pursuant to Section 524(g) of the Bankruptcy Code ............. 34

9.5   Presumed Acceptance of Plan ................................................................... 34

9.6   Reservation of Rights ................................................................................ 34

ARTICLE X CONDITIONS TO CONFIRMATION AND EFFECTIVENESS ................... 35

10.1   Conditions to Confirmation ..................................................................... 35

10.2   Conditions to Effectiveness ..................................................................... 36

| 10.3 | Waiver of Conditions | 38 |
|---|---|---|
| **ARTICLE XI INJUNCTIONS, RELEASES AND DISCHARGE** | | 38 |
| 11.1 | Discharge | 38 |
| 11.2 | Exculpation | 38 |
| 11.3 | Releases by Holders of Plan Trust Asbestos Claims | 38 |
| 11.4 | Discharge Injunction | 39 |
| 11.5 | Third Party Releases | 39 |
| 11.6 | Asbestos Channeling Injunction | 39 |
| 11.7 | Reservation of Rights | 40 |
| 11.8 | Rights Against Non-Debtors under Securities Laws | 40 |
| 11.9 | Rights Against Debtors Under Environmental Laws | 40 |
| 11.10 | Disallowed Claims and Disallowed Interests | 40 |
| 11.11 | Anti-Suit Injunction | 40 |
| 11.12 | Insurance Neutrality | 41 |
| 11.13 | No Liability for Solicitation or Participation | 42 |
| **ARTICLE XII MATTERS INCIDENT TO PLAN CONFIRMATION** | | 42 |
| 12.1 | Term of Certain Injunctions and Automatic Stay | 42 |
| 12.2 | No Successor Liability | 42 |
| 12.3 | Revesting | 42 |
| 12.4 | Vesting and Enforcement of Causes of Action | 42 |
| 12.5 | GHR/Kenesis Actions | 43 |
| **ARTICLE XIII MISCELLANEOUS** | | 43 |
| 13.1 | Jurisdiction | 43 |
| 13.2 | General Retention | 43 |
| 13.3 | Specific Purposes | 43 |
| 13.4 | Payment of Statutory Fees | 45 |
| 13.5 | Securities Law Matters | 45 |
| 13.6 | Plan Supplement | 45 |
| 13.7 | Allocation of Plan Distributions Between Principal and Interest | 45 |
| 13.8 | The Asbestos Claimants' Committee, the Futures Representative and the Bondholders' Committee | 45 |
| 13.9 | Revocation of Plan | 46 |
| 13.10 | Modification of Plan | 46 |
| 13.11 | Modification of Payment Terms | 46 |
| 13.12 | Entire Agreement | 47 |
| 13.13 | Headings | 47 |
| 13.14 | Professional Fee Claims | 47 |

13.15    Recordable Order .................................................................................................. 47

13.16    Preparation of Estates' Returns and Resolution of Tax Claims ........................... 47

13.17    No Admission ........................................................................................................ 47

13.18    Consent to Jurisdiction ......................................................................................... 47

13.19    Setoffs .................................................................................................................... 47

13.20    Successors and Assigns ......................................................................................... 47

13.21    Non-Debtor Waiver of Rights .............................................................................. 47

13.22    Further Authorizations .......................................................................................... 48

13.23    No Bar to Suits ...................................................................................................... 48

13.24    Conflicts ................................................................................................................ 48

13.25    Notices ................................................................................................................... 48

13.26    Duty to Cooperate ................................................................................................ 49

13.27    Governing Law ..................................................................................................... 49

iv

# INTRODUCTION

The Plan Proponents hereby propose this plan of reorganization pursuant to the provisions of Chapter 11 of the United States Bankruptcy Code. Capitalized terms used herein are defined in Article I below.

Reference is made to the Disclosure Statement distributed contemporaneously herewith for a discussion of the history, businesses, properties and results of operations of the Debtors and the risks associated with the Plan. All holders of Claims and Interests entitled to vote on the Plan are encouraged to read the Plan and Disclosure Statement in their entirety before voting to accept or reject the Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and Sections 13.6, 13.9 and 13.10 of the Plan, the Plan Proponents reserve the right to alter, amend, modify, revoke or withdraw the Plan prior to its substantial consummation.

# ARTICLE I

## DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

### 1.1    Scope of Definitions

All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in Section 1.2 of the Plan. Any term used in the Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

### 1.2    Definitions

**"ABI"** means American Biltrite Inc., a Delaware corporation.

**"ABI Asbestos Claim"** means any Asbestos Claim that may be asserted by ABI now or in the future other than an ABI Asbestos Indemnity Claim.

**"ABI Asbestos Indemnity Claim"** means any ABI Asbestos Personal Injury Indemnity Claim or ABI Asbestos Property Damage Indemnity Claim.

**"ABI Asbestos Personal Injury Indemnity Claim"** means any asbestos personal injury indemnification Claim or Demand that may be asserted by ABI against Congoleum at any time under the Joint Venture Agreement.

**"ABI Asbestos Property Damage Indemnity Claim"** means any asbestos related property damage indemnification Claim or Demand that may be asserted by ABI against Congoleum at any time under the Joint Venture Agreement.

**"ABI Canada License Agreement"** means the License Agreement, effective January 1, 2006, between Congoleum and American Biltrite (Canada) Ltd., as amended on the Effective Date pursuant to the Intercompany Settlement.

**"ABI Claim"** means any Claim or Demand at any time that may be asserted by ABI at any time against any Debtor, including without limitation ABI Asbestos Claims, ABI Rejection Damages Claims, and ABI Asbestos Indemnity Claims.

**"ABI Parties"** means any current or former officers, directors and employees of ABI, in their capacity as such.

**"ABI Rejection Damages Claims"** means any and all rejection damages claims that might arise upon the deemed rejection of the Intercompany Agreements provided for in Section 5.17 of the Plan.

"**Administrative Claim**" means any Claim for the payment of an Administrative Expense. The term "Administrative Claim" shall not include Asbestos Claims.

"**Administrative Expense**" means (a) any cost or expense of administration of the Reorganization Cases under section 503(b) of the Bankruptcy Code including, but not limited to, (1) any actual and necessary post-petition cost or expense of preserving the Estates or operating the Debtors' assets and businesses, (2) any payment to be made under the Plan to cure a default on an assumed executory contract or unexpired lease, (3) any post-petition cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of business, (4) the outstanding fees and expenses of the Indenture Trustee incurred in accordance with Section 6.6 of the Indenture relating to the Senior Notes, including the reasonable fees and expenses of counsel to the Indenture Trustee, and (5) compensation or reimbursement of expenses of professionals to the extent allowed by the Bankruptcy Court or the District Court under section 327, 328, 330(a), 331, 503(b) or 1103 of the Bankruptcy Code, including, without limitation, the Debtors and their professionals, the Futures Representative and its professionals, the Bondholders' Committee and its professionals, and the Asbestos Claimants' Committee and its professionals and (b) any fee or charge assessed against the Estates under 28 U.S.C. § 1930.

"**Affiliate**" shall have the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

"**Allowed**" means:

(a)    With respect to an Administrative Claim:

(i)    such amount that represents a Claim of a professional person employed under sections 327, 328, 524(g)(4)(B)(i) or 1103 of the Bankruptcy Code who is required to apply to the Bankruptcy Court or the District Court for the allowance of compensation and reimbursement of expenses pursuant to section 330 of the Bankruptcy Code, to the extent such Claim is allowed by a Final Order of the Bankruptcy Court or the District Court under sections 330 or 331 of the Bankruptcy Code;

(ii)    such amount that represents the reasonable fees and expenses of the Indenture Trustee and its counsel that were otherwise incurred in accordance with the terms of the Indenture and are outstanding on the Effective Date; and

(iii)    other than with respect to a Claim described in clauses (a)(i) and (a)(ii) of this definition, such amount that represents an actual or necessary expense of preserving the Estates or operating the business of any of the Debtors, any such Claim to the extent that it constitutes an Allowed Administrative Claim, or if such Claim is a Disputed Claim, any such Claim to the extent it is allowed in whole or in part by a Final Order of the Bankruptcy Court or the District Court and only to the extent that such allowed portion is deemed, pursuant to a Final Order of the Bankruptcy Court or the District Court, to constitute a cost or expense of administration under section 503 or 1114 of the Bankruptcy Code;

(b)    With respect to an Asbestos Property Damage Claim that was filed prior to the expiration of the Asbestos Property Damage Claim Bar Date, such amount as is liquidated and allowed by the Bankruptcy Court or the District Court; and

(c)    With respect to any Claim other than a Plan Trust Asbestos Claim, an Asbestos Property Damage Claim or an Administrative Claim, such Claim or any portion thereof (i) that has been allowed in whole or in part by a Final Order of the Bankruptcy Court or the District Court; (ii) that has been expressly allowed in the Plan; (iii) as to which, on or before the Effective Date, (A) no Proof of Claim has been filed with the Bankruptcy Court or the District Court and (B) the Claim is listed in the Schedules (as they may be amended) and not listed as disputed, contingent, or unliquidated; or (iv) for which a Proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court or District Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court or the District Court, or other applicable bankruptcy law, and as to which either (A) no objection to its allowance has been filed within the periods of limitation fixed by the Plan, the Bankruptcy Code, or any order of the Bankruptcy Court or District Court, or (B) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order.

"**Allowed Amount**" means the sum at which a Claim is Allowed.

"**Amended and Restated Bylaws**" means the Amended and Restated Bylaws of Reorganized Congoleum to become effective on the Effective Date, which shall be substantially in the form attached hereto as Exhibit "J". The Amended and Restated Bylaws will be filed as part of the Plan Supplement.

"**Amended and Restated Certificate**" means the Amended and Restated Certificate of Incorporation of Reorganized Congoleum to become effective on the Effective Date, which shall be substantially in the form attached hereto as Exhibit "K".  The Amended and Restated Certificate will be filed as part of the Plan Supplement.

"**Anti-Suit Injunction**" means the injunction described in Section 11.11 of the Plan.

"**Asbestos Channeling Injunction**" means the injunction described in Section 11.6 of the Plan.

"**Asbestos Claimant**" means the holder of an Asbestos Personal Injury Claim.

"**Asbestos Claimants' Committee**" means the official committee of the representatives of holders of present unsecured Asbestos Personal Injury Claims, solely in its capacity as such, which committee as of the date hereof consists of the following representatives of the holders of present unsecured Asbestos Personal Injury Claims: Perry Weitz, Esquire, Joseph Rice, Esquire, Steven Kazan, Esquire, Russell Budd, Esquire and Robert Taylor, II, Esquire.

"**Asbestos Claims**" means, collectively, Plan Trust Asbestos Claims and ABI Asbestos Claims.

"**Asbestos In-Place Insurance Coverage**" means any insurance coverage, not reduced to Cash settlement proceeds, available for the payment or reimbursement of liability, indemnity or defense costs arising from or related to Asbestos Claims or Demands or Plan Trust Expenses under any Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement.

"**Asbestos Insurance Action**" means any claim, cause of action, or right of any Debtor against any Asbestos Insurance Company, including without limitation, the Coverage Litigation, arising from or related to: (a) any such Asbestos Insurance Company's failure to provide or pay under Asbestos In-Place Insurance Coverage, (b) the refusal of any Asbestos Insurance Company to compromise and settle any Asbestos Claim under or pursuant to any Asbestos Insurance Policy, or (c) the interpretation or enforcement of the terms of any Asbestos Insurance Policy with respect to any Asbestos Claim.

"**Asbestos Insurance Action Recoveries**" means (a) Cash derived from and paid pursuant to Asbestos Insurance Settlement Agreements, (b) the right to receive proceeds of Asbestos In-Place Insurance Coverage, and (c) the right to receive the proceeds or benefits of any Asbestos Insurance Action.

"**Asbestos Insurance Assignment**" means the transfer, grant and assignment of the Asbestos Insurance Rights to the Plan Trust described in Article V of the Plan, which will be effectuated pursuant to the Insurance Transfer Agreement.

"**Asbestos Insurance Company**" means any insurance company, insurance broker, guaranty association, liquidator, rehabilitator or any other Entity with demonstrated or potential liability to any of the Debtors, the Reorganized Debtors, or the Plan Trust under or related to an Asbestos Insurance Policy.

"**Asbestos Insurance Policy**" means any insurance policy issued to or for the benefit of any of the Debtors in effect at any time on or before the Effective Date that may afford any of the Debtors indemnity or insurance coverage, upon which any claim has been or may be made with respect to any Asbestos Claim.

"**Asbestos Insurance Rights**" means any and all rights, titles, privileges, interests, claims, demands or entitlements to any proceeds, payments, initial or supplemental dividends, scheme payments, supplemental scheme payments, causes of action and choses in action related to Asbestos In-Place Insurance Coverage, whether now

3

existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, including but not limited to:

(i)     any and all rights to pursue or receive payments with respect to Asbestos Claims under any Asbestos In-Place Insurance Coverage, whether for liability, defense or otherwise;

(ii)     any and all rights to pursue or receive payments related to any Asbestos In-Place Insurance Coverage that was entered into by any domestic or foreign insolvent insurance company, whether in receivership, liquidation, rehabilitation, run-off, scheme of arrangement or any other form of proceeding;

(iii)     any and all rights to pursue or receive payments related to any Asbestos In-Place Insurance Coverage from any state insurance guaranty association in connection with any state insurance guaranty association statute; *provided, however,* that Asbestos Insurance Rights shall not include any rights or obligations under any insurance policy or settlement agreement to which the Debtors are a party insofar as such insurance policy or settlement agreement relates to Workers' Compensation Claims; and

(iv)     any and all rights to pursue any Causes of Action against, or to receive payments related to any Asbestos In-Place Insurance Coverage from, any Asbestos Insurance Company.

"**Asbestos Insurance Settlement Agreement**" means any settlement agreement between or among any of the Debtors and a Settling Asbestos Insurance Company relating to any Asbestos Claim or Asbestos Insurance Action.

"**Asbestos Insurer Coverage Defenses**" means all defenses at law or in equity that an Asbestos Insurance Company may have under any Asbestos Insurance Policy or applicable law to provide Asbestos In-Place Insurance Coverage to or for Asbestos Personal Injury Claims or Plan Trust Expenses that have been channeled to or assumed by or incurred by the Plan Trust pursuant to the Plan; *provided, however,* that in the event there is a Final Order determining that the Bankruptcy Code authorizes the Asbestos Insurance Assignment by preempting any terms of any Asbestos Insurance Policy or provisions of applicable non-bankruptcy law that otherwise might prohibit the Asbestos Insurance Assignment, "Asbestos Insurer Coverage Defenses" shall not include any defense that the Asbestos Insurance Assignment is prohibited by any Asbestos Insurance Policy or applicable non-bankruptcy law.

"**Asbestos Personal Injury Claim**" means (a) any claim, demand or lawsuit (including, but not limited to, any Claim or Demand), whenever and wherever arising or asserted against any of the Debtors or their respective present or former officers, directors or employees in their capacities as such and (b) any debt, obligation or liability (whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, bonded, secured or unsecured), whenever and wherever arising or asserted, of the Debtors or their respective present or former officers, directors or employees in their capacities as such (including, but not limited to, all thereof in the nature of or sounding in tort, contract, warranty, or any other theory of law, equity or admiralty); in either case (a) or (b) for, based on or arising by reason of, directly or indirectly, physical, emotional, bodily or other personal injury, sickness, disease, death or damages based on the foregoing (including, but not limited to, any claim or demand for compensatory damages, loss of consortium, proximate, consequential, general, special or punitive damages, reimbursement, indemnity, warranty, contribution or subrogation) whether or not diagnosable or manifested before the Confirmation of the Plan or the close of the Reorganization Cases, (x) caused or allegedly caused, in whole or part, directly or indirectly: (i) by exposure to asbestos or asbestos-containing products manufactured, supplied, distributed, handled, fabricated, stored, sold, installed, or removed by any Debtor and/or its predecessors; or (ii) by services, actions, or operations provided, completed or taken by any Debtor and/or its predecessors in connection with asbestos or asbestos-containing products or (y) caused or allegedly caused by asbestos for which any Debtor or its predecessors, are alleged to be liable under any applicable law including, but not limited to, Indirect Asbestos Claims, *provided* that Asbestos Personal Injury Claim shall not include Workers' Compensation Claims, ABI Asbestos Claims or Asbestos Property Damage Claims.

"**Asbestos Personal Injury Claim Sub-Account**" means that portion of the Plan Trust Assets to be made available for payment of Plan Trust Asbestos Claims (and related Plan Trust Expenses) other than Allowed Asbestos Property Damage Claims.

"**Asbestos Property Damage Claim**" means any Claim or remedy or liability for damage to property (whether or not such Claim, remedy or liability is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty or otherwise), for which the Debtors are alleged to be or may be responsible by judgment, order or settlement and that (1) arises from or relates to any building or other real property in which asbestos was or is, or asbestos-containing products were or are, alleged to have been installed prior to the Petition Date; and (2) seeks monetary or other relief for injury to, destruction, loss of use, diminution in value, and/or asbestos-related repair or maintenance of such property or for the cost of inspection, encapsulation, decontamination, containment, removal, or other abatement of the asbestos or asbestos-containing products installed or allegedly installed in such property.  Asbestos Property Damage Claim also includes any such Claims, remedies or liabilities as described immediately above that seek (a) compensatory damages (such as proximate, consequential, general and special damages) and punitive damages; and/or (b) reimbursement, indemnification, subrogation and/or contribution, including, without limitation, any Asbestos Property Damage Contribution Claim.  Notwithstanding the foregoing, Asbestos Property Damage Claim does not include any ABI Asbestos Claim or Asbestos Personal Injury Claim.

"**Asbestos Property Damage Claim Bar Date**" means May 3, 2004, the date designated by the Bankruptcy Court as the last date for filing Proofs of Claim on account of an Asbestos Property Damage Claim against the Debtors.

"**Asbestos Property Damage Claim Sub-Account**" means that portion of the Plan Trust Assets, consisting solely of the Asbestos Property Damage Insurance Rights, to be made available for payment of Allowed Asbestos Property Damage Claims.

"**Asbestos Property Damage Contribution Claim**" means any Claim or remedy or liability for damage to property asserted against the Debtors (whether or not such Claim, remedy or liability is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty or otherwise) that is: (1) held by any Entity or assignee or transferee thereof which has been, is, or may be a defendant in an action alleging damage to property that (i) arises from or relates to any building or other real property in which asbestos was or is, or asbestos-containing products were or are, alleged to have been installed prior to the Petition Date, and (ii) seeks monetary or other relief for injury to, destruction, loss of use, diminution in value, and/or asbestos-related repair or maintenance of such property or for the cost of inspection, encapsulation, decontamination, containment, removal, or other abatement of the asbestos or asbestos-containing products installed or allegedly installed in such property; and (2) on account of alleged liability by the Debtors for reimbursement, indemnification, subrogation, or contribution of any portion of any damages such Entity (or assignee or transferee thereof) has paid or may pay to the plaintiff in such action.  Notwithstanding anything herein to the contrary, Asbestos Property Damage Contribution Claim does not include any ABI Asbestos Claims or Asbestos Personal Injury Claims.

"**Asbestos Property Damage Insurance Rights**" means all rights arising under all insurance policies, issued to or for the benefit of any of the Debtors that may afford any of the Debtors indemnity or insurance coverage solely for Asbestos Property Damage Claims, which policies are set forth on Exhibit "A" attached hereto.  The foregoing includes, but is not limited to, rights under insurance policies, rights under settlement agreements made with respect to such insurance policies, rights against the estates of insolvent insurers that issued such policies or entered into such settlements, and rights against state insurance guaranty associations arising out of any such insurance policies issued by insolvent insurers.

"**Avoidance Actions**" means, collectively, the Omnibus Avoidance Action and the Sealed Avoidance Action.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*., as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Reorganization Cases.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of New Jersey.

**"Bankruptcy Professional"** means any Person (a) employed pursuant to an order of the Bankruptcy Court or District Court, as applicable, in accordance with section 327 or 1103 of the Bankruptcy Code and to be compensated for services pursuant to sections 327, 328, 329, 330 and/or 331 of the Bankruptcy Code, or (b) who applies to the District Court for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code.

**"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Reorganization Cases.

**"Bar Dates"** means the date(s), if any, designated by the Bankruptcy Court or the District Court as the last date(s) for filing Proofs of Claim against the Debtors.

**"Bondholders' Committee"** means the official committee of bondholders appointed in these Reorganization Cases on January 27, 2006, as reconstituted from time to time, solely in its capacity as such.

**"Business Day"** means any day other than a Saturday, Sunday or a legal holiday (as such term is defined in Bankruptcy Rule 9006(a)) on which commercial banks are open for business in New York, New York.

**"Cash"** means lawful currency of the United States of America and its equivalents.

**"Causes of Action"** means, without limitation, any and all rights, remedies, claims, causes of action, liabilities, obligations, suits, debts, sums of money, damages, judgments, and demands whatsoever, whether known or unknown, in law, equity, or otherwise which may be brought by or on behalf of the Debtors and/or the Estates, arising under any provision of the Bankruptcy Code or other applicable law, including the GHR/Kenesis Actions.

**"Century Entities"** shall have the meaning ascribed to such term in the Settlement and Buyback Agreement.

**"Claim"** means a claim against the Debtors (or any of them), whether or not asserted, as defined in section 101(5) of the Bankruptcy Code, and further shall include, but is not limited to, Asbestos Claims.

**"Claimant Agreement"** means that certain Settlement Agreement Between Congoleum and Various Asbestos Claimants, as amended by the first amendment thereto, entered into by Congoleum and certain Asbestos Claimants, through their counsel, prior to the Petition Date, as amended from time to time in accordance with its terms.

**"Claimants' Counsel"** means Joseph F. Rice, Esquire and Perry Weitz, Esquire, collectively, in their capacity under the Claimant Agreement as the representatives of certain holders of Asbestos Personal Injury Claims.

**"Class"** means a category of Claims or Interests, as classified in Article II of the Plan pursuant to section 1122(a)(1) of the Bankruptcy Code.

