

CAMILLE V. OTERO
Director

Gibbons P.C.
One Gateway Center
Newark, New Jersey 07102-5310
Direct: (973) 596-4509 Fax: (973) 639-8321
cotero@gibbonslaw.com

March 6, 2019

**VIA ECF**

Honorable James B. Clark, U.S.M.J.
United States District Court
District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, New Jersey  07101

      Re:   **DVL, Inc., et al. v. Congoleum Corp. and Bath Iron Works Corp.**
            **Civil Action No. 17-4261 (KM) (JBC)**

Dear Judge Clark:

      This firm represents Congoleum Corporation ("Congoleum") in the above-referenced matter.  Please accept this letter brief in opposition to Bath Iron Works Corporation's ("BIW") Motion to Compel Congoleum to produce documents protected by other courts' protective orders, including confidential settlement materials.

## I.    PRELIMINARY STATEMENT

      It is true that Congoleum has withheld from production certain documents protected by several confidentiality and protective orders entered by other courts.  But what BIW sees as some sort of nefarious plot to "hide the ball" is actually very much the opposite.  Congoleum has properly abided by confidentiality and protective orders (as it must) and provided BIW a detailed privilege log of those materials withheld pursuant to those orders.  Congoleum collected and reviewed more than 225,000 documents—spending hundreds of thousands of dollars in attorneys' fees and ESI costs—and has to date produced more than 25,000 documents (over 200,000 pages) to the parties.  For several reasons, BIW's motion should be denied.

      First, BIW makes this application in the wrong court.  Should BIW wish to overturn confidentiality and protective orders, it must first request such relief those orders from the parties in those matters, and then from the court that entered the order.  This motion is an "end run" around those standard procedures, and is contrary to principles of comity.  Congoleum has attempted to give notice of this motion to the interested parties (which BIW did not attempt to do), and anticipates that multiple parties will lodge objections to BIW's request.  This Court may not be the proper venue to evaluate the confidentiality concerns of non-parties and their matters litigated years ago in other courts.  Rather, the courts that entered the orders should decide, in the first instance, whether the order's useful life has run out or whether it should remain in effect.

      Second, it is BIW's overbroad discovery requests and fishing expedition that brought this issue to its unnecessary head.  The dispute between BIW and Congoleum is about which

GIBBONS P.C.

Honorable James B. Clark, U.S.M.J.
March 6, 2019
Page 2

company is the successor-in-interest to environmental liabilities for a property in Kearny, New Jersey (the "DVL Property") sold off by BIW's and Congoleum's common corporate parent in the 1960s, long before the spin-off and merger transaction in 1986 that is the subject of the Congoleum-BIW portion of this litigation. BIW's requests, however, go far afield from that transaction and the history of the DVL Property. In 2003, Congoleum filed for bankruptcy protection, largely due to asbestos liabilities. In 2010, Congoleum exited bankruptcy, and part of its approved plan of reorganization included settlements with various insurers regarding coverage for those asbestos liabilities. All of Congoleum's final executed settlement agreements with its insurers were publicly filed in the bankruptcy. BIW wrongly believes that these final insurance coverage settlement agreements, and Congoleum's CFO in a declaration to the bankruptcy court, are relevant to the interpretation of the 1986 corporate transactional agreement(s). Congoleum disagrees, as the portions of the 1986 agreement(s) relevant to the successor liability issues are unambiguous, and thus Congoleum disputes the relevance of these final asbestos-related insurance coverage settlement agreements and the CFO's declaration.

The insurance coverage settlement agreements and the referenced declaration are irrelevant because the critical question in the Congoleum-BIW portion of this litigation is whether *environmental liabilities* for the Kearny Property were either (a) retained by Congoleum-Nairn, Inc. and BIW, or (b) transferred to the newly created Congoleum in 1986. This case does not concern Congoleum's *product-line liabilities* (i.e., those caused by asbestos within manufactured floor tiles), and thus BIW's insurance-related discovery and the statements made in the declaration in the bankruptcy proceedings are not reasonably calculated to lead to admissible evidence. But even if the information regarding the asbestos insurance coverage settlements was theoretically within the realm of potential relevance, BIW goes a step further and demands not only the final executed settlements (which are all public), but asks to see the evolution of these settlement agreements through negotiations with the insurance carriers. BIW cannot meet the heightened standard required to overcome the presumption in favor of protecting these confidential settlement communications, as courts have held that it would chill future settlements to allow unobstructed discovery into such negotiations. As BIW has yet to take a deposition or exhausted all other means of obtaining the information it allegedly needs to defend this case, it cannot meet the high bar to warrant the production of the settlement negotiation-related documents.

