# Exhibit 3

Page 1

1    UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF NEW JERSEY
2    Civil Action No. 2:17-cv-04261(KM)(JBC)
     -----------------------------------x
3
     DVL, INC. and DVL KEARNY HOLDINGS,
4    LLC,
5                          Plaintiffs,
6               -against-
7    CONGOLEUM CORPORATION and BATH
     IRON WORKS CORPORATION,
8
                         Defendants.
9
     -----------------------------------x
10
                         Jenner & Block LLP
11                       919 Third Avenue
                         New York, New York
12
                         May 21, 2019
13                       8:27 a.m.
14
15      Videotaped Deposition of HOWARD N.
16   FEIST, III in the above-entitled action,
17   held at the above time and place, taken
18   before Dawn Matera, a Shorthand Reporter
19   and Notary Public of the State of New
20   York.
21               *     *     *
22
23
24
25

Page 2

1  A P P E A R A N C E S :
2
3     ZARWIN BAUM DEVITO KAPLAN SCHAER
      TODDY P.C.
4        Attorneys for Plaintiffs
           1818 Market Street
5          13th Floor
           Philadelphia, Pennsylvania 19103
6          (267)765-7341
7      By:  EITAN D. BLANC, ESQ.
           edblanc@zarwin.com
8
9
      JENNER & BLOCK LLP
10    Attorneys for Defendant Bath Iron
      Works Corporation
11         353 N. Clark Street
           Chicago, Illinois 60654
12         (312)222-9350
13     By:  WADE THOMSON, ESQ.
           wthomson@jenner.com
14         MICHAEL A. DOORNWEERD, ESQ.
           mdoornweerd@jenner.com
15
16
      GIBBONS P.C.
17    Attorneys for Defendant Congoleum
      Corporation and the witness
18       One Gateway Center
         Newark, New Jersey 07102
19       (973)596-4895
20     By:  KEVIN W. WEBER, ESQ.
           kweber@gibbonslaw.com
21
22
23
24
25

Page 3

1  A P P E A R A N C E S : (Continued)
2
3  Also Present:
4     CHRIS O'CONNOR,
         President and CEO of Congoleum
5         Corporation
6     DEVERELL WRITE,
         Videographer
7
            ~oOo~
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1          THE VIDEOGRAPHER:  We are going
2     on the record at 8:27 a.m. on
3     May 21st, 2019.  Please note that the
4     microphones are sensitive and may pick
5     up whispering and private
6     conversation.  Please place all cells
7     away from the microphones as they can
8     interfere with deposition audio.
9     Audio and video recording will
10    continue to take place unless all
11    parties agree to go off the record.
12         This is media unit 1 of the
13    video-recorded deposition of Howard N.
14    Feist taken by counsel for the
15    Defendant in the matter of DVL,
16    Incorporated and DVL Kearny Holdings,
17    LLC versus Congoleum Corporation and
18    Bath Iron Works Corporation.  This
19    case is filed in the U.S. District
20    Court for the District of New Jersey.
21         We are here at the offices of
22    Jenner & Block, located at 919 Third
23    Avenue, New York, New York.  My name
24    is Deverell Write representing
25    Veritext Solutions, and the court

Page 5

1     reporter is Dawn Matera from Veritext
2     Legal Solutions.
3          At this time will counsel please
4     state their appearances.
5          MR. THOMSON:  Wade Thomson and
6     Mike Doornweerd on behalf of Defendant
7     Bath Iron Works.
8          MR. BLANC:  Eitan Blanc on
9     behalf of the Plaintiffs.
10         MR. WEBER:  Kevin Weber from
11    Gibbons P.C. on behalf of Congoleum
12    and Mr. Feist.
13         THE VIDEOGRAPHER:  Will the
14    reporter please swear in the witness.
15    H O W A R D  N.  F E I S T, III, having
16    been first duly sworn by Dawn Matera, a
17    Notary Public, was examined and testified
18    as follows:
19    EXAMINATION BY MR. THOMSON:
20         Q.   Good morning Mr. Feist, I am
21    very aware that you've been deposed many
22    times before.  But I do want to go over
23    some of the ground rules so we have a
24    good record today.  And the most
25    important is that I would ask that we try

2 (Pages 2 - 5)

Page 14

1    A.   Yes.
2    Q.   And from roughly the year 2000
3  through 2012, you were also an officer of
4  American Biltrite?
5    A.   And they were my employer.
6    Q.   And they were your employer,
7  thank you. And generally speaking, what
8  is the relationship between Congoleum and
9  American Biltrite, or what was it during
10  those 12 years?
11    A.   It goes back before those 12
12  years. So in 1993, '92 or '93, Congoleum
13  acquired the Amtico Flooring Division of
14  American Biltrite for a combination of
15  cash and stock. And after that
16  combination, Roger Marcus, who was CEO of
17  American Biltrite, became CEO of
18  Congoleum as well.
19    Q.   And at some point Congoleum
20  became a publicly traded company,
21  correct?
22    A.   Yes.
23    Q.   What was your role in the
24  public filings for Congoleum from 2003
25  through to 2010?

Page 15

1    A.   I was the chief financial
2  officer, so I signed off on anything that
3  was filed in the SEC.
4    Q.   As a practical matter, when you
5  became employed by American Biltrite did
6  you physically move your office?
7    A.   Yes, I actually moved in 1999.
8    Q.   Just logistically, what would
9  you say your percentage of work for being
10  CFO of Congoleum versus being CFO of
11  American Biltrite, how did that break
12  down?
13    A.   It was maybe half and half.
14  But there was some overlap too. So
15  American Biltrite's results consolidated
16  into those of Congoleum. So it wasn't
17  like they were unrelated companies, they
18  were, you know, really part of the same
19  company. Subsidiary/parent relationship.
20    Q.   And as I understand it, for
21  some employees or some individuals that
22  worked for both companies, there were
23  shared service agreements between the
24  company, is that correct?
25    A.   Yes.

Page 16

1    Q.   And was your work pursuant to a
2  shared service agreement?
3    A.   The shared service agreement
4  covered like IT services. It covered
5  urethane. There was a management fee and
6  a personal services agreement. I don't
7  remember all of the details. The
8  agreements are publicly available.
9    Q.   Did you receive performance
10  reviews while you were CFO of Congoleum?
11    A.   Nothing formal I don't believe.
12    Q.   In 2012, can you explain why
13  you ceased being officer of Congoleum?
14    A.   Congoleum came out of
15  bankruptcy on June 30th, 2010 or July 1st
16  and there was a two-year management
17  agreement that basically kept the
18  existing management structure in place
19  for two years. And that agreement was
20  not renewed.
21    Q.   And do you have any severance
22  agreement with Congoleum?
23    A.   No.
24    Q.   Do you have any pension of any
25  kind with Congoleum?

Page 17

1    A.   Yes.
2    Q.   And when does the pension
3  become active?
4    A.   I have a vested benefit that
5  dates back to when I severed employment
6  in 2000.
7    Q.   And do you have any sense of
8  today's value of that vested benefit
9  package?
10    A.   My pension will be, you know,
11  at age 65, depending on which option I
12  take and after my ex-wife gets her piece
13  of it, $18,000 a year.
14    Q.   And I understand you have an
15  indemnification agreement with Congoleum;
16  is that correct?
17    A.   Yes.
18    Q.   And did you ask for that, can
19  you explain how that came about?
20    A.   That was something that the new
21  directors of Congoleum that were put in
22  place after, after the bankruptcy,
23  requested.
24    Q.   And I understand Congoleum is
25  paying for your expenses for

5 (Pages 14 - 17)

Page 54

1     A.   I'm having trouble
2   understanding the question, which
3   Congoleum you're talking about in that.
4     Q.   Sure.  Let's come back to this
5   question.  But let me do it this way.
6     A.   There was no 1986 Congoleum in
7   1955.  So it's a little confusing for me
8   to answer.
9     Q.   Let me go back to this.  These
10   are what you say are rights that
11   post-1986 the Congoleum flooring that you
12   worked for and that's suing Bath Iron
13   Works in this case, they have rights to
14   these 1955 policies, correct?
15     A.   Rights under them, yes.
16     Q.   Right.  And my question is, as
17   of 1955, are you aware of whether the
18   entity that was running, that had this
19   policy in 1955, whether they did anything
20   other than flooring?
21     MR. WEBER:  Objection to form.
22     A.   I don't know who the insureds
23   were under that 1955 policy.
24     Q.   You can put that to the side,
25   thanks.

Page 55

1     Mr. Feist, are you aware of a
2   ECRA, E-C-R-A, consent order with New
3   Jersey EPA that was entered into in 1986?
4     A.   I think I know what it is, yes.
5     Q.   Can you tell me what you recall
6   about that?
7     A.   New Jersey had a law where or
8   has a law, when a property changes hands,
9   there has to be a -- you can't sell a
10   property and dump it on the state.  So
11   there has to be financial responsibility
12   for the cleanup of the property.  And I
13   don't know exact particulars, but it had
14   to do with the fact the property was
15   sold and there was somebody in a position
16   to do any work that might be needed.
17     Q.   And who would have been
18   involved in negotiating or amending that
19   transfer of that liability as part of the
20   1986 agreements, if you know?
21     A.   It would have been an attorney.
22   I'm not sure.  Maybe Russ.  But I'm not
23   sure.
24     MR. THOMSON:  We've been going
25   about an hour, are you okay,

Page 56

1   Mr. Feist?  We can take a break
2   whenever you want.
3     THE WITNESS:  I'm fine.
4     Q.   Mr. Feist, I want to switch
5   gears and discuss with you the coverage
6   action that pitted Congoleum in or around
7   the year 2000 against many of its
8   insurance carriers in a lawsuit in the
9   State Court in New Jersey.  You're
10   familiar with that, correct?
11     A.   Yes.
12     Q.   And what was your role in
13   Congoleum for the coverage action?
14     A.   I was the chief financial
15   officer.  I was probably the point person
16   for most of the attorneys.
17     Q.   Okay.  And at that point in
18   time, during the coverage action,
19   Congoleum did not have in-house
20   attorneys, correct?
21     A.   That's correct.
22     Q.   Okay.  And so you liaised with
23   outside counsel for the coverage action
24   in your role as CFO for Congoleum,
25   correct?

Page 57

1     A.   Yes.
2     Q.   And who was the most involved
3   from Congoleum for the coverage action in
4   terms of working with outside counsel, if
5   it wasn't you?
6     A.   It was me.
7     Q.   So in that role in liaising
8   with outside counsel, you would review
9   pleadings, sometimes before they were
10   filed in the coverage action, correct?
11     A.   Yes.
12     Q.   We will get to this in more
13   detail, but at some point Congoleum filed
14   for bankruptcy after the coverage action
15   had been filed, right?
16     A.   Yes.
17     Q.   And what is your understanding
18   of the relationship to Congoleum's
19   bankruptcy in the 2000's to the coverage
20   action?
21     MR. WEBER:  I will object to the
22   form.
23     A.   They were largely intertwined.
24   The lack of insurance coverage is what
25   forced Congoleum into bankruptcy.  That's

15 (Pages 54 - 57)

Page 58

1  probably the simplest answer.
2      Q.   From your perspective, do you
3  know how the coverage action ended for
4  Congoleum?
5      A.   Well, it ended when the
6  bankruptcy was confirmed, I guess.
7      Q.   And part of what Congoleum was
8  seeking coverage for in the coverage
9  action was for environmental claims
10 against Congoleum, correct?
11     A.   We're seeking to -- I mean, it
12 was really driven by the asbestos.  But
13 obviously we wanted to keep whatever
14 insurance rights we could keep.
15     Q.   Mr. Feist, I appreciate that.
16 I ask that you answer my questions and
17 the day will go a lot quicker.  Part of
18 what Congoleum was seeking coverage for
19 in the coverage action was for
20 environmental claims against Congoleum,
21 correct?
22     A.   The coverage action was seeking
23 to clarify the insurance contracts
24 without respect to the specific
25 liabilities.