**"Collateral Trust"** means the Collateral Trust established pursuant to the Collateral Trust Agreement, the Security Agreement and the Claimant Agreement.

**"Collateral Trust Agreement"** means that certain irrevocable trust agreement entered into by Congoleum and Arthur J. Pergament and Wilmington Trust Company, as amended by the first amendment thereto, and any further modifications or amendments thereto.

**"Collateral Trustee"** means the Trustee as defined and named in the Collateral Trust Agreement.

**"Confirmation"** means the approval of the Plan by the District Court pursuant to section 1129 and other applicable sections of the Bankruptcy Code.

**"Confirmation Date"** means the date on which the Confirmation Order is entered on the docket of the District Court.

**"Confirmation Hearing"** means the hearing(s) which will be held before the District Court, as appropriate, at which the Plan Proponents will seek Confirmation of the Plan.

**"Confirmation Order"** means the order of the District Court confirming the Plan pursuant to section 1129 and other applicable sections of the Bankruptcy Code.

**"Congoleum"** means Congoleum Corporation, a Delaware corporation.

**"Congoleum Interests"** means, collectively, all equity interests in Congoleum outstanding immediately prior to the Effective Date including, without limitation, (a) shares of Class A common stock, par value $0.01 per share, and Class B Common Stock, par value $0.01 per share, of Congoleum and (b) any options, warrants, conversion rights, rights of first refusal, or other rights, contractual or otherwise, to acquire or receive any stock or other equity ownership interests in Congoleum.

**"Coverage Action"** means that certain civil action pending in the Superior Court of New Jersey, docket number MID-L-8908-01, as such action exists after giving effect to the Order entered therein on October 30, 2003 that dismissed, without prejudice, certain claims including Environmental Claims, as referenced in such Order.

**"Coverage Litigation"** means (i) the Coverage Action; and (ii) any other action which seeks to determine the extent of insurance coverage for defense of and liability for Asbestos Claims and related issues.

**"Debtor"** means each of Congoleum, Congoleum Sales, Inc. and Congoleum Fiscal, Inc., as debtors-in-possession in the Reorganization Cases, and **"Debtors"** means all of them collectively, and when the context so requires, as post-Confirmation entities reorganized hereunder.

**"Demand"** means a demand for payment against any of the Debtors within the meaning of section 524(g)(5) of the Bankruptcy Code, but excludes any demand in respect of an Asbestos Property Damage Claim or an ABI Asbestos Claim.

**"Direct Action"** means any cause of action or right to bring a cause of action possessed by an Asbestos Claimant against an Asbestos Insurance Company on account of such Asbestos Claimant's Plan Trust Asbestos Claim, whether arising by contract or under the laws of any jurisdiction.

**"Disallowed"** means a Claim or Interest, as the case may be, that is disallowed by the Plan, a Final Order of the District Court, or that is disallowed pursuant to the TDP.

**"Disbursing Agent"** means Reorganized Congoleum or any Person selected by Reorganized Congoleum to hold and distribute the consideration to be distributed to the holders of Allowed Claims (other than Plan Trust Asbestos Claims and Senior Note Claims) under the Plan.

**"DIP Financing Agreements"** means the Existing Credit Agreement as ratified and amended by the Ratification and Amendment Agreement, dated as of January 7, 2004 ("Ratification Agreement"), between Wachovia and Congoleum, as acknowledged by Guarantors (as defined in the Ratification Agreement), as amended, restated, modified and/ or supplemented, together with all agreements, documents and instruments at any time executed and/or delivered in connection therewith or related thereto, including the Reaffirmation and Amendment of Guarantor Documents, dated as of January 7, 2004, between Wachovia and Guarantors, as from time to time amended, modified, supplemented, extended, renewed, restated or replaced.

**"DIP Financing Claim"** means any Claim arising from or in connection with the DIP Financing Order or the DIP Financing Agreements.

**"DIP Financing Lender"** means Wachovia.

**"DIP Financing Order"** means the Final Order (1) Authorizing Debtors' Use of Cash Collateral, (2) Authorizing Debtors to Obtain Post-Petition Financing, (3) Granting Senior Liens and Priority Administrative Expense Status Pursuant to 11 U.S.C. §§105 and 364(c), (4) Modifying the Automatic Stay Pursuant to 11 U.S.C. §362, and (5) Authorizing Debtors to Enter Into Agreements with Congress Financial Corporation (as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced), which was approved by the Bankruptcy Court on February 2, 2004.

**"Discharge Injunction"** means the injunction described in Section 11.4 of the Plan.

**"Disclosure Statement"** means the Disclosure Statement with respect to the Plan, including all exhibits, appendices, schedules and annexes attached thereto, as submitted by the Plan Proponents pursuant to section 1125 of the Bankruptcy Code, as such Disclosure Statement may be further amended, supplemented or modified from time to time.

**"Disclosure Statement Approval Order"** means that certain order of the District Court entered on March 12, 2010, approving the adequacy of the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, as such order may be amended, modified or supplemented thereafter.

**"Disputed Claim"** means any Claim that has not been allowed by a Final Order as to which (a) a Proof of Claim has been filed with the Bankruptcy Court or the District Court, as applicable, and (b) an objection has been or may be timely filed or deemed filed under applicable law and any such objection has not been (i) withdrawn, (ii) overruled or denied by a Final Order or (iii) granted by a Final Order. For purposes of the Plan, a Claim that has not been Allowed by a Final Order shall be considered a Disputed Claim, whether or not an objection has been or may be timely filed, if (A) the amount of the Claim specified in the Proof of Claim exceeds the amount of any corresponding Claim listed in the Schedules, (B) the classification of the Claim specified in the Proof of Claim differs from the classification of any corresponding Claim listed in the Schedules, (C) any corresponding Claim has been listed in the Schedules as disputed, contingent or unliquidated, (D) no corresponding Claim has been listed in the Schedules or (E) such Claim is reflected as unliquidated or contingent in the Proof of Claim filed in respect thereof.

**"Distributions"** means any distribution by the Debtors or Reorganized Congoleum to a Record Holder of an Allowed Claim or Interest.

**"Distribution Date"** means, when used with respect to an Allowed Claim (other than a Plan Trust Asbestos Claim), the date which is as soon as reasonably practicable after the latest of: (a) the Effective Date; (b) the first Business Day of the next calendar month following the date on which the Claim becomes an Allowed Claim; or (c) the first Business Day of the next calendar month upon which the Claim matures and becomes due and payable according to its own terms, unless the Claim becomes Allowed within fifteen (15) Business Days before the first Business Day of the next calendar quarter, in which case the Distribution Date shall be the first Business Day of the next succeeding calendar quarter.

**"District Court"** means the United States District Court for the District of New Jersey, which withdrew the reference from the Bankruptcy Court pursuant to 28 U.S.C. § 157(d) as of August 17, 2009 and assumed authority over the Reorganization Cases.

**"Effective Date"** means the first Business Day after the Confirmation Date immediately following the first day upon which all of the conditions to the occurrence of the Effective Date specified in Section 10.2 of the Plan have been satisfied or waived pursuant to Section 10.3 of the Plan.

**"Entity"** means any Person, estate, trust, Governmental Unit or the United States Trustee.

**"Environmental Laws"** means (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601, *et seq.*, (b) the Resource Conservation and Recovery Act, as amended by the Hazardous and Solid Waste

Amendment of 1984, 42 U.S.C. §§ 6901, *et seq.*, (c) the Clean Air Act, 42 U.S.C. §§ 7401, *et seq.*, (d) the Clean Water Act of 1977, 33 U.S.C. §§ 1251, *et seq.*, (e) the Toxic Substances Control Act, 15 U.S.C. §§ 2601, *et seq.*, (f) all statutes or laws issued or promulgated by any Governmental Unit, as they may be amended from time to time, relating to environmental contamination or pollution, air pollution, water pollution, noise control and/or the handling, discharge, existence, release, disposal or recovery of on-site or off-site hazardous, toxic or dangerous wastes, substances, chemicals or materials, and (g) the ordinances, rules, regulations, orders, notices of violation, requests, demands and requirements issued or promulgated by any Governmental Unit in connection with such statutes or laws.

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

**"Estate(s)"** means, individually, the estate of each Debtor in the Reorganization Cases and, collectively, the estates of all Debtors in the Reorganization Cases, created pursuant to section 541 of the Bankruptcy Code.

**"Existing Credit Agreement"** means the Loan and Security Agreement between Congoleum, as borrower, and Wachovia, as lender, dated as of December 10, 2001, as amended by Amendment No. 1 to Loan and Security Agreement, dated September 19, 2002, by and between Wachovia and Congoleum, and Amendment No. 2 to Loan and Security Agreement, dated as of February 27, 2003, by and between Wachovia and Congoleum, and as otherwise amended, restated, modified and/or supplemented as of the Petition Date and any related documents.

**"Existing Securities"** means, collectively, the Senior Notes and Interests.

**"Existing Subsidiary Guaranty"** means the Limited Guaranty, dated as of February 27, 2003, executed by Congoleum Fiscal, Inc. and Congoleum Sales, Inc., as amended, restated, modified or supplemented as of the Petition Date.

**"Exit Facility**" means the revolving credit and term loan facility in the aggregate principal amount of $30,000,000 to be provided by lenders acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative in the form of a revolving loan and a term loan to Reorganized Congoleum secured by substantially all of the assets of Reorganized Congoleum and otherwise on terms and conditions, and pursuant to loan documentation, satisfactory and acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative which financing shall be consistent with the Exit Facility Commitment Letter or Term Sheet contained in the Plan Supplement.

**"Exit Facility Commitment Letter or Term Sheet"** means that certain agreement by and between the Debtors and Exit Facility Lenders, detailing the commitment of the Exit Facility Lenders to provide the Exit Facility, a copy of which will be provided in the Plan Supplement.

**"Exit Facility Lenders"** means the lenders who will provide the Exit Facility, with such lenders to be identified in the Exit Facility Commitment Letter or Term Sheet.

**"Final Distribution"** means the Distribution by the Debtors or Reorganized Congoleum that satisfies all Allowed Claims and Interests to the extent provided in accordance with this Plan.

**"Final Order"** means an order or judgment of the Bankruptcy Court or the District Court, as applicable, or other court of competent jurisdiction, the implementation, operation or effect of which has not been stayed and as to which order (or any revision, modification or amendment thereon) the time to appeal or seek review, rehearing or writ of certiorari has expired and as to which no appeal or petition for review, reconsideration, rehearing or certiorari has been taken and is pending.

**"Futures Representative"** means the Person appointed by the Bankruptcy Court to represent the rights and interests of the future Demands, who shall be R. Scott Williams, Esquire, or such other individual appointed by the District Court, pursuant to section 524(g) of the Bankruptcy Code.

"**General Unsecured Claim**" means any Claim against any Debtor arising prior to the Petition Date (regardless of whether such Claim is covered by insurance) to the extent that such Claim is neither secured nor entitled to priority under the Bankruptcy Code or by a Final Order of the Bankruptcy Court or District Court, as applicable (other than any Workers' Compensation Claim, ABI Claim, Senior Note Claim or Asbestos Claim), including, but not limited to: (a) any Claim arising from the rejection of an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and (b) any portion of a Claim to the extent the value of the holder's interest in the applicable Estate's interest in the property securing such Claim is less than the amount of the Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Claim, as determined pursuant to section 506(a) of the Bankruptcy Code; provided, however, General Unsecured Claims do not include claims against the Debtors under the Environmental Laws as set forth in Section 11.9 hereof, which survive the Reorganization Cases.

"**GHR/Kenesis Actions**" means any Causes of Action, including for malpractice, against Gilbert LLP (formerly known as Gilbert Oshinsky LLP, Gilbert Randolph LLP, Gilbert, Heintz & Randolph LLP) or The Kenesis Group LLC.

"**Governmental Unit**" means any domestic, foreign, provincial, federal, state, local or municipal (a) government, or (b) governmental agency, commission, department, bureau, ministry or other governmental entity.

"**Impaired**" means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"**Indenture**" means the Indenture by and between Congoleum Corporation, as Issuer, and First Union National Bank, as Trustee, dated as of August 3, 1998, as supplemented and amended from time to time, relating to the Senior Notes.

"**Indenture Trustee**" means HSBC Bank USA, N.A., as successor to First Union National Bank, not individually but as indenture trustee under the Indenture, and its successors and assigns.

"**Indirect Asbestos Claim**" means (i) any Claim based on a right of contribution, reimbursement, subrogation, or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) arising out of or based on an Asbestos Personal Injury Claim or another Indirect Asbestos Claim, (ii) any other derivative or indirect Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law, equity or admiralty, by reason of an Asbestos Personal Injury Claim or another Indirect Asbestos Claim (including, without limitation, any Claim (A) for attorneys' fees arising or incurred in connection with any Asbestos Personal Injury Claim, another Indirect Direct Asbestos Claim or an Asbestos Insurance Action or (B) arising out of or based on the rejection of any executory contract related to or involving asbestos), and (iii) any Claim arising out of Asbestos Insurance Policies or settlement agreements related thereto, in each case other than ABI Asbestos Claims or Asbestos Property Damage Claims.

"**Injunctions**" means the Discharge Injunction, the Asbestos Channeling Injunction, the Anti-Suit Injunction and any other injunctions entered by order of the Bankruptcy Court or the District Court in the Reorganization Cases (including but not limited to any injunction contained in any Final Order approving any Asbestos Insurance Settlement Agreement).

"**Insurance Transfer Agreement**" means the insurance assignment agreement referenced in Section 5.1(c) of the Plan and substantially in the form attached as Exhibit "B" to the Plan.

"**Intercompany Agreements**" means any and all agreements existing between any of the Debtors and ABI, including without limitation the (i) Joint Venture Agreement, (ii) Personal Services Agreement, (iii) stockholders agreement, made as of March 11, 1993, as amended, (iv) Business Relations Agreement, dated as of March 11, 1993, as amended, (v) Tax Sharing Agreement, dated as of March 11, 1993, (vii) Plan of Repurchase, dated as of February 1, 1995, and (viii) annual intercompany personal computing, desktop and voice and data system support and other information technology services agreements.

"**Intercompany Settlement**" shall have the meaning ascribed to such term in Section 5.17.

"**Interest**" means any equity interest in the Debtors existing immediately prior to the Effective Date, including without limitation, the Congoleum Interests and the Subsidiary Interests.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**Joint Venture Agreement**" means that certain Joint Venture Agreement, dated as of December 16, 1992, by and among American Biltrite Inc., Resilient Holdings Incorporated, Congoleum, Hillside Industries Incorporated and Hillside Capital Incorporated, as amended by the Closing Agreement, dated as of March 11, 1993, by and among the same parties.

"**Lender Secured Claim**" means any Claim of Wachovia arising under or relating to the Existing Credit Agreement, the Existing Subsidiary Guaranty and any related documents.

"**Lien**" means, with respect to any asset or property, any properly perfected and unavoidable mortgage, lien, pledge, charge, security interest, encumbrance or other security device of any kind pertaining to or affecting such asset or property.

"**Litigation Settlement Agreement**" means the compromise and settlement agreement referenced in Section 5.14 of the Plan, approved by the Bankruptcy Court by order dated October 31, 2008, which Litigation Settlement Agreement was amended by the First Amendment to the Litigation Settlement Agreement dated as of October 22, 2009, as the same may be approved by the District Court.

"**Litigation Settlement Claimant**" means a person whose Asbestos Personal Injury Claim was liquidated pursuant to or was subject to liquidation pursuant to the Claimant Agreement or a Pre-Petition Settlement Agreement who executed the Litigation Settlement Agreement.

"**New ABI Agreement**" means the agreement to be entered into between Reorganized Congoleum and ABI, which shall be in form and substance mutually agreeable to the Bondholders' Committee, the Asbestos Claimants' Committee, the Futures Representative, and ABI, and which shall govern the relationship between ABI and Reorganized Congoleum upon the Effective Date, thereby superseding any and all Intercompany Agreements and which agreement shall be substantially in the form attached as Exhibit "I" to the Plan. The New ABI Agreement will be filed with the Plan Supplement.

"**New Common Stock**" means the newly issued shares of Congoleum common stock, par value $.01 per share, to be issued by Reorganized Congoleum as of the Effective Date pursuant to the terms of the Plan.

"**New Indenture**" means the Indenture dated as of the Effective Date relating to the New Senior Notes and which shall be substantially in the form attached as Exhibit "D" to the Plan. The New Indenture will be filed as part of the Plan Supplement.

"**New Senior Notes**" means the Senior Secured Notes to be issued to holders of Allowed Senior Note Claims by Reorganized Congoleum in the initial aggregate principal amount of $33 million on the Effective Date and which shall be due and payable December 31, 2017 . There shall be no interest accruing or due and payable on the principal amount of the New Senior Notes for the first six months after the Effective Date. Thereafter, interest shall accrue on the principal amount of the New Senior Notes at the rate of 9% per annum and be payable semi-annually in cash. At the sole option of Reorganized Congoleum, however, beginning with the interest payment due 12 months after the Effective Date to and including the interest payment due 30 months after the Effective Date (the "PIK Period"), interest may be paid in kind by the issuance of additional New Senior Notes in the aggregate amount of the interest then due and payable on each such payment date within the PIK Period. The option shall be separately exercisable with respect to each of the four semi-annual periods within the PIK Period. If Reorganized Congoleum elects to pay interest in kind during any semi-annual period within the PIK Period, interest shall accrue on all the New Senior Notes during such semi-annual period, including any New Senior Notes issued previously in connection with an interest payment in kind, at the rate of 11% per annum; if the Company does not elect the PIK payment

option on any interest payment date within the PIK period, interest for such semi-annual period shall be calculated at the rate of 9% per annum on all the New Senior Notes during such semi-annual period, including any New Senior Notes issued previously in connection with an interest payment in kind. After the expiration of the PIK Period, the option to pay interest in kind shall expire, and be of no further force and effect, and all interest shall accrue at 9% per annum, payable semi-annually in cash.

Commencing with the end of the Company's Fiscal Year ending December 31, 2011, the Company shall calculate the average annual Consolidated Cash Flow for each of the prior two Fiscal Years for each of the Company's Fiscal Years ending 2011 through 2016 (each such date, a "Determination Date"). The Company shall then calculate an assumed net debt capacity (the "Net Debt Capacity") as of each such Determination Date by multiplying the applicable two-year average annual Consolidated Cash Flow by four. The Company shall issue additional notes ("Additional Notes") to Holders of Notes on the relevant Regular Record Date to the extent that the Net Debt Capacity as of such Determination Date, plus any Cash Equivalents on the Company's balance sheet (plus any undrawn commitment amount under the Company's then outstanding revolving credit facility to the extent available to be drawn on the Determination Date) as of such Determination Date, exceeds the sum of (i) the amount of the outstanding balance of the Company's then outstanding revolving credit facility (determined as the daily average of such loan for the Fiscal Year ending on such Determination Date, and assuming it was fully drawn to the extent available to be drawn on each day of calculation of such daily average); (ii) the $33.0 million of Initial Notes; (iii) the amount of Additional Notes (excluding interest accretion as provided in the penultimate sentence of this paragraph) issued with respect to all prior Determination Dates; and (iv) the amount of other interest-bearing Indebtedness outstanding as of such Determination Date. The calculation of the amount of Additional Notes to be issued shall take place within three months after each Determination Date, and the issuance of such Additional Notes shall take place on the first Interest Payment Date after such calculation. The Company shall pay interest with such Additional Notes in cash upon issuance of such Additional Notes at a rate of 9% per annum on the principal amount of such Additional Notes accrued from the first date of the Fiscal Year following the applicable Determination Date if the Company pays interest in cash on the then existing Notes on such issuance date; and if interest on existing Notes on such issuance date is paid in PIK Notes, the principal amount of Additional Notes shall be increased to include the interest accreted from the first date of the Fiscal Year following the applicable Determination Date to the applicable issue date at a rate per annum of 11% on the principal amount of Additional Notes otherwise to be issued not taking into account such accretion. In no event shall the cumulative amount of Additional Notes issued under the procedures set forth in this paragraph exceed $37.0 million (excluding interest accretion as provided in the penultimate sentence of this paragraph).

Upon a Change of Control (as defined in the New Indenture as are other terms used in this definition of New Senior Notes), the holders of the New Senior Notes may require Reorganized Congoleum to repurchase the New Senior Notes at an offer price in cash equal to 115% of the aggregate principal amount thereof plus accrued and unpaid interest thereon. Moreover, the New Senior Notes are not optionally redeemable at any time prior to maturity.

The New Senior Notes will be secured by liens or security interests in all the assets of Reorganized Congoleum, which liens or security interests shall be subordinate in priority only to the liens or security interests granted by Reorganized Congoleum under the Exit Facility but shall not otherwise be subordinated to the Exit Facility, and which New Senior Notes liens or security interests shall be *pari passu* with no other security interests or liens. The New Senior Notes shall be in the form set forth in the New Indenture.

"**Non-Asbestos Stock Distribution**" means 49.9% of the New Common Stock.

"**Non-Compensatory Damages**" means any and all damages awarded by a court of competent jurisdiction that are penal in nature, including, without limitation, punitive, punitory, exemplary, vindictive, imaginary or presumptive damages.

"**Omnibus Avoidance Action**" means that certain Adversary Proceeding No. 05-06245 (KCF), which was filed in the Bankruptcy Court on behalf of the Debtors on December 3, 2005, as amended.

"**Other Secured Claim**" means a Secured Claim arising prior to the Petition Date against any of the Debtors other than a Lender Secured Claim.

"**PBGC**" shall have the meaning ascribed to such term in Section 8.4(b).

"**Pension Plans**" means, collectively, that certain Congoleum Corporation Hourly Retirement Plan, that certain Congoleum Corporation Retirement Plan for Salaried Employees and that certain Congoleum Corporation Plant 2 Retirement Plan, in each case as the same may be amended from time to time.

"**Person**" means any person, individual, partnership, corporation, limited liability company, joint venture company, association or other entity or being of whatever kind, whether or not operating or existing for profit, including, but not limited to, any "person" as such term is defined in section 101(41) of the Bankruptcy Code, but excluding any Governmental Unit.