For these reasons, BIW's Motion to Compel should be denied.[1]

---

[1] Congoleum takes issue with any notion that it has in some way acted obstinately, or engaged in some sort of unfair gamesmanship. Congoleum advised BIW that it could not and would not produce the requested documents absent a court order directing it to do so. As seen in the entire email exchange included as BIW's Exhibit 2, Congoleum simply reserved its rights as to its future trial strategy and what exhibits it might use. BIW's demand that Congoleum tell BIW now—more than a year before trial—what evidence Congoleum might seek to introduce at trial someday, is obviously an unjustified request. But more to the point, the premise that Congoleum's refusal to

GIBBONS P.C.

Honorable James B. Clark, U.S.M.J.
March 6, 2019
Page 3

## II.   THE ORDERS AND CONGOLEUM'S POSITION

Congoleum advised BIW that it would protect, and not produce, documents in its possession that were subject to these four (4) orders, described below:

**(i)   June 6, 2002 Confidentiality Agreement and Order ("June 2002 Order").** This order was entered by the Honorable Mark B. Epstein, J.S.C. in the matter *Congoleum Corporation v. ACE Property & Casualty Company, et al.*, No. MID-L-8908-01 (the "Coverage Action"). There were more than 30 insurance carrier defendants in this declaratory judgment action regarding Congoleum's right to insurance coverage for certain asbestos liabilities. Congoleum has attempted to provide notice to these interested parties. (Ex. 1.) The June 2002 Order protected all confidential information from disclosure outside of that litigation (which went on for several years). BIW's overbroad discovery requests (to which Congoleum objected) included "[a]ny and all Documents relating to the Congoleum Coverage Action, including documents related to Congoleum's assertion of coverage for asbestos and environmental claims under the Century Policies." (Ex. 2, BIW's First Requests for Production, at No. 12; *see* Ex. 3, BIW's Second Requests for Production; *see also* Ex. 4, BIW's Third Requests for Production, No. 5 ("Deposition transcripts and exhibits from the Congoleum Coverage Action . . . .").) There were tens of thousands of documents exchanged in the coverage litigation (related to asbestos product liability—not environmental liability), all of which are protected by the June 2002 Order. Congoleum has produced its own documents from the coverage litigation, but obviously cannot produce any confidential documents in its possession received from the defendant insurance carriers.

**(ii)   June 2, 2004 Protective Order ("June 2004 Order").** This order entered by the Honorable Kathryn C. Ferguson in *In re: Congoleum Corporation, et al.*, No. 03-51524 (the "Bankruptcy"), protected from disclosure all confidential materials exchanged during the bankruptcy proceeding, and stated that such materials could only be used in the conduct of that matter (BIW Ex. 8, ¶ 7.) Judge Ferguson's order stated that "[t]his Protective Order shall survive the dismissal or closing of the above-titled bankruptcy cases." (*Id.*, ¶ 24.) BIW's document requests included "[a]ny and all Documents relating to the Bankruptcy Proceedings, including but not limited to, Documents related to Congoleum's Fourth Amended Joint Plan of Reorganization . . . ." (Ex. 2, at No. 13.) Congoleum's bankruptcy went on for more than 6 years, and BIW's overbroad requests include thousands

---

disclose its trial strategy somehow grants BIW a free pass to conduct unlimited discovery into Congoleum's confidential settlement negotiations with insurance carriers is an extreme and illogical leap.

of documents exchanged amongst the many parties involved in the bankruptcy. Again, Congoleum has not invoked the June 2004 Order to withhold from disclosure any of its own documents produced in the bankruptcy, but rather only to protect confidential documents Congoleum received from other parties (including insurers).