Page 59

1      Q.   And part of the disputes with
2  its insurers that led to Congoleum filing
3  the coverage action was because there was
4  disputes concerning coverage that
5  Congoleum was seeking for environmental
6  claims against Congoleum, correct?
7      A.   I wouldn't agree with the way
8  you put that.
9      Q.   Well, let's look at -- why
10 would you not agree with that?
11     A.   Because it wasn't --
12         THE WITNESS:  Can you reread the
13 question.
14         (Record read.)
15     A.   Yeah, so it was disputes
16 related to coverage of asbestos.  First
17 of all, it was the insurers that
18 initiated the coverage action for the one
19 thing.  And it was disputes over the
20 coverage for asbestos claims that was
21 driving that litigation.
22     Q.   I appreciate that.  But also
23 part of that litigation, whatever you
24 want to say was driving it, were
25 environmental claims for which Congoleum

Page 60

1  was seeking coverage, correct?
2      A.   As part of resolving it, of
3  course, we wanted to get whatever
4  environmental coverage we could be
5  entitled to.
6      Q.   So the answer to my question is
7  yes, part of the coverage action was
8  because Congoleum was seeking coverage
9  for environmental actions, yes or no?
10         MR. WEBER:  Object to the form.
11         You can answer.
12     A.   I'm not sure I would agree with
13 that, because I would say if there had
14 not been disputes over asbestos coverage,
15 there would not have been a coverage
16 action.
17     Q.   I appreciate that.  But once
18 there was a coverage action, Congoleum
19 brought its disputes for environmental
20 liabilities into the coverage action,
21 yes?
22     A.   Yes, it included all insurance
23 rights.
24     Q.   Including claims for
25 environmental coverage, correct?

Page 61

1      A.   Yes.
2      Q.   I am going to hand you what
3  we're marking as Feist Exhibit 5.
4         (Feist Exhibit 5, Document
5  entitled "First Amended Answer,
6  Counterclaim, Cross-Claim, Third-Party
7  Complaint and Jury Demand", was so
8  marked for identification, as of this
9  date.)
10     Q.   Mr. Feist, I've handed you
11 Feist Exhibit 5, and that is a pleading
12 from the coverage action entitled "First
13 Amended Answer, Counterclaim,
14 Cross-Claim, Third-Party Complaint and
15 Jury Demand."  And if you flip to page 3,
16 you could see this was filed by Congoleum
17 by and through its attorneys Dughi Hewit.
18 Do you see that?
19     A.   Yes.
20     Q.   And this document, page 34, was
21 filed on February 28th, 2002.  Are you
22 familiar with this document?
23     A.   I haven't seen it in a long
24 time, but I have seen it before.
25     Q.   Generally speaking, for a

16 (Pages 58 - 61)

Page 62

1  pleading of this nature in the coverage
2  action, would you have seen it before it
3  was filed?
4      A.  Yes.
5      Q.  Flip to page 8, please, of this
6  document.  And as I read the title, this
7  was both an answer to a complaint, but
8  also there were counterclaims, and this
9  may get to the point you were making
10  earlier, that under the introduction it
11  states it's a civil action for
12  declaratory relief against the
13  Plaintiffs, right?
14      So in short, Congoleum was
15  seeking an action against its insurance
16  carriers to provide coverage, right?
17      A.  I'm sorry, say that again.
18      Q.  Yeah, it's a generalized
19  question.  I don't mean to ask you for a
20  legal.  You understood, to your point,
21  the insurers had initiated the coverage
22  action, correct?
23      A.  Yes.
24      Q.  And then Congoleum countersued
25  against them for coverage, correct?

Page 63

1      A.  Well, to include all of the
2  carriers.
3      Q.  Right.
4      A.  Right.
5      Q.  In describing the parties
6  involved in the counterclaims, if you
7  look at page 9, under Congoleum
8  Corporation, it's paragraph 6, do you see
9  that?
10      A.  Yes.
11      Q.  And it reads over onto page 10,
12  and in 2002 Congoleum filed this document
13  with the Court, which you would have
14  reviewed beforehand, and in the first
15  full sentence on page 10 reads "Congoleum
16  is engaged principally in the business of
17  manufacturing resilient-sheet and tile
18  floor coverings.  Congoleum is a
19  successor to Congoleum-Nairn, Inc. and
20  Congoleum Industries, Inc., as well as a
21  successor to other corporations using the
22  name Congoleum Corporation and is
23  entitled to all rights and benefits of
24  the insurance contracts issued by
25  Defendants to such Congoleum

Page 64

1  predecessors."
2      Do you see that?
3      A.  Yes.
4      Q.  And as you sit here today, do
5  you believe that representation made to
6  the Court is false in any way?
7      MR. WEBER:  Objection to form.
8      A.  No.
9      Q.  And at this time, right, you
10  had the binder of the 1986 documents
11  available to you, correct?
12      A.  Yes.
13      Q.  And you also had detailed
14  information about Congoleum's corporate
15  history, correct?
16      A.  Yes.
17      Q.  Including you had provided the
18  insurers detailed information regarding
19  Congoleum's corporate history and a
20  notebook that contained the corporate
21  history; is that right?
22      A.  I don't recall that.
23      Q.  I am going to hand you as Feist
24  Exhibit 6, which amazingly was also Feist
25  Exhibit 6 in August 23 of 2003.

Page 65

1      (Feist Exhibit 6, Document
2      bearing Bates number CONG_0328620, was
3      so marked for identification, as of
4      this date.)
5      Q.  So we will go back to Exhibit
6  Feist 5, but just focusing for one second
7  to the line of questioning I got into,
8  Mr. Feist, on Feist Exhibit 6, that
9  document is a certification that you
10  signed and that was submitted in the
11  coverage action in 2003.
12      And I just want to draw your
13  attention first to the first page under
14  where it says certification of Howard N.
15  Feist, III, paragraph 1, "I am the chief
16  financial officer of Congoleum
17  Corporation.  I am fully familiar with
18  the facts recited herein.  I submit this
19  certification in opposition to the
20  motions for summary judgment filed by
21  certain excess insurers."
22      Do you see that?
23      A.  Yes.
24      Q.  And to my question, if you
25  could just flip to where paragraphs 13

17 (Pages 62 - 65)

Page 66

1 and 14 are. It's on page 6 of the
2 document, I believe. And there is a
3 discussion in paragraph 13 about there
4 being meetings in July 2001 among and
5 between Congoleum and some of its
6 insurers, correct?
7     A.   Yes.
8     Q.   And at the top of paragraph 14
9 it reads, your certification reads
10 "During the two day meeting Congoleum
11 went to significant effort and expense to
12 provide the insurers with detailed
13 information regarding its corporate
14 history."
15         Do you see that?
16     A.   Yes.
17     Q.   And sitting here today, do you
18 recall what that detailed information
19 regarding the corporate history was that
20 was provided to the insurers?
21     A.   I mean I don't recall
22 specifically, but I am sure it would have
23 been a history of the business.
24     Q.   Okay. And in 15 there is a
25 reference that Congoleum did several

Page 67

1 other things, conducted a tour of one of
2 its manufacturing facilities and a
3 notebook that contained, among other
4 things, corporate history was made
5 available to the insurers at the meeting.
6 Do you see that?
7     A.   Yes.
8     Q.   Are you familiar with what that
9 notebook was or what it contained
10 concerning corporate history?
11     A.   I don't remember what was in
12 that.
13     Q.   Okay. You can put Exhibit 6 to
14 the side and focusing back on Feist
15 Exhibit 5, which is that first amended
16 answer. If you could flip, please, to
17 page 16. And right above paragraph 28
18 there is a heading that reads "The
19 Underlying Environmental Claims." Do you
20 see that?
21     A.   Yes.
22     Q.   It says "The United States
23 Environmental Protection Agency, the New
24 Jersey Department of Environmental
25 Protection, other governmental agencies

Page 68

1 in the United States or its states or
2 territories abroad," et cetera,
3 et cetera, et cetera, "have alleged that
4 Congoleum is liable under," and then it
5 reads various types of claims. Do you
6 see that?
7     A.   Yes.
8     Q.   Okay. And the last sentence of
9 that paragraph reads "The underlying
10 environmental claims seek damages and
11 other relief for alleged property damage,
12 bodily injury and personal injury as
13 defined in the policies resulting from
14 environmental contamination and/or
15 exposures alleged to have occurred in
16 connection with certain sites in New
17 Jersey and elsewhere."
18         Do you see that?
19     A.   Yes.
20     Q.   And in paragraph 29, there is a
21 listing of underlying environmental
22 claims, including, without limitation,
23 ten sites located in New Jersey. Do you
24 see that?
25     A.   Yeah. They are not all in New

Page 69

1 Jersey.
2     Q.   Fair point. Ten sites located
3 in New Jersey and elsewhere. Thank you
4 for the correction. Right?
5     A.   Yes.
6     Q.   And number 6 there is the
7 Passaic River, correct?
8     A.   Correct.
9     Q.   And just back to our earlier
10 back and forth, these underlying
11 environmental claims, these were part of
12 what Congoleum was seeking coverage for
13 in the coverage action, correct?
14     A.   Well, these were allegations.
15 But to the extent they ultimately
16 developed into claims, depending on the
17 facts, you know, we certainly would have
18 wanted to have insurance for them.
19     Q.   Right. So Congoleum's attempt
20 to get coverage for these environmental
21 claims was part of the coverage action,
22 right?
23         MR. WEBER: Objection to form.
24         You can answer.
25     A.   I guess you could say yes.