"**Personal Services Agreement**" means that certain Personal Services Agreement dated as of March 11, 1993, by and between ABI and Congoleum and all amendments thereto.

"**Petition Date**" means December 31, 2003, the date on which the Debtors filed their petitions for relief commencing the Reorganization Cases.

"**Plan**" means this Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code and all exhibits and schedules annexed hereto or referenced herein, and any amendments or modifications thereto made in accordance with the Bankruptcy Code.

"**Plan Documents**" means the Plan, the Plan Trust Agreement, the TDP, the Exit Facility, the New Senior Notes, the New Indenture, the Registration Rights Agreement, the Amended and Restated Certificate, the Amended and Restated Bylaws, the Stockholders Agreement, the New ABI Agreement, and the Insurance Transfer Agreement, and all exhibits and schedules to any of the foregoing, including any included in a Plan Supplement.

"**Plan Proponents**" means, collectively, the Debtors, the Asbestos Claimants' Committee and the Bondholders' Committee.

"**Plan Supplement**" means the compilation of substantially final forms of documents, including, without limitation, a schedule identifying rejected contracts, the Exit Facility Commitment Letter or Term Sheet, the New ABI Agreement, Registration Rights Agreement, the New Indenture, the Stockholders Agreement, the Amended and Restated Bylaws and the Amended and Restated Certificate and schedules identifying the initial officers and the initial board of directors of Reorganized Congoleum, which the Plan Proponents shall file with the District Court no later than five (5) Business Days prior to the last date for filing objections to Confirmation of the Plan. Notwithstanding the foregoing, the Plan Proponents may amend the Plan Supplement and any attachments thereto through and including the Confirmation Date.

"**Plan Trust**" means the trust to be established pursuant to the Plan Trust Agreement and Section 5.1(a) of the Plan as of any date between (and inclusive of) the Confirmation Date and the Effective Date.

"**Plan Trust Agreement**" means that certain Congoleum Plan Trust Agreement, effective as of any date between (and inclusive of) the Confirmation Date and the Effective Date, substantially in the form attached hereto as Exhibit "E," as it may be modified from time to time in accordance with the terms thereof.

"**Plan Trust Asbestos Claims**" means, collectively, Asbestos Personal Injury Claims, future Demands and Allowed Asbestos Property Damage Claims.

"**Plan Trust Assets**" means the assets to be delivered to the Plan Trust pursuant to the Plan Documents and shall include, without limitation, the following assets and any income and profits thereon, and proceeds derived therefrom: (a) the Plan Trust Common Stock; (b) the Asbestos Insurance Rights; (c) all rights of the Debtors under, and all proceeds of, the Asbestos Insurance Settlement Agreements (except for those certain proceeds of the Asbestos Insurance Settlement Agreement with Liberty Mutual Insurance Company, which are payable to the Debtors as provided in Section 5.1(q) of the Plan); (d) the proceeds of the Asbestos In-Place Insurance Coverage; (e) the proceeds of the Asbestos Insurance Actions; (f) the proceeds of the Asbestos Insurance Action Recoveries; (g)

the rights granted to the Plan Trust pursuant to the Insurance Transfer Agreement; and (h) the Asbestos Property Damage Insurance Rights.

"**Plan Trust Bylaws**" means the bylaws as approved by the Plan Trustee, the Trust Advisory Committee and the Futures Representative, effective as of the effective date of the Plan Trust, as may be modified from time to time with the consent and approval of the Plan Trustee, the Trust Advisory Committee and the Futures Representative.

"**Plan Trust Common Stock**" means a number of shares of common stock of Reorganized Congoleum constituting 50.1% of the New Common Stock.

"**Plan Trust Documents**" means the Plan Trust Agreement, the Plan Trust Bylaws, the TDP and the other agreements, instruments and documents governing the establishment, administration and operation of the Plan Trust, as amended or modified from time to time in accordance with the Plan and such documents.

"**Plan Trust Expenses**" means any liabilities, costs, taxes or expenses of, or imposed upon or in respect of, the Plan Trust or, on and after the Effective Date, the Plan Trust Assets (except for payments to holders of Asbestos Claims on account of such Asbestos Claims).

"**Plan Trustee**" means the Person appointed pursuant to Article V of the Plan and the Plan Trust Agreement for the purpose of acting as Trustee of the Plan Trust in accordance with the terms and conditions contained in the Plan, the Plan Trust Agreement and the Confirmation Order.

"**Post-Petition Interest**" means interest accruing on and after the Petition Date on a Claim.

"**Pre-Petition Settled Claimant**" means a person whose Asbestos Personal Injury Claim was liquidated pursuant to or was subject to liquidation pursuant to the Claimant Agreement or a Pre-Petition Settlement Agreement, as the case may be (other than such persons whose claims have been previously expunged by order of the Bankruptcy Court, it being understood that defendants in the Omnibus Avoidance Action against whom a default has been granted shall not be considered to have had their claims expunged).

"**Pre-Petition Settlement Agreement**" means a settlement agreement, other than the Claimant Agreement, executed prior to the Petition Date to resolve an Asbestos Personal Injury Claim under which some or all of the consideration due has yet to be paid.

"**Priority Claim**" means any Claim (other than an Administrative Claim or a Priority Tax Claim) to the extent such Claim is entitled to a priority in payment under section 507(a) of the Bankruptcy Code.

"**Priority Tax Claim**" means any Claim to the extent that such Claim is entitled to a priority in payment under section 507(a)(8) of the Bankruptcy Code.

"**Professional Fee Claim**" means a Claim of a professional retained in the Reorganization Cases pursuant to sections 327, 328, and 1103 of the Bankruptcy Code, or otherwise, including such Claims of the Futures Representative and its professionals, for compensation or reimbursement of costs and expenses relating to services rendered on and after the Petition Date and prior to and including the Effective Date.

"**Proof of Claim**" means any proof of claim filed with the Bankruptcy Court or District Court or their duly appointed claims agent with respect to the Debtors pursuant to Bankruptcy Rule 3001 or 3002.

"**Pro Rata**" means with reference to any distribution on account of any Claim in any Class, the proportion that the amount of such Claim bears to the aggregate amount of all Claims (including Disputed Claims but excluding Disallowed Claims) in such Class.

"**Protected Party**" means any of the following parties:

        (a)      the Debtors and the Reorganized Debtors;

        (b)      any Entity that, pursuant to the Plan or after the Confirmation Date, becomes a direct or indirect transferee of, or successor to, the Plan Trust or the Debtors;

        (c)      the Persons designated on Exhibit "F" (as such Exhibit may be amended on or before the Confirmation Date) as current distributors of the product lines currently manufactured, sold or otherwise produced by Congoleum; or

        (d)      each Settling Asbestos Insurance Company.

**"Record Date"** means the date established in the Disclosure Statement Approval Order or any other Final Order of the District Court for determining the identity of holders of Claims entitled to vote to accept or reject this Plan and/or receive Distributions under this Plan. If no Record Date is established in the Disclosure Statement Approval Order or any other Final Order of the District Court, then the Record Date shall be the date of the entry of the Disclosure Statement Approval Order.

**"Record Holder"** means the holder of a Claim as of the Record Date.

**"Registration Rights Agreement"** means the agreement described in Section 5.8 of the Plan.

**"Reinstated"** means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the holder of such Claim or Interest so as to leave such Claim or Interest Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim or Interest as such maturity existed before such default; and (iii) compensating the holder of such Claim or Interest for any damages incurred as a result of any legal, equitable or contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest.

**"Reorganization Cases"** means the cases filed by the Debtors under Chapter 11 of the Bankruptcy Code.

**"Reorganized Congoleum"** means reorganized Congoleum (or any successor thereto) on and after the Effective Date.

**"Reorganized Debtors"** means the reorganized Debtors (or any successor thereto) on and after the Effective Date.

**"Representatives"** means, with respect to any Entity, the present and former directors, officers, members, employees, trustees, accountants (including independent certified public accountants), advisors, attorneys, consultants, experts or other agents of that Entity, or any other professionals of that Entity, in each case in their capacity as such; *provided, however,* that in no event shall "Representatives" mean Gilbert LLP (formerly known as Gilbert Oshinsky, LLP, Gilbert Randolph LLP and Gilbert Heintz & Randolph LLP) or Kenesis Group, LLC.

**"Schedules"** means the schedules, statements and lists filed by the Debtors with the Bankruptcy Court or District Court pursuant to Bankruptcy Rule 1007, if such documents are filed, as they have been and may be amended or supplemented from time to time.

 **"Sealed Avoidance Action"** means that certain Adversary Proceeding No. 05-06461 (KCF), as it may be amended, which was filed under seal in the Bankruptcy Court on behalf of the Debtors on December 29, 2005, against (a) Arthur J. Pergament, in his capacity as Collateral Trustee; (b) Joseph F. Rice and the law firm of Motley Rice LLC; (c) Perry Weitz and the law firm of Weitz & Luxenberg, P.C.; and (d) certain holders of pre-petition Asbestos Personal Injury Claims.

"**Secured Claim**" means any Claim (other than an Asbestos Claim) that is (a) secured in whole or part, as of the Petition Date, by a Lien which is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or (b) subject to setoff under section 553 of the Bankruptcy Code, but, with respect to both (a) and (b) above, only to the extent of the value, net of any senior lien, of the Estates' interest in the assets or property securing any such Claim or the amount subject to setoff, as the case may be.

"**Security Agreement**" means that certain Superceding [sic] Security Agreement entered into by Congoleum and the Collateral Trustee, dated June 11, 2003, as the same may be amended from time to time.

"**Senior Note Claim**" means any Claim of a holder of Senior Notes based upon the Senior Notes.

"**Senior Note Distribution**" means the Non-Asbestos Stock Distribution and $33 million initial principal amount of the New Senior Notes.

"**Senior Notes**" means the 8.625% Senior Notes Due 2008 in the original principal amount of $100 million issued by Congoleum and outstanding as of the Petition Date.

"**Settlement and Buyback Agreement**" means that certain Settlement and Buyback Agreement dated as of August 17, 2006 among the Debtors, Century Indemnity Company and the other parties thereto.

"**Settling Asbestos Insurance Company**" means any Asbestos Insurance Company that has, before the conclusion of the Confirmation Hearing before the District Court, entered into an Asbestos Insurance Settlement Agreement that is sufficiently comprehensive and otherwise on terms appropriate in the determination of each of the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative to warrant treatment under section 524(g) of the Bankruptcy Code (including, with respect to any Asbestos Insurance Settlement Agreement that is conditioned in whole or in part on a plan of reorganization proposed by the Debtors, an agreement from such Settling Asbestos Insurance Company in writing, in a form reasonably acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative that all conditions to its performance under its Asbestos Insurance Settlement Agreement based on or related to a plan proposed by the Debtors is satisfied in full by this Plan), which determination by the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative will be indicated by the inclusion of such Asbestos Insurance Company on a schedule of Settling Asbestos Insurance Companies filed by the Plan Proponents as Exhibit "H" to the Plan with the District Court before the conclusion of the Confirmation Hearing and approved by such District Court.

"**Stockholders Agreement**" means that certain stockholders agreement described in Section 5.9 of this Plan, which shall be substantially in the form attached hereto as Exhibit "L." The Stockholders Agreement will be filed as part of the Plan Supplement.

"**Subsidiary Debtors**" means, collectively, Congoleum Sales, Inc. and Congoleum Fiscal, Inc.

"**Subsidiary Interests**" means, collectively, the issued and outstanding shares of stock of the Subsidiary Debtors as of the Petition Date and any options, warrants or other contractual rights to acquire any shares of stock of the Subsidiary Debtors as of the Petition Date.

"**Substantial Contribution Claim**" shall have the meaning ascribed to such term in Section 3.5.

"**Tax Sharing Agreement**" means that certain Tax Sharing Agreement, dated as of November 1, 1996, by and between ABI and Congoleum.

"**TDP**" means the trust distribution procedures for the Plan Trust, substantially in the form attached as Exhibit "G" to the Plan, as it may be modified from time to time in accordance with the terms of the TDP and the Plan Trust Agreement.

**"Trust Advisory Committee"** or **"TAC"** means a Trust Advisory Committee to be formed to represent all holders of Asbestos Personal Injury Claims to advise the Plan Trustee and to approve and consent to certain actions as specified herein and in the Plan Trust Agreement, solely in its capacity as such.

**"United States Trustee"** means the Office of the United States Trustee for Region 3.

**"Unimpaired"** means, with reference to a Claim or Interest, unimpaired within the meaning of section 1124 of the Bankruptcy Code.

**"Unpaid Intercompany Amounts"** means the following intercompany payables, to the extent such payables arise following the Petition Date, are evidenced by invoices or other appropriate supporting documentation and remain unpaid as of the Effective Date: (i) payments due under the Personal Services Agreement, (ii) payments due for purchases of urethane or other products sold intercompany under the Business Relations Agreement, dated as of March 11, 1993, as amended, (iii) payments due under the Canadian Tile exclusivity agreement under the Business Relations Agreement, dated as of March 11, 1993, as amended, (iv) royalty payments due under the non-pvc license agreement dated January 1, 2006, (v) payments due under intercompany personal computing, desktop and voice and data system support and other information technology services agreements between ABI and the Debtors, (vi) payments due for items purchased by ABI and/or an ABI subsidiary for a Debtor and/or Debtor subsidiary, or purchased by a Debtor and/or a Debtor subsidiary for ABI and/or an ABI subsidiary, or purchased jointly by any of them and (vii) intercompany payments due as reimbursement of reasonable and necessary travel expenses incurred (whether by ABI or an ABI subsidiary, or a Debtor or a Debtor subsidiary) in connection with ABI personnel providing management services to any of the Debtors.

**"Voting Agent"** means Logan & Company, Inc.

**"Voting Procedures Order"** means the order entered by the District Court setting the voting procedures for this Plan.

**"Wachovia"** shall mean Wachovia Bank, National Association, successor by merger to Congress Financial Corporation.

**"Workers' Compensation Claim"** means any Claim (a) for benefits under a state-mandated workers' compensation system, that a past, present, or future employee of the Debtors and their predecessors is receiving, or may in the future have a right to receive, and/or (b) for reimbursement brought by any insurance company as a result of payments made to or for the benefit of such employees and fees and expenses incurred under any insurance policies covering such employee claims.

    1.3   **Rules of Interpretation: Application of Definitions, Rules of Construction, and Computation of Time**. Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine and neuter. For purposes of the Plan: (a) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the document shall be substantially in that form or substantially on those terms and conditions; (b) any reference in the Plan to an existing document or exhibit filed or to be filed means the document or exhibit as it may have been or may be amended, modified, or supplemented; (c) unless otherwise specified, all references in the Plan to Sections, Schedules, and Exhibits are references to sections, schedules, and exhibits of or to the Plan. Unless otherwise specified, the words "herein," "hereof," "hereto," "hereunder," and other words of similar meaning refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. The headings in the Plan are for convenience of reference only and shall not expand, limit, or otherwise affect the provisions of the Plan. Unless otherwise indicated herein, all references to dollars are to United States dollars. Unless otherwise expressly provided herein, in computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

    1.4   **Exhibits and Schedules**. All exhibits and schedules are incorporated into and are a part of the Plan as if set forth in full herein.

# ARTICLE II

## CLASSIFICATION OF CLAIMS AND INTERESTS

2.1 **Generally**.  Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of the Class and is classified in a different Class to the extent the Claim or Interest qualifies within the description of that different Class.  Solely for voting purposes, Claims against each Estate are classified as Claims against the Estates as a whole.

2.2 **Unclassified Claims**.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are excluded from the Classes set forth in Section 2.3 of the Plan.  The treatment accorded Administrative Claims, Priority Tax Claims and the DIP Financing Claim is set forth in Article III of the Plan.

2.3 **Classes**.  In accordance with section 1122 of the Bankruptcy Code, the following constitute the Classes of Claims against and Interests in the Debtors:

(a) <u>Class 1 – Priority Claims</u>.  Class 1 consists of all Priority Claims.  Class 1 is Unimpaired.

(b) <u>Class 2 – Lender Secured Claims</u>.  Class 2 consists of the Lender Secured Claims.  Class 2 is Unimpaired.

(c) <u>Class 3 – Other Secured Claims</u>.  Class 3 consists of all Other Secured Claims, each of which will be within a separate subclass, with each such subclass to be deemed a separate Class for all purposes.  Class 3 is (or these subclasses are) Unimpaired.

(d) <u>Class 4 – Senior Note Claims</u>.  Class 4 consists of all Senior Note Claims.  Class 4 is Impaired.

(e) <u>Class 5 – Workers' Compensation Claims</u>.  Class 5 consists of all Workers' Compensation Claims.  Class 5 is Unimpaired.

(f) <u>Class 6 – ABI Claims</u>.  Class 6 consists of all ABI Claims.  Class 6 is Impaired.

(g) <u>Class 7 – Asbestos Personal Injury Claims</u>.  Class 7 consists of all Asbestos Personal Injury Claims, including the unliquidated Asbestos Personal Injury Claims of Pre-Petition Settled Claimants.  Class 7 is Impaired.

(h) <u>Class 8 - Asbestos Property Damage Claims</u>.  Class 8 consists of all Asbestos Property Damage Claims.  Class 8 is Impaired.

(i) <u>Class 9 – General Unsecured Claims</u>.  Class 9 consists of all General Unsecured Claims.  Class 9 is Impaired.

(j) <u>Class 10 – Congoleum Interests</u>.  Class 10 consists of all Congoleum Interests.  Class 10 is Impaired.

(k) <u>Class 11 – Subsidiary Interests</u>.  Class 11 consists of all Subsidiary Interests.  Class 11 is Unimpaired.

Exhibit A--Plan.DOC

# ARTICLE III

## TREATMENT OF ADMINISTRATIVE
## CLAIMS AND PRIORITY TAX CLAIMS

3.1 **Summary**.  Pursuant to section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims against the Debtors are not classified for purposes of voting on, or receiving Distributions under, this Plan.  Similarly, Substantial Contribution Claims are not classified for purposes of voting on, or receiving Distributions under, this Plan.  Holders of such Claims are not entitled to vote on this Plan.  All such Claims are instead treated separately in accordance with this Article III and in accordance with the requirements set forth in section 1129(a)(9)(A) of the Bankruptcy Code.

3.2 **Administrative Claims**.  On the Distribution Date, each holder of an Allowed Administrative Claim, except as otherwise provided for herein, and subject to the requirements of Section 13.14 of the Plan, shall receive, in full satisfaction, settlement, release, extinguishment, and discharge of such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Claim or (b) such different treatment as to which the applicable Debtor and such holder shall have agreed upon in writing; *provided, however,* that Allowed Administrative Claims representing (i) post-petition liabilities incurred in the ordinary course of business by the Debtors and (ii) post-petition contractual liabilities arising under loans or advances to the Debtors, whether or not incurred in the ordinary course of business, shall be paid by Reorganized Congoleum in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto.

3.3 **Priority Tax Claims**.  On the Distribution Date, each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, (a) Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (b) such different treatment as to which the applicable Debtor and such holder shall have agreed upon in writing, or (c) at Reorganized Congoleum's sole discretion, deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim, over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim.

3.4 DIP Financing Claim.

Each holder of an Allowed DIP Financing Claim shall be paid indefeasibly in full on the Effective Date or as soon thereafter as practicable and shall receive in full satisfaction, settlement, release, extinguishment, and discharge of such Allowed DIP Financing Claim, (a)(i) Cash equal to the unpaid portion of such Allowed DIP Financing Claim, together with a release and termination agreement and any accompanying cash collateral, each in form, substance and amounts acceptable to DIP Financing Lender, or (ii) such different treatment as to which DIP Financing Lender shall have agreed to in writing, and (b) shall be released and discharged from any obligation, liability and/ or responsibility to fund or otherwise pay the Professional Fee Carve-Out (as defined in the DIP Financing Order) and /or any other claim or liability of any kind, nature or description that can be brought at any time for any reason against DIP Financing Lender relating to the Professional Fee Carve-Out or any other fees or expenses incurred by any Bankruptcy Professional.  Notwithstanding anything to the contrary contained in the Plan, the Confirmation Order, or otherwise, the Allowed DIP Financing Claim, and the liens and security interests securing such Allowed DIP Financing Claim shall continue in full force and effect in accordance with the terms, conditions and covenants of the DIP Financing Agreements and the DIP Financing Order, shall survive the Confirmation Date and continue in full force and effect in accordance with the terms and conditions of the DIP Financing Agreements and the DIP Financing Order until such time as the Allowed DIP Financing Claim has been indefeasibly paid in full and in Cash.  Each Allowed DIP Financing Claim shall include all interest, fees, costs and charges accrued up to the Effective Date, accrued at the rates provided for in the DIP Financing Agreements.  Pursuant to the DIP Financing Order, upon the indefeasible payment in full of an Allowed DIP Financing Claim, the Debtors shall forever release, discharge and acquit the DIP Financing Lender and its officers, directors, agents, attorneys and predecessors-in-interest of and from any and all claims, demands, liabilities, causes of action, and obligations of every kind with respect to the DIP Financing Agreement and DIP Financing Order.

3.5 **Substantial Contribution Claims**.  Any Entity who requests compensation or expense reimbursement for making a substantial contribution in the Reorganization Cases pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code ("Substantial Contribution Claim") must file an application with the clerk of the

District Court on or before a date that is sixty (60) days subsequent to the Effective Date and serve such application on counsel for the Debtors, counsel for the Futures Representative, counsel for the Asbestos Claimants' Committee, counsel for the Bondholders' Committee and on all other parties as otherwise required by the District Court and the Bankruptcy Code, or be forever barred from seeking such compensation or expense reimbursement. All Allowed Substantial Contribution Claims shall be paid by Reorganized Congoleum within sixty (60) days of allowance by the District Court.