**(iii)** **May 3, 2006 Order for Mediation ("May 2006 Order").** This order was entered by Judge Ferguson in *In re: Congoleum Corporation, et al.*, No. 03-51524, in furtherance of mediation discussions between Congoleum and its insurers. Congoleum and its insurers exchanged mediation submissions before the Honorable Mark Epstein, J.S.C. (ret.), who served as mediator along with bankruptcy Chief Judge Judith H. Wizmur, and engaged in protracted settlement discussions. BIW seeks the communications between Congoleum and its insurers regarding the settlement agreements. (*See, e.g*., Ex. 2, No. 15 ("Any and all Documents relating to the Century Settlement . . . .").) Congoleum has withheld from production all settlement communications with insurers. All final executed settlement agreements were publicly filed in the bankruptcy.

**(iv)** **October 26, 2017 Confidentiality Agreement ("OU2 Agreement").** Congoleum is a participant in the OU2 Allocation, whereby numerous parties seek to determine their relative responsibility for the costs associated with environmental clean-up activities in a portion of the Passaic River. The OU2 Allocation process was initiated by the United States Environmental Protection Agency and is overseen by a federally appointed mediator (David C. Batson). In this process, the participants exchange documents and position statements. Congoleum entered into the OU2 Agreement, and agreed that any communications or documents exchanged as part of the OU2 Allocation would remain confidential. BIW served broad requests related to the OU2 Allocation. (*See* Ex. 4, No. 8 ("Any and all Documents prepared for, submitted to, or received from any Persons related to the Diamond Alkali Superfund Site or the Lower Passaic River Study Area . . . .").) Congoleum has not withheld any of its own documents or communications with Mr. Batson. However, Congoleum cannot produce the position statements of other parties, nor documents received from other parties. In a February 27th email exchange, BIW appeared to agree, in part, to Congoleum's limitation. (Ex. 5, Email Exchange Between Kevin W. Weber and Sarah L. Futernick ("BIW agrees with Congoleum that it is not necessary to review and log the many documents uploaded by other parties to the database used in the Mediated Settlement Process, nor is BIW interested in all such documents.").) BIW's motion, however, seeks a declaration that Congoleum may not withhold any documents pursuant to the OU2 Agreement.

GIBBONS P.C.

Honorable James B. Clark, U.S.M.J.
March 6, 2019
Page 5

In its adherence to its obligations under these four (4) orders, Congoleum has been producing, and will continue to produce the following materials, to the extent responsive to discovery requests:

- Any documents Congoleum itself produced (i.e., Congoleum's documents) in the Coverage Action and Bankruptcy;
- Non-confidential litigation materials (pleadings, correspondence, transcripts, document productions, etc.) Congoleum filed or received in the Coverage Action and Bankruptcy; and
- Congoleum's communications with, and documents produced to, the OU2 Allocation mediator.

However, Congoleum maintains its objections and cannot produce the following unless ordered to do so:

- Any confidential documents (including pleadings, correspondence, transcripts, and document productions) received by Congoleum from other parties in the Coverage Action or Bankruptcy;
- All mediation and settlement related communications with insurers (both Congoleum's and the insurer's);
- Drafts of settlement agreements exchanged with insurers; and
- The communications or documents produced by any other party in the OU2 Allocation.

### III.   THIS COURT MUST RESPECT THE ORDERS OF OTHER COURTS

BIW is wrong on the law, and the cases it cites are plainly at odds with the weight of authority that holds that this Court must respect the confidentiality and protective orders entered by other courts.