18 (Pages 66 - 69)

Page 70

1    Q.   Did you have an understanding
2  that the Passaic River contamination site
3  implicated the Kearny operations of
4  Congoleum?
5            MR. WEBER:  Objection to form.
6            You can answer.
7    A.   I really didn't know much about
8  the Passaic River site other than it had
9  been identified.  It was not, you know,
10  we were dealing with 100,000 asbestos
11  lawsuits.  This was not big on the radar.
12    Q.   Big enough for your attorneys
13  to put it in a complaint that it filed
14  with the Court, right?
15            MR. WEBER:  Objection.
16    A.   Well, sure.
17    Q.   And to be clear, when, if you
18  recall, did you first become aware that
19  the U.S. EPA was considering Congoleum as
20  a potential responsible party as part of
21  the Passaic River Superfund for
22  contamination stemming from Kearny, New
23  Jersey?
24    A.   I know there was an inquiry
25  from the EPA, I don't remember the date

Page 71

1  of it.
2    Q.   And do you know in what
3  capacity you would have been made aware
4  of inquiries, generally speaking, from
5  the EPA concerning potential
6  contamination allegations concerning
7  Congoleum?
8    A.   We got a letter from the
9  attorneys for the audit every year
10  identifying any contingent liabilities
11  that would have warranted disclosure.  So
12  if it had been in that letter, I would
13  have seen it.
14            MR. THOMSON:  Why don't we go
15  off the record and take a quick
16  five-minute break.
17            THE VIDEOGRAPHER:  The time on
18  the video monitor is 9:44 a.m.  We are
19  off the record.  This ends media 1.
20            (Off the record.)
21            THE VIDEOGRAPHER:  We are back
22  on the record.  The time on the video
23  monitor is 9:53 a.m., and this starts
24  media 2.
25    Q.   Mr. Feist, prior to our break

Page 72

1  we had been discussing, generally, EPA
2  requests for information.  Do you recall
3  the EPA making a request for information
4  to Congoleum concerning a Martin Aaron
5  company site?
6    A.   I don't.
7    Q.   And generally speaking, do you
8  recall what the Martin Aaron company site
9  was?
10    A.   I don't.
11            MR. THOMSON:  Can you please
12  mark this as Exhibit 7.
13            (Feist Exhibit 7, Document
14  bearing Bates number DH&D-BIW-026594,
15  was so marked for identification, as
16  of this date.)
17    Q.   Exhibit 7, Mr. Feist, contains
18  a cover letter dated August 15th, 2003
19  and it's from the law firm of Dughi Hewit
20  to New Jersey's -- or sorry, to the U.S.
21  EPA.  Do you see that?
22    A.   Yes.
23    Q.   And enclosed it states on the
24  first page of this letter, number 1 is a
25  response to a 104(e) request for Sid

Page 73

1  Nayar information.  Number 2 is corporate
2  history of Congoleum.  Do you see that?
3    A.   Yes.
4    Q.   Okay.  Now, if you flip over to
5  the enclosed response of Congoleum
6  Corporation to 104(e), it's the third
7  page of the document I handed you.
8    A.   Sorry, which page?
9    Q.   The third page.
10            MR. WEBER:  099, right?
11            MR. THOMSON:  Yes.  Take the
12  first page and just flip the first
13  page back.  There you go.
14    Q.   The response of Congoleum
15  Corporation to the 104(e) request for
16  information.  Generally speaking, do you
17  have an understanding of what a 104(e)
18  request is?
19    A.   Just that it's an EPA request
20  for information.  Nothing beyond that.
21    Q.   And if you flip -- now I am
22  going to look at the Bates numbers,
23  right, so this is 9099.  If you flip two
24  pages back to 9101, there is a question
25  at the top of that page.  It's Q1 and

19 (Pages 70 - 73)

Page 98

1    A.   He was an attorney at Gilbert
2  Heintz.
3    Q.   And one law firm that I didn't
4  check the box on.  What did you
5  understand Gilbert Heintz to be in
6  Congoleum's bankruptcy?
7    A.   I call them legal strategy.
8  They were kind of a boutique firm that
9  dealt with asbestos insurance matters.
10    Q.   If you look at the second
11  e-mail from the top, the subject line
12  there is Congoleum pre-1986 policies.  Do
13  you see that?
14    A.   Yup.
15    Q.   And you were included on that
16  one.  And then when you send an e-mail to
17  Mr. Feldman on September 15th, 2005, it's
18  the same subject.  And you have an
19  attachment titled "Congo Corporate
20  Structure History pdf."  Do you see that?
21    A.   Yes.
22    Q.   And if you look at the
23  attachment, there is a bunch of
24  handwriting.  Do you see that?
25    A.   Yes.

Page 99

1    Q.   Do you recognize that?
2    A.   Yes.
3    Q.   And what is that document?
4    A.   It's the historical file that I
5  had of these transactions.
6    Q.   Do you know whose notes these
7  are?
8    A.   It says I had it from Tony
9  Harwood at Patterson bell nap, who got it
10  from Al DiMillo.
11    Q.   Do you know who Al DiMillo is?
12    A.   I think he was old Congoleum's
13  tax guy.
14    Q.   Do you remember why you were
15  sending this to your outside attorneys in
16  September of 2005?
17    MR. WEBER:  Just object to
18    the -- well, I will give the witness
19    an instruction not to disclose a
20    communication from your attorney.  If
21    you can do so without -- if you can
22    answer the question without doing so,
23    you may.
24    A.   I think generally, Congoleum's
25  history is complicated.  In negotiating

Page 100

1  settlements with the insurance carriers,
2  the insurance carriers obviously want the
3  policies to be completely extinguished.
4  The legal team that we had did not
5  appreciate Congoleum's history.  So when
6  it came time to actually draft the
7  settlement documents, they needed to be
8  educated on the history.
9    Q.   Makes sense.  To your point
10  about insurance carriers wanting to
11  extinguish the, I don't want to put words
12  in your mouth.
13    A.   The policy.
14    Q.   The policy, right.  You
15  understand that the common phrasing of
16  that in a bankruptcy is a buyback of a
17  policy, correct?
18    A.   Yes.
19    Q.   And in terms of the insurers
20  wanting to extinguish those rights, what,
21  if anything, does that have to do with
22  the corporate history of Congoleum?
23    A.   Because Congoleum could only
24  offer up its rights under these policies,
25  and not all rights under the policies.

Page 101

1    Q.   And how did you come to that
2  understanding?
3    A.   Maybe, I'm not sure --
4    Q.   How did you come to the
5  understanding of what rights --
6    A.   You can't sell something that
7  doesn't belong to you.
8    Q.   So first grade is what you're
9  saying?
10    A.   Yeah.
11    Q.   As of this time, 2005, you
12  still had available to you the actual
13  1986 transaction documents, correct?
14    A.   Yes.
15    Q.   You can put that document to
16  the side.  I am going to hand you what we
17  are marking as Feist Exhibit 11.
18    (Feist Exhibit 11, Excerpts from
19    privilege log provided by Congoleum,
20    was so marked for identification, as
21    of this date.)
22    Q.   You'd better get your glasses
23  out for this one.  So Mr. Feist, I will
24  direct and make sure to read to you
25  entries because of the small font here.

26 (Pages 98 - 101)

1      What I've handed you is
2  excerpts from a privilege log provided by
3  Congoleum in this matter.  Do you have a
4  general understanding of what a privilege
5  log is?
6      A.   Yes.
7      Q.   So what we did is we took the
8  table they provided us and put it in
9  chronological order for excerpts that I
10  am going to ask you about.  Without
11  regard to this document right now, do you
12  recall there generally being a question
13  about availability of corporate history
14  docs in the fall of 2005?
15      A.   A question about availability?
16      Q.   Yes.
17      A.   No.  I mean, not -- I knew what
18  we had.  The attorneys might not have
19  known something was available until they
20  asked the right person.
21      Q.   Perfectly understandable.  So
22  if you look at kind of midway down the
23  page, and if you see the numbers in the
24  left column are not consistent.  What is
25  consistent is the sort date, the second

1  column of dates.
2       So if you look at 9/15/2005,
3  which is several entries, but the entry I
4  am looking at is 1720.  Do you see that
5  entry?
6      A.   Yes.
7      Q.   And the e-mail subject is
8  Congoleum pre-1986 policies.  The e-mail
9  is from you to Mr. Feldman, and I believe
10  this is a document we were just looking
11  at, and the description of that document
12  from Congoleum attorneys is
13  attorney/client communications regarding
14  Congoleum's corporate history and the
15  availability of such documents.  Do you
16  see that?
17      A.   Yes.
18      Q.   And then right below that, also
19  on September 15th, there is another
20  e-mail entry, 1721, also the same
21  subject, attorney/client communication
22  regarding Congoleum's corporate history
23  and availability of documents.  Do you
24  see that?
25      A.   Yes.

1      Q.   And if you look down, two
2  entries below that, on September 28th,
3  2005, entry 979, there is an e-mail that
4  has a different subject header, Congoleum
5  transactions.  And you are one of the
6  people who receives an e-mail from Don
7  Golemme, and then there is a bunch of
8  outside counsel.  And that document is
9  described as an attorney/client
10  communication regarding Congoleum
11  transactions and the availability of such
12  documents.  Do you see that?
13      A.   Mm-mmm.
14      Q.   And there is another one on
15  September 28th, 2005, entry 1722, at the
16  very bottom of this page.  Do you see
17  that?
18      A.   Yup.
19      Q.   And then I won't go through all
20  of them, Mr. Feist, other than to say if
21  you look on page 2, and pretty much from
22  the top of that page to the second to
23  last entry, about nine entries, all from
24  September 2005 in which you're copied,
25  and the communications are described as

1  attorney/client communications regarding
2  Congoleum transactions and availability
3  of such documents.  Do you see those?
4      A.   Yes.
5      Q.   The one exception to that is
6  entry 1725 on 9/29/2005, the description
7  is listed as attorney/client
8  communication regarding Congoleum's
9  corporate history, okay.
10       So we've now looked at entries
11  representing over 14 e-mails, including
12  you and outside counsel, about Congoleum
13  history and Congoleum transactions in
14  September of 2005.  Mr. Feist, you don't
15  have any reason to doubt that you were
16  included on that many e-mails, at least,
17  in September of 2005 regarding those
18  subjects, do you?
19      A.   No.
20      Q.   And do you recall being
21  included in several more e-mails in
22  October of 2005 concerning Congoleum's
23  corporate history?
24      A.   I don't specifically recall it.
25      Q.   If you look at page 3 of the

27 (Pages 102 - 105)

Page 106

1  document I just handed you.  It starts at
2  the very top, the first entry 885, date
3  October 7th, 2005, the e-mail is from
4  you.  The subject matter is Congoleum
5  transactions.  The document is described
6  attorney/client communication regarding
7  Congoleum transactions and the
8  availability of such document.  Do you
9  see that?
10     A.  Yes.
11     Q.  And the next one, two, three,
12  three entries below that are all from
13  October -- well, let's do them one by
14  one, 1728, the very next one, 10/17, the
15  e-mail subject is now Congolum, between
16  you and Mr. Feldman.  And that is
17  described, again, the same way, correct?
18     A.  Yes.
19     Q.  The next entry is 887, this one
20  October 13th, 2005, the e-mail subject is
21  forward bound volume index, this is from
22  you to Mr. Golemme.  And it's listed as
23  attorney/client communication regarding
24  Congoleum transactions and the
25  availability of such documents, and there

Page 107

1  is no attorney included on here.
2          Generally speaking, do you
3  recall what the bound volume index was
4  that you were referring to?
5     A.  I don't.  But it probably was
6  the 1986, you know, given this e-mail and
7  the nature of the questions.  I don't
8  think -- but I am just guessing.
9     Q.  So it could be the bound
10  volumes that you still had in your
11  possession at that time of the '86 deals?
12     A.  Yes.
13     Q.  I am going to jump forward to
14  November of 2005.  And a slightly
15  different topic, Mr. Feist.  Do you
16  recall having e-mail communications with
17  your outside attorneys concerning
18  environmental exposure issues and the
19  Century settlement?
20     A.  Yes.
21     Q.  And if you can, without
22  disclosing attorney/client
23  communications, what was the issue
24  between Century and Congoleum relating to
25  the settlement and environmental