## ARTICLE IV

### TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

4.1     Claims and Interests

(a)     Class 1 – Priority Claims. On the Distribution Date, each holder of an Allowed Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Claim, either (i) the Allowed Amount of its Priority Claim, in Cash, or (ii) such different treatment as may be agreed to by such holder and Reorganized Congoleum. Class 1 is Unimpaired and the holders of Class 1 Claims are deemed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

(b)     Class 2 – Lender Secured Claims. The Lender Secured Claim shall be deemed Allowed for all purposes in connection with this Plan and shall be deemed to be previously indefeasibly paid in full on the Effective Date and Wachovia shall be released from any and all liabilities and causes of action in accordance with the DIP Financing Agreements and DIP Financing Order. Class 2 is Unimpaired and the holder of the Class 2 Claim is deemed to have accepted the Plan and, accordingly, is not entitled to vote on the Plan.

(c)     Class 3 – Other Secured Claims. Each holder of an Allowed Other Secured Claim shall receive one of the following three treatments at Reorganized Congoleum's sole option: (i) retain unaltered the legal, equitable and contractual rights (including, but not limited to, any Liens that secure such Claim) to which such Claim entitles such holder and such Allowed Other Secured Claim shall be Reinstated on the Effective Date, (ii) the Debtors shall surrender all collateral securing such Claim to the holder thereof, in full satisfaction of such holder's Allowed Class 3 Claim, without representation or warranty by, or recourse against, the Debtors or Reorganized Congoleum or (iii) such holder shall be otherwise treated in a manner so that such Claim shall be rendered Unimpaired. Class 3 is Unimpaired and the holders of Class 3 Claims are deemed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

(d)     Class 4 – Senior Note Claims. Senior Note Claims shall be Allowed in an aggregate amount equal to at least $103,593,750.00, which shall not be subject to any avoidance, reductions, set off, offset, recharacterization, subordination, counterclaims, defenses, disallowance, impairment or any other challenges under applicable law or regulation by any person or entity. On the Effective Date, each holder of an Allowed Senior Note Claim shall receive, in full satisfaction of its Senior Note Claim, its Pro Rata share of each of the securities included in the Senior Note Distribution. Class 4 is Impaired and holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

(e)     Class 5 – Workers' Compensation Claims. Each holder of an Allowed Workers' Compensation Claim shall be paid in the ordinary course pursuant to such rights that exist under any state workers' compensation system or laws applicable to such Claims. Class 5 is Unimpaired and the holders of Class 5 Claims are deemed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

(f)     Class 6 – ABI Claims. Pursuant to and in consideration of the Intercompany Settlement and Section 5.17 and other terms of the Plan, on the Effective Date all Intercompany Agreements shall be rejected and all ABI Claims, including without limitation any ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.17(b)(4)(B) of the Plan), shall be deemed Disallowed and expunged. Class 6 is Impaired and the holder of the Class 6 Claims is entitled to vote to accept or reject the Plan.

(g)     Class 7 – Asbestos Personal Injury Claims.

(i)     As of the Effective Date, all liability for all Asbestos Personal Injury Claims (which includes all Claims in Class 7) as well as liability for all future Demands shall be assumed, automatically and without further act or deed, by the Plan Trust and the Reorganized Debtors shall have no liability therefor.  Each Asbestos Personal Injury Claim and future Demands shall be resolved pursuant to the Plan Trust Agreement and the TDP.  The TDP shall apply to all holders of Asbestos Personal Injury Claims and future Demands, including any such holder who elects to resort to the legal system and obtains a judgment for money damages.

(ii)     As of the Effective Date, pursuant to the Plan, all Pre-Petition Settled Claimants, including the Litigation Settlement Claimants, in full satisfaction of his, her or its Asbestos Personal Injury Claim and any and all rights pursuant to any Pre-Petition Settlement Agreement, Claimant Agreement, Security Agreement, Collateral Trust Agreement or any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003, shall be restored to *status quo ante,* including with respect to any statutes of limitation related to such Asbestos Personal Injury Claim, as of the time each such Claimant initially filed or submitted its Asbestos Claim against the Debtors that resulted in the Claimant's Pre-Petition Settlement Agreement or the Claimant Agreement, respectively, and shall be treated by the Plan Trust as holding unliquidated Asbestos Personal Injury Claims under applicable federal or state law, which claims shall be resolved pursuant to the Plan Trust Agreement and the TDP in the same manner as all other Asbestos Personal Injury Claims in Class 7.  Pre-Petition Settled Claimants in Class 7 shall receive *pari passu* treatment under the Plan without regard to any lien, security interest or other claim to priority treatment whatsoever (*i.e.* it is understood that any such Pre-Petition Settled Claimant will need to reapply to the Plan Trust to satisfy the TDP including medical, exposure, statutes of limitation and other requirements).

(iii)     Class 7 is Impaired.  Holders of Class 7 Claims are entitled to vote with respect to the Plan.

(h)     Class 8 - Asbestos Property Damage Claims.  As of the Effective Date, all liability for all Allowed Asbestos Property Damage Claims shall be assumed, automatically and without further act or deed, by the Plan Trust and the Reorganized Debtors shall have no liability therefor.  Each Allowed Asbestos Property Damage Claim shall be paid solely from the Asbestos Property Damage Claim Sub-Account on account of the unpaid Allowed Amount of such Claim pursuant to the Plan Trust Agreement.  After the assets in the Asbestos Property Damage Claim Sub-Account have been exhausted or transferred therefrom in accordance with the Plan Trust Agreement, the Plan Trust shall have no further liability or obligation for or in respect of any Asbestos Property Damage Claims.  All Asbestos Property Damage Claims as to which a Proof of Claim was not filed prior to the expiration of the Asbestos Property Damage Claim Bar Date shall be deemed Disallowed.  Class 8 is Impaired and the holders of Class 8 Claims are entitled to vote to accept or reject the Plan.

(i)     Class 9 – General Unsecured Claims.  Except to the extent that a holder of an Allowed General Unsecured Claim in Class 9 has been paid by the Debtors prior to the Effective Date or agrees to alternate, less favorable, treatment, each holder of an Allowed Class 9 Claim shall receive, on the Distribution Date, in full and final satisfaction of such Allowed Class 9 Claim, Cash in the amount of $.35 for each $1.00 of such holder's Allowed Class 9 Claim.  Class 9 is Impaired and the holders of Class 9 Claims are entitled to vote to accept or reject the Plan.  General Unsecured Claims do not include Claims against the Debtors under the Environmental Laws as set forth in Section 11.9 hereof, which Claims (other than Claims held by ABI) survive the Reorganization Cases.

(j)     Class 10 – Congoleum Interests.  On the Effective Date, the Congoleum Interests shall be cancelled, the holders of the Congoleum Interests shall retain and receive nothing on account of such Interests.  Class 10 is Impaired and the holders of Class 10 Congoleum Interests are deemed to have rejected the Plan in accordance with the provisions of section 1126(g) of the Bankruptcy Code, and accordingly, their votes are not being solicited.

(k)     Class 11 – Subsidiary Interests.  On the Effective Date, the holder of the Subsidiary Interests shall retain such Subsidiary Interests.  Class 11 is Unimpaired and the holder of Class 11 Subsidiary Interests is deemed to have accepted the Plan, and accordingly, is not entitled to vote on the Plan.

4.2 **Reservation of Rights Regarding Claims**. Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' or Reorganized Congoleum's rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment. Except as otherwise explicitly provided in the Plan, nothing shall affect any of the Plan Trust's rights and defenses, both legal and equitable, with respect to any Asbestos Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

4.3 **Reservation of Fair and Equitable (Cram Down) Power**. The Plan Proponents reserve the right to confirm this Plan as to any impaired Class that does not accept the Plan by the requisite number of votes pursuant to the fair and equitable power of 11 U.S.C. § 1129(b).

# ARTICLE V

## IMPLEMENTATION OF THE PLAN

5.1 The Plan Trust

(a) **Establishment and Purpose of the Plan Trust**. On or prior to the Effective Date, the Plan Trust shall be established in accordance with the Plan Trust Agreement. The Plan Trust is intended to be a "qualified settlement fund" within the meaning of section 468B of the IRC and the Treasury Regulations promulgated thereunder. The purpose of the Plan Trust shall be to, among other things: (i) pay all Plan Trust Asbestos Claims in accordance with the Plan, the Plan Trust Agreement, the TDP and the Confirmation Order; (ii) preserve, hold, manage, and maximize the Plan Trust Assets for use in paying and satisfying Plan Trust Asbestos Claims in accordance with the Plan Trust Agreement and the TDP; (iii) prosecute, settle and manage the disposition of the Asbestos In-Place Insurance Coverage; and (iv) prosecute, settle, and manage Asbestos Insurance Actions and Direct Actions.

(b) **Funding and Receipt of Plan Trust Assets**. On the Effective Date, Reorganized Congoleum shall issue the Plan Trust Common Stock to the Plan Trust in accordance with the Plan and all Plan Trust Assets shall be transferred to, vested in, and assumed by, the Plan Trust free and clear of all Claims, Liens and encumbrances; *provided*, *however*, that to the extent that certain Plan Trust Assets, because of their nature or because they will accrue subsequent to the Effective Date, cannot be transferred to, vested in, and assumed by the Plan Trust on the Effective Date, such Plan Trust Assets shall be transferred to, vested in, and assumed by the Plan Trust free and clear of Claims, Liens and encumbrances, as soon as practicable after the Effective Date.

(c) **Insurance Transfer Agreement**. On the Effective Date, the Debtors shall deliver the Insurance Transfer Agreement attached hereto as Exhibit "B." Such agreement shall be valid, binding and enforceable. The Insurance Transfer Agreement shall transfer claims and rights set forth therein as Debtors may have, subject to any and all Asbestos Insurer Coverage Defenses.

(d) **Creation of Asbestos Property Damage Claim Sub-Account**. On the Effective Date, the Plan Trust shall cause the Asbestos Property Damage Insurance Rights and any proceeds thereof, including $1.2 million from the proceeds of that certain settlement agreement between the Debtors and Liberty Mutual Insurance Company approved by the Bankruptcy Court by order dated July 30, 2004, to be held in the Asbestos Property Damage Claim Sub-Account. In accordance with the terms of the Plan Trust Agreement, the Plan Trustee shall be permitted to transfer monies from the Asbestos Property Damage Claim Sub-Account to the Asbestos Personal Injury Claim Sub-Account, from time to time, to the extent that the funds in the Asbestos Property Damage Claim Sub-Account exceed the aggregate amount of all unpaid Asbestos Property Damage Claims that have been filed prior to the Asbestos Property Damage Claim Bar Date, and a reasonable reserve for Plan Trust Expenses and indemnification costs or expenses, in either case, related to Asbestos Property Damage Claims.

(e) **Assumption of Liabilities by the Plan Trust**. On the Effective Date, all liabilities, obligations and responsibilities relating to all Plan Trust Asbestos Claims shall be transferred to the Plan Trust as set

forth herein and the Plan Trustee, on behalf of the Plan Trust, shall expressly assume all liability for all Plan Trust Asbestos Claims and Demands as set forth herein, subject to the provisions of the Plan Trust Agreement.  With the exception of the liabilities identified hereinabove in this Section 5.1(e), in no event shall the Plan Trust assume any of the liabilities, obligations or responsibilities of the Debtors or Reorganized Congoleum.

(f)     **Discharge of Liabilities to Holders of Asbestos Claims**.  Except as provided in the Plan and the Confirmation Order, the transfer to, vesting in, and assumption by the Plan Trust of the Plan Trust Assets as contemplated by the Plan shall, among other things, discharge the Debtors and the Reorganized Debtors from and in respect of all Plan Trust Asbestos Claims.

(g)     **TDP**.  From and after the Effective Date, the Plan Trust shall pay the Plan Trust Asbestos Claims in accordance with the Plan Trust Agreement and the TDP.  The Plan Trustee shall have the power to administer, amend, supplement or modify the TDP in accordance with the terms thereof.

(h)     **Payment of Allowed Asbestos Property Damage Claims**.  From and after the Effective Date, the Plan Trust shall cause the payment of Allowed Asbestos Property Damage Claims from the Asbestos Property Damage Claim Sub-Account in accordance with the Plan Trust Agreement; *provided, however* that once the assets in the Asbestos Property Damage Claim Sub-Account have been exhausted, the Plan Trust shall have no further liability or obligation for or in respect of any Asbestos Property Damage Claims.

(i)     **Excess Plan Trust Assets**.  To the extent there are any Plan Trust Assets remaining after the payment in full of all Plan Trust Asbestos Claims and all Plan Trust Expenses (or provision has been made therefor) in accordance with the Plan Trust Agreement and the TDP, such excess Plan Trust Assets shall be transferred to a tax-exempt organization qualified under section 501(c)(3) of the IRC, which tax-exempt organization is to be determined by the Plan Trustee; *provided, however*, that the purpose thereof, if practicable, shall be related to the treatment of, research on or the relief of suffering of individuals suffering from asbestos-related lung disorders.

(j)     **Plan Trust Expenses**.  The Plan Trust shall pay all Plan Trust Expenses from the Plan Trust Assets in accordance with the Plan Trust Agreement.  Neither the Debtors, the Reorganized Debtors, nor their Affiliates shall have any obligation to pay any Plan Trust Expenses.  The Plan Trustee, each member of the TAC, the Futures Representative and the Representatives of each of the foregoing will have a lien upon the Plan Trust Assets which will be prior to any lien thereon, and the Plan Trust will grant a security interest in the Plan Trust Assets, all proceeds thereof and all accounts into which such proceeds or the Plan Trust Assets are deposited or maintained to secure payment of amounts payable to them as compensation or indemnification.

(k)     **Appointment of the Initial Plan Trustee.**  Effective as of the Effective Date, the District Court shall appoint the initial Plan Trustee to serve as Plan Trustee in accordance with the Plan Trust Agreement.  The Plan Trustee shall be designated no later than thirty (30) days prior to the Confirmation Hearing and shall be mutually acceptable to the Asbestos Claimants' Committee and the Futures Representative.  For purposes of performing his or her duties and fulfilling his or her obligations under the Plan Trust Agreement, the TDP and the Plan, the Plan Trustee shall be deemed to be a party in interest within the meaning of section 1109(b) of the Bankruptcy Code.  The Plan Trustee shall be the "administrator" of the Plan Trust as that term is used in Treas. Reg. Section 1.468B-2(k)(3).

(l)     **The Futures Representative**.  Effective as of the Effective Date, the District Court shall appoint a Person to serve as the Futures Representative from and after the Effective Date pursuant to the terms of the Plan Trust Agreement and who shall have the functions and rights provided in the Plan Trust Documents.

(m)     **Appointment of Trust Advisory Committee Members**.  Effective as of the Effective Date, the District Court shall appoint three initial members of the TAC (and thereupon the TAC shall be formed) to serve as members of the TAC in accordance with the Plan Trust Agreement.

(n)     **Institution and Maintenance of Legal and Other Proceedings**.  As of the Effective Date, the Plan Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other

proceedings related to any asset, liability, or responsibility of the Plan Trust, including, without limitation, the Coverage Action, in each case to the extent not adjudicated, compromised or settled prior to the Effective Date. The Plan Trust shall be empowered to initiate, prosecute, defend, and resolve all such actions in the name of the Debtors and/or Reorganized Congoleum if deemed necessary or appropriate by the Plan Trustee.  Except as otherwise provided by law or agreement, the Plan Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred subsequent to the Effective Date arising from or associated with any legal action or other proceeding brought pursuant to this Section 5.1(n) and shall pay or reimburse all deductibles, retrospective premium adjustments, or other charges which may arise from the receipt of insurance proceeds by the Plan Trust.  Without in any way limiting the foregoing and subject to any Asbestos Insurer Coverage Defenses, the Plan Trust shall be empowered to elect to (or not to), initiate, prosecute, defend, settle, and resolve all Asbestos Insurance Actions and Direct Actions, and to maintain, administer, preserve, or pursue the Asbestos-In-Place Insurance Coverage, the Asbestos Insurance Action Recoveries, Asbestos Insurance Rights, the Asbestos Insurance Policies and rights under the Asbestos Insurance Settlement Agreements.  All Causes of Action other than Asbestos Insurance Actions and Direct Actions shall remain the property of the Reorganized Debtors.

(o)     **Preservation of Insurance Claims**.  The discharge and releases provided herein, and the injunctive protection provided to the Debtors, the Reorganized Debtors and any Protected Party with respect to Demands as provided herein, shall neither diminish nor impair the enforceability of any of the Asbestos Insurance Policies by any Entity except (i) to the extent that any such Asbestos Insurance Company is also a Settling Asbestos Insurance Company or (ii) that all Asbestos Insurer Coverage Defenses are preserved.

(p)     **Indemnification by the Plan Trust**.  As and to the extent provided in the Plan Trust Agreement in Sections 1.4 and 4.6, the Plan Trust shall indemnify and hold harmless each of the Debtors, the Reorganized Debtors, the Plan Trustee, any officer and employee of the Plan Trust, the Futures Representative, each member of the TAC and, with respect to each of the foregoing, their respective past, present and future Representatives.

(q)     **Reimbursement of Defense and Indemnity Costs Relating to Asbestos Claims**.  All defense and indemnity costs incurred by Congoleum with respect to Asbestos Claims prior to the Effective Date shall be reimbursed from the proceeds of the Liberty Mutual Settlement.

5.2     **Certain Mergers**.  On the Effective Date, the Subsidiary Debtors shall merge with and into Congoleum, with Reorganized Congoleum as the sole surviving corporation.

5.3     **The Amended and Restated Certificate and the Amended and Restated Bylaws**.  The Amended and Restated Certificate and the Amended and Restated Bylaws of Reorganized Congoleum shall be in form and substance acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative and shall be consistent with the provisions of the Plan and the Bankruptcy Code. The Amended and Restated Certificate shall, among other things (a) authorize the issuance of New Common Stock pursuant to Section 5.7 of the Plan, and (b) provide, pursuant to section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-voting common equity securities.  The  Amended and Restated Bylaws and the Amended and Restated Certificate of Reorganized Congoleum shall be substantially in the form attached hereto as Exhibits "J" and "K", respectively.  The Amended and Restated Bylaws and the Amended and Restated Certificate will filed as part of the Plan Supplement.

5.4     **Directors and Officers of Reorganized Congoleum**.  The initial board of directors of Reorganized Congoleum shall consist of five (5) directors.  One of such directors shall be selected by the Bondholders' Committee, three of such directors shall be selected jointly by the Futures Representative and the Asbestos Claimants' Committee, and one of such directors shall be Reorganized Congoleum's chief executive officer.  The identity of such directors shall be disclosed by the Plan Proponents in the Plan Supplement.  To the extent any such Person is an Insider (as defined in section 101(31) of the Bankruptcy Code), the nature of any compensation for such Person will also be disclosed prior to the Confirmation Hearing.  Each of the Persons on the initial board of directors of Reorganized Congoleum shall serve in accordance with the Amended and Restated Certificate and the Amended and Restated Bylaws of Reorganized Congoleum, as the same may be amended from time to time.  Subsequently, Reorganized Congoleum's board of directors shall be elected in accordance with

24

Reorganized Congoleum's governing documents which governing documents shall be acceptable to the Bondholders' Committee and the Asbestos Claimants' Committee.

The initial officers of Reorganized Congoleum shall be set forth in the Plan Supplement. To the extent any such Person is an Insider (as defined in section 101(31) of the Bankruptcy Code), the nature of any compensation for such Person will also be disclosed at such time. The initial officers shall serve in accordance with the Amended and Restated Certificate and the Amended and Restated Bylaws of Reorganized Congoleum, as the same may be amended from time to time.

5.5 **Cancellation of Existing Securities and Agreements of the Debtors/Discharge of the Indenture Trustee**. Except as set forth in the Plan, upon the Effective Date, the Existing Securities shall be cancelled and the holders thereof shall have no further rights or entitlements in respect thereof against the Debtors except the right to receive any Distributions to be made to such holders under the Plan. To the extent possible, Distributions to be made under the Plan to the beneficial owners of the Senior Notes shall be made through the Depository Trust Company and its participants. The Confirmation Order shall authorize and direct the Indenture Trustee to take whatever action may be necessary or appropriate, in its reasonable discretion, to deliver the Distributions, including, without limitation, obtaining an order of the District Court. On the Effective Date, the Indenture Trustee and its agents shall be discharged of all their obligations associated with (i) the Senior Notes, (ii) the Indenture, and (iii) any related documents, and released from all Claims arising in the Reorganization Cases. As of the Effective Date, the Indenture shall be deemed fully satisfied and cancelled; *provided*, *however*, that the Indenture shall continue in effect solely for the purposes of: (1) allowing holders of the Senior Note Claims to receive distributions under the Plan, (2) allowing and preserving the rights of the Indenture Trustee to (a) make distributions in satisfaction of Allowed Senior Note Claims, (b) exercise its charging liens against any such distributions, and (c) seek compensation and reimbursement for any fees and expenses incurred in making such distributions. Upon completion of all such distributions, the Senior Notes and the Indenture shall terminate completely. From and after the Effective Date, the Indenture Trustee shall have no duties or obligations under the Indenture other than to make distributions pursuant to the Plan.

5.6 Exit Facility. On the Effective Date, Reorganized Congoleum shall obtain exit financing consistent with the terms and conditions set forth in the Exit Facility Commitment Letter or Term Sheet, which shall be filed as part of the Plan Supplement, from the Exit Facility Lenders.

5.7 **Issuance of New Securities and Debt Instruments**

(a) New Common Stock. On the Effective Date, Reorganized Congoleum shall issue the New Common Stock pursuant to the Plan. The Amended and Restated Certificate sets forth the rights and preferences of the New Common Stock. The New Common Stock shall be issued subject to the Stockholders Agreement described below.

(b) New Senior Notes. On the Effective Date, Reorganized Congoleum shall issue $33 million in initial principal amount of 9% New Senior Notes, which shall mature on December 31, 2017. The New Senior Notes shall be governed by the terms and conditions set forth in the New Indenture.