Courts in this circuit recognize the proper procedure for modifying a protective order of another court "is to petition for intervention for that limited purpose ***in the matter in which the order was entered***." *In re Pantopaque Prods. Liab. Litig.*, 938 F. Supp. 2d 266, 276 (D.N.J. 1996) ("Modification by one court of the orders of another offends basic notions of comity."); *see also Harper v. Trans Union, LLC*, 2005 WL 697490, at *2 (E.D. Pa. Mar. 24, 2005) ("Were I to grant plaintiff's motion to compel, I would necessarily interfere with the decision of a court of coordinate standing. Considerations of comity and orderly administration of justice require that I defer to the judgment of [the issuing court] on this matter."); *Inventio AG v. ThyssenKrupp Elevator Americas Corp.*, 662 F. Supp. 2d 375, 384 (D. Del. 2009) (finding that the court "is

without authority to alter the Protective Order entered by another court by ordering production of any documents within the scope of the Protective Order").

It is a well-established practice within the Third Circuit to avoid disturbing other courts' orders. *See Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 169 (3d Cir. 1982) ("Here, the principles of comity among courts of the same level of the federal system provide a further reason why the transferee court should not independently re-examine an issue already decided by a court of equal authority."); *Carpenter Co. v. BASF SE*, 2015 WL 3755010 (D.N.J. June 16, 2015) (noting the principle of comity precluded any reason to disturb another court's prior discovery order). For example, in *Harper*, the court refused to compel the defendants to produce information subject to a South Carolina court's protective order because to do so would have "interfere[d] with the continuing jurisdiction of the District of South Carolina over its Order protecting the confidentiality of the information plaintiff now seeks to discover." *Harper*, 2005 WL 697490, at *1.

BIW cites *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 785-87 (3d Cir. 1994) for the proposition that BIW must only establish "good cause" in order for this court to overturn the protective order of another court. That is simply incorrect, as in *Pansy* the court was reviewing ***its own protective order***—not the order of another court, as is the case here. *Id.* at 784-90 (discussing that "a district court retains the power to modify or lift confidentiality orders that it has entered," and "[t]he appropriate approach in considering motions to modify confidentiality orders is to use the same balancing test that is used in determining whether to grant such orders in the first instance"). Given the principles of comity outlined above, the standard for ordering production of documents protected by another court is much higher.

BIW presents its request to the wrong court, and it should first intervene in the Superior Court, Middlesex County and Bankruptcy Court of the District of New Jersey (on notice to all parties in those matters), and allow those courts the opportunity, in the first instance, to consider the enforcement of their own orders. Because the issuing court retains jurisdiction over any modifications to its own protective orders, BIW has failed to articulate any precise reasons in support of why its motion is properly before this Court.

BIW relies primarily on a non-binding out-of-circuit case, in which the court created a four-factor test in determining whether to modify the protective order issued by another court. *Tucker v. Ohtsu Tire & Rubber Co.*, 191 F.R.D. 495, 499-500 (D. Md. 2000). The *Tucker* case, however, is out of line with the Third Circuit's strong adherence to the principles of comity (discussed above). Although a handful of courts have followed the reasoning in *Tucker*, this district's practice requires a party seeking modification of a protective order to first petition the court that entered the protective order. *See In re Pantopaque*, 938 F. Supp. 2d at 276. Courts within the Third Circuit are guided by the same principles. *See Inventio AG*, 662 F. Supp. 2d at 384 (ordering the plaintiff to return to the judge who issued the protective order if the plaintiff

GIBBONS P.C.

Honorable James B. Clark, U.S.M.J.
March 6, 2019
Page 7

sought documents within the protective order's scope). New Jersey state courts follow the same basic principle. *See, e.g.*, *Hammock by Hammock v. Hoffmann-LaRoche, Inc.*, 142 N.J. 356, 364 (1995) (demonstrating that a nonparty seeking to modify a protective order generally first intervenes in the matter where the protective order was entered).