Page 108

1  exposure?
2          MR. WEBER:  So I need to give
3  the witness an instruction.  The
4  substance of negotiations with the
5  carriers is protected by more than one
6  confidentiality order.  So you're not
7  to disclose the substance of specific
8  negotiations with the carrier.  But if
9  you can answer Mr. Thomson's question
10  in a more general sense, you may do
11  so.
12          Do you need the question read
13  back?
14          THE WITNESS:  Yes, I do.
15          (Record read.)
16     A.  Generally, Century and any
17  carrier would want to extinguish as much
18  liability as possible.  Not just
19  asbestos, but also environmental and of
20  course for everybody.  We were trying to
21  keep as much coverage as possible.
22     Q.  And do you recall, sitting here
23  today, some of the specific settlement
24  negotiations, without disclosing them,
25  concerning settlement, the settlement

Page 109

1  with Century and Congoleum as it relates
2  to environmental exposure?
3     A.  No.
4     Q.  But suffice it to say when the
5  settlement agreement between Congoleum
6  and Century was ultimately signed by you
7  in 2006, that extinguished any ability
8  for anyone to go after Century for
9  environmental claims, correct?
10          MR. WEBER:  Objection to form.
11          You can answer.
12     A.  Extinguished Congoleum's
13  rights.  I don't think it extinguished
14  anybody else's rights.
15     Q.  Congoleum -- Century bought
16  back the policies, correct?
17     A.  They bought back Congoleum's
18  rights under the policies.  Not the
19  rights of other insureds, as I understand
20  it.
21     Q.  We will get back to that.  But
22  certainly as it relates to Congoleum and
23  Century, Congoleum, as part of settlement
24  with Century, negotiated for its
25  environmental rights to be extinguished,

28 (Pages 106 - 109)

Page 110

1  correct?
2     A.  Yes.
3     Q.  If you look at Exhibit 11,
4  again, please, - and kind of the middle
5  of the page starting on November 17th,
6  2005, entry 1758, the e-mail subject is
7  environmental exposure site info for Ace.
8  Do you see that?
9     A.  Yes.
10    Q.  And you're included there.  And
11  it's described as attorney forward of
12  settlement communications with Century
13  withheld pursuant to the 2002 protective
14  order.  Do you see that?
15    A.  Yes.
16    Q.  And without going through them
17  in detail, Mr. Feist, if you look at the
18  next one, two, three, four, five entries,
19  those are all entries in which you're
20  included on communications in November of
21  2005 relating to Congoleum exposure site
22  info and environmental exposure, correct?
23    A.  Yes.
24    Q.  The last one, 1766, dated
25  November 21st, 2005 is an e-mail directly

Page 111

1  between Norman Spindel at Lowenstein and
2  Tancred Schiavoni at O'Melveny.  Do you
3  see that?
4     A.  Yes.
5     Q.  And you were copied on that,
6  right?
7     A.  Yes.
8     Q.  The subject is Congoleum
9  environmental site info for Century.
10  Sitting here today, do you recall if you
11  were involved in the negotiations or
12  communications at least directly with
13  Century's attorney Tancred Schiavoni?
14    A.  I was not negotiating with him
15  directly.  But that would have been done
16  by the attorneys.
17    Q.  Do you have a recollection as
18  you sit here today why you would have
19  been copied on one of those e-mails with
20  outside counsel for Century?
21    A.  Well, because they were keeping
22  me informed.
23    Q.  And to your point, just a
24  couple of answers ago, whether the rights
25  of other people were extinguished through

Page 112

1  the settlement with Century and
2  Congoleum, do you recall that being an
3  issue of discussion with Century during
4  the settlement negotiations?
5        MR. WEBER:  Objection.  Sorry,
6  let me hear the question read back.
7        (Record read.)
8        MR. WEBER:  You can answer that
9  yes or no.
10    A.  I'm not sure I can, no.  I
11  mean, it was an element that needed to
12  be -- you know, again, we could not sell
13  back something that didn't belong to us.
14  Century needed to understand why that was
15  the case.  So there was a lot of
16  education around the corporate history
17  that had to take place.
18    Q.  In terms of understanding the
19  intent of Century and Congoleum in
20  reaching that agreement, would the
21  communications with Century prior to that
22  settlement shed light on that subject of
23  what the parties' intents were concerning
24  whose rights were being extinguished?
25        MR. WEBER:  Objection to form.

Page 113

1     A.  Sorry, say that again?
2     Q.  The communications that you
3  were involved in between Century and
4  Congoleum, right, these ones that I am
5  not allowed to ask you about, or you're
6  not allowed to answer, right, those would
7  shed light on what the parties' intent
8  were concerning the extinguishing of
9  rights for various parties, right?
10        MR. WEBER:  Objection to form.
11    A.  Well, the documents, you've
12  seen the history.  I don't think --
13  again, the insurance companies would have
14  wanted as broad a release as possible.
15  And we would have wanted to limit that,
16  we, as Congoleum at the time, would have
17  wanted to limit that release to what we
18  had the rights to release.
19    Q.  Why would you want to limit it
20  to --
21    A.  Because we couldn't sell
22  something that didn't belong to us.
23    Q.  And to be clear, the
24  communications between you and your
25  attorneys and Century, that would shed

29 (Pages 110 - 113)

Page 118

1 regarding Congoleum's corporate history.
2 Do you see that?
3    A.   Yes.
4    Q.   Okay.  And then the one
5 exception, entry 2203, from August 2nd,
6 2006, the e-mail was described as
7 attorney/client communication regarding
8 Congoleum's corporate history and
9 availability of such documents.  Do you
10 see that?
11    A.   Yes.
12    Q.   And generally speaking, as of
13 August 2nd, 2006, do you recall there
14 being any issue about availability of
15 documents?
16    A.   I think they asked if documents
17 were available.  We provided them what we
18 had.
19    Q.   Would you have provided your
20 outside counsel the 1986 deal documents?
21    MR. WEBER:  Objection to form.
22    A.   I think I made them available.
23 I think that e-mail that said index of
24 binder said here's what we got.
25    Q.   Okay.  I am going to hand you

Page 119

1 what we are marking as Feist Exhibit 13.
2    (Feist Exhibit 13, Document
3    bearing Bates number CONG_0220713, was
4    so marked for identification, as of
5    this date.)
6    Q.   Exhibit 13, Mr. Feist, is an
7 e-mail from Russell Hewit to somebody at
8 Covington, as well as you.  Do you see
9 that at the top of the e-mail?
10    A.   Yes.
11    Q.   And the communications are
12 redacted.  The subject is Congoleum
13 Corporation subsidiaries.  And then there
14 is a list of attachments, okay?  And if
15 you flip to the attachments, there is
16 various, what to me looked like printouts
17 of State of Delaware, inquiries of
18 entities incorporated in the State of
19 Delaware.  Does that seem right to you?
20    A.   Yes.
21    Q.   And generally speaking, do you
22 have an understanding of what you all
23 were looking at these for at the time?
24    A.   I guess they were trying to --
25 I don't know.  It's redacted, so I

Page 120

1 probably shouldn't even try to speculate
2 on it.
3    Q.   Okay.  Let's put that aside
4 then.  So are you saying that you're not
5 going to speculate because it would
6 disclose attorney/client communications?
7    A.   Right.  I mean, I can tell you
8 that I recognize some of these
9 entities listed in the attachments were
10 subsidiaries of 1986 Congoleum and some
11 were not.  Somebody obviously had an
12 interest in knowing who they were.
13    Q.   Let's go back to Exhibit 11,
14 which is that privilege log, please.  And
15 if you go to page 6 of 9 of the document.
16 Just to advance us forward, 2257, the
17 middle of the page, from August 4th,
18 2006, e-mail subject, a letter, a bunch
19 of attorneys there, and you're copied on
20 it.  And it's described as an
21 attorney/client communication regarding
22 Congoleum's corporate history.
23    And then the next one, the
24 bottom of this page, is 2393.  From
25 August 9th, 2006.  The subject is

Page 121

1 Congoleum.  The e-mail is from Russell
2 Hewit to you and several other attorneys.
3 And it's described as attorney/client
4 communication concerning settlement talks
5 with Century concerning corporate
6 history.  Do you see that?
7    A.   Yes.
8    Q.   And can you tell me what you
9 recall about settlement talks with
10 Century regarding Congoleum's corporate
11 history?
12    MR. WEBER:  Sorry, again, can I
13    have the question read back, please.
14    (Record read.)
15    MR. WEBER:  I'm sorry, I think
16    that one includes information
17    protected by the confidentiality
18    order.
19    Q.   Are you taking your attorney's
20 advice and refusing to disclose the
21 content of those discussions?
22    A.   I don't recall them
23 specifically, so...
24    Q.   Would reviewing these e-mails
25 concerning the corporate history in 2006,

31 (Pages 118 - 121)

Page 122

1  when you were negotiating the settlement
2  with Century, would those e-mails help
3  refresh your recollection as to the
4  parties' discussions concerning
5  settlement talks in Congoleum's corporate
6  history?
7      A.   They would.  But they might
8  still be attorney/client privilege or
9  negotiation.  Without seeing them, I
10  don't know what they are going to say or
11  what the rules might be for them.
12     Q.   I appreciate that.  Do you
13  think the communications between Century
14  and Congoleum in 2006, whether it was
15  e-mail communications or oral
16  communications, do you think knowing what
17  those communications were would shed
18  light on the context of actual
19  settlement?
20         MR. WEBER:  Objection to form.
21         THE WITNESS:  I'm sorry, repeat
22     that question, please?
23         (Record read.)
24         MR. WEBER:  Just note my
25     objection.

Page 123

1      A.   I'm not sure I understand the
2  context -- I'm not sure I understand the
3  question.
4      Q.   If I wanted to understand, oh,
5  here's a deal between Congoleum and
6  Century, right, the months of
7  negotiations, right, knowing what was
8  said back and forth, that would be
9  helpful to knowing what the deal was,
10  right?
11         MR. WEBER:  Objection to form.
12     A.   I think the deal is the
13  contract -- the settlement agreement is
14  the deal.
15     Q.   Of course it is.  Is it your
16  testimony under oath today, Mr. Feist,
17  that knowing the communications that went
18  back and forth between Century and
19  Congoleum leading up to the deal wouldn't
20  shed light on what the intent of the deal
21  is, is that your testimony?
22         MR. WEBER:  Objection to form.
23     A.   I don't know.
24     Q.   And you don't know, in part,
25  because you haven't seen these

Page 124

1  communications in some time, correct?
2      A.   If I saw them -- I don't recall
3  the communications specifically.  If I
4  saw them, then I could try to make a
5  conclusion about that.
6      Q.   Let's look at entry 2483, which
7  is on page 7 of 9, please.  It's in the
8  middle of the page there.  So now we're
9  at August 17th, 2006.  And again, an
10  e-mail from you to Russell Hewit and
11  other attorneys for Congoleum.  And it's
12  described as attorney/client
13  communication regarding Congoleum
14  corporate history.  Do you see that?
15     A.   Yes.
16     Q.   And is it fair to say,
17  Mr. Feist, we looked at at least over a
18  dozen or about a dozen entries in August
19  2006, prior to your submission of the
20  declaration, concerning corporate
21  history, is it fair to say that through
22  those communications you came to feel
23  comfortable with the representation to
24  the Bankruptcy Court that Congoleum was
25  the successor to Congoleum-Nairn?