5.8 **Registration Rights Agreement**. In the event the board of directors of Reorganized Congoleum determines in its discretion to register any of the New Common Stock with the Securities and Exchange Commission, or if Reorganized Congoleum is required under the Stockholders Agreement or applicable securities laws to register any of the New Common Stock with the Securities and Exchange Commission, any Person receiving Distributions of the New Common Stock issued on the Effective Date that is not entitled to an exemption from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code, or whose resale of the New Common Stock is otherwise restricted under the securities laws, shall be entitled to become a party to the Registration Rights Agreement. The Registration Rights Agreement shall be satisfactory in form and substance to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative, a substantially similar form of which will be contained in the Plan Supplement.

5.9 **Stockholders Agreement**. On the Effective Date, the Stockholders Agreement will be adopted by Reorganized Congoleum and be binding upon all holders of New Common Stock. All holders of New Common

Stock will be subject to the Stockholders Agreement which will, among other things, govern the access each holder of New Common Stock shall have to information with respect to Reorganized Congoleum and the ability to transfer such holder's New Common Stock. Each certificate representing share(s) of New Common Stock shall bear a legend indicating that the New Common Stock is subject to the Stockholders Agreement. The Stockholders Agreement will be effective as of the Effective Date. The Stockholders Agreement contains customary terms and conditions, including minority stockholder protections, and includes the minority stockholders having both a right of first refusal and right of first offer on the Plan Trust Common Stock. The Stockholders Agreement shall be satisfactory in form and substance to the Bondholders' Committee, the Asbestos Claimants' Committee and the Futures Representative, a substantially similar form of which is attached hereto as Exhibit "L." The Stockholders Agreement will be filed as part of the Plan Supplement.

5.10 **Effectuating Documents/Further Transactions**. Each of the Debtors (subject to the consent of the Bondholders' Committee, the Asbestos Claimants' Committee and the Futures Representative) and Reorganized Congoleum, and their respective officers and designees, is authorized and directed to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be requested by the Plan Proponents, or as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of the Plan, the Exit Facility, or any other Plan Document, or to otherwise comply with applicable law.

5.11 **Exemption from Certain Transfer Taxes and Recording Fees**. Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to Reorganized Congoleum or to any other Person or Entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

5.12 **Section 346 Injunction**. In accordance with section 346 of the Bankruptcy Code for the purposes of any state or local law imposing a tax, income will not be realized by the Estates, the Debtors or the Reorganized Debtors by reason of the forgiveness or discharge of indebtedness resulting from the consummation of the Plan. As a result, each state or local taxing authority is permanently enjoined and restrained, after the Confirmation Date, from commencing, continuing or taking any act to impose, collect or recover in any manner any tax against the Debtors or the Reorganized Debtors arising by reason of the forgiveness or discharge of indebtedness under the Plan.

5.13 **Corporate Action**. All matters provided for under the Plan involving the corporate structure of the Debtors or Reorganized Congoleum, or any corporate action to be taken by, or required of the Debtors or Reorganized Congoleum shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the stockholders or directors of any of such entities.

5.14 **Litigation Settlement Agreement**. (a) The Plan implements a compromise and settlement with respect to each such Litigation Settlement Claimant, pursuant to the Litigation Settlement Agreement, as amended, whose Asbestos Personal Injury Claim was liquidated pursuant to the Claimant Agreement or a Pre-Petition Settlement Agreement, as the case may be. The original Litigation Settlement Agreement was approved by the Bankruptcy Court by an order signed on October 31, 2008. The parties to the Litigation Settlement Agreement agreed to an amendment to conform such agreement to developments in the Reorganization Cases, and approval of such amendment is sought from the District Court under Bankruptcy Rule 9019 in connection with confirmation of this Plan.

(b) As of the Effective Date of the Plan:

(i) The Litigation Settlement Claimants shall waive any and all rights with respect to any pre-petition settlement of their Asbestos Personal Injury Claims against the Debtors, whether pursuant to any

Pre-Petition Settlement Agreement or the Claimant Agreement, including the liquidated amounts thereof; provided, however, that:

- any Asbestos Personal Injury Claim against the Debtors held by any such Litigation Settlement Claimant, including with respect to any statutes of limitation related thereto, shall be restored to the *status quo ante* as it existed as of the time the Litigation Settlement Claimant initially filed or submitted its Asbestos Personal Injury Claim against the Debtors that resulted in the Claimant's Pre-Petition Settlement Agreement or the Claimant Agreement (the "Submission Date");

- any statute of limitation with respect to such Asbestos Personal Injury Claim shall be tolled until the later of ninety (90) days after the expiration of any stay imposed due to the filing of the Debtors' chapter 11 cases of such additional time as may be provided pursuant to the TDP incorporated in the Plan (the "Asbestos Tolling Period");

- neither the Asbestos Tolling Period nor any other term or provision of the Litigation Settlement Agreement shall revive any statute of limitations that expired as of the Submission Date; and

- all parties retain the right to assert any statute of limitations defense or other defenses that they could have asserted as of the Submission Date.

(ii)   With respect to the Litigation Settlement Claimants, as amended, the Debtors shall be released from any and all obligations and duties imposed pursuant to any Pre-Petition Settlement Agreement, Claimant Agreement, the Collateral Trust Agreement, Security Agreement and any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003.

(iii)   The Debtors shall be deemed to have forever withdrawn, released, discharged, waived and forgiven the Litigation Settlement Claimants and Claimants' Counsel, and each of their respective assigns, administrators and successors in interest, for and from any and all claims, actions, causes of action, counterclaims, proofs of claim, and any other obligation of any kind or nature arising from or related to the Bankruptcy Code, the Avoidance Actions, and any and all claims related to any Pre-Petition Settlement Agreement, Claimant Agreement, the Collateral Trust Agreement, Security Agreement, pre-petition payments to Claimants Counsel, and any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003, including all pending and potential causes of action, whether accrued or to accrue, whether asserted by way of claim, counterclaim, cross-claim, third-party action, action for indemnity or contribution or otherwise; provided, however, that the foregoing shall not constitute a release of any rights to enforce the terms of the Litigation Settlement Agreement, as amended, or any defenses to Asbestos Personal Injury Claims that may be asserted by the Debtors as contemplated in the Litigation Settlement Agreement, as amended.

(iv)   Except as otherwise provided for in the Litigation Settlement Agreement, as amended, all Litigation Settlement Claimants and Claimants' Counsel shall be deemed to have forever withdrawn, released, discharged, waived and forgiven the Debtors and their respective assigns, administrators and successors in interest, for and from any and all claims, actions, causes of action, counterclaims, proofs of claim, and any other obligation of any kind or nature arising from or related to the Bankruptcy Code, the Avoidance Actions, and any and all claims related to any Pre-Petition Settlement Agreement, Claimant Agreement, the Collateral Trust Agreement, Security Agreement and any and all other agreements and amendments thereto with respect to the pre-packaged plan of reorganization filed by the Debtors on December 31, 2003, including all pending and potential causes of action, whether accrued or to accrue, whether asserted by way of a claim, counterclaim, cross-claim, third-party action, action for indemnity or contribution or otherwise; provided, however, that the foregoing shall not constitute a release of any rights to enforce the terms of the Litigation Settlement Agreement, as amended, and shall not constitute a release by Litigation Settlement Claimants of their Asbestos Personal Injury Claims against the Debtors, the Plan Trust, or any other party or entity.

(c)     Pursuant to the Litigation Settlement Agreement, as amended, and contingent upon confirmation of the Plan, the estates of Comstock, Cook and Arsenault have elected to withdraw their claims against the Debtors and will not seek recovery from the Debtors and/or Plan Trust, or otherwise participate in the Reorganization Cases.

(d)     Within 30 days after the Effective Date of the Plan, the District Court shall enter an order of dismissal of all claims and counterclaims in the Avoidance Actions, with prejudice, and with all parties to bear their own costs and attorneys fees.

(e)     Subject to the terms of this Plan, the mutual releases set forth in the Litigation Settlement Agreement, as amended, shall not abridge the right of Litigation Settlement Claimants to submit and recover upon their Asbestos Personal Injury Claims against the Debtors including as against the Plan Trust.

(f)     Each Litigation Settlement Claimant shall be entitled to submit its Asbestos Personal Injury Claim to the Debtors' bankruptcy estates, including the Plan Trust, as an unliquidated claim for resolution and treatment pursuant to TDP, provided that, any Litigation Settlement Claimant who received a partial payment from the Debtors with respect thereto prior to the Petition Date, including specifically claimants Cook, Arsenault, and Comstock, in addition to the other provisions hereof, hereby agrees to either: (a) not seek any further recovery with respect thereto against the Debtors, including from any Plan Trust, or (b) return and relinquish any such pre-petition partial payment for the benefit of the Plan Trust as a condition precedent to asserting any such further Asbestos Personal Injury Claim against the Debtors or the Plan Trust.

(g)     Pursuant to the Plan, any Pre-Petition Settled Claimant who is not a Litigation Settlement Claimant shall nevertheless receive the same treatment as the Litigation Settlement Claimants.

5.15   Review of Claimants' Counsel Expenses.  The expenses paid pre-petition by the Debtors to the Claimants' Counsel pursuant to the Claimant Agreement shall be subject to approval by the District Court in its discretion.

5.16   Non-Asbestos Reserve Fund

(a)     **Establishment of Reserve Fund**.  The Reorganized Debtors shall create a reserve fund (the "Reserve Fund") for claims, excluding asbestos claims, of any Governmental Units and any other Entities against the Debtors and/or Reorganized Debtors (the "Non-Asbestos Claims").  Within thirty (30) days after the Effective Date, the Plan Trust shall pay $3 million to the Reorganized Debtors for placement in the Reserve Fund (the "Reserve Fund Settlement Funds").  As used herein, the term "Known Insurance Claims" means Non-Asbestos Claims against the Debtors or Reorganized Debtors which arose from the operations of the Debtors prior to December 31, 2003 to the extent such claims survive the Reorganization Cases and claims are known to exist potentially as of the Fifth Anniversary of the Effective Date (the "Fifth Anniversary Date").  The Reserve Fund Settlement Funds shall be deposited in a segregated account and shall be used for the sole purpose of paying defense and indemnity costs incurred by the Reorganized Debtors after the Effective Date arising from Known Insurance Claims that are not paid in full by Liberty Mutual Insurance Company.   The Board of Directors of the Reorganized Debtors shall approve the initial payment made from the Non-Asbestos Reserve Fund.  Following the initial payment, the Board of Directors, in its sole discretion, may require notice before any subsequent payments are made out of the Non-Asbestos Reserve Fund.   The Reorganized Debtors shall provide the Plan Trustee with contemporaneous notice of payments made from the Non-Asbestos Reserve Fund.

(b)     **Termination of Reserve Fund**.  As of the Fifth Anniversary Date, any unused balance of the Reserve Fund shall be transferred by the Reorganized Debtors to the Plan Trust, and the Reserve Fund shall be terminated, provided, however, that to the extent there are any Known Insurance Claims as of the Fifth Anniversary Date that are unresolved, the Reserve Fund shall not be terminated on that date.  In such event, any Reserve Fund balance shall continue to be used to pay defense and indemnity costs incurred by the Reorganized Debtors arising from Known Insurance Claims until those claims are resolved.  In the event that a balance remains in the Reserve Fund after all Known Insurance Claims are resolved, any unused balance of the Reserve Fund shall be transferred by the Reorganized Debtors to the Plan Trust and at such time the Reserve Fund shall be terminated. For avoidance of doubt, in the event that the Reserve Fund continues after the Fifth Anniversary Date because there are Known

28

Insurance Claims, the Reserve Fund shall not be available for Non-Asbestos Claims for which notice of such Non-Asbestos Claim was first received by the Reorganized Debtors after the Fifth Anniversary Date.

      5.17   **Intercompany Settlement**.  (a)  The Plan implements a compromise and settlement with respect to ABI, the ABI Claims and the Intercompany Agreements (as set forth in this Section 5.17, the "Intercompany Settlement"). Pursuant to Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code and consistent with section 1129 of the Bankruptcy Code, the Plan shall constitute a motion for approval of, and the Confirmation Order shall authorize and constitute District Court approval of, the Intercompany Settlement.

      (b)    On the Effective Date, pursuant to Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code, in full and final satisfaction of the ABI Claims, and for good and valuable consideration including ABI's agreement to the treatment specified in the Plan for the ABI Claims and the Claims and Interests asserted by other parties in interest, the ABI Settlement shall be effectuated in accordance with the following terms:

      1.    All ABI Claims, including without limitation ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.17(b)(4)(B) of the Plan), shall be deemed Disallowed and expunged.

      2.    All Intercompany Agreements shall be deemed rejected, and any and all ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.17(b)(4)(B) of the Plan) arising therefrom shall be deemed Disallowed and expunged.

      3.    ABI and Reorganized Congoleum shall enter into and effectuate the New ABI Agreement, and which shall govern the relationship between ABI and Reorganized Congoleum upon the Effective Date.

      4.    The ABI Parties and ABI and their respective Representatives (in their capacities as such) shall be deemed to have received and exchanged mutual general releases with and from the Debtors, their Estates and Reorganized Congoleum, such that:

      A.   *As of the Effective Date, the Debtors, their Estates and Reorganized Congoleum shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, demands, debts, rights, causes of action and liabilities (other than their rights to enforce the terms of the Intercompany Settlement, the New ABI Agreement and the ABI Canada License Agreement, as amended by Section 5.17(b)(5) of the Plan, and their rights to payment of not more than $2 million on account of net Unpaid Intercompany Amounts remaining after intercompany offsets of Unpaid Intercompany Amounts), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, Reorganized Congoleum, the Reorganization Cases, the Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtors, their Estates or Reorganized Congoleum, as of the Petition Date or thereafter, against the ABI Parties, ABI and/or their respective Representatives (in their capacities as such); and*

      B.   *As of the Effective Date, the ABI Parties, ABI and their respective Representatives (in their capacities as such) shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, demands, debts, rights, causes of action and liabilities (other than their rights to enforce the terms of the Intercompany Settlement, the New ABI Agreement and the ABI Canada License Agreement, as amended by Section 5.17(b)(5) of the Plan, and their rights to payment of not more than $2 million on account of net Unpaid Intercompany Amounts remaining after intercompany offsets of Unpaid Intercompany Amounts), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, Reorganized Congoleum, the Reorganization Cases, the Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the ABI Parties, ABI and their respective Representatives (in their capacities as such), as of the Petition Date or thereafter, against the Debtors, their Estates or Reorganized Congoleum.*

5. The ABI Canada License Agreement shall be deemed to have been assumed by Congoleum and become an obligation of Reorganized Congoleum, *provided, however,* that Article 7.02 of the ABI Canada License Agreement shall be modified so that the "Term" thereof shall expire two years from the Effective Date and the ABI Canada License Agreement shall be deemed amended accordingly as of the Effective Date without any further action of any Person or Entity.

5.18 **Deemed Consolidation of Debtors For Plan Purposes Only**. Subject to the occurrence of the Effective Date, the Debtors shall be deemed consolidated under the Plan for Plan purposes only. Each and every Claim filed or to be filed against any of the Debtors shall be deemed filed against the deemed consolidated Debtors and shall be deemed one Claim against and obligation of the deemed consolidated Debtors. Such deemed consolidation, however, shall not (other than for purposes related to funding distributions under the Plan and as set forth above in this Section 5.18) affect: (i) the legal and organizational structure of the Debtors; (ii) any Liens that are required to be maintained under the Plan (A) in connection with executory contracts or unexpired leases that were entered into during the Reorganization Cases or that have been or will be assumed, (B) pursuant to the Plan, or (C) in connection with any Exit Facility; or (iii) The Debtors or Reorganized Debtors obligation to pay statutory fees pursuant to 28 U.S.C. § 1930(a)(6) for each of the three Debtors as provided in Article 13.4. Notwithstanding anything contained in the Plan to the contrary, the deemed consolidation of the Debtors shall not have any effect on any of the Claims being reinstated and left unimpaired under the Plan, and the legal, equitable, and contractual rights to which the holders of any such Claims are entitled shall be left unaltered by the Plan.

## ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS WITH RESPECT TO CLAIMS OTHER THAN PLAN TRUST ASBESTOS CLAIMS

6.1 **Plan Distributions**. The Disbursing Agent shall make all distributions required under the Plan (other than distributions to holders of Plan Trust Asbestos Claims and Senior Note Claims). Distributions shall be made on the Distribution Date (unless otherwise provided herein or ordered by the District Court) with respect to all Claims except for Plan Trust Asbestos Claims. Distributions to be made on the Distribution Date shall be deemed actually made on the Distribution Date if made either (a) on the Distribution Date or (b) as soon as practicable thereafter. With respect to Plan Trust Asbestos Claims, distributions to holders of Plan Trust Asbestos Claims shall be made in accordance with the Plan Trust Agreement and/or the TDP, as applicable. With respect to Senior Note Claims, Distributions will be made by the Indenture Trustee, whose reasonable fees and expenses in connection with such Distributions shall be paid by Reorganized Congoleum.

6.2 **Distributions of Cash**. Any Distribution of Cash made by Reorganized Congoleum pursuant to the Plan shall, at Reorganized Congoleum's option, be made by check drawn on a domestic bank or by wire transfer from a domestic bank.

6.3 **No Interest on Claims**. Unless otherwise specifically provided for in the Plan, the Confirmation Order, or a post-petition agreement in writing between the Debtors and a holder, Post-Petition Interest shall not accrue or be paid on Claims, and no holder shall be entitled to interest accruing on or after the Petition Date. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a Final Distribution is made when and if such Disputed Claim becomes an Allowed Claim. Notwithstanding the foregoing, this Section 6.3 shall not apply to Plan Trust Asbestos Claims which shall be governed in all cases by the Plan Trust Agreement and the TDP.

6.4 **Delivery of Distributions**. Distributions to holders of Allowed Claims other than Asbestos Claims shall be made by the Disbursing Agent or the Indenture Trustee, as applicable, (a) at the holder's last known address, or (b) at the address in any written notice of address change delivered to the Disbursing Agent or the Indenture Trustee, as applicable. If any holder's distribution made by the Disbursing Agent is returned as undeliverable, no further distributions to such holder shall be made, unless and until the Disbursing Agent is notified of such holder's then current address, at which time all missed distributions shall be made to such holder without interest. Amounts in respect of undeliverable distributions made through the Disbursing Agent shall be returned to Reorganized Congoleum until such distributions are claimed or become unclaimed property pursuant to Section 6.8 of the Plan. With respect to Plan Trust Asbestos Claims, distributions to the holders of Plan Trust Asbestos Claims

shall be made in accordance with the Plan Trust Agreement and/or the TDP, as applicable. With respect to Senior Note Claims, distributions to holders of Senior Note Claims shall be made in accordance with the Indenture.

6.5 **Distributions to Holders as of the Record Date**. All Distributions on Allowed Claims shall be made to the Record Holders of such Claims. As of the close of business on the Record Date, the Claims register maintained by the Voting Agent shall be closed, and there shall be no further changes in the Record Holder of any Claim. Reorganized Congoleum shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. Reorganized Congoleum shall instead be entitled to recognize and deal for all purposes under the Plan with the Record Holders as of the Record Date.

6.6 **Fractional Securities; Fractional Dollars**. Distributions of fractions of shares of New Common Stock will not be made and shall be rounded (up or down) to the nearest whole number, with half shares or less being rounded down. Reorganized Congoleum shall not be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

6.7 **Withholding of Taxes**. The Disbursing Agent shall withhold from any assets or property distributed under the Plan any assets or property that must be withheld pursuant to applicable law.

6.8 **Unclaimed Property.** Any Cash, assets and other property to be distributed on account of any Claim (other than a Plan Trust Asbestos Claim) under the Plan that remain unclaimed (including by an Entity's failure to negotiate a check issued to such Entity) or otherwise not deliverable to the Entity entitled thereto before the later of (a) one year after the date of distribution or (b) 120 calendar days after an order allowing such Entity's Claim becomes a Final Order, shall become vested in, and shall be transferred and delivered to, Reorganized Congoleum. In such event, such Entity's Claim shall no longer be deemed to be Allowed and such Entity shall be deemed to have waived its rights to such payments or distributions under the Plan pursuant to section 1143 of the Bankruptcy Code and shall have no further Claim in respect of such distribution and shall not participate in any further distributions under the Plan with respect to such Claim.

## ARTICLE VII

## RESOLUTION OF DISPUTED CLAIMS

7.1 **Disallowance of Improperly Filed Claims**. Subject to section 502(j) of the Bankruptcy Code and Bankruptcy Rules 3008 and 9006, any Administrative Claim, Asbestos Property Damage Claim or Claim (other than Asbestos Personal Injury Claims) for which the filing of a Proof of Claim, application or motion with the District Court is required under the terms of the Bankruptcy Code, the Bankruptcy Rules, any order of the Bankruptcy Court or District Court, as applicable (including one providing a Bar Date), or the Plan shall be Disallowed if and to the extent that such Proof of Claim (or other filing) is not timely and properly made.