In fact, it is customary across the nation that "[c]ourts generally respect one another's protective orders." *California Land Valley Co. v. Ross Sys., Inc.*, 2013 WL 1819909, at *1 (E.D. Cal. Apr. 30, 2013); *see. e.g.*, *Puerto Rico Aqueduct & Sewer Auth. v. Clow Corp.*, 111 F.R.D. 65, 67–68 (D. P.R. 1986) (concluding that the proper way for a third party to challenge a protective order is to move to intervene in the action in which it was issued, and principles of comity require a subsequent court to await a ruling by the court that issued the order); *Dushkin Pub'g Group, Inc. v. Kinko's Serv. Corp.,* 136 F.R.D. 334, 335 (D.D.C. 1991) (declining as a matter of comity and respect for another federal court to modify a protective order issued by the other court and instead requiring the party seeking the modification to first go to the issuing court); *Deford v. Schmid Prod. Co.*, 120 F.R.D. 648, 650, 655 (D. Md. 1987) (noting issues of comity and courtesy are involved where federal court is asked to modify a discovery order issued earlier by a state court); *Dart Indus., Inc. v. Liquid Nitrogen Processing Corp. of California*, 50 F.R.D. 286, 291–92 (D. Del. 1970) (limiting production and inspection of documents to be produced in this action, in the interest of comity, to those not covered by any protective order of the Illinois district court in a prior lawsuit); *Ford Motor Co. v. Versata Software, Inc.*, 2017 WL 914703, at *19 (N.D. Tex. Mar. 8, 2017) ("This Court will not take the extraordinary step of modifying or terminating this order of the United States District Court for the Eastern District of Texas—at least not until there has been an effort to file a motion with that court to modify or terminate its order."); *Barrella v. Village of Freeport*, 2012 WL 6103222, at *2 (E.D.N.Y. Dec. 8, 2012) ("[W]hile courts have permitted protected discovery to be disclosed in separate litigation, they have done so [only] under particular and distinguishable circumstances.").

Even if the Court adopted the *Tucker* test (which it should not), the motion should be denied. Under *Tucker*'s four-factor test—(1) whether the protective order resulted from a stipulation (which favors the party seeking modification) or a court order after a fully briefed dispute (which favors deference); (2) whether the protective order is one-sided and applies only against the Receiving Party (which favors the party seeking modification) or against all parties (which favors deference); (3) "the burden and expense to the [party] if they are required to file a new action in the [issuing] court"; and (4) "whether it is possible to incorporate terms in its own order which will further the protections originally ordered by the [issuing] court"—only the first factor arguably favors BIW. *See Tucker*, 191 F.R.D. at 501-02. Factor two favors Congoleum because the protective orders at issue were not one-sided, as in *Tucker* and the cases *Tucker* cites for authority, but instead applied uniformly to all parties in those litigations. Factor three favors Congoleum because, whereas the *Tucker* court noted the burden as it related to Maryland litigants to seek relief in a distant Texas court, BIW enjoys the weightless burden of simply petitioning the correct New Jersey courts connected to a New Jersey case. And finally the

GIBBONS P.C.

Honorable James B. Clark, U.S.M.J.
March 6, 2019
Page 8

*Tucker* court easily discharged the duties under its fourth factor by ensuring the defendant the same protections in that case that it received under its Texas protective order. *Id.* Here, however, the Court cannot further the original protective orders' safeguards because the documents BIW seeks under the protective orders would simultaneously disturb the confidential assurances of the other parties to those protective orders.

The parties to the confidentiality orders in the Coverage Action and Bankruptcy relied on those orders to protect their confidential information and to facilitate the settlement of a complex case. Parties to those matters have already raised concerns about BIW's demand for documents and reaffirmed their expectation that Congoleum would continue to comply with the protective order(s) in those matters. (Ex. 6, Letter from Century Insurance.) The intent of those orders would be frustrated by this Court's decree that the orders are simply no longer effective, as BIW suggests. And principles of comity would be severely undercut if this Court were to modify or vacate not one but multiple courts' protective orders with a single pen stroke. This Court should respect the orders of the Superior Court of New Jersey and Bankruptcy Court of the District of New Jersey, and BIW should first make its application in those other matters before it seeks extraordinary relief in this Court.

### IV. BIW'S THEORY DOES NOT CONSTITUTE GOOD CAUSE FOR MODIFYING THE ORDER OF ANOTHER COURT.

Even if this Court were to consider BIW's theory of "good cause," the motion should be denied. BIW's premise that it was Congoleum—rather than BIW—that put the bankruptcy and related insurance coverage settlements "at issue" in this litigation is factually wrong. Congoleum's crossclaim against BIW makes no reference whatsoever to the bankruptcy or insurance coverage settlements. (*See* ECF No. 13.) It was BIW's own Motion to Dismiss and BIW's crossclaim against Congoleum that first raised these theories, which Congoleum maintains are a red herring and ultimately irrelevant to the disputed issues in the litigation. (*See* ECF Nos. 24-1, 70.)