Page 125

1         MR. WEBER:  Objection to form.
2         THE WITNESS:  Could you repeat
3     the question.
4         (Record read.)
5      A.   I was comfortable that what I
6  stated in my declaration was correct.
7      Q.   And so in August 2006, when you
8  submitted your declaration to the
9  Bankruptcy Court concerning the
10  settlement between Congoleum and Century,
11  there were several revisions or drafts of
12  that declaration, correct?
13     A.   Yes.
14     Q.   And there was also several
15  drafts of the settlement agreement which
16  you were privy to, correct?
17     A.   Yes.
18     Q.   And those draft settlement
19  agreements, fair to say those would shed
20  light on the intents of the parties
21  concerning what was settled and
22  ultimately agreed upon, correct?
23         MR. WEBER:  Objection to form.
24     A.   It would shed light on the
25  wishes of the parties and the

32 (Pages 122 - 125)

1  compromises. The intent maybe, who
2  knows.
3      Q.   Do you recall how many drafts
4  of your declaration there were in August
5  2006?
6      A.   No.
7      Q.   Do you remember who was
8  involved in reviewing -- let me put it
9  this way. Who actually drafted your
10  declaration in August of 2006?
11      A.   It's like who drafts the New
12  York Times. I think the coordinator was
13  probably Erica Carrig at Pillsbury, a
14  junior. And Pillsbury submitted the
15  stuff, so they kind of controlled the
16  document. But I remember everybody
17  waited on it.
18      Q.   Okay. Let's look at some of
19  the entries and make sure I know who some
20  of these names are.
21      If you look at the bottom of
22  page 7 of 9 of Feist Exhibit 11, so if
23  you start with fourth from the bottom,
24  entry 2486, August 18th, 2006, do you see
25  that, draft declaration to support

1  Century settlement?
2      A.   Yes.
3      Q.   And Richard Epling from
4  Pillsbury sends it to you. And it's
5  described as attorney/client
6  communication regarding draft Feist
7  declaration in support of Century's
8  settlement. Do you see that?
9      A.   Mm-mmm.
10      Q.   That's consistent with your
11  recollection that at least the first
12  mention of it we see, at least on this
13  log, is coming from Pillsbury, is that
14  consistent with your recollection?
15      A.   Yes.
16      Q.   Okay. The next entry of 2487,
17  right below it, appears to be just the
18  attachment work product regarding draft
19  declaration. Below that entry 2488 from
20  August 18th, again it's described as
21  Feist declaration in support of Century
22  settlement. This time you send it to
23  Kerry Brennan at Pillsbury with a copy to
24  Mr. Epling at Pillsbury, and it's
25  described as attorney/client

1  communication regarding draft Feist
2  declaration in support of Century
3  settlement.
4      Kerry Brennan, who you were
5  thinking about or is this somebody
6  different?
7      A.   No, it's somebody different.
8      Q.   Okay. And do you recall Kerry
9  Brennan's role in your draft declaration?
10      A.   I mean, she was Richard's
11  partner and was very active in the case.
12      Q.   Okay. If you flip the page,
13  please. So now we're on page 8 of 9 of
14  Feist Exhibit 11. The first entry there
15  is 2490 from the same date. e-mail
16  subject is Feist declaration/settlement.
17  And now, Kerry Brennan of Pillsbury is
18  sending it to a much broader audience
19  including Covington attorneys Russ Hewit,
20  and there is Erica Carrig in the c.c.
21  group.
22      A.   Mm-mmm.
23      Q.   Attorney/client communication
24  regarding draft Feist declaration,
25  support of motion for approval of Century

1  settlement is the description. And do
2  you recall what, if any, the role of
3  Covington's attorneys would have been in
4  your draft declaration?
5      A.   To review it from a coverage
6  standpoint.
7      Q.   And the same question with
8  Mr. Russell Hewit, do you recall what his
9  role would have been in regards to your
10  declaration?
11      A.   It would also have been
12  coverage and, you know, Russ was familiar
13  with the corporate history to the extent
14  anybody is.
15      Q.   I won't go through them. But
16  then the next entry is at 2492, further
17  e-mails on August 18th, and then 2494,
18  further e-mails concerning draft Feist
19  declaration.
20      If you go down to the next
21  page, page 9 of 9 of Exhibit 11, at the
22  very top, the entry is 2512, is now
23  September 15th of 2006. And the subject
24  is revised Feist draft. And then there
25  is entry 2514, there is further e-mail

33 (Pages 126 - 129)

Page 130

1 concerning Feist affidavit. And finally
2 2515, September 15th, there is an e-mail,
3 subject, final version of Feist
4 declaration. Do you see that?
5    A.   Yes.
6    Q.   And is that generally
7 consistent with your recollection,
8 Mr. Feist, that there were at least, over
9 approximately a little less than a month,
10 there were, you know, six or seven
11 e-mails concerning your draft affidavit.
12 Does that sound right to you?
13    A.   That sounds reasonable.
14       MR. WEBER: I don't want to give
15 a speaking objection, but I think
16 you -- are you talking about the
17 Century affidavit or are you talking
18 about a different affidavit? Sorry.
19       MR. THOMSON: That's okay.
20       MR. WEBER: Not my practice to
21 do speaking objections.
22       MR. THOMSON: It's a fair
23 clarification.
24    Q.   And let's go back to
25 Mr. Weber's point. In the August 2006

Page 131

1 e-mails we went through concerning the
2 Feist declaration that specifically say
3 they are related to the Century
4 settlement, right? So if you look at
5 entry 2494, for example, on page 8 of 9,
6 kind of a third down there, you see that
7 from August 18th, 2006?
8    A.   Yes.
9    Q.   So some of those attorneys,
10 right, those are some of the same
11 attorneys, Mr. Dolin from Covington,
12 et cetera, those are some of the same
13 attorneys that you were having e-mail
14 exchanges with concerning Congoleum's
15 corporate history, correct?
16    A.   Yes.
17       MR. THOMSON: This is a good
18 stopping point. Could we go off the
19 record for a couple of minutes and
20 talk at least.
21       THE VIDEOGRAPHER: The time on
22 the video monitor is 11:05 a.m., we
23 are off the record. This ends media
24 2.
25       (Off the record.)

Page 132

1       THE VIDEOGRAPHER: We are back
2 on the record. The time on the video
3 monitor is 11:18 a.m. This starts
4 media 3.
5       (Feist Exhibit 14, Notice of
6 motion in Bankruptcy Court for
7 approval of settlement and buyback
8 agreement, was so marked for
9 identification, as of this date.)
10    Q.   Mr. Feist, we have been talking
11 a lot about your August 21st, 2006
12 declaration. I am handing you Exhibit
13 14, and that contains a motion in the
14 Bankruptcy Court for approval of the
15 settlement and buyback agreement and
16 releases between Congoleum, the Congoleum
17 entities and the Century entities, as it
18 states on the first page. Do you see
19 that?
20    A.   Yes.
21    Q.   And that's the notice of that
22 motion. And I will represent to you that
23 behind the notice, document, or Exhibit
24 14 contains the motion submitted by
25 Congoleum and some of the exhibits,

Page 133

1 including Exhibit A, which is the
2 settlement agreement itself, and Exhibit
3 B, which was your declaration, okay. And
4 we will get to all three of those in
5 turn.
6       Focusing first on the motion,
7 and the best way to do this, Mr. Feist,
8 at the top of the page, it says page 1 of
9 27. If you go two pages back. You're on
10 the notice right now. I apologize. So
11 there is the --
12    A.   Got it.
13    Q.   So the motion is 1 of 27. Do
14 you see that?
15    A.   Yes.
16    Q.   Okay. If you could look to
17 page 4 of 27, please, paragraph 8. First
18 off, you know that the motion for this
19 approval of the settlement agreement,
20 that was filed by attorneys for
21 Congoleum?
22    A.   Yes.
23    Q.   And it's dated August 21st,
24 2006. Paragraph 8 on page 4 of the
25 motion states "Congoleum and the Century

34 (Pages 130 - 133)

Page 134

1  Entities dispute whether and to what
2  extent a subject policies afford coverage
3  for: (i) all asbestos claims that may be
4  subject to the Claimant Agreement; (ii)
5  all other asbestos claims; and (iii) all
6  non asbestos-related claims such as
7  environmental and other general liability
8  claims (the 'Coverage Dispute')."
9       Do you see that?
10  A.  Yes.
11  Q.  So as defined in the motion,
12  the coverage dispute recognizes that some
13  of the disputes between Congoleum and
14  Century included environmental claims,
15  right?
16  A.  Yes.
17  Q.  And if you can flip over to --
18  well, before I get to a different
19  document. Century's position, the reason
20  it was willing to, it would have only
21  done -- let me start over in English.
22       Do you recall that Century's
23  position was it only would have entered
24  this settlement with Congoleum if Century
25  would be protected against future claims

Page 135

1  for both asbestos and non-asbestos
2  claims?
3       MR. WEBER: Objection to form.
4       You can answer.
5  A.  I am not following the
6  question. Can you repeat it?
7  Q.  Yeah. So let me get a document
8  to make it easier.
9       (Feist Exhibit 15, Document
10  bearing Bates number BATH000036, was
11  so marked for identification, as of
12  this date.)
13  Q.  So Exhibit 15, this is a
14  declaration in support of Congoleum's
15  motion for the approval of the settlement
16  between Congoleum and Century, right?
17  A.  Yes.
18  Q.  Okay. And this is filed just
19  two days later, from your declaration
20  this one is filed on August 23rd, 2006,
21  right?
22  A.  Yes.
23  Q.  And if you go over to the
24  second page of this document, Maria
25  Matteo Thompson identifies herself as

Page 136

1  assistant vice principal and president
2  with Resolute Management.
3       And you understood Resolute at
4  that time was working, representing
5  Century in regards to its insurance
6  coverage?
7  A.  Yes.
8  Q.  And if you flip to page 4 of 11
9  here, paragraph 7, she writes "As a
10  condition of the Settlement and Buyback
11  Agreement, Century will pay the
12  settlement and buyback amount only if it
13  can have certainty that the Century
14  Entities will be released from and have
15  injunctive protection against all claims,
16  including non-asbestos claims."
17       Do you see that?
18  A.  Yes.
19  Q.  And so you understood that was
20  part of the settlement agreement, right?
21  A.  I would defer to the settlement
22  agreement.
23  Q.  Let me strike that. You
24  understand that Century's representation
25  to the Court as part of seeking approval

Page 137

1  of the settlement was the representation
2  that I just made to you, right?
3       MR. WEBER: Objection to form.
4  A.  Yes.
5  Q.  Let's go back to the larger
6  exhibit, Exhibit 14, please. And if we
7  could look at paragraph 10 on page 4, 4.7
8  from the motion filed by Congoleum.
9  Paragraph 10 says "The parties engaged in
10  lengthy and comprehensive negotiations
11  regarding the terms of the Settlement
12  Transactions, and the Settlement and
13  Buyback Agreement represents an
14  arm's-length compromise on the issues of
15  all parties thereto. See declaration of
16  Howard N. Feist, III attached as Exhibit
17  B."
18       Do you see that?
19  A.  Yes.
20  Q.  Did you have a general
21  understanding as to why it was necessary
22  for you to submit a declaration in
23  support of the motion that Congoleum was
24  filing for approval of the settlement
25  with Century?