7.2 **Prosecution of Objections to Claims**. Unless otherwise ordered by the District Court after notice and a hearing, after the Effective Date, Reorganized Congoleum, the Bondholders' Committee, the Asbestos Claimants' Committee and the Futures Representative each shall have the right to make and file objections to Proofs of Claims, other than Proofs of Claims in respect of Asbestos Personal Injury Claims and Professional Fee Claims, at any time on or before ninety (90) days after the later of (i) the Effective Date or (ii) the date on which such Claim was filed with the District Court unless no Proof of Claim is required to be filed pursuant to Bankruptcy Rule 3002, the Plan or any order of the District Court; *provided, however,* that (x) this deadline may be extended by the District Court on motion by the Debtors, Reorganized Congoleum, the Bondholders' Committee, the Asbestos Claimants' Committee or the Futures Representative, as applicable, and (y) neither the Debtors, Reorganized Congoleum, the Futures Representative, the Bondholders' Committee, the Asbestos Claimants' Committee, nor any other Person may file an objection to any (1) Claim that was Allowed by a Final Order entered during the Reorganization Cases, or (2) Claim Allowed by the Plan. In addition, unless otherwise ordered by the District Court after notice and a hearing, after the Effective Date Reorganized Congoleum, the Bondholders' Committee, the Asbestos Claimants' Committee and the Futures Representative, subject to Sections 13.8 and 13.14 of the Plan, each shall have the exclusive right to make and file objections to Administrative Claims and to amend the Schedules or to object to any

31

Claim specified on the Schedules, at any time on or before sixty (60) days after the later of (i) the Effective Date or (ii) the date on which such Claim was filed with the District Court unless no Proof of Claim is required to be filed pursuant to Bankruptcy Rule 3002, the Plan or any order of the District Court; *provided, however,* that (x) this deadline may be extended by the District Court on motion by the Debtors, Reorganized Congoleum, the Bondholders' Committee, the Asbestos Claimants' Committee or the Futures Representative, as applicable, (y) neither the Debtors, Reorganized Congoleum, the Futures Representative, the Bondholders' Committee, the Asbestos Claimants' Committee nor any other Person may file an objection to any (1) Claim that was Allowed by a Final Order entered during the Reorganization Cases, or (2) Claim Allowed by the Plan, and (z) with respect to any Administrative Claim referred to in sub-clause (a)(4) of the definition of Administrative Expense, no objection may be filed with respect to any such Administrative Expense other than with respect to the reasonableness of such Administrative Expense or whether such Administrative Expense was incurred in accordance with Section 6.6 of the Indenture. Without prejudice to the right of any Asbestos Insurance Company to assert any Asbestos Insurer Coverage Defenses, after the Effective Date, only the Plan Trustee shall have the authority to contest Asbestos Personal Injury Claims and Asbestos Property Damage Claims and litigate to judgment, settle or withdraw such objections and each Asbestos Personal Injury Claim and Asbestos Property Damage Claim, whether or not a Proof of Claim was filed with the Bankruptcy Court or District Court, shall be satisfied exclusively in accordance with the Plan Trust Documents.

7.3  **No Distributions Pending Allowance**.  Notwithstanding any other provision hereof, if a Claim or any portion of a Claim (other than an Asbestos Personal Injury Claim) is a Disputed Claim, no payment or distribution shall be made on account of such Disputed Claim, unless and until such Disputed Claim becomes an Allowed Claim.

7.4  **Distributions After Allowance**.  Payments and distributions to each holder of a Claim that is Disputed, or that is not Allowed, to the extent that such Claim ultimately becomes Allowed, shall be made in accordance with the provisions hereof governing the Class of Claims in which such Claim is classified. As soon as practicable after the date that the order or judgment of the District Court allowing any Disputed Claim (other than a disputed Asbestos Claim) becomes a Final Order, Reorganized Congoleum shall distribute to the holder of such Claim any payment or property that would have been distributed to such holder if the Claim had been Allowed as of the Effective Date (or such other date on which such distribution would have been made).

## ARTICLE VIII

## TREATMENT OF EXECUTORY CONTRACTS,
## UNEXPIRED LEASES AND SETTLEMENTS

8.1  **Assumption of Unexpired Leases and Executory Contracts**

(a)  Assumption.  Except for any unexpired lease or executory contract that the Plan Proponents reject or designate as being subject to rejection on or before the Effective Date, as of the Effective Date, all executory contracts and unexpired leases not previously assumed or rejected by the Debtors pursuant to section 365 of the Bankruptcy Code shall be deemed to have been assumed by the Debtors, and the Plan shall constitute a motion to assume such executory contracts and unexpired leases. Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the District Court shall constitute approval of such assumptions pursuant to section 365(a) of the Bankruptcy Code and a finding by the District Court that each such assumption is in the best interests of the Debtors, the Estates and all parties in interest in the Reorganization Cases. With respect to each such executory contract or unexpired lease assumed by the Debtors, unless otherwise determined by the District Court pursuant to a Final Order or agreed to by the parties thereto on or before the Effective Date, any defaults of the Debtors with respect to such assumed executory contracts or leases existing as of the Effective Date shall be cured in the ordinary course of the Reorganized Debtors' business promptly after any such default becomes known to the Debtors and, if disputed, established pursuant to applicable law by the District Court, and the assumed executory contracts or leases shall be binding upon and enforceable upon the parties thereto, subject to any rights and defenses existing thereunder. Subject to the occurrence of the Effective Date, upon payment of such cure amounts, all defaults of the Debtors existing as of the Confirmation Date with respect to such executory contract or unexpired lease shall be deemed cured.

(b)    Rejection.  Notwithstanding subpart (a) of this Section 8.1, the Plan Proponents may reject those executory contracts and unexpired leases listed on an exhibit to be filed with the District Court as part of the Plan Supplement (as such list may be amended or supplemented up to and including the Confirmation Date).

(c)    ABI Canada License Agreement; Intercompany Agreements.  Pursuant to and in consideration of the Intercompany Settlement and Section 5.17 and other terms of the Plan, on the Effective Date (A) the ABI Canada License Agreement shall be amended as provided in the Intercompany Settlement and deemed to have been assumed by Congoleum and become a contractual obligation of Reorganized Congoleum, and the Plan shall constitute a motion to assume such license agreement and (B) all Intercompany Agreements shall be rejected and all ABI Claims, including without limitation any ABI Rejection Damages Claims (other than claims for payment of Unpaid Intercompany Amounts that may be asserted to the extent consistent with Section 5.17(b)(4)(B) of the Plan), shall be deemed Disallowed and expunged.

8.2    **Damages Upon Rejection**.  Except to the extent arising out of or based on the rejection of any executory contract related to or involving asbestos which shall be dealt with under the TDP, the District Court shall determine the dollar amount, if any, of the Claim of any Entity seeking damages by reason of the rejection of any executory contract or unexpired lease; *provided, however*, that such Entity must file a Proof of Claim with the District Court on or before thirty (30) calendar days following the later of the Confirmation Date or the date of rejection of the executory contract or unexpired lease.  To the extent that any such Claim is Allowed by the District Court by Final Order, such Claim shall become, and shall be treated for all purposes under the Plan as, a Class 9 General Unsecured Claim, and the holder thereof shall receive distributions as a holder of an Allowed Claim in such Class pursuant to the Plan unless such Claim is held by ABI, in which case such Claim shall be Disallowed and expunged.

8.3    **Insurance Agreements**.  Except to the extent expressly set forth in any Asbestos Insurance Settlement Agreement, nothing contained in the Plan or any negotiations leading up to the Plan, including this Section 8.3, shall constitute a waiver of:  (i)  any claim, right, or cause of action that any of the Debtors or the Plan Trust, as applicable, may have against any insurer, including under any insurance agreement; or (ii) any Asbestos Insurer Coverage Defenses that any Asbestos Insurance Company may have against the Debtors or the Plan Trust. The discharge and release provisions contained in the Plan shall neither diminish nor impair the duties or obligations of any Debtor or any other Entity under any Asbestos Insurance Policy or agreement relating thereto (including any Asbestos Insurance Settlement Agreement), nor shall the discharge and release provisions contained in the Plan diminish nor impair the duties, obligations or the Asbestos Insurer Coverage Defenses of any Asbestos Insurance Company under any Asbestos Insurance Policy or agreement relating thereto.  The Reorganized Debtors shall not voluntarily assist any Person in the establishment of any rights, action, cause of action or claim against the Century Entities or any other Settling Asbestos Insurance Company in anyway relating to any Asbestos Claim or other claim released under an Asbestos Insurance Settlement Agreement.

8.4    **Compensation and Benefits Programs**.  (a)  Except for the Congoleum Interests which are treated elsewhere in the Plan, unless otherwise agreed to by the affected parties or modified by order of the Bankruptcy Court or District Court, as applicable, all of the Debtors' obligations under employment and severance policies, and all compensation and benefit plan, policies, and programs shall be treated as though they are executory contracts that are deemed assumed under the Plan.

(b)    As of the Effective Date, the Pension Plans, as well as the collective bargaining agreement by and between the Debtors and Teamsters Local 312, shall be deemed to have been assumed by Reorganized Congoleum.  Reorganized Congoleum shall continue the Pension Plans, satisfy the minimum funding standards pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082, and administer the Pension Plans in accordance with their terms and the provisions of ERISA.  Furthermore, nothing in the Plan shall be construed as discharging, releasing or relieving the Debtors or Reorganized Congoleum, or any party, in any capacity, from any liability imposed under any law or regulatory provision with respect to the Pension Plans, the Pension Benefit Guaranty Corporation ("PBGC") or the Teamsters Pension Trust Fund of Philadelphia Vicinity (the "Teamsters Pension Fund").  The PBGC, the Pension Plans and the Teamsters Pension Fund shall not be enjoined or precluded from enforcing such liability as a result of any provision of the Plan or the Confirmation Order.  Notwithstanding anything in this Section 8.4, the Plan Trust shall not assume any of the liabilities, obligations, or responsibilities of the Debtors or Reorganized Congoleum with respect to the Pension Plans, the PBGC or the Teamster Pension Fund.

8.5    **Retiree Benefits**.  Notwithstanding any other provisions of the Plan (other than the last sentence of this Section 8.5), any payments that are due to any individual for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the Debtors prior to the Petition Date shall be continued for the duration of the period, if any, that the Debtors have obligated themselves to provide such benefits.  Notwithstanding the foregoing, no employee or retired employee (nor their spouses or dependents and beneficiaries) of the Debtors or the Reorganized Debtors shall be entitled to assert any Asbestos Claim against the Debtors or the Reorganized Debtors.

8.6    **Indemnification of Directors, Officers and Employees**.  The obligations of the Debtors to indemnify their current and former directors, officers or employees to the extent provided in the Debtors' constituent documents or required pursuant to applicable general corporation law shall be deemed and treated as obligations that are assumed by Reorganized Congoleum pursuant to the Plan as of the Effective Date; *provided, however,* that (i) with respect to acts or omissions occurring prior to, on or after the Petition Date, the indemnification obligation of Reorganized Congoleum is limited exclusively to the extent of proceeds available under any applicable directors and officers insurance policy for the act(s) and/or omission(s) at issue and (ii) no current or former director, officer or employee shall be indemnified with respect to the gross negligence, fraud or willful misconduct of such party.

# ARTICLE IX

## ACCEPTANCE OR REJECTION OF THE PLAN

9.1    **Classes Entitled to Vote**.  The holders of Claims or Interests in each Impaired Class of Claims or Interests, i.e., Classes 4, 6, 7, 8, 9 and 10 whose Claims or Interests are Allowed or temporarily allowed for voting purposes, are entitled to vote to accept or reject the Plan pursuant to the Voting Procedures Order; *provided however* that the holders of Congoleum Interests in Class 10 are deemed to have rejected the Plan in accordance with the provisions of Section 1126(g) of the Bankruptcy Code and, accordingly, their separate vote will not be solicited.

9.2    **Acceptance by Impaired Classes of Claims**.  Pursuant to section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if (a) the holders of at least two-thirds in dollar amount of the claims actually voting in such Class (other than Claims held by any holder designated pursuant to section 1126(e) of the Bankruptcy Code) have voted to accept the Plan and (b) more than one-half in number of such claims actually voting in such Class (other than Claims held by any holder designated pursuant to section 1126(e) of the Bankruptcy Code) have voted to accept the Plan.

9.3    **Acceptance by Impaired Class of Interests**.  Pursuant to section 1126(d) of the Bankruptcy Code, an Impaired Class of Interests shall have accepted the Plan if the holders of at least two-thirds in amount of the Allowed Interests actually voting in such Class (other than Interests held by any holder designated pursuant to section 1126(e) of the Bankruptcy Code) have voted to accept the Plan.  The holders of Congoleum Interests in Class 10 are deemed to have rejected the Plan in accordance with the provisions of section 1126(g) of the Bankruptcy Code.

9.4    **Acceptance Pursuant to Section 524(g) of the Bankruptcy Code**.  The Plan shall have been voted upon favorably as required by section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code.

9.5    **Presumed Acceptance of Plan**.  Classes 1, 2, 3, 5, and 11 are Unimpaired.  Under section 1126(f) of the Bankruptcy Code, the holders of Claims and Interests in such Classes are conclusively presumed to have voted to accept the Plan.

9.6    **Reservation of Rights**.  In the event that any Impaired Class fails to accept the Plan by the requisite numbers and amounts required by the Bankruptcy Code, the Plan Proponents reserve the right to seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

# ARTICLE X

## CONDITIONS TO CONFIRMATION AND EFFECTIVENESS

10.1  **Conditions to Confirmation**.  Confirmation of the Plan shall not occur unless each of the following conditions has been satisfied or waived in accordance with Section 10.3 below.  These conditions to Confirmation, which are designed, among other things, to ensure that the Injunctions, releases, and discharges set forth in Article XI shall be effective, binding and enforceable, are as follows:

(a)  The District Court shall have made specific findings and determinations, among others, in substantially the following form:

(i)  The Discharge Injunction and the Asbestos Channeling Injunction are to be implemented in connection with the Plan and the Plan Trust;

(ii)  As of the Petition Date, Congoleum has been named as a defendant in personal injury, wrongful death or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

(iii)  The Plan Trust, upon the Effective Date, shall assume the liabilities of the Debtors with respect to Plan Trust Asbestos Claims and Demands;

(iv)  The Plan Trust is to be funded in part by securities of Reorganized Congoleum in the form of the Plan Trust Common Stock, which constitutes an obligation of Reorganized Congoleum to make future payments to the Plan Trust;

(v)  On the Effective Date, the Plan Trust will own a majority of the voting shares of Reorganized Congoleum;

(vi)  The Plan Trust is to use its assets and income to pay Plan Trust Asbestos Claims and Plan Trust Expenses and otherwise as specifically set forth in the Plan Trust Agreement;

(vii)  Congoleum is likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Plan Trust Asbestos Claims, which are addressed by the Asbestos Channeling Injunction;

(viii)  The actual amounts, numbers and timing of future Demands cannot be determined;

(ix)  Pursuit of Demands outside the procedures prescribed by the Plan and the TDP is likely to threaten the Plan's purpose to deal equitably with Plan Trust Asbestos Claims and future Demands;

(x)  The Plan establishes a separate Class 7 for Asbestos Personal Injury Claims that are to be addressed by the Plan Trust and at least seventy-five percent (75%) of the Asbestos Claimants voting in Class 7 have accepted the Plan;

(xi)  The Plan establishes a separate class of Asbestos Property Damage Claims that are to be addressed by the Plan Trust and at least seventy-five percent (75%) of the claimants voting in such class have accepted the Plan;

(xii)  Pursuant to court orders or otherwise, the Plan Trust shall operate through mechanisms such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims or other comparable mechanisms, that provide reasonable assurance that the Plan Trust shall value, and be in a financial position to pay, Asbestos Personal Injury Claims and Demands therefor in substantially the same manner;

(xiii)     The Futures Representative was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Discharge Injunction and the Asbestos Channeling Injunction for the purpose of, among other things, protecting the rights of persons that might subsequently assert Demands of the kind that are addressed in the Discharge Injunction and the Asbestos Channeling Injunction and transferred to the Plan Trust;

(xiv)     In light of the benefits provided, or to be provided, to the Plan Trust on behalf of each Protected Party, the Asbestos Channeling Injunction is fair and equitable with respect to the persons that might subsequently assert Demands against any Protected Party;

(xv)     The Plan otherwise complies with section 524(g) of the Bankruptcy Code;

(xvi)     Congoleum's contributions to the Plan Trust provided for herein, together with the Asbestos Insurance Assignment, the Plan Trust Common Stock, constitute substantial assets of the Plan Trust and the reorganization;

(xvii)     The duties and obligations of the insurers that issued policies and their successors and assigns, or, with respect to any insolvent insurers, their liquidators and/or the state insurance guaranty funds that bear responsibility with respect to such rights under such policies which constitute the Asbestos Insurance Rights and Asbestos Property Damage Insurance Rights are not eliminated or diminished by the transfer pursuant to the Plan of the Debtors' rights in the Asbestos Insurance Rights and Asbestos Property Damage Insurance Rights pursuant to the Insurance Assignment Agreement;

(xviii)     The Settling Asbestos Insurance Companies are entitled to the benefits of the Asbestos Channeling Injunction with respect to Plan Trust Asbestos Claims;

(xix)     After Confirmation, each Asbestos Insurance Settlement Agreement of a Settling Asbestos Insurance Company and each Final Order of the Bankruptcy Court or District Court, as applicable, approving such Settlement Agreements shall be binding upon and inure to the benefit of the Plan Trust and the Plan Trustee, and the Plan Trust shall become fully bound by, and entitled to all of the rights afforded to the Plan Trust and/or the Debtors under, all of the terms and conditions of each such Asbestos Insurance Settlement Agreement without need for further act or documentation of any kind;

(xx)     After Confirmation, none of the Debtors, Reorganized Congoleum, the Futures Representative, the Plan Trustee, and the Asbestos Claimants' Committee shall seek to terminate, reduce or limit the scope of the Asbestos Channeling Injunction or any other injunction contained in the Plan that inures to the benefit of any Settling Asbestos Insurance Company;

(xxi)     As of the Effective Date, the Insurance Transfer Agreement shall be a valid and binding obligation of each of the parties thereto, shall be in full force and effect and shall be enforceable in accordance with its terms, in each case notwithstanding any anti-assignment provision in or incorporated into any Asbestos Insurance Policy and applicable state law; and

(xxii)     The Plan Trust is a "qualified settlement fund" pursuant to Section 468(B) of the IRC and the regulations issued pursuant thereto.

(b)     <u>Confirmation Order</u>.     The District Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order and any other order entered in conjunction therewith, each of which shall be in form and substance acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative and, insofar as such findings and determinations affect the Financing Order or the rights of Wachovia thereunder, Wachovia.

10.2     **Conditions to Effectiveness**.     Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date of the Plan shall not occur unless and until each of the following conditions has been satisfied or waived in accordance with Section 10.3 below:

Exhibit A--Plan.DOC

(a)     Confirmation Order.  The Confirmation Order shall have been entered by the District Court and the Confirmation Order and any order of the District Court shall be in form and substance acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative and the Confirmation Order (and affirming order of the District Court) shall have become a Final Order; *provided, however*, that the Effective Date may occur at a point in time when the Confirmation Order is not a Final Order at the option of the Plan Proponents unless the effectiveness of the Confirmation Order has been stayed, reversed or vacated.  The Effective Date may occur, again at the option of the Plan Proponents, on the first Business Day immediately following the expiration or other termination of any stay of effectiveness of the Confirmation Order.

(b)     Injunctions.  The Discharge Injunction, the Asbestos Channeling Injunction and the Anti-Suit Injunction shall be in full force and effect.

(c)     Exit Facility.  The Exit Facility to be entered into by Reorganized Congoleum, and all documents to be executed in connection with the Exit Facility, shall be in form and substance reasonably satisfactory to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative and shall have been executed and delivered and all conditions precedent to effectiveness thereof shall have been satisfied or waived by the parties thereto.

(d)     New Senior Notes and New Indenture.  The New Indenture shall have been executed and authorized and the New Senior Notes shall have been delivered in accordance with the New Indenture and shall constitute valid senior secured indebtedness of Reorganized Congoleum.

(e)     New Common Stock.  The New Common Stock shall have been issued in accordance with the Plan.

(f)     Plan Documents.  The Plan Documents necessary or appropriate to implement the Plan (which shall include without limitation, the Plan, the Plan Trust Agreement, the TDP, the Exit Facility, the New Senior Notes, the New Indenture, the Registration Rights Agreement, the Amended and Restated Certificate, the Amended and Restated Bylaws, the New ABI Agreement, the Stockholders Agreement, and the Insurance Transfer Agreement) shall have been executed, delivered and, where applicable, filed with the appropriate governmental authorities; all conditions precedent to the effectiveness of each of such Plan Documents shall have been satisfied or waived by the respective parties thereto; and the Plan Documents shall be in full force and effect.  The Plan Documents shall be acceptable to the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative.

(g)     Other Assurances.  The Debtors or the Plan Proponents shall have obtained either (i) a private letter ruling from the Internal Revenue Service establishing that the Plan Trust is a "qualified settlement fund" pursuant to Section 468(B) of the IRC and the regulations issued pursuant thereto, or (ii) other decisions, opinions or assurances regarding certain tax consequences of the Plan, satisfactory to the Debtors, the Asbestos Claimants' Committee and the Futures Representative.

(h)     The District Court shall have approved pursuant to Bankruptcy Rule 9019 the First Amendment to the Litigation Settlement Agreement.

(i)     Merger.  The District Court will have made a specific finding and determination that the merger of the Subsidiary Debtors with and into Congoleum, with Reorganized Congoleum as the sole surviving corporation, is authorized.

(j)     Judicial Fees.  All fees payable pursuant to 28 U.S.C. § 1930 if and to the extent assessed against the Bankruptcy Estates of the Debtors will have been paid in full.

(k)     [reserved]

(l)     [reserved]

Exhibit A--Plan.DOC

(m)    Other Approvals, Documents and Actions.  All authorizations, consents and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained, and all actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

10.3    **Waiver of Conditions**.  Each of the conditions set forth in Sections 10.1 and 10.2 above may be waived in whole or in part by the Plan Proponents without any notice to other parties in interest or the District Court and without a hearing.  The failure of the Plan Proponents to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

# ARTICLE XI

## INJUNCTIONS, RELEASES AND DISCHARGE

11.1    **Discharge**.  (a)  Except as specifically provided in the Plan, the Plan Documents or in the Confirmation Order, as of the Effective Date, Confirmation shall discharge the Debtors and the Reorganized Debtors pursuant to section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims of any nature whatsoever and Demands including, without limitation, any Claims, demands and liabilities that arose before Confirmation, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such Claim was filed or deemed filed under section 501 of the Bankruptcy Code, or such Claim was listed on the Schedules of the Debtors, (b) such Claim is or was Allowed under section 502 of the Bankruptcy Code, or (c) the holder of such Claim has voted on or accepted the Plan.  Except as specifically provided in the Plan or Plan Documents, the rights that are provided in the Plan as of the Effective Date shall be in exchange for and in complete satisfaction, settlement and discharge of all Claims (including without limitation Asbestos Claims) or Demands against, Liens on, and interests in the Debtors or the Reorganized Debtors or any of their assets or properties.  Notwithstanding anything herein to the contrary, nothing in this Section 11.1 shall affect the right of any Asbestos Insurance Company to assert any Asbestos Insurer Coverage Defenses.