Boiled down, BIW's theory is that Congoleum's post-1986 conduct is relevant to prove that Congoleum's belief (from 1986, through the 2000s bankruptcy, and up until the time of Congoleum's 2017 crossclaim against BIW) was that Congoleum was the sole successor-in-interest (in all respects) to Congoleum-Nairn, Inc. And, as the sole successor-in-interest, present-day Congoleum (an entity created in 1986) is the responsible party for the environmental liabilities at the Kearny Property—a property sold off by Congoleum-Nairn, Inc. in 1968.

In Congoleum's view, the meaning and intent of the 1986 agreement is clear and unambiguous and cannot be altered by statements made 20 years later, to parties outside of the agreement—particularly statements made in the wholly unrelated and narrow context of a bankruptcy and insurance coverage settlement that related to ***asbestos product-line liability***—not

*environmental liability* for alleged property damage. Congoleum's position is that BIW, rather than Congoleum, assumed the liabilities associated with the DVL Property because in the 1986 transaction BIW merged into Congoleum-Nairn, Inc., while newly created Congoleum was assigned very specific assets and the limited liabilities associated with those assets, which did not include the DVL Property. Because the DVL Property was not an asset or liability assigned to Congoleum in 1986, and Congoleum never owned the DVL Property, Congoleum-Nairn, Inc. (and thus BIW) retained those liabilities. *See Cytec Indus., Inc. v. B.F. Goodrich Co.*, 196 F. Supp. 2d 644, 655 (S.D. Ohio 2002) (holding that the holder of stock of the company from which environmental liability flowed was the proper successor-in-interest to that liability). The question of product liability for asbestos claims is completely separate and has zero relevance to this litigation.[2]

The discovery BIW seeks is not reasonably calculated to lead to the discovery of admissible evidence regarding the successor for the environmental liabilities. BIW's wide-ranging exploration goes too far. BIW effectively seeks *any* outward statements made by Congoleum, over 30+ years, to *any* person, in which Congoleum *may* have manifested *any* responsibility for *any* of the liabilities of Congoleum-Nairn, Inc. That fishing expedition cannot meet the heightened standard necessary for the Court to overturn these protective orders, because how Congoleum dealt with its asbestos (i.e., product-line) liabilities in the Coverage Action and Bankruptcy has no bearing on the question of successorship to the DVL Property's environmental liabilities.

BIW focuses the bulk of its attention on settlement negotiations between Congoleum and its insurers, where BIW believes Congoleum may have made outward statements regarding Congoleum's status as a successor to Congoleum-Nairn, Inc. In particular, BIW wants to see the positions taken during negotiations (including in mediation) and review the drafts of settlement agreements so it can see the evolution of various representations ultimately made by Congoleum in the final executed documents (which are public). As discussed above, none of this information is relevant, but nevertheless, as BIW has not deposed any Congoleum witnesses nor exhausted all other means of obtaining the information necessary for its defense, it cannot meet the heightened standard to warrant the production of such settlement communications.

While the "Third Circuit does not recognize a settlement privilege," parties seeking documents such as settlement communications must make a "heightened, more particularized showing of relevance." *Ford Motor Co. v. Edgewood Props., Inc.*, 257 F.R.D. 418, 423 (D.N.J. 2009); *see also Lesal Interiors v. Resolution Trust Corp.*, 153 F.R.D. 552, 562 (D.N.J. 2009)

---

[2] New Jersey recognizes the "products line" exception to the general rule of successor liability. *See Ramirez v. Amsted Indus., Inc.*, 86 N.J. 332, 359 (1981). Under the product-line liability exception, liability for a defective product follows the entity that maintains the product line, and not necessarily the corporate successor. *See id.* at 343.

GIBBONS P.C.