35 (Pages 134 - 137)

Page 138

1    A.   I think generally any facts
2   that were in a motion had to be supported
3   by declarations from the company.  I have
4   signed a ton of these.
5    Q.   If you look at the next page
6   here, paragraph 13, and this is all under
7   the heading of, paragraph 12 and 13 are
8   under the heading of "Settlement and
9   Buyback Agreement."
10       The first sentence of paragraph
11  13, says "Pursuant to the Approval Order
12  attached to the Settlement and Buyback
13  Agreement as Exhibit A, the Settlement
14  and Buyback Agreement is to be
15  implemented, in part, through the sale of
16  the subject policies to Century, pursuant
17  to Section 363(b) of the Bankruptcy
18  Code."
19       Do you see that?
20   A.   Yes.
21   Q.   And I am certainly not asking
22  for a legal opinion, Mr. Feist, but do
23  you have a general understanding as to
24  what that meant?
25       MR. WEBER:  Object to the form.

Page 139

1        You can answer.
2    A.   Again, I would go back to, we
3   were selling back our rights and the
4   Bankruptcy Code has got provisions for
5   approving sales like that.
6    Q.   And let's jump over to
7   paragraph 14.  The next page, page 6 of
8   27, "The Approval Order also provides
9   that effective upon the first payment
10  date but subject to the satisfaction of
11  the conditions precedent to the trigger
12  date, pursuant to Sections 105(a) and
13  306(b) and (f) of the Bankruptcy Code,
14  all persons and entities who have
15  asserted or who might subsequently
16  assert, claims, including asbestos
17  claims, against the Century Entities
18  relating to or arising out of the subject
19  policies, shall be forever enjoined,
20  barred and estopped from asserting any
21  such claims," et cetera, et cetera.
22       Do you see that?
23   A.   Yes.
24   Q.   And fair to say that as
25  represented here in the order, you

Page 140

1   understood that as a result of the
2   settlement being entered by the
3   Bankruptcy Court, all persons and
4   entities who might try to bring claims
5   against Century relating to the policy
6   were enjoined from doing so, correct?
7        MR. WEBER:  Objection to form.
8    A.   I mean, I need to trace back
9   all of the definitions.
10   Q.   Okay.  I don't want you to do
11  that, okay.  That will take a long time,
12  all right?
13   A.   Okay.
14   Q.   But generally speaking, did you
15  understand that that's the deal with a
16  buyback, that Century wanted and Century
17  got, through the settlement, that nobody
18  could use the policies, could sue under
19  the policies going forward after this
20  settlement?
21   A.   No, my understanding is Century
22  got the liabilities resulting from
23  Congoleum's rights under those policies
24  people couldn't sue Century for.  But I
25  don't believe rights of others under

Page 141

1   those policies would be affected.
2    Q.   And what is that understanding
3   based upon?
4    A.   It was in my declaration.
5    Q.   The one from 2006 that we're
6   going to look at?
7    A.   Yeah.
8    Q.   Did you have discussions about
9   that understanding of the settlement
10  agreement with Century?
11       MR. WEBER:  Objection.
12       Just an instruction, you can
13      answer that yes or no.
14   A.   I didn't negotiate directly
15  with Century.  It was all through the
16  lawyers.
17   Q.   Are you aware of whether there
18  were discussions about that aspect of
19  your understanding between Century and
20  Congoleum?
21       MR. WEBER:  Just yes or no.
22   A.   Yes.
23   Q.   Okay.  And do you know who
24  would have had those conversations with
25  Century concerning that issue in the

36 (Pages 138 - 141)

1  which is the Settlement and Buyback
2  Agreement.  It's on page 2 of 3 of the
3  filing, the term is settlement of policy
4  buyback agreement and release.  Do you
5  see that?
6      A.   Yes.
7      Q.   And just if you go to the last
8  page -- well, I'm sorry, it's not the
9  last page, because there are exhibits to
10  this too.  If you go to page 31 -- 32 of
11  63.  That's your signature on behalf of
12  Congoleum Corporation on August 17th,
13  2006?
14      A.   Yes.
15      Q.   So let's go on page 6 of 63,
16  under the definitions.
17          MR. WEBER:  Using the top
18      numbers?
19          MR. THOMSON:  Yes, 6 of 63, so
20      page 5 on the bottom.
21      Q.   So the definition K, for
22  Congoleum entities, right, it says means,
23  and then it lists almost 13 different
24  groups.  And the first groups were the
25  debtors.  And that included Congoleum

1  Corporation at the time, correct?
2      A.   I'm sorry?
3      Q.   You understood that the
4  debtors --
5      A.   Was Congoleum Corporation, yes.
6      Q.   Right.  Number 5, if you read
7  down a little, a couple of lines,
8  included the entity Congoleum-Nairn Inc.
9  named in the policies and then it lists a
10  bunch of policies and then at the very
11  last line of that page also lists the
12  entity Bath Industries, Inc. named in
13  several policies.  Do you see that?
14      A.   Yes.
15      Q.   And then reading over to the
16  next page, the second, end of the second
17  to the top line says "To the full extent,
18  but only to the extent such entities
19  conducted, managed, operated or were in
20  any way involved in the Congoleum
21  Flooring Business."
22          Do you see that?
23      A.   Yes.
24      Q.   And the last one I will point
25  to, if you go down to number 8, Roman

1  numerals number 8 there, a couple of
2  lines down, also defined as Congoleum
3  entities are "The direct or indirect
4  predecessors, successors and assigns of
5  each of the foregoing persons in their
6  capacities as such and to the full
7  extent, but only to the extent that the
8  debtors have power and authority to give
9  the releases set forth in Section 6 on
10  their behalf."
11          Do you see that?
12      A.   Yes.
13      Q.   Did you have any involvement in
14  drafting of that definition?
15      A.   I mean, it was drafted by the
16  lawyers.  I obviously reviewed it.
17      Q.   Do you recall how that, kind of
18  why this definition is in the settlement
19  agreement?
20          MR. WEBER:  Objection to form.
21      You can answer.
22      A.   No, I mean these are
23  complicated documents that had a lot of
24  wordsmithing done.
25      Q.   Do you know whether Century

1  asked for this definition to include all
2  of these different parties?
3          MR. WEBER:  Objection to form.
4      I will direct the witness not to
5      answer.
6      Q.   Are you going to accept your
7      attorney's --
8      A.   I don't know.  I mean I don't
9  know the answer to your question.  Not
10  that I don't know if I am going to accept
11  his advice.
12      Q.   Understood.  Fair to say you
13  recall any discussions about why this
14  definition contains the entities it does?
15          MR. WEBER:  Just a yes or no.
16      A.   Yes.
17      Q.   Okay.  And are you refusing to
18  disclose the content of those discussions
19  per your attorney's instructions?
20          MR. WEBER:  Well, now your
21      question includes both his own
22      attorneys and communications with
23      Century's.  You might want to clarify.
24      Q.   You said you recall some
25  discussions concerning which entities are

39 (Pages 150 - 153)

Page 166

1    Q.   Besides what you just stated,
2  do you know what individuals, if any,
3  would have been the ones to have put this
4  general concept that you're talking into
5  the negotiations between Congoleum and
6  Century when they were negotiating the
7  settlement in 2006?
8          MR. WEBER:  Object to the form.
9      Well, I'm not sure I understood the
10     question, but if you understood it,
11     you can answer.
12     A.   It wasn't really a negotiation.
13  There was drafting to be done that had
14  to, you know, had to make that happen.
15  And that's what they were trying to do.
16  And it's obviously a challenge for a
17  draftsperson.
18          But I mean we didn't negotiate,
19  if you give us a little more money we
20  will sell Bath's rights under the policy.
21     Q.   Just to be clear, the
22  settlement discussions represented in the
23  motion, it went on for years though,
24  right?  So when you say it wasn't much of
25  a negotiation, I am just trying to

Page 167

1  understand, are you saying in general?
2      A.   I am saying this definition.
3      Q.   I got it.  Okay.  Understood.
4  But to be clear, if we wanted to find out
5  whether this issue, iterations of this
6  definition, for example, what went in,
7  what people's wishes were and compromises
8  were, those would be in the drafts that
9  were exchanged between Century and
10  Congoleum, correct?
11     A.   Without looking -- I don't know
12  whether it was discussed with the
13  attorneys.  I'm not sure what you would
14  find in there.
15     Q.   But if we had a question about
16  what this stuff meant and we wanted to
17  see what people were bargaining for,
18  right, those drafts and those
19  communications we were talking about
20  between Congoleum and Century, that's
21  what would shed light on it, right?
22          MR. WEBER:  Objection to form.
23     Q.   So let's look at rep I, please,
24  on page 25 of 63.  The debtors represent
25  and warrant that, I am not going to read

Page 168

1  through them, several different entities,
2  and then second to last line "Bath Iron
3  Works Corp. have no responsibility for
4  any of the liabilities of the Congoleum
5  Flooring Business."
6          Do you see that?
7      A.   Yes.
8      Q.   Okay.  And fair to say that the
9  issue of whether Bath Iron Works had
10  responsibility for any of the liabilities
11  of the Congoleum Flooring Business was
12  one of the issues negotiated between
13  Century and Congoleum in 2006, right?
14          MR. WEBER:  Objection to form.
15     A.   No.
16     Q.   It was not one of the issues
17  that was part of the settlement
18  negotiations between Century and
19  Congoleum?
20     A.   I don't think so.  Why would it
21  be?
22     Q.   Why would it be included in
23  this representation?
24     A.   Only because we had to
25  delineate between the insurance rights of

Page 169

1  Congoleum and the insurance rights of
2  others.
3      Q.   Where does it say anything
4  about insurance rights in rep I for
5  Congoleum?
6      A.   Because the liabilities give
7  rise to the insurance rights.  So you
8  can't say that you're entitled to the
9  insurance without also saying that the
10  other potentially insured party is not
11  liable.
12     Q.   Right.  So once you say, if you
13  say you're entitled to certain insurance,
14  you're also acknowledging that you're
15  entitled, that you're responsible for the
16  liability for which you're getting a
17  coverage, right?
18          MR. WEBER:  Objection to form.
19     A.   Yes.
20     Q.   With regard to rep and warranty
21  I, do you recall any specific discussions
22  concerning that rep?
23     A.   No.
24     Q.   Lets look at rep K here.  Let's
25  go back to I actually for one second.  So

43 (Pages 166 - 169)

1  that last line, so Congoleum's
2  representing and warranting that Bath
3  Corp. has no responsibility for any of
4  the liabilities of the Congoleum Flooring
5  Business, right?  And as we saw from the
6  motion, one of the contested liabilities
7  between Century and Congoleum related to
8  environmental liabilities, correct?
9      A.   Correct.
10     Q.   And so in making the rep and
11  warranty I, Congoleum was stating that
12  Bath Iron Works Corp. had no
13  responsibility for those liabilities,
14  those environmental liabilities as well,
15  right?
16         MR. WEBER:  Objection to form.
17     A.   If they were liabilities of the
18  Congoleum Flooring Business.
19     Q.   Okay.  So that's a yes, if they
20  were liabilities of the Congoleum
21  Flooring Business and they were
22  environmental, those would be included in
23  this rep I, correct?
24     A.   Yes.
25     Q.   Let's look at rep K, please.