(b)    Notwithstanding any other provision of the Plan to the contrary, Confirmation shall not discharge any pre-Petition Date or post-Petition Date, pre-Confirmation Date liability that may be due from any of the Debtors to the Internal Revenue Service as currently set forth in certain Proofs of Claim and Administrative Expense Claim, as amended, filed by the Internal Revenue Service.  Should any pre-Petition Date or post-Petition Date, pre-Confirmation Date tax liabilities be determined by the Internal Revenue Service to be due from any of the Debtors for any of the tax periods reflected by such Proofs of Claim or Administrative Expense Claim, such liabilities shall be determined administratively or in a judicial forum in the manner in which such liabilities would have been resolved had these Reorganization Cases not been commenced.  Any resulting liabilities determined pursuant to a Final Order or other final determination shall be paid as if these Reorganization Cases had not been commenced.

11.2    **Exculpation**.  As of the Effective Date, (i) the Debtors, the Futures Representative, the Asbestos Claimants' Committee, the Bondholders' Committee and each of their Representatives shall not have or incur any liability to any Entity for any act or omission taken on or after the Petition Date in connection with or arising out of the negotiation of the Plan, any Plan Document or any prior plan of reorganization relating to the Debtors or other related documents, the pursuit of Confirmation of the Plan or any prior plan of reorganization relating to the Debtors, the consummation of the Plan, or the administration of the Plan, or the property to be distributed under the Plan; and (ii) in all respects the Debtors, Futures Representative, the Asbestos Claimants' Committee and the Bondholders' Committee shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and the other Plan Documents.  For avoidance of doubt, in no event shall any such party be exculpated from liability under this Section 11.2 in the case of the gross negligence, fraud or willful misconduct of such party.  None of the foregoing parties shall be exculpated under this provision with respect to any acts occurring prior to the Petition Date.  With respect to officers and directors of the Debtors, this section shall apply only to such officers and directors who were serving in such capacity on and after the Petition Date.

11.3    **Releases by Holders of Plan Trust Asbestos Claims**.  Pursuant to this Section 11.3 and the Confirmation Order, (which may include or incorporate by reference release(s) for the benefit of any Settling Asbestos Insurance Company consistent with the terms of this Section 11.3 and the terms of the relevant Asbestos

Exhibit A--Plan.DOC

Insurance Settlement Agreement), any holder of a Plan Trust Asbestos Claim that receives a payment from the Plan Trust shall be deemed to have unconditionally released the Plan Trust and each Settling Asbestos Insurance Company from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, arising from, relating to, or involving the manufacture, sale, distribution, installation, formulation, marketing, transport, handling or any other activity involving any asbestos containing products of Congoleum and any of Congoleum entities identified in the Confirmation Order, which may incorporate the terms of one or more Asbestos Insurance Settlement Agreement, or their premises to the extent such Claim arises from, relates to or involves exposure to asbestos, including without limitation, any operation claims, contribution claims, direct action claims, and insurance coverage claims. For the avoidance of doubt, in no event shall any such party be released under this Section 11.3 in the case of the gross negligence, fraud or willful misconduct of such party.

11.4 **Discharge Injunction**. Except as specifically provided in the Plan Documents to the contrary, the satisfaction, release, and discharge set forth in Section 11.1 shall also operate as an injunction, pursuant to sections 105, 524(g) and 1141 of the Bankruptcy Code, prohibiting and enjoining the commencement or continuation of any action, the employment of process or any act to collect, recover from, or offset (a) any Claim or Demand against or Interest in the Debtors, the Reorganized Debtors, or the Plan Trust by any Entity and (b) any cause of action, whether known or unknown, against the Debtors and the Reorganized Debtors based on such Claim or Interest described in subpart (a) of this Section 11.4.

11.5 **Third Party Releases**. No third party releases are being granted pursuant to the Plan nor are the Plan Proponents seeking approval of any such third party releases, except as set forth specifically in this Plan.

11.6 **Asbestos Channeling Injunction**. The sole recourse of the holder of a Plan Trust Asbestos Claim or Demand on account of such Claim or Demand or of a Person that had or could have asserted an Asbestos Claim or Demand shall be to the Plan Trust pursuant to the provisions of the Asbestos Channeling Injunction, the Plan, the Plan Trust Agreement and the TDP, and such holder shall have no right whatsoever at any time to assert its Plan Trust Asbestos Claim or Demand against the Debtors, the Reorganized Debtors, any other Protected Party, or any property or interest in property of the Debtors, the Reorganized Debtors, or any other Protected Party. Without limiting the foregoing, from and after the Effective Date, the Asbestos Channeling Injunction shall apply to all present and future holders of Plan Trust Asbestos Claims and Demands, and all such holders shall be permanently and forever stayed, restrained, and enjoined from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Plan Trust Asbestos Claims and Demands, other than from the Plan Trust in accordance with the Asbestos Channeling Injunction and pursuant to the Plan, the Plan Trust Agreement and the TDP:

      (a)     commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including a judicial, arbitration, administrative, or other proceeding) in any forum against or affecting any Protected Party or any property or interests in property of any Protected Party;

      (b)     enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Protected Party or any property or interests in property of any Protected Party;

      (c)     creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance against any Protected Party, or any property or interests in property of any Protected Party;

      (d)     setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and

      (e)     proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the Plan Trust, except in conformity and compliance with the Plan, the Plan Trust Agreement and the TDP.

Any right, claim or cause of action that an Asbestos Insurance Company may have been entitled to assert against a Settling Asbestos Insurance Company based on or relating to Asbestos Claims shall be channeled to and become a right, claim or cause of action as an offset claim against the Plan Trust and not against the Settling Asbestos Insurance Company in question and all persons, including any Asbestos Insurance Company, shall be enjoined from asserting any such right, claim or cause of action against a Settling Asbestos Insurance Company.

Except as otherwise expressly provided in the Plan, nothing contained in the Plan shall constitute or be deemed a waiver of any claim, right or cause of action that the Debtors, the Reorganized Debtors, or the Plan Trust may have against any Entity in connection with or arising out of or related to an Asbestos Claim. Notwithstanding any other provision in the Plan to the contrary, nothing in the Plan shall be understood to channel, prevent, impair or limit in any way enforcement against the Debtors, Reorganized Congoleum, or any other Protected Party of any rights provided in connection with any Workers' Compensation Claim.

11.7 **Reservation of Rights**. Notwithstanding any other provision of the Plan to the contrary, the satisfaction, release and discharge, and the Injunctions set forth in Article XI, shall not serve to satisfy, discharge, release, or enjoin (a) claims by any Entity (other than the Reorganized Debtors and their Affiliates) against the Plan Trust for payment of Plan Trust Asbestos Claims in accordance with the Plan, the Plan Trust Agreement and the TDP, as applicable, (b) claims by any Entity against the Plan Trust for the payment of Plan Trust Expenses, (c) claims by the Reorganized Debtors, the Plan Trust, or any other Entity to enforce the provisions of any Asbestos Insurance Settlement Agreement or any provision of the Plan or another Plan Document, or (d) the rights of any Asbestos Insurance Company to assert any claim, debt, obligation, cause of action or liability for payment against any other Asbestos Insurance Company that is not a Settling Asbestos Insurance Company.

11.8 **Rights Against Non-Debtors under Securities Laws**. Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan, and/or Confirmation Order, no provision shall release any non-Debtor, including any current and/or former officer and/or director of the Debtors from liability to the United States Securities and Exchange Commission, in connection with any legal action or claim brought by such governmental unit against such Person(s).

11.9 **Rights Against Debtors Under Environmental Laws**. Environmental rights and Claims of Governmental Units and rights and claims of injury, damages, cost recovery contribution, reimbursement and indemnity by other Entities (other than ABI) under applicable Environmental Laws shall survive the Reorganization Cases, shall not be discharged, impaired or adversely affected by the Plan and the Reorganization Cases and shall be determined in the manner and by the administrative or judicial tribunals in which such rights or Claims would have been resolved or adjudicated if the Reorganization Cases had not been commenced. Governmental Units and other Entities, other than ABI whose claims, if any, shall be discharged, need not file any Proofs of Claim under Environmental Laws in the Reorganization Cases in order to preserve Claims under Environmental Laws. Nothing in the Confirmation Order or Plan shall be construed as releasing or relieving any Entity of any liability under any Environmental Law.

11.10 **Disallowed Claims and Disallowed Interests**. On and after the Effective Date, the Debtors shall be fully and finally discharged from any liability or obligation on a Disallowed Claim or a Disallowed Interest and any order creating a Disallowed Claim or a Disallowed Interest that is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 will nevertheless become and be deemed to be a Final Order on the Effective Date. The Confirmation Order, except as otherwise provided herein, or unless the District Court orders otherwise, shall constitute an order: (a) disallowing all Claims (other than Plan Trust Asbestos Claims that have not been previously expunged by Final Order of the Bankruptcy Court or District Court, as applicable, or withdrawn) and Interests to the extent such Claims and Interests are not allowable under any provision of section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims, and Claims for unmatured interest, and (b) disallowing or subordinating, as the case may be, any Claims, or portions of Claims, for penalties or Non-Compensatory Damages.

11.11 **Anti-Suit Injunction**. With respect to any Settling Asbestos Insurance Company, this Section 11.11 and the Confirmation Order, which may include anti-suit injunction(s) for the benefit of any Settling Asbestos Insurance Company consistent with the terms of this Section 11.11 and the terms of the relevant Asbestos Insurance

Settlement Agreement, shall operate as an injunction, pursuant to section 105(a) of the Bankruptcy Code, permanently and forever prohibiting and enjoining the commencement, conduct or continuation of any action or cause of action, whether known or unknown, the employment of process or any act to collect, recover from or offset any non-asbestos claim, Claim or demand against any Settling Asbestos Insurance Company arising out of, relating to, or in connection with an Asbestos Insurance Policy or any other insurance policy or rights under such other insurance policy issued to or insuring the relationship of the relevant Settling Asbestos Insurance Companies with, the relevant Congoleum entities that are insureds under such policies, but such injunction pursuant to section 105(a) of the Bankruptcy Code shall not affect or modify the rights of Persons insured under policies of insurance except to the extent released in an Asbestos Insurance Settlement Agreement and/or enjoined pursuant to any Injunction contained in any order of the Bankruptcy Court or the District Court approving any Asbestos Insurance Settlement Agreement. The injunctions and other relief set forth in this Section 11.11 and elsewhere in this Plan in favor of any Settling Asbestos Insurance Company shall be deemed supplemental and in addition to, and not in lieu of, any injunctive relief, releases and other protections afforded to each Settling Asbestos Insurance Company under its respective Asbestos Insurance Settlement Agreement and any Final Order entered by the District Court approving such Asbestos Insurance Settlement Agreement.

11.12  **Insurance Neutrality**

(a)  Except as otherwise provided in Section 11.12(b):

(i)  Nothing in the Plan, the Plan Documents or the Confirmation Order shall preclude any Entity from asserting in any proceeding any and all claims, defenses, rights or causes of action that it has or may have under or in connection with any Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement with respect thereto;

(ii)  Nothing in the Plan, the Plan Documents or the Confirmation Order shall be deemed to waive any claims, defenses, rights or causes of action that any Entity has or may have under the provisions, terms, conditions, defenses and/or exclusions contained in any Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement with respect thereto, including but not limited to any and all such claims, defenses, rights or causes of action based upon or arising out of Asbestos Personal Injury Claims that are liquidated, resolved, discharged, channeled, or paid in connection with the Plan; and

(iii)  Notwithstanding anything to the contrary in the Confirmation Order, the Plan, or any of the Plan Documents, nothing in the Confirmation Order, the Plan, or any of the Plan Documents (including any other provision that purports to be preemptory or supervening other than Section 11.12(b)), shall in any way operate to impair, or have the effect of impairing, the insurers' legal, equitable, or contractual rights, if any, in any respect; nor shall the Plan, any of the Plan Documents, the Confirmation Order, or the estimation, liquidation or payment of any Claim for purposes of distribution by the Trust in accordance with the Plan and the Plan Documents have any binding effect on any Asbestos Insurance Company or have any res judicata or collateral estoppel effect upon any Asbestos Insurance Company for any other purpose, including without limitation with respect to the amount or the reasonableness of any such Claim, or constitute a binding determination on any issue or the creation of any liquidated claim with respect to any Asbestos Insurance Company. The rights of insurers shall be determined under the applicable Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement with respect thereto.

(b)  Notwithstanding the provisions of Section 11.12(a), Asbestos Insurance Companies shall be bound by the District Court's findings and conclusions with respect to whether, under the Bankruptcy Code, the assignment or transfer of rights under the Asbestos Insurance Assignment is valid and enforceable against each Asbestos Insurance Company notwithstanding any anti-assignment provision in or incorporated into any Asbestos Insurance Policy and applicable state law, and therefore Asbestos Insurance Companies shall be entitled to litigate that issue in connection with Confirmation, and shall retain all rights of appeal with respect thereto. Further, to the extent any Asbestos Insurance Company chooses, notwithstanding the protections provided by Section 11.12(a), to litigate any other issues in connection with Confirmation, and the District Court gives such Asbestos Insurance Company standing to litigate those issues and rules on the merits of those issues, then such Asbestos Insurance Company shall be bound by the District Court's findings and conclusions thereon, subject to any rights of appeal.

For the avoidance of doubt, nothing in Section 11.12(a) shall impair the injunctive relief and other protections afforded to each Settling Asbestos Insurance Company under the Asbestos Channeling Injunction and other provisions of this Plan, the Confirmation Order, and its respective Asbestos Insurance Settlement Agreement and any Final Order entered by the District Court or the Bankruptcy Court approving such Asbestos Insurance Settlement Agreement.

11.13 **No Liability for Solicitation or Participation**. Pursuant to section 1125(e) of the Bankruptcy Code, the Confirmation Order will provide that all of the Persons who have solicited acceptances or rejections of the Plan (including the Bondholders' Committee, the Asbestos Claimants' Committee, the Futures Representative, the Debtors and each of their respective members and Representatives, as applicable, and the Voting Agent) have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and are not liable on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale or purchase of securities.

## ARTICLE XII

## MATTERS INCIDENT TO PLAN CONFIRMATION

12.1 **Term of Certain Injunctions and Automatic Stay**

(a) All of the injunctions and/or automatic stays provided for in or in connection with the Reorganization Cases, whether pursuant to section 105, 362, 524(g), or any other provision of the Bankruptcy Code or other applicable law, in existence immediately prior to Confirmation shall remain in full force and effect until the Injunctions become effective, and thereafter if so provided by the Plan, the Confirmation Order, or by their own terms. In addition, on and after Confirmation, the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative may seek such further orders as they may deem necessary to preserve the status quo during the time between Confirmation and the Effective Date.

(b) Each of the Injunctions shall become effective on the Effective Date and shall continue in effect at all times thereafter. Notwithstanding anything to the contrary contained in the Plan, all actions in the nature of those to be enjoined by the Injunctions shall be enjoined during the period between the Confirmation Date and the Effective Date.

12.2 **No Successor Liability**. Except as otherwise expressly provided in the Plan, the Debtors, the Reorganized Debtors, their Affiliates, the Asbestos Claimants' Committee, the Bondholders' Committee, the Plan Trust and the Futures Representative do not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations of the Debtors relating to or arising out of the operations of or assets of the Debtors, whether arising prior to, on, or after the Confirmation Date. Neither the Debtors, the Reorganized Debtors, their Affiliates, nor the Plan Trust is, or shall be, a successor to the Debtors by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that the Reorganized Debtors and the Plan Trust shall assume the obligations specified in the Plan Documents and the Confirmation Order.

12.3 **Revesting**. Except as otherwise expressly provided in the Plan, on the Effective Date, Reorganized Congoleum shall be vested with all of the assets and property of the Estates, free and clear of all Claims, Liens, charges and other interests of holders of Claims or Interests, and may operate its business free of any restrictions imposed by the Bankruptcy Code or by the District Court.

12.4 **Vesting and Enforcement of Causes of Action**. Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, except as otherwise provided in the Plan, Reorganized Congoleum shall be vested with and have the right to enforce against any Entity any and all of the Debtors' Causes of Action other than Causes of Action related to Plan Trust Asbestos Claims and Plan Trust Assets (including the right to pursue such claims, if any, in the name of any Debtor if necessary), with the proceeds of the recovery of any such actions to be property of Reorganized Congoleum; *provided, however*, that nothing herein shall alter, amend, or modify the injunctions (including the Injunctions), releases, or discharges provided herein. Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, except as otherwise provided in the Plan, the Plan Trust shall be vested with and have the right to

42

enforce against any Entity any and all of the Debtors' Causes of Action relating to any Plan Trust Asbestos Claims or any Plan Trust Assets, including the right to pursue such claims, if any, in the name of any Debtor, if necessary; and for this purpose the Plan Trust shall be designated as a representative of the Estates, with the proceeds of the recovery of any such actions to be property of the Plan Trust; *provided, however,* that nothing herein shall alter, amend, or modify the injunctions (including the Injunctions), releases, or discharges provided herein.

After the Effective Date, Reorganized Congoleum, in its sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Causes of Action (or decline to do any of the foregoing), without further approval of the District Court. Reorganized Congoleum, or any successors, in the exercise of its sole discretion, may pursue such Causes of Action so long as it is in the best interests of Reorganized Congoleum or any successors holding such rights of action. The failure of the Plan Proponents to specifically list any claim, right of action, suit, proceeding or other Causes of Action in the Plan or the Plan Supplement does not, and will not be deemed to, constitute a waiver or release by the Debtors or Reorganized Congoleum of such claim, right of action, suit, proceeding or other Causes of Action, and Reorganized Congoleum will retain the right to pursue such claims, rights of action, suits, proceedings and other Causes of Action in its sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit, proceeding or other Causes of Action upon or after the Confirmation or consummation of the Plan.

12.5 **GHR/Kenesis Actions**.  On the Effective Date, the GHR/Kenesis Actions shall be preserved for enforcement solely by, and for the sole benefit of, Reorganized Congoleum.

## ARTICLE XIII

## MISCELLANEOUS

13.1 **Jurisdiction**.  Until the Reorganization Cases are closed, the District Court shall retain the fullest and most extensive jurisdiction permissible, including that necessary to ensure that the purposes and intent of the Plan are carried out.  Except as otherwise provided in the Plan, the District Court shall retain jurisdiction to hear and determine all Claims against and Interests in the Debtors, and to adjudicate and enforce all other causes of action which may exist on behalf of the Debtors.  Nothing contained herein shall prevent the Debtors, Reorganized Congoleum, or the Plan Trust from taking such action as may be necessary in the enforcement of any cause of action which the Debtors have or may have and which may not have been enforced or prosecuted by the Debtors, which cause of action shall survive Confirmation of the Plan and shall not be affected thereby except as specifically provided herein.  Nothing contained herein concerning the retention of jurisdiction by the District Court shall be deemed to be a retention of exclusive jurisdiction with respect to any Asbestos Insurance Action; rather any court other than the District Court which has jurisdiction over an Asbestos Insurance Action shall have the continuing right to exercise such jurisdiction.

13.2 **General Retention**.   Following the Confirmation of the Plan, the administration of the Reorganization Cases will continue at least until the completion of the transfers contemplated to be accomplished on the Effective Date.  Moreover, the Plan Trust shall be subject to the continuing jurisdiction of the District Court to the extent required by the requirements of section 468B of the IRC and the regulations issued pursuant thereto.  The District Court shall also retain jurisdiction for the purpose of classification of any Claim and the re-examination of Claims that have been Allowed for purposes of voting, and the determination of such objections as may be filed with the District Court with respect to any Claim.  The failure by the Debtors to object to, or examine, any Claim for the purposes of voting, shall not be deemed a waiver of the right of the Debtors, Reorganized Congoleum, or the Plan Trust, as the case may be, to object to or re-examine such Claim in whole or in part.

13.3 Specific Purposes.  In addition to the foregoing, the District Court shall retain jurisdiction for the following specific purposes after Confirmation:

(a) to modify the Plan after Confirmation, pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules;

(b)      to correct any defect, cure any omission, reconcile any inconsistency, or make any other necessary changes or modifications in or to the Plan, the Plan Documents or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance under the Plan Documents in the event that the Effective Date does not occur as provided herein so that the intended effect of the Plan may be substantially realized thereby;

(c)      to assure the performance by the Disbursing Agent, the Indenture Trustee and the Plan Trustee of their respective obligations to make distributions under the Plan;

(d)      to enforce and interpret the terms and conditions of the Plan Documents;

(e)      to enter such orders or judgments, including, but not limited to, injunctions as are necessary to (i) enforce the title, rights, and powers of the Debtors, the Reorganized Debtors, the Plan Trust, the Futures Representative and the Trust Advisory Committee or (ii) enable holders of Claims to pursue their rights against any Entity that may be liable therefor pursuant to applicable law or otherwise, including, but not limited to, Bankruptcy Court or District Court orders;

(f)      to hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits, tax proceedings, and similar or related matters with respect to the Debtors, the Reorganized Debtors, or the Plan Trust relating to tax periods or portions thereof ending on or before the Effective Date, arising on account of transactions contemplated by the Plan Documents, or relating to the period of administration of the Reorganization Cases;

(g)      to hear and determine all applications for compensation of professionals and reimbursement of expenses under sections 330, 331, or 503(b) of the Bankruptcy Code;

(h)      to hear and determine any causes of action arising during the period from the Petition Date through the Effective Date;

(i)      to hear and determine any claim, causes of action, dispute or other matter in any way related to the Plan Documents or the transactions contemplated thereby against the Debtors, the Reorganized Debtors, the Bondholders' Committee, the Asbestos Claimants' Committee, the Trust Advisory Committee, the Plan Trust, the Plan Trustee, or the Futures Representative and each of their respective Representatives;

(j)      to hear and determine any and all motions pending as of Confirmation for the rejection, assumption, or assignment of executory contracts or unexpired leases and the allowance of any Claim resulting therefrom;

(k)      to determine the allowance and/or disallowance of any Claims against the Debtors or their Estates, including, without limitation, any objections to any such Claims and the compromise and settlement of any Claim against the Debtors or their Estates;

(l)      to hear and determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)      to consider and act on the compromise and settlement of any Claim against or Interest in the Debtors or their Estates;

(n)      to hear and determine all questions and disputes regarding title to the assets of the Debtors, their Estates, Reorganized Congoleum or the Plan Trust;

(o)      to hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court or District Court, as applicable, in these Reorganization Cases;

(p)    to retain continuing jurisdiction with regard to the Plan Trust sufficient to satisfy the requirements of the Treasury Regulations promulgated under section 468B of the IRC (including Treas. Reg. Section 1.468B-1(c)(1));

(q)    to hear and determine any and all applications brought by the Plan Trustee to amend, modify, alter, waive, or repeal any provision of the Plan Trust Agreement or the TDP;

(r)    to enter such orders as are necessary to implement and enforce the Injunctions and the other injunctions described herein, including, without limitation, orders extending the protections afforded by section 524(g)(4) of the Bankruptcy Code to the Protected Parties, including without limitation, the Settling Asbestos Insurance Companies; and

(s)    to hear and determine any motions or contested matters involving or related to any GHR/Kenesis Action.