Honorable James B. Clark, U.S.M.J.
March 6, 2019
Page 10

(requiring the moving party to make a "particularized showing that the evidence sought is relevant and calculated to lead to the discovery of admissible evidence"). In *Ford v. Edgewood Properties*, the District of New Jersey denied Edgewood's request for confidential settlement communications between Ford and the NJDEP and found that "discovery which can only lead to inadmissible evidence is prohibited by the plain language of Rule 26 and would violate the command of Rule 1 of the Federal Rules of Civil Procedure, which requires that the Rules be construed and administered to secure the just, speedy, and inexpensive determination of every action." 257 F.R.D. at 423-24 (quoting *Steele v. Lincoln Financial Group*, 2007 WL 1052495, at *4 (N.D. Ill. Apr. 3, 2007)). BIW fails to make the heightened particularized showing how the negotiation communications—rather than the final settlement agreements—may be relevant to this action. As in *Ford*, "the negotiation of language between the parties goes solely to the resolution of the [proceeding] . . . and such fine-tuning of the settlement language between the parties will not yield admissible evidence." *Id.* at 424.

The Eastern District of Pennsylvania balanced the interplay between Rule 408 and Rule 26: "In keeping with the strong Congressional policy behind Rule 408 as well as the liberal discovery rules, we will . . . place the onus on the [party seeking discovery] to show that the documents relating to the settlement negotiations are relevant and likely to lead to the discovery of admissible evidence." *Fid. Fed. Sav. & Loan Ass'n v. Felicetti*, 148 F.R.D. 532, 534 (E.D. Pa. 1993). The District of New Jersey thereafter adopted this position—i.e., "to switch the burden of proof from the party in opposition to the discovery to the party seeking the information," *id.*—finding it to be "a reasonable position and, as far as it goes, this court is in agreement." *Lesal Interiors, Inc. v. Resolution Trust Corp.*, 153 F.R.D. 552, 562 (D.N.J. 1994). The District of New Jersey, however, further expanded the required inquiry. The court added that "this court must go further and determine whether and to what extent this discovery will impact elsewhere." *Id.* Balancing the interest and need for the documents from the requesting party, "the effects that may flow from their discovery" added an additional hurdle. *See id.* Here, BIW asserts that the confidential settlement negotiation documents are necessary for additional "context," but all the additional context BIW seeks was embodied in the final (and produced; and publicly available) settlement agreements. And disclosure of the negotiation documents impacts not only Congoleum but also the numerous insurers that participated under the same assurances of confidentiality. The "effects that may flow" from discovery into the negotiation process, therefore, go well beyond Congoleum's interests and intrudes upon the rights of many other parties and entities. As a consequence, BIW falls woefully short of its burden that the negotiation documents—clearly inadmissible under F.R.E. 408—are "likely" to lead to the discovery of admissible evidence. *Felicetti*, 148 F.R.D. at 534.

Moving even further away from what is properly discoverable under the Federal Rules, BIW seeks the production of "any and all" documents "relating to the purpose and/or goal(s) of the settlement agreements" and documents "relating to the benefits and/or assurances the insurers received and/or expected to receive by participating in the settlements." (Ex. 4, at No. 7.)

GIBBONS P.C.

Honorable James B. Clark, U.S.M.J.
March 6, 2019
Page 11

Because it cannot, BIW fails to articulate any reason why those overbroad requests might yield potentially admissible evidence. Importantly, BIW fails to address the significant difference in the discoverability of executed settlement agreements versus settlement negotiations. Once a settlement agreement is reached, the negotiations and their purposes and/or goals are deemed to have merged in the agreement. *White v. Kenneth Warren & Son, Ltd.*, 203 F.R.D. 364, 368 (N.D. Ill. 2001). Accordingly, the settlement agreements themselves provide BIW the necessary and sufficient context, and the documents regarding their negotiation—which cannot be admissible—should not be produced.

### V.   CONCLUSION

For the above reasons, BIW's motion to compel should be denied. We thank the Court for its continued courtesies in this matter.

Respectfully submitted,

s/ Camille V. Otero
Camille V. Otero
Director

cc:   All Counsel of Record (*via ECF*)