1  "The debtors represent and warrant that
2  the flooring operations of the Congoleum
3  entities to which they succeeded included
4  the manufacture, sale, distribution,
5  installation, formulation, marketing,
6  transport, handling or any other activity
7  involving in any way flooring, vinyl
8  sheeting, flooring or floor tile products
9  of any kind were headquartered in Kearny,
10  New Jersey continuously from before 1965
11  to 1987."
12         Do you see that?
13     A.   Yes.
14     Q.   I just want to ask you, well,
15  first, do you recall any discussions you
16  had concerning that specific rep and
17  warranty, Mr. Feist?
18     A.   No.
19     Q.   Do you recall if you were
20  involved in the actual drafting of that?
21     A.   I was not.
22     Q.   Do you know who would have
23  been?
24     A.   Could have been -- it was
25  probably a coverage lawyer.

1      Q.   I don't want to dwell on it,
2  but the definition we had looked at on
3  page 7 of 13, when it discussed the
4  Congoleum Flooring Business rep or
5  definition, that one, you know, much of
6  this is very similar to that last part of
7  that definition L on page 7 of 63,
8  Mr. Feist.  But that one refers to the
9  business as being headquartered.  This
10  one is a representation about the
11  flooring operations of the Congoleum
12  entities.  And I am just curious if you
13  knew why the definitions were slightly
14  different?
15     A.   They are worded differently.  I
16  don't think they are saying anything
17  differently.  They say headquartered in
18  Kearny.
19     Q.   Rep K talks about the flooring
20  operations of the Congoleum entities, the
21  definition we previously looked at, that
22  goes back to include the predecessors of
23  Congoleum were headquartered in Kearny?
24     A.   I don't know why there is a
25  difference.

1      Q.   Okay.  Can you just flip the
2  page once to page 26 of page 63 very
3  quickly, under section 13, where it says
4  "Entire agreement and term."  Do you see
5  that?
6      A.   Yes.
7      Q.   And about the third sentence
8  down, it says "If the facts or law
9  related to the subject matter of this
10  Settlement and Buyback Agreement are
11  found hereafter to be other than is now
12  believed by any of the parties, the
13  parties expressly accept and assume the
14  risk of such possible difference of fact
15  or law and agree that this Settlement and
16  Buyback Agreement nonetheless shall be
17  and remain effective according to its
18  terms."
19         Do you see that?
20     A.   Yes.
21     Q.   Do you recall how that
22  provision became a part of the settlement
23  agreement?
24     A.   No.
25     Q.   You don't recall any specific

1  discussions concerning that?
2     A.  Nope.
3     Q.  Okay.  But you understood even
4  if Congoleum was wrong about a factual
5  statement that was made in this
6  settlement, it was required to live by
7  it, right?
8        MR. WEBER:  Objection to form.
9        You can answer.
10    A.  I didn't think about it.
11    Q.  As I just read that sentence,
12  does that make sense to you as a
13  layperson, as a sophisticated
14  businessman?
15    A.  Yes.
16    Q.  Let's flip a couple of pages
17  back to your declaration.  And that's
18  going to be, you've got to go all the way
19  past the 63 pages, so right after 63 of
20  63, the next page should be Exhibit B of
21  your declaration.  Do you see that?
22    A.  Yes.
23    Q.  Just for formality's sake, the
24  last page, that's your signature there,
25  correct?

1     A.  Sorry, what page is that?
2     Q.  I will just use the bottom
3  pages for this one.  Page 7.
4     A.  Yes.
5     Q.  So the seven-page declaration
6  you submitted in support of Congoleum's
7  motion of approval of the
8  Century/Congoleum settlement, right?
9     A.  Yes.
10    Q.  And on page 1, it starts off
11  "I, Howard N. Feist, III, being of full
12  age, do hereby certifies as follows."
13    A.  Yes.
14    Q.  You understand you were
15  certifying the accuracy of your
16  statements to the Bankruptcy Court?
17    A.  I did.
18    Q.  So you understood you were in
19  essence under oath, right?
20    A.  Yes.
21    Q.  Let's jump forward to paragraph
22  8, which is on page 5 here.  So "The
23  terms of the settlement and buyback are
24  the product of extensive and
25  comprehensive arm's-length negotiations.

1  And they reflect true compromise by all
2  the parties thereto, including the FRC
3  and the ACC," right?
4     A.  Yes.
5     Q.  And then let's jump over to the
6  next page, paragraph 14 on page 6.  Do
7  you see that?
8     A.  Mm-mmm.
9     Q.  So it reads "Based upon a
10  review of the documents in Congoleum's
11  possession, I understand the following."
12        And so my first question,
13  Mr. Feist, is what documents did you
14  review to provide the following
15  representations in your declaration?
16    A.  I don't remember reviewing
17  specific documents.  It was documents
18  that I would have reviewed over time.
19    Q.  And at that time you still had
20  available to you the 1986 transaction
21  documents?
22    A.  Yes.
23    Q.  Okay.  And so to be clear, in
24  August 2006, when you filed this
25  agreement, did you look, at that time, at

1  the 1986 transaction documents?
2     A.  I don't remember.  I may have.
3  I mean, I was familiar with them.  I
4  might not have needed to look at them
5  again.
6     Q.  And sitting here today, can you
7  identify any specific document that you
8  would have reviewed at the time?
9     A.  I may have gone through a list
10  of, you know, a list of the insurance
11  policies.  I don't remember specifically.
12    Q.  Do you know if your attorneys,
13  any of the outside attorneys for
14  Congoleum reviewed the 1986 transaction
15  documents at the time?
16    A.  I don't.
17    Q.  And did you think you were
18  missing any important documents that you
19  needed at the time?
20    A.  No.
21    Q.  And do you recall around this
22  time that people were looking for certain
23  transaction documents relating to
24  Congoleum in the 1986 era?
25    A.  You mean from e-mails on the

45 (Pages 174 - 177)

1  privilege log?
2      Q.   Or generally.  Do you recall
3  that?
4      A.   I mean, from e-mail traffic,
5  obviously the names of these entities,
6  that had to be understood to draft this.
7      Q.   Do you recall that Don Golemme
8  affirmatively said to you and the outside
9  attorneys of Congoleum, that Congoleum
10 would not be contacting Bath Iron Works
11 about historical files?
12     A.   I don't remember that.
13     Q.   Handing you what I am marking
14 as Feist Exhibit 17.
15         (Feist Exhibit 17, Document
16     bearing Bates number CONG_0098647, was
17     so marked for identification, as of
18     this date.)
19     Q.   So let's start from the last
20 page of Exhibit 17, Mr. Feist.  So the
21 first e-mail in the chain from Tuesday,
22 September 25th, 2015.  So we're about 11
23 months before your declaration.  And it's
24 from Mr. Golemme to someone with the name
25 or initials of good@BragarWexler.

1          Do you know who that is?
2      A.   I don't.  No.
3      Q.   And copied as well as you is
4  Mr. Hewit, Mr. Feldman, and someone from
5  the Dughi Hewit firm.  Do you see that?
6      A.   Yes.
7      Q.   And the subject is Congoleum
8  transactions.  Mr. Golemme writes "David,
9  during January 8, 1988, when you were
10 with the Battle Fowler firm, you sent me
11 a summary of Congoleum transactions from
12 1968 to 1986.  We are trying to locate
13 the 1984 purchase agreement wherein N&R
14 Ventures did an LBO of Congoleum."
15         Do you see that?
16     A.   Yes.
17     Q.   You respond to Mr. Golemme and
18 copy your outside attorneys, you drop
19 that other person, on September 28th, and
20 you write "Don, You might also want to
21 try and contact Bath Iron Works' finance
22 or legal departments," right?
23     A.   Right.
24     Q.   Don writes back to you, right
25 above that, "Skip," he writes back also

1  on September 28th, "We will not be
2  contacting BIW.  However, we might
3  consider calling Hillside, since they
4  might have copies in our 1986 files."
5          Do you see that?
6      A.   Yes.
7      Q.   And then you say "I called John
8  at Hillside, they do not think they have
9  a copy of the 1984 agreements but
10 Rosemary will check their files"?
11     A.   Yup.
12     Q.   And then Don says, "I
13 understand in 2000 the Battle Fowler firm
14 was merged into Paul Hastings.  Do you or
15 John have a contact there that might be
16 able to locate the 1984 agreements."
17 Right?
18     A.   Right.
19     Q.   Do you recall if you contacted
20 or provided a contact to Mr. Golemme
21 concerning those old law firms?
22     A.   I don't.
23     Q.   And do you recall ever learning
24 why Mr. Golemme, during the bankruptcy
25 that could impact the rights of Bath Iron

1  Works, said that Congoleum would not be
2  contacting Bath Iron Works for historical
3  files?
4          MR. WEBER:  Objection to form.
5      A.   I don't know why Don decided
6  not -- said we're not contacting.
7      Q.   Let's look back to -- you can
8  put that document to the side.  Let's
9  look back at Feist Exhibit 14.  We are
10 looking at your declaration on
11 August 21st, 2006.  We are looking at
12 page 7 of 8, paragraph 14, right, we were
13 just talking about based on your review
14 of documents and then you made several
15 representations.
16     A.   Yes.
17     Q.   So paragraph -- let's look at
18 14A now.  If you could read that to
19 yourself, please.
20     A.   You're talking about with
21 respect to the Congoleum Flooring
22 Business?
23     Q.   Yes, there is A, B and C.  If
24 you could just read A and then look up
25 when you're done, please.

46 (Pages 178 - 181)

Page 182

1       (Witness reviews document.)
2       A.    Okay.
3       Q.    In this representation you made
4  to the Bankruptcy Court in August of
5  2006, Mr. Feist, is a true and accurate
6  statement, right?
7       A.    Yes.
8       Q.    And do you understand,
9  generally, why you had to include this
10  statement in your declaration in support
11  of Congoleum's motion for approval of the
12  settlement?
13       A.    That would have been advised by
14  attorneys.
15       Q.    And do you recall any specific
16  changes that you or other people made to
17  this subpart of your declaration, as you
18  sit here today?
19       A.    Yes.
20       Q.    What do you recall being
21  changed?
22       A.    It was just moving wording of
23  the respects to the Congoleum Flooring
24  Business to make it clearer, make it so I
25  thought it was clearer.

Page 183

1       Q.    And you recall that?  Have you
2  seen documents that show that recently or
3  you just recall that from that long ago?
4       A.    I just remember it was part of
5  the -- it was something I felt was
6  important.
7       Q.    Do you recall discussions about
8  that with anyone?
9       A.    Not specifically.
10       Q.    Do you recall where the "with
11  respect" was before you asked it to be
12  changed?
13       A.    I don't.
14       Q.    If you flip the page to 14B.
15  If you could just read that to yourself
16  and let me know.
17       A.    Okay.
18       Q.    And that representation you
19  made to the Bankruptcy Court in 2006 in
20  your declaration, that's a true and
21  accurate statement, correct?
22       A.    Yes.
23       Q.    And at the time of this
24  declaration in 2006, Congoleum had
25  certain environmental liabilities at the

Page 184

1  time, right?
2       A.    Alleged, yeah.
3       Q.    And do you recall any changes
4  to this provision that was made in the
5  drafts of your declaration?
6       A.    No.
7       Q.    Do you recall any discussions
8  about this provision in your declaration?
9       A.    I do not.
10       Q.    And finally, if you could just
11  read 14C to yourself and let me know when
12  you've read it.
13       A.    Okay.
14       Q.    And that representation to the
15  Bankruptcy Court in the declaration is a
16  true and accurate statement, right?
17       A.    Yes, other than Kearny being
18  misspelled.
19       Q.    Fair point.  And the same
20  question as before, do you recall making
21  any changes to any of the drafts
22  concerning this provision?
23       A.    No.
24       Q.    Do you recall any discussions
25  about the specific provision with anyone?