Notwithstanding anything to the contrary in this Section 13.3, (i) the allowance of Plan Trust Asbestos Claims (other than Asbestos Property Damage Claims) and the forum in which such allowance will be determined, shall be governed by and made in accordance with the Plan Trust Agreement and the TDP and (ii) the District Court will have concurrent rather than exclusive jurisdiction with respect to disputes relating to rights under insurance policies included in the Plan Trust Assets.

13.4    **Payment of Statutory Fees**.  All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the District Court at the Confirmation Hearing, shall be paid by the Debtors on or before the Effective Date and thereafter by Reorganized Congoleum as due until the Reorganization Cases are closed, converted or dismissed.  The Reorganized Debtors shall pay any quarterly fees payable pursuant to 28 U.S.C. § 1930(a)(6) to the United States Trustee after the Effective Date until such time as the case is converted, dismissed or closed pursuant to a final decree. The Reorganized Debtor shall file post-Effective Date reports, the form of which will be supplied by the United States Trustee.  Nothing contained in this Plan shall relieve the Debtors or Reorganized Debtors from making payments to the United States Trustee when due as required by 28 U.S.C. § 1930(a)(6).

13.5    **Securities Law Matters**.  It is an integral and essential element of the Plan that the issuance of the New Common Stock pursuant to the Plan shall be exempt from registration under the Securities Act, pursuant to section 1145 of the Bankruptcy Code and from registration under state securities laws.  Nothing in the Plan is intended to preclude the Securities and Exchange Commission from exercising its police and regulatory powers relating to the Debtors or any other entity.

13.6    **Plan Supplement**.  The Plan Supplement will contain, among other things, without limitation, substantially final forms of a schedule identifying rejected contracts, the Exit Facility Commitment Letter or Term Sheet, the Registration Rights Agreement, the New ABI Agreement, the New Indenture, the Stockholders Agreement, the Amended and Restated Bylaws, the Amended and Restated Certificate and schedules identifying the initial officers and the initial board of directors of Reorganized Congoleum, and shall be filed with the District Court no later than five (5) Business Days prior to the last date for filing objections to Confirmation of the Plan. Notwithstanding the foregoing, the Plan Proponents may amend the Plan Supplement and any attachments thereto, through and including the Confirmation Date.

13.7    **Allocation of Plan Distributions Between Principal and Interest**.  To the extent that any Allowed Claim entitled to a Distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such Distribution shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest. Notwithstanding the foregoing, no Distribution shall be made on account of Post-Petition Interest.

13.8    **The Asbestos Claimants' Committee, the Futures Representative and the Bondholders' Committee**.  As of the Effective Date, the Futures Representative shall (a) continue in existence and the rights,

duties and responsibilities of the Futures Representative appointed by the District Court to serve after the Effective Date shall be as set forth in the Plan Trust Documents and (b) continue in existence for purposes of the Reorganization Cases with respect to any appeal or request for reconsideration or stay pending appeal of the Confirmation Order and any unresolved and then-pending adversary proceedings and have the right to prosecute and/or object to applications for Professional Fee Claims.  The Representatives retained by the Futures Representative during the Reorganization Cases shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to, or arising from, the Reorganization Cases on the same date the Futures Representative ceases existence for purposes of the Reorganization Cases.  On the Effective Date, the Asbestos Claimants' Committee and the Bondholders' Committee shall be dissolved except for the purposes of: (i) any appeal or request for reconsideration or stay pending appeal of the Confirmation Order; (ii) any unresolved and then-pending adversary proceedings,  and (iii) prosecuting and/or objecting to Professional Fee claims.  Representatives of the Asbestos Claimants' Committee and the Bondholders Committee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to, or arising from, the Reorganization Cases on the same date the Asbestos Claimants' Committee or the Bondholders' Committee, as applicable, cease to exist for purposes of the Reorganization Cases.  Until the Effective Date, the Debtors shall pay the reasonable fees and expenses of the Asbestos Claimants' Committee, the Bondholders' Committee and the Futures Representative in accordance with any applicable fee order in the Reorganization Cases.  On the Effective Date, the  Trust Advisory Committee will assume those powers, duties, and responsibilities as provided in the Plan Trust Agreement.

13.9  **Revocation of Plan**.  The Plan Proponents reserve the right to revoke and withdraw the Plan before the entry of the Confirmation Order.  If the Plan Proponents revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then, with respect to all parties in interest, the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or such other Entity in any further proceedings involving the Debtors.

13.10  **Modification of Plan**.  The Plan Proponents may propose amendments to or modifications of any of the Plan Documents under § 1127 of the Bankruptcy Code and as herein provided, to the extent applicable law permits.  Subject to the limitations contained herein, the Plan Proponents may modify the Plan in accordance with this paragraph, before or after Confirmation, without notice or hearing, or after such notice and hearing as the District Court deems appropriate, if the District Court finds that the modification does not materially and adversely affect the rights of any parties in interest which have not had notice and an opportunity to be heard with regard thereto.   After Confirmation, the Plan Proponents may remedy any defects or omissions or reconcile any inconsistencies in the Plan or the Confirmation Order or any other order entered for the purpose of implementing the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan; provided, however, that none of the Debtors, the Reorganized Debtors, ABI, the Futures Representative, the Plan Trustee, the Asbestos Claimants' Committee, and the Bondholders' Committee shall seek to terminate, reduce or limit the scope of the Asbestos Channeling Injunction or any other injunction contained in the Plan that inures to the benefit of any Settling Asbestos Insurance Company.   Anything in the Plan or in any Plan Document to the contrary notwithstanding, following Confirmation but prior to the Effective Date, the Plan Documents shall not be modified, supplemented, changed or amended in any material respect except with the written consent of the Bondholders' Committee, the Debtors, the Asbestos Claimants' Committee and the Futures Representative.  In the event of any modification on or before Confirmation, any votes to accept or reject the Plan shall be deemed to be votes to accept or reject the Plan as modified, unless the District Court finds that the modification materially and adversely affects the rights of parties in interest which have cast said votes.  The Plan Proponents reserve the right in accordance with § 1127 of the Bankruptcy Code to modify the Plan at any time before the Confirmation Date.  Subject to § 1127 of the Bankruptcy Code, if the District Court determines at or in connection with the Confirmation Hearing that any provision of the Plan is invalid or unenforceable, the Plan Proponents may, at their discretion, sever such provision from the Plan without affecting the enforceability or operative effect of any or all other provisions of the Plan; *provided, however,* the Plan Proponents may not sever any provision from the Plan that incorporates or implements the terms of the Litigation Settlement Agreement, as amended, including the Amended Term Sheet attached thereto.

13.11  Modification of Payment Terms.  Reorganized Congoleum shall have the right to modify the treatment of any Allowed Claim (other than a Plan Trust Asbestos Claim), as provided in section 1123(a)(4) of the Bankruptcy Code, at any time after the Effective Date upon the consent of the holder of such Allowed Claim.

13.12 <u>Entire Agreement</u>. The Plan Documents and the Plan Trust Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions and documents. No Entity shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein or as may hereafter be agreed to by the parties in writing.

13.13 **Headings**. Headings are utilized in the Plan are for convenience and reference only and shall not constitute a part of the Plan for any other purpose.

13.14 **Professional Fee Claims**. All final requests for payment of Professional Fee Claims must be filed and served on Reorganized Congoleum and their counsel no later than 60 days after the Effective Date, unless otherwise ordered by the District Court. Objections to any application of such Bankruptcy Professionals or other Entities for compensation or reimbursement of expenses must be filed and served on the respective applicant and its counsel no later than the first Business Day following 30 days (or such other period as may be allowed by order of the District Court) after the date on which the applicable application for compensation or reimbursement was received. Reorganized Congoleum may pay the reasonable charges that they incur on and after the Effective Date for Bankruptcy Professionals' fees, disbursements, expenses or related support services without application to the District Court. Reorganized Congoleum shall pay the reasonable fees and expenses of the Bondholders' Committee, Asbestos Claimants' Committee and Futures Representative after the Effective Date in connection with the purposes set forth in Section 13.8 of this Plan, without application to the District Court.

13.15 **Recordable Order**. Upon Confirmation of the Plan, the Confirmation Order shall be deemed to be in recordable form, and shall be accepted by any recording officer for filing and recording purposes without further or additional orders, certifications, or other supporting documents.

13.16 **Preparation of Estates' Returns and Resolution of Tax Claims**. The Debtors or Reorganized Congoleum shall file all tax returns and other filings with governmental authorities and may file determination requests under section 505(b) of the Bankruptcy Code to resolve any Disputed Claim relating to taxes with a governmental authority.

13.17 **No Admission**. Nothing contained in the Plan or in the Disclosure Statement shall be deemed as an admission by the Debtors, the Bondholders' Committee, the Asbestos Claimants' Committee or Futures Representative with respect to any matter set forth herein or therein, including, without limitation, liability on any Claim or the propriety of any Claims classification.

13.18 **Consent to Jurisdiction**. Upon default under the Plan or any Plan Documents, the Debtors, Reorganized Congoleum, the Affiliates, the Plan Trust, the Trust Advisory Committee, the Futures Representative, ABI and the Plan Trustee consent to the jurisdiction of the District Court, or any successor thereto, and agree that it shall be the preferred forum for all proceedings relating to such default.

13.19 **Setoffs**. Subject to the limitations provided in section 553 of the Bankruptcy Code, the Debtors or the Plan Trust, as applicable, may, but shall not be required to, setoff against any Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever the Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such claim that the Debtors may have against such holder; *provided* that Reorganized Congoleum may not offset any obligations under the Plan Trust Common Stock against any claim that Reorganized Congoleum may have against the Plan Trust.

13.20 **Successors and Assigns**. The rights, duties, and obligations of any Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Entity.

13.21 **Non-Debtor Waiver of Rights**. Non-Debtor parties shall have the right to voluntarily waive any rights, benefits or protections that are afforded to them under the provisions of the Plan or any order issued in furtherance of the Plan, and such waiver shall supersede such rights, benefits or protections. Any such waiver shall

only be effective if, and then only to the extent that, such party expressly and specifically waives in writing one or more of such rights, benefits or protections.

13.22 **Further Authorizations**.  The Debtors, Reorganized Congoleum, the Bondholders' Committee, Asbestos Claimants' Committee, the Futures Representative and the Plan Trust, if and to the extent necessary, may seek with notice to the others such orders, judgments, injunctions, and rulings that any of them deem necessary to further carry out the intentions and purposes of, and give full effect to the provisions of, the Plan.

13.23 **No Bar to Suits**.  Except as otherwise provided in Article XI of this Plan, neither this Plan nor Confirmation hereof shall operate to bar or estop the Debtors or Reorganized Congoleum from commencing any Cause of Action, including any Bankruptcy Cause of Action, or any other legal action against any holder of a Claim or any  individual, corporation, partnership, trust, venture, governmental unit, or any other form of legal entity, whether such Cause of Action, or any other legal action arose prior to or after the Confirmation Date and whether or not the existence of such Cause of Action, or any other legal action was disclosed in any disclosure statement filed by the Debtors in connection with this Plan or whether or not any payment was made or is made on account of any Claim.

13.24 **Conflicts**.  Unless otherwise provided in the Confirmation Order, in the event of a conflict between the terms or provisions of the Plan and any other Plan Document, the terms of the other Plan Document will control.

13.25 **Notices**.  All notices, requests, elections, or demands in connection with the Plan shall be in writing and shall be mailed by registered or certified mail, return receipt requested, to:

**If to the Debtors:**

Congoleum Corporation
3500 Quakerbridge Road
Hamilton, NJ 08619
Attn:    Howard N. Feist
         CFO


         and

Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, NY 10033-4039
Attn:    Richard L. Epling
         Robin L. Spear
         Kerry A. Brennan

**If to the Futures Representative:**

R. Scott Williams, Esquire
Haskell Slaughter Young & Rediker, L.L.C.
2001 Park Place North, Suite 1400
Birmingham, AL  35203


         and

Orrick, Herrington & Sutcliffe LLP
1152 15th Street, N.W.
Washington, DC  20005
Attn:    Roger Frankel
         Richard Wyron
         Jonathan Guy

**If to the Asbestos Claimants' Committee:**

Caplin & Drysdale, Chtd.
One Thomas Circle, N.W.
Washington, D.C. 20005
Attn:    Peter Van N. Lockwood
         Ronald E. Reinsel

**If to the Bondholders' Committee:**

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attn:    Michael S. Stamer

Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington D.C. 20036
Attn:    James R. Savin


      13.26  **Duty to Cooperate**.  Notwithstanding anything herein to the contrary, nothing in the Plan, the Plan Documents or the Confirmation Order shall relieve (by way of injunction or otherwise) any of the Debtors or Reorganized Congoleum or any other Entity which is or claims to be an insured or entitled to indemnity under an Asbestos Insurance Policy from any duty to cooperate that may be required by any such insurance policy under applicable law with respect to the defense and/or settlement of any Claim for which coverage is sought under such Asbestos Insurance Policy.  To the extent that any entity incurs costs in satisfying such duty to cooperate with respect to Asbestos Personal Injury Claims after the Effective Date, the Plan Trust shall reimburse such entity for all such reasonable out-of-pocket expenses.

      13.27  **Governing Law**.  Except to the extent that federal law (including, but not limited to, the Bankruptcy Code and the Bankruptcy Rules) is applicable or where the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof that would require application of any other law.

Dated:  March 11, 2010

                                           CONGOLEUM CORPORATION

                                           By:           *s/ Howard N. Feist III*
                                           Name:  Howard N. Feist III
                                           Title:   Chief Financial Officer and Secretary

                                           CONGOLEUM SALES, INC.

                                         By:            *s/ Howard N. Feist III*
                                           Name:  Howard N. Feist III
                                           Title:   Vice President

                                           CONGOLEUM FISCAL, INC.

                                         By:            *s/ Howard N. Feist III*
                                           Name:  Howard N. Feist III
                                           Title:   Vice President

ASBESTOS CLAIMANTS' COMMITTEE

By: _____ *s/ Ronald E. Reinsel* _____
Name:   Ronald E. Reinsel
Title:    Counsel for the Asbestos Claimants' Committee

BONDHOLDERS' COMMITTEE

By:    _s/ Paul Kunz_____

Name:  Paul Kunz

Title:   Authorized representative of
        Deutsche Asset Management, not in its individual or
        principal capacity, but solely in its capacity as Chair
        of the Official Committee of Bondholders

FUTURES REPRESENTATIVE

By: _s/ R. Scott Williams_
    R. Scott Williams

EXHIBIT B

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Civil Action No. 09-4371 (JAP) |
| CONGOLEUM CORPORATION, et al., | Bankr. Case No. 03-51524 |
| Debtors. | Jointly Administered |

**NOTICE OF (A) ENTRY OF ORDER CONFIRMING THE FOURTH AMENDED
JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY
CODE DATED AS OF MARCH 11, 2010 (AS MODIFIED); AND (B) BAR DATES
FOR CERTAIN ADMINISTRATIVE CLAIMS AND PROFESSIONAL CLAIMS**

**PLEASE TAKE NOTICE that:**

1.      ***Confirmation of the Plan.***  Congoleum Corporation and its affiliated debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors" and, as a reorganized entity after emergence, "Reorganized Congoleum"), herby give notice that, on June 7, 2010 (the "Confirmation Date"), the Honorable Joel A. Pisano, at the United States District Court for the District of New Jersey (the "District Court"), entered an order (the "Confirmation Order") confirming the Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of Congoleum Corporation, *et al.* the Official Asbestos Claimants Committee, the Official Committee of Bondholders for Congoleum Corporation, *et al.,* and the Futures Representative dated as of March 11, 2010 (as amended, the "Plan").  All capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

2.      ***Effective Date.***  The Effective Date of the Plan has not yet occurred, and certain conditions set forth in Section 10.2 of the Plan must still be satisfied or waived before the Plan may become effective.  The Debtors will file with the District Court a notice of occurrence of the Effective Date within five (5) Business Days after the occurrence of the Effective Date.  Any party who wishes to confirm the actual occurrence of the Effective Date should check the records of the District Court.

3.      ***Bar Date for Administrative Claims.***  All requests for payment of any Administrative Claim (other than a Professional Fee Claim or Substantial Contribution Claim, each as defined below, or an Administrative Claim Allowed by the Plan) against any of the Debtors shall be filed with the Court and served upon counsel to the Debtors, the Bondholders' Committee, the Asbestos Claimants' Committee and the Futures Representative at the addresses set forth in Section 13.25 of the Plan not later than thirty (30) days after the Effective Date (the "Administrative Claims Bar Date").  If an Entity does not submit a request for payment of an Administrative Expense on or before the Administrative Claims Bar Date, such Entity shall be forever barred from seeking payment of such Administrative Expense from any Reorganized Debtor, or any of its successors or assigns, or out of the property of any of them. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim which is paid or payable by the Debtors in the ordinary course of business

4.      ***Bar Date for Professional Fee Claims.***  All final requests for payment of the fees of any professional retained in the Reorganization Cases pursuant to §§ 327, 328, and 1103 of the Bankruptcy Code, or otherwise, for compensation or reimbursement of costs and expenses relating to services rendered on and after the Petition Date and prior to and including the Effective Date, shall be filed and served on Reorganized Congoleum and their counsel no later than sixty (60) days after the Effective Date, unless otherwise ordered by the District Court (the "Professional Fee Bar Date").  If a Professional or other entity does not submit a request for payment of a

Professional Fee Claim on account of services rendered to the Estate on or before the Professional Fee Bar Date, such Entity shall be forever barred from seeking payment of such Professional Fee Claim from any Reorganized Debtor, or any of its successors or assigns, or out of the property of any of them.

     5.     **Bar Date for Substantial Contribution Claims.**  Any Entity who requests compensation or expense reimbursement for making a substantial contribution in the Reorganization Cases pursuant to §§ 503(b)(3), (4) and (5) of the Bankruptcy Code ("Substantial Contribution Claim") must file an application with the clerk of the District Court on or before a date that is sixty (60) days subsequent to the Effective Date (the "Substantial Contribution Bar Date") and serve such application on counsel for the Debtors, counsel for the Futures Representative, counsel for the Asbestos Claimants' Committee, counsel for the Bondholders' Committee and on all other parties as otherwise required by the District Court and the Bankruptcy Code, or be forever barred from seeking such compensation or expense reimbursement.

     6.     **Bar Date for Claims Arising from Rejection of Executory Contracts or Unexpired Leases.**  If the rejection by a Debtor, pursuant to the Plan, of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor, or the properties of any of them, unless a Proof of Claim is filed with the District Court on or before thirty (30) calendar days following the later of the Confirmation Date or the date of rejection of the executory contract or unexpired lease (the "Rejection Damages Bar Date").  Such Proof of Claim shall be treated in accordance with Section 8.2 of the Plan.

     7.     **Distribution to Record Holders of Allowed Claims**.  All Distributions on Allowed Claims shall be made to the Record Holders of such Claims.  As of the close of business on the Record Date, the Claims register maintained by the Voting Agent shall be closed, and there shall be no further changes in the Record Holder of any Claim.  Reorganized Congoleum and the Indenture Trustee (for purposes of any Distribution to Holders of Senior Notes) shall have no obligation to recognize any transfer of any Claim occurring after the Record Date.  Reorganized Congoleum shall instead be entitled to recognize and deal for all purposes under the Plan with the Record Holders as of the Record Date.

     8.     **Copies of the Plan and Confirmation Order.**  Any party-in-interest who wishes to obtain a copy of the Plan, any Exhibits to the Plan, or the Confirmation Order may view and download such documents on Congoleum's website at www.congoleum.com/investors.html and on the website of the Debtors' voting agent, Logan & Company, Inc. (the "Voting Agent"), at www.loganandco.com.

     9.     **Effect of Confirmation and the Effective Date.**  The Plan contains certain releases and injunctions, pursuant to which certain parties are released from liability for a variety of claims.  Included among these is an injunction that effectively has released Reorganized Congoleum from all liability for Asbestos Personal Injury Claims (pursuant to the terms of, and as defined in, the Plan) and channeling its liability for such claims to a Trust to be established for the payment of such claims.  You should read the Plan carefully to determine how it may affect your rights.

Dated: _____, 2010

**OKIN, HOLLANDER & DELUCA, L.L.P.**     **PILLSBURY WINTHROP SHAW PITTMAN LLP**
Gregory S. Kinoian (GK-7386)     Richard L. Epling (*pro hac vice* admission)
Paul S. Hollander (PH-2681)     Kerry A. Brennan (*pro hac vice* admission)
One Parker Plaza     1540 Broadway
Fort Lee, New Jersey 07024     New York, New York 10036
(201) 947-7500     (212) 858-1000

     Attorneys for Congoleum Corporation, *et al.*, Debtors and Debtors-in-Possession