Page 185

1       A.    No.
2       MR. THOMSON:  Why don't we go
3  off the record, please.
4       THE VIDEOGRAPHER:  The time on
5  the video monitor is 12:17 p.m., we
6  are off the record.  This ends media
7  unit 3.
8       (Lunch recess:  12:21 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

47 (Pages 182 - 185)

Page 186

1           Afternoon Session
2              12:57 p.m.
3  H O W A R D  N.  F E I S T, III, having
4  been previously duly sworn, was examined
5  and testified further as follows:
6           THE VIDEOGRAPHER:  We are back
7     on the record.  The time on the video
8     monitor is 12:53 p.m., and this starts
9     media unit 4.
10  EXAMINATION (Continued)
11  BY MR. THOMSON:
12     Q.   Mr. Feist, prior to lunch we
13  were talking about your declaration
14  submitted in the bankruptcy in August of
15  2006.  As reflected in Exhibit 1, I will
16  just -- I don't think you need to bring
17  it out, but if you need to, BIW submitted
18  an interrogatory to Congoleum asking to
19  identify all persons who may have
20  knowledge or information related to the
21  representations made by Congoleum as part
22  of the Century settlement motion.
23          And in the interrogatory 8,
24  Congoleum identified you, attorneys at
25  Dughi Hewit, Pillsbury, Okin Hollander

Page 187

1  and Covington, the only non-attorney
2  identified other than you was Roger
3  Marcus, former chief executive officer
4  for Congoleum.  I'm just curious what his
5  involvement would have been in the
6  Century settlement.
7     A.   I think he would have had
8  minimal.  Roger was involved kind of at a
9  strategic level and maybe the total
10  dollar amount.  But beyond that, he
11  didn't really get involved in the
12  details.
13     Q.   So you don't think he would
14  have been involved in the details of the
15  specific representations that we walked
16  through in your declaration?
17     A.   No.
18     Q.   To the extent, when you were
19  CFO of Congoleum, what was your
20  involvement in providing information to
21  Ernst & Young in connection with their
22  audits of financial statements of
23  Congoleum?
24     A.   We gave them whatever they
25  wanted.

Page 188

1     Q.   Okay.  And were you reviewing
2  what was sent to them or approving what
3  was sent to them or anything like that?
4     A.   No.  I mean normally, you know,
5  I would sign a request, either a letter
6  to an attorney, if it's for a legal
7  letter, if it's a bank balance
8  confirmation, the bank wants to see my
9  signature on it.  But I wouldn't normally
10  review the lawyers' work product other
11  than -- I would get a copy, but not --
12  they wouldn't run it by me first.
13     Q.   I am going to hand you what we
14  will mark as Feist Exhibit 18.
15          (Feist Exhibit 18, Document
16     bearing Bates number CONG_0047592, was
17     so marked for identification, as of
18     this date.)
19     Q.   So this Exhibit 18 is a letter
20  dated March 14th, 2007 from the law firm
21  of Dughi Hewit to Ernst & Young.  And in
22  the first paragraph it says "This is in
23  response to your request of February 1st,
24  2007 that we provide you with certain
25  information in connection with your audit

Page 189

1  of the financial statements of Congoleum
2  Corporation as of December 31st, 2006."
3  Right?
4     A.   Right.
5     Q.   And so this is, the date of
6  this letter is, you know, give or take
7  nine or ten months after your declaration
8  to the Bankruptcy Court in regard to the
9  Century settlement that you looked at,
10  right?
11     A.   Yes.
12     Q.   If you flip to page 5, which
13  has a Bates number in the bottom of
14  CONG_47585.  And there is a number 2 and
15  there is a list of the -- there is an
16  underlying sentence that says Diamond
17  Alkali Superfund site of the Passaic
18  River area study.  Do you see that?
19     A.   Yes.
20     Q.   And it reads "The United States
21  EPA served Congoleum Corporation with a
22  request for information late December
23  1996 concerning possible discharges from
24  Congoleum's former Kearny, New Jersey
25  plant into the Passaic River.  Congoleum

48 (Pages 186 - 189)

Page 190

1 has responded to EPA's request for
2 information." Do you see that?
3     A.   Yes.
4     Q.   And in discussing that
5 potential liability with Congoleum's
6 auditors, Mr. Hewit wrote, if you skip
7 down a paragraph, "Congoleum owned and
8 operated a manufacturing facility at the
9 Kearny site from the late 1880's to the
10 early or mid-1970's and then maintained
11 administrative offices in a small
12 laboratory at the site until the
13 mid-1980's."
14         Do you see that?
15     A.   Yes.
16     Q.   And Mr. Hewit is more familiar
17 with the history of the company than you,
18 correct?
19         MR. WEBER:  Objection to the
20     form.
21     A.   I don't know if he's more
22 familiar.  I would say we probably looked
23 at the same histories.
24     Q.   Okay.  And the last page here,
25 you get a cc of this letter to the

Page 191

1 auditors, correct?
2     A.   Yes.
3     Q.   And that statement that
4 Mr. Hewit made to your auditors as part
5 of financial reporting requirements of
6 publicly traded Congoleum at the time,
7 you have no reason to believe that
8 statement is inaccurate in any way,
9 right?
10     A.   That particular paragraph?
11     Q.   The sentence I read, yes.
12     A.   I don't have any reason to
13 think it's inaccurate.
14     Q.   And that representation to your
15 auditors, that's not in the context of
16 specific insurance policies, is it?
17     A.   No.
18     Q.   You can put that document to
19 the side.  This is going to be Feist
20 Exhibit 19.
21         (Feist Exhibit 19, 2009
22     declaration in relation to summary
23     judgment motion, was so marked for
24     identification, as of this date.)
25     Q.   So Exhibit 19, Mr. Feist, do

Page 192

1 you recall submitting another declaration
2 in the Bankruptcy Court in 2009 in
3 relation to a summary judgment motion?
4     A.   I am trying to get my bearings
5 on this.
6     Q.   Stick with the first page
7 first, if you read that first sentence it
8 might help to orient you.
9     A.   Okay.
10     Q.   And the declaration starts --
11 this is 2009, right?  So almost two and a
12 half, three years, getting close to three
13 years, two and a half years after your
14 declaration that we looked at in relation
15 to the Century policies.  And it starts
16 off with "Howard N. Feist, III under
17 penalty of perjury hereby declares as
18 follows."
19         Do you see that?
20     A.   Yes.
21     Q.   On the first page, there is a
22 subheading "Congoleum's Operations," and
23 then "Overview of Congoleum's Business,"
24 right?
25     A.   Yes.

Page 193

1     Q.   And your declaration to the
2 Bankruptcy Court was in paragraph 2,
3 "Congoleum was incorporated in Delaware
4 in 1986 but traces its corporate history
5 back to the Nairn Linoleum Company which
6 commenced operations in 1886."
7         Do you see that?
8     A.   Yes.
9     Q.   And do you recall why you had
10 to make that representation as part of
11 this summary judgment motion?
12     A.   No.  That's verbatim from the
13 10-K.
14     Q.   Right.  And have you looked at
15 this recently?
16     A.   This?
17     Q.   Yeah.
18     A.   No.
19     Q.   You're just familiar enough
20 with the 10-K, you know that that similar
21 language is in numerous 10-Ks filed with
22 the investing public, correct?
23     A.   Right.  Yes.
24     Q.   And so fair to say that
25 paragraph 2 there in your declaration to

49 (Pages 190 - 193)

1  the Court is a true and accurate
2  statement?
3      A.   Yes.
4      Q.   And similarly, that statement
5  reiterated to the investing public by
6  Congoleum in 10-Ks is a true and accurate
7  statement, correct?
8      A.   Yes.
9      Q.   You can put that document to
10 the side.  Actually, sorry, hold on,
11 we're going to go to paragraph, page 35
12 of your declaration.  So on page 34,
13 actually there is a discussion of the
14 effect of conversion or dismissal of the
15 Chapter 11 cases.  And you discuss the
16 current financial condition in the
17 following paragraphs.
18      In paragraph 98, it reads "If
19 the company successfully reorganizes, its
20 free cash flow will be used to retire the
21 senior notes under the amended joint
22 plan, for pension liabilities, contract
23 claims, lease obligations, environmental
24 claims and other indebtedness."
25      Do you see that?

1      A.   Yes.
2      Q.   And so the point is, one of the
3  things Congoleum was trying to get in
4  coming out of bankruptcy was that it
5  would have money to settle pending
6  environmental claims against it, correct?
7      A.   Yeah, when the bankruptcy test
8  is that the outcome in a reorganization
9  is better for the creditors than a
10 liquidation.  So this was a statement to
11 basically make that point.
12     Q.   Right, and so just to be clear,
13 though, to my question, one of the things
14 that was being stated was you wanted in
15 the plan the ability to pay pending
16 environmental claims against Congoleum
17 going forward, right?
18     A.   I mean the statement says what
19 it says.
20     Q.   Let's divorce ourselves from
21 the statement.  Do you recall the plan
22 that you helped put forward on behalf of
23 Congoleum?
24     A.   Yes.
25     Q.   And part of the plan, what you

1  wanted in the plan, was cash so you could
2  settle pending environmental claims,
3  correct?
4      A.   It was cash to run the business
5  for whatever the needs of the business
6  might be.
7      Q.   Including those that were
8  pending environmental claims as
9  specifically enumerated right here,
10 correct?
11     A.   These were general.  Whatever
12 the needs might be.
13     Q.   Is this false what you told the
14 Bankruptcy Court?
15     A.   No, it was not false.
16     Q.   That was one of the things you
17 represented to the Court, you wanted free
18 cash flow for environmental claims,
19 correct?
20     A.   Yes.
21     Q.   Also Workers' Compensation
22 claims are referenced in a different
23 paragraph here, if you want to go forward
24 to paragraph 127 on page 45 here.  It
25 says under the amended joint plan, "The

1  debtors will be in a position to use
2  their cash flow to pay their
3  post-petition and some pre-petition
4  unsecured claims in the ordinary course
5  such as," and it lists several things,
6  including four Workers' Compensation
7  claims and five environmental cleanup
8  costs.
9      Do you see that?
10     A.   Yes.
11     Q.   Do you recall there being at
12 any time Workers' Compensation claims
13 related to workers at Kearny that
14 Congoleum was still working to resolve
15 after 1986?
16     A.   I don't recall specifically.
17 We had self-insured.  So some of the
18 Workers' Comp programs, you know, it
19 wasn't just like when you buy a policy
20 and you're done with it.  They were
21 self-insured.
22      So we had ongoing payment
23 obligations for some of the workers.  But
24 the dates of when their injuries took
25 place, I wouldn't know.